Timothy E. Corriston
Connell Foley LLP
85 Livingston Avenue
Roseland, NJ 07068
Tel: (973) 535-0500
Fax: (973) 535-9217
Attorneys for Plaintiff
Borough of Edgewater

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER,<br><br>    Plaintiff,<br><br>vs.<br><br>WATERSIDE CONSTRUCTION, LLC;; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALUMINUM COMPANY OF AMERICA; A.P. NEW JERSEY, INC.; JOHN DOES 1-100; and ABC CORPORATIONS 1-100<br><br>    Defendants. | Civil Action No.<br><br>*Electronically Filed*<br><br>**COMPLAINT** |

Plaintiff Borough of Edgewater ("Edgewater" or "Plaintiff") by way of Complaint against Waterside Construction, LLC ("Waterside"), 38 COAH, LLC ("38 COAH"); Daibes Brothers, Inc. ("Daibes Brothers"); North River Mews Associates, LLC ("North River"); Fred A. Daibes ("Fred Daibes" or "Mr. Daibes"); TERMS Environmental Services, Inc. ("TERMS"); Aluminum Company of America ("ALCOA"); A.P. New Jersey, Inc. ("A.P."), John Does 1-100; and ABC Corporation 1-100 hereby alleges as follows:

3197804-1

**THE PARTIES**

1. Edgewater is a is a municipal corporation organized under the laws of the State of New Jersey with its principal place of business located at 55 River Road, Edgewater, Bergen County, New Jersey.

2. Waterside is a New Jersey limited liability company with offices at 22 Route 5, Edgewater, Bergen County, New Jersey.  Waterside is an affiliate, subsidiary or otherwise related to 38 COAH, Daibes Brothers, and Fred Diabes.

3. 38 COAH is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, Edgewater, Bergen County, New Jersey.  38 COAH is an affiliate, subsidiary or otherwise related to Waterside, Daibes Brothers, and Fred Diabes.  38 COAH is the present owner and/or person otherwise responsible for the Alcoa Site as defined herein.

4. Daibes Brothers is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, Bergen County, New Jersey.  Daibes Brothers is an affiliate, subsidiary or otherwise related to Waterside, 38 COAH, and Fred Diabes.

5. North River is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, Bergen County, New Jersey.  North River is an owner and/or person otherwise responsible for the Alcoa Site as defined herein.

6. Fred Daibes is an individual with offices at 22 Route 5, Edgewater, Bergen County, New Jersey.  Fred Daibes owned and/or controlled Waterside, 38 COAH, North River and Daibes Brothers.

7. TERMS is a New Jersey corporation with offices at 599 Springfield Avenue, Berkeley Heights, New Jersey.  TERMS was the environmental consultant and licensed site remediation professional for Edgewater for Veteran's Field as defined herein.

2

8.     ALCOA is a Pennsylvania Corporation with offices at 201 Isabella Street, Pittsburg, Pennsylvania 15212.   ALCOA is a prior owner, operator and/or generator is responsible for the contamination at the Alcoa site as defined herein.

9.     A.P. is a New Jersey Corporation.   A.P. is a prior owner, operator and/or generator is responsible for the contamination at the Alcoa site as defined herein.

10.     Defendants John Does 1-100 are others currently unknown who have generated, transported, or are otherwise responsible for the lease of hazardous substances at Veteran's Park.

11.     Defendants ABC Corporation 1-100 are others currently unknown who have generated, transported, or are otherwise responsible for the lease of hazardous substances at Veteran's Park.

## JURISDICTION AND VENUE

12.     This action arises under the federal law, Sections 107(a) an 113(b) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601 et seq. ("CERCLA"), 42 U.S.C. §§9607(a) and 9613(b), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 et seq., and for violations of New Jersey State law.   In addition, the Declaratory Judgments Act, 28 U.S.C. §2201, and Section 113(g)(2) of CERCLA, 42 U.S.C. §9613(g)(2), authorize this Court to grant Plaintiff declaratory relief.

13.     This is a Civil Action over which the United States District Court has original jurisdiction pursuant to 28 U.S.C. §1331.

14.     This court also has supplemental jurisdiction over Plaintiff's state law claims for relief pursuant to 28 U.S.C. §§1388 and 1367(a)  and for the additional reason that those claims

are joined with substantially related claims and arise out of the same common nucleus of operative facts and Plaintiff's federal law claims.

15.     This court is one of proper venue because all parties either have a principal place of business or are authorized to do business in the State of New Jersey.  This court is also one of proper venue pursuant to Section 113(b) of CERCLA, 42 U.S.C. §9613(b), because the releases or threatened releases alleged herein occurred in the District of New Jersey.

## BACKGROUND

16.     Veteran's Field is located at 1167 River Road, Edgewater, New Jersey and is known as Block 30, Lot 1 on the Tax Map for the Borough of Edgewater ("Veteran's Field" or the "Site").  It consists of approximately 27.58 acres consistent of a public park with fields, courts, playgrounds, picnic area, and community center.  The majority of the Site had previously been covered by lawn, soil, and wood chip areas with the remaining areas consisting of paved parking, walkways, and courts.

17.     In 2011, in conjunction with proposed improvements to Veteran's Field, Edgewater retained TERMS to conduct an initial investigation of the Site to assess historic contaminated fill at Veteran's Field.

18.     The results of TERMS' 2011 site investigation revealed "hot spot" areas on the Site that were noted to contain slightly elevated levels of certain contaminants, including Metals, Polychlorinated Biphenyls ("PCB") Polycyclic Aromatic Hydrocarbons ("PAH") and Extractable Petroleum Hydrocarbons ("EPH").

19.     The results of TERMS' 2011 site investigation revealed that PCBs were detected in historic fill on the Site, in four isolated areas, slightly in excess of the New Jersey Department

of Environmental Protection's ("NJDEP") residential direct contact soil remediation standard of 0.2 mg/kg.  The highest concentration of PCBs detected at the time of TERMS' 2011 site investigation was 2.5 mg/kg.

20.     In order to address the historic fill contamination identified in the 2011 site investigation revealed, TERMS prepared a Remedial Action Workplan ("RAW").  Pursuant to the RAW, the remediation of Metal, PCB, and EPH-impacted areas was accomplished using excavation, off-site disposal, and verification post excavation sample results.  This method was designed as a permanent and effective method to remove of all of the aforementioned known contamination at the Site, with the exception of the PAH contamination.

21.     The RAW addressed the PAH soil contamination by proposing to cover the historic fill soils with an engineering control in the form of a cap consisting of two (2) foot of clean fill and a demarcation geotextile fabric.  Also, an institutional control, in the form of a deed notice was proposed for the entire Site to resolve PAH soil contamination from historic fill.

22.     Subsequent to the excavation and off-site disposal of these areas, post excavation sample results collected by TERMS indicated that PCB concentrations in existing soils related to historic fill were below NJDEP's residential direct contact soil remediation standard of 0.2 mg/kg.  These soils were identified to contain only PAH contamination.  The RAW specifically required existing PAH contaminated soils to be capped with two (2) foot of clean fill and a demarcation geotextile fabric and that the imported clean fill soils were to be tested and approved prior to placement on the Site in accordance with NJDEP's Alternative and Clean Fill Guidance for Site Remediation Program Sites Updated December 29, 2011 Version 2.0.

5

23.    On or about June 27, 2012, Edgewater issued a bid notice for Veteran's Field Improvement Project ("Veteran's Field Project" or "Project").

24.    The scope of the work in the bid notice consisted of the remediation of Veteran's Field per the RAW and the installation of baseball fields and soccer field, along with associated drainage and grading.  The Project also included the installation of a playground and parking lot. The bid notice for the Veteran's Field Project required certified stone from a quarry or crushed virgin stone to be used to raise the elevation of the entire facility approximately four (4) feet.

