Timothy E. Corriston
Connell Foley LLP
85 Livingston Avenue
Roseland, NJ 07068
Tel: (973) 535-0500
Fax: (973) 535-9217
Attorneys for Plaintiff
Borough of Edgewater

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER,<br><br>     Plaintiff,<br><br>v.<br><br>WATERSIDE CONSTRUCTION, LLC;<br>38 COAH, LLC;<br>DAIBES BROTHERS, INC.;<br>NORTH RIVER MEWS ASSOCIATES, LLC;<br>FRED A. DAIBES;<br>TERMS ENVIRONMENTAL SERVICES, INC.;<br>ALCOA INC. (formerly known as "Aluminum Company of America");<br>ALCOA DOMESTIC LLC, as successor in interest to A.P. NEW JERSEY, INC.;<br>JOHN DOES 1-100; and ABC CORPORATIONS 1-100<br><br>and<br><br>WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; AND FRED A. DAIBES,<br><br>     Defendants/Third Party Plaintiffs,<br><br>v.<br><br>NEGLIA ENGINEERING ASSOCIATES,<br><br>     Third Party Defendants | Civil Action No.:2:14-CV-05060 (ES-MAH)<br><br>*Electronically Filed*<br><br>**SECOND AMENDED COMPLAINT** |

and

ALCOA DOMESTIC, LLC as successor in interest
to A.P. NEW JERSEY, INC.,

     Defendant/Third-Party Plaintiff,

v.

COUNTY OF BERGEN and RIVER ROAD
IMPROVEMENT PHASE II, INC.,

     Third-Party Defendants.

     Plaintiff Borough of Edgewater ("Edgewater" or "Plaintiff") by way of Second Amended Complaint against WATERSIDE CONSTRUCTION, LLC ("Waterside"); 38 COAH, LLC ("38 COAH"); DAIBES BROTHERS, INC. ("Daibes Brothers"); NORTH RIVER MEWS ASSOCIATES, LLC ("North River"); FRED A. DAIBES ("Fred Daibes" or "Mr. Daibes"); TERMS ENVIRONMENTAL SERVICES, INC. ("TERMS"); ALCOA INC. (formerly known as "Aluminum Company of America") and ALCOA DOMESTIC LLC, as successor in interest to A.P. NEW JERSEY, INC.; John Does 1-100; and ABC Corporation 1-100 hereby alleges as follows:

## THE PARTIES

     1.     Edgewater is a is a municipal corporation organized under the laws of the State of New Jersey with its principal place of business located at 55 River Road, Edgewater, Bergen County, New Jersey.

2.      Waterside is a New Jersey limited liability company with offices at 22 Route 5, Edgewater, Bergen County, New Jersey.  Waterside is an affiliate, subsidiary or otherwise related to 38 COAH, Daibes Brothers, and Fred Daibes.

3.      38 COAH is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, Edgewater, Bergen County, New Jersey.  38 COAH is an affiliate, subsidiary or otherwise related to Waterside, Daibes Brothers, and Fred Daibes.  38 COAH is the present owner and/or person otherwise responsible for the Alcoa Site as defined herein.

4.      Daibes Brothers is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, Bergen County, New Jersey.  Daibes Brothers is an affiliate, subsidiary or otherwise related to Waterside, 38 COAH, and Fred Daibes.

5.      North River is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, Bergen County, New Jersey.  North River is an owner and/or person otherwise responsible for the Alcoa Site as defined herein.

6.      Fred Daibes is an individual with offices at 22 Route 5, Edgewater, Bergen County, New Jersey.  Fred Daibes owned and/or controlled Waterside, 38 COAH, North River and Daibes Brothers.

7.      TERMS is a New Jersey corporation with offices at 599 Springfield Avenue, Berkeley Heights, New Jersey.  TERMS was the environmental consultant and licensed site remediation professional for Edgewater for Veteran's Field as defined herein.

8.      ALCOA INC. (formerly known as "Aluminum Company of America") ("ALCOA") is a Pennsylvania Corporation with offices at 201 Isabella Street, Pittsburg,

3

Pennsylvania 15212.  ALCOA is a prior owner, operator and/or generator is responsible for the contamination at the Alcoa site as defined herein.

9.      ALCOA DOMESTIC, L.L.C. is the successor-in-interest to A.P. NEW JERSEY, INC. which is a Pennsylvania Corporation with offices at 201 Isabella Street, Pittsburg, Pennsylvania 15212 and is a prior owner, operator and/or generator is responsible for the contamination at the Alcoa site as defined herein (jointly "ALCOA Domestic, LLC").

10.     Defendants John Does 1-100 are others currently unknown who have generated, transported, or are otherwise responsible for the lease of hazardous substances at Veteran's Park.

11.     Defendants ABC Corporation 1-100 are others currently unknown who have generated, transported, or are otherwise responsible for the lease of hazardous substances at Veteran's Park.

## JURISDICTION AND VENUE

12.     This action arises under the federal law, Sections 107(a) an 113(b) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601 et seq. ("CERCLA"), 42 U.S.C. §§9607(a) and 9613(b), and for violations of New Jersey State law.  In addition, the Declaratory Judgments Act, 28 U.S.C. §2201, and Section 113(g)(2) of CERCLA, 42 U.S.C. §9613(g)(2), authorize this Court to grant Plaintiff declaratory relief.

13.     This is a Civil Action over which the United States District Court has original jurisdiction pursuant to 28 U.S.C. §1331.

14.     This court also has supplemental jurisdiction over Plaintiff's state law claims for relief pursuant to 28 U.S.C. §§1388 and 1367(a)  and for the additional reason that those claims

4

are joined with substantially related claims and arise out of the same common nucleus of operative facts and Plaintiff's federal law claims.

