# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

BOROUGH OF EDGEWATER,

    Plaintiff,

    v.

WATERSIDE CONSTRUCTION, LLC;
38 COAH, LLC; DAIBES BROTHERS,
INC.; NORTH RIVER MEWS
ASSOCIATES, LLC; FRED A.
DAIBES; TERMS ENVIRONMENTAL
SERVICES, INC.; ALCOA INC.
(formerly known as "Aluminum
Company of America"); ALCOA
DOMESTIC LLC, as successor in
interest to A.P. NEW JERSEY, INC.;
JOHN DOES 1-100; and ABC
CORPORATIONS 1-100,

    Defendants,

and

WATERSIDE CONSTRUCTION, LLC;
38 COAH, LLC; DAIBES BROTHERS,
INC.; NORTH RIVER MEWS
ASSOCIATES, LLC; and FRED A.
DAIBES,

    Defendants/Third-Party Plaintiffs,

    v.

NEGLIA ENGINEERING
ASSOCIATES,

    Third-Party Defendant,

Civil Action No:
2:14-cv-5060

and

ALCOA DOMESTIC LLC, as successor in interest to A.P. NEW JERSEY, INC.,

      Defendant/Third-Party Plaintiff,

      v.

COUNTY OF BERGEN and RIVER ROAD IMPROVEMENT PHASE II, INC.,

      Third-Party Defendants.

---

## CERTIFICATION OF MICHAEL E. WALLER, ESQ. IN SUPPORT OF DEFENDANT ALCOA DOMESTIC LLC'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(C)

I, MICHAEL E. WALLER, of full age, hereby certifies as follows:

1.    I am an attorney admitted to practice before this Court and a partner of the law firm of K&L Gates LLP, attorneys for Alcoa Domestic, LLC, as successor in interest to Defendant A.P. New Jersey, Inc. ("Alcoa"). I have first-hand knowledge of the facts set forth in this Certification.

2.    I am fully familiar with the proceedings in this action and submit this Certification in support of Alcoa's Motion for Partial Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c).

3.     Attached hereto as <u>Exhibit 1</u> is a true and correct copy of Alcoa's Crossclaim as to North River Mews Associates, LLC ("North River"), Exhibit B ECF Dkt. No. 20.

4.     Attached hereto as <u>Exhibit 2</u> is a true and correct copy of Alcoa's Crossclaim as to North River, Exhibit A, ECF Dkt. No. 20.

5.     Attached hereto as <u>Exhibit 3</u> is a true and correct copy of Alcoa's Crossclaim as to North River, Exhibit C ECF Dkt. No. 20.

6.     Attached hereto as <u>Exhibit 4</u> is a true and correct copy of the Second Amended Complaint, ECF Dkt. No. 61.

7.     Attached hereto as <u>Exhibit 5</u> is a true and correct copy of the Waterside Construction, LLC, North River, 39 COAH Associates, LLC, Daibes Brothers, Inc., Fred A. Daibes and Third-Party Defendant River Road Improvement Phase II, Inc.'s Crossclaims as to Alcoa, ECF Dkt. No. 17.

8.     Attached hereto as <u>Exhibit 6</u> is a true and correct copy of the Terms Environmental Services, Inc. Crossclaims as to Alcoa, ECF Dkt. No. 14.

9.     Attached hereto as <u>Exhibit 7</u> is a true and correct copy of the Neglia Engineering Associates Crossclaims as to Alcoa, ECF Dkt. No. 45.

10.     Attached hereto as <u>Exhibit 8</u> is a true and correct copy of the Alcoa's Crossclaim as to North River, ECF Dkt. No. 20.

11.     Attached hereto as <u>Exhibit 9</u> is a true and correct copy of the Alcoa's Third Party Complaint as to River Road Improvement Phase II, Inc., ECF Dkt. No. 23.

12.     Attached hereto as <u>Exhibit 10</u> is a true and correct copy of <u>Am. Commercial Lines LLC v. Water Quality Ins. Syndicate,</u> No. 09 Civ. 7957 (LAK), 2010 WL 1379763 (S.D.N.Y. Mar. 29, 2010).

13.     Attached hereto as <u>Exhibit 11</u> is a true and correct copy of <u>Bradford v. Bolles,</u> Civ. No. 13–1910, 2014 WL 6895270 (D. N.J. Dec. 5, 2014).

14.     Attached hereto as <u>Exhibit 12</u> is a true and correct copy of <u>Montville Twp. V. Woodmont Builders, LLC,</u> Civ. No. 03-2680, 2009 WL 3253911 (D.N.J. Oct. 7, 2009).

15.     Attached hereto as <u>Exhibit 13</u> is a true and correct copy of <u>N.J. Physicians United Reciprocal Exchange v. Boynton & Boynton, Inc.,</u> Civ. No. 13–22862015, WL 5822930 (D.N.J. Oct. 1, 2015).

16.     I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: March 11, 2016

By: <u>/s/ Michael E. Waller</u>

# EXHIBIT 1

# EXHIBIT B



# AGREEMENT TO PURCHASE AND SELL REAL ESTATE

THIS AGREEMENT TO PURCHASE AND SELL REAL ESTATE (this "Agreement") is made and entered into as of the _____ day of June, 1997, by and between A. P. NEW JERSEY, INC., a Delaware corporation with a place of business at 1501 Alcoa Building, 425 Sixth Avenue, Pittsburgh, Pennsylvania 15219 ("Seller"), and NORTH RIVER MEWS ASSOCIATES, LLC, a New Jersey limited liability company with a place of business c/o Mr. John De Sheplo, Esquire, 260 Columbia Avenue, Fort Lee, New Jersey 07024 ("Buyer").

1.     **Purchase And Sale.** Seller agrees to sell, transfer, and convey to Buyer, and Buyer agrees to purchase from Seller, upon the terms, provisions and conditions hereinafter set forth those certain tracts, lots or parcels of real property situated in the Borough of Edgewater, County of Bergen and State of New Jersey, described in Exhibit A attached hereto and incorporated herein by reference (collectively, the "Property").

2.     **Purchase Price.** The purchase price which Seller agrees to accept for the Property and which Buyer agrees to pay therefor shall be a minimum of $8,000,000, and shall increase by $20,000 for each unit approved for construction on the Property in excess of 400 units (the "Purchase Price"). The Purchase Price shall be payable as follows:

(a)     At the Closing (defined below), Buyer shall deliver to Seller:

(i)     Buyer's fully executed unconditional promissory note (the "Note"), secured by Buyer's mortgage to the Property (the "Mortgage"), in the principal amount of the Purchase Price less $2,000,000, for a term of eighteen (18) months from the Closing Date and with an annual interest rate of 6% accruing until fully satisfied, substantially in the form and substance attached hereto as Exhibits B and C, respectively. Upon maturity of the Note, Buyer shall pay to Seller the amount of the Note, principal plus interest, by wire transfer in immediately available funds to the following account (the "Mellon Account"):

Mellon Bank NA, Pittsburgh, PA<br/>
ABA #043 000 261<br/>
Account Number: #000-1206<br/>
Account Name: Aluminum Company of America;

(ii)     An irrevocable, unconditional letter of credit (the "Letter of Credit") issued by PNC Bank, or a reputable commercial bank, savings bank or savings and loan association acceptable to Seller, to the benefit of Seller in the amount of $2,000,000, with an expiration date of not earlier than twenty-four (24) months after the Closing, in a form acceptable to Seller. The Letter of Credit shall be payable upon presentation of Seller's sight draft dated 18 months from the date of the Closing or upon presentation of Seller's sight draft dated earlier than 18 months from the date of the Closing accompanied by Seller's notarized written statement as follows: "North River Mews Associates, LLC is in

default of its obligations under a certain Agreement to Purchase and Sell Real Estate dated June ___, 1997 (the "Agreement"), with the undersigned, as Seller, and such default has not been cured in accordance with paragraph 8(b) of the Agreement.

(b)     Payment for Additional Units.  In the event Buyer, or anyone who acquires title to the Property or any part thereof from Buyer, receives approval to construct more than 400 units at the Property during the time period from May 1, 1997 through May 1, 2117, then at Closing, or within 15 days of receiving such approval, Buyer shall notify Seller of such approval and, within two (2) days following receipt of a building permit to construct the additional units shall pay to the Mellon Account, by wire transfer in immediately available funds, the amount of $20,000 for each additional unit for which approval was granted.

(i) Covenant.  This Section 2(b) shall be a covenant running with the land, and shall be recorded in the form of a Memorandum of Agreement with the Deed. Any subsequent transfer of the property is subject to Section 2(b), and Section 2(b) shall not merge with and into the Deed on Closing.

(ii) Estoppel Certificate.  From time to time, upon Buyer's request, Seller shall execute an estoppel certificate in a form reasonably acceptable to Buyer stating that Buyer is not in default of Section 2(b).

3.     Instruments Of Transfer.  At the Closing, Seller shall convey title to the Property to Buyer by Seller's warranty deed with covenant against grantor's acts (the "Deed") and Seller and Buyer shall execute and deliver to the other, and, where applicable, file and record such instruments of conveyance, transfer and assignment, as shall be necessary or appropriate in the opinion of their respective counsel or as required by the Title Company (defined below) to transfer to Buyer all of the aforesaid right, title and interest of Seller in the Property pursuant to this Agreement.

4.     Title Matters.

(a) Title Commitment.  Seller shall, at its sole cost and expense, as soon as reasonably possible following the execution of this Agreement, cause Chicago Title and Insurance Company (the "Title Company") to issue its commitment for an owner's fee policy of title insurance for the Property in the amount of the purchase price and designating Buyer as the proposed insured (the "Commitment").  Buyer shall, within fifteen (15) days after receipt of the Commitment, either:

(i)     Approve the form and substance of the Commitment; or

(ii)     Notify Seller in writing (the "Notice") to remove or satisfy any reasonable matters relating to the title or interests which are objectionable to Buyer as shown on the Commitment.  Seller shall have ninety (90) days following the receipt of the Notice to correct those objections specified in the Notice.  In the event that Seller is unwilling or unable to correct such objections, then, as Buyer's sole remedy and at Buyer's option to be exercised by written notice within thirty (30) days following the expiration of such 90-

day period, either accept such title and interest as Seller is able to furnish without reduction in or abatement of the Purchase Price and without liability of Seller to Buyer or terminate this Agreement. Upon such termination, neither party hereto shall thereafter have any further liability or obligation to the other party hereunder. Unless Buyer objects to the title condition and terminates this Agreement, said title condition shall be deemed to be acceptable and any objection to the condition shall be deemed to have been waived by Buyer for all purposes.

(b) Survey. Seller shall cause to be prepared an ALTA survey of the Property from a New Jersey licensed surveyor sufficient to delete the survey exception from the Commitment. The cost of the Survey shall be borne by Seller unless this Agreement is terminated before Closing, in which case the cost of the Survey shall be borne by Buyer.

(c) Title Insurance. Buyer shall bear the cost of the Policy of Title Insurance.

5. Warranties and Representations.

(a) Litigation and Claims. Except as set forth on Schedule 5(a), to Seller's knowledge there are no legal actions, suits, arbitrations or other legal, administrative or governmental proceedings pending or threatened against Seller which would materially adversely affect the condition or ability to use the Property as contemplated by this Agreement, nor is Seller aware of any basis for the foregoing.

(b) OTHER THAN THE REPRESENTATION AND WARRANTY SET FORTH IN THIS SECTION, BUYER SPECIFICALLY ACKNOWLEDGES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS, WITH ALL FAULTS" BASIS AND THAT BUYER SHALL HAVE AN OPPORTUNITY TO INSPECT THE PROPERTY AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING WITHOUT LIMITATION:

(i) the quality, nature, adequacy and physical condition of the Property, including, but not limited to, the structural elements, foundations, roofs, floors, appurtenances, access, landscaping, parking facilities, and the electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances;

(ii) the quality, nature, adequacy, and physical condition of soils, geology and any groundwater;

(iii) the existence, quality, nature, adequacy and physical condition of the Property;

(iv) the development potential of the Property, and the Property's use, habitability, merchantability, or fitness, suitability, value, or adequacy of the Property for any particular purpose;

3

(v)     the zoning or other legal status of the Property or any other public or private restrictions on use of the Property;

(vi)     the compliance of the Property or its operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity;

(vii)     the presence or removal of hazardous or toxic materials, substances or wastes in, on, under, or about the Property or the adjoining or neighboring property;

(viii)     the quality of any labor and materials used in any improvements on the Property;

(ix)     subject to Section 4 hereof, the condition of title to the Property, other than those representations and warranties, if any, contained in the Deed by operation of law;

(x)     the leases, service contracts, or other agreements affecting the Property; and

(xi)     the economics of the operation of the Property.

6.     **Conditions Precedent To Closing.**

(a)     **Buyer's and Seller's Conditions.**  Unless all of the following conditions are satisfied, Buyer shall not be obligated to purchase, and Seller shall not be obligated to sell, convey, or transfer, the Property (except as such conditions may hereafter be expressly waived by Buyer and Seller in writing):

(i)     The New Jersey Department of Environmental Protection ("NJDEP") shall have executed and issued a Memorandum of Agreement providing for the issuance of a "No Further Action" letter substantially in the form and substance attached hereto as Exhibits D and E, respectively.

(ii)     Seller, Buyer, River Road Improvement Phase II, Inc. and the County of Bergen, New Jersey, shall have entered into a Multi Party Property Acquisition Agreement substantially in the form and substance attached hereto as Exhibit F (the "Multi-Party Agreement").  The Multi-Party Agreement, once fully executed, shall be incorporated into this Agreement by reference and attached as Exhibit G.  The Multi Party Agreement shall contain provisions for:

(1)     the requirement to demolish the structures on the Property in accordance with a Remedial Action Work Plan submitted to the NJDEP by River Road Improvement Phase II, Inc. (the "Demolition");

4

(2)    the requirements that: (i) Seller will be responsible for payment of Demolition costs in the Amount of $9,500,000, (ii) Seller will be responsible for costs of disposal of material contaminated with PCB's at concentrations greater than 50 ppm at approved TSCA landfills if those disposal costs exceed $250,000 up to a maximum of $2,500,000, and (iii) Seller's total liability for Demolition and disposal of waste material will not exceed $12,000,000; and

(3)    the establishment of an acceptable funding mechanism for the Demolition.

(b)    Buyer's Conditions.  Unless all of the following conditions are satisfied, Buyer shall not be obligated to purchase the Property (except as such conditions may hereafter be expressly waived in writing by Buyer):

(i)    Buyer shall have received the necessary, final, non-appealable approvals of its development plans for the Property from the Borough of Edgewater, New Jersey. Seller agrees to execute all required consents to enable Buyer to meet this condition and all other requisite approvals; and

(ii)    From the date of this Agreement until the Closing, there shall not have occurred any material adverse change in the physical condition of the Property or the condition of title to the Property.

(c)    Seller's Conditions.  Unless all of the following conditions are satisfied, Seller shall not be obligated to sell, convey, and transfer the Property to Buyer (except as such conditions may hereafter be expressly waived in writing by Seller):

(i)    Seller shall have received from the County of Bergen, New Jersey, a guarantee of performance acceptable to Seller for the Demolition.

7.    **Environmental Conditions.**  The following terms and conditions shall survive Closing hereunder and shall not be merged with and into the Deed.

(a)    Hazardous Substance.  For the purposes hereof, the term "Hazardous Substance" shall mean any substance, chemical or waste that is listed or defined as hazardous, toxic, or dangerous under Applicable Law (defined below), and any asbestos containing materials, radioactive materials or petroleum products.

(b)    Applicable Law.  For the purposes hereof, the term "Applicable Law" shall mean the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1471 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; and the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; each as amended from time to time, together with the rules and regulations promulgated thereunder, and any and all formal or



informal orders, decrees or requests from the United States Environmental Protection Agency, the appropriate New Jersey state governmental and regulatory bodies, or any other governmental agency, authority or instrumentality having jurisdiction and any similar state and local laws and ordinances and the regulations implementing such statutes; together with any and all federal, state, and local environmental or land use laws, rules, ordinances, or regulations.

(c)     Environmental Reports.  Seller shall make available to Buyer the reports listed on Schedule 7(c), attached hereto and incorporated by reference, concerning the environmental condition of and contamination in, on, under, or about the Property (the "Environmental Reports").  The parties agree that the Environmental Reports and any and all reports, analyses, surveys, assessments, evaluations or the like prepared by Buyer and its representatives pursuant to Section 7(d) will establish the known environmental condition of the Property as of the Closing Date.  The Environmental Reports, and any and all reports, surveys and assessments, including all copies thereof, produced by Buyer or its representatives pursuant to this Agreement, shall be held in strict confidence by Buyer and shall not be disclosed by Buyer or its employees, consultants, agents and representatives, without the prior written consent of Seller.

(d)     Buyer's Assessment.  Buyer, at its sole cost and expense, may conduct an environmental transfer assessment of the Property prior to Closing ("Buyer's Assessment").  Seller shall permit Buyer or its representatives, at all reasonable times prior to the Closing Date, to enter upon any and all of the Property for the purposes of inspection, making tests, taking samples and soil borings, and/or conducting groundwater studies and such other investigations as Buyer shall deem appropriate, in order to complete Buyer's Assessment.

(e)     Restrictions on Buyer's Assessment.  Notwithstanding any other provision of this Agreement, Buyer's right to enter the Property for purposes of conducting Buyer's Assessment shall be subject to the following restrictions:

(i)     Buyer shall notify Seller at least twenty-four (24) hours prior to entry onto the Property to conduct such activity;

(ii)     All activities undertaken in connection with Buyer's Assessment shall fully comply with any Applicable Law, and other laws relating to worker safety and to proper disposal of any samples taken, and any soil or water generated in the process of taking the samples, and Buyer shall provide Seller with split samples of all soil, air or water sample so taken;

(iii)     Seller shall be permitted to have a representative present during all such investigations, and copy the results of on-site testing and visual inspections, and shall have complete access to all samples taken, test results, and boring records;

(iv)     In the event that Buyer shall not consummate this transaction for any reason, Buyer shall restore the Property to its condition prior to such investigative activities;



(v)   Buyer shall take all actions and implement all protections necessary to ensure that actions taken hereunder and equipment, materials, and substances generated, used or brought onto the Property pose no threat to the safety or health of persons or the environment, and cause no damage to the Property of Seller or of any other person;

(vi)   Buyer shall be solely responsible for the security of the activities, equipment and materials brought on the Property prior to the Closing Date;

(vii)   Buyer for itself, its successors and assigns, covenants and agrees that it shall indemnify and save harmless Seller, its successors and assigns, from and against any and all loss or liability, and all claims, damages, fees, costs and expenses resulting from, incident to or in any way arising out of the entry onto the Property to conduct Buyer's Assessment, or any other act done pursuant to the rights, privileges and authority hereby granted.  Buyer shall reimburse Seller for actual damage to the Property resulting from said activities.

(viii)   Unless specifically required by New Jersey law, any and all reports, surveys and assessments, including all copies thereof, produced by Buyer or its representatives pursuant to this Agreement shall be held in strict confidence by Buyer, shall not be disclosed by Buyer or its employees, consultants, agents and representatives, without the prior written consent of Seller, and shall be forthwith delivered to Seller at no cost or expense to Seller;

(ix)   Without limiting the effect of the last clause, Buyer shall require that any party performing services hereunder waive all rights to assert any lien or claim against Seller or the Property arising out of services performed hereunder and provide insurance against injury and damage to Seller or any other person, in coverage amounts and terms satisfactory to Seller, and shall obtain Seller's written approval of such coverage prior to that party's first entry onto the Property; and

(x)   Buyer and its representatives shall comply with all governmental laws and regulations and all policies and regulations of Seller in effect at such time, including, but not limited to, those relating to health and safety, and with such special regulations, rules or policies as may be considered appropriate by Seller under the circumstances and Seller shall have the right to refuse initial or continued access to the Property to any person when it determines that such action is necessary or desirable.

(f)   Indemnification of Seller.  Buyer shall indemnify, defend and hold Seller harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages, occurring on or after the Closing Date arising under Applicable Law related to Buyer's (or, during Buyer's ownership of the Property, any operators' or any third parties') use of the Property and/or any and all activities relating thereto.

(g)   Release of Seller.  Except in the event that Seller remains in default on any payment obligation after receiving notice of such default and opportunity to cure as set forth in Section 8, Buyer expressly releases Seller and agrees to waive all rights that it may have to seek

contribution from Seller for any response costs or claims that may arise as a result of the actions or inactions of Seller and any previous owner, operator or third party on or with respect to the Property relating to Hazardous Substances. Nothing in this provision shall alter or expand the parties' rights or obligations under the Multi Party Agreement.

8.   **Default.**

(a)   By Seller. If Seller fails to perform any of its obligations under this Agreement or the Multi Party Agreement, the same shall constitute a default of this Agreement and thereupon Buyer, at its option, may declare a forfeiture by written notice to Seller ("Notice of Seller's Default"). At the expiration of forty-five (45) days after the Notice of Seller's Default, if Seller has not remedied the default, or if Seller has not exercised all efforts to remedy the default as quickly as possible where the default is not capable of being remedied in forty-five (45) days, Buyer may declare this Agreement null and void. In any event, if such default is not remedied within 120 days after the Notice of Seller's Default, Buyer may declare this Agreement null and void.

(b)   By Buyer. If Buyer fails to perform any of its obligations under this Agreement or the Multi Party Agreement, the same shall constitute a default of this Agreement and thereupon Seller, at its option, may declare a forfeiture by written notice to Buyer ("Notice of Buyer's Default"). At the expiration of forty-five (45) days after the Notice of Buyer's Default, if Buyer has not remedied the default, or if Buyer has not exercised all efforts to remedy the default as quickly as possible where the default is not capable of being remedied in forty-five (45) days (an "Extended Default"), Seller may at its option:

(i)   if the default occurs before Closing and is not cured as described in Section 8(b), declare the Agreement null and void; or

(ii)   if the default occurs after Closing and Seller is not in default, upon thirty (30) days' written notice, demand immediate payment of the Note and/or Letter of Credit or immediately foreclose on the Mortgage.

In any event, if an Extended Default is not remedied within 120 days after the Notice of Buyer's Default, Seller may elect to exercise its remedies under this Section 8(b)(i) or (ii).

(c)   Limitation of Liability. In the event of default under this Agreement, the remedies of the parties are limited to the remedies set forth in Sections 8(a) and (b) above. No party shall be liable for any incidental or consequential damages for default under this Agreement.

(d)   Waiver of Breach. The waiver by either party of any condition or breach by the other party of any term, covenant, or condition herein contained shall not be deemed to be a waiver of any other condition of any subsequent breach of the same or any other term, covenant, or condition herein contained.

9.     Force Majeure.

(a)     "Force Majeure" shall mean an act, event or condition having a material adverse effect upon the rights or obligations of either party hereunder if such act, event, or condition is beyond the reasonable control of the parties to this Agreement and is relied upon as justification for the failure to perform any obligation set forth herein or to comply with any condition required of the respective parties pursuant to this Agreement. Such acts, events or conditions shall be limited to the following: (i) any labor strike or interruption, or (ii) the action or inaction of any governmental body of the United States of America or the State of New Jersey and any other subdivisions thereof exercising jurisdiction.

(b)     Each party hereto is excused from failure or delay in the performance of any act required hereunder (except for payment of the Letter of Credit, accrual and payment of interest on the Note, and Seller's payment obligations with respect to the Demolition) by reason of Force Majeure. In the event a party is rendered unable, either in whole or in part, to carry out the terms of this Agreement, such affected party shall give immediate notice ("Force Majeure Notice") to the other party and the obligations (other than payment of the Letter of Credit, accrual and payment of interest on the Note, and Seller's payment obligations with respect to the Demolition) of such affected party, to the extent affected by such Force Majeure and to the extent that due diligence is being used to resume performance at the earliest practicable date, shall be suspended. The parties hereto shall use their best efforts to overcome or remove any Force Majeure and to minimize the effect of such Fore Majeure. Notice shall be given to the other party when the effect of the Force Majeure has ceased. The parties hereto acknowledge that notwithstanding any Force Majeure, all payment obligations shall continue to be performed without delay, including but not limited to the payment of the Letter of Credit and the Note.

(c)     If any event of Force Majeure claimed by a party is not overcome or removed within two (2) years of the Force Majeure Notice being given, then at the option of the other party, upon ten (10) days' written notice, this Agreement shall be null and void.

9.     Closing.

(a)     Date and Location. The purchase and sale transaction contemplated by this Agreement shall close (the "Closing") on or before October 31, 1997, or on such other date as the parties may otherwise mutually agree (the "Closing Date"); provided, however, that the Closing Date shall not be later than December 31, 1997. The Closing shall be held at a location which is mutually agreeable to both parties.

(b)     Seller's Obligations. At the Closing, Seller shall:

(i)     Deliver to Buyer a duly executed and acknowledged deed in substantially the form and substance as Exhibit H, attached hereto (the "Deed");

(ii)     Deliver to Buyer a duly executed Affidavit of Title in substantially the form and substance as Exhibit I attached hereto;

(iii)     Deliver to Buyer possession of the Property;

(iv)    Deliver to Buyer reasonable evidence of Seller's capacity and authority for closing the transaction as required by the Title Company;

(v)    Deliver documents reasonably requested by the Title Company as administrative requirements for closing this transaction, including but not limited to an ALTA survey; and

(vi)    Deliver to Buyer an Owner's Policy of Title Insurance in the amount of the Purchase Price, dated as of the Closing Date.

(c)    Buyer's Obligations. At the Closing, Buyer shall:

(i)    Deliver to Seller the Note, Mortgage and Letter of Credit. Buyer shall pay to Seller the cost of the Policy of Title Insurance and the title search;

(ii)    Deliver to Seller reasonable evidence of Buyer's capacity and authority for closing the transaction; and

(iii)    Deliver documents reasonably requested by the Title Company as administrative requirements for closing this transaction.

(d)    Taxes. General real estate taxes for the then-current year relating to the Property shall be prorated as of the Closing Date and shall be adjusted in cash at Closing. If the Closing shall occur before the tax rate is fixed for the then current year, the apportionment of taxes shall be upon the basis of the tax rate for the next preceding year applied to the latest assessed valuation. All special taxes or assessments prior to the Closing Date shall be paid by Seller. Any rebates or refunds of taxes paid prior to Closing shall be for Seller's benefit. Seller shall pay all transfer tax on the Property that becomes due as a result of the transactions contemplated by this Agreement.

(e)    Costs. Except to the extent specifically allocated in this Agreement, each party shall pay its share of the normal and incidental costs associated with the Closing which are routinely incurred by a Seller and Buyer in a transaction of this character in the county where the Property is located.

10.    Risk Of Loss; Condemnation. Seller shall assume the risk of loss, destruction or damage to the Property by fire, Act of God, other casualty, or condemnation prior to the Closing Date and the transfer of title to the Property to Buyer. Buyer assumes, as of the Closing Date and transfer of title, all hazards of damage to or destruction of the Property and of the taking of the Property or any part thereof for public use, and agrees that no such damage, destruction or taking shall constitute a failure of consideration. Upon the execution of this Agreement, Buyer shall have an insurable interest in the Property.



-10-

11.     **Brokers.**  Seller and Buyer each represent and warrant to the other that no real estate brokers or finders are or were involved with respect to any of the transactions contemplated by this Agreement. Each party hereto will indemnify and save harmless the other from any claim or claims made by any brokers or finders for any commissions or compensation alleged to be due by reason of the indemnifying party involving such brokers or finders.

12.     **Notices.**  All notices, demands, elections, requests, consents and other communications hereunder shall be in writing and shall be given by personal delivery or sent by certified or registered mail, postage prepaid, return receipt requested and addressed to the parties hereto at the addresses below, or sent by facsimile to the parties at the facsimile numbers below, or at such other address or facsimile number as a party may designate:

Seller

Attention:  Mgr. - Corporate Real Estate
            2109 Alcoa Building
            425 Sixth Avenue
            Pittsburgh, PA 15219
            Facsimile No.: (412) 553-2661
            Telephone No.: (412) 553-2614

Buyer
Attention:  Mr. John De Sheplo
            260 Columbia Aveune
            Fort Lee, NJ  07024
            Facsimile No.: (201) 224-0572
            Telephone No.: (201) 224-6679

            Mr. Fred Daibes
            725 River Road
            Edgewater, NJ  07020
            Facsimile No.: (201) 313-9044
            Telephone No.: (201) 224-0003

with copy to: David Carmel, Esquire
            523 River Road
            Edgewater, NJ  07020
            Facsimile No.: (201) 943-5614
            Telephone No.: (201) 943-9160

13.     **Non-Foreign Person.**

(a)     **Seller's Certification.**  Seller certifies and affirms that Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1954, as amended. Seller will execute at or prior to the Closing Date such appropriate affidavit or affidavits as may

11

be necessary to evidence same in accordance with Treasury Department Regulation 1.1445-2T(b)(2)(iii).

(b)   Buyer's Certification.  Buyer certifies and affirms that Buyer is not a "foreign person" within the meaning of the federal International Investment Survey Act of 1976, as amended, 22 U.S.C. §3101, et seq.  Buyer will execute at or prior to the Closing Date such appropriate affidavit or affidavits as may be necessary to evidence the same.

14.   Like-Kind Exchange.  Seller may transfer or convey the Property to Buyer as a like-kind exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, through the use of a qualified intermediary; provided that the like-kind exchange does not delay Closing or affect any obligation or requirement of this Agreement, that certain Agreement to Purchase and Sell Real Estate between the parties related to the parking lot ("Parking Lot Agreement") or the Multi-Party Agreement.  If Seller elects, in its sole discretion, to convey or transfer the Property pursuant to such a like-kind exchange, Buyer shall cooperate with Seller in good faith to effect such exchange.  Buyer shall not incur any additional costs as a result of Seller's election to convey or transfer the Property pursuant to a like-kind exchange.

15.   Headings.  The headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation of this Agreement.

16.   Merger.  All understandings and agreements heretofore had between the parties, oral or written, are merged into this Agreement, which alone fully and completely expresses their understanding.

17.   Modification.  This Agreement shall not be modified or amended except by a written instrument duly executed by the parties hereto.

18.   Binding Effect And Assignment.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto.  Neither party shall assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld.  Any attempted assignment without such prior written consent shall be void.

19.   Governing Law.  This Agreement shall be construed and governed in accordance with the laws of the State of New Jersey.

20.   Prohibition Against Recording.  Neither Buyer nor Seller shall cause this Agreement, nor any part or memorandum thereof, to be placed or filed of record.

21.   **Modified Time Of The Essence.**  If full performance of this Agreement is not completed by the Closing Date, either party shall have the right thereafter to declare time to be of the essence of this Agreement by giving written notice thereof to the other party.  Such notice shall contain a declaration that time is of the essence and shall fix the time, place and date of final settlement, which date may not be sooner than thirty (30) days following the effective date of such notice.

22.   **Survival.**  Sections 2(b),  5, 7 and 8 shall survive the Closing and the consummation of the transaction contemplated by this Agreement.

23.   **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute an original of this Agreement, but all such counterparts shall constitute one and the same instrument.

13

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:                                   SELLER:
                                           A. P. NEW JERSEY, INC.

By: _____                  By: _____

                                           Its: _____


WITNESS:                                   BUYER:
                                           NORTH RIVER MEWS ASSOCIATES, LLC

By: _____                  By: _____
                                           North River Mews, Inc., Managing Member
                                           Fred A. Daibes, President

14

__IN WITNESS WHEREOF__, the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:

By: _____

SELLER:
A. P. NEW JERSEY, INC.

By: _____

Its: _____

Schedule 5(a)

Litigation

Complaint filed in Tax Court of New Jersey contesting 1997 real property tax assessments on 700 River Road, Block 74, Lot 1 and 732 River Road, Block 71, Lot 2.

SCHEDULE 7C

ENVIRONMENTAL REPORTS

Renaissance Square, Edgewater, New Jersey - Appendix G - General Site PCB Contamination Characterization (includes Exhibit 1, 2 and 3) prepared by Paulus Sokolowski and Sartor Inc. dated September 1986.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 1 prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 2 Appendices A-F, prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 3 Appendices G-I, prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Interim Response Action Final Report - A.P. New Jersey, Inc. - prepared by Metcalf & Eddy, Inc. dated September 1993.

Detailed Options Evaluation Report - Aluminum Company of America - Edgewater, New Jersey (DERS Project No. 3589) prepared by DuPont Environmental Remediation Services dated July 11, 1996.




## EXHIBIT "A"

THE PROPERTY to be conveyed shall consist of all those parcels of land and premises situate, lying and being in the Borough of Edgewater in the County of Bergen and State of New Jersey, more particularly described as follows:

## PARCEL A

BEGINNING at the intersection of the Southerly line of Russell Avenue and the Westerly line of River Road; thence

    (1)  Along the Westerly line of River Road South 21 degrees 41' 51" West a distance of 84.55 feet to a point; thence

    (2)  Along the Westerly line of River Road South 20 degrees 58' 51" West a distance of 132.06 feet to a point; thence

    (3)  Along the Westerly line of River Road forming a curve to the right with a radius of 283.97 feet (or 300.47 feet as the case may be) and an arc distance of 98.13 feet to a point; thence

    (4)  Along the Westerly line of River Road South 40 degrees 46' 51" West a distance of 154.71 feet to a point; thence

    (5)  Along the Westerly line of River Road South 40 degrees 43' 51" West a distance of 213.02 feet to a point; thence

    (6)  Along the Westerly line of River Road South 37 degrees 05' 21" West 157.71, to a spike in the pavement at the intersection of the Westerly line of River Road and the Northerly line of Vreeland Terrace; thence

    (7)  Along the Northerly line of Vreeland Terrace North 53 degrees 38' 09" West a distance of 463.00 feet to the Easterly line of Undercliff Avenue; thence

    (8)  Along the Easterly line of Undercliff Avenue North 23 degrees 23' 51" East a distance of 162.02 feet to a point; thence

    (9)  Along the Easterly line of Undercliff Avenue North 27 degrees 21' 56" East 204.30 feet to a point; thence

    (10)  Along the Easterly line of Undercliff Avenue North 27 degrees 38' 51" East 463.84 feet to a point on the Southerly line of Russell Avenue; thence

(11) Along the Southerly line of Russell Avenue South 54 degrees 54' 09" East a distance of 566.09 feet to the point and place of beginning.

