**EXHIBIT 7**

Daniel J. Cogan, Esq. (0611)
HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
40 Paterson Street, PO Box 480
New Brunswick, NJ 08903
(732) 545-4717
Attorneys for Third-Party Defendant, Neglia Engineering Associates

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK, NEW JERSEY

| | |
|---|---|
| Plaintiff, | Honorable Esther Salas, U.S.D.J. |
| BOROUGH OF EDGEWATER | CIVIL ACTION NO. 2:14-CV-05060 |
| -vs- | |
| Defendants, | **ANSWER TO THIRD-PARTY COMPLAINT, SEPARATE DEFENSES, COUNTERCLAIM, CROSSCLAIMS, ANSWER TO ALL CROSSCLAIMS, NOTICE OF ALLOCATION, REQUEST FOR DISCOVERY, DESIGNATION OF TRIAL COUNSEL, JURY DEMAND, REQUEST FOR STATEMENT OF DAMAGES** |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALUMINUM COMPANY OF AMERICA; A.P. NEW JERSEY, INC.; JOHN DOES 1-100; and ABC CORPORATIONS 1-100 | |
| and | |
| Defendants/Third-Party Plaintiffs, | |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES | **ELECTRONICALLY FILED** |
| -vs- | |
| Third-Party Defendant, | |
| NEGLIA ENGINEERING ASSOCIATES | |

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

      The Third-Party Defendant, Neglia Engineering Associates, by way of Answer to the Third-Party Complaint, says:

1

## PARTIES

1.  Admitted.

2.  This Third-Party Defendant admits that, at all times relevant hereto, it was the duly-appointed municipal engineer for the Borough of Edgewater.   The remaining allegation is a statement of law and not fact, thus, no response is required of this Third-Party Defendant.

3.  This Third-Party Defendant has insufficient knowledge to either admit or deny the allegations contained in this paragraph and, therefore, leaves the Third-Party Plaintiffs to their proofs with regard to same.

4.  This Third-Party Defendant has insufficient knowledge to either admit or deny the allegations contained in this paragraph and, therefore, leaves the Third-Party Plaintiffs to their proofs with regard to same.

## JURISDICTION AND VENUE

5.  Admitted.

6.  Admitted.

7.  Admitted.

8.  Admitted.

## FIRST COUNT

9.  This Third-Party Defendant incorporates by reference each and every response made previously in its Answer as if set forth more fully herein.

10.  This Third-Party Defendant has insufficient knowledge to either admit or deny the allegations contained in this paragraph and, therefore, leaves the Third-Party Plaintiffs to their proofs with regard to same.

11.  This Third-Party Defendant denies the allegations of this paragraph insofar as it is alleged that Neglia Engineering Associates directed the work of any entity with regard to the

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

2

Veteran's Field project. This Third-Party Defendant admits that it attended certain project meetings during the course of the project.

12.    This Third-Party Defendant denies the allegations contained in this paragraph.

13.    The negligence of the Third-Party Plaintiffs speaks for itself and, therefore, since no allegation is raised against the Third-Party Defendant in this paragraph, no further response is required.

14.    This Third-Party Defendant denies the allegations contained in this paragraph.

15.    This Third-Party Defendant denies the allegations contained in this paragraph.

WHEREFORE, the Third-Party Defendant, Neglia Engineering Associates, demands judgment dismissing the Third-Party Complaint, together with costs and counsel fees.

## SECOND COUNT

16.    This Third-Party Defendant incorporates by reference each and every response made previously in its Answer as if set forth more fully herein.

17.    The negligence of the Third-Party Plaintiffs speaks for itself and, therefore, since no allegation is raised against the Third-Party Defendant in this paragraph, no further response is required.

18.    This Third-Party Defendant denies the allegations contained in this paragraph.

WHEREFORE, the Third-Party Defendant, Neglia Engineering Associates, demands judgment dismissing the Third-Party Complaint, together with costs and counsel fees.

## THIRD COUNT

19.    This Third-Party Defendant incorporates by reference each and every response made previously in its Answer as if set forth more fully herein.

20.    Since this allegation is a statement of law and not fact, no response is required of this Third-Party Defendant.

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

3

21.     This Third-Party Defendant denies the allegations contained in this paragraph as the licensed site remediation professional ("LSRP") was responsible for approving all "fill" material that entered the project site.

22.     This Third-Party Defendant denies the allegations contained in this paragraph as the LSRP was responsible for approving all "fill" material that entered the project site.

23.     This Third-Party Defendant admits that the Plaintiff made such an allegation in its Complaint, but denies the remaining allegations contained in this paragraph as the LSRP was responsible for approving all "fill" material that entered the project site.

24.     This Third-Party Defendant denies the allegations contained in this paragraph as the LSRP was responsible for approving all "fill" material that entered the project site.

25.     This Third-Party Defendant denies the allegations contained in this paragraph.

WHEREFORE, the Third-Party Defendant, Neglia Engineering Associates, demands judgment dismissing the Third-Party Complaint, together with costs and counsel fees.


## FOURTH COUNT

26.     This Third-Party Defendant incorporates by reference each and every response made previously in its Answer as if set forth more fully herein.

27.     This Third-Party Defendant denies the allegations contained in this paragraph.

28.     This Third-Party Defendant denies the allegations contained in this paragraph.

29.     This Third-Party Defendant denies the allegations contained in this paragraph.

WHEREFORE, the Third-Party Defendant, Neglia Engineering Associates, demands judgment dismissing the Third-Party Complaint, together with costs and counsel fees.

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

4

## SEPARATE DEFENSES

### FIRST SEPARATE DEFENSE

If Plaintiff and/or Third-Party Plaintiffs suffered damages, the same were caused by Plaintiff's and/or Third-Party Plaintiffs' sole negligence.

### SECOND SEPARATE DEFENSE

If Plaintiff and/or Third-Party Plaintiffs suffered damages, the same were caused by Plaintiff's and/or Third-Party Plaintiffs' contributory negligence.

### THIRD SEPARATE DEFENSE

If Plaintiff and/or Third-Party Plaintiffs suffered damages, the same were caused by third persons over whom this Third-Party Defendant had no control.

### FOURTH SEPARATE DEFENSE

The responsibility of this Third-Party Defendant and the right of Plaintiff and/or Third-Party Plaintiffs to recover in this litigation can only be determined after the percentages of responsibility of all parties to this litigation have been determined. Accordingly, this Third-Party Defendant seeks an adjudication of the percentage of fault of Plaintiff, Third-Party Plaintiffs and each and every person whose fault contributed to this incident.

### FIFTH SEPARATE DEFENSE

The Third-Party Complaint fails to state a cause of action upon which relief can be granted.

### SIXTH SEPARATE DEFENSE

At all times relevant hereto, this Third-Party Defendant was protected by a qualified privilege and/or municipal immunity, and as such the Third-Party Plaintiffs are barred from any recovery herein.

### SEVENTH SEPARATE DEFENSE

This Third-Party Defendant did not violate any duty owed to the Third-Party Plaintiffs under common law, statute, regulations or standards.

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

## EIGHTH SEPARATE DEFENSE

The conduct of this Third-Party Defendant was not negligent.

## NINTH SEPARATE DEFENSE

The conduct of this Third-Party Defendant was not the proximate cause of Plaintiff's and/or Third-Party Plaintiffs' alleged damages.

## TENTH SEPARATE DEFENSE

At the time and place aforesaid, Plaintiff, Third-Party Plaintiffs and/or Co-Defendant(s) were negligent, barring or limiting recovery in whole or in part, and this Third-Party Defendant pleads the Comparative Negligence Statute as to all parties.

## ELEVENTH SEPARATE DEFENSE

The alleged damages complained of were due to unavoidable circumstances and causes beyond the control or fault of this Third-Party Defendant.

## TWELFTH SEPARATE DEFENSE

If Plaintiff and/or Third-Party Plaintiffs suffered damages, the same were caused by the negligence of Co-Defendant(s), and any recovery to which the Third-Party Plaintiffs would otherwise be entitled as against this Third-Party Defendant must be reduced by the application of the standard of comparative negligence set forth in <u>N.J.S.A.</u> 2A:15-5.1, *et seq.*

## THIRTEENTH SEPARATE DEFENSE

If Plaintiff and/or Third-Party Plaintiffs suffered damages, the same were caused by the negligence, breach of contract or breach of express or implied warranty of Co-Defendant(s), jointly, severally or in the alternative.

## FOURTHEENTH SEPARATE DEFENSE

The claims by the Third-Party Plaintiffs in this matter are barred by their own failure to mitigate any alleged loss or injury.

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

## FIFTEENTH SEPARATE DEFENSE

The claims asserted in the Third-Party Complaint against this Third-Party Defendant on the basis of alleged joint and several liability are barred since the acts and omissions of Co-Defendant(s) and/or Third-Party Plaintiffs were separate and distinct from those of this Third-Party Defendant, and neither the common law, nor any federal or state statute, renders this Third-Party Defendant jointly and severally liable for the acts or omissions of Co-Defendant(s) and/or Third-Party Plaintiffs.

## SIXTEENTH SEPARATE DEFENSE

This Third-Party Defendant was entitled to utilize and rely upon systems and procedures authorized and regulated by federal and state laws, and has, in fact, complied with all relevant statutory and administrative regulations applicable thereto.

## SEVENTEENTH SEPARATE DEFENSE

Costs alleged to be incurred in the future may not be recovered as they are remote, speculative and contingent.

## EIGHTEENTH SEPARATE DEFENSE

The Third-Party Plaintiffs failed to conduct themselves in a reasonable manner by their deliberate failure to take actions designed to avoid injury to members of the general public.

## NINETEENTH SEPARATE DEFENSE

At all relevant times, this Third-Party Defendant conducted itself in full compliance with all applicable federal, state and local laws, statutes, ordinances and regulations, which compliance bars the Third-Party Plaintiffs from asserting the claims herein.

## TWENTIETH SEPARATE DEFENSE

Assuming contamination occurred in the manner charged, which contamination is hereby denied, such contamination was an unavoidable consequence of lawful activities or an Act of God.

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

7

## TWENTY-FIRST SEPARATE DEFENSE

This Third-Party Defendant is not a "discharger" or a "responsible person" as defined by N.J.S.A. 58:10-23.11, *et seq.* (the "Spill Act") and, therefore, cannot be liable to the Third-Party Plaintiffs for any of the damages sought in the Third-Party Complaint.

## TWENTY-SECOND SEPARATE DEFENSE

The Third-Party Plaintiffs' claims are barred, either in whole or in part, based on Third-Party Plaintiffs' failure to comply with the express requirements of the Spill Act, as the Third-Party Plaintiffs have failed to establish a statutory basis for liability thereunder on the part of this Third-Party Defendant.

## TWENTY-THIRD SEPARATE DEFENSE

The costs allegedly incurred (or to be incurred) by the Third-Party Plaintiffs in connection with the cleanup of the Veteran's Field site are not recoverable as against this Third-Party Defendant under 42 U.S.C. § 9601, *et seq.* ("CERCLA").

## TWENTY-FOURTH SEPARATE DEFENSE

The Third-Party Plaintiffs are barred from recovery under CERCLA because their own actions caused the release of toxic substances and/or the conditions at the Veteran's Filed site, as alleged in the Plaintiff's First Amended Complaint.

## TWENTY-FIFTH SEPARATE DEFENSE

The Third-Party Plaintiffs' claims are barred by the doctrine of unclean hands.

## TWENTY-SIXTH SEPARATE DEFENSE

The Third-Party Plaintiffs are required to serve an Affidavit of Merit in this matter per N.J.S.A. 2A:53A-27.

## TWENTY-SEVENTH SEPARATE DEFENSE

The services performed by this Third-Party Defendant were done in accordance with the applicable standards of the engineering profession in existence at the time.

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

8

### TWENTY-EIGHTH SEPARATE DEFENSE

This Third-Party Defendant reserves the right to move to dismiss the Third-Party Complaint on the grounds that it did not violate any of its professional obligations or duties as a licensed professional of the State of New Jersey.

### TWENTY-NINTH SEPARATE DEFENSE

At all times alleged, this Third-Party Defendant followed plans, specifications and contracts set by a governmental body and did not deviate from said plans, contracts and specifications and, therefore, is cloaked with immunity.

### THIRTIETH SEPARATE DEFENSE

Pursuant to N.J.S.A. 2A:15-59.1, this matter is a frivolous suit and this Third-Party Defendant is entitled to damages for defending same.

### THIRTY-FIRST SEPARATE DEFENSE

This Third-Party Defendant adopts by reference all Separate Defenses heretofore or hereafter pled by Co-Defendant(s) and/or Defendants/Third-Party Plaintiffs, except insofar as such Separate Defenses may make any allegations against this Third-Party Defendant.

### THIRTY-SECOND SEPARATE DEFENSE

To the extent any pre-trial discovery may reveal the basis for additional separate defenses, this Third-Party Defendant reserves the right to amend its pleadings to include same.

### COUNTERCLAIM

The Third-Party Defendant, Neglia Engineering Associates, by way of Counterclaim against the Defendants/Third-Party Plaintiffs, Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., North River Mews Associates, LLC and Fred A. Daibes, says:

### FIRST COUNT
(Negligence of Third-Party Plaintiffs)

1.    Although the Third-Party Defendant, Neglia Engineering Associates, denies any liability whatsoever, it nonetheless asserts that any and all injuries and damages sustained by

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

9

Plaintiff were the proximate result of the negligence of the Defendants/Third-Party Plaintiffs, Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., North River Mews Associates, LLC and Fred A. Daibes, and demands dismissal of the Third-Party Complaint based on the sole negligence of the Third-Party Plaintiffs as aforesaid.

WHEREFORE, the Third-Party Defendant, Neglia Engineering Associates, demands dismissal of the Third-Party Complaint, together with interest, counsel fees, costs of suit, and such other relief as this Court deems appropriate and equitable.

### SECOND COUNT
(CERCLA Relief)

2.      The Third-Party Defendant, Neglia Engineering Associates, repeats and realleges each and every allegation contained in the First Count as if the same were more fully set forth at length herein and made a part hereof.

3.      The Defendants/Third-Party Plaintiffs, Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., North River Mews Associates, LLC and Fred A. Daibes, were the entities retained by the Borough of Edgewater to effect an environmental cleanup project at the Veteran's Field project site more particularly described in the Complaint and Third-Party Complaint (the "property").

4.      The aforementioned property is a facility within the definition of "Facility" set forth in Section 9601(9) of Title 42 U.S.C.A., otherwise known at the Comprehensive Environmental Response Compensation and Liability Act of 1980, 42 U.S.C. § 9601, et seq. ("CERCLA").

5.      The Third-Party Plaintiffs, Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., North River Mews Associates, LLC and Fred A. Daibes, were negligent in the maintenance, operation and security of said property, and caused the discharge of toxic materials as outlined by the Borough of Edgewater in its First Amended Complaint.

6.      Third-Party Defendant/Counterclaimant, Neglia Engineering Associates, is entitled to a declaration that it is not responsible for any clean-up costs and/or related damages incurred by the Third-Party Plaintiffs, Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., North

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

River Mews Associates, LLC and Fred A. Daibes, which may be incurred following resolution of the instant lawsuit. This declaration includes but is not limited to any and all costs incurred as a result of enforcement by either the United States Environmental Protection Agency, the New Jersey Department of Environmental Protection, or any other governmental or quasi-governmental agency or department.

WHEREFORE, the Third-Party Defendant/Counterclaimant, Neglia Engineering Associates, requests that this Court enter a declaratory judgment against the Third-Party Plaintiffs, Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., North River Mews Associates, LLC and Fred A. Daibes, to reflect that the Third-Party Defendant/Counterclaimant is not liable to the Third-Party Plaintiffs for any clean-up costs that may be incurred following resolution of the instant lawsuit.

### THIRD COUNT
(Allocation Pursuant to New Jersey Spill Act)

7.     The Third-Party Defendant, Neglia Engineering Associates, repeats and realleges each and every allegation contained in the First and Second Counts as if the same were more fully set forth at length herein and made a part hereof.

8.     To the extent alleged by the Borough of Edgewater in its Complaint, the Third-Party Plaintiffs, Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., North River Mews Associates, LLC and Fred A. Daibes, are responsible for the discharge onto, around, and/or into the soil, subsoil and groundwater, at the subject property and/or in the vicinity thereof, of hazardous substances defined in the New Jersey Spill Act Compensation and Control Act, N.J.S.A. 58:10-23.11, et seq. ("the Spill Act").

9.     The Spill Act provides, in pertinent part, that:

> Any person who has discharged a hazardous substance or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all clean-up and removal costs, no matter by whom incurred.

WHEREFORE, the Third-Party Defendant/Counterclaimant, Neglia Engineering Associates, demands a finding of liability against the Third-Party Plaintiffs, Waterside Construction, LLC, 38

HOAGLAND, LONGO
MORAN, DUNST &
DOLKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

11

COAH, LLC, Daibes Brothers, Inc., North River Mews Associates, LLC and Fred A. Daibes, pursuant to the Spill Act and that the relative fault of the parties be apportioned.

## CROSSCLAIMS

The Third-Party Defendant, Neglia Engineering Associates, by way of Crossclaims against Defendants, TERMS Environmental Services, Inc., Aluminum Company of America, A.P. New Jersey, Inc., John Does 1-100 and ABC Corporations 1-100, says:

### FIRST COUNT

1.    Although the Third-Party Defendant, Neglia Engineering Associates, denies any liability whatsoever, it nonetheless asserts that any and all injuries and damages sustained by Plaintiff and/or Third-Party Plaintiffs were the proximate result of the negligence of Defendants, TERMS Environmental Services, Inc., Aluminum Company of America, A.P. New Jersey, Inc., John Does 1-100 and ABC Corporations 1-100, and demands contribution pursuant to the Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A-1, et seq., and the Comparative Negligence Act of New Jersey from Co-Defendants, TERMS Environmental Services, Inc., Aluminum Company of America, A.P. New Jersey, Inc., John Does 1-100 and ABC Corporations 1-100, for the proportionate share of any and all sums that may be adjudged against this Third-Party Defendant in this action.

WHEREFORE, the Third-Party Defendant, Neglia Engineering Associates, demands a judgment of contribution from Defendants, TERMS Environmental Services, Inc., Aluminum Company of America, A.P. New Jersey, Inc., John Does 1-100 and ABC Corporations 1-100, together with interest, counsel fees, costs of suit, and such other relief as this Court deems appropriate and equitable.

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

## SECOND COUNT

    2.     The Third-Party Defendant, Neglia Engineering Associates, repeats and realleges each and every allegation contained in the First Count as if the same were more fully set forth at length herein and made a part hereof.

    3.     Although the Third-Party Defendant, Neglia Engineering Associates, denies any liability whatsoever, it nonetheless asserts that any and all injuries and damages sustained by Plaintiff were the proximate result of the negligence of Defendants, TERMS Environmental Services, Inc., Aluminum Company of America, A.P. New Jersey, Inc., John Does 1-100 and ABC Corporations 1-100, which negligence was primary and active, and if this Third-Party Defendant is found liable to Plaintiff and/or Third-Party Plaintiffs with respect to said injuries and damages, such liability resulted solely from secondary, imputed, vicarious or passive negligence, and Defendants aforesaid are liable to this Third-Party Defendant, by way of common law indemnification, for any and all sums which this Third-Party Defendant may be required to pay in this action.

    WHEREFORE, the Third-Party Defendant, Neglia Engineering Associates, demands judgment, by way of full indemnification, against Co-Defendants, TERMS Environmental Services, Inc., Aluminum Company of America, A.P. New Jersey, Inc., John Does 1-100 and ABC Corporations 1-100, for any and all sums which this Third-Party Defendant may be required to pay in this action, together with interest, counsel fees, costs of suit, and such other relief as this Court deems appropriate and equitable.

## THIRD COUNT

    4.     The Third-Party Defendant, Neglia Engineering Associates, repeats and realleges each and every allegation contained in the First and Second Counts as if the same were more fully set forth at length herein and made a part hereof.

    5.     To the extent alleged by the Borough of Edgewater in its First Amended Complaint, the Defendants, TERMS Environmental Services, Inc., Aluminum Company of America, A.P. New Jersey, Inc., John Does 1-100 and ABC Corporations 1-100, are responsible for the discharge onto,

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

around, and/or into the soil, subsoil and groundwater, at the subject property and/or in the vicinity thereof, of hazardous substances defined in the New Jersey Spill Act Compensation and Control Act, N.J.S.A. 58:10-23.11, *et. seq.* ("the Spill Act").

6.      The Spill Act provides, in pertinent part, that:

> Any person who has discharged a hazardous substance or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all clean-up and removal costs, no matter by whom incurred.

WHEREFORE, the Third-Party Defendant, Neglia Engineering Associates, demands a finding of liability against the Defendants, TERMS Environmental Services, Inc., Aluminum Company of America, A.P. New Jersey, Inc., John Does 1-100 and ABC Corporations 1-100, pursuant to the Spill Act, and that the relative fault of the parties be apportioned.

## ANSWER TO ALL CROSSCLAIMS

The Third-Party Defendant, Neglia Engineering Associates, by way of answer to any and all Crossclaims, says:

This Third-Party Defendant denies each and every allegation contained in any Defendants' Crossclaims and, therefore, leave Crossclaimants to their proofs.

WHEREFORE, the Third-Party Defendant, Neglia Engineering Associates, demands dismissal of any and all Crossclaims, together with interest, counsel fees, costs of suit, and such other relief as this Court deems appropriate and equitable.

## NOTICE OF ALLOCATION

This Third-Party Defendant hereby advises that, if any Defendant settles the within matter prior to conclusion of trial, the liability of any settling Defendant shall remain an issue and this Third-Party Defendant shall seek an allocation of percentage of negligence by the finder of fact against such settling Defendant and/or a credit in favor of this Third-Party Defendant consistent with such allocation.

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

14

## REQUEST FOR DISCOVERY

**PLEASE TAKE NOTICE** that demand is hereby made of Defendants/Third-Party Plaintiffs for complete compliance with Rule 26, for all discovery items/documentation.

## DESIGNATION OF TRIAL COUNSEL

Please be advised that **Daniel J. Cogan, Esq.,** has been designated as trial counsel on behalf of the Third-Party Defendant, Neglia Engineering Associates, in the above-captioned matter.

## JURY DEMAND

The Third-Party Defendant, Neglia Engineering Associates, hereby demands a trial by jury in accordance with Federal Rule of Civil Procedure 38.

## REQUEST FOR STATEMENT OF DAMAGES

**PLEASE TAKE NOTICE** that, in accordance with Local Civil Rule 8.1, the undersigned requests that within ten (10) days of service hereof upon you, you serve upon us a written statement of the amount of damages claimed in this action against this Third-Party Defendant, and against all defendants, if these amounts differ.

HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
Attorneys for Third-Party Defendant, Neglia Engineering Associates

By: _____ */s/ Daniel J. Cogan* _____
　　　　　　　　DANIEL J. COGAN

Dated: February 27, 2015

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

15

## PROOF OF MAILING

I, **Daniel J. Cogan, Esq.**, hereby certify that on this date that I served via electronic mail and ECF, a true and accurate copy of the within Answer to the Third-Party Complaint on behalf of Third-Party Defendant, Neglia Engineering Associates, to the following:

> Mr. William T. Walsh
> Clerk, United States District Court
> Martin Luther King, Jr. Federal Building and US Courthouse
> 50 Walnut Street
> Newark, NJ 07102

I hereby certify that on this date that I served via electronic mail, ECF and regular mail, a true and accurate copy of the within Answer to the Third-Party Complaint on behalf of the Third-Party Defendant, Neglia Engineering Associates, to the following:

Timothy E. Corriston, Esq.
Connell Foley LLP
85 Livingston Avenue
Roseland, NJ 07068
Attorney for Plaintiff/Counter-Defendant,
Borough of Edgewater

Patrick Papalia, Esq.
Archer & Greiner
21 Main Street, Suite 353
Court Plaza South, West Wing
Hackensack, NJ 07601
Attorney for Third-Party Plaintiffs/Counter-
Claimants/Cross-Claimants/Cross-
Defendants/Defendants,
38 Coach, LLC, Daibes Brothers, Inc., North
River Mews Associates, LLC, Waterside
Construction, LLC and Fred A. Daibes

David R. Pierce, Esq.
Lindabury, McCormick, Estabrook
  & Cooper, P.C.
53 Cardinal Drive
P.O. Box 2369
Westfield, NJ 07091
Attorney for Counter-Claimant/Cross-
Claimant/Cross-Defendant/Defendant,
Terms Environmental Services, Inc.

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

16

Debra S. Rosen, Esq.
Archer & Greiner, P.C.
1 Centennial Square
33 East Euclid Avenue
PO Box 3000
Haddonfield, NJ 08033
Attorney for Defendants/Cross
Defendants/ Third-Party Plaintiffs,
38 Coach, LLC, Daibes Brothers Inc., North
River Mews Associates, LLC and Fred A.
Daibes

Michael E. Waller, Esq.
Kirkpatrick, Lockhart, Preston,
  Gates & Ellis, LLP
One Newark Center, 10th Floor
Newark, NJ 07102-5252
Attorney for Third-Party Plaintiffs/Counter-
Claimants/Cross-Claimants/Cross-
Defendants/Defendants,
A.P. New Jersey, Inc. and Aluminum
Company of America

    I certify that the foregoing statements made by me are true.  I am aware that if any of the

statements made by me are willfully false, I am subject to punishment.

                    HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
                    Attorneys for Third-Party Defendant, Neglia Engineering
                    Associates

                    By: _____/s/ Daniel J. Cogan_____
                                    DANIEL J. COGAN

Dated: February 27, 2015

HOAGLAND, LONGO
MORAN, DUNST &
DOUKAS, LLP
ATTORNEYS AT LAW

NORTH JERSEY
40 PATERSON ST
PO BOX 480
NEW BRUNSWICK, NJ

SOUTH JERSEY
701 WILTSEY'S MILL RD
SUITE 202
HAMMONTON, NJ

**EXHIBIT 8**

Michael E. Waller
William H. Hyatt, Jr.
Karyllan D. Mack
K&L Gates LLP
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
Attorneys for Defendant Alcoa Inc. and
Alcoa Domestic LLC, as successor in
interest to Defendant A.P. New Jersey, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|   |   |
|---|---|
| BOROUGH OF EDGEWATER,<br><br>Plaintiff,<br><br>v.<br><br>WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALUMINUM COMPANY OF AMERICA; A.P. NEW JERSEY, INC.; JOHN DOES 1-100; and ABC CORPORATIONS 1-100,<br><br>Defendants. | Civil Action No.: 2:14-CV-05060 (ES-MAH)<br><br>**ANSWER TO FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, COUNTERCLAIMS, AND CROSSCLAIMS** |

Alcoa Inc. (formerly known as "Aluminum Company of America") and Alcoa Domestic

LLC, as the successor in interest to A.P. New Jersey, Inc., (collectively "Alcoa") by their counsel

K&L Gates LLP, answer the Plaintiff's First Amended Complaint as follows:

## THE PARTIES

1.      Inasmuch as Paragraph 1 contains allegations related to a party other than Alcoa,

Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

2.      Inasmuch as Paragraph 2 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

3.      Inasmuch as Paragraph 3 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

4.      Inasmuch as Paragraph 4 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

5.   ·    Inasmuch as Paragraph 5 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

6.      Inasmuch as Paragraph 6 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

7.      Inasmuch as Paragraph 7 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

8.      Alcoa admits that Alcoa Inc. is a Pennsylvania corporation with offices at 201 Isabella Street, Pittsburgh, Pennsylvania 15212.  Alcoa denies the remaining allegations set forth in Paragraph 8.

9.      Alcoa denies the allegations set forth in Paragraph 9, but Alcoa admits that A.P. New Jersey, Inc. was a Delaware corporation that merged into Alcoa Domestic LLC, a wholly-owned subsidiary of Alcoa Inc., in 2010.

10.      Inasmuch as Paragraph 10 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

11.      Inasmuch as Paragraph 11 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

## JURISDICTION AND VENUE

12.    Alcoa can neither admit nor deny the allegations set forth in Paragraph 12, inasmuch as it makes legal conclusions to which Alcoa is not required to respond and which may vary from party to party.

13.    Alcoa can neither admit nor deny the allegations set forth in Paragraph 13, inasmuch as it makes legal conclusions to which Alcoa is not required to respond and which may vary from party to party.

14.    Alcoa can neither admit nor deny the allegations set forth in Paragraph 14, inasmuch as it makes legal conclusions to which Alcoa is not required to respond and which may vary from party to party.

15.    Alcoa objects to the allegations contained in Paragraph 15 to the extent that Paragraph states conclusions to which no responsive pleading is required.  Alcoa denies the remaining factual allegations of Paragraph 15 except to admit that Alcoa conducts business in the State of New Jersey.

## BACKGROUND

16.    Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 16.

17.    Inasmuch as Paragraph 17 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

18.    Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 18.

19.    Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 19.

20.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 20.

21.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 21.

22.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 22.

23.     Inasmuch as Paragraph 23 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

24.     Inasmuch as Paragraph 24 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

25.     Inasmuch as Paragraph 25 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

26.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 26.

27.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 27.

28.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 28.

29.     Inasmuch as Paragraph 29 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

30.     Inasmuch as Paragraph 30 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

31.     Inasmuch as Paragraph 31 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

32.     Inasmuch as Paragraph 32 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

33.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 33.

34.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 34.

35.     Inasmuch as Paragraph 35 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

36.     Inasmuch as Paragraph 36 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

37.     Inasmuch as Paragraph 37 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

38.     Inasmuch as Paragraph 38 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

39.     Inasmuch as Paragraph 39 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

40.     Inasmuch as Paragraph 40 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

41.     Inasmuch as Paragraph 41 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

42.     Inasmuch as Paragraph 42 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

43.     Inasmuch as Paragraph 43 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

44.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 44.

45.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 45.

46.     Inasmuch as Paragraph 46 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

47.     Inasmuch as Paragraph 47 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

48.     Inasmuch as Paragraph 48 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

49.     Inasmuch as Paragraph 49 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

50.     Inasmuch as Paragraph 50 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

51.     Inasmuch as Paragraph 51 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

52.     Inasmuch as Paragraph 52 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

53.     Inasmuch as Paragraph 53 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

54.     Inasmuch as Paragraph 54 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.  Inasmuch as Paragraph 54 contains factual allegations related to Alcoa, Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in that Paragraph.

55.     Alcoa denies the allegations set forth in Paragraph 55, except Alcoa admits that at one time the site identified by Plaintiff as the "Alcoa Site" was owned by Alcoa Inc. and A.P. New Jersey, Inc. and was conveyed to North River Mews Associates, LLC in 1997.  Inasmuch as Paragraph 55 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

56.     Alcoa denies the allegations set forth in Paragraph 56, except Alcoa admits that at one time the site identified by Plaintiff as the "Alcoa Site" was owned by Alcoa Inc. and A.P. New Jersey, Inc. and was conveyed to North River Mews Associates, LLC in 1997.  Inasmuch as Paragraph 56 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

57.     Alcoa admits that NJDEP issued a Restricted Use No Further Action Letter on or about February 12, 2003.  Alcoa refers to the Restricted Use No Further Action Letter for the language therein and its exact meaning and effect.  Inasmuch as Paragraph 57 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

58.     Alcoa refers to the Restricted Use No Further Action Letter for the language therein and its exact meaning and effect.

7

59.     Inasmuch as Paragraph 59 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

60.     Inasmuch as Paragraph 60 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

61.     Alcoa refers to the Deed Notice for the language therein and its exact meaning and effect.

62.     Alcoa admits that there was a building known as "Building 12" on the site identified by Plaintiff as the "Alcoa Site." Alcoa admits that Building 12 was constructed, in part, out of concrete.

63.     Alcoa refers to the Deed Notice for the language therein and its exact meaning and effect. Alcoa denies that the Deed Notice required Alcoa to submit written certification to NJDEP of the maintenance of such institutional and engineering controls and that no changes have occurred.

64.     Alcoa refers to the Deed Notice for the language therein and its exact meaning and effect.

65.     Alcoa refers to the Deed Notice for the language therein and its exact meaning and effect.

66.     Inasmuch as Paragraph 66 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

67.     Inasmuch as Paragraph 67 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

68.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 68.

8

69.    Inasmuch as Paragraph 69 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

70.    Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 70.

71.    Inasmuch as Paragraph 71 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.  Inasmuch as Paragraph 71 contains allegations related to Alcoa, Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in that Paragraph.

72.    Inasmuch as Paragraph 72 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.  Inasmuch as Paragraph 72 contains allegations related to Alcoa, Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in that Paragraph.

73.    Inasmuch as Paragraph 73 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.  Inasmuch as Paragraph 73 contains allegations related to Alcoa, Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in that Paragraph.

74.    Inasmuch as Paragraph 74 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

75.    Inasmuch as Paragraph 75 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

76.    Inasmuch as Paragraph 76 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

77.     Inasmuch as Paragraph 77 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

78.     Inasmuch as Paragraph 78 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

79.     Inasmuch as Paragraph 79 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

80.     Inasmuch as Paragraph 80 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

81.     Inasmuch as Paragraph 81 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

## COUNT I
### Contribution under the Spill Act
### (as to Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, ALCOA, TERMS, A.P., John Does 1-100 and ABC Corporations 1-100)

82.     Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 82 of the First Amended Complaint.

83.     Alcoa refers to N.J.S.A. § 58:10-23.11f(a)(2) for the language therein and its exact meaning and effect.

84.     Alcoa can neither admit nor deny the allegations in Paragraph 84 inasmuch as it makes legal conclusions to which Alcoa is not required to respond and which may vary from party to party.

85.     Inasmuch as Paragraph 85 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

86.     Inasmuch as Paragraph 86 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

87.     Inasmuch as Paragraph 87 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

88.     Inasmuch as Paragraph 88 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

89.     Inasmuch as Paragraph 89 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

90.     Alcoa objects to the allegations contained in Paragraph 90 as that Paragraph states conclusions to which no responsive pleading is required. Alcoa Inc. admits that it is a corporation organized under the laws of the Commonwealth of Pennsylvania.

91.     Inasmuch as Paragraph 91 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

92.     Alcoa objects to the allegations contained in Paragraph 92 as that Paragraph states conclusions to which no responsive pleading is required.  Alcoa admits that A.P. New Jersey, Inc. was a Delaware corporation that merged into Alcoa Domestic LLC, a wholly-owned subsidiary of Alcoa Inc., in 2010.

93.     Inasmuch as Paragraph 93 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

94.     Inasmuch as Paragraph 94 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

95.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 95 and refers to Spill Act Section 58:10-23.11b, N.J.S.A. § 58:10-23.11b for the language therein and its exact meaning and effect.

96.     Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 96 and refers to Spill Act Section 58:10-23.11b, N.J.S.A. § 58:10-23.11b for the language therein and its exact meaning and effect.

