```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

BOROUGH OF EDGEWATER,              .
                                   .
        Plaintiff,                 .
                                   .  Case No. 14-cv-05060
vs.                                .
                                   .  Newark, New Jersey
WATERSIDE CONSTRUCTION, LLC,       .  May 3, 2016
et al.,                            .
                                   .
        Defendants.                .
```

```
                     TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE JAMES B. CLARK, III
                UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

For the Plaintiff:        TIMOTHY E. CORRISTON, ESQ.
                          Connell Foley, LLP
                          85 Livingston Avenue
                          Roseland, NJ 07068-1765
                          (973) 535-0500
                          tcorriston@connellfoley.com

                          NICOLE BIANCA DORY, ESQ.
                          Connell Foley LLP
                          85 Livingston Avenue
                          Roseland, NJ 07068
                          (973) 535-0500
                          ndory@connellfoley.com


For the Defendants        JASON T. SHAFRON, ESQ.
Waterside                 Shafron Law Group, LLC
Construction, 38          2 University Plaza, Suite 400
COAH LLC, Daibes          Hackensack, NJ 07601
Brothers Inc., and        (201) 343-7200
North River Mews,         jshafron@shafronlaw.com
and Fred Daibes:

```
 1   For the Alcoa          MICHAEL E. WALLER, ESQ.
     Defendants:            K&L Gates LLP
 2                          One Newark Center, 10th Floor
                            Newark, NJ 07102
 3                          (973) 848-4000
                            michael.waller@klgates.com
 4
                            DANA B. PARKER, ESQ.
 5                          K&L Gates LLP
                            One Newark Center, 10th Floor
 6                          Newark, NJ 07102
                            (973) 848-4091
 7                          dana.parker@klgates.com

 8
     For the Defendant      DAVID R. PIERCE, ESQ.
 9   Terms Environmental    Lindabury, McCormick & Estabrook, PC
     Services, Inc.:        53 Cardinal Drive
10                          PO Box 2369
                            Westfield, NJ 07091-2369
11                          (908) 233-6800
                            dpierce@lindabury.com
12

13   For the Third-Party    ROBERT PANSULLA, ESQ.
     Defendant County of    Finazzo Cossolini O'Leary Meola &
14   Bergen:                Hager
                            67 East Park Place, Suite 901
15                          Morristown, NJ 07960
                            (973) 343-4960
16                          robert.pansulla@finazzolaw.com

17
     For the Third-Party    PETER K. OLIVER, ESQ.
18   Defendant Neglia       Hoagland Longo
     Engineering            40 Paterson Street
19   Associates:            New Brunswick, NJ 08903
                            (732) 545-4717
20                          poliver@hoaglandlongo.com

