UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**Not for Publication**

| | |
|---|---|
| BOROUGH OF EDGEWATER, | |
| *Plaintiff*, | |
| v. | Civil Action No. 14-5060 |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALCOA INC. (formerly known as "Aluminum Company of America"); ALCOA DOMESTIC LLC, as successor in interest to A.P. NEW JERSEY, INC.; JOHN DOES 1-100; and ABC CORPORATIONS 1-100, | **OPINION** |
| *Defendants*, | |
| and | |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; and FRED A. DAIBES, | |
| *Defendants/Third-Party Plaintiffs*, | |
| v. | |
| NEGLIA ENGINEERING ASSOCIATES, | |
| *Third-Party Defendant*, | |
| and | |
| ALCOA DOMESTIC LLC, as successor in interest to A.P. NEW JERSEY, INC., | |

> *Defendant/Third-Party Plaintiff,*
>
> v.
>
> COUNTY OF BERGEN and RIVER ROAD
> IMPROVEMENT PHASE II, INC.,
>
> *Third-Party Defendants.*

**John Michael Vazquez, U.S.D.J.**

This matter comes before the Court on Defendant/Third-Party Plaintiff Alcoa Domestic LLC's ("Alcoa") motion for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Defendant North River Mews Associates, LLC ("North River"), and Third-Party Defendant River Road Improvement Phase II, Inc. ("RRIP") (collectively "Defendants") oppose this motion.[1] The Court held oral argument on September 13, 2016 pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Civil Rule 78.1. D.E. 172 (Transcript of Oral Argument). The Court has considered all submissions as well as the parties' oral arguments. For the reasons stated below, the Court denies Alcoa's motion.

---

[1] Alcoa's Brief in support of its Motion will be referred to hereinafter as "Alcoa Br." (D.E. 110), Defendants' Opposition to Alcoa's brief will be referred to hereinafter as "Def. Opp'n" (D.E. 128), and Alcoa's Reply Brief in support of its Motion will be referred to hereinafter as "Alcoa R.Br." (D.E. 130).

## I.  **BACKGROUND**

### A.  **General Background**

In 2011, Plaintiff, the Borough of Edgewater ("Edgewater"), began the Veteran's Field Project (the "Project"), an endeavor to remedy the contamination of Veteran's Field in Edgewater, New Jersey.  SAC ¶¶ 19-22.[2]  In 2012, Defendant Waterside,[3] a New Jersey contractor, was awarded the contract for the Project.  *Id*. ¶ 29.  The contract required that "certified stone from a quarry or crushed virgin stone be used as fill in certain areas of the [s]ite."  *Id*. ¶ 28.  Waterside worked on Veteran's Field from the summer of 2012 through October 2013,[4] when the site was closed to assess contamination on the site from the fill used by Waterside.  *Id*. ¶¶ 30, 46.

Despite strict fill requirements for the Project, Plaintiff alleges that "Waterside had previously and continued to utilize [] suspect fill materials in the parking lot areas and throughout the fields on the site."  *Id*. ¶ 43.  Subsequent inspections revealed that fill materials throughout the site were contaminated and contained PCB-contaminated crushed concrete.[5]  *Id*. ¶¶ 44, 45.  After the contamination was identified, "Waterside admitted that the contaminated fill materials that it imported to the [s]ite came from the former Alcoa site."  *Id*. ¶ 54.  The "Alcoa Site" is contaminated

---

[2] "SAC" refers to Plaintiff's Second Amended Complaint. (D.E. 61).

[3] Defendant Waterside is one of a group of Defendants collectively referred to as the "Waterside Defendants."  These Defendants are all related companies that are owned and/or controlled by Fred A. Daibes, and consist of: Waterside Construction, LLC ("Waterside"); North River, 38 COAH Associates, LLC; Daibes Brothers, Inc.; Fred A. Daibes; and Third-Party Defendant RRIP. *Id*. ¶ 2; Alcoa Br. at 2 n.1.

[4] There was a brief break in Waterside's work during that period due to Superstorm Sandy.  *Id*. ¶ 33.

[5] Polychlorinated Biphenyls ("PCBs") are a type of chemical contaminant that are regulated by the New Jersey Department of Environmental Protection ("NJDEP") and were detected at Veteran's Field. *Id*. ¶¶ 18, 19.

property located at River Road, Edgewater, New Jersey, and is currently owned by 38 COAH. *Id.*
¶¶ 3, 54-55. In 1997, North River purchased the Alcoa Site from Alcoa.

