```
                     UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY

BOROUGH OF EDGEWATER,                 .
                                      .
        Plaintiff,                    .
                                      . Case No. 14-cv-05060
vs.                                   .
                                      . Newark, New Jersey
WATERSIDE CONSTRUCTION, LLC,          . February 17, 2017
et al.,                               .
                                      .
        Defendants.                   .



                      TRANSCRIPT OF HEARING
             BEFORE THE HONORABLE JAMES B. CLARK, III
                  UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiff:      TIMOTHY E. CORRISTON, ESQ.
                        Connell Foley, LLP
                        85 Livingston Avenue
                        Roseland, NJ 07068-1765
                        (973) 535-0500
                        tcorriston@connellfoley.com

                        NICOLE BIANCA DORY, ESQ.
                        Connell Foley LLP
                        85 Livingston Avenue
                        Roseland, NJ 07068
                        (973) 535-0500
                        ndory@connellfoley.com



Audio Operator:

Transcription Service:  KING TRANSCRIPTION SERVICES
                        3 South Corporate Drive, Suite 203
                        Riverdale, NJ  07457
                        (973) 237-6080


Proceedings recorded by electronic sound recording (not all
parties were discernible on the record); transcript produced
by transcription service.
```

```
 1   (APPEARANCES continued)

 2
     For the Defendants        JASON T. SHAFRON, ESQ.
 3   Waterside                 Shafron Law Group, LLC
     Construction, 38          2 University Plaza, Suite 400
 4   COAH LLC, Daibes          Hackensack, NJ 07601
     Brothers Inc., and        (201) 343-7200
 5   North River Mews,         jshafron@shafronlaw.com
     and Fred Daibes:
 6                             ZACHARY BERNSTEIN, ESQ.
                               Shafron Law Group, LLC
 7                             2 University Plaza, Suite 400
                               Hackensack, NJ 07601
 8                             (201) 343-7200
                               Zbernstein@shafronlaw.com
 9

10   For the Alcoa            MICHAEL E. WALLER, ESQ.
     Defendants:              K&L Gates LLP
11                            One Newark Center, 10th Floor
                              Newark, NJ 07102
12                            (973) 848-4000
                              michael.waller@klgates.com
13
                              DANA B. PARKER, ESQ.
14                            K&L Gates LLP
                              One Newark Center, 10th Floor
15                            Newark, NJ 07102
                              (973) 848-4091
16                            dana.parker@klgates.com

17
     For the Defendant        DAVID R. PIERCE, ESQ.
18   Terms Environmental      Lindabury, McCormick & Estabrook, PC
     Services, Inc.:          53 Cardinal Drive
19                            PO Box 2369
                              Westfield, NJ 07091-2369
20                            (908) 233-6800
                              dpierce@lindabury.com
21
22   For the Third-Party      ROBERT PANSULLA, ESQ.
     Defendant County of      Finazzo Cossolini O'Leary Meola &
23   Bergen:                  Hager
                              67 East Park Place, Suite 901
24                            Morristown, NJ 07960
                              (973) 343-4960
25                            robert.pansulla@finazzolaw.com
```

1              (Commencement of proceedings at 3:09 P.M.)

2

3              THE COURT:  We are on the record in Borough of

4   Edgewater versus Waterside Construction LLC, et al.  That's

5   Docket Entry -- Civil Action Number 14-5060 (JMV).  It is

6   about 8 minutes after 3 in the noon on February 17th, 2017.

7              I guess starting with the plaintiffs, can we enter

8   our appearances.

9              MR. CORRISTON:  Yes, Your Honor, good afternoon.

10  Timothy Corriston from Connell Foley for the plaintiff

11  Edgewater, Borough of Edgewater.

12             MS. DORY:  Nicole Dory, Connell Foley also for the

13  Borough.

14             THE COURT:  Good afternoon.

15             MS. PARKER:  Dana Parker, K&L Gates, on behalf of

16  Alcoa Domestic and Alcoa Corp.

17             MR. WALLER:  Michael Waller of K&L Gates for Alcoa

18  and Alcoa Domestic.

19             MR. BERNSTEIN:  Zachary Bernstein with Shafron Law

20  Group for the Waterside defendants, Waterside Construction,

21  38 COAH LLC, Daibes Brothers Inc., North River Mews

22  Associates, LLC, Fred Daibes, and third-party River Road --

23             MR. SHAFRON:  Good afternoon, Your Honor, Jason

24  Shafron from Shafron Law Group also for the Waterside

25  defendants.

1           MR. PIERCE:  Good afternoon, Your Honor, David

2    Pierce, Lindabury, McCormick, Estabrook & Cooper representing

3    defendant Terms Environmental Services Inc.

4           MR. OLIVER:  Good afternoon, Your Honor, Peter

5    Oliver from Hoagland Longo representing third-party defendant

6    Neglia Engineering Associates.

7           MR. PANSULLA:  Good afternoon, Judge, Robert

8    Pansulla, Finazzo Cossolini O'Leary Meola & Hager for the

9    third-party defendant County of Bergen.

10           THE COURT:  Okay.  Good afternoon to all of you.

11           Look, I start out with an observation.  Since the

12    middle of January, I have 10 letters in this case.  I -- if I

13    were to get 10 letters in all 600 cases that I have, I'd have

14    6,000 letters a month.  I'd have to read 200 a day just to

15    keep up.

16           I don't know what to say to that.  I -- you know, I

17    understand that this case is contentious, that we don't sort

18    of really agree on anything, but I really -- the sign that

19    things are breaking down and people aren't cooperating is

20    usually when I get dozens and dozens of letter in a case.  I

21    really would hope and urge and wish that you all would start

22    to cooperate and get things done in a timely fashion.  I

23    don't know -- maybe that's idle hope, but that I open with

24    that observation, and, you know, having said that, I will try

25    to tackle the things that we have raised for today -- for the

1    conference today.

2              I see -- when I sift through my notes in the 10

3    letters, I see kind of four issues that we have to deal with.

4    They all seem to deal with plaintiff Alcoa or the Daibes --

5    I'll refer to them as the Daibes defendants.  I -- you folks

6    on the side, if you -- our last three, if you have things to

7    say or things to raise, we'll give you a chance at the end,

8    but otherwise, enjoy the show, I guess, is what I would say

9    for all of you.

10             The first issue is between Alcoa and the Daibes

11   defendants.  And I'll try to deal with each one at a time so

12   that we don't get bogged down or confused or tripping over

13   one another.

14             And the first issue, we focus on an Alcoa letter

15   that's dated January 11th, 2017, and that is Document 196 on

16   the docket.  And then a Daibes letter in response, dated

17   January 26th, 2017; that's Document Number 208 on the docket.

18             Now, Alcoa says that the Daibes defendants have not

19   produced tax returns and financial statements from 1987 to

20   the present and that they raised for the first time in --

21   facts or the allegation that many of the things that they

22   would produce were destroyed in the Sandy storm back in 2012.

23             Alcoa in its letter, also makes some specific

24   requests, given that it hasn't gotten a number -- or claims

25   that it hasn't gotten a number of things from the Daibes

1    defendants, suggests that I order a list of things that come

2    at the end of that letter.

3         In the responsive letter, counsel for Daibes says

4    that, well, we've had conversations, and I've produced what I

5    can produce.  I'm trying to get the tax returns from the IRS

6    and from New Jersey, but that will take six to eight weeks to

7    do.  And counsel for the Daibes defendants suggests that

8    these requests for loan and credit line and insurance and

9    bond and refinancing applications is new and that they don't

10   want to -- that they don't want to produce that.

11        Now, I do know the financial statements were part

12   of what you were supposed to produce, and, you know, I don't

13   know, based on these short letters, how complete or

14   incomplete the production was.

15        But let me turn -- who's going to speak for okay?

16   Mr. Waller or Ms. Parker?

17        MS. PARKER:  Ms. Parker.  I will.

18        THE COURT:  Ms. Parker, okay.

19        MS. PARKER:  So to --

20        THE COURT:  This is our first issue to tackle.  So

21   tell me -- tell me what we know now.  These letters are

22   almost month old.

23        MS. PARKER:  Absolutely.  Well, not much has

24   changed since we wrote the letters.

25        Before I wrote this letter -- and I'll tell you

1   asked exactly what was produced so it might give a sense of

2   sort of where we are.  No financial statements were produced.

3   No K-1 statements at all were produced.  We did receive a

4   handful of returns for some but not all of the Daibes

5   defendant corporate entities for spanning a period of three

6   or four years.  But, you know, notably what was missing were

7   the earlier returns and also some returns were not even

8   produced of any the corporate entities.

9           So we have a problem here.  And no financials,

10  correct.

11          So we have a problem here, because, you know, I

12  think we've already articulated to Your Honor the relevancy

13  of these requests as it goes and as it relates to our

14  potential indemnity and defense obligations that they owe to

15  us.  And being able to see the financial wherewithal of these

16  companies is significant in terms of some of the arguments

17  that we need to be able to make down the road.

18          THE COURT:  Well, and I think we've been through --

19          MS. PARKER:  Yeah.

20          THE COURT:  -- the relevance and that things need

21  to be produced.

22          Mr. Shafron, what am I supposed to do at this

23  point?

24          MR. SHAFRON:  Your Honor, thank you.  As you

25  recall -- and one of the -- by the way, the reasons there's

1   10 letters, I think is because every time a letter is

2   written, then a responding letter needs to be written, and

3   then a reply letter to the responding letter needs to get

4   written.

5          And you might or might not have been aware of the

6   dispute that had arisen after we were before you the last

7   time about the terms of the order.  And we were of the

8   impression when we left here that it would be -- because

9   that's what we were talking about -- it would approximately

10  six years of tax returns.  And then when we saw the draft

11  order, it talks about returns all the way back to 1997.

12         So once we -- once the order was signed indicating

13  that we had to do tax returns back to 1997, then we

14  endeavored to get them.  And that's when we found out where

15  we stand with returns.

16         And one of the reasons there's a confusion about

17  the returns is some of these entities don't exist anymore.

18  That's why there are no recent returns.  It's not like these

19  recent returns for these entities are being withheld.  There

20  weren't any tax returns for some of these entities.  It would

21  only be back in the 1997, you know, 2000, 2005 period, that's

22  the only time that there would be any returns, and we don't

23  have those.

24         So we took Ms. Parker's suggestion -- well, we

25  didn't agree to that list that she had suggested to

1   Your Honor about what additional information, but the point

2   was well-taken that the returns that we don't have and we

3   checked with our accountant and with the Daibes entities, and

4   what we produced is all that we have possession of.

