**LINDABURY, McCORMICK, ESTABROOK & COOPER, P.C.**
**53 Cardinal Drive**
**P.O. Box 2369**
**Westfield, N.J. 07091**
**(908) 233-6800**
**Attorneys For Defendant,**
**TERMS Environmental Services, Inc.**
**DRP-1812**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER,<br><br>       Plaintiff,<br>vs.<br><br>WATERSIDE CONSTRUCTION, LLC; 38<br>COAH, LLC, DAIBES BROTHERS, INC.;<br>NORTH RIVER MEWS ASSOCIATES, LLC;<br>FRED A. DAIBES; TERMS ENVIRONMENTAL<br>SERVICES, INC.; ALUMINUM COMPANY OF<br>AMERICA; A.P. NEW JERSEY, INC.; JOHN<br>DOES 1-100; and ABC CORPORATIONS 1-100,<br><br>       Defendants. | Civil Action No. 2:14-cv-05060-ES-MAH<br><br>**STATEMENT OF**<br>**UNCONTESTED MATERIAL FACTS** |

     Pursuant to Local Rule 56.1, Defendant, TERMS Environmental Services, Inc.

("TERMS"), makes the following Statement of Uncontested Facts in support of its motion for

summary judgment:

     1.   The Plaintiff, Borough of Edgewater ("Plaintiff" or "Edgewater") is a municipal

        corporation of the State of New Jersey.  Plaintiff's Fourth Amended Complaint, Par.

        1.

3112453v1

2. Waterside Construction LLC ("Waterside") is a construction company. Deposition of Fred Daibes [7/14/17] 10:2-8, attached to Certification of David R. Pierce, Esq. as Exhibit A.

3. Fred Daibes is the managing manager of Waterside Construction LLC. Deposition of Fred Daibes [7/14/17] 9:9-17, attached to Certification of David R. Pierce, Esq. as Exhibit A.

4. North River Mews Associates LLC is an entity in which Fred Daibes is the managing member. Deposition of Fred Daibes [7/14/17] 12:5-11, attached to Certification of David R. Pierce, Esq. as Exhibit A.

5. Daibes Brothers, Inc. is a corporation in which Fred Daibes in the majority shareholder. Deposition of Fred Daibes [7/14/17] 11:13-25, attached as to Certification of David R. Pierce, Esq. as Exhibit A.

6. 38 COAH Associates, LLC is an entity in which Fred Daibes is the sole member and the Managing Member. Deposition of Fred Daibes [7/14/17] 9:21-25, attached to Certification of David R. Pierce, Esq. as Exhibit A; Operating Agreement of 38 COAH Associates, LLC, Exhibit FD-4 in Daibes Dep., attached to Certification of David R. Pierce, Esq. as Exhibit B.

7. Fred Daibes, as managing member or majority shareholder, controls Waterside Construction, LLC, North River Mews Associates, LLC, Daibes Brothers, Inc. and 38 COAH, LLC. Deposition of Fred Daibes [7/14/17] 9:9-17; 9:21-25; 11:13-25; 12:5-11, attached to certification of David R. Pierce, Esq. as Exhibit A; Operating

2

Agreement of 38 COAH Associates, LLC, Exhibit FD-4 in Daibes Dep., attached to Certification of David R. Pierce, Esq. as Exhibit B.

8. Fred Daibes is unaware of who the other members or shareholders of Waterside Construction, LLC, North River Mews Associates, LLC, Daibes Brothers, Inc. and 38 COAH, LLC may be, but believes that he owns ninety percent of each entity and that a family member owns the remaining ten percent. Deposition of Fred Daibes [7/14/17] 12:5-25, attached to Certification of David R. Pierce, Esq. as Exhibit A.

9. Employees understood that they worked for the Daibes Organization and while not employed by 38 COAH, LLC worked on projects for 38 COAH LLC. Deposition of Shergoh Alkalini [10/10/17] 9:25-15:20, attached to Certification of David R. Pierce, Esq. as Exhibit C.

10. Employees in the Daibes organization signed documents as Vice-President without ever having been given that title. Deposition of Shergoh Alkalini [10/10/17] 16:3-19:15, attached to Certification of David R. Pierce, Esq. as Exhibit C.; Biennial Certification Monitoring Report Form for a Deed Notice & Engineering Control, Exhibit SA-1 in Alkalini Dep., attached to Certification of David R. Pierce, Esq., as Exhibit D.

11. Many employees in the Daibes organization were given the title Vice-President, however, their roles and responsibilities did not match that title. Deposition of Glenn Donlan [10/30/17] 12:11-13:14, attached to Certification of David R. Pierce, Esq., as Exhibit E.

3

12. Veteran's Field is public park owned by Plaintiff, Borough of Edgewater ("Plaintiff" or "Edgewater") and is located at 1167 River Road, Edgewater, New Jersey. Plaintiff's Fourth Amended Complaint, Par. 16.

13. TERMS is an environmental consulting firm. Certification of Ronald Dooney, Par. 3.

14. Ronald Dooney, principal of TERMS, is a Licensed Site Remediation Professional. Certification of Ronald Dooney, Par.2.

15. Defendant Arconic is an entity formed to hold the fabrication and related downstream operations and liabilities of the former Aluminum Company of America ("Alcoa"). Deposition of Kevin McKnight [2/1/17] 20:2-22:7, attached to Certification of David R. Pierce, Esq., as Exhibit F.

16. Alcoa operated a facility in Edgewater from approximately 1914 to 1965 (the "Former Alcoa Site"). Id. at [2/1/17] 59:6-21.

17. In or about 2011 Plaintiff sought funds from the New Jersey Department of Environmental Protection Green Acres program for purposes of making certain improvements to Veteran's Field. Deposition of Michael Berliner [7/26/17] 16:18-17:19, attached to Certification of David R. Pierce, Esq., as Exhibit G.

18. TERMS was retained by Edgewater in 2011 to conduct the Preliminary Assessment required under the Department of Environmental Protection's Green Acres program and investigate surface and subsurface conditions at Veteran's Field. Certification of Ronald Dooney, Par. 4.

19. TERMS' investigation in 2011 determined that Veteran's Field contained historic fill and hazardous substances, including several polyaromatic hydrocarbons ("PAHs"),

extractable petroleum hydrocarbons ("EPH") and polychlorinated biphenyls (PCBs")
at concentrations in excess of the New Jersey Department of Environmental
Protection's residential direct contact cleanup standards. Certification of Ronald
Dooney, Par. 5, Exhibit A.

20. PCBs were detected at four locations within Veteran's Field at concentrations in
excess of the New Jersey Department of Environmental Protection's residential direct
contact cleanup standards. Certification of Ronald Dooney, Par. 6, Exhibit B.

21. EPH was detected a single location at Veteran's Field at a concentration in excess of
the New Jersey Department of Environmental Protection's residential direct contact
cleanup standards. Certification of Ronald Dooney, Par. 7, Exhibit B.