25.    The bid notice for the Veteran's Field Project required certified stone from a quarry or crushed virgin stone to be used as fill in certain areas of the Site and, specifically, to be used for the two (2) foot of clean fill to cap existing PAH contaminated soils.

26.    On or about June 27, 2012, pursuant to public contract law, the contract for the Veteran's Field Project was awarded to Waterside, the low bidder.  The contractual documents specifically provided that time was of the essence and that the final completion date for the Project was April 2013.  On behalf of Waterside all of the contractual documents were executed by defendant, Fred Diabes.

27.    In the summer of 2012, Waterside commenced work on the Veteran's Field Project.  The initial phase of the Project was the removal of the contaminated historic fill material.

28.    After the contaminated historic fill material was removed, work began to cap Site soils with two (2) foot of clean fill and a demarcation geotextile fabric.  In accordance with the contractual documents for the Project, TERMS required Waterside to submit, for testing and approval, all fill material that was not provided from an approved site.

3197804-1

29.     After the contaminated historic fill material was removed and pursuant to the contractual documents for the Project, TERMS approved certain fill materials that had been tested and/or certified as clean fill to be imported to the Site by Waterside and used as part of the cap.

30.     In late October 2012, the Project was suspended due to Superstorm Sandy.

31.     The Project resumed in late spring of 2013.  Pursuant to FEMA requirements, the grade of the Project was increased and, as a result, the amount of fill required to cap Site soils increased.

32.     Thereafter, importation continued of approved fill materials that were used as part of the cap for Site soils.

33.     On numerous occasions prior to September 7, 2013, TERMS rejected as unfit fill materials proposed to be utilized by Waterside to cap Site soils.  As a result, Waterside became so frustrated with TERMS' rejection of proposed fill materials that Waterside attempted to have TERMS and some of its employees removed from the Project.

34.     On September 6, 2013, Waterside advised Jason Menzella, the Site supervisor for the Borough Engineer, Neglia Associates, that it would not be performing any work on Saturday, September 7, 2013 and that a concrete pour scheduled for that day would be performed on Friday, September 6, 2013.

35.     In the afternoon of Saturday, September 7, 2013, however, Mr. Menzella, while driving by the site, observed Waterside (contrary to its prior representations) working at the Site. Upon his arrival, Mr. Menzella observed Waterside employees intentionally covering up suspect

fill materials that had not been previously on the Site and, to his knowledge, had not been approved for use on the Site.

36. On September 7, 2013, Mr. Menzella was advised by a Waterside employee that Fred Diabes had just left the Site, but had been present all day. The employee could not explain why Waterside was intentionally covering up the suspect fill materials. The employee advised Mr. Menzella that he was just working as instructed and was told to get the work done "today."

37. On Monday, September 9, 2013, Ronald Dooney of TERMS went to the Site to inspect the suspect fill materials that were utilized at the Site and were observed by Mr. Menzella. At that time, all of the suspect fill materials had been covered up with clean and/or approved fill material.

38. On September 9, 2013, representatives of Waterside misrepresented to Mr. Dooney that the suspect fill materials were only utilized in the outfield area of the Little League field. On September 9, 2013, Mr. Dooney instructed Waterside not to utilize any more of the suspect fill materials or disturb the piles of it remaining on the Site.

39. Based upon the representations of Waterside that it would not use the suspect fill materials or disturb the piles of it remaining on the Site, TERMS did not, at that time, require Waterside to cease the work it was performing in the north parking lot and the other areas of the Site.

40. Unbeknownst to Edgewater and despite its representations to the contrary, Waterside had previously and continued to utilize the suspect fill materials in the parking lot areas and throughout the fields on the Site.

41.     In or about September 2013, TERMS collected samples from two piles of the suspect fill materials remaining on the Site.  The sample results revealed the suspect fill materials were contaminated with, *inter alia*, PCBs at concentrations at a range of 100 mg/kg that was a magnitude of thousands of times higher than NJDEP's soil remediation standards.  TERMS visually classified the piles as containing crushed concrete.

42.     Thereafter, in order to determine the extent of the contamination associated with the suspect fill materials used on the Site by Waterside, TERMS collected samples from several locations on the Site where Waterside had performed construction activities.  The results revealed that fill materials used as a base material throughout the Site were contaminated and contained crushed concrete with, *inter alia*, high levels of PCB concentrations, ranging from 100 to 350 mg/kg.

43.     As a result of these sample results demonstrating extensive PCB and other contamination throughout the Site associated with the suspect fill materials imported to the Site by Waterside, on October 3, 2013 TERMS issued a letter to Edgewater advising that Waterside had imported improper fill that contained high levels of PCBs and other contaminants to Veteran's Field and, as a result, TERMS was immediately closing the Site until TERMS could perform a complete assessment of the entire Site.

44.     Despite being instructed that the Site was closed, Waterside continued to work at the Site, which necessitated the placing of locks on the Site.

45.     From September to November 2013, TERMS collected and analyzed approximately 150 soil samples to assist in identifying the vertical and horizontal limits of the

releases caused by Waterside's improper importation of fill materials contaminated with PCBs and other contaminants to the Site.

46.     The results of this investigation indicated that contaminated fill materials improperly imported to the Site by Waterside contained PCB, Metals, PAH and pesticides concentrations in excess of NJDEP standards and were used throughout the Site.

47.     The results of the investigation also indicated that Waterside randomly placed fill materials contaminated with PCBs and other contaminants throughout the Site and blended contaminated fill materials with other fill materials.   The investigation indicated that the improper manner in which the contaminated fill materials were processed and spread cross-contaminated previously approved fill materials used on the Site.

48.     The investigation also indicated that surface impacts resulted from the improper release of contaminated fill materials throughout Veteran's Field by Waterside due to, e.g., cross-contamination from construction activities and/or being spread by dust or runoff.

49.     The investigation concluded that an estimated minimum volume of 25,000 cubic yards of soil contain elevated PCB levels as a result of the improper release of contaminated fill materials throughout Veteran's Field by Waterside.

50.     The sampling results performed by TERMS demonstrate that, as a result of the improper release of contaminated fill materials throughout Veteran's Field by Waterside, *inter alia*, levels of PCB contamination on Site ranged from 10 mg/kg to 300 mg/kg.  These results are in stark contrast to the PCB levels documented after the removal of historic fill from the Site in 2011 and prior to Waterside commencing work on the Site, which were below NJDEP's residential direct contact soil remediation standard of 0.2 mg/kg.

3197804-1

51.     After the contamination caused by Waterside was documented, Waterside admitted that the contaminated fill materials that it imported to the Site came from the former Alcoa site located at 660 River Road, Edgewater, New Jersey ("Alcoa Site"), John Does 1-100, and ABC Corporation 1-100.

52.     The Alcoa Site is a known contaminated site presently owned by 38 COAH, an entity which, upon information and belief, is owned or otherwise controlled by Fred Diabes.

53.     The Alcoa Site is a known contaminated site that was previously owned, controlled, or operated by Fred Diabes individually, North River, A.P. New Jersey, Inc. ("A.P."), and the Aluminum Company of America ("ALCOA").

54.     On or about February 12, 2003, the NJDEP issued to North River, ALCOA, and A.P. a Restricted Use No Further Action Letter for the remediation of certain portions of the Alcoa Site.

55.     The No Further Action Letter for the Alcoa Site also specifically required that North River, ALCOA, and A.P. place a Deed Notice on the Alcoa Site regarding PCB contamination with respect to a building located on the Alcoa Site known as "Alcoa Building 12."

56.     The No Further Action Letter for the Alcoa Site was signed by Fred Diabes on behalf of North River.

57.     A Deed Notice was prepared for the Alcoa Site on behalf of North River and was recorded with the Bergen County Clerk's office on or about January 14, 2003.  The Deed Notice for the Alcoa Site was signed by Fred Diabes on behalf of North River.