15.     This court is one of proper venue because all parties either have a principal place of business or are authorized to do business in the State of New Jersey.  This court is also one of proper venue pursuant to Section 113(b) of CERCLA, 42 U.S.C. §9613(b), because the releases or threatened releases alleged herein occurred in the District of New Jersey.

## BACKGROUND

16.     Veteran's Field is located at 1167 River Road, Edgewater, New Jersey and is known as Block 30, Lot 1 on the Tax Map for the Borough of Edgewater ("Veteran's Field" or the "Site").  It consists of approximately 27.58 acres consistent of a public park with fields, courts, playgrounds, picnic area, and community center.  The majority of the Site had previously been covered by lawn, soil, and wood chip areas with the remaining areas consisting of paved parking, walkways, and courts.

17.     In 2011, in conjunction with proposed improvements to Veteran's Field, Edgewater retained TERMS to conduct an initial investigation of the Site to assess historic contaminated fill at Veteran's Field.

18.     The results of TERMS' 2011 site investigation revealed "hot spot" areas on the Site that were noted to contain slightly elevated levels of certain contaminants, including Metals, Polychlorinated Biphenyls ("PCB") Polycyclic Aromatic Hydrocarbons ("PAH") and Extractable Petroleum Hydrocarbons ("EPH").

19.     The results of TERMS' 2011 site investigation revealed that PCBs were detected in historic fill on the Site, in four isolated areas, slightly in excess of the New Jersey Department

of Environmental Protection's ("NJDEP") residential direct contact soil remediation standard of 0.2 mg/kg.  The highest concentration of PCBs detected at the time of TERMS' 2011 site investigation was 2.5 mg/kg.

20.     In order to address the historic fill contamination identified in the 2011 site investigation revealed, TERMS prepared a Remedial Action Workplan ("RAW").  Pursuant to the RAW, the remediation of Metal, PCB, and EPH-impacted areas was accomplished using excavation, off-site disposal, and verification post excavation sample results.  This method was designed as a permanent and effective method to remove of all of the aforementioned known contamination at the Site, with the exception of the PAH contamination.

21.     The RAW addressed the PAH soil contamination by proposing to cover the historic fill soils with an engineering control in the form of a cap consisting of two (2) foot of clean fill and a demarcation geotextile fabric.  Also, an institutional control, in the form of a deed notice was proposed for the entire Site to resolve PAH soil contamination from historic fill.

22.     Subsequent to the excavation and off-site disposal of these areas, post excavation sample results collected by TERMS indicated that PCB concentrations in existing soils related to historic fill were below NJDEP's residential direct contact soil remediation standard of 0.2 mg/kg.  These soils were identified to contain only PAH contamination.  The RAW specifically required existing PAH contaminated soils to be capped with two (2) foot of clean fill and a demarcation geotextile fabric and that the imported clean fill soils were to be tested and approved prior to placement on the Site in accordance with NJDEP's Alternative and Clean Fill Guidance for Site Remediation Program Sites Updated December 29, 2011 Version 2.0.

6

23.      In or about 2012, Edgewater and TERMS entered into a valid contract (the "TERMS Agreement"), pursuant to which TERMS agreed to serve as the environmental consultant and Licensed Site Remediation Professional ("LSRP") for the Veteran's Field Project.

24.      As the environmental consultant and LSRP, TERMS was the gatekeeper and responsible for undertaking the testing of any fill material brought to or utilized at the Site.

25.      At all times TERMS had control over the process for importing fill to the Site and was responsible for developing and implementing the plan to sample, analyze, and approve the fill material prior to it being utilized at the Site.

26.      On or about June 27, 2012, Edgewater issued a bid notice for Veteran's Field Improvement Project ("Veteran's Field Project" or "Project").

27.      The scope of the work in the bid notice consisted of the remediation of Veteran's Field per the RAW and the installation of baseball fields and soccer field, along with associated drainage and grading.  The Project also included the installation of a playground and parking lot. The bid notice for the Veteran's Field Project required certified stone from a quarry or crushed virgin stone to be used to raise the elevation of the entire facility approximately four (4) feet.

28.      The bid notice for the Veteran's Field Project required certified stone from a quarry or crushed virgin stone to be used as fill in certain areas of the Site and, specifically, to be used for the two (2) foot of clean fill to cap existing PAH contaminated soils.

29.      On or about June 27, 2012, pursuant to public contract law, the contract for the Veteran's Field Project was awarded to Waterside, the low bidder.  The contractual documents specifically provided that time was of the essence and that the final completion date for the

Project was April 2013.  On behalf of Waterside all of the contractual documents were executed by defendant, Fred Daibes.

30.    In the summer of 2012, Waterside commenced work on the Veteran's Field Project.  The initial phase of the Project was the removal of the contaminated historic fill material.

31.    After the contaminated historic fill material was removed, work began to cap Site soils with two (2) foot of clean fill and a demarcation geotextile fabric.  In accordance with the contractual documents for the Project, TERMS required Waterside to submit, for testing and approval, all fill material that was not provided from an approved site.

32.    After the contaminated historic fill material was removed and pursuant to the contractual documents for the Project, TERMS approved certain fill materials that had been tested and/or certified as clean fill to be imported to the Site by Waterside and used as part of the cap.

33.    In late October 2012, the Project was suspended due to Superstorm Sandy.

34.    The Project resumed in late spring of 2013.  Pursuant to FEMA requirements, the grade of the Project was increased and, as a result, the amount of fill required to cap Site soils increased.

35.    Thereafter, importation continued of approved fill materials that were used as part of the cap for Site soils.

36.    On numerous occasions prior to September 7, 2013, TERMS rejected as unfit fill materials proposed to be utilized by Waterside to cap Site soils.  As a result, Waterside became

8

so frustrated with TERMS' rejection of proposed fill materials that Waterside attempted to have TERMS and some of its employees removed from the Project.