EXCEPTING, however, from the above described parcel all that parcel of land known as The Edgewater Cemetery and bounded and described as follows:

BEGINNING at a point which point is North 23 degrees 00' 16" East a distance of 161.72 feet from the intersection of the Westerly line of River Road with the Northerly line of Vreeland Terrace; thence

(1)  Parallel with the Northerly line of Vreeland Terrace North 53 degrees 38' 09" West a distance of 340.63 feet to a point; thence

(2)  North 35 degrees 08' 31" East a distance of 185.11 feet to a point; thence

(3)  South 54 degrees 51' 29" East a distance of 233.25 feet to a point; thence

(4)  South 35 degrees 08' 31" West a distance of 54.64 feet to a point; thence

(5)  South 54 degrees 51' 29" East a distance of 107.28 feet to a point; thence

(6)  South 35 degrees 07' 57" West a distance of 137.74 feet to a point and place of beginning.

SAID PREMISES are known as Lots 1, 2 and 3 in Block 74 as shown on the Tax Map of the Borough of Edgewater.

BEING the same premises conveyed as Parcel 1 to Amland Properties Corporation by Indenture between 700 River Road Realty, dated January 3, 1983 and recorded January 3, 1983 in the Office of the Clerk of Bergen County in Deed Book 6728, page 760.

**EXHIBIT 2**

# EXHIBIT A

02/24/99  WED 11:06 FAX

## MULTI-PARTY PROPERTY ACQUISITION AGREEMENT

THIS AGREEMENT made this __27th__ day of __June__, 1997

BETWEEN:      **A.P. NEW JERSEY, INC.,**
a New Jersey Corporation
(hereinafter called "A.P.")

AND:      **COUNTY OF BERGEN**
A Body Politic and Corporate
of the State of New Jersey
(hereinafter called the "County")

AND:      **NORTH RIVER MEWS ASSOCIATES, L.L.C.**
a New Jersey Limited Liability Company
(hereinafter called "North River")

AND:      **RIVER ROAD IMPROVEMENT PHASE II, INC.**
A New Jersey Corporation
(hereinafter called the "RRIP")

### WITNESSETH:

WHEREAS, North River is the fee owner and/or contract owner of certain lands under development or subject to plans for development, such lands being adjacent or in proximity to a segment of River Road (Phase II) located in the Borough of Edgewater, County of Bergen, State of New Jersey, as designated on a County plan entitled "Phase II River Road"; and

WHEREAS, the various projects and developments have been or are in the process of being designed and/or approved by the Bergen County Planning Board and Borough of Edgewater in connection with Phase II River Road; and

WHEREAS, said Bergen County approvals provide for certain work to be performed on portions of Phase II River Road, including the extension, realignment and

improvement of segments of same, as set forth on certain preliminary plans prepared by the County of Bergen; and

WHEREAS, the work for Phase II River Road is set forth in that certain Agreement dated November 1, 1996 between the Borough of Edgewater, County of Bergen and Edgewater Residential Community, L.L.C. ( hereinafter called "ERC"); and

WHEREAS, the project is known as New River Road (Phase II) and involves the construction and reconstruction and realignment along portions of existing River Road and the acquisition of certain other properties currently owned or under contract of purchase by ERC to facilitate the new alignment to construct and install other private and public facilities; and

WHEREAS, it has been determined by the respective governing bodies of the Borough of Edgewater and County of Bergen that portions of existing River Road and improvements thereon are unsightly and detrimental to the re-development of the area including, without limitation, areas at the intersection of River Road and Dempsey Avenue, areas in the vicinity of the post office Mail Bag Facility and areas in proximity to the former Alcoa plant and Binghamton Complex including on site conditions, its improvements, entrances and exits; and

WHEREAS, the execution of the  Phase II River Road plans involves participation and cooperation by the County of Bergen, the Borough of Edgewater and ERC to perform required work as set forth on the County Plans; and

WHEREAS, the Borough of Edgewater has by its Resolution dated August 12, 1996, approved and endorsed the conceptual County plan entitled "Phase II River Road" dated July 30, 1995, consisting of Sheets 1 through 4, for the redesigning and realignment

2

of a portion of River Road (Phase II) by the County of Bergen, which redesign and realignment is the subject matter hereof; and

WHEREAS, ERC has agreed to perform the work referred to in the Phase II River Road plans and in accordance with construction plans to be prepared by Boswell Engineering Co. ("the Boswell Plans"), such work commencing at the northerly property line of Hess Oil located on River Road north to and including its intersection with Route 5, extending to a point approximately sixty (60) feet north of said intersection, all of which work shall be completed in accordance with the Boswell Plans and specifications and approved by the County of Bergen; and

WHEREAS, in addition to the work set forth in the Tri-Parte Agreement between the Borough of Edgewater, County of Bergen and ERC, certain other work is deemed necessary by the County of Bergen to fully execute and safely implement the Phase II River Road plan including, without limitation:

a)   Road improvements per the Boswell Plans;

b)   Relocation of utilities, sewer, water, gas, electric;

c)   Traffic signalization, relocation and new installations;

d)   Demolish and removal and/or relocation of buildings and structures within or in close proximity of the proposed right of way of Phase II River Road;

e)   Removal, remediation, and abatement of conditions, structures or other improvements which, in the opinion of the County negatively impact on the efficient and safe movements of vehicular and pedestrian traffic on Phase I and Phase II River Road.

3



In connection with the above objectives and criteria, the County has taken into its planning consideration the public elementary school in close proximity to River Road and Russell Avenue, (the Alcoa property), as well as the residential areas surrounding same.

WHEREAS, ERC has agreed to acquire and convey or cause to be conveyed and dedicated for roadway purposes to the County of Bergen, by Deed of Easement and/or conveyance in fee, the right of way for road purposes as set forth in the Phase II River Road plans, to the following properties:

1. Lands comprised of the former Right of Way of the Susquehanna Railroad abutting the Binghamton Complex and the Alcoa Property ("A.P.") on both sides of Russell Avenue and existing River Road in the general vicinity of the Alcoa property ("A.P.") on River Road;

2. Lands comprised of the PMG Realty Associates, L.L.C. property, formerly known as the J. Fletcher Creamer Property, and access easement abutting existing River Road;

3. Lands comprised of the former Right of Way of the Susquehanna Railroad abutting the U.S. Postal Mail Bag Repair Facility and existing River road;

4. All right-of-way required through properties of the Borough of Edgewater, the current Municipal Parking Lot, the Department of Public Works Garage Property, the Ferry Plaza Building, the property owned by Ferry Bank Associates, L.P., property owned by Borough Associates, L.P. (formerly Ferry Plaza North), and

4

A&D Marine, Inc. and including the Route 5 River Road intersection and extending to a point approximately sixty (60) feet northerly of said intersection and as shown on the Phase II River Road plans; and

WHEREAS, certain properties required for the roadway improvement, as set forth on the Phase II River Road plans, are not under the control or current ownership of the County or ERC and require acquisition by the County, North River, or ERC respectively, and specifically property owned by A.P., also known as Alcoa property and buildings, the U.S. Postal Mail Bag Facility, and the Ferry Plaza Office and Retail Building; and

WHEREAS, ERC has agreed to contribute the sum of $3,852,698.00 to the Borough and County jointly toward the acquisition of such properties (excepting the A.P. property) and the construction of segments of the new roadway (Phase II River Road) and further to give the County an appropriate guarantee, Letter of Credit, Bond or similar security in form and content satisfactory to Bergen County Counsel, for the performance of the roadwork and ancillary work contemplated herein and set forth on the Phase II River Road plans and the Boswell Plans, drawings and specifications and approved by the County of Bergen; and

WHEREAS, the County, as a participant, agrees to contribute a total sum of $5,000,000 for the purposes of road construction and inspection, including the sum of $1,000,000 for such other public and private costs related to the acquisition, reconstruction and inspection of ancillary facilities of New River Road (Phase II) which funds shall be disbursed to the Borough and ERC for such use; and

5

WHEREAS, the road construction by ERC shall also include segments of New River Road (Phase II) extending from the Route 5/River Road intersection to an area at the property north of Hess Oil Co. and existing River Road, as set forth on the County plans and the Boswell construction plans and specifications; and

WHEREAS, the County has determined that the demolition and removal of the structures upon the A.P property are required for the efficient and safe movement of vehicular and pedestrian traffic, and said demolition and removal is in the best interest of the general public and region as a whole; and

WHEREAS, A.P. has agreed to pay RRIP, as set forth in this Agreement, for the demolition, removal and remediation of the structures on the A.P. property provided, however, that the funds shall be administered and disbursed by the County of Bergen, and provided further that said demolition, removal and remediation is supervised, inspected and guaranteed by the County of Bergen; and

WHEREAS, A.P. and the County, as a condition to said funding shall review and approve the demolition and remediation plan prepared by RRIP and approved by New Jersey Department of Environmental Protection ("DEP"), which shall, when completed and approved, provide and guarantee to A.P. and Alcoa the issuance of a No Further Action letter from DEP in form acceptable to A.P.

NOW, THEREFORE, in consideration of the premises and of such mutual promises, covenants and undertakings, the parties hereto agree as follows:

I.     AP agrees to sell and North River agrees to buy that property located on River Road in the Borough of Edgewater known as the "Alcoa Property; as more fully described in the Purchase and Sale of Real Estate Agreement.

6

2.     North River and RRIP agree that they will cause to be demolished and removed from the AP property all structures and improvements currently existing on the property. Said demolition and removal shall be completed in accordance with the Remedial Action Workplan submitted to the DEP and the demolition plan reviewed and approved by AP.

3.     AP agrees to pay to RRIP the sum of $9,500,000 for the demolition and removal of the structures as described in paragraph 2 above. In addition, AP agrees to pay to RRIP costs of disposal of PCB-contaminated material (PCB concentrations greater than 50 ppm) at approved TSCA landfills, if those disposal costs exceed $250,000.00, up to a maximum of $2,500,000.00. AP's total liability for demolition of the structures and disposal of waste material will not exceed $12,000,000.00.

4.     The County shall supervise the demolition of the A.P. property and shall administer the disbursement of funds to RRIP with the funds provided to it by A.P. A.P., upon the execution of this Agreement, shall make an initial deposit with the County of Bergen in the sum of $2,000,000 to be disbursed in accordance with the terms of this Agreement. The RRIP shall make periodic requisitions for demolition, removal and the related work completed, and said requisitions shall be funded at a minimum of once per month, or more frequently as the approved demolition and removal schedule may require. Upon satisfactory monthly inspections, the County shall, upon notice to A.P., forthwith authorize the disbursement of funds to RRIP.

AP will provide additional funds to the County of Bergen in the amount of, and upon receipt of, approved requisitions from RRIP for work performed on the demolition

7

and removal of the structures. AP shall continue to provide funds to the County of Bergen until the County of Bergen has received sufficient funds to satisfy AP's liability to RRIP for the demolition and removal of the structures.



5.     The acquisition of the A.P. property and the demolition, removal and remediation of the A.P. (Alcoa) buildings and structures shall be performed at the same time as construction of New River Road (Phase II) which shall be performed by ERC or its agents, in accordance with the Boswell Plans and specifications.

6.     Upon commencement of the roadway construction and upon the request of Bergen County, A.P. and North River shall execute Deeds of Easement or fee title (at the County's option) and make such Right of Way dedications in favor of the County as may be required to implement the Phase II River Road plans in the general area of the A.P. property on existing River Road.

7.     It is the intent of the parties that the excess portions of land acquired by the County and purchased by North River or ERC shall be deeded and/or abandoned by the County to North River or ERC. All legal formalities to accomplish this will be implemented by the County in an expeditious manner.



8.     AP shall fund the demolition, removal and remediation . as set forth in paragraph 4 of this Agreement. The construction and reconstruction of segments of New River Road (Phase II) shall be the sole responsibility of ERC and the County jointly, pursuant to the Developer's Agreement dated November 1, 1996, as amended.

9.     RRIP shall deposit with the County of Bergen a Performance Bond or Letter of Credit in an amount over and above the estimated demolition costs of $12,000,000. Said bond of RRIP to the County of Bergen shall be in form approved by

Bergen County Counsel's office and it shall fully guarantee the demolition and removal costs of the A.P. buildings and structures in a manner and schedule previously approved by DEP, the County, and A.P.

10.     The County guarantees to AP that the demolition and removal of the AP structures and building will be completed as provided in the the Remedial Action Workplan and the approved demolition plan. This guarantee is effective and enforceable only if AP is not in default of its obligations set forth in paragraph 4 of this Agreement.

11.     The County of Bergen, RRIP and North River agree to re-use the rubble from the demolished structures that are not contaminated with PCB's greater than 50 ppm in accordance with applicable New Jersey laws.

12.     ERC agrees that portions of the various drainage facilities which are constructed within the areas adjacent to the County Road shall be conveyed to and become the property of the County, and the County may make such other drainage connections thereto as it may desire, provided that such other connections shall not interfere or negatively impact on proper drainage of the lands of the ERC.

13.     The County shall from time to time, but not less than two times per month, be responsible for the periodic inspection of the work performed by ERC and RRIP. All costs and expenses of such inspections shall be paid by RRIP and shall be over and above the estimated cost of demolition, removal and remediation of A.P. property. RRIP shall request inspections of completed work by the County at least five (5) days prior to disbursement of funds attributable thereto. The requisitions for payment of completed work shall be made by RRIP to the County with notice to A.P. Approval by the County shall be required prior to funding said requisition.

9

14. RRIP shall notify the DEP, County Department of Public Works and County Engineer, in writing, at least five (5) days prior to the commencement of any demolition, removal or remediation work affecting the A.P. property and, to the extent required, the commencement of construction of segments of (Phase II) New River Road at the intersection of Russell Avenue and River Road.

15. Upon the execution of this Agreement by RRIP and the County, RRIP shall within thirty (30) days, furnish to the County, with a copy to A.P., the demolition, removal and remediation plans and schedules. Same are to be prepared by RRIP in conjunction with the approved environmental consultant and engineer. Said plans shall be approved by DEP, A.P. and the County.

16. It is understood and agreed that North River and RRIP shall defend and save the County and A.P. harmless from any and all claims that may be filed in any Court arising from the performance of this Agreement. In connection with the defense of any claim, the County and A.P. shall be entitled to select their own counsel. The County and A.P. shall fully cooperate in any such litigation provided, however, that neither the County nor A.P. shall be under any obligation to expend any funds for any purpose whatsoever in connection with such litigation. Should the County or A.P. be named as a party in any court, administrative or other action or proceeding, North River and RRIP agree to reimburse the County and/or A.P. (as applicable) for the cost of any legal, expert or other fees expended by the County and/or A.P. in such action or proceeding.

17. Incorporated herein and made a part hereof are the following documents:

a) the Developer's Agreement between ERC and Bergen County;

b) the Joint Reports, with reference to site plan nos. 2618 R-1 and 2366 R-1;

c) the Joint Report requirements of other developments which will participate in Phase II River Road reconstruction, including without limitation, A&D Marine, PMG Realty, L.L.C., Kings Ferry, Inc., Ferry Bank Associates, Borough Associates, L.P., North River Mews Residential Development (A.P.) and others, including the owners of property known as the U.S. Mail Bag and Ferry Plaza Building;

d) the Resolution of the Borough dated September 16, 1996, which authorizes, inter alia, the Borough's participation in Phase II and the commitment to promptly cooperate in the acquisition of properties necessary to complete Phase II River Road and the other improvements set forth on the County Plans;

e) the Boswell Plans approved by the County of Bergen identified as follows:

"River Road Improvements Phase II"
Construction Plans
Bergen County, Borough of Edgewater, New Jersey
Sheets 1 through 4
Job No. 96-215

as may be revised from time to time upon the mutual consent of the parties.

18.    This project involving the A.P. property, shall be designated, for all intents and purposes, as an element of a local governmental improvement project with North River, RRIP, and County as participants.

The County, ERC, and North River shall review and approve the Phase II River Road design by Boswell and shall obtain all approvals and permits required for the construction of the Phase II New River Road segment, and specifically permits from all utility companies involved or affected by the roadway improvements.

11

In this connection RRIP, as contractor, shall participate in and coordinate the efforts of the County and Borough of Edgewater with respect to the utility companies and any other permits or approvals which are required to demolish the A.P. buildings and structures and to construct New River Road Phase II segment.

20.   A.P. will cooperate with the County, its engineering consultants, and RRIP in overseeing the performance of the demolition, removal and remediation work.

21.   This Agreement shall be binding on the parties hereto and their heirs, executors, administrators, successors and assigns.

22.   All parties hereto have the requisite power and authority to enter into this Agreement and it is the intention of the parties to be bound by the terms hereof. The execution and delivery of this Agreement is valid and binding upon the parties hereto and the genuineness of any and all corporate resolutions executed may be assumed to be genuine by the parties in receipt thereof.

23.   This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute an original of this Agreement, but all such counterparts shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Witness:                                    A.P. NEW JERSEY, INC.

_____          By: _____

                                            KEVIN L. MCKNIGHT,  Vice-President


Witness:                                    COUNTY OF BERGEN

_Carol Gurtel_                       By: _____
CAROL GURTEL                                WILLIAM P. SCHUBER
NOTARY PUBLIC OF NEW JERSEY          County Executive
My Commission Expires Aug. 11, 1998


Witness:                                    NORTH RIVER MEWS ASSOCIATES, L.L.C.

_____          By: _____

                                            North River Mews, Inc., Managing Member
                                            FRED A. DAIBES, President


Witness:                                    RIVER ROAD IMPROVEMENT PHASE II, INC.

_____          By: _____

                                            FRED A. DAIBES, President

13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Witness:                                        A.P. NEW JERSEY, INC.

_____          By: _____
                                                KEVIN L. MCKNIGHT, Vice-President


Witness:                                        COUNTY OF BERGEN

_____          By: _____
                                                WILLIAM P. SCHUBER
                                                County Executive


Witness:                                        NORTH RIVER MEWS ASSOCIATES, L.L.C.

_____          By: _____
                                                North River Mews, Inc., Managing Member
                                                FRED A. DAIBES, President


Witness:                                        RIVER ROAD IMPROVEMENT PHASE II, INC.

_____          By: _____
                                                FRED A. DAIBES, President

13

STATE OF NEW JERSEY  )
          ) :SS
COUNTY OF BERGEN   )

    BE IT REMEMBERED that on this 24th day of _June_____,

1997, before me the subscriber, A NOTARY PUBLIC_____ of the State of New Jersey,

personally appeared/who being by me duly sworn, did depose and make proof to my
          WILLIAM P. SCHUBER
              Executive
satisfaction that he is the County/_____ of the County of Bergen, a Body Politic

and Corporate of the State of New Jersey; that xxxxzxzxzxzxzxz is the

xzxzxzzxzxzxzxzxxzzxzxxzzx of said County of Bergen; that the execution, as well

as the making of this Instrument has been duly authorized by a proper Resolution of the

Board of Chosen Freeholders of the County of Bergen; that deponent well knows that

corporate seal of said County of Bergen; and that the seal affixed to said Instrument is

such corporate seal and by the said William P. Schuber, as and for his voluntary

act and deed and as and for the voluntary act and deed of the said County of Bergen.

Sworn and subscribed to before me
this _24_ day of _June_____, 1997

_____Carol Gurtel_____

    CAROL GURTEL
   NOTARY PUBLIC OF NEW JERSEY
  My Commission Expires Aug. 11, 1998

        14

STATE OF NEW JERSEY     )
                        )   :SS

COUNTY OF BERGEN     )

        **BE IT REMEMBERED** that on this _____ day of _____,

1997, before me the subscriber, Kevin L. McKnight of the Commonwealth of

Pennsylvania, personally appeared who being by me duly sworn, did depose and make

proof to my satisfaction that he is the Vice-President of A.P. NEW JERSEY, INC., the

Corporation named in the within instrument;

    that the execution, as well as the making of this instrument has been duly authorized by a

proper Resolution of the Board of Directors of said Corporation; and that the seal affixed

to said instrument signed and delivered by said President as for the voluntary act and

deed of said Corporation, in presence of deponent, who thereupon subscribed his name

thereto as attesting witness.


                              A.P. NEW JERSEY, INC.


                        _____

                          Kevin L. McKnight

Sworn and subscribed to before me
this _____ day of _____, 1997


_____

STATE OF NEW JERSEY      )

                        )    :SS

COUNTY OF BERGEN       )

BE IT REMEMBERED that on this ___ day of _____

1997, before me the subscriber, _____ of the State of New Jersey,

personally appeared who being by me duly sworn, did depose and make proof to my

satisfaction that he is the _____ of RIVER ROAD IMPROVEMENT

PHASE II, INC., the Corporation named in the within instrument; that

_____ is the President of said Corporation; that the execution, as well as

the making of this instrument has been duly authorized by a proper Resolution of the

Board of Directors of said Corporation; and that the seal affixed to said instrument signed

and delivered by said President as for the voluntary act and deed of said Corporation, in

presence of deponent, who thereupon subscribed his name thereto as attesting witness.

                        RIVER ROAD IMPROVEMENT PHASE II, INC.

Sworn and subscribed to before me
this ___ day of _____, 1997

16

STATE OF NEW JERSEY          )
                             )          :SS
COUNTY OF BERGEN             )

    BE IT REMEMBERED that on this 14th day of July 1997, before me the subscriber, _____ of the State of New Jersey, personally appeared who being by me duly sworn, did depose and make proof to my satisfaction that he is the Managing Member of NORTH RIVER MEWS ASSOCIATES, L.L.C., the Corporation named in the within instrument; that the execution, as well as the making of this instrument has been duly authorized by a proper Resolution of the Board of Directors of said Corporation; and that the seal affixed to said instrument signed and delivered by said President as for the voluntary act and deed of said Corporation, in presence of deponent, who thereupon subscribed his name thereto as attesting witness.

                                  NORTH RIVER MEWS ASSOCIATES, L.L.C.

Sworn and subscribed to before me
this 14 day of July, 1997

17

Do We need these???

**EXHIBITS**

1.   Bergen County Planning Board Application No. SP2618R-1

2.   Bergen County Planning Board Application No. SP2366R-1

3.   Borough of Edgewater Resolution No. R195-96

4.   River Road Phase II Edgewater Plans, Drawings 1 through 4

5.   No Further Action Letter (Form) - New Jersey Department of Environmental Protection

18

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:                                          A. P. NEW JERSEY, INC.

By: _Arthur Grunfarber_                    By: _____

                                                 Its: _Vice-President_

**EXHIBIT 3**

# EXHIBIT C

## ENVIRONMENTAL INDEMNITY AGREEMENT

**THIS AGREEMENT** made this 13ᵗʰ day of March, 1999.

BETWEEN:        A. P. NEW JERSEY, INC.
                      a New Jersey corporation
                      (hereinafter called "A. P.")

AND:              NORTH RIVER MEWS ASSOCIATES, L.L.C.
                      a New Jersey limited liability company
                      (hereinafter called "North River")

AND:              RIVER ROAD IMPROVEMENTS PHASE II, INC.
                      a Delaware corporation
                      (hereinafter called "River Road")

### WITNESSETH:

**WHEREAS,** North River is the owner of certain real estate located in the Borough of Edgewater, County of Bergen, State of New Jersey pursuant to an Agreement to Purchase and Sell Real Estate entered into on June 27, 1997, by and between North River and A. P. (the "Purchase Agreement") and a Transfer Deed executed by A. P. on August 25, 1997, and recorded on August 26, 1997 as Instrument Number 104092 (the "Property"); and

**WHEREAS,** North River, River Road, A. P. and the County of Bergen, New Jersey, were all parties to a Multi-Party Property Acquisition Agreement also entered into on June 27, 1997, whereby, inter alia, North River and River Road agreed that they would cause to be demolished all of the structures on the Property; and

**WHEREAS,** North River, River Road, A. P. and the County of Bergen, New Jersey, were all parties to a Funding Agreement entered into on September 23, 1997, whereby, inter alia, the parties agreed that, to the extent that Building 12 on the Property is not demolished, A. P. shall withhold or cause Bergen County to withhold payment of $500,000 of the demolition funding until, among other conditions, A. P. receives a "No Further Action" letter from the NJDEP covering all the entire Property, including Building 12; and

**WHEREAS,** North River presently does not intend to demolish Building 12.

**NOW, THEREFORE,** in consideration of the premises and of such mutual promises, covenants and undertakings, which the parties acknowledge to be received and sufficient, the parties hereto agree as follows:

1.     In addition to and notwithstanding any other agreement or obligation of the parties, to the extent that Building 12 is not demolished, North River and River Road shall indemnify, defend and hold A. P. harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages, occurring at any time before, during or after North River's ownership of the Property, relating to Building 12 and the land under and adjacent thereto, arising under Applicable Law (as defined in the Purchase Agreement), including, but not limited to, remediation and disposal costs and expenses related to PCBs.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

Witness:                                          **A.P. New Jersey, Inc.**

By: _____
    JOHN MILLETT, Vice President

Witness:                                          **North River Mews Associates, L.L.C.**

By: _____
    North River Mews, Inc., Managing
    Member, FRED A. DAIBES,
    President

Witness:                                          **River Road Improvements Phase II, Inc.**

By: _____
    FRED A. DAIBES, President

STATE OF NEW JERSEY      :
                      :    ss:
COUNTY OF BERGEN      :

    *BEFORE ME*, a Notary Public, in and for said State, personally appeared Fred A. Daibes, President of North River Mews, Inc., which is the managing member of North River Mews Associates, L.L.C., a New Jersey limited liability company, and President of River Road Improvements Phase II, Inc., and stated and acknowledged that he was duly authorized in his capacities to execute the foregoing instrument for and in the name and behalf of the company and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration and purposes therein mentioned and set.

    WITNESS my hand and official seal on this 15th day of March, 1999.

                                     Notary Public
                                      MARK J. SOKOLICH
                                      Attorney at Law
                                      State of New Jersey

COMMONWEALTH OF PENNSYLVANIA    :
                                    :    ss:
COUNTY OF ALLEGHENY          :

    *BEFORE ME*, a Notary Public, in and for said State, personally appeared John Millett, Vice President of A.P. New Jersey, Inc., and stated and acknowledged that he was duly authorized in his capacity to execute the foregoing instrument for and in the name and behalf of the company and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration and purposes therein mentioned and set.

    WITNESS my hand and official seal on this 15th day of March, 1999.

                                        Notary Public
                                      MARK J. SOKOLICH
                                      Attorney at Law
                                      State of New Jersey

**EXHIBIT 4**

Timothy E. Corriston
Connell Foley LLP
85 Livingston Avenue
Roseland, NJ 07068
Tel: (973) 535-0500
Fax: (973) 535-9217
Attorneys for Plaintiff
Borough of Edgewater

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER, | Civil Action No.:2:14-CV-05060 (ES-MAH) |
| Plaintiff, | |
| v. | *Electronically Filed* |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALCOA INC. (formerly known as "Aluminum Company of America"); ALCOA DOMESTIC LLC, as successor in interest to A.P. NEW JERSEY, INC.; JOHN DOES 1-100; and ABC CORPORATIONS 1-100 | **SECOND AMENDED COMPLAINT** |
| and | |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; AND FRED A. DAIBES, | |
| Defendants/Third Party Plaintiffs, | |
| v. | |
| NEGLIA ENGINEERING ASSOCIATES, | |
| Third Party Defendants | |

3387813-1

and

ALCOA DOMESTIC, LLC as successor in interest
to A.P. NEW JERSEY, INC.,

      Defendant/Third-Party Plaintiff,

v.

COUNTY OF BERGEN and RIVER ROAD
IMPROVEMENT PHASE II, INC.,

      Third-Party Defendants.

Plaintiff Borough of Edgewater ("Edgewater" or "Plaintiff") by way of Second Amended Complaint against WATERSIDE CONSTRUCTION, LLC ("Waterside"); 38 COAH, LLC ("38 COAH"); DAIBES BROTHERS, INC. ("Daibes Brothers"); NORTH RIVER MEWS ASSOCIATES, LLC ("North River"); FRED A. DAIBES ("Fred Daibes" or "Mr. Daibes"); TERMS ENVIRONMENTAL SERVICES, INC. ("TERMS"); ALCOA INC. (formerly known as "Aluminum Company of America") and ALCOA DOMESTIC LLC, as successor in interest to A.P. NEW JERSEY, INC.; John Does 1-100; and ABC Corporation 1-100 hereby alleges as follows:

**THE PARTIES**

1.    Edgewater is a is a municipal corporation organized under the laws of the State of New Jersey with its principal place of business located at 55 River Road, Edgewater, Bergen County, New Jersey.

2

2.      Waterside is a New Jersey limited liability company with offices at 22 Route 5, Edgewater, Bergen County, New Jersey.   Waterside is an affiliate, subsidiary or otherwise related to 38 COAH, Daibes Brothers, and Fred Daibes.

3.      38 COAH is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, Edgewater, Bergen County, New Jersey. 38 COAH is an affiliate, subsidiary or otherwise related to Waterside, Daibes Brothers, and Fred Daibes. 38 COAH is the present owner and/or person otherwise responsible for the Alcoa Site as defined herein.

4.      Daibes Brothers is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, Bergen County, New Jersey.   Daibes Brothers is an affiliate, subsidiary or otherwise related to Waterside, 38 COAH, and Fred Daibes.

5.      North River is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, Bergen County, New Jersey. North River is an owner and/or person otherwise responsible for the Alcoa Site as defined herein.

6.      Fred Daibes is an individual with offices at 22 Route 5, Edgewater, Bergen County, New Jersey.  Fred Daibes owned and/or controlled Waterside, 38 COAH, North River and Daibes Brothers.

7.      TERMS is a New Jersey corporation with offices at 599 Springfield Avenue, Berkeley Heights, New Jersey.   TERMS was the environmental consultant and licensed site remediation professional for Edgewater for Veteran's Field as defined herein.

8.      ALCOA   INC. (formerly   known   as "Aluminum   Company   of   America") ("ALCOA") is a Pennsylvania Corporation with offices at 201 Isabella Street, Pittsburg,

Pennsylvania 15212.  ALCOA is a prior owner, operator and/or generator is responsible for the contamination at the Alcoa site as defined herein.

9.      ALCOA DOMESTIC, L.L.C. is the successor-in-interest to A.P. NEW JERSEY, INC. which is a Pennsylvania Corporation with offices at 201 Isabella Street, Pittsburg, Pennsylvania 15212 and is a prior owner, operator and/or generator is responsible for the contamination at the Alcoa site as defined herein (jointly "ALCOA Domestic, LLC").

10.     Defendants John Does 1-100 are others currently unknown who have generated, transported, or are otherwise responsible for the lease of hazardous substances at Veteran's Park.

11.     Defendants ABC Corporation 1-100 are others currently unknown who have generated, transported, or are otherwise responsible for the lease of hazardous substances at Veteran's Park.

## JURISDICTION AND VENUE

12.     This action arises under the federal law, Sections 107(a) an 113(b) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. §9601 et seq. ("CERCLA"), 42 U.S.C. §§9607(a) and 9613(b), and for violations of New Jersey State law.  In addition, the Declaratory Judgments Act, 28 U.S.C. §2201, and Section 113(g)(2) of CERCLA, 42 U.S.C. §9613(g)(2), authorize this Court to grant Plaintiff declaratory relief.

13.     This is a Civil Action over which the United States District Court has original jurisdiction pursuant to 28 U.S.C. §1331.

14.     This court also has supplemental jurisdiction over Plaintiff's state law claims for relief pursuant to 28 U.S.C. §§1388 and 1367(a)  and for the additional reason that those claims

4

are joined with substantially related claims and arise out of the same common nucleus of operative facts and Plaintiff's federal law claims.

15.     This court is one of proper venue because all parties either have a principal place of business or are authorized to do business in the State of New Jersey. This court is also one of proper venue pursuant to Section 113(b) of CERCLA, 42 U.S.C. §9613(b), because the releases or threatened releases alleged herein occurred in the District of New Jersey.

## BACKGROUND

16.     Veteran's Field is located at 1167 River Road, Edgewater, New Jersey and is known as Block 30, Lot 1 on the Tax Map for the Borough of Edgewater ("Veteran's Field" or the "Site"). It consists of approximately 27.58 acres consistent of a public park with fields, courts, playgrounds, picnic area, and community center. The majority of the Site had previously been covered by lawn, soil, and wood chip areas with the remaining areas consisting of paved parking, walkways, and courts.

17.     In 2011, in conjunction with proposed improvements to Veteran's Field, Edgewater retained TERMS to conduct an initial investigation of the Site to assess historic contaminated fill at Veteran's Field.

18.     The results of TERMS' 2011 site investigation revealed "hot spot" areas on the Site that were noted to contain slightly elevated levels of certain contaminants, including Metals, Polychlorinated Biphenyls ("PCB") Polycyclic Aromatic Hydrocarbons ("PAH") and Extractable Petroleum Hydrocarbons ("EPH").

19.     The results of TERMS' 2011 site investigation revealed that PCBs were detected in historic fill on the Site, in four isolated areas, slightly in excess of the New Jersey Department

5

of Environmental Protection's ("NJDEP") residential direct contact soil remediation standard of 0.2 mg/kg. The highest concentration of PCBs detected at the time of TERMS' 2011 site investigation was 2.5 mg/kg.

20. In order to address the historic fill contamination identified in the 2011 site investigation revealed, TERMS prepared a Remedial Action Workplan ("RAW"). Pursuant to the RAW, the remediation of Metal, PCB, and EPH-impacted areas was accomplished using excavation, off-site disposal, and verification post excavation sample results. This method was designed as a permanent and effective method to remove of all of the aforementioned known contamination at the Site, with the exception of the PAH contamination.

21. The RAW addressed the PAH soil contamination by proposing to cover the historic fill soils with an engineering control in the form of a cap consisting of two (2) foot of clean fill and a demarcation geotextile fabric. Also, an institutional control, in the form of a deed notice was proposed for the entire Site to resolve PAH soil contamination from historic fill.

22. Subsequent to the excavation and off-site disposal of these areas, post excavation sample results collected by TERMS indicated that PCB concentrations in existing soils related to historic fill were below NJDEP's residential direct contact soil remediation standard of 0.2 mg/kg. These soils were identified to contain only PAH contamination. The RAW specifically required existing PAH contaminated soils to be capped with two (2) foot of clean fill and a demarcation geotextile fabric and that the imported clean fill soils were to be tested and approved prior to placement on the Site in accordance with NJDEP's Alternative and Clean Fill Guidance for Site Remediation Program Sites Updated December 29, 2011 Version 2.0.

6

23.     In or about 2012, Edgewater and TERMS entered into a valid contract (the "TERMS Agreement"), pursuant to which TERMS agreed to serve as the environmental consultant and Licensed Site Remediation Professional ("LSRP") for the Veteran's Field Project.

24.     As the environmental consultant and LSRP, TERMS was the gatekeeper and responsible for undertaking the testing of any fill material brought to or utilized at the Site.