97.     Inasmuch as Paragraph 97 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

98.     Inasmuch as Paragraph 98 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

99.     Inasmuch as Paragraph 99 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

100.    Inasmuch as Paragraph 100 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

101.    Inasmuch as Paragraph 101 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

102.    Alcoa denies that it is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

103.    Inasmuch as Paragraph 103 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

104.    Alcoa denies that A.P. New Jersey, Inc. is a "discharger" or "person in any way responsible for a discharged hazardous substance" within the meaning of Spill Act Section 58:10-23.11f(a)(2), N.J.S.A. § 58:10-23.11f(a)(2).

105.    Inasmuch as Paragraph 105 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

106.    Inasmuch as Paragraph 106 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

107.    Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 107.

108.    Alcoa denies that Plaintiff is entitled to contribution from Alcoa Inc. or A.P. New Jersey, Inc. for investigation or remediation costs Plaintiff has incurred or will incur or for which Plaintiff is deemed liable. Inasmuch as Paragraph 108 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph. Nonetheless, Alcoa denies that Plaintiff is entitled to the relief described in that Paragraph.

## COUNT II
### Cost Recovery under CERCLA
**(as to Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, ALCOA, A.P., TERMS, John Does 1-100 and ABC Corporations 1-100)**

109.    Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 109 of the First Amended Complaint.

110.    Alcoa refers to Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), for the language therein and its exact meaning and effect.

111.    Alcoa refers to Sections 107(a)(1) and 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(1), (4)(B), for the language therein and its exact meaning and effect.

112.   Alcoa refers to Sections 107(a)(2) and 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(2), (4)(B), for the language therein and its exact meaning and effect.

113.   Alcoa refers to Sections 107(a)(3) and 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(3), (4)(B), for the language therein and its exact meaning and effect.

114.   Alcoa refers to Sections 107(a)(4) and 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4), (4)(B), for the language therein and its exact meaning and effect.

115.   Alcoa can neither admit nor deny the allegations set forth in Paragraph 115, inasmuch as it makes legal conclusions to which Alcoa is not required to respond and which may vary from party to party.  Alcoa admits that Alcoa Inc. is a corporation organized under the laws of the Commonwealth of Pennsylvania.  Alcoa admits that A.P. New Jersey, Inc. was a Delaware corporation that merged into Alcoa Domestic LLC, a wholly-owned subsidiary of Alcoa Inc., in 2010.  Inasmuch as Paragraph 115 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

116.   Alcoa denies that either Alcoa Inc. or A.P. New Jersey, Inc. are owners and/or "operators" of Veteran's Field within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).  Inasmuch as Paragraph 116 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

117.   Alcoa denies that either Alcoa Inc. or A.P. New Jersey, Inc. arranged, by contract, agreement, or otherwise, for disposal of hazardous substances at Veteran's Field.  Inasmuch as Paragraph 117 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

118.   Inasmuch as Paragraph 118 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

119.   Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 119.

120.   Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 120.

121.   Alcoa denies that either Alcoa Inc. or A.P. New Jersey, Inc. are liable under CERCLA as persons who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed.

122.   Alcoa denies that either Alcoa Inc. or A.P. New Jersey, Inc. are liable under Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), as persons who by contract, agreement, or otherwise arranged for the disposal or treatment of hazardous substances.

123.   Inasmuch as Paragraph 123 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

124.   Alcoa denies that Plaintiff is entitled to recovery from Alcoa Inc. or A.P. New Jersey, Inc. for its costs of response incurred in connection with Veteran's Field.   Inasmuch as Paragraph 124 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.   Nonetheless, Alcoa denies that Plaintiff is entitled to the relief described in that Paragraph.

### COUNT III
### Breach of Contract (as to Waterside)

125.   Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 125 of the First Amended Complaint.

126.   Inasmuch as Paragraph 126 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

127.   Inasmuch as Paragraph 127 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

128.   Inasmuch as Paragraph 128 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

129.   Inasmuch as Paragraph 129 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

130.   Inasmuch as Paragraph 130 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

131.   Inasmuch as Paragraph 131 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

132.   Inasmuch as Paragraph 132 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

133.   Inasmuch as Paragraph 133 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

134.   Inasmuch as Paragraph 134 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

135.   Inasmuch as Paragraph 135 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

136.   Inasmuch as Paragraph 136 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

137.   Inasmuch as Paragraph 137 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

138.    Inasmuch as Paragraph 138 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

139.    Inasmuch as Paragraph 139 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

140.    Inasmuch as Paragraph 140 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

141.    Inasmuch as Paragraph 141 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

142.    Inasmuch as Paragraph 142 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

143.    Inasmuch as Paragraph 143 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

144.    Inasmuch as Paragraph 144 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

145.    Inasmuch as Paragraph 145 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

146.    Inasmuch as Paragraph 146 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

## COUNT IV
### Fraud (as to Waterside and Fred Daibes)

147.    Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 147 of the First Amended Complaint.

148.    Inasmuch as Paragraph 148 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

149.    Inasmuch as Paragraph 149 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

150.    Inasmuch as Paragraph 150 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

151.    Inasmuch as Paragraph 151 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

152.    Inasmuch as Paragraph 152 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

153.    Inasmuch as Paragraph 153 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

154.    Inasmuch as Paragraph 154 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

155.    Inasmuch as Paragraph 155 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

**COUNT V**
**Negligence (as to Waterside)**

156.    Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 156 of the First Amended Complaint.

157.    Inasmuch as Paragraph 157 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

18

158.    Inasmuch as Paragraph 158 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

159.    Inasmuch as Paragraph 159 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

160.    Inasmuch as Paragraph 160 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

161.    Inasmuch as Paragraph 161 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

162.    Inasmuch as Paragraph 162 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

**COUNT VI**
**Unjust Enrichment (as to Waterside, ALCOA, A.P. and 38 COAH)**

163.    Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 163 of the First Amended Complaint.

164.    Inasmuch as Paragraph 164 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.  Inasmuch as Paragraph 164 contains allegations related to Alcoa, Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in that Paragraph.

165.    Inasmuch as Paragraph 165 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.  Inasmuch as Paragraph 165 contains allegations related to Alcoa, Alcoa denies the allegations contained in that Paragraph.

166.    Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 166.

167.    Alcoa denies knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 167.

168.    Alcoa can neither admit nor deny the allegations set forth in Paragraph 168, inasmuch as it makes legal conclusions to which Alcoa is not required to respond and which may vary from party to party.

169.    Alcoa object to the allegations contained in Paragraph 169 as that Paragraph states conclusions to which no responsive pleading is required.  Inasmuch as Paragraph 169 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.  Nonetheless, Alcoa denies that Plaintiff is entitled to the relief described in that Paragraph.

## COUNT VII
### Violations of the New Jersey Consumer Fraud Act (as to Waterside and Fred Daibes)

170.    Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 170 of the First Amended Complaint.

171.    Inasmuch as Paragraph 171 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

172.    Inasmuch as Paragraph 172 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

173.    Inasmuch as Paragraph 173 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

174.   Inasmuch as Paragraph 174 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

175.   Inasmuch as Paragraph 175 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

176.   Inasmuch as Paragraph 176 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

177.   Inasmuch as Paragraph 177 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

178.   Inasmuch as Paragraph 178 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

179.   Inasmuch as Paragraph 179 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

180.   Inasmuch as Paragraph 180 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

181.   Inasmuch as Paragraph 181 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

182.   Inasmuch as Paragraph 182 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

183.   Alcoa denies that contaminated fill materials imported to the Site came from the former Alcoa Site.  Inasmuch as Paragraph 183 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

184.   Inasmuch as Paragraph 184 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

185.    Inasmuch as Paragraph 185 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

186.    Inasmuch as Paragraph 186 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

187.    Inasmuch as Paragraph 187 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

188.    Inasmuch as Paragraph 188 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

189.    Inasmuch as Paragraph 189 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

190.    Inasmuch as Paragraph 190 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

191.    Inasmuch as Paragraph 191 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

192.    Inasmuch as Paragraph 192 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

193.    Inasmuch as Paragraph 193 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

194.    Inasmuch as Paragraph 194 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

## COUNT VIII
### Breach of Contract (as to TERMS)

195.    Alcoa repeats and re-alleges with the same force and effect as if set forth here in full its answers to each and every allegation contained in each paragraph incorporated by reference in Paragraph 195 of the First Amended Complaint.

196.    Inasmuch as Paragraph 196 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

197.    Inasmuch as Paragraph 197 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

198.    Inasmuch as Paragraph 198 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

199.    Inasmuch as Paragraph 199 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

200.    Inasmuch as Paragraph 200 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

201.    Inasmuch as Paragraph 201 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

202.    Inasmuch as Paragraph 202 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

203.    Inasmuch as Paragraph 203 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

204.    Inasmuch as Paragraph 204 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

205.   Inasmuch as Paragraph 205 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

206.   Inasmuch as Paragraph 206 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

## COUNT IX
### Negligence (as to TERMS)

207.   Inasmuch as Paragraph 207 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

208.   Inasmuch as Paragraph 208 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

209.   Inasmuch as Paragraph 209 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.

210.   Inasmuch as Paragraph 210 contains allegations related to a party other than Alcoa, Alcoa can neither admit nor deny the allegations set forth in that Paragraph.  Alcoa objects to the allegations contained in Paragraph 210 as that Paragraph states conclusions to which no responsive pleading is required.  Nonetheless, Alcoa denies that Plaintiff is entitled to the relief described in that Paragraph.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff's First Amended Complaint fails to state a claim upon which relief can be granted against Alcoa.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by reason of laches, estoppel, waiver, consent, unclean hands, res judicata, and/or other equitable defenses.

### THIRD AFFIRMATIVE DEFENSE

The applicable statute or statutes of limitations or other applicable law, rule, statute or regulation controlling or requiring the institution of suit within a certain period of time following its accrual, was not complied with by Plaintiff, for some or all of Plaintiff's alleged costs; accordingly, Plaintiff's claims are barred as a matter of law.

### FOURTH AFFIRMATIVE DEFENSE

The First Amended Complaint does not describe the claims made against Alcoa with sufficient particularity to determine what defenses may apply and Alcoa reserves the right to assert additional affirmative defenses as discovery progresses.  Alcoa adopts and incorporates herein all defenses raised by any other current Defendants and/or future Defendants or Third-Party Defendants, except to the extent that such defenses would shift liability to Alcoa.

### FIFTH AFFIRMATIVE DEFENSE

Alcoa has a complete defense to any liability under the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. § 9601 *et seq.* ("CERCLA") pursuant to CERCLA § 107(b)(3), 42 U.S.C. § 9607(b)(3), inasmuch as the alleged release or threatened release was caused solely by the acts or omissions of unrelated third parties who were not agents

25

or employees of Alcoa and with whom Alcoa had no contractual relationship; Alcoa exercised due care as to any alleged hazardous substances; and Alcoa took precautions against foreseeable third-party acts or omissions, and against the foreseeable consequences of such acts or omissions, within the meaning of CERCLA § 107(b), 42 U.S.C. § 9607(b).

### SIXTH AFFIRMATIVE DEFENSE

Plaintiff has no claim under CERCLA because Plaintiff has failed to establish a prima facie case against Alcoa.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiff has no claim under CERCLA because Alcoa and A.P. New Jersey, Inc. are not covered persons within the meaning of CERCLA.

### EIGHTH AFFIRMATIVE DEFENSE

"Hazardous substances," as defined in CERCLA § 101(14), 42 U.S.C. § 9601(14) were not released into the environment by Alcoa within the meaning of the word "release" as defined in CERCLA § 101(22), 42 U.S.C. § 9601(22).  Even if there were "hazardous substances," as defined in CERCLA § 101(14), 42 U.S.C. § 9601(14) released into the environment by Alcoa within the meaning of the word "release" as defined in CERCLA § 101(22), 42 U.S.C. § 9601(22), which Alcoa denies, the release did not affect the Veteran's Field site that is the subject of this Action.

### NINTH AFFIRMATIVE DEFENSE

The costs incurred or to be incurred by Plaintiff and which Plaintiff seeks to recover in this action are not recoverable to the extent that they are not necessary costs of response consistent with the National Contingency Plan.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff has failed to allege or establish the required nexus between Alcoa and the Veteran's Field site that is the subject of this Action.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent that Plaintiff did not comply with the statutory and/or regulatory prerequisites necessary to bring a CERCLA action.

## TWELFTH AFFIRMATIVE DEFENSE

To the extent that any or all of the Defendants are found liable in this matter, joint and several liability is inappropriate because the harms are divisible and there are reasonable bases for apportionment of the harms suffered.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff has no claim under the Spill Compensation and Control Act, N.J.S.A. § 58:10-23.11 *et seq.* ("Spill Act" or "Act") against Alcoa because neither Alcoa nor A.P. New Jersey, Inc. are dischargers and/or responsible persons within the meaning of the Act, and/or Plaintiff's damages, if any, are the result of conduct occurring prior to the effective date of the Spill Act.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred to the extent that Plaintiff did not comply with the requirements and prerequisites of the Spill Act.

## FIFTEENTH AFFIRMATIVE DEFENSE

In the event that Plaintiff is entitled to contribution from Alcoa under the Spill Act, such relief is limited to "clean up and removal costs" as defined at N.J.S.A. § 58:10-23b.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the statutory defenses to liability provided by the Spill Act.

## COUNTERCLAIM

Defendant Alcoa Inc. (formerly known as "Aluminum Company of America"), a Pennsylvania corporation having its principal place of business at 390 Park Avenue, New York, New York 10022-4608, and Alcoa Domestic LLC, a Delaware limited liability company having its principal place of business at 201 Isabella Street, Pittsburgh, Pennsylvania 15212-5858, as the successor in interest to Defendant A.P. New Jersey, Inc., (collectively "Alcoa") by their counsel K&L Gates LLP, by way of Counterclaim against the Plaintiff, Borough of Edgewater, say:

1.      This counterclaim arises under federal law, 42 U.S.C. § 9613(f).  The United States District Court has original jurisdiction over this counterclaim pursuant to 28 U.S.C. § 1331.

2.      This court has supplemental jurisdiction over Alcoa's state law counterclaims pursuant to 28 U.S.C. § 1367(a) because Alcoa's state law counterclaims are related to the same case or controversy as Alcoa's counterclaim for contribution under 42 U.S.C. § 9613(f).

3.      Plaintiff has consented to personal jurisdiction in this court by filing its First Amended Complaint.

4.      Plaintiff has consented to venue in this court by filing its First Amended Complaint.  Venue is also proper in this court pursuant to 42 U.S.C. § 9613(b), as the alleged release or damages occurred in this district.  Furthermore, a substantial part of the actions or omissions giving rise to this counterclaim occurred in this district.

5.      While continuing to deny the material allegations of the First Amended Complaint, Alcoa hereby demands indemnity and contribution pursuant to all applicable laws, including but not limited to, 42 U.S.C. § 9613(f), N.J.S.A. § 58:10-23.11 *et seq.*, N.J.S.A. § 2A:15-5.1 *et seq.* and/or N.J.S.A. § 2A:53A-1 *et seq.* from Plaintiff for a proportionate share of

costs, damages, or other loss or harm, if any, for which Alcoa may be held liable, or which it may in the future incur, related to the Veteran's Field site because, upon information and belief, materials requiring cleanup and removal or response action under state and federal environmental laws were present at the Veteran's Field site as a result of acts, omissions or other legal responsibility of others, including Plaintiff, its employees, agents or affiliates.

## CROSSCLAIMS

Defendant Alcoa Inc. (formerly known as "Aluminum Company of America"), a Pennsylvania corporation having its principal place of business at 390 Park Avenue, New York, New York 10022-4608, and Alcoa Domestic LLC, a Delaware limited liability company having its principal place of business at 201 Isabella Street, Pittsburgh, Pennsylvania 15212-5858, as the successor in interest to Defendant A.P. New Jersey, Inc., (collectively "Alcoa") by their counsel K&L Gates LLP, by way of Crossclaim against the Defendants, Waterside Construction, LLC ("Waterside"), 38 COAH, LLC ("38 COAH"), Daibes Brothers, Inc. ("Daibes Brothers"), North River Mews Associates, LLC ("North River"), Fred A. Daibes ("Daibes"), TERMS Environmental Services, Inc. ("TERMS"), John Does 1-100, and ABC Corporations 1-100, say:

## JURISDICTION AND VENUE

1.      These crossclaims arise under federal law, 42 U.S.C. § 9613(f).  The United States District Court has original jurisdiction over these crossclaims pursuant to 28 U.S.C. § 1331.

2.      This court has supplemental jurisdiction over Alcoa's state law crossclaims pursuant to 28 U.S.C. § 1367(a) because Alcoa's state law crossclaims are related to the same case or controversy as Alcoa's crossclaims for contribution under 42 U.S.C. § 9613(f).

3.      Defendants Waterside, 38 COAH, Daibes Brothers, North River, and TERMS are conducting business in the State of New Jersey and/or conducted business in the State of New Jersey during the relevant time period, and have or had sufficient contacts with the State of New Jersey to be subject to the jurisdiction of this court.  Upon information and belief, Defendant Daibes is domiciled in the State of New Jersey, and thus is subject to the jurisdiction of this court.

31

4.   Venue is proper in this court pursuant to 42 U.S.C. § 9613(b), as the alleged release or damages occurred in this district.  Furthermore, a substantial part of the actions or omissions giving rise to these crossclaims occurred in this district.

## CROSSCLAIMS FOR STATUTORY AND COMMON-LAW CONTRIBUTION

5.   While continuing to deny the material allegations of the First Amended Complaint, Alcoa hereby demands indemnity and contribution pursuant to all applicable laws, including but not limited to, 42 U.S.C. § 9613(f), N.J.S.A. § 58:10-23.11 *et seq.*, N.J.S.A. § 2A:15-5.1 *et seq.* and/or N.J.S.A. § 2A:53A-1 *et seq.* from Defendants Waterside, 38 COAH, Daibes Brothers, North River, Daibes, TERMS, John Does 1-100, and ABC Corporations 1-100 for a proportionate share of costs, damages, or other loss or harm, if any, for which Alcoa may be held liable, or which it may in the future incur, related to the Veteran's Field site because, upon information and belief, materials requiring cleanup and removal or response action under state and federal environmental laws were present at the Veteran's Field site as a result of acts, omissions or other legal responsibility of others, including Defendants Waterside, 38 COAH, Daibes Brothers, North River, Daibes, TERMS, John Does 1-100, and ABC Corporations 1-100, their employees, agents or affiliates.

## CROSSCLAIMS FOR NEGLIGENCE

6.   Alcoa repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 5 of these Crossclaims as if set forth more fully herein.

7.   As alleged in the First Amended Complaint, Defendants Waterside, 38 COAH, Daibes Brothers, North River, Daibes, TERMS, John Does 1-100, and ABC Corporations 1-100 caused or permitted fill material that they knew or should have known to be contaminated to be transported to or disposed at the Veteran's Field site in violation of applicable laws.

32

8.      Defendants Waterside, 38 COAH, Daibes Brothers, North River, Daibes, TERMS, John Does 1-100, and ABC Corporations 1-100 had a duty of care to ensure that the fill material in their possession or control that was transported to or disposed at Veteran's Field was not contaminated.

9.      Defendants Waterside, 38 COAH, Daibes Brothers, North River, Daibes, TERMS, John Does 1-100, and ABC Corporations 1-100 breached that duty of care when they caused contaminated fill material to be transported to or disposed at Veteran's Field.

10.      Although Alcoa continues to deny the allegations that contaminated fill material transported to or disposed at Veteran's Field originated at the Alcoa Site as defined in the First Amended Complaint, to the extent it is shown that Defendants Waterside, 38 COAH, Daibes Brothers, North River, Daibes, TERMS, John Does 1-100, and ABC Corporations 1-100 caused contaminated fill material from the Alcoa Site to be transported to or disposed at Veteran's Field, Alcoa and A.P. New Jersey, Inc. are part of an identifiable class that would suffer damage as the natural and probable consequence of that breach of duty.

11.      As a direct and proximate result of the breach of duty by Defendants Waterside, 38 COAH, Daibes Brothers, North River, Daibes, TERMS, John Does 1-100, and ABC Corporations 1-100, Alcoa has suffered damages in an amount to be determined at trial.

## CROSSCLAIM FOR BREACH OF CONTRACT

**(as Between Alcoa Domestic LLC, as successor in interest to Defendant A.P. New Jersey, Inc., and Defendant North River Mews Associates, LLC)**

12.      Alcoa repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 11 of these Crossclaims as if set forth more fully herein.

13.      On or about June 27, 1997, Defendant A.P. New Jersey, Inc. ("A.P.") and Defendant North River Mews Associates, LLC ("North River"), among other parties, entered

into a valid contract (the "Multi-Party Property Acquisition Agreement"), pursuant to which North River agreed to buy certain property (the "A.P. Property") in the Borough of Edgewater from A.P. A copy of the Multi-Party Property Acquisition Agreement is annexed hereto as Exhibit A.

14.     Pursuant to Paragraph 2 of the Multi-Party Property Acquisition Agreement, North River agreed to demolish and remove structures on the A.P. Property. North River further agreed that this demolition and removal would be completed in accordance with the Remedial Action Workplan submitted to the New Jersey Department of Environmental Protection and with the demolition plan reviewed and approved by A.P.

15.     Although Alcoa continues to deny the allegations that contaminated fill material transported to or disposed at Veteran's Field originated at the Alcoa Site as defined in the First Amended Complaint, to the extent it is shown that any Defendant caused contaminated fill material from the Alcoa Site to be transported to or disposed at Veteran's Field, such transportation or disposal constitutes a breach of the Multi-Party Property Acquisition Agreement by North River.

16.     A.P. has duly performed all of its obligations under the Multi-Party Property Acquisition Agreement.

17.     As a direct and proximate result of North River's breach of contract, Alcoa Domestic LLC, as successor in interest to A.P., has suffered damages in an amount to be determined at trial.

## CROSSCLAIM FOR INDEMNIFICATION

### (as Between Alcoa Domestic LLC, as successor in interest to Defendant A.P. New Jersey, Inc., and Defendant North River Mews Associates, LLC)

18.     Alcoa repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 17 of these Crossclaims as if set forth more fully herein.

19.     Pursuant to paragraph 16 of the Multi-Party Property Acquisition Agreement, North River agreed to defend and save A.P. harmless from any and all claims arising from the performance of that Agreement.  North River further agreed to reimburse A.P. for the cost of any legal, expert, or other fees expended by A.P. arising from such claims.

20.     On or about June 1997, A.P. and North River entered into a valid contract (the "Purchase and Sale Agreement"), pursuant to which A.P. agreed to sell the A.P. property to North River.  A copy of the Purchase and Sale Agreement is annexed hereto as Exhibit B.

21.     Pursuant to paragraph 7(f) of the Purchase and Sale Agreement, North River agreed to indemnify, defend, and hold A.P. harmless from any and all claims, including all foreseeable and unforeseeable consequential damages related to North River's (or, during North River's ownership of the A.P. Property, any operators' or third parties') use of the A.P. Property and/or any and all activities related thereto.

22.     Pursuant to paragraph 7(g) of the Purchase and Sale Agreement, North River expressly released and agreed to waive all rights it may have to seek contribution from A.P. for any response costs or claims that may arise as the result of the actions or inactions of A.P. or any previous owner or operator of the A.P. Property relating to Hazardous Substances, as defined in the Purchase and Sale Agreement.

23.     On or about March 13, 1999, A.P. and North River, among other parties, entered into a valid contract (the "Environmental Indemnity Agreement"), pursuant to which North River

35

agreed to indemnify, defend, and hold A.P. harmless from any and all claims, including all foreseeable and unforeseeable consequential damages, occurring before, during, or after North River's ownership of the A.P. Property, relating to Building 12 and the land under and adjacent thereto including remediation and disposal costs and expenses related to PCBs. A copy of the Environmental Indemnity Agreement is annexed hereto as Exhibit C.

24.    Although Alcoa continues to deny the allegations that contaminated fill material transported to or disposed at Veteran's Field originated at the Alcoa Site as defined in the First Amended Complaint or originated specifically at Building 12, to the extent it is shown that any Defendant caused contaminated fill material from the Alcoa Site or specifically from Building 12 to be transported to or disposed at Veteran's Field, Alcoa Domestic LLC, as successor in interest to A.P., is entitled to indemnification in an amount to be determined at trial from North River for any costs, expenses, or liability borne by Alcoa arising from such transportation or disposal.

25.    Alcoa Domestic LLC, as successor in interest to A.P., is entitled to reimbursement from North River for the cost of any legal, expert, or other fees expended by Alcoa arising from such transportation and disposal.

Dated: November 21, 2014

Respectfully submitted,

**K&L GATES LLP**

By: /s/ Michael E. Waller
    Michael E. Waller
    William H. Hyatt, Jr.
    Karyllan D. Mack
    One Newark Center, Tenth Floor
    Newark, New Jersey 07102
    Tel:  (973) 848-4000
    michael.waller@klgates.com
    william.hyatt@klgates.com
    karyllan.mack@klgates.com

    *Attorneys for Defendant Alcoa Inc. and
    Alcoa Domestic LLC, as successor in
    interest to Defendant A.P. New Jersey,
    Inc.*

## CERTIFICATION PURSUANT TO RULE 11.2 OF THE LOCAL CIVIL RULES OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

I hereby certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: November 21, 2014

By: _____
Michael E. Waller

38

# EXHIBIT A

02/24/98  WED 11:08 FAX

## MULTI-PARTY PROPERTY ACQUISITION AGREEMENT

THIS AGREEMENT made this 27<u>th</u> day of June, 1997

BETWEEN: **A.P. NEW JERSEY, INC.,**
   a New Jersey Corporation
   (hereinafter called "A.P.")

AND:  **COUNTY OF BERGEN**
   A Body Politic and Corporate
   of the State of New Jersey
   (hereinafter called the "County")

AND:  **NORTH RIVER MEWS ASSOCIATES, L.L.C.**
   a New Jersey Limited Liability Company
   (hereinafter called "North River")

AND:  **RIVER ROAD IMPROVEMENT PHASE II, INC.**
   A New Jersey Corporation
   (hereinafter called the "RRIP")

### WITNESSETH:

WHEREAS, North River is the fee owner and/or contract owner of certain lands under development or subject to plans for development, such lands being adjacent or in proximity to a segment of River Road (Phase II) located in the Borough of Edgewater, County of Bergen, State of New Jersey, as designated on a County plan entitled "Phase II River Road"; and

WHEREAS, the various projects and developments have been or are in the process of being designed and/or approved by the Bergen County Planning Board and Borough of Edgewater in connection with Phase II River Road; and

WHEREAS, said Bergen County approvals provide for certain work to be performed on portions of Phase II River Road, including the extension, realignment and

improvement of segments of same, as set forth on certain preliminary plans prepared by the County of Bergen; and

WHEREAS, the work for Phase II River Road is set forth in that certain Agreement dated November 1, 1996 between the Borough of Edgewater, County of Bergen and Edgewater Residential Community, L.L.C. ( hereinafter called "ERC"); and

WHEREAS, the project is known as New River Road (Phase II) and involves the construction and reconstruction and realignment along portions of existing River Road and the acquisition of certain other properties currently owned or under contract of purchase by ERC to facilitate the new alignment to construct and install other private and public facilities; and

WHEREAS, it has been determined by the respective governing bodies of the Borough of Edgewater and County of Bergen that portions of existing River Road and improvements thereon are unsightly and detrimental to the re-development of the area including, without limitation, areas at the intersection of River Road and Dempsey Avenue, areas in the vicinity of the post office Mail Bag Facility and areas in proximity to the former Alcoa plant and Binghamton Complex including on site conditions, its improvements, entrances and exits; and

WHEREAS, the execution of the  Phase II River Road plans involves participation and cooperation by the County of Bergen, the Borough of Edgewater and ERC to perform required work as set forth on the County Plans; and

WHEREAS, the Borough of Edgewater has by its Resolution dated August 12, 1996, approved and endorsed the conceptual County plan entitled "Phase II River Road" dated July 30, 1995, consisting of Sheets 1 through 4, for the redesigning and realignment

2

of a portion of River Road (Phase II) by the County of Bergen, which redesign and realignment is the subject matter hereof; and

WHEREAS, ERC has agreed to perform the work referred to in the Phase II River Road plans and in accordance with construction plans to be prepared by Boswell Engineering Co. ("the Boswell Plans"); such work commencing at the northerly property line of Hess Oil located on River Road north to and including its intersection with Route 5, extending to a point approximately sixty (60) feet north of said intersection, all of which work shall be completed in accordance with the Boswell Plans and specifications and approved by the County of Bergen; and

WHEREAS, in addition to the work set forth in the Tri-Parte Agreement between the Borough of Edgewater, County of Bergen and ERC, certain other work is deemed necessary by the County of Bergen to fully execute and safely implement the Phase II River Road plan including, without limitation:

a)  Road improvements per the Boswell Plans;

b)  Relocation of utilities, sewer, water, gas, electric;

c)  Traffic signalization, relocation and new installations;

d)  Demolish and removal and/or relocation of buildings and structures within or in close proximity of the proposed right of way of Phase II River Road;

e)  Removal, remediation, and abatement of conditions, structures or other improvements which, in the opinion of the County negatively impact on the efficient and safe movements of vehicular and pedestrian traffic on Phase I and Phase II River Road.

3

In connection with the above objectives and criteria, the County has taken into its planning consideration the public elementary school in close proximity to River Road and Russell Avenue, (the Alcoa property), as well as the residential areas surrounding same,

WHEREAS, ERC has agreed to acquire and convey or cause to be conveyed and dedicated for roadway purposes to the County of Bergen, by Deed of Easement and/or conveyance in fee, the right of way for road purposes as set forth in the Phase II River Road plans, to the following properties:



1. Lands comprised of the former Right of Way of the Susquehanna Railroad abutting the Binghamton Complex and the Alcoa Property ("A.P.") on both sides of Russell Avenue and existing River Road in the general vicinity of the Alcoa property ("A.P.") on River Road;

2. Lands comprised of the PMG Realty Associates, L.L.C. property, formerly known as the J. Fletcher Creamer Property, and access easement abutting existing River Road;

3. Lands comprised of the former Right of Way of the Susquehanna Railroad abutting the U.S. Postal Mail Bag Repair Facility and existing River road;

4. All right-of-way required through properties of the Borough of Edgewater, the current Municipal Parking Lot, the Department of Public Works Garage Property, the Ferry Plaza Building, the property owned by Ferry Bank Associates, L.P., property owned by Borough Associates, L.P. (formerly Ferry Plaza North), and

A&D Marine, Inc. and including the Route 5 River Road intersection and extending to a point approximately sixty (60) feet northerly of said intersection and as shown on the Phase II River Road plans; and

WHEREAS, certain properties required for the roadway improvement, as set forth on the Phase II River Road plans, are not under the control or current ownership of the County or ERC and require acquisition by the County, North River, or ERC respectively, and specifically property owned by A.P., also known as Alcoa property and buildings, the U.S. Postal Mail Bag Facility, and the Ferry Plaza Office and Retail Building; and

WHEREAS, ERC has agreed to contribute the sum of $3,852,698.00 to the Borough and County jointly toward the acquisition of such properties (excepting the A.P. property) and the construction of segments of the new roadway (Phase II River Road) and further to give the County an appropriate guarantee, Letter of Credit, Bond or similar security in form and content satisfactory to Bergen County Counsel, for the performance of the roadwork and ancillary work contemplated herein and set forth on the Phase II River Road plans and the Boswell Plans, drawings and specifications and approved by the County of Bergen; and

WHEREAS, the County, as a participant, agrees to contribute a total sum of $5,000,000 for the purposes of road construction and inspection, including the sum of $1,000,000 for such other public and private costs related to the acquisition, reconstruction and inspection of ancillary facilities of New River Road (Phase II) which funds shall be disbursed to the Borough and ERC for such use; and

5

**WHEREAS**, the road construction by ERC shall also include segments of New River Road (Phase II) extending from the Route 5/River Road intersection to an area at the property north of Hess Oil Co. and existing River Road, as set forth on the County plans and the Boswell construction plans and specifications; and

**WHEREAS**, the County has determined that the demolition and removal of the structures upon the A.P property are required for the efficient and safe movement of vehicular and pedestrian traffic, and said demolition and removal is in the best interest of the general public and region as a whole; and

**WHEREAS**, A.P. has agreed to pay RRIP, as set forth in this Agreement, for the demolition, removal and remediation of the structures on the A.P. property provided, however, that the funds shall be administered and disbursed by the County of Bergen, and provided further that said demolition, removal and remediation is supervised, inspected and guaranteed by the County of Bergen; and

**WHEREAS**, A.P. and the County, as a condition to said funding shall review and approve the demolition and remediation plan prepared by RRIP and approved by New Jersey Department of Environmental Protection ("DEP"), which shall, when completed and approved, provide and guarantee to A.P. and Alcoa the issuance of a No Further Action letter from DEP in form acceptable to A.P.

**NOW, THEREFORE**, in consideration of the premises and of such mutual promises, covenants and undertakings, the parties hereto agree as follows:

I.    AP agrees to sell and North River agrees to buy that property located on River Road in the Borough of Edgewater known as the "Alcoa Property; as more fully described in the Purchase and Sale of Real Estate Agreement.

6

2.      North River and RRIP agree that they will cause to be demolished and removed from the AP property all structures and improvements currently existing on the property. Said demolition and removal shall be completed in accordance with the Remedial Action Workplan submitted to the DEP and the demolition plan reviewed and approved by AP.

3.      AP agrees to pay to RRIP the sum of $9,500,000 for the demolition and removal of the structures as described in paragraph 2 above. In addition, AP agrees to pay to RRIP costs of disposal of PCB-contaminated material (PCB concentrations greater than 50 ppm) at approved TSCA landfills, if those disposal costs exceed $250,000.00, up to a maximum of $2,500,000.00. AP's total liability for demolition of the structures and disposal of waste material will not exceed $12,000,000.00.

4.      The County shall supervise the demolition of the A.P. property and shall administer the disbursement of funds to RRIP with the funds provided to it by A.P. A.P., upon the execution of this Agreement, shall make an initial deposit with the County of Bergen in the sum of $2,000,000 to be disbursed in accordance with the terms of this Agreement. The RRIP shall make periodic requisitions for demolition, removal and the related work completed, and said requisitions shall be funded at a minimum of once per month, or more frequently as the approved demolition and removal schedule may require. Upon satisfactory monthly inspections, the County shall, upon notice to A.P., forthwith authorize the disbursement of funds to RRIP.

AP will provide additional funds to the County of Bergen in the amount of, and upon receipt of, approved requisitions from RRIP for work performed on the demolition

7

and removal of the structures. AP shall continue to provide funds to the County of Bergen until the County of Bergen has received sufficient funds to satisfy AP's liability to RRIP for the demolition and removal of the structures.



5.      The acquisition of the A.P. property and the demolition, removal and remediation of the A.P. (Alcoa) buildings and structures shall be performed at the same time as construction of New River Road (Phase II) which shall be performed by ERC or its agents, in accordance with the Boswell Plans and specifications.

6.      Upon commencement of the roadway construction and upon the request of Bergen County, A.P. and North River shall execute Deeds of Easement or fee title (at the County's option) and make such Right of Way dedications in favor of the County as may be required to implement the Phase II River Road plans in the general area of the A.P. property on existing River Road.