21   Audio Operator:

22   Transcription Service:     KING TRANSCRIPTION SERVICES
                                3 South Corporate Drive, Suite 203
23                              Riverdale, NJ  07457
                                (973) 237-6080
24
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.
```

I N D E X

| Proceeding | Page |
|---|---|
| Proceedings | 4 |
| Topic: Amended complaint | 6 |
|     The Court's Ruling | 8 |
| Topic: Reconsideration of ruling on 12(c) motion | 8 |
|     The Court's Ruling | 18 |
| Topic: Discovery, Alcoa defendants | 19 |
| Topic: Daibes discovery | 27 |
| Topic: Privilege log | 32 |
|     The Court's Ruling | 37 |
| Topic: Sufficiency of responses | 38 |
|     The Court's Ruling | 41 |
| Topic: Daibes rolling production | 41 |
|     The Court's Ruling | 46 |
| Topic: Further discussion on discovery issues | 46 |
| Topic: Discovery on Daibes defendants' financial documents | 51 |
|     The Court's Ruling | 53 |
| Topic: Further discovery issues | 53 |
| Topic: Oil tanks | 57 |
|     The Court's Ruling | 57 |

 1              (Commencement of proceedings at 11:14 A.M.)

 2

 3              THE COURT:  All right.  We're on the record in

 4   Borough of Edgewater versus Waterside Construction, et al.,

 5   it's Docket Number 14-5060 (JMV).  And it is 11:14 on the

 6   morning of May 3rd, 2016.

 7              Can we get each of your appearances for the record,

 8   please, and I might as well start with plaintiff and go in

 9   order that way.

10              MR. CORRISTON:  Yes, Your Honor, good morning,

11   Timothy Corriston from the law firm of Connell Foley for the

12   plaintiff.

13              THE COURT:  Good morning.

14              MS. DORY:  Nicole Dory, Connell Foley for plaintiff

15   as well.

16              THE COURT:  Good morning.

17              MR. SHAFRON:  Good morning, Your Honor, Jason

18   Shafron, Shafron Law Group representing Waterside

19   Construction, 38 COAH LLC, Daibes Brothers Inc., and North

20   River Mews, and Fred Daibes.

21              THE COURT:  Good morning.

22              MS. PARKER:  Good morning, Dana Parker, K&L Gates

23   representing the defendants, the Alcoa defendants.

24              THE COURT:  Good morning.

25              MR. WALLER:  Good morning, Your Honor, Michael

1   Waller, K&L Gates, representing Alcoa Inc. and Alcoa Domestic

2   LLC.

3            THE COURT:  Good morning.

4            MR. PIERCE:  Good morning, Your Honor, David Pierce

5   of Lindabury, McCormick, Estabrook & Cooper representing

6   defendant Terms Environmental Services Inc.

7            THE COURT:  Good morning.

8            MR. PANSULLA:  Good morning, Judge, Robert

9   Pansulla, Finazzo Cossolini O'Leary Meola & Hager for the

10  third-party defendant County of Bergen.

11           THE COURT:  Good morning.

12           MR. OLIVER:  Good morning, Your Honor, Peter Oliver

13  from Hoagland Longo, representing third-party defendant

14  Neglia Engineering.

15           THE COURT:  All right.  Good morning.

16           Okay.  We are here on a number of issues.

17  Mr. Corriston had written and asked that we have an in-person

18  conference rather than a phone conference.  And I didn't see

19  any reason not to accommodate, and we do have a lot of

20  people.  If we try to do it on the phone, sometimes people

21  are tripping over one another.  So I'm glad to have you all

22  in today, despite the weather.

23           And I have from Mr. Corriston, I think, the things

24  that will govern or will serve as my, you know, guideposts

25  here.

 1              Two letters, Documents 126 and 127 on the docket,

 2    which are letters dated April 18th.  One is from

 3    Mr. Corriston.  It essentially requests that I reconsider the

 4    issue of leave to file a 12(c) motion.  And Docket 127 is

 5    from Ms. Parker urging that we stay firm for the denial of

 6    the -- of present leave to file that motion.  And then more

 7    importantly, Mr. Corriston's letter of doc- --

 8    Document Number 131 on the docket, a lengthy letter that

 9    really kind of outlines all the disputes that we need to --

10    we need to address today, a lot of discovery disputes, and it

11    also re- -- it mentions once again the question of filing a

12    12(c) motion and a number of other minor issues.

13              I'll try to take them one at a time and get through

14    this with reasonable dispatch.

15              The first issue, Mr. Corriston, on page 2 of your

16    letter, again, the April 26th letter, Document 131, is your

17    intention to file a -- an amended complaint.  Have you been

18    able to secure consent from all of the parties, or is that a

19    problem?

20              MR. CORRISTON:  Your Honor, when we consented to, I

21    believe, Mr. Pierce's application for consent to file an

22    amended answer, which we did, we indicated that we would like

23    to file an amended complaint.  The only person who, I

24    believe, consented was Mr. Pierce.  Other people were

25    somewhat silent on it, asking questions.  We tried to answer

 1   them.  So we said as long as we're preparing this motion to

 2   address the other issues or this order, might as well put the

 3   order -- the issue before the Court.

 4              THE COURT:  All right.  And since we're all here,

 5   we can figure it out.  I don't mean to strong-arm anybody

 6   into agreeing to allow Mr. Corriston to file an amended

 7   complaint.  But you're all here.

 8              Is there anybody who has a present objection to him

 9   filing an amended complaint?

10              MR. WALLER:  Your Honor, we do, on behalf of Alcoa

11   and Alcoa Domestic, we would object to amending the

12   complaint -- complaint at this point and the additional

13   claims ow two years into the case.

14              THE COURT:  All right.

15              MR. WALLER:  I could -- I could talk more

16   specifically, if you'd like --

17              THE COURT:  Well, you know, I -- you could -- you

18   could give me a rundown of what your reasons are, but I think

19   we are going to -- I mean, I am inclined, if you're not going

20   to all consent to allow Mr. Corriston to file the motion.

21   And then we'll consider it that way.  So I don't -- I don't

22   think you need to waste the time of --

23              MR. CORRISTON:  Thank Your Honor.

24              THE COURT:  -- today in making your petition as to

25   why you don't think the amendment is appropriate.

1           So let's -- as a first matter, and, Mr. Corriston,

2    it may be out of time to file such a motion under Judge

3    Hammer's original scheduling order.  I'm even sure.  But so

4    much has happened since then and there have been so many

5    repleadings and motions and answers, that I -- you know, in

6    some respects I hate to say it, because this is not a new

7    case, but I'm, in some respects, starting from ground zero,

8    so I would -- have no trouble allowing you to make that

9    motion, at least.

10           MR. CORRISTON:  Thank you.

11           THE COURT:  How soon would you want to make the

12    motion?

13           MR. CORRISTON:  Two weeks, Your Honor?

14           THE COURT:  Two weeks.  All right.  Let's -- all

15    right.  Why don't you file -- let's say why don't you -- you

16    need to file it by May -- May 20th.  And let's see if we

17    can't get responses by June 6th.  And it'll be returnable on

18    the 20th.  Okay?

19           MR. CORRISTON:  Thank you, Your Honor.

20           THE COURT:  Okay.  So that's Issue Number 1.

21           Now, part of issue Number 1 was -- or at least in

22    your letter, Mr. Corriston, you reraised this issue of filing

23    12(c) motion.  And, you know, we -- we ruled on that once.  I

24    guess my first question to you is what -- what new have you

25    brought to my attention, because motions for reconsideration,

1  I -- I think counsel for Alcoa, Ms. Parker, in her letter,

2  did raise the fact that you know, you need to bring something

3  new to the table, if you want somebody reconsider an order.

4          I don't pretend at all my orders are right or that

5  they're -- you know, the most insightful things out there.

6  But we made -- we made a decision, and that decision was not

7  to allow the motion to be filed at this point in time.  And I

8  don't know that I see anything in your application that I --

9  that I rethink this, if there's anything I would have

10  overlooked or I wasn't aware of when we first talked about

11  it.

12          So, Ms. Dory, if it's -- if you want to address

13  that, that's fine.

14          MS. DORY:  Yeah, if I might respond to that.

15          Your Honor, the reason why we asked for

16  reconsideration is in your order, you indicated that the

17  motion potentially involved addressing factual issues.  And

18  so we wanted to make sure that the Court understood that the

19  motion was based upon undisputed facts that are in the

20  pleadings.

21          THE COURT:  Well, in your letter -- let's see.  I

22  have those two letters.  And in your first letter, Docket --

23  or Document 126, you say -- and I quote:  The defense

24  asserted is the CERCLA -- and I don't mean to -- you know,

25  you may have a good motion to make.  I just -- part of my

1   responsibility, I think, to the new district judge is is that

2   he not be buried with motion after motion or wave after wave

3   of motions.  And to the extent that I can keep some of these

4   for the -- to be filed as a group at the end, I would prefer

5   to do that.

6           But, you say -- and I'll quote what you say here:

7   The defense asserted is the CERCLA 107(c)(3) defense, 42

8   U.S.C. 9607(b)(3), which asserts the complete absence of

9   causation by a defendant because a totally unrelated third

10  party is the sole cause of the release.  If applied, the

11  defense potentially allows these defendants to escape CERCLA

12  liability, notwithstanding the fact that they created the

13  hazardous materials that are the subject of this litigation.

14          You may -- the important part of that quote --

15  that's the end of the quote.  The important part of that

16  quote is that last clause:  Notwithstanding the fact they

17  created the hazardous material.  I think that the defendants

18  are probably all going to argue vociferously that, well, we

19  didn't create it or somebody else created it or you don't

20  have proof that we created it or we need discovery to be sure

21  who created it.

22          And isn't that a point of contention that might

23  lead the district judge to think, you know, I'm -- I guess

24  I'm not ready to consider this point yet.

25          MS. DORY:  Well, actually, Your Honor, I disagree,

1   because what's undisputed here is that Alcoa created PCB

2   contamination on the Alcoa site, and then that recycled

3   concrete was brought from the Alcoa site to Veterans Field.

4   So those two issues are pretty much undisputed.  And the

5   extent of the contamination and the extent of each party's

6   liability might be further disputed amongst the parties.

7            But what we would like the Court to address is that

8   there is a 1997 agreement which essentially AP, which is

9   Alcoa Domestics' former entity, arranged for the Alcoa

10  entities to -- in -- I guess in a short way of putting is

11  contract away their liability or limit their liability with

12  respect to that PCB contamination that they did create on the

13  Alcoa site.

14           So given that Your Honor is already addressing that

15  1997 agreement in the context of Alcoa's motion --

16           THE COURT:  Or Judge Vasquez is considering it.

17  You're right.

18           MS. DORY:  Right, yes, excuse me, Judge, the

19  district judge is addressing that.  We thought it would be

20  efficient for the Court to also address the legal issue of

21  whether that contract goes -- affects the 107(b)(3) defense,

22  which is a -- a legal issue that could be addressed by the

23  Court now and would greatly narrow the scope of discovery in

24  this case.

25           THE COURT:  Well, in her letter, Ms. Dory [sic]

1    says that you talk -- you mention the contract and what the

2    purpose of the contract is.  Isn't the question -- isn't the

3    question a question of contract intent, as she said?  And

4    isn't that kind of a fact we need to figure out, we need to

5    test through discovery?

6           MS. DORY:  No, don't believe so.  So, actually, the

7    Alcoa entities have made several arguments in the context of

8    their 12(c) motion as to the intent of that contract.  I

9    think those admissions could be used in evaluating the

10   context and -- excuse me -- the contract in the context of

11   the Borough's motion.  You know, we believe that the

12   contract --

13          THE COURT:  Well, how, exactly?  I appreciate your

14   representation that discovery is going to be made that much

15   more difficult.

16          This is a big CERCLA case.  You're going to cover

17   miles of ground.  Is this really going to change what you

18   have to cover in discovery?

19          I find -- I find that hard to believe.  I -- we've

20   got a -- an enormous cast of characters here.  You've got a

21   lot of things that you're going to want to probe.  I -- a

22   decision on that motion, is it really going to make a big

23   difference in the scope of discovery?

24          MS. DORY:  Well, actually a decision on that motion

25   would narrow the scope of our discovery issues with the Alcoa

Hearing
14-cv-05060, May 3, 2016

1    defendants.  So as we discussed later in the letter, and I --

2    we're prepared to address with you, we have two main issues

3    with the Alcoa defendants, and one of that is the pre-1997

4    information and documents related to not only Alcoa's

5    operations on the site, but also the allocation of liability

6    between Alcoa and AP.

7              THE COURT:  So they're the ones that are

8    resisting -- I mean, I would think they'd be just as

9    interested in streamlining discovery.  But they, you know,

10   say, hey, we need to conduct discovery, and we think there's

11   issues of fact here.  And we think that the motion would be

12   premature.  So it doesn't sound like you're on the same page

13   with them on that -- on that score, and while I say I

14   appreciate the suggestion that we would cut down on

15   discovery, I'm skeptical.  You know, I don't -- I don't know

16   that in the end, it would make a whole lot of difference.

17             Let me ask Ms. Parker, since -- unless Mr. Waller

18   you --

19             MR. WALLER:  Yeah, if you wouldn't -- if you

20   wouldn't mind, Your Honor.

21             THE COURT:  Okay.  Whoever -- whoever wants to

22   address that.

23             MS. PARKER:  Sure.

24             THE COURT:  I just wanted to -- I know it was

25   Ms. Parker's letter.

1           But you say it's a fact issue.  Right?

2           MR. WALLER:  Yes, we do, Your Honor, for what

3  they're trying to do.  And I think counsel is trying to

4  conflate the two different motions.  Our 12(c) motion is

5  directed between the parties that are actually -- parties to

6  the contracts that we raised before Judge Vasquez, the

7  contract of sales between us and the Daibes entities, the

8  Waterside -- various Waterside parties.

9           And what the County -- what the Borough is talking

10 about is then having those contracts interpreted as if they

11 had -- the purpose of them was to deal with disposal of

12 materials 20 years after the contract of sale.  And as we

13 quoted in our letter, they -- the Court has looked at that to

14 say, well, wait, those -- this contract actually -- contract

15 of sale of property for value actually constitute disposal of

16 material on that.  And we've cited some cases for you that

17 talk about that inquiry, inquiry as to whether that contract

18 is really a contract of disposal is an intent-based analysis.

19          THE COURT:  Would the judge's decision on the other

20 motion, you think, inform what the result is going to be in

21 this motion?

22          MR. WALLER:  No.