On August 12, 2014, Edgewater filed the Complaint in the present action against North
River, RRIP, other Waterside Defendants, and Alcoa, among others, seeking remediation costs
under the Comprehensive Environmental Response, Compensation, and Liability Act
("CERCLA"); the New Jersey Spill Act; and the common law to clean up Veteran's Field. D.E.
1. Subsequently, Plaintiff filed its Second Amended Complaint ("SAC") on May 6, 2015. D.E.
61.[6] Thereafter, North River, RRIP, and the other Waterside Defendants asserted various cross-
claims against Alcoa for contribution and indemnification pursuant to CERCLA, the Spill Act, and
the common law. D.E. 24.

On November 21, 2014, Alcoa filed its cross-claim against North River seeking defense
costs and indemnification pursuant to three agreements: (1) the Purchase and Sale Agreement, (2)
the Multi-Party Agreement; and (3) the Environmental Indemnity Agreement.    D.E. 20.
Subsequently, on December 5, 2014, Alcoa filed a Third-Party Complaint against RRIP seeking
defense costs and indemnification pursuant to the Multi-Party and Environmental Indemnity
Agreements. D.E. 23.

---

[6] Plaintiff's SAC is comprised of nine counts: Count I – Contribution under the Spill Act (as to
Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, ALCOA, TERMS, ALCOA
DOMESTIC, John Does 1-100 and ABC Corporations 1-100); Count II – Cost Recovery Under
CERCLA (as to Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, ALCOA,
ALCOA DOMESTIC, TERMS, John Does 1-100 and ABC Corporations 1-100); Count III –
Breach of Contract (as to Waterside); Count IV – Fraud (as to Waterside and Fred Daibes), Count
V – Negligence (as to Waterside); Count VI – Unjust Enrichment (as to Waterside, ALCOA,
ALCOA DOMETIC and 38 COAH); Count VII – Violations of the New Jersey Consumer Fraud
Act (as to Waterside and Fred Daibes); Count VIII – Breach of Contract (as to TERMS); and Count
IX – Negligence (as to TERMS).

### B. The Three Agreements and the Parties' Positions

The Agreements

As noted, North River bought the Alcoa Site from Alcoa[7] in 1997.  Alcoa Br. at 4.  In conjunction with the sale of the property, Alcoa and North River entered into a Purchase and Sale Agreement in June 1997.  *Id.* Ex. 1 [hereinafter "Purchase and Sale"].  This purchase was part of a local government redevelopment plan to widen River Road in Edgewater and to revitalize the surrounding areas, including the Alcoa Site.  *Id.*

Also in June 1997, and pursuant to the redevelopment plan, North River, RRIP, and Alcoa entered into the Multi-Party Property Acquisition Agreement.  *Id.* Ex. 2 [hereinafter "Multi-Party Agreement"].  The Multi-Party Agreement assumed that all of the buildings on the Alcoa Site would be demolished.  *Id.* Ex. 2 at 7 ¶ 2 ("North River and RRIP agree that they will cause to be demolished and removed from the [Alcoa] property all structures and improvements currently existing on the property.").  Building 12 on the Alcoa Site, however, was not razed.  As a result, North River, Alcoa and RRIP entered into a March 13, 1999 Environmental Indemnity Agreement.  *Id.* Ex. 3 [hereinafter "Environmental Agreement"].  This agreement relieved Alcoa of its obligation for all claims related to Building 12, stating that:

> [t]o the extent that Building 12 is not demolished, North River and River Road shall indemnify, defend and hold [Alcoa] harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages, occurring at any time before, during or after North River's ownership of the property, relating to Building 12 and the land under and adjacent thereto, arising under Applicable Law (as defined in the Purchase Agreement), including but not limited to, remediation and disposal costs and expenses related to PCBs.

---

[7] Alcoa was not the named party in the three agreements.  Instead, the party was A.P. New Jersey, Inc.  Alcoa is a successor in interest to A.P.  For ease of reference, the Court refers to the selling party as Alcoa.