5            But Ms. Parker's suggestion in her letter that,

6   well, you can request these from the IRS, so --

7            THE COURT:  So you --

8            MR. SHAFRON:  -- we've done it.  We've had our --

9   the company's accountant send those in for all of those

10  returns that have been requested.  All of the returns that we

11  don't have, we've sent to the IRS, and there's a fee for

12  that, and I guess that's bigger than I thought, but we've

13  done that, so to get those records.  And they told us --

14           THE COURT:  And you'll do that as soon as you can.

15           MR. SHAFRON:  And we did that already.  It was

16  done -- when was it --

17           THE COURT:  Well, you haven't received the returns.

18           MR. SHAFRON:  Well, we haven't received them.  As

19  soon as they're received, they're going to be -- that they're

20  going to be marked confidential, and they're going to be

21  produced.

22           And that, I can tell you because I was there when

23  it was done.

24           THE COURT:  And, Ms. Parker, what's --

25           MS. PARKER:  Well, I guess the first thing is we

1    haven't seen that request directly that was made to the IRS,

2    so we don't know the scope in terms of the years that they

3    requested.  And we also don't know if they made those

4    requests to just the federal as well the state IRS.

5            And additionally, just a point that we wanted to

6    make is that, you know, this is the first time that we've

7    heard that some of these entities no longer exist.  They're

8    citing pleadings.  They're responding to discovery on behalf

9    of all of these corporate entities.  And now all of a sudden

10   on the record we're hearing that they don't exist.  How is

11   that -- how do we square that?

12           MALE SPEAKER:  How do I square that?

13           MS. PARKER:  Or, I mean, I'm just trying to

14   understand his position that you're say --

15           MR. SHAFRON:  Tax returns -- I know that tax

16   returns certainly were not filed for those entities -- for

17   some of these entities.  So tax returns were not filed for

18   some of these entities.  Like, I know, I'm sure tax returns,

19   for example, was not filed for Daibes Brothers.  I'm sure

20   there were no -- what's that?  And River Road Improvement,

21   certainly.

22           So I mean, some of these entities that there are no

23   tax returns because they don't file tax returns.  Whether or

24   not they still exist as to the legal entity, I don't know,

25   but there's no tax returns have been filed for Daibes

 1   Brothers.   RRIP I know --

 2          THE COURT:  Are you seeking the state and the

 3   federal returns?

 4          MR. SHAFRON:  I -- you know what?  That's an

 5   excellent question.  Can you call?

 6          I know that we requested the federal.  I don't know

 7   if we requested the state returns.

 8          THE COURT:  Ms. Parker, do we need the state

 9   returns?

10          MS. PARKER:  It would be helpful.

11          THE COURT:  Because?

12          MS. PARKER:  If it shows some -- you know, a

13   discrepancy.  I'm assuming that they're consistent.  But, you

14   know, I am not a tax expert to be able to know -- to be able

15   to -- without showing it to an expert.

16          THE COURT:  Well, I think the contemplation was it

17   was going to be the state and the federal tax turns.

18          MR. SHAFRON:  I will -- I will confirm, Your Honor.

19   And if we have not requested from the state -- for the state

20   returns for these entities, we will do so immediately.

21          THE COURT:  All right.  Well, there shouldn't be

22   any -- there shouldn't be any ongoing confusion about those.

23   You're going to produce the federal returns.  You're going to

24   produce the state returns that you have for the given years.

25   And you're going to --

1           MR. SHAFRON:  We have.

2           THE COURT:  And you're going to request the ones

3   that you don't have from those two governing entities.

4           MR. SHAFRON:  And I want the record --

5           THE COURT:  This may be the only thing we tackle

6   today that's pretty cut-and-dried.  They want that done, and

7   they want it done as quickly as we can do it.

8           MR. SHAFRON:  Yes, and -- but I want the record to

9   be clear that all of the returns, and of course there are --

10  with Your Honor's order that we are in possession -- or our

11  accountant was in possession of, have been produced.  So now

12  we're talking about the ones that were not in our possession

13  that we are endeavoring to obtain pursuant to Alcoa's

14  suggestion.

15          THE COURT:  Yeah, I've been unhappy -- I've been

16  unhappy at the speed of production in this case in many

17  instances.  But at least with this, I do understand if they

18  don't have the returns and they're making efforts to go to

19  the IRS and to the state, they're not -- we'll get them when

20  we get them, and hopefully that will be sooner rather than

21  later, but they don't have any control over that, and I would

22  just ask you to use all --

23          MR. SHAFRON:  And we will.

24      (Simultaneous conversation)

25          THE COURT:  You haven't asked for the state.

 1              MR. SHAFRON:  We haven't asked for those --

 2              THE COURT:  I don't want to hear two months from

 3  now --

 4              MR. SHAFRON:  That we haven't asked.

 5              THE COURT:  -- Ms. Parker standing up and saying,

 6  geez, they still haven't asked for the state stuff.

 7  That's -- yeah.

 8              MS. PARKER:  Just two things that I wanted to add.

 9  They -- that doesn't address the fact that they still have

10  not given us any financial statements or K-1s.

11              THE COURT:  That's step two.

12              MS. PARKER:  And then the -- the other thing I

13  wanted to say is that we'd like to be copied on their

14  requests to the IRS, because we don't know exactly the scope

15  of what they're requesting.  And based on the history of

16  what's gone on, we're not very confident that they're

17  actually seeking what we're asking them for specifically in

18  terms of going back to 1997.  So we'd like to know now that

19  those requests are actually accurate and reflect Your Honor's

20  ruling and not another three months from now.

21              THE COURT:  Mr. Shafron, can you provide whatever

22  you send to the governing agency -- it's only going to serve

23  to make things smoother in the long run.  I really don't

24  relish the thought that you've gone after X and Alcoa thinks

25  you should have gone after Y, and we waste another couple of

 1    months.

 2            MS. PARKER:  And you can obviously redact the

 3    confidential --

 4            MR. SHAFRON:  Yeah, yeah, okay, so --

 5            THE COURT:  Just so they know what it is you're

 6    requesting.

 7            MR. SHAFRON:  Yes, we should be able to produce it.

 8            MS. PARKER:  Correct.

 9            THE COURT:  And that way we're on the same page and

10    that becomes a nonissue.

11            All right.  The second half of that, the financial

12    documents that you have here.  What exactly -- what can we do

13    to satisfy that request.  I mean this -- I said the tax

14    returns is easy, because it's a certain number of years,

15    there's a certain number of entities.  This is a little

16    harder.  You know, I have two short letters.  I don't know

17    exactly what it is we want regarding financials.  And I don't

18    know what it is you're entitled to.  We've made requests

19    before.  Mr. Shafron's letter says you're making new requests

20    now, things that -- you know, I think I went through the

21    list, requests for loan, credit line, insurance, bond and

22    refinancing applications.  He suggests that's a new request.

23            What is it we're looking for?

24            MS. PARKER:  The financial statements would be, in

25    our mind, would be backup that are used to generate the tax

1    returns.  So what we're trying to get a sense of is their

2    capitalization throughout the years.

3            We have -- we don't have anything.  So for us to

4    say -- you know, we're trying -- in our suggested order to

5    Your Honor, we're trying to get ahold of their financial

6    strength.  So we -- and we have nothing to work with to even

7    know if we have one document, if it's suitable.

8            THE COURT:  Right.  And I appreciate your need to

9    do that.  I just want to do it in as streamlined and easy a

10   way as possible so that we are not here again and again and

11   again, fighting over, you know, the edges of production and

12   saying I need more or I haven't been given something that I'm

13   entitled to.

14           MS. PARKER:  But normally, my understanding is is

15   that when a corporate entity files a tax return, they have to

16   provide the accountant with a balance sheet, profit-loss

17   statements, et cetera, for each year.  And then the

18   accountant uses that information to generate the returns.

19           So that at a minimum would be something that would

20   probably satisfy our requests.

21           THE COURT:  Okay.  Say that again.

22           MS. PARKER:  A balance sheet of the company's

23   assets and liabilities.  And any other potential backup

24   documents that they provided to the accountant.

25           THE COURT:  All right.  Now for each of these

1    entities and each of those years -- well, I know the answer

2    on some of them is going to be the same.  They're gone the

3    same way that the tax returns were gone.  And, here, you

4    can't go to the IRS to ask for the backup documents.  Right?

5              MR. SHAFRON:  Well, one of -- yes, Your Honor.  And

6    one of the -- and this is -- and this could very well be my

7    fault, but one of the -- because it wasn't in writing.  But

8    one of the reasons that we didn't argue the motions on this

9    subject matter was we had originally indicated to the Alcoa

10   defendants that this information wasn't available.

11             So what we said was we'll produce the tax returns,

12   because we don't have this financial information -- so we'll

13   produce the last few years of tax returns.  And maybe I'm

14   confused as to what it is that this is relevant to.  It

15   sounds like what Ms. Parker's saying it's relevant to is

16   collection of any cross-claim debt, if there were ever to be

17   any, that seems to be what Ms. Parker's suggesting --

18             MS. PARKER:  No.

19             MR. SHAFRON:  -- that the relevancy of these

20   documents are.

21             And if that's the case, I don't see how any of

22   these other documents, other than current documents, are

23   relevant.

24             MS. PARKER:  No, it actually has to do with our

25   veil-piercing argument in the sense that all these

1    corporate -- it's our understanding that a lot of these

2    corporate entities are the alter ego of the individual,

3    Mr. Daibes.  And if there are defense indemnity obligations

4    that some of the corporations have, but not all -- and

5    Mr. Daibes is really the alter ego of these companies, we're

6    entitled to know the capitalization of them in the event that

7    we have to pierce the corporate veil.

8              MR. SHAFRON:  Even if that were the theory and that

9    was an acceptable theory of why these documents would be

10   relevant, even then, I don't see how 1997 and 2005 documents

11   are relevant to whether these entities are -- I don't know

12   what the question is -- undercapitalized, I don't know what

13   the theory is as to how it is that these are alter egos from

14   each other if they're separate corporate entities.

15             But whatever that theory is, I don't -- then I

16   don't see at all -- which is why I was surprised that

17   suddenly 1997 documents were relevant to this inquiry.

18             MS. PARKER:  Well, the transaction at issue

19   occurred in 1997.  And then there was some subsequent

20   activity in the early 2000s that make that time period

21   relevant.  So that's why we're -- we're not doing it just for

22   fun.  There's a reason why we're going back to 1997.