22. PAHs were deemed to be present throughout Veteran's Field as part of historic fill at
concentrations in excess of the New Jersey Department of Environmental Protection's
residential direct contact cleanup standards. Certification of Ronald Dooney, Par. 8,
Exhibit B.

23. Edgewater decided that the PCBs in concentrations exceeding the New Jersey
Department of Environmental Protection's residential direct contact cleanup
standards should be remediated by removal of the PCBs. Certification of Ronald
Dooney, Par. 9, Exhibit B.

24. Edgewater requested a proposal from TERMS, and subsequently entered into a
contract with TERMS, pursuant to which TERMS was to, among other things,
prepare a Remedial Action Work Plan and provide oversight for: a) removal of the
PCBs from four "hot spots" where PCBs had been detected; b) removal of EPH from

5

a single location where concentrations exceeded the New Jersey Department of Environmental Protection's residential direct contact cleanup standards; and c) install an engineering control over the historic fill at Veteran's Field to cap the remaining PAH contamination. Certification of Ronald Dooney, Par. 10, Exhibit B.

25. In or about June, 2012 Edgewater issued a bid notice for the Veteran's Field Improvement Project (the "Project"). Specifications for Veteran's Field Improvements, April 2012, revised May 2012, attached to Certification of David R. Pierce, Esq. as Exhibit H.

26. Prior to commencement of the Project the highest concentration of PCBs detected at Veteran's Field was 0.952 parts per million (milligrams/kilogram). Certification of Ronald Dooney, Par. 11, Exhibit A.

27. The Project included not only the remediation of Veteran's Field pursuant to the Remedial Action Work Plan, but also included the installation and or construction of new playing fields, a playground, parking lots, community center and other new amenities. Deposition of Michael Berliner [7/26/17] 16:18-17:19, attached to Certification of David R. Pierce, Esq., as Exhibit G.

28. On or about June 27, 2012, Edgewater awarded the contract for the Veteran's Field Project to Waterside Construction, LLC. Deposition of Michael Berliner [7/26/17] 42:23-43:2, attached to Certification of David R. Pierce, Esq., as Exhibit G.

29. After Waterside was determined to be the successful bidder, Edgewater and Waterside entered into a written contract for the Veteran's Field Project (the "Project Contract"). Contract for Veteran's Field Improvements and Borough of Edgewater

6

Contract Form attached to Certification of David R. Pierce, Esq., as Exhibits I and J, respectively.

30. In the Project Contract, Neglia Engineering Associates ("Neglia") is designated as the Plaintiff's representative. Certification of David R. Pierce, Esq., Exhibit J at 490.

31. Pursuant to the Project Contract Neglia had authority, as Plaintiff's representative, to approve and reject work performed by Waterside. Id.

32. Pursuant to the Project Contract Neglia had the authority, as Plaintiff's representative, to require Waterside to correct any defective work. Id.

33. Pursuant to the Project Contract, inspection and approval of any work by Neglia, the Engineer, does not relieve Waterside of the obligation to perform in accordance with the Contract. Id. at 491.

34. Pursuant to the Project Contract, Plaintiff had the ability to suspend performance of the Contract for any reason it deemed to be in its best interest. Certification of David R. Pierce, Esq., Exhibit I at 467; Exhibit J at 492.

35. Pursuant to the bid documents, Waterside was aware that that bid required the use of certified clean fill material or virgin stone. Deposition of Matthew Vereb [2/15/17] 29:6-20, attached to Certification of David R. Pierce, Esq. as Exhibit K; Specifications for Veteran's Field Improvements, April 2012, revised May 2012, attached to Certification of David R. Pierce, Esq. as Exhibit H.

36. Although Waterside was aware that the bid documents required the use of certified clean fill material or crushed virgin stone Waterside bid on the Veteran's Field

7

Project based on the use of common fill. Deposition of Matthew Vereb [2/15/17] 184:9-185:4, attached to Certification of David R. Pierce, Esq. as Exhibit K.

37. Prior to the commencement of work, and during the work, on the Project representatives of TERMS attended multiple meetings with representatives of Neglia and representatives of Waterside at which the fill requirements and testing procedures were discussed. Deposition of Peter Lakatos [7/19/17] 74:1 -79:4; 119:2-120:12, attached to Certification of David R. Pierce, Esq. as Exhibit L; Deposition of Ronald Dooney [7/20/17] 43:24-47:15, attached to Certification of David R. Pierce, Esq. as Exhibit M.

38. At the various meetings referenced in paragraph 37, the participants discussed the testing requirements for fill material.  TERMS representatives explained that if Waterside was using rock from an undisturbed geological formation that they would have to test one sample to verify that it was suitable as fill material.  TERMS further explained that any other proposed fill material would have to be tested in accordance with the New Jersey Department of Environmental Protection's applicable guidance documents and regulations for alternative fill material.  Deposition of Peter Lakatos [7/19/17] 74:1 -79:4; 119:2-120:12, attached to Certification of David R. Pierce, Esq. as Exhibit L; Deposition of Ronald Dooney [7/20/17] 43:24-47:15, attached to Certification of David R. Pierce, Esq. as Exhibit M.

39. Several times during the Project TERMS sent Waterside representatives a copy of the New Jersey Department of Environmental Protection's guidance document on alternative fill which contained the sampling requirements. Deposition of Peter

8

Lakatos [7/19/17] 74:21 -75:13; 77:18-79:7, attached to Certification of David R. Pierce, Esq. as Exhibit L.

40. It was clearly explained to and understood by Waterside and its principal, Fred Daibes, at the beginning of the Project that proposed fill material was not supposed to be brought to Veteran's Field until it had been sampled and deemed appropriate by TERMS. Deposition of Fred Daibes [7/14/17] 134:7-136:5, attached to Certification of David R. Pierce, Esq. as Exhibit A.

41. The protocol established for approval of proposed fill material for use at the Project was for Waterside to identify to TERMS a potential donor site and provide as much information regarding that site as was available, including any available analytical results for the proposed fill material.  TERMS would review the available information and advise whether the proposed material was suitable for use, not suitable for use or that more information was needed.  If more information was needed TERMS would obtain samples of the proposed fill material at the donor site, have them analyzed and then advise, based on those analytical results, whether the proposed fill material was or was not suitable for use at the Project.  Deposition of Fred Daibes [7/14/17] 83:15-84:9; 135:11-136:5, attached to Certification of David R. Pierce, Esq. as Exhibit A; Deposition of Peter Lakatos [7/19/17] 119:2-120:25; 128:3-7, attached to Certification of David R. Pierce, Esq. as Exhibit L; Deposition of Ronald Dooney [7/20/17] 43:24-49:1; 76:19-22; 78:9-80:7, attached to Certification of David R. Pierce, Esq. as Exhibit M.

9

42. During the Project Waterside had control over access to Veteran's Field, possessing the key to the locked gate at the Project site. Certification of Ronald Dooney, Par.12; Deposition of Jason Menzella [8/11/16] 18:4-20:11, attached to Certification of David R. Pierce, Esq. as Exhibit N; Deposition of Michael Berliner [7/26/17] 38:13-21, attached to Certification of David R. Pierce, Esq. as Exhibit G.