11

58.     The affected areas of the Alcoa Site that were subject to the Deed Notice were the remaining shell of the former ALCOA manufacturing facility, consisting of the Northern, Eastern, and Southern exterior walls and the roof of Alcoa Building 12, and PCB contamination associated with Alcoa Building 12.

59.     Alcoa Building 12 was constructed, in part, out of concrete.

60.     The Deed Notice for the Alcoa Site specifically noted that Building 12 contained elevated levels of PCBs in excess of 0.49 mg/kg.  Due to these elevated levels, to prevent migration of the contaminants and to protect the public, the Deed Notice for the Alcoa Site stated that portions of Building 12 were painted with a NJDEP approved epoxy coating, required that the exterior walls be routinely and that the painted surfaces be examined to ensure that they remained sealed, and that North River, ALCOA, and A.P. submit written certification to NJDEP of the maintenance of such institutional and engineering controls and that no changes have occurred.

61.     The recorded Deed Notice for the Alcoa Site prohibited any owner or operator of the Alcoa Site from making any alteration, improvement or disturbance to certain affected areas, including portions of Alcoa Building 12, without first obtaining express written consent of the NJDEP.  But see Deed Notice, section 3(b)

62.     Section 10 of the Deed Notice for the Alcoa Site provides, *inter alia*, that the Deed Notice may only be terminated upon the filing of an instrument terminating the Deed Notice that is executed by NJDEP.

63.     On or about May 22, 2006 North River transferred ownership of the Alcoa Site to 38 COAH.

64.     Upon information and believe, another entity owned and controlled by Fred Daibes applied to NJDEP to terminate the Deed Notice for the Alcoa Site.

65.     In order to terminate the Deed Notice for the Alcoa Site, the NJDEP specifically required that a Remedial Action Outcome be issued by a Licensed Site Remediation Professional and include a notation that "building interiors not addressed."

66.     On or about October 19, 2010, 38 COAH recorded a Termination of Deed Notice for the Alcoa Site with the Bergen County Clerk's Office.  The Termination of Deed Notice for the Alcoa Site was signed by Fred Diabes on behalf of 38 COAH.

67.     Contrary to the requirement in the Termination of Deed Notice for the Alcoa Site was not signed by NJDEP.

68.     Subsequent to the recording of the Termination of Deed Notice for the Alcoa Site, Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River, and others purposely and improperly utilized the termination of the Deed Notice as part of a scheme to illegally crush, transfer and dispose of PCB-contaminated concrete and other materials originating from the Alcoa Site at Veteran's Field.

69.     Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River, and others purposely and improperly caused concrete from Alcoa Building 12 to be crushed at the Alcoa Site and then transported to and disposed of at Veteran's Field.

70.     In crushing PCB-contaminated concrete and then transferring and disposing the PCB-contaminated concrete and other contaminated materials from the Alcoa Site at Veteran's Field, these defendants also failed to comply with environmental laws that required them to, *inter alia*, obtain a Class B Recycling Permit from NJDEP.

13

**COUNT I**
**Contribution under the Spill Act**
**(as to Waterside, Fred Diabes, Diabes Brothers, 38 COAH , North River, ALCOA,**
**A.P., John Does 1-100 and ABC Corporations 1-100)**

71.     Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

72.     The New Jersey Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. 58.10-23.11f(a)(2) provides, in pertinent part that "[w]henever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of cleanup."

73.     Under the Spill Act, responsible parties are jointly and severally liable to the State for cleanup and removal costs related to discharges of hazardous substances.

74.     Waterside is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

75.     Fred Diabes is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

76.     Diabes Brothers is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

77.     38 COAH is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

78.     North River is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

79.     ALCOA is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

80.     A.P. is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

81.     John Does 1-100 is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

82.     ABC Corporations 1-100 is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

83.     "Discharges" within the meaning of Spill Act 58:10-23.11b(h), N.J.S.A. § 58:10-23.11b(h) have occurred at Veteran's Field.

84.     "Hazardous Substances" within the meaning of Spill Act Section 58:10-23.11b(k), N.J.S.A § 58:10-23.11b(k) have been discharged at Veteran's Field.

85.     Waterside is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

86.     Fred Diabes is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

87.     Diabes Brothers is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

15

88.     38 COAH is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

89.     North River is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

90.     ALCOA is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

91.     A.P. is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

92.     John Does 1-100 is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

93.     ABC Corporation 1-100 is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

94.     Edgewater has investigated a discharge of hazardous substance and has incurred and continues to incur investigation costs and will incur remediation costs.

95.     As a person who has cleaned up and removed a discharge of hazardous substance, and incurred costs in connection with that removal, pursuant to Spill Act Section 58:10-

23.11f(a)(2), N.J.S.A. §58:10-23.11f(a)(2), Edgewater is entitled to contribution from Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River, ALCOA, A.P., John Does 1-100 and ABC Corporation 1-100 and all investigation and remediation costs which Edgewater has or will incur, or for which Edgewater is deemed liable, should be allocated among Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River, ALCOA, A.P., John Does 1-100 and ABC Corporations 1-100 and Edgewater, using such equitable factors as the Court deems appropriate, including Waterside's express indemnification of Edgewater for all such costs under the contractual documents for the Project.

## COUNT II
### Cost Recovery Under CERCLA
### (as to Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River, ALCOA, A.P., John Does 1-100 and ABC Corporations 1-100)

96.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

97.    Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), provides that any "covered person" "shall be liable for … any … necessary costs of response by any other person consistent with the national contingency plan."

98.    Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), provides, in pertinent part, that "the owner or operator of a vessel or a facility" shall be liable as a "covered person" for "any other necessary costs of response incurred by any other person consistent with the national contingency plan" pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. 9607(a)(4)(B).

99.    Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), provides, in pertinent part, that "any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of" shall be liable as a "covered

17

person" for "any other necessary costs of response incurred by any other person consistent with the national contingency plan" pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. 9607(a)(4)(B).

100.    Section 107(a)(3) of CERCLA, 42 U.S.C. 9607(a)(3), provides, in pertinent part, that "any person who by contract, agreement, or otherwise arranged for disposal or treatment … of hazardous substances owned or possessed by such person" shall be liable as a "covered person" for "any other necessary costs of response incurred by any other person consistent with the national contingency plan" pursuant to Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4)(B).

101.    Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4), provides in pertinent part, that "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities … or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for … (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan" pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. 9607(a)(4)(B).

102.    A.P., ALCOA, Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River, John Does 1-100 and ABC Corporations 1-100 are each a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

103.    A.P., ALCOA, Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River and John Does 1-100 and ABC Corporation 1-100 are each an owner and/or "operator" of Veteran's Field within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

18

104.     A.P., ALCOA, Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River, John Does 1-100 and ABC Corporations 1-100 arranged, by contract, agreement, or otherwise, for disposal of hazardous substances at Veteran's Field.

105.     Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River, John Does 1-100 and ABC Corporations 1-100 accepted hazardous substances for transport to Veteran's Field.

106.     Veteran's Field is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

107.     Releases or threatened releases of hazardous substances in to the environment have occurred at Veteran's Field within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

108.     As to Veteran's Field, A.P., ALCOA, Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River, John Does 1-100 and ABC Corporations 1-100 are liable under Section 101(22) of CERCLA, 42 U.S.C. § 9607(a)(2), as a person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed.

109.     A.P., ALCOA, Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River, John Does 1-100 and ABC Corporations 1-100 are liable at Veteran's Field under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), as a person who by contract, agreement, or otherwise arranged for the disposal of treatment of hazardous substances.

110.     Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River, John Does 1-100 and ABC Corporations 1-100 are liable at Veteran's Field under Section 107(a)(4) of

19

CERCLA, 42 U.S.C. § 9607(a)(4), as a person who accepts or accepted any hazardous substances for transport to sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of hazardous substance.

111.    Pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), Edgewater is entitled to recovery from  ALCOA, A.P., Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River, John Does 1-100 and ABC Corporation 1-100 of its costs of response incurred in connection with Veteran's Field.