37.     On September 6, 2013, Waterside advised Jason Menzella, the Site supervisor for the Borough Engineer, Neglia Associates, that it would not be performing any work on Saturday, September 7, 2013 and that a concrete pour scheduled for that day would be performed on Friday, September 6, 2013.

38.     In the afternoon of Saturday, September 7, 2013, however, Mr. Menzella, while driving by the site, observed Waterside (contrary to its prior representations) working at the Site. Upon his arrival, Mr. Menzella observed Waterside employees intentionally covering up suspect fill materials that had not been previously on the Site and, to his knowledge, had not been approved for use on the Site.

39.     On September 7, 2013, Mr. Menzella was advised by a Waterside employee that Fred Daibes had just left the Site, but had been present all day.  The employee could not explain why Waterside was intentionally covering up the suspect fill materials.  The employee advised Mr. Menzella that he was just working as instructed and was told to get the work done "today."

40.     On Monday, September 9, 2013, Ronald Dooney of TERMS went to the Site to inspect the suspect fill materials that were utilized at the Site and were observed by Mr. Menzella.  At that time, all of the suspect fill materials had been covered up with clean and/or approved fill material.

41.     On September 9, 2013, representatives of Waterside misrepresented to Mr. Dooney that the suspect fill materials were only utilized in the outfield area of the Little League

field.  On September 9, 2013, Mr. Dooney instructed Waterside not to utilize any more of the suspect fill materials or disturb the piles of it remaining on the Site.

42.     Based upon the representations of Waterside that it would not use the suspect fill materials or disturb the piles of it remaining on the Site, TERMS did not, at that time, require Waterside to cease the work it was performing in the north parking lot and the other areas of the Site.

43.     Unbeknownst to Edgewater and despite its representations to the contrary, Waterside had previously and continued to utilize the suspect fill materials in the parking lot areas and throughout the fields on the Site.

44.     In or about September 2013, TERMS collected samples from two piles of the suspect fill materials remaining on the Site.  The sample results revealed the suspect fill materials were contaminated with, *inter alia*, PCBs at concentrations at a range of 100 mg/kg that was a magnitude of thousands of times higher than NJDEP's soil remediation standards.  TERMS visually classified the piles as containing crushed concrete.

45.     Thereafter, in order to determine the extent of the contamination associated with the suspect fill materials used on the Site by Waterside, TERMS collected samples from several locations on the Site where Waterside had performed construction activities.  The results revealed that fill materials used as a base material throughout the Site were contaminated and contained crushed concrete with, *inter alia*, high levels of PCB concentrations, ranging from 100 to 350 mg/kg.

46.     As a result of these sample results demonstrating extensive PCB and other contamination throughout the Site associated with the suspect fill materials imported to the Site

3387813-1

by Waterside, on October 3, 2013 TERMS issued a letter to Edgewater advising that Waterside had imported improper fill that contained high levels of PCBs and other contaminants to Veteran's Field and, as a result, TERMS was immediately closing the Site until TERMS could perform a complete assessment of the entire Site.

47.     Despite being instructed that the Site was closed, Waterside continued to work at the Site, which necessitated the placing of locks on the Site.

48.     From September to November 2013, TERMS collected and analyzed approximately 150 soil samples to assist in identifying the vertical and horizontal limits of the releases caused by Waterside's improper importation of fill materials contaminated with PCBs and other contaminants to the Site.

49.     The results of this investigation indicated that contaminated fill materials improperly imported to the Site by Waterside contained PCB, Metals, PAH and pesticides concentrations in excess of NJDEP standards and were used throughout the Site.

50.     The results of the investigation also indicated that Waterside randomly placed fill materials contaminated with PCBs and other contaminants throughout the Site and blended contaminated fill materials with other fill materials.  The investigation indicated that the improper manner in which the contaminated fill materials were processed and spread cross-contaminated previously approved fill materials used on the Site.

51.     The investigation also indicated that surface impacts resulted from the improper release of contaminated fill materials throughout Veteran's Field by Waterside due to, e.g., cross-contamination from construction activities and/or being spread by dust or runoff.

11

52.     The investigation concluded that an estimated minimum volume of 25,000 cubic yards of soil contain elevated PCB levels as a result of the improper release of contaminated fill materials throughout Veteran's Field by Waterside.

53.     The sampling results performed by TERMS demonstrate that, as a result of the improper release of contaminated fill materials throughout Veteran's Field by Waterside, *inter alia*, levels of PCB contamination on Site ranged from 10 mg/kg to 300 mg/kg.  These results are in stark contrast to the PCB levels documented after the removal of historic fill from the Site in 2011 and prior to Waterside commencing work on the Site, which were below NJDEP's residential direct contact soil remediation standard of 0.2 mg/kg.

54.     After the contamination caused by Waterside was documented, Waterside admitted that the contaminated fill materials that it imported to the Site came from the former Alcoa site located at 660 River Road, Edgewater, New Jersey ("Alcoa Site"), John Does 1-100, and ABC Corporation 1-100.

55.     The Alcoa Site is a known contaminated site presently owned by 38 COAH, an entity which, upon information and belief, is owned or otherwise controlled by Fred Daibes.

56.     The Alcoa Site is a known contaminated site that was previously owned, controlled, or operated by Fred Daibes individually, North River, A.P. New Jersey, Inc. ("A.P."), and the Aluminum Company of America ("ALCOA").

57.     On or about February 12, 2003, the NJDEP issued to North River, ALCOA, and A.P. a Restricted Use No Further Action Letter for the remediation of certain portions of the Alcoa Site.

3387813-1

58.     The No Further Action Letter for the Alcoa Site also specifically required that North River, ALCOA, and A.P. place a Deed Notice on the Alcoa Site regarding PCB contamination with respect to a building located on the Alcoa Site known as "Alcoa Building 12."

59.     The No Further Action Letter for the Alcoa Site was signed by Fred Daibes on behalf of North River.

60.     A Deed Notice was prepared for the Alcoa Site on behalf of North River and was recorded with the Bergen County Clerk's office on or about January 14, 2003.  The Deed Notice for the Alcoa Site was signed by Fred Daibes on behalf of North River.