25.     At all times TERMS had control over the process for importing fill to the Site and was responsible for developing and implementing the plan to sample, analyze, and approve the fill material prior to it being utilized at the Site.

26.     On or about June 27, 2012, Edgewater issued a bid notice for Veteran's Field Improvement Project ("Veteran's Field Project" or "Project").

27.     The scope of the work in the bid notice consisted of the remediation of Veteran's Field per the RAW and the installation of baseball fields and soccer field, along with associated drainage and grading.  The Project also included the installation of a playground and parking lot. The bid notice for the Veteran's Field Project required certified stone from a quarry or crushed virgin stone to be used to raise the elevation of the entire facility approximately four (4) feet.

28.     The bid notice for the Veteran's Field Project required certified stone from a quarry or crushed virgin stone to be used as fill in certain areas of the Site and, specifically, to be used for the two (2) foot of clean fill to cap existing PAH contaminated soils.

29.     On or about June 27, 2012, pursuant to public contract law, the contract for the Veteran's Field Project was awarded to Waterside, the low bidder.  The contractual documents specifically provided that time was of the essence and that the final completion date for the

7

Project was April 2013.  On behalf of Waterside all of the contractual documents were executed by defendant, Fred Daibes.

30.     In the summer of 2012, Waterside commenced work on the Veteran's Field Project.  The initial phase of the Project was the removal of the contaminated historic fill material.

31.     After the contaminated historic fill material was removed, work began to cap Site soils with two (2) foot of clean fill and a demarcation geotextile fabric.  In accordance with the contractual documents for the Project, TERMS required Waterside to submit, for testing and approval, all fill material that was not provided from an approved site.

32.     After the contaminated historic fill material was removed and pursuant to the contractual documents for the Project, TERMS approved certain fill materials that had been tested and/or certified as clean fill to be imported to the Site by Waterside and used as part of the cap.

33.     In late October 2012, the Project was suspended due to Superstorm Sandy.

34.     The Project resumed in late spring of 2013.  Pursuant to FEMA requirements, the grade of the Project was increased and, as a result, the amount of fill required to cap Site soils increased.

35.     Thereafter, importation continued of approved fill materials that were used as part of the cap for Site soils.

36.     On numerous occasions prior to September 7, 2013, TERMS rejected as unfit fill materials proposed to be utilized by Waterside to cap Site soils.  As a result, Waterside became

8

so frustrated with TERMS' rejection of proposed fill materials that Waterside attempted to have TERMS and some of its employees removed from the Project.

37.     On September 6, 2013, Waterside advised Jason Menzella, the Site supervisor for the Borough Engineer, Neglia Associates, that it would not be performing any work on Saturday, September 7, 2013 and that a concrete pour scheduled for that day would be performed on Friday, September 6, 2013.

38.     In the afternoon of Saturday, September 7, 2013, however, Mr. Menzella, while driving by the site, observed Waterside (contrary to its prior representations) working at the Site. Upon his arrival, Mr. Menzella observed Waterside employees intentionally covering up suspect fill materials that had not been previously on the Site and, to his knowledge, had not been approved for use on the Site.

39.     On September 7, 2013, Mr. Menzella was advised by a Waterside employee that Fred Daibes had just left the Site, but had been present all day.  The employee could not explain why Waterside was intentionally covering up the suspect fill materials.  The employee advised Mr. Menzella that he was just working as instructed and was told to get the work done "today."

40.     On Monday, September 9, 2013, Ronald Dooney of TERMS went to the Site to inspect the suspect fill materials that were utilized at the Site and were observed by Mr. Menzella.  At that time, all of the suspect fill materials had been covered up with clean and/or approved fill material.

41.     On September 9, 2013, representatives of Waterside misrepresented to Mr. Dooney that the suspect fill materials were only utilized in the outfield area of the Little League

9

field. On September 9, 2013, Mr. Dooney instructed Waterside not to utilize any more of the suspect fill materials or disturb the piles of it remaining on the Site.

42. Based upon the representations of Waterside that it would not use the suspect fill materials or disturb the piles of it remaining on the Site, TERMS did not, at that time, require Waterside to cease the work it was performing in the north parking lot and the other areas of the Site.

43. Unbeknownst to Edgewater and despite its representations to the contrary, Waterside had previously and continued to utilize the suspect fill materials in the parking lot areas and throughout the fields on the Site.

44. In or about September 2013, TERMS collected samples from two piles of the suspect fill materials remaining on the Site. The sample results revealed the suspect fill materials were contaminated with, *inter alia*, PCBs at concentrations at a range of 100 mg/kg that was a magnitude of thousands of times higher than NJDEP's soil remediation standards. TERMS visually classified the piles as containing crushed concrete.

45. Thereafter, in order to determine the extent of the contamination associated with the suspect fill materials used on the Site by Waterside, TERMS collected samples from several locations on the Site where Waterside had performed construction activities. The results revealed that fill materials used as a base material throughout the Site were contaminated and contained crushed concrete with, *inter alia*, high levels of PCB concentrations, ranging from 100 to 350 mg/kg.

46. As a result of these sample results demonstrating extensive PCB and other contamination throughout the Site associated with the suspect fill materials imported to the Site

10

by Waterside, on October 3, 2013 TERMS issued a letter to Edgewater advising that Waterside had imported improper fill that contained high levels of PCBs and other contaminants to Veteran's Field and, as a result, TERMS was immediately closing the Site until TERMS could perform a complete assessment of the entire Site.

47.     Despite being instructed that the Site was closed, Waterside continued to work at the Site, which necessitated the placing of locks on the Site.

48.     From September to November 2013, TERMS collected and analyzed approximately 150 soil samples to assist in identifying the vertical and horizontal limits of the releases caused by Waterside's improper importation of fill materials contaminated with PCBs and other contaminants to the Site.

49.     The results of this investigation indicated that contaminated fill materials improperly imported to the Site by Waterside contained PCB, Metals, PAH and pesticides concentrations in excess of NJDEP standards and were used throughout the Site.

50.     The results of the investigation also indicated that Waterside randomly placed fill materials contaminated with PCBs and other contaminants throughout the Site and blended contaminated fill materials with other fill materials.   The investigation indicated that the improper manner in which the contaminated fill materials were processed and spread cross-contaminated previously approved fill materials used on the Site.

51.     The investigation also indicated that surface impacts resulted from the improper release of contaminated fill materials throughout Veteran's Field by Waterside due to, e.g., cross-contamination from construction activities and/or being spread by dust or runoff.

3387813-1

52.     The investigation concluded that an estimated minimum volume of 25,000 cubic yards of soil contain elevated PCB levels as a result of the improper release of contaminated fill materials throughout Veteran's Field by Waterside.

53.     The sampling results performed by TERMS demonstrate that, as a result of the improper release of contaminated fill materials throughout Veteran's Field by Waterside, *inter alia*, levels of PCB contamination on Site ranged from 10 mg/kg to 300 mg/kg. These results are in stark contrast to the PCB levels documented after the removal of historic fill from the Site in 2011 and prior to Waterside commencing work on the Site, which were below NJDEP's residential direct contact soil remediation standard of 0.2 mg/kg.

54.     After the contamination caused by Waterside was documented, Waterside admitted that the contaminated fill materials that it imported to the Site came from the former Alcoa site located at 660 River Road, Edgewater, New Jersey ("Alcoa Site"), John Does 1-100, and ABC Corporation 1-100.

55.     The Alcoa Site is a known contaminated site presently owned by 38 COAH, an entity which, upon information and belief, is owned or otherwise controlled by Fred Daibes.

56.     The Alcoa Site is a known contaminated site that was previously owned, controlled, or operated by Fred Daibes individually, North River, A.P. New Jersey, Inc. ("A.P."), and the Aluminum Company of America ("ALCOA").

57.     On or about February 12, 2003, the NJDEP issued to North River, ALCOA, and A.P. a Restricted Use No Further Action Letter for the remediation of certain portions of the Alcoa Site.

Case 2:14-cv-05060-JMV-AME   Document 110-2   Filed 03/11/16   Page 66 of 243 PageID: 1357

Case 2:14-cv-05060-JMV-JBC   Document 61   Filed 05/06/15   Page 13 of 38 PageID: 867

58.     The No Further Action Letter for the Alcoa Site also specifically required that North River, ALCOA, and A.P. place a Deed Notice on the Alcoa Site regarding PCB contamination with respect to a building located on the Alcoa Site known as "Alcoa Building 12."

59.     The No Further Action Letter for the Alcoa Site was signed by Fred Daibes on behalf of North River.

60.     A Deed Notice was prepared for the Alcoa Site on behalf of North River and was recorded with the Bergen County Clerk's office on or about January 14, 2003. The Deed Notice for the Alcoa Site was signed by Fred Daibes on behalf of North River.

61.     The affected areas of the Alcoa Site that were subject to the Deed Notice were the remaining shell of the former ALCOA manufacturing facility, consisting of the Northern, Eastern, and Southern exterior walls and the roof of Alcoa Building 12, and PCB contamination associated with Alcoa Building 12.

62.     Alcoa Building 12 was constructed, in part, out of concrete.

63.     The Deed Notice for the Alcoa Site specifically noted that Building 12 contained elevated levels of PCBs in excess of 0.49 mg/kg. Due to these elevated levels, to prevent migration of the contaminants and to protect the public, the Deed Notice for the Alcoa Site stated that portions of Building 12 were painted with a NJDEP approved epoxy coating, required that the exterior walls be routinely and that the painted surfaces be examined to ensure that they remained sealed, and that North River, ALCOA, and A.P. submit written certification to NJDEP of the maintenance of such institutional and engineering controls and that no changes have occurred.

3387813-1

64.     The recorded Deed Notice for the Alcoa Site prohibited any owner or operator of the Alcoa Site from making any alteration, improvement or disturbance to certain affected areas, including portions of Alcoa Building 12, without first obtaining express written consent of the NJDEP.  But see Deed Notice, section 3(b)

65.     Section 10 of the Deed Notice for the Alcoa Site provides, *inter alia*, that the Deed Notice may only be terminated upon the filing of an instrument terminating the Deed Notice that is executed by NJDEP.

66.     On or about May 22, 2006 North River transferred ownership of the Alcoa Site to 38 COAH.

67.     Upon information and believe, another entity owned and controlled by Fred Daibes applied to NJDEP to terminate the Deed Notice for the Alcoa Site.

68.     In order to terminate the Deed Notice for the Alcoa Site, the NJDEP specifically required that a Remedial Action Outcome be issued by a Licensed Site Remediation Professional and include a notation that "building interiors not addressed."

69.     On or about October 19, 2010, 38 COAH recorded a Termination of Deed Notice for the Alcoa Site with the Bergen County Clerk's Office.  The Termination of Deed Notice for the Alcoa Site was signed by Fred Daibes on behalf of 38 COAH.

70.     Contrary to the requirement in the Termination of Deed Notice for the Alcoa Site was not signed by NJDEP.

71.     Subsequent to the recording of the Termination of Deed Notice for the Alcoa Site, Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, and others purposely and improperly utilized the termination of the Deed Notice as part of a scheme to illegally crush,

14

transfer and dispose of PCB-contaminated concrete and other materials originating from the Alcoa Site at Veteran's Field.

72.    Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, and others purposely and improperly caused concrete from Alcoa Building 12 to be crushed at the Alcoa Site and then transported to and disposed of at Veteran's Field.

73.    In crushing PCB-contaminated concrete and then transferring and disposing the PCB-contaminated concrete and other contaminated materials from the Alcoa Site at Veteran's Field, these defendants also failed to comply with environmental laws that required them to, *inter alia*, obtain a Class B Recycling Permit from NJDEP.

74.    TERMS knowingly permitted Waterside to bring stockpiles of contaminated fill material to the Site resulting in the release of hazardous wastes.

75.    TERMS further improperly permitted Waterside to utilize contaminated fill material in the parking lot areas being constructed for Veteran's Field.

76.    TERMS also permitted and instructed Waterside to reuse fill material on the Site which Waterside now contends was contaminated with PCBs and which TERMS failed to analyze and approve for reuse.

77.    After initially learning that Waterside improperly imported and utilized its contaminated fill at the Site, in violation of its contractual obligations, TERMS failed to take the appropriate actions to prevent Waterside from continuing to utilize the contaminated fill in the parking lot areas and around the fields on the Site.  Additionally, TERMS failed to prevent the continuing cross contamination of the Site caused by Waterside's work.

15

3387813-1

78.     TERMS violated its contractual obligations by failing to insure that unapproved fill materials were brought to and utilized at the Site.

79.     In its role as a LSRP, TERMS prepared and submitted to the United States Environmental Protection Agency ("USEPA") a self-implementing plan ("SIP") which proposed the remedy for addressing the contamination at the Site.  The sampling of the contamination performed by TERMS, which was the basis of the SIP, contained substantial data gaps with respect to the delineation of the impacted soils, as well as the quantification of volumes associated with the impacted soil.

80.     Additionally, the SIP prepared by TERMS, was not prepared in accordance with USEPA guidance documents and regulations.  The aforesaid actions of TERMS constitute a breach of its contract with Edgewater.

81.     Because of TERMS' failure to perform adequate sampling and prepare a SIP in accordance with USEPA guidelines and regulations, Edgewater was required to retain First Environment as a substitute to the LSRP, re-conduct the sampling of the Site, and prepare a new SIP.

**COUNT I**
**Contribution under the Spill Act**
**(as to Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, ALCOA,**
**TERMS, ALCOA DOMESTIC, John Does 1-100 and ABC Corporations 1-100)**

82.     Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

83.     The New Jersey Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. 58.10-23.11f(a)(2) provides, in pertinent part that "[w]henever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of

16

contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of cleanup."

84.    Under the Spill Act, responsible parties are jointly and severally liable to the State for cleanup and removal costs related to discharges of hazardous substances.

85.    Waterside is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

86.    Fred Daibes is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

87.    Daibes Brothers is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

88.    38 COAH is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

89.    North River is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

90.    ALCOA is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

91.    TERMS is a "person" within the meaning of the Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

92.    ALCOA DOMESTIC is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

93.    John Does 1-100 is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

3387813-1

94. ABC Corporations 1-100 is a "person" within the meaning of Spill Act Section 58:10-23.11b(o), N.J.S.A. § 58:10-23.11b(o).

95. "Discharges" within the meaning of Spill Act 58:10-23.11b(h), N.J.S.A. § 58:10-23.11b(h) have occurred at Veteran's Field.

96. "Hazardous Substances" within the meaning of Spill Act Section 58:10-23.11b(k), N.J.S.A § 58:10-23.11b(k) have been discharged at Veteran's Field.

97. Waterside is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

98. Fred Daibes is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

99. Daibes Brothers is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

100. 38 COAH is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

101. North River is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

102.   ALCOA is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

103.   TERMS is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

104.   ALCOA DOMESTIC is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

105.   John Does 1-100 is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

106.   ABC Corporation 1-100 is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

107.   Edgewater has investigated a discharge of hazardous substance and has incurred and continues to incur investigation costs and will incur remediation costs.

108.   As a person who has cleaned up and removed a discharge of hazardous substance, and incurred costs in connection with that removal, pursuant to Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. §58:10-23.11f(a)(2), Edgewater is entitled to contribution from Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, ALCOA, TERMS, A.P., John Does 1-100 and ABC Corporation 1-100 and all investigation and remediation costs which Edgewater

has or will incur, or for which Edgewater is deemed liable, should be allocated among Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, ALCOA, TERMS, A.P., John Does 1-100 and ABC Corporations 1-100 and Edgewater, using such equitable factors as the Court deems appropriate, including Waterside's express indemnification of Edgewater for all such costs under the contractual documents for the Project.

**COUNT II**
**Cost Recovery Under CERCLA**
**(as to Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, ALCOA, ALCOA DOMESTIC, TERMS, John Does 1-100 and ABC Corporations 1-100)**

109.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

110.    Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), provides that any "covered person" "shall be liable for ... any ... necessary costs of response by any other person consistent with the national contingency plan."

111.    Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), provides, in pertinent part, that "the owner or operator of a vessel or a facility" shall be liable as a "covered person" for "any other necessary costs of response incurred by any other person consistent with the national contingency plan" pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. 9607(a)(4)(B).

112.    Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), provides, in pertinent part, that "any person who at the time of disposal of any hazardous substances owned or operated any facility at which such hazardous substances were disposed of" shall be liable as a "covered person" for "any other necessary costs of response incurred by any other person consistent with the national contingency plan" pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. 9607(a)(4)(B).

20

113.    Section 107(a)(3) of CERCLA, 42 U.S.C. 9607(a)(3), provides, in pertinent part, that "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person" shall be liable as a "covered person" for "any other necessary costs of response incurred by any other person consistent with the national contingency plan" pursuant to Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4)(B).

114.    Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4), provides in pertinent part, that "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities ... or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for ... (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan" pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. 9607(a)(4)(B).

115.    ALCOA DOMESTIC,   ALCOA, WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporations 1-100 are each a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

116.    ALCOA DOMESTIC, ALCOA, WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, and John Does 1-100 and ABC Corporation 1-100 are each an owner and/or "operator" of Veteran's Field within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

21

117.    ALCO DOMESTIC, ALCOA, WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporations 1-100 arranged, by contract, agreement, or otherwise, for disposal of hazardous substances at Veteran's Field.

118.    WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporations 1-100 accepted hazardous substances for transport to Veteran's Field.

119.    Veteran's Field is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

120.    Releases or threatened releases of hazardous substances in to the environment have occurred at Veteran's Field within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

121.    As to Veteran's Field, ALCOA DOMESTIC, ALCOA, WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporations 1-100 are liable under Section 101(22) of CERCLA, 42 U.S.C. § 9607(a)(2), as a person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed.

122.    ALCOA DOMESTIC, ALCOA, WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporations 1-100 are liable at Veteran's Field under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), as a person who by contract, agreement, or otherwise arranged for the disposal of treatment of hazardous substances.

123.    WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporations 1-100 are liable at Veteran's Field under Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4), as a person who accepts or accepted any hazardous substances for transport to sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of hazardous substance.

124.    Pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), Edgewater is entitled to recovery from ALCOA DOMESTIC, ALCOA, WATERSIDE, FRED DAIBES, DAIBES BROTHERS, 38 COAH, NORTH RIVER, TERMS, John Does 1-100 and ABC Corporation 1-100 of its costs of response incurred in connection with Veteran's Field.

## COUNT III
### Breach of Contract (as to Waterside)

125.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

126.    In or about June 2012, Edgewater and Waterside entered into a valid contract (the "Agreement"), pursuant to which Waterside agreed to complete the Veteran's Field Project.

127.    The Agreement is made up of certain contractual documents that include the Bid, Bid Notice, Bid General Information, Instruction to Bidders, Contract Form, and Technical Specifications.

128.    The Agreement required that the Veteran's Field Project be completed by April 2013, which was within 9 months of the awarding of the Agreement.  Additionally, the Agreement expressly provides that "time is of the essence" for the completion of the Project.

23

129.   Notwithstanding a five month delay in construction for the Project due to Superstorm Sandy, Waterside failed to complete the Project in a timely manner.

130.   Due to Waterside's failure to complete the Project in a timely manner, among the damages to which Waterside is subject and Edgewater is entitled, is a charge of $1,000 per day for each and every working day until completion of the Project.

131.   Further, per the Agreement, Edgewater's engineer ("Engineer") is authorized and empowered to reject and refuse all work and materials utilized that do not comply in kind and quality with the specifications in the Agreement.  Moreover, the Agreement provides that the approval or acceptance of any part of the work or the materials used shall not prevent the rejection of said work or materials at any time thereafter should said work or materials be found to be defective or not in accordance with requirements of the specifications in the Agreement.

132.   The Agreement further provides that the Engineer may inspect and require tests or analyses of any portion of materials utilized at the Site at any time, either before or after installation, and any material found to be defective or not in conformance with the requirements of the specifications shall be rejected and removed immediately from the Site and replaced at Waterside's expense.  Further additional monies for the costs incurred shall be furnished by Waterside or its surety.

133.   The Agreement defines the term "material" to include "all the things of any kind, nature, and class as may be specified which become part of or used in construction of the work, together with all manufactured or prepared materials, articles, etc. used therein or placed thereon."

24

134.   The contaminated soil and fill materials utilized by Waterside on the Project are included in the definition of the term "material" in the Agreement.

135.   Pursuant to the Agreement, as a result of its failure to complete the Project in a timely manner, Waterside is responsible for all engineering, field work and inspection costs thereafter incurred by the Edgewater.

136.   The Agreement expressly provides that the Engineer and his authorized agents will define in the meaning and intent of the specifications in the Agreement, pass upon all materials and workmanship, and may reject any work that is not in accordance with the drawings and specifications.  Further, the Agreement provides that the Engineer is the judge of the quality of materials and his decision must be accepted as final.

137.   Pursuant to the Agreement, Waterside's liability with respect to defective materials and work is absolute in that inspection of the work and materials by the Engineer does not relieve Waterside of any of its obligation to fulfill the Agreement and defective work and unsuitable materials may be rejected notwithstanding that such work and materials may have been previously inspected and accepted.  Additionally, the liability of Waterside for damages is not dependent upon any question of negligence on Waterside's part or on the part of others.

138.   Pursuant to the Agreement, Waterside was required to purchase Commercial General Liability ("CGL") insurance for the Project to include as an additional insured, Edgewater, the Engineer and TERMS.  Among the claims required to be included in the CGL insurance are claims for property damage which may arise as a result of Waterside's operations with limits of $1,000,000 each occurrence and $2,000,000 aggregate.  Additionally, the Agreement provides that the CGL insurance "may not be restricted by any endorsement."

25

139.    The insurance provided by Waterside for the Project is inadequate and insurance has been declined to the Edgewater for the damages it incurred in this matter as a result of Waterside's improper use and placement of contaminated fill materials at Veteran's Field.

140.    Pursuant to the Agreement, Waterside was also to provide umbrella liability insurance for the Project of not less than $5,000,000 each occurrence and such occurrence could not be more restrictive than the coverage provided for under the primary policies.

141.    Pursuant to the Agreement, Waterside guaranteed its labor and all materials for the Project for a period of one year from date of substantial completion.

142.    The Agreement specifically requires Waterside to comply with all federal, state, county and municipal laws, ordinances and regulations in any manner affecting materials used in the work for the Project. Additionally, the Agreement provides that, at all times, Waterside was required to "observe and comply with all such laws, ordinances, regulations, orders, and decrees and shall protect and indemnify the Edgewater and its agents against any claim or liability arising from or based on the violation of any such law, ordinance, regulation, order, or decree, whether by himself or his employees."

143.    Edgewater has duly performed all its obligations under the Agreement.

144.    Waterside has breached the Agreement by failing to perform the terms and conditions contained therein.

145.    Waterside's breach of the Agreement directly and proximately caused Edgewater damages, including but not limited to, cost incurred by Edgewater in the cleanup, removal, and disposal of contaminated material from Veteran's Field, repairs and reconstruction costs for defective work performed by Waterside, and consequential and liquidated damages.

26

3387813-1

146.    Edgewater is entitled to contractual indemnification from Waterside for the foregoing damages, injuries, claims, and losses.

## COUNT IV
### Fraud (as to Waterside and Fred Daibes)

147.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

148.    As set forth in paragraphs 12-66, Waterside and Fred Daibes misrepresented that it used contaminated fill materials at the Site, where it used contaminated fill materials at the Site and when it used contaminated fill materials at the Site.

149.    Waterside and Fred Daibes' misrepresentations regarding the use of the contaminated fill materials at the Site were false.

150.    Waterside and Fred Daibes knew that the misrepresentations regarding its use of contaminated fill materials at the Site were false at the time Waterside made the misrepresentations.

151.    Waterside and Fred Daibes' misrepresentations regarding the use of contaminated fill materials at the Site were material.

152.    Waterside and Fred Daibes intended that Edgewater rely on the fraudulent misrepresentations regarding the use of contaminated fill materials at the Site.

153.    Edgewater's reliance on Waterside and Fred Daibes' fraudulent misrepresentations regarding the use of contaminated fill materials at the Site was reasonable.

154.    Edgewater has suffered damages as a result of Waterside and Fred Daibes' fraudulent misrepresentations regarding the use of contaminated fill materials at the Site.

3387813-1

155.    As a direct and proximate result of the Waterside and Fred Daibes' fraudulent misrepresentations, Edgewater has suffered damages in an amount to be determined at trial.

**COUNT V**
**Negligence (as to Waterside)**

156.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

157.    As set forth in paragraphs 12-66, beginning in or about the summer of 2013, Waterside began working on the Project.

158.    Pursuant to the Agreement, Waterside agreed to use only approved fill materials on the Project.

159.    Waterside owed a duty of care to Edgewater, as the contractor for the Veteran's Field Project, to comply with all applicable laws regarding the use of fill materials on the Project and to otherwise perform under the Agreement in such a manner so as not to cause Edgewater injury or damages.

160.    Waterside's unlawful use of contaminated fill materials on the Project was a breach of Waterside's duty of care owed to Edgewater.

161.    It was foreseeable that Waterside's use of contaminated fill materials on the Project would cause harm to Edgewater.

162.    As a direct and proximate result of the Waterside's breach of its duty of care owed to Edgewater, Edgewater has suffered damages in an amount to be determined at trial.

**COUNT VI**
**Unjust Enrichment (as to Waterside, ALCOA, ALCOA DOMESTIC and 38 COAH)**

163.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

28

164.   By transporting contaminated concrete and other materials from the Alcoa Site and delivering the contaminated concrete and other materials from the Alcoa Site at Veteran's Field, Waterside, ALCOA, ALCOA DOMESTIC and 38 COAH conferred a significant benefit because Waterside and 38 COAH saved a significant amount of money in removal and disposal costs of contaminated materials from the Alcoa Site and saved a significant amount of money in purchasing clean, approved materials for use as fill at Veteran's Field.

165.   Waterside, ALCOA, ALCOA DOMESTIC and 38 COAH unjustly received this benefit without payment.

166.   Edgewater mistakenly conferred this benefit upon Waterside, ALCOA, ALCOA DOMESTIC and 38 COAH because it was unaware that the fill materials delivered to Veteran's Field were contaminated.

167.   Had Edgewater known that the fill materials delivered to Veteran's Field were contaminated, Edgewater would have expected remuneration from Waterside, ALCOA, ALCOA DOMESTIC and 38 COAH at the time the benefit was conferred.

168.   Waterside, ALCOA, ALCOA DOMESTIC and 38 COAH have received and currently retain this significant monetary benefit to the detriment of Edgewater.

169.   As a result of Waterside's, ALCOA's, ALCOA DOMESTIC'S  and 38 COAH's unjust enrichment and unlawful retention of this benefit, Edgewater has suffered damages in an amount to be determined at trial.

3387813-1

## COUNT VII

**Violations of the New Jersey Consumer Fraud Act (as to Waterside and Fred Daibes)**

170.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

171.    This claim alleges violations of the New Jersey Consumer Fraud Act, N.J.S.A. §56:8-1 *et seq.* ("NJCFA").

172.    At all relevant times described herein, Waterside, by and at the direction of Fred Daibes, as the contractor performing the Veteran's Field Project, was acting as an agent for and/or on behalf of Edgewater, the property owner of Veteran's Field.

173.    As set forth in paragraphs 12-66, in agreeing to provide Edgewater with approved, clean fill for the Veteran's Field Project, then intentionally delivering contaminated fill materials to the Site and then misrepresenting where and when it used such contaminated fill materials at the Site, Waterside and Fred Daibes engaged in unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts because Waterside and Fred Daibes knowingly misrepresented the quality of the fill materials used at the Site.

174.    As alleged in Paragraphs 12-66 and 101-121, in June 2012 Waterside was awarded the contract for the Veteran's Field Project.

175.    The Agreement required Waterside to use only approved fill materials on the Site.

176.    On September 6, 2013, Waterside advised Jason Menzella, the Site supervisor for the Borough Engineer, Neglia Associates, that it would not be performing any work on Saturday, September 7, 2012.

177.     In the afternoon of Saturday, September 7, 2013, however, Mr. Menzella, while driving by the site, observed Waterside (contrary to its prior representations) working at the Site. Upon his arrival, Mr. Menzella observed Waterside employees intentionally covering up suspect fill materials that had not been previously on the Site and had not been approved for use on the Site.

178.     On September 7, 2013, Mr. Menzella was advised by a Waterside employee that Fred Daibes had just left the Site, but had been present all day.  The employee could not explain why Waterside was intentionally covering up the suspect fill materials.  The employee advised Mr. Menzella that he was just working as instructed and was told to get the work done "today."

179.     On Monday, September 9, 2013, Ronald Dooney of TERMS went to the Site to inspect the suspect fill materials that were utilized at the Site and were observed by Mr. Menzella.  At that time, all of the suspect fill materials had been intentionally covered up with clean and/or approved fill materials.

180.     On September 9, 2013, representatives of Waterside misrepresented to Mr. Dooney that the suspect fill materials were only utilized in the outfield area of the Little League field.  On September 9, 2013, Mr. Dooney instructed Waterside not to utilize any more of the suspect fill materials or disturb the piles of it remaining on the Site.

181.     Unbeknownst to Edgewater and despite its representations to the contrary, Waterside, by and at the direction of Fred Daibes, had previously and continued to utilize the suspect fill materials in the parking lot areas and throughout the fields on the Site.

182.     The results of an investigation by TERMS, on behalf of Edgewater, indicated that contaminated fill materials improperly imported to the Site by Waterside contained PCB, Metals,

3387813-1

PAH and pesticides concentrations in excess of NJDEP standards and were used throughout the Site.

183.    After the contamination caused by Waterside was documented, Waterside and Fred Daibes admitted that the contaminated fill materials that it imported to the Site came from the former Alcoa Site.

184.    Waterside had entered into the Agreement with Edgewater and agreed to provide Edgewater with approved, clean fill for the Veteran's Field Project and then intentionally delivered contaminated fill materials to the Site.

185.    Waterside and Fred Daibes then intentionally misrepresented to Edgewater where it used contaminated fill materials at the Site and when it used contaminated fill materials at the Site.

186.    Waterside and Fred Daibes entered into the Agreement, misrepresenting that it would only use clean, approved fill materials on the Site, and then misrepresented to Edgewater where and when it used contaminated fill materials on the Site, with the intention that Edgewater would rely upon these representations.

187.    Waterside and Fred Daibes engaged in such unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts with the intention that Edgewater would rely upon Waterside's conduct.

188.    In reliance on Waterside and Fred Daibes' unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material facts regarding the quality of the fill materials

that would be used on the Site, Edgewater entered into the Agreement with Waterside and Waterside subsequently transported contaminated fill materials to Veteran's Field without Edgewater's approval and used the contaminated fill materials throughout Veteran's Field.

189.    Edgewater's reliance on Waterside and Fred Daibes' unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission material facts was reasonable.

190.    At the time Waterside and Fred Daibes engaged in unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing, concealment, suppression, or omission of materials fact with regard to the contaminated fill materials, Edgewater did not know that the suspect fill materials were contaminated.

191.    Waterside and Fred Daibes' fraudulent misrepresentations, which caused contaminated fill materials to be delivered to and used throughout Veteran's Field without Edgewater's approval, constitutes unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing, concealment, suppression, or omission of material facts in violation of the NJCFA.

192.    As a result of Waterside and Fred Daibes' unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing, concealment, suppression, or omission of material facts in violation of the NJCFA, Edgewater has suffered damages.

193.    Waterside and Fred Daibes' unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations, and the knowing, concealment,

33

3387813-1

suppression, or omission of material facts in violation of the NJCFA, are the proximate cause of damages sustained by Edgewater.

194.    Accordingly, under Section 56:8-19 of the NJCFA, Edgewater is entitled to recover from Waterside and Fred Daibes' compensatory damages, treble damages, attorneys' fees and the costs of bringing this action.

## COUNT VIII
### Breach of Contract (as to TERMS)

195.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

196.    In or about 2012, Edgewater and TERMS entered into a valid contract (the "TERMS Agreement"), pursuant to which TERMS agreed to serve as the environmental consultant and Licensed Site Remediation Professional ("LSRP") for the Veteran's Field Project.

197.    As the environmental consultant and LSRP, TERMS was the gatekeeper and responsible for undertaking the testing of any fill material brought to or utilized at the Site.

198.    At all times TERMS had control over the process for importing fill to the Site and was responsible for developing and implementing the plan to sample, analyze, and approve the fill material prior to it being utilized at the Site.

199.    TERMS knowingly permitted Waterside to bring stockpiles of contaminated fill material to the Site resulting in the release of hazardous wastes.

200.    TERMS further improperly permitted Waterside to utilize contaminated fill material in the parking lot areas being constructed for Veteran's Field.

34

3387813-1

201.   TERMS also permitted and instructed Waterside to reuse fill material on the Site which Waterside now contends was contaminated with PCBs and which TERMS failed to analyze and approve for reuse.

202.   After initially learning that Waterside improperly imported and utilized its contaminated fill at the Site, in violation of its contractual obligations, TERMS failed to take the appropriate actions to prevent Waterside from continuing to utilize the contaminated fill in the parking lot areas and around the fields on the Site.  Additionally, TERMS failed to prevent the continuing cross contamination of the Site caused by Waterside's work.

203.   TERMS violated its contractual obligations by failing to insure that unapproved fill materials were brought to and utilized at the Site.

204.   In its role as a LSRP, TERMS prepared and submitted to the United States Environmental Protection Agency ("USEPA") a self-implementing plan ("SIP") which proposed the remedy for addressing the contamination at the Site.  The sampling of the contamination performed by TERMS, which was the basis of the SIP, contained substantial data gaps with respect to the delineation of the impacted soils, as well as the quantification of volumes associated with the impacted soil.

205.   Additionally, the SIP prepared by TERMS, was not prepared in accordance with USEPA guidance documents and regulations.  The aforesaid actions of TERMS constitute a breach of its contract with Edgewater.

206.   As a direct and approximate result of TERMS' breach of contract, Plaintiff has suffered damages in an amount to be determined at trial.  Because of TERMS' failure to perform adequate sampling and prepare a SIP in accordance with USEPA guidelines and regulations,

Edgewater was required to retain First Environment as a substitute to the LSRP, re-conduct the sampling of the Site, and prepare a new SIP.

## COUNT IX
### Negligence (as to TERMS)

207.    Plaintiff repeats, reasserts and incorporates by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

208.    TERMS owed a duty of care to Edgewater, as the environmental consultant, LSRP for the Veteran's Field Project, to insure that contaminated fill materials were not imported and placed on the Site, to prevent the cross-contamination at the Site to perform proper and adequate sampling of contamination of the Site, and to prepare a SIP which conformed with the USEPA regulations and guidelines in such a manner as to not cause Edgewater injury or damages.