7.      It is the intent of the parties that the excess portions of land acquired by the County and purchased by North River or ERC shall be deeded and/or abandoned by the County to North River or ERC. All legal formalities to accomplish this will be implemented by the County in an expeditious manner.



8.      AP shall fund the demolition, removal and remediation . as set forth in paragraph 4 of this Agreement. The construction and reconstruction of segments of New River Road (Phase II) shall be the sole responsibility of ERC and the County jointly, pursuant to the Developer's Agreement dated November 1, 1996, as amended.

9.      RRIP shall deposit with the County of Bergen a Performance Bond or Letter of Credit in an amount over and above the estimated demolition costs of $12,000,000. Said bond of RRIP to the County of Bergen shall be in form approved by

Bergen County Counsel's office and it shall fully guarantee the demolition and removal costs of the A.P. buildings and structures in a manner and schedule previously approved by DEP, the County, and A.P.

10.    The County guarantees to AP that the demolition and removal of the AP structures and building will be completed as provided in the the Remedial Action Workplan and the approved demolition plan. This guarantee is effective and enforceable only if AP is not in default of its obligations set forth in paragraph 4 of this Agreement.

11.    The County of Bergen, RRIP and North River agree to re-use the rubble from the demolished structures that are not contaminated with PCB's greater than 50 ppm in accordance with applicable New Jersey laws.

12.    ERC agrees that portions of the various drainage facilities which are constructed within the areas adjacent to the County Road shall be conveyed to and become the property of the County, and the County may make such other drainage connections thereto as it may desire, provided that such other connections shall not interfere or negatively impact on proper drainage of the lands of the ERC.

13.    The County shall from time to time, but not less than two times per month, be responsible for the periodic inspection of the work performed by ERC and RRIP. All costs and expenses of such inspections shall be paid by RRIP and shall be over and above the estimated cost of demolition, removal and remediation of A.P. property. RRIP shall request inspections of completed work by the County at least five (5) days prior to disbursement of funds attributable thereto. The requisitions for payment of completed work shall be made by RRIP to the County with notice to A.P. Approval by the County shall be required prior to funding said requisition.

9

14.    RRIP shall notify the DEP, County Department of Public Works and County Engineer, in writing, at least five (5) days prior to the commencement of any demolition, removal or remediation work affecting the A.P. property and, to the extent required, the commencement of construction of segments of (Phase II) New River Road at the intersection of Russell Avenue and River Road.

15.    Upon the execution of this Agreement by RRIP and the County, RRIP shall within thirty (30) days, furnish to the County, with a copy to A.P., the demolition, removal and remediation plans and schedules. Same are to be prepared by RRIP in conjunction with the approved environmental consultant and engineer. Said plans shall be approved by DEP, A.P. and the County.

16.    It is understood and agreed that North River and RRIP shall defend and save the County and A.P. harmless from any and all claims that may be filed in any Court arising from the performance of this Agreement. In connection with the defense of any claim, the County and A.P. shall be entitled to select their own counsel. The County and A.P. shall fully cooperate in any such litigation provided, however, that neither the County nor A.P. shall be under any obligation to expend any funds for any purpose whatsoever in connection with such litigation. Should the County or A.P. be named as a party in any court, administrative or other action or proceeding, North River and RRIP agree to reimburse the County and/or A.P. (as applicable) for the cost of any legal, expert or other fees expended by the County and/or A.P. in such action or proceeding.

17.    Incorporated herein and made a part hereof are the following documents:

a) the Developer's Agreement between ERC and Bergen County;

b) the Joint Reports, with reference to site plan nos. 2618 R-1 and 2366 R-1;

c) the Joint Report requirements of other developments which will participate in Phase II River Road reconstruction, including without limitation, A&D Marine, PMG Realty, L.L.C., Kings Ferry, Inc., Ferry Bank Associates, Borough Associates, L.P., North River Mews Residential Development (A.P.) and others, including the owners of property known as the U.S. Mail Bag and Ferry Plaza Building;

d) the Resolution of the Borough dated September 16, 1996, which authorizes, inter alia, the Borough's participation in Phase II and the commitment to promptly cooperate in the acquisition of properties necessary to complete Phase II River Road and the other improvements set forth on the County Plans;

e) the Boswell Plans approved by the County of Bergen identified as follows:

"River Road Improvements Phase II"
Construction Plans
Bergen County, Borough of Edgewater, New Jersey
Sheets 1 through 4
Job No. 96-215

as may be revised from time to time upon the mutual consent of the parties.

18.   This project involving the A.P. property, shall be designated, for all intents and purposes, as an element of a local governmental improvement project with North River, RRIP, and County as participants.

The County, ERC, and North River shall review and approve the Phase II River Road design by Boswell and shall obtain all approvals and permits required for the construction of the Phase II New River Road segment, and specifically permits from all utility companies involved or affected by the roadway improvements.

11

In this connection RRIP, as contractor, shall participate in and coordinate the efforts of the County and Borough of Edgewater with respect to the utility companies and any other permits or approvals which are required to demolish the A.P. buildings and structures and to construct New River Road Phase II segment.

20.    A.P. will cooperate with the County, its engineering consultants, and RRIP in overseeing the performance of the demolition, removal and remediation work.

21.    This Agreement shall be binding on the parties hereto and their heirs, executors, administrators, successors and assigns.

22.    All parties hereto have the requisite power and authority to enter into this Agreement and it is the intention of the parties to be bound by the terms hereof. The execution and delivery of this Agreement is valid and binding upon the parties hereto and the genuineness of any and all corporate resolutions executed may be assumed to be genuine by the parties in receipt thereof.

23.    This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute an original of this Agreement, but all such counterparts shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Witness:                                             A.P. NEW JERSEY, INC.

_____          By: _____

                                                     KEVIN L. MCKNIGHT,  Vice-President


Witness:                                             COUNTY OF BERGEN

*Carol Gurtel*                              By: _____

CAROL GURTEL                                 WILLIAM P. SCHUBER
NOTARY PUBLIC OF NEW JERSEY        County Executive
My Commission Expires Aug. 11, 1998


Witness:                                             NORTH RIVER MEWS ASSOCIATES, L.L.C.

_____          By: _____

                                                     North River Mews, Inc., Managing Member
                                                     FRED A. DAIBES, President


Witness:                                             RIVER ROAD IMPROVEMENT PHASE II, INC.

_____          By: _____

                                                     FRED A. DAIBES, President


13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Witness:                                                        A.P. NEW JERSEY, INC.

_____                   By: _____

                                                                    KEVIN L. MCKNIGHT, Vice-President

Witness:                                                        COUNTY OF BERGEN

_____                   By: _____

                                                                    WILLIAM P. SCHUBER
                                                                    County Executive

Witness:                                                        NORTH RIVER MEWS ASSOCIATES,
                                                                    L.L.C.

_____                   By: _____

                                                                    North River Mews, Inc., Managing Member
                                                                    FRED A. DAIBES, President

Witness:                                                        RIVER ROAD IMPROVEMENT PHASE II,
                                                                    INC.

_____                   By: _____

                                                                    FRED A. DAIBES, President

13

STATE OF NEW JERSEY )
                    )      :SS
COUNTY OF BERGEN    )

BE IT REMEMBERED that on this 24th day of June ,

1997, before me the subscriber, A NOTARY PUBLIC of the State of New Jersey,

personally appeared WILLIAM P. SCHUBER who being by me duly sworn, did depose and make proof to my

satisfaction that he is the County Executive of the County of Bergen, a Body Politic

and Corporate of the State of New Jersey; that xxxxzxzxzxzxzxz is the x

xzxzxzzxzxzxzxxzzxzxzxzxzx of said County of Bergen; that the execution, as well

as the making of this Instrument has been duly authorized by a proper Resolution of the

Board of Chosen Freeholders of the County of Bergen; that deponent well knows that

corporate seal of said County of Bergen; and that the seal affixed to said Instrument is

such corporate seal and by the said William P. Schuber, as and for his voluntary

act and deed and as and for the voluntary act and deed of the said County of Bergen.

Sworn and subscribed to before me
this 24 day of June , 1997

_Carol Gurtel_

CAROL GURTEL
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires Aug. 11, 1998

14

STATE OF NEW JERSEY      )
                                 )    :SS

COUNTY OF BERGEN      )

        BE IT REMEMBERED that on this _____ day of _____,

1997, before me the subscriber, Kevin L. McKnight of the Commonwealth of

Pennsylvania, personally appeared who being by me duly sworn, did depose and make

proof to my satisfaction that he is the Vice-President of A.P. NEW JERSEY, INC., the

Corporation named in the within instrument;

    that the execution, as well as the making of this instrument has been duly authorized by a

proper Resolution of the Board of Directors of said Corporation; and that the seal affixed

to said instrument signed and delivered by said President as for the voluntary act and

deed of said Corporation, in presence of deponent, who thereupon subscribed his name

thereto as attesting witness.


                                  A.P. NEW JERSEY, INC.


                               _____
                                   Kevin L. McKnight

Sworn and subscribed to before me
this _____ day of _____, 1997


_____

15

STATE OF NEW JERSEY          )
                            )          :SS
COUNTY OF BERGEN            )

BE IT REMEMBERED that on this 4th day of July,

1997, before me the subscriber, *An Attorney at Law* of the State of New Jersey,

personally appeared *Joseph Dubin* who being by me duly sworn, did depose and make proof to my

satisfaction that he is the *Secretary* of RIVER ROAD IMPROVEMENT

PHASE II, INC., the Corporation named in the within instrument; that

*Fred Daibes* is the President of said Corporation; that the execution, as well as

the making of this instrument has been duly authorized by a proper Resolution of the

Board of Directors of said Corporation; and that the seal affixed to said instrument signed

and delivered by said President as for the voluntary act and deed of said Corporation, in

presence of deponent, who thereupon subscribed his name thereto as attesting witness.

RIVER ROAD IMPROVEMENT PHASE II, INC.

Sworn and subscribed to before me
this 4th day of _____ July, 1997

*An Attorney at Law of NJ*

16

STATE OF NEW JERSEY          )
                             )          :SS
COUNTY OF BERGEN             )

BE IT REMEMBERED that on this ___ day of ___ 1997, before me the subscriber, ___ of the State of New Jersey, personally appeared who being by me duly sworn, did depose and make proof to my satisfaction that he is the Managing Member of NORTH RIVER MEWS ASSOCIATES, L.L.C., the Corporation named in the within instrument; that the execution, as well as the making of this instrument has been duly authorized by a proper Resolution of the Board of Directors of said Corporation; and that the seal affixed to said instrument signed and delivered by said President as for the voluntary act and deed of said Corporation, in presence of deponent, who thereupon subscribed his name thereto as attesting witness.

NORTH RIVER MEWS ASSOCIATES, L.L.C.

Sworn and subscribed to before me
this ___ day of ___, 1997

17

Do We need these???

## EXHIBITS

1.  Bergen County Planning Board Application No. SP2618R-1

2.  Bergen County Planning Board Application No. SP2366R-1

3.  Borough of Edgewater Resolution No. R195-96

4.  River Road Phase II Edgewater Plans, Drawings 1 through 4

5.  No Further Action Letter (Form) – New Jersey Department of Environmental Protection

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:                                   A. P. NEW JERSEY, INC.

By: _Arthur Grayfenstel_                   By: _____

                                           Its: _Vice-President_

# EXHIBIT B

# AGREEMENT TO PURCHASE AND SELL REAL ESTATE

THIS AGREEMENT TO PURCHASE AND SELL REAL ESTATE (this "Agreement") is made and entered into as of the _____ day of June, 1997, by and between A. P. NEW JERSEY, INC., a Delaware corporation with a place of business at 1501 Alcoa Building, 425 Sixth Avenue, Pittsburgh, Pennsylvania 15219 ("Seller"), and NORTH RIVER MEWS ASSOCIATES, LLC, a New Jersey limited liability company with a place of business c/o Mr. John De Sheplo, Esquire, 260 Columbia Avenue, Fort Lee, New Jersey 07024 ("Buyer").

     1.    **Purchase And Sale.** Seller agrees to sell, transfer, and convey to Buyer, and Buyer agrees to purchase from Seller, upon the terms, provisions and conditions hereinafter set forth those certain tracts, lots or parcels of real property situated in the Borough of Edgewater, County of Bergen and State of New Jersey, described in Exhibit A attached hereto and incorporated herein by reference (collectively, the "Property").

     2.    **Purchase Price.** The purchase price which Seller agrees to accept for the Property and which Buyer agrees to pay therefor shall be a minimum of $8,000,000, and shall increase by $20,000 for each unit approved for construction on the Property in excess of 400 units (the "Purchase Price"). The Purchase Price shall be payable as follows:

     (a)    At the Closing (defined below), Buyer shall deliver to Seller:

     (i)    Buyer's fully executed unconditional promissory note (the "Note"), secured by Buyer's mortgage to the Property (the "Mortgage"), in the principal amount of the Purchase Price less $2,000,000, for a term of eighteen (18) months from the Closing Date and with an annual interest rate of 6% accruing until fully satisfied, substantially in the form and substance attached hereto as Exhibits B and C, respectively. Upon maturity of the Note, Buyer shall pay to Seller the amount of the Note, principal plus interest, by wire transfer in immediately available funds to the following account (the "Mellon Account"):

Mellon Bank NA, Pittsburgh, PA
ABA #043 000 261
Account Number: #000-1206
Account Name: Aluminum Company of America;

     (ii)    An irrevocable, unconditional letter of credit (the "Letter of Credit") issued by PNC Bank, or a reputable commercial bank, savings bank or savings and loan association acceptable to Seller, to the benefit of Seller in the amount of $2,000,000, with an expiration date of not earlier than twenty-four (24) months after the Closing, in a form acceptable to Seller. The Letter of Credit shall be payable upon presentation of Seller's sight draft dated 18 months from the date of the Closing or upon presentation of Seller's sight draft dated earlier than 18 months from the date of the Closing accompanied by Seller's notarized written statement as follows: "North River Mews Associates, LLC is in

default of its obligations under a certain Agreement to Purchase and Sell Real Estate dated June ___, 1997 (the "Agreement"), with the undersigned, as Seller, and such default has not been cured in accordance with paragraph 8(b) of the Agreement.

(b)    Payment for Additional Units. In the event Buyer, or anyone who acquires title to the Property or any part thereof from Buyer, receives approval to construct more than 400 units at the Property during the time period from May 1, 1997 through May 1, 2117, then at Closing, or within 15 days of receiving such approval, Buyer shall notify Seller of such approval and, within two (2) days following receipt of a building permit to construct the additional units shall pay to the Mellon Account, by wire transfer in immediately available funds, the amount of $20,000 for each additional unit for which approval was granted.

(i) Covenant. This Section 2(b) shall be a covenant running with the land, and shall be recorded in the form of a Memorandum of Agreement with the Deed. Any subsequent transfer of the property is subject to Section 2(b), and Section 2(b) shall not merge with and into the Deed on Closing.

(ii) Estoppel Certificate. From time to time, upon Buyer's request, Seller shall execute an estoppel certificate in a form reasonably acceptable to Buyer stating that Buyer is not in default of Section 2(b).

3.    Instruments Of Transfer. At the Closing, Seller shall convey title to the Property to Buyer by Seller's warranty deed with covenant against grantor's acts (the "Deed") and Seller and Buyer shall execute and deliver to the other, and, where applicable, file and record such instruments of conveyance, transfer and assignment, as shall be necessary or appropriate in the opinion of their respective counsel or as required by the Title Company (defined below) to transfer to Buyer all of the aforesaid right, title and interest of Seller in the Property pursuant to this Agreement.

4.    Title Matters.

(a) Title Commitment. Seller shall, at its sole cost and expense, as soon as reasonably possible following the execution of this Agreement, cause Chicago Title and Insurance Company (the "Title Company") to issue its commitment for an owner's fee policy of title insurance for the Property in the amount of the purchase price and designating Buyer as the proposed insured (the "Commitment"). Buyer shall, within fifteen (15) days after receipt of the Commitment, either:

(i)    Approve the form and substance of the Commitment; or

(ii)    Notify Seller in writing (the "Notice") to remove or satisfy any reasonable matters relating to the title or interests which are objectionable to Buyer as shown on the Commitment. Seller shall have ninety (90) days following the receipt of the Notice to correct those objections specified in the Notice. In the event that Seller is unwilling or unable to correct such objections, then, as Buyer's sole remedy and at Buyer's option to be exercised by written notice within thirty (30) days following the expiration of such 90-

2.

day period, either accept such title and interest as Seller is able to furnish without reduction in or abatement of the Purchase Price and without liability of Seller to Buyer or terminate this Agreement. Upon such termination, neither party hereto shall thereafter have any further liability or obligation to the other party hereunder. Unless Buyer objects to the title condition and terminates this Agreement, said title condition shall be deemed to be acceptable and any objection to the condition shall be deemed to have been waived by Buyer for all purposes.

(b)  Survey.  Seller shall cause to be prepared an ALTA survey of the Property from a New Jersey licensed surveyor sufficient to delete the survey exception from the Commitment. The cost of the Survey shall be borne by Seller unless this Agreement is terminated before Closing, in which case the cost of the Survey shall be borne by Buyer.

(c)  Title Insurance.  Buyer shall bear the cost of the Policy of Title Insurance.

5.  Warranties and Representations.

(a)  Litigation and Claims.  Except as set forth on Schedule 5(a), to Seller's knowledge there are no legal actions, suits, arbitrations or other legal, administrative or governmental proceedings pending or threatened against Seller which would materially adversely affect the condition or ability to use the Property as contemplated by this Agreement, nor is Seller aware of any basis for the foregoing.

(b)  OTHER THAN THE REPRESENTATION AND WARRANTY SET FORTH IN THIS SECTION, BUYER SPECIFICALLY ACKNOWLEDGES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS, WITH ALL FAULTS" BASIS AND THAT BUYER SHALL HAVE AN OPPORTUNITY TO INSPECT THE PROPERTY AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING WITHOUT LIMITATION:

(i)  the quality, nature, adequacy and physical condition of the Property, including, but not limited to, the structural elements, foundations, roofs, floors, appurtenances, access, landscaping, parking facilities, and the electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances;

(ii)  the quality, nature, adequacy, and physical condition of soils, geology and any groundwater;

(iii)  the existence, quality, nature, adequacy and physical condition of the Property;

(iv)  the development potential of the Property, and the Property's use, habitability, merchantability, or fitness, suitability, value, or adequacy of the Property for any particular purpose;

(v)    the zoning or other legal status of the Property or any other public or private restrictions on use of the Property;

(vi)    the compliance of the Property or its operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity;

(vii)    the presence or removal of hazardous or toxic materials, substances or wastes in, on, under, or about the Property or the adjoining or neighboring property;

(viii)    the quality of any labor and materials used in any improvements on the Property;

(ix)    subject to Section 4 hereof, the condition of title to the Property, other than those representations and warranties, if any, contained in the Deed by operation of law;

(x)    the leases, service contracts, or other agreements affecting the Property; and

(xi)    the economics of the operation of the Property.

6.    **Conditions Precedent To Closing.**

(a)    <u>Buyer's and Seller's Conditions</u>.  Unless all of the following conditions are satisfied, Buyer shall not be obligated to purchase, and Seller shall not be obligated to sell, convey, or transfer, the Property (except as such conditions may hereafter be expressly waived by Buyer and Seller in writing):

(i)    The New Jersey Department of Environmental Protection ("NJDEP") shall have executed and issued a Memorandum of Agreement providing for the issuance of a "No Further Action" letter substantially in the form and substance attached hereto as Exhibits D and E, respectively.

(ii)    Seller, Buyer, River Road Improvement Phase II, Inc. and the County of Bergen, New Jersey, shall have entered into a Multi Party Property Acquisition Agreement substantially in the form and substance attached hereto as Exhibit F (the "Multi-Party Agreement").  The Multi-Party Agreement, once fully executed, shall be incorporated into this Agreement by reference and attached as Exhibit G.  The Multi Party Agreement shall contain provisions for:

(1)    the requirement to demolish the structures on the Property in accordance with a Remedial Action Work Plan submitted to the NJDEP by River Road Improvement Phase II, Inc. (the "Demolition");

(2)     the requirements that: (i) Seller will be responsible for payment of Demolition costs in the Amount of $9,500,000, (ii) Seller will be responsible for costs of disposal of material contaminated with PCB's at concentrations greater than 50 ppm at approved TSCA landfills if those disposal costs exceed $250,000 up to a maximum of $2,500,000, and (iii) Seller's total liability for Demolition and disposal of waste material will not exceed $12,000,000; and

(3)     the establishment of an acceptable funding mechanism for the Demolition.

(b)     Buyer's Conditions.  Unless all of the following conditions are satisfied, Buyer shall not be obligated to purchase the Property (except as such conditions may hereafter be expressly waived in writing by Buyer):

(i)     Buyer shall have received the necessary, final, non-appealable approvals of its development plans for the Property from the Borough of Edgewater, New Jersey. Seller agrees to execute all required consents to enable Buyer to meet this condition and all other requisite approvals; and

(ii)     From the date of this Agreement until the Closing, there shall not have occurred any material adverse change in the physical condition of the Property or the condition of title to the Property.

(c)     Seller's Conditions.  Unless all of the following conditions are satisfied, Seller shall not be obligated to sell, convey, and transfer the Property to Buyer (except as such conditions may hereafter be expressly waived in writing by Seller):

(i)     Seller shall have received from the County of Bergen, New Jersey, a guarantee of performance acceptable to Seller for the Demolition.

7.     Environmental Conditions.  The following terms and conditions shall survive Closing hereunder and shall not be merged with and into the Deed.

(a)     Hazardous Substance.  For the purposes hereof, the term "Hazardous Substance" shall mean any substance, chemical or waste that is listed or defined as hazardous, toxic, or dangerous under Applicable Law (defined below), and any asbestos containing materials, radioactive materials or petroleum products.

(b)     Applicable Law.  For the purposes hereof, the term "Applicable Law" shall mean the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1471 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; and the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; each as amended from time to time, together with the rules and regulations promulgated thereunder, and any and all formal or

informal orders, decrees or requests from the United States Environmental Protection Agency, the appropriate New Jersey state governmental and regulatory bodies, or any other governmental agency, authority or instrumentality having jurisdiction and any similar state and local laws and ordinances and the regulations implementing such statutes; together with any and all federal, state, and local environmental or land use laws, rules, ordinances, or regulations.

(c)   Environmental Reports.  Seller shall make available to Buyer the reports listed on Schedule 7(c), attached hereto and incorporated by reference, concerning the environmental condition of and contamination in, on, under, or about the Property (the "Environmental Reports").  The parties agree that the Environmental Reports and any and all reports, analyses, surveys, assessments, evaluations or the like prepared by Buyer and its representatives pursuant to Section 7(d) will establish the known environmental condition of the Property as of the Closing Date.  The Environmental Reports, and any and all reports, surveys and assessments, including all copies thereof, produced by Buyer or its representatives pursuant to this Agreement, shall be held in strict confidence by Buyer and shall not be disclosed by Buyer or its employees, consultants, agents and representatives, without the prior written consent of Seller.

(d)   Buyer's Assessment.  Buyer, at its sole cost and expense, may conduct an environmental transfer assessment of the Property prior to Closing ("Buyer's Assessment").  Seller shall permit Buyer or its representatives, at all reasonable times prior to the Closing Date, to enter upon any and all of the Property for the purposes of inspection, making tests, taking samples and soil borings, and/or conducting groundwater studies and such other investigations as Buyer shall deem appropriate, in order to complete Buyer's Assessment.

(e)   Restrictions on Buyer's Assessment.  Notwithstanding any other provision of this Agreement, Buyer's right to enter the Property for purposes of conducting Buyer's Assessment shall be subject to the following restrictions:

(i)   Buyer shall notify Seller at least twenty-four (24) hours prior to entry onto the Property to conduct such activity;

(ii)   All activities undertaken in connection with Buyer's Assessment shall fully comply with any Applicable Law, and other laws relating to worker safety and to proper disposal of any samples taken, and any soil or water generated in the process of taking the samples, and Buyer shall provide Seller with split samples of all soil, air or water sample so taken;

(iii)   Seller shall be permitted to have a representative present during all such investigations, and copy the results of on-site testing and visual inspections, and shall have complete access to all samples taken, test results, and boring records;

(iv)   In the event that Buyer shall not consummate this transaction for any reason, Buyer shall restore the Property to its condition prior to such investigative activities;

6

(v)    Buyer shall take all actions and implement all protections necessary to ensure that actions taken hereunder and equipment, materials, and substances generated, used or brought onto the Property pose no threat to the safety or health of persons or the environment, and cause no damage to the Property of Seller or of any other person;

(vi)    Buyer shall be solely responsible for the security of the activities, equipment and materials brought on the Property prior to the Closing Date;

(vii)    Buyer for itself, its successors and assigns, covenants and agrees that it shall indemnify and save harmless Seller, its successors and assigns, from and against any and all loss or liability, and all claims, damages, fees, costs and expenses resulting from, incident to or in any way arising out of the entry onto the Property to conduct Buyer's Assessment, or any other act done pursuant to the rights, privileges and authority hereby granted. Buyer shall reimburse Seller for actual damage to the Property resulting from said activities.

(viii)    Unless specifically required by New Jersey law, any and all reports, surveys and assessments, including all copies thereof, produced by Buyer or its representatives pursuant to this Agreement shall be held in strict confidence by Buyer, shall not be disclosed by Buyer or its employees, consultants, agents and representatives, without the prior written consent of Seller, and shall be forthwith delivered to Seller at no cost or expense to Seller;

(ix)    Without limiting the effect of the last clause, Buyer shall require that any party performing services hereunder waive all rights to assert any lien or claim against Seller or the Property arising out of services performed hereunder and provide insurance against injury and damage to Seller or any other person, in coverage amounts and terms satisfactory to Seller, and shall obtain Seller's written approval of such coverage prior to that party's first entry onto the Property; and

(x)    Buyer and its representatives shall comply with all governmental laws and regulations and all policies and regulations of Seller in effect at such time, including, but not limited to, those relating to health and safety, and with such special regulations, rules or policies as may be considered appropriate by Seller under the circumstances and Seller shall have the right to refuse initial or continued access to the Property to any person when it determines that such action is necessary or desirable.

(f)    Indemnification of Seller.  Buyer shall indemnify, defend and hold Seller harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages, occurring on or after the Closing Date arising under Applicable Law related to Buyer's (or, during Buyer's ownership of the Property, any operators' or any third parties') use of the Property and/or any and all activities relating thereto.

(g)    Release of Seller.  Except in the event that Seller remains in default on any payment obligation after receiving notice of such default and opportunity to cure as set forth in Section 8, Buyer expressly releases Seller and agrees to waive all rights that it may have to seek

contribution from Seller for any response costs or claims that may arise as a result of the actions or inactions of Seller and any previous owner, operator or third party on or with respect to the Property relating to Hazardous Substances. Nothing in this provision shall alter or expand the parties' rights or obligations under the Multi Party Agreement.

8.    Default.

(a)    By Seller.  If Seller fails to perform any of its obligations under this Agreement or the Multi Party Agreement, the same shall constitute a default of this Agreement and thereupon Buyer, at its option, may declare a forfeiture by written notice to Seller ("Notice of Seller's Default").  At the expiration of forty-five (45) days after the Notice of Seller's Default, if Seller has not remedied the default, or if Seller has not exercised all efforts to remedy the default as quickly as possible where the default is not capable of being remedied in forty-five (45) days, Buyer may declare this Agreement null and void.  In any event, if such default is not remedied within 120 days after the Notice of Seller's Default, Buyer may declare this Agreement null and void.

(b)    By Buyer.  If Buyer fails to perform any of its obligations under this Agreement or the Multi Party Agreement, the same shall constitute a default of this Agreement and thereupon Seller, at its option, may declare a forfeiture by written notice to Buyer ("Notice of Buyer's Default").  At the expiration of forty-five (45) days after the Notice of Buyer's Default, if Buyer has not remedied the default, or if Buyer has not exercised all efforts to remedy the default as quickly as possible where the default is not capable of being remedied in forty-five (45) days (an "Extended Default"), Seller may at its option:

(i)    if the default occurs before Closing and is not cured as described in Section 8(b), declare the Agreement null and void; or

(ii)    if the default occurs after Closing and Seller is not in default, upon thirty (30) days' written notice, demand immediate payment of the Note and/or Letter of Credit or immediately foreclose on the Mortgage.

In any event, if an Extended Default is not remedied within 120 days after the Notice of Buyer's Default, Seller may elect to exercise its remedies under this Section 8(b)(i) or (ii).

(c)    Limitation of Liability.  In the event of default under this Agreement, the remedies of the parties are limited to the remedies set forth in Sections 8(a) and (b) above.  No party shall be liable for any incidental or consequential damages for default under this Agreement.

(d)    Waiver of Breach.  The waiver by either party of any condition or breach by the other party of any term, covenant, or condition herein contained shall not be deemed to be a waiver of any other condition of any subsequent breach of the same or any other term, covenant, or condition herein contained.

9.     Force Majeure.

(a)     "Force Majeure" shall mean an act, event or condition having a material adverse effect upon the rights or obligations of either party hereunder if such act, event, or condition is beyond the reasonable control of the parties to this Agreement and is relied upon as justification for the failure to perform any obligation set forth herein or to comply with any condition required of the respective parties pursuant to this Agreement. Such acts, events or conditions shall be limited to the following; (i) any labor strike or interruption, or (ii) the action or inaction of any governmental body of the United States of America or the State of New Jersey and any other subdivisions thereof exercising jurisdiction.

(b)     Each party hereto is excused from failure or delay in the performance of any act required hereunder (except for payment of the Letter of Credit, accrual and payment of interest on the Note, and Seller's payment obligations with respect to the Demolition) by reason of Force Majeure. In the event a party is rendered unable, either in whole or in part, to carry out the terms of this Agreement, such affected party shall give immediate notice ("Force Majeure Notice") to the other party and the obligations (other than payment of the Letter of Credit, accrual and payment of interest on the Note, and Seller's payment obligations with respect to the Demolition) of such affected party, to the extent affected by such Force Majeure and to the extent that due diligence is being used to resume performance at the earliest practicable date, shall be suspended. The parties hereto shall use their best efforts to overcome or remove any Force Majeure and to minimize the effect of such Fore Majeure. Notice shall be given to the other party when the effect of the Force Majeure has ceased. The parties hereto acknowledge that notwithstanding any Force Majeure, all payment obligations shall continue to be performed without delay, including but not limited to the payment of the Letter of Credit and the Note.

(c)     If any event of Force Majeure claimed by a party is not overcome or removed within two (2) years of the Force Majeure Notice being given, then at the option of the other party, upon ten (10) days' written notice, this Agreement shall be null and void.

9.     Closing.

(a)     Date and Location. The purchase and sale transaction contemplated by this Agreement shall close (the "Closing") on or before October 31, 1997, or on such other date as the parties may otherwise mutually agree (the "Closing Date"); provided, however, that the Closing Date shall not be later than December 31, 1997. The Closing shall be held at a location which is mutually agreeable to both parties.

(b)     Seller's Obligations. At the Closing, Seller shall:

(i)     Deliver to Buyer a duly executed and acknowledged deed in substantially the form and substance as Exhibit H, attached hereto (the "Deed");

(ii)     Deliver to Buyer a duly executed Affidavit of Title in substantially the form and substance as Exhibit I attached hereto;

(iii)     Deliver to Buyer possession of the Property;



(iv)     Deliver to Buyer reasonable evidence of Seller's capacity and authority for closing the transaction as required by the Title Company;

(v)     Deliver documents reasonably requested by the Title Company as administrative requirements for closing this transaction, including but not limited to an ALTA survey; and

(vi)     Deliver to Buyer an Owner's Policy of Title Insurance in the amount of the Purchase Price, dated as of the Closing Date.

(c)     Buyer's Obligations.  At the Closing, Buyer shall:

(i)     Deliver to Seller the Note, Mortgage and Letter of Credit.  Buyer shall pay to Seller the cost of the Policy of Title Insurance and the title search;

(ii)     Deliver to Seller reasonable evidence of Buyer's capacity and authority for closing the transaction; and

(iii)     Deliver documents reasonably requested by the Title Company as administrative requirements for closing this transaction.

(d)     Taxes.  General real estate taxes for the then-current year relating to the Property shall be prorated as of the Closing Date and shall be adjusted in cash at Closing.  If the Closing shall occur before the tax rate is fixed for the then current year, the apportionment of taxes shall be upon the basis of the tax rate for the next preceding year applied to the latest assessed valuation.  All special taxes or assessments prior to the Closing Date shall be paid by Seller.  Any rebates or refunds of taxes paid prior to Closing shall be for Seller's benefit.  Seller shall pay all transfer tax on the Property that becomes due as a result of the transactions contemplated by this Agreement.

(e)     Costs.  Except to the extent specifically allocated in this Agreement, each party shall pay its share of the normal and incidental costs associated with the Closing which are routinely incurred by a Seller and Buyer in a transaction of this character in the county where the Property is located.

10.     Risk Of Loss; Condemnation.  Seller shall assume the risk of loss, destruction or damage to the Property by fire, Act of God, other casualty, or condemnation prior to the Closing Date and the transfer of title to the Property to Buyer.  Buyer assumes, as of the Closing Date and transfer of title, all hazards of damage to or destruction of the Property and of the taking of the Property or any part thereof for public use, and agrees that no such damage, destruction or taking shall constitute a failure of consideration.  Upon the execution of this Agreement, Buyer shall have an insurable interest in the Property.



11.   **Brokers.** Seller and Buyer each represent and warrant to the other that no real estate brokers or finders are or were involved with respect to any of the transactions contemplated by this Agreement. Each party hereto will indemnify and save harmless the other from any claim or claims made by any brokers or finders for any commissions or compensation alleged to be due by reason of the indemnifying party involving such brokers or finders.

12.   **Notices.** All notices, demands, elections, requests, consents and other communications hereunder shall be in writing and shall be given by personal delivery or sent by certified or registered mail, postage prepaid, return receipt requested and addressed to the parties hereto at the addresses below, or sent by facsimile to the parties at the facsimile numbers below, or at such other address or facsimile number as a party may designate:

Seller

Attention:   Mgr. - Corporate Real Estate
2109 Alcoa Building
425 Sixth Avenue
Pittsburgh, PA 15219
Facsimile No.: (412) 553-2661
Telephone No.: (412) 553-2614

Buyer
Attention:   Mr. John De Sheplo
260 Columbia Aveune
Fort Lee, NJ  07024
Facsimile No.: (201) 224-0572
Telephone No.: (201) 224-6679

Mr. Fred Daibes
725 River Road
Edgewater, NJ  07020
Facsimile No.: (201) 313-9044
Telephone No.: (201) 224-0003

with copy to: David Carmel, Esquire
523 River Road
Edgewater, NJ  07020
Facsimile No.: (201) 943-5614
Telephone No.: (201) 943-9160

13.   **Non-Foreign Person.**

(a)   **Seller's Certification.** Seller certifies and affirms that Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1954, as amended. Seller will execute at or prior to the Closing Date such appropriate affidavit or affidavits as may

be necessary to evidence same in accordance with Treasury Department Regulation 1.1445-2T(b)(2)(iii).