23          THE COURT:  No.  And why not?

24     (Simultaneous conversation)

25          MR. WALLER:  -- Your Honor.

1          THE COURT:  Pardon?

2          MR. WALLER:  Oh, I'm sorry.  You asked me and I

3   spoke over you.  Why not?

4          THE COURT:  Yes.

5          MR. WALLER:  Again, the -- our 12(c) motion is

6   designed to essentially establish the law as between the

7   parties to that contract, whether or not there's an indemnity

8   and a defense duty between those two parties.  It's not

9   designed to address the -- the disposal issue.  I mean, our

10  position is that the contracts are clear and unambiguous on

11  their face, that within the four corners of those contracts,

12  there is an indemnity ob- -- present indemnity obligation,

13  there is a present defense obligation.  And those contracts

14  prohibit the claims the Daibes parties -- Waterside, I'm

15  sorry, I keep --

16         THE COURT:  Well, if they're clear and unambiguous

17  on their face, then why do we have an intent issue?

18         MR. WALLER:  The intent issue goes to the issue

19  that the Borough would like to bring into this case and said,

20  no, no, no, that contract, there -- it may be a contract of

21  sale of property for value, but we think that contract is

22  also designed -- or the intent of it was for the disposal of

23  property.  Different issue than the contracts -- the contract

24  interpretation that we're arguing as between us and the

25  parties to that contract, not as they relate to a third

 1   party.

 2           THE COURT:  All right.  Ms. Dory?

 3           MS. DORY:  I just want to respond to that.  We also

 4   agree that the contracts are clear and unambiguous.  So if

 5   we're really talking about legal issues here, there's

 6   actually a provision in the 1997 multi-party agreement that

 7   allows PCB-contaminated concrete under 50 parts per billion

 8   to be reused.  Alcoa, AP they allowed that to happen.  That's

 9   where we are here.  That PCB-contaminated concrete was

10   reused.  It was reused on Beth & Steele [phonetic].  So while

11   the parties may dispute whether -- who brought it there or

12   the extent of liability with respect to that, the contract

13   and the legal issue there is clear.  And we think the Court

14   can address that now.

15           THE COURT:  Mr. Waller, did you have something to

16   say?  I saw you stand up.  You might have something to say in

17   response to that.  Go ahead.  But I also wanted to ask you

18   what your position was on -- on this notion that not -- not

19   allowing the motion to go forward will multiply discovery

20   beyond tolerable levels.

21           MR. WALLER:  I don't -- I'm sorry.  I don't

22   understand your question.  The -- do I think that granting

23   the motion would -- would reduce discovery?

24           THE COURT:  Unless -- well, assuming that they're

25   right and assuming they file a 12(c) motion and it's granted,

1    would that narrow discovery?

2              MR. WALLER:  No, because the disposal issues really

3    have to do with other parties.  I mean, the contract that

4    Ms. Dory references, the -- what we call the mart --

5    multi-party agreement was between a number of parties.  It's

6    not the purchase and sale agreement.  And in that multi-party

7    agreement, it provided very specific requirements as to the

8    disposal of materials.  And the person that was responsible

9    for -- or the entity that was responsible for the disposal of

10   that material is one of the other defendants, in the Daibes

11   group of defendants.

12             So that -- the -- whether or not it was disposed

13   of, how it was disposed of by that other party is still going

14   to be an issue.

15             So I don't see how that contract will eliminate --

16             THE COURT:  All right.  And I'm sorry, I had jumped

17   in.  You stood up.  You had something to say in response to

18   that --

19             MR. WALLER:  Oh, I don't remember, Your Honor.

20             THE COURT:  All right.  Well, Ms. Dory.

21             MS. DORY:  Well, I just wanted to reiterate that

22   those -- those issues as to intent and what happened

23   afterwards are really irrelevant.  What we're looking at is

24   the 107(b)(3) defense as to CERCLA, and that defense is clear

25   that you cannot have a contract to dispose of the materials

1    if they are subject to the defense.

2            And in this case, there is a contract that allows

3    PCB-contaminated concrete to be reused.  And that is the

4    contamination at issue in this case.  We think the issue is

5    very clear.  There's case law to support it, and we think

6    that the Court should address the issue now.

7            And as we get in -- later into the -- the discovery

8    dispute with Alcoa, the documents in the Amland suit and all

9    of the documents related to the 60 or so years during which

10   Alcoa operated on the site, that's all discovery that we're

11   looking for now, a tremendous amount of discovery.  We think

12   it can be -- we think it may be reduced if the Court

13   addresses the liability issue now.

14           Thank you.

15           THE COURT:  All right.  Thank you.

16           With respect to this issue, I -- very much

17   appreciate your arguments, Ms. Dory, and -- and, you know, it

18   may be that there's not an issue of fact.  I'm not entirely

19   sure whether I agree with the defendants on that, that

20   there's going to be an issue of fact here.  But I don't know

21   that I'm sold that discovery is going to be made all that

22   much more overwhelming by not having the judge consider this

23   motion right now.  And, you know, procedurally, I don't stand

24   on -- I don't want to stand on procedure or ceremony, but I

25   don't know that there's anything really new.  I mean, you

1    gave me more information or you fleshed out what information

2    I had before a little bit better than it had been fleshed out

3    when we made our earlier decision.  But I think I'm going to

4    stick with what we had decided before.  I mean, I don't feel

5    too terrible.  You're going to be able to make that motion

6    eventually.  And I -- I would rather not have Judge Vasquez

7    struggling over arguments, which undoubtedly will be made,

8    but, oh, it's not ripe to decide this yet, we need discovery

9    for this, we need discovery for that, we need to figure

10   this -- I'd just as soon stay where -- stay pat with what I

11   had decided before and wait until closer to the end of

12   discovery before we -- before we have that motion filed.

13            All right?

14            Following those two preliminary issues,

15   Mr. Corriston in his letter raised a series of issues with

16   respect to discovery, written discovery that allegedly is --

17   the responses have not been up to snuff or people are

18   actively resisting providing certain discovery.  I'll -- I'll

19   address the first one, which is 1 (A) in Mr. Corriston's

20   letter.  Again, that's on page -- begins on page 2, and this

21   is Document 131.  The issue being written discovery that was

22   addressed, the Alcoa defendants.  And the Alcoa defendants

23   are resisting discovery of information with respect to their

24   activities at the Alcoa property and otherwise that date --

25   that predate 1997, the sale of the Alcoa site to North River

1   Mews.

2           Mr. Corriston, I -- I mean, I have your letter.  I

3   think I understand or, Ms. Dory, you got this one too?

4           MS. DORY:  Yeah, yeah.

5           THE COURT:  All right.  I think I understand your

6   position.  I mean, you're taking a position that -- well,

7   I'll hear you, if you feel like you need to supplement it in

8   any way.

9           MS. DORY:  Okay.  I would just like to preface this

10  by saying we are -- we are trying to work this out with the

11  fellow parties.  Unfortunately, at the time that we wrote the

12  letter, we weren't that close.  Maybe we're a little bit

13  closer now.  But we did want to bring the issue to

14  Your Honor's attention, because it is an important one.  And

15  as I just stated to you in the context of the 12(c) motion,

16  it really goes to the heart of the liability --

17          THE COURT:  Well, let me -- let me give you two

18  observations, at least, that -- based on the letter.  I do

19  think that this material is relevant.  You know, you can make

20  arguments that it's not.  But I do think that, you know, what

21  happened there and how the PCBs got into this material and --

22  it all has some relevance, particularly given the broad

23  relevance that we normally ascribe to discovery materials.

24          But I am concerned that the countervailing issue is

25  proportionality.  You know?  I mean, the Alcoa folks, I don't

1   aim to have you say, we want everything about your activities

2   at that site from time immemorial, I mean, something has to

3   be worked out.  And I'm glad to hear that you're working it

4   out.  I don't know exactly what I was going to say to you all

5   except for those -- except for making those two observations.

6   Yes, you're right.  It seems to me that it's relevant.  It

7   seems to me that you're entitled to some stuff with respect

8   to it.  But you've got to -- we've got to try to -- we've got

9   to try to keep this to some -- to a finite amount of

10  discovery, to something workable.

11          So if you're working on it, I don't know what I can

12  add to -- to the progress you make.

13          Mr. Waller?

14          MR. WALLER:  I want to just say, Your Honor, that I

15  did speak with Ms. Dory yesterday, and we'll step up our

16  efforts to get material that we -- we discussed yesterday to

17  them in hopes that that removes some of those -- some of

18  those issues.

19          THE COURT:  Okay.  I mean, it should be directed to

20  how the PCBs got there and --

21          MR. WALLER:  Well, on that issue, if I may, I don't

22  mean to interrupt Your Honor.  I mean, this is not a site

23  that is unknown to the Borough.  It's been in their town

24  since 1900-something, and they have been involved in every

25  step of the sale.  They were very involved in the 1997 sale

1   of the property and redevelopment of that property beginning

2   in 1997.  This is when Alcoa sold the property outright to

3   the -- to the Waterside, Daibes defendants.

4          But that's not to say we're not cooperating.  We do

5   intend -- we understand -- and with Mr. Corriston's -- and

6   looking for, we're trying to keep it to a -- I'm not trying

7   to be obstructionist.  We are trying to keep it to a

8   manageable --

9          THE COURT:  Like I said, all I thought I could add

10  to this right now is to give you my -- my view that I'm not

11  going to be receptive to the argument that it's not relevant.

12  And I am concerned that I -- it should be proportional.

13          Mr. Corriston?

14          MR. CORRISTON:  Yes, Judge, just briefly, just so

15  you understand, we have in our discussions narrowed the

16  issues.  But there's -- there's critical issues here.  We

17  know generally about the operations.  We don't need to know

18  everything about their operations.  What we're trying to

19  identify is the specific type of PCBs they used, and it --

20  there's a term called "Aroclor," because there may be a -- we

21  need to be able to show that that's the same type of Aroclor

22  that now has been placed on this very public park to this

23  day, which is still not operational.  All right.

24          So obviously anything on that issue is relevant.

25          The other -- the other critical issue here and it

1    actually goes back to our 12(c) motion is that what happened

2    here is that Alcoa operated this property for whatever years.

3    There was PCB contamination, which they don't deny, in the

4    concrete, in the wood floors, everywhere, arising out of

5    their operations.  We know they bought their PCBs from

6    Monsanto.

7              They then sold the property, and there was a series

8    of transfers of properties -- of the property.

9              Then there was the Amland suit where a subsequent

10   property owner upon being -- learning that the wood that they

11   were going to use for the inside of the condos and things of

12   that nature was totally contaminated with PCBs.  So there's

13   two written opinions, I believe by Judge Trump on -- Barry --

14   Trump Barry on that case, so we had some general idea.  But

15   to think that the town was intimately involved in this

16   property other than it being a taxpayer and be aware that

17   there was some development applications is -- is incorrect.

18   We don't have any information.

19             So then what happens is Alcoa settles the case, and

20   we -- we know this from reported decisions as opposed to any

21   discovery that's been produced -- settles the case with

22   Amland, pays them $15 million, takes back the property, and

23   has an agreement where taking it back, they can assign it to

24   another related entity.

25             They then take that property back, assign it to

|Hearing
|14-cv-05060, May 3, 2016

1    another related entity, we assume for a dollar or something

2    like that, we don't have any of those documents.  That entity

3    subsequently enters into an agreement with North River Mews.

4    And now we get the trail that ultimately leads to this

5    devastating conduct that has happened.

6             Alcoa's taking the position, we had nothing to do

7    with this.  It's -- if anybody, it's AP Alcoa who had some

8    contact.

9             Well, when you create this much contamination on

10   the site, so much that you take the property back and pay

11   someone $15 million, transfer it for basically no

12   consideration to another entity, which we think was purely

13   done for purposes of a shell game and to protect Alcoa,

14   right, the -- the company that we all know with billions of

15   dollars of assets, I'll take my -- I'll take my risk, Judge,

16   all right, how much they have compared to how much these guys

17   have.  All right?

18            That's relevant.  What happened here?  Why are you

19   transferring a major liability to another entity for a dollar

20   and then arranging to have this PCB disposed of?  They can

21   say what they want about intent, and Mr. Waller alluded to --

22            THE COURT:  Who was it -- was it a confidential

23   settlement?  Aren't some of these papers a matter of public

24   record?

25            MR. CORRISTON:  Well, the point is -- here's the

1   issue, Judge.  If they have them, whether they're public

2   record or -- you know, for us to chase down somewhere going

3   back 30 years.  If they have them, they need to turn them

4   over, so what I'm trying to say, and I did -- I appreciate

5   our efforts to resolve this, but in no manner are we not

6   going to find out how and why this was done and what the

7   terms were, and we'll sign whatever protective orders need to

8   be done.  I can't believe that the Court would find a

9   confidentially -- if they're -- we don't even know if they're

10  confidential.  Nobody's taken that position.

11          But I'm just saying we will continue to work.  But

12  I just want the record clear, because we are not on a fishing

13  expedition.  The proofs and the issues that we need to

14  address are very narrow because if they arrange -- our

15  position is Alcoa, by entering into that contract with

16  Al P Coa [phonetic], and we don't know if there's a written

17  contract between the two entities, but arranging for Al P, AP

18  to take -- which is now Alcoa Domestic, to take on that

19  liability, that means Alcoa's also liable in this case.

20          So we're very, very -- we're looking for very, very

21  specific issues.  So this is not where we're looking

22  everything for the history.  We just want to get to the

23  bottom of that issue.

24          THE COURT:  And at this point, I -- all I really --

25  and some of these things don't sound like they're ripe for