*Id.* Ex. 3, ¶ 1.  The parties represent that Building 12 has now been demolished.  Def. Opp'n at 3;

D.E. 172, Transcript of Oral Argument, at 50:14-18.[8]

   Of the three agreements, the Purchase and Sale is central to the present dispute.  Section

Five of the Purchase and Sale, titled "Warranties and Representations" provides that:

> **OTHER THAN THE REPRESENTATION AND WARRANTY
> SET FORTH IN THIS SECTION, [NORTH RIVER]
> SPECIFICALLY ACKNOWLEDGES THAT [ALCOA] IS
> SELLING AND [NORTH RIVER] IS PURCHASING THE
> PROPERTY ON AN "AS IS, WITH ALL FAULTS" BASIS
> AND THAT [NORTH RIVER] SHALL HAVE AN
> OPPORTUNITY TO INSPECT THE PROPERTY AND IS
> NOT RELYING ON ANY REPRESENTATIONS OR
> WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS
> OR IMPLIED, FROM [ALCOA], ITS AGENTS, OR
> REPRESENTATIONS AS TO ANY MATTERS
> CONCERNING THE PROPERTY, INCLUDING WITHOUT
> LIMITATION:**
>
> (iii) the existence, quality, nature, adequacy and physical condition
> of the property;
> …
> (vii) the presence or removal of hazardous or toxic materials,
> substances or wastes in, on, under, or about the Property or the
> adjoining or neighboring property

(emphasis in original) (hereinafter "as is clause").

   Additionally, Section Six provides for Alcoa to pay for certain remediation costs.  Section

6(a)(ii)(2) states that Alcoa "will be responsible for costs of disposal of material contaminated with

PCB's at concentrations greater than 50 ppm at approved TSCA landfills if those disposal costs

exceed $250,000 up to a maximum of $2,500,000."  Alcoa also promised to pay $9,500,00 in

demolition costs, with a total cap of $12,000,000 for both demolition and disposal costs.

---

[8] Alcoa initially argued in its brief that "Building 12 is not actually and fully demolished." *See*
Alcoa R.Br. at 10 n.3.  However, both parties acknowledged during oral argument that Building
12 had, in fact, been torn down. D.E. 172 at 50:14-18.

Section Seven of the Purchase and Sale is entitled "Environmental Conditions." This Section defines numerous terms and conditions relating to the environmental situation of the property. Section 7(a) defines "hazardous substances," which includes "any substance, chemical or waste that is listed or defined as hazardous, toxic, or dangerous under Applicable Law." Section 7(b) goes on to define the "Applicable Law" in the contract, which includes CERCLA as well as the Spill Act and numerous other environmental laws and regulations.

The contract then turns to environmental reports regarding the condition of the property. Section 7(c) requires that Alcoa make available to North River all environmental reports concerning the condition of the property (the "Environmental Reports"). The parties further agree that the Environmental Reports, along with any reports prepared by the North River, will make up the "known environmental condition" of the property. Section 7(d) provides that North River, "at its sole cost and expense, may conduct an environmental transfer assessment of the [p]roperty prior to closing."

Sections 7(f) and 7(g) concern indemnification and a release, which are at the heart of the current motion. Section 7(f) discusses the indemnification of Alcoa, the seller, by North River, the buyer, stating:

> Indemnification of Seller. Buyer shall indemnify, defend and hold Seller harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages, occurring on or after the Closing Date arising under Applicable Law related to Buyer's (or, during Buyer's ownership of the Property, any operators' or any third parties') use of the Property and/or any and all activities relating thereto.

Purchase and Sale, § 7(f).

Section 7(g) then sets forth the circumstances surrounding the release of Alcoa:

> Release of Seller. Except in the event that Seller remains in default on any payment obligation after receiving notice of such default and

7

> opportunity to cure as set forth in Section 8, Buyer expressly
> releases Seller and agrees to waive all rights that it may have to seek
> contribution from Seller for any response costs or claims that may
> arise as a result of the actions or inactions of Seller and any previous
> owner, operator or third party on or with respect to the property
> relating to Hazardous Substances. Nothing in this provision shall
> alter or expand the parties' rights or obligations under the Multi-
> Party Agreement.

Purchase and Sale, § 7(g).

As noted, Alcoa agreed to pay up to $2,500,000 in disposal costs. Sections 8(a) and 12 of

the Purchase and Sale are also relevant to the present matter. Section 8(a) addresses default by

Alcoa. It states that if Alcoa "fails to perform any of its obligations under this Agreement or the

Multi[-]Party Agreement, the same shall constitute a default of this Agreement and thereupon,

[North River], at its option, may declare a forfeiture by written notice to seller." Purchase and

Sale, § 8(a). The Section goes on to explain the notice requirements concerning Alcoa's default,

and states that "where the default is not capable of being remedied in forty-five (45) days, [North

River] may declare this Agreement null and void." *Id.*

Lastly, the contract contains an integration clause, which states that "[a]ll understandings

and agreements heretofore had between the parties, oral or written, are merged into this

Agreement, which alone fully and completely expresses their understanding." Purchase and Sale,

§ 16 [hereinafter the "integration clause"].