23             THE COURT:  Yeah, and --

24             MS. PARKER:  Down that road.

25             THE COURT:  Down this road, Mr. Shafron.

1          MR. SHAFRON:  So with that said, so the issue is

2    are there other documents produced?  We're told that there

3    aren't.

4          Now, I am told --

5          THE COURT:  You've got to look and you've got to

6    represent that you have them or you don't have them.  And if

7    you have them, you've got to produce them.  All right?

8          MR. SHAFRON:  So we have not stated in writing that

9    some of these documents which I know we don't have, but we'll

10   do that.  We'll say in writing that we do not have those

11   documents.

12         And some of this information by the way -- and what

13   Your Honor indicated earlier to some of these issues -- for

14   example, we started the deposition this week of a project

15   manager for this project for my client.  And he was able to

16   answer some of the questions, some of the questions that

17   Edgewater had about some of the concerns that we had.

18         I'm sure that is going to be the case, and if

19   eventually the principal of some of these entities is going

20   to be deposed, they will have most of this information, and

21   to the extent that there is additional information that I'm

22   not able to obtain for some reason, I'm sure that they'll --

23   these questions will get answered.

24         And then if there are more documents that are

25   identified -- which I would be surprised, because I don't

1    have them, but if there were more documents would be

2    identified, they'll be identified at the deposition, I'm

3    quite sure.

4            THE COURT:  Well, I think that for Ms. Parker's

5    request, she's narrowed it to the balance sheet and the

6    backup documents that were provided to prepare the tax

7    returns.  To the extent you have them for at the entities

8    beginning in 1997, you need to produce them.  I think

9    we've -- by doing that, we've fairly narrowed this.  You're

10   going to be obligated to give them something, if you have it,

11   that will help them figure out the things that she has

12   already explained that they need to figure out.  If you don't

13   have them, you can't produce what you don't have, but you

14   need to represent to them, you know --

15           MR. SHAFRON:  And that, we can do, Your Honor.  And

16   I know there's one financial statement that I do know exists

17   that we can produce.  But the remaining, we don't have them.

18   So we'll either represent in writing that we don't have them,

19   which I think is most of them, and to the extent we have one,

20   we will provide that.

21           THE COURT:  All right.

22           MR. SHAFRON:  But not -- but we don't agree to

23   produce this other information, loan documents and credit

24   line --

25           THE COURT:  As of right now, I think we've agreed

1    that we can go to the balance sheets and the backup

2    documents.  I don't want to get -- I don't want this thing to

3    become so unwieldly that we bog down on this for months and

4    months and months.  I think what we're -- what we focused on

5    right now is fair.  I think that takes care of the first

6    issue, the tax returns and the backup or the financial

7    documents.

8              MS. PARKER:  I'm sorry, Your Honor.  He didn't talk

9    about the K-1s.

10             THE COURT:  The K-1s?

11             MS. PARKER:  The members of each of the corporate

12   entities.

13             THE COURT:  Let me see.  I think --

14             MS. PARKER:  They're in your December 2006 order.

15        (Pause in proceedings)

16             THE COURT:  All right.  Well, refresh my

17   recollection, Ms. Parker.

18             MS. PARKER:  You had also ordered that they produce

19   K-1s of the Daibes corporate entities.

20             THE COURT:  Right.

21             MS. PARKER:  And we haven't received any of

22   those --

23             THE COURT:  You're right.  Okay.

24             So, Mr. Shafron, how about that?

25             MR. BERNSTEIN:  I believe -- I am not certain, but

1   I believe some of the K-1s are actually with -- in the tax

2   returns that were produced from the corporate entity.  There

3   should be K-1 information.  But I don't know if we have

4   any -- have actual separate K-1s from any of the members

5   themselves.

6              THE COURT:  Well, do you all -- I mean it doesn't

7   sound like you dispute that you need to produce things.

8   Right?

9              MR. BERNSTEIN:  Not to the extent that we haven't,

10  but we will -- had produced them, I believe.

11             THE COURT:  Ms. Parker?

12             MS. PARKER:  Sure, but to the extent that likewise

13  they are obtainable through the IRS, we'd like them as well.

14  I mean, it should be in the same category as the tax returns.

15             THE COURT:  I agree.  This should be within the tax

16  returns.

17             MR. SHAFRON:  That's my understanding is that the

18  tax returns themselves contain the companies' K-1s.

19             THE COURT:  Maybe that's my problem.  I think I

20  just conflated them with the tax returns.

21             MR. SHAFRON:  To the extent that -- and what --

22  here's what I'll do.  I'll go back and this goes to

23  Ms. Parker's point about what was requested.  And I will find

24  out -- and we're going to send to Ms. Parker with the

25  requests that we sent to the IRS, and what -- we'll find out

1    from the IRS when we request the return what comes with that

2    return.  And I assume that K-1s that were filed with the

3    return are --

4              MS. PARKER:  It's my understanding -- and I'm not a

5    tax expert, but it's my understanding an individual members

6    of a certain -- of a corporation with the ones who receive

7    the K-1s from the corporate entity, and those -- the

8    individuals, for instance, Mr. Daibes, would have a separate

9    K-1 form that he would then file in connection with his

10   personal returns.

11             MR. SHAFRON:  That's a hundred percent right.

12             MS. PARKER:  Okay.  So that's what we're looking

13   for.  So I don't -- we don't need to rely on the corporate

14   entities' returns for the K-1 information.  You should be

15   looking to the individuals to give you the K-1s.

16             MR. SHAFRON:  And -- produced, to the extent we --

17   and, right.  That's what we produced, the personal returns

18   that we have, we've produced.  So that's the --

19             MS. PARKER:  But there's no K-1 in there.  That's

20   what I'm saying.  It's says you produced his returns, but

21   there's a separate document, which is a K-1 document, which I

22   didn't see, unless I missed it.

23             MR. SHAFRON:  Oh, all right.  And Ms. Parker's

24   correct about this.  If there was a return produced, it

25   should have -- it should have a K-1 with it.  Normally, if

1   you are an LLC member, you should have a K-1 with it.  I

2   would have assumed it was with the return.

3              It certainly wasn't --

4       (Simultaneous conversation)

5              MR. SHAFRON:  It certainly wasn't purposely

6   withheld.

7              THE COURT:  You know where I stand.  I mean, you

8   should produce these things.

9              MR. SHAFRON:  Yes, that --

10              THE COURT:  And Ms. Parker's entitled to them.  So

11   let's get it done, and let's get it done as quickly as we

12   can.

13              MR. SHAFRON:  That -- that I will.  To the extent

14   returns were produced, I would have assumed that K-1s were

15   with them.

16              THE COURT:  All right.  So we'll check -- you'll

17   have a meet-and-confer with Ms. Parker.  Between the two of

18   you, you'll check whether there are K-1s with the returns

19   that have already been produced.  If there aren't, they need

20   to be produced.  And hopefully you're going to get something

21   with the returns that we're going to get from the government

22   through your requests.  Right?

23              MS. PARKER:  Thank you, Your Honor.

24              THE COURT:  All right?  All right.  I think that

25   takes care of issue number one or the first group of letters.

1          Second group of letters includes a letter from the

2    plaintiff.  That's Document 206.  It's dated January 26th,

3    2017.  A letter from the Daibes defendants, dated

4    February 3rd, 2017.  That's Document 212.  And a letter from

5    the plaintiff dated February 8th, 2017.  That is

6    Document 2014.

7          Here, the plaintiff say -- alleges a number of

8    things.  First, that the plaintiff -- that the Daibes

9    defendants have not adequately responded to requests for

10   admissions that were propounded upon them.

11         Second thing that the plaintiff alleges is that the

12   Daibes defendants have not provided the names and full

13   contact information for people who were involved in that

14   period of that the fill was moved in this case.

15         The third thing that the plaintiffs allege is that

16   the Daibes defendants have not provided the name and contact

17   information for a fellow named Pilo, who was apparently

18   somebody kind of -- requests seems to be a subset of

19   Request 2, quite frankly.

20         And number four, the plaintiff says that the Daibes

21   defendants have not provided the payroll records for the

22   people who were involved in the fill-moving operation, that

23   only one week of pay records have been produced and that they

24   were looking for pay records for a substantial period of time

25   in 2013.

 1              Now, all of this is obviously highly relevant.  It

 2  just goes to the heart of what's going on.

 3              So -- and in the Daibes defendants' response,

 4  they -- they say they located the answers to -- or to the

 5  requests to admit, they've provided the identity of the

 6  people who worked at the field, including Porfrio Manuel, I

 7  guess it is, who is Pilo, and will produce them all for

 8  depositions.  And they say they've also produced some payroll

 9  records, but I think in the follow-up letter, the

10  plaintiff -- that is when the plaintiff complains it's only

11  payroll records for a week.

12              Again, Mr. Corriston or Ms. Dory, who's going to

13  speak?

14              MS. DORY:  I'll speak, Your Honor.

15              THE COURT:  All right.  So those aren't complicated

16  requests, I don't -- maybe the requests for admissions.  I

17  don't know, you know, the specifics on that.  But where do we

18  stand with all this?

19              MS. DORY:  Okay.  So I'll start with the requests

20  to admit.  You know, they did improve some of responses to

21  the requests to admit.  But there's still about 15 or so

22  among the various entities that we're not getting an

23  appropriate response.  You know, we asked one thing and

24  they're admitting something else.

25              And these are facts that are pretty critical to the

1    issues in this litigation.

2          So we'd like to have -- we'd like to present those

3    to Your Honor, and, you know, based upon their responses,

4    have those deemed admitted for their failure to provide an

5    adequate response.

6          THE COURT:  Mr. Shafron?  What seems to be the

7    problem?  I'm generally loathe to have situations where we

8    deem to admit because -- where we deem they're admitted

9    because there's -- there's a dispute about the adequacy of

10   the answers.  It's one thing if people just completely blow

11   them off and don't really care about answering at all.  But

12   sounds like you've at least had a response here.

13         So have you had a meet-and-confer, Mr. Shafron, on

14   these 15 or so requests to admit?

15         MR. SHAFRON:  Not -- well, we have -- well,

16   certainly through the letter writing, I guess you can

17   consider that a meet-and-confer.

18         As to the remaining 15 or so, I guess we haven't

19   had a recent meet-and-confer on that issue.  And we didn't --

20   and, again, the history here is -- our position was the

21   requests for admission that were recently served were fully

22   answered.  Not -- and I believe that was by a prior firm that

23   was representing the Waterside defendants.