43. During the excavation and removal of the contamination from the hot spots, TERMS had personnel stationed at Veteran's Field during all work in order to oversee and supervise the remediation. Certification of Ronald Dooney, Par. 13.

44. Waterside proposed using material from its construction yard at 440 River Road, however, analysis revealed that it was not suitable for use at Veteran's Field and TERMS advised Waterside that this material could not be used except for rock which was to be screened out of the other material. Deposition of Noah Skyta [10/5/17] 40:13-42:10; 55:16-58:7; 71:14-75:3, attached to Certification of David R. Pierce, Esq. as Exhibit O.

45. Despite being advised that material from its construction yard was not suitable for use at Veteran's Field, Waterside nevertheless transported material from its construction yard to Veteran's Field and attempted to use it as fill material. Deposition of Noah Skyta Dep. [10/5/17] 55:16-58:7; 71:14-75:3, attached to Certification of David R. Pierce, Esq.as Exhibit O; Deposition of Ronald Dooney [7/20/17] 56:15-58:13, attached to Certification of David R. Pierce, Esq.as Exhibit M.

46. TERMS employee on-site at Veteran's Field, Noah Skyta, informed Waterside and Daibes that the material from its construction yard could not be used on Veteran's

10

Field and instructed Waterside to remove all such material except for the rock which was to be screened out. Deposition of Noah Skyta [10/5/17] 55:16-58:7; 71:14-75:3, attached to Certification of David R. Pierce, Esq.as Exhibit O; Deposition of Ronald Dooney [7/20/17] 56:15-58:13, attached to Certification of David R. Pierce, Esq.as Exhibit M.

47. As a result of this on-site dispute, TERMS made it clear, via email to Waterside's project manager Matt Vereb, that Waterside was to inform TERMS prior to bringing any proposed fill material to Veteran's Field. Deposition of Matthew Vereb [2/15/17] 44:21-47:19, attached to Certification of David R. Pierce, Esq. as Exhibit K; Email from Jeff Freidman to Matt Vereb dated October 9, 2012, Exhibit MV-3, attached to Certification of David R. Pierce as Exhibit P, at W004473.

48. After removal of the contamination from the hot spots TERMS personnel were only present at Veteran's Field when they had been informed in advance that Waterside's expected activities were going to involve placement of fill material. Deposition of Ronald Dooney [7/20/17] 54:4-56:14, attached to Certification of David R. Pierce, Esq.as Exhibit M.

49. In October, 2012, Superstorm Sandy hit New Jersey and resulted in the shutdown of the Project. Deposition of Michael Berliner [7/26/17] 38:13-21, attached to Certification of David R. Pierce, Esq. as Exhibit G.

50. As a result of the impacts of Superstorm Sandy, Plaintiff decided to increase the final elevation at Veteran's Field to elevate it above the flood elevation. Certification of Ronald Dooney, Par. 14.

11

51. Plaintiff's decision to increase the final elevation at Veteran's Field had the effect of requiring Waterside to find and import a substantial additional volume of fill material for Veteran's Field. Certification of Ronald Dooney, Par. 15.

52. Work on the Project resumed in the first quarter of 2013. Certification of Ronald Dooney, Par. 16.

53. Waterside identified numerous potential donor sites to TERMS, however, many of those donor sites were deemed unsuitable for use at Veteran's Field. Deposition of Fred Daibes [7/14/17] 141:9-143:23, attached to Certification of David R. Pierce, Esq. as Exhibit A.

54. Waterside became frustrated with TERM's rejection of proposed fill material, blaming TERMS for delaying the completion of the Project. Id.

55. Despite the agreed upon protocol for the review and importation of fill material, Waterside brought proposed fill material to the Project prior to testing by TERMS on several occasions prior to September, 2013. Deposition of Michael Berliner [7/26/17] 54:18-57:11, attached to Certification of David R. Pierce, Esq. as Exhibit G; Deposition of Peter Lakatos [7/19/17] 121:1-126:10, attached to Certification of David R. Pierce, Esq. as Exhibit L; Deposition of Jason Menzella [8/11/16] 52:23-57:10, attached to Certification of David R. Pierce, Esq. as Exhibit N; Deposition of Matthew Vereb [3/24/17] 214:17-22, attached to Certification of David R. Pierce, Esq. as Exhibit Q.

56. Whenever it was discovered that Waterside had brought fill material to Veteran's field prior to testing, TERMS notified Plaintiff, through Neglia, of the incident and

12

instructed Waterside that it was not to use or spread that fill material until analysis had been completed. Deposition of Michael Berliner [7/26/17] 54:18-57:11, attached to Certification of David R. Pierce, Esq. as Exhibit G; Deposition of Peter Lakatos [7/19/17] 121:1-126:10, attached to Certification of David R. Pierce, Esq. as Exhibit L; Deposition of Matthew Vereb [3/24/17] 214:17-216:18, attached to Certification of David R. Pierce, Esq. as Exhibit Q.

57. When subsequent analysis revealed that the material brought to Veteran's Field before any testing was not suitable for use at Veteran's Field TERMS advised Waterside and Neglia that the material must be removed. Deposition of Michael Berliner [7/26/17] 54:18-57:11, attached to Certification of David R. Pierce, Esq. as Exhibit G; Deposition of Peter Lakatos [7/19/17] 121:1-126:10, attached to Certification of David R. Pierce, Esq. as Exhibit L; Deposition of Matthew Vereb [3/24/17] 227:8-229-4, attached to Certification of David R. Pierce, Esq. as Exhibit Q.

58. Despite Plaintiff's knowledge, through Neglia, that Waterside had failed to abide by the protocol for bringing fill material to Veteran's Field and, on more than one occasion, brought fill material to Veteran's Field before testing which was subsequently determined by testing to not be suitable for use at Veteran's Field, Plaintiff did not take any action against Waterside of shut the Project down until after September 7, 2013. Certification of Ronald Dooney, Par. 17.

13

59. During the Project Waterside personnel asked TERMS personnel whether they could use recycled concrete aggregate as fill at the Project. Deposition of Jason Menzella [8/11/16] 34:20-38:1, attached to Certification of David R. Pierce, Esq. as Exhibit N.

60. TERMS personnel advised Waterside personnel that recycled concrete aggregate could not be used as fill underneath any grass areas or fields. Id.

61. Waterside personnel subsequently asked TERMS personnel if they could use recycled concrete aggregate under impervious surfaces at the Project. Id.

62. TERMS personnel advised Waterside personnel that recycled concrete aggregate could be used as fill underneath paved areas at the Project, but only if it came from an approved recycling center or was tested. Id.; Deposition of Michael Neglia [11/27/17] 24:18-25:12 attached to Certification of David R. Pierce, Esq. as Exhibit R.