## COUNT III
### Breach of Contract (as to Waterside)

112.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

113.    In or about June 2012, Edgewater and Waterside entered into a valid contract (the "Agreement"), pursuant to which Waterside agreed to complete the Veteran's Field Project.

114.    The Agreement is made up of certain contractual documents that include the Bid, Bid Notice, Bid General Information, Instruction to Bidders, Contract Form, and Technical Specifications.

115.    The Agreement required that the Veteran's Field Project be completed by April 2013, which was within 9 months of the awarding of the Agreement.  Additionally, the Agreement expressly provides that "time is of the essence" for the completion of the Project.

116.    Notwithstanding a five month delay in construction for the Project due to Superstorm Sandy, Waterside failed to complete the Project in a timely manner.

117.    Due to Waterside's failure to complete the Project in a timely manner, among the damages to which Waterside is subject and Edgewater is entitled, is a charge of $1,000 per day for each and every working day until completion of the Project.

118.    Further, per the Agreement, Edgewater's engineer ("Engineer") is authorized and empowered to reject and refuse all work and materials utilized that do not comply in kind and quality with the specifications in the Agreement.  Moreover, the Agreement provides that the approval or acceptance of any part of the work or the materials used shall not prevent the rejection of said work or materials at any time thereafter should said work or materials be found to be defective or not in accordance with requirements of the specifications in the Agreement.

119.    The Agreement further provides that the Engineer may inspect and require tests or analyses of any portion of materials utilized at the Site at any time, either before or after installation, and any material found to be defective or not in conformance with the requirements of the specifications shall be rejected and removed immediately from the Site and replaced at Waterside's expense.  Further additional monies for the costs incurred shall be furnished by Waterside or its surety.

120.    The Agreement defines the term "material" to include "all the things of any kind, nature, and class as may be specified which become part of or used in construction of the work, together with all manufactured or prepared materials, articles, etc. used therein or placed thereon."

121.    The contaminated soil and fill materials utilized by Waterside on the Project are included in the definition of the term "material" in the Agreement.

122.     Pursuant to the Agreement, as a result of its failure to complete the Project in a timely manner, Waterside is responsible for all engineering, field work and inspection costs thereafter incurred by the Edgewater.

123.     The Agreement expressly provides that the Engineer and his authorized agents will define in the meaning and intent of the specifications in the Agreement, pass upon all materials and workmanship, and may reject any work that is not in accordance with the drawings and specifications.  Further, the Agreement provides that the Engineer is the judge of the quality of materials and his decision must be accepted as final.

124.     Pursuant to the Agreement, Waterside's liability with respect to defective materials and work is absolute in that inspection of the work and materials by the Engineer does not relieve Waterside of any of its obligation to fulfill the Agreement and defective work and unsuitable materials may be rejected notwithstanding that such work and materials may have been previously inspected and accepted.  Additionally, the liability of Waterside for damages is not dependent upon any question of negligence on Waterside's part or on the part of others.

125.     Pursuant to the Agreement, Waterside was required to purchase Commercial General Liability ("CGL") insurance for the Project to include as an additional insured, Edgewater, the Engineer and TERMS.  Among the claims required to be included in the CGL insurance are claims for property damage which may arise as a result of Waterside's operations with limits of $1,000,000 each occurrence and $2,000,000 aggregate.  Additionally, the Agreement provides that the CGL insurance "may not be restricted by any endorsement."

126.     The insurance provided by Waterside for the Project is inadequate and insurance has been declined to the Edgewater for the damages it incurred in this matter as a result of Waterside's improper use and placement of contaminated fill materials at Veteran's Field.

127.     Pursuant to the Agreement, Waterside was also to provide umbrella liability insurance for the Project of not less than $5,000,000 each occurrence and such occurrence could not be more restrictive than the coverage provided for under the primary policies.

128.     Pursuant to the Agreement, Waterside guaranteed its labor and all materials for the Project for a period of one year from date of substantial completion.

129.     The Agreement specifically requires Waterside to comply with all federal, state, county and municipal laws, ordinances and regulations in any manner affecting materials used in the work for the Project. Additionally, the Agreement provides that, at all times, Waterside was required to "observe and comply with all such laws, ordinances, regulations, orders, and decrees and shall protect and indemnify the Edgewater and its agents against any claim or liability arising from or based on the violation of any such law, ordinance, regulation, order, or decree, whether by himself or his employees."

130.     Edgewater has duly performed all its obligations under the Agreement.

131.     Waterside has breached the Agreement by failing to perform the terms and conditions contained therein.

132.     Waterside's breach of the Agreement directly and proximately caused Edgewater damages, including but not limited to, cost incurred by Edgewater in the cleanup, removal, and disposal of contaminated material from Veteran's Field, repairs and reconstruction costs for defective work performed by Waterside, and consequential and liquidated damages.

23

133.    Edgewater is entitled to contractual indemnification from Waterside for the foregoing damages, injuries, claims, and losses.

## COUNT IV
### Fraud (as to Waterside and Fred Diabes)

134.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

135.    As set forth in paragraphs 12-66, Waterside and Fred Diabes misrepresented that it used contaminated fill materials at the Site, where it used contaminated fill materials at the Site and when it used contaminated fill materials at the Site.

136.    Waterside and Fred Diabes' misrepresentations regarding the use of the contaminated fill materials at the Site were false.

137.    Waterside and Fred Diabes knew that the misrepresentations regarding its use of contaminated fill materials at the Site were false at the time Waterside made the misrepresentations.

138.    Waterside and Fred Diabes' misrepresentations regarding the use of contaminated fill materials at the Site were material.

139.    Waterside and Fred Diabes intended that Edgewater rely on the fraudulent misrepresentations regarding the use of contaminated fill materials at the Site.

140.    Edgewater's reliance on Waterside and Fred Diabes' fraudulent misrepresentations regarding the use of contaminated fill materials at the Site was reasonable.

141.    Edgewater has suffered damages as a result of Waterside and Fred Diabes' fraudulent misrepresentations regarding the use of contaminated fill materials at the Site.

24

142.     As a direct and proximate result of the Waterside and Fred Diabes' fraudulent misrepresentations, Edgewater has suffered damages in an amount to be determined at trial.

## COUNT V
### Negligence (as to Waterside)

143.     Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

144.     As set forth in paragraphs 12-66, beginning in or about the summer of 2013, Waterside began working on the Project.

145.     Pursuant to the Agreement, Waterside agreed to use only approved fill materials on the Project.

146.     Waterside owed a duty of care to Edgewater, as the contractor for the Veteran's Field Project, to comply with all applicable laws regarding the use of fill materials on the Project and to otherwise perform under the Agreement in such a manner so as not to cause Edgewater injury or damages.

147.     Waterside's unlawful use of contaminated fill materials on the Project was a breach of Waterside's duty of care owed to Edgewater.

148.     It was foreseeable that Waterside's use of contaminated fill materials on the Project would cause harm to Edgewater.

149.     As a direct and proximate result of the Waterside's breach of its duty of care owed to Edgewater, Edgewater has suffered damages in an amount to be determined at trial.

## COUNT VI
### Unjust Enrichment (as to Waterside, ALCOA, A.P. and 38 COAH)

150.     Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

3197804-1

151.    By transporting contaminated concrete and other materials from the Alcoa Site and delivering the contaminated concrete and other materials from the Alcoa Site at Veteran's Field, Waterside, ALCOA, A.P. and 38 COAH conferred a significant benefit because Waterside and 38 COAH saved a significant amount of money in removal and disposal costs of contaminated materials from the Alcoa Site and saved a significant amount of money in purchasing clean, approved materials for use as fill at Veteran's Field.

152.    Waterside, ALCOA, A.P. and 38 COAH unjustly received this benefit without payment.

153.    Edgewater mistakenly conferred this benefit upon Waterside, ALCOA, A.P. and 38 COAH because it was unaware that the fill materials delivered to Veteran's Field were contaminated.