61.     The affected areas of the Alcoa Site that were subject to the Deed Notice were the remaining shell of the former ALCOA manufacturing facility, consisting of the Northern, Eastern, and Southern exterior walls and the roof of Alcoa Building 12, and PCB contamination associated with Alcoa Building 12.

62.     Alcoa Building 12 was constructed, in part, out of concrete.

63.     The Deed Notice for the Alcoa Site specifically noted that Building 12 contained elevated levels of PCBs in excess of 0.49 mg/kg.  Due to these elevated levels, to prevent migration of the contaminants and to protect the public, the Deed Notice for the Alcoa Site stated that portions of Building 12 were painted with a NJDEP approved epoxy coating, required that the exterior walls be routinely and that the painted surfaces be examined to ensure that they remained sealed, and that North River, ALCOA, and A.P. submit written certification to NJDEP of the maintenance of such institutional and engineering controls and that no changes have occurred.

64.     The recorded Deed Notice for the Alcoa Site prohibited any owner or operator of the Alcoa Site from making any alteration, improvement or disturbance to certain affected areas, including portions of Alcoa Building 12, without first obtaining express written consent of the NJDEP.  But see Deed Notice, section 3(b)

65.     Section 10 of the Deed Notice for the Alcoa Site provides, *inter alia*, that the Deed Notice may only be terminated upon the filing of an instrument terminating the Deed Notice that is executed by NJDEP.

66.     On or about May 22, 2006 North River transferred ownership of the Alcoa Site to 38 COAH.

67.     Upon information and believe, another entity owned and controlled by Fred Daibes applied to NJDEP to terminate the Deed Notice for the Alcoa Site.

68.     In order to terminate the Deed Notice for the Alcoa Site, the NJDEP specifically required that a Remedial Action Outcome be issued by a Licensed Site Remediation Professional and include a notation that "building interiors not addressed."

69.     On or about October 19, 2010, 38 COAH recorded a Termination of Deed Notice for the Alcoa Site with the Bergen County Clerk's Office.  The Termination of Deed Notice for the Alcoa Site was signed by Fred Daibes on behalf of 38 COAH.

70.     Contrary to the requirement in the Termination of Deed Notice for the Alcoa Site was not signed by NJDEP.

71.     Subsequent to the recording of the Termination of Deed Notice for the Alcoa Site, Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, and others purposely and improperly utilized the termination of the Deed Notice as part of a scheme to illegally crush,

transfer and dispose of PCB-contaminated concrete and other materials originating from the Alcoa Site at Veteran's Field.

72.     Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, and others purposely and improperly caused concrete from Alcoa Building 12 to be crushed at the Alcoa Site and then transported to and disposed of at Veteran's Field.

73.     In crushing PCB-contaminated concrete and then transferring and disposing the PCB-contaminated concrete and other contaminated materials from the Alcoa Site at Veteran's Field, these defendants also failed to comply with environmental laws that required them to, *inter alia*, obtain a Class B Recycling Permit from NJDEP.

74.     TERMS knowingly permitted Waterside to bring stockpiles of contaminated fill material to the Site resulting in the release of hazardous wastes.

75.     TERMS further improperly permitted Waterside to utilize contaminated fill material in the parking lot areas being constructed for Veteran's Field.

76.     TERMS also permitted and instructed Waterside to reuse fill material on the Site which Waterside now contends was contaminated with PCBs and which TERMS failed to analyze and approve for reuse.

77.     After initially learning that Waterside improperly imported and utilized its contaminated fill at the Site, in violation of its contractual obligations, TERMS failed to take the appropriate actions to prevent Waterside from continuing to utilize the contaminated fill in the parking lot areas and around the fields on the Site.  Additionally, TERMS failed to prevent the continuing cross contamination of the Site caused by Waterside's work.

78.     TERMS violated its contractual obligations by failing to insure that unapproved fill materials were brought to and utilized at the Site.

79.     In its role as a LSRP, TERMS prepared and submitted to the United States Environmental Protection Agency ("USEPA") a self-implementing plan ("SIP") which proposed the remedy for addressing the contamination at the Site.  The sampling of the contamination performed by TERMS, which was the basis of the SIP, contained substantial data gaps with respect to the delineation of the impacted soils, as well as the quantification of volumes associated with the impacted soil.

80.     Additionally, the SIP prepared by TERMS, was not prepared in accordance with USEPA guidance documents and regulations.  The aforesaid actions of TERMS constitute a breach of its contract with Edgewater.

81.     Because of TERMS' failure to perform adequate sampling and prepare a SIP in accordance with USEPA guidelines and regulations, Edgewater was required to retain First Environment as a substitute to the LSRP, re-conduct the sampling of the Site, and prepare a new SIP.

**COUNT I**
**Contribution under the Spill Act**
**(as to Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, ALCOA, TERMS, ALCOA DOMESTIC, John Does 1-100 and ABC Corporations 1-100)**

82.     Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

83.     The New Jersey Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. 58.10-23.11f(a)(2) provides, in pertinent part that "[w]henever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of

16

contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of cleanup."

84.     Under the Spill Act, responsible parties are jointly and severally liable to the State for cleanup and removal costs related to discharges of hazardous substances.

85.     Waterside is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

86.     Fred Daibes is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

87.     Daibes Brothers is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

88.     38 COAH is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

89.     North River is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

90.     ALCOA is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

91.     TERMS is a "person" within the meaning of the Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

92.     ALCOA DOMESTIC is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

93.     John Does 1-100 is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

94.     ABC Corporations 1-100 is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

95.     "Discharges" within the meaning of Spill Act 58:10-23.11b(h), N.J.S.A. § 58:10-23.11b(h) have occurred at Veteran's Field.