209.    TERMS' failure to do so was a breach of TERMS' duty of care owed to Edgewater and constituted negligence.

210.    As a direct and approximate result of TERMS' breach of its duty of care of Edgewater, Edgewater has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby demands judgment against Defendants:

a.    Allocating among Edgewater and Defendants and any other persons found to be liable all responses costs incurred at or with respect to Veteran's Field described herein, pursuant to Section 58:10-23.11(f)(a)(2) of the Spill Act, N.J.S.A. § 58:10-23.11f(a)(2);

b.    Awarding Edgewater cost recovery from Defendants for all response costs incurred at or with respect to Veteran's Field pursuant to Section 107(a)(4)(B) of CERCLA, 42

36

U.S.C. § 9607(a)(4)(B), and issuing an Order requiring Defendants to pay such amounts to Edgewater; and

     c.     Allocating among Edgewater and Defendants and any other persons to be liable all response costs incurred at or with respect to Veteran's Field, pursuant to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B);

     d.     Entering a declaratory judgment pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), against Defendants and in favor of Edgewater declaring, adjudging, and decreeing that Defendants are liable to Edgewater for response costs or damages at Veteran's Field, such judgment to be binding on any subsequent action or actions to recover any further response costs or damages;

     e.     Entering a declaratory judgment pursuant to the Spill Act against Defendants and in favor of Edgewater declaring, adjudging, and decreeing that Defendants are liable to Edgewater for response costs or damages at Veteran's Field, pursuant to Section 58:10-23.11f(a)(2) of the Spill Act, N.J.S.A. § 58:10-23.11f(a)(2), such judgment to be binding on any subsequent action or actions to recover further response costs or damages;

     f.     Entering a declaratory judgment against Waterside and in favor of Edgewater declaring, adjudging, and decreeing that Waterside shall indemnify Edgewater pursuant to the Agreement for any all damages, economic losses, and claims arising from activity pursuant to the Agreement by Waterside, including without limitation costs that Edgewater has and will incur with respect to Veteran's Field, and attorneys' fees and costs;

     g.     Awarding Edgewater compensatory, incidental, consequential and liquidated damages, including but not limited to damages and reputable hard to Edgewater as a result of the

37

acts or omissions of Waterside as described herein;

     h.     Awarding Edgewater punitive damages for the fraudulent acts of Waterside described herein;

     i.     Awarding Edgewater interest and cost of suit, including reasonable attorneys' fees and experts' fees; and

     j.     Awarding Edgewater any other such relief as the Court deems just and proper.

**CONNELL FOLEY LLP**
**Attorneys for Plaintiff**
**Borough of Edgewater**

Dated: May 2, 2015     By:     *s/ Timothy E. Corriston*
     Timothy E. Corriston

3387813-1

**EXHIBIT 5**

ARCHER & GREINER
A Professional Corporation
One Centennial Square
Haddonfield, NJ 08033-0968
(856)795-2121
Attorneys for Defendants, Waterside Construction, LLC,
38 COAH, LLC, Daibes Brothers, Inc., North River Mews
Associates, LLC, and Fred A. Daibes

BY:   PATRICK PAPALIA, ESQUIRE
      DEBRA S. ROSEN, ESQUIRE

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BOROUGH OF EDGEWATER,<br><br>　　　　　　　Plaintiff,<br><br>vs.<br><br>WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALUMINUM COMPANY OF AMERICA; A.P. NEW JERSEY, INC.; JOHN DOES 1-100; and ABC CORPORATIONS 1-100,<br><br>　　　　　　　Defendants. | Civil Action No.: 2:14-CV-05060 (ES-MAH)<br><br><br>ELECTRONICALLY FILED<br><br><br>ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSES AND CROSSCLAIMS |

Defendants, Waterside Construction, LLC, 38 COAH, LLC, Daibes

Brothers, Inc., North River Mews Associates, LLC and Fred A. Daibes (hereinafter

collectively "Waterside" or "Defendants") by way of Answer to the First Amended

1

Complaint of Plaintiff, Borough of Edgewater ("Edgewater") hereby answers as follows:

## THE PARTIES

1.    The allegations of Paragraph 1 of the First Amended Complaint are not directed to Waterside and therefore no response thereto is required.

2.    Defendants admit only that Waterside Construction, LLC ("Waterside") is a New Jersey limited liability company with offices at 22 Route 5, Edgewater, Bergen County, New Jersey.  The remaining allegations of Paragraph 2 are denied as stated.

3.    Defendants admit only that 38 COAH, LLC ("38 COAH") is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, Bergen County, New Jersey are admitted.  The remaining allegations of Paragraph 3 are denied as stated.

4.    The allegations of Paragraph 4 of the First Amended Complaint are denied.

5.    Defendants admit only that North River Mews Associates, LLC ("North River") is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, Bergen County, New Jersey.  The remaining allegations of Paragraph 5 call for a legal conclusion to which no response is

required.  To the extent that factual allegations are made or intended to be made against these Defendants, said allegations are denied as stated.

6.   Defendants admit only that Fred Daibes is an individual.  The remaining allegations of Paragraph 6 are denied as stated.

7.   The allegations of Paragraph 7 of the First Amended Complaint are not directed to this Defendant and therefore no response thereto is required.

8.   The allegations of Paragraph 8 of the First Amended Complaint are not directed to this Defendant and therefore no response thereto is required.

9.   The allegations of Paragraph 9 of the First Amended Complaint are not directed to this Defendant and therefore no response thereto is required.

10.   The allegations of Paragraph 10 of the First Amended Complaint are not directed to this Defendant and therefore no response thereto is required.

11.   The allegations of Paragraph 11 of the First Amended Complaint are not directed to this Defendant and therefore no response thereto is required.

## JURISDICTION AND VENUE

12.   The allegations of Paragraph 12 of the First Amended Complaint call for a legal conclusion and therefore no response thereto is required.  To the extent that any factual allegations are made or intended to be made against these Defendants, said allegations are denied.

3

13.     The allegations of Paragraph 13 of the First Amended Complaint call for a legal conclusion and therefore no response thereto is required.  To the extent that any factual allegations are made or intended to be made against these Defendants, said allegations are denied.

14.     The allegations of Paragraph 14 of the First Amended Complaint call for a legal conclusion and therefore no response thereto is required.  To the extent that any factual allegations are made or intended to be made against these Defendants, said allegations are denied.

15.     The allegations of Paragraph 15 of the First Amended Complaint call for a legal conclusion and therefore no response thereto is required.  To the extent that any factual allegations are made or intended to be made against the Defendants, said allegations are denied.

## **BACKGROUND**

16.     Waterside admits that Veteran's Field is located at 1167 River Road, Edgewater, New Jersey, is known as Block 30, Lot 1 on the Tax Map of the Borough of Edgewater and is a public park consisting of approximately 27.58 acres.  Waterside has insufficient knowledge with which to admit or deny the remaining allegations.

4

17.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 17 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

18.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 18 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

19.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 19 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

20.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 20 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

21.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 21 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

22.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 22 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

23.    Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 23 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

24.    Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 24 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

25.    Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 25 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

26.    The allegations of Paragraph 26 of the First Amended Complaint are admitted.

27.    Defendants admit that the scope of work in the bid notice consisted of some remediation activities at Veteran's Field and installation of athletic fields along with the associated drainage and grading and the installation of a playground and parking lot.  Defendants have insufficient knowledge with which to admit or deny the remaining allegations of Paragraph 27 and therefore deny same and leave Plaintiff to its proofs.

28.    Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 28 and therefore deny same and leave Plaintiff to its proofs.

29.     With respect to those allegations which make conclusions of law, no response thereto is required.  To the extent that factual allegations are made or intended to be made as to these Defendants, said allegations are denied as stated.

30.     Defendants admit that in the summer of 2012, Waterside began work at Veteran's Field.  Defendants have insufficient knowledge with which to admit or deny the remaining allegations of Paragraph 30 and therefore deny same and leave Plaintiff to its proofs.

31.     Defendants specifically deny that TERMS required Waterside to submit for testing and approval all fill material that was not provided from an approved site.  With respect to the remaining allegations of Paragraph 31 of the First Amended Complaint, Defendants have insufficient knowledge with which to admit or deny said allegations and therefore deny same and leave Plaintiff to its proofs.

32.     Defendants admit that TERMS, as the entity with control over the process for importing fill to the site, approved fill materials for use at the site by Waterside.  Any remaining allegations set forth in Paragraph 32 of the First Amended Complaint are denied as stated.

33.     The allegations of Paragraph 33 of the First Amended Complaint are admitted.

34.     Defendants admit that the project resumed in late spring of 2013. Defendants have insufficient knowledge with which to admit or deny the remaining allegations of Paragraph 34 and therefore deny same and leave Plaintiff to its proofs.

35.     Defendants admit only that fill material continued to be brought to the site for use as part of the cap for site soils and also for use under sidewalks, roadways and parking lots.

36.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 36 of the First Amended Complaint. Defendants admit only that TERMS did on occasion reject the use of certain fill materials at the Veteran's Field site. Waterside denies that it made any attempt to have TERMS or its employees removed from the project.

37.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 37 and therefore deny same and leave Plaintiff to its proofs.

38.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 38 and therefore deny same and leave Plaintiff to its proofs.

39.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 39 and therefore deny same and leave Plaintiff to its proofs.

40.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 40 and therefore deny same and leave Plaintiff to its proofs.

41.     Defendants deny the allegations of Paragraph 41 of the First Amended Complaint that Waterside misrepresented any facts with respect to the fill material. Defendants have insufficient knowledge with which to admit or deny the remaining allegations of Paragraph 41 and therefore deny same and leave Plaintiff to its proofs.

42.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 42 and therefore deny same and leave Plaintiff to its proofs.

43.     Defendants deny that they undertook any actions contrary to any representations they made and instead acted at all times in accord with the direction of TERMS, as gatekeeper for fill material at the site who had provided that certain fill materials could be used over the geotextile membrane and under hard surfaces such as roadways and sidewalks.  Defendants have insufficient

knowledge with which to admit or deny any remaining allegations of Paragraph 43 and therefore deny same and leave Plaintiff to its proofs.

44.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 44 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

45.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 45 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

46.     Defendants admit only that they have received a copy of an October 3, 2013 letter from TERMS issued to Edgewater with respect to fill material at Veteran's Field and that TERMS was closing the site.  To the extent that Paragraph 46 of the First Amended Complaint makes allegations as to the contents of a document, said document speaks for itself.  Defendants have insufficient knowledge with which to admit or deny the remaining allegations of Paragraph 46 and therefore deny same and leave Plaintiff to its proofs.

47.     The allegations of Paragraph 47 of the First Amended Complaint are denied as stated.

48.     Defendants specifically deny that fill materials were improperly imported to the Veteran's Field site.  Defendants have insufficient knowledge with

10

which to admit or deny the remaining allegations of Paragraph 48 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

49.     Defendants specifically deny that fill materials were improperly imported to the Veteran's Field site.  Defendants have insufficient knowledge with which to admit or deny the remaining allegations of Paragraph 49 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

50.     Defendants specifically deny that fill materials were improperly imported to the Veteran's Field site.  Defendants have insufficient knowledge with which to admit or deny the remaining allegations of Paragraph 50 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

51.     Defendants specifically deny that fill materials were improperly imported to the Veteran's Field site.  Defendants have insufficient knowledge with which to admit or deny the remaining allegations of Paragraph 51 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

52.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 52 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

53.     Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 53 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

54.     Defendants specifically deny that Waterside caused contamination at the Veteran's Field site.  Waterside admits only that the recycled concrete fill material utilized at the Veteran's Field site came from property formerly owned by 38 COAH located at 660 River Road, Edgewater, New Jersey.

55.     Defendants admit only that the property located at 660 River Road, Edgewater, New Jersey is presently owned by 38 COAH.  The remaining allegations of Paragraph 55 of the First Amended Complaint are denied.

56.     Defendants admit only that the property located 660 River Road, Edgewater, New Jersey was previously owned by A.P. New Jersey, Inc. and the Aluminum Company of America.  The remaining allegations of Paragraph 56 of the First Amended Complaint are denied.

57.     The allegations of Paragraph 57 of the First Amended Complaint are admitted.

58.     The allegations of Paragraph 58 of the First Amended Complaint are denied as stated.

59.     Defendants admit that the February 12, 2003 No Further Action Letter for the Building 12 Area of Concern was signed by Fred Daibes as a managing member of the North River Mews Associates, LLC.

60.     The allegations of Paragraph 60 of the First Amended Complaint are denied as stated.  Defendants admit only that a Deed Notice was prepared for a

portion of the property at 660 River Road, Edgewater, New Jersey and was recorded on or about January 14, 2003.

61.     Defendants deny the allegations of Paragraph 61 of the First Amended Complaint that Building 12 was "the former ALCOA manufacturing facility" which facility encompassed many buildings.

62.     Defendants admit that parts of Building 12 were constructed with concrete.

63.     Paragraph 63 of the First Amended Complaint makes allegations as to the contents of a written agreement which document speaks for itself.

64.     Paragraph 64 of the First Amended Complaint makes allegations as to the contents of a written agreement which document speaks for itself.

65.     Paragraph 65 of the First Amended Complaint makes allegations as to the contents of a written agreement which document speaks for itself.

66.     Defendants admit that on or about May 22, 2006, North River transferred ownership of the 660 River Road property to 38 COAH.

67.     The allegations of Paragraph 67 of the First Amended Complaint are denied.

68.     The allegations of Paragraph 68 of the First Amended Complaint are denied.

69.     Defendants admit only that on or about October 19, 2010, 38 COAH recorded a Termination of Deed Notice signed by Fred Daibes, as prepared by its environmental consultant and as directed and approved by the NJDEP.

70.     Paragraph 70 of the First Amended Complaint makes allegations as to the contents of a written document which document speaks for itself.

71.     The allegations of Paragraph 71 of the First Amended Complaint are denied.

72.     The allegations of Paragraph 72 of the First Amended Complaint are denied.

73.     The allegations of Paragraph 73 of the First Amended Complaint are denied.

74.     The allegations of Paragraph 74 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

75.     The allegations of Paragraph 75 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

76.     The allegations of Paragraph 76 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

77.     The allegations of Paragraph 77 of the First Amended Complaint are not directed these Defendants and therefore no response thereto is required.  To the

extent that any allegations are made or intended to be made as to these Defendants, said allegations are denied.

78.　The allegations of Paragraph 78 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

79.　The allegations of Paragraph 79 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

80.　The allegations of Paragraph 80 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

81.　The allegations of Paragraph 81 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

## AS TO COUNT I

## CONTRIBUTION UNDER THE SPILL ACT

82.　Defendants repeat and incorporate by reference their responses to the previous paragraphs of this First Amended Complaint as if fully set forth herein in lieu of repetition.

83.　The allegations of Paragraph 83 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made with respect to these Defendants, said allegations are denied.

84.     The allegations of Paragraph 84 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made with respect to these Defendants, said allegations are denied.

85.     The allegations of Paragraph 85 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made with respect to these Defendants, said allegations are denied.

86.     The allegations of Paragraph 86 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made with respect to these Defendants, said allegations are denied.

87.     The allegations of Paragraph 87 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made with respect to these Defendants, said allegations are denied.

88.     The allegations of Paragraph 88 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made with respect to these Defendants, said allegations are denied.

89.     The allegations of Paragraph 89 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made with respect to these Defendants, said allegations are denied.

90.     The allegations of Paragraph 90 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

91.     The allegations of Paragraph 91 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

92.     The allegations of Paragraph 92 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

93.     The allegations of Paragraph 93 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

94.     The allegations of Paragraph 94 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

95.     The allegations of Paragraph 95 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

96.     The allegations of Paragraph 96 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any

factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

97.     The allegations of Paragraph 97 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

98.     The allegations of Paragraph 98 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

99.     The allegations of Paragraph 99 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

100.    The allegations of Paragraph 100 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

101.    The allegations of Paragraph 101 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any

factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

102.   The allegations of Paragraph 102 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

103.   The allegations of Paragraph 103 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

104.   The allegations of Paragraph 104 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

105.   The allegations of Paragraph 105 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

106.   The allegations of Paragraph 106 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

107.   Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 107 of the First Amended Complaint and therefore deny same and leave Plaintiff to its proofs.

108.   The allegations of Paragraph 108 of the First Amended Complaint call for a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

## AS TO COUNT II

## COST RECOVERY UNDER CERCLA

109.   Defendants repeat and incorporate by reference their responses to the previous paragraphs of this First Amended Complaint as if fully set forth herein in lieu of repetition.

110.   The allegations of Paragraph 110 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

111.   The allegations of Paragraph 111 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

112.   The allegations of Paragraph 112 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

113.   The allegations of Paragraph 113 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any

factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

114.   The allegations of Paragraph 114 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

115.   The allegations of Paragraph 115 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

116.   The allegations of Paragraph 116 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

117.   The allegations of Paragraph 117 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

118.   The allegations of Paragraph 118 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any

factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

119.   The allegations of Paragraph 119 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

120.   The allegations of Paragraph 120 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

121.   The allegations of Paragraph 121 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

122.   The allegations of Paragraph 122 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

123.   The allegations of Paragraph 123 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any

factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

124.   The allegations of Paragraph 124 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

## AS TO COUNT III

## BREACH OF CONTRACT

125.   Defendants repeat and incorporate by reference their responses to the allegations in the previous paragraphs of this First Amended Complaint as if fully set forth herein in lieu of repetition.

126.   The allegations of paragraph 126 of the First Amended Complaint contain legal conclusions to which no response is required.  To the extent that factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

127.   The allegations of paragraph 127 of the First Amended Complaint contain legal conclusions to which no response is required.  To the extent that factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

128.   Paragraph 128 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.

129.   The allegations of Paragraph 129 of the First Amended Complaint are denied.

130.   Paragraph 130 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.  Any remaining allegations of Paragraph 130 are denied.

131.   Paragraph 131 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.  Any remaining allegations of Paragraph 131 are denied.

132.   Paragraph 132 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.  Any remaining allegations of Paragraph 132 are denied.

133.   Paragraph 133 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.  Any remaining allegations of Paragraph 133 are denied.

134.   Paragraph 134 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.  Any remaining allegations of Paragraph 134 are denied.

135.   Paragraph 135 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.  Any remaining allegations of Paragraph 135 are denied.

136.   Paragraph 136 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.  Any remaining allegations of Paragraph 136 are denied.

137.   Paragraph 137 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.  Any remaining allegations of Paragraph 137 are denied.

138.   Paragraph 138 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.  Any remaining allegations of Paragraph 138 are denied.

139.   The allegations of Paragraph 139 of the First Amended Complaint are denied.

140.   Paragraph 140 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.  Any remaining allegations of Paragraph 140 are denied.

141.   Paragraph 141 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.  Any remaining allegations of Paragraph 141 are denied.

142.    Paragraph 142 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.  Any remaining allegations of Paragraph 142 are denied.

143.    Paragraph 143 of the First Amended Complaint makes allegations as to the contents of a writing which document speaks for itself.  Any remaining allegations of Paragraph 143 are denied.

144.    The allegations of Paragraph 144 of the First Amended Complaint are denied.

145.    The allegations of Paragraph 145 of the First Amended Complaint are denied.

146.    The allegations of Paragraph 146 of the First Amended Complaint are denied.

## AS TO COUNT IV

### FRAUD

147.    Defendants repeat and incorporate by reference their responses to the allegations in the previous paragraphs of this First Amended Complaint as if fully set forth herein in lieu of repetition.

148.    The allegations of Paragraph 148 of the First Amended Complaint are denied.

149.    The allegations of Paragraph 149 of the First Amended Complaint are denied.

150.    The allegations of Paragraph 150 of the First Amended Complaint are denied.

151.    The allegations of Paragraph 151 of the First Amended Complaint are denied.

152.    The allegations of Paragraph 152 of the First Amended Complaint are denied.

153.    The allegations of Paragraph 153 of the First Amended Complaint are denied.

154.    The allegations of Paragraph 154 of the First Amended Complaint are denied.

155.    The allegations of Paragraph 155 of the First Amended Complaint are denied.

## AS TO COUNT V

## NEGLIGENCE

156.    Defendants repeat and incorporate by reference the responses to the allegations in the previous paragraphs of this First Amended Complaint as if fully set forth herein in lieu of repetition.

157.   Defendants repeat and incorporate by reference their responses to the allegations in paragraphs 12-66 in lieu of repetition.  Defendants specifically deny that Waterside did not begin working on the project until the summer of 2013.

158.   Paragraph 158 of the First Amended Complaint makes allegations as to the contents of a written agreement which document speaks for itself.  To the extent that factual allegations are made or intended to be made as to Defendants, said allegations are denied.

159.   The allegations of Paragraph 159 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

160.   The allegations of Paragraph 160 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

161.   The allegations of Paragraph 161 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

162.   The allegations of Paragraph 162 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

## AS TO COUNT VI

## UNJUST ENRICHMENT

163.   Defendants repeat and incorporate by reference their responses to the previous paragraphs of this First Amended as if fully set forth herein in lieu of repetition.

164.   The allegations of Paragraph 164 of the First Amended Complaint are denied.

165.   The allegations of Paragraph 165 of the First Amended Complaint are denied.

166.   The allegations of Paragraph 166 of the First Amended Complaint are denied.

167.   The allegations of Paragraph 167 of the First Amended Complaint are denied.

168.   The allegations of Paragraph 168 of the First Amended Complaint are denied.

169.   The allegations of Paragraph 169 of the First Amended Complaint are denied.

## AS TO COUNT VII

## VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT

170.   Defendants repeat and incorporate by reference their responses to the previous paragraphs of this First Amended Complaint as if fully set forth herein in lieu of repetition.

171.   The allegations of Paragraph 171 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

172.   The allegations of Paragraph 172 of the First Amended Complaint set forth a legal conclusion to which no response is required.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

173.   Defendants repeat and incorporate by reference their responses to the allegations in Paragraphs 12-66 in lieu of repetition.  Any remaining allegations in Paragraph 173 of the First Amended Complaint are denied.

174.   Defendants repeat and incorporate by reference their responses to the allegations in Paragraphs 12-66 and 101-121 in lieu of repetition.  Any remaining allegations in Paragraph 174 of the First Amended Complaint are denied.

175.   Paragraph 175 of the First Amended Complaint makes allegations as to the contents of a written agreement which document speaks for itself.  To the extent that any factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

176.   The allegations of Paragraph 176 of the First Amended Complaint are denied.

177.   Defendants deny any allegations of Paragraph 177 of the First Amended Complaint that Waterside or its employees were intentionally covering up fill materials.  With respect to any remaining allegations of Paragraph 177, Defendants have insufficient knowledge with which to admit or deny said allegations and therefore deny same and leave Plaintiff to its proofs.

178.   Defendants deny any allegations of Paragraph 178 of the First Amended Complaint that Waterside or its employees were intentionally covering up fill materials.  With respect to any remaining allegations of Paragraph 178, Defendants have insufficient knowledge with which to admit or deny said allegations and therefore deny same and leave Plaintiff to its proofs.

179.   Defendants deny any allegations of Paragraph 179 of the First Amended Complaint that Waterside or its employees were intentionally covering up fill materials.  With respect to any remaining allegations of Paragraph 179, Defendants have insufficient knowledge with which to admit or deny said allegations and therefore deny same and leave Plaintiff to its proofs.

180.   The allegations of Paragraph 180 of the First Amended Complaint are denied.

181.   The allegations of Paragraph 181 of the First Amended Complaint are denied.

182.   Defendants have insufficient knowledge with which to admit or deny the allegations of Paragraph 182 of the First Amended Complaint with respect to the investigation undertaken by TERMS.  With respect to the remaining allegations of Paragraph 182 of the First Amended Complaint, said allegations are denied.

183.   The allegations of Paragraph 183 of the First Amended Complaint are denied as stated.

184.   To the extent that the allegations of Paragraph 184 of the First Amended Complaint make allegations as to the contents of a written agreement, said document speaks for itself.  With respect to any remaining allegations in Paragraph 186 of the First Amended Complaint, said allegations are denied.

185.    The allegations of Paragraph 185 of the First Amended Complaint are denied.

186.    The allegations of Paragraph 186 of the First Amended Complaint are denied.

187.    The allegations of Paragraph 187 of the First Amended Complaint are denied.

188.    The allegations of Paragraph 188 of the First Amended Complaint are denied.

189.    The allegations of Paragraph 189 of the First Amended Complaint are denied.

190.    The allegations of Paragraph 190 of the First Amended Complaint are denied.

191.    The allegations of Paragraph 191 of the First Amended Complaint are denied.

192.    The allegations of Paragraph 192 of the First Amended Complaint are denied.

193.    The allegations of Paragraph 193 of the First Amended Complaint are denied.

194.    The allegations of Paragraph 194 of the First Amended Complaint call for a legal conclusion to which no response is required.  To the extent that any

factual allegations are made or intended to be made as to these Defendants, said allegations are denied.

## AS TO COUNT VIII
## BREACH OF CONTRACT

195.   Defendants repeat and incorporate by reference their responses to the previous paragraphs of this First Amended Complaint as if fully set forth herein in lieu of repetition.

196.   The allegations of Paragraph 196 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

197.   The allegations of Paragraph 197 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

198.   The allegations of Paragraph 198 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

199.   The allegations of Paragraph 199 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

200.   The allegations of Paragraph 200 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

201.   The allegations of Paragraph 201 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

202.   The allegations of Paragraph 202 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

203.   The allegations of Paragraph 203 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

204.   The allegations of Paragraph 204 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

205.   The allegations of Paragraph 205 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

206.   The allegations of Paragraph 206 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

## AS TO COUNT IX

## NEGLIGENCE

207.   Defendants repeat and incorporate by reference their responses to the previous paragraphs of this First Amended Complaint as if fully set forth herein in lieu of repetition.

208.   The allegations of Paragraph 208 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

209.   The allegations of Paragraph 209 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

210.    The allegations of Paragraph 210 of the First Amended Complaint are not directed to these Defendants and therefore no response thereto is required.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or subject to reduction by reason of Plaintiff's own actions and/or the actions of its agent, TERMS.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the Plaintiff's own breach of contract.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because these Defendants were acting under and in accordance with instructions received from Plaintiff or received from Plaintiff's agent, TERMS.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrines of unclean hands, waiver and estoppel.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or subject to reduction by reason of Plaintiff's failure to mitigate its alleged damages.

36

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's alleged damages have been caused solely by the acts of third parties over whom these Defendants had no control or right of control or by superseding or intervening conduct of others outside of Defendants' control.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or subject to reduction because the damages claimed include costs that are not reasonable or necessary.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because Plaintiff's own actions prevented Defendants from completing performance.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part to the extent that the alleged costs incurred are not consistent with the National Contingency Plan or otherwise are not recoverable under CERCLA or the Spill Act.

## ELEVENTH AFFIRMATIVE DEFENSE

The costs allegedly incurred, or to be incurred as referenced in the First Amended Complaint, are not response costs recoverable from Defendants pursuant to CERCLA.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff is barred from relief under CERCLA and the Spill Act because its own acts or omissions have proximally caused the conditions alleged in the First Amended Complaint and in the alternative, are in pari delicto with others.

## THIRTEENTH AFFIRMATIVE DEFENSE

Any alleged damages suffered by Plaintiff, which are denied, and any releases or threatened release of hazardous substances or other contaminants as alleged, and any costs or damages resulting therefrom, were caused solely by the acts and/or omissions of third parties or their agents, employees or any party with a contractual relationship existing directly or indirectly with Plaintiff within the meaning of Section 107(b)(3) of CERCLA.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to comply with the requirements and prerequisites to liability under the Spill Compensation and Control Act, N.J.S.A. § 58:10-23.11 et seq. including without limitation Plaintiff's incurring costs not authorized by the Spill Act and Plaintiff's failure to clean up and remediate contamination according to the National Contingency Plan.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's First Amended Complaint must be dismissed for failure to join indispensable parties to this litigation.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the terms of the contract between the parties.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred, in Plaintiffs' claims are barred, in whole or in part, by the doctrine of set off.

## EIGHTEENTH AFFIRMATIVE DEFENSE.

Plaintiffs' claims are barred, in whole or in part, by the doctrine of recoupment.

## NINETEENTH AFFIRMATIVE DEFENSE

Without conceding any detrimental reliance on the part of Plaintiff, the Plaintiff acted unreasonably if any such reliance exists.

## TWENTIETH AFFIRMATIVE DEFENSE

Any loss suffered by the Plaintiffs was as a result of their own negligence, or the negligence or fault of their agents, which negligence or fault is greater than any alleged negligence of these Defendants, which negligence is specifically denied.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

The damages which Plaintiff seeks, if awarded, would result in unjust enrichment to Plaintiff.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff has no claim under the Spill Act as Defendants are not dischargers or responsible persons within the meaning of the act and there is no causal nexus.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred against individual shareholder Defendants as same cannot be held personally liable for the acts or omissions of its corporation.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to state a claims as they have no claim for cost recovery under Section107 of CERCLA.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Defendants hereby incorporate all affirmative and separate defenses which have been or will be pleaded by any party in this action to the extent that these defenses are applicable to Defendants as well as any additional applicable statutory or common law defenses and reserves the right to amend this Answer to assert additional defenses.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Defendants reserve the right to assert additional defenses that may be pertinent to Plaintiff's claims when the precise nature of said claims is further ascertained through discovery and based upon facts developed as this matter progresses.

**WHEREFORE,** Defendants demand judgment against Plaintiff dismissing Plaintiff's First Amended Complaint in its entirety together with court costs and attorneys fees and awarding such other and further relief as this Court shall deem equitable and just.

ARCHER & GREINER,
A Professional Corporation
Attorneys for Waterside


BY:   /s/ Patrick Papalia
DATED: November 21, 2014          PATRICK PAPALIA

## CROSSCLAIMS

Defendants Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., North River Mews Associates, LLC, and Fred A. Daibes (hereinafter collectively "Waterside") by way of crossclaim against Co-Defendants TERMS Environmental Services, Inc., Aluminum Company of America and A.P. Corporation (hereinafter collectively "Defendants") says:

## THE PARTIES

1.      Defendant, TERMS Environmental Services, Inc. ("TERMS") is a corporation of the State of New Jersey organized for the purpose of providing environmental consulting services.

2.      Defendant, Defendant, Alcoa Corporation (hereinafter "Alcoa"), a corporation, with a business address of 201 Isabella Street, Pittsburgh, PA, was the owner of the Property from 1917 to 1968 and owned and operated a manufacturing facility at the site.  Manufacturing was eventually discontinued and the Property was

sold.  It is believed that, among others, Alcoa's manufacturing activities caused the contamination at the site.

3.      Defendant, A.P. New Jersey, Inc., (hereinafter A.P.) is a Delaware corporation with a business address of 1501 Alcoa Building, 425 Sixth Ave., Pittsburgh, PA was a successor to Alcoa and owner of the Property

## JURISDICTION AND VENUE

4.      Plaintiff has initiated this action under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9607 et seq.

5.      This is an action over which the United States District Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

6.      This Court has supplemental jurisdiction over the crossclaims of Defendants pursuant to 28 U.S.C. §§ 1388 and 1367(a) and because those claims are joined with and arise out of the same common nucleus of facts as Plaintiff's federal law claims and supplemental state law claims asserted in the First Amended Complaint.

7.      Venue for these crossclaims is proper in this Court because all parties have a principal place of business or operations in the State of New Jersey.

## FIRST COUNT

8.     Waterside repeats and incorporates by reference the allegations set forth in paragraphs 1 through 7 of these Crossclaims as if set forth more fully herein.

9.     While Waterside denies any and all negligence or responsibility for any damages in this case, in the event that Waterside is adjudged liable for any loss, damage or injury the Plaintiff may have sustained, Waterside is entitled to, and hereby assert, a crossclaim for contribution against all other Defendants pursuant to the provisions of the New Jersey Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A-1 et seq. and the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 et seq.

## SECOND COUNT

10.     Waterside repeats and incorporates by reference the allegations set forth in paragraphs 1 through 9 of these Crossclaims as if set forth more fully herein.

11.     While  Waterside denies any and all negligence or responsibility for any damages in this case, in the event that Waterside is  adjudged liable for any loss, damage or injury the Plaintiff may have sustained, such liability would be solely vicarious, imputed, secondary or technical, while the negligence of all other defendants would be the active and primary basis for plaintiff's injuries and damages.

12.     Waterside is entitled to common law indemnification and/or contribution from all other defendants for all damages for which it may be held liable to plaintiff, plus interest, attorneys' fees and costs of suit.

## **THIRD COUNT**

13.     Waterside repeats and incorporates by reference the allegations set forth in paragraphs 1 through 12  of these Crossclaims as if set forth more fully herein.

14.     Section 107(a)(4)(B) of CERCLA, 42 U.S.C. §9607(a)(4)(B), provides in pertinent part that any "covered person" "shall be liable for … necessary costs of response by any other person consistent with the national contingency plan."

15.     Section 107(a)(2) of CERCLA, 42 U.S.C. §9607(a)(2), provides, in pertinent part, that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed" shall be liable as a "covered person".

16.     Section 107(a)(3) of CERCLA, 42 U.S.C. 9607(a)(3), provides, in pertinent part, that "any person who by contract, agreement, or otherwise arranged for disposal or treatment … of hazardous substances owned or possessed by such person"  shall be liable as a "covered person".

17.     Plaintiff has asserted in the First Amended Complaint, a claim against Waterside for cost recovery pursuant to Section 107 of CERCLA, 42 U.S.C. §9607.

18.     Defendants are each a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. §9601(21).

19.     Defendants are or were each an owner and/or operator of the Veteran's Field site within the meaning of Section 101(20) of CERCLA, 42 U.S.C. §9601(20) and/or arranged, by contract, agreement, or otherwise, for disposal of hazardous substances.

20.     Veteran's Field is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. §9601(9).

21.     Releases or threatened releases of hazardous substances in or to the environment have occurred at Veteran's Field within the meaning of Section 101(22) of CERCLA, 42 U.S.C. §9601(22).

22.     Defendants are liable under Sections 107(a)(2) and 107(a)(3) of CERCLA, 42 U.S. C. §9607(a)(2) and (3) for releases or threatened release of hazardous substances at Veteran's Field.

23.     Pursuant to Section 107(a) of CERCLA, Waterside is entitled to recovery from Defendants all of their costs of response incurred in connection with .

## **FOURTH COUNT**

24.     Waterside repeats and incorporates by reference the allegations contained in paragraphs 1 through 23 as if same were set forth at length herein.