(b)   Buyer's Certification.  Buyer certifies and affirms that Buyer is not a "foreign person" within the meaning of the federal International Investment Survey Act of 1976, as amended, 22 U.S.C. §3101, et seq.  Buyer will execute at or prior to the Closing Date such appropriate affidavit or affidavits as may be necessary to evidence the same.

14.   Like-Kind Exchange.  Seller may transfer or convey the Property to Buyer as a like-kind exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, through the use of a qualified intermediary; provided that the like-kind exchange does not delay Closing or affect any obligation or requirement of this Agreement, that certain Agreement to Purchase and Sell Real Estate between the parties related to the parking lot ("Parking Lot Agreement") or the Multi-Party Agreement.  If Seller elects, in its sole discretion, to convey or transfer the Property pursuant to such a like-kind exchange, Buyer shall cooperate with Seller in good faith to effect such exchange.  Buyer shall not incur any additional costs as a result of Seller's election to convey or transfer the Property pursuant to a like-kind exchange.

15.   Headings.  The headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation of this Agreement.

16.   Merger.  All understandings and agreements heretofore had between the parties, oral or written, are merged into this Agreement, which alone fully and completely expresses their understanding.

17.   Modification.  This Agreement shall not be modified or amended except by a written instrument duly executed by the parties hereto.

18.   Binding Effect And Assignment.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto.  Neither party shall assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld.  Any attempted assignment without such prior written consent shall be void.

19.   Governing Law.  This Agreement shall be construed and governed in accordance with the laws of the State of New Jersey.

20.   Prohibition Against Recording.  Neither Buyer nor Seller shall cause this Agreement, nor any part or memorandum thereof, to be placed or filed of record.

12

21.   **Modified Time Of The Essence.**  If full performance of this Agreement is not completed by the Closing Date, either party shall have the right thereafter to declare time to be of the essence of this Agreement by giving written notice thereof to the other party.  Such notice shall contain a declaration that time is of the essence and shall fix the time, place and date of final settlement, which date may not be sooner than thirty (30) days following the effective date of such notice.

22.   **Survival.**  Sections 2(b), 5, 7 and 8 shall survive the Closing and the consummation of the transaction contemplated by this Agreement.

23.   **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute an original of this Agreement, but all such counterparts shall constitute one and the same instrument.

13

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:                          SELLER:
                                  A. P. NEW JERSEY, INC.


By: _____        By: _____

                                  Its: _____


WITNESS:                          BUYER:
                                  NORTH RIVER MEWS ASSOCIATES, LLC

By: _____        By: _____
                                  North River Mews, Inc., Managing Member
                                  Fred A. Daibes, President

14

_IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:

SELLER:
A. P. NEW JERSEY, INC.

By: _____

By: _____

Its: _____

Schedule 5(a)

Litigation

Complaint filed in Tax Court of New Jersey contesting 1997 real property tax assessments on 700 River Road, Block 74, Lot 1 and 732 River Road, Block 71, Lot 2.





SCHEDULE 7C

ENVIRONMENTAL REPORTS

Renaissance Square, Edgewater, New Jersey - Appendix G - General Site PCB Contamination Characterization (includes Exhibit 1, 2 and 3) prepared by Paulus Sokolowski and Sartor Inc. dated September 1986.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 1 prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 2 Appendices A-F, prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 3 Appendices G-I, prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Interim Response Action Final Report - A.P. New Jersey, Inc. - prepared by Metcalf & Eddy, Inc. dated September 1993.

Detailed Options Evaluation Report - Aluminum Company of America - Edgewater, New Jersey (DERS Project No. 3589) prepared by DuPont Environmental Remediation Services dated July 11, 1996.



## EXHIBIT "A"

THE PROPERTY to be conveyed shall consist of all those parcels of land and premises situate, lying and being in the Borough of Edgewater in the County of Bergen and State of New Jersey, more particularly described as follows:

### PARCEL A

BEGINNING at the intersection of the Southerly line of Russell Avenue and the Westerly line of River Road; thence

(1) Along the Westerly line of River Road South 21 degrees 41' 51" West a distance of 84.55 feet to a point; thence

(2) Along the Westerly line of River Road South 20 degrees 58' 51" West a distance of 132.06 feet to a point; thence

(3) Along the Westerly line of River Road forming a curve to the right with a radius of 283.97 feet (or 300.47 feet as the case may be) and an arc distance of 98.13 feet to a point; thence

(4) Along the Westerly line of River Road South 40 degrees 46' 51" West a distance of 154.71 feet to a point; thence

(5) Along the Westerly line of River Road South 40 degrees 43' 51" West a distance of 213.02 feet to a point; thence

(6) Along the Westerly line of River Road South 37 degrees 05' 21" West 157.71, to a spike in the pavement at the intersection of the Westerly line of River Road and the Northerly line of Vreeland Terrace; thence

(7) Along the Northerly line of Vreeland Terrace North 53 degrees 38' 09" West a distance of 463.00 feet to the Easterly line of Undercliff Avenue; thence

(8) Along the Easterly line of Undercliff Avenue North 23 degrees 23' 51" East a distance of 162.02 feet to a point; thence

(9) Along the Easterly line of Undercliff Avenue North 27 degrees 21' 56" East 204.30 feet to a point; thence

(10) Along the Easterly line of Undercliff Avenue North 27 degrees 38' 51" East 463.84 feet to a point on the Southerly line of Russell Avenue; thence

(11) Along the Southerly line of Russell Avenue South 54 degrees 54' 09" East a distance of 566.09 feet to the point and place of beginning.

EXCEPTING, however, from the above described parcel all that parcel of land known as The Edgewater Cemetery and bounded and described as follows:

BEGINNING at a point which point is North 23 degrees 00' 16" East a distance of 161.72 feet from the intersection of the Westerly line of River Road with the Northerly line of Vreeland Terrace; thence

(1) Parallel with the Northerly line of Vreeland Terrace North 53 degrees 38' 09" West a distance of 340.63 feet to a point; thence

(2) North 35 degrees 08' 31" East a distance of 185.11 feet to a point; thence

(3) South 54 degrees 51' 29" East a distance of 233.25 feet to a point; thence

(4) South 35 degrees 08' 31" West a distance of 54.64 feet to a point; thence

(5) South 54 degrees 51' 29" East a distance of 107.28 feet to a point; thence

(6) South 35 degrees 07' 57" West a distance of 137.74 feet to a point and place of beginning.

SAID PREMISES are known as Lots 1, 2 and 3 in Block 74 as shown on the Tax Map of the Borough of Edgewater.

BEING the same premises conveyed as Parcel 1 to Amland Properties Corporation by Indenture between 700 River Road Realty, dated January 3, 1983 and recorded January 3, 1983 in the Office of the Clerk of Bergen County in Deed Book 6728, page 760.

# EXHIBIT C



## ENVIRONMENTAL INDEMNITY AGREEMENT

**THIS AGREEMENT** made this 13th day of March, 1999

BETWEEN:        A. P. NEW JERSEY, INC.
a New Jersey corporation
(hereinafter called "A. P.")

AND:        NORTH RIVER MEWS ASSOCIATES, L.L.C.
a New Jersey limited liability company
(hereinafter called "North River")

AND:        RIVER ROAD IMPROVEMENTS PHASE II, INC.
a Delaware corporation
(hereinafter called "River Road")

### WITNESSETH:

**WHEREAS**, North River is the owner of certain real estate located in the Borough of Edgewater, County of Bergen, State of New Jersey pursuant to an Agreement to Purchase and Sell Real Estate entered into on June 27, 1997, by and between North River and A. P. (the "Purchase Agreement") and a Transfer Deed executed by A. P. on August 25, 1997, and recorded on August 26, 1997 as Instrument Number 104092 (the "Property"); and

**WHEREAS**, North River, River Road, A. P. and the County of Bergen, New Jersey, were all parties to a Multi-Party Property Acquisition Agreement also entered into on June 27, 1997, whereby, inter alia, North River and River Road agreed that they would cause to be demolished all of the structures on the Property; and

**WHEREAS**, North River, River Road, A. P. and the County of Bergen, New Jersey, were all parties to a Funding Agreement entered into on September 23, 1997, whereby, inter alia, the parties agreed that, to the extent that Building 12 on the Property is not demolished, A. P. shall withhold or cause Bergen County to withhold payment of $500,000 of the demolition funding until, among other conditions, A. P. receives a "No Further Action" letter from the NJDEP covering all the entire Property, including Building 12; and

**WHEREAS**, North River presently does not intend to demolish Building 12.

**NOW, THEREFORE**, in consideration of the premises and of such mutual promises, covenants and undertakings, which the parties acknowledge to be received and sufficient, the parties hereto agree as follows:

i.      In addition to and notwithstanding any other agreement or obligation of the parties, to the extent that Building 12 is not demolished, North River and River Road shall indemnify, defend and hold A. P. harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages, occurring at any time before, during or after North River's ownership of the Property, relating to Building 12 and the land under and adjacent thereto, arising under Applicable Law (as defined in the Purchase Agreement), including, but not limited to, remediation and disposal costs and expenses related to PCBs.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first above written.

Witness:                                    **A.P. New Jersey, Inc.**

                                            By: _____
                                                JOHN MILLETT, Vice President

Witness:                                    **North River Mews Associates, L.L.C.**

                                            By: _____
                                                North River Mews, Inc., Managing
                                                Member, FRED A. DAIBES,
                                                President

Witness:                                    **River Road Improvements Phase II, Inc.**

                                            By: _____
                                                FRED A. DAIBES, President

STATE OF NEW JERSEY                    :
                                       :        ss:
COUNTY OF BERGEN                       :

    *BEFORE ME*, a Notary Public, in and for said State, personally appeared Fred A. Daibes, President of North River Mews, Inc., which is the managing member of North River Mews Associates, L.L.C., a New Jersey limited liability company, and President of River Road Improvements Phase II, Inc., and stated and acknowledged that he was duly authorized in his capacities to execute the foregoing instrument for and in the name and behalf of the company and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration and purposes therein mentioned and set.

    WITNESS my hand and official seal on this 15th day of March, 1999.

                        Notary Public
                        MARK J. SOKOLICH
                        Attorney at Law
                        State of New Jersey

COMMONWEALTH OF PENNSYLVANIA          :
                                       :        ss:
COUNTY OF ALLEGHENY                    :

    *BEFORE ME*, a Notary Public, in and for said State, personally appeared John Millett, Vice President of A.P. New Jersey, Inc., and stated and acknowledged that he was duly authorized in his capacity to execute the foregoing instrument for and in the name and behalf of the company and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration and purposes therein mentioned and set.

    WITNESS my hand and official seal on this 15th day of March, 1999.

                        Notary Public
                        MARK J. SOKOLICH
                        Attorney at Law
                        State of New Jersey

**EXHIBIT 9**

William H. Hyatt, Jr.
Michael E. Waller
Karyllan D. Mack
K&L Gates LLP
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
Attorneys for Alcoa Domestic LLC,
as successor in interest to Defendant/
Third-Party Plaintiff A.P. New Jersey, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER,<br><br>Plaintiff,<br><br>v.<br><br>WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALUMINUM COMPANY OF AMERICA; A.P. NEW JERSEY, INC.; JOHN DOES 1-100; and ABC CORPORATIONS 1-100,<br><br>Defendants,<br><br>Of which<br><br>ALCOA DOMESTIC, LLC, as successor in interest to A.P. NEW JERSEY, INC.,<br><br>is a Third-Party Plaintiff,<br><br>v.<br><br>COUNTY OF BERGEN and RIVER ROAD IMPROVEMENT PHASE II, INC.,<br><br>Third-Party Defendants | Civil Action No.: 2:14-CV-05060 (ES-MAH)<br><br>**THIRD-PARTY COMPLAINT OF ALCOA DOMESTIC LLC, AS SUCCESSOR IN INTEREST TO A.P. NEW JERSEY, INC.** |

Alcoa Domestic LLC, a Delaware limited liability company having its principal place of business at 201 Isabella Street, Pittsburgh, Pennsylvania 15212-5858, as the successor in interest to Defendant/Third-Party Plaintiff A.P. New Jersey, Inc., (hereinafter "Alcoa") by its counsel K&L Gates LLP, files this Third-Party Complaint against Third-Party Defendants the County of Bergen and River Road Improvement Phase II, Inc. and alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367, as Alcoa's third-party claims arise from the same case or controversy as the claims set forth in Plaintiff Borough of Edgewater's First Amended Complaint.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

2.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

3.      A.P. New Jersey, Inc. was a Delaware corporation that merged into Alcoa Domestic LLC, a wholly-owned subsidiary of Alcoa Inc., in 2010.

4.      Alcoa Domestic LLC is a Delaware limited liability company having its principal place of business at 201 Isabella Street, Pittsburgh, Pennsylvania 15212-5858.

5.      County of Bergen is a body politic and corporate of the State of New Jersey, maintaining an administration building located at One Bergen County Plaza, Hackensack, New Jersey 07601-7076.

6.      River Road Improvement Phase II, Inc. is a corporation organized under the laws of the State of New Jersey with offices at 1000 Portside Drive, Edgewater, New Jersey 07020.

2

## STATEMENT OF THIRD-PARTY CLAIMS

7.     Alcoa adopts and reasserts its previous defenses and allegations set out in its Answer to the First Amended Complaint, Affirmative Defenses, Counterclaim, and Crossclaims, as appropriate, in this Third-Party Complaint as if set forth verbatim herein.

8.     On or about June 27, 1997, Defendant/Third-Party Plaintiff A.P. New Jersey, Inc. ("A.P."), Third-Party Defendant River Road Improvement Phase II, Inc. ("RRIP"), Third-Party Defendant County of Bergen (the "County"), and Defendant North River Mews Associates, LLC ("North River") entered into a valid contract (the "Multi-Party Property Acquisition Agreement").  A copy of the Multi-Party Property Acquisition Agreement is annexed hereto as Exhibit A.

9.     On or about June 1997, A.P. and North River entered into a valid contract (the "Purchase and Sale Agreement"), pursuant to which North River agreed to purchase real property located in the Borough of Edgewater, Bergen County, New Jersey, from A.P.  A copy of the Purchase and Sale Agreement is annexed hereto as Exhibit B.

10.     Upon information and belief, the real property identified as the "Alcoa Site" in Plaintiff Borough of Edgewater's First Amended Complaint was the subject of the Purchase and Sale Agreement.

11.     Pursuant to the Multi-Party Property Acquisition Agreement, RRIP and North River agreed to develop certain properties located in the Borough of Edgewater, including the Alcoa Site, in accordance with plans developed by the County.

12.     Pursuant to Paragraph 2 of the Multi-Party Property Acquisition Agreement, RRIP agreed to demolish and remove the structures on the Alcoa Site in accordance with the

Remedial Action Workplan submitted to the New Jersey Department of Environmental

Protection and the demolition plan reviewed and approved by A.P.

13.     Pursuant to Paragraph 16 of the Multi-Party Property Acquisition Agreement, RRIP agreed to defend and save A.P. harmless from any and all claims that may be filed in any Court arising from the performance of the Multi-Party Property Acquisition Agreement.  RRIP further agreed to reimburse A.P. for the cost of any legal, expert or other fees expended by A.P. should A.P. be named as a party in any court, administrative or other action or proceeding.

14.     Pursuant to Paragraph 4 of the Multi-Party Property Acquisition Agreement, the County agreed to supervise the demolition at the Alcoa Site and to disburse funds to RRIP to pay for said demolition.

15.     Pursuant to Paragraph 10 of the Multi-Party Property Acquisition Agreement, the County guaranteed to A.P. that the demolition and removal of structures on the Alcoa Site would be completed in accordance with the Remedial Action Workplan and the demolition plan approved by A.P.

16.     Pursuant to Paragraph 13 of the Multi-Party Property Acquisition Agreement, the County agreed to inspect the work performed by RRIP at the Alcoa Site not less than two times per month.

17.     On or about March 13, 1999, A.P., North River, and RRIP entered into a valid contract (the "Environmental Indemnity Agreement"), pursuant to which RRIP agreed to indemnify, defend, and hold A.P. harmless from any and all claims, including all foreseeable and unforeseeable consequential damages, occurring before, during, or after North River's ownership of the Alcoa Site, relating to Building 12 and the land under and adjacent thereto including

4

remediation and disposal costs and expenses related to PCBs. A copy of the Environmental Indemnity Agreement is annexed hereto as Exhibit C.

18.     Plaintiff Borough of Edgewater (the "Borough"), in its First Amended Complaint, alleges that Alcoa Inc. and A.P. are liable under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, the New Jersey Spill Compensation and Control Act (the "Spill Act"), N.J.S.A. 58:10-23.11 *et seq.*, and New Jersey's common law of unjust enrichment for contamination of the Borough's property known as Veteran's Field.

19.     Upon information and belief, the Borough alleges that Defendant TERMS Environmental Services, Inc. and various entities owned or controlled by Defendant Fred A. Daibes, including Defendants North River, Waterside Construction, LLC, 38 COAH, LLC, and Daibes Brothers, Inc., caused contaminated fill material to be disposed of at Veteran's Field.

20.     Upon information and belief, the Borough alleges that Defendant Waterside Construction, LLC stated that the contaminated fill material disposed of at Veteran's Field originated at the Alcoa Site.

21.     Upon information and belief, the Borough alleges that the contaminated fill material disposed of at Veteran's Field contained crushed concrete from Building 12 at the Alcoa Site.

22.     Alcoa has and will continue to incur costs to defend itself against the Borough's claims as set forth in the First Amended Complaint as well as related Crossclaims.

23.     Although Alcoa continues to deny the material allegations of the Borough's First Amended Complaint, upon information and belief, the Borough seeks to require Alcoa to clean up or pay for the cost to clean up contaminants at Veteran's Field.

## COUNT I: BREACH OF CONTRACT

### (as to RRIP)

24.     Alcoa repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 23 of this Third-Party Complaint as if set forth more fully herein.

25.     The Multi-Party Property Acquisition Agreement is a valid contract between RRIP and A.P.

26.     A.P. has duly performed all of its obligations under the Multi-Party Property Acquisition Agreement.

27.     RRIP did not demolish and remove structures from the Alcoa Site in accordance with the Remedial Action Workplan and/or the demolition plan approved by A.P.

28.     Although Alcoa continues to deny the allegations that contaminated fill material transported to or disposed at Veteran's Field originated at the Alcoa Site, to the extent it is shown that any Defendant caused contaminated fill material from the Alcoa Site to be transported to or disposed at Veteran's Field, such transportation or disposal constitutes a breach of the Multi-Party Property Acquisition Agreement by RRIP.

29.     As a direct and proximate result of RRIP's breach of contract, Alcoa has suffered damages in an amount to be determined at trial.

### COUNT II: INDEMNIFICATION

### (as to RRIP)

30.     Alcoa repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 29 of this Third-Party Complaint as if set forth more fully herein.

31.     The Multi-Party Property Acquisition Agreement is a valid contract between RRIP and A.P.

32.    A.P. has duly performed all of its obligations under the Multi-Party Property Acquisition Agreement.

33.    The Environmental Indemnity Agreement is a valid contract between RRIP and A.P.

34.    A.P. has duly performed all of its obligations under the Environmental Indemnity Agreement.

35.    Pursuant to the Multi-Property Property Acquisition Agreement and the Environmental Indemnity Agreement, RRIP agreed to indemnify A.P. from any claims arising from the performance of the Multi-Party Property Acquisition Agreement and from any claims relating to Building 12 and remediation costs related to PCBs.

36.    Although Alcoa continues to deny the allegations that contaminated fill material transported to or disposed at Veteran's Field originated at the Alcoa Site or originated specifically at Building 12, to the extent it is shown that any Defendant caused contaminated fill material from the Alcoa Site or specifically from Building 12 to be transported to or disposed at Veteran's Field, Alcoa is entitled to indemnification in an amount to be determined at trial from RRIP for any costs, expenses, or liability borne by Alcoa arising from such transportation or disposal.

37.    Pursuant to the Multi-Party Property Acquisition Agreement, Alcoa is entitled to reimbursement from RRIP for the cost of any legal, expert, or other fees expended by Alcoa arising from such transportation and disposal.

## COUNT III: BREACH OF CONTRACT

### (as to the County)

38.     Alcoa repeats and incorporates herein by reference the allegations set forth in Paragraphs 1 through 37 of this Third-Party Complaint as if set forth more fully herein.

39.     The Multi-Party Property Acquisition Agreement is a valid contract between the County and A.P.

40.     A.P. has duly performed all of its obligations under the Multi-Party Property Acquisition Agreement.

41.     The County failed to supervise the demolition done by RRIP at the Alcoa Site as required by the Multi-Party Property Acquisition Agreement, which failure constituted a material breach of the Multi-Party Property Acquisition Agreement.

42.     The County failed to inspect the work performed by RRIP as required by the Multi-Party Property Acquisition Agreement, which failure constituted a material breach of the Multi-Party Property Acquisition Agreement.

43.     As a direct and proximate result of the County's breach of contract, Alcoa Domestic LLC, as successor in interest to A.P., has suffered damages in an amount to be determined at trial.

44.     Although Alcoa continues to deny the allegations that contaminated fill material transported to or disposed at Veteran's Field originated at the Alcoa Site, to the extent it is shown that any Defendant caused contaminated fill material from the Alcoa Site to be transported to or disposed at Veteran's Field, such transportation or disposal was not in accordance with the Remedial Action Workplan or the approved demolition plan.

8

45.     Pursuant to its guaranty that the demolition and removal of structures at the Alcoa Site would be completed in accordance with the Remedial Action Workplan and the approved demolition plan, the County is liable to Alcoa for any damages borne by Alcoa as a result of any improper demolition and removal of structures from the Alcoa Site.

**PRAYER FOR RELIEF**

WHEREFORE, Third-Party Plaintiff respectfully requests the following relief from this Court:

A.     Enter judgment in favor of Alcoa and against RRIP finding that RRIP has breached its obligations to Alcoa under the Multi-Party Property Acquisition Agreement.

B.     Enter judgment for all damages, monetary, consequential, and otherwise, available under law to Alcoa arising from RRIP's breach of the Multi-Party Property Acquisition Agreement.

C.     Declare that RRIP is obligated to indemnify, defend, and hold harmless Alcoa with respect to the Borough's claims in this action and any crossclaims, third-party claims, or other claims asserted against Alcoa in this action.

D.     Order RRIP to reimburse Alcoa for the cost of legal, expert, or other fees incurred by Alcoa arising from the demolition and removal of structures on the Alcoa Site.

E.     Enter judgment in favor of Alcoa and against the County finding that the County has breached its obligations to Alcoa under the Multi-Party Property Acquisition Agreement.

F.     Enter judgment for all damages, monetary, consequential, and otherwise, available under law to Alcoa arising from the County's breach of the Multi-Party Property Acquisition Agreement.

G.    Grant any other relief that the Court deems just and proper.

Dated: December 5, 2014

Respectfully submitted,

**K&L GATES LLP**

By: /s/ Michael E. Waller
Michael E. Waller
William H. Hyatt, Jr.
Karyllan D. Mack
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
michael.waller@klgates.com
william.hyatt@klgates.com
karyllan.mack@klgates.com

*Attorneys for Alcoa Domestic LLC, as
successor in interest to Defendant/Third-
Party Plaintiff A.P. New Jersey, Inc.*

## CERTIFICATION PURSUANT TO RULE 11.2 OF THE LOCAL CIVIL RULES OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

I hereby certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: December 5, 2014

By: _____
Michael E. Waller

# EXHIBIT A

02/24/99  WED 11:08 FAX

## MULTI-PARTY PROPERTY ACQUISITION AGREEMENT

THIS AGREEMENT made this 27th day of _June_, 1997

BETWEEN:    **A.P. NEW JERSEY, INC.,**
        a New Jersey Corporation
        (hereinafter called "A.P.")

AND:    **COUNTY OF BERGEN**
        A Body Politic and Corporate
        of the State of New Jersey
        (hereinafter called the "County")

AND:    **NORTH RIVER MEWS ASSOCIATES, L.L.C.**
        a New Jersey Limited Liability Company
        (hereinafter called "North River")

AND:    **RIVER ROAD IMPROVEMENT PHASE II, INC.**
        A New Jersey Corporation
        (hereinafter called the "RRIP")

### W I T N E S S E T H :

WHEREAS, North River is the fee owner and/or contract owner of certain lands under development or subject to plans for development, such lands being adjacent or in proximity to a segment of River Road (Phase II) located in the Borough of Edgewater, County of Bergen, State of New Jersey, as designated on a County plan entitled "Phase II River Road"; and

WHEREAS, the various projects and developments have been or are in the process of being designed and/or approved by the Bergen County Planning Board and Borough of Edgewater in connection with Phase II River Road; and

WHEREAS, said Bergen County approvals provide for certain work to be performed on portions of Phase II River Road, including the extension, realignment and

improvement of segments of same, as set forth on certain preliminary plans prepared by the County of Bergen; and

WHEREAS, the work for Phase II River Road is set forth in that certain Agreement dated November 1, 1996 between the Borough of Edgewater, County of Bergen and Edgewater Residential Community, L.L.C. ( hereinafter called "ERC"); and

WHEREAS, the project is known as New River Road (Phase II) and involves the construction and reconstruction and realignment along portions of existing River Road and the acquisition of certain other properties currently owned or under contract of purchase by ERC to facilitate the new alignment to construct and install other private and public facilities; and

WHEREAS, it has been determined by the respective governing bodies of the Borough of Edgewater and County of Bergen that portions of existing River Road and improvements thereon are unsightly and detrimental to the re-development of the area including, without limitation, areas at the intersection of River Road and Dempsey Avenue, areas in the vicinity of the post office Mail Bag Facility and areas in proximity to the former Alcoa plant and Binghamton Complex including on site conditions, its improvements, entrances and exits; and

WHEREAS, the execution of the Phase II River Road plans involves participation and cooperation by the County of Bergen, the Borough of Edgewater and ERC to perform required work as set forth on the County Plans; and

WHEREAS, the Borough of Edgewater has by its Resolution dated August 12, 1996, approved and endorsed the conceptual County plan entitled "Phase II River Road" dated July 30, 1995, consisting of Sheets 1 through 4, for the redesigning and realignment

of a portion of River Road (Phase II) by the County of Bergen, which redesign and realignment is the subject matter hereof; and

**WHEREAS,** ERC has agreed to perform the work referred to in the Phase II River Road plans and in accordance with construction plans to be prepared by Boswell Engineering Co. ("the Boswell Plans"), such work commencing at the northerly property line of Hess Oil located on River Road north to and including its intersection with Route 5, extending to a point approximately sixty (60) feet north of said intersection, all of which work shall be completed in accordance with the Boswell Plans and specifications and approved by the County of Bergen; and

**WHEREAS,** in addition to the work set forth in the Tri-Parte Agreement between the Borough of Edgewater, County of Bergen and ERC, certain other work is deemed necessary by the County of Bergen to fully execute and safely implement the Phase II River Road plan including, without limitation:

a)   Road improvements per the Boswell Plans;

b)   Relocation of utilities, sewer, water, gas, electric;

c)   Traffic signalization, relocation and new installations;

d)   Demolish and removal and/or relocation of buildings and structures within or in close proximity of the proposed right of way of Phase II River Road;

e)   Removal, remediation, and abatement of conditions, structures or other improvements which, in the opinion of the County negatively impact on the efficient and safe movements of vehicular and pedestrian traffic on Phase I and Phase II River Road.

3

In connection with the above objectives and criteria, the County has taken into its planning consideration the public elementary school in close proximity to River Road and Russell Avenue, (the Alcoa property), as well as the residential areas surrounding same.



WHEREAS, ERC has agreed to acquire and convey or cause to be conveyed and dedicated for roadway purposes to the County of Bergen, by Deed of Easement and/or conveyance in fee, the right of way for road purposes as set forth in the Phase II River Road plans, to the following properties:

1.  Lands comprised of the former Right of Way of the Susquehanna Railroad abutting the Binghamton Complex and the Alcoa Property ("A.P.") on both sides of Russell Avenue and existing River Road in the general vicinity of the Alcoa property ("A.P.") on River Road;

2.  Lands comprised of the PMG Realty Associates, L.L.C. property, formerly known as the J. Fletcher Creamer Property, and access easement abutting existing River Road;

3.  Lands comprised of the former Right of Way of the Susquehanna Railroad abutting the U.S. Postal Mail Bag Repair Facility and existing River road;

4.  All right-of-way required through properties of the Borough of Edgewater, the current Municipal Parking Lot, the Department of Public Works Garage Property, the Ferry Plaza Building, the property owned by Ferry Bank Associates, L.P., property owned by Borough Associates, L.P. (formerly Ferry Plaza North), and

4

A&D Marine, Inc. and including the Route 5 River Road intersection and extending to a point approximately sixty (60) feet northerly of said intersection and as shown on the Phase II River Road plans; and

WHEREAS, certain properties required for the roadway improvement, as set forth on the Phase II River Road plans, are not under the control or current ownership of the County or ERC and require acquisition by the County, North River, or ERC respectively, and specifically property owned by A.P., also known as Alcoa property and buildings, the U.S. Postal Mail Bag Facility, and the Ferry Plaza Office and Retail Building; and

WHEREAS, ERC has agreed to contribute the sum of $3,852,698.00 to the Borough and County jointly toward the acquisition of such properties (excepting the A.P. property) and the construction of segments of the new roadway (Phase II River Road) and further to give the County an appropriate guarantee, Letter of Credit, Bond or similar security in form and content satisfactory to Bergen County Counsel, for the performance of the roadwork and ancillary work contemplated herein and set forth on the Phase II River Road plans and the Boswell Plans, drawings and specifications and approved by the County of Bergen; and

WHEREAS, the County, as a participant, agrees to contribute a total sum of $5,000,000 for the purposes of road construction and inspection, including the sum of $1,000,000 for such other public and private costs related to the acquisition, reconstruction and inspection of ancillary facilities of New River Road (Phase II) which funds shall be disbursed to the Borough and ERC for such use; and.

5

WHEREAS, the road construction by ERC shall also include segments of New River Road (Phase II) extending from the Route 5/River Road intersection to an area at the property north of Hess Oil Co. and existing River Road, as set forth on the County plans and the Boswell construction plans and specifications; and

WHEREAS, the County has determined that the demolition and removal of the structures upon the A.P property are required for the efficient and safe movement of vehicular and pedestrian traffic, and said demolition and removal is in the best interest of the general public and region as a whole; and

WHEREAS, A.P. has agreed to pay RRIP, as set forth in this Agreement, for the demolition, removal and remediation of the structures on the A.P. property provided, however, that the funds shall be administered and disbursed by the County of Bergen, and provided further that said demolition, removal and remediation is supervised, inspected and guaranteed by the County of Bergen; and

WHEREAS, A.P. and the County, as a condition to said funding shall review and approve the demolition and remediation plan prepared by RRIP and approved by New Jersey Department of Environmental Protection ("DEP"), which shall, when completed and approved, provide and guarantee to A.P. and Alcoa the issuance of a No Further Action letter from DEP in form acceptable to A.P.

NOW, THEREFORE, in consideration of the premises and of such mutual promises, covenants and undertakings, the parties hereto agree as follows:

1.      AP agrees to sell and North River agrees to buy that property located on River Road in the Borough of Edgewater known as the "Alcoa Property; as more fully described in the Purchase and Sale of Real Estate Agreement.

6

2.     North River and RRIP agree that they will cause to be demolished and removed from the AP property all structures and improvements currently existing on the property. Said demolition and removal shall be completed in accordance with the Remedial Action Workplan submitted to the DEP and the demolition plan reviewed and approved by AP.

3.     AP agrees to pay to RRIP the sum of $9,500,000 for the demolition and removal of the structures as described in paragraph 2 above. In addition, AP agrees to pay to RRIP costs of disposal of PCB-contaminated material (PCB concentrations greater than 50 ppm) at approved TSCA landfills, if those disposal costs exceed $250,000.00, up to a maximum of $2,500,000.00. AP's total liability for demolition of the structures and disposal of waste material will not exceed $12,000,000.00.

4.     The County shall supervise the demolition of the A.P. property and shall administer the disbursement of funds to RRIP with the funds provided to it by A.P. A.P., upon the execution of this Agreement, shall make an initial deposit with the County of Bergen in the sum of $2,000,000 to be disbursed in accordance with the terms of this Agreement. The RRIP shall make periodic requisitions for demolition, removal and the related work completed, and said requisitions shall be funded at a minimum of once per month, or more frequently as the approved demolition and removal schedule may require. Upon satisfactory monthly inspections, the County shall, upon notice to A.P., forthwith authorize the disbursement of funds to RRIP.

AP will provide additional funds to the County of Bergen in the amount of, and upon receipt of, approved requisitions from RRIP for work performed on the demolition

7

and removal of the structures. AP shall continue to provide funds to the County of Bergen until the County of Bergen has received sufficient funds to satisfy AP's liability to RRIP for the demolition and removal of the structures. 

5.    The acquisition of the A.P. property and the demolition, removal and remediation of the A.P. (Alcoa) buildings and structures shall be performed at the same time as construction of New River Road (Phase II) which shall be performed by ERC or its agents, in accordance with the Boswell Plans and specifications.

6.    Upon commencement of the roadway construction and upon the request of Bergen County, A.P. and North River shall execute Deeds of Easement or fee title (at the County's option) and make such Right of Way dedications in favor of the County as may be required to implement the Phase II River Road plans in the general area of the A.P. property on existing River Road.

7.    It is the intent of the parties that the excess portions of land acquired by the County and purchased by North River or ERC shall be deeded and/or abandoned by the County to North River or ERC. All legal formalities to accomplish this will be implemented by the County in an expeditious manner.

8.    AP shall fund the demolition, removal and remediation . as set forth in paragraph 4 of this Agreement. The construction and reconstruction of segments of New River Road (Phase II) shall be the sole responsibility of ERC and the County jointly, pursuant to the Developer's Agreement dated November 1, 1996, as amended.

9.    RRIP shall deposit with the County of Bergen a Performance Bond or Letter of Credit in an amount over and above the estimated demolition costs of $12,000,000. Said bond of RRIP to the County of Bergen shall be in form approved by

Bergen County Counsel's office and it shall fully guarantee the demolition and removal costs of the A.P. buildings and structures in a manner and schedule previously approved by DEP, the County, and A.P.

10.     The County guarantees to AP that the demolition and removal of the AP structures and building will be completed as provided in the the Remedial Action Workplan and the approved demolition plan.  This guarantee is effective and enforceable only if AP is not in default of its obligations set forth in paragraph 4 of this Agreement.

11.     The County of Bergen, RRIP and North River agree to re-use the rubble from the demolished structures that are not contaminated with PCB's greater than 50 ppm in accordance with applicable New Jersey laws.

12.     ERC agrees that portions of the various drainage facilities which are constructed within the areas adjacent to the County Road shall be conveyed to and become the property of the County, and the County may make such other drainage connections thereto as it may desire, provided that such other connections shall not interfere or negatively impact on proper drainage of the lands of the ERC.