```
 1   any kind of decision, and all I want to do is emphasize that
 2   it's good that you're keeping it narrow.  All right?  It's
 3   good that you're keeping it focused.  I read the letter and
 4   thought oh, my god, you know, every -- everything since 1945
 5   or the 19-teens or whatever.  That -- that made the hairs on
 6   the back of my neck stand pup.
 7            MR. CORRISTON:  Yeah, no, Your Honor, we're very
 8   focused on what we need.
 9            And we are speaking -- and Mr. Waller is
10   cooperating to the extent plaintiff and defendants cooperate
11   and they do their jousting, whatever.  But I didn't want
12   Your Honor to think that we're looking for the world.
13            THE COURT:  Okay.
14            MR. CORRISTON:  We're very focused on what we need
15   in this case.
16            THE COURT:  Good.  Good.
17            MR. CORRISTON:  Thank you.
18            THE COURT:  All right.  Well, then that -- I'm
19   happy to hear that you're working together.  I -- you know, I
20   will again reiterate that I do think discovery in this regard
21   is generally relevant.  If -- if problems arise as you work
22   this out, you know where to find us, and as discrete issues
23   come up, I hope you're able to work everything out, quite
24   frankly.  But if you're not, we'll deal with discrete issues
25   as though come up.  Yes.
```

1          MS. DORY:  But I just wanted to add that we -- we

2  are trying work it out, but we wanted to reserve to bring

3  this issue to the Court --

4          THE COURT:  Sure.

5          MS. DORY:  If we're not able to do so soon.

6          THE COURT:  Understood.  Understood.

7          All right.  The next issue that is raised in the

8  letter with respect the production or the production of that

9  documents and the response to interrogatories by the Daibes

10  defendants, which, you know, the first five, I think, one,

11  two, three -- first five named defendants in the complaint.

12          You know, I've read this couple of pages, and I

13  guess I will ask Mr. Shafron, sounds like we don't have, you

14  know, any answers of substance to interrogatories, and it

15  sounds like the document production, according to this

16  letter, at least, has been, charitably, scattershot.  What --

17  what would you say in response to the letter?

18          MR. SHAFRON:  Thank Your Honor.  I -- I saw the

19  draft of this letter and read this section and, yes, when you

20  read the section, you would be under the impression that

21  interrogatories weren't answered, requests for admissions

22  weren't answered, documents weren't produced.

23          Substantial amount of documents were produced,

24  identified and produced.  And full answers to all

25  interrogatories and requests for admissions were given.

1         Some of the answers, the plaintiff was not

2  satisfied with and sent deficiency letters to us saying that

3  they don't -- they weren't satisfied with the answers.

4         THE COURT:  In February.

5         MR. SHAFRON:  Yes.

6         THE COURT:  Have you responded to the deficiency --

7         MR. SHAFRON:  And I will -- I will -- just for a

8  little background, since we're on the record, I just need to

9  make sure that the Court is aware, I substituted in as

10 counsel right at about that time.  And I think the end of

11 February.

12        I received those deficiency letters.  I was not the

13 one who produced the documents in the first instance.  As you

14 can imagine, this is a substantial document production.  I

15 mean, these were not a few interrogatories and a few requests

16 for admissions.  These were extensive discovery requests.  I

17 went through them all for the first time.  I wasn't -- I

18 didn't respond to them the first time.

19        And when I did go through them, I felt that most of

20 the answers that were given, were given to the best of the

21 ability of the various entities to respond to those discovery

22 requests.

23        And most of them, when I responded to the

24 deficiency letter, we explained exactly why the answers were

25 sufficient.

|Hearing
|14-cv-05060, May 3, 2016