The Multi-Party Agreement also contains a hold harmless and duty to defend clause:

> It is understood and agreed that North River and RRIP shall defend
> and save the County[9] and [Alcoa] harmless from any and all claims
> that may be filed in any Court arising from the performance of this
> Agreement. In connection with the defense of any claim, the County
> and [Alcoa] shall be entitled to select their own counsel. The County
> and [Alcoa] shall fully cooperate in any such litigation provided,
> however, that neither the County nor [Alcoa] shall be under any

---

[9] The county referred to is Bergen County, in which Edgewater is located.

8

> obligation to expend any funds for any purpose whatsoever in connection with such litigation. Should the County or [Alcoa] be named as a party in any court, administrative or other action proceeding, North River and RRIP agree to reimburse the County and/or [Alcoa] (as applicable) for the cost of any legal, expert or other fees expended by the County and/or [Alcoa] in such action of proceeding.

Multi-Party Agreement, § 16. The Multi-Party Agreement also expressly refers to the Purchase and Sale between North River and Alcoa. Multi-Party Agreement, § 1.

<u>Parties' Arguments</u>

Alcoa argues that the Purchase and Sale unambiguously release it from all claims related to the sale of the Alcoa Site. Alcoa Br. at 3. Further, Alcoa contends that the agreements (the Purchase and Sale as well as the Multi-Party Agreement) require North River and RRIP to fund Alcoa's defense of the present claims. *Id.* Therefore, Alcoa asks the Court to enforce the terms of the agreements by: "(1) dismissing the North River cross-claims asserted against Alcoa; (2) requiring North River and RRIP to reimburse Alcoa for all legal costs that Alcoa has incurred to defend itself in this lawsuit, plus interest; (3) requiring North River and RRIP to pay Alcoa's future defense costs in full on a current basis; and (4) requiring North River and RRIP to indemnify Alcoa for any judgment entered against it." *Id.* at 16-17.

Defendants, in response, argue that Alcoa "fraudulently induced North River and RRIP[10] to enter into the alleged contract by intentionally concealing a known environmental hazard." Def. Opp'n at 1. Further, Defendants argue that even if the agreements were valid when entered, Alcoa has not performed pursuant to the agreements and therefore its claim must fail. *Id.* Lastly, Defendants allege that "the contracts that Alcoa claims provide for release and indemnity are

---

[10] The Court notes that RRIP is a party to the Multi-Party Agreement but not to the Purchase and Sale.

inapplicable in this matter." *Id*. Defendants assert that "the validity of the contracts between Alcoa and Defendants is a factual question and therefore inappropriate for resolution of a Fed.R.Civ.P. 12(c) motion for judgment on the pleadings." *Id*.

## II. <u>STANDARD OF REVIEW</u>

Federal Rule of Civil Procedure 12(c) provides: "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." A motion for judgment on the pleadings is reviewed pursuant to the same standard as a motion to dismiss. *Wyndham Constr., LLC v. Columbia Cas. Ins. Co.*, No. 15-7667, 2016 WL 5329585, at *2 (D.N.J. Sept. 21, 2016). Thus, under Rule 12(c), "a court must take all allegations in the relevant pleading as true, viewed in the light most favorable to the non-moving party." *N.J. Physicians United Reciprocal Exch. v. Boynton & Boynton, Inc.*, 141 F. Supp. 3d 298, 302 (D.N.J. 2015). However, the Court is not required to accept "unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations." *Allah v. Brown*, 351 F. Supp. 2d 278, 280 (D.N.J. 2004).

The motion should not be granted "unless the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgement as a matter of law." *Perez v. Griffin*, 304 Fed. Appx. 72, 74 (3d Cir. 2008) (internal quotation marks omitted). In deciding a Rule 12(c) motion, courts may consider the allegations in the pleadings as well as "exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents." *Syndicate 1245 at Lloyd's v. Walnut Advisory Corp.*, 721 F. Supp. 2d 307, 314 (D.N.J. 2010). As a result, in this matter, the Court has not only considered the pleadings but also the three relevant agreements.