24         Then more specific requests were asked for, and

25   then we -- my firm answered -- gave more specific answers,

1   which they're still not satisfied.

2          Then it was presented to Your Honor a third round,

3   and we had a very difficult time because we had answered them

4   to the best of our ability, but we still met with other

5   representatives of the entities to see if we could get more

6   specific answers than the prior two times.  And as Ms. Dory

7   indicated, some of the answers we were able to refine the

8   answer to give more specific answers to the questions that

9   had previously been given --

10          THE COURT:  It's usually pretty self- -- it's

11   usually pretty obvious for the people involved when an answer

12   to a request to admit is a weasely answer or an evasive

13   answer.

14          It's usually yes, no, or we don't have enough

15   information to give you an answer one way or the other.

16          I don't know what -- I don't have the 15 or so in

17   front of me.  So I don't --

18          MS. DORY:  Yes, and I'll give you one example.

19   Okay?  And that is that we asked Waterside whether they knew

20   in 2013 when Building 12 was demolished, and that was --

21   materials in that building were taken to Veterans Field,

22   whether they knew in 2013 when that building was demolished

23   and crushed, that the building was contaminated with PCBs.

24          And the answer that we got was that they knew that

25   there was some contamination in Building 12.  And they're not

1   specifying whether they knew in 2013 when this was demolished

2   that it was contaminated with PCBs.  And that's a key --

3   those are key facts in the litigation.  And, you know, we can

4   certainly --

5            MR. SHAFRON:  What number -- what number question?

6   What number request to admit is that?

7            THE COURT:  And that seems to be a yes or.

8            I mean, you -- I guess you could answer it, we knew

9   it was contaminated, but we didn't know specifically it was

10  PCBs.  Or we knew it was PCBs.  Or we didn't know that it was

11  contaminated at all.  And --

12           MR. SHAFRON:  I mean, these words have been thrown

13  around in this case very loosely about what it means to be

14  contaminated, what it means to be -- whether it's less than

15  50 parts per million, whether it's more than 50 parts per

16  million, whether it's unsafe, whether it's -- I mean, there

17  is -- and so I just want to look to see what our answer was

18  to that.

19           MS. DORY:  Sure.  It's Request to Admit Number 45.

20  And there's some objections in the beginning.  But it says,

21  Waterside admits certain portions of the building contained

22  contamination.  And then there's some further language about

23  how they thought that the actions they took were authorized.

24           But we're asking them, did you know in 2013 when

25  you demolished the building that it was contaminated with

1    PCBs.

2              MR. SHAFRON:  I mean, that's a perfect example.  I

3    think Ms. Dory has pointed out an excellent example of how

4    we've gone back to look at these answers, and we've given

5    more specific answers, and we've given a very specific answer

6    now to the question.  The question was -- and now we said

7    Waterside admits that certain portions of Building 12

8    contained contamination.  I mean what -- we've now

9    admitted --

10             THE COURT:  Contamination with PCBs?

11             MR. CORRISTON:  We don't know, Judge.  We don't

12   know.  That's the game they're playing.  Yes.  No.  That's an

13   admission.

14             MS. DORY:  There's several more things --

15             MR. SHAFRON:  Right, so I --

16             THE COURT:  Well, I'll tell you what, I -- I don't

17   have -- I mean, you can attach -- some of them that have been

18   attached to the letter.

19             But what I would like you to do with respect --

20   well, let's hold off on the requests to admit for a second.

21   I'll deal with them last.

22             But how about the other -- the other three things.

23   They're a little more straightforward.  You know, the names

24   of the -- the names and the contact information of the folks

25   that were working there and the payroll records.

1          You say that you've given the names, and you're

2    willing to produce the people.  Why not just give the contact

3    information, let them subpoena the people?

4          MR. SHAFRON:  Well, I -- the people that we've

5    identified, somebody this week at deposition is named, which

6    is the Spiegal [phonetic] person.  He's an employee.  So

7    we're going to produce him for deposition.

8          So I mean, I assume that's why they want this

9    information is so that they can identify him for deposition.

10   Well, if they're employees, we'll produce them.  I mean, we

11   haven't -- we've never say that somebody who's identified, we

12   are not going to produce.  And, in fact, I think there's a

13   few people who are former employees that we have contact

14   with --

15        (Simultaneous conversation)

16          THE COURT:  Well, Ms. Dory, is it enough that they

17   will produce them for deposition?  Or you want the contact

18   information?

19          MS. DORY:  Well, we want to know all the people

20   that moved the dirty dirt that ended up at Veterans Field.

21   And he's identified one person.  And there's more than one

22   person.  We gave them photographs.  So that's -- that is one

23   part of it.

24          And then I mean, the other part of it is --

25          MR. CORRISTON:  Yeah, I just wanted to add,

1   Your Honor, the deposition that we took the other day, the

2   individual said, these computerized records -- I asked him

3   about the laborers, everybody was working, he said they all

4   turn in cards, goes to the foreman, it's all computerized.

5   It's all available.

6           And we're here where we have this, you know, very

7   noticeable gap for the relevant time period during this

8   period when they acknowledge transferring the material from

9   Building 12 to the field, including one of the key issues is

10  this --

11          THE COURT:   What's that time period?

12          MR. CORRISTON:   Well, they're -- it's really sort

13  of August to October of 2013.   Now, see, there's also a

14  distinction here, Your Honor.   They admit that they were

15  bringing this concrete aggregate material, which they claimed

16  they didn't know contained PCBs in it, there was

17  environmental reports going back to 1997 showing it's full of

18  PCBs, which they had possession of.   Went on into the parking

19  lots and paved areas.

20          One of the areas of dispute is the field itself.

21  We have a photograph -- this whole thing, the reason -- the

22  only reason they got caught is that Mr. Menzela [phonetic]

23  who worked for -- was driving home on a Saturday, when he was

24  told they weren't working and said, What's going on?   And he

25  noticed the concrete aggregate on the field.

1    The witness the other day who wasn't there but was

2    the director of operations, said we put it under the parking

3    lot areas only because Terms approved it, which is disputed,

4    and says, I don't know if it went on the field.  I don't know

5    where it went.  I can't say one way or the other.

6         Well, we have a photograph of three individuals

7    there spreading the material on the field.  We finally get

8    Pilo's name, which --

9         THE COURT:  No, I think I understand.  You don't

10   need to -- you know, give me chapter and verse of the case.

11        What you're getting at is you think there were a

12   lot of people there in this relevant time period.  You want

13   to know their names, and you want to have their contact

14   information.

15        MR. CORRISTON:  Right.  And it's two places,

16   Your Honor.  It's both at the field and then at the source,

17   where it came from.

18        THE COURT:  And I had mentioned that -- that those

19   people traveled back and forth from the field -- between

20   those two places.  Right?

21        MR. CORRISTON:  We're not sure exactly how they do,

22   but they could have ordered somebody put it on the truck, the

23   truck went to the site, and then the guys were spreading it.

24        THE COURT:  Mr. Shafron, that seems pretty

25   straightforward?

1              MR. SHAFRON:  It does, Your Honor.  We -- and my

2   understanding is we provided the names of all the people who

3   have worked in the area on that project.

4              THE COURT:  From your understanding, you're the

5   lawyer and should be better than an understanding, you've

6   either done it or you haven't doesn't it.  Right?

7              MR. SHAFRON:  We've -- there's -- we've sent a

8   letter indicating eight people and some -- and as a result of

9   that letter, deposition notices have been sent by the

10  plaintiff for the deposition of those people.

11             THE COURT:  So they're telling me you've identified

12  Pilo.  You're telling me you identified eight people.

13  What's -- where's the reality?

14             MR. CORRISTON:  I have a letter of January 27th,

15  2017, identifying Pilo.  I don't have anyone else.

16             And I'd like to see the records.  I want to know

17  who -- I want to know what the records show too so I can

18  verify.

19             THE COURT:  I mean that's the next -- the payroll

20  records.  I mean, you give the payroll records, we'll know

21  who they are, quite frankly.  It may not include the contact

22  information, but it'll tell us who all these people are.

23             So why -- why haven't we produced -- and you want

24  payroll records.  I mean, you were talking about all sorts of

25  months in January, but is it sufficient to go August to

 1  October?

 2            MR. CORRISTON:  Yes, Your Honor.  Is it?

 3            MS. DORY:  Well, the building, I think, was

 4  demolished a little bit later --

 5            MR. CORRISTON:  It was demolished on June 30th, so

 6  July -- well --

 7            MS. DORY:  We asked for April.

 8       (Simultaneous conversation)

 9            THE COURT:  Late June to -- late June to late

10  October?

11            MR. CORRISTON:  We asked from April.  We'll be

12  satisfied with June through October.

13            THE COURT:  All right.  So, Mr. Shafron, that's --

14  I mean, what possible argument could made that that stuff is

15  not relevant?  And --

16            MR. SHAFRON:  No, we --

17            THE COURT:  -- what legal argument could be made

18  that it shouldn't be produced.

19            MR. SHAFRON:  It's clearly relevant, Your Honor.

20  But we -- we never disputed whether information about a --

21  who was there, it's not relevant.  So that certainly is.

22            All right.  So to the extent -- because he did

23  testify that there were -- there were payroll records, or

24  that he inputted payroll in 2013.  So those records, I

25  assume, those records --

1           THE COURT:  Sounds like they might be confused or

2   it might not even be a heavy lift for --

3           MR. SHAFRON:  --

4           MR. CORRISTON:  He did testify they were

5   computerized.

6           By way of example, again, Your Honor, I should be

7   quiet when I'm winning, but he couldn't identify the two

8   people in the photo.  So we asked him too.  He couldn't

9   identify them.

10          MR. SHAFRON:  And, Your Honor, I will tell you,

11  because I was part of the internal investigation in order to

12  answer their concerns, I mean we asked people.  We showed

13  them the photos that they sent and said, Who are these

14  people?  And then we -- and I said, these are simple requests

15  that they're asking, who are they.  And we don't know.

16          By the way, I did find the letter -- Zach found the

17  letter, it was in January 6th, 2017, to Mr. Corriston, and we

18  said in trying to answer these responses, and we said that --

19  we named the people.