63. On September 6, 2013 Waterside personnel informed Jason Menzella, Neglia's chief inspector for the Project, that Waterside was not going to be performing any work at Veteran's Field on the following day, Saturday, September 7, 2013. Deposition of Jason Menzella [8/11/16] 40:5-23, attached to Certification of David R. Pierce, Esq. as Exhibit N.

64. As a result of Waterside's advice to Jason Menzella, neither Neglia nor TERMS were on-site at Veteran's Field on Saturday, September 7, 2013. Id. at 20:12-40:23.

65. While returning home from a baseball game at Yankee Stadium on Saturday, September 7, 2013, Jason Menzella observed several Waterside dump trucks present at Veteran's Field and activity at the site taking place.  Id.

14

66. Jason Menzella stopped at Veteran's Field to investigate the activity and observed Waterside personnel dump two truckloads of crushed concrete material onto the surface at Veteran's Field and another Waterside employee, Manuel Portifilio, spread the crushed concrete material. Id.

67. Jason Menzella also observed Waterside personnel cover the crushed concrete material with clean stone before compacting it. Id.

68. Jason Menzella witnessed Waterside personnel spread the crushed concrete material into areas of Veteran's Field that were designated to be part of a playing field and, therefore, to be covered by grass and not by any paving or other impervious surface. Id.

69. Jason Menzella, Neglia's chief inspector for the Project, had not, prior to September 7, 2013, observed any material similar to the material placed at Veteran's Field by Waterside on September 7. 2013 to be present at Veteran's Field. Id. at 31:22-32:9; 100:21-101:17.

70. Jason Menzella instructed Waterside personnel to cease covering the crushed concrete and left Veteran's Field. Id. at 38:8-40:1.

71. The following Monday Jason Menzella arrived back at Veteran's field and observed that Waterside personnel had not followed his instructions and had, in fact, covered the remaining crushed concrete material with crushed stone. Id.

72. On or about September 11, 2013 TERMS personnel received a telephone call from Mike Berliner of Neglia advising that Waterside had imported to and placed at Veteran's Field a large quantity of fill material that was untested and from an

15

unknown source.  Deposition of Ronald Dooney [7/20/17] 58:15-62:23, attached to Certification of David R. Pierce, Esq.as Exhibit M.

73. After learning of Waterside's activities in bringing crushed concrete material onto Veteran's Field on September 7, 2013, TERMS instructed Waterside that it was not to spread or utilize the crushed concrete material and not to import any additional material from that source. Deposition of Ronald Dooney [7/20/17] 98:18-99:25, attached to Certification of David R. Pierce, Esq. as Exhibit M.

74. TERMS never transported any demolition debris or concrete from the Former Alcoa Site to Veteran's Field. Certification of Ronald Dooney, Par. 18.

75. Waterside never advised TERMS that it was going to bring recycled concrete material from the Former Alcoa Site to Veteran's Field. Deposition of Matthew Vereb [3/24/17] 390:6-14, attached to Certification of David R. Pierce, Esq as Exhibit Q; Deposition of Mark IaFelice [6/21/17] 148:19-149:14; attached to Certification of David R. Pierce, Esq as Exhibit S;  Deposition of Kenneth Schiller [6/22/17] 38:25-41:11, attached to Certification of David R. Pierce, Esq as Exhibit T.

76. Prior to bringing the concrete debris from Building 12 at the Former Alcoa Site to Veteran's Field, Waterside never advised TERMS that the concrete material from Building 12 was contaminated with PCBs. Deposition of Matthew Vereb [2/15/17] 94:8-17, attached to Certification of David R. Pierce, Esq as Exhibit K.

77. On September 12, 2013 TERMS' personnel collected two composite samples of crushed concrete material that had been stockpiled at Veteran's Field and submitted the samples for laboratory analysis. Deposition of Ronald Dooney [7/20/17] 102:22-

16

103:12, attached to Certification of David R. Pierce as Exhibit M; Certification of Ronald Dooney, Par. 19, Exhibit C.

78. The results of the laboratory analysis of the samples of crushed concrete material obtained from Veteran's Field were received by TERMS on September 23, 2013 and indicated that the crushed concrete material was contaminated with PCBs. Certification of Ronald Dooney, Par. 20, Exhibit C.

79. The concentrations of PCBs reported in the analytical results received on September 23, 2013 were 71.9 and 99.4 parts per million. Certification of Ronald Dooney, Par. 21, Exhibit C.

80. After receipt of the analytical results on September 23, 2013, TERMS notified Neglia and Waterside that the crushed concrete material was not suitable for use at Veteran's Field and had to be removed. Deposition of Ronald Dooney [7/20/17] 105:21-106:20; attached to Certification of David R. Pierce, Esq. as Exhibit M; Exhibit RD-10, email from Peter Lakatos to Matt Vereb, dated September 24, 2013, attached to Certification of David R. Pierce, Esq. as Exhibit U.

81. After receipt of the analytical results on September 23, 213, TERMS had multiple discussion with Neglia and the Borough Administrator for Edgewater in which TERMS recommended that the Project be shut down. Deposition of Peter Lakatos [7/19/17] 138:20-146:16, attached to certification of David R. Pierce, Esq. as Exhibit L; Deposition of  Michael Neglia [11/27/17] 35:7-37:18, attached to certification of

17

David R. Pierce Esq. as Exhibit R; Deposition of Ronald Dooney [7/20/17] 117:4-118:12; 128:2-17, attached to certification of David R. Pierce, Esq. as Exhibit M.

82. Plaintiff did not agree to have work on the Project cease after receipt of the September 23, 2013 analytical results. Deposition of Peter Lakatos [7/19/17] 138:20-146:16, attached to certification of David R. Pierce, Esq. as Exhibit L.

83. On September 25, 2013, Waterside personnel advised TERMS personnel that no material from the Alcoa site had been brought to Veteran's Field. Jason Menzella [8/11/16] 67:15-69:18; 97:3-99:19, attached to Certification of David R. Pierce, Esq. as Exhibit N.

84. After receipt of the results of the initial sampling TERMS personnel placed plastic tarps on those areas of Veterans' Field where it was evident crushed concrete had been placed to prevent migration of PCB contamination. Deposition of Ronald Dooney [7/20/17] 128:18-129:3, attached to Certification of David R. Pierce, Esq. as Exhibit M; Deposition of Peter Lakatos [7/19/17] 138:20-141:22, attached to certification of David R. Pierce, Esq. as Exhibit L.

85. On September 30, 2013, TERMS' personnel collected twenty-seven additional samples of material from Veteran's Field on September 30, 2013 and submitted the samples for laboratory analysis. Certification of Ronald Dooney, Par. 23, Exhibit E; Deposition of Peter Lakatos [7/19/17] 139:7-142:11, attached to Certification of David R. Pierce, Esq. as Exhibit L

86. The results of the laboratory analysis of the samples of crushed concrete material obtained from Veteran's Field were received by TERMS on October 3, 2013 and

18

indicated that the crushed concrete material was contaminated with PCBs with the highest reported concentration at 448.2 parts per million. Certification of Ronald Dooney, Par. 24, Exhibit E.