154.    Had Edgewater known that the fill materials delivered to Veteran's Field were contaminated, Edgewater would have expected remuneration from Waterside, ALCOA, A.P. and 38 COAH at the time the benefit was conferred.

155.    Waterside, ALCOA, A.P. and 38 COAH have received and currently retains this significant monetary benefit to the detriment of Edgewater.

156.    As a result of Waterside's, ALCOA's, A.P.'s and 38 COAH's unjust enrichment and unlawful retention of this benefit, Edgewater has suffered damages in an amount to be determined at trial.

## COUNT VII

**Violations of the New Jersey Consumer Fraud Act (as to Waterside and Fred Diabes)**

157.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

158.    This claim alleges violations of the New Jersey Consumer Fraud Act, N.J.S.A. §56:8-1 *et seq.* ("NJCFA").

159.    At all relevant times described herein, Waterside, by and at the direction of Fred Diabes, as the contractor performing the Veteran's Field Project, was acting as an agent for and/or on behalf of Edgewater, the property owner of Veteran's Field.

160.    As set forth in paragraphs 12-66, in agreeing to provide Edgewater with approved, clean fill for the Veteran's Field Project, then intentionally delivering contaminated fill materials to the Site and then misrepresenting where and when it used such contaminated fill materials at the Site, Waterside and Fred Diabes engaged in unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts because Waterside and Fred Diabes knowingly misrepresented the quality of the fill materials used at the Site.

161.    As alleged in Paragraphs 12-66 and 101-121, in June 2012 Waterside was awarded the contract for the Veteran's Field Project.

162.    The Agreement required Waterside to use only approved fill materials on the Site.

163.    On September 6, 2013, Waterside advised Jason Menzella, the Site supervisor for the Borough Engineer, Neglia Associates, that it would not be performing any work on Saturday, September 7, 2012.

27

164.    In the afternoon of Saturday, September 7, 2013, however, Mr. Menzella, while driving by the site, observed Waterside (contrary to its prior representations) working at the Site. Upon his arrival, Mr. Menzella observed Waterside employees intentionally covering up suspect fill materials that had not been previously on the Site and had not been approved for use on the Site.

165.    On September 7, 2013, Mr. Menzella was advised by a Waterside employee that Fred Diabes had just left the Site, but had been present all day.  The employee could not explain why Waterside was intentionally covering up the suspect fill materials.  The employee advised Mr. Menzella that he was just working as instructed and was told to get the work done "today."

166.    On Monday, September 9, 2013, Ronald Dooney of TERMS went to the Site to inspect the suspect fill materials that were utilized at the Site and were observed by Mr. Menzella.  At that time, all of the suspect fill materials had been intentionally covered up with clean and/or approved fill materials.

167.    On September 9, 2013, representatives of Waterside misrepresented to Mr. Dooney that the suspect fill materials were only utilized in the outfield area of the Little League field.  On September 9, 2013, Mr. Dooney instructed Waterside not to utilize any more of the suspect fill materials or disturb the piles of it remaining on the Site.

168.    Unbeknownst to Edgewater and despite its representations to the contrary, Waterside, by and at the direction of Fred Diabes, had previously and continued to utilize the suspect fill materials in the parking lot areas and throughout the fields on the Site.

169.    The results of an investigation by TERMS, on behalf of Edgewater, indicated that contaminated fill materials improperly imported to the Site by Waterside contained PCB, Metals,

28

PAH and pesticides concentrations in excess of NJDEP standards and were used throughout the Site.

170.     After the contamination caused by Waterside was documented, Waterside and Fred Diabes admitted that the contaminated fill materials that it imported to the Site came from the former Alcoa Site.

171.     Waterside had entered into the Agreement with Edgewater and agreed to provide Edgewater with approved, clean fill for the Veteran's Field Project and then intentionally delivered contaminated fill materials to the Site.

172.     Waterside and Fred Diabes then intentionally misrepresented to Edgewater where it used contaminated fill materials at the Site and when it used contaminated fill materials at the Site.

173.     Waterside and Fred Diabes entered into the Agreement, misrepresenting that it would only use clean, approved fill materials on the Site, and then misrepresented to Edgewater where and when it used contaminated fill materials on the Site, with the intention that Edgewater would rely upon these representations.

174.     Waterside and Fred Diabes engaged in such unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts with the intention that Edgewater would rely upon Waterside's conduct.

175.     In reliance on Waterside and Fred Diabes' unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts regarding the quality of the fill materials

that would be used on the Site, Edgewater entered into the Agreement with Waterside and Waterside subsequently transported contaminated fill materials to Veteran's Field without Edgewater's approval and used the contaminated fill materials throughout Veteran's Field.

176.   Edgewater's reliance on Waterside and Fred Diabes' unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission material facts was reasonable.

177.   At the time Waterside and Fred Diabes engaged in unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing, concealment, suppression, or omission of materials fact with regard to the contaminated fill materials, Edgewater did not know that the suspect fill materials were contaminated.

178.   Waterside and Fred Diabes' fraudulent misrepresentations, which caused contaminated fill materials to be delivered to and used throughout Veteran's Field without Edgewater's approval, constitutes unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing, concealment, suppression, or omission of material facts in violation of the NJCFA.

179.   As a result of Waterside and Fred Diabes' unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing, concealment, suppression, or omission of material facts in violation of the NJCFA, Edgewater has suffered damages.

180.   Waterside and Fred Diabes' unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing, concealment,

suppression, or omission of material facts in violation of the NJCFA, are the proximate cause of

damages sustained by Edgewater.

181.    Accordingly, under Section 56:8-19 of the NJCFA, Edgewater is entitled to

recover from Waterside and Fred Diabes' compensatory damages, treble damages, attorneys'

fees and the costs of bringing this action.

### COUNT VIII

### Violations of NJ RICO
### (as to Fred Diabes, 38 COAH, Diabes Brothers, North River, John Does 1-100 and ABC Corporations 1-100)

182.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the

previous paragraphs of this Complaint as if fully set forth herein.

183.    This claim asserts violations of the New Jersey RICO Act, N.J.S.A. §2C:41-1, *et.*

*seq.* ("NJ RICO").

184.    During the relevant time period, Fred Diabes, 38 COAH, Waterside, North River,

Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 formed an enterprise with the

intent of distributing concrete and other materials that they knew were contaminated in violation

of environmental regulations. As set forth herein, Fred Diabes, 38 COAH, Waterside, North

River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 schemed to distribute the

contaminated concrete and other materials so as to avoid incurring the significant costs of

disposing of this material properly and in compliance with law and to avoid the significant cost

of purchasing clean, approved materials to be used as fill at Veteran's Field. Thus, Fred Diabes,

38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-

100 were able to profit substantially all the while knowing that the contaminated concrete and

other materials were not environmentally sound.  In order to perpetrate this scheme or artifice, Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 engaged in multiple fraudulent and illegal acts to conceal the true contamination level of the concrete and other materials to induce Edgewater into accepting it, notwithstanding Waterside's obligation pursuant to the Agreement to only use clean, approved fill materials at Veteran's Field. In reliance on the statements, representations and conduct of Waterside and the other members of the RICO enterprise, Waterside caused contaminated concrete and other materials to be delivered to and used as fill at Veteran's Field, which was not in compliance with applicable environmental regulations and law or the Agreement. Edgewater has incurred substantial costs to pay for the investigation and remediation of Veteran's Field and substantial damages as the result of Waterside and the other members of the RICO enterprise having transported and disposed of contaminated concrete and other materials at the Site.

  **A. The Enterprise**

 185. Fred Diabes and 38 COAH, John Does 1-100 and ABC Corporations 1-100 are each a "person," as that term is defined in N.J.S.A. § 2C:41-1(b).

 186. Defendants John Does 1-100 are individuals who committed, participated in, solicited others to engage in, received benefits from and knowingly assisted, conspired with or urged others to commit the fraudulent and wrongful acts set forth herein.