96.     "Hazardous Substances" within the meaning of Spill Act Section 58:10-23.11b(k), N.J.S.A § 58:10-23.11b(k) have been discharged at Veteran's Field.

97.     Waterside is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

98.     Fred Daibes is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

99.     Daibes Brothers is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

100.    38 COAH is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

101.    North River is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

102.     ALCOA is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

103.     TERMS is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

104.     ALCOA DOMESTIC is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

105.     John Does 1-100 is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

106.     ABC Corporation 1-100 is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

107.     Edgewater has investigated a discharge of hazardous substance and has incurred and continues to incur investigation costs and will incur remediation costs.

108.     As a person who has cleaned up and removed a discharge of hazardous substance, and incurred costs in connection with that removal, pursuant to Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. §58:10-23.11f(a)(2), Edgewater is entitled to contribution from Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, ALCOA, TERMS, A.P., John Does 1-100 and ABC Corporation 1-100 and all investigation and remediation costs which Edgewater

has or will incur, or for which Edgewater is deemed liable, should be allocated among Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, ALCOA, TERMS, A.P., John Does 1-100 and ABC Corporations 1-100 and Edgewater, using such equitable factors as the Court deems appropriate, including Waterside's express indemnification of Edgewater for all such costs under the contractual documents for the Project.

**COUNT II**
**Cost Recovery Under CERCLA**
**(as to Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, ALCOA, ALCOA DOMESTIC, TERMS, John Does 1-100 and ABC Corporations 1-100)**

109.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

110.    Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), provides that any "covered person" "shall be liable for … any … necessary costs of response by any other person consistent with the national contingency plan."

111.    Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), provides, in pertinent part, that "the owner or operator of a vessel or a facility" shall be liable as a "covered person" for "any other necessary costs of response incurred by any other person consistent with the national contingency plan" pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. 9607(a)(4)(B).

112.    Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), provides, in pertinent part, that "any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of" shall be liable as a "covered person" for "any other necessary costs of response incurred by any other person consistent with the national contingency plan" pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. 9607(a)(4)(B).

20

113.    Section 107(a)(3) of CERCLA, 42 U.S.C. 9607(a)(3), provides, in pertinent part, that "any person who by contract, agreement, or otherwise arranged for disposal or treatment … of hazardous substances owned or possessed by such person" shall be liable as a "covered person" for "any other necessary costs of response incurred by any other person consistent with the national contingency plan" pursuant to Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4)(B).

114.    Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4), provides in pertinent part, that "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities … or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for … (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan" pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. 9607(a)(4)(B).

115.    ALCOA DOMESTIC,   ALCOA, WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporations 1-100 are each a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

116.    ALCOA DOMESTIC, ALCOA, WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, and John Does 1-100 and ABC Corporation 1-100 are each an owner and/or "operator" of Veteran's Field within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

117.   ALCO DOMESTIC, ALCOA, WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporations 1-100 arranged, by contract, agreement, or otherwise, for disposal of hazardous substances at Veteran's Field.

118.   WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporations 1-100 accepted hazardous substances for transport to Veteran's Field.

119.   Veteran's Field is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

120.   Releases or threatened releases of hazardous substances in to the environment have occurred at Veteran's Field within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

121.   As to Veteran's Field, ALCOA DOMESTIC, ALCOA, WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporations 1-100 are liable under Section 101(22) of CERCLA, 42 U.S.C. § 9607(a)(2), as a person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed.

122.   ALCOA DOMESTIC, ALCOA, WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporations 1-100 are liable at Veteran's Field under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), as a person who by contract, agreement, or otherwise arranged for the disposal of treatment of hazardous substances.

123.    WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporations 1-100 are liable at Veteran's Field under Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4), as a person who accepts or accepted any hazardous substances for transport to sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of hazardous substance.

124.    Pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), Edgewater is entitled to recovery from  ALCOA DOMESTIC, ALCOA, WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporation 1-100 of its costs of response incurred in connection with Veteran's Field.

## COUNT III
### Breach of Contract (as to Waterside)

125.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

126.    In or about June 2012, Edgewater and Waterside entered into a valid contract (the "Agreement"), pursuant to which Waterside agreed to complete the Veteran's Field Project.

127.    The Agreement is made up of certain contractual documents that include the Bid, Bid Notice, Bid General Information, Instruction to Bidders, Contract Form, and Technical Specifications.

128.    The Agreement required that the Veteran's Field Project be completed by April 2013, which was within 9 months of the awarding of the Agreement.  Additionally, the Agreement expressly provides that "time is of the essence" for the completion of the Project.

129.     Notwithstanding a five month delay in construction for the Project due to Superstorm Sandy, Waterside failed to complete the Project in a timely manner.

130.     Due to Waterside's failure to complete the Project in a timely manner, among the damages to which Waterside is subject and Edgewater is entitled, is a charge of $1,000 per day for each and every working day until completion of the Project.

131.     Further, per the Agreement, Edgewater's engineer ("Engineer") is authorized and empowered to reject and refuse all work and materials utilized that do not comply in kind and quality with the specifications in the Agreement.  Moreover, the Agreement provides that the approval or acceptance of any part of the work or the materials used shall not prevent the rejection of said work or materials at any time thereafter should said work or materials be found to be defective or not in accordance with requirements of the specifications in the Agreement.

132.     The Agreement further provides that the Engineer may inspect and require tests or analyses of any portion of materials utilized at the Site at any time, either before or after installation, and any material found to be defective or not in conformance with the requirements of the specifications shall be rejected and removed immediately from the Site and replaced at Waterside's expense.  Further additional monies for the costs incurred shall be furnished by Waterside or its surety.

133.     The Agreement defines the term "material" to include "all the things of any kind, nature, and class as may be specified which become part of or used in construction of the work, together with all manufactured or prepared materials, articles, etc. used therein or placed thereon."

24

134.    The contaminated soil and fill materials utilized by Waterside on the Project are included in the definition of the term "material" in the Agreement.