33.     Section 113(f) of CERCLA, 42 U.S.C. §9613(f), provides that any person may seek contribution from any other person who is liable or potentially liable under Section 107(a) of CERCLA, 42 U.S.C. §9607(a).

34.     Defendants are liable or potentially liable under Section 107(a), 42 U.S.C. §9607(a).

35.     Waterside is entitled to maintain a contribution action against Defendants pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. §9613(f)(1).

## **FIFTH COUNT**

36.     Waterside repeats and incorporates by reference the allegations contained in paragraphs 1 though 35 as if same were set forth at length herein.

58.     New Jersey's Spill Compensation and Control Act, ("Spill Act"), N.J.S.A. 58:10—23.11, et seq., provides for a right of contribution against all dischargers and persons in any way responsible for a discharge.

59.     Defendants are "persons" within the meaning of the Spill Act, N.J.S.A. §58:10-23.11b(o).

60.     "Discharges" within the meaning of the Spill Act, N.J.S.A. §58:10-23.11b(h) have occurred at the Veteran's Field site.

61.     "Hazardous Substances" within the meaning of the Spill Act, N.J.S.A. §58:10-23.11b(k), have been discharged at the Veteran's Field.

62.     Defendants are dischargers or persons in any way responsible for a discharge under the Spill Act, N.J.S.A. §58:10-23.11f(a)(2).

63.     Waterside has incurred costs to investigate and remediate the discharge(s) of hazardous substances and will continue to incur such costs.

64.     As a person who has cleaned up and removed a discharge of hazardous substances, and incurred costs in connection with that removal, Waterside is entitled to contribution from Defendants pursuant to N.J.S.A. §58:10-23.11f(a)(2) and all investigation and remediation costs which Waterside has or will incur, or for which Waterside is deemed liable, should be allocated among Defendants using such equitable factors as the Court deems appropriate.

## SIXTH COUNT

65.     Waterside repeats and incorporates by reference the allegations contained in paragraphs 1 through 64 as if same were set forth at length herein.

66.     Defendant, TERMS, is agent of Plaintiff, Borough of Edgewater.

67.     As agent of Plaintiff, TERMS was responsible for approving of all fill material which was utilized at the Veteran's Field site pursuant to the agreements between Plaintiff and TERMS.

47

68.     Representatives of TERMS specifically approved the use of the recycled concrete fill material under roadways and sidewalks at the Veteran's Field site.

69.     Plaintiffs allege that such approval by TERMS was in breach of contract or otherwise wrongful.

70.     Waterside has incurred costs and expenses and will incur costs and expenses in the future as a result of TERMS breach of contract or otherwise wrongful conduct in approving the use fill material at the Veteran's Field site.

71.     Waterside is entitled to recover from TERMS said costs and expenses.

**WHEREFORE**, Waterside demands judgment against Defendants as follows:

(a)     declaring that the Defendants are liable under CERCLA Section 107(a) and/or 113(f) for Waterside's  response costs and/or contribution for those response costs Waterside is required to pay to Plaintiff or others;

(b)     contribution for costs incurred pursuant to the New Jersey Spill Act;

(c)     compensatory damages for costs incurred by Waterside;

(d)     contribution and indemnification and

(e)     awarding Waterside interest, costs of this action, including reasonable attorneys' fees to the extent permitted by law, and such other, and further relief as the Court determines is just, equitable and appropriate.

ARCHER & GREINER,
A Professional Corporation
Attorneys for Waterside

BY: /s/ Patrick Papalia
PATRICK PAPALIA

DATED: November 21, 2014

## CERTIFICATION PURSUANT TO Rule 11.2

I hereby certify that the matter in controversy is not the subject of any other

action pending in any court or any pending arbitration or administrative proceeding.

/s/ Patrick Papalia
PATRICK PAPALIA

DATED: November 21, 2014

11764156v1

49

**EXHIBIT 6**

David R. Pierce, Esq.  #1812
LINDABURY, McCORMICK, ESTABROOK & COOPER P.C.
53 Cardinal Drive
P. O. Box 2369
Westfield, New Jersey 07091
(908) 233-6800
Attorneys for Defendant,
TERMS Environmental Services, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER, | Civil Action No.: 2:14-cv-05060-ES-MAH |
| Plaintiff | |
| vs. | ANSWER TO PLAINTIFF'S FIRST AMENDED COMPLAINT WITH COUNTERCLAIMS AND CROSS-CLAIMS |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALUMINUM COMPANY OF AMERICA; A.P. NEW JERSEY, INC.; JOHN DOES 1-100; and ABC CORPORATIONS 1-100, | |
| Defendants | |

Defendant, TERMS Environmental Services, Inc., by way of Answer to the First Amended

Complaint of Plaintiff, Borough of Edgewater, hereby says:

**THE PARTIES**

1.      Admitted.

2.      Defendant admits that Waterside Construction, LLC is a New Jersey limited

2547255v1

liability company, but lacks information and knowledge sufficient to form a belief as to the truth of the remainder of the allegations contained in paragraph 2 of the First Amended Complaint and therefore denies same.

3.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 3 of the First Amended Complaint and therefore denies same.

4.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 4 of the First Amended Complaint and therefore denies same.

5.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 5 of the First Amended Complaint and therefore denies same.

6.     Defendant admits that Fred Daibes is an individual and that he owned and/or controlled Waterside Construction, LLC, but lacks information and knowledge sufficient to form a belief as to the truth of the remainder of the allegations contained in paragraph 6 of the First Amended Complaint and therefore denies same.

7.     Defendant admits that TERMS Environmental Services, Inc. ("TERMS") is a New Jersey corporation with an office at 599 Springfield Avenue, Berkeley Heights, New Jersey and was engaged as an environmental consultant for certain work for Plaintiff relating to Veteran's Field and denies the remainder of the allegations contained in Paragraph 7 of the First Amended Complaint.

2547255v1                                        2

8.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 8 of the First Amended Complaint and therefore denies same.

9.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 9 of the First Amended Complaint and therefore denies same.

10.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 10 of the First Amended Complaint and therefore denies same.

11.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 11 of the First Amended Complaint and therefore denies same.

## JURISDICTION AND VENUE

12.    Paragraph 12 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

13.    Paragraph 13 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

14.    Paragraph 14 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

2547255v1

3

15.    Paragraph 15 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

## **BACKGROUND**

16.    Defendant admits that Veteran's Field is located at 1167 River Road, Edgewater, New Jersey, is known as Block 30, Lot 1 on the Tax Map of the Borough of Edgewater and is a public park consisting of approximately 27.58 acres, and prior to the activities referenced in the First Amended Complaint contained ball fields, athletic courts, playgrounds, a picnic area and a community center, but lacks information and knowledge sufficient to form a belief as to the truth of the remainder of the allegations contained in paragraph 16 of the First Amended Complaint and therefore denies same.

17.    Admitted.

18.    Admitted.

19.    Admitted.

20.    Admitted.

21.    Admitted.

22.    Admitted.

23.    Defendant admits that in or about 2011 Plaintiff and Defendant, TERMS entered into a contract for the provision of environmental consulting services by TERMS to Plaintiff and neither admits nor denies the content and terms of that contract but refers the court to the document which speaks for itself.  The remainder of the

2547255v1

4

allegations contained in Paragraph 23 of the First Amended Complaint contain conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

24.   Defendant admits that it was responsible for testing any proposed fill material for Veteran's Field identified to it by Waterside Construction, LLC and for which prior certification as acceptable fill material was not presented by Waterside Construction, LLC and denies the remainder of the allegations contained in Paragraph 24 of the First Amended Complaint.

25.   Defendant admits that it was responsible for developing the plan for sampling, analyzing and approving proposed fill material identified to it by Waterside Construction, LLC for use at Veteran's Field and denies the remainder of the allegations contained in Paragraph 25 of the First Amended Complaint.

26.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 26 of the First Amended Complaint and therefore denies same.

27.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 27 of the First Amended Complaint and therefore denies same.

28.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 28 of the First Amended Complaint and therefore denies same.

29.   Defendant lacks information or knowledge sufficient to form a belief about the

truth of the allegations contained in Paragraph 29 of the First Amended Complaint and therefore denies same.

30.     Admitted.

31.     Defendant admits that after contaminated soils were removed from Veteran's Field by Waterside Construction, LLC work was initiated to cap the remaining Site soils with a demarcation layer and clean fill.   Defendant further admits that it instructed Waterside Construction, LLC ("Waterside") that Waterside was to provide TERMS with documentation certifying that any fill material Waterside proposed to use at Veteran's Field satisfied the requirements for acceptable fill material and that if no such documentation was available, then Waterside was to identify the source of any fill material Waterside proposed to use at Veteran's Field so that TERMS could collect samples of the proposed fill material and have it analyzed. Defendant denies the remainder of the allegations contained in Paragraph 31 of the First Amended Complaint.

32.     Defendant admits that it collected samples of various fill materials proposed for use at Veteran's Field by Waterside and had those samples analyzed.   Defendant further admits that the testing results demonstrated that some proposed fill materials satisfied the NJDEP requirements and were suitable for use at Veteran's Field and that some other proposed fill materials did not satisfy the NJDEP requirements and were not suitable for use at Veteran's Field and that defendant advised Waterside and Plaintiff's representatives of the results of all such testing. Defendant denies the remainder of the allegations contained in Paragraph 32 of the

First Amended Complaint.

33.     Admitted.

34.     Admitted.

35.     Defendant admits that after Super Storm Sandy, it continued to collect samples of various fill materials proposed for use at Veteran's Field by Waterside and had those samples analyzed.   Defendant further admits that the testing results demonstrated that some proposed fill materials satisfied the NJDEP requirements and were suitable for use at Veteran's Field and that some other proposed fill materials did not satisfy the NJDEP requirements and were not suitable for use at Veteran's Field and that defendant advised Waterside and Plaintiff's representatives of the results of all such testing.   Defendant denies the remainder of the allegations contained in Paragraph 35 of the First Amended Complaint.

36.     Defendant admits that it collected samples of various fill materials proposed for use at Veteran's Field by Waterside and had those samples analyzed.   Defendant further admits that the testing results demonstrated that some proposed fill materials satisfied the NJDEP requirements and were suitable for use at Veteran's Field and that some other proposed fill materials did not satisfy the NJDEP requirements and were not suitable for use at Veteran's Field and that defendant advised Waterside and Plaintiff's representatives of the results of all such testing..   Defendant admits that Waterside and Fred Daibes became frustrated by TERMS insistence that proper documentations and/or testing be provided for proposed fill material and that Waterside and Daibes sought to have TERMS and its employees

2547255v1

7

removed from the Project. Defendant denies the remainder of the allegations contained in Paragraph 36 of the First Amended Complaint.

37.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 37 of the First Amended Complaint and therefore denies same.

38.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 38 of the First Amended Complaint and therefore denies same.

39.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 39 of the First Amended Complaint and therefore denies same.

40.     Defendant admits that on or about September 9, 2013, representatives of TERMS went to Veteran's Field and observed fill material containing crushed concrete that was placed at the site by Waterside over the prior weekend and that some of said fill material had been covered with different materials.   Defendant denies the remainder of the allegations contained in Paragraph 40 of the First Amended Complaint.

41.     Defendant admits that representatives of TERMS advised Waterside that it was not to move any fill material containing crushed concrete to any other area at Veteran's Field and that Waterside was not to disturb the stockpiles of fill material containing crushed concrete that Waterside had placed at Veteran's Field.   Defendant denies the remainder of the allegations contained in Paragraph 41 of the First Amended

8

Complaint.

42. Denied.

43. Defendant admits that Waterside, by and at the direction of Daibes, placed fill material containing crushed concrete and contaminated with PCBs at various areas of Veteran's Field.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 43 of the First Amended Complaint and therefore denies same.

44. Admitted.

45. Admitted.

46. Admitted.

47. Admitted.

48. Admitted.

49. Admitted.

50. Defendant admits that Waterside placed fill materials contaminated with PCBs and other contaminants at the Site and blended contaminated fill materials with other fill materials.   Defendant further admits that the investigation indicated that the improper manner in which contaminated fill materials were processed and spread cross-contaminated clean fill material previously used at the Site.   Defendant denies the remainder of the allegations contained in Paragraph 50 of the First Amended Complaint.

51. Admitted.

52. Admitted.

2547255v1

9

53.   Defendant admits that sampling and analysis showed that fill material deposited onto Veteran's Field by Waterside was contaminated with PCBs at concentrations ranging from 10 mg/kg to 300 mg/kg and that the concentrations of PCBs in the soils at Veteran's Field after the prior removal of contaminated soil were below NJDEP's residential direct contact soil remediation standard of 0.2 mg/kg. Defendant denies the remainder of the allegations contained on Paragraph 53 of the First Amended Complaint.

54.   Admitted.

55.   Defendant admits that the Alcoa Site is a known contaminated site and denies the remainder of the allegations contained in Paragraph 55 of the First Amended Complaint.

56.   Defendant admits that the Alcoa Site is a known contaminated site and denies the remainder of the allegations contained in Paragraph 56 of the First Amended Complaint.

57.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 57 of the First Amended Complaint and therefore denies same.

58.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 58 of the First Amended Complaint and therefore denies same.

59.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 59 of the First Amended Complaint

and therefore denies same.

60.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 60 of the First Amended Complaint and therefore denies same.

61.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 61 of the First Amended Complaint and therefore denies same.

62.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 62 of the First Amended Complaint and therefore denies same.

63.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 63 of the First Amended Complaint and therefore denies same.

64.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 64 of the First Amended Complaint and therefore denies same.

65.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 65 of the First Amended Complaint and therefore denies same.

66.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 66 of the First Amended Complaint and therefore denies same.

2547255v1

67.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 67 of the First Amended Complaint and therefore denies same.

68.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 68 of the First Amended Complaint and therefore denies same.

69.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 69 of the First Amended Complaint and therefore denies same.

70.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 70 of the First Amended Complaint and therefore denies same.

71.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 71 of the First Amended Complaint and therefore denies same.

72.     Defendant admits that Defendants Waterside and Daibes caused crushed concrete material from the former Alcoa property to be transported to and disposed of at Veteran's Field.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 72 of the First Amended Complaint and therefore denies same.

73.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 73 of the First Amended Complaint

2547255v1

and therefore denies same.

74.  Denied.

75.  Denied.

76.  Denied.

77.  Denied.

78.  Denied.

79.  Defendant admits that it prepared and submitted to the United States Environmental Protection Agency a proposed self-implementing plan concerning the remediation of the contaminated material brought to Veteran's Field by Defendants Waterside and Daibes and denies the remainder of the allegations contained in Paragraph 79 of the First Amended Complaint.

80.  Denied.

81.  Denied.

## COUNT I

82.  Defendant repeats and incorporates herein the answers set forth in the previous Paragraphs of this Answer as of set forth at length herein.

83.  Paragraph 83 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

84.  Paragraph 84 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

85.     Paragraph 85 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

86.     Paragraph 86 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

87.     Paragraph 87 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

88.     Paragraph 88 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

89.     Paragraph 89 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

90.     Paragraph 90 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

91.     Paragraph 91 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

92.     Paragraph 92 of the First Amended Complaint contains conclusions of law and not

allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

93. Paragraph 93 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

94. Paragraph 94 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

95. Paragraph 95 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

96. Paragraph 96 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

97. Paragraph 97 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

98. Paragraph 98 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

99. Paragraph 99 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and

2547255v1

leaves Plaintiff to its proofs.

100. Paragraph 100 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

101. Paragraph 101 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

102. Paragraph 102 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

103. Denied.

104. Paragraph 104 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

105. Paragraph 105 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

106. Paragraph 106 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

107. Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 107 of the First Amended Complaint

16

2547255v1

and therefore denies same.

108.    Paragraph 108 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

## COUNT II

109.    Defendant repeats and incorporates herein the answers set forth in the previous Paragraphs of this Answer as if set forth at length herein.

110.    Paragraph 110 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

111.    Paragraph 111 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

112.    Paragraph 112 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

113.    Paragraph 113 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

114.    Paragraph 114 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

2547255v1

115.   Paragraph 115 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

116.   Paragraph 116 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

117.   Denied as to Defendant, TERMS.  Defendant lacks information or knowledge sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 117 of the First Amended Complaint and therefore denies same.

118.   Denied as to Defendant, TERMS.  Defendant lacks information or knowledge sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 118 of the First Amended Complaint and therefore denies same.

119.   Paragraph 119 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

120.   Paragraph 120 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

121.   Paragraph 121 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same

2547255v1

and leaves Plaintiff to its proofs.

122.   Paragraph 122 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

123.   Paragraph 123 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

124.   Paragraph 124 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

## COUNT III

125.   Defendant repeats and incorporates herein the answers set forth in the previous Paragraphs of this Answer as if set forth at length herein.

126.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 126 of the First Amended Complaint and therefore denies same.

127.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 127 of the First Amended Complaint and therefore denies same.

128.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 128 of the First Amended Complaint and therefore denies same.

129.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 129 of the First Amended Complaint and therefore denies same.

130.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 130 of the First Amended Complaint and therefore denies same.

131.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 131 of the First Amended Complaint and therefore denies same.

132.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 132 of the First Amended Complaint and therefore denies same.

133.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 133 of the First Amended Complaint and therefore denies same.

134.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 134 of the First Amended Complaint and therefore denies same.

135.     Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 135 of the First Amended Complaint and therefore denies same.

136.     Defendant lacks information or knowledge sufficient to form a belief about the

2547255v1

truth of the allegations contained in Paragraph 136 of the First Amended Complaint and therefore denies same.

137.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 137 of the First Amended Complaint and therefore denies same.

138.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 138 of the First Amended Complaint and therefore denies same.

139.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 139 of the First Amended Complaint and therefore denies same.

140.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 140 of the First Amended Complaint and therefore denies same.

141.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 141 of the First Amended Complaint and therefore denies same.

142.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 142 of the First Amended Complaint and therefore denies same.

143.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 143 of the First Amended Complaint

2547255v1

and therefore denies same.

144.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 144 of the First Amended Complaint and therefore denies same.

145.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 145 of the First Amended Complaint and therefore denies same.

146.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 146 of the First Amended Complaint and therefore denies same.

## COUNT IV

147.   Defendant repeats and incorporates herein the answers set forth in the previous Paragraphs of this Answer as if set forth at length herein.

148.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 148 of the First Amended Complaint and therefore denies same.

149.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 149 of the First Amended Complaint and therefore denies same.

150.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 150 of the First Amended Complaint and therefore denies same.

2547255v1

151.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 151 of the First Amended Complaint and therefore denies same.

152.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 152 of the First Amended Complaint and therefore denies same.

153.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 153 of the First Amended Complaint and therefore denies same.

154.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 154 of the First Amended Complaint and therefore denies same.

155.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 155 of the First Amended Complaint and therefore denies same.

## COUNT V

156.    Defendant repeats and incorporates herein the answers set forth in the previous Paragraphs of this Answer as if set forth at length herein.

157.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 157 of the First Amended Complaint and therefore denies same.

158.    Defendant lacks information or knowledge sufficient to form a belief about the

2547255v1

truth of the allegations contained in Paragraph 158 of the First Amended Complaint and therefore denies same.

159.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 159 of the First Amended Complaint and therefore denies same.

160.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 160 of the First Amended Complaint and therefore denies same.

161.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 161 of the First Amended Complaint and therefore denies same.

162.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 162 of the First Amended Complaint and therefore denies same.

## COUNT VI

163.    Defendant repeats and incorporates herein the answers set forth in the previous Paragraphs of this Answer as if set forth at length herein.

164.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 164 of the First Amended Complaint and therefore denies same.

165.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 165 of the First Amended Complaint

and therefore denies same.

166.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 166 of the First Amended Complaint and therefore denies same.

167.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 167 of the First Amended Complaint and therefore denies same.

168.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 168 of the First Amended Complaint and therefore denies same.

169.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 169 of the First Amended Complaint and therefore denies same.

## COUNT VII

170.    Defendant repeats and incorporates herein the answers set forth in the previous Paragraphs of this Answer as if set forth at length herein.

171.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 171 of the First Amended Complaint and therefore denies same.

172.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 172 of the First Amended Complaint and therefore denies same.

25

2547255v1

173.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 173 of the First Amended Complaint and therefore denies same.

174.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 174 of the First Amended Complaint and therefore denies same.

175.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 175 of the First Amended Complaint and therefore denies same.

176.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 176 of the First Amended Complaint and therefore denies same.

177.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 177 of the First Amended Complaint and therefore denies same.

178.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 178 of the First Amended Complaint and therefore denies same.

179.   Defendant admits that on September 9, 2013 Ronald Dooney of TERMS went to Veteran's Field and observed fill material containing crushed concrete that was placed at the site by Waterside over the prior weekend and that some of said fill material had been covered with different fill material.   Defendant lacks

information or knowledge sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 179 of the First Amended Complaint and therefore denies same.

180.   Defendant admits that representatives of TERMS advised Waterside that it was not to move any fill material containing crushed concrete to any other area at Veteran's Field and that Waterside was not to disturb the stockpiles of fill material containing crushed concrete that Waterside had placed at Veteran's Field.   Defendant denies the remainder of the allegations contained in Paragraph 180 of the First Amended Complaint.

181.   Defendant admits that Waterside, by and at the direction of Daibes, placed fill containing crushed concrete and contaminated with PCBs at various areas of Veteran's Field.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 181 of the First Amended Complaint and therefore denies same.

182.   Admitted.

183.   Admitted.

184.   Admitted that Waterside and Daibes delivered contaminated fill material to Veteran's Field.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the remainder of the allegations contained in Paragraph 184 of the First Amended Complaint and therefore denies same.

185.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 185 of the First Amended Complaint

2547255v1

and therefore denies same.

186.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 186 of the First Amended Complaint and therefore denies same.

187.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 187 of the First Amended Complaint and therefore denies same.

188.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 188 of the First Amended Complaint and therefore denies same.

189.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 189 of the First Amended Complaint and therefore denies same.

190.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 190 of the First Amended Complaint and therefore denies same.

191.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 191 of the First Amended Complaint and therefore denies same.

192.    Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 192 of the First Amended Complaint and therefore denies same.

2547255v1

193.   Defendant lacks information or knowledge sufficient to form a belief about the truth of the allegations contained in Paragraph 193 of the First Amended Complaint and therefore denies same.

194.   Paragraph 194 of the First Amended Complaint contains conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

## COUNT VIII

195.   Defendant repeats and incorporates herein the answers set forth in the previous Paragraphs of this Answer as if set forth at length herein.

196.   Defendant admits that in or about 2011, it and Plaintiff entered into a contract for the provision of environmental consulting services by TERMS to Plaintiff and neither admits nor denies the content and terms of that contract but refers the court to the document which speaks for itself.   The remainder of the allegations contained in Paragraph 196 of the First Amended Complaint contain conclusions of law and not allegations of facts and Defendant therefore, neither admits nor denies same and leaves Plaintiff to its proofs.

197.   Defendant admits that it was responsible for testing any proposed fill material for Veteran's Field identified to it by Waterside Construction, LLC and for which prior certification as acceptable· fill material was not presented by Waterside Construction, LLC and denies the remainder of the allegations contained in Paragraph 197 of the First Amended Complaint.

198.   Denied.

199.  Denied.

200.  Denied.

201.  Denied.

202.  Denied.

203.  Denied.

204.  Defendant admits that it prepared and submitted to the United States Environmental Protection Agency a proposed self-implementing plan concerning the remediation of the contaminated material brought to Veteran's Field by Defendants Waterside and Daibes and denies the remainder of the allegations contained in Paragraph 204 of the First Amended Complaint.

205.  Denied.

206.  Denied.

## COUNT IX

207.  Defendant repeats and incorporates herein the answers set forth in the previous Paragraphs of this Answer as of set forth at length herein.

208.  Denied.

209.  Denied.

210.  Denied.

## PRAYER FOR RELIEF

WHEREFORE, and by reason of the foregoing, Defendant, TERMS Environmental Services, Inc., demands judgment in its favor and against Plaintiff, Borough of Edgewater, dismissing Plaintiff's First Amended Complaint.

2547255v1

30

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or subject to reduction by reason of Plaintiff's own contributory negligence.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or subject to reduction by reason of Plaintiff's failure to mitigate its alleged damages.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the equitable doctrine of unclean hands.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's alleged damages have been caused solely by the acts of third parties over whom this Defendant had no dominion or control.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the equitable doctrine of laches.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the equitable doctrine of waiver.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because this Defendant was acting under and in accordance with instructions received from Plaintiff.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because the conduct of this Defendant was in accordance with the course of dealing established between Plaintiff and this Defendant.

## NINTH AFFIRMATIVE DEFENSE

This Defendant owed no duty to Plaintiff to control the actions of the other Defendants.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims fail to state a claim upon which relief may be granted.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the Plaintiff's own breach of contract.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or subject to reduction because the damages claimed are not consistent with the National Contingency Plan.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or subject to reduction because the damages claimed include costs that are not reasonable or necessary.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or subject to reduction by reason of the Doctrine of Comparative Negligence.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or subject to reduction because Defendant is entitled to common law indemnification from Plaintiff.

## SIXTEENTH SEPARATE DEFENSE

Plaintiff's claims are barred or subject to reduction because Defendant is entitled to common law contribution from Plaintiff.

2547255v1

<u>SEVENTEENTH SEPARATE DEFENSE</u>

Plaintiff's claims are barred or subject to reduction because Defendant is entitled to contribution from Plaintiff pursuant to the Spill Compensation and Control Act, <u>N.J.S.A</u>. 58:10-23.11, <u>et seq</u>.

<u>EIGHTEENTH SEPARATE DEFENSE</u>

Plaintiff's claims are barred because Plaintiff's own actions prevented Defendant from completing performance.

<u>NINETEENTH AFFIRMATIVE DEFENSE</u>

Plaintiff's claims are barred or subject to reduction because Defendant is entitled to contribution from, and/or equitable apportionment with Plaintiff pursuant to the Comprehensive Environmental Response Compensation and Liability Act, 42 <u>U.S.C</u>. § 9613(f)(1).

**COUNTERCLAIMS**

Defendant, TERMS Environmental Services, Inc. ("TERMS"), a corporation of the State of New Jersey, having its principal place of business at 599 Springfield Avenue, Berkeley Heights, New Jersey, 07922, by way of Counterclaim against the Plaintiff, Borough of Edgewater, ("Plaintiff"), says:

**THE PARTIES**

1.      TERMS is a corporation of the State of New Jersey organized for the purpose of providing environmental consulting services.

2.      Upon information and belief, Plaintiff, Borough of Edgewater, is a municipal corporation organized under the laws of the State of New Jersey with an principal place of business located at 55 River Road, Edgewater, Bergen County, New

33

2547255v1

Jersey.

3.    Waterside Construction, LLC ("Waterside") is a New Jersey limited liability company with offices at 22 Route 5, Edgewater, Bergen County, New Jersey.

4.    Fred Daibes ("Daibes") is an individual with offices at 22 Route 5, Edgewater, Bergen County, New Jersey.   Fred Daibes owns and/or controls Waterside.

## JURISDICTION AND VENUE

5.    This action arises under federal law, specifically Section 113(f)(1) of the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9613(f)(1) ("CERCLA").

6.    This is an action over which the United States District Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

7.    This court has supplemental jurisdiction over the state law Counterclaims of Defendant, TERMS Environmental Services, Inc., pursuant to 28 U.S.C. §§ 1388 and 1367(a) and because those claims are joined with and arise out of the same common nucleus of facts as Plaintiff's federal law claims and supplemental state law claims asserted in the First Amended Complaint and Defendant's Federal law counterclaims.

8.    Venue for these Counterclaims is proper in this court because all parties have a principal place of business or operations in New Jersey.

## FIRST COUNT

9.    Plaintiff is, and at all times relevant hereto was, the owner of certain real property

commonly known as Veteran's Field, located at 1167 River Road, Edgewater, New Jersey and designated as Block 30, Lot 1 on the Tax Map of the Borough of Edgewater ("Veteran's Field" or the "Site").

10. In or about June, 2012, Plaintiff initiated a project for the remediation and restoration of the Site (the "Project").

11. Waterside was awarded the bid and entered into a contract with Plaintiff as the contractor for the Project.

12. At all times relevant hereto Neglia Engineering was serving as the Borough Engineer for Plaintiff and was acting for, on behalf of, at the discretion of, and as the agent for Plaintiff.

13. During the Project Plaintiff maintained control of the Site, including access to the Site, and the Project work schedule.

14. As alleged by Plaintiff in the First Amended Complaint, Jason Menzella ("Menzella"), an employee of Neglia Associates, acted as Plaintiff's Site supervisor for the Project.

15. As alleged by Plaintiff in the First Amended Complaint, on or about September 6, 2013, Waterside advised Menzella that it would not be performing any work at the Site on Saturday, September 7, 2013.

16. As alleged by Plaintiff in the First Amended Complaint, on September 7, 2013 Menzella observed employees of Waterside working at the Site; specifically, Mr. Menzalla observed them covering up fill materials that had not previously been present on the Site (the "Suspect Fill").

17.   As alleged by Plaintiff in the First Amended Complaint, Menzella did not believe that the Suspect Fill had been approved for use at the Site.

18.   Plaintiff, upon becoming aware, or suspecting, that Waterside had brought fill that had not been approved for use to the Site did not take any action to cause Waterside to cease work activities at the Site.

19.   Plaintiff did not contact Defendant, TERMS during the weekend of September 7-8, 2013 to advise TERMS that Waterside had brought the Suspect Fill to the site.

20.   The Suspect Fill utilized at the Site by Waterside contained crushed concrete and was contaminated with, among other things, polychlorinated bi-phenyls ("PCBs").

21.   PCBs are a hazardous substance as defined under CERCLA, 42 U.S.C. § 9601(14).

22.   The deposition of the Suspect Fill at the Site constitutes the disposal of and a release or threatened release of a hazardous substance as defined under CERCLA, 42 U.S.C. § 9601(22).

23.   The Site is a facility as defined under CERCLA, 42 U.S.C. § 9601(9).

24.   Pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607(a)(1-4), the following persons are liable for: a) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; and b) any other necessary costs of response incurred by any other person consistent with the national contingency plan:

(1) the owner and operator of a vessel or a facility;

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

25.     Plaintiff has asserted, in the First Amended Complaint, a claim against Defendant, TERMS Environmental Services, Inc. for cost recovery pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607.

26.     Plaintiff is a "person" within the meaning of Section 101(21) of CERCLA, 42. U.S.C. § 9601 (21).

27.     Plaintiff is an owner and/or operator of Veteran's Field within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

28.     Plaintiff was the owner and/or operator of Veteran's Field at the time that the Suspect Fill was disposed of at Veteran's Field.

29.     Plaintiff, Waterside and Fred Daibes arranged, by contract, agreement, or otherwise, for disposal of hazardous substances at Veteran's Field.

30.     Plaintiff is liable under Section 107 of CERCLA, 42 U.S.C. § 9607(a)(1)-(3), with respect to the Suspect Fill deposited at the Site.

31.     Pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), Defendant,

TERMS Environmental Services, Inc. is entitled to maintain a contribution action against Plaintiff with respect to any response costs which Plaintiff seeks to recover from TERMS.

## SECOND COUNT

32. Plaintiff repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 31 of this Counterclaim as if set forth more fully herein.

33. The New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11 et. seq., provides, in pertinent part that "[w]henever one or more dischargers or persons clean up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of cleanup." N.J.S.A. 58.10-13 11f (a)(2).

34. Under the Spill Act, responsible parties are jointly and severally liable to the State for cleanup and removal costs related to discharges of hazardous substances.

35. PCBs are a hazardous substance as defined in the Spill Act, N.J.S.A. 58:10-23.11b.

36. The deposition of the Suspect Fill, contaminated with PCBs, constitutes a discharge of a hazardous substance as defined in the Spill Act, N.J.S.A. 58:10-23.11b.

37. Plaintiff is a "person" within the meaning of the Spill Act, N.J.S.A. 58:10-2b.11b.

38. Plaintiff, as the owner and operator of Veteran's Field at the time of a discharge of a hazardous substance at Veteran's Field is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of the Spill Act, N.J.S.A. 58:10-23.11f(a)(2).

38

39.     Plaintiff has asserted, in the First Amended Complaint, a claim against Defendant, TERMS Environmental Services, Inc., for contribution pursuant to the Spill Act, N.J.S.A. 58:10-23.11f(a)(2).

40.     Pursuant to the Spill Act, N.J.S.A. 58:10-23.11f(a)(2), Defendant, TERMS Environmental Services, Inc. is entitled to maintain a contribution action against Plaintiff with respect to any cleanup and removal costs which Plaintiff seeks to recover from TERMS.

### THIRD COUNT

41.     Defendant repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 40 of this Counterclaim as if set forth more fully herein.

42.     On or about May 16, 2011, Plaintiff engaged Defendant to provide certain environmental consulting services, including, without limitation, soil sampling, sample analysis by a third party laboratory and the services of Ronald Dooney, a Licensed Site Remediation Professional ("LSRP") in connection with a project relating to the site known as Veterans' Field.   A copy of the authorizing resolution passed by the governing body of Plaintiff is attached hereto as Exhibit A.

43.     On or about March 18, 2013, Plaintiff extended the engagement of Defendant's services and authorized additional environmental consulting services.   A copy of the authorizing resolution passed by the governing body of Plaintiff is attached hereto as Exhibit B.

44.     On or about February 18, 2014, Plaintiff extended the engagement of Defendant by adopting a resolution retaining Defendant to oversee the implementation of the

Remedial Action Workplan for the removal of the Suspect Fill from Veteran's Field. A copy of the authorizing resolution passed by the governing body of Plaintiff is attached hereto as Exhibit C.

45.    At all times relevant hereto, the scope of services contracted for by Plaintiff included all of the work necessary to support and lead to the issuance of a Remedial Action Outcome for Veteran's Field by Ronald Dooney, LSRP.

46.    From on or about May, 2011 through May 4, 2014, in furtherance of the contract between Plaintiff and Defendant, Defendant undertook and performed various environmental consulting services, including soil sampling, securing sample analysis from a third party laboratory, and securing data validation services from another third party contractor.

47.    Defendant provided the requested services and/or secured the requested services from third parties at the direction of, and for the benefit of, Plaintiff.

48.    Plaintiff accepted and retained the benefit of the services rendered by Defendant and/or secured by Defendant from others.

49.    Defendant issued invoices to Plaintiff for services rendered or secured from others for the period from August 1, 2013 through May 4, 2014.

50.    At the time Plaintiff engaged Defendant, Plaintiff agreed to pay Defendant for all services provided and/or secured from others for the benefit of Plaintiff.