13.     The County shall from time to time, but not less than two times per month, be responsible for the periodic inspection of the work performed by ERC and RRIP.  All costs and expenses of such inspections shall be paid by RRIP and shall be over and above the estimated cost of demolition, removal and remediation of A.P. property.  RRIP shall request inspections of completed work by the County at least five (5) days prior to disbursement of funds attributable thereto.  The requisitions for payment of completed work shall be made by RRIP to the County with notice to A.P.  Approval by the County shall be required prior to funding said requisition.

9

14.    RRIP shall notify the DEP, County Department of Public Works and County Engineer, in writing, at least five (5) days prior to the commencement of any demolition, removal or remediation work affecting the A.P. property and, to the extent required, the commencement of construction of segments of (Phase II) New River Road at the intersection of Russell Avenue and River Road.

15.    Upon the execution of this Agreement by RRIP and the County, RRIP shall within thirty (30) days, furnish to the County, with a copy to A.P., the demolition, removal and remediation plans and schedules.  Same are to be prepared by RRIP in conjunction with the approved environmental consultant and engineer.  Said plans shall be approved by DEP, A.P. and the County.

16.    It is understood and agreed that North River and RRIP shall defend and save the County and A.P. harmless from any and all claims that may be filed in any Court arising from the performance of this Agreement.  In connection with the defense of any claim, the County and A.P. shall be entitled to select their own counsel.  The County and A.P. shall fully cooperate in any such litigation provided, however, that neither the County nor A.P. shall be under any obligation to expend any funds for any purpose whatsoever in connection with such litigation.  Should the County or A.P. be named as a party in any court, administrative or other action or proceeding, North River and RRIP agree to reimburse the County and/or A.P. (as applicable) for the cost of any legal, expert or other fees expended by the County and/or A.P. in such action or proceeding.

17.    Incorporated herein and made a part hereof are the following documents:

a)  the Developer's Agreement between ERC and Bergen County;

b)  the Joint Reports, with reference to site plan nos. 2618 R-1 and 2366 R-1;

c)  the Joint Report requirements of other developments which will participate in Phase

II River Road reconstruction, including without limitation, A&D Marine, PMG

Realty, L.L.C., Kings Ferry, Inc., Ferry Bank Associates, Borough Associates, L.P.,

North River Mews Residential Development (A.P.) and others, including the owners

of property known as the U.S. Mail Bag and Ferry Plaza Building;

d)  the Resolution of the Borough dated September 16, 1996, which authorizes, inter alia,

the Borough's participation in Phase II and the commitment to promptly cooperate in

the acquisition of properties necessary to complete Phase II River Road and the other

improvements set forth on the County Plans;

e)  the Boswell Plans approved by the County of Bergen identified as follows:

"River Road Improvements Phase II"
Construction Plans
Bergen County, Borough of Edgewater, New Jersey
Sheets 1 through 4
Job No. 96-215

as may be revised from time to time upon the mutual consent of the parties.

18.    This project involving the A.P. property, shall be designated, for all intents

and purposes, as an element of a local governmental improvement project with North

River, RRIP, and County as participants.

The County, ERC, and North River shall review and approve the Phase II

River Road design by Boswell and shall obtain all approvals and permits required for the

construction of the Phase II New River Road segment, and specifically permits from all

utility companies involved or affected by the roadway improvements.

11

In this connection RRIP, as contractor, shall participate in and coordinate the efforts of the County and Borough of Edgewater with respect to the utility companies and any other permits or approvals which are required to demolish the A.P. buildings and structures and to construct New River Road Phase II segment.

20.    A.P. will cooperate with the County, its engineering consultants, and RRIP in overseeing the performance of the demolition, removal and remediation work.

21.    This Agreement shall be binding on the parties hereto and their heirs, executors, administrators, successors and assigns.

22.    All parties hereto have the requisite power and authority to enter into this Agreement and it is the intention of the parties to be bound by the terms hereof. The execution and delivery of this Agreement is valid and binding upon the parties hereto and the genuineness of any and all corporate resolutions executed may be assumed to be genuine by the parties in receipt thereof.

23.    This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute an original of this Agreement, but all such counterparts shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Witness:                                        A.P. NEW JERSEY, INC.

_____            By: _____

                                                KEVIN L. MCKNIGHT,  Vice-President


Witness:                                        COUNTY OF BERGEN

*Carol Gurtel*                            By: _____
_____
CAROL GURTEL                          WILLIAM P. SCHUBER
NOTARY PUBLIC OF NEW JERSEY      **County Executive**
My Commission Expires Aug. 11, 1998


Witness:                                        NORTH RIVER MEWS ASSOCIATES, L.L.C.

_____            By: _____

                                                North River Mews, Inc., Managing Member
                                                FRED A. DAIBES, President


Witness:                                        RIVER ROAD IMPROVEMENT PHASE II, INC.

_____            By: _____

                                                FRED A. DAIBES, President


13

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Witness:                                          A.P. NEW JERSEY, INC.

_____          By: _____
                                                  KEVIN L. MCKNIGHT, Vice-President


Witness:                                          COUNTY OF BERGEN

_____          By: _____
                                                  WILLIAM P. SCHUBER
                                                  County Executive


Witness:                                          NORTH RIVER MEWS ASSOCIATES, L.L.C.

_____          By: _____
                                                  North River Mews, Inc., Managing Member
                                                  FRED A. DAIBES, President


Witness:                                          RIVER ROAD IMPROVEMENT PHASE II, INC.

_____          By: _____
                                                  FRED A. DAIBES, President

STATE OF NEW JERSEY )

                      )   :SS

COUNTY OF BERGEN )

BE IT REMEMBERED that on this 24th day of June

1997, before me the subscriber, A NOTARY PUBLIC of the State of New Jersey,

personally appeared WILLIAM P. SCHUBER who being by me duly sworn, did depose and make proof to my

satisfaction that he is the County/Executive of the County of Bergen, a Body Politic

and Corporate of the State of New Jersey; that xxxxzxzxzxzxzxz is the

xzxzxzzxzxzxzxzxxzzxzxxzzx of said County of Bergen; that the execution, as well

as the making of this Instrument has been duly authorized by a proper Resolution of the

Board of Chosen Freeholders of the County of Bergen; that deponent well knows that

corporate seal of said County of Bergen; and that the seal affixed to said Instrument is

such corporate seal and by the said William P. Schuber, as and for his voluntary

act and deed and as and for the voluntary act and deed of the said County of Bergen.

Sworn and subscribed to before me
this 24 day of June, 1997

_Carol Gurtel_

**CAROL GURTEL**
**NOTARY PUBLIC OF NEW JERSEY**
My Commission Expires Aug. 11, 1998

14

STATE OF NEW JERSEY      )
                            )    :SS

COUNTY OF BERGEN      )

      BE IT REMEMBERED that on this _____ day of _____,

1997, before me the subscriber, Kevin L. McKnight of the Commonwealth of

Pennsylvania, personally appeared who being by me duly sworn, did depose and make

proof to my satisfaction that he is the Vice-President of A.P. NEW JERSEY, INC., the

Corporation named in the within instrument;

  that the execution, as well as the making of this instrument has been duly authorized by a

proper Resolution of the Board of Directors of said Corporation; and that the seal affixed

to said instrument signed and delivered by said President as for the voluntary act and

deed of said Corporation, in presence of deponent, who thereupon subscribed his name

thereto as attesting witness.

                                    **A.P. NEW JERSEY, INC.**

                                    _____
                                      Kevin L. McKnight

Sworn and subscribed to before me
this _____ day of _____, 1997

_____

15

STATE OF NEW JERSEY          )

                             )          :SS

COUNTY OF BERGEN          )

BE IT REMEMBERED that on this ___ day of _____ 1997, before me the subscriber, _____ of the State of New Jersey, personally appeared who being by me duly sworn, did depose and make proof to my satisfaction that he is the _____ of RIVER ROAD IMPROVEMENT PHASE II, INC., the Corporation named in the within instrument; that _____ is the President of said Corporation; that the execution, as well as the making of this instrument has been duly authorized by a proper Resolution of the Board of Directors of said Corporation; and that the seal affixed to said instrument signed and delivered by said President as for the voluntary act and deed of said Corporation, in presence of deponent, who thereupon subscribed his name thereto as attesting witness.

RIVER ROAD IMPROVEMENT PHASE II, INC.

Sworn and subscribed to before me
this ___ day of _____, 1997

16

STATE OF NEW JERSEY     )

                           )    :SS

COUNTY OF BERGEN     )

       BE IT REMEMBERED that on this ____ day of _____ 1997, before me the subscriber, _____ of the State of New Jersey, personally appeared who being by me duly sworn, did depose and make proof to my satisfaction that he is the Managing Member of NORTH RIVER MEWS ASSOCIATES, L.L.C., the Corporation named in the within instrument; that the execution, as well as the making of this instrument has been duly authorized by a proper Resolution of the Board of Directors of said Corporation; and that the seal affixed to said instrument signed and delivered by said President as for the voluntary act and deed of said Corporation, in presence of deponent, who thereupon subscribed his name thereto as attesting witness.

                                 NORTH RIVER MEWS ASSOCIATES, L.L.C.

Sworn and subscribed to before me
this ____ day of _____, 1997

17

Do We need these???

## EXHIBITS

1.  Bergen County Planning Board Application No. SP2618R-1

2.  Bergen County Planning Board Application No. SP2366R-1

3.  Borough of Edgewater Resolution No. R195-96

4.  River Road Phase II Edgewater Plans, Drawings 1 through 4

5.  No Further Action Letter (Form) - New Jersey Department of Environmental Protection

18

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:                                    A. P. NEW JERSEY, INC.

By: _Arthur J. Greenfield_                  By: _[signature]_

                                            Its: _Vice-President_

# EXHIBIT B

## AGREEMENT TO PURCHASE AND SELL REAL ESTATE



THIS AGREEMENT TO PURCHASE AND SELL REAL ESTATE (this "Agreement") is made and entered into as of the _____ day of June, 1997, by and between A. P. NEW JERSEY, INC., a Delaware corporation with a place of business at 1501 Alcoa Building, 425 Sixth Avenue, Pittsburgh, Pennsylvania 15219 ("Seller"), and NORTH RIVER MEWS ASSOCIATES, LLC, a New Jersey limited liability company with a place of business c/o Mr. John De Sheplo, Esquire, 260 Columbia Avenue, Fort Lee, New Jersey 07024 ("Buyer").

    1.    **Purchase And Sale.** Seller agrees to sell, transfer, and convey to Buyer, and Buyer agrees to purchase from Seller, upon the terms, provisions and conditions hereinafter set forth those certain tracts, lots or parcels of real property situated in the Borough of Edgewater, County of Bergen and State of New Jersey, described in Exhibit A attached hereto and incorporated herein by reference (collectively, the "Property").

    2.    **Purchase Price.** The purchase price which Seller agrees to accept for the Property and which Buyer agrees to pay therefor shall be a minimum of $8,000,000, and shall increase by $20,000 for each unit approved for construction on the Property in excess of 400 units (the "Purchase Price"). The Purchase Price shall be payable as follows:

    (a)    At the Closing (defined below), Buyer shall deliver to Seller:

    (i)    Buyer's fully executed unconditional promissory note (the "Note"), secured by Buyer's mortgage to the Property (the "Mortgage"), in the principal amount of the Purchase Price less $2,000,000, for a term of eighteen (18) months from the Closing Date and with an annual interest rate of 6% accruing until fully satisfied, substantially in the form and substance attached hereto as Exhibits B and C, respectively. Upon maturity of the Note, Buyer shall pay to Seller the amount of the Note, principal plus interest, by wire transfer in immediately available funds to the following account (the "Mellon Account"):

Mellon Bank NA, Pittsburgh, PA
ABA #043 000 261
Account Number:  #000-1206
Account Name:  Aluminum Company of America;

    (ii)    An irrevocable, unconditional letter of credit (the "Letter of Credit") issued by PNC Bank, or a reputable commercial bank, savings bank or savings and loan association acceptable to Seller, to the benefit of Seller in the amount of $2,000,000, with an expiration date of not earlier than twenty-four (24) months after the Closing, in a form acceptable to Seller. The Letter of Credit shall be payable upon presentation of Seller's sight draft dated 18 months from the date of the Closing or upon presentation of Seller's sight draft dated earlier than 18 months from the date of the Closing accompanied by Seller's notarized written statement as follows: "North River Mews Associates, LLC is in

default of its obligations under a certain Agreement to Purchase and Sell Real Estate dated June ___, 1997 (the "Agreement"), with the undersigned, as Seller, and such default has not been cured in accordance with paragraph 8(b) of the Agreement.

(b)   Payment for Additional Units.  In the event Buyer, or anyone who acquires title to the Property or any part thereof from Buyer, receives approval to construct more than 400 units at the Property during the time period from May 1, 1997 through May 1, 2117, then at Closing, or within 15 days of receiving such approval, Buyer shall notify Seller of such approval and, within two (2) days following receipt of a building permit to construct the additional units shall pay to the Mellon Account, by wire transfer in immediately available funds, the amount of $20,000 for each additional unit for which approval was granted.

(i)   Covenant.  This Section 2(b) shall be a covenant running with the land, and shall be recorded in the form of a Memorandum of Agreement with the Deed. Any subsequent transfer of the property is subject to Section 2(b), and Section 2(b) shall not merge with and into the Deed on Closing.

(ii)   Estoppel Certificate.  From time to time, upon Buyer's request, Seller shall execute an estoppel certificate in a form reasonably acceptable to Buyer stating that Buyer is not in default of Section 2(b).

3.   Instruments Of Transfer.  At the Closing, Seller shall convey title to the Property to Buyer by Seller's warranty deed with covenant against grantor's acts (the "Deed") and Seller and Buyer shall execute and deliver to the other, and, where applicable, file and record such instruments of conveyance, transfer and assignment, as shall be necessary or appropriate in the opinion of their respective counsel or as required by the Title Company (defined below) to transfer to Buyer all of the aforesaid right, title and interest of Seller in the Property pursuant to this Agreement.

4.   Title Matters.

(a)  Title Commitment.  Seller shall, at its sole cost and expense, as soon as reasonably possible following the execution of this Agreement, cause Chicago Title and Insurance Company (the "Title Company") to issue its commitment for an owner's fee policy of title insurance for the Property in the amount of the purchase price and designating Buyer as the proposed insured (the "Commitment").  Buyer shall, within fifteen (15) days after receipt of the Commitment, either:

(i)   Approve the form and substance of the Commitment; or

(ii)   Notify Seller in writing (the "Notice") to remove or satisfy any reasonable matters relating to the title or interests which are objectionable to Buyer as shown on the Commitment.  Seller shall have ninety (90) days following the receipt of the Notice to correct those objections specified in the Notice.  In the event that Seller is unwilling or unable to correct such objections, then, as Buyer's sole remedy and at Buyer's option to be exercised by written notice within thirty (30) days following the expiration of such 90-

2



day period, either accept such title and interest as Seller is able to furnish without reduction in or abatement of the Purchase Price and without liability of Seller to Buyer or terminate this Agreement. Upon such termination, neither party hereto shall thereafter have any further liability or obligation to the other party hereunder. Unless Buyer objects to the title condition and terminates this Agreement, said title condition shall be deemed to be acceptable and any objection to the condition shall be deemed to have been waived by Buyer for all purposes.

(b) Survey. Seller shall cause to be prepared an ALTA survey of the Property from a New Jersey licensed surveyor sufficient to delete the survey exception from the Commitment. The cost of the Survey shall be borne by Seller unless this Agreement is terminated before Closing, in which case the cost of the Survey shall be borne by Buyer.

(c) Title Insurance. Buyer shall bear the cost of the Policy of Title Insurance.

5.     Warranties and Representations.

(a)     Litigation and Claims. Except as set forth on Schedule 5(a), to Seller's knowledge there are no legal actions, suits, arbitrations or other legal, administrative or governmental proceedings pending or threatened against Seller which would materially adversely affect the condition or ability to use the Property as contemplated by this Agreement, nor is Seller aware of any basis for the foregoing.

(b)     OTHER THAN THE REPRESENTATION AND WARRANTY SET FORTH IN THIS SECTION, BUYER SPECIFICALLY ACKNOWLEDGES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS, WITH ALL FAULTS" BASIS AND THAT BUYER SHALL HAVE AN OPPORTUNITY TO INSPECT THE PROPERTY AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING WITHOUT LIMITATION:

(i)     the quality, nature, adequacy and physical condition of the Property, including, but not limited to, the structural elements, foundations, roofs, floors, appurtenances, access, landscaping, parking facilities, and the electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances;

(ii)     the quality, nature, adequacy, and physical condition of soils, geology and any groundwater;

(iii)     the existence, quality, nature, adequacy and physical condition of the Property;

(iv)     the development potential of the Property, and the Property's use, habitability, merchantability, or fitness, suitability, value, or adequacy of the Property for any particular purpose;

(v)    the zoning or other legal status of the Property or any other public or private restrictions on use of the Property;

(vi)    the compliance of the Property or its operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity;

(vii)    the presence or removal of hazardous or toxic materials, substances or wastes in, on, under, or about the Property or the adjoining or neighboring property;

(viii)    the quality of any labor and materials used in any improvements on the Property;

(ix)    subject to Section 4 hereof, the condition of title to the Property, other than those representations and warranties, if any, contained in the Deed by operation of law;

(x)    the leases, service contracts, or other agreements affecting the Property; and

(xi)    the economics of the operation of the Property.

6.    **Conditions Precedent To Closing.**

(a)    <u>Buyer's and Seller's Conditions</u>.  Unless all of the following conditions are satisfied, Buyer shall not be obligated to purchase, and Seller shall not be obligated to sell, convey, or transfer, the Property (except as such conditions may hereafter be expressly waived by Buyer and Seller in writing):

(i)    The New Jersey Department of Environmental Protection ("NJDEP") shall have executed and issued a Memorandum of Agreement providing for the issuance of a "No Further Action" letter substantially in the form and substance attached hereto as Exhibits D and E, respectively.

(ii)    Seller, Buyer, River Road Improvement Phase II, Inc. and the County of Bergen, New Jersey, shall have entered into a Multi Party Property Acquisition Agreement substantially in the form and substance attached hereto as Exhibit F (the "Multi-Party Agreement").  The Multi-Party Agreement, once fully executed, shall be incorporated into this Agreement by reference and attached as Exhibit G.  The Multi Party Agreement shall contain provisions for:

(1)    the requirement to demolish the structures on the Property in accordance with a Remedial Action Work Plan submitted to the NJDEP by River Road Improvement Phase II, Inc. (the "Demolition");

4.

(2)     the requirements that: (i) Seller will be responsible for payment of Demolition costs in the Amount of $9,500,000, (ii) Seller will be responsible for costs of disposal of material contaminated with PCB's at concentrations greater than 50 ppm at approved TSCA landfills if those disposal costs exceed $250,000 up to a maximum of $2,500,000, and (iii) Seller's total liability for Demolition and disposal of waste material will not exceed $12,000,000; and

(3)     the establishment of an acceptable funding mechanism for the Demolition.

(b)     Buyer's Conditions.  Unless all of the following conditions are satisfied, Buyer shall not be obligated to purchase the Property (except as such conditions may hereafter be expressly waived in writing by Buyer):

(i)     Buyer shall have received the necessary, final, non-appealable approvals of its development plans for the Property from the Borough of Edgewater, New Jersey. Seller agrees to execute all required consents to enable Buyer to meet this condition and all other requisite approvals; and

(ii)     From the date of this Agreement until the Closing, there shall not have occurred any material adverse change in the physical condition of the Property or the condition of title to the Property.

(c)     Seller's Conditions.  Unless all of the following conditions are satisfied, Seller shall not be obligated to sell, convey, and transfer the Property to Buyer (except as such conditions may hereafter be expressly waived in writing by Seller):

(i)     Seller shall have received from the County of Bergen, New Jersey, a guarantee of performance acceptable to Seller for the Demolition.

7.     Environmental Conditions.  The following terms and conditions shall survive Closing hereunder and shall not be merged with and into the Deed.

(a)     Hazardous Substance.  For the purposes hereof, the term "Hazardous Substance" shall mean any substance, chemical or waste that is listed or defined as hazardous, toxic, or dangerous under Applicable Law (defined below), and any asbestos containing materials, radioactive materials or petroleum products.

(b)     Applicable Law.  For the purposes hereof, the term "Applicable Law" shall mean the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1471 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; and the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; each as amended from time to time, together with the rules and regulations promulgated thereunder, and any and all formal or



informal orders, decrees or requests from the United States Environmental Protection Agency, the appropriate New Jersey state governmental and regulatory bodies, or any other governmental agency, authority or instrumentality having jurisdiction and any similar state and local laws and ordinances and the regulations implementing such statutes; together with any and all federal, state, and local environmental or land use laws, rules, ordinances, or regulations.

(c)     Environmental Reports.  Seller shall make available to Buyer the reports listed on Schedule 7(c), attached hereto and incorporated by reference, concerning the environmental condition of and contamination in, on, under, or about the Property (the "Environmental Reports").  The parties agree that the Environmental Reports and any and all reports, analyses, surveys, assessments, evaluations or the like prepared by Buyer and its representatives pursuant to Section 7(d) will establish the known environmental condition of the Property as of the Closing Date.  The Environmental Reports, and any and all reports, surveys and assessments, including all copies thereof, produced by Buyer or its representatives pursuant to this Agreement, shall be held in strict confidence by Buyer and shall not be disclosed by Buyer or its employees, consultants, agents and representatives, without the prior written consent of Seller.

(d)     Buyer's Assessment.  Buyer, at its sole cost and expense, may conduct an environmental transfer assessment of the Property prior to Closing ("Buyer's Assessment").  Seller shall permit Buyer or its representatives, at all reasonable times prior to the Closing Date, to enter upon any and all of the Property for the purposes of inspection, making tests, taking samples and soil borings, and/or conducting groundwater studies and such other investigations as Buyer shall deem appropriate, in order to complete Buyer's Assessment.

(e)     Restrictions on Buyer's Assessment.  Notwithstanding any other provision of this Agreement, Buyer's right to enter the Property for purposes of conducting Buyer's Assessment shall be subject to the following restrictions:

(i)     Buyer shall notify Seller at least twenty-four (24) hours prior to entry onto the Property to conduct such activity;



(ii)     All activities undertaken in connection with Buyer's Assessment shall fully comply with any Applicable Law, and other laws relating to worker safety and to proper disposal of any samples taken, and any soil or water generated in the process of taking the samples, and Buyer shall provide Seller with split samples of all soil, air or water sample so taken;

(iii)     Seller shall be permitted to have a representative present during all such investigations, and copy the results of on-site testing and visual inspections, and shall have complete access to all samples taken, test results, and boring records;

(iv)     In the event that Buyer shall not consummate this transaction for any reason, Buyer shall restore the Property to its condition prior to such investigative activities;

(v)      Buyer shall take all actions and implement all protections necessary to ensure that actions taken hereunder and equipment, materials, and substances generated, used or brought onto the Property pose no threat to the safety or health of persons or the environment, and cause no damage to the Property of Seller or of any other person;

(vi)      Buyer shall be solely responsible for the security of the activities, equipment and materials brought on the Property prior to the Closing Date;

(vii)      Buyer for itself, its successors and assigns, covenants and agrees that it shall indemnify and save harmless Seller, its successors and assigns, from and against any and all loss or liability, and all claims, damages, fees, costs and expenses resulting from, incident to or in any way arising out of the entry onto the Property to conduct Buyer's Assessment, or any other act done pursuant to the rights, privileges and authority hereby granted.  Buyer shall reimburse Seller for actual damage to the Property resulting from said activities.

(viii)      Unless specifically required by New Jersey law, any and all reports, surveys and assessments, including all copies thereof, produced by Buyer or its representatives pursuant to this Agreement shall be held in strict confidence by Buyer, shall not be disclosed by Buyer or its employees, consultants, agents and representatives, without the prior written consent of Seller, and shall be forthwith delivered to Seller at no cost or expense to Seller;

(ix)      Without limiting the effect of the last clause, Buyer shall require that any party performing services hereunder waive all rights to assert any lien or claim against Seller or the Property arising out of services performed hereunder and provide insurance against injury and damage to Seller or any other person, in coverage amounts and terms satisfactory to Seller, and shall obtain Seller's written approval of such coverage prior to that party's first entry onto the Property; and

(x)      Buyer and its representatives shall comply with all governmental laws and regulations and all policies and regulations of Seller in effect at such time, including, but not limited to, those relating to health and safety, and with such special regulations, rules or policies as may be considered appropriate by Seller under the circumstances and Seller shall have the right to refuse initial or continued access to the Property to any person when it determines that such action is necessary or desirable.

(f)      Indemnification of Seller.  Buyer shall indemnify, defend and hold Seller harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages, occurring on or after the Closing Date arising under Applicable Law related to Buyer's (or, during Buyer's ownership of the Property, any operators' or any third parties') use of the Property and/or any and all activities relating thereto.

(g)      Release of Seller.  Except in the event that Seller remains in default on any payment obligation after receiving notice of such default and opportunity to cure as set forth in Section 8, Buyer expressly releases Seller and agrees to waive all rights that it may have to seek

contribution from Seller for any response costs or claims that may arise as a result of the actions or inactions of Seller and any previous owner, operator or third party on or with respect to the Property relating to Hazardous Substances. Nothing in this provision shall alter or expand the parties' rights or obligations under the Multi Party Agreement.

8.  **Default.**

(a)  <u>By Seller</u>.  If Seller fails to perform any of its obligations under this Agreement or the Multi Party Agreement, the same shall constitute a default of this Agreement and thereupon Buyer, at its option, may declare a forfeiture by written notice to Seller ("Notice of Seller's Default"). At the expiration of forty-five (45) days after the Notice of Seller's Default, if Seller has not remedied the default, or if Seller has not exercised all efforts to remedy the default as quickly as possible where the default is not capable of being remedied in forty-five (45) days, Buyer may declare this Agreement null and void.  In any event, if such default is not remedied within 120 days after the Notice of Seller's Default, Buyer may declare this Agreement null and void.

(b)  <u>By Buyer</u>.  If Buyer fails to perform any of its obligations under this Agreement or the Multi Party Agreement, the same shall constitute a default of this Agreement and thereupon Seller, at its option, may declare a forfeiture by written notice to Buyer ("Notice of Buyer's Default"). At the expiration of forty-five (45) days after the Notice of Buyer's Default, if Buyer has not remedied the default, or if Buyer has not exercised all efforts to remedy the default as quickly as possible where the default is not capable of being remedied in forty-five (45) days (an "Extended Default"), Seller may at its option:

(i)  if the default occurs before Closing and is not cured as described in Section 8(b), declare the Agreement null and void; or

(ii)  if the default occurs after Closing and Seller is not in default, upon thirty (30) days' written notice, demand immediate payment of the Note and/or Letter of Credit or immediately foreclose on the Mortgage.

In any event, if an Extended Default is not remedied within 120 days after the Notice of Buyer's Default, Seller may elect to exercise its remedies under this Section 8(b)(i) or (ii).

(c)  <u>Limitation of Liability</u>.  In the event of default under this Agreement, the remedies of the parties are limited to the remedies set forth in Sections 8(a) and (b) above.  No party shall be liable for any incidental or consequential damages for default under this Agreement.

(d)  <u>Waiver of Breach</u>.  The waiver by either party of any condition or breach by the other party of any term, covenant, or condition herein contained shall not be deemed to be a waiver of any other condition of any subsequent breach of the same or any other term, covenant, or condition herein contained.

9.   Force Majeure.

(a)   "Force Majeure" shall mean an act, event or condition having a material adverse effect upon the rights or obligations of either party hereunder if such act, event, or condition is beyond the reasonable control of the parties to this Agreement and is relied upon as justification for the failure to perform any obligation set forth herein or to comply with any condition required of the respective parties pursuant to this Agreement.  Such acts, events or conditions shall be limited to the following:  (i) any labor strike or interruption, or (ii) the action or inaction of any governmental body of the United States of America or the State of New Jersey and any other subdivisions thereof exercising jurisdiction.

(b)   Each party hereto is excused from failure or delay in the performance of any act required hereunder (except for payment of the Letter of Credit, accrual and payment of interest on the Note, and Seller's payment obligations with respect to the Demolition) by reason of Force Majeure.  In the event a party is rendered unable, either in whole or in part, to carry out the terms of this Agreement, such affected party shall give immediate notice ("Force Majeure Notice") to the other party and the obligations (other than payment of the Letter of Credit, accrual and payment of interest on the Note, and Seller's payment obligations with respect to the Demolition) of such affected party, to the extent affected by such Force Majeure and to the extent that due diligence is being used to resume performance at the earliest practicable date, shall be suspended.  The parties hereto shall use their best efforts to overcome or remove any Force Majeure and to minimize the effect of such Fore Majeure.  Notice shall be given to the other party when the effect of the Force Majeure has ceased.  The parties hereto acknowledge that notwithstanding any Force Majeure, all payment obligations shall continue to be performed without delay, including but not limited to the payment of the Letter of Credit and the Note.

(c)   If any event of Force Majeure claimed by a party is not overcome or removed within two (2) years of the Force Majeure Notice being given, then at the option of the other party, upon ten (10) days' written notice, this Agreement shall be null and void.

9.   Closing.

(a)   Date and Location.  The purchase and sale transaction contemplated by this Agreement shall close (the "Closing") on or before October 31, 1997, or on such other date as the parties may otherwise mutually agree (the "Closing Date"); provided, however, that the Closing Date shall not be later than December 31, 1997.  The Closing shall be held at a location which is mutually agreeable to both parties.

(b)   Seller's Obligations.  At the Closing, Seller shall:

(i)   Deliver to Buyer a duly executed and acknowledged deed in substantially the form and substance as Exhibit H, attached hereto (the "Deed");

(ii)   Deliver to Buyer a duly executed Affidavit of Title in substantially the form and substance as Exhibit I attached hereto;

(iii)   Deliver to Buyer possession of the Property;

(iv)     Deliver to Buyer reasonable evidence of Seller's capacity and authority for closing the transaction as required by the Title Company;

(v)     Deliver documents reasonably requested by the Title Company as administrative requirements for closing this transaction, including but not limited to an ALTA survey; and

(vi)     Deliver to Buyer an Owner's Policy of Title Insurance in the amount of the Purchase Price, dated as of the Closing Date.

(c)     Buyer's Obligations.  At the Closing, Buyer shall:

(i)     Deliver to Seller the Note, Mortgage and Letter of Credit.  Buyer shall pay to Seller the cost of the Policy of Title Insurance and the title search;

(ii)     Deliver to Seller reasonable evidence of Buyer's capacity and authority for closing the transaction; and

(iii)     Deliver documents reasonably requested by the Title Company as administrative requirements for closing this transaction.

(d)     Taxes.  General real estate taxes for the then-current year relating to the Property shall be prorated as of the Closing Date and shall be adjusted in cash at Closing.  If the Closing shall occur before the tax rate is fixed for the then current year, the apportionment of taxes shall be upon the basis of the tax rate for the next preceding year applied to the latest assessed valuation.  All special taxes or assessments prior to the Closing Date shall be paid by Seller.  Any rebates or refunds of taxes paid prior to Closing shall be for Seller's benefit.  Seller shall pay all transfer tax on the Property that becomes due as a result of the transactions contemplated by this Agreement.

(e)     Costs.  Except to the extent specifically allocated in this Agreement, each party shall pay its share of the normal and incidental costs associated with the Closing which are routinely incurred by a Seller and Buyer in a transaction of this character in the county where the Property is located.

10.     Risk Of Loss; Condemnation.  Seller shall assume the risk of loss, destruction or damage to the Property by fire, Act of God, other casualty, or condemnation prior to the Closing Date and the transfer of title to the Property to Buyer.  Buyer assumes, as of the Closing Date and transfer of title, all hazards of damage to or destruction of the Property and of the taking of the Property or any part thereof for public use, and agrees that no such damage, destruction or taking shall constitute a failure of consideration.  Upon the execution of this Agreement, Buyer shall have an insurable interest in the Property.



10

    **11.**    **Brokers.**  Seller and Buyer each represent and warrant to the other that no real estate brokers or finders are or were involved with respect to any of the transactions contemplated by this Agreement.  Each party hereto will indemnify and save harmless the other from any claim or claims made by any brokers or finders for any commissions or compensation alleged to be due by reason of the indemnifying party involving such brokers or finders.

    **12.**    **Notices.**  All notices, demands, elections, requests, consents and other communications hereunder shall be in writing and shall be given by personal delivery or sent by certified or registered mail, postage prepaid, return receipt requested and addressed to the parties hereto at the addresses below, or sent by facsimile to the parties at the facsimile numbers below, or at such other address or facsimile number as a party may designate:

<u>Seller</u>

Attention:    Mgr. - Corporate Real Estate
                2109 Alcoa Building
                425 Sixth Avenue
                Pittsburgh, PA 15219
                Facsimile No.: (412) 553-2661
                Telephone No.: (412) 553-2614

<u>Buyer</u>
Attention:    Mr. John De Sheplo
                260 Columbia Aveune
                Fort Lee, NJ  07024
                Facsimile No.: (201) 224-0572
                Telephone No.: (201) 224-6679

                Mr. Fred Daibes
                725 River Road
                Edgewater, NJ  07020
                Facsimile No.: (201) 313-9044
                Telephone No.: (201) 224-0003

with copy to: David Carmel, Esquire
                 523 River Road
                 Edgewater, NJ  07020
                 Facsimile No.: (201) 943-5614
                 Telephone No.: (201) 943-9160

    **13.**    **Non-Foreign Person.**

    **(a)**    <u>Seller's Certification</u>.  Seller certifies and affirms that Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1954, as amended. Seller will execute at or prior to the Closing Date such appropriate affidavit or affidavits as may

be necessary to evidence same in accordance with Treasury Department Regulation 1.1445-2T(b)(2)(iii).

    (b)   Buyer's Certification.  Buyer certifies and affirms that Buyer is not a "foreign person" within the meaning of the federal International Investment Survey Act of 1976, as amended, 22 U.S.C. §3101, et seq.  Buyer will execute at or prior to the Closing Date such appropriate affidavit or affidavits as may be necessary to evidence the same.



    **14.**    **Like-Kind Exchange.**  Seller may transfer or convey the Property to Buyer as a like-kind exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, through the use of a qualified intermediary; provided that the like-kind exchange does not delay Closing or affect any obligation or requirement of this Agreement, that certain Agreement to Purchase and Sell Real Estate between the parties related to the parking lot ("Parking Lot Agreement") or the Multi Party Agreement.  If Seller elects, in its sole discretion, to convey or transfer the Property pursuant to such a like-kind exchange, Buyer shall cooperate with Seller in good faith to effect such exchange.  Buyer shall not incur any additional costs as a result of Seller's election to convey or transfer the Property pursuant to a like-kind exchange.

    **15.**    **Headings.**  The headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation of this Agreement.

    **16.**    **Merger.**  All understandings and agreements heretofore had between the parties, oral or written, are merged into this Agreement, which alone fully and completely expresses their understanding.