```
 1              We still have a dispute.

 2              Do I think that most of these disputes would be

 3    worked out between the plaintiff and us?  Yes.  I do think

 4    that we can resolve most of them.  Some of them, I think that

 5    we will have an issue.  I think particularly the one that

 6    we'll have the most issue with is the way in which documents

 7    are produced.  I mean, we -- from my understanding, we

 8    produced documents en masse, described them and Bates-stamped

 9    and provided them.  Apparently, the plaintiff is not

10    satisfied that they weren't identified with specific

11    interrogatories and document requests.  That is not my

12    understanding of what our responsibility to do is when we

13    produce all of the documents to the plaintiff and identify in

14    each interrogatory that they are in response to that

15    interrogatory.  It's not our responsibility to specifically

16    identify every document that responds to every interrogatory.

17              So that's --

18              THE COURT:  Well, that's --

19              MR. SHAFRON:  We do have a dispute there.

20              THE COURT:  That's debatable.  And I think we

21    could -- and I would hope we could work that out.  But I do,

22    you know -- I do want to know you're producing all the

23    documents.  I --

24              MR. SHAFRON:  One of the main --

25              THE COURT:  I know 404(b) tells me that I'm not
```

1   supposed to take other bad acts or other, you know, problems

2   and assume that they're repeating themselves in a particular

3   case.  But I've had -- I've had other litigation with

4   Mr. Daibes, and I've had difficulty in getting responses

5   timely and getting full responses.  So for me, it is a little

6   bit of a history.  You were not the attorney in that --

7           MR. SHAFRON:  I was not, Your Honor.

8           THE COURT:  And I -- you know -- so I cast no

9   aspersions, but I'm -- you know, I'm in "fool me once, shame

10  on you, fool me twice, shame on me" mode at this point.

11          I -- you know, I'm distressed.  I don't know what

12  to do with, frankly, something like the -- the pages 4 to 6

13  of Mr. Corriston's letter, because it sounds like the

14  discovery responses are -- are so inadequate, I mean, I would

15  have to parse through them one after the other after the

16  other, and I'm really not interested in doing that right now.

17  I'm not in a position to do it, because I don't have the

18  requests and the responses in front of me.  But I loathe the

19  idea of having to do that down the road.

20          And I only mention my prior experiences because I

21  don't want -- I don't want to get involved in something like

22  that in this case.

23          MR. SHAFRON:  And I appreciate that, Your Honor.

24  And I don't want Your Honor to have to do that.  And I want

25  to make sure that our responses are responsive.

1    One of the concerns in the letter that I saw was

2  that there were documents that go back and forth with regard

3  to a DEP matter with my client and that the Borough learned

4  that that is going on and the documents weren't produced as

5  quickly as possible through us to the plaintiff.

6    Now -- now I am involved in that, and I can be -- I

7  can assure the Court and the plaintiff that I'm not

8  handling -- my firm is not handling the mat- -- any matters

9  with the DEP, so there's just a process what goes through

10  with their documents exchanged there, they have to be

11  produced to me from -- from the client to me to plaintiff.

12  And they will.  And on an ongoing basis, those documents will

13  be produced.  There is nothing -- there's no reason why they

14  wouldn't be, and they are going to be.  That -- that's

15  simply -- and past documents that were between the DEP and my

16  client have been produced.

17    THE COURT:  Well, the best thing -- because I

18  aim -- it's more important to me that the plaintiffs get all

19  of the relevant documents.  I would like -- if you could

20  categorize them to some extent.  But you know, again, I

21  rational -- I looked and I said, what do I do with -- with

22  this kind of a letter.  I'm concerned by it and it doesn't

23  portend well, you know, what we're -- what we're looking at

24  going down the road.

25    But I think I want to just address the different

 1   things one at a time that Mr. Corriston raised in his letter

 2   and tell you what I would -- what I would like or what I

 3   would expect.

 4          Now, the first thing Mr. Corriston raised and, you

 5   know, on page 4 is that you haven't provided a privilege log.

 6          Are we going to do that?  I think -- think they're

 7   entitled to it.

 8          MR. SHAFRON:  If -- if that's the case, Your Honor,

 9   and there are privileged documents that have been withheld,

10   then certainly a privilege log will be produced.

11          THE COURT:  And, you know, before I even go down

12   this list, I would note that the Alcoa defendants are joining

13   in on this kind of general issue that the discovery from the

14   Daibes defendants has been less than -- less than

15   spectacular.  Is that right?

16          MR. WALLER:  Yes, that's right.  Thank you,

17   Your Honor.

18          MR. SHAFRON:  And, Your Honor, and to the extent --

19   and the letter doesn't reflect this, as long as we're talking

20   about joining in, I just -- I listened to this back-and-forth

21   between the plaintiff and the Alcoa defendants about

22   discovery, and obviously, the issue of the past Alcoa

23   documents is central to our defense to this case and to the

24   motion that's pending now.  I mean the whole issue about

25   these undisclosed oil tanks that Alcoa did not disclose to us

1  at any time, did not disclose to us prior to closing, at the

2  closing, until the demolition, we have no discovery.

3          THE COURT:  Well -- that a little later in the

4  letter, I got it from Mr. Corriston.

5          MR. SHAFRON:  Oh.

6          THE COURT:  So we'll address that.

7          Go ahead.

8          MR. WALLER:  I think that's very disingenuous.

9  First of all, Your Honor, to raise that, because the issues

10  that counsel just raised about the oil tanks are in Borough

11  of Edgewater case.

12          UNIDENTIFIED SPEAKER:  -- different litigation.

13          MR. WALLER:  Different litigation entirely.  So I

14  really -- talk about trying to -- other things in this case,

15  I --

16          MR. SHAFRON:  Your Honor, I'm not sure I agree with

17  the --

18          THE COURT:  Well, let's --

19      (Simultaneous conversation)

20          MR. SHAFRON:  With the idea that they're not in

21  this case.  It's central to -- they just filed a motion,

22  premature motion, arguing that there are documents which

23  provide defense and indemnity which were based on sale

24  documents and -- and around the time of sale where they

25  failed to disclose substantial oil tanks that contaminated

 1   the property.  To argue now that it has nothing to do with

 2   this case when they just filed a motion seeking to enforce

 3   those agreements which were based on that fraudulent failure

 4   to represent this is -- that is disingenuous.

 5            THE COURT:  Well, let's -- Mr. Waller, we'll deal

 6   with this at the -- a little bit in the future.  All right?

 7   I want to get through the --

 8            MR. WALLER:  Thank you, Your Honor.

 9            THE COURT:  -- the Daibes responses first.

10            MR. WALLER:  As long as I have kind of a standing

11   objection.

12            THE COURT:  Okay.  All right.  So first thing,

13   Mr. Shafron, is we need to provide a privilege log.  All

14   right?

15            MR. SHAFRON:  Yes, Your Honor.

16            THE COURT:  Second thing that Mr. Corriston raises

17   in his letter that he outlined for you specific deficiencies

18   in a letter dated February 17th, 2016.  Have you formally

19   responded to that letter?

20            MR. SHAFRON:  Yes, we have, Your Honor.

21            THE COURT:  Okay.  Paragraph by paragraph, category

22   by category?

23            MR. SHAFRON:  Yes, Your Honor.  Most of the

24   responses to that -- those deficiency letters were that the

25   original responses were, in fact, responsive.  And so to the

1    extent that there are additional documents that they're

2    seeking, I -- we have to -- the only way to resolve that, I

3    suppose, is to meet and confer as to whether or not there are

4    any other documents.

5            But if -- when we go through the individual

6    responses that my prior firm Archer & Greiner responded to,

7    they -- there were many of those answers that they simply

8    didn't like the answer to the question.  I mean they -- they

9    were responded to fully by the defendant, and there was --

10   the deficiency letter pointed out that they just didn't

11   appreciate the way it was responded to.

12           So I -- to the extent that there aren't documents,

13   there aren't.  To the extent that we produced what we have,

14   that's the response.

15           I don't know how else those are going to be

16   responded to other than we're going to --

17           THE COURT:  No, I -- I don't either.  I mean, you

18   may find that -- you may be incredulous as to some responses

19   that, hey, we don't have any documents.  But if that's the

20   position they're going to take and they say they don't have

21   any documents, I don't know what -- what the response is from

22   my perspective.

23           And, Ms. Dory, go ahead.

24           MS. DORY:  Sorry, if I -- if I may just quickly try

25   to summarize this status for Your Honor and also the precise

 1    issue that's involved here.

 2         First of all, Mr. Shafron's suggestion that he

 3    responded to the deficiency letter, yes, he submitted letters

 4    to us and he did respond.  But as he said, he basically said

 5    that the prior responses were sufficient.

 6         We received, as you identified, no privilege log.

 7    We received documents, 85,000 pages of documents.

 8    Approximately 60- to 70,000 pages are data.  They're lab

 9    data.  They're not useful.

10         15,000 pages, something like that, a lot of it has

11    to do with this UST issue that Mr. Shafron has identified for

12    you.  There's not very many emails.  There's virtually no

13    notes.  There's no documents related to the issue in this

14    case that's critical, which is the PCB-contaminated concrete,

15    demolition of that concrete, specifically a building

16    identified as Building 12, when that was crushed, how it was

17    crushed, who -- who directed that to be crushed, and when the

18    material was taken to Veterans Field.  We have no documents

19    on that.

20         So if they don't have documents on that, then we'd

21    like them to admit that.

22         If they do have documents on that, we'd like to

23    have them.

24         THE COURT:  And that's -- and that's fair,

25    Mr. Shafron.  You need to say, you know, you either have them

1   and you produce them or you say you don't have them.  All

2   right.

3            MR. SHAFRON:  That -- that is fair.  My -- my

4   understanding is they were produced.  If they -- if there

5   aren't any further documents, then we'll make that

6   representation.

7            THE COURT:  All right.

8            MS. DORY:  So --

9            THE COURT:  Go ahead.

10           MS. DORY:  And just with respect to the document --

11  the responses to the document requests, we basically got the

12  same canned response for every single document request.  So I

13  don't know how the documents were produced.  We think they're

14  completely disorganized.  We think they're relying upon the

15  documents being produced in the order that they're kept.  I'd

16  like to know what the order is.  I'd like to make sure we've

17  identified all custodians that should produce records.  It

18  seems like only very few custodians have produced records.

19           THE COURT:  Yeah, I think that, Mr. Shafron,

20  they're entitled to have some guidance.  Whether I want to

21  have you go back and get all these documents and if there's

22  50 document requests categorize them into 50 separate, I

23  don't -- I don't know that I want to do that.  But I'm going

24  to, you know, direct that you meet and confer on this and at

25  least -- and that you have a representative that might be

1   able to help the -- the plaintiff's counsel and counsel for

2   Alcoa to understand, you know, what documents relate to what.

3   All right?

4           And if you're dissatisfied, the only thing I can

5   tell you, Ms. Dory, and I will be receptive to the notion

6   that if you -- if you don't get what you consider

7   satisfactory explanation as to what these documents relate

8   to, when you have depositions of people who ought to know,

9   I'll entertain an application that you want the depositions

10  to go longer than the typical 7 hours because you need that

11  time to figure out what these documents relate to.  All

12  right?

13          MS. DORY:  Okay.  Thank you, Your Honor.

14          THE COURT:  Mr. Shafron, do you follow?

15          MR. SHAFRON:  Yes, I do.

16          THE COURT:  Okay.

17          MS. DORY:  And then, Your Honor, if I might just

18  continue?

19          THE COURT:  Yes.

20          MS. DORY:  With respect to interrogatories, I guess

21  it goes back to the issue is the -- how the PCB-contaminated

22  concrete got to Veterans Field, how it was crushed.  If they

23  don't have the documents, we'd like them to respond to

24  interrogatories.  We asked very detailed interrogatories for

25  the same information.

1          We also had requests to admit which, frankly, their

2    responses were just nonresponsive.  There was certain

3    information that should be admitted, based upon their

4    answers -- based upon their answer in this case, seems like

5    the information should be admitted.  But there's a lot of

6    objections.  And the -- it's just avoiding the answers.

7          So there's also specific requests to admit that if

8    they can't get the answers to, we'd like to --

9    Your Honor's --

10         THE COURT:  Yeah, I'm sitting here and I have --

11   I'm in a difficult position only because I don't want to have

12   this exercise take us forever.

13         But I also, Mr. Shafron, don't want to reward you

14   by saying, hey, look, do it at deposition, and having, you

15   know, what con- -- what turns out to be insufficient

16   responses to written requests ignored and force them to do --

17         MR. SHAFRON:  And I agree, Your Honor.

18         THE COURT:  -- deserve responses.

19         MR. SHAFRON:  And I think -- and I agree with

20   Your Honor on the idea of to the extent that there may be

21   documents that are not sufficiently identified with

22   interrogatories, at that -- if we can't agree, that could be

23   something that could be worked out at deposition.

24         But I disagree on the request for admissions.  I do

25   believe that we've answered those requests for admissions.  I

1    mean, those weren't blanket denials or anything like that.   I

2    mean, we followed what we're required to do, and to the

3    extent that we're -- we have to admit something, we admitted

4    it.

5            Yeah, there are objections, but then we admit part

6    and deny other parts.   And this is a perfect example of what

7    I'm talking about is then the -- the deficiency letter says

8    we're not satisfied with the fact that you denied that.   I

9    mean, that's -- that's not a basis of an objection.   I mean,