## III. <u>ANALYSIS</u>

### A. **Contractual Provisions**

"The principal goal of contract interpretation is to 'ascertain and effectuate the objectively manifested intentions of the contracting parties.'" *Heffron v. Adamar of N.J., Inc.*, 270 F. Supp. 2d 562, 570 (D.N.J. 2003) (quoting *Pacitti v. Macy's,* 193 F.3d 766, 773 (3d Cir. 1999)). In determining the "objective intent" of the parties, the first step is to determine "whether the relevant terms and provisions of the contract are clear or ambiguous." *Id.* The determination of whether a contract or a specific term therein is clear or ambiguous is a question of law for the court to decide. *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.*, 726 F. Supp. 525, 531 (D.N.J. 1989). An ambiguity exists if a contract is "susceptible to two reasonably alternative interpretations." *Id.* Generally, the interpretation of ambiguous contract terms is a question of fact. *Id.* In determining the objective intent of the parties, "the terms of the contract must be given their plain and ordinary meaning." *Kaufman v. Provident Life & Cas. Ins. Co.*, 828 F. Supp. 275, 283 (D.N.J. 1992), *aff'd*, 993 F.2d 877 (3d Cir. 1993) (internal quotation marks omitted).

Alcoa argues that the terms of the Purchase and Sale unambiguously release Alcoa from any claims arising under CERLA, the Spill Act, or any other state law predicated on contamination at the Alcoa Site. Alcoa Br. at 11-12. Additionally, Alcoa cites to Section 7(g), which requires North River and RRIP to "indemnify, defend and hold Seller harmless from any and all claims" arising under environmental law, including those at issue here. *Id.* at 13. Alcoa similarly asserts that the Multi-Party Agreement is unambiguous and requires both North River and RRIP to defend Alcoa. Alcoa Br. at 13-14. Thus, Alcoa argues that the contracts are unambiguous and require a dismissal of all claims asserted against Alcoa by Defendants, and further requires that Defendants pay for Alcoa's defense costs and indemnify Alcoa against any judgment. *Id.* at 17.

In the Court's view, the plain terms of the Purchase and Sale do not seem as clear and unambiguous as Alcoa suggests. Alcoa is correct that Section 7(f) addresses indemnification and apparently supports its position. However, the clarity of the provision is clouded by related provisions in the Purchase and Sale. Section 6(2) saddles Alcoa with the financial responsibility, up to 2.5 million dollars, for the costs of disposing of contaminated material. Purchase and Sale, § 6(a)(ii)(2). North River submits that Alcoa is in violation of this provision. Alcoa admits that it has not made this payment but argues that it is not in default because North River never requested it nor notified Alcoa of default. Section 7(g) then addresses North River's release of Alcoa, stating:

> [e]xcept in the event that [Alcoa] remains in default on any payment obligation after receiving notice of such default and opportunity to cure as set forth in Section 8, [North River] expressly releases [Alcoa] and agrees to waive all rights that it may have to seek contribution from [Alcoa] for any response costs or claims that may arise as a result of the actions or inactions of [Alcoa] and any previous owner, operator or third party on or with respect to the property relating to Hazardous Substances.

*Id.* § 7(g) (emphasis added). Therefore, it appears that Section 7(g) only applies when Alcoa is *not* in default. In other words, a reasonable reading of the provision could be that if Alcoa is in default, North River may seek contribution from Alcoa. This provision seems to be at odds with the indemnification provision, which is addressed in the paragraph, Section 7(f), immediately preceding Section 7(g).[11]

---

[11] As a result, the Purchase and Sale may be ambiguous due to the apparent conflict of these two sections. The Court is not, however, reaching the issue because the question of Alcoa's default must first be resolved. Similarly, the Purchase and Sale and the Multi-Party Agreement, when read together, raise a potential ambiguity. On the one hand, North River may be permitted to seek contribution from Alcoa pursuant to the Purchase and Sale (if Alcoa is in default of the contract). On the other, North River and RRIP may nevertheless have a duty to defend Alcoa pursuant to the Multi-Party Agreement. Again, the Court is not reaching this issue until the inquiry concerning Alcoa's default under the Purchase and Sale is decided.

The threshold question is, thus, whether or not Alcoa is in default of its payment obligations. As noted, North River maintains that Alcoa failed to make its required disposal payments under the contract and is therefore in default. Def. Opp'n at 15-16. In its brief, Alcoa did not directly contest this, but responded that it is not in default because "once the parties entered into the Environmental Indemnity Agreement, any obligations that Alcoa may have had concerning remediation in the Multi-Party Agreement ceased." Alcoa R.Br. at 9. Additionally, at oral argument, Alcoa indicated that it was not in default because it was never asked for money nor notified of any default, as required by the Purchase and Sale. *See* D.E. 172, Transcript of Oral Argument, at 58:6 to 60:5.