20          We said in response to your question "who performed

21  the work at Veterans Field?" and we said Porfilio Manuel, Bob

22  Rambone [phonetic], Thomas Finn [phonetic], Phillip --

23  Schiller, Pedro Suo [phonetic], Antonio Vasolanos [phonetic],

24  Sparkman Vegas [phonetic], Zachary Daibes, Tom Pellegrino

25  [phonetic], and Sylvester Cordoba [phonetic].  That was -- we

1   had found that those were the people.  And they've sent that

2   notice to some of those people.

3          And so -- and then we said, we'll contact every one

4   of those people and make them available for deposition except

5   for Sylvester Cordoba.  He's no longer --

6          THE COURT:  Now, do you need their contact

7   information?  Or is it enough that they've given you the

8   names and they're going to produce them for deposition?

9          MS. DORY:  Well, we -- it would be enough if they'd

10  be produced for a deposition with the exception of the one

11  person, I think, that they couldn't produce.

12         But the issue, just so Your Honor understands, is

13  in that letter, there wasn't confirmation of whether these

14  individuals actually were involved in spreading the

15  materials.  So that was part of the problem.

16         And there is, there was actually applications made

17  by Waterside, every time they wanted payment from the

18  Borough, they had to produce an application with all their

19  backup materials.  And they produced all of the applications

20  for payment with backup for the entire time period except for

21  this one application which is the relevant time period in the

22  litigation.

23         So in addition to the payroll records, we're also

24  looking for any other documents associated with that payment

25  application that covers the relevant time period.

```
 1              THE COURT:  All right.  Let's see.  Payroll records
 2  from June of '13 to October of '13.  Applications for payment
 3  for what -- when would it be?  September?  Or in that period?
 4              MS. DORY:  Yes, I believe it's Application
 5  Number 11.  I'll have to confirm it.
 6              MR. CORRISTON:  10 and 11 both don't have any
 7  information.
 8              MS. DORY:  10 and 11.
 9              THE COURT:  All right.  And -- address of the one
10  person you can't produce.
11              MR. SHAFRON:  I think we asked -- we did ask, but
12  they didn't have any information on that individual,
13  Your Honor, what -- we said we need the last address for
14  them, and --
15       (Simultaneous conversation)
16              THE COURT:  Well, then confirm that in writing to
17  Mr. Corriston and Ms. Dory, and --
18              MR. SHAFRON:  I will do that.
19              THE COURT:  -- and I guess you're on your way
20  trying to find this guy, if you need to.
21              MR. CORRISTON:  And, Your Honor, just in
22  particular, I want to make sure that I'm not limiting this,
23  but I want to make sure that we get September 7th, who was
24  working at both those sites for the company that --
25              MR. SHAFRON:  To the extent that that's able to be
```

1    determined from the payroll records or from individuals who

2    are going to testify, I mean I think that questions were

3    asked of the supervisor, project manager of this project this

4    week and he was unable to identify those individuals.

5            I -- if they're able to be determined from these

6    other requests that they're asking, then we're certainly

7    happy to provide that information.  But --

8            THE COURT:  Now, with respect to the requests -- so

9    we have it straight, you're going to tell them who was on the

10   job, if you can on September 7th.  You're going to provide

11   those payroll records for a period of about five months.

12   You're going to provide the application for payment Number 10

13   and Number 11.  And you're going to give the address of the

14   one person that you cannot produce.  You've already

15   identified the other people that you think have been -- or

16   were working during the period of time in question.

17           The only other --

18           MR. CORRISTON:  I'm sorry, Your Honor.  One

19   clarification, just on September 7th, just so it's not

20   limited, we want to know who was working at the Alcoa site,

21   who was driving the trucks from the Alcoa site to the field,

22   which we have reports, there were actual complaints because

23   there were so many trucks going back and forth.  And then who

24   worked actually on the field on that day.  Thank you.

25           THE COURT:  That's a clarification.  I think that

1    was -- and produce the information.  But that's fine.

2           With respect to the requests for admissions, I want

3    you to meet and confer and not by letter.  So I want you to

4    talk about them on the phone.  If you cannot work -- and the

5    one that we actually discussed, I think we can get a little

6    more specific with the answer to that one.

7           If after you actually met and conferred on the

8    phone or in person and talked about these things, there are

9    requests for admission that remain, you know, unsatisfactory

10   to the plaintiff, the answers to requests for admission that

11   remain unsatisfactory, then I'd like you to send me a joint

12   letter, all right, of five pages or less.  I'd like you to do

13   that.  I'd like you to take care of that all within two

14   weeks.  All right?

15          MS. DORY:  Thank you, Your Honor.

16          THE COURT:  And, frankly, you know, none of this

17   stuff in these letters for Issue 2, I get that the identity

18   of the people, the payroll records, we don't have the problem

19   that we had with respect to the Alcoa where you're going to

20   the IRS and it may take several weeks to get the stuff.  It

21   should have been produced.  You ought to be able to get your

22   hands on it relatively quickly.  So I want that all produced

23   within two weeks too.  All right?

24          So I want all of the issues that have emanated from

25   these letters regarding the complaints raised in the

 1   plaintiff's letter of January 26th, 2017, that Document 206,

 2   I want them dealt with in two weeks.  All right?

 3           And aside from the requests for admissions, it's

 4   all pretty straightforward.  I don't need to see you guys

 5   again on this.  You've got a certain number of people that

 6   were working there.  We want to know who they were.  We've

 7   got payroll records.  We want to produce them.  I -- there's

 8   no room to -- here.  This ought to be pretty straightforward.

 9           So let's get that all done within two weeks.

10           All right.  Issue Number 3 are the --

11           MR. SHAFRON:  Your Honor?

12           THE COURT:  Yes.

13           MR. SHAFRON:  I'm trying to move this as fast as I

14   can, but I also want to be in compliance.  This is a vacation

15   week coming up this week.  And -- but I'm only going to be

16   gone for half the week.

17           THE COURT:  Well, I don't want to ruin vacations.

18   I'm very --

19           MR. SHAFRON:  And then the week after that, Zach is

20   going to be -- unfortunately, there's a small office -- the

21   two of us, and Zach's on vacation the following week.  And

22   currently, we have the deposition of Mr. Daibes scheduled for

23   the 1st and the 2nd.

24           So I want --

25           THE COURT:  You've got two vacations in there.  How

1   about four weeks?

2           MR. SHAFRON:  Yeah, and I'm going to work -- on

3   payroll records, if they're available, I will try to do those

4   as soon as possible.  And the identities are -- we are

5   already know so that those -- those are done.  And the only

6   question is more specific about who was working where.  And

7   if we're able to produce that, I will -- I want them to have

8   that information before they depose Mr. Daibes, so I'm going

9   to try to endeavor to do that.

10          But anything else, like more specific joint letter

11  on requests for admissions, I just -- being realistic, I

12  just --

13      (Simultaneous conversation)

14          THE COURT:  All right.  I'll say I'll say four

15  weeks.

16          Ms. Dory?

17          MS. DORY:  Well, we had asked for some of this

18  information before Mr. Daibes' deposition, so, you know --

19          THE COURT:  Yeah, Mr. Shafron, please use your best

20  efforts to get the stuff, and, you know, I -- to have a

21  deposition held up or to have him redeposed, your client

22  won't be happy about that.

23          MR. SHAFRON:  Oh, no.  No.

24          THE COURT:  And I won't hesitate to have him show

25  up again if you're producing things after his deposition.

1          MR. SHAFRON:  Well, as it is --

2          THE COURT:  -- and they have questions about it.

3          MR. SHAFRON:  Your Honor, as we stand today, we did

4    schedule the deposition.  Right?  I offered the dates of the

5    1st and the 2nd.  But what we took -- we took two days of

6    Mr. McKnight's deposition, but I didn't -- I still haven't

7    been able to ask a single question.

8          So the -- our codefendant, Mr. Hazen [phonetic] is

9    Alcoa's representative.  And they have offered a couple of

10   other dates to finish that deposition, which is now -- those

11   dates are -- the dates offered were Tuesday and Wednesday of

12   next week, which I -- Wednesday and Thursday, which I

13   certainly can't do.

14         And -- but I need to complete Mr. McKnight's

15   deposition before we start Mr. Daibes' deposition.

16         Mr. Daibes is ready to testify.  He's not, because

17   I don't -- I don't conduct depositions that way with somebody

18   who's got a direct conflicting issue with me, is I take two

19   days of deposition on key issues.  I haven't asked -- I

20   haven't even been able to ask a single question.  And then

21   we're going to -- then we're going to have my client in the

22   middle, and then -- and then I get to ask questions of the

23   person who's already -- his deposition has already begun.

24         If I complete -- and, again, if there's somebody

25   who's not -- it's not a conflicting testimony on a key issue

1    in the case, then I don't -- like, for example, Mr. -- who

2    just testified.

3              UNIDENTIFIED SPEAKERS:  Davaro [phonetic].

4              MR. SHAFRON:  Ms. Davaro, we didn't finish

5    Ms. Davaro's dep.  I don't think his testimony is going to --

6    if we have to split that up between two different -- I don't

7    think there's any difference.

8              But I don't -- I'm not now going to have

9    Mr. McKnight sit there and listen to all of the testimony.  I

10   have to be honest, this is the way it works.  You have to

11   listen to all the testimony of Mr. Daibes, and then we're

12   going to finish his deposition.  I don't take depositions

13   that --

14             THE COURT:  Mr. McKnight's going to sit in on

15   Mr. Daibes' --

16             MR. SHAFRON:  No, he's going to read -- he's going

17   to have -- he's going to read the transcript, and he's going

18   to -- I mean, so we get daily -- daily transcripts from that

19   deposition.

20             So the point being is I assume we're going to

21   schedule Mr. McKnight's deposition for the following week,

22   and then Mr. Daibes' deposition shortly thereafter.

23             THE COURT:  Well, I don't know that that's a fair

24   assumption.

25             What are we saying with --

1          MR. WALLER:  Your Honor, Michael Waller, again,

2    from K&L Gates.

3          That is not a fair assumption.  I have no idea what

4    Mr. McKnight's availability is after next week.

5          We did provide Wednesday and Thursday.  We offered

6    that, at any rate.  And I'm mystified of this having to

7    complete a deposition before you can begin somebody --

8    somebody else's deposition.

9          And I think inadvertently what was suggested is

10   that somehow there McKnight --

11         THE COURT:  Well, we are not mystified --

12         MR. WALLER:  -- would change his testimony --

13     (Simultaneous conversation)

14         THE COURT:  -- obviously, you don't want

15   somebody -- you know, he doesn't want your guy to have the

16   benefit of his guy's testimony.