87. After receipt of the October 3, 2013 analytical results TERMS notified Plaintiff, through Neglia, and after further discussions with Neglia and Plaintiff, TERMS was authorized to send a letter to Waterside advising that all work on the Project was to cease. Deposition of Peter Lakatos [7/19/17] 138:20-146:16, attached to Certification of David R. Pierce, Esq. as Exhibit L; Deposition of Michael Neglia [11/27/17] 35:7-37:18, attached to Certification of David R. Pierce, Esq. as Exhibit R; Deposition of Ronald Dooney [7/20/177] 114:23-116:16; 117:4-118:12; 128:2-17; 133:19-134:12, attached to Certification of David R. Pierce, Esq. as Exhibit M

88. On October 4, 2013, TERMS issued letters to Plaintiff and Waterside advising, based on the October 3, 2013 analytical results, that all work on the Project was to cease. Deposition of Ronald Dooney [7/20/17] 118:13-119:25, attached to certification of David R. Pierce, Esq. as Exhibit M

89. In October 2013, subsequent to the issuance of the October 4, 2013 letters,  Ron Dooney of TERMS, at Plaintiff's request, placed a lock on the gate at Veteran's Field to attempt to prevent Waterside from continuing to access Veteran's Field. Deposition of Ronald Dooney [7/20/17] 116:17-117:3; 124:13-125:21; 126:10-23, attached to certification of David R. Pierce, Esq. as Exhibit M

90. On October 7, 2013, Waterside advised Plaintiff, through counsel, that it claimed that any importation of crushed concrete by Waterside was done "at the direction and

19

supervision of TERMS and with their approval." Deposition of Phillip Boggia
[10/30/17] 13:1-16:14, attached to Certification of David R. Pierce, Esq. as Exhibit V;
Deposition of Gregory Franz [9/22/17] 47:9-49:2, attached to Certification of David
R. Pierce, Esq. as Exhibit W; Exhibit GF-6, Letter from Matthew Slowinski, Esq.
dated October 7, 2013, attached to Certification of David R. Pierce, Esq. as Exhibit X.

91. Despite knowledge of the assertion by Waterside that any importation of crushed
    concrete by Waterside was done "at the direction and supervision of TERMS and
    with their approval," Plaintiff continued to engage TERMS to investigation and
    remediate the PCB contamination at Veteran's Field.  Deposition of Phillip Boggia
    [10/30/17] 13:1-16-14; 17:16-19:11; attached to Certification of David R. Pierce, Esq.
    as Exhibit V; Deposition of Gregory Franz [9/22/17] 49:6-50:20, attached to
    Certification of David R. Pierce, Esq. as Exhibit W; Exhibit GF-7, Letter from Pete
    Lakatos to Gregory Franz dated October 18, 2013, attached to Certification of David
    R. Pierce, Esq. as Exhibit Y; Exhibit GF-8, Minutes of A Special Session of the
    Edgewater Mayor and Council, dated November 6, 2013, attached to certification of
    David R. Pierce, Esq. as Exhibit Z.

92. At Plaintiff's request TERMS conducted extensive sampling at Veteran's Field in
    October and November, 2013. Deposition of Gregory Franz [9/22/17] 65:9-20,
    attached to Certification of David R. Pierce, Esq. as Exhibit W; Certification of
    Ronald Dooney, Par. 25; Exhibit GF-11, Borough of Edgewater Resolution, dated
    February 18, 2014, attached to certification of David R. Pierce, Esq. as Exhibit AA.

93. Plaintiff, Waterside and TERMS engaged in discussions regarding the importation of PCB contaminated fill to Veteran's Field and how to remedy that. Deposition of Gregory Franz [9/22/17] 58:14-60:21, attached to Certification of David R. Pierce, Esq. as Exhibit W; Exhibit GF-10, Borough of Edgewater Resolution, dated February 18, 2014, attached to certification of David R. Pierce, Esq. as Exhibit BB.

94. During the discussions referenced in paragraph 93, Waterside requested that all the analytical data collected by TERMS be validated. Deposition of Phillip Boggia [10/30/17] 19:24-20:7; attached to Certification of David R. Pierce, Esq. as Exhibit V; Certification of Ronald Dooney, Par. 26; Exhibit GF-10, Borough of Edgewater Resolution, dated February 18, 2014, attached to certification of David R. Pierce, Esq. as Exhibit BB; Exhibit GF-12, letter from Ronald Dooney to Gregory Franz, dated February 5, 2014, attached to certification of David R. Pierce, Esq. as Exhibit CC.

95. Plaintiff agreed to have the analytical data validation by a laboratory and authorized TERMS to undertake that process. Certification of Ronald Dooney, Par. 27; Deposition of Gregory Franz [9/22/17] 87:14-88:1, attached to Certification of David R. Pierce, Esq. as Exhibit W: Exhibit GF-12, letter from Ronald Dooney to Gregory Franz, dated February 5, 2014, attached to Certification of David R. Pierce, Esq. as Exhibit CC.

96. The data validation process was completed and nearly all the analytical results obtained by TERMS were affirmatively validated as accurate and usable. Deposition of Fred Daibes [7/18/17] 187:2-189:18, attached to Certification of David R. Pierce, Esq. as Exhibit DD; Deposition of Gregory Franz [9/22/17] 61:1-6, attached to

Certification of David R. Pierce, Esq. as Exhibit W; Certification of Ronald Dooney, Par. 28; Exhibit GF-10, Borough of Edgewater Resolution, dated February 18, 2014, attached to certification of David R. Pierce, Esq. as Exhibit BB; Exhibit GF-12, letter from Ronald Dooney to Gregory Franz, dated February 5, 2014, attached to certification of David R. Pierce, Esq. as Exhibit CC.

97. The Mayor and Borough Council of Plaintiff instructed TERMS to prepare a Remedial Action Workplan based on the removal of all PCB contamination at concentrations in excess of the residential direct contact standard of 0.2 parts per million. Deposition of Phillip Boggia [10/30/17] 15:17-17:15; attached to Certification of David R. Pierce, Esq. as Exhibit V; Exhibit GF-12, letter from Ronald Dooney to Gregory Franz, dated February 5, 2014, attached to certification of David R. Pierce, Esq. as Exhibit CC.

98. On February 18, 2014, based upon the sampling and analytical data obtained by TERMS, Plaintiff approved a Remedial Action Workplan developed by TERMS, which called for the excavation and disposal of the PCB contaminated materials, and authorized TERMS to implement that Workplan. Certification of Ronald Dooney, Par. 29; Exhibit GF-12, letter from Ronald Dooney to Gregory Franz, dated February 5, 2014, attached to certification of David R. Pierce, Esq. as Exhibit CC, Exhibit GF-11, Borough of Edgewater Resolution, dated February 18, 2014, attached to certification of David R. Pierce, Esq. as Exhibit AA.