 187. Defendants ABC Corporations 1-100 are corporations, which committed, participated in, solicited others to engage in, received benefits from and knowingly assisted, conspired with or urged others to commit the fraudulent and wrongful acts set forth herein.

188.    At all relevant times, Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 comprised an "enterprise," within the meaning of N.J.S.A. § 2C:41-1(c) ("Enterprise").

189.    The Enterprise has or had an existence beyond that which is merely necessary to commit predicate acts.

190.    The Enterprise oversaw and coordinated the commission of numerous predicate acts on an ongoing basis in furtherance of the scheme to defraud Plaintiff, Edgewater and others and to unlawfully distribute contaminated concrete and other materials.

191.    At all relevant times, the Enterprise was operated, managed and controlled by Fred Diabes, 38 COAH, John Does 1-100 and ABC Corporations 1-100.

192.    Each member of the Enterprise participated directly and/or indirectly in the conduct of the affairs of the Enterprise by agreeing to defraud, or to aid other members of the Enterprise in defrauding, Plaintiff, Edgewater and others, and to unlawfully distribute, or to aid other members of the Enterprise in unlawfully distributing, contaminated concrete and other materials.

193.    As evidence of its intentional scheme to defraud Plaintiff, Edgewater and others and to unlawfully distribute contaminated concrete and other materials, the Enterprise divided various tasks among its members to effectuate its unlawful purpose, as set forth below.

194.    The Alcoa Site is a known contaminated site presently owned by 38 COAH, an entity which, upon information and belief, is owned or otherwise controlled by Fred Diabes.

195.    The Alcoa Site is a known contaminated site that was previously owned, controlled, or operated by Fred Diabes individually and North River.

33

196.   Fred Diabes, 38 COAH and North River owned and/or controlled the contaminated concrete and other materials located at the Alcoa Site.  As part of their ownership and control of the concrete and other materials, Fred Diabes, 38 COAH and North River had the authority to determine how the concrete and other materials would be disposed, the sampling methodology for testing the concrete and other materials, the protocol for handling the concrete and other materials, and how and to whom the contaminated concrete and other materials would be distributed.

197.   38 COAH and North River are responsible for the remediation and clean-up and removal costs for the Alcoa Site.

198.   Upon information and belief, Fred Diabes, 38 COAH and North River hired Waterside to serve as the general contractor in charge of demolition, disposal and construction at the Alcoa Site. As the general contractor, Waterside also had control of demolition and disposal operations at the Alcoa Site, including the generation of contaminated concrete and other materials from the Alcoa Site. As general contractor, Waterside was hired and was responsible for supervising individuals that handled, sampled, loaded, distributed and disposed of the contaminated concrete and other materials.

199.   Upon information and belief, as an officer of Waterside, Fred Diabes supervised individuals that handled, sampled, loaded, distributed and disposed of the contaminated concrete and other materials generated from the Alcoa Site.

200.   The No Further Action Letter for the Alcoa Site specifically noted that Building 12 contained elevated levels of PCBs in excess of 0.49 mg/kg.  Due to these elevated levels, to prevent migration of the contaminants and to protect the public, the No Further Action Letter for

34

the Alcoa Site stated that portions of Alcoa Building 12 were painted with a NJDEP approved epoxy coating, required that the exterior walls and painted surfaces be routinely examined to ensure that they remained sealed, and that North River, ALCOA, and A.P. submit written certification to NJDEP of the maintenance of such institutional and engineering controls and that no changes have occurred.

201.    The No Further Action Letter for the Alcoa Site specifically required that North River, ALCOA, and A.P. ensure that a Deed Notice for the Alcoa Site filed on January 14, 2003 regarding PCB contamination with respect to Alcoa Building 12 was complied with.

202.    The No Further Action Letter for the Alcoa Site was signed by Fred Diabes on behalf of North River.

203.    A Deed Notice had been prepared for the Alcoa Site and recorded with the Bergen County Clerk's office on or about January 14, 2003.  The Deed Notice for the Alcoa Site was signed by Fred Diabes on behalf of North River.

204.    The affected areas of the Alcoa Site that were subject to the Deed Notice were the remaining shell of the former ALCOA manufacturing facility, consisting of the Northern, Eastern, and Southern exterior walls and the roof of Alcoa Building 12, and PCB contamination associated with Alcoa Building 12.

205.    Alcoa Building 12 was constructed, in part, out of concrete.

206.    The recorded Deed Notice for the Alcoa Site prohibited any owner or operator of the Alcoa Site from making any alteration, improvement or disturbance to certain affected areas, including portions of Alcoa Building 12, without first obtaining express written consent of the NJDEP.

207.    Section 10 of the Deed Notice for the Alcoa Site provides, *inter alia*, that the Deed Notice may only be terminated upon the filing of an instrument terminating the Deed Notice that is executed by NJDEP.

208.    On or about May 22, 2006 North River transferred ownership of the Alcoa Site to 38 COAH.

209.    In or about 2010, Diabes Brothers or another entity controlled by Diabes applied to NJDEP to terminate the Deed Notice for the Alcoa Site.  By letter dated September 17, 2010, as a condition of termination of the Deed Notice for the Alcoa Site, the NJDEP specifically required that a Remedial Action Outcome be issued by a Licensed Site Remediation Professional and include an insert that "building interiors not addressed."   The September 17, 2010 Letter from NJDEP further stated "The Department of Environmental Protection does not regulate the remediation of building interiors unless there is a known of suspected discharge of a hazardous substance or hazardous waste that may result in a discharge to the environment.  The insert is intended to clarify to all parties that the response action outcome did not address contamination that may be in the building."

210.    On or about October 19, 2010, 38 COAH recorded a Termination of Deed Notice for the Alcoa Site with the Bergen County Clerk's Office.  The Termination of Deed Notice for the Alcoa Site was signed by Fred Diabes on behalf of 38 COAH.

211.    Contrary to the requirement in the Deed Notice for the Alcoa Site, the Termination of Deed Notice for the Alcoa Site was not executed by NJDEP.

212.    Subsequent to the recording of the Termination of Deed Notice for the Alcoa Site, Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC

Corporations 1-100 and others purposely and improperly utilized the Termination of the Deed Notice for the Alcoa Site as part of a scheme to illegally crush, transfer and dispose of PCB-contaminated concrete and other materials originating from the Alcoa Site at Veteran's Field.

213.    Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River, and others purposely and improperly caused concrete from Alcoa Building 12 to be crushed at the Alcoa Site and then transported to and disposed of at Veteran's Field.

214.    In crushing PCB-contaminated concrete and then transferring and disposing the PCB-contaminated concrete and other contaminated materials from the Alcoa Site at Veteran's Field, these defendants also failed to comply with environmental laws that required them to, *inter alia*, obtain a Class B Recycling Permit from NJDEP.

215.    Although Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 may have possessed various levels of expertise with regard to environmental rules and regulations, each of these parties knew that it was unlawful to distribute contaminated concrete and other materials from the Alcoa Site without NJDEP approval.

### B.    The Purpose of the Enterprise

216.    As described herein, Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 intended to transfer contaminated concrete that would be generated from demolishing the Alcoa Site buildings and other contaminated materials to Veteran's Field to avoid the significant disposal costs of those materials and to avoid the cost of purchasing clean, approved fill for use at Veteran's Field.

217.    In addition, Waterside and other members of the RICO Enterprise failed to obtain the proper approvals and permits to crush, transfer and/or use contaminated concrete and other materials as fill materials at Veteran's Field.

218.    The use of improper fill materials at Veteran's Field had been a point of dispute between Waterside and Edgewater; on numerous occasions prior to September 7, 2012, TERMS rejected as unfit fill materials proposed to be utilized by Waterside to cap Site soils.  As a result, Waterside became so frustrated with TERMS' rejection of proposed fill materials that Waterside attempted to have TERMS and some of its employees removed from the Project.