135.    Pursuant to the Agreement, as a result of its failure to complete the Project in a timely manner, Waterside is responsible for all engineering, field work and inspection costs thereafter incurred by the Edgewater.

136.    The Agreement expressly provides that the Engineer and his authorized agents will define in the meaning and intent of the specifications in the Agreement, pass upon all materials and workmanship, and may reject any work that is not in accordance with the drawings and specifications.  Further, the Agreement provides that the Engineer is the judge of the quality of materials and his decision must be accepted as final.

137.    Pursuant to the Agreement, Waterside's liability with respect to defective materials and work is absolute in that inspection of the work and materials by the Engineer does not relieve Waterside of any of its obligation to fulfill the Agreement and defective work and unsuitable materials may be rejected notwithstanding that such work and materials may have been previously inspected and accepted.  Additionally, the liability of Waterside for damages is not dependent upon any question of negligence on Waterside's part or on the part of others.

138.    Pursuant to the Agreement, Waterside was required to purchase Commercial General Liability ("CGL") insurance for the Project to include as an additional insured, Edgewater, the Engineer and TERMS.  Among the claims required to be included in the CGL insurance are claims for property damage which may arise as a result of Waterside's operations with limits of $1,000,000 each occurrence and $2,000,000 aggregate.  Additionally, the Agreement provides that the CGL insurance "may not be restricted by any endorsement."

139.     The insurance provided by Waterside for the Project is inadequate and insurance has been declined to the Edgewater for the damages it incurred in this matter as a result of Waterside's improper use and placement of contaminated fill materials at Veteran's Field.

140.     Pursuant to the Agreement, Waterside was also to provide umbrella liability insurance for the Project of not less than $5,000,000 each occurrence and such occurrence could not be more restrictive than the coverage provided for under the primary policies.

141.     Pursuant to the Agreement, Waterside guaranteed its labor and all materials for the Project for a period of one year from date of substantial completion.

142.     The Agreement specifically requires Waterside to comply with all federal, state, county and municipal laws, ordinances and regulations in any manner affecting materials used in the work for the Project. Additionally, the Agreement provides that, at all times, Waterside was required to "observe and comply with all such laws, ordinances, regulations, orders, and decrees and shall protect and indemnify the Edgewater and its agents against any claim or liability arising from or based on the violation of any such law, ordinance, regulation, order, or decree, whether by himself or his employees."

143.     Edgewater has duly performed all its obligations under the Agreement.

144.     Waterside has breached the Agreement by failing to perform the terms and conditions contained therein.

145.     Waterside's breach of the Agreement directly and proximately caused Edgewater damages, including but not limited to, cost incurred by Edgewater in the cleanup, removal, and disposal of contaminated material from Veteran's Field, repairs and reconstruction costs for defective work performed by Waterside, and consequential and liquidated damages.

26

146.    Edgewater is entitled to contractual indemnification from Waterside for the foregoing damages, injuries, claims, and losses.

**COUNT IV**
**Fraud (as to Waterside and Fred Daibes)**

147.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

148.    As set forth in paragraphs 12-66, Waterside and Fred Daibes misrepresented that it used contaminated fill materials at the Site, where it used contaminated fill materials at the Site and when it used contaminated fill materials at the Site.

149.    Waterside and Fred Daibes' misrepresentations regarding the use of the contaminated fill materials at the Site were false.

150.    Waterside and Fred Daibes knew that the misrepresentations regarding its use of contaminated fill materials at the Site were false at the time Waterside made the misrepresentations.

151.    Waterside and Fred Daibes' misrepresentations regarding the use of contaminated fill materials at the Site were material.

152.    Waterside and Fred Daibes intended that Edgewater rely on the fraudulent misrepresentations regarding the use of contaminated fill materials at the Site.

153.    Edgewater's reliance on Waterside and Fred Daibes' fraudulent misrepresentations regarding the use of contaminated fill materials at the Site was reasonable.

154.    Edgewater has suffered damages as a result of Waterside and Fred Daibes' fraudulent misrepresentations regarding the use of contaminated fill materials at the Site.

3387813-1

155.    As a direct and proximate result of the Waterside and Fred Daibes' fraudulent misrepresentations, Edgewater has suffered damages in an amount to be determined at trial.

**COUNT V**
**Negligence (as to Waterside)**

156.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

157.    As set forth in paragraphs 12-66, beginning in or about the summer of 2013, Waterside began working on the Project.

158.    Pursuant to the Agreement, Waterside agreed to use only approved fill materials on the Project.

159.    Waterside owed a duty of care to Edgewater, as the contractor for the Veteran's Field Project, to comply with all applicable laws regarding the use of fill materials on the Project and to otherwise perform under the Agreement in such a manner so as not to cause Edgewater injury or damages.

160.    Waterside's unlawful use of contaminated fill materials on the Project was a breach of Waterside's duty of care owed to Edgewater.

161.    It was foreseeable that Waterside's use of contaminated fill materials on the Project would cause harm to Edgewater.

162.    As a direct and proximate result of the Waterside's breach of its duty of care owed to Edgewater, Edgewater has suffered damages in an amount to be determined at trial.

**COUNT VI**
**Unjust Enrichment (as to Waterside, ALCOA, ALCOA DOMESTIC and 38 COAH)**

163.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

3387813-1

164.    By transporting contaminated concrete and other materials from the Alcoa Site and delivering the contaminated concrete and other materials from the Alcoa Site at Veteran's Field, Waterside, ALCOA, ALCOA DOMESTIC and 38 COAH conferred a significant benefit because Waterside and 38 COAH saved a significant amount of money in removal and disposal costs of contaminated materials from the Alcoa Site and saved a significant amount of money in purchasing clean, approved materials for use as fill at Veteran's Field.