51.    Plaintiff has paid a portion of one invoice for services for the period from August 1, 2013 through May 4, 2014, but has failed and refused to pay the remaining balance of such invoices.

52.     There is currently due and owing to the Defendant the sum of Two Hundred Two Thousand One Hundred Forty-Five and 46/100 Dollars ($202,145.46) for the services provided to or for the benefit of Plaintiff, which were accepted, and the benefit of which were retained, by Plaintiff.

53.     Despite demand from Defendant, Plaintiff has failed and refused to pay the outstanding sum due in the amount of Two Hundred Two Thousand One Hundred Forty-Five and 46/100 Dollars ($202,145.46).

54.     In or about May, 2014, Plaintiff wrongfully terminated its contract with Defendant and has failed and refused to utilize the services of Defendant to complete the scope of work agreed to in the original proposal and as amended by subsequent resolutions adopted by Plaintiff.

55.     Plaintiff's termination of its contract with Defendant constituted a breach of that contract by Plaintiff.

56.     Plaintiff's refusal to tender payment for services rendered constitutes a breach of its contract with Defendant.

57.     As a result of the Plaintiff's breach of its contract with Defendant, Defendant has suffered damages.

## FOURTH COUNT

58.     Defendant repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 57 of this Counterclaim as if set forth more fully herein.

59.     There is currently due and owing to the Defendant the sum of Two Hundred Two Thousand One Hundred Forty-Five and 46/100 Dollars ($202,145.46) on a certain

2547255v1

41

book account for services provided to and/or secured for the benefit of, Plaintiff.

60.     Defendant has demanded payment from Plaintiff.

61.     Despite written demand, Plaintiff has failed and refused to pay for said services.

### FIFTH COUNT

62.     Defendant repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 61 of this Counterclaim as if set forth more fully herein.

63.     At the time the Plaintiff engaged Defendant to provide and/or obtain certain services from third parties, Plaintiff promised to pay the reasonable value for such services rendered and/or secured for the benefit of Plaintiff.

64.     Defendant has provided and/or secured services for the benefit of Plaintiff that have a reasonable value equal to or in excess of Two Hundred Two Thousand One Hundred Forty-Five and 46/100 Dollars ($202,145.46).   There is currently due and owing to Defendant the reasonable sum of Two Hundred Two Thousand One Hundred Forty-Five and 46/100 Dollars ($202,145.46) for services rendered and/or secured for the benefit of Plaintiff.

65.     Defendant has demanded payment from Plaintiff for the reasonable value for said services.

66.     Plaintiff has failed and refused to pay the reasonable value for said services.

### SIXTH COUNT

67.     Defendant repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 66 of this Counterclaim as if set forth more fully herein.

68.     Plaintiff, having been indebted to Defendant in the sum of Two Hundred Two

2547255v1

Thousand One Hundred Forty-Five and 46/100 Dollars ($202,145.46) upon an account stated between the Defendant and the Plaintiff did promise to pay the Defendant said amount upon demand.

69.   Defendant has demanded payment for said monies due and owing to it from the Plaintiff.

70.   Plaintiff has failed and refused to pay said monies due and owing to Defendant.

## SEVENTH COUNT

71.   Defendant repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 70 of this Counterclaim as if set forth more fully herein

72.   There is currently due and owing to Defendant for services provided and/or secured for the benefit of Plaintiff an agreed-upon amount of Two Hundred Two Thousand One Hundred Forty-Five and 46/100 Dollars ($202,145.46).

73.   Plaintiff promised to pay the agreed-upon amount.

74.   Defendant has demanded payment for said services from the Plaintiff.

75.   Plaintiff has failed and refused to pay said sum.

## EIGHTH COUNT

76.   Defendant repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 75 of this Counterclaim as if set forth more fully herein.

77.   Plaintiff has received a benefit in the form of receiving certain services rendered by Defendant or secured from third parties by Defendant for the benefit of Plaintiff without paying the agreed-upon price for same.

78.   Such benefit is at the expense of Defendant, and Plaintiff has knowledge and/or

appreciation of such benefit.

79.    Acceptance and retention of such benefit under these circumstances by the Plaintiff without payment of fair market value to Defendant would be unjust and inequitable.

80.    Plaintiff has been unjustly enriched, and Defendant is entitled to payment of the aforementioned monies plus interest and attorneys' fees and costs.

81.    Said sum of money has not been paid by Plaintiff, although demand to Plaintiff for payment has heretofore been duly made.

82.    By reason thereof, Defendant has been damaged in an amount not less than Two Hundred Two Thousand One Hundred Forty-Five and 46/100 Dollars ($202,145.46).

## CROSSCLAIMS

Defendant, TERMS Environmental Services, Inc. ("TERMS"), a corporation of the State of New Jersey, having its principal place of business at 599 Springfield Avenue, Berkeley Heights, New Jersey, 07922, by way of Crossclaim against the Defendants, Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., North River Mews Associates, LLC, Fred A. Daibes, Aluminum Company of America, A.P. New Jersey, Inc., John Does 1-100 and ABC Corporations 1-100, says:

## THE PARTIES

1.    Defendant, TERMS Environmental Services, Inc. is a corporation of the State of New Jersey organized for the purpose of providing environmental consulting

44

services.

2.      Upon information and belief, Waterside Construction , LLC ("Waterside")  is a New Jersey limited liability company with offices at 22 Route 5, Edgewater, Bergen County, New Jersey.   Waterside is an affiliate, subsidiary or otherwise related to 38 COAH, Daibes Brothers, and Fred Daibes.

3.      38 COAH, LLC ("38 COAH") is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, Bergen County, New Jersey.   38 COAH is an affiliate, subsidiary  or  otherwise  related  to  Waterside,  Daibes Brothers, and Fred Daibes.   38  COAH  is  the  present  owner  and/or  person otherwise responsible for the Alcoa Site as defined herein.

4.      Daibes Brothers, Inc. ("Daibes Brothers") is a New Jersey corporation with offices at 1000 Portside Drive, Edgewater, Bergen County, New Jersey.   Daibes Brothers is an affiliate, subsidiary or otherwise related to Waterside, 38 COAH, and Fred Daibes.

5.      North River Mews Associates, LLC ("North River") is a New Jersey limited liability company with offices at 1000 Portside Drive, Edgewater, Bergen County, New Jersey.   North River is an owner and/or person otherwise responsible for the Alcoa Site as defined herein.

6.      Fred A. Daibes ("Daibes") is an individual with offices at 22 Route 5, Edgewater, Bergen County, New Jersey.   Daibes owned and/or controlled Waterside, 38 COAH, North River and Daibes Brothers.

7.      ALCOA is a Pennsylvania Corporation with offices at 201 Isabella Street,

Pittsburg, Pennsylvania 15212.   ALCOA is a prior owner, operator and/or generator is responsible for the contamination at the Alcoa site as defined herein.

8.   A.P. New Jersey, Inc. ("A.P.")  is a New Jersey Corporation.   A.P. is a prior owner, operator and/or generator is responsible for the contamination at the Alcoa site as defined herein.

9.   Defendants, John Does 1-100 are others currently unknown who have generated, transported, or are otherwise responsible for the lease of hazardous substances at Veteran's Field.

10.   Defendants, ABC Corporation 1-100 are others currently unknown who have generated, transported, or are otherwise responsible for the lease of hazardous substances at Veteran's Field.

## JURISDICTION AND VENUE

11.   This action arises under federal law, specifically Section 113(f)(1) of the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9613(f)(1) ("CERCLA").

12.   This is an action over which the United States District Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

13.   This court has supplemental jurisdiction over the state law Crossclaims of Defendant, TERMS Environmental Services, Inc., pursuant to 28 U.S.C. §§ 1388 and 1367(a) and because those claims are joined with and arise out of the same common nucleus of facts as Plaintiff's federal law claims and supplemental state

2547255v1

law claims asserted in the First Amended Complaint and TERMS' federal law Crossclaims.

14.     Venue for these Crossclaims is proper in this court because all parties have a principal place of business or operations in New Jersey.

## FIRST COUNT

15.     Plaintiff is, and all times relevant hereto was, the owner of certain real property commonly known as Veteran's Field, located at 1167 River Road, Edgewater, New Jersey and designated as Block 30, Lot 1 on the Tax Map of the Borough of Edgewater ("Veteran's Field" or the "Site").

16.     In or about June, 2012, Plaintiff initiated a project for the removal of contaminated fill material from the Site and restoration of the Site (the "Project").

17.     Waterside was awarded the bid and entered into a contract with Plaintiff as the contractor for the Project.

18.     As alleged by Plaintiff in its First Amended Complaint, Jason Menzella ("Menzella"), an employee of Borough Engineer, Neglia Associates, acted as Plaintiff's Site supervisor for the Project.

19.     As alleged by Plaintiff in its First Amended Complaint, on or about September 6, 2013, Waterside advised Menzella that it would not be performing any work at the Site on Saturday, September 7, 2013.

20.     As alleged by Plaintiff in its First Amended Complaint, on September 7, 2013, Menzella observed employees of Waterside working at the Site; specifically, Mr. Menzella observed them covering up fill materials that had not previously been

47

2547255v1

present at the Site (the "Suspect Fill").

21.     The Suspect Fill brought to and deposited at the Site by Waterside contained crushed concrete and was contaminated with, among other things, polychlorinated bi-phenyls ("PCBs").

22.     Defendant, Daibes, subsequently admitted that the Suspect Fill originated from the former Alcoa plant located at 600 River Road, Edgewater, New Jersey (the "Alcoa Site").

23.     Upon information and belief, the Alcoa Site was, and/or is, owned, controlled and operated by Daibes, North River, A.P. and Alcoa.

24.     Upon information and belief, Daibes, Waterside, Daibes Brothers, 38 COAH, North River, A.P. and others caused the Suspect Fill to be crushed at the Alcoa Site and transported to and placed at the Site.

25.     Daibes, Waterside, Daibes Brothers, 38 COAH, North River and A.P. failed to obtain a Class B Recycling Permit from the New Jersey Department of Environmental Protection before transporting the Suspect Fill to the Site and using it as the Site as fill material.

26.     PCBs are a hazardous substance as defined under CERCLA, 42 U.S.C. § 9601 (14).

27.     The deposition of the Suspect Fill at the site constitutes the disposal of and a release or threatened release of a hazardous substance as defined under CERCLA, 42 U.S.C. § 9601 (22).

28.     The Site is a facility as defined under CERCLA, 42 U.S.C. § 9601(9).

29.     Pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607(a)(1-4), the following

2547255v1

persons are liable for: a) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; and b) any other necessary costs of response incurred by any other person consistent with the national contingency plan:

    (1)    the owner and operator of a vessel or a facility;

    (2)    any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;

    (3)    any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances; and

    (4)    any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

30.    Plaintiff has asserted, in the First Amended Complaint, a claim against Defendant, TERMS Environmental Services, Inc. for cost recovery pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607.

31.    A.P., ALCOA, Waterside, Daibes, Daibes Brothers, 38 COAH, John Does 1-100 and ABC Corporations 1-100 are each a "person" within the meaning of Section 101 (21) of CERCLA, 42 U.S.C. §9601(21).

32.    A.P., ALCOA, Waterside, Daibes, Daibes Brothers, 38 COAH, North River,

and John Does 1-100 and ABC Corporations 1-100 are each an operator of Veteran's Field within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

33. A.P., ALCOA, Waterside, Daibes, Daibes Brothers, 38 COAH, North River, John Does 1-100 and ABC Corporations 1-100 arranged, by contract, agreement, or otherwise, for disposal of hazardous substances at Veteran's Field.

34. Waterside, Daibes, Daibes Brothers, 38 COAH, North River, John Does 1-100 and ABC Corporations 1-100 accepted hazardous substances for transport to Veteran's Field.

35. Waterside, Daibes, Daibes Brothers, 38 COAH, North River, A.P., Alcoa, John Does 1-100 and ABC Corporations 1-100 were each an operator of Veteran's Field at the time that the Suspect Fill was disposed of at Veteran's Field.

36. A.P., ALCOA, Waterside, Daibes, Daibes Brothers, 38 COAH, North River, John Does 1-100 and ABC Corporations 1-100 are liable under Section 107 of CERCLA, 42 U.S.C. § 9607(a)(1)-(4) with respect to the Suspect Fill deposited at the Site.

37. Pursuant to Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), Defendant, TERMS Environmental Services, Inc. is entitled to maintain a contribution action against Alcoa, A.P., Waterside, Daibes, Daibes Brothers, 38 COAH, North River, John Does 1-100 and ABC Corporations 1-100 with respect to any response costs which Plaintiff seeks to recover from TERMS.

## SECOND COUNT

38.    Plaintiff repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 37 of these Crossclaims as if set forth more fully herein.

39.    The New Jersey Spill Compensation and Control Act, ("Spill Act") N.J.S.A. 58:10-23.11, et. seq., provides, in pertinent part that "[w]henever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance who are liable for the cost of cleanup." N.J.S.A. 58.10-23.11f (a)(2),

40.    Under the Spill Act, responsible parties are jointly and severally liable to the State for cleanup and removal costs related to discharges of hazardous substances.

41.    Waterside is a "person" within the meaning of the Spill Act, N.J.S.A. 58-10-23.11b.

42.    Fred Daibes is a "person" within the meaning of the Spill Act, N.J.S.A. 58:10-23.11b.

43.    Daibes Brothers is a "person" within the meaning of the Spill Act, N.J.S.A. 58:10-23.11b.

44.    38 COAH is a "person" within the meaning of the Spill Act, N.J.S.A. 58:10-23.11b.

45.    North River is a "person" within the meaning of the Spill Act, N.J.S.A. 58:10-13.11b(o).

46.    ALCOA is a "person" within the meaning of the Spill Act, N.J.S.A. 58:10-23.11b.

47.    A.P. is a "person" within the meaning of the Spill Act, N.J.S.A. 58:10-23.11b.

2547255v1

51

48. John Does 1-100 is a "person" within the meaning of the Spill Act, N.J.S.A. 58:10-23.11b.

49. ABC Corporations 1-100 is a "person" within the meaning of the Spill Act, N.J.S.A. 58:10-23.11b.

50. PCBs are a hazardous substance as defined in the Spill Act, N.J.S.A. 58:10-23.11b.

51. The deposition at Veteran's Field of the Suspect Fill, contaminated with PCBs, constitutes a discharge of a hazardous substance as defined in the Spill Act, N.J.S.A. 58:10-23.11b.

52. Plaintiff has asserted, in the First Amended Complaint, a claim against Defendant, TERMS Environmental Services, Inc., for contribution pursuant to the Spill Act, N.J.S.A. 58:10-23.11f(a)(2).

53. Waterside is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of the Spill Act, N.J.S.A. 58:10-23.11f(a)(2), with respect to the Suspect Fill disposed of at Veteran's Field.

54. Daibes is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of the Spill Act, N.J.S.A. 58:10-23.11f(a)(2), with respect to the Suspect Fill disposed of at Veteran's Field.

55. Daibes Brothers is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of the Spill Act, N.J.S.A. 58:10-23.11f(a)(2), with respect to the Suspect Fill disposed of at Veteran's Field.

2547255v1

56.     38 COAH is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of the Spill Act, <u>N.J.S.A.</u> 58:10-23.11f(a)(2), with respect to the Suspect Fill disposed of at Veteran's Field.

57.     North River is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of the Spill Act, <u>N.J.S.A.</u> 58:10-23.11f(a)(2), with respect to the Suspect Fill disposed of at Veteran's Field.

58.     ALCOA is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of the Spill Act, <u>N.J.S.A.</u> 58:10-23.11f(a)(2), with respect to the Suspect Fill disposed of at Veteran's Field.

59.     A.P. is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of the Spill Act, <u>N.J.S.A.</u> 58:10-23.11f(a)(2), with respect to the Suspect Fill disposed of at Veteran's Field.

60.     John Does 1-100 is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of the Spill Act, <u>N.J.S.A.</u> 58:10-23.11f(a)(2), with respect to the Suspect Fill disposed of at Veteran's Field.

61.     ABC Corporations 1-100 is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of the Spill Act, <u>N.J.S.A.</u> 58:10-23.11f(a)(2), with respect to the Suspect Fill disposed of at Veteran's Field.

62.     Pursuant to the Spill Act, <u>N.J.S.A.</u> 58:10-23.11f(a)(2), Defendant, TERMS Environmental Services, Inc., is a entitled to maintain a contribution action against Defendants, Waterside, Daibes, Daibes Brothers, 38 COAH, North River, A.P.

2547255v1

Alcoa, John Does 1-100 and ABC Corporation 1-100 with respect to any cleanup and removal costs which Plaintiff seeks to recover from Defendant, TERMS.

### THIRD COUNT

63. Plaintiff repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 62 of these Crossclaims as if set forth more fully herein.

64. While defendant, TERMS Environmental Consulting, Inc., denies any and all negligence or legal duty in this case, in the event that the defendant, TERMS Environmental Consulting, Inc., is adjudged liable for any loss, damage or injury the plaintiff may have sustained, such liability would be solely vicarious, imputed, secondary or technical, while the negligence of all other defendants would be the active and primary basis for plaintiff's injuries and damages.

65. Defendant, TERMS Environmental Consulting, Inc., is entitled to common law indemnification and/or contribution from all other defendants for all damages for which it may be held liable to plaintiff, plus interest, attorneys' fees and costs of suit.

### FOURTH COUNT

66. Plaintiff repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 65 of these Crossclaims as if set forth more fully herein.

67. While defendant, TERMS Environmental Consulting, Inc., denies any and all negligence on its part in this case, in the event that the defendant, TERMS Environmental Consulting, Inc., is adjudged liable for any loss, damage or injury the plaintiff may have sustained, TERMS Environmental Consulting, Inc., is

54

2547255v1

entitled to, and hereby asserts, a crossclaim for contribution against all other defendants pursuant to the provisions of the New Jersey Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A-1 et seq. and the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 et seq.

## FIFTH COUNT

68. Plaintiff repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 67 of these Crossclaims as if set forth more fully herein.

69. On or about May 16, 2011, the governing body of the Borough of Edgewater adopted a resolution retaining TERMS Environmental Services, Inc. to perform certain environmental work relating to Veteran's Field as set forth in a proposal dated April 21, 2011.

70. On or about June 18, 2012, the governing body of the Borough of Edgewater adopted a resolution approving an extension of the existing Professional Services Contract with TERMS Environmental Services, Inc. to perform additional environmental work relating to Veteran's Field and the Project.

71. On or about March 18, 2013, the governing body of the Borough of Edgewater adopted another resolution retaining TERMS Environmental Services, Inc. to perform additional services relating to Veteran's Field and the Project, including the provision of additional testing services for the verification of the use of clean fill material.

2547255v1

72.    During the course of the Veterans' Field Project, Waterside and Fred Daibes objected to, and attempted to circumvent, the directions of TERMS regarding the testing and verification of fill material to be used at Veteran's Field.

73.    Daibes has and exerts substantial political influence in the Borough of Edgewater and in Bergen County, New Jersey.

74.    During the course of the Project, Daibes stated to Ronald Dooney, President of TERMS, words that in substance conveyed an intent to have TERMS removed from the Project.

75.    During the course of the Project, it was intimated to Ronald Dooney by agents of Plaintiff that TERMS needed to change the site personnel assigned to the Project or TERMS would lose the job and that TERMS needed to find a way to "work with" Daibes if it wanted to continue to work on the Project.

76.    The events set forth in paragraph 75 above could only have transpired as a result of active efforts by Daibes to have TERMS removed from the Project.

77.    As a result of the discussion referenced in paragraph 75 above, TERMS removed its employee Noah Skyte from the Project and replaced him with Matthew Follo.

78.    Subsequent to the deposition of the Suspect Fill at Veteran's Field by Waterside, Daibes continued to exert efforts to have TERMS removed as the environmental consulting firm for the Project.

79.     On or about February 18, 2014, the governing body of the Borough of Edgewater adopted a resolution retaining TERMS Environmental Services, Inc. to oversee the implementation of the Remedial Action Workplan for the removal of the Suspect Fill from Veteran's Field.

80.     Daibes' efforts to have TERMS removed as the environmental consulting firm for the Veterans' Field Project were intentional and malicious.

81.     Sometime after February 18, 2014, Defendant, Fred Daibes, made an assertion that the Suspect Fill was utilized at Veteran's Field by Waterside because TERMS had approved its use.

82.     The statement made by Fred Daibes that the Suspect Fill was utilized at Veteran's Field by Waterside because TERMS had approved its use was untrue.

83.     At the time that Fred Daibes made the statement that the Suspect Fill was utilized at Veteran's Field by Waterside because TERMS had approved its use, he knew, or through the exercise of due care, should have known, that it was untrue.

84.     Daibes untrue statement that the Suspect Fill was utilized at Veteran's Field by Waterside because TERMS had approved its use was made intentionally and with malice.

85.     On or about May 2, 2014, TERMS was advised, by way of a letter to its' attorney, that Plaintiff was no longer going to use TERMS' services in connection with the

restoration of Veteran's Field or the implementation of the Remedial Action Workplan for the removal of the Suspect Fill from Veteran's Field.

86.　　At all times prior to May 2, 2014, TERMS had an expectation that its existing relationship with Plaintiff and its retention as the environmental consultant on the Project would continue until the end of the Project.

87.　　As a result of the false statement made by Daibes, Plaintiff ceased to use the services of TERMS and replaced TERMS on the Project with another environmental consulting firm.

88.　　As a result of Daibes' efforts to have TERMS removed as the environmental consulting firm for the Project, Plaintiff ceased to utilize the services of TERMS.

89.　　The false statement made by Daibes constitutes slander *per se*.

90.　　As a result of the false statement made by Daibes, TERMS has suffered damages.

91.　　TERMS is entitled to recover its damages from Daibes.

## SIXTH COUNT

92.　　Plaintiff repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 91 of these Crossclaims as if set forth more fully herein.

93.　　The actions of Daibes constitute tortious interference with the contract between Defendant, TERMS Environmental Services, Inc., and Plaintiff.

58

2547255v1

94.     As a result of the tortious interference with contract by Daibes, TERMS has suffered damages.

95.     TERMS is entitled to recover its damages from Daibes.

## SEVENTH COUNT

96.     Plaintiff repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 95 of these Crossclaims as if set forth more fully herein.

97.     The actions of Daibes constitute tortious interference the economic advantage enjoyed by Defendant, TERMS Environmental Services, Inc.

98.     As a result of the tortious interference with TERMS' economic advantage by Daibes, TERMS has suffered damages.

99.     TERMS is entitled to recover its damages from Daibes.

Lindabury, McCormick, Estabrook & Cooper, P.C.
Attorneys for Defendant, TERMS Environmental Services, Inc.

*David R. Pierce*
David R. Pierce, Esq.

Dated: November 4, 2014

## CERTIFICATION PURSUANT TO RULE 11.2
## OF THE LOCAL CIVIL RULES FOR THE DISTRICT OF NEW JERSEY

I hereby certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

*David R. Pierce*
David R. Pierce, Esq.

Dated:   November 4, 2014

59

2547255v1

# EXHIBIT "A"

2320666v1



**BOROUGH OF EDGEWATER**
**RESOLUTION**

| COUNCILPERSON | YES | No | ABSTAIN | ABSENT |
|---|---|---|---|---|
| HOLTJE | | | | ✓ |
| HENWOOD | ✓ | | | |
| MONTE | ✓ | | | |
| VIDAL | ✓ | | | |
| JORDAN | ✓ | | | |
| ROSE | ✓ | | | |

DATE: May 16, 2011

RESOLUTION No. 2011-128

INTRODUCED BY: _N. Rose_

SECOND BY: _D. Jordan_

### VETERANS FIELD ENVIRONMENTAL SITE INVESTIGATION FOR HUDSON RIVER WATERFRONT WALKWAY PROJECT

**WHEREAS** the Borough of Edgewater has authorized phase II of the Veterans Field Improvements Project; and

**WHEREAS** this project is being funded by both the New Jersey Environmental Protection Agency Green Acres Program as well as the Bergen County Open Space Trust Program;

**WHEREAS** in order for the Borough of Edgewater to proceed with Phase II, the NJDEP Green Acres Program requires an environmental investigation report;

**WHEREAS** Neglia Engineering Associates, the Borough's Engineer, provided for an initial environmental report which resulted in elevated levels of historic fill compounds at two and four foot depths;

**WHEREAS** the Borough Engineer has recommended additional testing to confirm that no hazards exist and that all elevated compounds are determined to be acceptable for historic fill.

**NOW THEREFORE BE IT RESOLVED** the Edgewater Mayor and Council hereby authorize TERMS Environmental Services, 599 Springfield Avenue, Berkley Heights, New Jersey 07922 to perform additional testing for soils at Veterans Field at a cost not to exceed $7,720.00

I hereby certify that the above resolution was adopted by the Mayor and Council on May 16, 2011.

BARBARA RAE, RMC, CMC
Borough Clerk

# EXHIBIT "B"

2320666v1

**MINUTES OF A REGULAR SESSION OF THE EDGEWTER MAYOR & COUNCIL HELD IN THE NANCY MERSE COUNCIL CHAMBERS AT 55 RIVER ROAD, EDGEWATER, COUNTY OF BERGEN, STATE OF NEW JERSEY ON MARCH 18, 2013**

**PRESIDING:** James F. Delaney, Mayor

**PRESENT:** Councilman Doran, Councilman Monte, Councilman Jordan and Councilman Bartolomeo

**ALSO PRESENT:** Administrator Gregory S. Franz, Borough Clerk Barbara Rae and Borough Attorney Philip Boggia

**ABSENT:** Councilman Henwood and Councilman Vidal

**OPEN PUBLIC MEETING ACT STATEMENT**

Mayor Delaney read the Open Public Meetings Act Statement in the Record.

**MOMENT OF SILENCE**

Mayor Delaney asked for a moment of silence and remembered Mary O'Connor.

**SALUTE TO THE FLAG**

Councilman Bartolomeo led the Pledge of Allegiance.

**CONFERENCE**

    1. Police Promotion of Joseph Criscuolo

          - Motion to go out of regular order of business to make the appointment

**MOTION**

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Bartolomeo

Motion to go out of regular order of business to make Sergeant appointment.

On roll call the vote was as follows:

| Councilman Henwood | Absent |
|---|---|
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Absent |
| Councilman Jordan | Yes |
| Councilman Bartolomeo | Yes |

The Clerk then read Resolution 2013-069 in its entirety:

**RESOLUTION
2013-069**

March 18, 2013

**INTRODUCED:** Councilman Jordan
**SECOND:** Councilman Bartolomeo

1

**WHEREAS** Chapter 66 of the Code of the Borough of Edgewater establishes the Organization of the Edgewater Police Department; and

**WHEREAS** a vacancy will exist in the position of Police Sergeant on April 1, 2013; and

**WHEREAS** as a result of the New Jersey Department of Personnel competitive examination for the position of Police Sergeant, the following candidate is now placed No. 1 and is eligible for appointment:

> Joseph Criscuolo,
> New Milford, NJ

**NOW THEREFORE BE IT RESOLVED** by the Mayor and Council of the Borough of Edgewater that Police Sergeant is hereby appointed to the position of Police Sergeant in the Edgewater Police Department effective April 1, 2013 and is to be paid a salary in accordance with the present salary ordinance.

On roll call the vote was as follows:

| | |
|---|---|
| Councilman Henwood | Absent |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Absent |
| Councilman Jordan | Yes |
| Councilman Bartolomeo | Yes |

Mayor Delaney administered the oath of Office to Police Sergeant Joseph Criscuolo.

Mayor Delaney and the Council congratulated Sergeant Criscuolo.

## MOTION

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Bartolomeo

Motion to return to the regular order of business.

On roll call the vote was as follows:

| | |
|---|---|
| Councilman Henwood | Absent |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Absent |
| Councilman Jordan | Yes |
| Councilman Bartolomeo | Yes |

### 2. Neglia Engineering Representative David Juzmeshi

- Mr. Juzmeshi was present to discuss the damages sustained at Veterans Field as a result of Hurricane Sandy.
- Administrator Franz spoke about the possibility of increasing the depth of original contract design.
- The question is should the Borough raise the design elevations of the main field, and increase the modular block wall and importing fill items. Continued discussion about the proposed new flood maps and whether or not to further elevate Veterans Field.
- Mr. Juzmeshi indicated the cost could be an additional $300,000 to $400,000.
- Consensus of the council was to move forward to obtain specs and a formal proposal from Neglia.

On roll call the vote was as follows:

2

| Councilman Henwood | Absent |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Absent |
| Councilman Jordan | Yes |
| Councilman Bartolomeo | Yes |

Neglia to prepare information for the next Work Session.

**OPEN MEETING TO THE PUBLIC**

Mayor Delaney opened the meeting to the public and the following were heard:

Tom Tansey, 611 Undercliff Avenue:

- Referenced two letters discussed two years ago which pertained to the walkway. Spoke about Walkway letter dated June 3, 2010 of NJDEP.  Said he takes issue with third paragraph.
- Asked Borough Attorney Boggia about the rezoning of the area from P to Recreation.
- Spoke about another letter from Ellen Monoque Hudson River Conservancy.  He said that the letter represented she was a member of Hudson County Commission.  Secondly, the letter referenced the Edgewater Renaissance.  He took issue with this because the walkway has nothing to do with a renaissance but rather the walkway is mandated by the State of New Jersey.
- He referenced the website that listed M. Hogan as a trustee.

Mary Hogan, 606 Undercliff Avenue:

- Speaks for herself but feels we need to raise the field to what is already there; to leave it too low is not helpful either.
- Requests light on Route 5.  Borough Administrator asked if a directional light would be more feasible.
- Spoke about FEMA mapping and the shore.  Recommends that the Borough not wait until August  Also spoke about the Walkway at the Ballfield.
- Question on 2 Resolutions.

Denis Gallagher, 18 Arlington Terrace:

- He stated that he didn't hear any mention of the actual sea wall and asked if it was evaluated.

   ** At this time the Municipal Clerk informed the Governing Body and the public that the meeting has not been recording.

- Spoke about Vreeland Terrace Building, the for sale sign and the deed restriction.  Asked for Attorney's input.
- Spoke about Le Jardin property and a court case where he claims Mr. Daibes told judge that he can't make any use of the property.
- Stated the town has the power to fix it and wants town to look into matter.

No one else wished to be heard therefore the Mayor closed the meeting to the public.

Mayor Delaney responded to Mr. Gallagher and asked Borough Attorney Boggia to also respond and he did.

Attorney Boggia spoke about the deed restriction that was not put on the affordable housing section but on the other remaining portion of the property.  It says what the property could be developed for and that we are confident that the deed restriction remains.

Administrator Franz also spoke on the issue.  He clarified the deed restriction does reference recreational and spa like.  No where does it say municipal recreational facility.

3

**APPROVAL OF MINUTES**

The following minutes were listed for approval:  February 4, 2013 Regular Meeting, February 4, 2013 1st Closed Session, February 4, 2013 2nd Closed Session and February 19, 2013 Regular Meeting.

MOTION

March 18, 2013

**INTRODUCED:**  Councilman Doran
**SECOND:** Councilman Jordan

A motion to approve the minutes of the February 4, 2013 Regular Meeting, February 4, 2013 1st Closed Session, February 4, 2013 2nd Closed Session and February 19, 2013 Regular Meeting.

On roll call the vote was as follows:

| | |
|---|---|
| Councilman Henwood | Absent |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Absent |
| Councilman Jordan | Yes |
| Councilman Bartolomeo | Yes |

**COMMUNICATIONS/PETITIONS**

None.

**RECEIPT OF BIDS**

None

**ADOPTION/PUBLIC HEARING OF ORDINANCES**

None.

**COMMUNICATIONS/PETITIONS**

None.

**INTRODUCTION OF ORDINANCES**

1. **1490-2013   An Ordinance Deleting and Replacing Chapter 318 of the Code of the Borough of Edgewater in Order to Revise the Fees Chargeable for Public Documents.**

The Clerk read Ordinance 1490-2013 by title only as follows:

BOROUGH OF EDGEWATER
ORDINANCE NO. 1490-2013

AN ORDINANCE DELETING AND REPLACING CHAPTER 318 OF THE CODE OF THE BOROUGH OF EDGEWATER IN ORDER TO REVISE THE FEES CHARGEABLE FOR PUBLIC DOCUMENTS

The Clerk read the following resolution for Ordinance 1490-2013

:RESOLUTION

March 18, 2013

4

**INTRODUCED:** Councilman Jordan
**SECOND:** Councilman Doran

WHEREAS AN ORDINANCE DELETING AND REPLACING CHAPTER 318 OF THE CODE OF THE BOROUGH OF EDGEWATER IN ORDER TO REVISE THE FEES CHARGEABLE FOR PUBLIC DOCUMENTS was introduced on March 18, 2013, and passes its first reading and will be considered for final passage and public hearing on April 15, 2013 at 7:00 pm Municipal Building, 55 River Road, Edgewater, New Jersey.

Discussion:

Borough Clerk reviewed the change and the reason for the Ordinance.

On roll call the vote was as follows:

| | |
|---|---|
| Councilman Henwood | Absent |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Absent |
| Councilman Jordan | Yes |
| Councilman Bartolomeo | Yes |

**1491-2013**  An Ordinance Amending and Supplementing Chapter 81 of the Code of the Borough of Edgewater In order to Set Fees for Certain Permits, ID Cards, and Letters of Good Standing

The Clerk read Ordinance 1491-2013 by title only as follows:

**BOROUGH OF EDGEWATER**
**ORDINANCE NO. 1491-2013**

**AN ORDINANCE AMENDING AND SUPPLEMENTING CHAPTER 81 OF THE CODE OF THE BOROUGH OF EDGEWATER IN ORDER TO SET FEES FOR CERTAIN PERMITS, ID CARDS, AND LETTERS OF GOOD STANDING**

The Clerk read the following resolution for Ordinance 1491-2013

**:RESOLUTION**

March 18, 2013

**INTRODUCED:**  Councilman Doran
**SECOND:** Councilman Bartolomeo/Councilman Monte

WHEREAS AN ORDINANCE AMENDING AND SUPPLEMENTING CHAPTER 81 OF THE CODE OF THE BOROUGH OF EDGEWATER IN ORDER TO SET FEES FOR CERTAIN NPERMITS, ID CARDS AND LETTERS OF GOOD STANDING was introduced on March 18, 2013, and passes its first reading and will be considered for final passage and public hearing on April 15, 2013 at 7:00 pm Municipal Building, 55 River Road, Edgewater, New Jersey.