    **17.**    **Modification.**  This Agreement shall not be modified or amended except by a written instrument duly executed by the parties hereto.

    **18.**    **Binding Effect And Assignment.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto.  Neither party shall assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld.  Any attempted assignment without such prior written consent shall be void.

    .19.    **Governing Law.**  This Agreement shall be construed and governed in accordance with the laws of the State of New Jersey.

    **20.**    **Prohibition Against Recording.**  Neither Buyer nor Seller shall cause this Agreement, nor any part or memorandum thereof, to be placed or filed of record.

21. **Modified Time Of The Essence.** If full performance of this Agreement is not completed by the Closing Date, either party shall have the right thereafter to declare time to be of the essence of this Agreement by giving written notice thereof to the other party. Such notice shall contain a declaration that time is of the essence and shall fix the time, place and date of final settlement, which date may not be sooner than thirty (30) days following the effective date of such notice.

22. **Survival.** Sections 2(b), 5, 7 and 8 shall survive the Closing and the consummation of the transaction contemplated by this Agreement.

23. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute an original of this Agreement, but all such counterparts shall constitute one and the same instrument.

13

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:                                    SELLER:
                                            A. P. NEW JERSEY, INC.


By: _____                  By: _____

                                            Its: _____


WITNESS:                                    BUYER:
                                            NORTH RIVER MEWS ASSOCIATES, LLC

By: _____                  By: _____
                                            North River Mews, Inc., Managing Member
                                            Fred A. Daibes, President

14.

_IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:

SELLER:
A. P. NEW JERSEY, INC.

By: _Cotter J. Crawford_

By: _____

Its: _Vice - President_

Schedule 5(a)

Litigation



Complaint filed in Tax Court of New Jersey contesting 1997 real property tax assessments on 700 River Road, Block 74, Lot 1 and 732 River Road, Block 71, Lot 2.



SCHEDULE 7C

ENVIRONMENTAL REPORTS

Renaissance Square, Edgewater, New Jersey - Appendix G - General Site PCB-Contamination Characterization (includes Exhibit 1, 2 and 3) prepared by Paulus Sokolowski and Sartor Inc. dated September 1986.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 1 prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 2 Appendices A-F, prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 3 Appendices G-I, prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Interim Response Action Final Report - A.P. New Jersey, Inc. - prepared by Metcalf & Eddy, Inc. dated September 1993.

Detailed Options Evaluation Report - Aluminum Company of America - Edgewater, New Jersey (DERS Project No. 3589) prepared by DuPont Environmental Remediation Services dated July 11, 1996.

## EXHIBIT "A"

THE PROPERTY to be conveyed shall consist of all those parcels of land and premises situate, lying and being in the Borough of Edgewater in the County of Bergen and State of New Jersey, more particularly described as follows:

## PARCEL A

BEGINNING at the intersection of the Southerly line of Russell Avenue and the Westerly line of River Road; thence

   (1)  Along the Westerly line of River Road South 21 degrees 41' 51" West a distance of 84.55 feet to a point; thence

   (2)  Along the Westerly line of River Road South 20 degrees 58' 51" West a distance of 132.06 feet to a point; thence

   (3)  Along the Westerly line of River Road forming a curve to the right with a radius of 283.97 feet (or 300.47 feet as the case may be) and an arc distance of 98.13 feet to a point; thence

   (4)  Along the Westerly line of River Road South 40 degrees 46' 51" West a distance of 154.71 feet to a point; thence

   (5)  Along the Westerly line of River Road South 40 degrees 43' 51" West a distance of 213.02 feet to a point; thence

   (6)  Along the Westerly line of River Road South 37 degrees 05' 21" West 157.71, to a spike in the pavement at the intersection of the Westerly line of River Road and the Northerly line of Vreeland Terrace; thence

   (7)  Along the Northerly line of Vreeland Terrace North 53 degrees 38' 09" West a distance of 463.00 feet to the Easterly line of Undercliff Avenue; thence

   (8)  Along the Easterly line of Undercliff Avenue North 23 degrees 23' 51" East a distance of 162.02 feet to a point; thence

   (9)  Along the Easterly line of Undercliff Avenue North 27 degrees 21' 56" East 204.30 feet to a point; thence

   (10)  Along the Easterly line of Undercliff Avenue North 27 degrees 38' 51" East 463.84 feet to a point on the Southerly line of Russell Avenue; thence

(11)  Along the Southerly line of Russell Avenue South 54 degrees 54' 09" East a distance of 566.09 feet to the point and place of beginning.

EXCEPTING, however, from the above described parcel all that parcel of land known as The Edgewater Cemetery and bounded and described as follows:

BEGINNING at a point which point is North 23 degrees 00' 16" East a distance of 161.72 feet from the intersection of the Westerly line of River Road with the Northerly line of Vreeland Terrace; thence

(1)  Parallel with the Northerly line of Vreeland Terrace North 53 degrees 38' 09" West a distance of 340.63 feet to a point; thence

(2)  North 35 degrees 08' 31" East a distance of 185.11 feet to a point; thence

(3)  South 54 degrees 51' 29" East a distance of 233.25 feet to a point; thence

(4)  South 35 degrees 08' 31" West a distance of 54.64 feet to a point; thence

(5)  South 54 degrees 51' 29" East a distance of 107.28 feet to a point; thence

(6)  South 35 degrees 07' 57" West a distance of 137.74 feet to a point and place of beginning.

SAID PREMISES are known as Lots 1, 2 and 3 in Block 74 as shown on the Tax Map of the Borough of Edgewater.

BEING the same premises conveyed as Parcel 1 to Amland Properties Corporation by Indenture between 700 River Road Realty, dated January 3, 1983 and recorded January 3, 1983 in the Office of the Clerk of Bergen County in Deed Book 6728, page 760.

Case 2:14-cv-05060-JMV-JBC   Document 23-2   Filed 12/05/14   Page 21 of 21 PageID: 461







# EXHIBIT C



## ENVIRONMENTAL INDEMNITY AGREEMENT

**THIS AGREEMENT** made this 13th day of March, 1999

BETWEEN:          A. P. NEW JERSEY, INC.
                  a New Jersey corporation
                  (hereinafter called "A. P.")

AND:              NORTH RIVER MEWS ASSOCIATES, L.L.C.
                  a New Jersey limited liability company
                  (hereinafter called "North River")

AND:              RIVER ROAD IMPROVEMENTS PHASE II, INC.
                  a Delaware corporation
                  (hereinafter called "River Road")

## WITNESSETH:

**WHEREAS,** North River is the owner of certain real estate located in the Borough of Edgewater, County of Bergen, State of New Jersey pursuant to an Agreement to Purchase and Sell Real Estate entered into on June 27, 1997, by and between North River and A. P. (the "Purchase Agreement") and a Transfer Deed executed by A. P. on August 25, 1997, and recorded on August 26, 1997 as Instrument Number 104092 (the "Property"); and

**WHEREAS,** North River, River Road, A. P. and the County of Bergen, New Jersey, were all parties to a Multi-Party Property Acquisition Agreement also entered into on June 27, 1997, whereby, inter alia, North River and River Road agreed that they would cause to be demolished all of the structures on the Property; and

**WHEREAS,** North River, River Road, A. P. and the County of Bergen, New Jersey, were all parties to a Funding Agreement entered into on September 23, 1997, whereby, inter alia, the parties agreed that, to the extent that Building 12 on the Property is not demolished, A. P. shall withhold or cause Bergen County to withhold payment of $500,000 of the demolition funding until, among other conditions, A. P. receives a "No Further Action" letter from the NJDEP covering all the entire Property, including Building 12; and

**WHEREAS,** North River presently does not intend to demolish Building 12.

**NOW, THEREFORE,** in consideration of the premises and of such mutual promises, covenants and undertakings, which the parties acknowledge to be received and sufficient, the parties hereto agree as follows:

1.     In addition to and notwithstanding any other agreement or obligation of the parties, to the extent that Building 12 is not demolished, North River and River Road shall indemnify, defend and hold A. P. harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages, occurring at any time before, during or after North River's ownership of the Property, relating to Building 12 and the land under and adjacent thereto, arising under Applicable Law (as defined in the Purchase Agreement), including, but not limited to, remediation and disposal costs and expenses related to PCBs.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

Witness:

_____

Witness:

_____

Witness:

_____

**A.P. New Jersey, Inc.**

By: _____

JOHN MILLETT, Vice President

**North River Mews Associates, L.L.C.**

By: _____

North River Mews, Inc., Managing Member, FRED A. DAIBES, President

**River Road Improvements Phase II, Inc.**

By: _____

FRED A. DAIBES, President

STATE OF NEW JERSEY                  :
                                     :        ss:
COUNTY OF BERGEN                     :

    *BEFORE ME,* a Notary Public, in and for said State, personally appeared Fred A. Daibes, President of North River Mews, Inc., which is the managing member of North River Mews Associates, L.L.C., a New Jersey limited liability company, and President of River Road Improvements Phase II, Inc., and stated and acknowledged that he was duly authorized in his capacities to execute the foregoing instrument for and in the name and behalf of the company and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration and purposes therein mentioned and set.

    WITNESS my hand and official seal on this 15 day of Mau u , 1999.

                             Notary Public
                             MARK J. SOKOLICH
                             Attorney at Law
                             State of New Jersey

COMMONWEALTH OF PENNSYLVANIA         :
                                     :        ss:
COUNTY OF ALLEGHENY                  :

    *BEFORE ME,* a Notary Public, in and for said State, personally appeared John Millett, Vice President of A.P. New Jersey, Inc., and stated and acknowledged that he was duly authorized in his capacity to execute the foregoing instrument for and in the name and behalf of the company and further stated and acknowledged that he had so signed, executed and delivered said foregoing instrument for the consideration and purposes therein mentioned and set.

    WITNESS my hand and official seal on this 15 day of Malul , 1999.

                             Notary Public
                             MARK J. SOKOLICH
                             Attorney at Law
                             State of New Jersey





Username: KLDOMAIN\lentzc



Job : 255
Date: 3/11/2016
Time: 1:15:25 PM

William H. Hyatt, Jr.
Michael E. Waller
Karyllan D. Mack
K&L Gates LLP
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel: (973) 848-4000
Attorneys for Alcoa Domestic LLC,
as successor in interest to Defendant/
Third-Party Plaintiff A.P. New Jersey, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER, | |
| Plaintiff, | |
| v. | Civil Action No.: 2:14-CV-05060 (ES-MAH) |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALUMINUM COMPANY OF AMERICA; A.P. NEW JERSEY, INC.; JOHN DOES 1-100; and ABC CORPORATIONS 1-100, | **CERTIFICATION OF SERVICE** |
| | *Document Filed Electronically* |
| Defendants, | |
| Of which | |
| ALCOA DOMESTIC, LLC, as successor in interest to A.P. NEW JERSEY, INC., | |
| is a Third-Party Plaintiff, | |
| v. | |
| COUNTY OF BERGEN and RIVER ROAD IMPROVEMENT PHASE II, INC., | |
| Third-Party Defendants | |

I, Michael E. Waller, of full age, hereby certify as follows:

1.      I am a partner with the law firm of K&L Gates, LLP, attorneys for Defendants Aluminum Company of America and A.P. New Jersey, Inc.

2.      On December 5, 2014, I caused to be served, via ECF: (1) Third-Party complaint of Alcoa Domestic, LLC as Successor In Interest to A.P. New Jersey, Inc. and (2) this Certification of Service, on all counsel of record.

I hereby certify that the foregoing statements made by me are true to the best of my knowledge and belief.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated:  Newark, New Jersey
           December 5, 2014

Respectfully submitted,

K&L GATES LLP

By:   /s/ Michael E. Waller

Michael E. Waller
William H. Hyatt, Jr.
Karyllan D. Mack
One Newark Center, Tenth Floor
Newark, New Jersey 07102-5285
Telephone:  (973) 848-4000
Facsimile:  (973) 848-4001
(michael.waller@klgates.com)
(william.hyatt@klgates.com)
(karyllan.mack@klgates.com)

*Attorneys for Alcoa Domestic LLC, as successor in interest to Defendant/Third-Party Plaintiff A.P. New Jersey, Inc.*

**EXHIBIT 10**

American Commercial Lines LLC v. Water Quality Ins. Syndicate, Not Reported in...

2010 WL 1379763

2010 WL 1379763
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

AMERICAN COMMERCIAL LINES LLC, Plaintiff,
v.
WATER QUALITY INSURANCE SYNDICATE,
Defendant.

No. 09 Civ. 7957(LAK).
|
March 29, 2010.

MEMORANDUM AND ORDER

LEWIS A. KAPLAN, District Judge.

*1 This action concerns a dispute between an insured, American Commercial Lines LLC ("ACL"), and its insurer, the Water Quality Insurance Syndicate ("WQIS"), about the extent to which a WQIS-issued insurance policy covers ACL's investigation and defense costs related to a maritime accident and oil spill on the Mississippi River in July 2008. The parties disagree as to whether WQIS's obligation to reimburse ACL's investigation and defense costs ended when its payments under two other coverage clauses reached the policy limits for those coverages. The matter is before the Court on the parties' cross-motions for partial judgment on the pleadings.[1]

*Facts*[2]

*The Accident*
On July 23, 2008, an unmanned, non-self propelled vessel named Barge DM–932 (the "Barge") was involved in an accident on the Mississippi River near New Orleans.[3] The Barge sank, and approximately 300,000 gallons of fuel oil spilled into the river,[4] ACL, as owner of the Barge, has been sued as a result of the accident and oil spill.[5] ACL promptly notified WQIS.[6]

*The Insurance Policy*
The Barge was insured under WQIS policy number 40–27083 (the "Policy") at the time of the accident.[7] The insuring provisions, which are found in Part I of the Policy, required WQIS to (1) indemnify ACL for "such amounts as [it] shall have become liable to pay and shall have paid for pollution response or damages" as owner or operator of the Barge, and (2) reimburse ACL for "certain other costs and expenses."[8] Those "other costs and expenses" included costs or expenses ACL incurred by reason of or with respect to:

- "[t]he Discharge or Substantial Threat of a Discharge of Oil" ("Coverage A"),

- "[t]he Discharge or Substantial Threat of a Discharge of Hazardous Substances" ("Coverage B"), and
- "Investigation and Defense" ("Coverage C").[9]

Coverage A covers six categories of liability, principally related to the Oil Pollution Act of 1990, for which WQIS must reimburse ACL.[10] Coverage B covers three additional categories.[11] Coverage C provides that WQIS must reimburse ACL for "[c]osts and expenses incurred by [ACL] with prior consent of WQIS for investigation of, or defense against, any liabilities covered under COVERAGE A or B of PART I of the *Policy.*"[12] None of these three insuring clauses contains any relevant limits on WQIS's reimbursement obligation.[13]

Part II, Article A, of the Policy contains limits on WQIS's liability under the Policy:

"1) LIMIT APPLICABLE TO COVERAGE A and B OF PART I: The limit of liability under this Policy with respect to all indemnity provided under COVERAGE A and B OF PART I shall be the amount stated on the Vessel Schedule. This limit shall apply to each Vessel with respect to each separate Occurrence ....
"2) LIMIT APPLICABLE TO COVERAGE C of PART I: The amounts payable for costs and expenses incurred by [ACL] with the prior consent of WQIS for investigation of, or defense against, any liabilities covered under COVERAGE A and B of PART I *shall be in addition to the limits of liability stated in ARTICLE A(1) of PART II.*"[14]

*2 WQIS's payments under Coverage A have reached the policy limit for that coverage set out in the Vessel Schedule.[15] The parties disagree as to whether WQIS nevertheless remains obligated to reimburse ACL under

American Commercial Lines LLC v. Water Quality Ins. Syndicate, Not Reported in...

2010 WL 1379763

Coverage C for investigation and defense costs incurred by reason of the discharge of oil in the accident.

## Discussion

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standard applicable to dismissals pursuant to Fed.R.Civ.P. 12(b)(6).[16] The Court therefore views the pleadings in the light most favorable to, and draws all reasonable inferences in favor of, the non-moving party.[17] Judgment is appropriate if, based on the pleadings, the moving party is entitled to judgment as a matter of law.[18]

Under New York law,[19] the terms of the insurance policy determine the insurer's obligations. Insurance policies, like all other contracts, are "interpreted to give effect to the intent of the parties as expressed in the clear language of the contract."[20]

The Court's initial obligation is to determine whether the contract is unambiguous with respect to the issue disputed by the parties.[21] Ambiguity exists when a contract term "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the entire integrated agreement" and who is aware of the customs and usages of the relevant trade.[22] Otherwise clear language is not made ambiguous, however, "merely because the parties urge different interpretations in litigation" unless each interpretation is "reasonable."[23] There is no ambiguity where one party's interpretation of the contract "strains the language beyond its reasonable and ordinary meaning."[24]

If the text of the contract is unambiguous, its meaning is a question of law for the court.[25] If, on the other hand, the contract's terms are ambiguous, extrinsic evidence may be used to determine the parties' intent.[26] The meaning of an ambiguous contract when extrinsic evidence is introduced is a question of fact .[27]

When the Policy is read as a whole, its language with respect to WQIS's obligation to pay ACL's investigation and defense costs is unambiguous. Coverage C obliges WQIS to reimburse ACL for "costs and expenses incurred by [ACL] with the prior consent of WQIS for investigation of, or defense against, any liabilities covered under COVERAGE A or B of PART I of the Policy."[28] This provision, on its face, contains no temporal or quantitative limit on WQIS's reimbursement obligation.

The Policy's only other provision relating to WQIS's

Coverage C obligation is found in Part II, Article A(2). Far from limiting WQIS's reimbursement requirement, this provision expressly provides that the amounts payable by WQIS under Coverage C "shall be in addition to the limits" the Policy imposes on WQIS's Coverage A and B. This language makes clear that the parties did not intend to limit WQIS's obligations under Part I, Coverage C as they did for Part I, Coverage A and B.

*3 WQIS argues that its obligation to make payments for investigation and defense costs under Coverage C has ended, as there no longer are any "liabilities covered" under Coverage A or B because its payments already have reached the limits set out in Part II, Article A(1). This interpretation is unreasonable for three reasons.

First, as noted above, the Policy explicitly provides that WQIS's obligation under Part I, Coverage C is "in addition to the limits of liability" stated in Part II, A(1). The plain meaning of this is that WQIS's Coverage C obligation does not terminate merely because WQIS's payments under Coverage A or B have reached the cap on such payments.

Second, the Policy text shows that the parties did not intend to limit WQIS's Part I, Coverage C obligation. The parties knew how to restrict WQIS's reimbursement obligations when they wanted to do so.[29] The Policy, however, is devoid of any such restrictions Coverage C. The fact that the Policy contains express language limiting the insurer's obligation in some instances undercuts any inference that the parties intended to do so where such language is absent.[30]

Third, while the "limits on liability under th[e] Policy" in Part II, Article A(1) cap the maximum amount that WQIS may be obliged to pay under Coverage A or B for any particular incident, they do not limit the scope of the coverage provided under those provisions. The fact that WQIS has reached the payment limits does not change whether an incident is a "liability covered" by Coverage A and B. The phrase "liability covered under COVERAGE A or B of PART I of the Policy" in Part I, Coverage C plainly refers to ACL's potential grounds for financial responsibility, not WQIS's obligation to pay, as it contains no reference to the Part II, Article A(1) limits.

## Conclusion

For the foregoing reasons, ACL's motion for partial judgment on the pleadings determining that WQIS's contractual obligation under the Policy to reimburse ACL

American Commercial Lines LLC v. Water Quality Ins. Syndicate, Not Reported in...

2010 WL 1379763

for costs incurred and to be incurred by ACL in the investigation and defense of all claims asserted against ACL as a result of the subject oil spill continues until all such costs are reimbursed, regardless of whether other indemnity limits under the Policy have been reached [DI 9] is granted. WQIS's cross-motion for partial judgment on the pleadings and other relief [DI 13] is denied.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 1379763

## Footnotes

1    The parties have submitted affidavits in connection with their opposition and reply papers. The Court did not consider these affidavits in rendering this opinion and hereby excludes them. The affidavits would not have changed the result had they been considered.

2    The following facts were alleged in the complaint and admitted in the answer.

3    Cpt. ¶¶ 8, 15.

4    *Id.* ¶¶ 18, 17, 18.

5    *Id.* ¶¶ 11, 22.

6    *Id.* ¶ 30.

7    *Id.* ¶¶ 8, 28.

8    *Id.* ¶ 24.

9    *Id.*

10   *Id.*

11   *Id.*

12   *Id.* (emphasis in original).

13   The Policy provisions specifically exclude from coverage liabilities under specific provisions of the Oil Pollution Act of 1990 and the Comprehensive Environmental Response, Compensation and Liability Act. *See id.*

14   *Id.* (emphasis added).

15   *Id.* ¶ 34. There is some dispute about when WQIS's payments reached the $5 million Coverage A limit. ACL contends that this occurred on August 28, 2008. *Id.* ¶ 33. WQIS argues that it exhausted its indemnity limits on or about August 26, 2008. Ans. ¶¶ 33, 42.

16   *See Hayden v. Paterson,* 594 F.3d 150, 160 (2d Cir.2010) (citing *Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir.2009)).

17   *See id.; Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994); *Madonna v. United States,* 878 F.2d 62, 65 (2d Cir.1989).

American Commercial Lines LLC v. Water Quality Ins. Syndicate, Not Reported in...

2010 WL 1379763

18    *Burns v. Int'l Sec. Servs. v. Int'l Union,* 47 F.3d 14, 15 (2d Cir.1995).

19    The parties agree that New York law applies to the interpretation of the insurance policy. *See, e.g.,* Pl. Br. at 8; Def. Opp. Br. at 12–13. In addition, the insurance policy contains a choice of law provision which states that "the law applicable to the interpretation of this Policy ... shall be federal maritime law or, in the absence of federal maritime law, the law of the State of New York, without regard for New York's choice of law rules." Cpt. ¶ 24; Ans. ¶ 24.

20    *Morgan Stanley Group Inc. v. New England Ins. Co.,* 225 F.3d 270, 275 (2d Cir.2000) (quoting *Vill. of Sylvan Beach v. Travelers Indem. Co.,* 55 F.3d 114, 115 (2d Cir.1995)).

21    *Law Debenture Trust Co. of New York v. Maverick Tube Corp.,* 595 F.3d 458, 465–66 (2d Cir.2010); *Int'l Multifoods Corp. v. Comm. Union Ins. Co.,* 309 F.3d 76, 83 (2d Cir.2002).

22    *Law Debenture Trust Co.,* 595 F.3d at 466 (quoting *Int'l Multifoods,* 309 F.3d at 83).

23    *Id.* at 467.

24    *Id.; see Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 300 (2d Cir.1996) ("[W]here consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity.").

25    *Postlewaite v. McGraw–Hill,* 411 F.3d 63, 67 (2d Cir.2005).

26    *Int'l Multifoods,* 309 F.3d at 83.

27    *JA Apparel Corp. v. Abboud,* 568 F.3d 390, 397 (2d Cir.2009).

28    Cpt. ¶ 24.

29    *See, e.g.,* Part II, Article A(1).

30    See *Law Debenture Trust Co.,* 595 F.3d at 467; *W.W.W. Assocs. Inc. v. Giancontieri,* 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990).

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT 11**

2014 WL 6895270
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

Drew BRADFORD, Plaintiff,
v.
Joe BOLLES, et al., Defendants.

Civ. No. 13–1910.
|
Filed Dec. 5, 2014.

### Attorneys and Law Firms

Drew Bradford, Bedminster, NJ, pro se.

John Charles Allen, Law Offices of John Charles Allen, LLC, New Brunswick, NJ, for Plaintiff.

Scott D. Rodgers, Cooper and Rodgers, P.C., Somerville, NJ, Timothy P. Beck, DiFrancesco, Kunzman, Coley, Yospin, Bernstein & Bateman, PC, Warren, NJ, for Defendants.

### MEMORANDUM OPINION

THOMPSON, District Judge.

**\*1** Presently before the Court are multiple motions filed by Plaintiff Drew Bradford and by Summit Defendants.[1] On October 20, 2014, Plaintiff filed a Motion to File Out of Time, a Motion for Reconsideration of this Court's August 4, 2014 Opinion and Order,[2] and a Motion to Amend Plaintiff's Complaint. (Doc. No. 52). Subsequently on October 24, 2014, Summit Defendants filed a Motion for Judgment on the Pleadings and a Motion for Summary Judgment on Count I of their Counterclaim. (Doc. No. 54). On December 1, 2014, this Court held a show cause hearing to address the apparent abandonment of Plaintiff's lawyer. This lawyer failed to appear, and Mr. Bradford represented to the court that he would be proceeding *pro se.* On that same day, Plaintiff filed a Motion for Sanctions against Summit Defendants and their counsel. (Doc. No. 66). After reviewing the parties' written submissions and considering the parties' December 1, 2014 oral arguments, all of Plaintiff's

Motions will be denied, Summit Defendants' Motion for Judgment on the Pleadings will be granted and their Motion for Summary Judgment will be dismissed as moot.

### I. Plaintiff's Motions

Local Civil Rule 7.1(i) requires any Motions for Reconsideration to be filed within 14 days after the entry of the order or judgment on the original motion. Plaintiff's Motion for Reconsideration was filed on October 20, 2014, more than two months after the Court's August 4, 2014 Order was entered. Nevertheless, in light of Plaintiff's recent abandonment by his lawyer, the Court has considered Plaintiff's Motion for Reconsideration and finds no grounds for reconsideration. In order to succeed on a motion for reconsideration, the moving party must demonstrate (1) an intervening change in controlling law; (2) the availability of new, previously unavailable evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice. *See North River Ins. Co. v. CIGNA Reins. Co.,* 52 F.3d 1194, 1218 (3d Cir.1995). Reconsideration is an "extraordinary remedy" and thus granted "very sparingly." *Ivan v. Middlesex Cnty.,* 612 F.Supp.2d. 546, 551 (D.N.J. May 6, 2009). After reviewing Plaintiff's briefs in support of his Motion (Doc. No. 52, 53, 60, 62, 67), Plaintiff has demonstrated no facts, no change in controlling law, and no clear error of law or manifest injustice that warrants reconsideration. Therefore, Plaintiff's Motion to File Out of Time will be dismissed as moot, and his Motion for Reconsideration will be denied.

Plaintiff's Motion to Amend the Complaint seeks to add a new Judiciary Defendant, Elizabeth Lipari. Under Fed.R.Civ.P. 15(a) (2), leave to amend the complaint is freely granted unless there is undue delay, bad faith, undue prejudice, or futility. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Here, Plaintiff's amendment would be futile. The Court's August 4, 2014 Opinion granted Judiciary Defendants' Motion to Dismiss on the basis of these Defendants' immunities, among other reasons. (Doc. No. 49 at 6). As a fellow staff member of Somerset County court, Ms. Lipari enjoys the same immunities as her co-workers, the Judiciary Defendants. Therefore, Plaintiff's proposed amendment to his Complaint is futile, and his Motion to Amend the Complaint will be denied.

**\*2** Finally, Plaintiff brings a Motion for Sanctions against Summit Defendants, their counsel, and counsel's firm. (Doc. No. 66). Fed.R.Civ.P. 11 allows the court in its

Bradford v. Bolles, Slip Copy (2014)

2014 WL 6895270

discretion to impose appropriate sanctions against attorneys and parties who have signed and filed pleadings, motions, or other papers that after reasonable inquiry are not grounded in fact or warranted by law. Such sanctions should be imposed only in the "exceptional circumstance" and should be guided by equitable considerations. *Doering v. Union Cnty. Bd. Of Chosen Freeholders,* 857 F.2d 191, 194–95 (3d Cir.1988). After reviewing Plaintiff's Motion (Doc. No. 66) and in light of the dispositive ruling in favor of Summit Defendants (see below), the Court does not find any grounds for sanctions here. Therefore, Plaintiff's Motion for Sanctions will be denied.

## II. Summit Defendants' Motions

In assessing a Motion for Judgment on the Pleadings under Fed.R.Civ.P. 12(c) the Court must accept as true all of a plaintiff's well-pleaded factual allegations, construe the complaint in the light most favorable to the nonmoving party, and determine whether the movant is entitled to judgment as a matter of law. *See Mele v. Fed. Reserve Bank of N.Y.,* 359 F.3d 251, 253 (3d Cir.2004). Here, all of Plaintiff's claims against the Summit Defendants are time-barred or otherwise precluded as they stem from events that occurred between 2005 and 2006. 42 U.S.C. § 1983 claims are subject to the statute of limitations applicable to the underlying personal injury claim in the state in which the claim arises. *See Kach v. Hose,* 589 F.3d 626, 634 (3d Cir.2009). In New Jersey, the statute of limitations for personal injury claims is two years from the date of accrual. *See* N.J.S.A. 2A:14–2. Plaintiff's claims of false arrest, false imprisonment, malicious prosecution, conspiracy to maliciously

prosecute, and failure to investigate an arrest accrued in 2005 or 2006 and are thus time barred since Plaintiff did not file his Complaint until March 27, 2013. In addition, Plaintiff's claims against the City of Summit and the Summit Defendants are covered by a contractual release signed by Plaintiff and arise out of the same set of facts that were the subject of Plaintiff's Superior Court claim in the *Bradford v. Gleason* case. Thus, these claims are also precluded by the terms of the Release and by New Jersey's Entire Controversy Doctrine, N.J. Ct. R. 4:30A, res judicata, and collateral estoppel. Lastly, to the extent that Plaintiff asserts a claim based on the false testimony of one of the Summit Defendants, there is no such cause of action. Therefore, Summit Defendants' Motion for Judgment on the Pleadings is granted, and judgment will be entered in favor of Summit Defendants.

During the hearing on December 1, 2014, Summit Defendants stated that they would withdraw their Counterclaims and instead seek reasonable attorneys' fees from Plaintiff for defending the lawsuit. Therefore Summit Defendants' Motion for Summary Judgment on Count I of their Counterclaim will be dismissed as moot, and the Court will direct Summit Defendants to timely file their Motion for Attorneys' Fees, including an affidavit of services.

**All Citations**

Slip Copy, 2014 WL 6895270

**Footnotes**

1    These Defendants include: the City of Summit, the Summit Police Department, Captain Steve Zagorski, Andrew Bartolotti, and W. Paul Kelly.

2    This Opinion and Order granted the Judiciary Defendants' Motion to Dismiss. (Doc. No. 49, 50). The Judiciary Defendants include: Joe Bolles, Mary Braunschweiger, Eugene Farkas, the Honorable Glenn A. Grant, J.A.D., Meryl Nadler, Patrice Rindok, the Trial Court Administration, and the Administrative Office of the Courts.

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT 12**

2009 WL 3253911

2009 WL 3253911
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

MONTVILLE TOWNSHIP, Plaintiff,
v.
WOODMONT BUILDERS, LLC, et. al.,
Defendants.

Civ. No. 03–2680 (DRD).
|
Oct. 7, 2009.

West KeySummary

1    **Environmental Law**
     **Weight and Sufficiency**

     Township failed to present evidence that the
     previous property owners disposed of
     contaminants on the property purchased by the
     township and thus, the previous owners were not
     liable under the Comprehensive Environmental
     Response, Compensation, and Liability Act
     (CERCLA). The township alleged that the prior
     owners disposed of hazardous chemicals on the
     parcel, because they operated an orchard during
     the time they owned the property and used
     hazardous chemicals as pesticides. However, the
     township's evidence consisted of a draft of a tax
     return, but no signed and authenticated copy was
     ever produced, and one farm assessment form,
     although the township alleged there were three,
     that said the entire property was used for
     fruit crops and the entire property was used for
     woodland     products.     Comprehensive
     Environmental Response, Compensation, and
     Liability Act of 1980, § 107(a)(2), 42 U.S.C.A.
     § 9607(a)(2).

     Cases that cite this headnote

**Attorneys and Law Firms**

Coffey & Associates, by: Gregory J. Coffey, Esq. and
Richard J. Dewland, Esq., Morristown, NJ, for Plaintiff.

Stern, Lavinthal, Frankenberg & Norgaard, LLC, by:
Mark S. Winter, Esq., Livingston, NJ, for Defendants
David and Nathan Mandelbaum, Ronald G. Targan, and
Richard W. Koralek.

Wolff & Samson, PC, by: Lee Henig–Elona, Esq., West
Orange, NJ, for Defendant Woodmont Builders, LLC.

*OPINION*

DEBEVOISE, Senior District Judge.

*1 This matter involves a dispute between Plaintiff
Montville Township ("Montville" or "the Township") and
Defendants over which party is responsible for the cost of
remediating environmental contamination on a parcel of
property purchased by the Township in 1999 ("the
Property"). Montville, which engaged in a voluntary
cleanup of the Property under the oversight of the New
Jersey Department of Environmental Protection
("NJDEP"), seeks to recover cleanup costs from the
developer who contracted to build residences on a portion
of the Property, Woodmont Builders, LLC
("Woodmont"), and the group of individuals who owned
the Property before it was purchased by the Township
(the "Mandelbaums").[1] The Township originally filed a
14–Count Complaint asserting claims under (1) §§ 107(a)
and 113(f) of the Comprehensive Environmental
Response, Compensation, and Liability Act of 1980
("CERCLA"), 42 U.S.C. §§ 9601–9675, as modified by
the Superfund Amendments and Reauthorization Act of
1986, Pub.L. No. 99–499, 100 Stat. 1613; (2) the New
Jersey Spill Compensation and Control Act (the "Spill
Act"), N.J. Stat. Ann. §§ 58:10–23.11 to 23.11(2); and (3)
various common law doctrines. In a ruling issued on
September 10, 2004 the Court dismissed nine of the
twelve claims asserted against the Mandelbaums.
Subsequently, the Mandelbaums and Woodmont moved,
respectively, for summary judgment and judgment on the
pleadings. Those motions were granted and the remaining
claims dismissed on August 12, 2005. After the
Township's Motion for Reconsideration of that ruling was
denied, it timely sought review from the Court of Appeals
for the Third Circuit.

Montville Tp. v. Woodmont Builders, LLC, Not Reported in F.Supp.2d (2009)

2009 WL 3253911

While the Township's appeal was pending the Supreme Court decided *United States v. Atlantic Research Corp.,* 551 U.S. 128, 127 S.Ct. 2331, 168 L.Ed.2d 28 (2007), a case which overruled a prior decision by the Court of Appeals on which this Court had relied in dismissing Montville's CERCLA claims. Based on that intervening change in law, the Court of Appeals on August 8, 2007 reversed in part this Court's prior rulings and remanded the case for further consideration in light of *Atlantic Research.*

The Mandelbaum Defendants and Woodmont now move for summary judgment. In response to those Motions, Montville cross-moves for summary judgment on its claims for declaratory judgment and cleanup costs under CERCLA § 107(a) and the New Jersey Spill Act. For the reasons set forth below, the Motions for Summary Judgment submitted by the Mandelbaums and Woodmont will be granted, and the Township's motion will be denied. The Township's claims under CERCLA and the Spill Act will be dismissed. The Court of Appeals did not disturb the Court's earlier ruling dismissing all common law claims, and that decision remains in effect.