10   we -- we say we admit this part and we deny these two parts,

11   and they think we should admit those parts.

12           I don't know what more has to be done with respect

13   to requests for admission.

14           THE COURT:   Well, Ms. Dory, I mean that's a fair

15   point.   If they're denying it, they're denying it.   If you're

16   incredulous, well, then you can test that in a deposition and

17   maybe get a different response or a waffly response from a --

18   I don't know.

19           But what were you going to say?

20           MS. DORY:   Well, I do think that there are about a

21   handful of requests to admit that they have not sufficiently

22   answered.   And if we could bring those to Your Honor's

23   attention to get them to actually admit or deny the response,

24   I think that would be helpful, especially, as we're starting

25   depositions in a few months.

1          THE COURT:  Well, have -- have that and meet and

2    confer and figure out if these are things that you can work

3    out.

4          But if -- you know, if it comes to it, let me know,

5    and we'll try to figure that out as quickly as we can.  All

6    right?

7          MS. DORY:  Thank you.

8          THE COURT:  Now another problem that

9    Mr. Corriston's letter raises is, Mr. Shafron, apparently the

10   production, at least as it has been conducted so far by your

11   clients has been a rolling production, we'll give you stuff

12   as we find it, and there's no end in sight.

13         I want to put a -- I want to put a time frame on

14   this.  I want to -- we'll have a point at which they know

15   they've got everything from you that is in your possession

16   that's revellent to this case.  When are we going to do that

17   by?  I can't -- I can't -- we can't all operate on this idea

18   that, well, I -- we're just going to kind of mosey through

19   our records, and we'll give you what we've got as it becomes

20   apparent.

21         MR. SHAFRON:  Your Honor, I'm open to suggestions.

22   I mean, we -- we're reviewing documents, and I -- and, again,

23   I'm sorry, I assumed properly or improperly, that the

24   documents that are responsive to these requests were reviewed

25   by my predecessor counsel and that they were produced what

1    was in their possession at the time that they responded to

2    requests.

3          To the extent -- I gave an example of documents

4    that are on a rolling basis, one of their major objections is

5    documents that are -- that are happening now and that we

6    produce them as we receive them.  But to the extent that

7    there are other documents that we -- that my clients are in

8    possession of, that I'm unaware of, that haven't been

9    produced, then I -- --

10         THE COURT:  Well, all you need to do is --

11         MR. SHAFRON:  -- we need a deadline, I suppose.

12         THE COURT:  -- tell your clients give me

13   everything, because I've got to give it to them.

14         MR. SHAFRON:  Correct.

15         THE COURT:  And if they withhold after that,

16   then --

17         MR. SHAFRON:  That's correct.  And did I --

18         THE COURT:  They do it at their own peril.

19         MR. SHAFRON:  And I'm under the impression that

20   when the 75,000 documents were produced in response to

21   initial discovery requests, that that was done.

22         Now, to the extent that there may be other

23   documents, yes, I agree that my clients have to take a

24   position that this is all the documents that are responsive

25   to these requests and have to do it relatively soon.

1           THE COURT:  So you would --

2           MR. SHAFRON:  I would appreciate prior to

3  beginning -- I'm sure plaintiff would appreciate prior to the

4  beginning of depositions.

5           So --

6           THE COURT:  When are the first depositions

7  scheduled for?

8           MS. DORY:  I don't believe we have anything

9  scheduled as of yet.  The end of the depositions, I believe,

10  is in October.

11           MR. SHAFRON:  So I would -- I would propose -- and

12  I think that some of these issues we may be able to resolve

13  when we meet and confer, particularly if there's handful of

14  requests for admissions that we may be able to agree on some

15  or most of them.

16           But as to documents, maybe we can outline what

17  those are so to the extent we're at the -- we're at the

18  beginning of May, maybe we -- the meet-and-confer process, I

19  meet and confer with my client, make sure there are no

20  additional documents and we have a final date, and maybe the

21  end of July for all documents to be produced, should be well

22  in advance of any depositions, and then we'll know for

23  sure --

24           THE COURT:  What do you think?

25           MS. DORY:  With all due respect to Mr. Shafron, I

     1  understand he was substituted in this case.  But this case

     2  has been going on for quite a few years, and I would feel

     3  more comfortable, perhaps, if we had a deadline sometime in

     4  mid-June.

     5          THE COURT:  Why don't we do the end of June?  All

     6  right?  And, look, I know you're going to meet and confer

     7  and -- but we just had a program last week, Practice in Front

     8  of Federal Magistrate Judges.  I went down to Monroeville,

     9  and we had -- and my topic was discovery and discovery

    10  motions and all that.  And I -- I said to the crowd, look,

    11  there are some cases, I don't get any discovery disputes, and

    12  in other cases I get -- 50 interrogatories and 20 document

    13  requests and -- and when I get that second situation, I know

    14  somebody isn't playing nice.  And I'm not going to make any

    15  judgments or -- or guesses or predictions at this point, but

    16  I would think, you know, if we have a meaningful

    17  meet-and-confer and everybody is dealing straight with

    18  everybody, you could work most of this stuff out.  And if I

    19  have a handful of things I have to deal with, fine.

    20          I'm going to be distressed if I hear that, you

    21  know, every interrogatory and every request for admission and

    22  every document request is disputed.

    23          I understand plaintiff's concern, and I have no

    24  doubt that, you know, your aggression with the initial

    25  discovery responses is justified.

 1          I would remind, though, that if they say we don't

 2   have it or if they say that's all there is, as -- even if it

 3   seems unbelievable, there's really not much I can do, if

 4   they're -- they -- they make that representation at their own

 5   peril.  Right?  And if they say we don't have any further

 6   documents and then something pops up later, we'll have to

 7   deal with that, and I -- and the district judge won't be

 8   particularly happy about important documents showing up or --

 9   or court representations being made late in the -- late in

10   the game.

11          But I just wanted you to know that it's -- it's not

12   going to be much help for you to come and say, well, they

13   said there's nothing here, but we really can't believe that.

14   Or they said there's -- you know, that they produced all the

15   documents, but there really ought to be more.

16          Again, they -- they -- Mr. -- Mr. Shafron's an

17   officer of the court.  He has to advise his clients that we

18   need everything, and we need to be as upfront as possible.

19   But if that's the ultimate -- if that's the ultimate

20   response, I don't know what I can do with that.  You know?  I

21   mean, except tell you, well, that's what they're saying.

22   That's their position and -- and they -- they've taken that

23   and they've got to live with it, and it may not work for them

24   in the long run.  All right?

25          MS. DORY:  Yes, Your Honor, thank you, and I'd just

1    like them to -- if that's the response, I'd like them to --

2              THE COURT:  Right, you'd like to have that response

3    and make sure, okay, now we've got everything we --

4              MS. DORY:  Right.  Right.

5              THE COURT:  -- I understand.

6              MS. DORY:  Yeah, and the privilege log --

7              THE COURT:  So we'll have the rolling production

8    over with by the end of June.  All right?  They've got to

9    have all your documents by then so that they can move forward

10   with depositions.

11             MR. SHAFRON:  Thank Your Honor.

12             THE COURT:  Now, one thing that Mr. Corriston's

13   letter raises, I don't know exactly that I'd do this right

14   now, but he said that, you know, there's -- there's no

15   organization to the production and everything's just kind of

16   been thrown on the plaintiff's laps, and I presume Alcoa's

17   laps as well.  And yet, you very much -- the Daibes

18   defendants have very much taken the position that they're --

19   they're very separate and apart.  You know, they're not

20   related to one another.

21             And I mean, if that's the case, have we taken an

22   effort to respond to these vis-à-vis each of the Daibes

23   defendants?  I mean, you have to -- it's one or the other.

24   They're either operating together and they're making a

25   production together, or if we're going to take the position

1   that they're hardly related at all and they're operating on

2   separate, you know, in separate spheres, and you know, you

3   can't tag what -- then you've got to kind of make production

4   on behalf of each of defendants, don't you?

5            MR. SHAFRON:  I -- I would agree --

6            THE COURT:  Do you follow what I'm -- what I'm

7   saying?

8            MR. SHAFRON:  I do, Your Honor.  And we did -- and

9   I understand the plaintiff's concern on this issue, because

10  we did respond individually to all of the discovery requests,

11  but many of the responses are the same.  So I understand the

12  plaintiff is saying, well, you made this document production,

13  and now they want to know, well, which entity actually

14  produced these documents, because they're all produced in

15  defense of the case and in response to requests by each

16  entity.

17           But I think what they really want to know is, well,

18  who had custody of these documents, which entity had custody

19  or something to that effect.

20           I think that's fair.  And I -- we have undertaken

21  to do that, and that clearly wasn't done.  I -- I think

22  that's -- I think that's a fair question on some of those

23  issues, which is which entity is producing that, and this

24  entity doesn't have any documents.  And to the extent there's

25  some entities we don't even believe belong in this case,

1   so -- or individuals who belong in this case, then the

2   plaintiffs are entitled to know that that -- that person

3   or -- or entity doesn't actually individually maintain any

4   documents, so that -- that's fair.  That's just going to

5   take -- to be frank with the Court, it's just going to take

6   some time for me to be able to make that distinction when the

7   documents have already been produced in that way to -- to the

8   plaintiff in prior productions before my involvement.

9            And I'm going to try to undertake to do that by --

10           THE COURT:  Just make an effort to do it.

11           But, Mr. Shafron, I appreciate that you're new to

12   the case.  I don't envy your -- your tasks ahead of you, but

13   you've taken the case, you're going to have a lot work that

14   you --

15           MR. SHAFRON:  That's true.

16           THE COURT:  -- you need to focus on, this and that.

17   And you need to focus on it now.

18           MR. SHAFRON:  And I've been doing that, Your Honor.

19   I don't want to make it seem like even though I came in in

20   February, I haven't been focused on this case.  I have.

21           But there -- on this particular issue and where

22   there's been -- by the way, I should add, there's been --

23   since I got on the case, there's been motions and all has

24   happened in basically March and April.

25           But -- but this issue is just specifically, I'm

1  acknowledging that I believe that the plaintiff is entitled

2  to some of that response, and on that issue, I -- I just --

3  that's an issue that needs a lot of attention on my part, and

4  I'll give it that attention now.

5        It's just -- it's just -- it's just going to be

6  difficult to do.  I have to sit down with each of those

7  entities.  I have to go through all the documents.  I have to

8  now parse them out and say, is this a document that was

9  maintained by this entity, was this maintained by this

10  entity.  That wasn't done, and I'm going to have to do that.

11        So that's just --

12        THE COURT:  When we talked about meet-and-confers

13  and -- again, it's with plaintiff and it's with the Alcoa

14  defendants, you're talking about both of them.  Right?

15        MR. SHAFRON:  Yes, Your Honor.

16        THE COURT:  Yes.

17        MS. DORY:  Mr. Shafron just brought up individuals,

18  and we'd just like to highlight that Mr. Daibes is a key

19  individual in this case, and we'd like to make sure that all

20  of his documents are produced.

21        THE COURT:  Understood?

22        MR. SHAFRON:  Understood, Your Honor.

23        THE COURT:  Okay.  Now, the next thing that

24  Mr. Corriston's letter says is that, you know, you gave

25  generalized responses to interrogatories.  I think we've

 1   talked about that already, haven't we?  Do we need to focus

 2   on those interrogatories and give specific responses -- maybe

 3   they're short responses.  Maybe you can make the case.  But

 4   they shouldn't be, you know, the subject of continuing review

 5   and discovery responses for a lot of these -- we need to get

 6   answers, and I think that they're entitled to that.  And I

 7   don't know much more without the interrogatories sitting in

 8   front of me and the answers, I don't know what else I can

 9   say, but certainly we'll make that subject to the

10   meet-and-confer as well.

11           And the next point in Mr. Corriston's letter, same

12   thing, that they think you're withholding documents.  And

13   they make a specific point in the letter of the kind of

14   documents that they would expect that you might have.  You

15   know, for example, the -- let's see.

16           MR. SHAFRON:  Well, I think, Your Honor, I

17   addressed one of key issues that they point out, which is

18   they would expect to receive documents that involve my

19   client's interaction with the EPA and -- I think it was the

20   EPA.

21           MR. CORRISTON:  It's both.  They're --

22           MR. SHAFRON:  -- the entity --

23           MR. CORRISTON:  -- the jurisdiction of the EPA and

24   the NJDEP.

25           MR. SHAFRON:  Right.  And -- and I can assure this

 1   Court and I can represent to this Court because I have

 2   investigated this, and there's no withholding of documents or

 3   intention to withhold documents on this issue.  They're

 4   just -- this is just a matter of someone else is producing

 5   those documents.  They have to be now given to me, I have to

 6   review them, and then I have to produce them.  That's all --

 7           THE COURT:  All right.

 8           MR. SHAFRON:  -- that's all that's involved here.

 9           THE COURT:  As long as we understand that.

10           Now, the other significant issue here, it's going

11   to be raised more by the Alcoa defendants, as I understand

12   than -- than the plaintiff, but I'm sure plaintiff is

13   interested as well, they have asked for financial documents