As to Alcoa's first argument, the Court cannot discern any language in the Environmental Indemnity Agreement to support a finding that the indemnity agreement completely extinguished Alcoa's prior obligations, under either the Purchase and Sale or the Multi-Party Agreement. The Environmental Indemnity Agreement concerned a discrete part of the Alcoa Site, Building 12, and only to the extent the building was "not demolished" as originally contemplated by the parties. Since Building 12 has actually been demolished, the Environmental Indemnity Agreement no longer appears relevant and the Purchase and Sale as well as the Multi-Party Agreement remain in full force and effect.

The information as to whether Alcoa was, or is, in default comes solely from the parties' oral and written representations to the Court. Alcoa R.Br. at 9; Def. Opp'n at 15-16. There has been no discovery on the issue. The Court cannot divine from the pleadings, the three agreements,

or from the parties' representations whether Alcoa was or is in default. Therefore, the motion is denied and the parties are permitted to take discovery as to Alcoa's alleged default.[12]

## B. Fraud

Defendants allege that "Alcoa fraudulently induced North River and RRIP to enter into the alleged contracts by intentionally concealing a known environmental hazard." Def. Opp'n at 1. In this regard, Defendants refer to the Purchase and Sale Agreement, to which RRIP is not a party. Alcoa provided North River with environmental reports that purported to establish "the known environmental condition of the property." *Id.* at 2. These reports indicated that there were five underground storage tanks (USTs) on the Alcoa Site, which were removed from the property prior to its sale. *Id.* North River later discovered two additional USTs underneath Building 12. *Id.* Defendants allege that "[t]he [two additional] USTs were buried in a subterranean vault beneath two floor slabs of concrete with the second, newer floor slab constructed in a way to conceal the access man-ways for the USTs, thereby effectively hiding any indication of the existence of the USTs." *Id.* at 3. Thus, Defendants argue that in failing to disclose the two additional USTs, "Alcoa perpetuated a fraud on Defendants and fraudulently induced Defendants to purchase the property." *Id.* at 10.

"In order to establish a claim for fraudulent inducement, five elements must be shown: '(1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party;

---

[12] The Court notes that the issue concerning Alcoa's alleged default may ultimately involve a genuine issue of material fact, depending upon the proof, in which case the Court will rule as to how the ultimate resolution of the default issue should be presented to the trier-of-fact. On the other hand, depending upon discovery, the issue of default may be a legal question or present no genuine issue of material fact, in which case the Court will rule upon it before turning to the questions of indemnification, contribution, and duty to defend pursuant to the Purchase and Sale as well as the Multi-Party Agreement.

(5) to his detriment.'" *RNC Sys., Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012) (quoting *Metex Mfg. Corp. v. Manson,* No. 05–2948, 2008 WL 877870, at \*4 (D.N.J. Mar. 28, 2008)).  In New Jersey, a party can bring a claim for fraud in the inducement as an equitable remedy that results in rescission of a contract. *TekDoc Servs., LLC v. 3i-Infotech Inc.*, No. 09-6573, 2013 WL 2182565, at \*21 n.18 (D.N.J. May 20, 2013).

Alcoa challenges Defendants' fraudulent inducement allegation on two grounds: (1) the affirmative defense of fraud is insufficiently pled; and (2) the fraud claim is barred by the terms of the Purchase and Sale. Alcoa R.Br. at 2-8.

As to the sufficiency of the pleading, Alcoa indicates that the fraud claim is not properly pled and cannot be considered by the Court. *Id.* at 6-8. Defendants' affirmative defense of fraud states that Alcoa's "[c]ross-claims are barred or subject to reduction by Alcoa's misrepresentations and/or fraud in the inducement of contract." Def. Opp'n, Ex. K (Defendants' Answer to Alcoa's Cross-claims). At oral argument Defendants argued that since they asserted fraud as an affirmative defense to Alcoa's cross-claims, they only need to meet the notice standard of pleading rather than the *Iqbal/Twombly* plausibility standard.[13] D.E. 172 at 69:17-23. Additionally, Defendants point out that Alcoa did not make a Rule 12(f) motion to strike the affirmative defense as an insufficient pleading. *Id.* at 69:10-16.

Courts in this District have generally found the *Iqbal/Twombly* plausibility standard inapplicable to the pleading of affirmative defenses under Rule 8(c). *See Newborn Bros., Co., Inc. v. Albion Eng'g Co.*, 299 F.R.D. 90, 97 (D.N.J. 2014) ("This Court joins those courts in the District of New Jersey and other district courts within the Third Circuit which have held that the heightened *Twombly/Iqbal* standard is not applicable to the pleading of affirmative defenses under Rule

---

[13] *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

8(c)."). Instead, affirmative defenses are insufficiently pled only where "the defense could not possibly prevent recovery under any pleaded or inferable set of facts." *Id*. at *7.