17         MR. WALLER:  Well, I would prefer --

18         THE COURT:  It's not a big mystery.

19         MR. WALLER:  If that's the way it works, Judge, I

20   would prefer that they not have my witness's --

21     (Simultaneous conversation)

22         THE COURT:  But you're right.  You're right.  It's

23   just the way scheduling works sometimes.  I -- Mr. Shafron, I

24   don't know that -- somebody has to go first.  And I don't

25   think that that's a good enough reason to start derailing

```
 1   depositions.

 2            MR. SHAFRON:  Oh, no, I certainly don't want to

 3   derail any depositions.  I just -- when a deposition --

 4   especially when a deposition has been started, finish that

 5   deposition.  And then we do the next depositions.  I --

 6   and --

 7            THE COURT:  Well --

 8            MR. SHAFRON:  -- it's nothing nefarious.

 9       (Simultaneous conversation)

10            THE COURT:  -- that's just --

11            MR. SHAFRON:  I'm not suggesting Mr. McKnight,

12   there's anything improper or nefarious about what reading the

13   transcript from the daily deposition.  It's just about --

14   that's just about the way depositions work is that when you

15   have a day of deposition in the middle, I don't schedule

16   depositions that way.  I never have.

17            THE COURT:  Oh, well -- if they've been scheduled,

18   let's get them done.

19            MR. SHAFRON:  I'm going to try to do that.

20            THE COURT:  We're not going to start posturing

21   about who goes first, who goes second, and trying to get

22   comparative --

23            MR. SHAFRON:  Right, and I --

24            THE COURT:  Otherwise, every case I have would be a

25   headache like that, and I'm not going to do that.
```

1          MS. DORY:  I just wanted to clarify, you said four

2    weeks from today, if we hadn't resolved our requests to

3    admit.  And would that also be the deadline to submit a joint

4    submission?

5          THE COURT:  Yeah, I'd like you to do the -- I mean,

6    I want you to have the meet-and-confer as soon as you can.  I

7    would expect a letter to me within four weeks.

8          MS. DORY:  That we hadn't resolved it.  And then a

9    joint submission also at that date?

10         THE COURT:  And make that submission -- try to keep

11   it five pages or less.  I mean, if you -- if you feel you

12   need more than that, fine.  But, you know, all I need to know

13   is here's the requests for admissions, and here's a short

14   blurb on why I think the answers are either inadequate or

15   adequate.  And hopefully you can keep that reasonably

16   manageable.  All right?

17         MS. DORY:  Thank you, Your Honor.

18         THE COURT:  Okay.

19         MR. SHAFRON:  It may very well be, Your Honor, that

20   some of these questions, we're going to sit and ask these

21   questions at 30(b)(6) depositions which are coming up.  And

22   before that, they will be satisfied with whatever answers

23   that they're going to get at deposition.

24         THE COURT:  And you're going to meet and confer.  I

25   mean -- and work this out.

 1            MR. SHAFRON:  First thing --

 2        (Simultaneous conversation)

 3            THE COURT:  All right.  Moving on to number three

 4    are our packet of letters, our third packet of letters.  I

 5    have a letter from the Alcoa defendants, dated February 14th,

 6    2017, just three days ago.  Document 20 -- 216.

 7            MALE SPEAKER:  Happy Valentine's Day, Your Honor.

 8            THE COURT:  And I have a letter from the Daibes

 9    defendants dated February 16th, 2017, and that's

10    Document Number 220.

11            Now, in the Alcoa letter, Alcoa says that they've

12    served requests for written for discovery 40 days ago upon

13    the Daibes defendants; I guess interrogatories, requests for

14    admissions, and document requests.

15            MR. SHAFRON:  We're combined into one document.

16            THE COURT:  All right.  And now you're asking to

17    have things admitted -- deemed admitted and directing answers

18    and whatnot.

19            And the Daibes defendants essentially say, hey,

20    look, we've been doing written discovery forever and ever,

21    and now these are thrown at us in January of 2017.  It's well

22    past the time for -- the time set by the Court for service of

23    interrogatories.

24            I understand requests for documents, you know, they

25    kind of come at any time, particularly if they arise out of a

1   discovery during a deposition.  And you've got requests for

2   admissions.

3          Ms. Parker, I guess the first thing -- why more

4   interrogatories?  I mean usually we have interrogatories --

5          MS. PARKER:  Absolutely.

6          THE COURT:  -- at the beginning.  You have 25, and

7   you're done.

8          MS. PARKER:  Absolutely, Your Honor.  Just to give

9   you some background, Judge --

10          MR. SHAFRON:  I think they were requests for

11   admit -- they're interrogatories too?

12          MS. PARKER:  They're interrogatory -- there was one

13   document, and it's combined.  But just -- but just to give

14   you some background, Judge Vazquez had issued his opinion on

15   our motion for judgment on the pleadings.  By virtue of his

16   opinion, there were suggestions or certain issues that he

17   raised that could potentially be dispositive for Alcoa and

18   certain factual issues that we needed to establish for that

19   claim -- our claims to succeed.

20          When that opinion came out, we then posed these

21   discovery requests on the Daibes defendants.

22          It was our understanding, pursuant to your

23   December 2006 order, that the fact discovery deadline in this

24   case was extended till the end of February, which was why we

25   thought it was appropriate from a timing perspective to serve

1   these.

2          THE COURT:  And it's probably going to get extended

3   again.

4          No, I ask only specifically with respect to the

5   interrogatories.

6          MS. PARKER:  Yeah, which really more actually -- to

7   be honest with you, it's really actually only -- the document

8   itself is a request to admit.  And if in the end -- and we

9   phrased it, if you're denying this request, provide an

10  explanation.

11         So it's a -- so formally, is it a really a request

12  to admit?  Yes.  But we labeled it combined, because there

13  was a subpart in that that said, if you're going to deny

14  this, we'd like an explanation and produce a document that

15  says otherwise.

16         THE COURT:  All right.

17         MS. PARKER:  So it was -- I mean, if you want to

18  call it a request to admit, it was a request to admit with

19  subparts.

20         THE COURT:  All right.  Now, Mr. Shafron, I

21  understand your -- why you at least balked at first.  And I'm

22  not going to deem that you think it's admitted right now.

23         But why -- you know, it sounds like they had a

24  good-faith reason for asking.  And I think certainly can

25  propound requests for admission and additional requests for

 1  production as we go along.  Maybe that will obviate some

 2  deposition testimony or at least shorten up some deposition

 3  testimony.

 4        Given what you've just heard, are you still

 5  resistant to answering these?  Or if I give you a certain

 6  amount time to answer them, will you go ahead and do it?

 7        MR. SHAFRON:  Well, first of all, that wasn't my

 8  understanding, Your Honor.  I didn't know that written

 9  discovery and requests for admit -- and if they're calling

10  them interrogatories, interrogatories -- I thought the

11  factual discovery deadline that you extended was about

12  take -- about depositions.  I didn't know that we're now

13  serving new requests for admits now.  And --

14        THE COURT:  Requests for admissions come -- they're

15  an unusual bird in the discovery -- in the world of

16  discovery, and they, I find, come at any time.

17        Requests for production are the same way.  You

18  know, you might find something out during discovery.  You

19  send out a subpoena or you -- you know, do requests for

20  production following up on deposition testimony, which

21  somebody revealed that documents exists nobody really knew

22  before.

23        So those two -- that's why I focus on the

24  interrogatories.  Interrogatories are something I very much

25  expect to be done with at the very beginning of discovery and

1    not revisit them.

2            But to the extent Ms. Parker's explained these are

3    really requests for admission, and if you're going to deny,

4    you know, why.

5            MR. SHAFRON:  Well, then, Your Honor, if

6    Your Honor's inclined to allow these requests for admit, we

7    would answer requests to admit, but I'm not answering them in

8    the way -- I respectfully request to not be required to

9    answer in the way that they were presented.  I actually

10   didn't even realize they were presented that way that they're

11   sort of like a hybrid between requests to admit and

12   interrogatories -- that now I have to admit or deny and then

13   give a big long explanation and as to why it is we -- we

14   either admit or deny or explain why we can't admit or deny.

15   Or admit to the part that we can admit and deny the remaining

16   part.

17           I'm loathe to do that, Your Honor, at this point.

18           MS. PARKER:  Your Honor, may I approach and just

19   show you what this document is, because you'll understand

20   what I was saying.

21           THE COURT:  How many did we have?

22           MS. PARKER:  Is it -- now -- you have the number.

23   I don't -- look at the end of that document.

24       (Simultaneous conversation)

25           THE COURT:  Yeah -- it's 10.  Right?

1           MS. PARKER:  Yeah.  It's not a lot.

2           THE COURT:  So that's not....

3           I certainly don't have any problem with the

4    requests for admissions.  The follow-up stuff looks

5    perilously close to a reopening of all written discovery,

6    and -- I'm on the fence right now.

7           MS. PARKER:  And, you know, as I said to

8    Your Honor, the reason these were very carefully crafted to

9    sort of mirror Judge Vazquez's opinion.  And that's why we --

10   we're trying to save time in depositions and down the road.

11          MR. SHAFRON:  And, Your Honor, and since we're on

12   the record on this issue, I have to disagree with

13   Ms. Parker's characterization that there was something in

14   Judge Vazquez's decision which was new to the Alcoa

15   defendants and that now there's an entirely new area of

16   factual inquiry that they're interested in that they couldn't

17   have been or shouldn't have been aware of when this whole

18   entire matter was briefed and argued in front of Judge

19   Vazquez.

20          I -- whether or not Your Honor's considering

21   requiring us to answer requests for admissions, either way, I

22   think I just better put it on the record that I certainly

23   don't agree with that characterization, that there's

24   something new that occurred there.

25          And by the way, I should put on the record that all

1    the characterizations of the plaintiff about what's happened

2    to this case, I haven't argued with.  But we're only at a --

3    we're only at a discovery conference.

4             But I just want to make sure that there is not some

5    tacit understanding or agreement that by me not saying

6    anything, that I agree with that characterization.  I

7    certainly do not.

8             And if Your Honor is going -- we didn't serve any

9    further requests for admit because we thought the time for

10   that was over.  If we're -- if we're in that mode of serving

11   new requests for admissions, we would certainly -- then we

12   would be entitled to serve new requests for admit as well, I

13   would assume.

14            So --

15            THE COURT:  If you are serving less than 30 -- or

16   more than 30 days before the end of discovery, I'm inclined

17   to allow you to do that.