99. Based upon instructions from Plaintiff's representatives, TERMS prepared and submitted to the United States Environmental Protection Agency ("USEPA"), a Self-

22

Implementing Plan ("SIP") for investigation and remediation of the PCB contamination at Veteran's Field using the data that it had and without conducting any further sampling at Veteran's Field. Deposition of Peter Lakatos, [7/19/17] 100:2-101:4, attached to Certification of David R. Pierce, Esq. as Exhibit L; Deposition of Gregory Franz [9/22/17] 88:19-89:1, attached to Certification of David R. Pierce, Esq. as Exhibit W; Certification of Ronald Dooney, Par. 30.

100.   On May 2, 2014, TERMS was informed, through counsel, that its services for the Plaintiff had been terminated. Certification of David R. Pierce, Esq. Exhibit EE.

101.   In November, 2013, TERMS issued invoice "13-Veterans Field, Edgewater-4" to Edgewater in the amount of $161,390.00 for services rendered in connection with the Veteran's Field Project. Certification of Ronald Dooney, Par. 31, Exhibit F.

102.   Edgewater paid $128.484.50 towards invoice "13-Veterans Field, Edgewater-4", leaving a balance due of $32,905.50. Certification of Ronald Dooney, Par. 32.

103.   In February, 2014, TERMS issued invoice "14-Veterans Field, Edgewater, NJ-PCBs" to Edgewater in the amount of $139,957.55 for services rendered in connection with the investigation of the PCB contamination at Veteran's Field subsequent to September 7, 2013, including sampling and analysis of material at Veteran's Field, for data validation costs and preparation of Remedial Action Workplans, including the Self Implementing Plan submitted to the US Environmental Protection Agency the Veteran's Field Project. Certification of Ronald Dooney, Par. 33, Exhibit G.

23

104.    In February, 2014 TERMS issued invoice "14-Veterans Field, Edgewater, NJ (Valid)" to Edgewater in the amount of $29,242.41 for services rendered in connection with the data validation portion of the Veteran's Field Project. Certification of Ronald Dooney, Par. 34, Exhibit H.

105.    Despite demand, Edgewater has failed and refused to pay TERMS for the balance due on invoice "13-Veterans Field, Edgewater-4" and for any of the amounts due under invoices "14-Veterans Field, Edgewater, NJ-PCBs" and "14-Veterans Field, Edgewater, NJ (Valid)". Deposition of Gregory Franz [9/22/17] 71:9-73:3; 93:4-12, attached to Certification of David R. Pierce, Esq. as Exhibit W; Exhibit GF-14, letter from Timothy Corriston, Esq, to Patrick Papalia, Esq., dated April 30, 2014, attached to certification of David R. Pierce, Esq. as Exhibit FF; Certification of Ronald Dooney, Par. 35.

106.    The balance due to TERMS from Edgewater is $202,145.46. Certification of Ronald Dooney, Par. 36.

107.    After the termination of Plaintiff's relationship with TERMS, TERMS withdrew the SIP previously submitted to USEPA. Certification of Ronald Dooney, Par. 37, Exhibit I.

108.    Plaintiff did not replace TERMS because the SIP was deficient, Plaintiff replaced TERMS because Waterside was pointing fingers at TERMS and Edgewater wanted a clean break from all parties involved. Deposition of Gregory Franz [9/22/17] 90:2-23, attached to Certification of David R. Pierce, Esq. as Exhibit W;

24

109.    No comments on TERMS' SIP were ever received from EPA. Deposition of Todd
        Delaney [3/1/19] 265:15-18, attached to Certification of David R. Pierce, Esq. as
        Exhibit GG; Certification of Ronald Dooney. Par. 38.

110.    Plaintiff's expert, Todd Delaney, conceded that it was his experience that EPA
        would not reject a deficient SIP, but that EPA would advise the consultant of any
        changes that needed to be made in order for the SIP to be approved. Deposition of
        Delaney [3/1/19] 265:15-18, attached to Certification of David R. Pierce, Esq. as
        Exhibit GG.

111.    Between 1965 and 1983 the ownership of Former Alcoa Site was transferred
        amongst several different entities. Deposition of Kevin McKnight [2/1/17] 186:7-
        188:24, attached to Certification of David R. Pierce, Esq., as Exhibit F; Exhibit KM-
        14, letter from David Paddock to Lee Holz, dated July 3, 1991, attached to
        certification of David R. Pierce, Esq. as Exhibit HH.

112.    One of the entities that owned the Former Alcoa Site was Amland Properties
        Corp. ("Amland"). Deposition of Kevin McKnight [2/1/17] 186:7-188:24, attached to
        Certification of David R. Pierce, Esq., as Exhibit F; Exhibit KM-14, letter from David
        Paddock to Lee Holz, dated July 3, 1991, attached to certification of David R. Pierce,
        Esq. as Exhibit HH.

113.    Amland became aware that the Former Alcoa Site was contaminated with PCBs
        and initiated a lawsuit against Alcoa with respect to responsibility to investigate and
        remediate the Former Alcoa Site (the "Amland Action"). Deposition of Kevin

25

McKnight [2/1/17] 29:16-23; 62:23-65:16; attached to Certification of David R. Pierce, Esq., as Exhibit F.

114.    The Amland Action was resolved in 1991 by a settlement pursuant to which, among other things, Alcoa was to reacquire title to the Former Alcoa Site from Amland. Id. at 135:7-20; Exhibit KM-7, Document with bates numbers EW07177-EW07180 at EW07178, attached to certification of David R. Pierce, Esq. as Exhibit II; Exhibit KM-9, Settlement Agreement between Amland Properties Corp and Aluminum Company of America, dated April 30, 1999, attached to Certification of David R. Pierce, Esq. as Exhibit JJ.

115.    Alcoa used a wholly owned subsidiary company, A.P. New Jersey, Inc., to take title to the Former Alcoa Site. Deposition of Kevin McKnight [2/1/17] 40:11-41:16, attached to Certification of David R. Pierce, Esq., as Exhibit F.

116.    At the time that A. P. New Jersey, Inc. took title to the Former Alcoa Site, the Former Alcoa Site contained numerous multi-story buildings previously utilized in Alcoa Inc.'s manufacturing operations. Deposition of Kevin McKnight [2/1/17] 186:7-188:24,  attached to Certification of David R. Pierce, Esq., as Exhibit F; Exhibit KM-14, letter from David Paddock to Lee Holz, dated July 3, 1991, attached to certification of David R. Pierce, Esq. as Exhibit HH.

117.    Pursuant to the extensive sampling undertaken, it was determined that the Former Alcoa Site and the buildings situated thereon were heavily contaminated with PCBs, with concentrations in excess of 50 parts per million identified in numerous locations, including within the building materials, particularly concrete and brick floors and

26

walls, comprising the structures situated on the Former Alcoa Site. Deposition of Kevin McKnight [2/1/17] 186:7-188:24, attached to Certification of David R. Pierce, Esq., as Exhibit F; Exhibit KM-14, letter from David Paddock to Lee Holz, dated July 3, 1991, attached to certification of David R. Pierce, Esq. as Exhibit HH.