219.    In order to avoid TERMS' rejection as unfit of the contaminated concrete and other materials originating from the Alcoa Site for use as fill at Veteran's Field, Waterside and Fred Diabes, with the knowledge of North River and 38 COAH sought to transfer contaminated concrete and other materials originating from the Alcoa Site to Veteran's Field without notifying or obtaining the approval of TERMS or Edgewater.

220.    Faced with the significant costs of legally disposing of the contaminated concrete and other materials originating from the Alcoa Site and to avoid the cost of purchasing clean, approved fill for use at Veteran's Field, Waterside and Fred Diabes, with the agreement of and/or assistance from North River and 38 COAH, agreed to transfer and dispose of the contaminated concrete and other materials for re-use on Veteran's Field in intentional and deliberate contravention of the NJDEP regulations, the February 12, 2003 Restricted Use No Further Action Letter for the Alcoa Site, the January 14, 2003 Deed Notice for the Alcoa Site and the September 17, 2010 Letter from NJDEP requiring the proper disposal of contaminated concrete and other materials originating from the Alcoa Site.

C.     **The Pattern of Racketeering Activity**

221.    Beginning in at least February 2003 and continuing through at least September 2012, and in furtherance of the scheme to defraud Plaintiff, Edgewater and others and to unlawfully distribute contaminated concrete and other materials containing PCBs and other contaminants from the Alcoa Site, Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 knowingly and intentionally conducted or participated in the Enterprise's affairs through a pattern of racketeering activity.

222.    As part of this pattern of racketeering activity, on or about February 12, 2003 Fred Diabes, North River, A.P., and ALCOA executed a Restricted Use No Further Action Letter issued for the Alcoa Site by NJDEP and agreed to remain liable for clean-up and removal costs associated with the Alcoa Site and ensure that the requirements in the January 14, 2003 Deed Notice for the Alcoa Site with respect to PCB contamination were complied with.

223.    On or about May 22, 2006 North River then transferred ownership of the Alcoa Site to 38 COAH.

224.    On or about October 19, 2010, 38 COAH recorded a Termination of Deed Notice for the Alcoa Site with the Bergen County Clerk's Office.  The Termination of Deed Notice for the Alcoa Site was not effective because it was not signed by NJDEP.

225.    In or about June 2012, Waterside entered into the Agreement with Edgewater by which Waterside agreed to be the contractor for the Project, provide a significant amount of fill materials and use only clean, approved materials as fill at Veteran's Field.

3197804-1

226.    At the same time that Waterside was acting as the contractor for the Project and was obligated by the Agreement to use only clean, approved materials as fill at Veteran's Field, Waterside was also acting as the contractor for the Alcoa Site.

227.    To avoid the significant costs of legally disposing of the contaminated concrete and other materials originating from the Alcoa Site and to avoid the cost of purchasing clean, approved fill for use at Veteran's Field, Waterside, Fred Diabes, Diabes Brothers, 38 COAH, North River and others purposely and improperly utilized the Termination of the Deed Notice, which was not signed by NJDEP, as part of a scheme to illegally crush, transfer and dispose of PCB-contaminated concrete and other materials originating from the Alcoa Site at Veteran's Field.

228.    To conceal the unlawful transfer of contaminated concrete and other materials from the Alcoa Site to Veteran's Field, on September 6, 2013, Waterside intentionally misrepresented to Jason Menzella, the Site supervisor for the Borough Engineer, Neglia Associates, that it would not be performing any work on Saturday, September 7, 2013.

229.    Without Edgewater's prior knowledge or approval, on Saturday, September 7, 2013 Waterside employees, under the supervision of Fred Diabes, transferred and disposed of contaminated concrete and other materials from the Alcoa Site to Veteran's Field and then covered up the contaminated concrete and other materials from the Alcoa Site with materials that clean and/or approved for use as fill at Veteran's Field.

230.    On September 9, 2013, representatives of Waterside misrepresented to Ronald Dooney of TERMS that the suspect fill materials (contaminated concrete and other materials from the Alcoa Site) were only utilized in the outfield area of the Little League field.

231.     Unbeknownst to Edgewater and despite its representations to the contrary, Waterside had previously and continued to utilize the suspect fill materials (contaminated concrete and other materials from the Alcoa Site) in the parking lot areas and throughout the fields on the Site.

232.     In crushing PCB-contaminated concrete and then transferring and disposing the PCB-contaminated concrete and other contaminated materials from the Alcoa Site at Veteran's Field, these defendants also failed to comply with environmental laws that required them to, *inter alia*, obtain a Class B Recycling Permit from NJDEP.

233.     Upon information and belief, in preparing, filing, and performing under the foregoing documents, Waterside and others fraudulently concealed and/or misrepresented the contamination, the nature of the contamination, and/or the extent of the contamination of the concrete and other materials originating from the Alcoa Site, with the intention that Plaintiff, Edgewater and others would rely upon such fraudulent concealment and/or misrepresentations and accept contaminated concrete and other materials originating from the Alcoa Site for use at Veteran's Field.

234.     Plaintiff, Edgewater reasonably relied on the fraudulent concealment and/or misrepresentations regarding the contamination, the nature of the contamination, and/or the extent of the contamination of the concrete and other materials originating from the Alcoa Site and Waterside's use of such materials at Veteran's Field.

235.     In preparing, filing, and performing under the foregoing documents in furtherance of the scheme or artifice to defraud Edgewater and to unlawfully distribute contaminated concrete and other materials originating from the Alcoa Site, Fred Diabes, 38 COAH, Waterside,

41

North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 committed "at least two acts of racketeering activity ... the last of which occurred within ten years after the commission of a prior act of racketeering activity" and, therefore, constituted a "pattern of racketeering" within the meaning of N.J.S.A. § 2C:41-1(d)(2).

236.    As set forth above, this pattern consisted of repeated continuous acts that had the same or similar purposes, results, participants, victims, or methods of commission, and are interrelated by distinguishing characteristics rather than isolated events, within the meaning of N.J.S.A. § 2C:41-1(d)(2).

### D.    The Intentional Nature of the Pattern of Racketeering Activity

237.    It was the purpose of the Enterprise to defraud Plaintiff, Edgewater and others and to unlawfully distribute contaminated concrete and other materials from the Alcoa Site for use at Veteran's Field in order to avoid the cost of complying with environmental laws and regulations, including the significant expense of properly and lawfully handling, testing, and disposing of contaminated concrete and other materials originating from the Alcoa Site and purchasing clean, approved fill to be used at Veteran's Field, to create and disseminate false and misleading information regarding such contaminated concrete and other materials, and to conceal knowledge of the same, with the objective of profiting from the enterprise at the expense of Edgewater.

238.    This scheme or artifice was intended to, and did, allow Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 to profit through the avoidance of significant expenses to comply with environmental laws and regulations, to properly and lawfully handle, test, and dispose of contaminated concrete and other materials originating from the Alcoa Site and to purchase clean, approved fill for use on at

Veteran's Field. The Enterprise operated by Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 achieved these objectives by the conduct of racketeering activity described herein.

      **E.**      **The Conduct of the Enterprise is Prohibited "Racketeering Activity"**

239.    In engaging in the foregoing activities, Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 engaged in at least two predicate acts defined as "racketeering activity" under N.J.S.A. § 2C:41-1, including violations of:

      (a)    N.J.S.A. § 2C:20-4 (theft by deception)

      (b)    N.J.S.A. § 2C:21-7(A)(d) (selling or offering for sale adulterated or mislabeled commodities);

      **1.**      **The Pattern of Racketeering Activity Violated**
                    **N.J.S.A. § 2C:20-4**

240.    N.J.S.A. § 2C:20-4 provides that "[a] person is guilty of theft if he purposely obtains property of another by deception. A person deceives if he purposely:

a. Creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind, and including, but not limited to, a false impression that the person is soliciting or collecting funds for a charitable purpose; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise;
b. Prevents another from acquiring information which would affect his judgment of a transaction; or
c. Fails to correct a false impression which the deceiver previously created or reinforced, or which the deceiver knows to be influencing another to whom he stands in a fiduciary or confidential relationship."