165.    Waterside, ALCOA, ALCOA DOMESTIC and 38 COAH unjustly received this benefit without payment.

166.    Edgewater mistakenly conferred this benefit upon Waterside, ALCOA, ALCOA DOMESTIC and 38 COAH because it was unaware that the fill materials delivered to Veteran's Field were contaminated.

167.    Had Edgewater known that the fill materials delivered to Veteran's Field were contaminated, Edgewater would have expected remuneration from Waterside, ALCOA, ALCOA DOMESTIC and 38 COAH at the time the benefit was conferred.

168.    Waterside, ALCOA, ALCOA DOMESTIC and 38 COAH have received and currently retain this significant monetary benefit to the detriment of Edgewater.

169.    As a result of Waterside's, ALCOA's, ALCOA DOMESTIC'S  and 38 COAH's unjust enrichment and unlawful retention of this benefit, Edgewater has suffered damages in an amount to be determined at trial.

**COUNT VII**

**Violations of the New Jersey Consumer Fraud Act (as to Waterside and Fred Daibes)**

170.     Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

171.     This claim alleges violations of the New Jersey Consumer Fraud Act, N.J.S.A. §56:8-1 *et seq.* ("NJCFA").

172.     At all relevant times described herein, Waterside, by and at the direction of Fred Daibes, as the contractor performing the Veteran's Field Project, was acting as an agent for and/or on behalf of Edgewater, the property owner of Veteran's Field.

173.     As set forth in paragraphs 12-66, in agreeing to provide Edgewater with approved, clean fill for the Veteran's Field Project, then intentionally delivering contaminated fill materials to the Site and then misrepresenting where and when it used such contaminated fill materials at the Site, Waterside and Fred Daibes engaged in unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts because Waterside and Fred Daibes knowingly misrepresented the quality of the fill materials used at the Site.

174.     As alleged in Paragraphs 12-66 and 101-121, in June 2012 Waterside was awarded the contract for the Veteran's Field Project.

175.     The Agreement required Waterside to use only approved fill materials on the Site.

176.     On September 6, 2013, Waterside advised Jason Menzella, the Site supervisor for the Borough Engineer, Neglia Associates, that it would not be performing any work on Saturday, September 7, 2012.

177.    In the afternoon of Saturday, September 7, 2013, however, Mr. Menzella, while driving by the site, observed Waterside (contrary to its prior representations) working at the Site. Upon his arrival, Mr. Menzella observed Waterside employees intentionally covering up suspect fill materials that had not been previously on the Site and had not been approved for use on the Site.

178.    On September 7, 2013, Mr. Menzella was advised by a Waterside employee that Fred Daibes had just left the Site, but had been present all day.  The employee could not explain why Waterside was intentionally covering up the suspect fill materials.  The employee advised Mr. Menzella that he was just working as instructed and was told to get the work done "today."

179.    On Monday, September 9, 2013, Ronald Dooney of TERMS went to the Site to inspect the suspect fill materials that were utilized at the Site and were observed by Mr. Menzella.  At that time, all of the suspect fill materials had been intentionally covered up with clean and/or approved fill materials.

180.    On September 9, 2013, representatives of Waterside misrepresented to Mr. Dooney that the suspect fill materials were only utilized in the outfield area of the Little League field.  On September 9, 2013, Mr. Dooney instructed Waterside not to utilize any more of the suspect fill materials or disturb the piles of it remaining on the Site.

181.    Unbeknownst to Edgewater and despite its representations to the contrary, Waterside, by and at the direction of Fred Daibes, had previously and continued to utilize the suspect fill materials in the parking lot areas and throughout the fields on the Site.

182.    The results of an investigation by TERMS, on behalf of Edgewater, indicated that contaminated fill materials improperly imported to the Site by Waterside contained PCB, Metals,

PAH and pesticides concentrations in excess of NJDEP standards and were used throughout the Site.

183.    After the contamination caused by Waterside was documented, Waterside and Fred Daibes admitted that the contaminated fill materials that it imported to the Site came from the former Alcoa Site.

184.    Waterside had entered into the Agreement with Edgewater and agreed to provide Edgewater with approved, clean fill for the Veteran's Field Project and then intentionally delivered contaminated fill materials to the Site.

185.    Waterside and Fred Daibes then intentionally misrepresented to Edgewater where it used contaminated fill materials at the Site and when it used contaminated fill materials at the Site.

186.    Waterside and Fred Daibes entered into the Agreement, misrepresenting that it would only use clean, approved fill materials on the Site, and then misrepresented to Edgewater where and when it used contaminated fill materials on the Site, with the intention that Edgewater would rely upon these representations.

187.    Waterside and Fred Daibes engaged in such unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts with the intention that Edgewater would rely upon Waterside's conduct.

188.    In reliance on Waterside and Fred Daibes' unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts regarding the quality of the fill materials

that would be used on the Site, Edgewater entered into the Agreement with Waterside and Waterside subsequently transported contaminated fill materials to Veteran's Field without Edgewater's approval and used the contaminated fill materials throughout Veteran's Field.

189.    Edgewater's reliance on Waterside and Fred Daibes' unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission material facts was reasonable.

190.    At the time Waterside and Fred Daibes engaged in unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing, concealment, suppression, or omission of materials fact with regard to the contaminated fill materials, Edgewater did not know that the suspect fill materials were contaminated.

191.    Waterside and Fred Daibes' fraudulent misrepresentations, which caused contaminated fill materials to be delivered to and used throughout Veteran's Field without Edgewater's approval, constitutes unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing, concealment, suppression, or omission of material facts in violation of the NJCFA.

192.    As a result of Waterside and Fred Daibes' unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing, concealment, suppression, or omission of material facts in violation of the NJCFA, Edgewater has suffered damages.

193.    Waterside and Fred Daibes' unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing, concealment,

suppression, or omission of material facts in violation of the NJCFA, are the proximate cause of damages sustained by Edgewater.