On roll call the vote was as follows:

| | |
|---|---|
| Councilman Henwood | Absent |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Absent |
| Councilman Jordan | Yes |
| Councilman Bartolomeo | Yes |

**COMMITTEE COUNCIL LIAISON REPORTS**

Councilman Henwood – Absent.

5

Councilman Doran spoke about the great job being done at North Firehouse by Tom Quinton and the DPW staff.

Councilman Monte – No report.

Councilman Vidal – Absent.

Councilman Jordan -  No report.

Councilman Bartolomeo – No report.

## RESOLUTIONS

A motion to approve Resolutions 2013-070 to 2013-097 was made by Councilman Doran and seconded by Councilman Jordan.

On roll call the vote was as follows:

| | |
|---|---|
| Councilman Henwood | Absent |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Absent |
| Councilman Jordan | Yes |
| Councilman Bartolomeo | Yes |

### RESOLUTION
### 2013-070

March 18, 2013

**INTRODUCED:**  Councilman Doran
**SECOND:**  Councilman Jordan

Resolution 2013-070, Transfer for 3/18/2013 are attached to the end of these minutes.

All council members present voted aye.  None opposed.  None abstained.

### RESOLUTION
### 2013-071

March 18, 2013

**INTRODUCED:**  Councilman Doran
**SECOND:**  Councilman Jordan

### RESOLUTION PROVIDING FOR INCREASE IN RESERVE
### FOR UNCOLLECTED TAXES PERCENTAGE

**WHEREAS,** the Borough of Edgewater collected only 97.74% of the 2011 taxes due to an increase in State and County tax appeals as a result of unfavorable economic conditions in the local economy and real estate markets for 2011, and

**WHEREAS,** the lower percentage collected in 2011 has an effect on the "Reserve for Uncollected Taxes" in 2012, and

**WHEREAS,** the Governing Body is desirous of reducing the 2011 total tax levy by the amount of the tax appeals in calculating the 2011 tax collection percentage resulting in a collection percentage of 97.93% for 2011, and

**WHEREAS,** the Governing Body desires to anticipate 97.93% collection for 2012, to help reduce the "Reserve for Uncollected Taxes", with prior written consent of the Director of Local Government Services,

**NOW, THEREFORE, BE IT RESOLVED** by the Governing Body of the Borough of Edgewater, County of

6

Bergen, State of New Jersey, that the prior written consent of the Director of Local Government Services be requested to anticipate 97.93% collection of taxes in 2012 in figuring the "Reserve for Uncollected Taxes".

**BE IT FURTHER RESOLVED** that two certified copies of this resolution be forwarded to the Office of the Director of Local Government Services.

APPROVED: , 2012

_____
Director, Division of Local Government Services

All council members present voted aye.  None opposed.  None abstained.

## RESOLUTION
## 2013-072

March 18, 2013

**INTRODUCED:**  Councilman Doran
**SECOND:**  Councilman Jordan

### BOAT SLIP ELECTRIC RATES

**WHEREAS,** the Borough of Edgewater would like to set the following fees for electric rates for boat slips located at the Edgewater Marina Park and Ferry Landing as follows:

| | |
|---|---|
| Boats with battery chargers | $25.00 per month |
| Boats with battery chargers and refrigerators | $50.00 per month |
| Boats with battery chargers, refrigerators & air conditioning | $75.00 per month |

**NOW THEREFORE BE IT RESOLVED** by the Borough of Edgewater Governing Body that the above fees for electric rates are hereby set at the above rates and are effective immediately.

All council members present voted aye.  None opposed.  None abstained.

## RESOLUTION
## 2013-073

March 18, 2013

**INTRODUCED:**  Councilman Doran
**SECOND:**  Councilman Jordan

### TAX REIMBURSEMENT CERTIFICATION

**WHEREAS,** the Recycling Enhancement Act, P.L. 2007, chapter 311 has established a recycling find from which tonnage grants may be made to municipalities in order to encourage local source separation and recycling programs; and

**WHEREAS,** there is levied upon the owner or operator of every solid waste facility (with certain exceptions) a recycling tax of $3.00  per ton on all solid waste accepted for disposal or transfer at the solid waste facility.

**WHEREAS,** whenever a municipality operates a municipal service system for solid waste collection, or provides for regular solid waste collection service under a contract awarded pursuant to the "Local Public Contracts Law", the amount of grant monies received by the municipality shall not be less than the annual amount of recycling tax paid by the municipality except that all grant moneys received by the municipality shall be expended only for its recycling program.

**NOW THEREFORE BE IT RESOLVED** by the Borough of Edgewater that the Borough of Edgewater hereby certifies a submission of expenditure for taxes paid pursuant to P.L. 2007, Chapter 311, in 2012 in the amount of $12,481.26.  Documentation supporting this submission is available at the Edgewater Recycling

7

Department, 540 River Road, Edgewater, NJ 07020 and shall be maintained for no less than five years from this date.

Tax certified by: Kathy Frato

| | |
|---|---|
| Name of official: | Kathy Frato |
| Title of official: | Recycling Coordinator |
| Date: | March 18, 2013 |

All council members present voted aye. None opposed. None abstained.

**RESOLUTION**
**2013-074**

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

**WHEREAS,** N.J.S.A. 40A:9-154 requires that a governing body of each municipality shall appoint a Principal Public Works Manager for the municipality; and

**WHEREAS,** no person shall be selected to perform the duties of a Principal Public Works Manager unless he holds a public works manager certificate issued pursuant to section 3 of PL 1991, c.258 (C.40A:9-154,6c), which certificate has not been revoked or suspended in accordance with the provisions of subsection b. of section 6 of PL 1991, c.258 (C.40A:9-154.6f); and

**NOW, THEREFORE BE IT RESOLVED** by the governing body that Thomas Quinton is hereby appointed as the Principal Public Works Manager for a period not to exceed one year; and

**BE IT FURTHER RESOLVED** by the governing body that this appointment does not include any additional salary or benefits.

All council members present voted aye. None opposed. None abstained.

**RESOLUTION**
**2013-075**

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

**WHEREAS,** the Mandatory Source Separation and Recycling Act, P.L. 1987, c.102, has established a recycling fund from which tonnage grant may be made to municipalities in order to encourage local source separation and recycling programs; and

**WHEREAS,** it is the intent and the spirit of the Mandatory Source Separation and Recycling Act to use the tonnage grants to develop new municipal recycling programs and to continue and to expand existing programs; and

**WHEREAS,** the New Jersey Department of Environmental Protection has promulgated recycling regulations to implement the Mandatory Source Separation and Recycling Act; and

**WHEREAS,** the recycling regulations impose on municipalities certain requirements as a condition for applying for tonnage grants, including but not limited to, making and keeping accurate, verifiable records of materials collected and claimed by the municipality; and

**WHEREAS,** a resolution authorizing this municipality to apply for such tonnage grants will memorialize the commitment of this municipality to recycling and to indicate the assent of the Mayor and Council to the efforts undertaken by the municipality and the requirements contained in the Recycling Act and recycling regulations; and

**WHEREAS,** such a resolution should designate the individual authorized to ensure the application is completed and timely filed.

**NOW, THEREFORE, BE IT RESOLVED** by the Mayor and Council of the Borough of Edgewater that the Borough of Edgewater hereby endorses the submission of the 2012 Recycling Tonnage Grant Application to the New Jersey Department of Environmental Protection and designates Recycling Coordinator Kathy Frato to ensure that the application is properly filed; and

BE IT FURTHER RESOLVED that the monies received from the Recycling Tonnage Grant will be deposited in a dedicated recycling trust fund to be used solely for the purposes of recycling.

All council members present voted aye.  None opposed.  None abstained.

## RESOLUTION
## 2013-076

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

### Deputy Registrar Inter-Local Agreement

**WHEREAS** the State of New Jersey requires that each municipality appoint a Deputy Registrar as per NJAC 8:2A-4.1(f) and,

**WHEREAS** the Borough of Edgewater is desirous of entering into an inter-local service agreement with the Borough of Fairview to serve as the Deputy Registrar and,

**WHEREAS** the Borough of Edgewater will reciprocate registrar duties to Fairview in the event a registrar is needed and,

**WHEREAS** the Borough of Fairview will endorse a similar resolution to formalize this inter-local service agreement to share services.

**NOW THEREFORE BE IT RESOLVED** by the Governing Body that the Borough of Fairview Registrar is hereby appointed to serve as the Borough of Edgewater's Deputy Registrar; and

**AND BE IT FURTHER RESOLVED** that the Borough of Edgewater will reciprocate the same service at no cost to the Borough of Edgewater or the Borough of Fairview.

All council members present voted aye.  None opposed.  None abstained.

## RESOLUTION
## 2013-077

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

**RESOLVED** that Zelia Ruperti, 1121 Anderson Avenue, Ft. Lee, NJ,, owner of Norm's Ice Cream be Granted  a license to sell ice cream products from her Ice Cream Truck during the hours of 11:00 a.m. to 7:00 p.m. when school is in session, and from 11:00 a.m. to 9:00 p.m., for the rest of the year subject to the following conditions:

1. The Vendor must obtain all necessary Board of Health permits before any sales begin.

2. All New Jersey requirements for signalization of ice cream trucks shall be complied with before operating within this Borough.

3. The vehicle operator shall not park her vehicle for the purpose of selling merchandise within 250 feet of any store selling ice cream products.

4. The vehicle shall not at any time double park to vend products.

5. No products shall be sold from the vehicle within 250 feet of a church when the church is in service.

6. The operator of the vehicle shall pick up all discarded wrappers before starting up the vehicle after sales.

7. This license is only for the sale of ices, ice cream, soda, and candy.

8. No vehicle shall vend products at Veteran's Field while the Edgewater Little League is playing and any municipal sponsored event. No hot dogs are to be sold.

9. Ice Cream truck is not to be parked on Borough streets.

All council members present voted aye. None opposed. None abstained.

## RESOLUTION
## 2013-078

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

**WHEREAS** it is the recommendation of the Borough Administrator to appoint the following individuals to serve in the temporary-seasonal, full-time positions as marina staff not to exceed 40 hours per week; and

| | | |
|---|---|---|
| Ralph Rambone | - | Marina |
| Gary Price | - | Marina |

**WHEREAS** the hourly rate of pay for these positions is set at $12.00 per hour; and

**WHEREAS** said positions do not include any paid benefits; and

**NOW, THEREFORE BE IT RESOLVED** by the Governing Body that the above named applicants are hereby appointed to the positions of temporary – seasonal, full-time positions as marina staff effective March 18, 2013 through November 15, 2013.

All council members present voted aye. None opposed. None abstained.

## RESOLUTION
## 2013-079

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

Resolution 2013-079, Salaries & Wages, is attached to the end of these minutes.

All council members present voted aye. None opposed. None abstained.

## RESOLUTION
## 2013-080

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

Resolution 2013-080, Salaries & Wages, is attached to the end of these minutes.

All council members present voted aye. None opposed. None abstained.

## RESOLUTION
## 2013-081

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

Resolution 2013-081, Services & Supplies, is attached to the end of these minutes.

All council members present voted aye.  None opposed.  None abstained.

**RESOLUTION**
**2013-082**

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

**WHEREAS,** there exists in the Borough of Edgewater a Volunteer First Aid Squad and an application has been submitted for membership and approved by the Volunteer First Aid Squad, and

**WHEREAS,** the Bylaws of the Edgewater Volunteer First Aid Squad requires approval of all applicants by the Mayor and Council, and

**NOW THEREFORE BE IT RESOLVED** by the Mayor and Council that the applicant listed below is hereby appointed as a member of the Edgewater Volunteer First Aid Squad:

Faten Masri
Edgewater, NJ

All council members present voted aye.  None opposed.  None abstained.

**RESOLUTION**
**2013-083**

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

WHEREAS the Borough of Edgewater had purchased tax sale certificate # 12-301 2011 on November 28, 2012 for property known as Edgewater Road, Block 0007900002  04; and

WHEREAS, the tax sale certificate to be redeemed for $336.66 effective through February 23, 2013; and

WHEREAS, there was no premium amount; and

NOW THEREFORE BE IT RESOLVED by the Mayor and Council that the Tax Collector/ Treasurer is authorized to issue a refund check drawn to the current account at T.D. Bank in the amount of Three Hundred Thirty Six Dollars and sixty-six cents($336.66) payable to:

Borough of Edgewater
55 River Road
Edgewater, NJ  07020

All council members present voted aye.  None opposed.  None abstained.

**RESOLUTION**
**2013-084**

March 18, 2013

**INTRODUCED:** Councilman Doran

SECOND: Councilman Jordan

## VETERANS FIELD IMPROVEMENTS
## CHANGE ORDER NO. 3
### NEA File No.: EDGWMUN 11.014

**BE IT RESOLVED** by the Mayor and Council of the Borough of Edgewater, Bergen County, New Jersey upon the recommendation of the Borough Engineer that the Change Order for the Contract listed below be and is hereby approved.

**BE IT RESOLVED** that the Chief Financial Officer has certified that funds are available for this purpose as follows:

I, Joseph Iannaconi, Jr., C.F.O. has certified that funding is available for t his purpose through 1474-2012.

JOSEPH IANNACONI, JR., C.F.O.

**BE IT RESOLVED** by the Mayor and Council of the Borough of Edgewater, Bergen County, New Jersey upon the recommendation of the Borough Engineer that the Change Order for the Contract listed below be and is hereby approved.

TITLE OF JOB:  <u>VETERANS FIELD IMPROVEMENTS – SUPERSTORM SANDY DAMAGE AND DELAYS</u>

CONTRACTOR: <u>WATERSIDE CONSTRUCTION 22 ROUTE 5, EDGEWATER, NJ</u>

CHANGE ORDER NO.   <u>3</u>

AMOUNT OF CHANGE THIS RESOLUTION: <u>$201,694.04 or a 2.79% Increase.</u>

All council members present voted aye.  None opposed.  None abstained.

## RESOLUTION
### 2013-085

March 18, 2013

INTRODUCED:  Councilman Doran
SECOND:  Councilman Jordan

**A Resolution authorizing additional environmental work as an extension of an existing Professional Services Contract to TERMS Environmental Services for Remediation Testing and Monitoring Services at Veterans Field**

WHEREAS, the Borough of Edgewater requires the services of a professional Environmental Engineer to address the requirement for the remediation to the contaminated soils/historic fill detected at Veteran's field; and

WHEREAS, the Borough has determined that the value of these services will exceed $17,500; and

WHEREAS, the *Local Public Contracts Law, N.J.S.A.* 40A:11-5(1)(a)(i) permits the award of this professional services contract without the need for full public bidding procedures; and

WHEREAS, *N.J.S.A.* 40A:11-5(1)(a)(i) further requires that contracting unit publish notice that that the resolution of award and the contract itself are available for public inspection; and

WHEREAS, on June 18, 2012, by way of resolution 2012-191 the Borough authorized for certain environmental engineering services from TERMS Environmental Services, Inc., with offices at 599 Springfield Avenue, Berkeley Heights, New Jersey, 07922; and

12

**WHEREAS**, the estimated cost of the services to be provided was between $128,500.00 and $149,750.00, the final amount to be determined by the specific services rendered and the hours expended, based upon the rate schedule provided by TERMS which was attached to the original proposal hereto; and

**WHEREAS**, TERMS has completed and submitted a Business Entity Disclosure Certification which certifies that TERMS Environmental Services, Inc. has not made any reportable contributions to a political candidate or candidate committee in the Borough of Edgewater in the previous one year, and that the contract will prohibit TERMS from making any reportable contributions through the term of the contract; and

**WHEREAS**, based on an updated proposal dated March 4, 2013, as a result of additional testing to ensure clean fill is transported to the site, an estimated cost of services to be provided is between $232,750.00 and $367,020.00; and

**WHEREAS**, the Borough's Chief Financial Officer has certified that funds have been appropriated and are available for this purpose as follows:

I, Joseph Iannaconi, Jr., do hereby certify that funding is available through

_____
JOSEPH IANNACONI, JR., C.F.O.

**NOW, THEREOF, BE IT RESOLVED** by the Mayor & Council of the Borough of Edgewater that a professional services contract is hereby amended to TERMS Environmental Services, Inc., to provide the site and safety oversight/management and environmental reporting related to the soil remediation that will be performed by others at Veterans Field, as more particularly set forth in the attached Proposal dated June March 4, 2013.

**BE IT FURTHER RESOLVED** that this contract is awarded without competitive bids as a "professional services" Contract in accordance with *N.J.S.A.* 40A:11-5(1)(a)(i) of the *Local Public Contracts Law* because the subject matter of the contract is for professional services by a firm or professional authorized to practice within the State of New Jersey.

**BE IT FURTHER RESOLVED** that this Contract is being awarded pursuant to the alternative process of the *New Jersey Local Unit Pay to Play Law, N.J.S.A.* 19:44A-20.5, and in compliance therewith, and the Business Entity Disclosure Certification will be placed on file with this Resolution.

**BE IT FURTHER RESOLVED** that the Mayor and Borough Clerk are hereby authorized to execute the above Contract for professional services, consistent with this Resolution.

**BE IT FURTHE RESOLVED** that a notice of the award of the above contract shall be published in The Record as required by law within ten (10) days of the adoption of this Resolution.

All council members present voted aye. None opposed. None abstained.

**RESOLUTION**
**2013-086**

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

WHEREAS the Borough of Edgewater Department of Public Works is interested in purchasing (1) one new 2013 Utility Truck with a snowplow and lift gate; and

WHEREAS DFFLM, LLC, T/A Ditschman/ Flemington Ford of 215 Route 202 & 31, Flemington NJ 08822 has confirmed said vehicle is on State Contract # A83577 for the price of Thirty Five Thousand Two Hundred Fifty Dollars and zero cents ($43,071.00); and

WHEREAS the Chief Financial Officer has certified that funds are available as follows:

I, Joseph Iannaconi, Jr. do hereby that funds are available through the Recycling Trust Account

JOSEPH IANNACONI, JR., C.F.O.

**NOW THEREFORE BE IT RESOLVED** by the Mayor and Council that authorization is hereby granted to purchase the said vehicle in the amount not to exceed Thirty Five Thousand Two Hundred Fifty Dollars and zero cents ($35,250.00).

All council members present voted aye.  None opposed.  None abstained.

**RESOLUTION**
**2013-087**

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

**WHEREAS** the Borough of Edgewater Department of Public Works is interested in purchasing (1) one new 2013 F350 DRW Mason Dump truck with a snowplow and lift gate; and

**WHEREAS** DFFLM, LLC, T/A Ditschman/ Flemington Ford of 215 Route 202 & 31, Flemington NJ 08822 has confirmed said vehicle is on State Contract # A83577 for the price of  Forty Three Thousand Seventy-one Dollars and zero cents ($43,071.00); and

**WHEREAS** the Chief Financial Officer has certified that funds are available as follows:

I, Joseph Iannaconi, Jr. do hereby certify that funds are available through the Recycling Trust Account

JOSEPH IANNACONI, JR., C.F.O.

**NOW THEREFORE BE IT RESOLVED** by the Mayor and Council that authorization is hereby granted to purchase the said vehicle in the amount not to exceed Forty Three Thousand Seventy-one Dollars and zero cents ($43,071.00) for the purchase as outlined above.

All council members present voted aye.  None opposed.  None abstained.

**RESOLUTION**
**2013-088**

March 18, 2013

**INTRODUCED:**  Councilman Doran
**SECOND:**  Councilman Jordan

BE IT RESOLVED by the Mayor and Council of the Borough of Edgewater that the following organization be granted permission to conduct a Raffle in accordance with the application on file in the office of the Borough Clerk.

RA:  0004     Church of the Holy Rosary
RA:  0005     Church of the Holy Rosary

All council members present voted aye.  None opposed.  None abstained.

**RESOLUTION**
**2013-089**

March 18, 2013

**INTRODUCED:**  Councilman Doran
**SECOND:**  Councilman Jordan

**2013 CDBG SANITARY SEWER IMPROVEMENTS BID AWARD**
**NEA FILE NO.: EDGWADM12.001**

14

WHEREAS on March 15, 2013 the Borough of Edgewater received sealed bids for the 2013 Community Development Block Grant Project for Sanitary Sewer Improvements, NEA File No.: EDGWADM12.001;and,

WHEREAS the apparent low bidder of two (2) bids was submitted by Gotthold Paving, Edgewater, New Jersey in the amount of $148,901.90; and

WHEREAS the CFO has certified that funds are available as follows:
Joseph Iannaconi, Jr., C.F.O. do hereby certify that funding is available for this project through Ordinance 482; and

_____
OSEPH IANNACONI, JR.
hief Financial Officer

WHEREAS the Borough Engineer and Borough Attorney Philip Boggia have reviewed the bid documents and recommend award to Gotthold Paving as the lowest responsible bidder. an amount not to exceed $148,901.90

    All council members present voted aye.  None opposed.  None abstained.

### RESOLUTION
### 2013-090

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

#### 2013 CDBG ROADWAY IMPROVEMENTS BID AWARD
#### NEA FILE NO.: EDGWADM 13.001

WHEREAS on March 15, 2013 the Borough of Edgewater received sealed bids for the 2013 Community Development Block Grant Project for Roadway Improvements, NEA File No.: EDGWADM13.001;and,

WHEREAS the apparent low bidder of four (4) bids was submitted by JJ Sinisi Asphalt, 272 Broad Avenue, Fairview, NJ 07022 as follows:

| | |
|---|---|
| Base Bid (Edgewater Place) | $ 86,050.14 |
| Base Bid (Hilliard Avenue) | $ 69,549.13 |
| Total Base Bids | $155,599.27 |

WHEREAS the CFO has certified that funds are available as follows:
Joseph Iannaconi, Jr., C.F.O. do hereby certify that funding is available for this project through Ordinance 1482; and

_____
JOSEPH IANNACONI, JR.
Chief Financial Officer

WHEREAS the Borough Engineer and Borough Attorney Philip Boggia have reviewed the bid documents and recommend award JJ Sinisi Asphalt as the lowest responsible bidder. an amount not to exceed $155,599.27

    All council members present voted aye.  None opposed.  None abstained.

### RESOLUTION
### 2013-091

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

#### 2013 CDBG STREETSCAPE – UNDERCLIFF AVENUE BID AWARD
#### NEA FILE NO.: EDGWADM 13.001

WHEREAS on March 15, 2013 the Borough of Edgewater received sealed bids for the 2013 Community Development Block Grant Project for Streetscape – Undercliff Avenue, NEA File No.: EDGWADM13.001;and,

WHEREAS the apparent low bidder of six (6) bids was submitted by Reggio Construction , 1575 West Street, Fort Lee, New Jersey 07024 as follows:

| | |
|---|---|
| Base Bid (Valley Pl. to Hudson Ave) | $ 70,586.83 |
| Alt. Bid "A" (Hudson Avenue to Dempsey Ave.) | $102,952.68 |
| Alt. Bid "B" (Dempsey Ave. to Hilliard Ave.) | $ 85,223.63 |
| Total Base Bid + Alt. Bid "A" | $173,539.51 |
| Total Base Bid & Alt. Bid "A" & Alt. Bid "B" | $258,763.14 |

WHEREAS the CFO has certified that funds are available as follows:
Joseph Iannaconi, Jr., C.F.O. do hereby certify that funding is available for this project through Ordinance 1487; and

JOSEPH IANNACONI, JR.
Chief Financial Officer

WHEREAS the Borough Engineer and Borough Attorney Philip Boggia have reviewed the bid documents and recommend award Reggio Construction  as the lowest responsible bidder in an amount not to exceed $258,763.14

All council members present voted aye.  None opposed.  None abstained.

## RESOLUTION
## 2013-092

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

### OLD WOOD ROAD SANITARY SEWER AND ROADWAY IMPROVEMENTS
### CONSTRUCTION MANAGEMENT SERVICES

WHEREAS the Borough of Edgewater has recently received bids for the sanitary sewer and roadway improvements along Old Wood Road which will be funded by a Community Development Block Grant; and

WHEREAS, Neglia Engineering Associates, 34 Park Avenue, PO Box 426, Lyndhurst, NJ  07071 has submitted a proposal dated March 15, 2013 for the Construction Management services for said project outlining a Scope of Services in the amount not to exceed Sixteen Thousand Seven Hundred Dollars and Zero Cents ($16,700.00); and

WHEREAS the Chief Financial Officer Joseph Iannaconi, Jr. has certified that funds are available as follows:

Joseph Iannaconi, Jr. has certified that funds are available for this project through Ordinance No. 1482

JOSEPH IANNACONI, JR., C.F.O.

NOW, THEREFORE, BE IT RESOLVED by the Governing Body that the proposal for Professional Services submitted by Borough Engineer Neglia Engineering Associates in the amount not to exceed $16,700.00 is hereby accepted; and

BE IT FURTHER RESOLVED by the Governing Body that the Mayor and Borough Clerk are hereby authorized to sign said proposal.

All council members present voted aye.  None opposed.  None abstained.

## RESOLUTION
## 2013-093

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

16

### UNDERCLIFF AVENUE STREETSCAPE IMPROVEMENTS
### CONSTRUCTION MANAGEMENT SERVICES

WHEREAS the Borough of Edgewater has recently received bids for the Streetscape Improvements along Undercliff Avenue, from Valley Place to Hudson Avenue, which will be funded by a Community Development Block Grant; and

WHEREAS, Neglia Engineering Associates, 34 Park Avenue, PO Box 426, Lyndhurst, NJ 07071 has submitted a proposal dated March 15, 2013 for the Construction Management services for said project outlining a Scope of Services in the amount not to exceed Eleven Thousand FiveHundred Dollars and Zero Cents ($11,500.00); and

WHEREAS the Chief Financial Officer Joseph Iannaconi, Jr. has certified that funds are available as follows:

Joseph Iannaconi, Jr. has certified that funds are available for this project through Ordinance No. 1487

_____
JOSEPH IANNACONI, JR., C.F.O.

NOW, THEREFORE, BE IT RESOLVED by the Governing Body that the proposal for Professional Services submitted by Borough Engineer Neglia Engineering Associates in the amount not to exceed $11,500.00 is hereby accepted; and

BE IT FURTHER RESOLVED by the Governing Body that the Mayor and Borough Clerk are hereby authorized to sign said proposal.

All council members present voted aye. None opposed. None abstained.

### RESOLUTION
### 2013-094

March 18, 2013

INTRODUCED: Councilman Doran
SECOND: Councilman Jordan

### HILLIARD AVENUE and EDGEWATER PLACE ROADWAY IMPROVEMENTS
### CONSTRUCTION MANAGEMENT SERVICES

WHEREAS the Borough of Edgewater has recently received bids for the Hilliard Avenue and Edgewater Place Roadway Improvements which includes the milling and paving of Hilliard Avenue and Edgewater Place and which will be partially funded by a Community Development Block Grant; and

WHEREAS, Neglia Engineering Associates, 34 Park Avenue, PO Box 426, Lyndhurst, NJ 07071 has submitted a proposal dated March 15, 2013 for the Construction Management services for said project outlining a Scope of Services in the amount not to exceed Eight Thousand One Hundred Dollars and Zero Cents ($8,100.00); and

WHEREAS the Chief Financial Officer Joseph Iannaconi, Jr. has certified that funds are available as follows:

Joseph Iannaconi, Jr. has certified that funds are available for this project through Ordinance No. 1482

_____
JOSEPH IANNACONI, JR., C.F.O.

NOW, THEREFORE, BE IT RESOLVED by the Governing Body that the proposal for Professional Services submitted by Borough Engineer Neglia Engineering Associates in the amount not to exceed $8,100.00 is hereby accepted; and

BE IT FURTHER RESOLVED by the Governing Body that the Mayor and Borough Clerk are hereby authorized to sign said proposal.

All council members present voted aye. None opposed. None abstained.

### RESOLUTION
### 2013-095

March 18, 2013

17

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

### 2013 CDBG Roadway Improvements Edgewater Place and Hilliard Avenue

WHEREAS, N.J.S.A. 59:4-6 provides in pertinent part that neither the public entity nor a public employee is liable for an injury caused by the plan or design of public property or any improvement thereto where the plan or design was approved in advance of construction by the Borough of Edgewater or a public employee exercising discretionary authority on its behalf or where such plan or design was prepared in conformity with standards previously approved by the Borough of Edgewater; and

WHEREAS, the following improvement to public property has been designed by Neglia Engineering Associates; and

WHEREAS, the Borough of Edgewater wishes to record its approval of said design.

NOW, THEREFORE, BE IT RESOLVED by the Mayor and Council of the Borough of Edgewater as follows:

1.     Plans and specifications entitled "2013 CDBG Roadway Improvements Edgewater Place and Hilliard Avenue" and prepared by Neglia Engineering Associates dated February 2013 be, and hereby are, approved.

2.     Upon the completion of the improvements described herein above, Neglia Engineering Associates shall inspect said improvement and certify to the Borough of Edgewater, before final payment is made for same that said improvement has been constructed in accordance with the above referenced design.

3.     The Borough of Edgewater Clerk shall archive this Resolution in a manner consistent with the purpose of perpetually documenting governmental immunity in the event of any claim based upon the plan, design or construction of the improvement.

All council members present voted aye. None opposed. None abstained.

### RESOLUTION
### 2013-096

March 18, 2013

**INTRODUCED:** Councilman Doran
**SECOND:** Councilman Jordan

### 2013 CDBG Sanitary Sewer Improvements Old Wood Road

WHEREAS, N.J.S.A. 59:4-6 provides in pertinent part that neither the public entity nor a public employee is liable for an injury caused by the plan or design of public property or any improvement thereto where the plan or design was approved in advance of construction by the Borough of Edgewater or a public employee exercising discretionary authority on its behalf or where such plan or design was prepared in conformity with standards previously approved by the Borough of Edgewater; and

WHEREAS, the following improvement to public property has been designed by Neglia Engineering Associates; and

WHEREAS, the Borough of Edgewater wishes to record its approval of said design.

NOW, THEREFORE, BE IT RESOLVED by the Mayor and Council of the Borough of Edgewater as follows:

1.     Plans and specifications entitled "2013 CDBG Sanitary Sewer Improvements" and prepared by Neglia Engineering Associates dated February 2013 be, and hereby are, approved.

2.     Upon the completion of the improvements described herein above, Neglia Engineering Associates shall inspect said improvement and certify to the Borough of Edgewater, before final payment is made for same that said improvement has been constructed in accordance with the above referenced design.

3.     The Borough of Edgewater Clerk shall archive this Resolution in a manner consistent with the purpose of perpetually documenting governmental immunity in the event of any claim based upon the plan, design or construction of the improvement.

All council members present voted aye. None opposed. None abstained.

### RESOLUTION

2013-097

March 18, 2013

INTRODUCED: Councilman Doran
SECOND: Councilman Jordan

### 2013 CDBG Streetscape Undercliff Avenue

WHEREAS, N.J.S.A. 59:4-6 provides in pertinent part that neither the public entity nor a public employee is liable for an injury caused by the plan or design of public property or any improvement thereto where the plan or design was approved in advance of construction by the Borough Edgewater or a public employee exercising discretionary authority on its behalf or where such plan or design was prepared in conformity with standards previously approved by the Borough Edgewater; and

WHEREAS, the following improvement to public property has been designed by Neglia Engineering Associates; and

WHEREAS, the Borough of Edgewater wishes to record its approval of said design.

NOW, THEREFORE, BE IT RESOLVED by the Mayor and Council of the Borough of Edgewater as follows:

1.      Plans and specifications entitled "2013 CDBG Streetscape – Undercliff Avenue" and prepared by Neglia Engineering Associates dated February 2013 be, and hereby are, approved.

2.      Upon the completion of the improvements described herein above, Neglia Engineering Associates shall inspect said improvement and certify to the Borough of Edgewater, before final payment is made for same that said improvement has been constructed in accordance with the above referenced design.

3.      The Borough of Edgewater Clerk shall archive this Resolution in a manner consistent with the purpose of perpetually documenting governmental immunity in the event of any claim based upon the plan, design or construction of the improvement.

All council members present voted aye.  None opposed.  None abstained.

)LD BUSINESS

.t this time, Mayor Delaney announced that he had made the following appointments to the Edgewater Shade
ree Board:

| | |
|---|---|
| - Councilman Anthony Bartolomeo | 3 yrs. |
| -Robert Christiansen, Chairman of Zoning Board | 2 yrs |
| -Kevin O'Connor, Chairman of Planning Board | 2 yrs. |
| -Pat Caruso | 1 yr. |
| -Donnie Rae | 1 yr. |
| -Alt. No. 1      Sam DeNorchia, Jr. | 1 yr. |

Noted that there is a vacancy for Alternate #2.

NEW BUSINESS:

Mayor Delaney issued the following proclamations:

### PROCLAMATION

### TO DESIGNATE THE WEEK
### OF
### MAY 19-25, 2013
### as
### EMERGENCY MEDICAL SERVICES WEEK

*WHEREAS, emergency medical services is a vital public service; and*

*WHEREAS the members of emergency medical service teams are ready to provide are ready to provide lifesaving care to those in need 24 hours a day, 7 days a week; and*

*WHEREASS access to quality emergency care dramatically improves the survival and recovery rate of those who experience sudden illness or injury; and*

*WHEREAS the emergency medical services system consists of emergency physicians, emergency nurses, emergency medical technicians, paramedics, firefighters, educators, administrators and others; and*

*WHEREAS the members of the emergency medical services teams, whether career or volunteer, engage in thousands of hours of specialized training and continuing education to enhance their lifesaving skills; and*

*WHEREAS it is appropriate to recognize the value and the accomplishments of emergency medical services providers by designating Emergency Medical Services Week; and*

*NOW THEREFORE BE IT RESOLVED that, I, James F. Delaney, Mayor of the Borough of Edgewater in recognition of this event, do hereby proclaim:*

*THE WEEK OF MAY 19 THRU MAY 25, 2013*

*as*

*EMERGENCY MEDICAL SERVICES WEEK*

_____
*JAMES F. DELANEY, Mayor*

*ATTEST:*

_____
*BARBARA RAE, RMC, CMC*
*Borough Clerk*

*BOROUGH OF EDGEWATER*
*OFFICE OF THE MAYOR*
*PROCLAMATION*

*CELEBRATE ARBOR DAY*

*WHEREAS in 1872, J. Sterling Morton proposed to the Nebraska Board of Agriculture that a special day be set aside for the planting of trees ; and*

*WHEREAS this holiday, called ARBOR DAY, was first observed with the planting of more than a million trees in Nebraska; and*

*WHEREAS Arbor Day is now observed throughout the nation and the world; and*

*WHEREAS trees can reduce the erosion of our precious topsoil by wind and water, cut heating and cooling costs, moderate the temperature, clean the air, produce life-giving oxygen, and provide habitat for wildlife; and*

*WHEREAS trees are a renewable resource giving us paper, wood for our homes, fuel for our fires, and beautify our community; and*

*WHEREAS, trees, wherever they are planted, are a source of joy and spiritual renewal.*

*NOW, THEREFORE* I, *James F. Delaney, Mayor of the Borough of Edgewater, do hereby proclaim April 26, 2013 as*

## ARBOR DAY

to be celebrated In the Borough of Edgewater on  April 26 , 2013, and I urge all citizens to celebrate Arbor Day and to support efforts to protect our trees and woodlands; and

*FURTHER,* I urge all citizens to plant trees to gladden the heart and promote the well-being of this and future generations.