## I. BACKGROUND

The facts out of which this litigation arises are substantially similar to those in a related case, *Bonnieview Homeowners Association v. Woodmont Builders, LLC,* Civ. No. 03–4317(DRD). The Court's September 22, 2009 Opinion in that case lays out much of the background relevant to today's ruling, and is incorporated herein. *See* —— F.Supp.2d ——, 2009 U.S. Dist. LEXIS 86737 (D.N.J.2009). For the sake of brevity, the Court will refrain from revisiting the majority of the facts outlined in that ruling.

### A. The Property
**\*2** As discussed above, this matter involves a dispute over responsibility for the cost of remediating soil contamination on the Property, which was sold by the Mandelbaum Defendants to the Township and Woodmont in 1999. From 1941 until it was abandoned sometime prior to 1970, the Property was the site of a fruit orchard known as "Bonnieview Farms." During the orchard's operation, the Property's soil was contaminated with several hazardous chemicals—including dichlorodiphenyltnchloro ethane ("DDT"), arsenic, and lead—that were widely utilized as pesticides prior to the

enactment of environmental regulations banning their use. In 1970, the Property was purchased by the Mandelbaum Defendants. Those individuals held the Property for 29 years before splitting it into a 100–acre portion that was sold to the Township for use as open space to be enjoyed by Montville's citizens and a 30–acre portion on which Woodmont contracted to develop a residential neighborhood.

Prior to purchasing the Property, Montville hired the environmental engineering firm Post, Buckley, Schuh & Jernigan, Inc. ("PBS & J") to perform an environmental assessment on the land. In its April 1998 report, PBS & J noted that the Property contained various debris, but concluded that "none of the observed debris was considered hazardous, [but] additional material in lower layers could be classified as such. No sampling is recommended for this area at this time; however, when the debris is removed, the lower layers should be carefully examined." Before closing on the Property, Montville was told that the debris had been removed, but did not take steps to investigate possible contamination in the lower soil levels. After the purchase was complete, however, the Township discovered that the debris had not been removed. A later environmental survey of the Property revealed that the lower soil levels were contaminated. After receiving the results of that survey, the Township conducted a voluntary cleanup of the Property in cooperation with the NJDEP.

### B. Prior District Court Proceedings
On June 5, 2003, the Township filed suit seeking to recover the cost of its cleanup from PSB & J, Woodmont, and each of the individual Mandelbaum Defendants. In its 14-count Complaint, Montville asserted claims pursuant to (1) §§ 107(a) and 113(f) of the CERCLA, (2) the New Jersey Spill Act, and (3) various common law causes of action.[2] Both the Mandelbaum Defendants and PSB & J moved to dismiss. In an Opinion and Order dated August 31, 2004, this Court granted in part those motions, dismissing eight of the twelve counts asserted against the Mandelbaum Defendants and ten of the thirteen counts against PBS & J. On September 10, 2004, the Court amended its earlier Opinion and Order to dismiss an additional claim, Montville's action under CERCLA § 107(a) asserted against the Mandelbaums in Count I of its Complaint. *See Montville Twp. v. Woodmont Builders, LLC,* No. 03–2680, 2004 U.S. Dist. LEXIS 30606 (D.N.J. September 10, 2004).

**\*3** On September 27, 2005, PBS & J moved to dismiss the remaining claims asserted against it. That motion was granted on January 6, 2006. In the same ruling, the Court

Montville Tp. v. Woodmont Builders, LLC, Not Reported in F.Supp.2d (2009)

2009 WL 3253911

dismissed with prejudice Montville's claims against all individual Defendants except David and Nathan Mandelbaum. The Township did not appeal that decision. Thus, PBS & J and the individual Defendants other than David and Nathan Mandelbaum are no longer involved in these proceedings.

After the Court's Amended Opinion and Order of September 10, 2004, the only remaining causes of action asserted by the Township against the Mandelbaum Defendants were for (1) contribution under CERCLA § 113(f) (Count II), (2) declaratory judgment under CERCLA (Count III), and (3) negligent misrepresentation (Count XII). The Mandelbaums later moved for summary judgment on those claims, while Woodmont moved for summary judgment or judgment on the pleadings dismissing the claims against it. On August 12, 2005, the Court granted those motions and dismissed all remaining claims. *See Montville Twp. v. Woodmont Builders, LLC,* No. 03–2680, 2005 U.S. Dist. LEXIS 18079, 2005 WL 2000204 (D.N.J. Aug. 17, 2005). In doing so, the Court found that the Township's CERCLA and New Jersey Spill Act claims were barred by a January 22, 2004, settlement agreement between entered into by the Township and Woodmont in connection with a state court proceeding. The agreement stated that the Township would "make no claim of any sort under CERCLA or the New Jersey Spill Act or any other environmental statute or law against Woodmont or its contractors in connection with this cleanup." *Id.* at *3. In the alternative, the Court found that Montville's claims should be dismissed on their substantive merits. That holding was based partially on a portion of the Court's September 10, 2004 ruling in which it ruled that the Township could not bring a claim under CERCLA § 107(a) because it was a "potentially responsible party" ("PRP")[3] and had not asserted an "innocent owner" defense. *Montville,* 2004 U.S. Dist. LEXIS 30606 at *14. Having dismissed the Township's CERCLA § 107(a) claims in its earlier decision, the Court stated in its August 12, 2005 ruling that Montville could not seek contribution for the costs of its cleanup under CERCLA § 113(f) because it faced no liability under CERCLA §§ 106 or 107(a). *Montville,* 2005 U.S. Dist. LEXIS 18079 at * 21, 2005 WL 2000204. On August 30, 2005, the Montville moved for reconsideration of the Court's August 17, 2005 Order, and also sought leave to amend its Complaint to assert an innocent owner defense-which would preclude its being a PRP and thereby allow the Township to state a CERCLA § 107(a) claim. The Court denied both motions on September 28, 2005, after which the Township sought review from the Court of Appeals.

## C. Appeal and Remand

While the Township's appeal was pending the Supreme Court decided *Atlantic Research,* in which it held that (1) CERCLA § 113(f) does not provide the exclusive means of seeking cleanup costs for environmental remediation, and (2) a PRP may seek such costs under § 107(a) of the Act. That judgment overruled a previously-binding decision by the Court of Appeals on which this Court had relied in holding that the Township could not bring a claim under CERCLA § 107(a) because it was a PRP. *See E.I. DuPont de Nemours & Co. v. United States,* 460 F.3d 515, 543 (3d Cir.2006) (holding that CERCLA § 113 provides the exclusive remedy for a PRP seeking cleanup costs from other PRPs, and such relief may not be pursued under § 107(a) unless the party alleges that it is an "innocent owner."). In *Atlantic Research,* the Supreme Court distinguished actions to recover incurred cleanup costs under § 107(a)—which may be sought by any private party, including a PRP, at any time—from actions for "contribution" under § 113(f), which may only be undertaken by a party subject to a judgment or settlement agreement based on §§ 106 or 107(a) that resulted in an inequitable distribution of common liability. *Atl. Research,* 551 U.S. at 139 n. 6 ("[C]osts incurred voluntarily are recoverable only by way of § 107(a)(4)(B), and costs of reimbursement to another person pursuant to a legal judgment or settlement are recoverable only under § 113(f).").

**\*4** Based on the Supreme Court's ruling in *Atlantic Research,* the Court of Appeals reversed this Court's decision holding that Montville was not entitled to pursue a claim under CERCLA § 107(a) or declaratory judgment against the Mandelbaum Defendants or Woodmont because it was a PRP, and remanded for further proceedings. In doing so, it stated that:

> [T]he District Court was correct in concluding the Township could not sue for contribution under § 113(f) (because it faced no liability under §§ 106 or 107(a)), but incorrect in concluding the Township could not sue to recover costs under § 107(a) (because it was a PRP). On remand, the District Court should reconsider Counts I (CERCLA § 107(a)) and III (declaratory judgment under CERCLA) of the Township's complaint against the Mandelbaum Defendants and Woodmont in light of *Atlantic Research Corp.*

*Montville Twp. v. Woodmont Builders, LLC,* 244 Fed.

2009 WL 3253911

App'x 514, 518 (3d Cir.2007). Additionally, the Court of Appeals stated that, "[g]iven the District Court's focus on the merits of the CERCLA claims against the Mandelbaum Defendants and Woodmont in its summary judgment opinion, the court should also re-visit the question of whether the settlement agreement bars the Township's § 107(a) claim against Woodmont." *Id.* at 519 n. 8.

The Court of Appeals noted that Montville's claims under the New Jersey Spill Act were not briefed by either party or addressed on appeal. It stated, however, that this Court's ruling dismissing those claims would be vacated, "if necessary," in light of the Supreme Court's decision in *Atlantic Research. Id.* at 519. In its pending motion, Montville alleges that it is entitled to summary judgment on its Spill Act claims. The Supreme Court did not address that statute in *Atlantic Research.* Therefore, there has been no intervening change in law that would affect the validity of the Court's earlier ruling. In light of the broad language used by the Court of Appeals in vacating that ruling, however, Montville's claims under the Spill Act arguably remain open and will be addressed in today's decision.

## II. DISCUSSION

The parties now move for summary judgment on their respective claims. Montville contends that it is entitled to cleanup costs under CERCLA § 107(a) and a declaratory judgment as to the liability of both Woodmont and the Mandelbaum Defendants. Additionally, the Township claims that it is entitled to summary judgment on its claims under the New Jersey Spill Act. Woodmont argues that (1) Montville's claims against it are barred by the January 22, 2004 settlement agreement and (2) the Township has failed to demonstrate that it disposed of any hazardous substances on the open space parcel of the Property. Similarly, the Mandelbaums claim that the Township has not adequately demonstrated that they disposed of any hazardous materials, and on that basis contend that the CERCLA and Spill Act claims against them must be dismissed.

### A. Standard of Review

**\*5** Summary judgment is proper where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable

jury could find for the non-moving party." *Kaucher v. County of Bucks,* 455 F.3d 418, 423 (3d Cir.2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." *Id.* Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. *Id.* at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine fact issue exists and a trial is necessary. *Id.* at 324. In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *See Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate. *Id.* at 251–52.

### B. Common Law Claims

The substantive merits of the Township's common law claims, which are laid out in Counts V through XII of its Complaint, need not be revisited. All but one of those claims—the Township's negligent misrepresentation allegations contained in Count XII—were dismissed as to the Mandelbaums in this Court's September 10, 2004 Opinion and Order. *See Montville,* No. 03–2680, 2004 U.S. Dist. LEXIS 30606 at \*43. The Court granted summary judgment in favor of the Mandelbaums and dismissed the remaining common law claim against them on August 12, 2005. In the same ruling, it granted Woodmont's request for judgment on the pleadings on Counts V through X and summary judgment on Counts XI and XII. *See Montville,* 2005 U.S. Dist. LEXIS 18079 at \* 37–38, 2005 WL 2000204.

Montville Tp. v. Woodmont Builders, LLC, Not Reported in F.Supp.2d (2009)

2009 WL 3253911

In its Motion for Reconsideration of the latter ruling, the Township only made arguments relating to its claims under the CERCLA and New Jersey Spill Act. There was no mention whatsoever of Montville's common law claims in the brief it filed in support of its Motion. *See generally* (Pl.'s Br. Supp. Mot. Reconsideration of August 26, 2005.) Similarly, the Township did not raise its common law claims in its appeal from this Court's denial of its Motion for Reconsideration. In fact, the Court of Appeals specifically noted that "[t]he parties' briefing [on appeal] did not analyze the remaining New Jersey Spill Act and common law claims, which is on the CERCLA claims." *Montville,* 244 Fed. App'x at 519. The Court of Appeals then stated that "[n]onetheless, we will vacate the District Court's disposition *of the remaining claims for reconsideration,* if necessary, in light of this opinion." *Id.* (emphasis added). As the emphasized portion of that statement makes clear, the Court of Appeals vacated this Court's judgment only with respect to those issues that were raised in Montville's Motion for Reconsideration. Thus, the Court of Appeals left undisturbed the portions of this Court's September 10, 2004 and August 12, 2005 rulings dismissing Montville's common law claims, and that dismissal remains effective.

*6 Even if the Court of Appeals had not specifically limited its decision to Montville's CERCLA and New Jersey Spill Act claims, well-established precedent would compel the conclusion that the vacatur did not apply to this Court's dismissal of the common law claims. It is axiomatic that, "absent exceptional circumstances, issues not raised before the district court are waived on appeal." *Fletcher–Harlee Corp. v. Pote Concrete Contractors, Inc.,* 482 F.3d 247, 253 (3d Cir.2007). "[A]ny issue that could have been but was not raised on appeal is waived and thus not remanded." *Beazer E., Inc. v. Mead Corp.,* 525 F.3d 255, 263 (3d Cir.2008). It is undisputed that the Township made no arguments relating to its common law claims during its appeal. In fact, the Township made no reference to those claims in its Motion for Reconsideration—the denial of which led to its appeal—and has not raised those claims since the case was remanded. Therefore, the Township has waived its opportunity to dispute the dismissal of its common law claims.

**C. Montville's CERCLA and New Jersey Spill Act Claims Against Woodmont**

The Township's CERCLA and New Jersey Spill Act claims against Woodmont are barred by the January 22, 2004 settlement between the parties. That agreement, which was entered into in connection with a state litigation between Montville and Woodmont, stated that the Township would "make no claim of any sort under CERCLA or the New Jersey Spill Act or any other environmental statute or law against Woodmont or its contractors in connection with this cleanup." *See Montville,* 2005 U.S. Dist. LEXIS 18079 at *3, 2005 WL 2000204. Pursuant to the settlement agreement, the state court in February 2004 entered a stipulation and Order dismissing with prejudice the Township's claims against Woodmont. *Id.* The Township has not sought in the present action to void that Order or the settlement. Therefore, the settlement agreement remains effective, and its specific language barring Montville's CERCLA and Spill Act claims against Woodmont requires that those claims be dismissed. *See Fisher Dev. Co. v. Boise Cascade Corp.,* 37 F.3d 104, 109–110 (3d Cir.1994) (holding that (1) parties may contractually allocate their responsibility for environmental pursuant to CERCLA § 107(e)(1) and (2) an agreement including a general release of liability is effective in barring future CERCLA claims).

Even in the absence of the settlement agreement's bar, Woodmont would be entitled to summary judgment on Montville's CERCLA and Spill Act claims. In its initial brief, the Township alleged that Woodmont was liable as a "person who arranged for the disposal of hazardous substances on the property of another" pursuant to CERCLA § 107(a)(3). *See* 42 U.S.C. § 9607(a) (outlining the four categories of PRPs who may be held liable under CERCLA § 107). The Court specifically found that Woodmont was not an "arranger" in its September 22, 2009 ruling in the companion case brought by the homeowners on the 30–acre residential portion of the Property. *Bonnieview,* 2009 U.S. Dist. LEXIS 86737 at *41–42 ("[T]here is no evidence that Woodmont took intentional steps to dispose of a hazardous substance—because it is undisputed that Woodmont was unaware of the contamination in the soils at the time it developed the Residential Lots—so it cannot be liable as an arranger under § 107(a)(3).").

*7 In its reply brief, the Township changed its argument to contend that Woodmont is liable under CERCLA § 107(a)(2) as an "operator" of the Property. In order to establish that Woodmont is liable as an "operator" of the open space parcel, the Township must demonstrate that Woodmont "disposed of" hazardous chemicals on that section of the Property. It is undisputed that Woodmont did not add any additional pesticides to the Property. The Township argues, however, that Woodmont's removal of debris from the open space portion of the Property and construction of two retention basins on that area constituted a disposal. That argument is premised on the

Township's contention that Woodmont removed soil while building those basins and then spread that soil—which Montville claims was contaminated—across the rest of the open space portion of the Property.

The Township has not offered any evidence that Woodmont's activities on the open space parcel of the Property—as distinct from the 30–acre residential plot that is the subject of the suit in *Bonnieview*—resulted in the spread of contaminated soil. In fact, the Township has presented no evidence that the small portions of soil on the open space parcel that were disturbed in connection with Woodmont's activities on that portion of the Property were, in fact, contaminated. Rather, the Township makes the blanket statement that "[i]mpacts from Woodmont Builders' activities have been well documented in the soil investigations conducted at the Subject Property." (Pl.'s Br. Supp. Mot. Summ. J. 22.) In making that statement, Montville presumably alludes to an environmental report commissioned by the plaintiff's in *Bonnieview*, which found that Woodmont's activities in clearing, aggregating, and then redistributing the top layer of soil on the 30–acre residential parcel of the Property likely resulted in the spread of hazardous chemicals to portions of that soil that had not previously been contaminated. *See Bonnieview*, 2009 U.S. Dist. LEXIS 86737 at *18–22 (discussing the report and its findings). That report dealt only with the residential portion of the Property. Although Montville could have commissioned a similar report examining the open space parcel, they have not done so. Thus, the Court is left with nothing but the Township's unsupported factual allegations that Woodmont's activities on the open space parcel resulted in the disposal of contaminants. Such allegations, without more, cannot form the basis for a reasonable judgment in the Township's favor. *See Anderson*, 477 U.S. at 252 (A "mere scintilla of evidence [is] insufficient [to survive a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff."). Therefore, the Court would be required to grant summary judgment in favor of Woodmont on the CERCLA claims asserted against it even if those claims were not barred by the January 22, 2004 settlement agreement between the parties.

**\*8** The merits of the Township's claim against Woodmont under the New Jersey Spill Act are similarly deficient. Under that statute, "[a]ny person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable ... for all cleanup and removal costs no matter by whom incurred." N.J. Stat. Ann. § 58:10–23.11g(c)(1). A "discharge" is defined as, "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking,

pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State." N.J. Stat. Ann. § 58:10–23.11b. "New Jersey courts have consistently interpreted the definition of 'discharge' to exclude the migration of hazardous substances already present in the soil or in groundwaters." *White Oak Funding, Inc. v. Winning*, 341 N.J.Super. 294, 775 A.2d 222, 225 (N.J.Super.App.Div.2001). Thus, "[i]mposition of Spill Act liability ... requires some act or omission of human conduct which causes a hazardous material not previously present to enter the waters or land." *Id.* at 225. As discussed above, it is undisputed that Woodmont did not add any contaminants that were not previously present the soil of the open space parcel of the Property. Therefore, Woodmont would be entitled to summary judgment if the Court were to consider the merits of the Township's Spill Act claims.

### D. Montville's CERCLA and New Jersey Spill Act Claims Against the Mandelbaums

Montville's claims against the Mandelbaum Defendants also fail. The Township alleges that the Mandelbaums are liable under CERCLA § 107(a)(2) as former owners or operators of the Property. That section defines as a PRP "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." *See* 42 U.S.C. § 9607(a)(2). CERCLA § 101(29) adopts the definition of "disposal" from the Solid Waste Disposal Act, 42 U.S.C. § 6903(3), which states:

> The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

The Court of Appeals has held that the term "disposal" includes "not only the initial introduction of contaminants onto a properly but also the spreading of contaminants due to subsequent activity." *United States v. CDMG Realty Co.,* 96 F.3d 706, 719 (3d Cir.1996). "[T]his definition of disposal does not limit disposal to a one-time occurrence-there may be other disposals when hazardous substances are moved, dispersed, or released during landfill excavations and fillings." *Id.* (quoting

*Tanglewood E. Homeowners v. Charles–Thomas, Inc.,* 849 F.2d 1568, 1573 (5th Cir.1988) (internal quotations omitted)).

**\*9** Montville contends that there are material questions of fact as to whether the Mandelbaums disposed of hazardous chemicals on the open space parcel during the period between 1970 and 1999 when they owned the Property. The Township has produced no evidence that the Mandelbaums engaged in excavations that moved, dispersed, or spread the contaminants that were in the soil when they took possession of the Property, and does not appear to make any allegations to that effect. Rather, the Township claims that the Mandelbaums continued to operate an orchard during the 29 years in which they owned the Property, and that operation resulted in the addition of the contaminants at issue in this case—which include DDT, arsenic, and lead—to the soil in the open space parcel. The Township presents only two pieces of evidence in support of that contention: (1) an Application for Farmland Assessment to the State of New Jersey ("Farm Assessment form") submitted by David Mandelbaum in 1989 in which he stated both that the entire Property was used for "fruit crops" and that the entire Property was used for "woodland products," and (2) an unsigned draft of a 1988 federal tax return for Bonnieview Farms that listed "fruit" as the principal product or service.

No reasonable juror could hold that the Mandelbaums disposed of hazardous materials on the Property based on the Township's evidence. As a preliminary matter, the Court notes that the second form submitted by Montville in support of its claim—the 1988 federal tax return—appears wholly unreliable. As stated in *Bonnieview,* 2009 U.S. Dist. LEXIS 86737 at \*6 n. 2, "[t]here is no evidence that this form was anything more than a draft prepared by an outside accountant or that it was ever finalized, signed or filed with the Internal Revenue Service." The version of the form furnished by Montville in connection with this litigation does not bear a signature, and the Township has been unable to produce a signed and authenticated copy—despite the fact that it could have easily done so at any point during the almost six-year duration of this case by making a discovery request for the Mandelbaums' tax records. Without such evidence, no reasonable juror could attribute the representation contained in the form that the Property's principal product was "fruit" to the Mandelbaum Defendants. Therefore, the Court will disregard the draft 1988 federal tax return.

The 1989 Farm Assessment form submitted by the Township in support of its claim is similarly unreliable.

One portion of that form states that the entire Property was used for "fruit crops," while another specifies that the entire parcel was used for "woodland products." The Mandelbaums argue that the inclusion of "fruit crops" on the form was simply an error. That contention draws support from the testimony of local residents, who stated that the orchard previously ceased operation on the Property in the 1960s. Moreover, the Township has not produced any documentation—such as receipts from the sale of the fruit that was supposedly produced on the Property; payroll records for the orchard's workers; or an expert report alleging that the hazardous chemicals in the soil were introduced in the late 1980s, when it alleges the Mandelbaums were operating the orchard, rather than almost 20 years earlier[1]—that the Property was used for fruit-bearing trees that would necessitate the use of pesticides rather than forest products.

**\*10** In fact, Montville's own evidence lends credence to the Mandelbaums' claims that the inclusion of "fruit crops" on the Farm Assessment form was an error. The Township states in its brief that the Mandelbaums filed such an assessment for the years 1988, 1989, and 1990. Tellingly, though, it has produced only the 1989 form. It is likely that the Township's omission of the other two forms was motivated by the fact that they do not include a reference to fruit crops.[5] Moreover, it is highly improbable that the Mandelbaums could have operated a fruit orchard for a period of only three years—the investment of time and capital involved in planting the threes necessary for such a venture would have consumed several years, and it would have been completely irrational to allow the trees to mature only to abandon the operation after such a short period of time.

The implausibility of the Township's allegations that the Mandelbaums added hazardous chemicals to the Property by operating a fruit farm in the late 1980s is further demonstrated by the fact that at least one of the chemicals present in the soil on that land, DDT, would not have been available at that time. The sale and use of that chemical in the United States was banned by the Environmental Protection Agency in 1972. *See Envtl. Def. Fund v. EPA,* 489 F.2d 1247, 1249–50 (D.C.Cir.1973) (discussing the administrative proceedings leading up to the ban and upholding the agency action prohibiting the use of DDT). Even if the Mandelbaums had been operating a fruit orchard on the Property, they would not have been able to purchase and use DDT, and thus could not have been responsible for the addition of that chemical to the soil on the open space parcel.

In light of that fact and the unreliability of the only two pieces of evidence submitted by Montville in support of

Montville Tp. v. Woodmont Builders, LLC, Not Reported in F.Supp.2d (2009)

2009 WL 3253911

its contention that the Mandelbaums operated a fruit orchard on the Property, the Court finds that no reasonable juror could rule that the Mandelbaums disposed of hazardous materials during their period of ownership. Therefore, the Mandelbaums' Motion for Summary Judgment will be granted and the Township's claims for cleanup costs under CERCLA § 107(a)(2) and declaratory judgment will be dismissed. *See Anderson*, 477 U.S. at 252 (stating that unsupported factual allegations that amount to a "mere scintilla" of evidence will not be sufficient to survive a motion for summary judgment).

The Township's claims under the New Jersey Spill Act must also fail. "Imposition of Spill Act liability ... requires some act or omission of human conduct which causes a hazardous material not previously present to enter the waters or land." *See White Oak,* 775 A.2d at 225. As discussed above, the Township has presented no credible evidence that the Mandelbaums added any hazardous material to the soil on the Property. Therefore, the Court will grant summary judgment in favor of the Mandelbaums and dismiss the Township's Spill Act claims.

### III. CONCLUSION

**\*11** For the reasons set forth above, the Motions for Summary Judgment by Woodmont and the Mandelbaum Defendants are granted. The Township's Motion for Summary Judgment is denied, and all remaining claims are dismissed.

The Court will enter an Order implementing this Opinion.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3253911

Footnotes

1    The prior owners include Defendants David and Nathan Mandelbaum, along with former Defendants Ronald G. Targan, Leslie J. Koralek, and Richard W. Koralek. As discussed below, Montville's claims against all individual Defendants other than David and Nathan Mandelbaum have been dismissed.

2    Count I was brought under CERCLA § 107(a); Count II was brought under CERCLA § 113(f); Count III was for a declaratory judgment under CERCLA; and Count IV was brought under the New Jersey Spill Act. The remaining counts were common law claims.

3    As stated by the Court of Appeals, "potentially responsible party" and "PRP" are EPA-created terms of art, and are not specifically used in CERCLA. However, they have been adopted and utilized by the Supreme Court. *See Atl. Research,* 551 U.S. at 131.

4    A rough estimate of the time period on which the chemicals were introduced to the soil could presumably have been produced by tracking the degree to which the various pesticides had broken down into their component elements or combined with other substances in the soil, and then comparing that data to pesticides that had been introduced to similar soil at a known time.

5    It is worth noting that the Township has failed, despite repeated requests on the part of the Mandelbaums, to produce various documents related to the contamination on the Property. Those documents include (1) an environmental report relating to the remediation of the Property during the Township's cleanup, (2) minutes from meetings of the Township Committee and Executive Session, (3) reports of the Township Environmental Commission and Health Department, (4) and all Farm Assessment forms submitted by the Mandelbaums from 1970 until they sold the Property in 1999. On October 1, 2008, this Court entered an Order compelling the production of those documents. The Township has failed to comply with that Order, and the Mandelbaum Defendants have moved for sanctions under Federal Rule of Civil Procedure 37(b). Because today's ruling disposes of all remaining claims, the pending Motion for Sanctions need not be addressed. However, the fact that the Township is in default of its discovery obligations would be grounds for dismissal even if its claims were meritorious. *See* Fed.R.Civ.P. 37(b)(2)(A)(v) (authorizing dismissal of a party's claims for failure to comply with a discovery order); *Nat'l Hockey League v. Metro. Hockey Club,* 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (affirming order of dismissal for repeated failure to comply with discovery orders).

Montville Tp. v. Woodmont Builders, LLC, Not Reported in F.Supp.2d (2009)

2009 WL 3253911

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT 13**

2015 WL 5822930
United States District Court,
D. New Jersey.

New Jersey Physicians United Reciprocal
Exchange, Plaintiff,
v.
Boynton & Boynton, Inc. Kevin Byrne; Does 1–10,
Defendants.
Whitboy, Inc., d/b/a Boynton & Boynton,
Third–Party Plaintiff,
v.
Joanna Elias; Eric Poe; and Does 1–10,
Third–Party Defendants.
New Jersey Physicians United Reciprocal
Exchange, Plaintiff,
v.
The Medical Protective Company, Inc. d/b/a
Princeton Insurance Company; Does 1–10,
Defendants.

Civil Action No. 12–5610 (FLW)(LHG), Civil
Action No. 13–2286 (FLW)(LHG),
|
Signed October 1, 2015

**Synopsis**
**Background:** Not-for-profit reciprocal interinsurance exchange in the business of selling malpractice insurance to physicians and other potential policyholders brought action against insurance broker, alleging, inter alia, violation of Lanham Act. Broker filed counterclaim against exchange and third-party complaint against two of exchange's employees, alleging unfair competition and false promotion in violation of the Lanham Act, and tortious interference with contract and prospective economic advantage. Plaintiff and third-party defendants moved for judgment on the pleadings.

**Holdings:** The District Court, Wolfson, J., held that:

[1] broker had standing to bring Lanham Act claims against exchange;

[2] broker lacked standing to bring Lanham Act claims against employees of exchange;

[3] broker sufficiently stated unfair competition and false promotion claims under Lanham Act against exchange;

[4] allegations were sufficient to state a claim of tortious interference with contract against exchange;

[5] broker failed to state a claim of tortious interference with prospective economic advantage against exchange; and

[6] broker failed to state claims of tortious interference with contract or prospective economic advantage against employees of exchange.

Plaintiff's motion granted in part and denied in part, and third-party defendants' motion granted.

West Headnotes (14)

[1]     **Federal Civil Procedure**
        ⚖═Clear right to judgment
        **Federal Civil Procedure**
        ⚖═Want of Fact Issue

        Judgment on the pleadings will be granted where the moving party clearly establishes there are no material issues of fact to be resolved, and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 12(c).

        Cases that cite this headnote

[2]     **Antitrust and Trade Regulation**
        ⚖═Pleading

        To maintain a cause of action for false advertising under the Lanham Act, a plaintiff must plead an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations. Lanham Trade-Mark Act § 43, 15 U.S.C.A. § 1125(a).

        Cases that cite this headnote

New Jersey Physicians United Reciprocal Exchange v...., --- F.Supp.3d ---- (2015)

2015 WL 5822930, 2015-2 Trade Cases P 79,349

[3]     **Antitrust and Trade Regulation**
        ⬤═Persons protected and entitled to sue

Insurance broker, who alleged it suffered an economic injury that was proximately caused by reciprocal interinsurance exchange's alleged misrepresentation of a favorable rating to broker's client, had standing to pursue its Lanham Act unfair competition and false promotion claims against exchange; broker's alleged injury, its commercial interest in sales to client, fell within the "zone of interests" protected by the Lanham Act. Lanham Trade-Mark Act § 43, 15 U.S.C.A. § 1125(a).

Cases that cite this headnote

[4]     **Antitrust and Trade Regulation**
        ⬤═Particular cases

Insurance broker lacked standing to pursue its Lanham Act unfair competition and false promotion claims against individual employees of reciprocal interinsurance exchange, based on alleged misrepresentations made by employees to broker's clients, absent allegation of loss resulting from such misrepresentations. Lanham Trade-Mark Act § 43, 15 U.S.C.A. § 1125(a).

Cases that cite this headnote

[5]     **Antitrust and Trade Regulation**
        ⬤═Grounds, Subjects, and Scope of Relief

A plaintiff seeking only injunctive relief for false advertising under the Lanham Act needs only to plead a reasonable basis for the belief that plaintiff is likely to be damaged as a result of the false advertising. Lanham Trade-Mark Act § 43, 15 U.S.C.A. § 1125(a).

Cases that cite this headnote

[6]     **Antitrust and Trade Regulation**
        ⬤═Representations, assertions, and descriptions in general
        **Antitrust and Trade Regulation**
        ⬤═Presumptions, inferences, and burden of proof

In order to state a claim under the Lanham Act to recover monetary damages for false advertising, plaintiff must plead that the falsification or misrepresentation actually deceives a portion of the buying public; however, this does not place upon the plaintiff a burden of proving or pleading detailed individualization of loss of sales, as such proof goes to quantum of damages and not to the very right to recover. Lanham Trade-Mark Act § 43, 15 U.S.C.A. § 1125(a).

Cases that cite this headnote

[7]     **Antitrust and Trade Regulation**
        ⬤═Particular cases

Insurance broker sufficiently alleged an actual injury, as required to state unfair competition and false promotion claims under Lanham Act against reciprocal interinsurance exchange, where broker alleged that exchange's misrepresentation to broker's client, that it had a favorable rating, actually deceived a portion of the buying public that profited exchange, and that client was deceived by the misrepresentation, ceased using broker, and switched its insurance coverage to that of exchange, all based on that misrepresentation. Lanham Trade-Mark Act § 43, 15 U.S.C.A. § 1125(a).

Cases that cite this headnote

[8]     **Antitrust and Trade Regulation**
        ⬤═Advertising, Marketing, and Promotion
        **Antitrust and Trade Regulation**
        ⬤═Representations Concerning Others or Their Products; Disparagement

To allege a claim of false promotion in violation

New Jersey Physicians United Reciprocal Exchange v...., --- F.Supp.3d ---- (2015)

2015 WL 5822930, 2015-2 Trade Cases P 79,349

of Lanham Act, plaintiff must plead: (1) defendant made false or misleading statements about plaintiff's, or his own, product; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff. Lanham Trade-Mark Act § 43, 15 U.S.C.A. § 1125(a)(1)(B).

Cases that cite this headnote

[9]     **Antitrust and Trade Regulation**
⬤⮡Advertising, Marketing, and Promotion

Liability for false promotion arises under Lanham At if the defendant makes a commercial message or statement that is either literally false, or literally true but ambiguous such that it has the tendency to deceive consumers; if plaintiff alleges literal falsity, he need not show that the audience was misled, but if the advertisement is literally true, plaintiff must persuade the court that the persons to whom the advertisement is addressed would find that the message received left a false impression about the product. Lanham Trade-Mark Act § 43, 15 U.S.C.A. § 1125(a)(1)(B).

Cases that cite this headnote

[10]    **Antitrust and Trade Regulation**
⬤⮡Particular cases

Insurance broker sufficiently alleged that reciprocal interinsurance exhange's statements to broker's client, regarding its rating, were either literally false, or misleading and tending to deceive, as required to state a false promotion claim under Lanham Act against exchange, where broker alleged that an unknown representative of exchange had verbally advised client's representative that exchange had received a favorable rating, and explained why such statement was false. Lanham Trade-Mark

Act § 43, 15 U.S.C.A. § 1125(a)(1)(B).

Cases that cite this headnote

[11]    **Torts**
⬤⮡Prospective advantage, contract or relations; expectancy

Under New Jersey law, tortious interference with contract or prospective economic benefit has four elements: (1) a protected interest; (2) malice—that is, defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages.

2 Cases that cite this headnote

[12]    **Torts**
⬤⮡Insurance in general

Allegations that insured was already a client of insurance broker at time reciprocal interinsurance exchange made misrepresentation, and that insured ceased to be broker's client and began procuring medical malpractice insurance directly from exchange based on the alleged misrepresentation, were sufficient, under New Jersey law, to state a claim of tortious interference with contract against exchange.

Cases that cite this headnote

[13]    **Torts**
⬤⮡Insurance in general
**Torts**
⬤⮡Pleading

To state a claim, under New Jersey law, of tortious interference with prospective economic advantage against reciprocal interinsurance exchange, based on exchange's alleged

New Jersey Physicians United Reciprocal Exchange v...., --- F.Supp.3d ---- (2015)

2015 WL 5822930, 2015-2 Trade Cases P 79,349

misrepresentation to insurance broker's client, broker was required to identify any prospective economic advantage it expected from client that exchange tortiously interfered with.