14   and have argued, you know, for purposes of possible veil

15   piercing and CERCLA liability, the financial documents are

16   relevant.

17           Are you prepared to produce those?

18           MR. SHAFRON:  No, Your Honor.  I don't -- I don't

19   think those documents are relevant at this time at all.  I

20   mean, talk about we're having a fishing expedition, they want

21   now in this part of the proceeding, they want full financial

22   information regarding individuals who were named --

23   improperly named in this case and now they want discovery?

24   That, we're not prepared to produce those documents,

25   Your Honor.

1          I mean, we're now producing the -- I mean, they're

2    looking for the -- a full financial documents for -- for

3    example, Fred Daibes.  I mean that's -- it's not appropriate

4    in this stage of litigation.  If at the end of the case,

5    they're looking to pierce the corporate veil and they're able

6    to do that, then those documents may become relevant.  But

7    they're not relevant at this stage.

8          THE COURT:  Mr. Waller?

9          MR. WALLER:  It's interesting before counsel

10   indicated that he thought individuals were improperly named

11   in this case.  Other counsel has indicated that Mr. Daibes is

12   the focal point.

13         Our position is that all of these separate little

14   companies that have been developed by Mr. Daibes are owned

15   and controlled by him.  They are his alter egos.  As we set

16   forth in the joint letter for -- for you, is that they are

17   relevant to establish liability now, and we will be asking

18   him questions about that during his deposition.  And it also

19   is very important for allocation of CERCLA liability, which

20   is something that we do need to establish through discovery.

21   So on those two points alone -- and I think the case law that

22   we cited talks about how relevant it is during the -- the

23   meat of the case, if you will, as opposed to at the very end,

24   when I guess we're all arguing about judgment, which at that

25   point, it's way too late.

1        If their position is no and Your Honor would

2  undertake it, we can certainly brief that issue for the

3  Court.

4        THE COURT:  I -- you anticipated what I -- I don't

5  really have much in the way of a substantive response from

6  Mr. Shafron, and I don't want to, you know, deny him that

7  opportunity.  So why don't --

8        MR. SHAFRON:  And, Your Honor, I should say when

9  I --

10        THE COURT:  Mm-hmm.

11        MR. SHAFRON:  -- with respect to the preparation of

12  this letter, I did prepare some response to all of these

13  arguments and submitted it to be submitted to this letter,

14  and I was told by the plaintiff that's not the intent of this

15  letter.  This letter is just to lay out the issues rather

16  than to respond to the issues, because I would have responded

17  to all of these in the letter, but I didn't -- that wasn't

18  the intent of the letter.

19        THE COURT:  Well, I think we've dealt with the

20  other -- with the issues up to this point to my satisfaction

21  and -- but on this issue, I think I'm going to ask you to

22  brief it and do it on the same schedule that we gave

23  Mr. Corriston for the amended complaint.  All right?

24        MR. WALLER:  Yes, Your Honor, if -- if I may

25  also -- we also submitted a deficiency letter as of

1    February 11th to the Waterside/Daibes parties and did not

2    receive a response.

3              There was a meet-and-confer with counsel,

4    Mr. Shafron wasn't there, it was the previous counsel, I

5    don't remember the date, but I do remember that we were going

6    to get a response to this and some additional documents by --

7    I want to say the end of March, is my recollection.  I'm

8    looking at Tim.  I thought he was on --

9        (Simultaneous conversation)

10             MALE SPEAKER:  March 30th maybe?

11             MR. WALLER:  But in the event we -- if there will

12   be a future meet-and-confer, I do think, though, we know what

13   counsel's position is with respect to the financial

14   information we're looking for.  We don't have his position

15   with respect to the other deficiency items we raised in our

16   February 11th letter.  So I would ask for a response to that

17   so that we can participate meaningfully in a meet-and-confer.

18   At least we'll have the framework of a --

19             THE COURT:  I think the --

20             MR. WALLER:  -- of a discussion.

21             THE COURT:  I think that's fair, don't you,

22   Mr. Shafron?

23             MR. SHAFRON:  Absolutely, Your Honor.  In fact,

24   I -- and I -- but I was unaware that there were deficiency

25   letters from Alcoa that were unresponded to.  So I -- to the

 1   extent that there are, absolutely they're entitled to a

 2   response.  And a --

 3              THE COURT:  But you --

 4              MR. SHAFRON:  -- and included in the

 5   meet-and-confer to respond to that.

 6              THE COURT:  Exactly.

 7              MR. WALLER:  And one -- I'm sorry, one more -- I'm

 8   sorry, Your Honor, we talked about on the same schedule as

 9   the motion to leave for amend [*sic*] that the Borough will

10   provide.  Is there a reply set out in that schedule?  I know

11   you talked about motions.

12              THE COURT:  Normally discovery responses -- or

13   discovery motions, I think the local rules don't contemplate

14   a reply.

15              MALE SPEAKER:  We don't need one for the --

16              MR. WALLER:  That's fine.  I just wanted to make

17   sure I --

18         (Simultaneous conversation)

19              THE COURT:  Yeah, I don't -- I don't think it's

20   necessary.  If you find that it's absolutely necessary, write

21   a letter and say, I'd like to do a quick reply, and we'll

22   consider that.

23              MR. WALLER:  Thank you, Your Honor.

24              MR. CORRISTON:  Judge, one other issue just -- I

25   know Mr. Shafron was nice enough to say he's going to gather

1   the DEP and EPA records.  Could we have some type of deadline

2   for that, because they may be critical to how we move forward

3   in discovery.  I don't care if this is 30 days or whatever,

4   but they clearly have this -- you know, this thing back to

5   October, right?

6            THE COURT:  Well, why don't we -- if we're going to

7   wait until June 30th for the other documents, why don't we

8   just put that date on it as well --

9            MR. CORRISTON:  Thank you.

10           THE COURT:  -- and I believe that will be the date

11  for all documents.

12           MR. SHAFRON:  To the -- yeah, and to the extent I

13  can get those documents early, I'll provide them, but I will

14  certainly endeavor to meet the June 30th deadline.

15           THE COURT:  Okay.

16           MS. DORY:  Your Honor, if we could include in that

17  date the deadline for the privilege log as well, that would

18  be helpful.

19           THE COURT:  Sure.  How soon do we think we can get

20  a privilege -- I guess a privilege log on the same date.

21  Does that make sense?

22           MR. SHAFRON:  Yes, yes, Your Honor.

23           MR. CORRISTON:  That's fine, Your Honor.

24           THE COURT:  All right.

25           Okay.  Now, it's mentioned that in this letter the

 1   Terms -- the Borough has not yet received defendant Terms'

 2   corrective document production.

 3            Is that still the case?

 4            MS. DORY:  No, Your Honor, we actually did receive

 5   it just a few days ago, so we're just reserving.  We haven't

 6   reviewed it all yet, so --

 7            THE COURT:  Okay.

 8            MS. DORY:  We don't have anything --

 9            MR. SHAFRON:  Your Honor, we'll work that out with

10   them.  We've been working together.

11            THE COURT:  Okay.  The only other thing is this

12   issue about the oil tanks.  And you want to know something,

13   Mr. Shafron and Mr. Waller?  I'm -- I'm a little concerned

14   about that too, that I hear that -- you know, Mr. Waller says

15   it has nothing to do with this case.  You feel it has

16   everything to do with this case.

17            Why don't we make that another issue for you to

18   address in the briefs that you're going to send to me.  All

19   right?  So I will be dealing with not only the financial

20   documents but the question of whether the Daibes defendants

21   are entitled to discovery with respect to those tanks.  All

22   right?

23            MR. SHAFRON:  On that issue, Your Honor, I would be

24   filing the initial brief on that.

25            THE COURT:  Yes.

1          MR. SHAFRON:  Okay.  Thank you.

2          THE COURT:  All right?

3          MR. WALLER:  We can certainly do that, Your Honor,

4    although I have to say, though, it's probably going to be

5    based very much on the contract terms.  In our 12(c) motion,

6    those contracts very specifically have a no additional

7    representations, no representations outside of the contract.

8    In fact, it's in bold face, all caps type.

9          And further, the reps and warranties talk about no

10   further warranties offered at the site other than what are in

11   those contracts.  And the parties agreed in those contracts,

12   there was two conveyancy [*sic*] documents, because there's two

13   separate parcels that were conveyed, in which the parties

14   agreed as to the known condition of the site.  Again, it

15   dates back to the 19-aught something.

16         THE COURT:  I understand, you feel strongly about

17   your argument.  But it sounds like Mr. Shafron feels very

18   strongly you ought to get this discovery, so I want to give

19   him a chance to explain --

20         MR. WALLER:  Understood.

21         THE COURT:  All right.

22         MR. CORRISTON:  And, Your Honor, I don't want to

23   keep rearguing this motion, which has just been filed, but I

24   mean this -- to argue that these documents are clear on their

25   face and then argue first of all, that they're ambiguous and

1    that need additional discovery for other purposes, but here

2    the -- the fact that to say that we agreed on what it is when

3    they knowingly, purposely withheld key information from us in

4    that -- in the time of the sale, that there are these major

5    underground storage tanks that they didn't report to the DEP?

6    They didn't report to anyone, and they certainly didn't

7    disclose to us.  To say that, well, we agreed on the known

8    condition and then now -- and that -- those tanks had PCB

9    material, oil in them and leaked and contaminated the

10   property, central to this case.  No discovery has been taken

11   on that issue to date.  And that's why we're going to seek

12   additional time to take -- to take discovery.

13           THE COURT:  Well, I'm going to --

14       (Simultaneous conversation)

15           THE COURT:  I'm going to give you chance to tell me

16   this in writing.

17           MR. CORRISTON:  And I hope that Judge Vasquez will

18   entertain oral argument on this motion to address these

19   issues.  I mean, these are the key issues on the motion, that

20   we don't have any discovery on this issue at all.  And to

21   argue that these are clear on their face, it couldn't be any

22   farther from clear when you're talking about what the

23   intention was that they know what the -- what the

24   environmental condition of the property is and they're

25   telling us what it is, and then find out that they're not

 1   telling us that these two major tanks are under -- under the

 2   building that we ultimately took down.  It's -- it's

 3   shocking, frankly.  To sit -- to stand and argue that the

 4   documents are clear on their face because representations

 5   were made that they're not making representations.

 6           THE COURT:  I -- yeah, I understand you both have

 7   positions.  And I'm giving you the opportunity to state those

 8   more formally in a brief.  I'm -- I'm not crazy about the

 9   fact that now I've got three briefs coming in a couple of

10   weeks, but that -- that will give you a chance to flesh this

11   out, much better than you can today on the fly and --

12           MR. CORRISTON:  I appreciate that, Your Honor,

13   thank you.

14           THE COURT:  And we'll consider it you know, in due

15   course.

16           MR. WALLER:  Your Honor, I hate to just leave you

17   with a misimpression left by the counsel for the Daibes

18   entities.  The fact of the matter is there was a very long --

19   period.  All of the documents that -- they had an opportunity

20   to investigate.  There was a long Amland litigation before

21   that.  Those documents were made available.  They had the

22   opportunity to do all that.  This is a sophisticated

23   developer who had done this before.  These are not babes in

24   the woods.  So, again, we think all of that --

25           (Simultaneous conversation)

1           MR. SHAFRON:  Okay, babes in the woods?  This is

2   Alcoa who's representing to us what the environmental

3   condition of the property is.

4           MR. WALLER:  That's not -- that's not correct.

5           MR. SHAFRON:  I mean that --

6       (Simultaneous conversation)

7           MR. SHAFRON:  It's incredible.

8           MR. WALLER:  Read the contracts again.

9       (Simultaneous conversation)

10          THE COURT:  I understand.  You keep going back and

11  forth, but it's really -- I'm going to wait to see what you

12  have to say in your briefs.

13          The only other thing in the letter that

14  Mr. Corriston sent to me is a paragraph where third-party

15  defendant County of Bergen respectfully submits that it will

16  ultimately establish its entitlement to full indemnity.  That

17  paragraph, I mean it's interesting, but it doesn't really

18  sound like you're asking for anything or -- or, you know,

19  seeking any kind of order from the Court.  You're just

20  advising us is that --

21          MR. PANSULLA:  I filed the motion of joinder, if

22  you recall, and you subsequently sent the notice that that

23  was done inappropriately.  I did -- quite frankly, I reacted

24  to other filings.  I thought, perhaps with the deadlines that

25  we had proposed to you that counsel had agree to, was going

1    to accept it.  I guess since that time, Judge, you've already

2    ruled that that's a nonissue, and I believe we raised it on

3    the telephone conference that we had.  And if Alcoa's

4    successful, I'll have that legal argument to argue with you.

5              THE COURT:  Okay.

6              The only other thing, since we have denied the

7    request to file the 12(c) motion, Ms. Dory, I think there's

8    still a motion on the docket, right, that you filed a couple

9    of days before I entered that April 14th order.  Is that

10   right?

11             MS. DORY:  Right.

12             THE COURT:  I think that will need to be

13   administratively terminated --

14             MS. DORY:  Yes.

15             THE COURT:  -- and obviously, you got the work

16   done, and if it needs to be supplemented after some

17   discovery, you can refile it.  That's certainly without

18   prejudice to refiling it down the road.  All right?

19             MS. DORY:  Yes --

20             THE COURT:  That concludes that letter.

21             Is there anything else that we need -- I mean I'm

22   told that the fact discovery -- I don't recall, but the fact

23   discovery deadline, Mr. Corriston, you recall as the end of

24   October?

25             MR. CORRISTON:  October 31st.

|Hearing
|14-cv-05060, May 3, 2016