In *F.T.C. v. Hope New Modifications, LLC*, Chief Judge Simandle concluded that "the pleading standards of *Twombly* and *Iqbal* do not apply to affirmative defenses under Rule 8(c)." No. 09-1204, 2011 WL 883202, at *4 (D.N.J. Mar. 10, 2011). There, the court discussed the persuasive textual analysis of Rule 8(c), which requires a plaintiff to "show" he is entitled to relief, while merely requiring parties asserting an affirmative defense to "state" that defense. *Id*. at *2. Additionally, Chief Judge Simandle addressed the rationale behind adopting a lower pleading standard for affirmative defenses than for other pleadings, stating that "the concern for notice to plaintiffs [is] of a lesser concern" when pleading affirmative defenses. *Id*. at *3. This rationale, combined with the "persuasive textual analysis," was sufficient to place Rule 8(c) outside the ambit of *Twombly* and *Iqbal*. *Id*.

Yet, even when cases determine that affirmative defenses in general are not subject to the plausibility requirement, courts have indicated that they are nevertheless subject to Rule 9(b) requirements when asserting fraud. *See e.g., Tyco Fire Prod. LP v. Victaulic Co.*, 777 F. Supp. 2d 893, 905 n.7 (E.D. Pa. 2011) (finding allegations of fraud subject to Rule 9(b)'s particularized pleading standard whether they are pled in the Complaint or through an affirmative defense.).

The Court does not reach the *Iqbal/Twombly* or Rule 9(b) issue in this matter for a simple reason: Alcoa has not moved to strike Defendants' affirmative defense pursuant to Rule 12(f). Instead, Alcoa mentioned the alleged faulty pleading in response to Defendants' arguments. Thus, at this stage, Defendants' affirmative defense of fraud remains in the case.

Next, Alcoa argues that when Defendants signed the Purchase and Sale, they agreed to take the property on an **"AS IS, WITH ALL FAULTS' BASIS."** Alcoa R.Br. at 2-3 (emphasis in

original).  The Purchase and Sale goes on to state that the North River "is not relying on any representations or warranties of any kind whatsoever, express or implied, from [Alcoa], its agents, or representative as to any matters concerning the property."  *Id*.  Additionally, the integration clause provides that "[a]ll understandings and agreements heretofore had between the parties, oral or written are merged into this Agreement, which alone fully and completely expresses their understanding."  *Id*.  Since the Purchase and Sale establishes that North River purchased the property "as is," the integration clause waived all warranties, and North River had an opportunity to conduct its own due diligence, Alcoa concludes that "North River's would-be fraud claims are plainly barred by the Purchase and Sale Agreement."  *Id*. at 5.

An "as is" clause can bar a claim for breach of contract. *Allied Corp. v. Frola*, 730 F. Supp. 626, 630 (D.N.J. 1990).  However, such a clause does not necessarily extinguish all tort, as opposed to contract, claims.  *Id*.  Here, Defendants have alleged fraud in the inducement, which can potentially exist even if the "as is" clause bars contract actions.

Elements three and four of fraud in the inducement turn on the issue of reliance. *See Walid v. Yolanda for Irene Couture, Inc.*, 425 N.J. Super 171, 180 (App. Div. 2012).  Thus, what constitutes reasonable reliance "is a critical element of plaintiff's cause of action."  *Id*.  The determination of reliance often turns on whether a buyer *justifiably* relied on a seller's information. *Id*. at 181 (quoting The Restatement (Second) of Torts § 537 (1977) (emphasis added)).  When a contract contains an "as is" or "no representation" clause, the language does not create an absolute defense to reliance on the part of the seller. *Id*. at 185. This is especially true where the "allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge." *Id*. at 186 (internal quotation marks omitted).  In such cases, even a specific disclaimer "will not undermine

another party's allegation of reasonable reliance on the misrepresentation." *Id.* (internal quotation marks omitted).

Nevertheless, even if a fraud in the inducement claim survives the "as is" clause argument, there are additional hurdles that can still bar the claim. Two such hurdles are (1) the economic loss doctrine; and (2) an integration clause. The Court will address each issue in turn.