18            MR. SHAFRON:  Thank you.

19            THE COURT:  I'm allowing everybody else to do it,

20   so --

21            MR. SHAFRON:  Thank you.

22            THE COURT:  But let's not go hog-wild.

23            10 is not so bad.  I don't want to hear, you know,

24   that we sent out 500 tomorrow.

25            MR. SHAFRON:  We should be -- we're not at 500, by

1   no means --

2           THE COURT:  Ms. Parker, the only thing this doesn't

3   anticipate, suppose the answer is we don't have sufficient

4   facts to either admit or deny?

5           MS. PARKER:  Well, then they can write that in the

6   answer below.  Right?  There is a space.

7           THE COURT:  Okay.  You know, Mr. Shafron, it's

8   only -- it's 10 -- they do seem to be carefully crafted.  I'm

9   going to -- as drafted, I'm going to direct you to answer

10  these.  But you can answer them -- can you do it within that

11  28-day period that I set for everything else?

12          MR. SHAFRON:  Yes, Your Honor.

13          THE COURT:  Okay.  All right.  Let's answer these

14  10 in the next -- in the next four weeks.

15          All right.  That takes care of Issue Number 3.

16          And the last issue was raised in the letter from

17  the plaintiffs, sent on Valentine's Day, Document 217.  I

18  received a response from the Alcoa defendants the very next

19  day.  That's Document 218.  And then I got a letter from the

20  plaintiffs yesterday, the 16th of February, and that's

21  Document 221.

22          The plaintiff's letter says that a Keith McKnight,

23  a fact witness and a 30(b)(6) witness for Alcoa was recently

24  deposed.  And he took the position at the deposition that

25  Alcoa doesn't really know if they're -- if Alcoa used PCBs at

1    the site in question.

2            Now, the plaintiff is concerned about that because

3    they had thought it was rather clear that PCBs had been --

4    that it was understood that PCBs have been present and/or

5    used at the site for years prior to 1997 and that this Amland

6    suit and the subsequent settlement of it will be sure

7    evidence of that being the case.  And they want discovery

8    with respect to all that, if Alcoa's position is going to be

9    that we don't know whether PCBs were used at the site.

10           Alcoa responded by saying, gee, we just received

11   word of this.  We really are not ready to deal with it.  We

12   haven't even had a chance to have a meet and confer.  Let's

13   not talk about it today.

14           And the -- which I understand.  I mean, this is

15   getting the letter two days ago on something so important is

16   kind of a small window.

17           And then the plaintiff said, hey, we've been -- in

18   their last letter, said we've been talking about this for a

19   long time.  We would at least like to chat about it at the

20   conference and see if we can't get some sort of guidance.

21           I guess the question for Ms. Parker is --

22           MS. PARKER:  He's going to handle this one.

23           THE COURT:  Well, is that the official position of

24   Alcoa that they -- that they don't know whether PCBs were

25   used at the spot?  It does -- and maybe you're not ready to

1    talk about it today, and I understand that.  But it does

2    raise a kind of a grim prospect of this litigation becoming

3    five times as big as it is right now.

4             MR. WALLER:  There is --

5             THE COURT:  And reopen all of that Amland

6    litigation, everything --

7             MR. WALLER:  No, no, I can say this, Your Honor.

8    And Mr. Corriston referenced it earlier, we have produced and

9    other parties have produced numerous environmental reports

10   that establish that there was environmental contamination at

11   the site, one, when Alcoa reacquired the property in '91, and

12   when it was sold in '97.  There is no issue that in '97 when

13   the property was sold to the Daibes defendants, that there

14   was PCB contamination in the concrete in the buildings.

15            We -- one of the reports that we produced had a

16   color chart that actually plotted all the environment -- the

17   PCB contamination per floor per building.

18            THE COURT:  But you're a defendant here.  And if

19   you're going to take the position, well, there was

20   contamination there, but we're still not sure who was

21   responsible for it, da, da, da, then that sounds like

22   we're -- we're going to relitigate things that from -- and

23   just tell me.  If we're going to, we're going to.  But God

24   help us if --

25            MR. WALLER:  Well, I don't know yet, Your Honor.  I

```
 1   don't -- you know, and I think that's part of what I want --
 2   and we had just a very quick conversation with Mr. Corriston
 3   the other day.  I thought it was a good start.  We can
 4   continue on -- he kind of outlined a little bit of kind of
 5   what they need.  And to be honest, my contact is out with
 6   pneumonia.
 7             THE COURT:  All right.
 8             MR. WALLER:  So there wasn't really much I could
 9   do.
10             THE COURT:  No, I understand.
11             MR. WALLER:  And I can't --
12             THE COURT:  I just don't --
13             MR. WALLER:  And Mr. McKnight testified that, yes,
14   there were PCB-containing transformers on the site.  There
15   was an affidavit that was -- that was actually produced by
16   Edgewater from the -- they've gotten some files from the
17   Amland litigation where a guy said, yes, they were there.
18   The place was clean and -- but yet they were found open, and
19   the copper had been pulled out them sometime before or
20   around -- you know, sometime before it was sold to the Daibes
21   defendants.  All that is out there.  So in terms of the
22   contamination and it being there in '91 and '97, that's not
23   an issue.
24             But beyond that as to where Mr. Corriston needs to
25   go -- and, again, we just started that conversation
```

1    yesterday, and whatnot, you know, I think it needs to be

2    explored a little bit.

3                THE COURT:  It may not be something that's very

4    easy to solve, but, boy, it's going to multiply the tasks and

5    the discovery in this case like a hydrogen bomb, I think.

6                MR. CORRISTON:  Yeah, and let me just explain

7    something also.  The period before '97, this facility shut

8    down in 1965.  It was sold to other people.  There was --

9    then there's two defendants here.  There's Alcoa Domestic,

10   which took title in '97.  Then there's the other Alcoa which

11   operated this facility.  And quite frankly, you know, I was

12   shocked, because you have to realize Alcoa paid the people

13   who owned the facility -- who they purchased it back from $15

14   million and knowing that the environmental report said it was

15   $25 million to clean it up, the PCBs, and now we get a

16   witness saying, well, I'm not sure we did it.  So --

17               THE COURT:  No, I understand and --

18               MR. CORRISTON:  And also, Your Honor, Judge Barry's

19   decision cites the fact that -- and we need some candor with

20   the Court and I realize they need time, cites the fact that

21   Alcoa admitted it used PCB hydraulic fluids at the facility.

22   They actually had -- we have a memo from 1956 saying that

23   there were 14 processes at the facility where they used PCB

24   hydraulics.  This building was the aluminum mill, full of

25   machinery.

1          So one of the things I said to Mr. Waller, I said,

2   Look, if you're going to make me jump through the hoops, I'm

3   going to jump through the hoops.

4          I said, but if Mr. McKnight is not the appropriate

5   witness, someone must have some historical knowledge of the

6   processes that Alcoa used in making aluminum.  It wasn't that

7   different.  They have no less than three Superfund sites and

8   five sites I identified on the Internet with extensive PCB

9   contamination from waste oils used in their processes --

10          MR. WALLER:  Irrelevant, prejudicial.  It's not

11  coming in at trial.  You know, the rest of it, we can talk

12  about.

13          THE COURT:  No, no, no, I --

14      (Simultaneous conversation)

15          MR. CORRISTON:  I don't think we're at trial.

16          But, Your Honor, the point is we -- and I

17  realize -- I'm willing to give them some time, but we need to

18  know which fork we're going down.

19          THE COURT:  No, I agree.  We do need to -- we need

20  to know at some point whether Alcoa's going to say, yeah, we

21  were the source of any PCBs that were at the site, or, gee,

22  we don't think we were.  I mean, if you take that position,

23  "gee, we don't think we were," I see this litigation becoming

24  a lot more --

25          MR. CORRISTON:  Another pointed, Your Honor,

 1   remember, they wouldn't give us the Amland stuff.  I had to

 2   go to New York and get what I could, and we're still trying

 3   to get some of the documents, because we don't have the

 4   exhibits.  That was this issue.

 5         In fact, they filed a third-party complaint to get

 6   Monsanto, because they didn't warn them that PCB hydraulic

 7   fluids were dangerous and could cause contamination.

 8         THE COURT:  But,Mr. Corriston, you don't have to --

 9   I mean, I appreciate your presentation, but I understand.  If

10   Alcoa is going to take the position that we don't know the

11   source of the PCBs at this site, then you're going to have to

12   get a lot of this discovery, I would think, I mean, I'll have

13   to -- I'll have to take each dispute as it comes, but it

14   wouldn't surprise me that you would want this discovery and

15   that you might, in fact, be entitled to an awful lot of it.

16   And.

17         MR. WALLER:  Your Honor, I'm not sure we're there

18   yet, but I would ask the Court keep an open mind as to, given

19   the claims in this case and given the fact that there's no

20   dispute that it was there, Alcoa owned the property at the

21   time it was sold, and given plaintiff's claims, I'm not

22   sure -- you know, I'm not there yet, to what extent this

23   really so relevant.

24         And we may be there.  I don't know.  I'd like to

25   see if the -- maybe it would help -- maybe with my client,

1    for example, if Mr. Corriston can share the memo he has with

2    me.   Standing --

3              THE COURT:   You're not sure how relevant it is that

4    there are PCBs at the site?

5              MR. WALLER:   No, that --

6              UNIDENTIFIED SPEAKER:   -- caused them.

7              MR. WALLER:   -- but as to -- if they were there, if

8    there was contamination there, we're not disputing that at

9    all when Alcoa reacquired in '91 and sold it in '97 --

10             THE COURT:   Well, I guess it wouldn't be -- I guess

11   it wouldn't be relevant --

12             MR. WALLER:   For CERCLA purposes.

13             THE COURT:   -- if you, as owner of the property --

14   strictly liable for the presence of PCBs, yeah, then, who

15   really cares?   But I don't know that that's the case.

16             MR. WALLER:   That's what I'm saying, we may not be

17   there yet.

18             THE COURT:   -- you disabuse me of that notion.

19             MR. WALLER:   Your Honor, we may not be there.

20             THE COURT:   Okay.   All right.

21             MR. CORRISTON:   The memo I referred to is

22   absolutely referenced in their -- Mr. McKnight referenced in

23   his own deposition, they have --

24             MR. WALLER:   Oh, that was the one?   Okay.

25             MR. CORRISTON:   But, Your Honor, it's -- it's

1    important because, again, we need to separate Alcoa Domestic

2    and Alcoa because Alcoa is claiming that they did not cause

3    any of this concrete to be contaminated, and that's their

4    defense.  And that's fine when -- if that's their deference,

5    we're entitled to discovery.