118.    In 1997 A.P. New Jersey, Inc., North River Mews Associates, LLC, and River Road Improvement Phase 2, LLC, among others, entered into a series of agreements pursuant to which A.P. New Jersey, Inc, would transfer ownership of the Former Alcoa Site to North River Mews Associates, LLC. Deposition of Kevin McKnight [2/2/17] 383:2-384:12, attached to Certification of David R. Pierce, Esq., as Exhibit KK; Exhibit KM-31, Multi-Party Property Acquisition Agreement, dated June 27, 1997, attached to Certification of David R. Pierce, Esq. as Exhibit LL.

119.    Pursuant to that series of agreements, North River Mews Associates, LLC and River Road Improvement Phase 2, LLC agreed to undertake the demolition and removal of the building situated on the Former Alcoa Site and A.P. New Jersey agreed to pay up to $9,5000,000 for costs of demolition and up to $2,500,000 for the disposal of PCB waste containing PCB concentrations in excess of 50 parts per million. Deposition of Kevin McKnight [2/2/17] 383:2-384:12, attached to Certification of David R. Pierce, Esq., as Exhibit KK; Exhibit KM-31, Multi-Party Property Acquisition Agreement, dated June 27, 1997, attached to Certification of David R. Pierce, Esq. as Exhibit LL.

120.    In or about 1997 North River Mews Associates, LLC retained the services of EnviroSciences, Inc., an environmental consulting firm, to assist it in connection with

27

3112453v1

the acquisition of the Former Alcoa Site, the demolition of the existing buildings and the disposal of the resultant waste. Deposition of Irving Cohen [10/31/17] 9:2-10:17; 45:15-47:16; 49:4-50:11, attached to Certification of David R. Pierce, Esq. as Exhibit MM.

121.   Envirosciences Inc. investigated the Former Alcoa Property and developed a Remedial Action WorkPlan for the demolition of the buildings and the disposal of waste materials. Deposition of Irving Cohen [10/31/17] 45:15-47:16, attached to Certification of David R. Pierce, Esq. as Exhibit MM; Exhibit IC-1, letter from Elizabeth Cespro to Jamie McBlaine, dated September 17, 1997, attached to certification of David R. Pierce, Esq. as Exhibit NN.

122.   The Remedial Action WorkPlan called for the off-site disposal at an appropriate facility of all PCBs wastes with concentrations in excess of 50 parts per billion. Deposition of Irving Cohen [10/31/17] 45:15-47:16; 51:3-12, attached to Certification of David R. Pierce, Esq. as Exhibit MM; Exhibit IC-1, letter from Elizabeth Cespro to Jamie McBlaine, dated September 17, 1997, attached to Certification of David R. Pierce, Esq. as Exhibit NN.

123.   Pursuant to the Remedial Action WorkPlan debris with PCB concentrations less than 50 parts per million were to be utilized as road base for a River Road expansion project. Deposition of Irving Cohen [10/31/17] 45:15-47:16; 51:3-12, attached to Certification of David R. Pierce, Esq. as Exhibit MM; Exhibit IC-1, letter from Elizabeth Cespro to Jamie McBlaine, dated September 17, 1997, attached to Certification of David R. Pierce, Esq. as Exhibit NN.

124.   In order to reuse the debris with PCB concentrations less than 50 parts per million North River Mews Associates, LLC was required to obtain, and did obtain, a Class B Recycling Permit. Deposition of Irving Cohen [10/31/17] 45:15-47:16, attached to Certification of David R. Pierce, Esq. as Exhibit MM; Exhibit IC-1, letter from Elizabeth Cespro to Jamie McBlaine, dated September 17, 1997, at EW005593, attached to Certification of David R. Pierce, Esq. as Exhibit NN; Deposition of Fred Daibes [7/14/17] 173:9-175:15, attached to Certification of David R. Pierce as Exhibit A.

125.   Fred Daibes signed the application for the Class B Recycling Permit on behalf of River Road Improvement II, LLC. Deposition of Fred Daibes [7/18/17] 191:10-194:13, attached to Certification of David R. Pierce, Esq. as Exhibit DD; Exhibit FD-38, Application For Approval To Operate A Limited Class B Recyclable Materials Center, dated July, 1997, attached to Certification of David R. Pierce, Esq. as Exhibit OO.

126.   Fred Daibes was aware that only material with PCB concentrations of less than 49 parts per million could be recycled. Deposition of Fred Daibes [7/18/17] 191:10-194:13, attached to Certification of David R. Pierce, Esq. as Exhibit DD.

127.   At some point during the remediation of the Former Alcoa Site a decision was made to demolish all buildings except Building 12 and a separate Remedial Action WorkPlan was developed for Building 12. Deposition of Fred Daibes [7/14/17] 95:17-97:17, attached to Certification of David R. Pierce, Esq. as Exhibit A; Deposition of John Gear [9/8/17] 62:15-64:5, attached to Certification of David R.

29

Pierce, Esq. as Exhibit PP; Exhibit JG-11, letter from Mark London to Jamie McBlaine, dated October 18, 1999, attached to Certification of David R. Pierce, Esq. as Exhibit QQ.

128.   As referenced in a Remedial Action Report, the Remedial Action for Building 12 resulted in the removal and disposal of floor panels with PCB concentrations in excess of 0.49 parts per million. Deposition of John Gear [9/8/17] 62:15-64:5, attached to Certification of David R. Pierce, Esq. as Exhibit PP; Exhibit JG-11, letter from Mark London to Jamie McBlaine, dated October 18, 1999, attached to Certification of David R. Pierce, Esq. as Exhibit QQ.

129.   Since the walls of Building 12 had never been sampled Envirosciences, Inc. proposed that the walls of Building 12 be sampled. Deposition of John Gear [9/8/17] 62:15-64:5, attached to Certification of David R. Pierce, Esq. as Exhibit PP; Exhibit JG-11, letter from Mark London to Jamie McBlaine, dated October 18, 1999, attached to Certification of David R. Pierce, Esq. as Exhibit QQ.

130.   Sampling of the walls in Building 12 revealed that portions of the walls were contaminated with PCBs. Deposition of John Gear [9/8/17] 62:15-64:5, attached to Certification of David R. Pierce, Esq. as Exhibit PP; Exhibit JG-11, letter from Mark London to Jamie McBlaine, dated October 18, 1999, attached to Certification of David R. Pierce, Esq. as Exhibit QQ.