241.    The contaminated concrete and other materials distributed by Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 and used on Veteran's Field, were represented to be clean fill.

242.     Edgewater in fact paid more for the services provided in order to get clean fill.

243.     Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 misrepresented the nature and value of fill.

244.     Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 obtained additional value for themselves by deceiving Edgewater.

## 2.     The Pattern of Racketeering Activity Violated
## N.J.S.A. § 2C:21-7(A)(d)

245.     Pursuant to N.J.S.A. § 2C:21-7(A)(d), it is a criminal offense to sell, offer or expose[] for sale adulterated or mislabeled commodities."

246.     Pursuant to N.J.S.A. § 2C:21-7, "adulterated" is defined as "varying from the standard of composition or quality prescribed by or pursuant to any statute providing criminal penalties for such variance, or set by established commercial usage."

247.     The contaminated concrete and other materials distributed by Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 and used on Veteran's Field, was and is "adulterated" because it "var[ies] from the standard of composition or quality prescribed by or pursuant to any statute providing criminal penalties for such variance, or set by established commercial usage."

248.     In crushing PCB-contaminated concrete and then transferring and disposing the PCB-contaminated concrete and other contaminated materials from the Alcoa Site at Veteran's Field, these defendants failed to comply with environmental laws that required them to, *inter alia*, obtain a Class B Recycling Permit from NJDEP.

44

249.    Beginning prior to September 7, 2012 and continuing thereafter, Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 knowingly and intentionally sold, offered, and/or exposed for sale "adulterated" concrete and other materials that originated from the Alcoa Site.

250.    Upon information and belief, concrete and other materials that originated from the Alcoa Site and were distributed pursuant to the Agreement was "adulterated," in violation of N.J.S.A. § 2C:21-7.

**F.    The Pattern of Racketeering Activity Proximately Resulted in Harm to Plaintiff**

251.    Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 have engaged in, or had their activities affect, commerce.

252.    Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 participated, both directly and indirectly, in the conduct of the Enterprise's affairs, as described above, through a pattern of racketeering activity.

253.    By their acts and omissions in operating as an Enterprise to, perpetrate the pattern of racketeering activity described herein, Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 conspired to defraud, and in fact did defraud, Plaintiff, Edgewater and others, and conspired to commit the predicate offenses described herein, in violation of N.J.S.A. § 2C:41-2(d).

254.    In engaging in the pattern of racketeering activity described herein, Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100 intended to, and did, defraud Edgewater.

255.     As a direct and proximate result of Fred Diabes, 38 COAH, Waterside, North River, Diabes Brothers, John Does 1-100 and ABC Corporations 1-100's racketeering activity, Plaintiff has suffered damages in an amount to be determined at trial.

256.     Under N.J.S.A. § 2C:41-4(c), Plaintiff seek recovery of treble damages, the costs of bringing this lawsuit, and reasonable attorneys' fees.

## COUNT IX
## Breach of Contract (as to TERMS)

257.     Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

258.     In or about 2012, Edgewater and TERMS entered into a valid contract (the "TERMS Agreement"), pursuant to which TERMS agreed to serve as the environmental consultant and Licensed Site Remediation Professional ("LSRP") for the Veteran's Field Project.

259.     As the environmental consultant and LSRP, TERMS was the gatekeeper and responsible for undertaking the testing of any fill material brought to or utilized at the Site.

260.     TERMS violated its contractual obligations by failing to insure that unapproved fill materials were brought to and utilized at the Site.

261.     After initially learning that Waterside improperly imported and utilized its contaminated fill at the Site, violation of its contractual obligations, and failed to take the appropriate actions to prevent Waterside from continuing to utilize the contaminated fill in the parking lot areas and around the fields on the Site.  Additionally, Waterside failed to present the continuing cross contamination of the Site caused by Waterside's work.

262.     In its role as a LSRP, TERMS prepared and submitted to the United States Environmental Protection Agency ("USEPA") a self-implementing plan ("SIP") which proposed

46

the remedy for addressing the contamination at the Site.  The sampling of the contamination performed by TERMS, which was the basis of the SIP, contained substantial data gaps with respect to the delineation of the impacted soils, as well as the quantification of volumes associated with the impacted soil.

263.    Additionally, the SIP prepared by TERMS, was not prepared in accordance with USEPA guidance documents and regulations.  The aforesaid actions of TERMS constitute a breach of its contract with Edgewater.

264.    As a direct and approximate result of TERMS' breach of contract, Plaintiff has suffered damages in an amount to be determined at trial.  Because of TERMS' failure to perform adequate sampling and prepare a SIP in accordance with USEPA guidelines and regulations, Edgewater was required to retain First Environment as a substitute to the LSRP, re-conduct the sampling of the Site, and prepare a new SIP.

## COUNT X
## Negligence (as to TERMS)

265.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

266.    TERMS owed a duty of care to Edgewater, as the environmental consultant, LSRP for the Veteran's Field Project, to insure that contaminated fill materials were not imported and placed on the Site, to prevent the cross-contamination at the Site to perform proper and adequate sampling of contamination of the Site, and to prepare a SIP which conformed with the USEPA regulations and guidelines in such a manner as to not cause Edgewater injury or damages.

267.   TERMS' failure to do so was a breach of TERMS' duty of care owed to Edgewater and constituted negligence.

268.   As a direct and approximate result of TERMS' breach of its duty of care of Edgewater, Edgewater has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby demands judgment against Defendants:

a.     Allocating among Edgewater and Defendants and any other persons found to be liable all responses costs incurred at or with respect to Veteran's Field described herein, pursuant to Section 58:10-23.11(f)(a)(2) of the Spill Act, N.J.S.A. § 58:10-23.11f(a)(2);

b.     Awarding Edgewater cost recovery from Defendants for all response costs incurred at or with respect to Veteran's Field pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), and issuing an Order requiring Defendants to pay such amounts to Edgewater; and

c.     Allocating among Edgewater and Defendants and any other persons to be liable all response costs incurred at or with respect to Veteran's Field, pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B);

d.     Entering a declaratory judgment pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), against Defendants and in favor of Edgewater declaring, adjudging, and decreeing that Defendants are liable to Edgewater for response costs or damages at Veteran's Field, such judgment to be binding on any subsequent action or actions to recover any further response costs or damages;

e.     Entering a declaratory judgment pursuant to the Spill Act against Defendants and

in favor of Edgewater declaring, adjudging, and decreeing that Defendants are liable to Edgewater for response costs or damages at Veteran's Field, pursuant to Section 58:10-23.11f(a)(2) of the Spill Act, N.J.S.A. § 58:10-23.11f(a)(2), such judgment to be binding on any subsequent action or actions to recover further response costs or damages;

f.      Entering a declaratory judgment against Waterside and in favor of Edgewater declaring, adjudging, and decreeing that Waterside shall indemnify Edgewater pursuant to the Agreement for any all damages, economic losses, and claims arising from activity pursuant to the Agreement by Waterside, including without limitation costs that Edgewater has and will incur with respect to Veteran's Field, and attorneys' fees and costs;

g.      Awarding Edgewater compensatory, incidental, consequential and liquidated damages, including but not limited to damages and reputable hard to Edgewater as a result of the acts or omissions of Waterside as described herein;

h.      Awarding Edgewater punitive damages for the fraudulent acts of Waterside described herein;

i.      Awarding Edgewater interest and cost of suit, including reasonable attorneys' fees and experts' fees; and

j.      Awarding Edgewater any other such relief as the Court deems just and proper.


                                    **CONNELL FOLEY LLP**
                                    **Attorneys for Plaintiff**
                                    **Borough of Edgewater**


Dated: August __, 2014              By:    *s/ Timothy E. Corriston*
                                           Timothy E. Corriston