194.    Accordingly, under Section 56:8-19 of the NJCFA, Edgewater is entitled to recover from Waterside and Fred Daibes' compensatory damages, treble damages, attorneys' fees and the costs of bringing this action.

## COUNT VIII
### Breach of Contract (as to TERMS)

195.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

196.    In or about 2012, Edgewater and TERMS entered into a valid contract (the "TERMS Agreement"), pursuant to which TERMS agreed to serve as the environmental consultant and Licensed Site Remediation Professional ("LSRP") for the Veteran's Field Project.

197.    As the environmental consultant and LSRP, TERMS was the gatekeeper and responsible for undertaking the testing of any fill material brought to or utilized at the Site.

198.    At all times TERMS had control over the process for importing fill to the Site and was responsible for developing and implementing the plan to sample, analyze, and approve the fill material prior to it being utilized at the Site.

199.    TERMS knowingly permitted Waterside to bring stockpiles of contaminated fill material to the Site resulting in the release of hazardous wastes.

200.    TERMS further improperly permitted Waterside to utilize contaminated fill material in the parking lot areas being constructed for Veteran's Field.

201.    TERMS also permitted and instructed Waterside to reuse fill material on the Site which Waterside now contends was contaminated with PCBs and which TERMS failed to analyze and approve for reuse.

202.    After initially learning that Waterside improperly imported and utilized its contaminated fill at the Site, in violation of its contractual obligations, TERMS failed to take the appropriate actions to prevent Waterside from continuing to utilize the contaminated fill in the parking lot areas and around the fields on the Site.  Additionally, TERMS failed to prevent the continuing cross contamination of the Site caused by Waterside's work.

203.    TERMS violated its contractual obligations by failing to insure that unapproved fill materials were brought to and utilized at the Site.

204.    In its role as a LSRP, TERMS prepared and submitted to the United States Environmental Protection Agency ("USEPA") a self-implementing plan ("SIP") which proposed the remedy for addressing the contamination at the Site.  The sampling of the contamination performed by TERMS, which was the basis of the SIP, contained substantial data gaps with respect to the delineation of the impacted soils, as well as the quantification of volumes associated with the impacted soil.

205.    Additionally, the SIP prepared by TERMS, was not prepared in accordance with USEPA guidance documents and regulations.  The aforesaid actions of TERMS constitute a breach of its contract with Edgewater.

206.    As a direct and approximate result of TERMS' breach of contract, Plaintiff has suffered damages in an amount to be determined at trial.  Because of TERMS' failure to perform adequate sampling and prepare a SIP in accordance with USEPA guidelines and regulations,

Edgewater was required to retain First Environment as a substitute to the LSRP, re-conduct the sampling of the Site, and prepare a new SIP.

## COUNT IX
### Negligence (as to TERMS)

207. Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

208. TERMS owed a duty of care to Edgewater, as the environmental consultant, LSRP for the Veteran's Field Project, to insure that contaminated fill materials were not imported and placed on the Site, to prevent the cross-contamination at the Site to perform proper and adequate sampling of contamination of the Site, and to prepare a SIP which conformed with the USEPA regulations and guidelines in such a manner as to not cause Edgewater injury or damages.

209. TERMS' failure to do so was a breach of TERMS' duty of care owed to Edgewater and constituted negligence.

210. As a direct and approximate result of TERMS' breach of its duty of care of Edgewater, Edgewater has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby demands judgment against Defendants:

a.     Allocating among Edgewater and Defendants and any other persons found to be liable all responses costs incurred at or with respect to Veteran's Field described herein, pursuant to Section 58:10-23.11(f)(a)(2) of the Spill Act, N.J.S.A. § 58:10-23.11f(a)(2);

b.     Awarding Edgewater cost recovery from Defendants for all response costs incurred at or with respect to Veteran's Field pursuant to Section 107(a)(4)(B) of CERCLA, 42

U.S.C. § 9607(a)(4)(B), and issuing an Order requiring Defendants to pay such amounts to Edgewater; and

c.      Allocating among Edgewater and Defendants and any other persons to be liable all response costs incurred at or with respect to Veteran's Field, pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B);

d.      Entering a declaratory judgment pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), against Defendants and in favor of Edgewater declaring, adjudging, and decreeing that Defendants are liable to Edgewater for response costs or damages at Veteran's Field, such judgment to be binding on any subsequent action or actions to recover any further response costs or damages;

e.      Entering a declaratory judgment pursuant to the Spill Act against Defendants and in favor of Edgewater declaring, adjudging, and decreeing that Defendants are liable to Edgewater for response costs or damages at Veteran's Field, pursuant to Section 58:10-23.11f(a)(2) of the Spill Act, N.J.S.A. § 58:10-23.11f(a)(2), such judgment to be binding on any subsequent action or actions to recover further response costs or damages;

f.      Entering a declaratory judgment against Waterside and in favor of Edgewater declaring, adjudging, and decreeing that Waterside shall indemnify Edgewater pursuant to the Agreement for any all damages, economic losses, and claims arising from activity pursuant to the Agreement by Waterside, including without limitation costs that Edgewater has and will incur with respect to Veteran's Field, and attorneys' fees and costs;

g.      Awarding Edgewater compensatory, incidental, consequential and liquidated damages, including but not limited to damages and reputable hard to Edgewater as a result of the

37

acts or omissions of Waterside as described herein;

h.       Awarding Edgewater punitive damages for the fraudulent acts of Waterside described herein;

i.       Awarding Edgewater interest and cost of suit, including reasonable attorneys' fees and experts' fees; and

j.       Awarding Edgewater any other such relief as the Court deems just and proper.


                                    **CONNELL FOLEY LLP**
                                    **Attorneys for Plaintiff**
                                    **Borough of Edgewater**


Dated: May 2, 2015              By:     *s/ Timothy E. Corriston*
                                        Timothy E. Corriston

38