*DATE:*  March 18, 2013

_____

**James F. Delaney,** *Mayor*

*ATTEST:*

_____

**BARBARA RAE, RMC, CMC,** Borough Clerk

**ADMINISTRATOR REPORTS**

Progress.

**BOROUGH CLERK**

No report.

**CLOSED SESSION DISCUSSION**

### RESOLUTION AUTHORIZING EXECUTIVE SESSION

March 18, 2013

**INTRODUCED:** Councilman Monte
**SECOND:** Councilman Jordan

**WHEREAS,** the Borough of Edgewater desires to meet in private and/or Executive Session to discuss matters that are permitted by the exceptions to the Open Public Meetings Act as indicated herein:·

_____1.  Any matter which, by express provision of Federal law or State statute or court rule shall be rendered confidential or excluded from discussion in public;

_____2.  Any matter in which the release of information would impair a right to receive funds from the federal government;

_____3  Any material the disclosure of which constitutes an unwarranted invasion of individual privacy;

__XX__4.  Any collective bargaining agreement, or the terms and conditions which are proposed for inclusion in any collective bargaining agreement, including the negotiation of terms and conditions with employees or representatives of employees of the public body.

_____5.  Any matter involving the purchase, lease, or acquisition of real estate with public funds, the setting of a banking rates or investment of public funds, where it could adversely affect the public·interest if discussion of such matters were disclosed;

_____6.  Any tactics and techniques utilized in protecting the safety and property of the public provided that their disclosure could impair such protection. Any investigations of violations or possible violations of the law;

_____7.  Any pending or anticipated litigation or contract negotiation in which the public

body is, or may become a party. Any matters falling within the attorney-client privilege to the extent that confidentiality is required in order for the attorney to exercise his ethical duties as a lawyer;

   XX 8. Any matter involving the employment, appointment, termination of employment, terms and conditions of employment, evaluation of the performance of, promotion or disciplining of any specific prospective public officer or employee or current public officer or employee employed or appointed by the public body, unless all the individual employees or appointees whose rights could be adversely affected request in writing that such matter or matters be discussed at a public meeting.

   9. Any deliberation of a public body occurring after a public hearing that may result in the imposition of a specific civil penalty upon the responding party or the suspension or loss of a license or permit belonging to the responding party as a result of an act or commission for which the responding party bears responsibility.

**NOW, THEREFORE, BE IT RESOLVED** that the Mayor and Council shall recess into private and/or Executive and Closed Session to discuss the aforementioned subject matter and the minutes of same may be disclosed at such time in the future as the GOVERNING BODY in it discretion may determine according to law.

On roll call the vote was as follows:

| | |
|---|---|
| Councilman Henwood | Absent |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Absent |
| Councilman Jordan | Yes |
| Councilman Bartolomeo | Yes |

The governing body returned from Closed Session.

**PRESENT ON ROLL CALL:** Councilman Doran, Councilman Monte, Councilman Jordan and Councilman Bartolomeo

**ALSO PRESENT:** Mayor Delaney, Administrator Gregory S. Franz, Borough Clerk Barbara Rae and Borough Attorney Philip Boggia.

**ABSENT:** Councilman Henwood and Councilman

### MOTION

March 18, 2013

**INTRODUCED:** Councilman Jordan
**SECOND:** Councilman Monte

Motion to adjourn.

On roll call the vote was as follows:

| | |
|---|---|
| Councilman Henwood | Absent |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Absent |
| Councilman Jordan | Yes |
| Councilman Bartolomeo | Yes |

Barbara Rae, RMC, CMC
Borough Clerk

**APPROVED:** April 15, 2013

22

# EXHIBIT "C"

2320666v1

MINUTES OF A REGULAR MEETING OF THE EDGEWATER MAYOR AND COUNCIL HELD IN THE NANCY MERSE COUNCIL CHAMBERS, LOCATED AT 55 RIVER ROAD, EDGEWATER, COUNTY OF BERGEN, STATE OF NEW JERSEY ON FEBRUARY 18, 2014

PRESIDING:  Mayor James F. Delaney

PRESENT ON ROLL CALL: Councilman Henwood, Councilman Doran, Councilman Monte, Councilman Vidal  and Councilman Bartolomeo

ALSO PRESENT:  Administrator Gregory S. Franz, and Attorney Philip Boggia

ABSENT:  Councilman Jordan and Borough Clerk Barbara Rae

Mayor Delaney read the Open Public Meetings Act Statement into the Record.

MOMENT OF SILENCE

Mayor Delaney remembered Police Chief Skidmore's mother.

SALUTE TO THE FLAG

Councilman Monte led the Pledge of Allegiance.

OPEN TO THE PUBLIC

Mayor Delaney opened the meeting to the public and the following were heard:

Marvin Donadic, 233 Columbus Place, Cliffside Park:

- Referenced  his appearance at the January meeting when he spoke about a handicapped parking issue at the Commons.
- Mayor Delaney said that he will speak to the Police Chief as soon as he returns.
- Frustrated at waiting for information.
- Believes Police should issue a ticket and let the Court decide.

Mary Hogan, 606 Undercliff Avenue:

- Referenced discussions regarding the review of the Master Plan.
- Had questions regarding the attorneys for the Governing Body and the Planning Board.
- Asked why the Borough's experts are being billed to iPark.
- Spoke about what she believes is an unhealthy atmosphere at the meetings and in the Borough.
- Referenced comments made by Councilman Henwood at the last meeting.
- Referenced and quoted from an email from Borough Planner dated December 5th to Administrator Franz regarding the Edgewater Re-exam.
- Believes there is a very poor negative atmosphere in the Borough.

At this time, Councilman Henwood clarified the comments he made at the last meeting.

Valory Bardinas, 16 Hudson Terrace:

- Complimented the DPW for the fantastic snow removal job.
- Thanked Administrator for messages noting that she appreciates the information.
- Questioned the number of signs around town.
- Also spoke about comments made and nearby residents' concerns about traffic and taxes.
- Spoke about lack of back and access roads.

Aries Hernandez, Fitness Factory:

- Spoke about hosting a basketball program at the Community Center.

1

No one else wished to be heard therefore the Mayor closed the meeting to the public.

**CONFERENCE**

Budget Discussions:

1.   **Health Department**

Patti Dalton, Borough Nurse and Registrar Lynn Minetti reviewed the budget.

Nurse Dalton spoke about the cost for the County Health Services.   Spoke about lack of funding for Community programs, equipment issues and mandated health screenings.

Administrator Franz asked what the Nurse's Office needs for the Summer Camp Program.   Discussion about electronic health records and the need for duplication.  Discussion about part-time nurse.

2.   **Building Department**

John Candelmo, Construction Official

Reviewed budget and spoke about need for vehicle. Discussion about vehicle.  Mr. Candelmo responded to Administrator Franz' suggestion about a possible hybrid vehicle.  Further discussion.

Fire Prevention and First Aid Squad Personnel unable to attend tonight.  Budget discussion had originally been scheduled for February 3rd.   That meeting was cancelled due to the snow storm. Administrator Franz to meet with Fire Prevention and First Aid Squad personnel and will then pass the information on to the Governing Body.

**MOTION**

February 18, 2014

**INTRODUCED**:  Councilman Doran
**SECOND**:  Councilman Monte

Motion to carry the minutes of January 27, 2014.

On roll call the vote was as follows;

| | |
|---|---|
| Councilman Henwood | Yes |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Abstain |
| Councilman Jordan | Absent |
| Councilman Bartolomeo | Yes |

**RECEIPT OF BIDS - none**

**ADOPTION/PUBLIC HEARING OF ORDINANCES – none**

**COMMUNICATIONS/PETITIONS  - none**

**INTRODUCTION OF ORDINANCES**

2

**1.1503-2014**  An Ordinance of the Borough of Edgewater, County of Bergen, State of New Jersey, Amending, Supplementing and Reaffirming the Development Project Redevelopment Plan for the IPark Property

The Clerk read Ordinance 1503-2014 by title only as follows:

BOROUGH OF EDGEWATER
ORDINANCE NO. 1503-2014

AN ORDINANCE OF THE BOROUGH OF EDGEWATER, COUNTY OF BERGEN, STATE OF NEW JERSEY, AMENDING, SUPPLEMENTING AND REAFFIRMING THE DEVELOPMENT PROJECT REDEVELOPMENT PLAN FOR THE i PARK PROPERTY

RESOLUTION

February 18, 2014

INTRODUCED: Councilman Doran
SECONDED: Councilman Bartolomeo

WHEREAS AN ORDINANCE OF THE BOROUGH OF EDGEWATER, COUNTY OF BERGEN, NEW JERSEY AMENDING, SUPPLEMENTING AND REAFFIRMING THE DEVELOPMENT PROJECT REDEVELOPMENT PLAN FOR THE Ipark PROPERTY was introduced on February 18, 2014 and passes its first reading and will be considered for final passage and public hearing on April 21, 2014 at 7:00 p.m. at the Edgewater Municipal Building, 55 River Road, Edgewater, New Jersey.

Discussion:

Councilman Henwood spoke about the changes and impact. Mayor Delaney also reviewed some of the changes.

On roll call the vote was as follows:

| | |
|---|---|
| Councilman Henwood | Yes |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Yes |
| Councilman Jordan | Absent |
| Councilman Bartolomeo | Yes |

**1.1504-2014**  An Ordinance Amending and Supplementing Chapter 282, "Parking Lots," and Chapter 293, "Parks and Recreation Areas," To Update Parking Restrictions for Municipal Recreation Areas ande Historic Borough Hall

The Clerk read Ordinance 1504-2014 by title only as follows:

ORDINANCE NO. 1504-2014

AN ORDINANCE AMENDING AND SUPPLEMENTING CHAPTER 282, "PARKING LOTS," AND CHAPTER 293, "PARKS AND RECREATION AREAS," TO UPDATE PARKING RESTRICTIONS FOR MUNICIPAL RECREATION AREAS AND HISTORIC BOROUGH HALL

3

## RESOLUTION

February 18, 2014

**INTRODUCED:** Councilman Monte
**SECONDED:** Councilman Vidal

**WHEREAS AN ORDINANCE AMENDING AND SUPPLEMENTING CHAPTER 282, 'PARKING LOTS," AND CHAPTER 293, "PARKS AND RECREATION AREAS," TO UPDATE PARKING RESTRICTIONS FOR MUNICIPAL RECREATION AREAS AND HISTORIC BOROUGH HALL** introduced on February 18, 2014, and passes its first reading and will be considered for final passage and public hearing on March 18, 2014 at 7:00 pm at the Edgewater Municipal Building, 55 River Road, Edgewater, New Jersey.

Discussion:

Mayor Delaney reviewed change.

On roll call the vote was as follows:

| | |
|---|---|
| Councilman Henwood | Yes |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Yes |
| Councilman Jordan | Absent |
| Councilman Bartolomeo | Yes |

## COMMITTEE/COUNCIL LIAISON REPORTS

**Councilman Henwood -** Thanked the DPW for its continuing hard work during a difficult winter.

**Councilman Doran** – No report.

**Councilman Monte** – No report.

**Councilman Vidal** – Spoke about Munidex and updating software. Will be scheduling meetings to review sub accounts. Councilman Henwood spoke about sub account spending. Discussion. included easy to read reports.

**Mayor Delaney** --All commended the DPW for all its hard work with the snow removal.

## RESOLUTIONS

A motion to approve Resolutions 2014-051 to 2014-062 was made by Councilman Vidal and seconded by Councilman Bartolomeo.

On roll call the vote was as follows:

| | |
|---|---|
| Councilman Henwood | Yes |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Yes |
| Councilman Jordan | Absent |
| Councilman Bartolomeo | Yes |

## RESOLUTION
## 2014-051

February 18, 2014

4

INTRODUCED:  Councilman Vidal
SECOND:  Councilman Bartolomeo

WHEREAS, the Borough of Edgewater has received a request from Sergeant Steven Tibus to be paid for ninety (90) hours of compensation time that he has accumulated in his comp time bank; and

WHEREAS, the hourly rate to be paid to Sergeant Tibus shall be $68.91 for a total amount of

$6,201.90; and

WHEREAS,I, Joseph Iannaconi, Jr., the Chief Financial Officer, hereby certify that funds shall be made available for this purpose; under line item for Salaries & Wages:

_____

JOSEPH IANNACONI, Jr.

NOW, THEREFORE BE IT RESOLVED by the Mayor and Council that Sergeant Tibus' request to be paid for ninety (90) hours of his banked compensatory time is hereby granted at the total amount not to exceed $6,201.90 reducing his comp bank to 8.25 hours as per the Police Chief's memo dated January 24, 2014.

All council members present voted aye.  None opposed.  None abstained.

RESOLUTION
2014-052

February 18, 2014

INTRODUCED:  Councilman Vidal
SECOND:  Councilman Bartolomeo

WHEREAS  municipalities are required to annually reappoint all school crossing guard employees in

Accordance with N.J.S.A.40A:9-154.1 and under Borough Ordinance No. 71-54 ; and

NOW THEREFORE BE IT RESOLVED by the Mayor and Council that the following individuals are reappointed to serve in the position of School Crossing Guards in the Borough of Edgewater during the school year:

| | |
|---|---|
| Susan Laughlin | Barbara Wenger |
| Amy Sandnes | Theresa Borrello |
| Tania Quinton | Carridad Chacon |
| Phyllis Reilly | Celeste Wroldsen |
| Odette Sader | Yusef Klein |
| Dawn Doherty | Lisa Desantis |
| Patty Faten Masri | Angela DeFries |
| Cathy Ring | Virginia Pastorino |
| Loretta Wenger | Ken DePaul |
| Preksha Patel | June Palladino |
| Loretta Tampori | Nora Fedorow |

5

Kristina Prifti                                    Nancy Vereen

                                                   Clare Frank

All council members present voted aye.  None opposed.  None abstained.

## RESOLUTION
## 2014-053
February 18, 2014

**INTRODUCED:** Councilman Vidal
**SECOND:** Councilman Bartolomeo

**WHEREAS,** the Borough of Edgewater had created the position of Special Law Enforcement Officer as authorized by Borough Ordinance No. 1317-2005; and

**WHEREAS,** Linda Flores, Kevin Milligan, Ivan Cecilio, Justin Bursztyn and Cheryl Armstrong have been serving in the position of Special Law Enforcement Officers; and

**WHEREAS,** under N.J.S.A.14-146.14, Special Law Enforcement Officers may be appointed for terms not to exceed one year; and

**NOW, THEREFORE BE IT RESOLVED** by the Governing Body that Linda Flores, Kevin Milligan, Ivan Cicilio and Justin Bursztyn, are hereby re-appointed to serve in the positions of Special Law Enforcement Officer for a period of one year; and

**BE IT FURTHER RESOLVED** said appointments are part-time positions, which shall not exceed 19 hours per week, at an hourly rate as set forth in the current salary ordinance.

All council members present voted aye.  None opposed.  None abstained.

## RESOLUTION
## 2014-054
February 18, 2014

**INTRODUCED:** Councilman Vidal
**SECOND:** Councilman Bartolomeo

**WHEREAS** Sunshine State Certificates IV had purchased tax sale certificate # 120992 2011 on November 28, 2012 for property known as 1255 River Road, Block Lot Qualifier 0002500001; and

**WHEREAS,** the tax sale certificate to be redeemed for $28,214.06 is effective through February 4, 2014; and

**WHEREAS,** the premium amount paid is $10,100.00; and

**NOW THEREFORE BE IT RESOLVED** by the Mayor and Council that the Tax Collector/

Treasurer is authorized to issue a refund check drawn to the current account at T.D.

6

Bank in the amount of Thirty Eight Thousand Three Hundred Fourteen Dollars and six cents ($38,314.06) payable to:

SUNSHINE STATE CERTIFICATES IV

7900 Miami Lakes Drive West

Miami Lakes, Fl 33016

All council members present voted aye.  None opposed.  None abstained.

**RESOLUTION**
**2014-055**

February 18, 2014

**INTRODUCED:**  Councilman Vidal
**SECOND:**  Councilman Bartolomeo

**RESOLUTION SUPPORTING THE GOVERNOR'S COUNCIL ON ALCOHOLISM AND DRUG ABUSE FISCAL GRANT CYCLE JULY 2014-JUNE 2019**

**WHEREAS** the Governor's Council on Alcoholism and Drug Abuse established the Municipal Alliances for the Prevention of Alcoholism and Drug Abuse in 1989 to educate and engage residents, local government and law enforcement officials, schools, nonprofit organizations, the faith community , parents, youth and other allies in efforts to prevent alcoholism and drug abuse in communities throughout New Jersey

**WHEREAS** the Borough Council of the Borough of Edgewater, County of Bergen, State of New Jersey recognizes that the abuse of alcohol and drugs is a serious problem in our society amongst persons of all ages; and therefore has an established Municipal Alliance Committee; and

**WHEREAS** the Borough Council further recognizes that it is incumbent upon not only public officials but upon the entire community to take action to prevent such abuses in our community; and

**WHEREAS** the Borough Council has applied for funding to the Governor's Council on Alcoholism and Drug Abuse through the County of Bergen; and

**NOW, THEREFORE BE IT RESOLVED** by the Borough of Edgewater, County of Bergen, and State of New Jersey hereby recognizes the following:

1.  The Borough Council does hereby authorize submission of a strategic plan for the Edgewater Municipal Alliance grant for Fiscal Year 2014 in the amount of :

| | |
|---|---|
| DEDR | $9,876.00 |
| CASH MATCH | $2,469.00 |
| IN-KIND | $7,407.00 |

7

2. The Borough Council acknowledges the terms and conditions for administering the Municipal Alliance grant, including the administrative compliance and audit requirements.


APPROVED: _____

JAMES F. DELANEY, Mayor


All council members present voted aye. None opposed. None abstained.


## RESOLUTION 2014-056

February 18, 2014


INTRODUCED: Councilman Vidal
SECOND: Councilman Bartolomeo

Resolution 2014-056, Salaries & Wages, is attached to the end of these minutes.

All council members present voted aye. None opposed. None abstained.


## RESOLUTION 2014-057

February 18, 2014


INTRODUCED: Councilman Vidal
SECOND: Councilman Bartolomeo

Resolution 2014-057, Salaries & Wages, is attached to the end of these minutes.

All council members present voted aye. None opposed. None abstained.


## RESOLUTION 2014-058

February 18, 2014


INTRODUCED: Councilman Vidal
SECOND: Councilman Bartolomeo

Resolution 2014-058, Services & Supplies, is attached to the end of these minutes.

All council members present voted aye. None opposed. None abstained.


## RESOLUTION 2014-059

February 18, 2014


INTRODUCED: Councilman Vidal
SECOND: Councilman Bartolomeo

8

WHEREAS the Mayor and Council have received a request from Sharon Carroll, requesting use of the Senior Citizen Bus and driver for transportation to the Paterson Museum and Great Falls and returning to Edgewater at 2:30p.m.; and

WHEREAS said trip will be held on Wednesday, April 16, 2014; and

WHEREAS participants will depart from the Edgewater Community Center at 9:00 a.m. for direct drop off at the Paterson Museum and Great Falls and return trip pick up for transportation to the the Edgewater Community Center.

NOW THEREFORE BE IT RESOLVED by the Mayor and Council that permission is hereby granted to Sharon Carroll's request for use of the Senior Citizen Bus and driver upon availability on the above listed date; and

BE IT FURTHER RESOLVED by the Mayor and Council that if for some reason the trip

needs to be rescheduled, permission is hereby granted for the use of the bus based on availability.

All council members present voted aye.  None opposed.  None abstained.

## RESOLUTION
## 2014-060

February 18, 2014

INTRODUCED:  Councilman Vidal
SECOND:  Councilman Bartolomeo

HE   WHEREAS the Edgewater Recreation Department is in need of additional help; and

WHEREAS Jaber Jaber has made application to the Borough Recreation Department for a part time position and was interviewed by the Borough Administrator and the Recreation Leader; and

NOW THEREFORE BE IT RESOLVED by the Mayor and Council that Jaber Jaber is hereby appointed to the Edgewater Recreation Department as a part-time employee at a salary in accordance with the current salary ordinance; and

BE IT FURTHER RESOLVED that said position does not include any medical benefits.

All council members present voted aye.  None opposed.  None abstained.

## RESOLUTION
## 2014-061

February 18, 2014

INTRODUCED:  Councilman Vidal

SECOND:  Councilman Bartolomeo

WHEREAS there are outstanding checks in the Public Assistance Trust Fund II Account in the amount of $1,866.00; and

NOW THEREFORE BE IT RESOLVED by the Governing Body that these outstanding checks are hereby cancelled.

All council members present voted aye.  None opposed.  None abstained.

9

**RESOLUTION**
**2014-062**

February 18, 2014

**INTRODUCED:** Councilman Vidal

**SECOND:** Councilman Bartolomeo

**WHEREAS** on Sunday, February 8, 2014, Neglia Engineering Associates was called to a sink hole on Orchard Street adjacent to the George Washington School bus zone; and

**WHEREAS** upon consultation with both the Department of Public Works and Neglia Engineering Associates it was determined the sink hole posed a threat to the health and safety of residents; and

**WHEREAS** Neglia Engineering Associates declared an emergency in compliance with New Jersey State Statute N.J.A.C. 5:34-1 et seq. and N.J.S.A. 40A:11-1; and

**WHEREAS** Gotthold Paving of Edgewater, New Jersey 07020 was consulted and hired to excavate to determine the cause of the sink hold and make the necessary repair as per N.J.S.A. 40A: 11-1, et seq; and

**NOW THEREFORE BE IT RESOLVED** by the Edgewater Mayor and Council that Gotthold Paving of Edgewater New Jersey 07020 has been authorized to perform said emergent repair at the provided cost estimate of $5,000 to $7,000; and

**BE IT FURTHER RESOLVED** that I, Joseph Iannaconi, Jr., Chief Financial Officer, have certified that funds are available in the operating budget under Account No. 26-2902-275 – Sewer Maintenance:

**JOSEPH IANNACONI, JR., C.F.O.**

At this time, Councilman Henwood spoke about the request to transfer 3 units of affordable housing from the - to 38 COAH. Spoke about the pending sale and deed restriction.  Borough Attorney Boggia also spoke about the request and the affordable housing obligation.  He also spoke about additional steps that have to be taken. .

After further discussion, the following motion was adopted:

**MOTION**

February 18, 2014

INTRODUCED:  Councilman Henwood

SECOND:  Councilman Bartolomeo

A motion from Councilman Henwood for the transfer of 3 units of affordable housing from the St. Moritz to 38 COAH and the motion is in support by the Governing Body of lifting the deed restriction at the St. Moritz for 3 units of affordable housing to transfer those 3 units to 38 COAH.

Discussion:

Borough Attorney Boggia replied to Ms. Bardinas' comments about the item not being listed on the Agenda.

On roll call the vote was as follows:

| | |
|---|---|
| Councilman Henwood | Yes |
| Councilman Doran | Abstain |
| Councilman Monte | Abstain |
| Councilman Vidal | Yes |
| Councilman Jordan | Absent |
| Councilman Bartolomeo | Yes |

10

**OLD BUSINESS**

None.

**NEW BUSINESS**

None.

**ATTORNEY REPORT**

Will be discussing the Veterans Field Project and Riverside Construction and whether action should be taken. Need to go into Closed. Recommendation may be made to take formal action.

**ADMINISTRATOR**

Some items had been discussed at the Work Session.

**School Board Request re: Generator**

School Board requesting a contribution toward a generator for the George Washington School.

**River Road Sewer**

Spoke about 4 houses on River Road built several years ago. Driveway from River Road leading up to the homes is considered a drive way, not a road way. Have had several sewer problems in the area and owners have been advised to correct the problems. Obviously there is a break. Several notifications, including Board of Health notices, have been sent to the property owners. If there is no response the Borough will execute the repairs and lien the property. Discussion. Council consensus is to give owners a final notice and, if necessary, immediately proceed with the repairs.

**Elected Officials' Training Seminars**

Next year will be available on line.

PSE&G will be installing underground power lines from Dempsey Avenue to north of Route 5. Will be starting within the next week or two. Explained temporary traffic changes.

MAYOR/COUNCIL REQUESTS

Mayor Delaney announced that he had appointed Adrian Rodriquez to the Library Board. Ms. Rodriquez fills the unexpired 5 years term of T. Watson. Term expires December 31, 2018. Noted that Mayoral designee appointment will be filled at a later date.

Borough Clerk

New Process placing documents on line. Meeting with vendor was postponed because of whether.

**CLOSED SESSION DISCUSSION**

1. Contract discussion re: Waterside Construction
2. Police Personnel
3. Terms Environmental and Neglia Engineering

**RESOLUTION AUTHORIZING EXECUTIVE SESSION**

11

February 18, 2014

INTRODUCED: Councilman Vidal

SECOND: Councilman Bartolomeo

**WHEREAS**, the Borough of Edgewater desires to meet in private and/or Executive Session to discuss matters that are permitted by the exceptions to the Open Public Meetings Act as indicated herein:

_____ 1. Any matter which, by express provision of Federal law or State statute or court rule shall be rendered confidential or excluded from discussion in public;

_____ 2. Any matter in which the release of information would impair a right to receive funds from the federal government;

_____ 3. Any material the disclosure of which constitutes an unwarranted invasion of individual privacy;

__XX__ 4. Any collective bargaining agreement, or the terms and conditions which are proposed for inclusion in any collective bargaining agreement, including the negotiation of terms and conditions with employees or representatives of employees of the public body.

_____ 5. Any matter involving the purchase, lease, or acquisition of real estate with public funds, the setting of a banking rates or investment of public funds, where it could adversely affect the public interest if discussion of such matters were disclosed;

_____ 6. Any tactics and techniques utilized in protecting the safety and property of the public provided that their disclosure could impair such protection. Any investigations of violations or possible violations of the law;

__XX__ 7. Any pending or anticipated litigation or contract negotiation in which the public body is, or may become a party. Any matters falling within the attorney-client privilege to the extent that confidentiality is required in order for the attorney to exercise his ethical duties as a lawyer;

_____ 8. Any matter involving the employment, appointment, termination of employment, terms and conditions of employment, evaluation of the performance of, promotion or disciplining of any specific prospective public officer or employee or current public officer or employee employed or appointed by the public body, unless all the individual employees or appointees whose rights could be adversely affected request in writing that such matter or matters be discussed at a public meeting.

_____ 9. Any deliberation of a public body occurring after a public hearing that may result in the imposition of a specific civil penalty upon the responding party or the suspension or loss of a license or permit belonging to the responding party as a result of an act or commission for which the responding party bears responsibility.

**NOW, THEREFORE, BE IT RESOLVED** that the Mayor and Council shall recess into private and/or Executive and Closed Session to discuss the aforementioned subject matter and the minutes of same may be disclosed at such time in the future as the GOVERNING BODY in it discretion may determine according to law.

On roll call the vote was as follows:

12

| Councilman Henwood | Yes |
| Councilman Doran | Yes |
| Councilman Monte | Abstain |
| Councilman Vidal | Yes |
| Councilman Jordan | Absent |
| Councilman Bartolomeo | Yes |

The governing body returned from Closed Session.

**PRESENT ON ROLL CALL:** Councilman Henwood, Councilman Doran, Councilman Monte, Councilman Vidal and Councilman Bartolomeo

**ALSO PRESENT:** Mayor Delaney, Administrator Gregory S. Franz and Borough Attorney Philip Boggia.

**ABSENT:** Councilman Jordan and Borough Clerk Barbara Rae

**MOTION**

February 18, 2014

**INTRODUCED:** Councilman Henwood
**SECOND:** Councilman Vidal

Motion to return to Open Session.

On roll call the vote was as follows:

| Councilman Henwood | Yes |
| Councilman Doran | Yes |
| Councilman Monte | Abstain |
| Councilman Vidal | Yes |
| Councilman Jordan | Absent |
| Councilman Bartolomeo | Yes |

Mayor Delaney noted that two resolutions will be voted on regarding the Ball field and the contract with Waterside Construction.

Borough Attorney Boggia spoke on the issue.

Administrator Franz then read Resolution 2014-064 in its entirety:

**RESOLUTION**
**2014-064**

February 18, 2014

**INTRODUCED:** Councilman Henwood

**SECOND:** Councilman Vidal

13

WHEREAS TERMS Environmental Services, Inc., prepared a Summary Report dated February 5, 2014, setting forth the results of their investigation concerning the contaminated materials that was imported onto Veteran's Field by Waterside Construction, LLC; and

WHEREAS the Summary Report confirms that the soil samples taken at Veteran's Field have been validated by an independent testing lab selected by the contractor, Waterside Construction, LLC, and said test results have been provided to the contractor. These test results have not been disputed by the contractor or the contractor's Licensed Site Remediation Professional; and

WHEREAS the Governing Body has authorized TERMS to prepare a Remedial Action Work Plan )RAW) which will be submitted to the New Jersey Department of Environmental Protection for approval in order to remediate the contaminated soil that was imported to Veteran's Field and said Work Plan is dated February 6, 2014; and

WHEREAS the remediation plan requires the excavation and removal of all previously identified improper soil as set forth in the Plan; and

NOW, THEREFORE BE IT RESOLVED that the Governing body hereby approves, endorses and authorizes the Remedial Action Work Plan prepared by TERMS Environmental dated February 6, 2014 which plan was summarized by TERMS in their letter dated February 5, 2014; and

BE IT FURTHER RESOLVED that the Governing Body shall implement the Remedial Action Work Plan upon approval from the New Jersey Department of Environmental Protection and Environmental Protection Agency, if applicable.

Discussion:

Councilman Henwood and Councilman Vidal spoke about the resolution.

Councilman Doran asked for and received a legal opinion prior to voting. Borough Attorney Boggia saw no problem with Councilman Doran voting on this resolution.

On roll call the vote was as follows:

| | |
|---|---|
| Councilman Henwood | Yes |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Yes |
| Councilman Jordan | Absent |
| Councilman Bartolomeo | Yes |

Administrator Franz then read Resolution 2014-063 in its entirety:

RESOLUTION
2014-063

February 18, 2014

INTRODUCED: Councilman Vidal

SECOND: Councilman Bartolomeo

WHEREAS the Borough of Edgewater, in accordance with the Local Public Contract Law, awarded a contract to Waterside Construction, LLC on June 18, 2012 by Resolution No. 2012-192, which project included remediation and renovations to Veteran's Field in accordance with the bid specifications; and

14

**WHEREAS** the site remediation included the removal and disposal of contaminated materials from the site in accordance with State and Federal regulations and the terms and conditions set forth in the Contract; and

**WHEREAS** pursuant to the terms of the Contract, the Contractor was obligated to import only certified clean fill or stone to the site from a quarry and/or crushed virgin rock; In addition, the contractor could use only certified clean top soil and sod from a clean approved source; and

**WHEREAS** the Borough retained the services of TERMS Environmental Services to act as their Licensed Site Remediation Professional (LSRP) to oversee the entire remediation project and to ensure that the Contractor complied with the terms and conditions of the Contract. Any fill brought to site was subject to the approval of the LSRP; and

**WHEREAS** by letter dated October 3, 2013, TERMS Environmental Services issued a letter to the Borough, advising that the Contractor had imported improper fill that contained high levels of PCB's onto Veteran's Field. As a result thereof, TERMS immediately closed the field until such time as they could complete an assessment of the field and develop a work plan to remove the fill. TERMS issued a follow-up letter dated October 30, 2013, confirming that improper fill was brought to Veteran's Field by the Contractor; and

**WHEREAS** meetings were held between the Borough representatives, TERMS and Waterside Construction to discuss the level of contamination and the steps that must be taken in order to remediate the site and remove the improper fill brought on to the site by the Contractor; and

**WHEREAS** meetings were held between the Borough representatives, TERMS and Waterside Construction to discuss the level of contamination and the steps that must be taken in order to remediate the site and remove the improper fill brought on to the site by the Contractor; and

**WHEREAS** by letter dated February 5, 2014, TERMS advised the Borough that all soil samples taken at the site had been validated by an independent testing lab selected by the Contractor, and further advised that approximately 25,000 cubic yards of improper fill must be removed from the site; and

**WHEREAS** after thorough deliberation and consideration, the Borough has determined that Waterside Construction had imported contaminated fill onto the site and such action constitutes a material breach of contract, and that Waterside Construction, LLC does not have the means nor qualifications under New Jersey law to remediate the site; and

**NOW, THEREFORE BE IT RESOLVED** that the Borough of Edgewater hereby declares Waterside Construction in DEFAULT of the Contract for violations of the terms and conditions of the Contract, and the Borough shall pursue all remedies available to them to hold the Contractor responsible for such breach and the Borough shall pursue the prompt completion of this project. Furthermore, the Borough will retain the Services of TERMS and Neglia Engineering during the period the Remedial Action Work Plan is implemented to remediate the soil contamination. At the conclusion of the Remedial Action Work Plan, the Borough will evaluate both the LSRP and the Engineer to determine whether they or other consultants will be retained to complete the renovations to Veteran's Field.

A copy of this Resolution shall be sent to Waterside Construction, LLC and Liberty Mutual Insurance Company, which company issued the Performance and Payout

Discussion:

Borough Attorney Boggia spoke on the issue. Councilman Henwood also spoke about the issue.

On roll call the vote was as follows:

Councilman Henwood          Yes

15

| Councilman Doran | Yes |
| Councilman Monte | Abstain |
| Councilman Vidal | Yes |
| Councilman Jordan | Absent |
| Councilman Bartolomeo | Yes |

**MOTION**

February 18, 2014

**INTRODUCED:** Councilman Henwood

**SECOND:** Councilman Vidal

Motion to adjourn.

On roll call the vote was as follows:

| Councilman Henwood | Yes |
| Councilman Doran | Yes |
| Councilman Monte | Yes |
| Councilman Vidal | Yes |
| Councilman Jordan | Absent |
| Councilman Bartolomeo | Yes |

Gregory S. Franz for
Barbara Rae, RMC, CMC

**APPROVED:** March 18, 2014

16