2 Cases that cite this headnote

[14]     **Torts**
&#9758;Insurance in general
**Torts**
&#9758;Pleading

Under New Jersey law, to state claims of tortious interference with contract or prospective economic advantage, based on alleged misrepresentations made to broker's clients by employees of reciprocal interinsurance exchange, broker was required to allege damages.

2 Cases that cite this headnote

**Attorneys and Law Firms**

Manuel J. Almeida, Jr., Rudolph & Kayal, Manasquan, NJ, Stephen A. Rudolph, Rudolph & Kayal, Manasquan, NJ, for Plaintiff.

Christina L. Capobianco, Jay Barry Harris, Fineman Krekstein & Harris PC, Philadelphia, PA, James M. Nardelli, Parsons & Nardelli, Red Bank, NJ, for Defendants.

*OPINION*

WOLFSON, United States District Judge:

**\*1** This matter comes before the Court on a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) filed by Plaintiff New Jersey Physicians United Reciprocal Exchange ("NJ PURE"), and Third-party Defendants Joanna Elias ("Elias") and Eric

Poe ("Poe") (collectively "Third–Party Defendants"), seeking dismissal of the First Amended Counterclaim, Third Party Complaint and Demand for Trial by Jury ("Counterclaim") filed by Defendant/Third-party Plaintiff Whitboy, Inc. d/b/a Boynton and Boynton's ("Boynton").

For the following reasons, NJ PURE's motion to dismiss is denied in part and granted in part, and Third–Party Defendants' motion to dismiss is granted. Specifically, NJ PURE's motion to dismiss Counts I and II of the counterclaim is denied. NJ PURE's motion to dismiss Count III of the counterclaim is denied with respect to Boynton's claim of tortious interference with its contract with OB/GYN of North Jersey. NJ PURE's motion to dismiss Count III of the counterclaim is granted with respect to Boynton's claim of tortious interference with its prospective economic advantage with OB/GYN of North Jersey, and tortious interference with its contract and prospective economic advantage with University Radiology Group; Pulmonary & Allergy Associates; and unknown, prospective customers. Third–Party Defendants' motion to dismiss the third-party claims is granted, and the third-party complaint is dismissed.

**I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**
The following facts are drawn from Boynton's counterclaim and third party complaint, the allegations of which are assumed as true for the purposes of this motion.

Boynton is an insurance agent that, among other things, brokers the sale of medical malpractice insurance policies to physicians and other individuals engaged in the provision of healthcare. Counterclaim ¶¶ 1, 5, 13. Plaintiff NJ PURE is a "reciprocal inter-insurance exchange," that is engaged in the "direct sale of medical malpractice insurance policies that it produces itself to physicians and other individuals and institutions engaged in the provision of healthcare." Counterclaim ¶¶ 2, 6, 14. Third–Party Defendants Elias and Poe were employees of NJ PURE during the relevant time period asserted in the Counterclaim. Counterclaim ¶¶ 3, 16.

Boynton alleges it is in direct competition with NJ PURE because NJ PURE markets its medical malpractice insurance policies directly to potential insureds, without the use of a broker. Counterclaim ¶¶ 15–17. Boynton further alleges NJ PURE made false and misleading statements that NJ PURE was rated favorably by A.M. Best Company ("A.M.Best")[1] to several existing and prospective customers of Boynton, when it has not been so-rated. Counterclaim ¶¶ 24–26. Specifically, Boynton alleges:

• On April 25, 2012, NJ PURE, through Poe, emailed a representative of Boynton's client, University Radiology Group ("URG"), and represented that NJ PURE had an A.M. Best Capital Adequacy Ratio ("BCAR") score of 183.6, which "qualifies [NJ PURE] for an A++ (Superior) rating." Counterclaim ¶¶ 27–31.

*2 • On May 11, 2012, NJ PURE, through Elias, emailed a representative of Boynton's client, Pulmonary & Allergy Associates ("PAA"), and represented that NJ PURE had an A.M. Best Capital Adequacy Ratio ("BCAR") score of 183.6, which "qualifies [NJ PURE] for an A++ (Superior) rating." Counterclaim ¶¶ 32–35. In a later meeting in May 2012, Elias also allegedly "touted NJ Pure's rating with A.M. Best Company" to a representative of PAA. Counterclaim ¶¶ 36–37.

• At some point in May or June 2012, an unknown employee of NJ PURE verbally advised Boynton's client, OB/GYN of North Jersey ("OB/GYN"), "that NJ PURE had received a favorable rating from A.M. Best Company," and that "[b]ased upon [that] solicitation ... [OB/GYN] left Boynton and began procuring its medical malpractice insurance coverage through NJ PURE." Counterclaim ¶¶ 39–40.

• On various other dates, unknown employees of NJ PURE contacted prospective and existing clients of Boynton to solicit their medical malpractice business by providing false and misleading information concerning NJ PURE's rating with A.M. Best. Counterclaim ¶ 41.

NJ PURE brought suit against Boynton and Defendant Kevin Byrne ("Byrne") on September 7, 2012, and filed an amended complaint on September 21, 2012, and a second amended complaint on May 17, 2013, alleging Lanham Act violations and common law claims for trade libel, libel, libel *per se,* slander, slander *per se,* tortious interference with prospective contractual relations, and unfair competition under the Insurance Trade Practices Act ("ITPA"), N.J.S.A. 17:29B–4(2)–(3).

On July 17, 2013, Boynton and Byrne moved to dismiss NJ PURE's claims for violation of the Lanham Act, libel, slander, and unfair competition under the ITPA. On January 28, 2014, the Court dismissed the Complaint only as to the claim of unfair competition under the ITPA, and denied Boynton's motion to dismiss the other counts.

On February 28, 2014, Boynton filed a counterclaim against NJ PURE, and a third-party complaint against Poe and Elias, alleging that Boynton suffered economic injury

as a result of NJ PURE's false statements that NJ PURE was favorably rated by A.M. Best. On March 21, 2014, NJ PURE and Third–Party Defendants filed a motion to dismiss Boynton's counterclaim and third-party complaint.

On April 21, 2014, Boynton filed a motion for leave to amend the counterclaim and third-party complaint. On September 29, 2014, the Court ordered Boynton's counterclaims and third-party complaint stricken, and referred Boynton's motion to amend to Magistrate Judge Bongiovanni. On November 25, 2014, Magistrate Judge Bongiovanni granted Boynton's motion to amend its counterclaim and third-party complaint.

On December 10, 2014, Boynton filed its first amended counterclaim and third-party complaint, in which Boynton asserted four causes of action (in three counts) against NJ PURE: (1) Unfair Competition in violation of the Lanham Act, 15 U.S.C.A. § 1125(a)(1)(A); (2) False promotion in violation of the Lanham Act, 15 U.S.C.A. § 1125(a)(1)(B); and (3) tortious interference with (i) contract and (ii) prospective economic advantage. Boynton alleges identical counts against Elias and Poe in its third-party complaint. On April 23, 2015, NJ PURE and Third–Party Defendants answered the counterclaim and third-party complaint. On May 29, 2015, NJ PURE and Third–Party Defendants filed the instant motion to dismiss the counterclaim and third-party complaint pursuant to Federal Rule of Civil Procedure 12(c).

## II. STANDARD OF REVIEW
*3 Rule 12(c) of the Federal Rules of Civil Procedure allows a party to move for judgment on the pleadings "after the pleadings are closed but within such time as not to delay trial." Fed.R.Civ.P. 12(c). The applicable standard on a motion for judgment on the pleadings is similar to that applied on a motion to dismiss pursuant to Rule 12(b)(6). *Spruill v. Gillis,* 372 F.3d 218, 223 n. 2 (3d Cir.2004). When reviewing a motion made pursuant to Rule 12(c), a court must take all allegations in the relevant pleading as true, viewed in the light most favorable to the non-moving party. *Gomez v. Toledo,* 446 U.S. 635, 636 n. 3, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Mele v. Fed. Reserve Bank of N.Y.,* 359 F.3d 251, 253 (3d Cir.2004). All reasonable inferences must be made in the non-moving party's favor. *See In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 314 (3d Cir.2010). "The motion should not be granted 'unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment in its favor as a matter of law.' " *Mele,* 359 F.3d at 253 (quoting *Leamer v. Fauver,* 288 F.3d 532, 535 (3d

Cir.2002)). Accordingly, in order to survive a motion for judgment on the pleadings, the non-moving party's pleading must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This standard requires the non-moving party to show "more than a sheer possibility that a defendant has acted unlawfully," but does not create as high of a standard as to be a "probability requirement." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

[1]The Third Circuit has required a three-step analysis to meet the plausibility standard mandated by *Twombly* and *Iqbal.* First, the court should "outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi,* 696 F.3d 352, 365 (3d Cir.2012). Next, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id.; see also Iqbal,* 556 U.S. at 678–79, 129 S.Ct. 1937 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). It is well-established that a proper complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations and citations omitted). Finally, the court should assume the veracity of all well-pled factual allegations, and then "determine whether they plausibly give rise to an entitlement to relief." *Bistrian,* 696 F.3d at 365 (quoting *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937). A claim is facially plausible when there is sufficient factual content to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. The third step of the analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679, 129 S.Ct. 1937. Judgment on the pleadings pursuant to Rule 12(c) will be granted where the moving party clearly establishes there are no material issues of fact to be resolved, and that he or she is entitled to judgment as a matter of law. *DiCarlo v. St. Mary Hosp.,* 530 F.3d 255, 259 (3d Cir.2008).

## III. DISCUSSION

### A. Boynton has Alleged a *Prima Facie* violation of the Lanham Act against NJ PURE, but Not Against Third–Party Defendants.

Boynton asserts two different causes of action under the Lanham Act: Count I, "unfair competition" under 15 U.S.C.A. § 1125(a)(1)(A), and Count II, "false promotion" under 15 U.S.C.A. § 1125(a)(1)(B).[2] NJ PURE and Third–Party Defendants move to dismiss Boynton's Lanham Act counts on three grounds: (1) lack of prudential standing under the Lanham Act; (2) failure to allege an actual injury, and (3) failure to allege any statement that is literally false or misleading and tending to deceive. The motion to dismiss Counts I and II of the counterclaim is denied because Boynton has standing to pursue its Lanham Act claims against NJ PURE, and it has sufficiently alleged NJ PURE made literally false or misleading statements that proximately caused an actual injury to Boynton. The motion to dismiss Counts I and II of the third–party complaint is granted because Boynton does not have standing to pursue its Lanham Act claims against Third–Party Defendants.

### i. Boynton has Standing under the Lanham Act to Assert Claims against NJ PURE, but Not Against Third–Party Defendants.

*4 As a preliminary matter, the Court notes that the parties have expended considerable briefing on the issue of "prudential standing" under the Lanham Act, focusing specifically on the multi-factor balancing test articulated by the Third Circuit in *Conte Bros. Auto. v. Quaker State–Slick 50, Inc.,* 165 F.3d 221 (3d Cir.1998).[3] However, the Supreme Court established a new analytical framework for determining standing under the Lanham Act and other statutes in *Lexmark International, Inc. v. Static Control Components, Inc.,* —— U.S. ——, 134 S.Ct. 1377, 1384, 188 L.Ed.2d 392 (2014). No party addresses the *Lexmark* decision.[4]

[2]In *Lexmark,* the Supreme Court held that, rather than employ the five-factor *Conte* test to determine "prudential" standing (a label the Court described as "misleading," 134 S.Ct. at 1386), or other tests utilized by different circuits,[5] courts should instead apply (1) the statutory zone-of-interests test and (2) the proximate cause requirement, which, together, "suppl[y] the relevant limits on who may sue" under, *inter alia,* the Lanham Act. *Id.* at 1391. The Court held that under the statutory zone-of-interests test, to come within the zone of interests protected by § 1125(a), "a plaintiff must allege an injury to a commercial interest in reputation or sales." *Id.* at 1390. And, under proximate causation principles, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 1392. In other words, to maintain a cause of action for false advertising under § 1125(a), "a plaintiff must plead ... an injury to a

New Jersey Physicians United Reciprocal Exchange v...., --- F.Supp.3d ---- (2015)

2015 WL 5822930, 2015-2 Trade Cases P 79,349

commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Id.* at 1395.

**\*5** [3]Here, Boynton alleges in its counterclaim that it suffered an economic injury—loss of a customer—which was proximately caused by NJ PURE's misrepresentation of its rating by A.M. Best:

> 39. Upon information and belief sometime in May or June 2012, an employee, representative or agent of NJ PURE, whose identity is presently unknown to Boynton, acting with the actual and apparent authority of NJ PURE, verbally advised Boynton's customer OB/GYN of North Jersey that NJ PURE had received a favorable rating from A.M. Best Company.

> 40. Based upon the solicitation referred to in the preceding paragraph, the customer left Boynton and began procuring its medical malpractice insurance coverage through NJ PURE.

Counterclaim ¶¶ 39–40. Based on these allegations, the Court finds that Boynton has standing to pursue its Lanham Act claims against NJ PURE Boynton has alleged an injury that comes within the "zone of interests" protected by the Lanham Act—its commercial interest in sales to OB/GYN.[6] *Lexmark*, 134 S.Ct. at 1390. And Boynton avers that this injury was proximately caused by NJ PURE's allegedly false and misleading statement to OB/GYN regarding its A.M. Bestrating. *id.* at 1392.[7]

[4]However, with respect to Boynton's third-party claims, no such loss is alleged. Boynton alleges that Poe misrepresented NJ PURE's rating to URG, but that customer is not alleged to have ceased its business relationship with Boynton. Counterclaim ¶¶ 27–31. Likewise, Boynton alleges that Elias made similar misrepresentations to PAA in email and in person, but that customer is also not alleged to have ceased its business relationship with Boynton. Counterclaim ¶¶ 32–38. Although Boynton alleges that it has suffered "substantial economic damages" as a result of these statements, Counterclaim ¶¶ 74, 80, it does not allege any loss of sales or damage to its business reputation that was proximately caused by Third–Party Defendants. Accordingly, Counts I and II of the third-party complaint are dismissed for lack of standing.

**ii. Boynton has Alleged an Actual Injury under the Lanham Act against NJ PURE.**

**\*6** [5] [6]NJ PURE argues that Boynton cannot recover monetary damages because it does not allege an "actual injury" under the Lanham Act. A plaintiff seeking only injunctive relief to stop violations of Section 43(a) of the Lanham Act needs only to plead "a reasonable basis for the belief that plaintiff is likely to be damaged as a result of the false advertising." *Warner–Lambert Co. v. BreathAsure, Inc.,* 204 F.3d 87, 95 (3d Cir.2000). In order to state a claim under the Lanham Act to recover monetary damages, Boynton must plead that it was damaged as result of NJ PURE's misrepresentation or that NJ PURE profited from that misrepresentation. *See* 15 U.S.C.A. § 1117. In other words, Boynton must plead "that the falsification or misrepresentation actually deceives a portion of the buying public." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 922 (3d Cir.) (citing *Parkway Baking Co. v. Freihofer Baking Co.,* 255 F.2d 641, 648 (3d Cir.1958), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). However, "[t]his does not place upon the plaintiff a burden of proving [or pleading] detailed individualization of loss of sales. Such proof goes to quantum of damages and not to the very right to recover." *Id.* (quoting *Parkway Baking,* 255 F.2d at 648); *see also Warner–Lambert,* 204 F.3d at 92 ("[A] plaintiff seeking damages under § 43(a) must establish customer reliance but need not quantify loss of sales as that goes to the measure of damages, not plaintiff's cause of action.").

[7]Here, Boynton has alleged that NJ PURE's misrepresentation actually deceived a portion of the buying public which profited NJ PURE—Boynton alleges that OB/GYN was deceived by NJ PURE's misrepresentation regarding it's A.M. Best rating, ceased using Boynton as its broker, and switched its insurance coverage to NJ PURE, all based on that misrepresentation. Counterclaim ¶¶ 39–40. NJ PURE's alleged conduct thus led Boynton to seek both injunctive relief and monetary relief under the Lanham Act, Counterclaim ¶ 65(a-e), which are proper requests for relief here.

**iii. Boynton has Alleged that NJ PURE's Statements were Literally False or Misleading and Tending to Deceive.**

[8]NJ PURE also argues that Count II of the counterclaim must be dismissed for failure to allege that NJ PURE's statements were either literally false, or misleading and tending to deceive. To allege a Lanham Act violation under 15 U.S.C.A. § 1125(a)(1)(B), Boynton must plead:

(1) the defendant made false or misleading statements about the plaintiff's [or his own] product; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff.

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.,* 292 F.Supp.2d 594, 598 (D.N.J.2003) (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.,* 276 F.3d 160, 171 (3d Cir.2001); *see also Trans USA Prods. v. Howard Berger Co.,* No. 07–5924, 2008 WL 852324, at *4–5, 2008 U.S. Dist. LEXIS 25370, at *13–14 (D.N.J. Mar. 28, 2008).

[9]"[L]iability arises under section 43(a)(1)(B) if the defendant makes a commercial message or statement that is either literally false, or literally true but ambiguous such that it has the tendency to deceive consumers." *Trans USA Prods.,* 2008 WL 852324 at *4–5, 2008 U.S. Dist. LEXIS 25370 at *12–13 (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.,* 290 F.3d 578, 586 (3d Cir.2002); *see also Castrol Inc. v. Pennzoil Co.,* 987 F.2d 939, 943 (3d Cir.1993) (noting "a plaintiff must prove *either* literal falsity *or* consumer confusion, but not both") (emphasis in original). "[I]f the plaintiff alleges literal falsity, he need not show that the audience was misled." *Trans USA Prods.,* 2008 WL 852324 at *5, 2008 U.S. Dist. LEXIS 25370 at *14 (citing *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.,* 401 F.3d 123, 136 (3d Cir.), *cert. denied,* 546 U.S. 1031, 126 S.Ct. 734, 163 L.Ed.2d 569 (2005)). "If the advertisement is literally true, the plaintiff must persuade the court that the persons to whom the advertisement is addressed would find that the message received left a false impression about the product." *Blue Cross of Greater Phila.,* 898 F.2d at 922–23 (citation and internal quotation marks omitted).

*7 "When analyzing a challenged advertisement, the court first determines what message is conveyed." *See id.* at 922. In doing so, many district courts within this circuit have applied a so-called "slightly heightened" or "intermediate" pleading standard for false advertising claims under the Lanham Act, although the Third Circuit has not yet addressed the issue.[8] *See, e.g., Trans USA Prods.,* 2008 WL 852324 at *5, 2008 U.S. Dist. LEXIS 25370 at *14–15; *Wellness Publ'g v. Barefoot,* No.

02–3773, 2008 WL 108889, at *14–16, 2008 U.S. Dist. LEXIS 1514, at *44–47 (D.N.J. Jan. 9, 2008); *Evco Tech. & Dev. Co. v. Buck Knives, Inc.,* No. 05–6198, 2006 WL 2773421, at *4–5, 2006 U.S. Dist. LEXIS 68549, at *14–19 (E.D.Pa. Sept. 22, 2006); *Gallup, Inc. v. Talentpoint, Inc.,* No. 00–5523, 2001 WL 1450592, at *13–14, 2001 U.S. Dist. LEXIS 18560, at *37–39 (E.D.Pa. Nov. 13, 2001); *Max Daetwyler Corp. v. Input Graphics, Inc.,* 608 F.Supp. 1549, 1556 (E.D.Pa.1985). As a district court in New Jersey has explained:

[B]ased on [the] fraudulent element necessary in a Lanham Act claim, this Court has applied an "intermediate" pleading requirement to false advertising claims asserted under section 43(a)(1)(B) that imposes a pleading standard between those standard[s] required under Federal Rules of Civil Procedure 8 and 9. This intermediate approach, first applied in *Max Daetwyler Corp. v. Input Graphics, Inc.,* 608 F.Supp. 1549 (E.D.Pa.1985), strikes a balance between application and outright rejection of Rule 9(b). The slightly heightened pleading requirement is necessary in Lanham Act claims because, [i]n litigation in which one party is charged with making false statements, it is important that the party charged be provided with sufficiently detailed allegations regarding the nature of the alleged falsehoods to allow him to make a proper defense. Thus, Plaintiff must plead its Lanham Act claims with more particularity than traditional notice pleading under Rule 8 but something less than the specificity of Rule 9.

*Trans USA Prods.,* 2008 WL 852324 at *5,2008 U.S. Dist. LEXIS 25370 at *14–15 (citations and internal quotation marks omitted).[9]

[10]Assuming *arguendo* that this intermediate pleading standard is applicable in Lanham Act false advertising claims, Boynton has clearly satisfied such a standard. Here, Boynton alleges that in "May or June of 2012" an unknown representative of NJ Pure "verbally advised" a representative of OB/GYN that "NJ PURE had received a favorable rating from A.M. Best Company."[10]

**New Jersey Physicians United Reciprocal Exchange v....., --- F.Supp.3d ---- (2015)**

2015 WL 5822930, 2015-2 Trade Cases P 79,349

Counterclaim ¶ 40. Although Boynton does not allege the exact content of the statement NJ PURE made to OB/GYN, it has provided a two-month date range, and provided a specific allegation as to the nature of the statement made and why that statement was false. Boynton's allegation rises above the level of specificity that other courts have rejected under the intermediate pleading standard for false advertising claims under the Lanham Act. *See, e.g., Trans USA Prods.,* 2008 WL 852324 at *5–6, 2008 U.S. Dist. LEXIS 25370 at *16–17 (granting motion to dismiss where complaint did not identify what devices were sold with counterfeit marks or the time period during which those products were sold); *Barefoot,* 2008 WL 108889 at *15–16, 2008 U.S. Dist. LEXIS 1514 at *45–47 (dismissing complaint where allegations did "little more than parrot the relevant statute"); *Max Daetwyler,* 608 F.Supp. at 1554, 1556 (finding that allegation that defendants merely "falsely advertised the quality and nature" of a blade-shaped device for wiping excess ink from printing surfaces "cannot be read as an allegation that defendants misrepresented the configuration of their blade to make it appear that the blade was shaped similarly to plaintiffs' blade."). Indeed, in contrast to the deficient allegations in *Max Daetwyler,* Boynton not only alleges that NJ PURE misrepresented the quality of its insurance services, but it specifically alleges that NJ PURE misrepresented that NJ PURE had been rated favorably by A.M. Best. Boynton's allegation regarding the nature of NJ PURE's allegedly literally false or misleading statement—i.e., that in May or June of 2012, NJ PURE falsely represented that it had (1) a rating from A.M. Best and (2) that that rating was favorable—is "sufficiently detailed" so as to allow NJ PURE to mount a proper defense. *See Trans USA Prods.,* 2008 WL 852324 at *4–5, 2008 U.S. Dist. LEXIS 25370 at *12–14; *Evco Tech.,* 2006 WL 2773421 at *4, 2006 U.S. Dist. LEXIS 68549 at *14.

**B. Boynton has Alleged a *Prima Facie* Case of Tortious Interference with Contract Against NJ PURE, but not Third–Party Defendants.**

*8 [11]NJ PURE and Third-party Defendants move to dismiss Count III of the counterclaim and third-party complaint based on a failure to plead damages with sufficient specificity.[11] Under New Jersey law, tortious interference with contract (or prospective economic benefit) has four elements: "(1) a protected interest; (2) malice—that is, defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages." *Vosough v. Kierce,* 437 N.J.Super. 218, 234, 97 A.3d 1150 (App.Div.2014) (quoting *DiMaria Const., Inc. v. Interarch,* 351

N.J.Super. 558, 567, 799 A.2d 555 (App.Div.2001), *aff'd o.b.,* 172 N.J. 182, 797 A.2d 137 (2002)), *certif. denied,* 221 N.J. 218, 110 A.3d 931 (2015).

[12] [13]NJ PURE incorrectly argues that "[w]ith regard to [OB/GYN], Boynton has not alleged any facts that would give rise to a probability that, without interference of NJ PURE, this entity would have obtained their insurance coverage through Boynton as a broker." On the contrary, Boynton alleged that OB/GYN was already a customer of Boynton's when NJ PURE made its misrepresentation, and that it ceased to be Boynton's client and began procuring medical malpractice insurance directly from NJ PURE based on NJ PURE's alleged misrepresentation. Counterclaim ¶ 40. However, while this allegation supports a claim for tortious interference with an existing contract, it does not support a claim of tortious interference with a prospective economic advantage. *See Fineman v. Armstrong World Indus.,* 980 F.2d 171, 195 (3d Cir.1992); *Storis v. GERS Retail Sys.,* No. 94–4400, 1995 WL 337100, at *5, 1995U.S. Dist. LEXIS 7614, at *14–15 (D.N.J. May 31, 1995) (while a plaintiff need not prove "that it had sufficiently concrete prospective contracts with its customers" in opposition to a motion to dismiss, it must "at least allege specific prospective contracts that were interfered with" by the defendant). Boynton's counterclaim fails to identify any prospective economic advantage it expected from OB/GYN that NJ PURE tortiously interfered with, and, accordingly, that cause of action is dismissed without prejudice.[12]

*9 [14]Boynton has also not alleged any damage with respect to the misrepresentations that Third–Party Defendants made to URG and PAA (on behalf of NJ PURE), because there are no allegations that those entities ceased their relationship with Boynton. Nor is Boynton's vague allegation that unknown, prospective customers may have been lost sufficient to survive dismissal. *See Graco Inc. v. PMC Global, Inc.,* No. 08–1304, 2012 WL 762448, at *17, 2012 U.S. Dist. LEXIS 188865, at *49–50 (D.N.J. Feb. 15, 2012) ("Economic damages are a substantive element of a tortious interference claim. These damages must be identified with a certain degree of specificity. '[C]laimed loss of ... unknown customers' is insufficient.") (quoting *Eli Lilly and Co. v. Roussel Corp.,* 23 F.Supp.2d 460, 494 (D.N.J.1998)); *Advanced Oral Techs., L.L.C. v. Nutrex Research, Inc.,* No. 10–5303, 2011 WL 1080204, at *4, 2011 U.S. Dist. LEXIS 28625, at *10 (D.N.J. Mar. 21, 2011) ("Plaintiff 'must allege an injury that is more concrete than lost business of unknown, unsolicited, or hypothetical customers.' ") (quoting *Novartis Pharmaceuticals Corp. v. Bausch & Lomb, Inc.,* No. 07–5945, 2008 WL 4911868, at *2–3, 2008 U.S. Dist. LEXIS 92133, at *7 (D.N.J. Nov. 13,

2008)). However, in the event Boynton should learn in discovery the identity of any prospective customers it lost as a result of NJ PURE's alleged misrepresentations, it may amend its pleadings accordingly.

Accordingly, NJ PURE's motion to dismiss Count III of the counterclaim is granted in part with respect to Boynton's claims regarding URG, PAA, and unknown prospective customers, and tortious interference with prospective economic advantage with OB/GYN, and denied in part with respect to Boynton's claim of tortious interference with its contract with OB/GYN. Third–Party Defendants' motion to dismiss Count III of the third-party complaint is granted, and all claims against these individuals are dismissed.

## IV. CONCLUSION

For the foregoing reasons, NJ PURE's motion to dismiss is denied in part and granted in part, and Third–Party Defendants' motion to dismiss is granted. Specifically, NJ PURE's motion to dismiss Counts I and II of the

counterclaim is denied. NJ PURE's motion to dismiss Count III of the counterclaim is denied with respect to Boynton's claim of tortious interference with its contract with OB/GYN of North Jersey. NJ PURE's motion to dismiss Count III of the counterclaim is granted with respect to Boynton's claim of tortious interference with its prospective economic advantage with OB/GYN of North Jersey, and tortious interference with its contract and prospective economic advantage with University Radiology Group; Pulmonary & Allergy Associates; and unknown, prospective customers. Third–Party Defendants' motion to dismiss the third-party claims is granted, and the third-party complaint is dismissed.

## All Citations

--- F.Supp.3d ----, 2015 WL 5822930, 2015-2 Trade Cases P 79,349

## Footnotes

[1]    Boynton alleges that A.M. Best is a well-known company devoted to issuing in-depth reports and financial strength ratings of insurance companies, and that a favorable rating from A.M. Best is a "coveted assurance of an insurance company's financial strength." *See generally* Counterclaim ¶¶ 18–23.

[2]    "Section 1125(a) of Title 15 of the United States Code creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Knit With v. Knitting Fever, Inc.,* —— Fed.Appx. ——, ——, No. 12–3219, 2015 WL 5147749, at *8, 2015 U.S.App. LEXIS 15575, at *27 (3d Cir. Sept. 2, 2015). Specifically, Section 43(a) of the Lanham Act provides:
       Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
       (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
       (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
       shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C.A. § 1125(a)(1).

[3]    Those five factors are "(1) The nature of the plaintiff's alleged injury: Is the injury of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws? (2) The directness or indirectness of the asserted injury. (3) The proximity or remoteness of the party to the alleged injurious conduct. (4) The speculativeness of the damages claim. (5) The risk of duplicative damages or complexity in apportioning damages." *Conte Bros.,* 165 F.3d at 233 (citations and internal quotation marks omitted).

[4]    Although no party addresses *Lexmark,* additional briefing in not necessary on the issue. In abrogating *Conte,* the Supreme Court described that test as a "commendable effort to give content to an otherwise nebulous inquiry," but found it "slightly off the mark." *Lexmark,* 134 S.Ct. at 1392. The Court observed that *Conte's* "first factor can be read as requiring that the plaintiff's injury be within the relevant zone of interests and the second and third as requiring (somewhat redundantly) proximate causation," but took issue with the Third Circuit's treatment of these requirements as factors that could be balanced against each other. *Id.* Additionally, the Court found the fourth and fifth factors (relating to damages) were inappropriate considerations when determining standing. *Id.* By analyzing the first three

New Jersey Physicians United Reciprocal Exchange v...., --- F.Supp.3d ---- (2015)
2015 WL 5822930, 2015-2 Trade Cases P 79,349

factors under *Conte,* the parties implicitly addressed the two factors required under *Lexmark,* and, accordingly, the Court can consider their arguments within the appropriate context of *Lexmark* to determine whether Boynton has standing under the Lanham Act.

5    In *Lexmark,* the Supreme Court also rejected the direct-competitor test and reasonable interests test. *Id.* at 1392–93.

6    Relying on the deposition testimony of Byrne, NJ PURE argues that Boynton, as a broker, is not compensated directly by procurers of medical malpractice insurance, but instead is paid by insurers based on the premiums Boynton's generates on their behalf. However, the Court must accept Boynton's allegation that it lost OB/GYN as a customer as true for purposes of this motion. *Mele,* 359 F.3d at 253.

7    NJ PURE argues, within the rubric of *Conte,* that Boynton has failed to allege a competitive and direct injury, and that Boynton's damages are too remote because another class of plaintiffs—other insurance companies—were more directly injured by NJ PURE's alleged misrepresentations. These arguments are unavailing. First, the Supreme Court in *Lexmark* also rejected application of a "direct-competitor test" for standing under the Lanham Act. 134 S.Ct. at 1392. As the Court observed: "[t]o be sure, a plaintiff who does not compete with the defendant will often have a harder time establishing proximate causation. But a rule categorically prohibiting all suits by noncompetitors would read too much into the Act's reference to 'unfair competition' in § 1127." *Id.* Second, while Boynton and NJ PURE may not compete in *producing* insurance policies, they clearly compete in *selling* insurance policies—even if direct competition were still a requirement after *Lexmark.* Boynton and NJ PURE are clearly in direct competition to sell medical malpractice insurance in the same market. Whether other entities were more injured by NJ PURE's alleged misrepresentations does not affect whether Boynton has standing under the Lanham Act.

8    *Groupe SEB USA, Inc. v. Euro–Pro Operating LLC,* No. 14–137, 2014 WL 1316039, at *4, 2014 U.S. Dist. LEXIS 44063, at *11 (W.D.Pa. Apr. 1, 2014) ("[T]he Third Circuit has not yet adopted this heightened pleading standard, and district courts disagree over the applicable standard. Moreover, as other district courts in this circuit have observed, the standard set forth in [*Max Daetwyler Corp. v. Input Graphics, Inc.,* 608 F.Supp. 1549 (E.D.Pa.1985) ] was decided prior to the Supreme Court's decisions in *Twombly* and *Iqbal* as well as the Third Circuit's decision in *Fowler.*") (citations omitted).

9    Federal Rule of Civil Procedure 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

10   Boynton also alleges that NJ PURE (through Elias and Poe) sent emails to URG and PAA representing that NJ PURE had a certain BCAR score, and that that score would "qualif[y]" it for an A++ rating, Counterclaim ¶¶ 27–31, 34–35, and that in May 2012 Elias met with a representative of PAA and "affirmatively stated that NJ PURE had an official rating with A.M. Best Company." Counterclaim ¶¶ 36–37. However, since neither of these communications are alleged to have resulted in damage to Boynton, the Court need not address whether they sufficiently plead the literally false or misleading requirement.

11   Boynton has asserted two closely-related, but distinct, causes of action in Count III of its counterclaim against NJ PURE and Count III of its third-party complaint against Third–Party Defendants; that is, Boynton alleges both (1) tortious interference with existing contract and (2) tortious interference with prospective economic advantage. *See Church & Dwight Co. v. SPD Swiss Precision Diagnostics,* No. 10–453, 2010 WL 5239238, at *4–5, 2010 U.S. Dist. LEXIS 133114, at *12–13 (D.N.J. Dec. 16, 2010); *Printing Mart–Morristown v. Sharp Electronics Corp.,* 116 N.J. 739, 750, 563 A.2d 31 (1989). However, the two causes of action have essentially the same elements, differing only with respect to the "the existence of a contract, rather than merely a reasonable expectation of an agreement." *Morin v. 20/20 Cos.,* No. 10–6476, 2012 WL 3880205, at *10, 2012 U.S. Dist. LEXIS 126744, at *30 (D.N.J. Sept. 5, 2012); *McAbee v. Univ. of Med. & Dentistry of N.J. Sch. of Osteopathic Med.,* No. A–5771–09T1, 2012 WL 2428126, at *5, 2012 N.J.Super. Unpub. LEXIS 1516, at *13–14 (App.Div. June 28, 2012).

12   Although Boynton alleges that OB/GYN was its customer, Counterclaim ¶ 40, it alleges no facts which would show that it expected future economic benefits from OB/GYN, other than those obtained under its existing contract. Indeed, the Counterclaim provides no allegation describing what the business relationship OB/GYN had with its former insurance company, brokered by Boynton, and how Boynton was compensated for brokering that relationship. For example, Boynton did not allege that it would receive commission payments if OB/GYN renewed its policy with the insurance company brokered by Boynton. Nor did Boynton allege that it lost further opportunities to broker new insurance policies for OB/GYN.

**New Jersey Physicians United Reciprocal Exchange v...., --- F.Supp.3d ---- (2015)**

2015 WL 5822930, 2015-2 Trade Cases P 79,349

---

**End of Document**                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.