```
 1              THE COURT:  So I don't -- I'm not inclined to
 2    tinker with that --
 3              MR. CORRISTON:  Yeah, that's fine.
 4              THE COURT:  I mean, maybe down the road, something
 5    will come up where we need to tinker with that, but I'll be
 6    in touch with you on a regular basis, and we can -- we can do
 7    that, if we need to.
 8              MR. CORRISTON:  Judge, so we did submit a case
 9    management order that we can resubmit and -- you know, to
10    modify it to address some of the issues Your Honor had
11    addressed today.
12              THE COURT:  Well, I have the one you submitted in
13    front of me.
14              MR. CORRISTON:  If you'd like, we can -- and you
15    know, we'll meet and confer with the other parties, so --
16    they have any questions.
17              THE COURT:  Let me just -- one second.  I want to
18    confer with my clerk.
19         (Pause in proceedings)
20              THE COURT:  All right.  You know -- you know,
21    that -- if you can meet and confer and put together an order
22    that reflects what we've talked about today and, you know,
23    sets these deadlines, that would be fine, Mr. Corriston.
24              MR. CORRISTON:  Thank you, Your Honor, we will be
25    happy to do it.
```

 1                THE COURT:  If I need to tinker with it and cross

 2  out a day or modify it a little bit, I will, but that -- that

 3  would be very much appreciated.

 4                Anything else that we need to talk about today,

 5  folks?

 6                MR. CORRISTON:  No, Your Honor, thank you for your

 7  time.

 8                THE COURT:  All right.  Thank you very much, folks.

 9  We'll be in touch, I'm sure.

10                (Conclusion of proceedings at 12:28 P.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|Hearing
|14-cv-05060, May 3, 2016
Certification

1                          Certification

2          I, SARA L. KERN, Transcriptionist, do hereby certify

3    that the 65 pages contained herein constitute a full, true,

4    and accurate transcript from the official electronic

5    recording of the proceedings had in the above-entitled

6    matter; that research was performed on the spelling of proper

7    names and utilizing the information provided, but that in

8    many cases the spellings were educated guesses; that the

9    transcript was prepared by me or under my direction and was

10   done to the best of my skill and ability.

11         I further certify that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14

15

16

17

18   s/ *Sara L. Kern*                    10th of May, 2016

19   Signature of Approved Transcriber              Date

20

21

     Sara L. Kern, CET**D-338
22   King Transcription Services
     3 South Corporate Drive, Suite 203
23   Riverdale, NJ  07457
     (973) 237-6080

24

25