"The economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract." *Chen v. HD Dimension Corp.*, No. 10-863, 2010 WL 4721514, at *8 (D.N.J. Nov. 15, 2010). Thus, "whether a tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties." *Id.* A party may bring claims based on fraud in the inducement, as long as the "underlying allegations involve misrepresentations unrelated to the performance of the contract," such as those that "precede the actual commencement of the agreement." *Id.*; *see also RNC Sys., Inc.*, 861 F. Supp. 2d at 452 (finding the alleged misrepresentations to directly relate to plaintiff's performance under the contract and, as a result, that the fraud claim was barred by the economic loss doctrine).

Here, the economic loss doctrine does not appear applicable since Defendants are alleging that the fraudulent omission on which they relied was the failure of Alcoa to disclose the two additional USTs. According to Defendants, the material omission preceded the entry of the Purchase and Sale Agreement. Moreover, Defendants indicate that as a result of the fraudulent inducement, they are seeking rescission of the contract rather than attempting to recover damages coextensive with a breach of contract claim. *See* D.E. 172, Transcript of Oral Argument, at 103:01-20. Therefore, the economic loss doctrine, which applies only when a party is seeking to recover purely economic losses that would be covered in a breach of contract action, is not presently

18

applicable. Central to this finding is Defendants' representation that they are only seeking rescission of the Purchase and Sale.

Another potential hurdle to permitting the fraud claim to proceed is the integration clause contained in the Purchase and Sale. "In general, where a contract contains an integration clause, the parol evidence rule bars the introduction of evidence of extrinsic negotiations or agreements to supplement or vary its terms." *CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, No. 15-3103, 2016 WL 1718100, at *3 (D.N.J. Apr. 29, 2016). An exception exists for fraud in the inducement of the contract itself, however, but "[t]he alleged fraud [] must concern a matter not addressed in the agreement." *Id.* When the alleged fraudulent misrepresentations concern terms of the contract, "the claim becomes one for breach of contract, not fraudulent inducement." *Id.* In such cases, the integration clause bars the fraud claim. *See RNC Sys., Inc.*, 861 F. Supp. 2d at 455 (finding the fraudulent inducement claim to concern matters "expressly addressed in the integrated writing" and therefore holding the misrepresentations inadmissible under the integration clause and the parol evidence rule). However, when the underlying claims are extrinsic to the contract and can support a claim of fraudulent inducement, an integration clause does not act to bar those counts. *See CDK Glob., LLC*, 2016 WL 1718100, at *4 (finding that the allegations supported a claim for fraudulent inducement and therefore were not barred by the integration clause).

The Purchase and Sale contains an integration clause which states that "[a]ll understandings and agreements heretofore had between the parties, oral or written, are merged into this Agreement, which alone fully and completely expresses their understanding." Purchase and Sale, § 16. This clause is not as extensive as those in other cases in which integration clauses barred claims for fraud in the inducement. *See e.g.*, *RNC Sys., Inc.*, 861 F. Supp. 2d at 454-55 (integration clause superseding "all prior or simultaneous ***representations***, discussions,

negotiations, letters, proposals, agreements and understandings between the Parties" barred evidence of prior misrepresentations) (emphasis added); *Blanos v. Penn Mut. Life Ins. Co.*, No. 09-5174, 2010 WL 143670, at *6 (D.N.J. Jan. 12, 2010) (finding an integration clause to bar a fraud claim where it stated that it "supersede[d] and replace[d] all prior negotiations, proposed agreements and agreements, written or oral," and explicitly provided that neither party had "made any promise, ***representation*** or warranty whatsoever, express or implied, not contained" in the contract.) (emphasis added).  The integration clauses in those matters are broader than the one in the current case because they account for representations prior to the contract.

The Court will not decide the issue concerning the viability of the fraudulent inducement claim, as potentially barred by the integration provision, at this juncture.  Although Alcoa briefly cited to the integration clause in its brief, its argument relied largely on the "as is" clause in the Purchase and Sale.  As noted, the "as is" clause is not an absolute defense under the law.  Since the Court is denying Alcoa's motion in light of the contractual language concerning default and the consequences flowing therefrom, it will not reach the fraud in the inducement question vis-à-vis the integration clause.  To be clear, the Court has not made any determination as to whether the integration clause will bar a fraud in the inducement claim.  Moreover, the Court is not foreclosing either party from, in the future, making any arguments concerning the validity or futility of the fraud in the inducement claim.

IV.     **CONCLUSION**

The Court finds that Alcoa's motion for partial judgment on the pleadings is **DENIED**. An appropriate order accompanies this opinion.

**Date:** December 14, 2016

_____
JOHN MICHAEL VAZQUEZ
UNITED STATES DISTRICT JUDGE