6              THE COURT:  Well, is that -- I mean, I am not --

7    you're not sure that that's your defense right now.  Is that

8    right?

9              MR. WALLER:  Yeah, that's -- that's correct.  I

10   don't mean -- again, under the CERCLA claims, I'm not sure

11   any of this is -- really matters.  But we're more than

12   willing to talk to Mr. Corriston about it.

13             THE COURT:  All right.  Well, I guess it -- the

14   final -- do any of our extra defendants have anything to add

15   to --

16             MS. PARKER:  They're so patient.

17             MR. CORRISTON:  Do we have a time period in which

18   we have to report back to the Court on this issue as to

19   whether -- we're going to meet-and-confer.  Obviously, you

20   have to talk to your client.

21             THE COURT:  Can you let me know by the end of

22   March?

23             MR. CORRISTON:  That is fine, because one of the

24   issues I did raise -- and I just -- I said, look, I don't

25   have -- I'm going to have to call Mr. McKnight back if we

1    continue before I get this production, unless it -- it --

2    maybe there's another witness, so I don't really care.  So

3    that's one of the issues I said, if there's another witness,

4    I'm fine continuing with him and not calling him back.  But I

5    just want to make it clear that I'm reserving my right that

6    at some point, I'm going to need someone with knowledge on

7    this, if we can't work it out amongst ourselves.

8                THE COURT:  All right.  So let us know by letter by

9    the end of March what the upshot of your back and forth is.

10               MR. SHAFRON:  Thank you, Your Honor.  And I just --

11               MR. CORRISTON:  Oh, I'm sorry, one more issue.

12   Excuse me.  We learned during the deposition of Mr. McKnight

13   that Alcoa is no longer Alcoa.  The company was split in two.

14   So we're going to need -- we're going to have talk about

15   that.  I'm just raising the issue, we may have to file an

16   amended pleading.

17               THE COURT:  An amended?  Okay.  You probably

18   wouldn't have a problem with that.

19               MR. WALLER:  Not at all, Your Honor.

20               MR. CORRISTON:  My one concern that you may or may

21   not have a problem with was Mr. McKnight testified the

22   company was split in two and that he believed that the

23   company that would be liable for any liability attributed in

24   this case is Alconic [phonetic].

25               MR. WALLER:  That's correct.

1          MR. CORRISTON:   I'm fine as long as I get that

2    representation, and if there's some reason it later proves

3    incorrect, I don't want someone saying, oh, you blew the

4    statute of limitations or something like that.   So if we

5    could just -- I don't want to sue anybody --

6        (Simultaneous conversation)

7          MR. WALLER:   No, no, it will not be a problem.

8          THE COURT:   -- protect yourself.   I --

9          MR. CORRISTON:   Thank you, Your Honor.   I'll work

10   it out with Mr. Waller.

11         MR. WALLER:   Definitely.

12         THE COURT:   All right.

13         MR. CORRISTON:   Sorry, Jason.

14         MR. SHAFRON:   Your Honor, there's just one more

15   issue, and it wasn't raised in the letter, but we have to --

16   my chance to depose Mr. McKnight is coming up, hopefully

17   soon, depending on when we --

18         MR. WALLER:   Next week.

19         MR. SHAFRON:   -- dates, I can't do it.   I have

20   court all day on Thursday, I can't do that.

21         But I'm reviewing the history of the dispute that

22   we have with Alcoa on probably the most crucial issue in the

23   case as it relates to my clients and Alcoa.   And I don't know

24   how familiar Your Honor is with all of that.   The crucial

25   issue -- at least one of the most crucial issues between us

1    is that they're claiming indemnity pursuant to a series of --

2    that they say -- and release one of them, signatory to the

3    agreement is -- has to indemnify the Alcoa defendants.

4            Part of our claim is that those -- those

5    agreements, to the extent that they would be -- if they --

6    initiated by the fraud that was committed by Alcoa in failing

7    to disclose to us the existence of two substantial oil tanks

8    that are under -- that are under Building 12 that we

9    discovered 2012, 2013 when that building was demolished.

10           The reason I'm bringing it up now is we've had a

11   series of letters back and forth in discovery where we asked

12   for all of the information about what they knew, what Alcoa

13   knew about, those -- crucial issue.  And it obviously is a

14   crucial issue because it was what was argued in motion

15   practice in front of Judge Vazquez.  It is probably the

16   central issue that was argued in front of Judge Vazquez about

17   the extent of the fraud and how that would impact the

18   enforceability of any agreement.

19           In response to our request for a whole -- all of

20   the documents associated with that, we received a response

21   back, basically to distill it to its essence, none of that

22   information is relevant.  Okay?  And then we -- wrote back

23   that it is.  Then the last letter that we received on that

24   issue, again, and the last letter that I recall receiving on

25   that issue was a June 29th, 2016, letter, a three-page letter

1   from Mr. Waller where he, again, at length, attempted to take

2   the position that none of those documents that we're

3   requesting are relevant.

4          Since the time that that occurred -- and they said

5   they had no documents.  They said the one documents that we

6   might have had, we sent to you --

7          THE COURT:  About -- when they were talking about

8   oil tanks.

9          MR. SHAFRON:  The oil tanks.  That we sent to

10  you -- since that time, they found documents -- a few

11  documents and produced those to us.

12         MR. WALLER:  The documents we produced to your

13  client, which show the tanks.  Don't forget that part.

14         MR. SHAFRON:  That's the allegation, which, again,

15  I don't want to argue this whole case now, but I -- it's --

16  it's going to be an interesting trial position to take that

17  they knew about these tanks and didn't disclose them to --

18  when they said all the tanks had been removed from the

19  property.

20         But that's for another day.

21         We have Mr. McKnight's deposition.  I just want a

22  confirmation today so I don't have to get you on the phone

23  that when I asked -- start asking all of these questions at

24  Mr. McKnight's deposition, they're not going to take the

25  position that none of this information is relevant.

1              That --

2              THE COURT:  I mean, relevance isn't a legitimate --

3              MR. SHAFRON:  Right.

4              THE COURT:  I mean --

5              MR. SHAFRON:  Is it likely to lead to admissible

6    evidence.  They still -- their position strikingly, still,

7    that none of this has anything to do with --

8              THE COURT:  Unless you've got a privilege issue,

9    don't call me on it --

10             MR. SHAFRON:  I hope not.  But if I have --

11        (Simultaneous conversation)

12             THE COURT:  -- if it's a relevance thing --

13        (Simultaneous conversation)

14             MR. SHAFRON:  -- Mr. McKnight fly in from

15   Pittsburgh, I certainly don't want that to be the position

16   that's asserted at the dep.  It is certainly directly

17   relevant, and if it -- at least likely to lead to admissible

18   evidence.  But I -- but it's directly relevant.  It's the

19   most -- probably the most important issue as it relates --

20        (Simultaneous conversation)

21             THE COURT:  Which, likely to lead to admissible

22   isn't the test really anymore.

23             MR. SHAFRON:  What's the test?

24             THE COURT:  Well, it's just kind of a -- it's a

25   general -- is a relevance test.  The amendments at the end of

1    2014 got rid of that.

2              MR. SHAFRON:  Oh, I haven't fought it out since

3    then.

4              THE COURT:  -- that time-honored -- I was so used

5    to that.  It made so much sense to me, but --

6              MR. SHAFRON:  Yeah --

7              THE COURT:  -- they got rid of that.

8              MR. SHAFRON:  So, that's all, Your Honor.  I

9    just -- I didn't know whether that -- the Alcoa defendants

10   were continuing to take that position that no -- that

11   knowledge, that information, those documents were not

12   relevant --

13       (Simultaneous conversation)

14             THE COURT:  Well, I can tell you if I get a phone

15   call, I'm likely in a situation where somebody's saying it's

16   not relevant -- a deposition is broad, the scope of discovery

17   is broad, I'm going to -- unless there's a privilege issue,

18   I'm -- I would urge you not to fight that one, allow the

19   question to go forward --

20             I think we -- I think it's pretty clear we need to

21   push out the fact discovery deadline.

22             What do you think, the end of May?

23             MR. CORRISTON:  I think that's appropriate,

24   Your Honor.

25             THE COURT:  Does that make sense?  All right.  I'll

1    do that for now.

2              And we'll probably -- we'll probably set a call for

3    sometime around then to see how we're doing, and what -- you

4    know, what we need to do for other deadlines.  You guys will

5    probably have things that you bring up to me long before

6    then.  I mean, they have a call -- a call may become

7    necessary because of other issues you bring up, but the end

8    of May call will just be our, you know, regularly scheduled

9    case management or making sure we're staying on top of the

10   case kind call.

11             Anything further, Mr. Corriston?

12             MR. CORRISTON:  No, Your Honor, just thank you.  I

13   would say.  The security guards, when I came in, said he's

14   the only one still here.  I said, well, either --

15             THE COURT:  It's not Memorial Day weekend or --

16   everybody's just getting out of here.

17             MR. CORRISTON:  I said he either scheduled this at

18   this time because he was very busy or he wanted to make a

19   point to us.

20             THE COURT:  No.  It's just -- and I have --

21   although, yeah, Friday, I -- that was probably a trick on my

22   part.  So I don't know.  Let me just before -- are we done

23   with things for the record?

24             UNIDENTIFIED SPEAKER:  Yes, Your Honor.  We'll go

25   off the -- we'll go off the record.

1                    (Conclusion of proceedings at 4:29:33)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    Certification

2        I, SARA L. KERN, Transcriptionist, do hereby certify

3    that the 71 pages contained herein constitute a full, true,

4    and accurate transcript from the official electronic

5    recording of the proceedings had in the above-entitled

6    matter; that research was performed on the spelling of proper

7    names and utilizing the information provided, but that in

8    many cases the spellings were educated guesses; that the

9    transcript was prepared by me or under my direction and was

10   done to the best of my skill and ability.

11       I further certify that I am in no way related to any of

12   the parties hereto nor am I in any way interested in the

13   outcome hereof.

14

15

16

17

18   S/ *Sara L. Kern*                    1st of March, 2017

19   _____        _____
     Signature of Approved Transcriber             Date

20

21
     Sara L. Kern, CET**D-338
22   King Transcription Services
     3 South Corporate Drive, Suite 203
23   Riverdale, NJ  07457
     (973) 237-6080
24

25