131.   The remedial action proposed with respect to the walls of Building 12 and subsequently approved by the DEP and completed by Envirosciences on behalf of North River Mews Associates, LLC, was to wash the walls with a water based

30

solution and then coat the walls containing PCB contamination with an epoxy paint to seal them and to record a Deed Notice restricting the use and access of Building 12. Deposition of John Gear [9/8/17] 55:2-60:4; 62:15-64:5, attached to Certification of David R. Pierce, Esq. as Exhibit PP; Exhibit JG-11, letter from Mark London to Jamie McBlaine, dated October 18, 1999, attached to Certification of David R. Pierce, Esq. as Exhibit QQ; Exhibit FD-36, Remedial Action Report, dated August, 2002, attached to Certification of David R. Pierce, Esq. as Exhibit RR.

132.    In 2010 Building 12 suffered a partial wall collapse. Deposition of Shergoh Alkalini [10/10/17] 27:7-29:1, attached to Certification of David R. Pierce, Esq. as Exhibit C; Exhibit JG-2, letter from Shergoh Alkalini to New Jersey Department of Environmental Protection, dated April 28, 2010, attached to Certification of David R. Pierce as Exhibit SS; Deposition of John Gear [9/8/17] 25:18-33:12; 42:14-45:25, attached to Certification of David R. Pierce, Esq. as Exhibit PP; Exhibit JG-3, letter from John Gear to Kirsten Pointiin-Hahn, dated August 30, 2010, attached to Certification of David R. Pierce, Esq. as Exhibit TT; Exhibit JG-4, letter from John Gear to Berek Don, dated September 15, 2010, attached to Certification of David R. Pierce, Esq. as Exhibit UU; Deposition of Irving Cohen [10/31/17] 34:9-35:1, attached to certification of David R. Pierce, Esq. as Exhibit MM.

133.    The debris from the Building 12 wall collapse was sampled and analyzed for disposal purposes by Envirosciences, Inc. and the analysis of the sample from the Building 12 wall collapse debris indicated that the wall debris was contaminated with PCBs at a concentration of 91 parts per million. Deposition of John Gear [9/8/17]

31

42:14-49:20, attached to Certification of David R. Pierce, Esq. as Exhibit PP; Exhibit JG-5, Analytical Data Report by IAL, attached to Certification of David R. Pierce, Esq. as Exhibit VV; Exhibit JG-7, Chain of Custody, attached to Certification of David R. Pierce, Esq. as Exhibit WW; Exhibit JG-6, Summary Report by Integrated Analytical Laboratories, LLC, attached to Certification of David R. Pierce, Esq. as Exhibit XX; Exhibit JG-4, letter from John Gear to Berek Don, dated September 15, 2010, attached to Certification of David R. Pierce, Esq. as Exhibit UU.

134.    Envirosciences, Inc. transmitted these analytical results to Berek Don of Daibes Enterprises together with a proposal for proper disposal of the wall debris. Deposition of John Gear [9/8/17] 49:21-52:15, attached to Certification of David R. Pierce, Esq. as Exhibit PP; Exhibit JG-8, letter from John Gear to Berek Don, dated April 11, 2011, attached to Certification of David R. Pierce, Esq. as Exhibit YY.

135.    In 2010 Envirosciences, Inc. was retained to remove the Deed Notice that had been recorded against Building 12. Deposition of Irving Cohen [10/31/17] 33:3-35:15, attached to certification of David R. Pierce, Esq. as Exhibit MM; Exhibit JG-1, letter from Irving Cohen to Berek Don, dated May 3, 2010, attached to Certification of David R. Pierce, Esq. as Exhibit ZZ.

136.    Envirosciences, Inc. was able to complete the removal of the Deed Notice against Building 12 because The DEP no longer regulated building interiors. Deposition of John Gear [9/8/17] 66:20-24, attached to Certification of David R. Pierce, Esq. as Exhibit PP.

137.    Envirosciences, Inc. advised Fred Daibes in writing that in the event of any future demolition on Building 12 the walls containing PCBs would have to be sampled and disposed of at a licensed facility. Deposition of John Gear [9/8/17] 36:7-41:25, attached to Certification of David R. Pierce, Esq. as Exhibit PP; Exhibit JG-3, letter from John Gear to Kirsten Pointiin-Hahn, dated August 30, 2010, attached to Certification of David R. Pierce, Esq. as Exhibit TT.

138.    In April, 2012, North River Mews Associates, LLC entered into a ground lease with E. Ra Joe pursuant to which Mr. Rae Jo leased the Former Alcoa Site, including Building 12, from North River Mews Associates, LLC. Deposition of Fred Daibes [7/14/17] 143:24-146:21; attached to Certification of David R. Pierce, Esq. as Exhibit A;  Deposition of Fred Daibes [7/18/17] 83:13-84:5, attached to Certification of David R. Pierce, Esq. as Exhibit DD; Exhibit FD-23, Ground Lease between North River View Associates, LLC and E. Rae Jo, dated April 5, 2012, attached to Certification of David R. Pierce, Esq. as Exhibit AAA.

139.    In April, 2012 Waterside entered into a contract with The Heaven, LLC for the demolition of Building 12 at the Former Alcoa Site and the construction of a new building on the site of Building 12. Deposition of Fred Daibes [7/14/17] 149:20-151-20, attached to Certification of David R. Pierce, Esq. as Exhibit A; Exhibit FD-9, Standard Form of Agreement Between Owner and Contractor, between Waterside Construction, LLC and The Heaven, LLC, dated November 27, 2012, attached to Certification of David R. Pierce, Esq. as Exhibit BBB.

33

140.   Waterside began the demolition of Building 12 at the Former Alcoa Site in March, 2013. Matthew Vereb Deposition [2/15/17] 53:5-24, attached to Certification of David R. Pierce, Esq. as Exhibit K; Exhibit MV-5, Construction Permit attached to Certification of David R. Pierce, Esq., as Exhibit CCC; Deposition of Kenneth Schiller [6/22/17] 92:6-94:13, attached to Certification of David R. Pierce, Esq., as Exhibit T; Deposition of Glenn Donlan [10/30/17] 31:8-32:8, attached to Certification of David R. Pierce, Esq., as Exhibit E.

141.   As some point in time during the demolition of Building 12 Waterside had internal discussions about the use of the Building 12 demolition debris at Veteran's Field and concluded that they could use the resulting concrete debris under paved areas because that was what had been done with concrete from the Former Alcoa Site during prior demolition.  Matthew Vereb Deposition [2/15/17] 66:18-72:22, attached to Certification of David R. Pierce, Esq. as Exhibit K

142.   Fred Daibes was aware, at the time of the demolition of Building 12, that portions of Building 12 were contaminated with PCBs. Deposition of Fred Daibes [7/14/17] 167:21-168:8, attached to Certification of David R. Pierce, Esq. as Exhibit A.

143.   There was no contract, either written or oral, between TERMS and Waterside. Deposition of Fred Daibes [7/18/17] 173:21-174:5, attached to Certification of David R. Pierce, Esq. as Exhibit DD.

34

**LINDABURY, McCORMICK, ESTABROOK & COOPER, P.C.**
Attorneys for Defendant, TERMS Environmental Services, Inc.

By: _____
David R. Pierce, Esq.

Dated:   January 30, 2020

35