# EXHIBIT M

2643092v1

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
Civil Action No.: 2:14-CV-05060, (ES-MAH)

BOROUGH OF EDGEWATER,                    )
                                         )
                 Plaintiff,              )
                                         )
            -- vs --                     )
                                         )
WATERSIDE CONSTRUCTION, LLC;             )
39 COAH, LLC; DAIBES BROTHERS,           )
INC.; NORTH RIVER MEWS                   )
ASSOCIATES, LLC; FRED A.                 )
DAIBES; TERMS ENVIRONMENTAL              )
SERVICES, INC.; ALUMINUM                 )
COMPANY OF AMERICA; A.P. NEW             )
JERSEY, INC.; JOHN DOES 1-100;           )
and ABC CORPORATIONS 1-100,              )
                                         )
                 Defendants.             )
                                         )
And                                      )
                                         )
ALCOA DOMESTIC, LLC, as                  )
successor in interest to A.P.            )
NEW JERSEY, INC.,                        )
                                         )
     Third-party Plaintiff,              )
                                         )
            -- vs --                     )
                                         )
COUNTY OF BERGEN and RIVER               )
ROAD IMPROVEMENT PHASE II,               )
INC.,                                    )
                                         )
     Third-party Defendants.             )

DEPOSITION OF:  RONALD DOONEY, LSRP
JULY 20, 2017

TAYLOR & FRIEDBERG, LLC
Certified Court Reporters
60 Washington Street
Morristown, New Jersey 07960
(973)285-0411
E-mail: csr@taylorfriedberg.com



Page 2

1   (caption continued)
2   And                                )
                                       )
3   Waterside Construction, LLC;  )
    38 COAH, LLC; Daibes Brothers,)
4   Inc.; North River Mews        )
    Associates, LLC; and Fred A.  )
5   Daibes,                       )
                                  )
6        Defendants/             )
         Third-party Plaintiffs,  )
7                                 )
         -- vs --                 )
8                                 )
    Neglia Engineering           )
9   Associates,                  )
                                 )
10       Third-party Defendant.  )
    -- -- -- -- -- -- -- --      )
11
12
13
14
15
16
17
18
19
20
21
22
23
25

Page 4

1   A P P E A R A N C E S:
2
3   CONNELL FOLEY, LLP
    BY:  TIMOTHY E. CORRISTON, ESQ.
4   85 Livingston Avenue, Suite 105
    Roseland, New Jersey 07068
5   (973) 535-0500
    Attorneys for Plaintiff
6
7
8   SHAFRON LAW GROUP, LLC
    BY:  JASON T. SHAFRON, ESQ.
9   Two University Plaza, Suite 400
    Hackensack, New Jersey 07601
10  (201) 343-7200
    (201) 343-7288 (fax)
11  Jshafron@shafronlaw.com
    Attorneys for  Defendant/Third-party Plaintiff
12  Waterside Construction, LLC
13
14  LINDABURY, MCCORMICK, ESTABROOK & COOPER, P.C.
    BY:  DAVID R. PIERCE, ESQ.
15  53 Cardinal Drive, PO Box 2369
    Westfield, New Jersey 07091
16  (908) 233-6800 x2352
    www.lindabury.com
17  Attorneys for Defendant Terms Environmental
    Services, Inc.
18
19  K&L GATES
    BY:  DANA B. PARKER, ESQ.
20  One Newark Center, Tenth Floor
    Newark, New Jersey 07102-5285
21  (973) 848-4000
    Attorneys for Third-party Plaintiff
22  ALCOA Domestic, LLC
23
24
25

Page 3

1            T R A N S C R I P T of the
2   deposition of RONALD DOONEY, LSRP, called for
3   Oral Examination by the parties in the above-entitled
4   action, said deposition being taken pursuant to Notice,
5   by and before KATHLEEN M. LAROCCA, License No.
6   30XI00219100, a Certified Court Reporter of the State
7   of New Jersey, at the law offices of LINDABURY,
8   MCCORMICK, ESTABROOK & COOPER, P.C., 53 Cardinal Drive,
9   Westfield, New Jersey 07091, on Thursday, July 20,
10  2017, commencing at 10:05 A.M.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1   A P P E A R A N C E S (continued):
2
3   FINAZZO COSSOLINI O'LEARY MEOLA & HAGER, LLC
    BY:  ROBERT J. PANSULLA, ESQ.
4   67 East Park Place, Suite 901
    Morristown, New Jersey 07960
5   (973) 343-4960
    robert.pansulla@finazzolaw.com
6   Attorneys for Third-party Defendant
    County of Bergen
7
8
    HOAGLAND, LONGO, MORAN, DUNST & DOUKAS, LLP
9   BY:  JOSEPH A. PETRILLO, III, ESQ.
    40 Paterson Street, PO Box 480
10  New Brunswick, New Jersey 08903
    (732) 545-4717 Ext. 3849
11  Attorneys for Third-party Defendant
    Neglia Engineering Associates
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TAYLOR & FRIEDBERG, LLC
(973) 285-0411

Page 6

INDEX

| | WITNESS | DIRECT | CROSS | REDIR | RECROSS |
|---|---|---|---|---|---|
RONALD DOONEY, LSRP
By MR. SHAFRON         8**
By MR. CORRISTON
By MS. PARKER
By MR. PETRILLO
By MR. PANSULLA

EXHIBITS

No.       Description          Page

RD-1    Defendant TERMS Environmental Services,
        Inc's Response to Waterside's First Set
        of Interrogatories

RD-2    Defendant TERMS Environmental Services,
        Inc.'s Amended Response to Defendant
        Waterside Construction, LLC's First Set
        of Interrogatories Pursuant to
        F.R.C.P.26(e)

RD-3    TERMS Document, three pages, to Gregory
        Franz, Re: Veterans Park Completion of
        Site Remediation, Remaining Scope/Cost

RD-4    E-mail from Ronald Dooney to Greg Franz,
        March 4, 2013
RD-5    Defendant TERMS Environmental Services,
        Inc.'s Amended Response to Plaintiff
        Borough of Edgewater's First Set of
        Interrogatories Pursuant to FRCP 26(e)

RD-6    E-mail From Michael Berliner to Ron Dooney,
        September 12, 2013, Bates-stamped
        NEGLIA001737

RD-8    October 3, 2013, Letter from Ronald Dooney
        to Gregory S. Franz, Bates-stamped W000174

Page 7

EXHIBITS (continued)

No.       Description          Page
RD-9    E-mail from Michael J. Neglia to
        Ron Dooney, October 7, 2013,
        Bates-stamped W004397 through W004398
RD-10   E-mail from Peter Lakatos to Matt Vereb,
        September 24, 2013, Bates-stamped T0088447

RD-11   E-mail from Michael Berliner to Ron Dooney,
        August 23, 2012, Bates-stamped T0100248

Page 8

1    RONALD DOONEY, LSRP,
2  599 Springfield Avenue, Berkeley Heights, New Jersey
3  07922, first having been duly sworn, testifies as
4  follows:
5  DIRECT EXAMINATION
6  BY MR. SHAFRON:
7    Q    Good morning, Mr. Dooney.  My name is
8  Jason Shafron. I'm from the Shafron Law Group.  I
9  represent the Waterside defendants in a case, Borough
10 of Edgewater versus Waterside defendants, and others,
11 and a third-party defendant -- or actually direct
12 defendant, TERMS Environmental Services.  Are you
13 familiar with the case?
14   A    Yes.
15   Q    All right.  Have you had an opportunity
16 to speak with your attorney before we start today?
17   A    Yes.
18   Q    All right.  Have you ever had your
19 deposition taken before?
20   A    Yes.
21   Q    All right.  About how many times?
22   A    Maybe six, seven.
23   Q    When was the most recent one?
24   A    Probably about a month and a half ago.
25   Q    What type of case was that?

Page 9

1    A    It was a case where I was the LSRP for a
2  short period on a sale of a property that I became the
3  LSRP after the sale.
4    Q    What was the name of the case?
5    A    It was Christian Peter versus -- I'm not
6  sure -- Alcatel, I think.
7    Q    And I assume you were represented by an
8  attorney at that deposition?
9    A    No.
10   Q    Okay.  So you testified there without an
11 attorney?
12   A    Yes.
13   Q    Do you remember who the attorney for the
14 plaintiff or the defendant was?
15   A    No, I don't recall the names.
16   Q    Did you get a copy of your transcript
17 from that deposition?
18   A    I believe I did.
19   Q    All right.  And do you remember when the
20 next most recent deposition was?
21   A    Couple years earlier maybe.  I'm not
22 really sure.  It was another case where I was not the
23 LSRP, but I was the consultant.
24   Q    Did you have an attorney on that case?
25   A    No.

3  (Pages 6 to 9)

Page 10

1    Q    Again, you were deposed, but no attorney?
2    A    That's correct.
3    Q    Do you have a copy of the transcript from
4  that deposition?
5    A    I don't recall.  I may have gotten one.
6    Q    Okay.  We'll get into the rest of those
7  in a minute.
8        Then I'm just going to briefly tell you
9  what's going to happen.
10       I'm going to ask a series of questions
11 and you should answer them as fully and fairly as you
12 can.  Do you understand that?
13   A    Yes.
14   Q    You've taken an oath to tell the truth
15 which carries the same force and effect as if we were
16 in a court of law.  Do you understand that?
17   A    Yes.
18   Q    All right.  If you don't understand a
19 question that I ask, let me know that you don't
20 understand and I'll try to rephrase the question in a
21 way that you can understand, all right?
22   A    Yes.
23   Q    That's very important, because if I ask
24 you a question and you give me an answer, I am going to
25 assume that you understood the question, all right?

Page 11

1    A    Yes.
2    Q    All right.  I don't want you to guess at
3  any answer, but if you're able to give me an estimate
4  of something, just tell me that you're giving me an
5  estimate, all right?
6    A    Yes.
7    Q    All right.  If you need to take a break
8  at any time, just let me know.  It's not a marathon, a
9  torture session, all right?
10   A    Okay.
11   Q    All right.  So you were telling me
12 earlier about cases that you were involved with.  The
13 second most recent case that you described, what was
14 that case about?
15   A    I had reviewed some documents for a
16 client and it was about my findings.  I don't recall
17 the specifics.
18   Q    Were you a party in that case?
19   A    No.
20   Q    And in the most recent deposition were
21 you a party in this case?
22   A    No.
23   Q    Okay.  Were you ever involved in any
24 litigated matter where you were a party other than --
25 where TERMS was a party other than in this case?

Page 12

1    A    No.
2    Q    All right.  What did you do to prepare
3  for today's deposition?
4    A    Nothing specific.
5    Q    Okay.  Did you review any documents in
6  preparation for today?
7    A    Do you mean prior to -- immediately prior
8  to today?
9    Q    Well, let's start with -- yeah, in the
10 last week or two, in preparation for today's deposition
11 did you review any documents?
12   A    Might have looked at one or two documents
13 here and there, but nothing specific.
14   Q    And other than any conversations with the
15 attorney, did you do anything else in preparation for
16 today's deposition?
17   A    No.
18   Q    Did you speak to anyone else other than
19 your attorney in preparation for today's deposition?
20   A    I spoke to my attorney, I spoke to Pete
21 Lakatos this morning.
22   Q    And he was deposed yesterday --
23   A    Uh-huh.
24   Q    -- you understand that?
25   A    Yes.

Page 13

1    Q    Did you talk to him about his testimony
2  from yesterday?
3    A    No.  I just asked, How did it go?  And he
4  said, I think it went pretty well.
5    Q    Okay.
6        All right.  So where do you live?
7    A    201 Woodland Avenue, Morristown,
8  New Jersey.
9    Q    All right.  And where did you go to high
10 school?
11   A    Passaic Valley Regional High School,
12 Little Falls.
13   Q    All right.  And then did you go to
14 college after high school?
15   A    Yes.
16   Q    Directly after high school?
17   A    Yes.
18   Q    Where did you go?
19   A    Rutgers University, Cook College.
20   Q    What year did you graduate there?
21   A    1983.
22   Q    And what degree did you get?
23   A    I had a bachelor of science in geology.
24   Q    And what was the first job that you had
25 that's any way related to environmental work?

4  (Pages 10 to 13)

Page 14

1    A    I worked for an environmental engineering
2  company.
3    Q    Which one was that?
4    A    The first one was -- hm, it's a while
5  ago -- Charles Manganaro -- Charles A. Manganaro
6  Consulting Engineers.  They called it CAMCE.
7    Q    When did you start there?
8    A    When did I start?  Sometime in maybe the
9  summer of 1984.
10    Q    Oh, okay.  Shortly after college?
11    A    Yes.
12    Q    Okay.  How long did you work there?
13    A    Two, two and a half to three years, I
14  would say.
15    Q    And then after that did you have another
16  environmental-related job?
17    A    I worked on a highway reconstruction
18  project, had some environmental, but it was more
19  engineering related.
20    Q    Who did you work for?
21    A    Nigro Brothers.
22    Q    Spell that.
23    A    N-i-g-r-o.
24    Q    How long did you work for Nigro Brothers?
25    A    Several years.

Page 15

1    Q    And after that where did you work?
2    A    I worked briefly as the -- in the
3  construction official's office in West Paterson as the
4  controller.
5    Q    All right.  And then after that?
6    A    I worked at an environmental services
7  company that had a laboratory and a field services
8  division.  The parent company was YWC.  It was called
9  York Labs.
10    Q    What year did you start there?
11    A    Somewhere in the '89-ish.  '88, '89.
12    Q    And how long did you work there?
13    A    They changed names several times.  I
14  worked there until I went to JCA in, say, '92.
15    Q    Okay.  And what type of company was JCA?
16    A    JCA was an environmental and engineering
17  consulting company.
18    Q    What did you do there?
19    A    I ran the North Jersey office.
20    Q    And generally what did the company do?
21    A    I was not involved much in the
22  engineering, but we did environmental consulting,
23  varying levels.  Property transfer, cleanups,
24  investigations.
25    Q    Is it similar to the type of work that

Page 16

1  TERMS does now?
2    A    Yes.
3    Q    And when you say that you weren't doing
4  much of the engineering work, was it you were mostly
5  involved in the administration work?
6    A    No.  I mean, I was not doing strict
7  engineering.  I was doing environmental investigations
8  and cleanups.  No engineering design or anything along
9  those lines.
10    Q    And how long did you work there?
11    A    Till 1997.
12    Q    And then where in 1997 did you work?
13    A    I formed TERMS.
14    Q    And what type of business entity is
15  TERMS?
16    A    It originally was an LLC.  It is now an
17  S corp.
18    Q    When it was formed it was an LLC?
19    A    It was formed as, actually, Technical &
20  Environmental Resource Management Services, LLC.
21    Q    Technical & Environmental Resource?
22    A    Resource Management Services.  That's why
23  it was shortened to TERMS.
24    Q    All right.  And when --
25    A    When was that?

Page 17

1    Q    -- when it was formed, it was a
2  single-member LLC?
3    A    No.
4    MR. PIERCE:  Objection.
5    You can answer.
6    THE WITNESS:  I did have a partner at one
7  time.
8  BY MR. SHAFRON:
9    Q    When?  At the time when it was formed?
10    A    I'm not sure if I -- I believe we formed
11  it with the two of us.  I mean, we were working
12  together at the time, but I'm not sure if we were both
13  on the -- I think so.
14    Q    Who was it?
15    A    I believe so.
16    His name was Joe Malaszynski (phonetic).
17    Q    Did you both come from JCA or from
18  somewhere else?
19    A    No, he was, um -- I don't know where he
20  was before that, but he was not working at JCA, no.
21    Q    And then at some point you said that the
22  business entity was changed to an S corporation?
23    A    It was several years.  Maybe four years
24  later.  I don't remember the exact year.
25    Q    Was there some event or reason other than

5  (Pages 14 to 17)

Page 18

1    advice of professionals why it changed to an S corp?
2        A    Well, it was a combination of that, and
3    we both decided we were gonna do our own thing, so.
4        Q    Oh --
5        A    He went off and I think he's a chef in a
6    restaurant now.
7        Q    So the -- Mr. Malaszynski leaving was a
8    main event which brought you to change from an LLC to
9    an S corporation, is that --
10        MR. PIERCE:   Objection.
11        You can answer.
12        THE WITNESS:   I don't know whether it was
13    a main event.  It happened around the same time.
14    BY MR. SHAFRON:
15        Q    All right.  And since that time, has
16    TERMS remained an S corporation till today?
17        A    Yes.
18        Q    And have you been the only shareholder of
19    the corporation since that time?
20        A    Yes.
21        Q    Has TERMS been involved in any lawsuits
22    at any time where it was a party?
23        A    I don't know what -- I mean, we had a --
24    one incident where I purchased a company from a person
25    down in Georgia.  He was dying, he passed away.  There

Page 19

1    was a subsequent case with his widow that we settled,
2    but I'm not sure if that was -- that constitutes that.
3    I think that's -- if we were party to anything, any
4    other case, I don't believe so.
5        Q    Okay.
6        All right.  Had you ever worked with
7    or -- strike that.
8        Have you ever had any contact with the
9    Borough of Edgewater before your contact with them
10    associated with work at the Veterans Field Project?
11        A    No.
12        MR. PIERCE:   I'm going to object.
13        You can answer.  That's fine.
14        THE WITNESS:   No.
15    BY MR. SHAFRON:
16        Q    All right.  Had you ever had any -- or
17    had TERMS ever done any work on any matter prior to the
18    Veterans Field Project where any of the parties in this
19    case were involved?
20        A    Yes.
21        Q    Which parties?
22        A    Neglia --
23        Q    Okay.
24        A    -- Engineering.
25        Q    What was the most recent project before

Page 20

1    the Veterans Field Project that TERMS was involved in a
2    project with Neglia?
3        A    I believe it was the Owens Field Project
4    in Nutley.
5        Q    Do you remember when that project was,
6    what years?
7        A    Probably would have started in somewhere
8    in 2011.
9        Q    And when did it end or at least your
10    involvement in it end?
11        A    Does it really end?
12        My involvement in the actual getting the
13    case to closure probably ended in sometime in '14.
14        Q    Just generally what type of project is
15    the Owens Field Project?
16        A    It was -- they identified historic fill
17    on the site and they capped it and created a new field
18    on it.
19        Q    What type of historic field was involved
20    in this case?
21        A    I would say typical historic fill.  There
22    was PAHs.  I don't recall, there might have been a
23    couple of metals slightly elevated.
24        Q    And where is Owens Field?
25        A    Nutley.

Page 21

1        Q    And just generally how is it capped?
2        A    There was clean fill brought in and then
3    they put an artificial turf over the top.
4        Q    In that matter who were you retained by?
5    And when I mean you, I mean TERMS.
6        A    Ultimately by the Borough of Nutley.
7        Q    Was TERMS the LSRP on that project?
8        A    I was the LSRP.
9        Q    Did there ever come a time when you had
10    to work with any lawyers associated with that matter?
11        A    No.
12        Q    All right.  And are there any other
13    matters in the -- from 2000 forward where you or TERMS
14    worked with any of the other parties in this litigation
15    that we're here today about?
16        A    Other than Edgewater?
17        Q    Yes, other than this matter.
18        A    Well, I worked for Edgewater in other.
19        Q    Okay.  When did you work for Edgewater?
20        A    There was -- it was a -- their marina
21    site had an open case and they wanted me to help close
22    it out.  I worked probably for a short stretch as --
23    right around the time that this incident on Veterans
24    Field took place.  So it would have been somewhere in
25    the '13 to '14, 2013 to '14.

6  (Pages 18 to 21)

Page 22

1    Q    Were you the LSRP on that matter?
2    A    For a short period, yes.
3    Q    And you were retained by the Borough of
4   Edgewater in that matter?
5    A    Yes.
6    Q    And when I say you, both you as an LSRP
7   personally and TERMS were both retained?
8    A    Yes.
9    Q    And can you just give me a brief
10  description of what that project was?
11   A    There was a tank that was used at the
12  marina, an underground storage tank, that was leaking.
13  Case remained open and they were looking for me as the
14  LSRP to close it.
15   Q    And the marina was a Borough of Edgewater
16  owned site?
17   A    I believe so, yes.
18   Q    And did it successfully close out as far
19  as you know?
20   A    I don't know. I released myself as the
21  LSRP.
22   Q    And I don't know if that's an LSRP
23  technical term, but what does it mean to release
24  yourself?
25   A    Well, you -- when you become the LSRP you

Page 23

1   retain yourself, with -- obviously, you have to be
2   hired to be retained. But I have to retain myself
3   online on a form that the DEP has. And it's a
4   retention release form. You're either being retained
5   or released when you fill it out. That's their term,
6   so.
7    Q    So sometime in 2014 you went on that
8   computer and signed -- and executed whatever form it is
9   for you to be released as the LSRP; is that right?
10   A    After discussions with the Borough of
11  Edgewater, yes.
12   Q    And by discussions you mean they agreed
13  for you to be released?
14   A    Yes.
15   Q    All right.
16   A    I guess.
17   Q    Was it your understanding that whatever
18  project that was going on at the marina site continued
19  after you released yourself?
20   A    I assume it would.
21   Q    Are you aware whether a different LSRP
22  came on that project after you released yourself?
23   A    Not aware.
24   Q    Okay. Were all of your and/or TERMS's
25  bills paid in that matter?

Page 24

1    A    Yes.
2    Q    Did you work on any other matters with
3   the Borough of Edgewater?
4    A    There was one site that it was an open --
5   a vacant lot, basically, that they owned that there was
6   discussion of putting a deed notice on it. But I was
7   never retained, nor did I do anything official.
8    Q    So that was more in a consulting role?
9    A    They were asking my opinion.
10   Q    Where was that?
11   A    I believe it was on Undercliff.
12   Q    Approximately when was that?
13   A    Somewhere in 2013, probably.
14   Q    And in your role as giving an opinion in
15  that matter, were you actually retained by the Borough
16  of Edgewater?
17   A    No.
18   Q    Did they pay you for your opinion on that
19  matter?
20   A    It was -- I mean, there was barely any
21  time spent on it.
22   Q    So --
23   A    So the answer is, no, I didn't get paid
24  specifically, but it came up in the course of
25  discussions, so.

Page 25

1    Q    Any other matters where you worked with
2   the Borough of Edgewater?
3    A    No.
4    Q    And I had originally limited my questions
5   to 2000 and forward with respect to other parties in
6   this litigation. Are there any other matters at any
7   time that you or TERMS worked with the Borough of
8   Edgewater?
9    A    No. Those were the Veterans Park and the
10  two we just discussed.
11   Q    And you told me about the project that
12  you worked with Neglia on in Nutley. Were there other
13  projects that you worked with Neglia engineering on at
14  any time?
15   A    Yes.
16   Q    What was the one that was the next most
17  recent after -- before the Nutley project?
18   A    I believe there was one in Lyndhurst that
19  we were doing a -- helping them to close out a tank. I
20  can't recall. There were a few others that -- I think
21  we did a Phase I on a property. We did some indoor air
22  testing on another site.
23        These were mostly for Neglia, not
24  directly for the borough that they were being done in.
25  Neglia worked for the town. In most cases we got

7  (Pages 22 to 25)

Page 26

1    subcontracted from Neglia to do whatever needed to be
2    done.
3        Q    So your best recollection is that in most
4    or if -- or all of the cases that you worked with
5    Neglia before the case we're here today about, TERMS
6    was a subcontractor of Neglia?
7        MR. PETRILLO:  Objection.
8        MR. PIERCE:  You can answer.
9        THE WITNESS:  Not -- not all of them.
10   Some we were sub, some we worked directly.  We were
11   given a purchase order or requisition from the town.
12   BY MR. SHAFRON:
13       Q    Understood.
14       For example, on the Nutley project, were
15   you retained by Nutley or were you retained by Neglia?
16       A    We were retained by Nutley.
17       Q    Okay.  Are all of the projects that you
18   worked with Neglia on public-related projects?
19       A    I believe there were some that weren't.
20       Q    Okay.  Have you ever done any work with
21   any of the other parties in this litigation before this
22   litigation?
23       A    No.
24       Q    All right.  How did you first find out
25   about the Veterans Field Project?

Page 27

1        A    We got a call from Neglia.
2        Q    And what did -- well, who called you?
3        A    I believe it was Mike Berliner.
4        Q    And he spoke to you?
5        A    I don't recall whether he spoke to me
6    first.  He may have spoken to Pete first.
7        Q    But at some point did Mr. Berliner speak
8    to you about potentially having TERMS become involved
9    in the Veterans Field Project?
10       A    Yes, but the initial involvement was
11   related to a question or a requirement that the DEP had
12   put on them for -- they were requesting Green Acres
13   funds for doing some improvements, and that's when we
14   first got engaged.
15       Q    What was that engagement, the scope of
16   that engagement?
17       A    We were taking soil samples at -- in an
18   area that they were going to get Green Acres funds to
19   redo a part of the park.
20       Q    And this is in the area of the Veterans
21   Field Project?
22       A    Well, ultimately, yes.  But it wasn't the
23   whole field at the time.
24       Q    When was that where you were first
25   contacted about that?

Page 28

1        A    That was probably in 2011.
2        Q    And on that initial scope of work, were
3    you retained by Neglia or the Borough of Edgewater?
4        A    We were retained by the Borough of
5    Edgewater.
6        Q    And who did you talk to at the Borough of
7    Edgewater to determine both the scope of work that
8    TERMS was going to do and how much TERMS would get paid
9    for that work?
10       A    Initially I didn't discuss it with the
11   Borough of Edgewater directly, it was through Neglia,
12   but I was officially engaged by the Borough with the
13   purchase order.
14       Q    So you spoke to someone at Neglia about
15   the scope of the work and what the billing rates would
16   be for TERMS' involvement in that part of the project?
17       A    Best of my recollection I provided a
18   proposal, and provided it to Neglia who discussed it
19   with the Borough.
20       Q    And then at some point Neglia agreed to
21   the TERMS that you had proposed, and then was it Neglia
22   that presented that proposal to the Borough for
23   approval or was it TERMS that presented it?
24       MR. PETRILLO:  Objection to the form.
25       MR. PIERCE:  You can answer.

Page 29

1        THE WITNESS:  I believe it was Neglia who
2    presented it.
3    BY MR. SHAFRON:
4        Q    And what did you receive from the town to
5    confirm that you had been retained on that project?
6        A    I'm sure it was a purchase order.
7        Q    Is that different than the proposal that
8    you submitted to Neglia?
9        A    Again, best of my recollection, they
10   would be attached to the propo- -- to the purchase
11   order.
12       Q    And what was the scope of that project,
13   generally?
14       A    Collect some near-surface soil samples
15   and analyze them for compounds that were requested by
16   the DEP.
17       Q    And did that scope of work end at a
18   certain time?
19       A    That -- yes.  We completed that scope of
20   work.
21       Q    And when was that?
22       A    Sometime in 2011, I would say.
23       Q    And at the time when that scope of work
24   was completed, was TERMS completed with all of their
25   work at or around the Veterans Field Project?

Page 30

1    MR. PIERCE: Objection to form. For that
2  particular project?
3    MR. SHAFRON: For any -- for any work.
4  BY MR. SHAFRON:
5    Q    In other words, you hadn't yet been
6  retained for any other work when you were finished with
7  this work; isn't that correct?
8    MR. PIERCE: You can answer.
9    THE WITNESS: I believe we had not
10  completed our final report before we were engaged to do
11  additional sampling in the field.
12  BY MR. SHAFRON:
13    Q    And how did it come to your attention
14  that additional work was going to be necessary?
15    A    The town asked my opinion as to whether
16  additional sampling, after we found contaminants in the
17  initial samples, seemed appropriate.
18    Q    And was it you that responded yes?
19    A    I said, I mean, if you want to know
20  what's on the rest of the field, that's what you would
21  have to do, is take some samples.
22    Q    Did that work require a new purchase
23  order or was that included in the prior purchase order?
24    A    No. Ultimately it would require a new
25  purchase order.

Page 31

1    Q    And was it a new proposal submitted for
2  that work?
3    A    Yes, I'm sure there was.
4    Q    Did it work the same way where it was
5  submitted to Neglia first?
6    A    On that one as well, I believe, yes.
7    Q    And what was the scope of work of that
8  proposal?
9    A    It was similar to the previous scope, but
10  with more samples spread throughout the field.
11    Q    Generally, what was the results that
12  TERMS found as a result of that second round of
13  sampling?
14    A    We identified impacted historic fill,
15  basically throughout the entire site.
16    Q    All right. And did there come some point
17  where that second scope of work that was submitted, and
18  the second purchase order was submitted, where that
19  work came to a close before any additional work was
20  done at the Veterans Field site?
21    A    I would say it was the same answer as
22  before. We morphed into a new stage, as is typical in
23  environmental when you find something. We went from
24  finishing up when we knew what the results were. We
25  hadn't finished the entire scope because the report

Page 32

1  wasn't written because we needed to do more samples.
2    Q    What was the next scope of work that
3  TERMS was involved with at the Veterans Field site?
4    A    That was probably -- well, again,
5  additional sampling to identify the depth of the fill
6  and delineate a couple of spots within the field itself
7  where compounds were depicted.
8    Q    And what do you mean by determine the
9  depth of the fill?  What does that mean?
10    A    When we initially did samples, we focused
11  on the surface to determine if there was an exposure to
12  the, you know, scenario on the surface.
13    Q    Is there a reason why the first round was
14  limited to the surface?
15    A    Best of my recollection, that's what the
16  town wanted to start with.
17    Q    And did something change, that you're
18  aware of, as to why in this next phase that basically
19  the testing was deeper?
20    A    Well, based on regulations, we found
21  contamination. We had to -- in order to address it in
22  accordance with the regulations and the guidance
23  documents, we had to vertically determine the extent of
24  fill.
25    Q    And in a general manner, what did you

Page 33

1  what did TERMS find as a result of that round?
2    A    The fill extended to varying depths
3  across the field, and mostly to the ground water.
4    Q    Just generally, how deep is the ground
5  water in that area?
6    A    It varies with the tied. Um, sometimes
7  several feet, sometimes six, seven. I -- I don't
8  recall exactly.
9    Q    Yeah. I'm just trying to get a feel for
10  it. I know you can't tell me exactly.
11    A    It can be very shallow --
12    Q    Right.
13    A    -- since it's right on the river.
14    Q    Right.
15          But sometimes it can be upwards of 6 or
16  7 feet?
17    A    Yeah. It may have been more than that at
18  some times. I couldn't say for sure.
19    Q    When TERMS was originally retained, did
20  you assign someone specific at TERMS to work on that
21  project?
22    A    I assigned Pete Lakatos as my project
23  manager.
24    Q    And was it the same -- was he also the
25  project manager for the second scope of work they

TAYLOR & FRIEDBERG, LLC
(973) 285-0411

Page 34

1  described?
2      A    Yes.
3      Q    And I guess it was the third scope of
4  work also?
5      A    From the time we started work on the
6  Veterans Field property, he was basically -- he was the
7  project manager for everything.
8      Q    And during the time that he was the
9  project manager at the Veterans Field site, what was
10 your role?
11     A    I was the LSRP of record.
12     Q    Other than serving as the LSRP, did you
13 have any other role in that project?
14     A    Can I clarify that last...
15     Q    Yes.
16     A    I was not the LSRP for the first phase.
17 It was -- there was no LSRP requirement at that time.
18 It was a due diligence phase, if you will, that they
19 were, so.
20     Q    All right.
21     A    And I'm sorry, can you repeat the last
22 one?
23     Q    Yeah.
24          So other than serving as the LSRP at some
25 point in the project, did you have any other role as

Page 35

1  the president -- I assume you were the president of
2  TERMS?
3      A    Yes, I am.
4      Q    All right.  Did you have any other role?
5      A    In the Veterans Field Project?
6      Q    Yes.
7      A    Yeah.  I was consulting with Pete and my
8  staff as necessary, talking with the representatives
9  from Neglia and from the Borough at times.
10     Q    You said that at some point in the
11 various scope of works that TERMS is involved with at
12 the Veterans Field site, you personally became the LSRP
13 of record?
14     A    Yes.
15     Q    When was that?
16     A    I believe it was late in 2011.
17     Q    After the testing of the field was
18 completed in 2011, was there another scope of work that
19 was presented to Neglia or the Borough for TERMS' work?
20     A    Yes.  I'm not sure whether we separated
21 out preparing the documents specifically to procure a
22 contractor, or whether we gave them -- I believe we
23 gave them a scope that included the possibility of
24 capping the site.  Not us capping it, but that would be
25 something to go procure somebody for.

Page 36

1          So it was probably -- if you want to call
2  it that, we were developing a work plan of how to
3  address the contaminants we just -- that had determined
4  were there.
5      Q    I want to make sure that I understand how
6  this part of your work developed.
7          So testing was completed on the historic
8  fill by TERMS in 2011; is that right?
9      A    I believe so.
10     Q    Okay.  And as a result of that testing,
11 did the Borough ask TERMS for recommendations on what
12 to do or something else?
13     A    At that point we started having a little
14 more direct contact with the Borough, mostly through
15 Greg Franz.  But again, some of it was discussed with
16 Neglia who may have discussed some with the Borough,
17 and then we might have had follow-ups and trying to
18 determine what way the town wanted to go to address
19 this.
20     Q    And ultimately did you -- did TERMS
21 present options to the Borough and the Borough selected
22 one of those options, or did it happen some other way?
23     A    I think we may have discussed some
24 options, but it was -- I -- my recollection, it was
25 very clear from the beginning that the best option --

Page 37

1  they believed -- the Borough believed the best option
2  was going to be cap it rather than trying to remove all
3  of the soil.  So it became clear that that option was
4  the number one option.
5      Q    Did anyone tell you why removing all of
6  the historic fill was not a viable option?
7      A    I'm assuming it was pretty obvious that
8  it was cost-prohibitive.
9      Q    Generally, when the discussion of capping
10 the field was discussed, what did that mean to you?
11     A    It meant that you would have to bring in
12 clean fill to create a cap and/or some other, you know,
13 type of impervious cover.
14     Q    Was it your understanding that if the
15 area with contaminated historic fill was appropriately
16 capped, then ultimately there would be no environmental
17 risk at the property?
18     A    Yes.
19     Q    And was there a new scope of work that
20 was presented by TERMS to either Neglia or the town --
21 when I say the town, I mean the Borough of Edgewater --
22 with respect to the next phase of TERMS' work?
23          MR. PETRILLO:  Just objection to form.
24          You can answer.
25          MR. PIERCE:  You can answer.

10  (Pages 34 to 37)



Page 38

1      THE WITNESS: Yes. At some point I'm
2  sure there was. I'm not sure, because at that point
3  they started -- Neglia started to develop bid
4  specifications to go out to bid. So we were consulting
5  with them as to what would be included from an
6  environmental perspective. And I believe we had
7  prepared a Remedial Action Workplan.
8      Again, I'm not sure which number the
9  proposal that was that was in there. But ultimately
10 once it was procured, there was another scope presented
11 to the town for us to provide our, you know, oversight,
12 if you will.
13 BY MR. SHAFRON:
14     Q  And at the time when you were working
15 with Neglia in 2011, 2012, what was your understanding
16 of what Neglia's role was in association with the
17 Veterans Field Project?
18     MR. PETRILLO: Objection to form.
19     MR. PIERCE: You can answer.
20     THE WITNESS: They were providing
21 engineering services to the Borough.
22     MR. PETRILLO: Jason, take five?
23     MR. SHAFRON: Okay.
24     (Whereupon a recess was taken.)
25 ///

Page 40

1  signed them?
2      A  I reviewed them. I -- in what level of
3  detail -- but yes, I reviewed them.
4      Q  Were you asked to review files at TERMS
5  Environmental in order to answer these interrogatories
6  and requests for production of the documents in this
7  matter?
8      A  Was it --
9      Q  Did you look for documents?
10     A  I'm sure at some point I looked for some
11 documents. We also had somebody copying e-mails or
12 whatever.
13     Q  Yeah, I want -- that's the next thing I
14 wanted to ask you. At Mr. Lakatos's deposition he said
15 that someone came in to TERMS's office and was
16 obtaining e-mails. Do you know what he was referring
17 to?
18     A  I believe that somebody was hired by
19 either the attorneys or the insurance company to
20 compile those documents so that -- it was an IT issue,
21 I guess. They were just trying to do it in a manner
22 that they retrieved everything that had key words or,
23 you know, anything to do with this case was the
24 intention, I believe.
25     Q  So just generally, TERMS opened up its

Page 39

1      (Whereupon Defendant TERMS
2  Environmental Services, Inc.'s Response to
3  Waterside's First Set of Interrogatories was
4  marked RD-1 for identification.)
5      (Whereupon Defendant TERMS
6  Environmental Services, Inc.'s Amended Response to
7  Defendant Waterside Construction, LLC's First Set
8  of Interrogatories Pursuant to F.R.C.P.26(e) was
9  marked RD-2 for identification.)
10 BY MR. SHAFRON:
11     Q  I'm going to show you what's been marked
12 as RD-1 for identification, which is Defendant TERMS
13 Environmental Services Responses to Waterside's first
14 set of interrogatories. And just for the record, at
15 Mr. Lakatos's deposition we marked as Exhibit PL-5, a
16 copy of the same interrogatories. The only difference
17 between that marked copy and what's been marked as RD-1
18 today is that on -- just after page 70 is a signature
19 page on RD-1. Can you turn to that?
20     Is that your signature?
21     A  Yes.
22     Q  Okay. And did you sign this
23 certification on or about June 30th, 2015?
24     A  Yeah. I guess I did, yes.
25     Q  Did you review these answers before you

Page 41

1  e-mail servers and whatever else is available, and
2  someone came in to review that for documents which
3  were -- at that point, I assume whoever came in they
4  believe was relevant to whatever was being requested?
5      A  Essentially, yes.
6      Q  All right. And during the year 2010, did
7  TERMS Environmental Services have any type of insurance
8  which insured TERMS Environmental Services for
9  anything?
10     A  Yes, I'm sure we did.
11     Q  What type of insurance.
12     A  It would have been general comprehensive
13 liability, pollution liability, workers' compensation,
14 and professional liability, I believe.
15     Q  Are you aware of each if those policies
16 have separate policy limits?
17     A  At the time it was probably -- I believe
18 they were a million per occurrence.
19     Q  And was the same true in 2011 through to
20 today?
21     A  I think the limits are higher now.
22     Q  When did the limits of professional
23 liability insurance change, if it did?
24     A  Sometime this year.
25     Q  What did it change from and what is it

11  (Pages 38 to 41)



Page 42

1 now?
2     A    It was a million per occurrence, it is
3 now 2 million per occurrence.
4     Q    Is it with the same company?
5     A    When we made that change, yes. Is it the
6 same company as before, I think it is. I'm not really
7 sure. Same broker, but they might have underwritten it
8 through somebody else.
9     Q    Who was the broker?
10     A    Lobosco & Sons.
11     Q    Where are they located?
12     A    Woodland Park.
13     Q    A/k/a West Paterson.
14     A    Yup. Well, previously.
15     Q    Do you remember in the 2011 to 2014 time
16 period who TERMS' professional liability insurer was?
17     A    I don't know whether it was -- I -- I
18 don't know whoever is on the documents. I don't -- I
19 just deal with the broker and they write it through
20 whoever they're writing it through.
21     Q    Do you know which policies that TERMS
22 made a claim to with respect to the claims against
23 TERMS in this matter? And what I'm saying, you
24 indicated there was a pollution liability policy,
25 comprehensive liability policy, and professional

Page 44

1     Q    23.
2          At the top of the page it discusses an
3 August 22nd, 2012, meeting with you and Peter Lakatos,
4 TERMS, Mike Berliner of Neglia, and Matt Vereb of
5 Waterside. Do you recall that meeting?
6     A    I don't recall the exact date of the
7 meeting, but I recall a meeting around that time, so
8 I'm sure it was that date.
9     Q    And you see what it indicates, that the
10 subject matter of the meeting was for the purposes of
11 reviewing soil testing procedures. Do you see that?
12     A    Yes.
13     Q    Does that your refresh your recollection
14 of what that meetings was about?
15     A    Yes, I guess that's generally what it was
16 about.
17     Q    And then it says that at that meeting it
18 was agreed that Waterside could use fill material,
19 other than quarry materials or blasted rock, so long as
20 the proposed material was sampled and analyzed in
21 accordance with the testing requirements, and this it
22 says what the testing requirements are. Do you see
23 that?
24     A    Yes.
25     Q    Right.

Page 43

1 liability policy?
2     A    I'm not sure whether they were made to
3 several of those lines or just one. I...
4     Q    Okay. Show you what's been marked as
5 RD-2 for identification. And this is an amended
6 response by TERMS to first set of interrogatories. And
7 it's -- on the last page there's a signature line. Do
8 you see that?
9     A    Yes.
10     Q    All right. Is that your signature?
11     A    Yes.
12     Q    All right. And it's dated
13 September 30th, 2016. Do you remember reviewing these
14 amended responses on or about September 30th, 2016, and
15 signing?
16     A    In general, yes. Not specifically
17 what -- that it was that date, but if that's what it
18 says, I'm sure it was.
19     Q    Do you have any knowledge of what was
20 amended in this response from the original answers to
21 interrogatories?
22     A    I don't recall exactly what was amended.
23 I'm sure it was discussed at some point.
24     Q    If you turn to page 23 of RD-1.
25     A    I'm sorry, what page?

Page 45

1          Did you provide all of the information
2 from -- about meeting to give this answer to
3 interrogatory?
4          MR. PIERCE: Objection. It's
5 attorney-client communication.
6          MR. SHAFRON: Well, the witness said he
7 generally remembers that this meeting occurred.
8          MR. PIERCE: If you want to ask him about
9 the facts, ask him about the facts.
10          MR. SHAFRON: All right.
11          MR. PIERCE: Don't ask him about what he
12 discussed with me --
13          MR. SHAFRON: Well, I don't want to
14 know --
15          MR. PIERCE: -- or provided to me. The
16 document states it was provided -- prepared with the
17 assistance of Counsel, and it contains numerous
18 objections, which are legal objections.
19 BY MR. SHAFRON:
20     Q    All right. Do you specifically recall
21 that at that meeting that what I just read to you was
22 agreed among the people at that meeting?
23     A    I recall several meetings where the same
24 issue was discussed, and it was always discussed with
25 the same specifics that anything brought to the site

12 (Pages 42 to 45)



Page 46

```
1    that was not from a certified quarry or other material
2    that could be considered certified, would have to be
3    tested in accordance with the alternative clean fill
4    document.
5         Q    So just so I understand what it says in
6    this answer.  Do you mean that it was agreed that
7    Waterside could use other material that was tested, but
8    not quarry materials or blasted rock?
9              MR. PIERCE:  Objection.
10             You can answer.
11             THE WITNESS:  They could use -- I'm --
12   can you repeat the --
13   BY MR. SHAFRON:
14        Q    Well, the sentence says that Waterside
15   could use fill material other than quarry materials or
16   blasted rock, so long as -- and I assume it means that
17   other proposed material was sampled and analyzed.
18   So --
19        A    And it met the appropriate --
20        Q    Right.
21        A    -- levels.
22        Q    So does it mean that it was agreed that
23   materials other than quarry materials or blasted rock
24   could be used?
25        A    Yes.  It could be used as long as it was
```

Page 48

```
1              MR. PIERCE:  Objection to form.  You're
2    taking a portion of a sentence --
3              MR. SHAFRON:  Yes.
4              MR. PIERCE:  -- out of context.
5              MR. SHAFRON:  Yes.
6              MR. PIERCE:  You can answer.
7              THE WITNESS:  We were working with Neglia
8    to communicate to the Borough what was going on with
9    testing and results and some cases.  You know, we were
10   testing material that didn't appear to be worth
11   testing, but the Town said, you know, we should go
12   ahead and test whatever material they proposed -- being
13   Waterside -- proposed.  And that was usually, you know,
14   that was -- that was what we were doing with everything
15   that we were brought, proposed material that was
16   brought to our attention.
17   BY MR. SHAFRON:
18        Q    So when it -- says that TERMS would
19   advise Waterside and Plaintiff through Neglia, was it
20   your understanding that it was TERMS's obligation to
21   inform Neglia, and that Neglia's obligation to inform
22   the Town?
23             MR. PETRILLO:  Objection to form.
24             You can answer.
25             THE WITNESS:  That was the initial
```

Page 47

```
1    tested in accordance with those documents and it met
2    the criteria.
3         Q    Did it mean that quarry materials or
4    blasted rock could be used without the testing
5    requirements that are discussed in the sentence?
6         A    The requirements of DEP at the time was
7    that each of the virgin quarry, virgin rock material or
8    quarry, they required one test per year of those
9    facilities, and that would satisfy the requirements to
10   consider it certified clean fill.
11             Without coming from a virgin source or a
12   quarry, certified quarry, with those one-a-year
13   samples, then you had to follow the alternate and clean
14   fill guidance requirements for frequency and
15   parameters.
16        Q    And you see in the next paragraph it says
17   right in the middle of the paragraph there's a sentence
18   and the sentence -- right in the middle of the sentence
19   says, "TERMS would advise Waterside and Plaintiff
20   through Neglia that material was suitable for use as
21   fill material."  See that?
22        A    Yes.
23        Q    All right.  With respect to that
24   advising, what was your understanding of what Neglia's
25   role was at the project?
```

Page 49

```
1    understanding, yes.
2    BY MR. SHAFRON:
3         Q    And you see the next paragraph about
4    "TERMS was never given control of the job."  Do you see
5    that?
6         A    Yes.
7         Q    Was it your understanding that anyone
8    else at the site had control of job or the job site?
9         A    My understanding, and what other jobs
10   have -- basically I draw from other jobs that once
11   contractor is given the site, they're responsible for
12   controlling what goes on at the site and that it gets
13   done in accordance with the contract documents.
14        Q    Other than -- and in this case that would
15   be Waterside?
16        A    Yes.
17        Q    All right.  So your understanding of that
18   comes from your experience on other projects; is that
19   right?
20        A    Yes, first, to some extent, but it
21   appeared the same here.
22        Q    All right.  Did anyone ever tell you
23   that, that Waterside had control of the job site?
24        A    I don't know whether anybody specifically
25   said Waterside's in control.  Actually, I take that
```

13 (Pages 46 to 49)



Page 50

```
1    back. I believe, you know, Fred Daibes said he was in
2    control.
3        Q    And was it your belief that TERMS had no
4    authority or ability to stop Waterside, if Waterside
5    ignored TERMS's directions and instructions?
6        A    Legally, I don't know that we had any
7    authority to stop anybody.
8        Q    And then at the bottom of the page
9    there's -- the final paragraph starts, "On about
10   September 27th, 2012, Waterside, at the direction of
11   Daibes brought to Veterans Field approximately five
12   truckloads of soil from 440 River Road, material that
13   had not been deemed unsuitable for use" -- "that had
14   been deemed unsuitable for use by TERMS on about
15   August 21st, 2012."  Do you see that?
16       A    Yes.
17       Q    Were you aware of this allegation at on
18   or about September 27th, 2012?
19            MR. PIERCE:  Objection.  You're asking
20   him about the allegation or the incident?
21            MR. SHAFRON:  The incident.
22            MR. PIERCE:  You can answer.
23            THE WITNESS:  Oh, sorry.
24            MR. SHAFRON:  And by the way, just for
25   the rest of the deposition, unless your attorney or
```

Page 52

```
1        Q    And do you have any knowledge of what's
2    referenced in the first sentence that this material
3    "had been deemed unsuitable for use by TERMS on or
4    about August 21st, to 12"?
5        A    Again, most of my recollection was there
6    was material that was tested, and before the test
7    results were in, the materials brought to the site.
8        Q    You see on the next page --
9            MR. CORRISTON:  What page?
10           MR. SHAFRON:  24.
11   BY MR. SHAFRON:
12       Q    -- in the middle of the remaining part of
13   the paragraph in the top of page 24 there is a sentence
14   that starts "TERMS subsequently advised."  Do you see
15   that?
16       A    Yes.
17       Q    Who from TERMS advised Waterside what it
18   says in that sentence?
19       A    I'm assuming it was Pete Lakatos.
20       Q    But wasn't you; is that right?
21       A    Not personally, no.
22       Q    Do you have any understanding of -- well,
23   strike that.
24            Just read that sentence into the record.
25       A    Out loud?
```

Page 51

```
1    anyone else says do not answer the question, you can
2    answer the question.
3            MR. CORRISTON:  Unless your attorney says
4    do not answer.
5            THE WITNESS:  I understand.
6            MR. SHAFRON:  No one else is going to do
7    that.
8            THE WITNESS:  As to the exact date, I'm
9    not gonna say that I remember the exact date, but I do
10   remember an incident involving Noah Skyta of my office.
11   But I can't -- there's some quotes in here that I -- I
12   don't I can't speak to.
13   BY MR. SHAFRON:
14       Q    All right.  What do you remember about
15   this material that's referenced in this paragraph that
16   starts "on or about September 27th, 2012"?
17       A    Best of my recollection there was some
18   material that was at Waterside's other, I guess, yard
19   or site, that had some debris in it that they wanted to
20   bring so the site.  And, initially, I believe that's
21   what started this, they said they couldn't bring it in.
22            They actually brought it in after they
23   mentioned it, I think, to Pete as a -- and/or Noah as a
24   possible source, and they brought it in before there
25   was any approval to do that.
```

Page 53

```
1        Q    Yes, sir.  Please.
2        A    "TERMS subsequently advised Waterside
3    that if this material was screened and the soil,
4    blacktop, concrete, and debris removed, then Waterside
5    could use the remaining rock as part of the subbase for
6    paved parking area to be constructed."
7        Q    Is that your understanding of what
8    someone from TERMS advised Waterside at that time?
9        A    Yes, I -- generally, yes.
10       Q    Do you have any idea why -- if the
11   material was screened, why the blacktop and concrete
12   would have to be removed?
13       A    I believe the meaning of this was
14   screened to remove the soil, blacktop, concrete, and
15   debris.
16       Q    Do you know why TERMS was advising that
17   the blacktop and concrete would be required to be
18   screened and removed?
19       A    Because it wasn't clean fill.
20       Q    Okay.  And then it says, "TERMS advised
21   Waterside that all soil, concrete, blacktop, and debris
22   from the 440 River Road material had to be removed from
23   Veterans Field."  Is that right?  Were you involved in
24   this advice?
25       A    I'm sure I was -- had a conversation
```

14 (Pages 50 to 53)



Page 54

1  about it. I don't know. Again, I was not personally
2  saying -- the one calling them and saying you have to
3  remove it.
4       Q    All right. If you turn to page 25, and
5  then --
6            MR. PIERCE: This is RD-1, correct?
7            MR. SHAFRON: Yes.
8  BY MR. SHAFRON:
9       Q    The bottom of the page there's a
10 paragraph that starts, "Ron Dooney of TERMS." Do you
11 see that?
12      A    Yes.
13      Q    Just take a moment and read that
14 paragraph to yourself.
15           All right. So do you recall this series
16 of telephone conversations and meeting in late 2012
17 between you and Greg Franz of the Borough of Edgewater?
18      A    Yes.
19      Q    And was the result of this series, that
20 you had indicated that you didn't think that in order
21 to keep costs reasonable, that a TERMS employee should
22 be there full-time?
23      A    Can you say that again?
24      Q    All right. Let me ask it a different
25 way.

Page 56

1  the Veterans Field site?
2       A    I don't understand the question.
3       Q    What did you do? How many people did you
4  have there? The --
5       A    It varied by what was going on.
6  Sometimes there were -- we didn't have anybody there
7  because they were working on putting in curbs or
8  something, or whatever -- I mean, I'm not saying it was
9  curbs, but they were doing something that was not
10 related to bringing in fill or whatever.
11           Whenever we were made aware or advised
12 that that was going to happen, we tried to have
13 somebody there, you know, as much as we could, as long
14 as we knew about it.
15      Q    Show you what's been marked as PL-6 for
16 identification. It was an e-mail dated September 27th,
17 2012, from Noah Skyta to you and Peter Lakatos. Do you
18 recall receiving this e-mail O on or about
19 September 27, 2012?
20      A    Not specifically.
21      Q    Do you recall seeing this e-mail at any
22 time since it was sent?
23      A    Yes.
24      Q    When did you see it?
25      A    I saw it as part of the discussions of

Page 55

1            Do you see the last sentence of that
2  paragraph, which goes onto page 26, it says Mr. Franz
3  responded to you that he wanted to keep TERMS cost
4  reasonable and did not think that TERMS needed to have
5  someone out at the site on a full-time basis. Do you
6  see that?
7       A    Yes.
8       Q    Was it your recommendation that TERMS
9  have someone on a full-time basis and Mr. Franz thought
10 that was not necessary, or something different?
11      A    No. I recall that we discussed, you
12 know, if we were going to have somebody full-time there
13 it was going to be costly, was that absolutely
14 necessary? There was discussion that there were other
15 representatives also there, so they could advise us
16 when there might be something that we would need to be
17 there for.
18      Q    Do you mean other representatives of the
19 town?
20      A    Well, either of the town or of Neglia at
21 the time, and that we would provide periodic and, you
22 know, inspections or oversight as the job progression
23 dictated.
24      Q    So what was the final result of those
25 conversations with respect to the staffing by TERMS at

Page 57

1  case, I guess. I don't know exactly when I saw it
2  first.
3            But I recall this is the matter you were
4  just discussing. I recall discussing some of this,
5  that they jumped the gun, they brought it in, we told
6  them to screen it and just use the rock. I believe
7  that was essentially what was done with this.
8       Q    And you see the first sentence in the
9  second paragraph? Just read that sentence out loud.
10      A    The second sentence of the --
11      Q    No. The first sentence, the second
12 paragraph.
13      A    Sorry.
14           "As Ron and I agreed at the last meeting
15 to let them bring some of the concrete and stone from
16 440 River Road for subbase for blacktop."
17      Q    Do you recall a meeting with -- that you
18 and Mr. -- or at least you and Noah Skyta attended,
19 where TERMS let -- well, what this says there -- let
20 them -- I'll ask you -- I assume that means
21 Waterside -- bring some of the concrete and stone from
22 the 440 River Road for subbase for the blacktop.
23      A    I never said you could bring concrete
24 anywhere. I said they could -- if they screened it,
25 that the stone would be acceptable, but all the other

15  (Pages 54 to 57)



Page 58

```
 1   material had to be -- could not be brought or had to be
 2   removed if it had already been brought.
 3       Q    So is it your testimony that know Noah
 4   Skyta's statement to you and Peter in that first
 5   sentence of the second paragraph is mistaken?
 6       MR. PIERCE:  Objection.
 7       You can answer.
 8       THE WITNESS:  I don't know whether he was
 9   generalizing about the material or not, but I know, as
10   discussed previously in the document RD-1, that is my
11   recollection of what happened.  It was brought, we told
12   them to screen it and only use the rock, and get rid of
13   the other material.
14   BY MR. SHAFRON:
15       Q    Going back to RD-1, if you turn to page
16   27.  There's a long paragraph that starts towards the
17   top of the page, it says in 2013 and Mr. Lakatos
18   attended a series of meetings, and then it -- the
19   paragraph goes on to describe some of the those
20   meetings.  Do you see that?
21       A    Yes.
22       Q    All right.  And about two-thirds of the
23   way down the paragraph there's a sentence that starts,
24   "Mr. Berliner inquired."  Do you see that?
25       A    Yes.
```

Page 60

```
 1   approach.  Is that your understanding?
 2       A    Yes.
 3       Q    All right.  And it is it your
 4   understanding that nothing changed at all between the
 5   first time the answers -- the second answers, and it
 6   was just an error in the first time that it was
 7   written?
 8       A    I was just made aware of it, but yes, I
 9   would say that's -- it was an oversight.
10       Q    Okay.  Turn to page 42 of the initial
11   answers to interrogatories, there's a Question 13.  And
12   it asks about fill material being brought in over the
13   weekend.  Do you see that?
14       A    Yes, I see it.
15       Q    And the beginning sentence says that "On
16   or about September 11th, 2013, Mr. Dooney received a
17   telephone call from Mike Berliner who told him that a
18   town bus driver had seen Waterside running trucks from
19   the ALCOA site to Veterans Field over the past
20   weekend."  Do you see that?
21       A    Yes.
22       Q    All right.  Do you remember that call?
23       A    I remember the conversation.  I don't
24   remember the exact date, but right around there.
25       Q    What do you recall from that telephone
```

Page 59

```
 1       Q    Okay.  And then after that sentence it
 2   says Mr. Boggia also responded by stating, "No, they're
 3   going to clean it.  There were no PCBs before, they
 4   have to take it all out."  Do you see that?
 5       A    I see that.
 6       Q    Do you remember Mr. Boggia saying that at
 7   any meeting?
 8       A    I don't know whether that's a direct
 9   quote from what I recall.  It was essentially what was
10   said, though.  It was basically there were options to
11   leave some low levels of the PCBs that had been
12   imported improperly.  And his response on behalf of the
13   Town was that it wasn't there before, get rid of it all
14   even if you're allowed to legally leave some of that
15   material there.
16       Q    Did you agree with Mr. Boggia's statement
17   that there were no PCBs at the site before?
18       A    The reference he was making was to the
19   area of concern that had been created by the PCB-laden
20   concrete that had been brought in.  So toward that,
21   yes.
22       Q    And at the bottom of the paragraph it
23   talks about TERMS submitting a performance-based
24   approach, and there is R D-2, the amended responses, it
25   indicated that that should have been a risk-based
```

Page 61

```
 1   call?
 2       A    That Mike Berliner told me that there was
 3   a bus driver, initially, had seen Waterside running
 4   trucks into the field over the weekend.
 5       Subsequently, he said it was actually
 6   somebody from the DPW, but I don't -- I don't know
 7   exactly, you know, why there was that discrepancy; but
 8   that's what I was told initially, and then subsequently
 9   was told it was somebody from the DPW who saw them
10   doing this.
11       Q    During the course of TERMS's work at the
12   Veterans Field Project, had work ever been conducted on
13   Saturdays prior to September 11, 2013?
14       A    Yes, with prior notice that they were
15   going to be working, there were some.  I don't know how
16   often it happened, but it wasn't every weekend.  But
17   they were trying to work some weekends.
18       Q    Mr. Lakatos testified that he worked on
19   some Saturdays.  Does that sound right to you?
20       A    Yes.
21       Q    All right.  And would there be some
22   Saturdays where there may have been work being done at
23   the site where no one from TERMS was going to be
24   present or was present?
25       A    There may have been.  It would have
```

16 (Pages 58 to 61)

Page 62

1    likely not included any -- any work related to the
2    environmental aspect of the job, or they may have done
3    things that we weren't aware of.
4        Q    Okay.  When is the first time that you
5    personally visited the site after September 11, 2013?
6        A    It would have been right after that.  I
7    don't know exactly.  Maybe the next day.  It might have
8    been later -- I don't think it was later that day.  I
9    think it was the following day that I went out there,
10   and then several times over the next week or so.
11       Q    All right.  Are you sure that you went a
12   day or two after September 11th, 2013?
13       And one of the reasons I'm asking that is
14   because Mr. Lakatos told us yesterday that he was
15   intimately involved in this project from the beginning,
16   indicated that he didn't go to the site until
17   approximately September 29th, which would be about at
18   least two weeks after those phone calls that you just
19   described.
20       A    I remember meeting Mike Berliner at the
21   site sometime after he told me of this incident, and I
22   don't believe it was more than a week.  It had to be
23   within a couple of days.
24       Q    And in the middle of the page it
25   indicates that "On or about September 12th, 2013, Matt

Page 63

1    Follo of TERMS visited Veterans Field."
2        A    I'm sorry, what page?
3        Q    43.
4        Do you see that?
5        A    I see it, yes.
6        Q    All right.  Were you with Mr. Follo
7    during that visit on September 12th, 2013?
8        A    No.
9        Q    And it indicates that whatever
10   information Mr. Follo obtained, he related that
11   information to Mr. Lakatos.  Did Mr. Follo relate any
12   of that information directly to you on September 12th,
13   2013?
14       A    Not that I recall.
15       (Whereupon TERMS Document, three
16   pages, to Gregory Franz, Re: Veterans Park
17   Completion of Site Remediation, Remaining
18   Scope/Cost, was marked RD-3 for identification.)
19   BY MR. SHAFRON:
20       Q    Show you what's been marked as RD-3 for
21   identification, which is a -- well, it's -- the first
22   paragraph indicates that is -- it is presented as a
23   status and summary of required tasks and costs
24   associated with completing the site remediation at the
25   Veterans Park site in Edgewater, New Jersey, and it's

Page 64

1    on TERMS Environmental Services letterhead.
2        MS. PARKER:  This document's not
3    Bates-stamped.  You guys know that?
4        MR. SHAFRON:  Do you --
5        I'm sorry.
6        THE WITNESS:  I don't know.
7        MS. PARKER:  Hold on for a second, David.
8        Do you know if this was maybe one of the
9    documents that you produced initially without the Bates
10   stamp numbers on them?
11       MR. PIERCE:  I don't know.  I don't know
12   if this is from us or if it's from Edgewater.
13       MR. CORRISTON:  Here's all I can tell
14   you.  I asked for my paralegal to find a copy.  She
15   found this copy.  She didn't have time to go through a
16   Bates-stamped copy, but I'm sure it's been produced by
17   TERMS and us.
18       MS. PARKER:  Do you want to just say
19   something for the record, Dave?
20       MR. PIERCE:  Yeah, I do.
21       It doesn't have a date, and I don't know
22   if that's part of the original document or not, but.
23       MR. CORRISTON:  There's another document
24   that goes with it, right?
25       MR. SHAFRON:  There is another document.

Page 65

1        MR. CORRISTON:  Can I see that, please.
2        Again, it's not Bates-stamped, but I
3    assume we have a Bates-stamped copy.
4        Why don't you mark this RD-4.
5        MR. PIERCE:  I mean, I'll let you ask
6    Mr. Dooney questions about this, but I'm going to
7    reserve objections.
8    BY MR. SHAFRON:
9        Q    Do you recognize what's been marked as
10   RD-3?
11       A    I -- I guess it certainly looks familiar.
12   I don't know if it's the exact document I produced or
13   was produced by my office.  As you said, not only is it
14   not Bates-stamped, there's no date on it, which is very
15   unusual for something coming out of our office.
16       Q    Based on the scope of work which is
17   included in this document under Budgetary Cost
18   Estimate/Remaining Tasks, do you have any idea what
19   stage of the project this document may have been
20   presented?
21       A    Based on -- again, I'm -- I'm just
22   reading it.  But based on this, it appears it would
23   have been generated after the Hurricane Sandy delay.
24   There was a long delay, as I think most people might
25   have heard about.  I don't remember the exact time that

17  (Pages 62 to 65)

Page 66

1   this would have -- date would have been produced, but
2   it's -- you know, looks like, okay, they're going to
3   start back up, here's what we understand is left to be
4   done.  And based on that understanding, here's what we
5   think sampling and oversight will cost.
6       Q    Is this the type of document that you
7   were describing earlier in your deposition that would
8   get submitted to the Borough and attached to a purchase
9   order and constitute the retention by TERMS by the
10  Borough of Edgewater?
11          MR. PIERCE:  Objection.  It
12  mischaracterizes testimony.
13          But you can answer.
14          THE WITNESS:  Basically this would be the
15  type of document, yes, that would be attached to a
16  purchase order.
17  BY MR. SHAFRON:
18      Q    And you see if you look under -- on the
19  second page it says, "Task 4, Oversight Soil
20  Remediation/Capping, and then in parenthesis, minimum
21  anticipated time - restarting oversight on
22  February 11th, 2013."  Do you see that?
23      A    Yes.
24      Q    All right.  What does it mean when it
25  talks about restarting oversight?

Page 68

1   the samples, get the analytical results and determine
2   if it was appropriate to bring to the site.
3       Q    So for example, for this portion of the
4   project, the sampling it says would be 30 hours at $85
5   an hour.  Do you see that?
6           MR. PIERCE:  Objection.
7   BY MR. SHAFRON:
8       Q    And again I'm not -- we don't know if
9   this was your actual proposal.  We'll find that out
10  later.  I just want to make sure that I understand,
11  generally, the types of tasks that TERMS engaged in and
12  what it was.  So here it says sampling 30 hours at $85
13  an hour.  Do you see that?
14      A    Yes.
15      Q    So that would be the estimate for doing
16  the tasks that -- and the analysis with 56 samples at
17  $1,500 a sample that you just described?
18      A    Yes.
19      Q    Okay.  And that work is different than
20  Task 4, which is oversight, right?
21      A    Yes.
22      Q    All right.  How is it different?
23      A    In one case, we -- in Task 1, we would be
24  advised there was a site that they want proposed --
25  Waterside proposed to bring in whatever volume of soil

Page 67

1       A    As I previously mentioned, after Sandy
2   the job was shut down for some period of time,
3   therefore, we restarted.  When Waterside restarted
4   their construction activities or capping activities,
5   this would have been what I'm -- what would have been
6   referred to as restarting.
7       Q    All right.  And that's my fault, because
8   it was really a compound question.  I was less
9   interested in the restarting part and more about the
10  oversight part.
11          What does it mean that this was a task of
12  oversight?
13      A    We were asked to provide our oversight to
14  make sure that things were going in properly and that
15  nothing was brought to the site that shouldn't be.
16      Q    Well, for example, Task 1 is clean fill
17  sample collection and analysis.  You see that?
18      A    Yes.
19      Q    All right.  Generally, what is that task?
20      A    As previously mentioned, the agreed-upon
21  procedure was Waterside would identify material they
22  would propose to be brought to the site.  We would
23  determine based on the size whatever pile it was or how
24  much material they were proposing, we would determine
25  how many samples to take and go to that site and take

Page 69

1   it was.  Depending on the volume, a person -- whoever
2   it was from our office -- would go collect the sample
3   from that site -- collect sample or samples.  That was
4   Task 1.
5           Task 2 is providing somebody on an
6   interim, as-needed basis to watch what was going on
7   while they were placing material or, you know, whatever
8   they might be doing of an environmental nature at the
9   site.  They being Waterside, sorry.
10      Q    And how does Task 4 differ than task --
11  Task 1?
12          MR. PIERCE:  Objection.  Asked and
13  answered.
14          You can answer.
15          THE WITNESS:  Task 1 involves sampling at
16  other sites of the material that was proposed to be
17  brought to the site.  Task 4 doesn't necessarily
18  involve any sampling.
19  BY MR. SHAFRON:
20      Q    What does it involve?
21      A    Watching what was going on at the site.
22      Q    Okay.  And it says that the billing for
23  this Task 4 was a per diem cost of $750 a day.  Do you
24  see that?
25      A    Yeah.  Estimated, yeah.

18  (Pages 66 to 69)

Page 70

1    Q    Right. And if this was the actual
2  proposal that was given and it was part of a purchase
3  order, that would mean that TERMS would be -- would be
4  reimbursed at a per diem rate of $750 a day for
5  oversight, irregardless of how many TERMS employees
6  were actually on the site; is that right?
7    A    No.
8    Q    Okay. Why is it -- why am I mistaken?
9    A    Well, the second per diem cost would be
10 for having two people at the site. If the necessity
11 arose that there were too many -- too much activity
12 going in different parts of the site, we might need a
13 second person.
14   Q    Okay. So if the per diem cost at $750
15 per day assumes that there is a TERMS employee --
16 there's one TERMS employee on the site on that day
17 that's being billed for, is that fair?
18   A    Essentially that would have been the
19 plan.
20   Q    And if two employees were on site on a
21 given day, then TERMS would bill 1300 for that day?
22   A    That was -- that was, again, I believe
23 this is accurate, but.
24   Q    Right.
25        (Whereupon E-mail from Ronald Dooney

Page 71

1  to Greg Franz, March 4, 2013, was marked RD-4 for
2  identification.)
3  BY MR. SHAFRON:
4    Q    Show you what's been marked as RD-4 for
5  identification, which is a March 4th, 2013, e-mail from
6  you, and it looks like it's to Greg Franz at the
7  Borough of Edgewater. Is that right?
8        MR. PIERCE: I'm going to, again, note my
9  objection to this document. It has no Bates numbers.
10 It also appears to have been produced by
11 Mr. Corriston's office, it has Kristin Campbell at the
12 top of the document. I reserve all objections to the
13 questions, but you may question him about this
14 document.
15 BY MR. SHAFRON:
16   Q    Do you recall sending this e-mail on or
17 about March 4th, 2013?
18   A    Generally, in a -- I mean, I don't recall
19 the date, but yeah.
20   Q    Does it --
21   A    The essence, yes.
22   Q    Does it appear that the attached invoice
23 that's referenced in the first sentence of this e-mail
24 is what was marked as RD-3 for --
25        MR. PIERCE: Objection.

Page 72

1        You can answer.
2        MR. SHAFRON: -- identification?
3        THE WITNESS: No.
4  BY MR. SHAFRON:
5    Q    Okay. Does it appear that what is --
6  what was marked as RD-3 is what's referenced in the
7  fourth paragraph of this e-mail where it says, "I also
8  prepared the attached summary of Anticipated Minimum
9  and Maximum scope of work and cost that may be required
10 to complete the Remediation of the field in accordance
11 with the Remedial Action Workplan." You see that?
12   A    Yes.
13        MR. PIERCE: Again, objection.
14        You can answer.
15        THE WITNESS: I see it, yes.
16 BY MR. SHAFRON:
17   Q    I asked you --
18   A    Oh.
19   Q    -- does it appear that RD-3 is what's
20 referenced in that fourth paragraph of the e-mail?
21        MR. PIERCE: Same objection.
22        THE WITNESS: On the surface, yes, it
23 appears that way.
24        MR. SHAFRON: I just need a few minutes.
25        Do you want to start or break?

Page 73

1        MS. PARKER: Want to break for lunch.
2        (Whereupon a recess was taken.)
3  CROSS-EXAMINATION
4  BY MR. CORRISTON:
5    Q    Mr. Dooney, good morning. How are you?
6    A    Fine. How are you?
7    Q    My name is Tim Corriston, we met before.
8  I represent the Borough of Edgewater in this
9  litigation.
10       The same instructions apply. Do you
11 understand that?
12   A    Yes.
13   Q    In this litigation I'm going to -- in
14 this -- I'm going to -- strike that.
15       I'm going to show you what's been marked
16 as MV-6 for identification. This is Waterside's
17 amended answers to interrogatories dated November 23rd,
18 2016. I'm going to ask that you read the amended
19 response to number 2, beginning on page 3 here. Read
20 it to yourself, please.
21   A    The amended answers starting at the top
22 of the --
23   Q    Start with --
24   A    -- subject --
25   Q    Starting with the paragraph on page 3

19  (Pages 70 to 73)



Page 74

```
 1    that begins with "subject to and without waiving the
 2    foregoing."
 3        A    Okay.
 4            MR. PIERCE:  Well, there's two
 5    paragraphs.  You're talking about the one at the top of
 6    the page.
 7            THE WITNESS:  This one.
 8            MR. CORRISTON:  Yes.  The top of the
 9    page.  That's number 3.  This is the answer to
10    number 2.
11            MR. PANSULLA:  What was the reference
12    number, Tim, the marking?
13            MR. CORRISTON:  MV-6.
14            MR. PANSULLA:  MV-6?
15            MR. CORRISTON:  Yes.
16    BY MR. CORRISTON:
17        Q    All right.  Those interrogatories
18    reference that in early September of 2013 there was a
19    meeting -- doesn't say where -- where TERMS granted
20    Waterside verbal approval that recycled concrete fill
21    material could be used under roadways and walkways at
22    Veterans Field.  Further maintains that you were
23    present, Mr. Lakatos, Mr. Neglia, Mr. Berliner,
24    Mr. Vereb, Mr. Iafelice, Mr. Schiller, and Mr. Arfuso
25    was present.
```

Page 76

```
 1        Q    Was TERMS ever advised that Waterside was
 2    transporting recycled concrete fill -- or RCA as we've
 3    referred to some of the material -- from the ALCOA site
 4    to Veterans Field?
 5        A    No.
 6        Q    Did TERMS ever authorize Waterside to do
 7    so?
 8        A    No.
 9        Q    Do you recall being at any meetings with
10    the individuals identified in this answer to
11    interrogatory where that subject was even raised?
12        A    The only meetings I recall were not
13    discussing concrete, they were discussing the
14    Waterside's lack of ability to find suitable material
15    to be used as clean fill at the site, and what -- what
16    were they going to do about it.  And that's never
17    concrete.  Never heard the word ALCOA until after this
18    happened.
19        Q    And did, at any time, TERMS advise
20    Waterside that it would not have to test any fill
21    material being brought to the field?
22        A    Never.
23        Q    The modification of the contract, which
24    initially required quarry stone or rock, correct?
25            MR. PIERCE:  Objection.
```

Page 75

```
 1            MR. PIERCE:  Objection.  That's -- you
 2    said interrogatories.  These are Waterside's answers to
 3    interrogatories.
 4            MR. CORRISTON:  Yes.
 5            MR. PIERCE:  Okay.
 6    BY MR. CORRISTON:
 7        Q    Were you at such a meeting?
 8        A    I don't recall --
 9            MR. SHAFRON:  Objection to the form.
10            MR. PIERCE:  Object to form.
11            You can answer.
12            THE WITNESS:  Sorry.
13            I don't recall being at a meeting in
14    early September, but I was never at a meeting that
15    the -- what took place in that -- was stated in that
16    paragraph took place.  Never -- never at a meeting that
17    we approved bringing concrete.
18    BY MR. CORRISTON:
19        Q    Recycled concrete fill?
20        A    Or -- that's correct.
21        Q    All right.  So let me clarify this.
22            Did TERMS ever approve Waterside
23    utilizing recycled concrete fill under roadways and
24    sidewalks at Veterans Field?
25        A    No.
```

Page 77

```
 1            MR. CORRISTON:  There was a modification?
 2            MR. PIERCE:  Objection.
 3            You can answer.
 4            MR. SHAFRON:  Objection.
 5    BY MR. CORRISTON:
 6        Q    I'm going to -- strike that.
 7            Not that the contract was modified, but
 8    you do recall -- and I believe Mr. Shafron asked you
 9    questions -- at which a meeting -- there was a meeting
10    discussed as to the use of fill from nonvirgin sources
11    and the protocol that would be utilized.  Do you
12    remember that?
13        A    I remember having at least one, probably
14    more than one, meeting where that topic was discussed.
15        Q    And the permitting Waterside to use fill
16    as opposed to what was initially specified saved
17    Waterside significant monies, correct?
18            MR. PIERCE:  Objection.
19            You can answer.
20            THE WITNESS:  I would assume it did.
21    BY MR. CORRISTON:
22        Q    And that was not your request, that was
23    Waterside's request, correct?
24        A    Correct.
25        Q    And initially you billed Waterside for
```

20 (Pages 74 to 77)



Page 78

1 the testing that was performed, correct?
2  A   For the initial testing, the first
3 material we tested, yes.
4  Q   Did they pay that?
5  A   No.
6  Q   And at that time the town advised you
7 that they would pay it in order to move the job along?
8  A   That's correct.
9  Q   Now, you discussed briefly -- and I don't
10 want to go over every incident -- but there were
11 occasions where Waterside would bring material to the
12 field prior to being tested, correct?
13  A   I recall several occasions where that
14 happened, yes.
15  Q   That was in violation of the protocol
16 that TERMS set up?
17  MR. PIERCE:  Objection.
18  You can answer.
19  THE WITNESS:  Yes.
20 BY MR. CORRISTON:
21  Q   And under those circumstances, TERMS
22 would require Waterside to segregate the material, it
23 would then be -- segregate it and not spread it and
24 then test it, correct?
25  MR. SHAFRON:  Objection to form.

Page 79

1  THE WITNESS:  We -- yes, we told them
2 that they should not bring anything until it was
3 tested.  In some cases material was there before it was
4 tested; in other cases it was tested but the results
5 weren't available.
6  Whenever we got results for material that
7 had been brought, on those several occasions, without
8 having the results, anything that came back bad we told
9 them it had to be removed.  But I remember at least one
10 occasion where that happened and the results came back
11 okay, so the material was allowed to be used.  But we
12 didn't know it was okay because we didn't have the
13 results before it was brought there.
14 BY MR. CORRISTON:
15  Q   Okay.  They weren't supposed to bring it
16 before they tested it or you got the test results,
17 correct?
18  A   Right.  Weren't supposed to bring it to
19 the site until we had results indicating that it was
20 acceptable to be used at the site.
21  Q   And on the occasions they did do that,
22 you would not let them use it until you obtained the
23 results?
24  MR. PIERCE:  Objection.
25  You can answer.

Page 80

1  THE WITNESS:  We told them they weren't
2 supposed to bring it.  When we found it was there, if
3 we found out before the test results, we would say,
4 Don't spread it.  And then occasions where they spread
5 it, we told them to remove it.  That's all --
6 obviously, precedes the actions that we're discussing
7 that caused this litigation.
8 BY MR. CORRISTON:
9  Q   Right.
10  Did you understand what the requirements
11 were for the fill that was acceptable at Veterans
12 Field?
13  MR. PIERCE:  Objection.
14  You can answer.
15  THE WITNESS:  Not sure I understand the
16 question.
17 BY MR. CORRISTON:
18  Q   The level of contam-- level of the PCBs
19 permitted.
20  MR. PIERCE:  Objection.
21  You can answer.
22  THE WITNESS:  There were no PCBs allowed.
23 Everything that was to be brought to this field as
24 certified clean fill for the cap had to be -- and
25 anything brought to the site, because we didn't have a

Page 81

1 beneficial reuse permit.  So it was told numerous times
2 everything brought to the site had to be certified
3 clean fill or come from a quarry which allowed it to be
4 considered certified, and that had to be tested in
5 accordance with the clean fill document, and it had to
6 meet all of the criteria that the DEP's site
7 remediation standards.
8 BY MR. CORRISTON:
9  Q   Did Mr. Franz ever communicate to you
10 that that requirement could be ignored --
11  MR. PIERCE:  Objection.  Which
12 requirement?
13  MR. CORRISTON:  -- or disregarded?
14  MR. PIERCE:  Which requirement?
15  MR. CORRISTON:  The clean fill
16 requirement.
17  THE WITNESS:  It -- the question is
18 did --
19  MR. PIERCE:  Again, an objection.
20  MR. CORRISTON:  I'll withdraw it.
21  MR. PIERCE:  Okay.
22 BY MR. CORRISTON:
23  Q   That requirement didn't change throughout
24 the project, correct?
25  MR. PIERCE:  Objection.  I'm not sure

TAYLOR & FRIEDBERG, LLC
(973) 285-0411

Page 82

1  what requirement you're talking about. Are you talking
2  about the contractual requirement or the DEP's
3  requirements?
4  BY MR. CORRISTON:
5      Q    I'm talking about the requirement to
6  utilize clean fill with no PCB contamination. That
7  never changed?
8      A    No.
9      Q    You testified earlier about being
10  informed that either, initially a bus driver and then
11  subsequently the DPW, observed vehicles transporting
12  material from, purportedly, ALCOA to the field in
13  September of 2013?
14          MR. SHAFRON: Objection.
15          THE WITNESS: I did say that, yeah. I'm
16  not sure what the question was.
17  BY MR. CORRISTON:
18      Q    Did you later learn that, in fact, it was
19  someone called the DPW to advise about concern about
20  trucks bringing material from ALCOA to the field?
21      A    The first thing I was told was a bus
22  driver called someone. I -- no one communicated who
23  that was. Then I was told that it was actually a DPW
24  employee who noticed it. That's what I was told at
25  that time.

Page 83

1      Q    Okay.
2      A    I have seen other subsequent things that
3  said one of the employees involved with the field from
4  Neglia also somehow knew of this by passing the field
5  or whatever.
6      Q    But you had no personal knowledge?
7      A    Until I got that phone call after that
8  weekend, no, I had no knowledge.
9          (Whereupon Defendant TERMS
10  Environmental Services, Inc.'s Amended Response to
11  Plaintiff Borough of Edgewater's First Set of
12  Interrogatories Pursuant to FRCP 26(e) was marked
13  RD-5 for identification.)
14  BY MR. CORRISTON:
15      Q    Mr. Dooney, can you look at what we've
16  marked as RD-5 and advise whether you recognize that
17  document.
18      A    It's my signature.
19      Q    On the certification page?
20      A    Yes.
21      Q    Do you recall an issue arising regarding
22  OSHA certificates?
23      A    Yes.
24      Q    Is that an issue you had personal
25  involvement with?

Page 84

1      A    Yes.
2      Q    And what do you recall about that issue?
3      A    That it started with the kickoff meeting
4  where we discussed the need to have OSHA certificates
5  for all employees who were gonna be in direct contact
6  with the soil. In other words, people on the ground;
7  not truck drivers, not equipment operators.
8      Q    And what was the issue that arose with
9  that and Waterside?
10      A    That we continually asked for them and we
11  never got them.
12      Q    Never?
13      A    I don't believe we -- we may have
14  received some of them at some point, but I don't -- I
15  know we did not get them right away and we did not get
16  them completely.
17      Q    Your -- the answers to interrogatories,
18  if you turn to page 15, it indicates that you had a
19  conversation -- or several conversations, it's not
20  clear -- with Mr. Berliner and Mr. Franz?
21          MR. PIERCE: Are you --
22          MR. SHAFRON: Hold on one second, because
23  my page 15 doesn't say that.
24          MR. CORRISTON: Oh, I'm sorry.
25          MR. PIERCE: You're referring to the

Page 85

1  original answers.
2          MR. CORRISTON: You know what, let me go
3  back. I'm trying to track it. I got confused. Let
4  me --
5          MS. PARKER: It's 12:20. Do you want to
6  take a break right here? I just have to get ready for
7  my call.
8          MR. CORRISTON: Sure.
9          (Whereupon E-mail From Michael
10  Berliner to Ron Dooney, September 12, 2013,
11  Bates-stamped NEGLIA001737, was marked RD-6 for
12  identification.)
13          (Whereupon October 3, 2013, Letter
14  from Ronald Dooney to Gregory S. Franz,
15  Bates-stamped W000174, was marked RD-8 for
16  identification.)
17          (Whereupon E-mail from Michael J.
18  Neglia to Ron Dooney, October 7, 2013,
19  Bates-stamped W004397 through W004398, was marked
20  RD-9 for identification.)
21  BY MR. CORRISTON:
22      Q    Mr. Dooney, I'm going to refer you to
23  page 8 of the amended answers to interrogatories in
24  front of you, RD-5. At the bottom of page 8 and
25  continuing on to page 9 you reference having

22 (Pages 82 to 85)

Page 86

1  conversations with Mr. Berliner and Mr. Franz about the
2  OSHA certificate issue. Do you recall those
3  conversations?
4        A    I recall several, yes.
5        Q    Okay.
6             MR. PIERCE: Read the entire --
7             THE WITNESS: Oh, okay.
8             MR. PIERCE: It goes on to the next page.
9             THE WITNESS: Okay. I read it.
10 BY MR. CORRISTON:
11       Q    The answer indicates that Mr. Berliner
12 and Mr. Franz responded that they could not -- that
13 TERMS should not go to the NJ DEP and that they would
14 get Mr. Dooney what he needed. Was that -- do you
15 recall specifically that conversation?
16       A    I guess first, I mean, whose answers are
17 these? Are they --
18       Q    Your -- TERMS.
19       A    To a question that was asked just
20 generally?
21       Q    Yes.
22       A    That's what I'm trying to figure out what
23 the -- where the answer came from.
24       Q    Well, regardless of where it came from,
25 did you have a conversation with Mr. Berliner and

Page 87

1  Mr. Franz about whether you should go to the NJ DEP?
2        A    I don't recall specifically asking, but I
3  do remember there was an issue with getting the OSHA
4  certificates that we've asked for. What do we do to get
5  them? And I don't know whether I said going to the
6  DEP. I mean, technically, you know, if you're not
7  following the Remedial Action Workplan, that's one of
8  the mechanisms to try to, you know, address it, by
9  telling the DEP that there's a deviation from the work
10 plan. So it might have -- it might have been stated
11 that way.
12            But, essentially, we were having trouble
13 with them providing the certificates that we asked for
14 in the beginning of the job.
15       Q    Waterside provided them?
16       A    Right. And/or their subcontractors.
17       Q    And do you recall that Mr. Berliner and
18 Mr. Franz were going to try to help you get those from
19 Waterside?
20       A    Yes. At some point they said, We'll --
21 you know, We'll make sure that we get them.
22       Q    Okay. Noah Skyta, he was your -- he is
23 your employee, correct?
24       A    He is, yes.
25       Q    And you were shown earlier a document

Page 88

1  regarding some issues he was having with the way
2  Waterside was performing?
3             MR. SHAFRON: Objection to form.
4             THE WITNESS: There was something that
5  was talking about bringing material without it having
6  been tested, yes.
7  BY MR. CORRISTON:
8        Q    Do you recall a shouting match, having
9  knowledge or learning of a shouting match between him
10 and Mr. Daibes?
11       A    I don't know that it was a shouting
12 match, but I recall there was an incident near the
13 beginning of the job between them.
14       Q    And do you recall a subsequent meeting
15 which you apparently did not attend, but they called
16 you from the meeting regarding replacing Noah with Joe?
17            MR. PIERCE: Objection.
18            You can answer.
19            THE WITNESS: I don't remember exactly
20 who said what first, but I talked with Mike Berliner,
21 and he said, Look -- at some point -- this was after a
22 couple of, you know, that incident that you're
23 referring to that there was either a shouting match or
24 whatever, disagreement, there was subsequently another
25 issue that came up about, I believe, the certificates

Page 89

1  that you were just talking about. And Mike Berliner
2  said, You got to do something because Fred's making --
3  Fred Daibes is making, you know, a problem within the
4  town, and if you don't replace him, then you -- you
5  know, you're going to have to do something else and get
6  rid of him.
7             So, yes, they -- that came up. Whether
8  it was Joe Noon who I was replacing, I don't remember
9  exactly where that -- when that conversation took
10 place. Ultimately, I think Pete Lakatos spent a good
11 deal of time there that wasn't initially planned.
12 BY MR. CORRISTON:
13       Q    Did you agree to remove Noah from the
14 site?
15       A    I did.
16       Q    After Noah was removed, were there any
17 other -- did any other personnel have any shouting
18 matches with Mr. Daibes or anyone from Waterside, to
19 your knowledge?
20            MR. SHAFRON: Objection to form.
21            THE WITNESS: I don't know that there was
22 a shouting match ever. I was never told there was a
23 shouting match. It was that he said, You have to do
24 this, and -- but no, to the latter part of that
25 question, I don't recall anybody else ever having an

Page 90

1    altercation of any kind.
2    BY MR. CORRISTON:
3        Q    And did you have to replace any other --
4    any of your other employees who worked at the site, or
5    did you replace any of your other employees who worked
6    at the site because of any disputes or disagreements
7    with Waterside personnel?
8        A    I did not replace anyone else because of
9    any disputes, no.
10       Q    And Joe was -- what's his last name, I'm
11   sorry? Joe?
12       A    Noon, N-o-o-n.
13       Q    Thank you.
14             He was capable of performing the task
15   that Noah had been performing?
16       A    Yes.
17       Q    And Mr. Lakatos was also capable of
18   performing that task?
19       A    Again, it's -- yes, but it depends on
20   what task they were -- what was going on on any given
21   day what was necessary.
22       Q    Well, you didn't place personnel at the
23   site who weren't capable of performing the function
24   necessary, correct?
25       A    We got to a point where we were just

Page 91

1    providing eyes in the field, so to speak, to let --
2    make sure that the people in the position controlling
3    the job, which was mostly Pete Lakatos, was aware of
4    everything that was going on.
5        Q    Did Pete Lakatos have more
6    responsibility -- strike that.
7             Was he your supervisor for the job?
8             MR. PIERCE:  Objection.
9             You can answer.
10            THE WITNESS:  He was project manager.
11   BY MR. CORRISTON:
12       Q    Okay.  And what does that mean if you're
13   project manager?  What were his responsibilities?
14       A    Basically to deal with the day-to-day
15   issues that were part of our scope of work, and
16   whatever would come up that we had to get involved in.
17       Q    Did you have any meetings with Mr. Franz,
18   Mr. Berliner, and Mr. Daibes, and Mr. Vereb about
19   trying to move along the project quicker and address
20   some fill issues?
21       A    I can recall at least one, yes.
22       Q    And what do you recall about that?
23       A    That Mr. Daibes was complaining that we
24   were, quote, rejecting all the material he proposed as
25   being suitable or thought was suitable to bring to the

Page 92

1    site as clean fill.  And we stated, All we're doing is
2    testing it in accordance with the requirements, as
3    we've stated all along.  And if it doesn't meet the
4    limits, then it can't be used at the site.
5             And at one point we actually, at one of
6    those meetings -- so I think there probably was two,
7    because I remember one that we discussed was material
8    from another site that we had found that was clean,
9    already tested, free, would be loaded, and it was in
10   Cedar Knolls, and he said, That's too far, I'm not
11   going there.
12            Subsequently, said, Well, how am I
13   supposed to get material?  And we said, You can go to a
14   quarry and get it.  And his response was, That's never
15   going to happen, because that's going to cost too much.
16            And that was the substance of whatever
17   other meeting that that kind of discussion was the same
18   thing as, you know, this is the process.  And, you
19   know, I can't tell you, you know, how else to get it,
20   but this is what you have to do in order to satisfy the
21   requirements here.
22       Q    And you did not yield on that position,
23   correct?
24       A    No.
25       Q    And Neglia did not ask you to yield on

Page 93

1    that position, correct?
2        A    No.
3        Q    And the Borough did not ask you to yield
4    on that position, correct?
5             MR. PIERCE:  I would like to clarify the
6    answers.  You asked him if it was correct and he said
7    no.  I want to know --
8             MR. CORRISTON:  You're right.
9    BY MR. CORRISTON:
10       Q    Counsel makes a good point.  You
11   didn't -- you never changed your position as to what
12   the fill requirements were, correct?
13       A    That's correct.
14       Q    Despite Mr. Daibes inquiring as to
15   whether you could, or he could bring material that did
16   not necessarily meet those requirements, correct?
17       A    That's correct.  There was a discussion
18   at one point about bringing stuff that might have had
19   contaminants, and we said the only other way you could
20   do this is to get a beneficial reuse permit from the
21   state.  Which would still -- would potentially have
22   allowed him to bring some contamination and put it
23   under the cap, but that was determined that it would
24   take too long, and.  So that was the only other
25   discussion we ever had about bringing material in any

24 (Pages 90 to 93)

Page 94

1  other way than what we have been stating all along was
2  the requirement.  As soon as they found out that would
3  take a permit and it would take months and, you know --
4  months to get, they abandoned that, so that was it.
5          MR. PIERCE:  Could you mark the prior two
6  questions, please, because I want to come back to those
7  at some point.
8  BY MR. CORRISTON:
9          Q   When you say they, you mean Waterside,
10  correct?
11         A   Yes, I --
12         Q   You just used the term they.
13         A   Yes.
14         Q   Did you have a meeting with Mr. Berliner,
15  Mr. Franz where it was communicated to you that the
16  Borough counsel had concerns that TERMS was holding up
17  the job?
18         A   I don't know whether it was -- was it a
19  meeting, I believe it was a meeting or it was
20  definitely a phone call.
21         Q   And what happened as a result of that?
22         A   We were told by Mr. Boggia that there was
23  discussion with counsel people and others, that they
24  were being told we were -- TERMS and I -- were holding
25  up the job because we continued to reject the material

Page 95

1  that was proposed for use at the site.  And we said,
2  We're not rejecting anything, we're just comparing it
3  to the standards, and if it's -- if it meets the
4  standards, it's acceptable.  That was the substance of
5  that conversation.
6          Q   Did anyone from the Borough object to you
7  requiring Waterside to meet the standards that you just
8  referenced?
9          MR. SHAFRON:  Objection to form.
10         THE WITNESS:  Well, again, the attorney
11  was saying that there was discussion that we were the
12  cause of delays and getting this project done.  And all
13  we said was, you know, it's not our delay.  You can --
14  you know, again, one of the comments was, You can
15  finish this up immediately by just going and getting
16  stuff from a quarry.  But it was clearly not acceptable
17  from a financial standpoint for Waterside.
18  BY MR. CORRISTON:
19         Q   Okay.  Go back to my question.  You
20  indicated that in response to people raising an issue
21  like -- you know, you know, you think that was likely Waterside
22  raising that issue?
23         MR. PIERCE:  Objection.
24         You can answer.
25         THE WITNESS:  I don't -- I assume.

Page 96

1  BY MR. CORRISTON:
2          Q   You indicated that you were following the
3  standards that were set, correct?
4          A   I was following the DEP's regulations and
5  guidance, yes.
6          Q   Did anyone from the Borough, I'm not
7  asking about them saying that you're delaying it, but
8  did they ask you to change that standard and permit
9  material that was not permitted onto the site?
10         A   No.
11         MR. PIERCE:  Objection.  Are you asking
12  if they asked him to allow material on the site that
13  did not meet the standard?
14         MR. CORRISTON:  Yes.
15         THE WITNESS:  The answer is no, they did
16  not ask me to allow stuff on the site.
17  BY MR. CORRISTON:
18         Q   And you wouldn't, would you?
19         A   No.
20         Q   No, you wouldn't?
21         A   No, I wouldn't.
22         Q   Mr. Dooney, I've handed you a copy of
23  RD-6.  I'd ask that you review that document and let me
24  know after you've completed your review.
25         MR. PIERCE:  Off the record for a second.

Page 97

1          (Whereupon a discussion was held off the
2  record.)
3  BY MR. CORRISTON:
4          Q   Okay.  You testified earlier today that
5  it was on or about September 11, 2013, that you
6  received the call regarding the transportation of
7  material to the field from ALCOA?
8          MS. PARKER:  Objection.  I don't think he
9  said that on that day he found out that it came from
10  ALCOA.
11  BY MR. CORRISTON:
12         Q   Can you turn to page 22 of RD-5, please?
13  And if you could read the last paragraph.
14         MR. PIERCE:  To himself or out loud?
15         MR. CORRISTON:  He can read it to himself
16  right now.
17  BY MR. CORRISTON:
18         Q   All right.  Can you read the first
19  sentence into the record?
20         A   "On or about September 11, 2013,
21  Mr. Dooney received a telephone call from Mike Berliner
22  who told him that a town bus driver had seen Waterside
23  running trucks from the ALCOA site to Veterans Field
24  over the past weekend."
25         Q   Reading your response, which is your

25  (Pages 94 to 97)



Page 98

1  answers to interrogatories you signed in response to
2  questions that we asked, does that refresh your
3  recollection as to receiving a call from Mr. Berliner
4  and being told that materials were being trucked to the
5  site from ALCOA?
6      A    That's what I recall.
7      Q    And the next sentence references that you
8  had some concerns because of that.  What were your
9  concerns and why did you have concerns?
10     A    The concern was the material hadn't been
11 tested.  I was told also that the ALCOA site obviously
12 was a contaminated site, which I didn't know
13 specifically about.  But the main concern was that we
14 were bringing material from another site that hadn't
15 been tested that may have been a known contaminated
16 site at some point.
17     Q    If you turn to the next page, please.
18     A    Of RD-5?
19     Q    Yes.
20          If you look at the second -- if you could
21 read the second paragraph to yourself, first, please.
22     A    Okay.
23     Q    It says there that on -- the first
24 sentence says, "On September 11, 2013, TERMS advised
25 plaintiff in writing, through Neglia, that Waterside

Page 99

1  had brought untested fill material to the site and
2  requested confirmation from the Borough."  Do you see
3  that?
4      A    Yes.
5      Q    Do you recall whether you authored any
6  such writing?
7      A    I sent an e-mail on the 12th.  So it may
8  be that the date is the 12th that the e-mail was sent.
9      Q    That was my question, so -- right?
10          And then the e-mail that you sent on the
11 12th, that's reflected on RD-6?
12     A    Yes.
13     Q    Okay.  What was the purpose of sending
14 that e-mail?
15     A    To put in writing what we found out and
16 what the necessary steps to address it were.
17     Q    Okay.  And what recommendation did you
18 make at that time regarding the work -- any work to be
19 permitted by the contractor?
20     A    We said that any material that hadn't
21 already been spread that had been brought onto the site
22 without it being tested first, not be spread, and that
23 we would have to test the material that was on the site
24 already to determine if it contained any contaminants
25 above the standards.

Page 100

1      Q    And did you also recommend that at that
2  time that any future material being brought to the site
3  be tested prior to being transported?
4          MR. PIERCE:  Objection.
5          You can answer.
6          THE WITNESS:  I believe in the
7  next-to-last paragraph I stated, "As the LSRP for
8  Veterans Field, I reiterate -- I'm reiterating the
9  requirement that all future material be tested prior to
10 being transported to the site, as" -- looks like
11 there's something missing there.  So that's not a
12 complete -- I don't know whether that's germane or not,
13 but it's not -- something's missing, a page or
14 something.
15 BY MR. CORRISTON:
16     Q    This is how it was -- well, this was
17 produced by Neglia, this version, but.
18          All right.
19     A    Well, that's the -- I mean, the essence
20 of the answer to your question is, yes, it was
21 reiterated at that time.
22     Q    Okay.  Was there a reason you did not
23 copy any representatives of Waterside on the e-mail?
24     A    No.  I was contacting the engineer for
25 the site to tell them what -- you know, basically put

Page 101

1  in writing what I had already been told.
2      Q    And did Mr. -- it actually indicates in
3  the first sentence, "Per discussions earlier yesterday
4  and today," do you see that portion of it?
5      A    Yes.
6      Q    Was there anything that you and
7  Mr. Berliner discussed that isn't -- anything material
8  as to the instructions you gave that is not included in
9  that e-mail?
10         MR. PIERCE:  Objection.
11         You can answer.
12         THE WITNESS:  Not that I recall, no.
13 BY MR. CORRISTON:
14     Q    And then Mr. Berliner responded, that's
15 also part of RD-6, the first portion of it?
16         Yes?
17         MR. PIERCE:  Objection.
18         You can answer.
19         THE WITNESS:  What's the --
20 BY MR. CORRISTON:
21     Q    The top of RD-6.  This is Mr. Berliner
22 responding to you, correct?
23     A    Yes.
24     Q    You see that e-mail?
25         And do you recall receiving that e-mail?



Page 102

1    A    Yes.
2    Q    What did you do after Mr. Berliner's --
3  in response to Mr. Berliner's e-mail, if anything?
4    A    I'm assuming there was either another
5  e-mail or a phone call after that. I don't recall
6  exactly, but at some point there was direction to the
7  contractor -- and I'm not sure whether it came from
8  Neglia or from us, but I think it may have come from
9  Neglia, but I don't recall exactly.
10   Q    Mr. Berliner, his response is essentially
11 that as the LSRP, you need to address this with the
12 contractor.
13        MR. PIERCE:  Objection.
14        MR. CORRISTON:  Is that a fair summary?
15        MR. PIERCE:  Objection.
16        You can answer.
17        THE WITNESS:  It -- yeah, it appears that
18 that's what he was saying in that e-mail.
19 BY MR. CORRISTON:
20   Q    If you continue down on this page to the
21 third paragraph. You see that?
22        MR. PIERCE:  Which document are you
23 referring to?
24        MR. CORRISTON:  RD-5.
25        THE WITNESS:  Page 23?

Page 103

1  BY MR. CORRISTON:
2    Q    Yes.
3    A    Okay.
4    Q    It references Mr. Follo visiting the site
5  on September 12th, 2013?
6    A    Yes.
7    Q    And it further indicates that Mr. Follo
8  was instructed to take samples by Mr. Lakatos, correct?
9    A    Yes.
10   Q    Were you present when Mr. Follo took
11 those samples?
12   A    No.
13        MR. PIERCE:  Objection.
14        Asked and answered, but you can answer.
15 BY MR. CORRISTON:
16   Q    If you go down two more paragraphs it
17 begins with, "During a telephone call." Do you see
18 that paragraph?
19   A    Yes.
20   Q    Could you read it and let us know when
21 you're finished.
22   A    Done.
23   Q    Do you recall Mr. Daibes informing you
24 that material had -- the material -- and I presume he's
25 talking about the material that -- those stockpiles

Page 104

1  that Mr. Follo were sampling, that that had come from
2  ALCOA?
3    A    Yes.
4    Q    And do you recall him telling you that it
5  was one truckload?
6    A    At that time, that was what he said.
7    Q    And during the course of the subsequent
8  events, did that change, in terms of how many
9  truckloads?
10        MR. SHAFRON:  Objection.
11        THE WITNESS:  Yes.
12        Initially -- elaborate a little bit.
13 Initially he said it was one truckload, it was very
14 clear where it was, and that it could be removed and
15 taken off the site.  Subsequently, it -- I was told
16 there were more than one load.  The amounts varied
17 throughout the, you know, course of the next couple of,
18 you know, days, weeks, whatever.  But it was clear,
19 after seeing this, there was more than one load at the
20 site.
21 BY MR. CORRISTON:
22   Q    Did you subsequently draw a conclusion
23 that you could not rely upon what Mr. Daibes was
24 telling you?
25        MR. SHAFRON:  Objection to form.

Page 105

1        THE WITNESS:  Well, I wasn't going to
2  rely on it because the evidence seemed to contradict
3  it.  And I wouldn't rely on it if -- if I was going to
4  be signing off on what was actually brought to the
5  site, I was going to have to determine it by sampling
6  it.
7  BY MR. CORRISTON:
8    Q    Go down to the bottom paragraph of
9  page 23 of RD-5.  Can you read that to yourself and let
10 me know when you're finished.
11   A    Finished.
12   Q    Do you recall that -- and I know you may
13 not recall the exact date, if you do, let me know --
14 that the lab results of the initial testing that was
15 performed of the material that was represented as
16 originating from the ALCOA site identified
17 contamination?
18   A    I don't recall a day, but I know that the
19 initial results were -- had compounds and PCBs most
20 notably above the standard.
21        MR. CORRISTON:  Mark this, please.
22        (Whereupon E-mail from Peter Lakatos
23 to Matt Vereb, September 24, 2013, Bates-stamped
24 T0088447, was marked RD-10 for identification.)
25 ///

TAYLOR & FRIEDBERG, LLC
(973) 285-0411



Page 106

```
1    BY MR. CORRISTON:
2        Q    Mr. Dooney, I've put in front of you
3    RD-10 for identification. Do you recall receiving a
4    copy of this e-mail that was sent by Mr. Lakatos to
5    Matt Vereb?
6        A    I don't recall specifically, but I know
7    it -- obviously, I was CC'd on it and I know it was
8    happening.
9            MR. CORRISTON: For the record, the Bates
10   is T0088447.
11   BY MR. CORRISTON:
12       Q    And what was Mr. Lakatos communicating on
13   September 24th, 2013, to Mr. Vereb?
14           MR. PIERCE: Objection.
15           MR. SHAFRON: Objection.
16           MR. PIERCE: You can answer.
17           THE WITNESS: That the results of the
18   initial testing showed that the material had
19   contaminants and was not going to be able to be left at
20   the site.
21   BY MR. CORRISTON:
22       Q    Did you have any direct conversations
23   with Mr. Vereb or anyone on behalf of Waterside on this
24   issue?
25           MR. PIERCE: Objection. On this date --
```

Page 108

```
1        You can answer.
2            THE WITNESS: Late September one says.
3    BY MR. CORRISTON:
4        Q    I'm talking about the top.
5        A    Oh.
6            Yes.
7        Q    That's consistent with the instructions
8    that are included in RD-10, correct?
9        A    Yes.
10       Q    Below that is another paragraph that
11   says, "In late September 2013 Ronald Dooney and Matt
12   Follo of TERMS met Mr. Daibes at Veterans Field, and
13   Mr. Daibes advised that Waterside had actually brought
14   in eight or nine truckloads of the material."  Is that
15   an accurate reading of the first sentence?
16       A    Yes.
17       Q    And is that what you were just previously
18   referring to in terms of meeting Mr. Daibes at the
19   field?
20       A    Yes.
21       Q    That does not have a date attached to it,
22   it just says late September 2013.  Do you know if that
23   was before Mr. Lakatos notified TERMS that this
24   stockpile fill material was not suitable on
25   September 24, 2013, or after that?
```

Page 107

```
1            MR. CORRISTON: Yes.
2            MR. PIERCE: -- or --
3    BY MR. CORRISTON:
4        Q    In or about September 23rd or
5    September 24th, 2013.
6        A    I didn't have any discussions with
7    Mr. Vereb. I did have a discussion with Mr. Daibes at
8    the site on or about when these results first became
9    known.
10       Q    After the results were known?
11       A    No. Right about when -- it might have
12   been this day. I didn't know of the results, but I
13   knew around the time we had the conversation that the
14   results were coming in. So I didn't know for sure that
15   they were above, but we were basically saying no
16   concrete, no nothing, we got to stop everything until
17   we get the results. So there was a conversation around
18   this time, but it was before the results were
19   available.
20       Q    All right. And if you could look at page
21   24 of RD-5. The top of page 24 references
22   September 24th, 2013. And basically is the same
23   subject matter as the e-mail that we've marked as
24   RD-10; is that accurate?
25           MR. PIERCE: Objection.
```

Page 109

```
1            MR. PIERCE: Objection. You mean he
2    notified Waterside? You said TERMS.
3    BY MR. CORRISTON:
4        Q    "That Mr. Lakatos notified Matt Vereb of
5    Waterside on September 24th, 2013, that the stockpile
6    fill material was not suitable for use at Veterans
7    Field and must be removed."
8        A    I'm sorry. The question is?
9        Q    This next reference says in late
10   September 2013. Is that before or after September 24,
11   2013, on September 24 --
12       A    It could have been on, but it was --
13       Q    -- 2013?
14           Let me finish my...
15       A    Sorry.
16       Q    -- or on September 24th, 2013?
17       A    I can't be certain. I don't recall. But
18   it could have been -- it was before I knew of the
19   results. It's possible it was on the 24th, and that
20   that was being communicated while I was out on the
21   site.
22           I don't -- I don't recall the exact date,
23   but I know that at that time we didn't necessarily
24   have -- or I didn't have results.
25       Q    If you could read that paragraph which
```

TAYLOR & FRIEDBERG, LLC
(973) 285-0411



Page 110

1  begins with, "In late September 2013," to yourself, and
2  let me know when you're finished.
3      A    I'm done.
4      Q    First, is that an accurate summary of
5  your conversation with Mr. Daibes on the unknown date
6  in late September 2013?
7      A    Appears to be, yes.
8      Q    Is there anything in this paragraph that
9  is inaccurate?
10     A    I don't see anything specific, no.
11     Q    It indicates that while you were speaking
12 with Mr. Daibes you observed trucks being -- trucks
13 transporting or attempting to transport crushed
14 concrete to the field; is that accurate?
15     A    Yes.
16     Q    And why did that raise a concern?
17     A    Because we were out there because
18 concrete had been brought in from another site without
19 it being tested, and we were not made aware of this
20 material, where it was coming from, whether it had been
21 tested. So that was what started the conversation
22 about, Now we're sitting here talking about concrete
23 being brought from a different site, and more trucks
24 with concrete started showing up.
25     Q    And did you stop the trucks from bringing

Page 112

1      Q    Can you read the last paragraph of this
2  page 24 of RD-5, please?
3      A    Page 24?
4      Q    24. The last paragraph.
5      A    Got it.
6      Q    Begins with "Mr. Dooney."
7      A    Yes.
8      Q    Ready?
9      A    Yeah.
10     Q    This paragraph indicates that you had a
11 telephone conference with Mr. Berliner?
12     A    Yes.
13     Q    When was that telephone conference?
14     A    It would have been either the same day or
15 probably the next day after meeting at the site. I
16 don't recall exactly, but it was right around this time
17 of the previous paragraph's discussion of a meeting at
18 the site.
19     Q    And you indicate that Mr. Berliner stated
20 that they're using the recycled concrete material all
21 over town. Do you see what that --
22     A    That was what was stated, was they're --
23 used this material elsewhere in town. And I -- that's
24 what he said. And I said, This is site remediation
25 program site, it's different than wherever else you're

Page 111

1  the material onto the site?
2      A    I didn't personally stop them. I asked
3  my guy to go tell the people who were directing the
4  trucks that they couldn't come on the site.
5      Q    Did they listen?
6      A    The first truck, I think, if I remember
7  right, kept going onto the site, but never dumped, and
8  had them turned around. And then ultimately somebody
9  else came after that and was on the other side of the
10 site.
11          Again, I didn't see them actually dump,
12 but we had to stop them because there were more trucks
13 coming, and Daibes said -- I don't know, they must have
14 been in transit -- he said, We won't bring anything
15 else to the site, just like the paragraph says, and
16 then --
17     Q    Okay.
18     A    -- showed up.
19     Q    In the middle of the paragraph indicates
20 that "Mr. Daibes protested, stating that it was going
21 under the sidewalks. Mr. Dooney responded that it
22 could not be used anywhere unless it was tested, and
23 said, 'Fred, we're not bringing anything else here
24 until it's tested.'" Is that accurate?
25     A    Yes.

Page 113

1  doing things in town, and you can't bring it in unless
2  you test it first.
3      Q    Did Mr. Berliner respond any further?
4      A    Not that I recall, no.
5      Q    Did he agree with you?
6      A    Again, I don't recall a disagreement.
7  He -- best of my recollection, he said okay.
8      Q    If you could turn to page 25, please, of
9  RD-5. It indicates that "On September 29th" -- or
10 "30th" -- this is the first paragraph -- "Mr. Lakatos
11 visited Veterans Field and immediately observed that
12 more material than had" -- than just -- "than just that
13 contained in the stockpiles have been brought to
14 Veterans Field."  Do you see that?
15     A    Yes.
16     Q    And further that "In that Waterside had
17 not correctly or accurately described the site work to
18 him." You see that statement?
19     A    Yes.
20     Q    So as of September 29th or 30th. When
21 Mr. Lakatos went there, Waterside was still performing
22 site work at the field, correct?
23          MR. PIERCE: Objection.
24          You can answer.
25          MR. SHAFRON: Objection.

## Page 114

1    THE WITNESS: Yes. I -- I don't know
2  exactly what was being moved or whatever, but yes, they
3  were still at the site.
4  BY MR. CORRISTON:
5    Q    Were you at the field with Mr. Lakatos on
6  this date -- or dates? It's hard to tell which it is.
7    A    Not that I recall. I don't think I was.
8    Q    After your meeting with Mr. Daibes, did
9  you return to the field at any time prior to locking
10  the field? You know what I mean by locking the field?
11  When you lock the gates?
12    A    I know what you mean by locking a field.
13        I'm sure I probably was there at some
14  point.
15    Q    Do you have a specific recollection as
16  you sit here?
17    A    No.
18    Q    Do you keep any type of diary or
19  work sheet or something in your computer indicating on
20  what date and time you were at a specific site?
21    A    Not always. It depends on if it's a
22  planned visit or whatever.
23    Q    Mr. Dooney, I placed in front of you RD-8
24  for identification. It's an October 3rd, 2013, letter
25  from yourself to Mr. Franz, Bates W000174. Please let

## Page 115

1  me know after you have read it.
2    A    Done.
3    Q    This letter, what was the purpose of this
4  letter?
5    A    It was to memorialize a conversation I
6  had with Mr. Franz at his request.
7    Q    And did that conversation occur on
8  October 3rd, 2013?
9    A    Yes. I believe it occurred right before
10  I wrote this.
11    Q    What was the subject matter? In other
12  words, I know the purpose was to memorialize a
13  conversation, but what were you instructing?
14    A    We had had -- Mr. Franz and I had had
15  several conversations about, you know, the ongoing work
16  that was complicating the situation that the contractor
17  wasn't following the direction. And, ultimately, he,
18  Mr. Franz, said write a letter stating what the problem
19  is and that you're requiring that all work cease at the
20  site.
21        This was, you know, again, several
22  conversations about it before this, but -- so this was
23  not the first -- I guess the only point I want to make
24  is, this was not the first that I talked to -- that
25  Mr. Franz was aware of the issue, but this was

## Page 116

1  memorializing it as he -- you know, we discussed and he
2  requested.
3    Q    Did you recommend that the site be closed
4  or did he recommend it or request it?
5    A    I think it was a mutual... In our
6  discussion it was clear that we needed to do something
7  to stop the continued movement across the site, if
8  nothing else, now that we knew it was fairly
9  contaminated.
10    Q    And was that mutual decision made on
11  October 3rd?
12    A    Well, yeah, I think it -- I think we
13  mutually -- discussed it mutually, came to that
14  conclusion that this is what we should do. And he
15  said, Put it in writing, send it to me, and that was
16  what initiated this.
17    Q    Prior to October 3rd, 2013, had you or
18  Mr. Franz had any disagreements as to whether the site
19  should be closed or not?
20    A    I wouldn't say disagreements. Basically
21  we said they need to stop moving material anywhere
22  around the site, need to stop moving through this
23  contaminated area, but he didn't say -- we didn't have
24  a disagreement about it. It just -- unfortunately, it
25  took several times of telling the contractor not to do

## Page 117

1  things that we eventually issued this. As you pointed
2  out earlier, he asked me to get locks and them -- put
3  our locks on the gates.
4    Q    So I just want to make clear. During --
5  you know, from when you first learned of the issue
6  around September 11th or 12th, October 3rd in 2013, you
7  and Mr. Franz were in communications regarding the
8  situation; is that accurate?
9    A    Yes.
10    Q    And the -- there was no determination or
11  recommendation prior to October 3rd, 2013, to close the
12  site, you were trying to work with the contractor?
13        MR. PIERCE: Objection.
14        MR. CORRISTON: Is that fair?
15        MR. PIERCE: You can answer.
16        THE WITNESS: Yeah. There was discussion
17  about other work that could be done on the site, or
18  whether other work could be done on the site. So that
19  was part of the discussion was, if they stayed out of
20  this area and they went and worked on something over --
21  you know, on the other side of the site that had
22  nothing to do with the cap, could they continue to do
23  that?
24        And part of the problem was containing
25  the contamination that was already there and not

30 (Pages 114 to 117)

Page 118

1   spreading it further by going through with trucks or
2   whatever. So it -- once it became clear that there was
3   no way to do pieces of work that weren't going to
4   have -- be a problem, then it was determined that we
5   should just shut the whole site down.
6   BY MR. CORRISTON:
7        Q    And that was on October 3rd?
8        A    On or about, yes.
9        Q    And a significant factor in that
10   determination was the fact that the contractor was
11   disregarding the instructions?
12       A    Yes.
13       Q    Mr. Dooney, I'm going to show you RD-9
14   for identification. Mr. Dooney, I'm going to introduce
15   this into the record, but in the interim, you can
16   review it.
17            MR. CORRISTON: RD-9 is Bates-stamped
18   W004397 through 4399.
19            Actually, some of them have a third page
20   on it. I'm going to make it just W004397 to 4398. You
21   can remove the third page. I think we marked that
22   separately already.
23   BY MR. CORRISTON:
24       Q    Let me know when you're ready,
25   Mr. Dooney.

Page 119

1        A    Okay.
2        Q    Okay. So, if you turn to the second
3   page, which is W004398. Do you recognize that
4   document?
5        A    Yeah, it came from my e-mail, yup. Yes,
6   I guess I...
7        Q    And am I correct that at this e-mail
8   which is dated October 4th, 2013, you forwarded the
9   Veterans Field stop work directive that you had
10   previously sent to the Borough to Matt Vereb of
11   Waterside? Or it was a separate stop work directive,
12   if you recall?
13       A    I believe it was the same one that was
14   provided to the letter that we just discussed, RD-8.
15       Q    And further in the body of the e-mail,
16   you advise Mr. Vereb that all site operations are to be
17   discontinued and no entry to the site is allowed until
18   further notice. Is that accurate?
19       A    That is --
20            MR. PIERCE: Objection.
21            You can answer.
22            THE WITNESS: Sorry.
23            That is accurate, and it was based on,
24   again, conversations with Greg Franz.
25   ///

Page 120

1   BY MR. CORRISTON:
2        Q    Did you -- at the -- on October 4, 2013,
3   or October 3rd, 2013, did you have any conversations
4   with Mr. Vereb?
5        A    I don't recall any direct phone
6   conversation or -- not on the site either, I don't
7   believe so.
8        Q    If you go down to the first page of the
9   exhibit, which is W004397.
10       A    Right.
11       Q    There's an e-mail from Mr. Michael Neglia
12   to yourself dated October 7, 2013, about a meeting. Do
13   you see that?
14       A    Yes.
15       Q    And it's indicating that Mr. Daibes was
16   requesting a meeting?
17       A    It's what it says.
18       Q    Do you recall that?
19       A    Not specifically.
20       Q    Was there a meeting with Mr. Daibes and
21   Mr. Neglia or someone from Neglia in conjunction, you
22   know, that was scheduled consistent with this e-mail?
23       A    That day, I -- I don't recall. I mean, I
24   know there was at least a meeting or two after that at
25   Neglia's office.

Page 121

1        Q    And --
2        A    But I don't know that it was that --
3   later that day.
4        Q    What do you recall about the meeting at
5   Neglia's office?
6            First of all, who was there?
7        A    Looks like -- I don't know whether --
8   Matt Vereb might have been there, but Mr. Boggia was
9   there, Mike Berliner, Mike Neglia, Pete Lakatos, Greg
10   Franz, myself, and I don't recall whether Matt was
11   there, but Fred Daibes was there.
12            And the discussion was, What do we have
13   to do to address this issue? And I recall at that
14   point we had another estimate of 1100 yards of material
15   that had come in, but by that point we had already
16   determined that it had been spread across a much larger
17   area than was initially indicated.
18       Q    Can you just stop there -- and I'm going
19   to let you finish your answer, but while you're on
20   that. Can you just explain that further? I didn't
21   understand what you were saying about another 1100
22   yards.
23       A    Well, initially it was one load, then it
24   was six or seven loads, then it was 1100 yards.
25            I don't know that that's stated anywhere

Page 122

1  in here, but I recall that that's what Mr. Daibes said
2  at that time. Because I think it was clear that this
3  stuff had been spread around, so we knew that it
4  appeared to be more than six or seven loads. So that
5  was the discussion started by, How much material are we
6  talking about?
7          And at that time I don't believe it was
8  fully delineated. So we started talking about, What
9  can we do with it? Because at one point there was talk
10 about returning it to the site of origination, which
11 was not an option.
12     Q   Okay. If you could turn to page 26 of
13 RD-5. The last paragraph, if you could please read it.
14     A   Okay.
15     Q   Is that, the paragraph, this last
16 paragraph, is that the meeting you just referred to in
17 your testimony or is this a different meeting?
18     A   Different meeting.
19     Q   So when it indicates on page 26 that
20 there was a meeting where Mr. Daibes had represented
21 that there were eight or nine truckloads of material
22 brought into the field, in this subsequent meeting that
23 amount increased again?
24     MR. PIERCE: Objection.
25     MR. SHAFRON: Objection to form.

Page 123

1          MR. PIERCE: You can answer.
2          THE WITNESS: Yes. Again, that was just
3  statements about the volume, not any way to verify the
4  volume.
5  BY MR. CORRISTON:
6      Q   If you could turn to page 27 of RD-5, the
7  second paragraph, if you could read that.
8      A   Okay.
9      Q   That refers to a meeting with a
10 representative of Edgewater. Do you see that first
11 sentence there?
12     A   Yes.
13     Q   Who was that with?
14     A   Greg Franz.
15     Q   And when was that?
16     A   I don't recall the exact date. It
17 probably was before the meeting that I had -- no, had
18 to be after that meeting.
19         Sometime in, I'm guessing, early, you
20 know, October. Right after they found out the results
21 had come in. So what was that, late September, then.
22         So by that time we had results, and I
23 talked with Greg Franz and I was told that Mr. Daibes
24 said he was going to take the material back to where it
25 came from. I talked to Greg Franz and said, You can't

Page 124

1  do that. And he said, All right, well, tell him
2  what -- tell them that they're not going to be able to
3  do that.
4          And I went out and told -- went to tell
5  Mr. Daibes, and he said, I spoke to the town, we're
6  going to just load it on the truck and take it back
7  where it came from. And I said, I just spoke to the
8  town and told them that's not going to happen. And he
9  said, Oh, then what do we have to do about it?
10     Q   And was that before or after you had
11 closed the site, this meeting that you're referring to?
12     A   That was before.
13     Q   Then if you go down to the second-to-last
14 paragraph, indicates, "In or about October 2013 Ron
15 Dooney of TERMS physically placed a lock on the gate to
16 the fence at Veterans Field." Do you see that?
17     A   Yes.
18     Q   We spoke about that earlier briefly. I
19 believe you testified that that was at Mr. Franz'
20 suggestion or direction?
21     A   It was an agreement that we both thought,
22 That's all we can do at this point is to put a
23 different lock on the gate. So it was -- it was a
24 suggestion that, I guess, he probably made that I
25 agreed with.

Page 125

1      Q   And which gate?
2      A   I put it on two -- at two gates. There
3  were really only two gates at that time.
4          Problem is that these were temporary
5  fences which could be lifted up in panels and off the
6  pins that they were set on and, therefore, locking
7  one -- two panels together really didn't do anything,
8  but it was all we could do because of the type of
9  fencing that was there.
10     Q   When was that?
11     A   What day was it? Um.
12     Q   Let me start with this. It was certainly
13 after you closed the site, correct?
14     A   Well, it was after that letter saying no
15 more access.
16     Q   And how long after that letter, if you
17 can recall?
18     A   Days.
19     Q   Did you purchase the locks or did you
20 have them?
21     A   I purchased them.
22     Q   Did you use cash or a credit card or an
23 account?
24     A   I -- um, my guess is I probably used a
25 credit card.

32  (Pages 122 to 125)

Page 126

1  Q   And where did you purchase them?
2  A   Somewhere along River Road somewhere, I
3  think. I -- I don't remember exactly where I purchased
4  them, but.
5  Q   What credit card would you have used?
6  A   I don't know.  One of my company credit
7  cards.
8  Q   And would that have -- would you
9  have -- strike that.
10     After you purchased them, did you go
11 right to the site and utilize the locks?
12 A   I believe so.  I think I did this on a
13 weekend, I'm not sure.
14 Q   After you locked the site -- strike that.
15     When you locked the site, Waterside had
16 equipment on the site?
17 A   Yes.
18 Q   And after you locked the site, Waterside
19 removed that equipment?
20 A   At some point, yes.
21 Q   Were the locks broken?
22 A   No.  I believe they just moved the panels
23 as I described before.
24 Q   After you locked the site, other than
25 Waterside removing its equipment, do you have any

Page 128

1  BY MR. CORRISTON:
2  Q   Let me clarify my question.
3      Did you have any conversations or
4  communications with the NJ DEP regarding your ability
5  as an LSRP to issue the letter that you issued on
6  October 3rd, 2013?
7  A   No, not specifically.  What I -- I
8  discussed with Greg Franz, because I didn't feel
9  like I could just write a letter that had any official
10 legal weight to it to shut the site down.  So I needed
11 the town to be behind shutting down the site.  That's
12 why we had that discussion.
13 Q   And Greg agreed?  You both agreed
14 mutually?
15 A   Yeah, we both agreed it was the right
16 thing to do, due to the circumstances that were arising
17 at the site.
18 Q   You referenced and Mr. Lakatos referenced
19 the use of plastic tarps at the site after you learned
20 of the contamination?
21 A   We were concerned because the site was
22 not being maintained at that time, because we had
23 stopped work on the site, that that dust blowing across
24 the surface of this area could be a potential problem
25 for migration off the site and be a health hazard.  So

Page 127

1  knowledge of Waterside performing any other work at the
2  site?
3  A   None that I know of.
4  MR. CORRISTON:  Let me just look at my
5  notes.  Why don't we take a quick break.
6      (Whereupon a recess was taken.)
7  BY MR. CORRISTON:
8  Q   Mr. Dooney, we're back on the record.  I
9  have a few follow-ups.
10     Prior to issuing the October 3rd, 2013,
11 letter shutting down the site, did you have any
12 conversations with representatives of the New Jersey
13 Department of Environmental Protection?
14 MR. PIERCE:  Objection.  Regarding the
15 site?
16 MR. CORRISTON:  Regarding the shutting
17 down of the site.
18 THE WITNESS:  I don't recall.  I
19 definitely had some conversations with them prior to
20 that about the need for a confirmed discharge
21 notification once we became aware that this material
22 came from a site and was contaminated.  That, I
23 definitely had a conversation with the DEP.  As far as
24 after I locked the gates, did I have a conversation?  I
25 don't recall one.

Page 129

1  we recommended and placed plastic tarps over the top of
2  the material -- over the area that was known to be
3  impacted.
4  Q   Were those tarps removed?
5  A   Not by us.  At some point I'm sure they
6  must have been, but I didn't -- we didn't remove them.
7  Q   Do you have knowledge of Waterside
8  removing those tarps prior to the job being locked?
9  A   No, not specifically, no.
10 Q   And when you speak about migration, it
11 could also be dust migration within the site itself?
12 A   Well, the majority of the rest of the
13 site had been capped.  So there wasn't as much concern
14 there as there was here, because we knew the levels
15 were very elevated.  So a minor amount of dust could
16 cause a problem, where it wouldn't be as much of a
17 problem around the rest of the site because it was
18 mostly capped already.
19 Q   But the contamination could spread from
20 one area of the site to another area of the site?
21 A   Well, yeah.  I mean, we were trying to
22 eliminate all exposure to that -- the area where we
23 knew this contamination existed.
24 Q   Where you knew at that time?
25 A   Yeah.  Well, at that time we -- right.



Page 130

```
 1    Yes.
 2         MR. CORRISTON:  That's all I have for
 3    now.  Thank you.
 4         (Whereupon a discussion was held off
 5    the record.)
 6         MR. CORRISTON:  Let's go on the record.
 7         There is no RD-7.  The document that was
 8    intended to be RD-7 was marked as RD-10.
 9         (Whereupon E-mail from Michael
10    Berliner to Ron Dooney, August 23, 2012,
11    Bates-stamped T0100248, was marked RD-11 for
12    identification.)
13    REDIRECT EXAMINATION
14    BY MR. SHAFRON:
15         Q    Show you what's been marked as RD-11,
16    which is a August 23rd, 2012, e-mail from Michael
17    Berliner at Neglia to you, and the subject is Dust
18    Control.  You see that?
19         A    Yes.
20         Q    Have you ever seen this e-mail before?
21         A    I don't recall it specifically, but it
22    was to me.  I remember discussing this at some point.
23         Q    And what do you remember about
24    discussions involving the subject matter of this
25    e-mail?
```

Page 132

```
 1         Q    Show you what's been marked as PL-7 for
 2    identification.  It's a standard terms and conditions.
 3    See that document?
 4         A    Yes.
 5         Q    Have you ever seen this document before?
 6         A    Yes.
 7         Q    What is it?
 8         A    It's a standard terms and conditions that
 9    gets attached to most of our proposals and contracts.
10         Q    So is this the type of document that
11    would be attached to a purchase order with the proposal
12    as well?
13         MR. PIERCE:  Objection.
14         You can answer.
15         THE WITNESS:  In some case -- it would
16    probably be attached, but in some cases, clients take
17    exception to some things.  So we may revise it or
18    remove it, depends on what the exceptions are.
19    BY MR. SHAFRON:
20         Q    Do you know if this form of standard
21    terms and conditions was used at any time on the
22    Veterans Field Project?
23         A    I don't know for sure, no.
24         Q    Do you have any reason to believe that it
25    was not used?
```

Page 131

```
 1         A    There was a question about dust that
 2    wasn't being addressed, and they said that was one way
 3    that they could do it.  We told them that they needed
 4    to take -- you know, get set up with a hydrant or
 5    whatever, but in a short term that didn't seem like
 6    there would be an issue with that.  And I don't think
 7    it actually -- I'm not even sure whether it lasted for
 8    more than, you know, one time.
 9         Q    How would Pete have made the decision to
10    allow the use of Hudson River water to control the
11    dust?
12         MR. PIERCE:  Objection.
13         You can answer if you can.
14         THE WITNESS:  I -- he used his judgment
15    as a project manager.
16    BY MR. SHAFRON:
17         Q    Was that something that he would need to
18    check with you about before he allowed, or he would
19    make that decision on his own?
20         A    We may have discussed it at some point,
21    whether it was a process that would have been an issue.
22    But, again, I think this was a short-lived, better to
23    do this when it was really dusty than to let the dust
24    blow off-site.  This was early -- early on in the
25    project.
```

Page 133

```
 1         MR. PIERCE:  Objection.
 2         You can answer.
 3         THE WITNESS:  Only that some towns won't
 4    allow the language that's in here to go into their
 5    purchase order, but I don't recall whether it was or
 6    wasn't here.
 7    BY MR. SHAFRON:
 8         Q    Do you remember any discussions with
 9    anyone about the terms of a standard terms and
10    conditions form like PL-7 with respect to the Veterans
11    Field?
12         A    I don't recall, no.
13         Q    Looking back again at RD-5, page 26.  And
14    it's in the center of the page.  There's the first that
15    says September 4th, 2015, do you see that?
16         This is the same subject matter you were
17    discussing with Mr. Corriston.
18         A    Yes, I see it.  I see it.
19         Q    All right.  And so is it true that on
20    October 4, 2013, TERMS required all activity at the
21    park to be stopped and all access to the site
22    prohibited?
23         A    Based on concurrence of the conversations
24    with the Borough.
25         Q    And we looked at an e-mail where -- you
```



Page 134

1   sent to Matt Vereb, instructing that no further work
2   should be done, right?
3           Can't find that document now.
4           MR. PETRILLO: RD-9.
5   BY MR. SHAFRON:
6       Q   RD-9.
7       A   Yes.
8       Q   All right.  Is there any reason why Greg
9   Franz at -- or someone at the Borough didn't send that
10  notice to Matt Vereb rather than you and TERMS?
11      A   Well, because he asked me to do it.  Why
12  he asked me, that's for him.
13      Q   And in RD-8, do you have that?
14          Second-to-last paragraph it says, "As the
15  LSRP for the site, I am requiring that all site
16  operation be discontinued until such time that we can
17  complete our assessment of the extent of the affected
18  area and develop a Workplan to address the proper
19  removal of this material."  Do you see that?
20      A   Yes.
21      Q   Was it your understanding that as the
22  LSRP for the site you had the authority to require that
23  all site operation be discontinued?
24      A   After conferring with the Borough, who
25  agreed that this should be done, I don't know that I

Page 136

1   I was asked to do.
2   BY MR. SHAFRON:
3       Q   I believe your answer was you didn't see
4   any reason why it was not appropriate for you to do
5   that; is that right?
6       A   I was asked to write the letter in its
7   current form.  And as it's written, I didn't see that
8   there was any problem saying, as the LSRP, I'm
9   requiring, after I already discussed it with the
10  Borough and knew that we were in concurrence, then I
11  was asked to write -- to send this letter to the
12  contractor.
13          MR. SHAFRON: All right.  Subject to any
14  follow-up questions, that's all the questions I have.
15  Thank you.
16  RECROSS-EXAMINATION
17  BY MS. PARKER:
18      Q   Hi.
19      A   Hi.
20      Q   My name is Dana Parker.  I'm with K&L
21  Gates, and I represent the ALCOA defendants in this
22  case.  I just have a few questions for you.
23          If you could go back to Exhibit 8,
24  please.  It's the letter we were just looking at.  And
25  this is the October 3rd, 2013, letter from yourself to

Page 135

1   would have the authority to close the site if the
2   Borough said you can't close the site.  So I conferred
3   with them, we agreed that we would close the site and
4   that I would write this -- I would send this letter to
5   the contractor.
6       Q   But this letter isn't addressed to the
7   contractor, right?  RD-8 is addressed to Mr. Franz,
8   right?
9       A   And it was ultimately forwarded to
10  contractor.
11      Q   Okay.  But in the letter RD-8 to
12  Mr. Franz, you're not -- in that second-to-last
13  paragraph you're not asking him whether you could close
14  the site, right?  It's you are requiring that all site
15  operation be discontinued; is that right?
16          MR. PIERCE: Objection.  It's been asked
17  and answered.
18          You can answer.
19          THE WITNESS: We discussed it before
20  we -- before I wrote this letter we discussed what we
21  should do.  My client, through Greg Franz, said, Here's
22  what we should do; write up a letter saying as the LSRP
23  that we're going to shut the site down.  It's what he
24  asked for me to do.  I didn't see any reason that it
25  wasn't appropriate to say it that way, and that's what

Page 137

1   the Borough discontinuing operations at the site.  The
2   first paragraph you indicate that "Waterside recently
3   trucked crushed concrete onto the site over the
4   weekend, and it's not clear where the material was
5   generated from."  Do you see that?
6       A   Yes.
7       Q   Okay.  And what did you mean when you
8   wrote, "It's not clear where the material was generated
9   from"?
10      A   I meant I had no specific knowledge that
11  it was from ALCOA, only what I had heard.
12      Q   Okay.  And is that true today?
13      A   Yeah.  I -- I was not there.  I don't
14  know for sure where it came from.
15      Q   Okay.  And if we can go to Exhibit 5,
16  page 11, in the last paragraph, references, it's, "On
17  September 27th, 2012, Waterside, at the direction of
18  Daibes, brought to Veterans Field five truckloads of
19  soil from 440 River Road."  And I believe you had
20  testified previously that this was material that had
21  been deemed unsuitable by TERMS; is that correct?
22      A   Yes.
23      Q   Okay.  To your knowledge, was this the
24  first time with the Veterans Field project that
25  Waterside had brought in fill that had been deemed



Page 138

1  unsuitable without TERMS's knowledge?
2      A    It was -- I believe it was brought in
3  before we knew whether it was suitable.  But, yes, it
4  was the first incident of bringing material to the site
5  that hadn't been previously tested and approved.
6      Q    Right.
7          And you later found out that it was
8  unsuitable, correct?
9      A    That it had material in it, yes, that was
10 unsuitable.
11     Q    Correct.
12         Was there a possibility that that
13 material could have migrated onto a larger area of the
14 site?
15         MR. SHAFRON: Objection to form.
16         THE WITNESS: I'm not sure what the
17 question is.
18 BY MS. PARKER:
19     Q    Sure.
20         The fill, the material that was brought
21 in from 440 River Road, correct?
22     A    Right.
23     Q    Was it possible that that material,
24 before it was removed, could have migrated in any form
25 onto the site?

Page 140

1          MR. PIERCE: Objection.
2          You can answer.
3          THE WITNESS: I believe it came from the
4  surface of that site, yes.
5  BY MS. PARKER:
6      Q    And then on page 20, the top paragraph
7  refers to an instance on July 12th, 2013, where
8  Waterside had apparently, during that week, delivered
9  approximately 40 loads of material to Veterans Field
10 from an unknown source.  Do you see that?
11     A    Yes.
12     Q    And did you later find out that that
13 material was contaminated and not suitable for the
14 Veterans Field Project?
15     A    I don't recall the specifics of that one,
16 but.
17     Q    Maybe if you read the next paragraph.
18     A    That's what I'm reading.
19         Yes, this material -- yeah, there was
20 compounds in it.  And we told them based on what the
21 results were, that we estimated approximately a hundred
22 yards of it that was impacted and should be removed.
23     Q    Okay.  And my question again is, is there
24 any way that this material could have migrated
25 throughout the site?  Is it possible?

Page 139

1      A    Not in any substantial way, no.
2      Q    Not dust or anything like that?
3      A    Well, it was -- it was pieces of, you
4  know, concrete, asphalt.  It would have had to have
5  been, you know, broken up and spread specifically.
6      Q    Okay.
7      A    So I would say that that risk was very
8  minimal.
9      Q    Okay.  And if you go to page 17, the top
10 paragraph refers to another instance on March 25, 2013,
11 where Waterside brought in approximately 60 loads of
12 soil, crushed concrete, stone, brick and asphalt to
13 Veterans Field without prior notice to TERMS.  Do you
14 see that?
15     A    Yes.
16     Q    And it's correct that you later
17 determined that this was not suitable, correct?  This
18 material was not suitable for the project?
19     A    Yes.
20     Q    Okay.  And that it was contaminated,
21 correct?
22     A    It had some contaminants in it, if I
23 recall, yes.
24     Q    Okay.  And that material came from the
25 Undercliff Project in Edgewater; is that correct?

Page 141

1      A    No.  Because they actually put clean
2  material over it.
3      Q    Okay.
4      A    We had to remove that to get at the
5  material.
6      Q    Okay.  Now on page 22, bottom of the
7  paragraph, it refers to the September 11, 2013,
8  incident when you received a telephone call from Mike
9  Berliner of Waterside running trucks to
10 Veterans Field.  Do you see that?
11     A    Yes.
12     Q    Okay.  You had testified -- if you go
13 back to Exhibit 8 -- that you weren't clear where the
14 material was generated from; is that correct?
15     A    That I did not have specific knowledge.
16     Q    Okay.
17     A    What I was told was that's where it came
18 from.
19     Q    Okay.  So if we go to page 23, is this
20 the first instance -- in the middle of the page it
21 refers to a telephone call between yourself and
22 Mr. Daibes, where Mr. Daibes said the material brought
23 to the Veterans Field site from ALCOA site consisted of
24 one truckload.  Do you see that?
25     A    Page 23?

36 (Pages 138 to 141)



Page 142

1    Q    Yeah. It's sort of in the bottom middle
2    of the page.
3    A    Okay.
4         MR. PIERCE:  Starts out "During" --
5    BY MS. PARKER:
6    Q    "During a telephone call."
7    A    During --
8    Q    Uh-huh.
9    A    Yes, I see it.
10   Q    So was that the first time that someone
11   from Waterside had told you that some of the material
12   came from Veterans Field -- I'm sorry, came from ALCOA
13   site?
14   A    Yes.
15   Q    Okay. And at first Mr. Daibes told you
16   that it was one truckload; is that correct?
17   A    That's correct.
18   Q    Okay. But again, you never saw the
19   trucks being loaded from the ALCOA site and being
20   brought to Veterans Field; is that correct?
21   A    That's correct.
22   Q    Okay. And there were prior instances
23   that you were aware of where Waterside brought
24   contaminated material onto the site from other sources,
25   correct?

Page 144

1         MR. SHAFRON:  Asked and answered.
2    BY MS. PARKER:
3    Q    -- correct?
4    A    Yes.
5    Q    Okay. And if we go to page 24,
6    Mr. Daibes -- the second paragraph refers to that in
7    late September 2013 Mr. Daibes advised that Waterside
8    had actually brought in eight to nine truckloads of
9    material. Do you see that?
10   A    Yes.
11   Q    Okay. And at the end of that paragraph
12   there's reference to you recounting the history of the
13   former Ford plant. Do you see that?
14   A    Yes.
15   Q    Why were you recounting the history of
16   the former Ford plant?
17   A    Because Mr. Daibes was questioning why
18   concrete is of any concern.
19   Q    Okay.
20   A    And I told him that the concern became
21   obvious, clear enough, that they came up with a
22   guidance document that you had to follow for recycled
23   concrete because of the Ford plant.
24   Q    Okay. When you first received notice
25   September 11, 2013, that material was being brought

Page 143

1    A    Yes.
2    Q    Okay. And those were -- the other
3    instances are just the instances that you're aware of;
4    is that correct?
5         MR. PIERCE:  Objection.
6         MR. SHAFRON:  Objection to form.
7         MR. PIERCE:  You can answer.
8         THE WITNESS:  They're the other instances
9    we're aware of, but I have no knowledge that -- no
10   reason to believe that other stuff was brought there
11   that we didn't know about, but, yeah, I mean.
12   BY MS. PARKER:
13   Q    Is it possible, though?
14   A    Sure.
15        MR. PIERCE:  Objection.
16        THE WITNESS:  Not --
17   BY MS. PARKER:
18   Q    You can answer.
19   A    It's possible.
20   Q    Okay. So initially Mr. Daibes had told
21   you on the phone that the material was one truckload;
22   is that correct?
23        MR. PIERCE:  Objection.
24   BY MS. PARKER:
25   Q    You just said that --

Page 145

1    onto the site, you said you went there shortly after
2    that; is that correct?
3    A    Yes.
4    Q    And did you see the piles of material?
5    A    There were some piles. Some of it looked
6    like it had already been spread.
7    Q    Okay. So at that point, you wouldn't be
8    in a position to determine actually how many truckloads
9    were brought over; is that correct?
10   A    No. Some of it was spread, mixed.
11   Q    Okay. So the answer is you wouldn't be
12   able to determine that?
13   A    No.
14   Q    So you were relying entirely on what --
15        MR. PIERCE:  I want to make sure the
16   answer --
17        MS. PARKER:  Sure.
18        MR. PIERCE:  -- and the question is
19   clear.
20        MR. SHAFRON:  Okay.
21        MR. PIERCE:  Could you read that question
22   back, please?
23        (Whereupon requested portion was
24   read back.)
25        MS. PARKER:  Okay. That's not clear.

37  (Pages 142 to 145)

TAYLOR & FRIEDBERG, LLC
(973) 285-0411



Page 146

1     MR. PIERCE: Okay.
2     MS. PARKER: Let me rephrase that.
3  BY MS. PARKER:
4     Q    When you went to the site on September or
5  shortly after September 11, 2013, you're able to
6  visibly see material that was brought onto the site; is
7  that correct?
8     A    Yes.
9     Q    Okay. And could you tell how many
10  truckloads were brought onto the site at that time?
11     A    No, not specifically.
12     Q    And why is that?
13     A    Because it appeared that material had
14  been spread beyond what was stockpiled on the site.
15     Q    Okay. So your knowledge regarding how
16  much material was brought over, allegedly, from the
17  ALCOA site is based entirely on what Mr. Daibes told
18  you; is that correct?
19     A    I had varying accounts from Mr. Daibes.
20  And, again, because it was mixed in it, there's really
21  no way we can tell exactly how much material was ever
22  brought over.
23     Q    Okay. And you personally have no way of
24  knowing if it actually even came from the ALCOA site;
25  is that correct?

Page 148

1  the record or no?
2     MR. PIERCE: No.
3     I'd like to instruct the witness to
4  listen to the question carefully. They're asking you
5  questions that they end with "is that correct," and
6  you're answering no, because I think you're answering
7  the initial part of the question. Please pay careful
8  attention to the question they ask you.
9     MS. PARKER: Do you want to repeat the
10  last question so we can make sure that that doesn't
11  happen. Why don't you read the last question.
12     (Whereupon requested portion was
13  read back.)
14  BY MS. PARKER:
15     Q    Are you aware of any fingerprinting that
16  was ever done comparing the material that was allegedly
17  brought onto the Veterans Field with that of the
18  material from the ALCOA site?
19     A    I'm not aware of any fingerprinting that
20  was ever done.
21     Q    Thank you.
22     You had talked about certain insurance
23  that you -- TERMS maintains; is that correct?
24     A    Yes.
25     Q    And you were talking about certain limits

Page 147

1     A    I have no way of verifying that, no.
2     Q    Okay. Did anyone ever ask you to conduct
3  any type of test to match the material that was
4  allegedly brought over from the ALCOA site with
5  material that was actually at the ALCOA site?
6     A    Not specifically.
7     Q    What do you mean by not specifically?
8     A    We didn't do any test, but there was
9  discussion with one of Waterside's consultants through
10  meetings that they were indicating there might be
11  different Aroclors.
12     Q    Uh-huh.
13     A    But we didn't do any testing, and I don't
14  know what the results of those tests were. That was
15  just a -- comments that were made about matching it up
16  with --
17     Q    Right.
18     A    -- that material.
19     Q    But to your knowledge, no fingerprinting
20  was done; is that correct?
21     A    Not to my knowledge.
22     Q    Okay. You were talking --
23     MR. PIERCE: Before you ask another
24  question --
25     MS. PARKER: Sure. You want to go off

Page 149

1  that at the time in 2013, I believe you said you had a
2  policy with the $1 million limit; is that correct?
3     A    The $1 million per occurrence, yes.
4     Q    Do you maintain or did you maintain at
5  the time any excess policies? Do you know what --
6     MR. PIERCE: Objection.
7  BY MS. PARKER:
8     Q    Do you know what an excess policy is?
9     MR. PIERCE: You can answer.
10     THE WITNESS: I do, and no, we did not.
11  BY MS. PARKER:
12     Q    Okay. So the only insurance that you had
13  in place were one million per occurrence; is that
14  correct? Per policy.
15     A    Yes.
16     Q    Okay. Why did you increase your limits
17  recently?
18     A    One of our prospective clients required
19  that we have additional insurance if we want to do
20  business with them.
21     MS. PARKER: Okay. I think that's it.
22  RECROSS-EXAMINATION
23  BY MR. PANSULLA:
24     Q    Good afternoon, Mr. Dooney. My name's
25  Robert Pansulla. I'm with the law firm of Finazzo,



Page 150

1  Cossolini, O'Leary, Meola & Hager. I represent the
2  third-party defendant, County of Bergen, in this
3  lawsuit.
4        Had you had any dealings with
5  representatives of the County of Bergen relative to the
6  Veterans Field Project?
7     A   No.
8     Q   Do you know if anyone at TERMS had any
9  dealings with any representatives of the County of
10 Bergen relative to the Veterans Field Project?
11    A   Not to my knowledge.
12    Q   Are you familiar or were you involved
13 with the demolition of the ALCOA site at all?
14    A   Not at all.
15    Q   Were you involved at all with any of the
16 River Road improvements that were engaged in the late
17 '90s up near the ALCOA property?
18    A   Not at all.
19    Q   Are you familiar at all with any of the
20 agreements that were in place between the County of
21 Bergen and ALCOA and some of the Waterside entities --
22 or Daibes entities, not the Waterside entities --
23 relative to that project in the late 1990s?
24    A   No, I'm not familiar with any of those.
25    Q   And as far as you know, TERMS wouldn't

Page 151

1  have any involvement either, not just yourself?
2     A   That's correct.
3         MR. PANSULLA: I have nothing further.
4  RECROSS-EXAMINATION
5  BY MR. PETRILLO:
6     Q   Good afternoon, sir. My name is Joseph
7  Petrillo. I represent Neglia in this case. I just
8  have a few follow-ups.
9         First I just want to start out with some
10 of your testimony regarding the LSRP. You, sir, are an
11 LSRP, but TERMS is not an LSRP, correct, the entity
12 TERMS?
13    A   That's correct.
14    Q   Because LSRPs, that's an individual
15 thing, correct?
16    A   That's correct, yes.
17    Q   During the course of the Veterans Field
18 Project, were other individuals employed by TERMS
19 LSRPs?
20    A   No.
21    Q   Okay. I take it --
22        What does LSRP mean?
23    A   Licensed site remediation professional.
24    Q   And I take it that you had to obtain that
25 license in some way?

Page 152

1     A   Yes.
2     Q   How did you do that?
3     A   Well, first, certain eligibility
4  requirements have to be met; educational, experience in
5  certain areas, and then a test you have to pass.
6     Q   Okay. And do you have to do anything in
7  order to maintain that license?
8     A   Yes.
9     Q   And what is that?
10    A   It's ongoing continuing education credits
11 that are authorized or approved by the DEP and the LSRP
12 board in certain areas of technical expertise and so
13 forth.
14    Q   And is there reporting requirement every
15 couple years?
16    A   We have to renew our license every three
17 years. And during that three years I think we have to
18 take a total -- in different areas, but a total of
19 something along the lines of 35 continuing education
20 credits.
21    Q   Okay. And when did you first obtain that
22 license?
23    A   I believe it was 2009.
24    Q   And you've maintained it ever since to
25 the present?

Page 153

1     A   Yes.
2     Q   Are there any administrative regulations
3  that govern LSRPs that you're aware of?
4     A   There are -- yeah, there's regulations
5  that govern what we're allowed to do with respect to
6  providing oversight in lieu of the DEP providing
7  oversight, if that's what you're asking, I'm not sure.
8     Q   Providing oversight for a remediation
9  project?
10    A   Yes.
11    Q   Is there anything within those
12 regulations that give LSRPs authority to shut down a
13 project site?
14    A   None that I'm aware.
15    Q   Okay. You testified earlier that TERMS
16 didn't necessarily have to have a site presence at
17 Veterans Field when work such as curbing was going on,
18 but you'd want to be there when Waterside was bringing
19 in fill. Do you recall that?
20    A   Yes.
21    Q   Why would TERMS want to have someone
22 there when Waterside was bringing in fill?
23    A   Want to make sure that it was placed
24 properly, that it was in the right depth or thickness
25 of the material. That it also appeared to be what it

TAYLOR & FRIEDBERG, LLC
(973) 285-0411

Page 154

```
1    was supposed to be. Not -- supposed to be clean fill
2    and it turned out to be something else. But that was
3    basically just to make sure that the work plan was
4    adhered to.
5        Q     And it would be your expectation that
6    TERMS would be notified on those days when Waterside
7    was bringing fill to the site?
8        A     That was the way it was supposed to work
9    and, for the most part, did.
10       Q     Are you aware of a Saturday, September 7,
11   2013, incident where Jason Menzella discovered
12   Waterside doing work on a Saturday that was not
13   previously told to him that it was going to occur?
14            MR. SHAFRON: Objection to form.
15            THE WITNESS: I was told that, at one
16   time, that it was -- Jason noticed on his way back from
17   a ball game or something that they were working when
18   they weren't supposed to.
19   BY MR. PETRILLO:
20       Q     And at or around that time period, you
21   were aware that this is what precipitated notice that
22   contaminated materials were being brought to the site,
23   correct?
24       A     If I understand, the question is did I
25   become aware of it after that, shortly after that?
```

Page 155

```
1        Q     Yes.
2        A     I was made aware that material was
3    brought in that weekend, and that's what commenced the
4    testing of the material that we found was contaminated.
5        Q     Just a follow-up regarding RCA.
6            I understand your prior testimony, but
7    were you, sir, ever involved in any meeting or
8    conversation where Waterside asked if they can use RCA
9    at the Veterans Field?
10       A     No.
11       Q     You talked about testing at source sites,
12   and that TERMS didn't reject material, but that it
13   found certain materials didn't meet the standard. Do
14   you recall that testimony?
15       A     Yes.
16       Q     Did TERMS ever permit substandard
17   material to be used at Veterans Field?
18       A     No.
19       Q     Did Neglia ever tell you to allow
20   contaminated material to be used at Veterans Field?
21       A     No.
22       Q     Did Neglia ever tell you to use -- to
23   allow the use of RCA at Veterans Field?
24       A     No.
25       Q     And Neglia did not have authority over
```

Page 156

```
1    TERMS to tell you those things, correct?
2            MR. SHAFRON: Objection to form.
3            THE WITNESS: I don't know the answer to
4    that. I mean, I wouldn't have agreed to it, but I
5    mean, did they have authority over me to do certain
6    things, maybe. But I wouldn't have agreed if they had
7    said do this even though you don't want to do it. I
8    wouldn't have allowed it.
9    BY MR. PETRILLO:
10       Q     You wouldn't have allowed it and it
11   didn't happen anyway?
12       A     Right, but.
13       Q     You testified that it was clear that some
14   of the material, contaminated material, brought to the
15   site had been spread. There's some testimony in the
16   case that permission was given to Waterside to use RCA
17   in the south parking lot area. So I want to ask you
18   where you personally observed this contaminated
19   material as spread. Was it limited to the south
20   parking lot area?
21       A     I didn't have a map showing the limits of
22   all the areas, but it was in the area -- that south
23   parking area and appearing to extend into what would
24   have been ultimately a play area.
25       Q     Was it next to the tennis courts?
```

Page 157

```
1        A     It was -- it wasn't immediately adjacent,
2    but it was closer than -- you know, it was out by the
3    road, it was back under what would have been the
4    parking lot and where -- the play location. That's
5    where it was more centered, where I saw.
6        Q     Okay. You were asked by Ms. Parker
7    whether you -- strike that.
8            You said you have no way of knowing
9    exactly how much contaminated material was brought in.
10   Did TERMS ever during the course of its investigation
11   develop an estimate of how much material was brought
12   in?
13       A     Let me answer it first and then -- got to
14   make sure it's clear.
15            We estimated how much material would have
16   to be removed because of the material that was brought
17   in. And that was somewhere in the 25,000 to 30,000
18   yards. However, because it was mixed, blended --
19   whatever phrase you want to use -- we don't know
20   exactly how much of the source material it took to
21   contaminate the 25 to 30,000 yards.
22       Q     Okay.
23       A     If that is -- answers your question.
24            I -- I don't know how much was initially
25   brought, but I know how much it ultimately impacted at
```

40 (Pages 154 to 157)



**Page 158**

1   the site.
2       Q    Right.
3           And you testified about a discussion with
4   Mr. Berliner regarding a telephone call where he told
5   you that a bus driver noticed material being trucked
6   from ALCOA to the Veterans Field, and then another
7   conversation you had with Mr. Daibes where he admitted
8   that it had come from ALCOA.  Do you have any other
9   information from any source other than counsel that
10  this material came from ALCOA?
11      A    No.
12      Q    Discussion with anybody else?  Anything
13  else?
14      A    I mean, there's -- I think there's some
15  correspondence that people have put out that said it.
16  But again, I don't know whether they have firsthand
17  knowledge of where it came from.
18      Q    Other than correspondence, any other
19  discussions you had with people at the time that the
20  contamination was identified that said that to you?
21      A    No.  It was the conversation with Mike
22  Berliner, that was initially the first time I heard
23  ALCOA.  And then Daibes, but then I guess what happened
24  after that was, it just became part of the discussion
25  that it was assumed that it was ALCOA.  But I don't

**Page 159**

1   know if any of those people had firsthand knowledge
2   when they said it came from ALCOA or they just
3   continued to repeat what was being said by everybody.
4       Q    Okay.
5           MR. PETRILLO:  That's all I have.  Thank
6   you, sir.
7   RECROSS-EXAMINATION
8   BY MR. PIERCE:
9       Q    Okay.  I'd like to go back and clarify a
10  couple questions and answers from Corriston's
11  examination.
12          MR. PIERCE:  Could you go back to page 92
13  of the transcript.
14          Could you read the first question and
15  answer on that page?
16          (Whereupon requested portion was
17  read back.)
18  BY MR. PIERCE:
19      Q    Okay.  It's a compound question, because
20  it asks, "You did not yield on that position," and then
21  it says, "correct?"  And your answer was no.  What did
22  you understand -- what were you answering when you
23  answered that no?
24      A    That I would not yield to letting them
25  bring material that hadn't been tested.

**Page 160**

1           MR. PIERCE:  Okay.  Could you read the
2   second question and answer on that page, please.
3           (Whereupon requested portion was
4   read back.)
5   BY MR. PIERCE:
6       Q    Again, it's an affirmative question and
7   then a correct, and you answered no.  What were you
8   answering when you answered no to that question?
9       A    That Neglia did not ask me to yield on
10  that position.
11          MR. PIERCE:  Thank you.  That's all I
12  have.
13          MR. CORRISTON:  I think there's a third
14  one.  I'll go back.
15  FURTHER RECROSS-EXAMINATION
16  BY MR. CORRISTON:
17      Q    I also asked you to -- strike that.
18          Did the Borough ask you to yield on that
19  position?
20      A    And the answer would be no, the Borough
21  did not ask me to yield on that position.
22          MR. CORRISTON:  Thank you.
23          MR. PIERCE:  Thank you.
24          You're a free man.
25          MR. SHAFRON:  Just one second.

**Page 161**

1           MR. PIERCE:  You had a couple follow-up,
2   Jason?
3           MR. SHAFRON:  No.
4           Thank you.
5           MR. PIERCE:  We're done.
6           MS. PARKER:  Thank you.
7           MR. PETRILLO:  Thank you, sir.
8           THE COURT REPORTER:  Does everybody want
9   copies that wanted copies yesterday?
10          MS. PARKER:  I think so, yes.
11          MR. PETRILLO:  Yes.
12          MR. PANSULLA:  Yeah.
13          MR. SHAFRON:  I have the original PL
14  exhibits, so I'm going to give those to you to give to
15  the court reporter from yesterday to attach to that
16  transcript.
17          THE COURT REPORTER:  Okay.
18          (Whereupon the deposition was
19  concluded at 3:06 p.m.)
20
21
22
23
24
25

```
1          TAYLOR & FRIEDBERG, LLC
2          ERRATA SHEET - Page 1 of 2
3        Testimony of:  RONALD DOONEY, LSRP
4     BOROUGH OF EDGEWATER v. WATERSIDE CONSTRUCTION, LLC
5        Taken on:  July 20, 2017
6
    Page/Line Number     Change      Reason for Change
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1          TAYLOR & FRIEDBERG, LLC
2          ERRATA SHEET - Page 2 of 2
3        Testimony of:  RONALD DOONEY, LSRP
4     BOROUGH OF EDGEWATER v. WATERSIDE CONSTRUCTION, LLC
5        Taken on:  July 20, 2017
6
7     _____
    Witness name
8
9   Signed and sworn to before me on
10  this _____ day of _____ 2017.
11
12  _____
    Notary Public of the State of New Jersey
13
14
15
16
17
18
19
20
21
22
23
24
25
```

42 (Pages 162 to 163)

CERTIFICATION

BOROUGH OF EDGEWATER v. WATERSIDE CONSTRUCTION, LLC

Civil Action No.: 2:14-CV-05060, (ES-MAH)

JULY 20, 2017

I, KATHLEEN M. LAROCCA, a Certified Court Reporter of the State of New Jersey, do hereby certify prior to the commencement of the examination, RONALD DOONEY, LSRP was duly sworn by me to testify the truth, the whole truth, and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative, nor employee, nor attorney, nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.2

*Kathleen M. Larocca*

KATHLEEN M. LAROCCA, CCR
License No. XI00219100

**A**

**A.M** 3:10
**A.P** 1:9,13
**A/k/a** 42:13
**abandoned** 94:4
**ABC** 1:10
**ability** 50:4 76:14
128:4
**able** 11:3 106:19
124:2 145:12
146:5
**above-entitled** 3:3
**absolutely** 55:13
**acceptable** 57:25
79:20 80:11 95:4
95:16
**access** 125:15
133:21
**account** 125:23
**accounts** 146:19
**accurate** 70:23
107:24 108:15
110:4,14 111:24
117:8 119:18,23
**accurately** 113:17
**Acres** 27:12,18
**action** 1:2 3:4 38:7
72:11 87:7
**actions** 80:6
**activities** 67:4,4
**activity** 70:11
133:20
**actual** 20:12 68:9
70:1
**additional** 30:11,14
30:16 31:19 32:5
149:19
**address** 32:21 36:3
36:18 87:8 91:19
99:16 102:11
121:13 134:18
**addressed** 131:2
135:6,7
**adhered** 154:4
**adjacent** 157:1
**administration**

16:5
**administrative**
153:2
**admitted** 158:7
**advice** 18:1 53:24
**advise** 47:19 48:19
55:15 76:19 82:19
83:16 119:16
**advised** 52:14,17
53:2,8,20 56:11
68:24 76:1 78:6
98:24 108:13
144:7
**advising** 47:24
53:16 141:9
**affirmative** 160:6
**afternoon** 149:24
151:6
**ago** 8:24 14:5
**agree** 59:16 89:13
113:5
**agreed** 23:12 28:20
44:18 45:22 46:6
46:22 57:14
124:25 128:13,13
128:15 134:25
135:3 156:4,6
**agreed-upon** 67:20
**agreement** 124:21
**agreements** 150:20
**ahead** 48:12
**air** 25:21
**Alcatel** 9:6
**ALCOA** 1:13 4:22
60:19 76:3,17
82:12,20 97:7,10
97:23 98:5,11
104:2 105:16
136:21 137:11
141:23 142:12,19
146:17,24 147:4,5
148:18 150:13,17
150:21 158:6,8,10
158:23,25 159:2
**allegation** 50:17,20
**allegedly** 146:12
147:4 148:16

**allow** 96:12,16
131:10 133:4
155:19,23
**allowed** 59:14
79:11 80:22 81:3
93:22 119:17
131:18 153:5
156:8,10
**altercation** 90:1
**alternate** 47:13
**alternative** 46:3
**ALUMINUM** 1:8
**amended** 6:13,19
39:6 43:5,14,20
43:22 59:24 73:17
73:18,21 83:10
85:23
**AMERICA** 1:9
**amount** 122:23
129:15
**amounts** 104:16
**analysis** 67:17
68:16
**analytical** 68:1
**analyze** 29:15
**analyzed** 44:20
46:17
**and/or** 23:24 37:12
51:23 87:16
**answer** 10:11,24
11:3 17:5 18:11
19:13 24:23 26:8
28:25 30:8 31:21
37:24,25 38:19
40:5 45:2 46:6,10
48:6,24 50:22
51:1,2,4 58:7
66:13 69:14 72:1
72:14 74:9 75:11
76:10 77:3,19
78:18 79:25 80:14
80:21 86:11,23
88:18 91:9 95:24
96:15 100:5,20
101:11,18 102:16
103:14 106:16
108:1 113:24

117:15 119:21
121:19 123:1
131:13 132:14
133:2 135:18
136:3 140:2 143:7
143:18 145:11,16
149:9 156:3
157:13 159:15,21
160:2,20
**answered** 69:13
103:14 135:17
144:1 159:23
160:7,8
**answering** 148:6,6
159:22 160:8
**answers** 39:25
43:20 60:5,5,11
73:17,21 75:2
84:17 85:1,23
86:16 93:6 98:1
157:23 159:10
**anticipated** 66:21
72:8
**anybody** 49:24
50:7 56:6 89:25
158:12
**anyway** 156:11
**apparently** 88:15
140:8
**appear** 48:10 71:22
72:5,19
**appeared** 49:21
122:4 146:13
153:25
**appearing** 156:23
**appears** 65:22
71:10 72:23
102:17 110:7
**apply** 73:10
**approach** 59:24
60:1
**appropriate** 30:17
46:19 68:2 135:25
136:4
**appropriately**
37:15
**approval** 28:23

51:25 74:20
**approve** 75:22
**approved** 75:17
138:5 152:11
**approximately**
24:12 50:11 62:17
139:11 140:9,21
**area** 27:18,20 33:5
37:15 53:6 59:19
116:23 117:20
121:17 128:24
129:2,20,20,22
134:18 138:13
156:17,20,22,23
156:24
**areas** 152:5,12,18
156:22
**Arfuso** 74:24
**arising** 83:21
128:16
**Aroclors** 147:11
**arose** 70:11 84:8
**artificial** 21:3
**as-needed** 69:6
**asked** 13:3 30:15
40:4 64:14 67:13
69:12 72:17 77:8
84:10 86:19 87:13
93:6 96:12 98:2
103:14 111:2
117:2 134:11,12
135:16,24 136:1,6
136:11 144:1
155:8 157:6
160:17
**asking** 24:9 50:19
62:13 87:2 96:7
96:11 135:13
148:4 153:7
**asks** 60:12 159:20
**aspect** 62:2
**asphalt** 139:4,12
**assessment** 134:17
**assign** 33:20
**assigned** 33:22
**assistance** 45:17
**associated** 19:10

21:10 63:24
**Associates** 1:7 2:4
2:9 5:11
**association** 38:16
**assume** 9:7 10:25
23:20 35:1 41:3
46:16 57:20 65:3
77:20 95:25
**assumed** 158:25
**assumes** 70:15
**assuming** 37:7
52:19 102:4
**attach** 161:15
**attached** 29:10
66:8,15 71:22
72:8 108:21 132:9
132:11,16
**attempting** 110:13
**attend** 88:15
**attended** 57:18
58:18
**attention** 30:13
48:16 148:8
**attorney** 8:16 9:8
9:11,13,24 10:1
12:15,19,20 50:25
51:3 95:10
**attorney-client**
45:5
**attorneys** 4:5,11,16
4:21 5:6,11 40:19
**August** 7:7 44:3
50:15 52:4 130:10
130:16
**authored** 99:5
**authority** 50:4,7
134:22 135:1
153:12 155:25
156:5
**authorize** 76:6
**authorized** 152:11
**available** 41:1 79:5
107:19
**Avenue** 4:4 8:2
13:7
**aware** 23:21,23
32:18 41:15 50:17

56:11 60:8 62:3
91:3 110:19
115:25 127:21
142:23 143:3,9
148:15,19 153:3
153:14 154:10,21
154:25 155:2

**B**

**B** 4:19 6:8 7:1
**bachelor** 13:23
**back** 50:1 58:15
66:3 79:8,10 85:3
94:6 95:19 123:24
124:6 127:8
133:13 136:23
141:13 145:22,24
148:13 154:16
157:3 159:9,12,17
160:4,14
**bad** 79:8
**ball** 154:17
**barely** 24:20
**based** 32:20 65:16
65:21,22 66:4
67:23 119:23
133:23 140:20
146:17
**basically** 24:5
31:15 32:18 34:6
49:10 59:10 66:14
91:14 100:25
107:15,22 116:20
154:3
**basis** 55:5,9 69:6
**Bates** 64:9 71:9
106:9 114:25
**Bates-stamped**
6:22,24 7:4,5,7
64:3,16 65:2,3,14
85:11,15,19
105:23 118:17
130:11
**beginning** 36:25
60:15 62:15 73:19
87:14 88:13
**begins** 74:1 103:17

110:1 112:6
**behalf** 59:12
106:23
**belief** 50:3
**believe** 9:18 17:10
17:15 19:4 20:3
22:17 24:11 25:18
26:19 27:3 29:1
30:9 31:6 35:16
35:22 36:9 38:6
40:18,24 41:4,14
41:17 50:1 51:20
53:13 57:6 62:22
70:22 77:8 84:13
88:25 94:19 100:6
115:9 119:13
120:7 122:7
124:19 126:12,22
132:24 136:3
137:19 138:2
140:3 143:10
149:1 152:23
**believed** 37:1,1
**beneficial** 81:1
93:20
**Bergen** 1:17 5:6
150:2,5,10,21
**Berkeley** 8:2
**Berliner** 6:21 7:6
27:3,7 44:4 58:24
60:17 61:2 62:20
74:23 84:20 85:10
86:1,11,25 87:17
88:20 89:1 91:18
94:14 97:21 98:3
101:7,14,21
102:10 112:11,19
113:3 121:9
130:10,17 141:9
158:4,22
**Berliner's** 102:2,3
**best** 26:3 28:17
29:9 32:15 36:25
37:1 51:17 52:5
113:7
**better** 131:22
**beyond** 146:14

**bid** 38:3,4
**bill** 70:21
**billed** 70:17 77:25
**billing** 28:15 69:22
**bills** 23:25
**bit** 104:12
**blacktop** 53:4,11
53:14,17,21 57:16
57:22
**blasted** 44:19 46:8
46:16,23 47:4
**blended** 157:18
**blow** 131:24
**blowing** 128:23
**board** 152:12
**body** 119:15
**Boggia** 59:2,6
94:22 121:8
**Boggia's** 59:16
**borough** 1:3 6:20
8:9 19:9 21:6
22:3,15 23:10
24:3,15 25:2,7,24
28:3,4,6,11,12,19
28:22 35:9,19
36:11,14,16,21,21
37:1,21 38:21
48:8 54:17 66:8
66:10 71:7 73:8
83:11 93:3 94:16
95:6 96:6 99:2
119:10 133:24
134:9,24 135:2
136:10 137:1
160:18,20 162:4
163:4
**bottom** 50:8 54:9
59:22 85:24 105:8
141:6 142:1
**Box** 4:14 5:9
**break** 11:7 72:25
73:1 85:6 127:5
**brick** 139:12
**brief** 22:9
**briefly** 10:8 15:2
78:9 124:18
**bring** 37:11 51:20

51:21 57:15,21,23
68:2,25 78:11
79:2,15,18 80:2
91:25 93:15,22
111:14 113:1
159:25
**bringing** 56:10
75:17 82:20 88:5
93:18,25 98:14
110:25 111:23
138:4 153:18,22
154:7
**broken** 126:21
139:5
**broker** 42:7,9,19
**Brothers** 1:6 2:3
14:21,24
**brought** 18:8 21:2
45:25 48:15,16
50:11 51:22,24
52:7 57:5 58:1,2
58:11 59:20 60:12
67:15,22 69:17
76:21 79:7,13
80:23,25 81:2
99:1,21 100:2
105:4 108:13
110:18,23 113:13
122:22 137:18,25
138:2,20 139:11
141:22 142:20,23
143:10 144:8,25
145:9 146:6,10,16
146:22 147:4
148:17 154:22
155:3 156:14
157:9,11,16,25
**Brunswick** 5:10
**Budgetary** 65:17
**bus** 60:18 61:3
82:10,21 97:22
158:5
**business** 16:14
17:22 149:20

**C**

**C** 3:1 4:1 5:1

**call** 27:1 36:1 60:17 60:22 61:1 83:7 85:7 94:20 97:6 97:21 98:3 102:5 103:17 141:8,21 142:6 158:4
**called** 3:2 14:6 15:8 27:2 82:19,22 88:15
**calling** 54:2
**calls** 62:18
**CAMCE** 14:6
**Campbell** 71:11
**cap** 37:2,12 80:24 93:23 117:22
**capable** 90:14,17 90:23
**capped** 20:17 21:1 37:16 129:13,18
**capping** 35:24,24 37:9 67:4
**caption** 2:1
**card** 125:22,25 126:5
**Cardinal** 3:8 4:14
**cards** 126:7
**careful** 148:7
**carefully** 148:4
**carries** 10:15
**case** 8:9,13,25 9:1,4 9:22,24 11:13,14 11:18,21,25 19:1 19:4,19 20:13,20 21:21 22:13 26:5 40:23 49:14 57:1 68:23 132:15 136:22 151:7 156:16
**cases** 11:12 25:25 26:4 48:9 79:3,4 132:16
**cash** 125:22
**cause** 95:12 129:16
**caused** 80:7
**CC'd** 106:7
**cease** 115:19
**Cedar** 92:10

**center** 4:20 133:14
**centered** 157:5
**certain** 29:18 109:17 148:22,25 152:3,5,12 155:13 156:5
**certainly** 65:11 125:12
**certificate** 86:2
**certificates** 83:22 84:4 87:4,13 88:25
**certification** 39:23 83:19
**certified** 1:23 3:6 46:1,2 47:10,12 80:24 81:2,4
**change** 18:8 32:17 41:23,25 42:5 81:23 96:8 104:8 162:6,6
**changed** 15:13 17:22 18:1 60:4 82:7 93:11
**Charles** 14:5,5
**check** 131:18
**chef** 18:5
**Christian** 9:5
**circumstances** 78:21 128:16
**Civil** 1:2
**claim** 42:22
**claims** 42:22
**clarify** 34:14 75:21 93:5 128:2 159:9
**clean** 21:2 37:12 46:3 47:10,13 53:19 59:3 67:16 76:15 80:24 81:3 81:5,15 82:6 92:1 92:8 141:1 154:1
**cleanups** 15:23 16:8
**clear** 36:25 37:3 84:20 104:14,18 116:6 117:4 118:2 122:2 137:4,8

141:13 144:21 145:19,25 156:13 157:14
**clearly** 95:16
**client** 11:16 135:21
**clients** 132:16 149:18
**close** 21:21 22:14 22:18 25:19 31:19 117:11 135:1,2,3 135:13
**closed** 116:3,19 124:11 125:13
**closer** 157:2
**closure** 20:13
**COAH** 1:6 2:3
**collect** 29:14 69:2,3
**collection** 67:17
**college** 13:14,19 14:10
**combination** 18:2
**come** 17:17 21:9 30:13 31:16 81:3 91:16 94:6 102:8 104:1 111:4 121:15 123:21 158:8
**comes** 49:18
**coming** 47:11 65:15 107:14 110:20 111:13
**commenced** 155:3
**commencing** 3:10
**comments** 95:14 147:15
**communicate** 48:8 81:9
**communicated** 82:22 94:15 109:20
**communicating** 106:12
**communication** 45:5
**communications** 117:7 128:4
**company** 1:9 14:2

15:7,8,15,17,20 18:24 40:19 42:4 42:6 126:6
**comparing** 95:2 148:16
**compensation** 41:13
**compile** 40:20
**complaining** 91:23
**complete** 72:10 100:12 134:17
**completed** 29:19,24 29:24 30:10 35:18 36:7 96:24
**completely** 84:16
**completing** 63:24
**Completion** 6:16 63:17
**complicating** 115:16
**compound** 67:8 159:19
**compounds** 29:15 32:7 105:19 140:20
**comprehensive** 41:12 42:25
**computer** 23:8 114:19
**concern** 59:19 82:19 98:10,13 110:16 129:13 144:18,20
**concerned** 128:21
**concerns** 94:16 98:8,9,9
**concluded** 161:19
**conclusion** 104:22 116:14
**concrete** 53:4,11,14 53:17,21 57:15,21 57:23 59:20 74:20 75:17,19,23 76:2 76:13,17 107:16 110:14,18,22,24 112:20 137:3 139:4,12 144:18

144:23
**concurrence** 133:23 136:10
**conditions** 132:2,8 132:21 133:10
**conduct** 147:2
**conducted** 61:12
**conference** 112:11 112:13
**conferred** 135:2
**conferring** 134:24
**confirm** 29:5
**confirmation** 99:2
**confirmed** 127:20
**confused** 85:3
**conjunction** 120:21
**CONNELL** 4:3
**consider** 47:10
**considered** 46:2 81:4
**consisted** 141:23
**consistent** 108:7 120:22
**constitute** 66:9
**constitutes** 19:2
**constructed** 53:6
**construction** 1:6 2:3 4:11 6:13 15:3 39:7 67:4 162:4 163:4
**consultant** 9:23
**consultants** 147:9
**consulting** 14:6 15:17,22 24:8 35:7 38:4
**contact** 19:8,9 36:14 84:5
**contacted** 27:25
**contacting** 100:24
**contained** 99:24 113:13
**containing** 117:24
**contains** 45:17
**contam-** 80:18
**contaminants** 30:16 36:3 93:19 99:24 106:19

139:22
**contaminate**
157:21
**contaminated**
37:15 98:12,15
116:9,23 127:22
139:20 140:13
142:24 154:22
155:4,20 156:14
156:18 157:9
**contamination**
32:21 82:6 93:22
105:17 117:25
128:20 129:19,23
158:20
**context** 48:4
**continually** 84:10
**continue** 102:20
117:22
**continued** 2:1 5:1
7:1 23:18 94:25
116:7 159:3
**continuing** 85:25
152:10,19
**contract** 49:13
76:23 77:7
**contractor** 35:22
49:11 99:19 102:7
102:12 115:16
116:25 117:12
118:10 135:5,7,10
136:12
**contracts** 132:9
**contractual** 82:2
**contradict** 105:2
**control** 49:4,8,23
49:25 50:2 130:18
131:10
**controller** 15:4
**controlling** 49:12
91:2
**conversation** 53:25
60:23 84:19 86:15
86:25 89:9 95:5
107:13,17 110:5
110:21 115:5,7,13
120:6 127:23,24

**conversations**
12:14 54:16 55:25
84:19 86:1,3
106:22 115:15,22
119:24 120:3
127:12,19 128:3
133:23
**Cook** 13:19
**COOPER** 3:8 4:13
**copies** 161:9,9
**copy** 9:16 10:3
39:16,17 64:14,15
64:16 65:3 96:22
100:23 106:4
**copying** 40:11
**corp** 16:17 18:1
**corporation** 17:22
18:9,16,19
**CORPORATIO...**
1:10
**correct** 10:2 30:7
54:6 75:20 76:24
77:17,23,24 78:1
78:8,12,24 79:17
81:24 87:23 90:24
92:23 93:1,4,6,12
93:13,16,17 94:10
96:3 101:22 103:8
108:8 113:22
119:7 125:13
137:21 138:8,11
138:21 139:16,17
139:21,25 141:14
142:16,17,20,21
142:25 143:4,22
144:3 145:2,9
146:7,18,25
147:20 148:5,23
149:2,14 151:2,11
151:13,15,16
154:23 156:1
159:21 160:7
**correctly** 113:17
**correspondence**
158:15,18
**Corriston** 4:3 6:4

51:3 52:9 64:13
64:23 65:1 73:4,7
74:8,13,15,16
75:4,6,18 77:1,5
77:21 78:20 79:14
80:8,17 81:8,13
81:15,20,22 82:4
82:17 83:14 84:24
85:2,8,21 86:10
88:7 89:12 90:2
91:11 93:8,9 94:8
95:18 96:1,14,17
97:3,11,15,17
100:15 101:13,20
102:14,19,24
103:1,15 104:21
105:7,21 106:1,9
106:11,21 107:1,3
108:3 109:3 114:4
117:14 118:6,17
118:23 120:1
123:5 127:4,7,16
128:1 130:2,6
133:17 160:13,16
160:22
**Corriston's** 71:11
159:10
**Cossolini** 5:3 150:1
**cost** 55:3 65:17
66:5 69:23 70:9
70:14 72:9 92:15
**cost-prohibitive**
37:8
**costly** 55:13
**costs** 54:21 63:23
**counsel** 45:17
93:10 94:16,23
158:9
**County** 1:17 5:6
150:2,5,9,20
**couple** 9:21 20:23
32:6 62:23 88:22
104:17 152:15
159:10 161:1
**course** 24:24 61:11
104:7,17 151:17
157:10

**court** 1:1,23 3:6
10:16 161:8,15,17
**courts** 156:25
**cover** 37:13
**create** 37:12
**created** 20:17
59:19
**credit** 125:22,25
126:5,6
**credits** 152:10,20
**criteria** 47:2 81:6
**CROSS** 6:2
**CROSS-EXAMI...**
73:3
**crushed** 110:13
137:3 139:12
**csr@taylorfried...**
1:25
**curbing** 153:17
**curbs** 56:7,9
**current** 136:7

**D**

**D** 6:1 8:1,1
**D-2** 59:24
**Daibes** 1:6,8 2:3,5
50:1,11 88:10
89:3,18 91:18,23
93:14 103:23
104:23 107:7
108:12,13,18
110:5,12 111:13
111:20 114:8
120:15,20 121:11
122:1,20 123:23
124:5 137:18
141:22,22 142:15
143:20 144:6,7,17
146:17,19 150:22
158:7,23
**Dana** 4:19 136:20
**date** 43:17 44:6,8
51:8,9 60:24
64:21 65:14 66:1
71:19 99:8 105:13
106:25 108:21
109:22 110:5

114:6,20 123:16
**dated** 43:12 56:16
73:17 119:8
120:12
**dates** 114:6
**Dave** 64:19
**David** 4:14 64:7
**day** 62:7,8,9,12
69:23 70:4,15,16
70:21,21 90:21
97:9 105:18
107:12 112:14,15
120:23 121:3
125:11 163:10
**day-to-day** 91:14
**days** 62:23 104:18
125:18 154:6
**deal** 42:19 89:11
91:14
**dealings** 150:4,9
**debris** 51:19 53:4
53:15,21
**decided** 18:3
**decision** 116:10
131:9,19
**deed** 24:6
**deemed** 50:13,14
52:3 137:21,25
**deep** 33:4
**deeper** 32:19
**defendant** 2:10
4:16 5:6,11 6:10
6:12,13,19 8:11
8:12 9:14 39:1,5,7
39:12 83:9 150:2
**Defendant/Third...**
4:11
**defendants** 1:11,19
8:9,10 136:21
**Defendants/** 2:6
**definitely** 94:20
127:19,23
**degree** 13:22
**delay** 65:23,24
95:13
**delaying** 96:7
**delays** 95:12

delineate 32:6
delineated 122:8
delivered 140:8
demolition 150:13
DEP 23:3 27:11
29:16 47:6 86:13
87:1,6,9 127:23
128:4 152:11
153:6
DEP's 81:6 82:2
96:4
Department 127:13
Depending 69:1
depends 90:19
114:21 132:18
depicted 32:7
deposed 10:1 12:22
deposition 1:20 3:2
3:4 8:19 9:8,17,20
10:4 11:20 12:3
12:10,16,19 39:15
40:14 50:25 66:7
161:18
depth 32:5,9
153:24
depths 33:2
describe 58:19
described 11:13
34:1 62:19 68:17
113:17 126:23
describing 66:7
description 6:9 7:2
22:10
design 16:8
Despite 93:14
detail 40:3
determination
117:10 118:10
determine 28:7
32:8,11,23 36:18
67:23,24 68:1
99:24 105:5 145:8
145:12
determined 36:3
93:23 118:4
121:16 139:17
develop 38:3

134:18 157:11
developed 36:6
developing 36:2
deviation 87:9
diary 114:18
dictated 55:23
diem 69:23 70:4,9
70:14
differ 69:10
difference 39:16
different 23:21
29:7 54:24 55:10
68:19,22 70:12
110:23 112:25
122:17,18 124:23
147:11 152:18
diligence 34:18
direct 6:2 8:5,11
36:14 59:8 84:5
106:22 120:5
directing 111:3
direction 50:10
102:6 115:17
124:20 137:17
directions 50:5
directive 119:9,11
directly 13:16
25:24 26:10 28:11
63:12
disagreement
88:24 113:6
116:24
disagreements 90:6
116:18,20
discharge 127:20
discontinued
119:17 134:16,23
135:15
discontinuing
137:1
discovered 154:11
discrepancy 61:7
discuss 28:10
discussed 25:10
28:18 36:15,16,23
37:10 43:23 45:12
45:24,24 47:5

55:11 58:10 77:10
77:14 78:9 84:4
92:7 101:7 116:1
116:13 119:14
128:8 131:20
135:19,20 136:9
discusses 44:2
discussing 57:4,4
76:13,13 80:6
130:22 133:17
discussion 24:6
37:9 55:14 92:17
93:17,25 94:23
95:11 97:1 107:7
112:17 116:6
117:16,19 121:12
122:5 128:12
130:4 147:9 158:3
158:12,24
discussions 23:10
23:12 24:25 56:25
101:3 107:6
130:24 133:8
158:19
disputes 90:6,9
disregarded 81:13
disregarding
118:11
DISTRICT 1:1,1
division 15:8
document 6:15
45:16 46:4 58:10
63:15 64:22,23,25
65:12,17,19 66:6
66:15 71:9,12,14
81:5 83:17 87:25
96:23 102:22
119:4 130:7 132:3
132:5,10 134:3
144:22
document's 64:2
documents 11:15
12:5,11,12 32:23
35:21 40:6,9,11
40:20 41:2 42:18
47:1 49:13 64:9
doing 16:3,6,7

25:19 27:13 48:14
56:9 61:10 68:15
69:8 92:1 113:1
154:12
Domestic 1:13 4:22
Dooney 1:20 3:2
6:3,17,21,23 7:3,6
8:7 54:10 60:16
65:6 70:25 73:5
83:15 85:10,14,18
85:22 86:14 96:22
97:21 106:2
108:11 111:21
112:6 114:23
118:13,14,25
124:15 127:8
130:10 149:24
162:3 163:3
DOUKAS 5:8
DPW 61:6,9 82:11
82:19,23
draw 49:10 104:22
Drive 3:8 4:14
driver 60:18 61:3
82:10,22 97:22
158:5
drivers 84:7
due 34:18 128:16
duly 8:3
dump 111:11
dumped 111:7
DUNST 5:8
dust 128:23 129:11
129:15 130:17
131:1,11,23 139:2
dusty 131:23
dying 18:25

**E**
E 4:1,1,3 5:1,1 6:1
6:8 7:1 8:1
e-mail 1:25 6:17,21
7:3,5,6 41:1 56:16
56:18,21 70:25
71:5,16,23 72:7
72:20 85:9,17
99:7,8,10,14

100:23 101:9,24
101:25 102:3,5,18
105:22 106:4
107:23 119:5,7,15
120:11,22 130:9
130:16,20,25
133:25
e-mails 40:11,16
earlier 9:21 11:12
66:7 82:9 87:25
97:4 101:3 117:2
124:18 153:15
early 74:18 75:14
123:19 131:24,24
East 5:4
Edgewater 1:3 8:10
19:9 21:16,18,19
22:4,15 23:11
24:3,16 25:2,8
28:3,5,7,11 37:21
54:17 63:25 64:12
66:10 71:7 73:8
123:10 139:25
162:4 163:4
Edgewater's 6:20
83:11
education 152:10
152:19
educational 152:4
effect 10:15
eight 108:14 122:21
144:8
either 23:4 37:20
40:19 55:20 82:10
88:23 102:4
112:14 120:6
151:1
elaborate 104:12
elevated 20:23
129:15
eligibility 152:3
eliminate 129:22
employed 151:18
employee 54:21
70:15,16 82:24
87:23
employees 70:5,20

83:3 84:5 90:4,5
**ended** 20:13
**engaged** 27:14
  28:12 30:10 68:11
  150:16
**engagement** 27:15
  27:16
**engineer** 100:24
**engineering** 2:8
  5:11 14:1,19
  15:16,22 16:4,7,8
  19:24 25:13 38:21
**Engineers** 14:6
**entire** 31:15,25
  86:6
**entirely** 145:14
  146:17
**entities** 150:21,22
  150:22
**entity** 16:14 17:22
  151:11
**entry** 119:17
**environmental** 1:8
  4:16 6:10,12,19
  8:12 13:25 14:1
  14:18 15:6,16,22
  16:7,20,21 31:23
  37:16 38:6 39:2,6
  39:13 40:5 41:7,8
  62:2 64:1 69:8
  83:10 127:13
**environmental-r...**
  14:16
**equipment** 84:7
  126:16,19,25
**ERRATA** 162:2
  163:2
**error** 60:6
**ES-MAH** 1:2
**ESQ** 4:3,8,14,19
  5:3,9
**essence** 71:21
  100:19
**essentially** 41:5
  57:7 59:9 70:18
  87:12 102:10
**ESTABROOK** 3:8

4:13
**estimate** 11:3,5
  68:15 121:14
  157:11
**Estimate/Remain...**
  65:18
**estimated** 69:25
  140:21 157:15
**event** 17:25 18:8,13
**events** 104:8
**eventually** 117:1
**everybody** 159:3
  161:8
**evidence** 105:2
**exact** 17:24 44:6
  51:8,9 60:24
  65:12,25 105:13
  109:22 123:16
**exactly** 33:8,10
  43:22 57:1 61:7
  62:7 88:19 89:9
  102:6,9 112:16
  114:2 126:3
  146:21 157:9,20
**examination** 3:3
  8:5 130:13 159:11
**example** 26:14
  67:16 68:3
**exception** 132:17
**exceptions** 132:18
**excess** 149:5,8
**executed** 23:8
**exhibit** 39:15 120:9
  136:23 137:15
  141:13
**exhibits** 161:14
**existed** 129:23
**expectation** 154:5
**experience** 49:18
  152:4
**expertise** 152:12
**explain** 121:20
**exposure** 32:11
  129:22
**Ext** 5:10
**extend** 156:23
**extended** 33:2

**extent** 32:23 49:20
  134:17
**eyes** 91:1

**F**

**F.R.C.P.26(e)** 6:14
  39:8
**facilities** 47:9
**fact** 82:18 118:10
**factor** 118:9
**facts** 45:9,9
**fair** 70:17 102:14
  117:14
**fairly** 10:11 116:8
**Falls** 13:12
**familiar** 8:13 65:11
  150:12,19,24
**far** 22:18 92:10
  127:23 150:25
**fault** 67:7
**fax** 4:10
**February** 66:22
**feel** 33:9 128:8
**feet** 33:7,16
**fence** 124:16
**fences** 125:5
**fencing** 125:9
**field** 15:7 19:10,18
  20:1,3,15,17,19
  20:24 21:24 26:25
  27:9,21,23 29:25
  30:11,20 31:10,20
  32:3,6 33:3 34:6,9
  35:5,12,17 37:10
  38:17 50:11 53:23
  56:1 60:19 61:4
  61:12 63:1 72:10
  74:22 75:24 76:4
  76:21 78:12 80:12
  80:23 82:12,20
  83:3,4 91:1 97:7
  97:23 100:8
  108:12,19 109:7
  110:14 113:11,14
  113:22 114:5,9,10
  114:10,12 119:9
  122:22 124:16

132:22 133:11
  137:18,24 139:13
  140:9,14 141:10
  141:23 142:12,20
  148:17 150:6,10
  151:17 153:17
  155:9,17,20,23
  158:6
**figure** 86:22
**files** 40:4
**fill** 20:16,21 21:2
  23:5 31:14 32:5,9
  32:24 33:2 36:8
  37:6,12,15 44:18
  46:3,15 47:10,14
  47:21 53:19 56:10
  60:12 67:16 74:20
  75:19,23 76:2,15
  76:20 77:10,15
  80:11,24 81:3,5
  81:15 82:6 91:20
  92:1 93:12 99:1
  108:24 109:6
  137:25 138:20
  153:19,22 154:1,7
**final** 30:10 50:9
  55:24
**financial** 95:17
**Finazzo** 5:3 149:25
**find** 26:24 31:23
  33:1 64:14 68:9
  76:14 134:3
  140:12
**findings** 11:16
**fine** 19:13 73:6
**fingerprinting**
  147:19 148:15,19
**finish** 95:15 109:14
  121:19
**finished** 30:6 31:25
  103:21 105:10,11
  110:2
**finishing** 31:24
**firm** 149:25
**first** 6:11,13,20 8:3
  13:24 14:4 26:24
  27:6,6,14,24 31:5

32:13 34:16 39:3
  39:7,13 43:6
  49:20 52:2 57:2,8
  57:11 58:4 60:5,6
  62:4 63:21 71:23
  78:2 82:21 83:11
  86:16 88:20 97:18
  98:21,23 99:22
  101:3,15 107:8
  108:15 110:4
  111:6 113:2,10
  115:23,24 117:5
  120:8 121:6
  123:10 133:14
  137:2,24 138:4
  141:20 142:10,15
  144:24 151:9
  152:3,21 157:13
  158:22 159:14
**firsthand** 158:16
  159:1
**five** 38:22 50:11
  137:18
**Floor** 4:20
**focused** 32:10
**FOLEY** 4:3
**Follo** 63:1,6,10,11
  103:4,7,10 104:1
  108:12
**follow** 47:13
  144:22
**follow-up** 136:14
  155:5 161:1
**follow-ups** 36:17
  127:9 151:8
**following** 62:9 87:7
  96:2,4 115:17
**follows** 8:4
**force** 10:15
**Ford** 144:13,16,23
**foregoing** 74:2
**form** 23:3,4,8 28:24
  30:1 37:23 38:18
  48:1,23 75:9,10
  78:25 88:3 89:20
  95:9 104:25
  122:25 132:20

133:10 136:7
138:15,24 143:6
154:14 156:2
**formed** 16:13,18,19
17:1,9,10
**former** 144:13,16
**forth** 152:13
**forward** 21:13 25:5
**forwarded** 119:8
135:9
**found** 30:16 31:12
32:20 64:15 80:2
80:3 92:8 94:2
97:9 99:15 123:20
138:7 155:4,13
**four** 17:23
**fourth** 72:7,20
**Franz** 6:16,17,24
36:15 54:17 55:2
55:9 63:16 71:1,6
81:9 84:20 85:14
86:1,12 87:1,18
91:17 94:15
114:25 115:6,14
115:18,25 116:18
117:7 119:24
121:10 123:14,23
123:25 128:8
134:9 135:7,12,21
**Franz'** 124:19
**FRCP** 6:20 83:12
**Fred** 1:7 2:4 50:1
89:3 111:23
121:11
**Fred's** 89:2
**free** 92:9 160:24
**frequency** 47:14
**FRIEDBERG** 1:22
162:1 163:1
**front** 85:24 106:2
114:23
**full-time** 54:22
55:5,9,12
**fully** 10:11 122:8
**function** 90:23
**funds** 27:13,18
**further** 74:22 103:7

113:3,16 118:1
119:15,18 121:20
134:1 151:3
160:15
**future** 100:2,9

___

**G**

**game** 154:17
**gate** 124:15,23
125:1
**gates** 4:19 114:11
117:3 125:2,3
127:24 136:21
**general** 32:25
41:12 43:16
**generalizing** 58:9
**generally** 15:20
20:14 21:1 29:13
31:11 33:4 37:9
40:25 44:15 45:7
53:9 67:19 68:11
71:18 86:20
**generated** 65:23
137:5,8 141:14
**geology** 13:23
**Georgia** 18:25
**germane** 100:12
**getting** 20:12 87:3
95:12,15
**give** 10:24 11:3
22:9 45:2 153:12
161:14,14
**given** 26:11 49:4,11
70:2,21 90:20
156:16
**giving** 11:4 24:14
**go** 13:3,9,13,18
35:25 36:18 38:4
48:11 62:16 64:15
67:25 69:2 78:10
85:2 86:13 87:1
92:13 95:19
103:16 105:8
111:3 120:8
124:13 126:10
130:6 133:4
136:23 137:15

139:9 141:12,19
144:5 147:25
159:9,12 160:14
**goes** 49:12 55:2
58:19 64:24 86:8
**going** 10:8,9,10,24
19:12 23:18 27:18
28:8 30:14 37:2
39:11 48:8 51:6
55:12,13 56:5,12
58:15 59:3 61:15
61:23 65:6 66:2
67:14 69:6,21
70:12 71:8 73:13
73:14,15,18 76:16
77:6 85:22 87:5
87:18 89:5 90:20
91:4 92:11,15,15
95:15 105:1,3,5
106:19 111:7,20
118:1,3,13,14,20
121:18 123:24
124:2,6,8 135:23
153:17 154:13
161:14
**gonna** 18:3 51:9
84:5
**good** 8:7 73:5 89:10
93:10 149:24
151:6
**gotten** 10:5
**govern** 153:3,5
**graduate** 13:20
**granted** 74:19
**Green** 27:12,18
**Greg** 6:17 36:15
54:17 71:1,6
119:24 121:9
123:14,23,25
128:8,13 134:8
135:21
**Gregory** 6:15,24
63:16 85:14
**ground** 33:3,4 84:6
**Group** 4:7 8:8
**guess** 11:2 23:16
34:3 39:24 40:21

44:15 51:18 57:1
65:11 86:16
115:23 119:6
124:24 125:24
158:23
**guessing** 123:19
**guidance** 32:22
47:14 96:5 144:22
**gun** 57:5
**guy** 111:3
**guys** 64:3

___

**H**

**H** 6:8 7:1
**Hackensack** 4:9
**Hager** 5:3 150:1
**half** 8:24 14:13
**handed** 96:22
**happen** 10:9 36:22
56:12 92:15 124:8
148:11 156:11
**happened** 18:13
58:11 61:16 76:18
78:14 79:10 94:21
158:23
**happening** 106:8
**hard** 114:6
**hazard** 128:25
**health** 128:25
**heard** 65:25 76:17
137:11 158:22
**Heights** 8:2
**held** 97:1 130:4
**help** 21:21 87:18
**helping** 25:19
**Hi** 136:18,19
**high** 13:9,11,14,16
**higher** 41:21
**highway** 14:17
**hired** 23:2 40:18
**historic** 20:16,19
20:21 31:14 36:7
37:6,15
**history** 144:12,15
**hm** 14:4
**HOAGLAND** 5:8
**Hold** 64:7 84:22

**holding** 94:16,24
**hour** 68:5,13
**hours** 68:4,12
**Hudson** 131:10
**hundred** 140:21
**Hurricane** 65:23
**hydrant** 131:4

___

**I**

**Iafelice** 74:24
**idea** 53:10 65:18
**identification** 39:4
39:9,12 43:5
56:16 63:18,21
71:2,5 72:2 73:16
83:13 85:12,16,20
105:24 106:3
114:24 118:14
130:12 132:2
**identified** 20:16
31:14 76:10
105:16 158:20
**identify** 32:5 67:21
**ignored** 50:5 81:10
**II** 1:17
**III** 5:9
**immediately** 12:7
95:15 113:11
157:1
**impacted** 31:14
129:3 140:22
157:25
**impervious** 37:13
**important** 10:23
**imported** 59:12
**improperly** 59:12
**IMPROVEMENT**
1:17
**improvements**
27:13 150:16
**inaccurate** 110:9
**Inc.'s** 6:11,13,19
39:2,6 83:10
**incident** 18:24
21:23 50:20,21
51:10 62:21 78:10
88:12,22 138:4

141:8 154:11
**included** 30:23
35:23 38:5 62:1
65:17 101:8 108:8
**increase** 149:16
**increased** 122:23
**indicate** 112:19
137:2
**indicated** 42:24
54:20 59:25 62:16
95:20 96:2 121:17
**indicates** 44:9
62:25 63:9,22
84:18 86:11 101:2
103:7 110:11
111:19 112:10
113:9 122:19
124:14
**indicating** 79:19
114:19 120:15
147:10
**individual** 151:14
**individuals** 76:10
151:18
**indoor** 25:21
**inform** 48:21,21
**information** 45:1
63:10,11,12 158:9
**informed** 82:10
**informing** 103:23
**initial** 27:10 28:2
30:17 48:25 60:10
78:2 105:14,19
106:18 148:7
**initially** 28:10
32:10 51:20 61:3
61:8 64:9 76:24
77:16,25 82:10
89:11 104:12,13
121:17,23 143:20
157:24 158:22
**initiated** 116:16
**inquired** 58:24
**inquiring** 93:14
**inspections** 55:22
**instance** 139:10
140:7 141:20

**instances** 142:22
143:3,3,8
**instruct** 148:3
**instructed** 103:8
**instructing** 115:13
134:1
**instructions** 50:5
73:10 101:8 108:7
118:11
**insurance** 40:19
41:7,11,23 148:22
149:12,19
**insured** 41:8
**insurer** 42:16
**intended** 130:8
**intention** 40:24
**interest** 1:13
**interested** 67:9
**interim** 69:6
118:15
**interrogatories**
6:11,14,20 39:3,8
39:14,16 40:5
43:6,21 60:11
73:17 74:17 75:2
75:3 83:12 84:17
85:23 98:1
**interrogatory** 45:3
76:11
**intimately** 62:15
**introduce** 118:14
**investigation**
157:10
**investigations**
15:24 16:7
**invoice** 71:22
**involve** 69:18,20
**involved** 11:12,23
15:21 16:5 18:21
19:19 20:1,19
27:8 32:3 35:11
53:23 62:15 83:3
91:16 150:12,15
155:7
**involvement** 20:10
20:12 27:10 28:16
83:25 151:1

**involves** 69:15
**involving** 51:10
130:24
**irregardless** 70:5
**issue** 40:20 45:24
83:21,24 84:2,8
86:2 87:3 88:25
95:20,22 106:24
115:25 117:5
121:13 128:5
131:6,21
**issued** 117:1 128:5
**issues** 88:1 91:15
91:20
**issuing** 127:10

———————————
|              **J**              |

**J** 5:3 7:3 85:17
**Jason** 4:8 8:8 38:22
154:11,16 161:2
**JCA** 15:14,15,16
17:17,20
**Jersey** 1:1,9,14,24
3:7,9 4:4,9,15,20
5:4,10 8:2 13:8
15:19 63:25
127:12 163:12
**job** 13:24 14:16
49:4,8,8,23 55:22
62:2 67:2 78:7
87:14 88:13 91:3
91:7 94:17,25
129:8
**jobs** 49:9,10
**Joe** 17:16 88:16
89:8 90:10,11
**JOHN** 1:9
**Joseph** 5:9 151:6
**Jshafron@shafr...**
4:10
**judgment** 131:14
**July** 1:21 3:9 140:7
162:5 163:5
**jumped** 57:5
**June** 39:23

———————————
|              **K**              |

**K&L** 4:19 136:20
**KATHLEEN** 3:5
**keep** 54:21 55:3
114:18
**kept** 111:7
**key** 40:22
**kickoff** 84:3
**kind** 90:1 92:17
**knew** 31:24 56:14
83:4 107:13
109:18 116:8
122:3 129:14,23
129:24 136:10
138:3
**Knolls** 92:10
**know** 10:19 11:8
17:19 18:12,23
22:19,20,22 30:19
32:12 33:10 37:12
38:11 40:16,23
42:17,18,21 45:14
48:9,11,13 49:24
50:1,6 53:16 54:1
55:12,22 56:13
57:1 58:3,8,9 59:8
61:6,7,15 62:7
64:3,6,8,11,11,21
65:12 66:2 68:8
69:7 79:12 84:15
85:2 87:5,6,8,21
88:11,22 89:3,5
89:21 92:18,19,19
93:7 94:3,18
95:13,14,21 96:24
98:12 100:12,25
103:20 104:17,18
105:10,12,13,18
106:6,7 107:12,14
108:22 109:23
110:2 111:13
114:1,10,12 115:1
115:12,15,21
116:1 117:5,21
118:24 120:22,24
121:2,7,25 123:20
126:6 127:3 131:4
131:8 132:20,23

134:25 137:14
139:4,5 143:11
147:14 149:5,8
150:8,25 156:3
157:2,19,24,25
158:16 159:1
**knowing** 146:24
157:8
**knowledge** 43:19
52:1 83:6,8 88:9
89:19 127:1 129:7
137:10,23 138:1
141:15 143:9
146:15 147:19,21
150:11 158:17
159:1
**known** 98:15 107:7
107:10 129:2
**Kristin** 71:11

———————————
|              **L**              |

**L** 8:1,1
**lab** 105:14
**laboratory** 15:7
**Labs** 15:9
**lack** 76:14
**Lakatos** 7:5 12:21
33:22 44:3 52:19
56:17 58:17 61:18
62:14 63:11 74:23
89:10 90:17 91:3
91:5 103:8 105:22
106:4,12 108:23
109:4 113:10,21
114:5 121:9
128:18
**Lakatos's** 39:15
40:14
**language** 133:4
**larger** 121:16
138:13
**LAROCCA** 3:5
**lasted** 131:7
**late** 35:16 54:16
108:2,11,22 109:9
110:1,6 123:21
144:7 150:16,23

law 3:7 4:7 8:8
    10:16 149:25
lawsuit 150:3
lawsuits 18:21
lawyers 21:10
leaking 22:12
learn 82:18
learned 117:5
    128:19
learning 88:9
leave 59:11,14
leaving 18:7
left 66:3 106:19
legal 45:18 128:10
legally 50:6 59:14
let's 12:9 130:6
letter 6:23 85:13
    114:24 115:3,4,18
    119:14 125:14,16
    127:11 128:5,9
    135:4,6,11,20,22
    136:6,11,24,25
letterhead 64:1
letting 159:24
level 40:2 80:18,18
levels 15:23 46:21
    59:11 129:14
liability 41:13,13
    41:14,23 42:16,24
    42:25 43:1
license 3:5 151:25
    152:7,16,22
Licensed 151:23
lieu 153:6
lifted 125:5
limit 149:2
limited 25:4 32:14
    156:19
limits 41:16,21,22
    92:4 148:25
    149:16 156:21
LINDABURY 3:7
    4:13
line 43:7
lines 16:9 43:3
    152:19
listen 111:5 148:4

litigated 11:24
litigation 21:14
    25:6 26:21,22
    73:9,13 80:7
little 13:12 36:13
    104:12
live 13:6
Livingston 4:4
LLC 1:6,6,7,13,22
    2:3,3,4 4:7,11,22
    5:3 16:16,18,20
    17:2 18:8 162:1,4
    163:1,4
LLC's 6:13 39:7
LLP 4:3 5:8
load 104:16,19
    121:23 124:6
loaded 92:9 142:19
loads 121:24 122:4
    139:11 140:9
Lobosco 42:10
located 42:11
location 157:4
lock 114:11 124:15
    124:23
locked 126:14,15
    126:18,24 127:24
    129:8
locking 114:9,10,12
    125:6
locks 117:2,3
    125:19 126:11,21
long 14:12,24 15:12
    16:10 44:19 46:16
    46:25 56:13 58:16
    65:24 93:24
    125:16
LONGO 5:8
look 40:9 66:18
    83:15 88:21 98:20
    107:20 127:4
looked 12:12 40:10
    133:25 145:5
looking 22:13
    133:13 136:24
looks 65:11 66:2
    71:6 100:10 121:7

lot 24:5 156:17,20
    157:4
loud 52:25 57:9
    97:14
low 59:11
LSRP 1:20 3:2 6:3
    9:1,3,23 21:7,8
    22:1,6,14,21,22
    22:25 23:9,21
    34:11,12,16,17,24
    35:12 100:7
    102:11 128:5
    134:15,22 135:22
    136:8 151:10,11
    151:11,22 152:11
    162:3 163:3
LSRPs 151:14,19
    153:3,12
lunch 73:1
Lyndhurst 25:18

_____

**M**

M 3:5
main 18:8,13 98:13
maintain 149:4,4
    152:7
maintained 128:22
    152:24
maintains 74:22
    148:23
majority 129:12
making 59:18 89:2
    89:3
Malaszynski 17:16
    18:7
man 160:24
Management 16:20
    16:22
manager 33:23,25
    34:7,9 91:10,13
    131:15
Manganaro 14:5,5
manner 32:25
    40:21
map 156:21
marathon 11:8
March 6:18 71:1,5

71:17 139:10
marina 21:20 22:12
    22:15 23:18
mark 65:4 94:5
    105:21
marked 39:4,9,11
    39:15,17,17 43:4
    56:15 63:18,20
    65:9 71:1,4,24
    72:6 73:15 83:12
    83:16 85:11,15,19
    105:24 107:23
    118:21 130:8,11
    130:15 132:1
marking 74:12
match 88:8,9,12,23
    89:22,23 147:3
matches 89:18
matching 147:15
material 14:18,20
    46:1,7,15,17 47:7
    47:20,21 48:10,12
    48:15 50:12 51:15
    51:18 52:2,6 53:3
    53:11,22 58:1,9
    58:13 59:15 60:12
    67:21,24 69:7,16
    74:21 76:3,14,21
    78:3,11,22 79:3,6
    79:11 82:12,20
    88:5 91:24 92:7
    92:13 93:15,25
    94:25 96:9,12
    97:7 98:10,14
    99:1,20,23 100:2
    100:9 101:7
    103:24,24,25
    105:15 106:18
    108:14,24 109:6
    110:20 111:1
    112:20,23 113:12
    116:21 121:14
    122:5,21 123:24
    127:21 129:2
    134:19 137:4,8,20
    138:4,9,13,20,23
    139:18,24 140:9

140:13,19,24
    141:2,5,14,22
    142:11,24 143:21
    144:9,25 145:4
    146:6,13,16,21
    147:3,5,18 148:16
    148:18 153:25
    155:2,4,12,17,20
    156:14,14,19
    157:9,11,15,16,20
    158:5,10 159:25
materials 14:19
    46:8,15,23,23
    47:3 52:7 98:4
    154:22 155:13
Matt 7:5 44:4
    62:25 105:23
    106:5 108:11
    109:4 119:10
    121:8,10 134:1,10
matter 11:24 19:17
    21:4,10,17 22:1,4
    23:25 24:15,19
    40:7 42:23 44:10
    57:3 107:23
    115:11 130:24
    133:16
matters 21:13 24:2
    25:1,6
Maximum 72:9
MCCORMICK
    3:8 4:13
mean 12:7 16:6
    17:11 18:23 21:5
    21:5 22:23 23:12
    24:20 30:19 32:8
    32:9 37:10,21
    46:6,22 47:3
    55:18 56:8 65:5
    66:24 67:11 70:3
    71:18 86:16 87:6
    91:12 94:9 100:19
    109:1 114:10,12
    120:23 129:21
    137:7 143:11
    147:7 151:22
    156:4,5 158:14

meaning 53:13
means 46:16 57:20
meant 37:11
137:10
mechanisms 87:8
meet 81:6 92:3
93:16 95:7 96:13
155:13
meeting 44:3,5,7,7
44:10,17 45:2,7
45:21,22 54:16
57:14,17 59:7
62:20 74:19 75:7
75:13,14,16 77:9
77:9,14 84:3
88:14,16 92:17
94:14,19,19
108:18 112:15,17
114:8 120:12,16
120:20,24 121:4
122:16,17,18,20
122:22 123:9,17
123:18 124:11
155:7
meetings 44:14
45:23 58:18,20
76:9,12 91:17
92:6 147:10
meets 95:3
memorialize 115:5
115:12
memorializing
116:1
mentioned 51:23
67:1,20
Menzella 154:11
Meola 5:3 150:1
met 46:19 47:1 73:7
108:12 152:4
metals 20:23
Mews 1:7 2:4
Michael 6:21 7:3,6
85:9,17 120:11
130:9,16
middle 47:17,18
52:12 62:24
111:19 141:20

142:1
migrated 138:13,24
140:24
migration 128:25
129:10,11
Mike 27:3 44:4
60:17 61:2 62:20
88:20 89:1 97:21
121:9,9 141:8
158:21
million 41:18 42:2
42:3 149:2,3,13
minimal 139:8
minimum 66:20
72:8
minor 129:15
minute 10:7
minutes 72:24
mischaracterizes
66:12
missing 100:11,13
mistaken 58:5 70:8
mixed 145:10
146:20 157:18
modification 76:23
77:1
modified 77:7
moment 54:13
monies 77:17
month 8:24
months 94:3,4
MORAN 5:8
morning 8:7 12:21
73:5
morphed 31:22
Morristown 1:24
5:4 13:7
move 78:7 91:19
moved 114:2
126:22
movement 116:7
moving 116:21,22
mutual 116:5,10
mutually 116:13,13
128:14
MV-6 73:16 74:13
74:14

N
N 3:1 4:1 5:1 6:1
8:1,1
N-i-g-r-o 14:23
N-o-o-n 90:12
name 8:7 9:4 17:16
73:7 90:10 136:20
151:6 163:7
name's 149:24
names 9:15 15:13
nature 69:8
near 88:12 150:17
near-surface 29:14
necessarily 69:17
93:16 109:23
153:16
necessary 30:14
35:8 55:10,14
90:21,24 99:16
necessity 70:10
need 11:7 55:16
70:12 72:24 84:4
102:11 116:21,22
127:20 131:17
needed 26:1 32:1
55:4 86:14 116:6
128:10 131:3
Neglia 2:8 5:11 7:3
19:22 20:2 25:12
25:13,23,25 26:1
26:5,6,15,18 27:1
28:3,11,14,18,20
28:21 29:1,8 31:5
35:9,19 36:16
37:20 38:3,15
44:4 47:20 48:7
48:19,21 55:20
74:23 83:4 85:18
92:25 98:25
100:17 102:8,9
120:11,21,21
121:9 130:17
151:7 155:19,22
155:25 160:9
Neglia's 38:16
47:24 48:21

120:25 121:5
NEGLIA001737
6:22 85:11
never 24:7 49:4
57:23 75:14,16,16
76:16,17,22 82:7
84:11,12 89:22
92:14 93:11 111:7
142:18
new 1:1,9,14,24 3:7
3:9 4:4,9,15,20
5:4,10,10 8:2 13:8
20:17 30:22,24
31:1,22 37:19
63:25 127:12
163:12
Newark 4:20,20
next-to-last 100:7
Nigro 14:21,24
nine 108:14 122:21
144:8
NJ 86:13 87:1
128:4
Noah 51:10,23
56:17 57:18 58:3
87:22 88:16 89:13
89:16 90:15
nonvirgin 77:10
Noon 89:8 90:12
North 1:7 2:4 15:19
notably 105:20
Notary 163:12
note 71:8
notes 127:5
notice 3:4 24:6
61:14 119:18
134:10 139:13
144:24 154:21
noticed 82:24
154:16 158:5
notification 127:21
notified 108:23
109:2,4 154:6
November 73:17
number 37:4 38:8
73:19 74:9,10,12
162:6

numbers 64:10
71:9
numerous 45:17
81:1
Nutley 20:4,25 21:6
25:12,17 26:14,15
26:16

O
O 8:1,1,1 56:18
O'Leary 5:3 150:1
oath 10:14
object 19:12 75:10
95:6
objection 17:4
18:10 26:7 28:24
30:1 37:23 38:18
45:4 46:9 48:1,23
50:19 58:6 66:11
68:6 69:12 71:9
71:25 72:13,21
75:1,9 76:25 77:2
77:4,18 78:17,25
79:24 80:13,20
81:11,19,25 82:14
88:3,17 89:20
91:8 95:9,23
96:11 97:8 100:4
101:10,17 102:13
102:15 103:13
104:10,25 106:14
106:15,25 107:25
109:1 113:23,25
117:13 119:20
122:24,25 127:14
131:12 132:13
133:1 135:16
138:15 140:1
143:5,6,15,23
149:6 154:14
156:2
objections 45:18,18
65:7 71:12
obligation 48:20,21
observed 82:11
110:12 113:11
156:18

**obtain** 151:24 152:21
**obtained** 63:10 79:22
**obtaining** 40:16
**obvious** 37:7 144:21
**obviously** 23:1 80:6 98:11 106:7
**occasion** 79:10
**occasions** 78:11,13 79:7,21 80:4
**occur** 115:7 154:13
**occurred** 45:7 115:9
**occurrence** 41:18 42:2,3 149:3,13
**October** 6:23 7:3 85:13,18 114:24 115:8 116:11,17 117:6,11 118:7 119:8 120:2,3,12 123:20 124:14 127:10 128:6 133:20 136:25
**off-site** 131:24
**office** 15:3,19 40:15 51:10 65:13,15 69:2 71:11 120:25 121:5
**offices** 3:7
**official** 24:7 128:9
**official's** 15:3
**officially** 28:12
**Oh** 14:10 18:4 50:23 72:18 84:24 86:7 108:5 124:9
**okay** 9:10 10:6 11:10,23 12:5 13:5 14:10,12 15:15 19:5,23 21:19 23:24 26:17 26:20 36:10 38:23 39:22 43:4 53:20 59:1 60:10 62:4 66:2 68:19 69:22 70:8,14 72:5 74:3

75:5 79:11,12,15 81:21 83:1 86:5,7 86:9 87:22 91:12 95:19 97:4 98:22 99:13,17 100:22 103:3 111:17 113:7 119:1,2 122:12,14 123:8 135:11 137:7,12 137:15,23 139:6,9 139:20,24 140:23 141:3,6,12,16,19 142:3,15,18,22 143:2,20 144:5,11 144:19,24 145:7 145:11,20,25 146:1,9,15,23 147:2,22 149:12 149:16,21 151:21 152:6,21 153:15 157:6,22 159:4,9 159:19 160:1 161:17
**once** 38:10 49:10 118:2 127:21
**one-a-year** 47:12
**ongoing** 115:15 152:10
**online** 23:3
**open** 21:21 22:13 24:4
**opened** 40:25
**operation** 134:16 134:23 135:15
**operations** 119:16 137:1
**operators** 84:7
**opinion** 24:9,14,18 30:15
**opportunity** 8:15
**opposed** 77:16
**option** 36:25 37:1,3 37:4,6 122:11
**options** 36:21,22,24 59:10
**Oral** 3:3
**order** 26:11 28:13

29:6,11 30:23,23 30:25 31:18 32:21 40:5 54:20 66:9 66:16 70:3 78:7 92:20 132:11 133:5 152:7
**original** 43:20 64:22 85:1 161:13
**originally** 16:16 25:4 33:19
**originating** 105:16
**origination** 122:10
**OSHA** 83:22 84:4 86:2 87:3
**oversight** 38:11 55:22 60:9 66:5 66:19,21,25 67:10 67:12,13 68:20 70:5 153:6,7,8
**Owens** 20:3,15,24
**owned** 22:16 24:5

**P**
**P** 3:1 4:1,1 5:1,1 8:1
**P.C** 3:8 4:13
**p.m** 161:19
**page** 6:9 7:2 39:18 39:19 43:7,24,25 44:2 50:8 52:8,9 52:13 54:4,9 55:2 58:15,17 60:10 62:24 63:2 66:19 73:19,25 74:6,9 83:19 84:18,23 85:23,24,25 86:8 97:12 98:17 100:13 102:20,25 105:9 107:20,21 112:2,3 113:8 118:19,21 119:3 120:8 122:12,19 123:6 133:13,14 137:16 139:9 140:6 141:6,19,20 141:25 142:2 144:5 159:12,15

160:2 162:2 163:2
**Page/Line** 162:6
**pages** 6:15 63:16
**PAHs** 20:22
**paid** 23:25 24:23 28:8
**panels** 125:5,7 126:22
**Pansulla** 5:3 6:6 74:11,14 149:23 149:25 151:3 161:12
**paragraph** 47:16 47:17 49:3 50:9 51:15 52:13 54:10 54:14 55:2 57:9 57:12 58:5,16,19 58:23 59:22 63:22 72:7,20 73:25 75:16 97:13 98:21 100:7 102:21 103:18 105:8 108:10 109:25 110:8 111:15,19 112:1,4,10 113:10 122:13,15,16 123:7 124:14 134:14 135:13 137:2,16 139:10 140:6,17 141:7 144:6,11
**paragraph's** 112:17
**paragraphs** 74:5 103:16
**paralegal** 64:14
**parameters** 47:15
**parent** 15:8
**parenthesis** 66:20
**park** 5:4 6:16 25:9 27:19 42:12 63:16 63:25 133:21
**Parker** 4:19 6:5 64:2,7,18 73:1 85:5 97:8 136:17 136:20 138:18 140:5 142:5

143:12,17,24 144:2 145:17,25 146:2,3 147:25 148:9,14 149:7,11 149:21 157:6 161:6,10
**parking** 53:6 156:17,20,23 157:4
**part** 27:19 28:16 36:6 52:12 53:5 56:25 64:22 67:9 67:10 70:2 89:24 91:15 101:15 117:19,24 148:7 154:9 158:24
**particular** 30:2
**parties** 3:3 19:18 19:21 21:14 25:5 26:21
**partner** 17:6
**parts** 70:12
**party** 11:18,21,24 11:25 18:22 19:3
**pass** 152:5
**Passaic** 13:11
**passed** 18:25
**passing** 83:4
**Paterson** 5:9 15:3 42:13
**paved** 53:6
**pay** 24:18 78:4,7 148:7
**PCB** 82:6
**PCB-laden** 59:19
**PCBs** 59:3,11,17 80:18,22 105:19
**people** 45:22 56:3 65:24 70:10 84:6 91:2 94:23 95:20 111:3 158:15,19 159:1
**performance-bas...** 59:23
**performed** 78:1 105:15
**performing** 88:2

90:14,15,18,23
113:21 127:1
**period** 9:2 22:2
42:16 67:2 154:20
**periodic** 55:21
**permission** 156:16
**permit** 81:1 93:20
94:3 96:8 155:16
**permitted** 80:19
96:9 99:19
**permitting** 77:15
**person** 18:24 69:1
70:13
**personal** 83:6,24
**personally** 22:7
35:12 52:21 54:1
62:5 111:2 146:23
156:18
**personnel** 89:17
90:7,22
**perspective** 38:6
**Pete** 12:20 27:6
33:22 35:7 51:23
52:19 89:10 91:3
91:5 121:9 131:9
**Peter** 7:5 9:5 44:3
56:17 58:4 105:22
**Petrillo** 5:9 6:5
26:7 28:24 37:23
38:18,22 48:23
134:4 151:5,7
154:19 156:9
159:5 161:7,11
**phase** 1:17 25:21
32:18 34:16,18
37:22
**phone** 62:18 83:7
94:20 102:5 120:5
143:21
**phonetic** 17:16
**phrase** 157:19
**physically** 124:15
**pieces** 118:3 139:3
**PIERCE** 4:14 17:4
18:10 19:12 26:8
28:25 30:1,8
37:25 38:19 45:4

45:8,11,15 46:9
48:1,4,6 50:19,22
54:6 58:6 64:11
64:20 65:5 66:11
68:6 69:12 71:8
71:25 72:13,21
74:4 75:1,5,10
76:25 77:2,18
78:17 79:24 80:13
80:20 81:11,14,19
81:21,25 84:21,25
86:6,8 88:17 91:8
93:5 94:5 95:23
96:11,25 97:14
100:4 101:10,17
102:13,15,22
103:13 106:14,16
106:25 107:2,25
109:1 113:23
117:13,15 119:20
122:24 123:1
127:14 131:12
132:13 133:1
135:16 140:1
142:4 143:5,7,15
143:23 145:15,18
145:21 146:1
147:23 148:2
149:6,9 159:8,12
159:18 160:1,5,11
160:23 161:1,5
**pile** 67:23
**piles** 145:4,5
**pins** 125:6
**PL** 161:13
**PL-5** 39:15
**PL-6** 56:15
**PL-7** 132:1 133:10
**place** 5:4 21:24
75:15,16 89:10
90:22 149:13
150:20
**placed** 114:23
124:15 129:1
153:23
**placing** 69:7
**plaintiff** 1:4,15 4:5

4:11,21 6:19 9:14
47:19 48:19 83:11
98:25
**Plaintiffs** 2:6
**plan** 36:2 70:19
87:10 154:3
**planned** 89:11
114:22
**plant** 144:13,16,23
**plastic** 128:19
129:1
**play** 156:24 157:4
**Plaza** 4:8
**please** 53:1 65:1
73:20 94:6 97:12
98:17,21 105:21
112:2 113:8
114:25 122:13
136:24 145:22
148:7 160:2
**PO** 4:14 5:9
**point** 17:21 27:7
28:20 31:16 34:25
35:10 36:13 38:1
38:2 40:10 41:3
43:23 84:14 87:20
88:21 90:25 92:5
93:10,18 94:7
98:16 102:6
114:14 115:23
121:14,15 122:9
124:22 126:20
129:5 130:22
131:20 145:7
**pointed** 117:1
**policies** 41:15
42:21 149:5
**policy** 41:16 42:24
42:25 43:1 149:2
149:8,14
**pollution** 41:13
42:24
**portion** 48:2 68:3
101:4,15 145:23
148:12 159:16
160:3
**position** 91:2 92:22

93:1,4,11 145:8
159:20 160:10,19
160:21
**possibility** 35:23
138:12
**possible** 51:24
109:19 138:23
140:25 143:13,19
**potential** 128:24
**potentially** 27:8
93:21
**precedes** 80:6
**precipitated**
154:21
**preparation** 12:6
12:10,15,19
**prepare** 12:2
**prepared** 38:7
45:16 72:8
**preparing** 35:21
**presence** 153:16
**present** 36:21
61:24,24 74:23,25
103:10 152:25
**presented** 28:22,23
29:2 35:19 37:20
38:10 63:22 65:20
**president** 35:1,1
**presume** 103:24
**pretty** 13:4 37:7
**previous** 31:9
112:17
**previously** 42:14
58:10 67:1,20
108:17 119:10
137:20 138:5
154:13
**prior** 12:7,7 19:17
30:23 61:13,14
78:12 94:5 100:3
100:9 114:9
116:17 117:11
127:10,19 129:8
139:13 142:22
155:6
**probably** 8:24 20:7
20:13 21:22 24:13

28:1 32:4 36:1
41:17 77:13 92:6
112:15 114:13
123:17 124:24
125:24 132:16
**problem** 89:3
115:18 117:24
118:4 125:4
128:24 129:16,17
136:8
**procedure** 67:21
**procedures** 44:11
**process** 92:18
131:21
**procure** 35:21,25
**procured** 38:10
**produced** 64:9,16
65:12,13 66:1
71:10 100:17
**production** 40:6
**professional** 41:14
41:22 42:16,25
151:23
**professionals** 18:1
**program** 112:25
**progression** 55:22
**prohibited** 133:22
**project** 14:18 19:10
19:18,25 20:1,2,3
20:5,14,15 21:7
22:10 23:18,22
25:11,17 26:14,25
27:9,21 28:16
29:5,12,25 30:2
33:21,22,25 34:7
34:9,13,25 35:5
38:17 47:25 61:12
62:15 65:19 68:4
81:24 91:10,13,19
95:12 131:15,25
132:22 137:24
139:18,25 140:14
150:6,10,23
151:18 153:9,13
**projects** 25:13
26:17,18 49:18
**proper** 134:18

**properly** 67:14 153:24
**property** 9:2 15:23 25:21 34:6 37:17 150:17
**propo-** 29:10
**proposal** 28:18,22 29:7 31:1,8 38:9 68:9 70:2 132:11
**proposals** 132:9
**propose** 67:22
**proposed** 28:21 44:20 46:17 48:12 48:13,15 68:24,25 69:16 91:24 95:1
**proposing** 67:24
**prospective** 149:18
**Protection** 127:13
**protested** 111:20
**protocol** 77:11 78:15
**provide** 38:11 45:1 55:21 67:13
**provided** 28:17,18 45:15,16 87:15 119:14
**providing** 38:20 69:5 87:13 91:1 153:6,6,8
**Public** 163:12
**public-related** 26:18
**purchase** 26:11 28:13 29:6,10 30:22,23,25 31:18 66:8,16 70:2 125:19 126:1 132:11 133:5
**purchased** 18:24 125:21 126:3,10
**purportedly** 82:12
**purpose** 99:13 115:3,12
**purposes** 44:10
**pursuant** 3:4 6:14 6:20 39:8 83:12
**put** 21:3 27:12

93:22 99:15 100:25 106:2 116:15 117:2 124:22 125:2 141:1 158:15
**putting** 24:6 56:7

_____

**Q**

**quarry** 44:19 46:1 46:8,15,23 47:3,7 47:8,12,12 76:24 81:3 92:14 95:16
**question** 10:19,20 10:24,25 27:11 51:1,2 56:2 60:11 67:8 71:13 80:16 81:17 82:16 86:19 89:25 95:19 99:9 100:20 109:8 128:2 131:1 138:17 140:23 145:18,21 147:24 148:4,7,8,10,11 154:24 157:23 159:14,19 160:2,6 160:8
**questioning** 144:17
**questions** 10:10 25:4 65:6 71:13 77:9 94:6 98:2 136:14,14,22 148:5 159:10
**quick** 127:5
**quicker** 91:19
**quote** 59:9 91:24
**quotes** 51:11

_____

**R**

**R** 3:1,1 4:1,14 5:1 8:1,1 59:24
**raise** 110:16
**raised** 76:11
**raising** 95:20,22
**ran** 15:19
**rate** 70:4
**rates** 28:15
**RCA** 76:2 155:5,8

155:23 156:16
**RD-1** 6:10 39:4,12 39:17,19 43:24 54:6 58:10,15
**RD-10** 7:5 105:24 106:3 107:24 108:8 130:8
**RD-11** 7:6 130:11 130:15
**RD-2** 6:12 39:9 43:5
**RD-3** 6:15 63:18,20 65:10 71:24 72:6 72:19
**RD-4** 6:17 65:4 71:1,4
**RD-5** 6:19 83:13,16 85:24 97:12 98:18 102:24 105:9 107:21 112:2 113:9 122:13 123:6 133:13
**RD-6** 6:21 85:11 96:23 99:11 101:15,21
**RD-7** 130:7,8
**RD-8** 6:23 85:15 114:23 119:14 134:13 135:7,11
**RD-9** 7:3 85:20 118:13,17 134:4,6
**read** 45:21 52:24 54:13 57:9 73:18 73:19 86:6,9 97:13,15,18 98:21 103:20 105:9 109:25 112:1 115:1 122:13 123:7 140:17 145:21,24 148:11 148:13 159:14,17 160:1,4
**reading** 65:22 97:25 108:15 140:18
**ready** 85:6 112:8 118:24

**really** 9:22 20:11 42:6 67:8 125:3,7 131:23 146:20
**reason** 17:25 32:13 100:22 132:24 134:8 135:24 136:4 143:10 162:6
**reasonable** 54:21 55:4
**reasons** 62:13
**recall** 9:15 10:5 11:16 20:22 25:20 27:5 33:8 43:22 44:5,6,7 45:20,23 54:15 55:11 56:18 56:21 57:3,4,17 59:9 60:25 63:14 71:16,18 75:8,13 76:9,12 77:8 78:13 83:21 84:2 86:2,4,15 87:2,17 88:8,12,14 89:25 91:21,22 98:6 99:5 101:12,25 102:5,9 103:23 104:4 105:12,13 105:18 106:3,6 109:17,22 112:16 113:4,6 114:7 119:12 120:5,18 120:23 121:4,10 121:13 122:1 123:16 125:17 127:18,25 130:21 133:5,12 139:23 140:15 153:19 155:14
**receive** 29:4
**received** 60:16 84:14 97:6,21 141:8 144:24
**receiving** 56:18 98:3 101:25 106:3
**recess** 38:24 73:2 127:6
**recognize** 65:9

83:16 119:3
**recollection** 26:3 28:17 29:9 32:15 36:24 44:13 51:17 52:5 58:11 98:3 113:7 114:15
**recommend** 100:1 116:3,4
**recommendation** 55:8 99:17 117:11
**recommendations** 36:11
**recommended** 129:1
**reconstruction** 14:17
**record** 34:11 35:13 39:14 52:24 64:19 96:25 97:2,19 106:9 118:15 127:8 130:5,6 148:1
**recounting** 144:12 144:15
**RECROSS** 6:2
**RECROSS-EXA...** 136:16 149:22 151:4 159:7 160:15
**recycled** 74:20 75:19,23 76:2 112:20 144:22
**REDIR** 6:2
**REDIRECT** 130:13
**redo** 27:19
**refer** 85:22
**reference** 59:18 74:11,18 85:25 109:9 144:12
**referenced** 51:15 52:2 71:23 72:6 72:20 95:8 128:18 128:18
**references** 98:7 103:4 107:21 137:16

referred 67:6 76:3
122:16
referring 40:16
84:25 88:23
102:23 108:18
124:11
refers 123:9 139:10
140:7 141:7,21
144:6
reflected 99:11
refresh 44:13 98:2
regarding 83:21
88:1,16 97:6
99:18 117:7
127:14,16 128:4
146:15 151:10
155:5 158:4
regardless 86:24
Regional 13:11
regulations 32:20
32:22 96:4 153:2
153:4,12
reimbursed 70:4
reiterate 100:8
reiterated 100:21
reiterating 100:8
reject 94:25 155:12
rejecting 91:24
95:2
relate 63:11
related 13:25 14:19
27:11 56:10 62:1
63:10
relative 150:5,10
150:23
release 22:23 23:4
released 22:20 23:5
23:9,13,19,22
relevant 41:4
rely 104:23 105:2,3
relying 145:14
remained 18:16
22:13
remaining 6:16
52:12 53:5 63:17
Remedial 38:7
72:11 87:7

remediation 6:16
63:17,24 72:10
81:7 112:24
151:23 153:8
Remediation/Ca...
66:20
remember 9:13,19
17:24 20:5 42:15
43:13 51:9,10,14
59:6 60:22,23,24
62:20 65:25 77:12
77:13 79:9 87:3
88:19 89:8 92:7
111:6 126:3
130:22,23 133:8
remembers 45:7
removal 134:19
remove 37:2 53:14
54:3 80:5 89:13
118:21 129:6
132:18 141:14
removed 53:4,12
53:18,22 58:2
79:9 89:16 104:14
109:7 126:19
129:4 138:24
140:22 157:16
removing 37:5
126:25 129:8
renew 152:16
repeat 34:21 46:12
148:9 159:3
rephrase 10:20
146:2
replace 89:4 90:3,5
90:8
replacing 88:16
89:8
report 30:10 31:25
reporter 3:6 161:8
161:15,17
Reporters 1:23
reporting 152:14
represent 8:9 73:8
136:21 150:1
151:7
representative

123:10
representatives
35:8 55:15,18
100:23 127:12
150:5,9
represented 9:7
105:15 122:20
request 77:22,23
115:6 116:4
requested 29:15
41:4 99:2 116:2
145:23 148:12
159:16 160:3
requesting 27:12
120:16
requests 40:6
require 30:22,24
78:22 134:22
required 47:8
53:17 63:23 72:9
76:24 133:20
149:18
requirement 27:11
34:17 81:10,12,14
81:16,23 82:1,2,5
94:2 100:9 152:14
requirements
44:21,22 47:5,6,9
47:14 80:10 82:3
92:2,21 93:12,16
152:4
requiring 95:7
115:19 134:15
135:14 136:9
requisition 26:11
reserve 65:7 71:12
Resource 16:20,21
16:22
respect 25:5 37:22
42:22 47:23 55:25
133:10 153:5
respond 113:3
responded 30:18
55:3 59:2 86:12
101:14 111:21
responding 101:22
response 6:11,13

6:19 39:2,6 43:6
43:20 59:12 73:19
83:10 92:14 95:20
97:25 98:1 102:3
102:10
responses 39:13
43:14 59:24
responsibilities
91:13
responsibility 91:6
responsible 49:11
rest 10:6 30:20
50:25 129:12,17
restarted 67:3,3
restarting 66:21,25
67:6,9
restaurant 18:6
result 31:12 33:1
36:10 54:19 55:24
94:21
results 31:11,24
48:9 52:7 68:1
79:4,6,8,10,13,16
79:19,23 80:3
105:14,19 106:17
107:8,10,12,14,17
107:18 109:19,24
123:20,22 140:21
147:14
retain 23:1,2
retained 21:4 22:3
22:7 23:2,4 24:7
24:15 26:15,15,16
28:3,4 29:5 30:6
33:19
retention 23:4 66:9
retrieved 40:22
return 114:9
returning 122:10
reuse 81:1 93:20
review 12:5,11
39:25 40:4 41:2
96:23,24 118:16
reviewed 11:15
40:2,3
reviewing 43:13
44:11

revise 132:17
rid 58:12 59:13
89:6
right 8:15,18,21
9:19 10:18,21,25
11:2,5,7,9,11 12:2
13:6,9,13 15:5
16:24 18:15 19:6
19:16 21:12,23
23:9,15 26:24
31:16 33:12,13,14
34:20 35:4 36:8
41:6 43:10,12
44:25 45:10,20
46:20 47:17,18,23
49:17,19,22 51:14
52:20 53:23 54:4
54:15,24 58:22
60:3,22,24 61:19
61:21 62:6,11
63:6 64:24 66:24
67:7,19 68:20,22
70:1,6,24 71:7
74:17 75:21 79:18
80:9 84:15 85:6
87:16 93:8 97:16
97:18 99:9 100:18
107:11,20 111:7
112:16 115:9
120:10 123:20
124:1 126:11
128:15 129:25
133:19 134:2,8
135:7,8,14,15
136:5,13 138:6,22
147:17 153:24
156:12 158:2
risk 37:17 139:7
risk-based 59:25
river 1:7,17 2:4
33:13 50:12 53:22
57:16,22 126:2
131:10 137:19
138:21 150:16
road 1:17 50:12
53:22 57:16,22
126:2 137:19

138:21 150:16
157:3
**roadways** 74:21
75:23
**Robert** 5:3 149:25
**robert.pansulla...**
5:5
**rock** 44:19 46:8,16
46:23 47:4,7 53:5
57:6 58:12 76:24
**role** 24:8,14 34:10
34:13,25 35:4
38:16 47:25
**Ron** 6:21 7:3,6
54:10 57:14 85:10
85:18 124:14
130:10
**Ronald** 1:20 3:2
6:3,17,23 70:25
85:14 108:11
162:3 163:3
**Roseland** 4:4
**round** 31:12 32:13
33:1
**running** 60:18 61:3
97:23 141:9
**Rutgers** 13:19

**S**

**S** 3:1 4:1 5:1 6:8,24
7:1 8:1 16:17
17:22 18:1,9,16
85:14
**sale** 9:2,3
**sample** 67:17 68:17
69:2,3
**sampled** 44:20
46:17
**samples** 27:17
29:14 30:17,21
31:10 32:1,10
47:13 67:25 68:1
68:16 69:3 103:8
103:11
**sampling** 30:11,16
31:13 32:5 66:5
68:4,12 69:15,18

104:1 105:5
**Sandy** 65:23 67:1
**satisfy** 47:9 92:20
**Saturday** 154:10
154:12
**Saturdays** 61:13,19
61:22
**saved** 77:16
**saw** 56:25 57:1
61:9 142:18 157:5
**saying** 42:23 54:2,2
56:8 59:6 95:11
96:7 102:18
107:15 121:21
125:14 135:22
136:8
**says** 43:18 44:17,22
46:5,14 47:16,19
48:18 51:1,3
52:18 53:20 55:2
57:19 58:17 59:2
60:15 66:19 68:4
68:12 69:22 72:7
98:23,24 108:2,11
108:22 109:9
111:15 120:17
133:15 134:14
159:21
**scenario** 32:12
**scheduled** 120:22
**Schiller** 74:24
**school** 13:10,11,14
13:16
**science** 13:23
**scope** 27:15 28:2,7
28:15 29:12,17,19
29:23 31:7,9,17
31:25 32:2 33:25
34:3 35:11,18,23
37:19 38:10 65:16
72:9 91:15
**Scope/Cost** 6:16
63:18
**screen** 57:6 58:12
**screened** 53:3,11
53:14,18 57:24
**second** 11:13 31:12

31:17,18 33:25
57:9,10,11 58:5
60:5 64:7 66:19
70:9,13 84:22
96:25 98:20,21
119:2 123:7 144:6
160:2,25
**second-to-last**
124:13 134:14
135:12
**see** 43:8 44:9,11,22
47:16,21 49:3,4
50:15 52:8,14
54:11 55:1,6
56:24 57:8 58:20
58:24 59:4,5
60:13,14,20 63:4
63:5 65:1 66:18
66:22 67:17 68:5
68:13 69:24 72:11
72:15 99:2 101:4
101:24 102:21
103:17 110:10
111:1 112:21
113:14,18 120:13
123:10 124:16
130:18 132:3
133:15,18,18
134:19 135:24
136:3,7 137:5
139:14 140:10
141:10,24 142:9
144:9,13 145:4
146:6
**seeing** 56:21 104:19
**seen** 60:18 61:3
83:2 97:22 130:20
132:5
**segregate** 78:22,23
**selected** 36:21
**send** 116:15 134:9
135:4 136:11
**sending** 71:16
99:13
**sent** 56:22 99:7,8
99:10 106:4
119:10 134:1

**sentence** 46:14 47:5
47:17,18,18 48:2
52:2,13,18,24
55:1 57:8,9,10,11
58:5,23 59:1
60:15 71:23 97:19
98:7,24 101:3
108:15 123:11
**separate** 41:16
119:11
**separated** 35:20
**separately** 118:22
**September** 6:22 7:5
43:13,14 50:10,18
51:16 56:16,19
60:16 61:13 62:5
62:12,17,25 63:7
63:12 74:18 75:14
82:13 85:10 97:5
97:20 98:24 103:5
105:23 106:13
107:4,5,22 108:2
108:11,22,25
109:5,10,10,11,16
110:1,6 113:9,20
117:6 123:21
133:15 137:17
141:7 144:7,25
146:4,5 154:10
**series** 10:10 54:15
54:19 58:18
**servers** 41:1
**services** 1:8 4:17
6:10,12,19 8:12
15:6,7 16:20,22
38:21 39:2,6,13
41:7,8 64:1 83:10
**serving** 34:12,24
**session** 11:9
**set** 6:11,13,20 39:3
39:7,14 43:6
78:16 83:11 96:3
125:6 131:4
**settled** 19:1
**seven** 8:22 33:7
121:24 122:4
**Shafron** 4:7,8 6:4

8:6,8,8 17:8 18:14
19:15 26:12 29:3
30:3,4,12 38:13
38:23 39:10 45:6
45:10,13,19 46:13
48:3,5,17 49:2
50:21,24 51:6,13
52:10,11 54:7,8
58:14 63:19 64:4
64:25 65:8 66:17
68:7 69:19 71:3
71:15 72:2,4,16
72:24 75:9 77:4,8
78:25 82:14 84:22
88:3 89:20 95:9
104:10,25 106:15
113:25 122:25
130:14 131:16
132:19 133:7
134:5 136:2,13
138:15 143:6
144:1 145:20
154:14 156:2
160:25 161:3,13
**shallow** 33:11
**shareholder** 18:18
**sheet** 114:19 162:2
163:2
**short** 9:2 21:22
22:2 131:5
**short-lived** 131:22
**shortened** 16:23
**shortly** 14:10 145:1
146:5 154:25
**shouting** 88:8,9,11
88:23 89:17,22,23
**show** 39:11 43:4
56:15 63:20 71:4
73:15 118:13
130:15 132:1
**showed** 106:18
111:18
**showing** 110:24
156:21
**shown** 87:25
**shut** 67:2 118:5
128:10 135:23

153:12
shutting 127:11,16
  128:11
side 111:9 117:21
sidewalks 75:24
  111:21
sign 39:22
signature 39:18,20
  43:7,10 83:18
signed 23:8 40:1
  98:1 163:9
significant 77:17
  118:9
signing 43:15 105:4
similar 15:25 31:9
single-member
  17:2
sir 53:1 151:6,10
  155:7 159:6 161:7
sit 114:16
site 6:16 20:17
  21:21 22:16 23:18
  24:4 25:22 31:15
  31:20 32:3 34:9
  35:12,24 45:25
  49:8,8,11,12,23
  51:19,20 52:7
  55:5 56:1 59:17
  60:19 61:23 62:5
  62:16,21 63:17,24
  63:25 67:15,22,25
  68:2,24 69:3,9,17
  69:21 70:6,10,12
  70:16,20 76:3,15
  79:19,20 80:25
  81:2,6 89:14 90:4
  90:6,23 92:1,4,8
  95:1 96:9,12,16
  97:23 98:5,11,12
  98:14,16 99:1,21
  99:23 100:2,10,25
  103:4 104:15,20
  105:5,16 106:20
  107:8 109:21
  110:18,23 111:1,4
  111:7,10,15
  112:15,18,24,25

113:17,22 114:3
114:20 115:20
116:3,7,18,22
117:12,17,18,21
118:5 119:16,17
120:6 122:10
124:11 125:13
126:11,14,15,16
126:18,24 127:2
127:11,15,17,22
128:10,11,17,19
128:21,23,25
129:11,13,17,20
129:20 133:21
134:15,15,22,23
135:1,2,3,14,14
135:23 137:1,3
138:4,14,25 140:4
140:25 141:23,23
142:13,19,24
145:1 146:4,6,10
146:14,17,24
147:4,5 148:18
150:13 151:23
153:13,16 154:7
154:22 156:15
158:1
sites 69:16 155:11
sitting 110:22
situation 115:16
  117:8
six 8:22 33:7
  121:24 122:4
size 67:23
Skyta 51:10 56:17
  57:18 87:22
Skyta's 58:4
slightly 20:23
soil 27:17 29:14
  37:3 44:11 50:12
  53:3,14,21 66:19
  68:25 84:6 137:19
  139:12
somebody 35:25
  40:11,18 42:8
  55:12 56:13 61:6
  61:9 69:5 111:8

something's 100:13
Sons 42:10
soon 94:2
sorry 34:21 43:25
  50:23 57:13 63:2
  64:5 69:9 75:12
  84:24 90:11 109:8
  109:15 119:22
  142:12
sort 142:1
sound 61:19
source 47:11 51:24
  140:10 155:11
  157:20 158:9
sources 77:10
  142:24
south 156:17,19,22
speak 8:16 12:18
  27:7 51:12 91:1
  129:10
speaking 110:11
specific 12:4,13
  33:20 110:10
  114:15,20 137:10
  141:15
specifically 24:24
  35:21 43:16 45:20
  49:24 56:20 86:15
  87:2 98:13 106:6
  120:19 128:7
  129:9 130:21
  139:5 146:11
  147:6,7
specifications 38:4
specifics 11:17
  45:25 140:15
specified 77:16
Spell 14:22
spent 24:21 89:10
spoke 12:20,20
  27:4,5 28:14
  124:5,7,18
spoken 27:6
spots 32:6
spread 31:10 78:23
  80:4,4 99:21,22
  121:16 122:3

129:19 139:5
145:6,10 146:14
156:15,19
spreading 118:1
Springfield 8:2
staff 35:8
staffing 55:25
stage 31:22 65:19
stamp 64:10
standard 96:8,13
  105:20 132:2,8,20
  133:9 155:13
standards 81:7
  95:3,4,7 96:3
  99:25
standpoint 95:17
start 8:16 12:9 14:7
  14:8 15:10 32:16
  66:3 72:25 73:23
  125:12 151:9
started 20:7 34:5
  36:13 38:3,3
  51:21 84:3 110:21
  110:24 122:5,8
starting 73:21,25
starts 50:9 51:16
  52:14 54:10 58:16
  58:23 142:4
state 3:6 93:21
  163:12
stated 75:15 87:10
  92:1,3 100:7
  112:19,22 121:25
statement 58:4
  59:16 113:18
statements 123:3
states 1:1 45:16
stating 59:2 94:1
  111:20 115:18
status 63:23
stayed 117:19
steps 99:16
stockpile 108:24
  109:5
stockpiled 146:14
stockpiles 103:25
  113:13

stone 57:15,21,25
  76:24 139:12
stop 50:4,7 107:16
  110:25 111:2,12
  116:7,21,22 119:9
  119:11 121:18
stopped 128:23
  133:21
storage 22:12
Street 1:23 5:9
stretch 21:22
strict 16:6
strike 19:7 52:23
  73:14 77:6 91:6
  126:9,14 157:7
  160:17
stuff 93:18 95:16
  96:16 122:3
  143:10
sub 26:10
subbase 53:5 57:16
  57:22
subcontracted 26:1
subcontractor 26:6
subcontractors
  87:16
subject 44:10 73:24
  74:1 76:11 107:23
  115:11 130:17,24
  133:16 136:13
submitted 29:8
  31:1,5,17,18 66:8
submitting 59:23
subsequent 19:1
  83:2 88:14 104:7
  122:22
subsequently 52:14
  53:2 61:5,8 82:11
  88:24 92:12
  104:15,22
substance 92:16
  95:4
substandard
  155:16
substantial 139:1
successfully 22:18
successor 1:13

**suggestion** 124:20 124:24
**suitable** 47:20 76:14 91:25,25 108:24 109:6 138:3 139:17,18 140:13
**Suite** 4:4,8 5:4
**summary** 63:23 72:8 102:14 110:4
**summer** 14:9
**supervisor** 91:7
**supposed** 79:15,18 80:2 92:13 154:1 154:1,8,18
**sure** 9:6,22 17:10 17:12 19:2 29:6 31:3 33:18 35:20 36:5 38:2,2,8 40:10 41:10 42:7 43:2,18,23 44:8 53:25 62:11 64:16 67:14 68:10 80:15 81:25 82:16 85:8 87:21 91:2 102:7 107:14 114:13 126:13 129:5 131:7 132:23 137:14 138:16,19 143:14 145:15,17 147:25 148:10 153:7,23 154:3 157:14
**surface** 32:11,12,14 72:22 128:24 140:4
**sworn** 8:3 163:9

**T**

**T** 3:1,1 4:8 6:8 7:1
**T0088447** 7:5 105:24 106:10
**T0100248** 7:7 130:11
**take** 11:7 30:21 38:22 49:25 54:13 59:4 67:25,25

85:6 93:24 94:3,3 103:8 123:24 124:6 127:5 131:4 132:16 151:21,24 152:18
**taken** 3:4 8:19 10:14 38:24 73:2 104:15 127:6 162:5 163:5
**talk** 13:1 28:6 122:9
**talked** 88:20 115:24 123:23,25 148:22 155:11
**talking** 35:8 74:5 82:1,1,5 88:5 89:1 103:25 108:4 110:22 122:6,8 147:22 148:25
**talks** 59:23 66:25
**tank** 22:11,12 25:19
**tarps** 128:19 129:1 129:4,8
**task** 66:19 67:11,16 67:19 68:20,23 69:4,5,10,10,11 69:15,17,23 90:14 90:18,20
**tasks** 63:23 65:18 68:11,16
**TAYLOR** 1:22 162:1 163:1
**technical** 16:19,21 22:23 152:12
**technically** 87:6
**telephone** 54:16 60:17,25 97:21 103:17 112:11,13 141:8,21 142:6 158:4
**tell** 10:8,14 11:4 33:10 37:5 49:22 64:13 92:19 100:25 111:3 114:6 124:1,2,4 146:9,21 155:19

155:22 156:1
**telling** 11:11 87:9 104:4,24 116:25
**temporary** 125:4
**tennis** 156:25
**Tenth** 4:20
**term** 22:23 23:5 94:12 131:5
**terms** 1:8 4:16 6:10 6:12,15,19 8:12 11:25 16:1,13,15 16:23 18:16,21 19:17 20:1 21:5,7 21:13 22:7 25:7 26:5 27:8 28:8,8 28:21,23 29:24 31:12 32:3 33:1 33:19,20 35:2,11 36:8,11,20 37:20 39:1,5,12 40:4,25 41:7,8 42:21,23 43:6 44:4 47:19 48:18 49:4 50:3 50:14 52:3,14,17 53:2,8,16,20 54:10,21 55:3,4,8 55:25 57:19 59:23 61:23 63:1,15 64:1,17 66:9 68:11 70:3,5,15 70:16,21 74:19 75:22 76:1,6,19 78:16,21 83:9 86:13,18 94:16,24 98:24 104:8 108:12,18,23 109:2 124:15 132:2,8,21 133:9 133:9,20 134:10 137:21 139:13 148:23 150:8,25 151:11,12,18 153:15,21 154:6 155:12,16 156:1 157:10
**TERMS'** 28:16 35:19 37:22 42:16

**TERMS's** 23:24 40:15 48:20 50:5 61:11 138:1
**test** 47:8 48:12 52:6 76:20 78:24 79:16 80:3 99:23 113:2 147:3,8 152:5
**tested** 46:3,7 47:1 52:6 78:3,12 79:3 79:4,4,16 81:4 88:6 92:9 98:11 98:15 99:22 100:3 100:9 110:19,21 111:22 138:5 159:25
**tested.'** 111:24
**testified** 9:10 61:18 82:9 97:4 124:19 137:20 141:12 153:15 156:13 158:3
**testifies** 8:3
**testimony** 13:1 58:3 66:12 122:17 151:10 155:6,14 156:15 162:3 163:3
**testing** 25:22 32:19 35:17 36:7,10 44:11,21,22 47:4 48:9,10,11 78:1,2 92:2 105:14 106:18 147:13 155:4,11
**tests** 147:14
**Thank** 90:13 130:3 136:15 148:21 159:5 160:11,22 160:23 161:4,6,7
**thickness** 153:24
**thing** 18:3 40:13 82:21 92:18 128:16 151:15
**things** 62:3 67:14 83:2 113:1 117:1 132:17 156:1,6
**think** 9:6 13:4

17:13 18:5 19:3 25:20 36:23 41:21 42:6 51:23 54:20 55:4 62:8,9 65:24 66:5 89:10 92:6 95:21 97:8 102:8 111:6 114:7 116:5 116:12,12 118:21 122:2 126:3,12 131:6,22 148:6 149:21 152:17 158:14 160:13 161:10
**third** 34:3 102:21 118:19,21 160:13
**third-party** 1:15,19 2:6,10 4:21 5:6,11 8:11 150:2
**thought** 55:9 91:25 124:21
**three** 6:15 14:13 63:15 152:16,17
**Thursday** 3:9
**tied** 33:6
**till** 16:11 18:16
**Tim** 73:7 74:12
**time** 11:8 17:7,9,12 18:13,15,19,22 21:9,23 24:21 25:7,14 27:23 29:18,23 34:5,8 34:17 38:14 41:17 42:15 44:7 47:6 53:8 55:21 56:22 60:5,6 62:4 64:15 65:25 66:21 67:2 76:19 78:6 82:25 89:11 99:18 100:2 100:21 104:6 107:13,18 109:23 112:16 114:9,20 122:2,7 123:22 125:3 128:22 129:24,25 131:8 132:21 134:16 137:24 142:10 146:10 149:1,5

154:16,20 158:19
158:22
**times** 8:21 15:13
33:18 35:9 62:10
81:1 116:25
**TIMOTHY** 4:3
**today** 8:16 12:6,8
18:16 21:15 26:5
39:18 41:20 97:4
101:4 137:12
**today's** 12:3,10,16
12:19
**told** 25:11 57:5
58:11 60:17 61:2
61:8,9 62:14,21
79:1,8 80:1,5 81:1
82:21,23,24 89:22
94:22,24 97:22
98:4,11 101:1
104:15 123:23
124:4,8 131:3
140:20 141:17
142:11,15 143:20
144:20 146:17
154:13,15 158:4
**top** 21:3 44:2 52:13
58:17 71:12 73:21
74:5,8 101:21
107:21 108:4
129:1 139:9 140:6
**topic** 77:14
**torture** 11:9
**total** 152:18,18
**town** 25:25 26:11
29:4 30:15 32:16
36:18 37:20,21
38:11 48:11,22
55:19,20 59:13
60:18 78:6 89:4
97:22 112:21,23
113:1 124:5,8
128:11
**towns** 133:3
**track** 85:3
**transcript** 9:16
10:3 159:13
161:16

**transfer** 15:23
**transit** 111:14
**transport** 110:13
**transportation**
97:6
**transported** 100:3
100:10
**transporting** 76:2
82:11 110:13
**tried** 56:12
**trouble** 87:12
**truck** 84:7 111:6
124:6
**trucked** 98:4 137:3
158:5
**truckload** 104:5,13
141:24 142:16
143:21
**truckloads** 50:12
104:9 108:14
122:21 137:18
144:8 145:8
146:10
**trucks** 60:18 61:4
82:20 97:23
110:12,12,23,25
111:4,12 118:1
141:9 142:19
**true** 41:19 133:19
137:12
**truth** 10:14
**try** 10:20 87:8,18
**trying** 33:9 36:17
37:2 40:21 61:17
85:3 86:22 91:19
117:12 129:21
**turf** 21:3
**turn** 39:19 43:24
54:4 58:15 60:10
84:18 97:12 98:17
113:8 119:2
122:12 123:6
**turned** 111:8 154:2
**two** 4:8 12:10,12
14:13,13 17:11
25:10 62:12,18
70:10,20 74:4

92:6 94:5 103:16
120:24 125:2,2,3
125:7
**two-thirds** 58:22
**type** 8:25 15:15,25
16:14 20:14,19
37:13 41:7,11
66:6,15 114:18
125:8 132:10
147:3
**types** 68:11
**typical** 20:21 31:22

_____

**U**

**Uh-huh** 12:23
142:8 147:12
**ultimately** 21:6
27:22 30:24 36:20
37:16 38:9 89:10
111:8 115:17
135:9 156:24
157:25
**um** 17:19 33:6
125:11,24
**Undercliff** 24:11
139:25
**underground**
22:12
**understand** 10:12
10:16,18,20,21
12:24 36:5 46:5
51:5 56:2 66:3
68:10 73:11 80:10
80:15 121:21
154:24 155:6
159:22
**understanding**
23:17 37:14 38:15
47:24 48:20 49:1
49:7,9,17 52:22
53:7 60:1,4 66:4
134:21
**understood** 10:25
26:13
**underwritten** 42:7
**unfortunately**
116:24

**UNITED** 1:1
**University** 4:8
13:19
**unknown** 110:5
140:10
**unsuitable** 50:13
50:14 52:3 137:21
138:1,8,10
**untested** 99:1
**unusual** 65:15
**upwards** 33:15
**use** 44:18 46:7,11
46:15 47:20 50:13
50:14 52:3 53:5
57:6 58:12 77:10
77:15 79:22 95:1
109:6 125:22
128:19 131:10
155:8,22,23
156:16 157:19
**usually** 48:13
**utilize** 82:6 126:11
**utilized** 77:11
**utilizing** 75:23

_____

**V**

**v** 162:4 163:4
**vacant** 24:5
**Valley** 13:11
**varied** 56:5 104:16
**varies** 33:6
**various** 35:11
**varying** 15:23 33:2
146:19
**vehicles** 82:11
**verbal** 74:20
**Vereb** 7:5 44:4
74:24 91:18
105:23 106:5,13
106:23 107:7
109:4 119:10,16
120:4 121:8 134:1
134:10
**verify** 123:3
**verifying** 147:1
**version** 100:17
**versus** 8:10 9:5

**vertically** 32:23
**Veterans** 6:16
19:10,18 20:1
21:23 25:9 26:25
27:9,20 29:25
31:20 32:3 34:6,9
35:5,12 38:17
50:11 53:23 56:1
60:19 61:12 63:1
63:16,25 74:22
75:24 76:4 80:11
97:23 100:8
108:12 109:6
113:11,14 119:9
124:16 132:22
133:10 137:18,24
139:13 140:9,14
141:10,23 142:12
142:20 148:17
150:6,10 151:17
153:17 155:9,17
155:20,23 158:6
**viable** 37:6
**violation** 78:15
**virgin** 47:7,7,11
**visibly** 146:6
**visit** 63:7 114:22
**visited** 62:5 63:1
113:11
**visiting** 103:4
**volume** 68:25 69:1
123:3,4
**vs** 1:5,16 2:7

_____

**W**

**W000174** 6:24
85:15 114:25
**W004397** 7:4 85:19
118:18,20 120:9
**W004398** 7:4 85:19
119:3
**waiving** 74:1
**walkways** 74:21
**want** 11:2 30:19
36:1,5 40:13 45:8
45:13 64:18 68:10
68:24 72:25 73:1

78:10 85:5 93:7
94:6 115:23 117:4
145:15 147:25
148:9 149:19
151:9 153:18,21
153:23 156:7,17
157:19 161:8
**wanted** 21:21 32:16
36:18 40:14 51:19
55:3 161:9
**Washington** 1:23
**wasn't** 27:22 32:1
52:20 53:19 59:13
61:16 89:11 105:1
115:17 129:13
131:2 133:6
135:25 157:1
**watch** 69:6
**Watching** 69:21
**water** 33:3,5
131:10
**Waterside** 1:6 2:3
4:11 6:13 8:9,10
39:7 44:5,18 46:7
46:14 47:19 48:13
48:19 49:15,23
50:4,4,10 52:17
53:2,4,8,21 57:21
60:18 61:3 67:3
67:21 68:25 69:9
74:20 75:22 76:1
76:6,20 77:15,17
77:25 78:11,22
84:9 87:15,19
88:2 89:18 90:7
94:9 95:7,17,21
97:22 98:25
100:23 106:23
108:13 109:2,5
113:16,21 119:11
126:15,18,25
127:1 129:7 137:2
137:17,25 139:11
140:8 141:9
142:11,23 144:7
150:21,22 153:18
153:22 154:6,12

155:8 156:16
162:4 163:4
**Waterside's** 6:11
39:3,13 49:25
51:18 73:16 75:2
76:14 77:23 147:9
**way** 10:21 13:25
31:4 36:18,22
50:24 54:25 58:23
72:23 87:11 88:1
93:19 94:1 118:3
123:3 131:2
135:25 139:1
140:24 146:21,23
147:1 151:25
154:8,16 157:8
**We'll** 10:6 68:9
87:20,21
**we're** 21:15 26:5
80:6 92:1 95:2,2
110:22 111:23
124:5 127:8
135:23 143:9
153:5 161:5
**we've** 76:2 83:15
87:4 92:3 107:23
**week** 12:10 62:10
62:22 140:8
**weekend** 60:13,20
61:4,16 83:8
97:24 126:13
137:4 155:3
**weekends** 61:17
**weeks** 62:18 104:18
**weight** 128:10
**went** 13:4 15:14
18:5 23:7 31:23
62:9,11 113:21
117:20 124:4,4
145:1 146:4
**weren't** 16:3 26:19
62:3 79:5,15,18
80:1 90:23 118:3
**West** 15:3 42:13
**Westfield** 3:9 4:15
**widow** 19:1

**withdraw** 81:20
**witness** 6:2 17:6
18:12 19:14 26:9
29:1 30:9 38:1,20
45:6 46:11 48:7
48:25 50:23 51:5
51:8 58:8 64:6
66:14 69:15 72:3
72:15,22 74:7
75:12 77:20 78:19
79:1 80:1,15,22
81:17 82:15 86:7
86:9 88:4,19
89:21 91:10 95:10
95:25 96:15 100:6
101:12,19 102:17
102:25 104:11
105:1 106:17
108:2 114:1
117:16 119:22
123:2 127:18
131:14 132:15
133:3 135:19
138:16 140:3
143:8,16 148:3
149:10 154:15
156:3 163:7
**Woodland** 13:7
42:12
**word** 76:17
**words** 30:5 40:22
84:6 115:12
**work** 13:25 14:12
14:20,24 15:1,12
15:25 16:4,5,10
16:12 19:10,17
21:10,19 24:2
26:20 28:2,7,9,15
29:17,20,23,25
30:3,6,7,14,22
31:2,4,7,17,19,19
32:3 33:20,25
34:4,5 35:18,19
36:2,6 37:19,22
61:11,12,17,22
62:1 65:16 68:19
72:9 87:9 91:15

99:18,18 113:17
113:22 114:19
115:15,19 117:12
117:17,18 118:3
119:9,11 127:1
128:23 134:1
153:17 154:3,8,12
**worked** 14:1,17
15:2,6,14 19:6
21:14,18,22 25:1
25:7,12,13,25
26:4,10,18 61:18
90:4,5 117:20
**workers'** 41:13
**working** 17:11,20
38:14 48:7 56:7
61:15 154:17
**Workplan** 38:7
72:11 87:7 134:18
**works** 35:11
**worth** 48:10
**wouldn't** 96:18,20
96:21 105:3
116:20 129:16
145:7,11 150:25
156:4,6,8,10
**write** 42:19 115:18
128:9 135:4,22
136:6,11
**writing** 42:20 98:25
99:6,15 101:1
116:15
**written** 32:1 60:7
136:7
**wrote** 115:10
135:20 137:8
**www.lindabury....**
4:16

**X**

**X** 6:1,8 7:1
**x2352** 4:15

**Y**

**Y** 8:1
**yard** 51:18
**yards** 121:14,22,24

140:22 157:18,21
**yeah** 12:9 33:9,17
34:23 35:7 39:24
40:13 64:20 69:25
69:25 71:19 82:15
102:17 112:9
116:12 117:16
119:5 128:15
129:21,25 137:13
140:19 142:1
143:11 153:4
161:12
**year** 13:20 15:10
17:24 41:6,24
47:8
**years** 9:21 14:13,25
17:23,23 20:6
152:15,17,17
**yesterday** 12:22
13:2 62:14 101:3
161:9,15
**yield** 92:22,25 93:3
159:20,24 160:9
160:18,21
**York** 15:9
**yup** 42:14 119:5
**YWC** 15:8

**Z**

**0**

**07068** 4:4
**07091** 3:9 4:15
**07102-5285** 4:20
**07601** 4:9
**07922** 8:3
**07960** 1:24 5:4
**08903** 5:10

**1**

**1** 67:16 68:23 69:4
69:11,15 149:2,3
162:2
**1-100** 1:9,10
**1,500** 68:17
**10:05** 3:10
**105** 4:4

Page 183

**11** 61:13 62:5 97:5
   97:20 98:24
   137:16 141:7
   144:25 146:5
**1100** 121:14,21,24
**11th** 60:16 62:12
   66:22 117:6
**12** 6:22 52:4 85:10
**12:20** 85:5
**12th** 62:25 63:7,12
   99:7,8,11 103:5
   117:6 140:7
**13** 21:25 60:11
**1300** 70:21
**14** 20:13 21:25,25
**15** 84:18,23
**17** 139:9
**1983** 13:21
**1984** 14:9
**1990s** 150:23
**1997** 16:11,12

_____

**2**

**2** 42:3 69:5 73:19
   74:10 162:2 163:2
   163:2
**2:14-CV-05060** 1:2
**20** 1:21 3:9 140:6
   162:5 163:5
**2000** 21:13 25:5
**2009** 152:23
**201** 4:9,10 13:7
**2010** 41:6
**2011** 20:8 28:1
   29:22 35:16,18
   36:8 38:15 41:19
   42:15
**2012** 7:7 38:15 44:3
   50:10,15,18 51:16
   54:16 56:17,19
   130:10,16 137:17
**2013** 6:18,22,23 7:3
   7:5 21:25 24:13
   58:17 60:16 61:13
   62:5,12,25 63:7
   63:13 66:22 71:1
   71:5,17 74:18

**82:13** 85:10,13,18
   97:5,20 98:24
   103:5 105:23
   106:13 107:5,22
   108:11,22,25
   109:5,10,11,13,16
   110:1,6 114:24
   115:8 116:17
   117:6,11 119:8
   120:2,3,12 124:14
   127:10 128:6
   133:20 136:25
   139:10 140:7
   141:7 144:7,25
   146:5 149:1
   154:11
**2014** 23:7 42:15
**2015** 39:23 133:15
**2016** 43:13,14
   73:18
**2017** 1:21 3:10
   162:5 163:5,10
**21st** 50:15 52:4
**22** 97:12 141:6
**22nd** 44:3
**23** 7:7 43:24 44:1
   102:25 105:9
   130:10 141:19,25
**233-6800** 4:15
**2369** 4:14
**23rd** 73:17 107:4
   130:16
**24** 7:5 52:10,13
   105:23 107:21,21
   108:25 109:10,11
   112:2,3,4 144:5
**24th** 106:13 107:5
   107:22 109:5,16
   109:19
**25** 54:4 113:8
   139:10 157:21
**25,000** 157:17
**26** 55:2 122:12,19
   133:13
**26(e)** 6:20 83:12
**27** 56:19 58:16
   123:6

**27th** 50:10,18
   51:16 56:16
   137:17
**29th** 62:17 113:9
   113:20

_____

**3**

**3** 6:23 73:19,25
   74:9 85:13
**3:06** 161:19
**30** 68:4,12
**30,000** 157:17,21
**30th** 39:23 43:13
   43:14 113:10,20
**30XI00219100** 3:6
**343-4960** 5:5
**343-7200** 4:9
**343-7288** 4:10
**35** 152:19
**38** 2:3
**3849** 5:10
**39** 1:6
**3rd** 114:24 115:8
   116:11,17 117:6
   117:11 118:7
   120:3 127:10
   128:6 136:25

_____

**4**

**4** 6:18 66:19 68:20
   69:10,17,23 71:1
   120:2 133:20
**40** 5:9 140:9
**400** 4:8
**42** 60:10
**43** 63:3
**4398** 118:20
**4399** 118:18
**440** 50:12 53:22
   57:16,22 137:19
   138:21
**480** 5:9
**4th** 71:5,17 119:8
   133:15

_____

**5**

**5** 137:15

**53** 3:8 4:14
**535-0500** 4:5
**545-4717** 5:10
**56** 68:16
**599** 8:2

_____

**6**

**6** 33:15
**60** 1:23 139:11
**67** 5:4

_____

**7**

**7** 7:3 33:16 85:18
   120:12 154:10
**70** 39:18
**732** 5:10
**750** 69:23 70:4,14

_____

**8**

**8** 6:4 85:23,24
   136:23 141:13
**848-4000** 4:21
**85** 4:4 68:4,12
**88** 15:11
**89** 15:11
**89-ish** 15:11

_____

**9**

**9** 85:25
**901** 5:4
**908** 4:15
**90s** 150:17
**92** 15:14 159:12
**973** 4:5,21 5:5
**973)285-0411** 1:24

# Exhibit Separator

EXHIBIT
PL-6
7-19-17 R?

**From:** Noah Skyta [nskyta@termsconsulting.com]
**Sent:** Thursday, September 27, 2012 4:14 PM
**To:** 'Ronald F. Dooney'; 'Peter Lakatos'
**Subject:** vet field

Ron and Pete,

Today was a little heated down at the field with Fred Diabes and his Hench men. As they want to bring in whatever they want.

As Ron and I agreed at the last meeting to let them bring some of the concrete and stone from 440 river road for sub base for the blacktop. They jumped the gun on bringing this material in today, and most loads were full of soil. They did start to screen out the dirt but it's all concrete and brick. While I was leaving I noticed someone walk through the gate look at the concrete that was dumped, and then jump in a car a leave. This might be a issue later or it might be nothing, but we need to be ready for answers.

With the email sent to the town website asking why trucks are bringing material from the Town Center project in Cliffside park (former DPW Yard). Pete reviewed the soil from the site and its is Unacceptable .

The trucks in question are bringing in stone from the site. I went there today to look for myself. Its only stone and this stone is going for the breakwater. That plan called for virgin stone of certain size in certain layers as approved by the Hudson county soil conservation district. This is not part of our work plan. There is a large pile of soil at town center there but its covered in a plastic. It's the former DPW yard.

As for the topsoil, Andrew is going to certify the soil, as we have said repeatedly to them. No letter as of yet. 6 loads were delivered today.

They are basically scrambling to find soil without testing, the soil there already is almost gone. Going forward we should not let anything on the site unless its been tested and clean.

Ron, I think you should come to site once a week to see what's going on to make our phone conversations a little easier.

**TERMS Environmental Services**
Noah Skyta
Project Manager
Please consider the environment before printing this email

T0104388

# Exhibit Separator

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**Plaintiff,**

BOROUGH OF EDGEWATER,

vs.

**Defendants,**
WATERSIDE CONSTRUCTION, LLC; 38
COAH, LLC; DAIBES BROTHERS, INC.;
NORTH RIVER MEWS ASSOCIATES, LLC;
FRED A. DAIBES; TERMS
ENVIRONMENTAL SERVICES, INC.;
ALUMINUM COMPANY OF AMERICA; A.P.
NEW JERSEY, INC.; JOHN DOES 1-100; and
ABC CORPORATIONS 1-100,

And

ALCOA DOMESTIC, LLC as successor in
interest to A.P. NEW JERSEY, INC.,

**Third-Party Plaintiff,**
vs.

**Third-Party Defendants,**
COUNTY OF BERGEN  and RIVER ROAD
IMPROVEMENT PHASE II, INC.,

And

**Defendants/Third Party Plaintiffs,**
Waterside Construction, LLC, 38 COAH, LLC,
Daibes Brothers, Inc., North River Mews
Associates, LLC and Fred A. Daibes,

vs.
**Third-Party Defendant,**
Neglia Engineering Associates,

Civil Action No.: 2:14-CV-05060
(ES-MAH)

**DEFENDANT TERMS ENVIRONMENTAL
SERVICES, INC.'S RESPONSE TO
WATERSIDE'S FIRST SET OF
INTERROGATORIES**

2576763v



To:     Patrick Papalia, Esq.
        Debra Rosen, Esq.
        Archer & Greiner
        21 Main Street, Suite 353
        Court Plaza South, West Wing
        Hackensack, New Jersey 07601

Defendant TERMS Environmental Services, Inc. ("TERMS") by and through its attorneys, Lindabury, McCormick, Estabrook & Cooper, P.C., hereby submits its responses and objections pursuant to Rule 34 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") to the First Set Of Interrogatories ("Interrogatories") by Defendants, Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., North River Mews Associates, LLC and Fred A. Daibes and Third-Party Defendant, River Road Improvement Phase II, Inc. (collectively "Waterside"). These responses are made solely for the purpose of, and in relation to, this action. Each answer is given subject to all appropriate objections (including but not limited to objections concerning competency, relevancy, materiality, propriety and admissibility) which would require the exclusion of any statement contained herein if it were made by a witness present and testifying in Court. All such objections and grounds therefore are reserved and may be interposed at the time of trial.

The responses to these interrogatories are accurate as of the date that they are made. The party on whose behalf these answers are given has not yet completed its investigation of the facts relating to this action, has not yet completed its discovery in this action, and has not yet completed its preparation for trial. Consequently, the following answers are given without prejudice to the answering party's right to amend these answers to interrogatories and to produce, at the time of trial, subsequently discovered evidence relating to the proof of facts subsequently discovered to be material and it cannot exclude the possibility that it may obtain more complete

2

information or other information which indicates that the answers or responses contained herein are incorrect.

Except for facts explicitly admitted herein, no admission of any nature whatsoever is to be implied or inferred.  The fact that any interrogatory herein has been answered should not be taken as an admission,  or a concession of the existence, of any facts set forth or assumed by such interrogatory, or that such answers constitute evidence of any fact thus set forth or assumed.

All answers must be construed as given on the basis of present recollection.  Any interrogatory deemed as continuing is objected to as oppressive, overly burdensome and improper and will not be regarded as continuing in nature.

3

## GENERAL OBJECTIONS

The answers provided herein are all made subject to the following general objections:

1.  All of the general objections made by defendant are hereby incorporated into each and every response to specific interrogatories and any response made by defendant to any interrogatory is made without waiver of these general objections or any specific objection articulated therein.

2.  Defendant objects to the definitions and instructions provided with these interrogatories insofar as they impose obligations beyond those required by the Federal Rules Of Civil Procedure and the Local Civil Rules and are vague, overbroad, ambiguous and unduly burdensome.

3.  Defendant objects to these interrogatories to the extent that they seek information currently in the possession or under the control of the requesting party or any other party to this action.

4.  Defendant objects to these interrogatories to the extent that they seek to compel defendant to provide, obtain and/or create information and/or documents outside of the possession and/or control of defendant.

5.  Defendant objects to these interrogatories to the extent that they seek information beyond the time period relevant to the subject matter of this action.

6.  Defendant objects to these interrogatories to the extent that they seek to require the disclosure of information and/or documents which are protected by the attorney-client, attorney work product and/or and other privileges.  Any disclosure

4

of information protected by a privilege against disclosure is unintentional and inadvertent and shall not be considered a waiver of any applicable privilege.

7. Defendant objects to these Interrogatories to the extent that they are duplicative and cumulative and/or seek information that may be obtained from other sources or through other means of discovery that are more convenient, more efficient, more practical, less burdensome and/or less expensive.

8. Defendant objects to these Interrogatories as unduly burdensome, vexatious and harassing to the extent that they seek to require Defendant to recount, restate and/or summarize correspondence, email and other written documents which speak for themselves and/or which analysis or summary can be performed by the requesting party.

9. Defendant objects to these interrogatories to the extent that they seek to require the respondent to form and or divulge legal conclusions and/or require specialized knowledge to formulate a response.

10. Defendant objects to these interrogatories to the extent that they seek to require the disclosure of information and/or documents beyond that required by applicable law.

11. Defendant expressly reserves the right to interpose further objections to these interrogatories not specifically articulated herein, and waives no objection hereto by providing a response to any particular interrogatory. Defendant further reserves the right to object to the introduction into evidence of any response to any interrogatory set forth herein.

5

12.     Defendant objects to these interrogatories insofar as they seek information regarding "all" or "each" or "every" person, fact, circumstance or document, as such interrogatories are vague, overly broad and unduly burdensome.

13.     Defendant provides its responses to these interrogatories based upon information currently available and reserves the right to amend its responses upon discovery of additional information, evidence or grounds for objection at any time prior to trial.

14.     Defendant objects to these interrogatories insofar as they are irrelevant, vexatious, designed to harass, annoy or embarrass defendant and/or not designed to lead to the discovery of relevant or admissible evidence.

15.     Defendant objects to these Interrogatories as overly broad, vague and ambiguous in that the term "Veteran's Field" is used generically and encompasses an area greater than the limited area of Veteran's Field that was subject to the New Jersey Department of Environmental Protection's Site Remediation Program and oversight by a Licensed Site Remediation Professional.

Without waving the foregoing or any other objections, based upon present recollection, information and belief, and subject to such other facts and information as may be revealed through continuing discovery, defendant provides the following responses.

6

## RESPONSES TO INTERROGATORIES

1. Identify the person answering these Interrogatories giving full name, title and present business address.

ANSWER:

Ronald Dooney, President of TERMS Environmental Services, Inc.
599 Springfield Avenue
Berkeley Heights, NJ 07922

(908) 464-2800

2. Identify any documents or persons other than Your attorney who were consulted in the preparation of the answers to these Interrogatories or who were otherwise the source of information contained in the answers to these Interrogatories.

ANSWER:

Noah Skyta, TERMS Environmental Services, Inc.
Peter Lakotas, TERMS Environmental Services, Inc.

Defendant refers Waterside to documents that will be provided in response to Waterside's First Request For The Production Of Documents.

3. Identify all persons having knowledge of any facts or events related to this litigation, including all persons who have information which supports any of the allegations, claims or defenses contained in TERMS's Answer to Plaintiff's First Amended Complaint with Counterclaim and Cross-claims and/or any other pleading filed in this matter and with regard to each person so named, provide a brief narrative description of the factual area in which he or she is knowledgeable.

7

2576763v

ANSWER:

Defendant objects to this Interrogatory in that it seeks to compel TERMS to obtain and provide information that is within the knowledge and possession of third parties and beyond TERMS' knowledge and control. Without waiving the foregoing or any other objection, defendant states that the following individuals may have information regarding the issues and matters in controversy in this case:

Michael Berliner

Neglia Engineering Associates
34 Park Avenue
P.O. Box 426
Lyndhurst, New Jersey 07071
(201) 939-8805

Mr. Berliner has knowledge of the Veteran's Field Project, including the original investigation and remediation; the specifications for, and the preparation and awarding of, the bid for the Veteran's Field Project; the communications between plaintiff and TERMS Environmental Services, Inc. ("TERMS"); the communications between Neglia Engineering Associates and TERMS; the instructions and directions provided by plaintiff to TERMS; the attempts by Fred Daibes and Waterside Construction, LLC to have TERMS and/or its personnel removed from the Veteran's Field Project; the activities and/or performance of Waterside Construction, LLC during the Veteran's Field Project; the communications with Waterside Construction, LLC relating to the identification and testing of fill material for use in the Veteran's Field Project; the importation of contaminated fill to Veterans' Field by Waterside Construction, LLC; and plaintiff's decisions to not pay TERMS for work completed and to terminate the use of TERMS' services.

Michael Neglia
Neglia Engineering Associates
34 Park Avenue
P.O. Box 426
Lyndhurst, New Jersey 07071
(201) 939-8805

Mr. Neglia has knowledge of the Veteran's Field Project, including the original investigation and remediation; the specifications for, and the preparation and awarding of, the bid for the Veteran's Field Project; the communications between

8

plaintiff and TERMS; the communications between Neglia Engineering Associates and TERMS; the instructions and directions provided by plaintiff to TERMS; the attempts by Fred Daibes and Waterside Construction, LLC to have TERMS and/or its personnel removed from the Veteran's Field Project; the activities and/or performance of Waterside Construction, LLC during the Veteran's Field Project; the communications with Waterside Construction, LLC relating to the identification and testing of fill material for use in the Veteran's Field Project; the importation of contaminated fill to Veterans' Field by Waterside Construction, LLC; and plaintiff's decisions to not pay TERMS for work completed and to terminate the use of TERMS' services.


Dino Menzella
Neglia Engineering Associates
34 Park Avenue
P.O. Box 426
Lyndhurst, New Jersey 07071
(201) 939-8805

Mr. Menzella may have knowledge of the importation of contaminated fill to Veterans' Field by Waterside Construction, LLC; the activities and/or performance of Waterside Construction, LLC during the Veteran's Field Project; and the communications with Waterside Construction, LLC relating to the identification and testing of fill material for use in the Veteran's Field Project.


Jason Menzella
Neglia Engineering Associates
34 Park Avenue
P.O. Box 426
Lyndhurst, New Jersey 07071
(201) 939-8805

Mr. Menzella may have knowledge of the importation of contaminated fill to Veterans' Field by Waterside Construction, LLC;

Steve Reddington
Waterside Construction, LLC
1000 Portside Drive
Edgewater, New Jersey 07020
(201) 840-0050

Mr. Reddington may have knowledge of the attempts by Fred Daibes and Waterside Construction, LLC to have TERMS and/or its personnel removed from the Veteran's Field Project; the activities and/or performance of Waterside

Construction, LLC during the Veteran's Field Project; communications between Waterside Construction, LLC and TERMS relating to fill material acceptable for use at Veteran's Field; communications between Waterside Construction, LLC and TERMS relating to the identification and testing of fill material for use in the Veteran's Field Project; and the importation of contaminated fill to Veterans' Field by Waterside Construction, LLC.

Matt Vereb
Waterside Construction, LLC
1000 Portside Drive
Edgewater, New Jersey 07020
(201) 840-0050

Mr. Vereb may have knowledge of the attempts by Fred Daibes and Waterside Construction, LLC to have TERMS and/or its personnel removed from the Veteran's Field Project; the activities and/or performance of Waterside Construction, LLC during the Veteran's Field Project; communications between Waterside Construction, LLC and TERMS relating to fill material acceptable for use at Veteran's Field; communications between Waterside Construction, LLC and TERMS relating to the identification and testing of fill material for use in the Veteran's Field Project; and the importation of contaminated fill to Veterans' Field by Waterside Construction, LLC.

Fred Daibes
Waterside Construction, LLC
1000 Portside Drive
Edgewater, New Jersey 07020
(201) 840-0050

Mr. Daibes may have knowledge of the attempts by Fred Daibes and Waterside Construction, LLC to have TERMS and/or its personnel removed from the Veteran's Field Project; the activities and/or performance of Waterside Construction, LLC during the Veteran's Field Project; communications between Waterside Construction, LLC and TERMS relating to fill material acceptable for use at Veteran's Field; communications between Waterside Construction, LLC and TERMS relating to the identification and testing of fill material for use in the Veteran's Field Project; the importation of contaminated fill to Veterans' Field by Waterside Construction, LLC; and the acquisition and remediation of the former Alcoa Site; the existence, nature and extent of contamination at the former Alcoa Site.

Ronald Dooney
TERMS Environmental Services, Inc.
599 Springfield Avenue
Berkeley Heights, New Jersey 07922
(908) 464-0028

Mr. Dooney has knowledge of the Veteran's Field Project, including the agreements between plaintiff and TERMS; the original investigation and remediation; the specifications for and the preparation of the bid for the Veteran's Field Project; the communications between plaintiff and TERMS; the communications between Neglia Engineering Associates and TERMS; the instructions and directions provided by plaintiff to TERMS; the attempts by Fred Daibes and Waterside Construction, LLC to have TERMS and/or its personnel removed from the Veteran's Field Project; the activities and/or performance of Waterside Construction, LLC during the Veteran's Field Project; the communications with Waterside Construction, LLC relating to the identification and testing of fill material for use in the Veteran's Field Project; the importation of contaminated fill to Veterans' Field by Waterside Construction, LLC; invoices issued to plaintiff; plaintiff's failure and refusal to pay TERMS for work completed; the preparation of various reports relating to the Veteran's Field Project; the submission of various documents regarding the Veteran's Field Project to governmental agencies; the collection and analysis of samples from Veteran's Field and sources of proposed fill material identified by Waterside Construction, LLC; and the loss of work resulting from the publication of false statements about TERMS performance and instructions.

Pete Lakatos
TERMS Environmental Services, Inc.
599 Springfield Avenue
Berkeley Heights, New Jersey 07922
(908) 464-0028

Mr. Lakatos has knowledge of the Veteran's Field Project, including the original investigation and remediation; the communications between plaintiff and TERMS; the communications between Neglia Engineering Associates and TERMS; the instructions and directions provided by plaintiff to TERMS; the attempts by Fred Daibes and Waterside Construction, LLC to have TERMS and/or its personnel removed from the Veteran's Field Project; the activities and/or performance of Waterside Construction, LLC during the Veteran's Field Project; the communications with Waterside Construction, LLC relating to the identification and testing of fill material for use in the Veteran's Field Project; the importation of contaminated fill to Veterans' Field by Waterside Construction, LLC; the preparation of various reports relating to the Veteran's Field Project; the

11

submission of various documents regarding the Veteran's Field Project to governmental agencies; the collection and analysis of samples from Veteran's Field and sources of proposed fill material identified by Waterside Construction, LLC.

Noah Skyta
TERMS Environmental Services, Inc.
599 Springfield Avenue
Berkeley Heights, New Jersey 07922
(908) 464-0028

Mr. Skyta has knowledge of the Veteran's Field Project, including the original investigation and remediation; the communications between plaintiff and TERMS; the communications between Neglia Engineering Associates and TERMS; the instructions and directions provided by plaintiff to TERMS; the attempts by Fred Daibes and Waterside Construction, LLC to have TERMS and/or its personnel removed from the Veteran's Field Project; the activities and/or performance of Waterside Construction, LLC during the Veteran's Field Project; the communications with Waterside Construction, LLC relating to the identification and testing of fill material for use in the Veteran's Field Project; the importation of contaminated fill to Veterans' Field by Waterside Construction, LLC; the preparation of various reports relating to the Veteran's Field Project; the submission of various documents regarding the Veteran's Field Project to governmental agencies; and the collection and analysis of samples from Veteran's Field and sources of proposed fill material identified by Waterside Construction, LLC.

Joe Noon
TERMS Environmental Services, Inc.
599 Springfield Avenue
Berkeley Heights, New Jersey 07922
(908) 464-0028

Mr. Noon has knowledge of sampling events conducted by TERMS at Veterans' Field.

Matthew Follo
New York, New York

Mr. Follo has knowledge of the communications between Neglia Engineering Associates and TERMS; the activities and/or performance of Waterside Construction, LLC during the Veteran's Field Project and the importation of contaminated fill to Veterans' Field by Waterside Construction, LLC.

12

Rick O'Brien
Beneficial Soil Solutions, Inc.
12170 Mount Albert Road
Ellicott City, Maryland  21042
(410) 531-3205

Mr. O'Brien has knowledge of the preparation by TERMS of the Self-Implementing Plan for PCB remediation that was submitted by TERMS to the United States Environmental Protection Agency and communications made by Waterside Construction, LLC and/or related or affiliated companies regarding the existence and nature of contamination at the former Alcoa Site.


Harry Bundesmann
HSBEC, LLC
76 Prince Drive
Watchung, NJ 07069
(610) 550-1821

Mr. Bundesmann has knowledge of the preparation by TERMS of the Self-Implementing Plan for PCB remediation that was submitted by TERMS to the United States Environmental Protection Agency.

Ms. Jeri Rossi
DDMS, Inc.
186 Center Street
Clinton, New Jersey 08809
(908) 479-1975

Ms. Rossi has knowledge of the validation of the analytical results from the analysis of samples collected by TERMS from Veteran's Field.

Polly Newbold
DDMS, Inc.
186 Center Street
Clinton, New Jersey 08809
(908) 479-1975

Ms. Newbold has knowledge of the validation of the analytical results from the analysis of samples collected by TERMS from Veteran's Field.

13

Andrew W. Robinson
Groundwork, Inc.
166 Bloomfield Avenue
Verona, New Jersey 07044
(973) 857-5033

Mr. Robinson has knowledge of sources of fil material proposed to be used at Veteran's Field by Waterside Construction, LLC.

Camille Retoma
W.A.T.E.R. Works Laboratory, Inc.
360 Glenwood Avenue
East Orange, New Jersey 07017
(973) 678-3787

Ms. Retoma has knowledge of the analytical results from the analysis of samples collected by TERMS from Veteran's Field and/or sources of fill material for use by Waterside Construction, LLC.
Rodger Ferguson
Penn Jersey Environmental Consulting
326 Willow Grove Road
Stewartsville, New Jersey 08886
(908) 329-6060

Mr. Ferguson has knowledge of the remediation of the former Alcoa Site, the sampling conducted by TERMS of Veteran's Field after the importation of contaminated fill material by Waterside Constructions, and validation of the data obtained through such sampling.   Mr. Ferguson also has knowledge of communications regarding Veteran's Field and TERMS with Fred Daibes, Waterside Construction, LLC and related/affiliated companies.

Gregory S. Franz
Edgewater Borough
916 River Road
Edgewater, New Jersey 07020
(201) 943-1700

Mr. Franz has knowledge of the Veteran's Field Project, including the agreements between plaintiff and TERMS; the communications between plaintiff and TERMS Environmental Services, Inc. ("TERMS"); the instructions and directions provided by plaintiff to TERMS; the attempts by Fred Daibes and Waterside Construction, LLC to have TERMS and/or its personnel removed from the Veteran's Field Project; the communications between Fred Daibes and/or

14

Waterside Constructions, LLC and plaintiff; and plaintiff's decisions to not pay TERMS for work completed and to terminate the use of TERMS' services.

James F. Delaney
Edgewater Borough
916 River Road
Edgewater, New Jersey 07020
(201) 943-1700

Mr. Delaney has knowledge of the Veteran's Field Project, including the agreements between plaintiff and TERMS; the communications between plaintiff and TERMS Environmental Services, Inc. ("TERMS"); the instructions and directions provided by plaintiff to TERMS; the attempts by Fred Daibes and Waterside Construction, LLC to have TERMS and/or its personnel removed from the Veteran's Field Project; the communications between Fred Daibes and/or Waterside Constructions, LLC and plaintiff; and plaintiff's decisions to not pay TERMS for work completed and to terminate the use of TERMS' services.

Councilman Henwood
Edgewater Borough
916 River Road
Edgewater, New Jersey 07020
(201) 943-1700

Mr. Henwood has knowledge of the Veteran's Field Project, including the agreements between plaintiff and TERMS; the communications between plaintiff and TERMS Environmental Services, Inc. ("TERMS"); the instructions and directions provided by plaintiff to TERMS; the attempts by Fred Daibes and Waterside Construction, LLC to have TERMS and/or its personnel removed from the Veteran's Field Project; the communications between Fred Daibes and/or Waterside Constructions, LLC and plaintiff; and plaintiff's decisions to not pay TERMS for work completed and to terminate the use of TERMS' services.

Philip Boggia
71 Mt. Vernon Street
Ridgefield Park, New Jersey 07660
(201) 641-0006

Mr. Boggia has knowledge of the Veteran's Field Project, including the agreements between plaintiff and TERMS; the communications between plaintiff and TERMS Environmental Services, Inc. ("TERMS"); the instructions and directions provided by plaintiff to TERMS; the attempts by Fred Daibes and Waterside Construction, LLC to have TERMS and/or its personnel removed from the Veteran's Field Project; the communications between Fred Daibes and/or

15

Waterside Constructions, LLC and plaintiff; and plaintiff's decisions to not pay TERMS for work completed and to terminate the use of TERMS' services.

Ben Rao
Alpha Lab
35 Whitney Road – Suite 5
Mahwah, New Jersey 07430
Telephone:  (201) 847-9100

Mr. Rao has knowledge of the analytical results from the analysis of samples collected by TERMS from Veteran's Field and/or sources of fill material for use by Waterside Construction, LLC.

Ralph Kocsis
Alpha Lab
35 Whitney Road – Suite 5
Mahwah, New Jersey 07430
(201) 847-9100

Mr. Kocsis has knowledge of the analytical results from the analysis of samples collected by TERMS from Veteran's Field and/or sources of fill material for use by Waterside Construction, LLC.

Martin Downs
Creamer-Sanzari
101 E. Broadway
Hackensack, New Jersey 07601
(201) 678-2609

Mr. Downs has knowledge of sources of fill material proposed to be used at Veteran's Field by Waterside Construction, LLC.

Joe Bolowski
Control Services, LLC
P.O. Box 269
Bayonne, New Jersey 07002
(201) 437-3826

Mr. Bolowski has knowledge of sources of fill material proposed to be used at Veteran's Field by Waterside Construction, LLC.

16

Richard Katz
Penn Jersey Environmental Consulting
2034 East Wellington Road
Newton, Pennsylvania 18940
(215) 860-1231

Mr. Katz has knowledge of sources of fill material proposed to be used at
Veteran's Field by Waterside Construction, LLC.

Joseph Hochreiter
Senior Environmental Consulting, LLC
252 Hollow Branch Lane
Yardley, Pennsylvania 19067
(215) 493-0343

Mr. Hochreiter has knowledge of sources of fill material proposed to be used at
Veteran's Field by Waterside Construction, LLC.

Yilmaz Arban
S & S Environmental Services, Inc.
98 Sand Park Road
Cedar Grove, New Jersey 07009
(973) 857-7188

Mr. Arban has knowledge of sources of fill material proposed to be used at
Veteran's Field by Waterside Construction, LLC.

Kristin Hahn
NJDEP
401 E. State Street
Trenton, New Jersey 08625
(609) 292-1252

Ms. Hahn has knowledge of the administration of the remediation of the former
Alcoa Site and the existence, nature and extent of contamination at the former
Alcoa Site.

Yacoub E. Yacoub
NJDEP
401 E. State Street
Trenton, New Jersey 08625
(609) 292-1252

17

Mr. Yacoub has knowledge of the administration of the remediation of the former Alcoa Site and the existence, nature and extent of contamination at the former Alcoa Site.


Jamie McBlaine
NJDEP
401 E. State Street
Trenton, New Jersey 08625
(609) 292-1252

Ms. McBlaine of the NJDEP has knowledge of the various violations committed by Waterside Construction, LLC and its related and/or affiliated companies regarding the improper activities at the former Alcoa site and the improper importation of contaminated fill to Veteran's Field.

Ann Finnegan
USEPA Region Two
2890 Woodbridge Avenue
Edison, NJ 08837
(732) 906-6177

Ms. Finnegan has knowledge of the submissions by TERMS Environmental Services, Inc. and the Borough of Edgewater and its consultants and the Daibes' related entities and its consultants regarding PCB contamination at the former Alcoa site and Veteran's Field.


Mary C. Siller
NJ Department of Environmental Protection
Solid Waste Compliance and Enforcement
(609) 341-5441

Ms. Siller of the NJDEP has knowledge of the various violations committed by Waterside Construction, LLC and its related and/or affiliated companies regarding the improper activities at the former Alcoa site and the improper importation of contaminated fill to Veteran's Field.


James Haklar
USEPA Region Two
2890 Woodbridge Avenue
Edison, New Jersey 08837
(732) 906-6817

2576763v

Mr. Haklar has knowledge of the submissions by TERMS Environmental Services, Inc. regarding PCB contamination at Veteran's Field resulting from the importation of contaminated fill material by Waterside Construction, LLC.

Tom Bambrick
First Environment, Inc.
91 Fulton Street – Suite 1
Boonton, New Jersey 07005
(973) 334-0003

Mr. Bambrick has knowledge of the remediation of contaminated material improperly imported to Veteran's Field, the location, nature and extent of contamination resulting from the contaminated fill improperly imported to Veteran's Field

4. Identify each and every person whom You have retained or intend to rely upon at trial as an expert witness and set forth in detail the facts and opinions to which each expert is expected to testify

ANSWER:

Defendant objects to this interrogatory as premature. Without waiving the foregoing or any other objection Defendant states that it has not retained any experts at this time. Defendant will provide expert reports of experts expected to testify at trial in accordance with the court's scheduling orders.

5. Identify each and every person other than those named in the response to Interrogatory No. 4 who has been retained, specifically employed or consulted by You in anticipation of litigation who is not expected to be called as a witness at trial.

19

2576763v

ANSWER:

Defendant objects to this Interrogatory as overly broad, unduly burdensome and beyond the proper scope of discovery .

6.      Explain in detail any admissions you maintain were allegedly made by or on

behalf of any party in connection with this action and attach hereto any

documents which refer or relate to Your response to this interrogatory.

ANSWER:

Defendant objects to this Interrogatory in that it seeks to compel Defendant to form and divulge legal conclusions. Without waiving the foregoing or any other objection, Defendant states that the following admissions have been made:

Fred Daibes and/or Waterside admitted to Ronald Dooney that Waterside brought material   to Veteran's Field that originated from Alcoa Site

Fred Daibes and/or Waterside admitted to Ronald Dooney that Waterside brought 8 truckloads or 9 truckloads of material from the Alcoa Site to Veteran's Field.

Various employees of Waterside admitted to employees of Neglia that material brought from the Alcoa Site to Veteran's Field was blended with other materials at Veteran's Field before it was spread in various areas of Veteran's Field

Fred Daibes admitted to Peter Lakatos of TERMS that material from the Alcoa Site had been placed under paved parking areas at Veteran's Field

7.      Explain in detail any declarations against interest you maintain were made by any

party or on behalf of any other person in connection with this action and attaché

hereto any documents which refer or relate to Your response to this interrogatory.

ANSWER:

Defendant objects to this Interrogatory in that it seeks to compel Defendant to form and divulge legal conclusions. Without waiving the foregoing or any other objection, Defendant states see the answer to No 6.

20

8.      Identify and describe all studies or inspections of the Property conducted by or on

behalf of TERMS with respect to any Hazardous Substances discovered or

allegedly present at the Property.

ANSWER:

Defendant objects to this Interrogatory as vague and ambiguous in that the terms "study" and "investigation" are not defined and are capable of differing interpretations. Defendant further objects to this Interrogatory as unduly burdensome, overly broad, vexatious and harassing in that it seeks to compel TERMS to assemble, process, manipulate and summarize information that is contained within documents which manipulation and/or summary can be performed by the requesting party and to the extent that it seeks to compel TERMS to provide information that can be obtained by other means that are more convenient, more efficient, more practical, less burdensome and/or less expensive. Without waiving the foregoing or any other objection, Defendant states that the work it conducted included, but is not limited to the following:

TERMS conducted a test pit investigation at the Property in 2011; collected samples from test pits, surface and subsurface soils; interpreted analytical results; prepared Site/Remedial Investigation Reports; prepared a Remedial Action Work Plan for removal of "hot spots" and implementation of an engineering control; observed the removal of contaminated hot spots; collected post excavation samples; required additional excavation based on initial post-excavation sample results; observed fill material brought to Veteran's Field; sampled and analyzed various proposed fill materials brought to Veteran's Field by Waterside; advised Waterside to remove material from Veteran's Field that was deemed unsuitable for use as fill material at Veteran's Field based upon analytical results; was informed by Waterside that fill material present at Veteran's Field had been brought by Waterside from the Alcoa Site; sampled the fill material present at Veteran's Field that had been brought by Waterside from the Alcoa Site; advised Waterside to leave fill material that had been brought by Waterside from the Alcoa Site in place, and to not move, spread or cover the material; received, reviewed and interpreted laboratory analysis of samples of fill material that had been brought by Waterside from the Alcoa Site to Veteran's Field and confirmed that it was contaminated with PCBs; undertook data validation of laboratory analytical data from samples of fill material that had been brought by Waterside to Veteran's Field from the Alcoa Site; and confirmed the data validation of laboratory analytical data from samples of fill material that had been brought by Waterside to Veteran's Field from the Alcoa Site with Waterside's LSRP, Rodger Ferguson; See also the answer to Nos. 10, 11, 13 and 14.

21

2576763v

9.   Please identify all persons from whom You have obtained a statement, whether written or oral, concerning any matter in issue in the Action and identify all persons with information relating to your response to this Interrogatory and attach hereto all documents relating to your response.

ANSWER:

Defendant received a letter from Mary Hogan with photographs.  Defendant refers Waterside to documents that will be provided in response to Waterside's First Request For The Production Of Documents.

10.   Identify all agreements, written or oral, entered into between Plaintiffs and Defendants and/or Third-Party Defendants, including but not limited to any contract between Plaintiff and TERMS, with respect to or relating to Veteran's Field.

ANSWER:

Defendant objects to this Interrogatory in that it seeks to compel TERMS to obtain and provide information that is within the knowledge and possession of third parties and beyond TERMS' knowledge and control.  Without waiving the foregoing or any other objection, defendant states that:

On or about August 17, 2012 Matt Vereb emailed Peter Lakatos of TERMS and identified a site known as the Reserve at Bell Air in West Orange, New Jersey as a potential source of fill material and requested a proposal from TERMS for sampling this proposed source of fill material to verify that it was suitable for use as fill material at Veteran's Field.

On or about August 17, 2012, Peter Lakatos of TERMS emailed Matt Vereb of Waterside a proposal for sampling the proposed fill material from the Reserve at Bell Air site in West Orange, New Jersey.

22

On or about August 22, 2012, Ronald Dooney and Peter Lakatos of TERMS, Mike Berliner of Neglia and Matt Vereb of Waterside attended a meeting at the offices of Neglia for purposes of reviewing soil testing procedures. At that meeting it was agreed that Waterside could use fill material other than quarry materials or blasted rock so long as the proposed material was sampled and analyzed in accordance with the testing requirements contained in the New Jersey Department of Environmental Protection ("NJDEP") Alternative and Clean Fill Guidance for SRP Sites and the results confirmed that the proposed fill material did not exceed the Residential Direct Contact Standards ("RDCS") established by the NJDEP. Edgewater's representatives instructed TERMS to work with Waterside to document that fill actually used satisfied criteria for use as clean fill. Edgewater's representatives also made it clear that it did not want the Project delayed.

It was agreed by all, including Waterside and Plaintiff, through its representatives, that Waterside would identify proposed fill materials to TERMS so that TERMS could complete the required testing and analysis before the material was brought to Veteran's Field. In the event that the analysis of the proposed fill material indicated that all contaminants were present in concentrations below the most stringent applicable standard then TERMS would advise Waterside and Plaintiff, through Neglia, that the material was suitable for use as fill material at Veteran's Field. In the event that the analysis of the proposed fill material indicated that any contaminant was present in concentrations in excess of the most stringent applicable standard then TERMS would advise Waterside and Plaintiff, through Neglia, that the material was not suitable for use as fill material at Veteran's Field and Waterside would not bring the material to Veteran's Field.

TERMS was never given control of job or the job site, it had no authority or ability to stop Waterside if Waterside ignored TERMS' directions/instructions and could not prevent Waterside or anyone else from entering the site.

In a conversation between Mr. Dooney of TERMS and Fred Daibes of Waterside, when Mr. Dooney raised the issue of the OSHA certificates Mr. Daibes responded "[w]e know the environmental game, you'll get what you need."

On or about August 28, 2012, Waterside requested that TERMS conduct the sampling necessary for the proposed Route 3 source and executed a proposal from TERMS for that sampling.

On or about September 27, 2012 Waterside, at the direction of Daibes, brought to Veteran's Field approximately five truckloads of soil from 440 River Road, material that had been deemed unsuitable for use by TERMS on or about August 21, 2012. The material from 440 River Road consisted of dirt or soil, concrete, blacktop, debris and rock. Upon discovering that Waterside had brought this material to Veteran's Field Noah Skyta of TERMS advised Fred Daibes of Waterside that this material could not be used at Veteran's Field and had to be

23

removed. Dino Menzella of Neglia, upon hearing Mr. Skyta's instructions to Mr. Daibes stated to Mr. Skyta "[y]ou can't talk to Freddy like that" Mr. Skyta turned additional truckloads of this material away from Veteran's Field. Bryan Christiansen of Waterside was also present. TERMS subsequently advised Waterside that if this material was screened and the soil, blacktop, concrete and debris removed, then Waterside could use the remaining rock as part of the sub-base for the paved parking area to be constructed. TERMS advised Waterside that all soil, concrete, blacktop and debris from the 440 River Road material had to be removed from Veteran's Field.

On or about September 27, 2012, Waterside brought shot rock from the Hudson Avenue site in Fort Lee, New Jersey to Veteran's Field without prior sampling and analysis by TERMS. Mike Berliner of Neglia determined that this shot rock material could be utilized as part of the rip rap on the Hudson River Walkway which was not part of the Veteran's Park Project and was not subject to oversight by TERMS.

On or about September 28, 2012, TERMS reiterated to Waterside that TERMS needed to know the source of material being brought Veteran's Field before it was actually brought to Veteran's Field so that TERMS could coordinate the sampling and analysis to confirm that the proposed fill material was suitable for use at Veteran's Field and that Waterside should notify TERMS at the beginning of each day, or on the day before, where Waterside would be bringing fill material from. TERMS also reminded Waterside that it needed the OSHA certificates. ON or about September 28, 202, Matt Vereb of Waterside agreed to provide advance notice of proposed fill materials as requested and promised to obtain and provide the OSHA certificates.

Mr. Dooney attended a meeting at the offices of Waterside with Mr. Daibes and Mr. Vereb of Waterside, Mr. Berliner of Neglia and Greg Franz from, Edgewater. Mr. Daibes stated that they have to move this job along and that "[e]verytime I try to bring in soil Noah tells me I can't." Mr. Daibes further stated that it was clear that Noah wants to stop the job and that "[y]ou better get him in line or else TERMS is not going to be on this job anymore." Mr. Dooney stated "[l]ook Fred, nobody's trying to bust your chops, we just have to make sure it's clean." Mr. Dooney also stated that you couldn't cap dirty stuff with dirty stuff and certainly not with dirtier stuff. Mr. Daibes then responded by saying that this stuff was not dirtier, that it was just above the standards. Mr. Dooney then stated that if it has some contamination at a lower concentration, then you can use it but only if you have a beneficial reuse permit. Mr. Daibes then said that a permit was going to take too long, picked up the telephone and said he was going to call Kim Guadano and that he would have the permit in a day. Mr. Daibes then asked "[w]hat is it we're asking for exactly?" Mr. Dooney responded "[a] beneficial reuse permit." Mr. Daibes then hung up the telephone and said "[o]k, let's just do it the right way" and indicated that he was no longer going to pursue a beneficial reuse permit.

24

Mr. Dooney received a telephone call from Mr. Berliner in which Mr. Berliner stated "I'm not telling you what to do, but if you don't replace Noah or remove him from the site the town's going to fire TERMS from the site."

In or about late September to early October, 2012, Dino Menzella of Neglia called Peter Lakatos of TERMS and advised him that Waterside was putting rock under the southern parking lot as sub-base but it was unknown if that material was the material that had been brought to the site on September 27, 2012.  Mr. Lakatos went to Veteran's Field and met with Mike Berliner and Dino Menzella of Neglia and observed, with them, that the material in question had been compacted and combined with other site materials.  Mr. Berliner stated that "[t]hey've already spread it.  What do you want to do?"  Mr. Lakatos spoke with Ronald Dooney of TERMS via telephone and explained the situation, including the fact that the initial testing of mixed materials from 440 River Road contained low level PAHs and that it was now impossible to distinguish that material from other materials on site.  Mr. Dooney recommended that the material be left in place and covered with a fabric filter and two feet of clean fill.  Mr. Berliner did not object to this proposed solution.

When the Route 3 material was no longer available Mr. Dooney received a telephone call from Mr. Berliner.  When Mr. Dooney asked what was going on with respect to the Route 3 material Mr. Berliner indicated that the Route 3 contractor had wised up and found someone to pay for the material and that Fred was not going to pay for it.

Mr. Dooney spoke with Mr. Franz regarding the testing of proposed fill material indicating that Waterside was responsible for testing the material pursuant to the contract.  Mr. Franz responded that the Borough did not want Waterside to test the material, they wanted TERMS to test it and were willing to pay TERMS to do so.  Mr. Dooney questioned that the Borough was really going to do that when it was Waterside's obligation and the response from Mr. Franz was yes.  Mr. Dooney advised Mr. Franz that Waterside had not paid TERMS' bill for prior testing and Mr. Franz told Mr. Dooney "[j]ust put it on your next bill to us."

Ronald Dooney of TERMS had a series of telephone conversations and at least one meeting with Greg Franz in late 2012 to review the parameters of TERMS proposals for providing oversight and LSRP services for the Veteran's Field Project.  During these communications, Mr. Dooney and Mr. Franz discussed the fact that Waterside was behind schedule and the desirability of having TERMS personnel on site full time.  Mr. Dooney advised Mr. Franz that he could see the project taking another 9 months to a year to complete and that he did not think that Edgewater would want to pay TERMS for providing such service.  They discussed the fact that Waterside had been instructed to advise/alert TERMS when they were going to be conducting work at Veteran's Field.  Mr. Dooney

25

asked Mr. Franz what he wanted TERMS to do and stated that if TERMS kept someone out at the site full time it would be a big number. Mr. Franz responded that he wanted to keep TERMS' costs reasonable and that he did not think that TERMS needed to have someone out at the site on a full time basis.

Mr. Dooney had telephone conversations and at least one meeting with Mike Berliner and Greg Franz regarding continuing testing of proposed fill material for Waterside. Mr. Dooney indicate that Waterside was having TERMS sample a source for 200 yards in one location, for 500 yards in another and that the testing for such small amounts of material at new sites was disproportionately costly because of the sampling frequency requirements. Mr. Franz instructed Mr. Dooney to just test whatever Waterside wants.

On or about October 2, 2012, Peter Lakatos of TERMS met at Waterside's offices with Mike Berliner and Mike Neglia of Neglia and Fred Daibes and Bryan Christiansen of Waterside. Waterside's representatives stated "[w]e want Noah out. He's the man of every time we want to do something he says no. We're trying to get this done in a timely manner and need someone who is going to work with us." Mr. Daibes stated "[w]e have to go through Pete for all the answers, we don't see Ron, Pete's the one who knows what's going on." The Neglia representatives stated that "[i]f you're asking for Pete to be up here and to fire Noah, we're not comfortable with that; you're picking a particular guy to be your oversight." Mr. Lakatos stated that "Ron doesn't really want me up there at the field, I've got other things to do." The Waterside representatives responded by stating "[n]o, no, we'll take anybody but Noah." The Neglia representatives asked Mr. Lakatos how he felt about this and he responded that they would have to ask Mr. Dooney. Mr. Daibes then stated that "[i]f Noah is still there we'll need to find another environmental consultant, I can't work with TERMS." The Neglia representative then asked "Pete, is there anything we can do to get someone else up here and get Noah off the job?" Mr. Lakatos called Mr. Dooney and Mr. Dooney told Mr. Lakatos that "[w]e'll send Joe [Noon] up, I can't have you up there every day and I'll have to fire Noah."

On or about March 25, 2013 Waterside brought approximately 60 loads of soil, crushed concrete, stone, brick and asphalt to Veteran's Field without prior notice to TERMS. On or about March 27, 2013 TERMS made inquiry to Waterside as to the source of this material and was advised that the source was the Undercliff site. A visual inspection of the material, however, determined that it did not appear to be representative of Undercliff soils. Peter Lakatos of TERMS sampled the material and the results indicated that it was contaminated. Upon inspection of Veteran's Field TERMS discovered that the material in question appeared, by virtue of machinery tracks leading to the retaining wall and brick walkway, to have been spread over at the retaining wall and brick walkway which was not part of the Veteran's Field Project for remediation of the historic fill, and therefore

26

was not subject to review by the LSRP. Peter Lakotas of TERMS advised Mike Berliner of Neglia of the foregoing facts and Mr. Berliner did not voice any objection.

In 2013 Ronald Dooney and Peter Lakatos of TERMS attended several meetings at the offices of Neglia with Mike Neglia and Mike Berliner of Neglia and Greg Franz, Philip Boggia, Esq. and Jim Delaney of Edgewater. At these meetings Mr. Boggia stated "[i]t's obvious he [Fred Daibes] did this, he's got to take care of it and it's got to be done quickly, like tomorrow." Mr. Boggia then asked "[w]hat has to be done, he [Fred Daibes] is paying for it, I don't care what it costs." Mr. Lakatos advised all present that disposal was going to be expensive and reviewed various alternatives, including, among others, the use of a central dump site and rail cars. Mr. Lakatos further advised all present that there needed to be a self-implementing plan and a remedial action workplan prepared and submitted to the USEPA and NJDEP. Mr. Lakatos explained to all present that there were two options for the remediation. The first option was to undertake a risk based approach since this was not a spill or historic contamination, but that this approach required that TERMS take more grid samples and obtain the prior approval of NJDEP which would take 30 days. Mr. Lakatos explained that the second option was to take a performance based approach which involved a 10 foot by 10 foot grid approach with composite samples and that this was a more time consuming and more expensive approach. Mr. Boggia stated "[w]hy should we do more, we know where it [the contamination] is?" Mr. Lakatos advised all present that the only way to get the cleanup done without review was to use the performance based approach. Mr. Boggia then stated that they should use the risk based approach and asked Mr. Lakatos if TERMS had enough samples. Mr. Lakatos advised all present that it was up to USEPA and they could require more samples. Mr. Berliner inquired about the potential of using artificial turf to help address the contamination issue and Mr. Dooney responded by stating that they would still have to be some cleanup to some level. Mr. Boggia also responded by stating "[n]o, they're going to clean it; there were no PCBs before, they have to take it all out." At a meeting after Waterside's representatives indicated that they wanted to have TERMS' sampling data validated, Mr. Boggia stated that it "[w]ould take forever to validate more samples, let's submit this, go with what we have now and see what they [USEPA] say in thirty days." Mr. Lakatos stated that the cleanup was not going to be surgical and that there would likely be hot spots remaining after the initial excavation that would have to be excavated further. Based upon these discussions and the instructions and/or directions received from Plaintiff's representatives, TERMS prepared and submitted a SIP to the USEPA using the performance based alternative with confirmation sampling.

27

Plaintiff and Waterside agreed to engage in a process of validating sampling data and Waterside agreed to pay for the data validation services.

Although Waterside agreed to pay for the data validation services, plaintiff directed Terms to bill plaintiff for that work.

TERMS submitted proposal to Edgewater for investigation and remediation of the fill material from the Alcoa Site and plaintiff approved that TERMS proposal and the retention of TERMS for the investigation and remediation of the fill material from the Alcoa Site at a Borough Council meeting on February 18, 2014.

Defendant also refers Waterside to documents that will be provided in response to Waterside's First Request For The Production Of Documents.

11.   Identify and describe all sampling and testing of fill material conducted by

TERMS or any other person or entity with respect to or relating to the Property.

ANSWER:

Defendant objects to this Interrogatory in that it seeks to compel TERMS to obtain and provide information that is within the knowledge and possession of third parties and beyond TERMS' knowledge and control. Defendant further objects to this Interrogatory as unduly burdensome, overly broad, vexatious and harassing in that it seeks to compel TERMS to assemble, process, manipulate and summarize information that is contained within documents which manipulation and/or summary can be performed by the requesting party and to the extent that it seeks to compel TERMS to provide information that can be obtained by other means that are more convenient, more efficient, more practical, less burdensome and/or less expensive. Defendant further objects to this Interrogatory to the extent that it is duplicative of prior Interrogatories. Defendant also objects to this Interrogatory to the extent that it is unlimited with respect to time. Without waiving the foregoing or any other objection, defendant states that:

On or about June 22, 2012, Mike Berliner of Neglia emailed TERMS and provided analytical data for materials at a source of fill material proposed to be used by Waterside. The proposed source was the Arilex/Infinity, LLC property at 340-342 Old River Road, Edgewater, New Jersey

On July 13, 2012 Matt Vereb of Waterside emailed Peter Lakatos of TERMS analytical data for the proposed Arilex/Infinity, LLC source

28

On July 16, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside via email that the material from the proposed Arilex/Infinity, LLC source would require additional sampling and analysis before it could be used at Veteran's Field

On July 27, 2012 Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site on Hudson Avenue in Fort Lee (just south of the George Washington bridge) as a potential source of shot rock to be used as rip rap on the sea wall and advised TERMS that Waterside was bringing that rock to Veteran's Field.

In response Peter Lakatos of TERMS advised Matt Vereb, on or about July 30, 2012, that the material from Fort Lee must be separately stockpiled and not used until testing could be performed.

On or about August 9, 2012 Matt Vereb Lakatos of Waterside identified to Peter Lakatos of TERMS a site known as 440 River Road, Edgewater, New Jersey as a potential source of fill material.

On or about August 14, 2012, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site along State Route 3 in Clifton, New Jersey as a potential source of fill material and provided information about its quality. Peter Lakatos of TERMS advised Matt Vereb that the information provided was not sufficient and that additional sampling was required in order to verify whether this was suitable for use at Veteran's Field.

On or about August 14, 2012, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site in West Orange, New Jersey as a potential source of fill material and provided information about its quality.

On or about August 16, 2012, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and requested that TERMS provide a proposal to Waterside for performing the sampling of the material from along State Route 3 in Clifton, New Jersey to verify that it was suitable for use as fill material at Veteran's Field.

On or about August 17, 2012 Matt Vereb emailed Peter Lakatos of TERMS and identified a site known as the Reserve at Bell Air in West Orange, New Jersey as a potential source of fill material and requested a proposal from TERMS for sampling this proposed source of fill material to verify that it was suitable for use as fill material at Veteran's Field.

29

On or about August 17, 2012, Peter Lakatos of TERMS emailed Matt Vereb of Waterside a proposal for sampling the proposed fill material from the Reserve at Bell Air site in West Orange, New Jersey.

On or about August 17, 2012, Peter Lakatos of TERMS emailed Matt Vereb of Waterside a proposal for sampling the proposed fill material from along State Route 3 in Clifton, New Jersey. Pete Lakatos of TERMS inspected the proposed Route 3 fill material source and determined that it would most likely satisfy the requirements for use as clean fill. Mr. Lakatos collected samples of the Route 3 material for analysis and based upon his inspection of the Route 3 material Mr. Lakatos advised Waterside that it could bring the material to Veteran's Field but that it should be separately stockpiled and not used until the samples had been analyzed and it was confirmed that the material was suitable for use as fill as Veteran's Field.

On or about August 17, 2012 Matt Vereb emailed Peter Lakatos of TERMS and identified a site known as Highlands at Hilltop, 200 White Rock Road, Verona, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

In August, 2012, Peter Lakotas collected a sample of material from the site known as Highlands at Hilltop and asked Matt Vereb if he really wanted Terms to test this material for clean fill

On or about August 17, 2012, Peter Lakatos of TERMS advised Steve Reddington of Waterside that virgin rock from the Arilex/Infinity site that had been transported to 440 River Road in Edgewater, New Jersey would be suitable for use at Veteran's Field provided that it was crushed and analysis of a sample of the fines indicated that it conformed to the residential direct contact standards.

On or about August 21, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside and Mike Berliner of Neglia that the test results for the proposed source at 440 River Road in Edgewater, New Jersey indicated that the soil from this site was not suitable for use at Veteran's Field because it contained PAHs and low levels of pesticides.

30

On or about August 21, 2012 Matt Vereb emailed Peter Lakatos of TERMS and identified two sites known as Towne Centre Urban Renewal Co., consisting of sites at 679 Anderson Avenue and 689-691 Anderson Avenue, Cliffside Park, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about August 22, 2012 Peter Lakatos of TERMS advised Matt Vereb of Waterside that the Towne Centre source required more sampling and analysis

On or about August 23, 2012 Matt Vereb emailed Peter Lakatos of TERMS and provided information on compost proposed to be added to top soil.

On or about August 24, 2012, Peter Lakatos of TERMS advised Matt Vereb that the proposed compost required a certification from the source.

On or about August 28, 2012, Waterside requested that TERMS conduct the sampling necessary for the proposed Route 3 source and executed a proposal from TERMS for that sampling.

On or about August 30, 2012, Mike Berliner of Neglia requested that Ron Dooney of TERMS contact Downs Tree Service to discuss the required testing for a proposed source of topsoil

On or about August 31, 2012 Matt Vereb of Waterside identified to Mike Berliner of Neglia, a proposed source of top soil in Sparta, New Jersey provided by Grinnell Recycling, Inc. and included a certification from Grinnell

On or about August 31, 2012, Matt Vereb emailed Peter Lakatos of TERMS and identified a site known as Hackensack Hospital as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about September 4, 2012 Peter Lakatos of TERMS advised Matt Vereb of Waterside that the Hackensack Hospital source required more sampling and analysis

On or about September 5, 2012, Matt Vereb emailed Peter Lakatos of TERMS and identified a site known as Boverini Stadium, Passaic, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

31

On or about September 5, 2012, Matt Vereb of Waterside email Peter Lakatos of TERMS test results for the proposed topsoil from Grinnell in Sparta, New Jersey

On or about September 6, 2012 Peter Lakatos of TERMS advised Matt Vereb of Waterside that the Boverini Stadium source was not suitable for use at Veteran's Field

On or about September 6, 2012, Ron Dooney of TERMS advised Matt Vereb of Waterside that the proposed top soil source from Grinnell in Sparta, New Jersey was acceptable for use at Veteran's Field provided that Grinnell's LSRP, Andrew Robinson, provided a certification that the material qualified as clean fill

On or about September 12, 2012 Peter Lakatos of TERMS advised Matt Vereb of Waterside that the material from the East side of Route 3 was suitable for use at Veteran's Field, but limited to a quantity of 600 loads (12,000 cubic yards)

On or about September 24, 2012 Matt Vereb emailed Peter Lakatos of TERMS additional test results for the proposed top soil source from Grinnell in Sparta, New Jersey.

On or about September 24, 2012 Matt Vereb emailed Peter Lakatos of TERMS additional test results for the proposed source previously identified as Towne Centre in Cliffside Park, New Jersey.

On or about September 25, 2012 Peter Lakatos of TERMS emailed Matt Vereba and advised him that the proposed Towne Centre material was not suitable for use at Veteran's Field.

On or about September 25, 2012 Matt Vereb emailed Peter Lakatos of TERMS and identified a site known as Boverini Stadium, Passaic, New Jersey as a potential source of fill material and provided some soil testing data regarding new soils from this proposed source.

On or about September 25, 2012 Peter Lakatos of TERMS emailed Matt Vereb of Waterside and advised him that the sample for the newly proposed material from Boverini Stadium was not sufficient and that additional sampling and analysis was required.

32

In or about September, 2012, Noah Skyta of TERMS asked Fred Daibes to provide the certification from Andrew Robinson, LSRP, of Groundworks certifying the topsoil as clean fill. Mr. Daibes promised to provide the certification.

In or about September, 2012, an engineer from Neglia examined the topsoil from Grinnell and advised that it was more like mulch than topsoil and that it was not suitable for use on the ballfield.

On or about September 27, 2012, Waterside brought shot rock from the Hudson Avenue site in Fort Lee, New Jersey to Veteran's Field without prior sampling and analysis by TERMS. Mike Berliner of Neglia determined that this shot rock material could be utilized as part of the rip rap on the Hudson River Walkway which was not part of the Veteran's Park Project and was not subject to oversight by TERMS.

On or about October 3, 2012, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as 145-68 28th Street, Rosedale, New York as a potential source of fill material and provided some soil testing data regarding new soils from this proposed source.

On or about October 3, 2012, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as the Stella Doro site in the Bronx, New York as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about October 4, 2012 Peter Lakatos of TERMS emailed Matt Vereb of Waterside and advised him that the proposed material from the Stella Doro site in the Bronx, New York was not suitable for use at Veteran's Field.

On or about October 4, 2012 Peter Lakatos of TERMS emailed Matt Vereb of Waterside and advised him that the proposed material from 145-68 28th Street, Rosedale, New York was not suitable for use at Veteran's Field.

On or about October 4, 2012, Matt Vereb emailed Peter Lakatos and requested that TERMS sample a proposed site situated at Undercliff Avenue.

On or about October 9, 2012, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified the Westbound side of Route 3 in Clifton, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

33

On or about October 9, 2012 Peter Lakatos of TERMS emailed Matt Vereb of Waterside and advised him that while an initial review of the data for he soils from the Westbound side of Route 3 appeared good, more samples were needed.

On or about October 11, 2012, Matt Vereb of Waterside identified to TERMS a site at 521 Livingston Avenue in Norwood, New Jersey as a potential source of fill material.

On or about October 12, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material in Norwood, New Jersey would need to be sampled and analyzed.

On or about October 15, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside that material from Undercliff and from Route 3 Eastbound and Westbound sites in Clifton, New Jersey were still awaiting receipt of laboratory analysis, TERMS had not yet been requested to sample material from Route 3 Westbound in Lyndhurst, New Jersey and that if any of this material was brought to Veteran's Field it had to be stockpiled separately until testing results indicated whether or not they were suitable for use at Veteran's Field. Matt Vereb of Waterside confirmed in an email to Peter Lakatos that material being brought to Veteran's Field was previously approved material from Eastbound Route 3.

On or about October 15, 2012, Peter Lakatos emailed Matt Vereb and advised him that an additional 2000 cubic yards of material from the Eastbound Route 3 site in Clifton, New Jersey was acceptable for use at Veteran's Field. Mr. Lakatos also advised Mr. Vereb that all virgin rock and 500 cubic yards of soil from the Undercliff site was acceptable for use at Veteran's Field.

On or about October 18, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material in Norwood, New Jersey would need to be sampled and analyzed.

On or about October 22, 2012, Matt Vereb of Waterside identified to TERMS a site at 16 Graham Street in Alpine, New Jersey as a potential source of fill material.

On or about October 23, 2012, Matt Vereb of Waterside identified to TERMS a site in Fort Lee, New Jersey as a potential source of fill material.

34

On or about October 24, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material in Fort Lee, New Jersey was not suitable for use at Veteran's Field.

In or about October, 2012, Waterside identified to TERMS a site in Ridgewood, New Jersey as a potential source of fill material.

In or about October, 2012, Waterside identified to TERMS a site in Oakland, New Jersey as a potential source of fill material.

On or about November 6, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed sources for fill material in Norwood, Oakland and Alpine, New Jersey were all suitable for use at Veteran's Field and that the proposed source in Ridgewood, New Jersey was not suitable for use at Veteran's Field.

On or about December 3, 2012, Mike Berliner identified to TERMS a site along Route 5 as a proposed source of fill material for Veteran's Field.

On or about December 3, 2012 Peter Lakatos of TERMS suggested to Mike Berliner that the material from Route 5 could be used as rip rap on the Hudson River Walkway sea wall project which was not part of the Veteran's Field Project and therefore, not subject to review by TERMS.

On or about March 25, 2013 Waterside brought approximately 60 loads of soil, crushed concrete, stone, brick and asphalt to Veteran's Field without prior notice to TERMS. On or about March 27, 2013 TERMS made inquiry to Waterside as to the source of this material and was advised that the source was the Undercliff site. A visual inspection of the material, however, determined that it did not appear to be representative of Undercliff soils. Peter Lakatos of TERMS sampled the material and the results indicated that it was contaminated. Upon inspection of Veteran's Field TERMS discovered that the material in question appeared, by virtue of machinery tracks leading to the retaining wall and brick walkway, to have been spread over at the retaining wall and brick walkway which was not part of the Veteran's Field Project for remediation of the historic fill, and therefore was not subject to review by the LSRP. Peter Lakotas of TERMS advised Mike Berliner of Neglia of the foregoing facts and Mr. Berliner did not voice any objection.

35

On or about April 16, 2013 Peter Lakatos of TERMS advised Matt Vereb of Waterside, as well as Mike Berliner and Jason (Dino) Menzella of Neglia, that the test results indicated that the material from the Undercliff site was not acceptable for use at Veteran's Field and had to be removed.

In or about April, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside about a site located at Horse Hill Road, Hanover, New Jersey as a potential source of fill material.

On or about April 26, 2013, Peter Lakatos of TERMS sampled the material at Horse Hill Road.

In or about May, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the test results indicated that the material from Horse Hill Road was suitable for use at Veteran's Field, however, Mr. Vereb indicated that the site was too far from Veteran's Field and that Waterside would not use that material.

On or about May 1, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site located at 76th Street in North Bergen, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about May 2, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as 1099 Hendricks Causeway in Ridgefield, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about May 2, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material at 1099 Hendricks Causeway in Ridgewood, New Jersey was not suitable for use at Veteran's Field

On or about May 2, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as 2111 Hope Avenue as a potential source of fill material and provided some soil testing data regarding this proposed source.

36

On or about May 3, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the testing provided for the proposed source of fill material at 2111 Hope Avenue was missing various analytical parameters and could not be deemed usable at Veteran's Field without further testing.

On or about May 6, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as Wallace Trucking in Pennington Park, as a potential source of fill material and provided some soil testing data regarding this proposed source. This material was never sampled and never used n connection with the Veteran's Field Project.

On or about May 20, 2013, Mike Berliner of Neglia emailed Peter Lakatos of TERMS and asked him to call Matt Vereb of Waterside about some soil from Paramus Catholic.

On or about May 21, 2013, Mike Berliner of Neglia emailed Peter Lakatos of TERMS and advised him that the soil from Paramus Catholic was no longer available.

On or about May 30, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as 333 Westfield Avenue, Elizabeth, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about May 30, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material at 333 Westfield Avenue, Elizabeth, New Jersey was not suitable for use at Veteran's Field.

In or about July, 2013, Waterside identified to TERMS a site designated as Lawton and Anderson as a potential source of fill material.

On or about July 1, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as 7373 West Side, North Bergen, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

37

On or about July 3, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material at 7373 West Side, North Bergen, New Jersey was not suitable for use at Veteran's Field.

On or about July 4, 2013, Mike Berliner of Neglia emailed Peter Lakatos of TERMS and identified a site known as 646 Undercliff Avenue, Edgewater, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about July 4, 2013, Peter Lakatos of TERMS advised Mike Berliner of Neglia that the proposed source for fill material at 646 Undercliff Avenue, Edgewater, New Jersey had previously been sampled and deemed not to be suitable for use at Veteran's Field.

On or about July 12, 2013, Peter Lakatos of TERMS advised Mike Berliner of Neglia and Matt Vereb of Waterside that the surface materials at the proposed source for fill material known as Lawton and Anderson was not suitable for use at Veteran's Field. Peter Lakatos subsequently sampled fines and rock from an excavation that was approximately 50 feet deep and advised Mike Berliner of Neglia and Matt Vereb of Waterside that the fines from the excavation were not suitable for use at Veteran's Field but that the rock was suitable for use at Veteran's Field.

Mr. Dooney had a series of telephone calls with Mike Berliner of Neglia regarding the material brought to Veteran's Field by Waterside from the unknown source. Mr. Berliner indicated that he had had a conversation with Peter Lakatos of TERMS who had advised him that some of the material had tested dirty and that Mr. Lakatos had suggested that he call Ron about what they were going to do to document the removal of this material. Mr. Berliner indicated that Waterside was asking what needed to be done to correct this issue and stated "[w]e've got to address this right away. What do we have to do to do that?" Mr. Dooney said that they had to get rid of at least some of this material if not all of it; take out 5 or 6 loads, approximately 100 yards, and give me the manifests. Mr. Berliner than asked "[i]f I get them to take out 100 yards and give you manifests that will be enough?" Mr. Dooney said yes and Mr. Berliner then said that he would get them to do that.

38

On or about July 26, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that if Waterside provided test results and a certification from a LSRP authorizing the use of soil from 646 Undercliff Avenue, Edgewater, New Jersey that Waterside could use 20 tons of soil from that source as fill material at Veteran's Field.

On July 29, 2013, Mr. Dooney met Mr. Daibes at Veteran's field to review material that Waterside had brought to the site. Mr. Dooney observed debris and at least one drum in the material that had been brought to the site. Mr. Dooney stated to Mr. Daibes "[y]ou're saying this stuff is clean, I almost tripped over a drum." Mr. Daibes said that the material was coming from a residential site and was clean. Mr. Dooney then said that it did not matter, that they still had to test it because they were using it on a site remediation program site. When Mr. Dooney pointed out the drum and other debris Mr. Daibes responded by saying that he didn't know how that got mixed in. Mr. Dooney then told Mr. Daibes that he had been told that Mr. Daibes had approvals for fill material from his own LSRP, but that he hadn't seen any such approvals and that he still had to approve the material as the LSRP for the site. Mr. Daibes asked Mr. Dooney to come back to his office where he showed him a letter from Andrew Robinson of Groundworks. Mr. Dooney read the letter which stated that one sample had been collected and analyzed, that the results were below the standards, but that the author was not the LSRP of record and that the were no representations about how many samples would be needed. Mr. Dooney asked Mr. Daibes if he had read the letter. Mr. Daibes said that he had not and asked what it said. Mr. Dooney told Mr. Daibes that its for one test which is good for 20 yards. Mr. Dooney then said to Mr. Daibes that he had heard the Mr. Daibes was telling people that he had approval from a LSRP. Mr. Daibes responded by stating no, that he was telling them that he had a source.

On or about August 22, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as Hollywood Memorial as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about August 30, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as Livingston Street, Northvale as a potential source of fill material and provided some soil testing data regarding this proposed source.

39

On or about September 3, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material at Livingston Street, Northvale was not suitable for use at Veteran's Field.

On or about September 10, 2013, Peter Lakatos of TERMS sampled the material at Hollywood Memorial. Peter Lakatos of TERMS subsequently advised Matt Vereb of Waterside that the proposed source for fill material at Hollywood Memorial was acceptable for use at Veteran's Field.

On or about September 12, 2013, Matt Follo of TERMS collected samples of material stockpiled at Veteran's Field and which had originated from the Alcoa Site.

In or about September, 2013 Waterside identified to TERMS a proposed source of fill material known as We Care and provided some soil testing data regarding this proposed source.

On or about September 19, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material known as We Care was not suitable for use at Veteran's Field.

On September 23, 2013 TERMS received the laboratory results for the initial samples of the fill material that had originated from the Alcoa Site and which confirmed that the stockpiled fill material was contaminated with, among other things, PCBs.

On September 24, 2013, Peter Lakatos of TERMS notified Matt Vereb of Waterside that the stockpiled fill material was not suitable for use at Veteran's Field and must be removed

On September 30, 2013, Peter Lakatos of TERMS visited Veteran's Field for purposes of collecting additional samples from the suspect fill material. Matt Follo of TERMS was also present as were Fred Daibes and Bryan Christianson of Waterside. When TERMS personnel tried to set up for a preliminary investigation with a geoprobe, Mr. Daibes insisted that Waterside would dig test pits for TERMS to collect samples. Mr. Daibes asked "What are you guys looking for, this stuff's all good. Don't make holes in the parking lot it's just paved." Mr. Daibes also stated that the material under the parking lot is the same material that is in the sidewalk and lighting island forms. Mr. Lakatos advised Mr. Daibes that he didn't know how much of this stuff is here, where it's been put and that he had to sample it all. Bryan Christiansen stated that "[i]t [the material] went over here"

40

indicating an area near the north parking lot. Mr. Lakatos proceeded to collect samples.

On or about October 3, 2013, TERMS received the results of the analysis of samples collected on September 30 and the results verified that the material that had been placed in the sidewalk and lighting island forms as well as the material underneath the parking lots were contaminated with PCBS.

Between October 15, 2013 and October 30, 2013, TERMS again visited Veteran's Field to collect additional samples of the suspect fil material.

In or about October, 2013, Matt Vereb of Waterside contacted Peter Lakatos of TERMS and identified a site known as Madonna Cemetery as a potential source of fill material and provided some soil testing data regarding this proposed source.

In or about October, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material at Madonna Cemetery was not suitable for use at Veteran's Field

In 2013 Ronald Dooney and Peter Lakatos of TERMS attended several meetings at the offices of Neglia with Mike Neglia and Mike Berliner of Neglia and Greg Franz, Philip Boggia, Esq. and Jim Delaney of Edgewater. At these meetings Mr. Lakatos advised all present that disposal was going to be expensive and reviewed various alternatives, including, among others, the use of a central dump site and rail cars. Mr. Lakatos further advised all present that there needed to be a self-implementing plan and a remedial action workplan prepared and submitted to the USEPA and NJDEP. Mr. Lakatos explained to all present that there were two options for the remediation. The first option was to undertake a risk based approach since this was not a spill or historic contamination, but that this approach required that TERMS take more grid samples and obtain the prior approval of NJDEP which would take 30 days. Mr. Lakatos explained that the second option was to take a performance based approach which involved a 10 foot by 10 foot grid approach with composite samples and that this was a more time consuming and more expensive approach. Mr. Boggia stated "[w]hy should we do more, we know where it [the contamination] is?" Mr. Lakatos advised all present that the only way to ge the cleanup done without review was to use the performance based approach. Mr. Boggia then stated that they should use the risk based approach and asked Mr. Lakatos if TERMS had enough samples. Mr. Lakatos advised all present that it was up to USEPA and they could require more samples. Mr. Berliner inquired about the potential of using artificial turf to help address the contamination issue and Mr. Dooney responded by stating that they would still have to be some cleanup to some level. Mr. Boggia also responded by stating "[n]o, they're going to clean it; there were no PCBs before, they have to take it all out." At a meeting after Waterside's representatives indicated that they wanted to have TERMS' sampling data validated, Mr. Boggia stated that it

`

"[w]ould take forever to validate more samples, let's submit this, go with what we have now and see what they [USEPA] say in thirty days." Mr. Lakatos stated that the cleanup was not going to be surgical and that there would likely be hot spots remaining after the initial excavation that would have to be excavated further. Based upon these discussions and the instructions and/or directions received from Plaintiff's representatives, TERMS prepared and submitted a SIP to the USEPA using the performance based alternative with confirmation sampling.

See also the answers to Nos. 8 and 10.

12.   Identify and describe the plan for sampling, analyzing and approving proposed fill material for the Property referenced in Paragraph 25 of TERMS' Answer to the First Amended Complaint.

ANSWER:

Defendant objects to this Interrogatory as vague and ambiguous in that the term "approving" is not defined and is susceptible to differing interpretations. Without waiving the foregoing or any other objection, Defendant states see the answers to Nos. 10 and 11.

13.   Identify and describe all facts in support of Your answer in Paragraph 40 of TERMS Answer to the First Amended Complaint that Waterside had placed fill material containing crushed concrete over the weekend and that some fill material had been covered with different materials.

ANSWER:

On or about September 11, 2013, Mr. Dooney received a telephone call from Mike Berliner   who told him that a town bus driver had seen Waterside running trucks from the Alcoa Site to Veteran's Field over the past weekend. In subsequent conversations it was related that it was an employee from the DPW and then, in even later conversations, a Neglia employee who witnessed the trucks coming to Veteran's Field over that weekend.

42

On or about September 11, 2013, Peter Lakatos of TERMS received a telephone call from Michael Berliner of Neglia in which Mr. Berliner advised Mr. Lakatos that Waterside had imported a large volume of fill material to Veteran's Field from an unidentified source over the weekend. Mr. Lakatos advised Mr. Berliner that TERMS would look into it.

On September 11, 2013 TERMS advised Plaintiff in writing, through Neglia, that Waterside had brought untested fill material to the site and requested confirmation from the Borough, through Neglia, that Waterside had been instructed not to cover or move the stockpiled fill material until testing results were available and that Waterside had been instructed not to bring in any additional material from the source of this material.

On or about September 12, 2013, Matt Follo of TERMS visited Veteran's Field and observed several piles of stockpiled material that were not previously present at Veteran's Field and appeared to contain crushed concrete. Mr. Follo related this information to Mr. Lakatos who instructed him to collect samples from the stockpiled material. Mr. Lakatos then called Waterside's foreman, Mark (last name unknown) and advised him that TERMS had been getting reports of large amounts of material coming in." Mark responded that "[t]he kid's [Matt Follo] on drugs; there's a couple of piles, no big impact." Mr. Lakatos instructed Waterside's foreman, Mark, not to spread or use the stockpiled material and not to bring in any additional material from the source of this material.

On or about September 29 or 30, 2013, Peter Lakatos of TERMS visited Veteran's Field and immediately observed that more material than just that contained in the stockpiles had been brought to Veteran's Field and that Waterside had not correctly or accurately described the site work to him. Mr. Lakatos observed that while certain areas of the Site had been paved, the sidewalks and lighting island had not been poured with concrete and were still open forms. Within those forms Mr. Lakatos observed the presence of pieces of crushed concrete which matched the stockpiled material that had not been moved as evidenced by both locations containing pieces of a distinctive brick with a star like pattern. By examining the sidewalk and lighting islands areas and brushing back some of the rock, Mr. Lakatos could also see that the crushed concrete material extended under the newly paved areas as well. Mr. Lakatos also observed that a 150 foot by 150 foot area had received lift material and was dressed with stone on top of it and that this was the only area on the field that had

43

been covered with crushed stone.   Mr. Lakatos then spoke to Waterside's foreman, Mark, and stated "[y]ou guys aren't supposed to bring concrete to the site, where did it come from?"   Mark only responded by stating that "[t]his is just sub-base."

In a subsequent meeting with TERMS, Waterside and Edgewater representatives, Fred Daibes admitted that the fill material imported to Veteran's Field by Waterside in September, 2013 had originated from the Alcoa Site.

See also the answer to No. 11.

14.    Identify and describe all communications, either written or oral, between any

representative or employee of TERMS and Waterside with respect to fill material

for use at the Property.

ANSWER:

Defendant objects to this Interrogatory as unduly burdensome, overly broad, vexatious and harassing in that it seeks to compel TERMS to assemble, process, manipulate and summarize information that is contained within documents which manipulation and/or summary can be performed by the requesting party and to the extent that it seeks to compel TERMS to provide information that can be obtained by other means that are more convenient, more efficient, more practical, less burdensome and/or less expensive.  Defendant further objects to this Interrogatory to the extent that it is duplicative of prior Interrogatories.  Without waiving the foregoing or any other objection, defendant states that:

A pre-construction meeting was held at the Community Center at Veteran's Field and was attended by Ronald Dooney and Noah Skyta of TERMS, Matt Vereb and another unknown representative of Waterside, Greg Franz for Edgewater, the head of the Edgewater Department of Public Works and an unknown individual from the Edgewater Health Department.  The discussion generally focused on the logistics of the Veteran's Field Project, such as the projected start date and how material was going to be brought into the site.  TERMS representatives reviewed the requirements of the Health and Safety Plan with all persons present and advised them that Waterside would need to install and use a decontamination station for the trucks and implement dust control measures consisting of using a water truck to wet the ground surface.  TERMS also advised Waterside and the others present that it needed to receive from Waterside certificates demonstrating

44

compliance with OSHA training requirements for all workers involved in the hot spot remediation portion of the project.

Subsequent to the pre-construction meeting Ronald Dooney and Noah Skyta of TERMS attended a meeting at the offices of Waterside with Mike Berliner of Neglia and Fred Daibes, Steve Reddington of Waterside and Andrew Robinson, a LSRP occasionally used by Waterside and Daibes. Waterside was reminded that the bid specifications required that Waterside provide certified clean fill that originated from a quarry or a source of blasted rock. Mr. Daibes questioned where he was going to obtain the fill material required for the Project and stated that everyone had to work together on the project. At this meeting Waterside also asked additional questions about the logistics of the project, the timing of activities and testing requirements for fill material. TERMS representatives explained that the Project required Waterside to excavate and remove the contaminated hot spots first. TERMS also advised Waterside that if they were using rock from an undisturbed geological formation that they would have to test one sample to verify that it was suitable as fill material and that any other proposed fill material would have to be tested in accordance with the applicable guidance documents and regulations. Daibes questioned the testing requirements and Mr. Dooney stated that this was not a typical construction project and that because it was a site subject to NJDEP's Site Remediation Program that everything being used for fill had to be tested. A discussion ensued during which TERMS described how proposed alternate fill materials could be tested and analyzed to determine if they met the criteria for use as alternate fill in lieu of certified clean fill. Mr. Daibes asked why he could not use contaminated fill material and was advised by Ron Dooney of TERMS that Waterside would need to obtain a Beneficial Reuse Permit from the NJDEP in order to do so. Mr. Dooney made a comment to the effect that by obtaining a beneficial reuse permit Waterside would essentially be turning Veteran's Field into a landfill. Mr. Daibes did not like this comment and stated that he was going to call Karen Kloo of NJDEP who he stated was a good friend of his. Mr. Dooney also described the requirements for use of contaminated fill materials including the requirement that the contaminants had to be the same as the contaminants already at the site. Discussion of potential sources for fill material and topsoil was held. Mr. Dooney advised that unless Waterside was using quarry certified material any proposed fill material would have to be tested in accordance with NJDEP requirements and that the results must show that there were no contaminants above residential direct contact standards. Mr. Daibes stated that he would get his own LSRP to certify the fill materials and that he knew tons of them. At the end of the meeting Mr. Daibes announced that he had changed his mind about pursuing beneficial reuse and was not going to call Karen Kloo of NJDEP "because the town would give him too much grief."

A site layout meeting was held at Veteran's Field and attended by Ronald Dooney and Noah Skyta of TERMS, Matt Vereb of Waterside, Mike Berliner and another unknown employee of Neglia, the head of the Edgewater Department of Public

Works and the Edgewater Borough Police Chief. Discussion of the site layout was held, including a review of where and how trucks would enter the site, where they would be loaded and where and how they would leave the site. Mr. Dooney advised all present that TERMS still needed to receive from Waterside certificates demonstrating compliance with OSHA training requirements for all workers involved in the hot spot remediation portion of the project and that they would need to control dust and should have a water truck at the Site. TERMS representatives also reiterated that dust control was a big issue and that Waterside needed to supply a water truck. Waterside representatives indicated that they were going to start the project at the end of June, 2012. TERMS reviewed the hot spot areas and what was involved in their removal. Waterside asked whether they had to do the hot spot removal and wait or if they could do other work too. Mr. Dooney advised those present that Waterside would have to wait for the results of post-excavation samples to confirm that all the contamination had been removed and that there was a risk of spreading the contamination if Waterside worked in nearby areas at the same time. Waterside representatives then stated that they were going to cordon off the hot spot areas so that they could work in other areas. Mr. Dooney indicated that was ok as long as Waterside provided good clearance around the hot spots in case the post excavation sampling results indicated that any of the hot spot excavations had to be expanded.

On or about August 22, 2012, Ronald Dooney and Peter Lakatos of TERMS, Mike Berliner of Neglia and Matt Vereb of Waterside attended a meeting at the offices of Neglia for purposes of reviewing soil testing procedures. At that meeting it was agreed that Waterside could use fill material other than quarry materials or blasted rock so long as the proposed material was sampled and analyzed in accordance with the testing requirements contained in the New Jersey Department of Environmental Protection ("NJDEP") Alternative and Clean Fill Guidance for SRP Sites and the results confirmed that the proposed fill material did not exceed the Residential Direct Contact Standards ("RDCS") established by the NJDEP. Edgewater's representatives instructed TERMS to work with Waterside to document that fill actually used satisfied criteria for use as clean fill. Edgewater's representatives also made it clear that it did not want the Project delayed.

Various discussions at various times were held between representatives of TERMS and Waterside regarding the requirements for testing fill to certify it as clean and suitable for use at Veteran's Field.

On or about July 20, 2012, Peter Lakatos of TERMS emailed to Steve Reddington of Waterside a full copy of the NJDEP Guidance document Alternative and Clean Fill Guidance For SRP Sites, NJDEP, updated December 29, 2011, Version 2.0.

46

In or about September, 2012, Noah Skyta of TERMS and Fred Daibes of Waterside got into a shouting match at Veteran's Field over the material being brought to Veteran's Field by Waterside. Dino Menzella was present although not a participant in the discussions between Mr. Sktya and Mr. Daibes. Mr. Skyta told Mr. Daibes that TERMS still had not received the OSHA certificates from Waterside, that they needed to provide and use a water truck for dust control and that Waterside had to test everything it was bringing into Veteran's Field before it actually came to Veteran's Field so that if it's bad it doesn't get mixed and we don't have to take it all out. Mr. Berliner of Neglia somehow became aware of this situation and called Mr. Dooney and told him that Mr. Daibes was calling people at the town and that "[h]e [Daibes] was pissed that Noah was busting his chops and that he [Mr. Skyta] was causing all this to be delayed." Mr. Dooney told Mr. Berliner that he would go out to the Site. Mr. Dooney subsequently met Mr. Daibes at Veteran's Field. Mr. Daibes told Mr. Dooney that "[y]our fucking guy is trying to ruin this job. He's busting my chops, he's questioning everything we do, it's causing delays. That's not the way this job's going to go." Mr. Dooney told Mr. Daibes to slow down and that he would talk to Noah, and that maybe Noah could be more diplomatic but that this was not a typical construction project and that because it was a site subject to NJDEP's Site Remediation Program that everything being used for fill had to be tested and that everyone had to do it the right way. Mr. Daibes calmed down and said "[n]o, no, I'm going to do it right, my kids are going to be playing on this field." Mr. Daibes then complained that "[n]ow he's telling me I can't bring the stuff from my yard over here, it's clean." Mr. Daibes then suggested to Mr. Dooney that they go back to Mr. Daibes yard (440 River Road) to look at the material. Mr. Dooney agreed and he and Mr. Skyta met Mr. Daibes and Matt Vereb of Waterside at the Waterside yard. When they arrived at Waterside's yard Mr. Dooney and Mr. Skyta observed two piles of material, one consisting of recycled concrete with rebar and brick and the other containing soil with some concrete and a tank sticking out of it. Mr. Dooney stated that this was not clean fill. Mr. Daibes then asked why it had to be "clean-clean." Mr. Dooney then stated that if Waterside wanted to bring in stuff that has contamination they need to obtain a beneficial reuse permit. Mr. Skyta then stated that TERMS had already tested the material and that it could not be used at Veteran's Field. Mr. Daibes then responded by asking Mr. Skyta "[w]hat are you some sort of cowboy?" Mr. Daibes further stated that he had to get this job done and asked whether they couldn't run more tests and use it if it passed those tests. Mr. Dooney advised Mr. Daibes and Mr. Vereb that Waterside could not use this material even if they ran more tests which passed. Mr. Dooney also stated that there are different guidance documents for certified clean fill and for concrete with different testing requirements and that concrete could be worse than soil.

Mr. Skyta, on a subsequent occasion at Veteran's Field, indicated to Mr. Daibes that Waterside needed to really use a water truck to control the dust. Mr. Dooney thereafter received a call from Mr. Berliner in which Mr. Berliner stated that

2576763v

"Fred's not used to being told what to do." At a subsequent meeting between Mr. Dooney and Mr. Daibes, Mr. Daibes stated "[n]o one tells me what to do in my town."

On or about September 27, 2012, Fred Daibes or Waterside's foreman, Mark (last name unknown) asked Noah Skyta of TERMS if Waterside couldn't just blend contaminated material with clean fill and use the blended material at Veteran's Field. Mr. Skyta advised the Waterside representative that if even if it was permissible, if the contaminated material was 100 times the allowable limit they would need to blend 1 ton of contaminated material with 100 tons of clean material to reach the allowable concentration. Mr. Skyta advised the Waterside representative that this was not the way to solve the problem of finding clean fill material. Mr. Dooney had, in the past advised Waterside that it could not blend dirty soil from offsite, period.

On or about September 27, 2012 Waterside, at the direction of Daibes, brought to Veteran's Field approximately five truckloads of soil from 440 River Road, material that had been deemed unsuitable for use by TERMS on or about August 21, 2012. The material from 440 River Road consisted of dirt or soil, concrete, blacktop, debris and rock. Upon discovering that Waterside had brought this material to Veteran's Field Noah Skyta of TERMS advised Fred Daibes of Waterside that this material could not be used at Veteran's Field and had to be removed. Dino Menzella of Neglia, upon hearing Mr. Skyta's instructions to Mr. Daibes stated to Mr. Skyta "[y]ou can't talk to Freddy like that" Mr. Skyta turned additional truckloads of this material away from Veteran's Field. Bryan Christiansen of Waterside was also present. TERMS subsequently advised Waterside that if this material was screened and the soil, blacktop, concrete and debris removed, then Waterside could use the remaining rock as part of the sub-base for the paved parking area to be constructed. TERMS advised Waterside that all soil, concrete, blacktop and debris from the 440 River Road material had to be removed from Veteran's Field.

On or about March 29, 2013, Peter Lakotas reminded Matt Vereb that only 500 cubic yards from the Undercliff site had been deemed acceptable for use at Veteran's Field and that 8 more samples would have to be collected and analyzed for the material recently brought to Veteran's Field. Mr. Lakatos instructed Mr. Vereb that the additional material from the Undercliff site was not to be used or spread unless and until test results confirmed that it was suitable for use at Veteran's Field.

On or about July 12 or 13, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the approximately 40 loads of material that Waterside had delivered to Veteran's Field from July 5 to July 12, 2013 from an unknown source and which contained a mix of rock and soil with some concrete and rebar, and without prior notice to TERMS or an opportunity for TERMS to sample and test

48

this material, could not be spread until appropriate testing was performed. It was later determined that this material originated from Undercliff.

On or about July 12, 2013, Ronald Dooney and Peter Lakatos of TERMS attended a meeting at the offices of Neglia with Mike Neglia and Mike Berliner of Neglia and Fred Daibes, Bryan Christiansen, Bryan (last name unknown), and Phil (last name unknown) of Waterside. Waterside representatives asked "[w]here are we going to get material for this site." Mr. Daibes stated "I'm going to call DEP, I know people down there, this is ridiculous, too expensive and too much testing." TERMS representatives stated that "[w]e had sites that passed but you said were too far." Mr. Daibes then asked "[w]hat can we do to finish the job? Where are we going to get topsoil in New Jersey?" TERMS representatives responded that Waterside should go to Mt. Hope, Weldon or another quarry and buy clean fill. Mr. Daibes said "that will never happen" due to cost. Someone in attendance suggested using "like on like" material for fill and Mr. Dooney told everyone what the applicable regulations allowed. It was agreed at this meeting that Waterside would use 18 inches of rock and 6 inches of clean fill to achieve the two foot thick cap proposed for Veteran's Field.

A meeting was held in 2013 and attended by Mr. Dooney and Peter Lakatos of TERMS, Mr. Daibes and Matt Vereb of Waterside, Mike Neglia and Mike Berliner of Neglia and Greg Franz. During this meeting Mr. Daibes commented that "[y]ou're [TERMS] killing me here because your guys keep rejecting everything I try to bring in. All you want to do is obstruct things, you just want to keep testing." Mr. Dooney responded by indicating that TERMS was not rejecting anything, that it was just comparing test results to applicable standards to see if it satisfied the requirements for clean fill. Mr. Dooney then stated that TERMS was trying to help Waterside find soil, that TERMS had told Waterside about 50,000 yards of soil near the Mennen Arena that had already been tested and that the owner would load onto trucks for Waterside, but that Daibes had rejected that as being too far away. Mr. Daibes asked how he was going to find soil to finish the job. Mr. Dooney replied that it was not TERMS' obligation and that Waterside should go get material from Tilcon or some other quarry. Mr. Daibes stated that would never happen and observed that it cost about $15 per yard from Tilcon. Mr. Dooney stated that Waterside couldn't bring in dirty material unless it obtained a beneficial reuse permit and Mr. Daibes responded by stating that they didn't have the time to do that.

During a telephone call between Mr. Dooney and Mr. Daibes between September 12, 2013 and September 23, 2013, Mr. Daibes stated that the material brought to Veteran's Field from the Alcoa Site consisted of one truckload.

In late September, 2013 Ronald Dooney and Matt Follo of TERMS met Mr. Daibes at Veteran's Field and Mr. Daibes advised that Waterside had actually brought in 8 or 9 truckloads of the material. Mr. Dooney stated that he would have to test it to which Mr. Daibes responded that he could just take it back to the

49

source.  Mr. Dooney said that couldn't happen and that nothing was going to be done until TERMS knew what was going on.  At that time, trucks started coming into Veteran's Field with crushed concrete.  Mr. Dooney stopped the trucks and asked Mr. Daibes what ws going on and asked if the trucks contained recycled concrete.  Mr. Daibes said no, that it is coming from a recycling plant that has permits and they tested it.  Mr. Dooney obtained the name of the facility from Mr. Daibes and called it asking where it was coming from and whether it had been tested.  The person who answered the telephone stated that they had run one test.  Mr. Dooney then advised Mr. Daibes that he could not bring this stuff into Veteran's Field.  Mr. Daibes protested, stating that it was going under the sidewalks.  Mr. Dooney responded that it could not be used anywhere unless it was tested and said "Fred, we're not bringing anything else here until it's tested."  Mr. Daibes responded by stating that he had enough material at Undercliff to finish the job and asked Mr. Dooney to test that.  Mr. Daibes then stated "[y]ou know what, I don't need any more fill, but if I do, I'll bring it in from a quarry."  Mr. Daibes also then stated that he wanted TERMS to test material from another source.  Mr. Dooney asked what was going on because Mr. Daibes had just said that if he needed any material he was going to get it from a quarry.  Mr. Daibes then said that he wanted to have it tested just in case.  Mr. Follo stated that there was still a concrete slab over the area that Mr. Daibes wanted to have tested and Mr. Dooney told Mr. Daibes to give TERMS a week's notice once the slab was removed so that they could do the necessary testing.  As the conversation was ending more trucks with recycled concrete arrived at Veteran's Field and Mr. Dooney instructed Mr. Follo to turn them away.  Mr. Dooney then asked Mr. Daibes what was going on, that he had told him that the material could not be brought into Veteran's Field.  Mr. Daibes responded that those trucks must have been in transit and he had no way of knowing that.  Mr. Daibes then asked what was the problem with concrete, stating that they use it everywhere.   Mr Dooney recounted the history of the former Ford plant and the dispersal of PCB contaminated concrete from that facility and that the applicable regulations require that concrete be tested for PCBs and PAHs at a minimum before it can be recycled and reused as fill material.  Mr. Daibes asked how anyone knew that the concrete contained PCBs and Mr. Dooney responded that DEP knew based on prior experience.

In or about October, 2013, Peter Lakatos of TERMS met at Veteran's Field with Fred Daibes, Bryan Christiansen, Mark (foreman, last name unknown) and Kenny (site supervisor, last name unknown) all from Waterside.  Mr. Lakatos advised all present that the latest samples of the material from the Alcoa site had come back.  Mr. Daibes inquired as to how bad the results were and Mr. Lakatos responded that the results were pretty bad.   Mr. Lakatos advised all present that the contaminant levels exceeded Federal limits and that he still didn't "know what the hell happened here" and that he really needed to start griding out the field for more sampling. Mr. Daibes stated that he would bring workers out to help TERMS, but Mr. Lakatos advised him that Waterside personnel could not help as

50

he needed to do corings. Mr. Lakatos then advised all present that they had to get everyone off the field. A Waterside representative told subcontractors working on the playground that they had to go home because permits had not yet been issued. Mr. Lakatos advised Waterside representatives that they needed to send their workers home. Waterside representatives advised Mr. Lakatos that they were just working on the fieldhouse. Mr. Lakatos advised Waterside representatives that dust is going to blow around the field and that the areas with exposed contaminated material, such as the piles and exposed medians had to be covered. Waterside personnel proceeded to cover the areas containing exposed materials.

On October 4, 2013 TERMS issued written notice to Waterside advising that all access to and work at the site was to cease until the contamination from the fill material originating from the Alcoa site was addressed

On or about November 21, 2013, Rodger Ferguson requested that TERMS authorize Waterside to bring up to 1,500 cubic yards of fill material from the Undercliff site to Veteran's Field.

On or about November 25, 2013, Ronald Dooney of TERMS advised Mr. Ferguson that Waterside was not to bring any material from the Undercliff site to Veteran's Field until further notice.

TERMS transmitted documents and data from the laboratory analysis of the fill material from Alcoa and the prior investigation of historic fill at Veteran's Field to Waterside and its representatives.

TERMS attended various meetings with Fred Daibes, other Waterside representatives, and representatives of Plaintiff, including but not limited to personnel from Neglia, to discuss site conditions and activities and the actions to be taken in connection with the fill material from the Alcoa Site.

TERMS attended various meetings with Waterside's LSRP, Rodger Ferguson, Greg Franz, and representative of Waterside and Neglia, to discuss sampling data, requests for data validation, and potential approaches to resolving the situation and Waterside's request to have the sampling data verified.

TERMS communicated with Waterside's LSRP regarding the sampling data and data validation.

TERMS transmitted the data validation results to Waterside's LSRP and confirmed Waterside's concurrence that the sampling data had been properly validated and was reliable and useable.

51

See also the answers to Nos. 10, 11 and 13.

Defendant also refers Waterside to documents that will be provided in response to Waterside's First Request For The Production Of Documents.

15.    Explain in detail the basis for Your allegation in Paragraph 43 of TERMS'

Answer to the First Amended Complaint that Waterside, by and at the direction of

Daibes, placed fill material containing crushed concrete and contaminated with

PCBs at the Property.

ANSWER:

Defendant objects to this Interrogatory to the extent that it is duplicative of prior Interrogatories. Without waiving the foregoing or any other objection, defendant states that it collected samples of the fill material brought to Veteran's Field by Waterside from the Former Alcoa Site and laboratory analysis confirmed that the fill material from the Former Alcoa Site contained PCBs in concentrations exceeding applicable standards.

On or about October 3, 2013, TERMS received the results of the analysis of samples collected on September 30 and the results verified that the material that had been placed in the sidewalk and lighting island forms as well as the material underneath the parking lots were contaminated with PCBS.

TERMS subsequently collected additional samples from the Site to delineate the extent of the PCB contamination resulting from the use of the fill material from the Former Alcoa Site. TERMS also compared the sampling results to prior sampling results for the Site, including the post hot-spot remediation sampling to confirm that the PCB contamination was the result of the use of the fill material from the Former Alcoa Site.

Daibes owns and/or controls Waterside. Daibes owns and/or control the entity that owns the Alcoa Site. Daibes was present at Veteran's Field and directed the work of Waterside at the time when the material from the Alcoa Site was imported to and deposited at Veteran's Field. Waterside employees stated, when asked about the material from the Alcoa Site, that they were just doing what Daibes had told them to do.

See also the answers to Nos. 10, 11, 13 and 14.

Defendant also refers Waterside to documents that will be provided in response to Waterside's First Request For The Production Of Documents.

16. Identify and describe all written or oral communications, reports or data which

you submitted to or received from any governmental agency, including but not

limited to the United States Environmental Protection Agency and/or the New

Jersey Department of Environmental protection with respect to the Property.

ANSWER:

Defendant objects to this Interrogatory as unduly burdensome, overly broad, vexatious and harassing in that it seeks to compel TERMS to assemble, process, manipulate and summarize information that is contained within documents which manipulation and/or summary can be performed by the requesting party and to the extent that it seeks to compel TERMS to provide information that can be obtained by other means that are more convenient, more efficient, more practical, less burdensome and/or less expensive. Defendant further objects to this Interrogatory as unduly burdensome, harassing and vexatious in that it is not limited with respect to time. Defendant also objects to this Interrogatory as not reasonably calculated to lead to discovery of relevant information.

Without waiving the foregoing or any other objection, Defendant states that prior to the importation of contaminated fill in September, 2013 from the Alcoa Site, TERMS had contacted NJDEP to obtain guidance on whether additional sampling was required to support the imposition of a deed notice on Veteran's Field after the initial sampling at the site. TERMS reviewed the planned remediation of historic fill and planned improvements at Veteran's Field with Linda Fischer of NJDEP. The only other involvement of NJDEP and USEPA with the Veteran's Field Project prior to importation of contaminated fill from the Alcoa Site in September, 2013 was the NJDEP's receipt of notice of discharge relating to historic fill, notice of retention of LSRP and Annual Remediation Fee form. After

53

the import of contaminated fill by Waterside in September, 2013, TERMS communicated with USEPA regarding the preparation and filing of a SIP and notified NJDEP of the discharge resulting from the importation of contaminated fill material from the Alcoa Site. TERMS subsequently communicated to USEPA that it was withdrawing the SIP and filed a notice of dismissal of as LSRP on the Veteran's Field site with NJDEP.

In addition, when the bid documents for the Veteran's Field Project (the "Project") were being prepared, Neglia Engineering Associates ("Neglia") requested assistance from TERMS in the preparation of language concerning the fill material to be used to restore the park after removal of the contaminated hot spots. TERMS suggested that the bid documents specify that the contractor was to used certified clean fill originating from a quarry or a source of blasted rock in order to avoid the use of other materials that could be certified as clean fill through analytical testing.

Ronald Dooney of TERMS had a telephone conversation with Mike Berliner of Neglia during which Mr. Berliner advised Mr. Dooney "[b]etween you and me he's [Daibes/Waterside] got a source of rock." Mr. Berliner then asked Mr. Dooney whether it could be used and what had to be done to test it. Mr. Dooney advised Mr. Berliner that if the rock was from an undisturbed geological formation they could use a single test for all of the rock from that formation and that if it was not from an undisturbed geological formation then it would have to be tested in accordance with the NJDEP guidance documents and regulations. Mr. Berliner stated that the rock was not from an industrial site, that they were going to be getting it by blasting it off the side of a cliff. Mr. Dooney advised Mr. Berliner that if it was an undisturbed geological formation and not on a DEP site, then one test would be enough.

It was made clear to TERMS, through various comments at meetings and telephone conversations that Plaintiff would not tolerate any shut down of the Veteran's Field Project and that TERMS was to work with Waterside and be as accommodating as possible in order to avoid project delays.

Ronald Dooney of TERMS had several telephone conversations and meetings with Mike Berliner of Neglia and Greg Franz of Edgewater in which Mr. Dooney advised both Mr. Berliner and Mr. Franz that he had asked Waterside numerous times for the OSHA certificates and that Waterside had still not provided any. Mr. Dooney also advised Mr. Berliner and Mr. Franz that Waterside was not following the Health and Safety Plan because it refused to supply or use (after the Town supplied a water truck) for dust control at veteran's Field. Mr. Dooney asked Mr. Berliner and Mr. Franz what he was supposed to do, whether he should go to NJDEP and have them shut the job down. Mr. Berliner and Mr. Franz responded that they could not, that TERMS should not go to the NJDEP and that they would get Mr. Dooney what he needed. Mr. Berliner and Mr. Franz then asked Mr. Dooney if this was really a hazardous waste site. Mr. Dooney advised

54

them that it was not a hazardous waste site under Federal law but that state law does apply the federal training requirements on all site in the state's site remediation program.

On or about September 27, 2012, Waterside brought shot rock from the Hudson Avenue site in Fort Lee, New Jersey to Veteran's Field without prior sampling and analysis by TERMS. Mike Berliner of Neglia determined that this shot rock material could be utilized as part of the rip rap on the Hudson River Walkway which was not part of the Veteran's Park Project and was not subject to oversight by TERMS.

Mr. Dooney received a telephone call from Mr. Berliner in which Mr. Berliner stated "I'm not telling you what to do, but if you don't replace Noah or remove him from the site the town's going to fire TERMS from the site."

In or about late September to Early October, 2012, Dino Menzella of Neglia called Peter Lakatos of TERMS and advised him that Waterside was putting rock under the southern parking lot as sub-base but that it was unknown if that material was the material that had been brought to the site on September 27, 2012. Mr. Lakatos went to Veteran's Field and met with Mike Berliner and Dino Menzella of Neglia and observed, with them, that the material in question had been compacted and combined with other site materials. Mr. Berliner stated that "[t]hey've already spread it. What do you want to do?" Mr. Lakatos spoke with Ronald Dooney of TERMS via telephone and explained the situation, including the fact that the initial testing of mixed material from 440 River Road contained low level PAHs and that it was now impossible to distinguish that material from other materials on site. Mr. Dooney recommended that the material be left in place and covered with a fabric filter and two feet of clean fill. Mr. Berliner did not object to this proposed solution.

When the Route 3 material was no longer available Mr. Dooney received a telephone call from Mr. Berliner. When Mr. Dooney asked what was going on with respect to the Route 3 material Mr. Berliner indicated that the Route 3 contractor had wised up and found someone to pay for the material and that Fred was not going to pay for it.

Mr. Dooney spoke with Mr. Franz regarding the testing of proposed fill material indicating that Waterside was responsible for testing the material pursuant to the contract. Mr. Franz responded that the Borough did not want Waterside to test the material, they wanted TERMS to test it and were willing to pay TERMS to do so. Mr. Dooney questioned that the Borough was really going to do that when it was Waterside's obligation and the response from Mr. Franz was yes. Mr. Dooney advised Mr. Franz that Waterside had not paid TERMS' bill for prior testing and Mr. Franz told Mr. Dooney "[j]ust put it on your next bill to us."

2576763v

Ronald Dooney of TERMS had a series of telephone conversations and at least one meeting with Greg Franz in late 2012 to review the parameters of TERMS proposals for providing oversight and LSRP services for the Veteran's Field Project. During these communications, Mr. Dooney and Mr. Franz discussed the fact that Waterside was behind schedule and the desirability of having TERMS personnel on site full time. Mr. Dooney advised Mr. Franz that he could see the project taking another 9 months to a year to complete and that he did not think that Edgewater would want to pay TERMS for providing such service. They discussed the fact that Waterside had been instructed to advise/alert TERMS when they were going to be conducting work at Veteran's Field. Mr. Dooney asked Mr. Franz what he wanted TERMS to do and stated that if TERMS kept someone out at the site full time it would be a big number. Mr. Franz responded that he wanted to keep TERMS' costs reasonable and that he did not think that TERMS needed to have someone out at the site on a full time basis.

Mr. Dooney had telephone conversations and at least one meeting with Mike Berliner and Greg Franz regarding continuing testing of proposed fill material for Waterside. Mr. Dooney indicate that Waterside was having TERMS sample a source for 200 yards in one location, for 500 yards in another and that the testing for such small amounts of material at new sites was disproportionately costly because of the sampling frequency requirements. Mr. Franz instructed Mr. Dooney to just test whatever Waterside wants.

On or about December 3, 2012, Mike Berliner identified to TERMS a site along Route 5 as a proposed source of fill material for Veteran's Field.

On or about December 3, 2012 Peter Lakatos of TERMS suggested to Mike Berliner that the material from Route 5 could be used as rip rap on the Hudson River Walkway sea wall project which was not part of the Veteran's Field Project and therefore, not subject to review by TERMS.

Mr. Dooney had a series of telephone calls and at least one meeting with Mr. Berliner and Mr. Franz in which Mr. Berliner and Mr. Franz indicated that the members of the Borough Council were being told that TERMS is holding up the job because it is rejecting everything. Mr. Dooney stated that TERMS was not rejecting anything, that the material was either good or not good, that TERMS was not rejecting material just to piss off Mr. Daibes. Mr. Dooney also stated that TERMS was only comparing test results to the applicable standard to see if it meets the criteria for clean fill and that TERMS was not rejecting material, just advising whether or not it qualified as clean fill.

Mr. Dooney also received telephone calls from Mr. Berliner, Mr. Franz and Philip Boggia, Borough attorney, in which they stated that what Borough Council was hearing was that TERMS was obstructing the job, rejecting material and that it was just because TERMS wanted to make more money on sampling and analysis. Mr. Dooney subsequently attended a meeting with Peter Lakatos of TERMS,

56

Mike. Neglia and Mike. Berliner of Neglia, Greg Franz and Phillip Boggia where similar claims were discussed. Mr. Dooney advised that those claims were nonsense and that he had written letters to the Borough describing what had been happening. Mr. Boggia stated that Borough Council members did not want to read letters and that they were getting emails. Mr. Franz admitted that he had previously advised Mr. Dooney that he did not want to receive email from him. Mr. Boggia also advised Mr. Dooney that Mr. Daibes was telling council members that he had approval for material from his own LSRP.

Between July 5 and July 12, 2013 Waterside delivered approximately 40 loads of material to Veteran's Field from an unknown source and which contained a mix of rock and soil with some concrete and rebar without prior notice to TERMS or an opportunity for TERMS to sample and test this material.

On or about July 12, 2013, Matt Follo of TERMS emailed Peter Lakatos of TERMS a photograph of material imported to Veteran's Field by Waterside. Peter Lakatos of TERMS thereupon notified Mike Berliner and Jason Menzella of Neglia that within the past week Waterside had delivered approximately 40 loads of material to Veteran's Field from an unknown source and which contained a mix of rock and soil with some concrete and rebar without prior notice to TERMS or an opportunity for TERMS to sample and test this material and that the material could not be spread until appropriate testing was performed.

On October 2, 2013 TERMS coordinated with Plaintiff, through Neglia, the restriction of access to the site by contractors other than Waterside and municipal employees seeking to perform work at the site.

On October 3, 2013 TERMS reported to the NJDEP the discharge at Veteran's Field resulting from the placement of the contaminated fill originating from the Alcoa Site.

On October 3, 2013 TERMS prepared a letter to Borough Administrator Greg Franz advising the Borough of, and summarizing, the current situation regarding the contamination of the park and placing the Borough on notice that TERMS was requiring all activity at the park to be stopped and all access to the site prohibited.

On October 4, 2013, and after discussions with Neglia nd Greg Franz, TERMS issued, through Neglia Engineering, a letter to Borough Administrator Greg Franz advising the Borough of, and summarizing, the current situation regarding the contamination of the park and placing the Borough on notice that TERMS was requiring all activity at the park to be stopped and all access to the site prohibited.

57

Mr. Dooney and Mr. Lakatos of TERMS attended a meeting with Mike Neglia and Mike Berliner of Neglia, Greg Franz, Philip Boggia, Esq. and the Mayor of Edgewater to discuss the situation with the contaminated material from the Alcoa Site and the associated costs. Mr. Dooney advised the group that Mr. Daibes had told him that Waterside had brought 8 or 9 truckloads of that material to Veteran's Field. Mr. Dooney then estimated that 8 or 9 loads weighed several hundred tons, assumed that there were 300 tons of material and that it was the worst case and it was all above TCSA levels and estimated a cost of probably $100,000 to remove and dispose of it.

Mr. Dooney had a telephone conversation with Mr. Berliner in which Mr. Berliner stated, that at Veteran's Field the Waterside people are telling everyone that it was o.k. because they blended the material with other material. Mr. Dooney stated that this was not better but actually worse and not acceptable, that by doing this Waterside had created a larger volume of contaminated material. At another meeting with representative of Edgewater Mr. Dooney was asked if they could solve the problem by having Mr. Daibes just take the material back to where it had come from. Mr. Dooney stated that they could not do that. Later that day Mr. Dooney met Mr. Daibes at Veteran's Field who told Mr. Dooney that he spoke with the Town and that they were going to load the material onto trucks and take it back to the other site. Mr. Dooney responded "[n]o, absolutely not, you're not doing that." Mr. Daibes then said that he would call the town and Mr. Dooney responded by telling Mr. Daibes to go ahead and do that because he had just come from a meeting with the town's representatives.

In October, 2013, Peter Lakatos and Ronald Dooney of TERMS had a series of telephone conversations with Greg Franz of Plaintiff in which they were trying to get Edgewater to take action to close Veteran's Field and instruct Waterside to cease all work at Veteran's Field due to the high levels of contamination from the Alcoa material and advised Mr. Franz that they were covering the exposed material with plastic because of concerns regarding dust from the Alcoa material.

After Mr. Dooney placed a lock on the gates at Veteran's Field Mr. Dooney had at least one telephone call and one conference with Greg Franz discussing Waterside's access to the site. Mr. Franz indicated that Waterside had told him that they wanted to come in and get their equipment. Mr. Dooney stated that Waterside could not do that, that they were not properly trained and that it was a different ballgame now because the contaminant levels exceed TSCA limits. Mr. Franz responded by saying that he did not know what to tell Mr. Daibes, that he wants to get his equipment. Mr. Franz asked "[h]ow can I tell them no?" Mr. Dooney stated that Waterside would have to decontaminate the equipment with properly trained personnel. Approximately a week later Mr. Dooney observed that all of Waterside's equipment had been removed from Veteran's Field and that there was no evidence that it had been decontaminated prior to removal. Mr. Dooney then discussed this occurrence with Mr. Franz and Mr. Franz said "I

58

don't know what to tell you." Mr. Dooney observed that they obviously wanted their equipment and came and got it.

In 2013 Ronald Dooney and Peter Lakatos of TERMS attended several meetings at the offices of Neglia with Mike Neglia and Mike Berliner of Neglia and Greg Franz, Philip Boggia, Esq. and Jim Delaney of Edgewater. At these meetings Mr. Boggia stated "[i]t's obvious he [Fred Daibes] did this, he's got to take care of it and it's got to be done quickly, like tomorrow." Mr. Boggia then asked "[w]hat has to be done, he [Fred Daibes] is paying for it, I don't care what it costs." Mr. Lakatos advised all present that disposal was going to be expensive and reviewed various alternatives, including, among others, the use of a central dump site and rail cars. Mr. Lakatos further advised all present that there needed to be a self-implementing plan and a remedial action workplan prepared and submitted to the USEPA and NJDEP. Mr. Lakatos explained to all present that there were two options for the remediation. The first option was to undertake a risk based approach since this was not a spill or historic contamination, but that this approach required that TERMS take more grid samples and obtain the prior approval of NJDEP which would take 30 days. Mr. Lakatos explained that the second option was to take a performance based approach which involved a 10 foot by 10 foot grid approach with composite samples and that this was a more time consuming and more expensive approach. Mr. Boggia stated "[w]hy should we do more, we know where it [the contamination] is?" Mr. Lakatos advised all present that the only way to get the cleanup done without review was to use the performance based approach. Mr. Boggia then stated that they should use the risk based approach and asked Mr. Lakatos if TERMS had enough samples. Mr. Lakatos advised all present that it was up to USEPA and they could require more samples. Mr. Berliner inquired about the potential of using artificial turf to help address the contamination issue and Mr. Dooney responded by stating that they would still have to be some cleanup to some level. Mr. Boggia also responded by stating "[n]o, they're going to clean it; there were no PCBs before, they have to take it all out." At a meeting after Waterside's representatives indicated that they wanted to have TERMS' sampling data validated, Mr. Boggia stated that it "[w]ould take forever to validate more samples, let's submit this, go with what we have now and see what they [USEPA] say in thirty days." Mr. Lakatos stated that the cleanup was not going to be surgical and that there would likely be hot spots remaining after the initial excavation that would have to be excavated further. Based upon these discussions and the instructions and/or directions received from Plaintiff's representatives, TERMS prepared and submitted a SIP to the USEPA using the performance based alternative with confirmation sampling.

59

In 2013 Peter Lakatos and Ronald Dooney of TERMS attended a meeting at the offices of Neglia with Mike Neglia and Mike Berliner of Neglia during which Mr. Neglia stated "[y]ou guys are environmental consultants and you go by the book on this."

TERMS had telephone conversations with Mike Berliner of Neglia Engineering on various dates regarding the site conditions and activities and the actions to be taken in connection with the fill material from the Alcoa Site.

TERMS notified Plaintiff, through Greg Franz, Borough Administrator, of Waterside's failure to stop work at Veteran's Field despite TERMS' instructions to do so.

TERMS Attended meetings with Greg Franz, Plaintiff's attorneys and representatives of Neglia and Borough Council to discuss and plan the scope of the investigation and remediation relating to the fill material from the Alcoa Site.

TERMS prepared and submitted to Greg Franz summaries of the status of Veteran's Field, the investigation of fill material from the Alcoa Site and the anticipated remedial action workplan requirements.

In 2014 Peter Lakatos of TERMS attended at the offices of Philip Boggia, Esq. with Gregory Franz, Philip Boggia, and Tim Corriston as representative of Plaintiff. At this meeting Mr. Boggia stated "[w]e're going after them [Waterside], work with Tim, he's going to help represent the town as an environmental attorney."

In 2014 Peter Lakatos of TERMS attended a meeting with Mike Neglia and Mike Berliner of Neglia, Councilman Henwood, Greg Franz and Philip Boggia, Esq. of Edgewater, Waterside's attorney and representatives of Liberty Mutual. Mr. Lakatos was asked to explain, start to finish, what happened at Veteran's Field. During a break in the meeting, Mr. Lakatos, Mike Neglia, Mike Berliner, Greg Franz and Philip Boggia had a discussion at which time Mr. Boggia stated "[w]e got him, the evidence is overwhelming." In addition, Mike Neglia stated "[e]verytime they go to blame TERMS, TERMS has the right answer."

See also the answers to Nos. 10, 11, 13 and 14.

Defendant also refers Waterside to documents that will be provided in response to Waterside's First Request For The Production Of Documents.

60

17.   Explain in detail the basis for Your allegation in Paragraph 19 of TERMS'

Crossclaims that "Waterside advised Menzella that it would not be performing

any work at the Site on Saturday, September 7, 2013."

ANSWER:

That allegation is based upon a similar allegation asserted by Plaintiff in its
Second Amended Complaint.

18.   Explain in detail the basis for Your allegations in the First Count of the

Crossclaims that Defendants are liable under CERCLA.

ANSWER:

Defendant objects to this Interrogatory to the extent that it seeks to compel
Defendant to form and divulge legal conclusions. Without waiving the foregoing
or any other objection, Defendant states that Waterside and Daibes knew that the
Alcoa Site, including, without limitation, Building #12 located at the Alcoa Site,
was contaminated with PCBs. PCBs are a hazardous substance. Defendants
caused material originating from the Alcoa Site, including debris from the
demolition of Building #12, to be deposited at Veteran's Field in Edgewater
Borough. The material originating from the Alcoa Site and deposited at Veteran's
Field in Edgewater Borough included, without limitation concrete debris and/or
waste and was contaminated with, among other things, PCBs at concentrations
exceeding applicable standards for PCB contamination. Daibes owns and/or
control the non-individual defendants. In performing work at Veteran's Field for
the Veteran's Field Project Defendants were an operator of Veteran's Field at the
time that the material from the Alcoa Site was deposited at Veteran's Field.
Defendants were and/or are owners and/or operators of the Alcoa Site located in
Edgewater, New Jersey at the time that material from the Alcoa Site was removed
from the Alcoa Site and deposited at Veteran's Field. Defendants arranged with
various trucking companies whose identity is not yet known to transport the
material from the Alcoa Site to Veteran's Field. Some of the material from the
Alcoa Site that was taken to Veteran's Field was spread by Defendants over
various portions of Veteran's Field by Defendants. Some of the material from the
Alcoa Site that was taken to Veteran's Field was mixed with other materials by
Defendants and spread over various portions of Veteran's Field by Defendants.

See also the answers to Nos. 8, 10, 11, 12, 13, 14 and 15.

19.     Explain in detail the basis for Your allegations in the Second Count of the

Crossclaims that Defendants are liable under the Spill Act.

ANSWER:

Defendant objects to this Interrogatory to the extent that it seeks to compel Defendant for form and divulge legal conclusions.  Without waiving the foregoing or any other objection, Defendant states see the answer to No. 18.

20.     Explain in detail the basis for Your allegations in the Third Count of the

Crossclaims that TERMS is entitled to common law indemnification and/or

contribution from Defendants.

ANSWER:

Defendant objects to this Interrogatory to the extent that it seeks to compel Defendant for form and divulge legal conclusions.  Without waiving the foregoing or any other objection, Defendant states that Defendants ignored and failed to follow or heed TERMS instructions not to bring material to Veteran's Field before it had been sampled and deemed suitable for use at Veteran's Field.

The Waterside Defendants ignored and failed to follow or heed TERMS instructions not to spread or utilize at Veteran's Field any material that Defendants had brought to Veteran's Field before it had been sampled and deemed suitable for use at Veteran's Field.

Waterside brought to Veteran's Field material that had been deemed by TERMS, based upon sampling and analysis of the material, unsuitable for use at Veteran's Field.  At all times, despite TERMS role as environmental consultant providing oversight Defendants had exclusive control over what materials were brought to and deposited onto Veteran's Field – TERMS had no physical ability to prevent Defendants from bringing materials to the site.

TERMS did not participate in the importation of fill material from the Alcoa Site to Veteran's Field and had no knowledge of the importation of material from the Alcoa Site to Veteran's Field until after the material had already been deposited at Veteran's Field, spread by Waterside and/or covered up by paving and/or crushed stone.

Daibes is an experienced, sophisticated and highly successful real estate developer and well connected with Borough politicians.

62

TERMS role was to supervise and advise whether proposed fill met the residential direct contact standard and was suitable for use as fill at Veteran's Field or not.

TERMS was not given control of the job or the site, it had no authority or ability to stop Waterside if Waterside ignored TERMS' directions/instructions and could not prevent Waterside or anyone else from entering the site.

TERMS advised the Borough, either directly or through Neglai when Waterside disregarded the agreed upon protocols

Waterside ignored directions/instructions from TERMS and failed to observe agreed upon procedures.

Waterside brought material to Veteran's Field before having it tested.

Waterside brought material to Veteran's Field that had been tested and deemed unsuitable by TERMS.

Waterside brought contaminated fill to site without providing prior notice to TERMS of the proposed source and an opportunity for TERMS to collect and analyze samples from the proposed source.

At all times, despite TERMS role was that of an environmental consultant providing oversight, Waterside and Daibes had exclusive control over what materials were brought to and deposited onto Veteran's Field and plaintiff had the exclusive ability to control access to Veteran's Field – TERMS had no ability to prevent Waterside from bringing materials to Veteran's Field.

When TERMS confronted Waterside and Daibes about improper and untested fill material and the failure to provide dust suppression, Daibes threatened to have TERMS thrown off the job and complained to political cronies on Edgewater Council and sought to have TERMS replaced on the project.

Waterside, as directed by Daibes, brought material to Veteran's Field from the Alcoa Site.

No party to this litigation ever advised or informed TERMS, prior to the deposition of material from the Alcoa Site at Veteran's Field, that material from the Alcoa Site was proposed or intended to be used as fill material at Veteran's Field.

Waterside ignored TERMS' directions not to move, spread or cover the Alcoa Material that had been brought to Veteran's Field once TERMS was aware that this material had been brought to the Site.

63

TERMS had no dominion, control, possession or any other association with, or knowledge of the existence of, the material from the Alcoa Site before it was placed on Veteran's Field.

Waterside and/or Daibes were solely responsible for making the arrangements to transport material from the Alcoa Site to Veteran's Field.

Defendants owned or controlled the Alcoa Site at the time when materials from the Alcoa Site, were imported to and deposited upon Veteran's Field.

PCBs are a hazardous substance.

River Road Improvement, Phase II, Inc. was and/or is owned and/or controlled by Fred Daibes.

Fred Daibes and/or a company owned and/or controlled by Fred Daibes caused material originating from the Alcoa Site to be deposited at Veteran's Field in Edgewater Borough.

The material originating from the Former Alcoa Site and deposited at Veteran's Field in Edgewater Borough included, without limitation, concrete debris and/or waste and was contaminated with, among other things, PCBs at concentrations exceeding applicable standards for PCB contamination.
Waterside has not undertaken any remedial action at Veteran' Field related to the material from the Alcoa Site.

The materials from the Alcoa Site that were deposited onto Veteran's Field contained concrete waste resulting from the demolition of Building #12 at the Alcoa Site.

Waterside and Daibes knew or should have known that the Alcoa Site, Building #12 and the concrete waste resulting from the demolition of Building #12 were contaminated with PCBs.

Waterside and Daibes knew or should have known that no beneficial reuse permit had been obtained for the concrete waste resulting from the demolition of Building #12 at the Alcoa Site.

Waterside and Daibes did not cause any testing of the concrete waste from the demolition of Building #12 at the Alcoa Site to be performed before depositing that material at Veteran's Field.

Waterside and its representatives, including, without limitation, Daibes, Matt Vereb and Steve Reddington were aware of the sampling and analysis

64

requirements for certifying alternate fill and clean fill and deliberately and intentionally ignored those requirements.

Waterside and its representatives, including, without limitation, Daibes, Matt Vereb and Steve Reddington were aware of the need for a beneficial reuse permit for the reuse of recycled concrete and deliberately and intentionally ignored that requirement.

Daibes, as a sophisticated real estate developer in the Edgewater area, was aware of and familiar with the environmental restrictions on the use of fill materials and recycled concrete aggregate and the need to obtain a beneficial reuse permit for the proper reuse of recycled concrete aggregate.

TERMS never advised Waterside that it could use recycled concrete aggregate under paved areas without testing or a beneficial reuse permit.

TERMS advised Waterside that if it wanted to use recycled concrete aggregate under paved areas at Veteran's Field then Waterside would have to obtain a beneficial reuse permit or test the material in accordance with the concrete recycling/reuse guidance document to show that it was not contaminated.

Any alleged reliance by Waterside on the purported statement by TERMS that recycled concrete aggregate could be used under paved areas was not reasonable.

See also the Answers to No. 8, 10, 11, 12, 13, 14, 15 and 18.

21.    Explain in detail the basis for Your allegations in the Fourth Count of the

Crossclaims that TERMS is entitled to contribution from Defendants pursuant to

the New Jersey Joint Tortfeasors Contribution Act, NJSA 2A:53A-1 et seq and

the Comparative Negligence Act, NJSA 2A:15-5.1 et seq.

ANSWER:

Defendant objects to this Interrogatory to the extent that it seeks to compel Defendant to form and divulge legal conclusions. Without waiving the foregoing or any other objection, Defendant states see the answers to Nos. 18 and 20.

65

22.     Explain in detail the basis for Your allegations Paragraph 72 of the Fifth Count of

the Crossclaims that Waterside and Daibes attempted to circumvent the direction

of TERMS regarding the testing and verification of fill material to be used at the

Property.

ANSWER:

Defendant objects to this Interrogatory as duplicative and cumulative. Without waiving the foregoing or any other objection, Defendant states that Waterside brought fill material from the Alcoa Site to Veteran's Field without providing prior notice to TERMS of the proposed source of such material and opportunity for TERMS to collect and analyze samples from the proposed source.

Waterside and Daibes never advised or informed TERMS, prior to the deposition at Veteran's Field of material from the Alcoa Site, that material from the Alcoa Site was proposed to be used as fill material at Veteran's Field

Waterside ignored TERMS instructions and/or directions not to move, spread or cover the material from the Alcoa Site that had been brought to Veteran's Field.

Waterside ignored TERMS instructions/directions not to bring fill material to Veteran's Field until it had been sampled and analyzed and confirmed to be suitable for use as clean fill at Veteran's Field.

Waterside ignored TERMS instructions that fill material from 440 River Road, Edgewater, New Jersey was not suitable for use at Veteran's Field and brought that material to Veteran's Field anyhow. When this was discovered Noah Skyta of TERMS had a heated discussion with Daibes and advised him that the unapproved material had to be removed. This event was a principal cause of Daibes efforts to have TERMS removed from the Project and resulted in Edgewater advising TERMS that if it did not remove Mr. Skyta from the job that it would lose the Project.

Waterside ignored TERMS instructions that sufficient testing for only 500 cubic yards of fill material from the Undercliff site had been conducted and brought

66

approximately 60 additional truck loads in excess of the 500 cubic yards to Veteran's Field without prior notice to TERMS.  When this was discovered TERMS sampled the material again, confirmed that the material was not suitable for use as clean fill and instructed Waterside to remove the material from Veteran's Field.

A company owned and/or controlled by Daibes owned the Alcoa Site at the time when Waterside caused material originating from the Alcoa Site to be deposited at Veteran's Field.

The material originating from the Alcoa Site and deposited at Veteran's Field in Edgewater Borough included, without limitation concrete debris and/or waste and was contaminated with, among other things, PCBs at concentrations exceeding applicable standards for PCB contamination.

The materials from the Alcoa Site that were deposited onto Veteran's Field contained concrete waste resulting from the demolition of Building #12 at the Alcoa Site.

Daibes knew that the Alcoa Site, Building #12 and the concrete waste resulting from the demolition of Building #12 were contaminated with PCBs.

Daibes was aware that no beneficial reuse permit had been obtained for the concrete waste resulting from the demolition of Building #12 at the Alcoa Site.

Waterside and Daibes did not cause any testing of the concrete waste from the demolition of Building #12 at the Alcoa Site to be performed before depositing that material at Veteran's Field.

Waterside and its representatives, including, without limitation, Daibes, Matt Vereb and Steve Reddington were aware of the sampling and analysis requirements for certifying alternate fill and clean fill and deliberately and intentionally ignored those requirements.

Waterside and its representatives, including, without limitation, Daibes, Matt Vereb and Steve Reddington were aware of the need for a beneficial reuse permit for the reuse of recycled concrete and deliberately and intentionally ignored that requirement.

Daibes, as a sophisticated real estate developer in the Edgewater area, was aware of the and familiar with environmental restrictions on the use of fill materials and recycled concrete aggregate and the need to obtain a beneficial reuse permit for the proper reuse of recycled concrete aggregate.

See also the answers to Nos. 11, 13  and 14.

67

23.    Identify and describe all communications between TERMS and Defendants in which it was conveyed that Defendants, including but not limited to Daibes, intended to have TERMS removed from the Veteran's Field project as alleged in Paragraph 74 of the Fifth Count of the Crossclaims.

ANSWER:

    Defendant objects to this Interrogatory as duplicative and cumulative. Without waiving the foregoing or any other objection, Defendant states see the answers to Nos. 11, 13, 14, 16 and 22.

24.    Identify and describe all communications between TERMS and any representative, employee or agent of Plaintiff that TERMS needed to change site personnel assigned to the Project and find a way to work with Daibes if TERMS wanted to continue to work on the Veteran's Field project as alleged in Paragraph 75 of the Fifth Count of the Crossclaims.

ANSWER:

    Defendant objects to this Interrogatory as duplicative and cumulative. Without waiving the foregoing or any other objection, Defendant states see the answers to Nos. 11, 13, 14, 16, 22 and 23

25.    Explain in detail the basis for Your allegations in Paragraphs 76 and 78 of the Fifth Count of the Crossclaims that there were active efforts by Daibes to have TERMS removed from the project.

ANSWER:

    Defendant objects to this Interrogatory as duplicative and cumulative. Without waiving the foregoing or any other objection, Defendant states that Waterside and

68

Daibes alleged that TERMS permitted contamination and/or use of contaminated fill in an October 2013 letter from Daibes to Plaintiff. Despite the allegations contained in Daibes' October 2013 letter, plaintiff elected to retain Terms to oversee investigation and remediation of the PCB contaminated materials imported to Veteran's Field from the Alcoa Site; Plaintiff approved TERMS proposal as a meeting of Borough Council held on February 18, 2014. Subsequently, Plaintiff terminated its relationship with TERMS using purported claims that TERMS permitted contamination use of contaminated fill as a pretext for that termination. Daibes is experienced developer and familiar with environmental restrictions on the use of fill materials and recycled concrete aggregate and could not reasonably rely upon any purported statements by TERMS that recycled concrete aggregate could be used under paved areas. Daibes is well connected with Borough politicians. Borough had been settlement negotiations with Daibes and Daibes demanded that Edgewater Terminate TERMS and bring claim against TERMS.

See also the answers to Nos. 11, 13, 14, 16, 22, 23 and

26.    Explain in detail the basis for Your allegations in the Fifth Count of the

Crossclaims that Daibes is liable for slander *per se.*

ANSWER:

Defendant objects to this Interrogatory to the extent that it seeks to compel Defendant for form and divulge legal conclusions. Without waiving the foregoing or any other objection, Defendant states that Waterside and Daibes alleged in an October 2013 letter from Daibes to Plaintiff that TERMS permitted contamination and/or use of contaminated fill. That statement is untrue and at the time when Daibes wrote that letter he knew that such statement was not true. The statement contained in the October 2013 letter relates to and concerns TERMS conduct in its profession and/or business.

27.    Explain in detail the basis for Your allegations in the Sixth Count of the

Crossclaims that Daibes is liable for tortious interference with contract.

ANSWER:

Defendant objects to this Interrogatory to the extent that it seeks to compel Defendant for form and divulge legal conclusions. Without waiving the foregoing

69

or any other objection, Defendant states, see the answers to Nos. 22, 23, 24, 25 and 26.

28.    Explain in detail the basis for Your allegations in the Seventh Count of the

Crossclaims that Daibes is liable for tortious interference with TERMS' economic

advantage.

ANSWER:

Defendant objects to this Interrogatory to the extent that it seeks to compel Defendant for form and divulge legal conclusions.  Without waiving the foregoing or any other objection, Defendant states see the answers to Nos.22, 23, 24, 25, 26 and 27.

29.    Identify and describe in detail all damages and other relief, including any

injunctive relief, Plaintiff is seeking against Defendants.

ANSWER:

Defendant objects to this Interrogatory in that it seeks to compel TERMS to obtain and provide information that is within the knowledge and possession of third parties and beyond TERMS' knowledge and control.   Defendant further objects to this interrogatory as premature in that discovery is ongoing and Defendant does not have all relevant information within its possession. Without waiving the foregoing or any other objection Defendant states that damages it seeks to recover from the Waterside defendants include any and all damages awarded against this Defendant in favor of any other party, including, but not limited to, to any other party for the costs of investigating and/or remediating Veteran's Field, as well as TERMS' loss of business and punitive damages.

70

# CERTIFICATION

I, Ronald Dooney, herein certify that:

1.     I am Ronald Dooney, the President of TERMS Environmental Services, Inc.   I hereby certify that I have read the foregoing Answers by TERMS Environmental Services, Inc. to the First Set of Interrogatories propounded by Defendants Waterside Construction, LLC, Fred Daibes, Daibes Brothers, Inc., North River Mews Associates, LLC and Third Party Defendant, River Road Improvement Phase II, Inc.   I am informed that the facts stated therein have been assembled by authorized employees and/or counsel of TERMS Environmental Services, Inc., and I believe the Answers are true and correct.

2.     I hereby affirm that the foregoing statements by me are true.   Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Ronald Dooney, President
TERMS Environmental Services, Inc.

Dated: June 30, 2015

# Exhibit
# Separator

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **Plaintiff,** | Civil Action No.: 2:14-CV-05060 (ES-MAH) |
| BOROUGH OF EDGEWATER, | |
| vs. | |
| **Defendants,** WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALUMINUM COMPANY OF AMERICA; A.P. NEW JERSEY, INC.; JOHN DOES 1-100; and ABC CORPORATIONS 1-100, | **DEFENDANT TERMS ENVIRONMENTAL SERVICES, INC.'S AMENDED RESPONSE TO PLAINTIFF BOROUGH OF EDGEWATER'S FIRST SET OF INTERROGATORIES PURSUANT TO F.R.C.P. 26(e)** |
| And | |
| ALCOA DOMESTIC, LLC as successor in interest to A.P. NEW JERSEY, INC., | |
| **Third-Party Plaintiff,** vs. | |
| **Third-Party Defendants,** COUNTY OF BERGEN and RIVER ROAD IMPROVEMENT PHASE II, INC., | |
| And | |
| **Defendants/Third Party Plaintiffs,** Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., North River Mews Associates, LLC and Fred A. Daibes, | |
| vs. **Third-Party Defendant,** Neglia Engineering Associates, | |

TO:   Timothy E. Corriston, Esq.
      Connell Foley, LLP
      85 Livingston Avenue
      Roseland, New Jersey 07068

2638946v1                                    1



EXHIBIT
RD-5
7-20-17  KL

Defendant TERMS Environmental Services, Inc. ("TERMS") by and through its attorneys, Lindabury, McCormick, Estabrook & Cooper, P.C., hereby submits its amended responses pursuant to Rule 26(e) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") to the First Set Of Interrogatories ("Interrogatories") by Plaintiff Borough of Edgewater.

The response to Interrogatory number 2 is hereby amended to read as follows:

RESPONSE:

Defendant objects to this Interrogatory in that it seeks to compel TERMS to obtain and provide information that is within the knowledge and possession of third parties and beyond TERMS' knowledge and control. Defendant further objects to this Interrogatory as unduly burdensome, overly broad, vexatious and harassing in that it seeks to compel TERMS to assemble, process, manipulate and summarize information that is contained within documents which manipulation and/or summary can be performed by the requesting party and to the extent that it seeks to compel TERMS to provide information that can be obtained by other means that are more convenient, more efficient, more practical, less burdensome and/or less expensive. Defendant further objects to this Interrogatory to the extent that subparts hereof are duplicative. Defendant further objects to this Interrogatory as vague and ambiguous in that the terms "directed", "approved" and "composition" are not defined and are subject to differing interpretations. Defendant further objects to this Interrogatory as beyond the proper scope of discovery in that it seeks to compel Defendant to form and divulge legal conclusions and or expert opinions. Defendant also objects to this Interrogatory to the extent that it is unlimited with respect to time. Defendant also objects to this Interrogatory as vague and ambiguous and not reasonably calculated to lead to the discovery of relevant information to the extent that it is based upon the assumption that material could not properly be used as fill material if it contained any contaminants. Defendant also objects to this Interrogatory as vague and ambiguous and not reasonably calculated to lead to the discovery of relevant information to the extent that it is based upon the assumption that all fill materials imported to Veteran's Field were approved for use at Veteran's Field. Without waiving the foregoing or any other objection, defendant states that:

Based upon its prior investigation of Veteran's Feld, TERMS Environmental Services, Inc. ("TERMS") prepared the Remedial Action Workplan and Health and Safety Plan for the remediation of Veteran's Field dated 6/6/12. The Remedial Action Workplan stated that the excavations will be backfilled with Quarry Supplied certified clean fill.

When the bid documents for the Veteran's Field Project (the "Project") were being prepared, Neglia Engineering Associates ("Neglia") requested assistance from

TERMS in the preparation of language concerning the fill material to be used to restore the park after removal of the contaminated hot spots. TERMS suggested that the bid documents specify that the contractor was to used certified clean fill originating from a quarry or a source of blasted rock in order to avoid the use of other materials that could be certified as clean fill through analytical testing.

A pre-construction meeting was held at the Community Center at Veteran's Field and was attended by Ronald Dooney and Noah Skyta of TERMS, Matt Vereb and another unknown representative of Waterside, Greg Franz for Edgewater, the head of the Edgewater Department of Public Works and an unknown individual from the Edgewater Health Department. The discussion generally focused on the logistics of the Veteran's Field Project, such as the projected start date and how material was going to be brought into the site. TERMS representatives reviewed the requirements of the Health and Safety Plan with all persons present and advised them that Waterside would need to install and use a decontamination station for the trucks and implement dust control measures consisting of using a water truck to wet the ground surface. TERMS also advised Waterside and the others present that it needed to receive from Waterside certificates demonstrating compliance with OSHA training requirements for all workers involved in the hot spot remediation portion of the project.

Subsequent to the pre-construction meeting Ronald Dooney and Noah Skyta of TERMS attended a meeting at the offices of Waterside with Mike Berliner of Neglia and Fred Daibes, Steve Reddington of Waterside and Andrew Robinson, a LSRP occasionally used by Waterside and Daibes. Waterside was reminded that the bid specifications required that Waterside provide certified clean fill that originated from a quarry or a source of blasted rock. Mr. Daibes questioned where he was going to obtain the fill material required for the Project and stated that everyone had to work together on the project. At this meeting Waterside also asked additional questions about the logistics of the project, the timing of activities and testing requirements for fill material. TERMS representatives explained that the Project required Waterside to excavate and remove the contaminated hot spots first. TERMS also advised Waterside that if they were using rock from an undisturbed geological formation that they would have to test one sample to verify that it was suitable as fill material and that any other proposed fill material would have to be tested in accordance with the applicable guidance documents and regulations. Daibes questioned the testing requirements and Mr. Dooney stated that this was not a typical construction project and that because it was a site subject to NJDEP's Site Remediation Program that everything being used for fill had to be tested. A discussion ensued during which TERMS described how proposed alternate fill materials could be tested and analyzed to determine if they met the criteria for use as alternate fill in lieu of certified clean fill. Mr. Daibes asked why he could not use contaminated fill material and was advised by Ron Dooney of TERMS that Waterside would need to obtain a Beneficial Reuse Permit from the NJDEP in order to do so. Mr. Dooney made a comment to the effect that by obtaining a beneficial reuse permit Waterside would essentially be turning Veteran's Field into a landfill. Mr. Daibes did not like this comment and stated that he was going to call Karen

Kloo of NJDEP who he stated was a good friend of his. Mr. Dooney also described the requirements for use of contaminated fill materials including the requirement that the contaminants had to be the same as the contaminants already at the site. Discussion of potential sources for fill material and topsoil was held. Mr. Dooney advised that unless Waterside was using quarry certified material, any proposed fill material would have to be tested in accordance with NJDEP requirements and that the results must show that there were no contaminants above residential direct contact standards. Mr. Daibes stated that he would get his own LSRP to certify the fill materials and that he knew tons of them. At the end of the meeting Mr. Daibes announced that he had changed his mind about pursuing beneficial reuse and was not going to call Karen Kloo of NJDEP "because the town would give him too much grief."

Ronald Dooney of TERMS had a telephone conversation with Mike Berliner of Neglia during which Mr. Berliner advised Mr. Dooney "[b]etween you and me he's [Daibes/Waterside] got a source of rock." Mr. Berliner then asked Mr. Dooney whether it could be used and what had to be done to test it. Mr. Dooney advised Mr. Berliner that if the rock was from an undisturbed geological formation they could use a single test for all of the rock from that formation and that if it was not from an undisturbed geological formation then it would have to be tested in accordance with the NJDEP guidance documents and regulations. Mr. Berliner stated that the rock was not from an industrial site, that they were going to be getting it by blasting it off the side of a cliff. Mr. Dooney advised Mr. Berliner that if it was an undisturbed geological formation and not on a DEP site, then one test would be enough.

A site layout meeting was held at Veteran's Field and attended by Ronald Dooney and Noah Skyta of TERMS, Matt Vereb of Waterside, Mike Berliner and another unknown employee of Neglia, the head of the Edgewater Department of Public Works and the Edgewater Borough Police Chief. Discussion of the site layout was held, including a review of where and how trucks would enter the site, where they would be loaded and where and how they would leave the site. Mr. Dooney advised all present that TERMS still needed to receive from Waterside certificates demonstrating compliance with OSHA training requirements for all workers involved in the hot spot remediation portion of the project and also told them that they would need to control dust and should have a water truck at the Site. TERMS representatives also reiterated that dust control was a big issue and that Waterside needed to supply a water truck. Waterside representatives indicated that they were going to start the project at the end of June, 2012. TERMS reviewed the hot spot areas and what was involved in their removal. Waterside asked whether they had to do the hot spot removal and wait or if they could do other work too. Mr. Dooney advised those present that Waterside would have to wait for the results of post-excavation samples to confirm that all the contamination had been removed and that there was a risk of spreading the contamination if Waterside worked in nearby areas at the same time. Waterside representatives then stated that they were going to cordon off the hot spot areas so that they could work in other areas. Mr. Dooney indicated that was ok as long as Waterside provided good clearance around the hot

spots in case the post excavation sampling results indicated that any of the hot spot excavations had to be expanded.

It was made clear to TERMS, through various comments at meetings and telephone conversations that Plaintiff would not tolerate any shut down of the Veteran's Field Project and that TERMS was to work with Waterside and be as accommodating as possible in order to avoid project delays.

On or about June 22, 2012, Mike Berliner of Neglia emailed TERMS and provided analytical data for materials at a source of fill material proposed to be used by Waterside. The proposed source was the Arilex/Infinity, LLC property at 340-342 Old River Road, Edgewater, New Jersey.

On July 13, 2012 Matt Vereb of Waterside emailed Peter Lakatos of TERMS analytical data for the proposed Arilex/Infinity, LLC source.

On July 16, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside via email that the material from the proposed Arilex/Infinity, LLC source would require additional sampling and analysis before it could be used at Veteran's Field.

Various discussions at various times were held between representatives of TERMS and Waterside regarding the requirements for testing fill to certify it as clean and suitable for use at Veteran's Field.

On or about July 20, 2012, Peter Lakatos of TERMS emailed to Steve Reddington of Waterside a full copy of the NJDEP Guidance document Alternative and Clean Fill Guidance For SRP Sites, NJDEP, updated December 29, 2011, Version 2.0.

On July 27, 2012 Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site on Hudson Avenue in Fort Lee (just south of the George Washington bridge) as a potential source of shot rock to be used as rip rap on the sea wall and advised TERMS that Waterside was bringing that rock to Veteran's Field.

In response Peter Lakatos of TERMS advised Matt Vereb, on or about July 30, 2012, that the material from Fort Lee must be separately stockpiled and not used until testing could be performed.

On or about August 9, 2012 Matt Vereb Lakatos of Waterside identified to Peter Lakatos of TERMS a site known as 440 River Road, Edgewater, New Jersey as a potential source of fill material.

On or about August 14, 2012, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site along State Route 3 in Clifton, New Jersey as a potential source of fill material and provided information about its quality. Peter Lakatos of TERMS advised Matt Vereb that the information provided was not sufficient and that additional sampling was required in order to verify whether this was suitable for use at Veteran's Field.

On or about August 14, 2012, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site in West Orange, New Jersey as a potential source of fill material and provided information about its quality.

On or about August 16, 2012, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and requested that TERMS provide a proposal to Waterside for performing the sampling of the material from along State Route 3 in Clifton, New Jersey to verify that it was suitable for use as fill material at Veteran's Field.

On or about August 17, 2012 Matt Vereb emailed Peter Lakatos of TERMS and identified a site known as the Reserve at Bell Air in West Orange, New Jersey as a potential source of fill material and requested a proposal from TERMS for sampling this proposed source of fill material to verify that it was suitable for use as fill material at Veteran's Field.

On or about August 17, 2012, Peter Lakatos of TERMS emailed Matt Vereb of Waterside a proposal for sampling the proposed fill material from the Reserve at Bell Air site in West Orange, New Jersey.

On or about August 17, 2012, Peter Lakatos of TERMS emailed Matt Vereb of Waterside a proposal for sampling the proposed fill material from along State Route 3 in Clifton, New Jersey. Pete Lakatos of TERMS inspected the proposed Route 3 fill material source and determined that it would most likely satisfy the requirements for use as clean fill. Mr. Lakatos collected samples of the Route 3 material for analysis and based upon his inspection of the Route 3 material Mr. Lakatos advised Waterside that it could bring the material to Veteran's Field but that it should be separately stockpiled and not used until the samples had been analyzed and it was confirmed that the material was suitable for use as fill as Veteran's Field.

On or about August 17, 2012 Matt Vereb emailed Peter Lakatos of TERMS and identified a site known as Highlands at Hilltop, 200 White Rock Road, Verona, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

In August, 2012, Peter Lakotas collected a sample of material from the site known as Highlands at Hilltop and asked Matt Vereb if he really wanted Terms to test this material for clean fill.

On or about August 17, 2012, Peter Lakatos of TERMS advised Steve Reddington of Waterside that virgin rock from the Arilex/Infinity site that had been transported to 440 River Road in Edgewater, New Jersey would be suitable for use at Veteran's Field provided that it was crushed and analysis of a sample of the fines indicated that it conformed to the residential direct contact standards.

On or about August 21, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside and Mike Berliner of Neglia that the test results for the proposed source at 440 River Road in Edgewater, New Jersey indicated that the soil from this site was not suitable for use at Veteran's Field because it contained PAHs and low levels of pesticides.

On or about August 21, 2012 Matt Vereb emailed Peter Lakatos of TERMS and identified two sites known as Towne Centre Urban Renewal Co., consisting of sites at 679 Anderson Avenue and 689-691 Anderson Avenue, Cliffside Park, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about August 22, 2012 Peter Lakatos of TERMS advised Matt Vereb of Waterside that the Towne Centre source required more sampling and analysis.

On or about August 22, 2012, Ronald Dooney and Peter Lakatos of TERMS, Mike Berliner of Neglia and Matt Vereb of Waterside attended a meeting at the offices of Neglia for purposes of reviewing soil testing procedures. At that meeting it was agreed that Waterside could use fill material other than quarry materials or blasted rock so long as the proposed material was sampled and analyzed in accordance with the testing requirements contained in the New Jersey Department of Environmental Protection ("NJDEP") Alternative and Clean Fill Guidance for SRP Sites and the results confirmed that the proposed fill material did not exceed the Residential Direct Contact Standards ("RDCS") established by the NJDEP. Edgewater's representatives instructed TERMS to work with Waterside to document that fill actually used satisfied criteria for use as clean fill. Edgewater's representatives also made it clear that it did not want the Project delayed.

It was agreed by all, including Waterside and Plaintiff, through its representatives, that Waterside would identify proposed fill materials to TERMS so that TERMS could complete the required testing and analysis before the material was brought to Veteran's Field. In the event that the analysis of the proposed fill material indicated that all contaminants were present in concentrations below the most stringent applicable standard then TERMS would advise Waterside and Plaintiff, through Neglia, that the material was suitable for use as fill material at Veteran's Field. In the event that the analysis of the proposed fill material indicated that any contaminant was present in concentrations in excess of the most stringent applicable standard then TERMS would advise Waterside and Plaintiff, through Neglia, that the material was not suitable for use as fill material at Veteran's Field and Waterside would not bring the material to veteran's Field.

Waterside disregarded the agreed upon procedure for the identification and testing of proposed fill material before bringing it to Veteran's Field and on various occasions brought untested material to Veteran's Field.

Whenever TERMS discovered that Waterside had brought untested and uninspected materials to Veteran's Field TERMS instructed Waterside to stockpile and not use or spread those materials until testing was completed. In the event that the analysis of that material indicated that all contaminants were present in concentrations below the most stringent applicable standard then TERMS would advise Waterside and Plaintiff, through Neglia, that the material was suitable for use as fill material at Veteran's Field. In the event that the analysis of that material indicated that any contaminant was present in concentrations in excess of the most stringent applicable standard then TERMS would advise Waterside and Plaintiff, through Neglia, that the material was not suitable for use as fill material at Veteran's Field and that Waterside had to remove the material from Veteran's Field.

Waterside disregarded the agreed upon procedure for the identification and testing of proposed fill material before bringing it to Veteran's Field and on various occasions brought material to Veteran's Field that had been tested and deemed unsuitable for use as fill material at Veteran's Field.

Whenever TERMS discovered that Waterside had brought materials to Veteran's Field that Waterside had previously been advised by TERMS were not suitable for use at Veteran's Field TERMS notified Plaintiff, through Neglia, and instructed Waterside not to use or spread that material until further direction from TERMS. TERMS then collected samples of that material and, when the analysis of those samples confirmed that the material was not suitable for use at Veteran's Field, advised Waterside and Plaintiff, through Neglia, that Waterside had to remove those materials from Veteran's Field.

If tested and suitable fill material brought to the site contained debris, such as license plates, concrete or blacktop, TERMS physically removed that debris from the fill material and placed it into a pile for disposal from the site

TERMS was never given control of job or the job site, it had no authority or ability to stop Waterside if Waterside ignored TERMS' directions/instructions and could not prevent Waterside or anyone else from entering the site.

TERMS advised the Borough either directly or through Neglia when Waterside disregarded the agreed upon protocols.

Ronald Dooney of TERMS had several telephone conversations and meetings with Mike Berliner of Neglia and Greg Franz of Edgewater in which Mr. Dooney advised both Mr. Berliner and Mr. Franz that he had asked Waterside numerous times for the OSHA certificates and that Waterside had still not provided any. Mr. Dooney also advised Mr. Berliner and Mr. Franz that Waterside was not following the Health and Safety Plan because it refused to supply or use (after the Town

supplied a water truck) for dust control at veteran's Field. Mr. Dooney asked Mr. Berliner and Mr. Franz what he was supposed to do, whether he should go to NJDEP and have them shut the job down. Mr. Berliner and Mr. Franz responded that they could not, that TERMS should not go to the NJDEP and that they would get Mr. Dooney what he needed. Mr. Berliner and Mr. Franz then asked Mr. Dooney if this was really a hazardous waste site. Mr. Dooney advised them that it was not a hazardous waste site under Federal law but that state law does apply the federal training requirements on all site in the state's site remediation program.

In a conversation between Mr. Dooney of TERMS and Fred Daibes of Waterside, when Mr. Dooney raised the issue of the OSHA certificates Mr. Daibes responded "[w] know the environmental game, you'll get what you need."

On or about August 23, 2012 Matt Vereb emailed Peter Lakatos of TERMS and provided information on compost proposed to be added to top soil.

On or about August 24, 2012, Peter Lakatos of TERMS advised Matt Vereb that the proposed compost required a certification from the source.

On or about August 28, 2012, Waterside requested that TERMS conduct the sampling necessary for the proposed Route 3 source and executed a proposal from TERMS for that sampling.

On or about August 30, 2012, Mike Berliner of Neglia requested that Ron Dooney of TERMS contact Downs Tree Service to discuss the required testing for a proposed source of topsoil.

On or about August 31, 2012 Matt Vereb of Waterside identified to Mike Berliner of Neglia a proposed source of top soil in Sparta, New Jersey provided by Grinnell Recycling, Inc. and included a certification from Grinnell.

On or about August 31, 2012, Matt Vereb emailed Peter Lakatos of TERMS and identified a site known as Hackensack Hospital as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about September 4, 2012 Peter Lakatos of TERMS advised Matt Vereb of Waterside that the Hackensack Hospital source required more sampling and analysis.

On or about September 5, 2012, Matt Vereb emailed Peter Lakatos of TERMS and identified a site known as Boverini Stadium, Passaic, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about September 5, 2012, Matt Vereb of Waterside emailed Peter Lakatos of TERMS test results for the proposed topsoil from Grinnell in Sparta, New Jersey.

On or about September 6, 2012 Peter Lakatos of TERMS adivsed Matt Vereb of Waterside that the Boverini Stadium source was not suitable for use at Veteran's Field.

On or about September 6, 2012, Ron Dooney of TERMS advised Matt Vereb of Waterside that the proposed top soil source from Grinnell in Sparta, New Jersey was acceptable for use at Veteran's Field provided that Grinnell's LSRP, Andrew Robinson, provided a certification that the material qualified as clean fill.

On or about September 12, 2012 Peter Lakatos of TERMS advised Matt Vereb of Waterside that the material from the East side of Route 3 was suitable for use at Veteran's Field, but limited to a quantity of 600 loads (12,000 cubic yards).

On or about September 24, 2012 Matt Vereb emailed Peter Lakatos of TERMS additional test results for the proposed top soil source from Grinnell in Sparta, New Jersey.

On or about September 24, 2012 Matt Vereb emailed Peter Lakatos of TERMS additional test results for the proposed source previously identified as Towne Centre in Cliffside Park, New Jersey.

On or about September 25, 2012 Peter Lakatos of TERMS emailed Matt Vereba and advised him that the proposed Towne Centre material was not suitable for use at Veteran's Field.

On or about September 25, 2012 Matt Vereb emailed Peter Lakatos of TERMS and identified a site known as Boverini Stadium, Passaic, New Jersey as a potential source of fill material and provided some soil testing data regarding new soils from this proposed source.

On or about September 25, 2012 Peter Lakatos of TERMS emailed Matt Vereb of Waterside and advised him that the sample for the newly proposed material from Boverini Stadium was not sufficient and that additional sampling and analysis was required.

In or about September, 2012, Noah Skyta of TERMS asked Fred Daibes to provide the certification from Andrew Robinson, LSRP, of Groundworks certifying the topsoil as clean fill. Mr. Daibes promised to provide the certification.

In or about September, 2012, an engineer from Neglia examined the topsoil from Grinnell and advised that it was more like mulch than topsoil and that it was not suitable for use on the ballfield.

In or about September, 2012, Noah Skyta of TERMS and Fred Daibes of Waterside got into a shouting match at Veteran's Field over the material being brought to Veteran's Field by Waterside. Dino Menzella was present although not a participant in the discussions between Mr. Sktya and Mr. Daibes. Mr. Skyta told

Mr. Daibes that TERMS still had not received the OSHA certificates from Waterside, that they needed to provide and use a water truck for dust control and that Waterside had to test everything it was bringing into Veteran's Field before it actually came to Veteran's Field so that if it's bad it doesn't get mixed and we don't have to take it all out. Mr. Berliner of Neglia somehow became aware of this situation and called Mr. Dooney and told him that Mr. Daibes was calling people at the town and that "[h]e [Daibes] was pissed that Noah was busting his chops and that he [Mr. Skyta] was causing all this to be delayed." Mr. Dooney told Mr. Berliner that he would go out to the Site. Mr. Dooney subsequently met Mr. Daibes at Veteran's Field. Mr. Daibes told Mr. Dooney that "[y]our fucking guy is trying to ruin this job. He's busting my chops, he's questioning everything we do, it's causing delays. That's not the way this job's going to go." Mr. Dooney told Mr. Daibes to slow down and that he would talk to Noah, and that maybe Noah could be more diplomatic but that this was not a typical construction project and that because it was a site subject to NJDEP's Site Remediation Program that everything being used for fill had to be tested and that everyone had to do it the right way. Mr. Daibes calmed down and said "[n]o, no, I'm going to do it right, my kids are going to be playing on this field." Mr. Daibes then complained that "[n]ow he's telling me I can't bring the stuff from my yard over here, it's clean." Mr. Daibes then suggested to Mr. Dooney that they go back to Mr. Daibes yard (440 River Road) to look at the material. Mr. Dooney agreed and he and Mr. Skyta met Mr. Daibes and Matt Vereb of Waterside at the Waterside yard. When they arrived at Waterside's yard Mr. Dooney and Mr. Skyta observed two piles of material, one consisting of recycled concrete with rebar and brick and the other containing sol with some concrete and a tank sticking out of it. Mr. Dooney stated that this was not clean fill. Mr. Daibes then asked why it had to be "clean-clean." Mr. Dooney then stated that if Waterside wanted to bring in stuff that has contamination they need to obtain a beneficial reuse permit. Mr. Skyta then stated that TERMS had already tested the material and that it could not be used at Veteran's Field. Mr. Daibes then responded by asking Mr. Skyta "[w]hat are you some sort of cowboy?" Mr. Daibes further stated that he had to get this job done and asked whether they couldn't run more tests and use it if it passed those tests. Mr. Dooney advised Mr. Daibes and Mr. Vereb that Waterside could not use this material even if they ran more tests which passed. Mr. Dooney also stated that there are different guidance documents for certified clean fill and for concrete with different testing requirements and that concrete could be worse than soil.

Mr. Skyta, on a subsequent occasion at Veteran's Field, indicated to Mr. Daibes that Waterside needed to really use a water truck to control the dust. Mr. Dooney thereafter received a call from Mr. Berliner in which Mr. Berliner stated that "Fred's not used to being told what to do." At a subsequent meeting between Mr. Dooney and Mr. Daibes, Mr. Daibes stated "[n]o one tells me what to do in my town."

On or about September 27, 2012 Waterside, at the direction of Daibes, brought to Veteran's Field approximately five truckloads of soil from 440 River Road, material that had been deemed unsuitable for use by TERMS on or about August 21, 2012.

2638946v1                                  11

The material from 440 River Road consisted of dirt or soil, concrete, blacktop, debris and rock. Upon discovering that Waterside had brought this material to Veteran's Field Noah Skyta of TERMS advised Fred Daibes of Waterside that this material could not be used at Veteran's Field and had to be removed. Dino Menzella of Neglia, upon hearing Mr. Skyta's instructions to Mr. Daibes stated to Mr. Skyta "[y]ou can't talk to Freddy like that." Mr. Skyta turned additional truckloads of this material away from Veteran's Field. Bryan Christiansen of Waterside was also present. TERMS subsequently advised Waterside that if this material was screened and the soil, blacktop, concrete and debris removed, then Waterside could use the remaining rock as part of the sub-base for the paved parking area to be constructed. TERMS advised Waterside that all soil, concrete, blacktop and debris from the 440 River Road material had to be removed from Veteran's Field.

On or about September 27, 2012, Fred Daibes or Waterside's foreman, Mark (last name unknown) asked Noah Skyta of TERMS if Waterside couldn't just blend contaminated material with clean fill and use the blended material at Veteran's Field. Mr. Skyta advised the Waterside representative that if even if it was permissible, if the contaminated material was 100 times the allowable limit they would need to blend 1 ton of contaminated material with 100 tons of clean material to reach the allowable concentration. Mr. Skyta advised the Waterside representative that this was not the way to solve the problem of finding clean fill material. Mr. Dooney had, in the past advised Waterside that it could not blend dirty soil from offsite, period.

On or about September 27, 2012, Waterside started bringing onto Veteran's Field topsoil from the Grinnell site in Sparta, New Jersey despite not having provided a certification from Grinnell's LSRP as requested.

On or about September 27, 2012, Waterside brought shot rock from the Hudson Avenue site in Fort Lee, New Jersey to Veteran's Field without prior sampling and analysis by TERMS. Mike Berliner of Neglia determined that this shot rock material could be utilized as part of the rip rap on the Hudson River Walkway which was not part of the Veteran's Park Project and was not subject to oversight by TERMS.

On or about September 28, 2012, TERMS reiterated to Waterside that TERMS needed to know the source of material being brought Veteran's Field before it was actually brought to Veteran's Field so that TERMS could coordinate the sampling and analysis to confirm that the proposed fill material was suitable for use at Veteran's Field and that Waterside should notify TERMS at the beginning of each day, or on the day before, where Waterside would be bringing fill material from. TERMS also reminded Waterside that it needed the OSHA certificates. On or about

September 28, 202, Matt Vereb of Waterside agreed to provide advance notice of proposed fill materials as requested and promised to obtain and provide the OSHA certificates.

Mr. Dooney attended a meeting at the offices of Waterside with Mr. Daibes and Mr. Vereb of Waterside, Mr. Berliner of Neglia and Greg Franz from, Edgewater. Mr. Daibes stated that they have to move this job along and that "[e]verytime I try to bring in soil Noah tells me I can't." Mr. Daibes further stated that it was clear that Noah wants to stop the job and that "[y]ou better get him in line or else TERMS is not going to be on this job anymore." Mr. Dooney stated "[l]ook Fred, nobody's trying to bust your chops, we just have to make sure it's clean." Mr. Dooney also stated that you couldn't cap dirty stuff with dirty stuff and certainly not with dirtier stuff. Mr. Daibes then responded by saying that this stuff was not dirtier, that it was just above the standards. Mr. Dooney then stated that if it has some contamination at a lower concentration, then you can use it but only if you have a beneficial reuse permit. Mr. Daibes then said that a permit was going to take too long, picked up the telephone and said he was going to call Kim Guadano and that he would have the permit in a day. Mr. Daibes then asked "[w]hat is it we're asking for exactly?" Mr. Dooney responded "[a] beneficial reuse permit." Mr. Daibes then hung up the telephone and said "[o]k, let's just do it the right way" and indicated that he was no longer going to pursue a beneficial reuse permit.

Mr. Dooney received a telephone call from Mr. Berliner in which Mr. Berliner stated "I'm not telling you what to do, but if you don't replace Noah or remove him from the site the town's going to fire TERMS from the site."

In or about late September to Early October, 2012, Dino Menzella of Neglia called Peter Lakatos of TERMS and advised him that Waterside was putting rock under the southern parking lot as sub-base but it was unknown if that material was the material that had been brought to the site on September 27, 2012. Mr. Lakatos went to Veteran's Field and met with Mike Berliner and Dino Menzella of Neglia and observed, with them, that the material in question had been compacted and combined with other site materials. Mr. Berliner stated that "[t]hey've already spread it. What do you want to do?" Mr. Lakatos spoke with Ronald Dooney of TERMS via telephone and explained the situation, including the fact that initial testing of mixed material from 440 River Road contained low level PAHs and that it was now impossible to distinguish that material from other materials on site. Mr. Dooney recommended that the material be left in place and covered with a fabric filter and two feet of clean fill. Mr. Berliner did not object to this proposed solution.

When the Route 3 material was no longer available Mr. Dooney received a telephone call from Mr. Berliner. When Mr. Dooney asked what was going on with respect to the Route 3 material Mr. Berliner indicated that the Route 3 contractor had wised up and found someone to pay for the material and that Fred was not going to pay for it.

Mr. Dooney spoke with Mr. Franz regarding the testing of proposed fill material indicating that Waterside was responsible for testing the material pursuant to the contract. Mr. Franz responded that the Borough did not want Waterside to test the

material, they wanted TERMS to test it and were willing to pay TERMS to do so. Mr. Dooney questioned that the Borough was really going to do that when it was Waterside's obligation and the response from Mr. Franz was yes. Mr. Dooney advised Mr. Frnaz that Waterside had not paid TERMS' bill for prior testing and Mr. Franz told Mr. Dooney "[j]ust put it on your next bill to us."

Ronald Dooney of TERMS had a series of telephone conversations and at least one meeting with Greg Franz in late 2012 to review the parameters of TERMS proposals for providing oversight and LSRP services for the Veteran's Field Project. During these communications, Mr. Dooney and Mr. Franz discussed the fact that Waterside was behind schedule and the desirability of having TERMS personnel on site full time. Mr. Dooney advised Mr. Franz that he could see the project taking another 9 months to a year to complete and that he did not think that Edgewater would want to pay TERMS for providing such service. They discussed the fact that Waterside had been instructed to advise/alert TERMS when they were going to be conducting work at Veteran's Field. Mr. Dooney asked Mr. Franz what he wanted TERMS to do and stated that if TERMS kept someone out at the site full time it would be a big number. Mr. Franz responded that he wanted to keep TERMS' costs reasonable and that he did not think that TERMS needed to have someone out at the site on a full time basis.

Mr. Dooney had telephone conversations and at least one meeting with Mike Berliner and Greg Franz regarding continuing testing of proposed fill material for Waterside. Mr. Dooney indicate that Waterside was having TERMS sample a source for 200 yards in one location, for 500 yards in another and that the testing for such small amount of material at new sites was disproportionately costly because of the sampling frequency requirements. Mr. Franz instructed Mr. Dooney to just test whatever Waterside wants.

On or about October 2, 2012, Peter Lakatos of TERMS met at Waterside's offices with Mike Berliner and Mike Neglia of Neglia and Fred Daibes and Bryan Christiansen of Waterside. Waterside's representatives stated "[w]e want Noah out. He's the man of every time we want to do something he says no. We're trying to get this done in a timely manner and need someone who is going to work with us." Mr. Daibes stated "[w]e have to go through Pete for all the answers, we don't see Ron, Pete's the one who knows what's going on." The Neglia representatives stated that "[i]f you're asking for Pete to be up here and to fire Noah, we're not comfortable with that; you're picking a particular guy to be your oversight." Mr. Lakatos stated that "Ron doesn't really want me up there at the field, I've got other things to do." The Waterside representatives responded by stating "[n]o, no, we'll take anybody but Noah." The Neglia representatives asked Mr. Lakatos how he felt about this and he responded that they would have to ask Mr. Dooney. Mr. Daibes then stated that "[i]f Noah is still there we'll need to find another environmental consultant, I can't work with TERMS." The Neglia representative then asked "Pete, is there anythng we can do to get someone else up here and get Noah off the job?" Mr. Lakatos called Mr. Dooney and Mr. Dooney told Mr. Lakatos that "[w]e'll send Joe [Noon] up, I can't have you up there every day and

I'll have to fire Noah."

On or about October 3, 2012, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as 145-68 28th Street, Rosedale, New York as a potential source of fill material and provided some soil testing data regarding new soils from this proposed source.

On or about October 3, 2012, Matt Vereb of Waterside emailed Peter Lakatos of potential source of fill material and provided some soil testing data regarding this proposed source.

On or about October 4, 2012 Peter Lakatos of TERMS emailed Matt Vereb of Waterside and advised him that the proposed material from the Stella Doro site in the Bronx, New York was not suitable for use at Veteran's Field

On or about October 4, 2012 Peter Lakatos of TERMS emailed Matt Vereb of Waterside and advised him that the proposed material from 145-68 28th Street, Rosedale, New York was not suitable for use at Veteran's Field.

On or about October 4, 2012, Matt Vereb emailed Peter Lakatos and requested that TERMS sample a proposed site situated at Undercliff Avenue.

On or about October 9, 2012, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified the Westbound side of Route 3 in Clifton, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about October 9, 2012 Peter Lakatos of TERMS emailed Matt Vereb of Waterside and advised him that while an initial review of the data for he soils from the Westbound side of Route 3 appeared good, more samples were needed.

On or about October 11, 2012, Matt Vereb of Waterside identified to TERMS a site at 521 Livingston Avenue in Norwood, New Jersey as a potential source of fill material.

On or about October 12, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material in Norwood, New Jersey would need to be sampled and analyzed

On or about October 15, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside that material from Undercliff and from Route 3 Eastbound and Westbound sites in Clifton, New Jersey were still awaiting receipt of laboratory analysis, TERMS had not yet been requested to sample material from Route 3 Westbound in Lyndhurst, New Jersey and that if any of this material was brought to Veteran's Field it had to be stockpiled separately until testing results indicated whether or not they were suitable for use at Veteran's Field.  Matt Vereb of Waterside confirmed in an email to Peter Lakatos that material being brought to

Veteran's Field was previously approved material from Eastbound Route 3.

On or about October 15, 2012, Peter Lakatos emailed Matt Vereb and advised him that an additional 2000 cubic yards of material from the Eastbound Route 3 site in Clifton, New Jersey was acceptable for use at Veteran's Field.  Mr. Lakatos also advised Mr. Vereb that all virgin rock and 500 cubic yards of soil from the Undercliff site was acceptable for use at Veteran's Field.

On or about October 18, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material in Norwood, New Jersey would need to be sampled and analyzed.

On or about October 22, 2012, Matt Vereb of Waterside identified to TERMS a site at 16 Graham Street in Alpine, New Jersey as a potential source of fill material.

On or about October 23, 2012, Matt Vereb of Waterside identified to TERMS a site in Fort Lee, New Jersey as a potential source of fill material.

On or about October 24, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material in Fort Lee, New Jersey was not suitable for use at Veteran's Field.

In or about October, 2012, Waterside identified to TERMS a site in Ridgewood, New Jersey as a potential source of fill material.

In or about October, 2012, Waterside identified to TERMS a site in Oakland, New Jersey as a potential source of fill material.

In late October, 2012, Super Storm Sandy impacted that area and Veteran's Field was flooded.

On or about November 6, 2012, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed sources for fill material in Norwood, Oakland and Alpine, New Jersey were all suitable for use at Veteran's Field and that the proposed source in Ridgewood, New Jersey was not suitable for use at Veteran's Field.

On or about December 3, 2012, Mike Berliner identified to TERMS a site along Route 5 as a proposed source of fill material for Veteran's Field.

On or about December 3, 2012 Peter Lakatos of TERMS suggested to Mike Berliner that the material from Route 5 could be used as rip rap on the Hudson River Walkway sea wall project which was not part of the Veteran's Field Project and therefore, not subject to review by TERMS.

On or about March 25, 2013 Waterside brought approximately 60 loads of soil, crushed concrete, stone, brick and asphalt to Veteran's Field without prior notice to TERMS. On or about March 27, 2013 TERMS made inquiry to Waterside as to the source of this material and was advised that the source was the Undercliff site. A visual inspection of the material, however, determined that it did not appear to be representative of Undercliff soils. Peter Lakatos of TERMS sampled the material and the results indicated that it was contaminated. Upon inspection of Veteran's Field TERMS discovered that the material in question appeared, by virtue of machinery tracks leading to the retaining wall and brick walkway, to have been spread over at the retaining wall and brick walkway which was not part of the Veteran's Field Project for remediation of the historic fill, and therefore was not subject to review by the LSRP. Peter Lakotas of TERMS advised Mike Berliner of Neglia of the foregoing facts and Mr. Berliner did not voice any objection.

On or about March 29, 2013, Peter Lakotas reminded Matt Vereb that only 500 cubic yards from the Undercliff site had been deemed acceptable for use at Veteran's Field and that 8 more samples would have to be collected and analyzed for the material recently brought to Veteran's Field. Mr. Lakatos instructed Mr. Vereb that the additional material from the Undercliff site was not to be used or spread unless and until test results confirmed that it was suitable for use at Veteran's Field.

On or about April 16, 2013 Peter Lakatos of TERMS advised Matt Vereb of Waterside, as well as Mike Berliner and Jason (Dino) Menzella of Neglia, that the test results indicated that the material from the Undercliff site was not acceptable for use at Veteran's Field and had to be removed.

In or about April, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside about a site located at Horse Hill Road, Hanover, New Jersey as a potential source of fill material.

On or about April 26, 2013, Peter Lakatos of TERMS sampled the material at Horse Hill Road.

In or about May, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the test results indicated that the material from Horse Hill Road was suitable for use at Veteran's Field, however, Mr. Vereb indicated that the site was too far from Veteran's Field and that Waterside would not use that material.

On or about May 1, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site located at 76th Street in North Bergen, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about May 2, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as 1099 Hendricks Causeway in Ridgefield, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about May 2, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material at 1099 Hendricks Causeway in Ridgewood, New Jersey was not suitable for use at Veteran's Field.

On or about May 2, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as 2111 Hope Avenue as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about May 3, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the testing provided for the proposed source of fill material at 2111 Hope Avenue was missing various analytical parameters and could not be deemed usable at Veteran's Field without further testing.

On or about May 6, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as Wallace Trucking in Pennington Park, as a potential source of fill material and provided some soil testing data regarding this proposed source. This material was never sampled and never used n connection with the Veteran's Field Project.

On or about May 20, 2013, Mike Berliner of Neglia emailed Peter Lakatos of TERMS and asked him to call Matt Vereb of Waterside about some soil from Paramus Catholic

On or about May 21, 2013, Mike Berliner of Neglia emailed Peter Lakatos of TERMS and advised him that the soil from Paramus Catholic was no longer available.

On or about May 30, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as 333 Westfield Avenue, Elizabeth, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about May 30, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material at 333 Westfield Avenue, Elizabeth, New Jersey was not suitable for use at Veteran's Field.

Mr. Dooney had a series of telephone calls and at least one meeting with Mr. Berliner and Mr. Franz in which Mr. Berliner and Mr. Franz indicated that the members of the Borough Council were being told that TERMS is holding up the job because it is rejecting everything. Mr. Dooney stated that TERMS was not rejecting anything, that the material was either good or not good, that TERMS was not

rejecting material just to piss off Mr. Daibes. Mr. Dooney also stated that TERMS was only comparing test results to the applicable standard to see if it meets the criteria for clean fill and that TERMS was not rejecting material, just advising whether or not it qualified as clean fill.

Mr. Dooney also received telephone calls from Mr. Berliner, Mr. Franz and Philip Boggia, Borough attorney, in which they stated that what Borough Council was hearing was that TERMS was obstructing the job, rejecting material and that it was just because TERMS wanted to make more money on sampling and analysis. Mr. Dooney subsequently attended a meeting with Peter Lakatos of TERMS, Mike Neglia and Mike. Berliner of Neglia, Greg Franz and Phillip Boggia where similar claims were discussed. Mr. Dooney advised that those claims were nonsense and that he had written letters to the Borough describing what had been happening. Mr. Boggia stated that Borough Council members did not want to read letters and that they were getting emails. Mr. Franz admitted that he had previously advised Mr. Dooney that he did not want to receive email from him. Mr. Boggia also advised Mr. Dooney that Mr. Daibes was telling council members that he had approval for material from his own LSRP.

In or about July, 2013, Waterside identified to TERMS a site designated as Lawton and Anderson as a potential source of fill material.

On or about July 1, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as 7373 West Side, North Bergen, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about July 3, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material at 7373 West Side, North Bergen, New Jersey was not suitable for use at Veteran's Field.

On or about July 4, 2013, Mike Berliner of Neglia emailed Peter Lakatos of TERMS and identified a site known as 646 Undercliff Avenue, Edgewater, New Jersey as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about July 4, 2013, Peter Lakatos of TERMS advised Mike Berliner of Neglia that the proposed source for fill material at 646 Undercliff Avenue, Edgewater, New Jersey had previously been sampled and deemed not to be suitable for use at Veteran's Field.

Between July 5 and July 12, 2013 Waterside delivered approximately 40 loads of material to Veteran's Field from an unknown source and which contained a mix of rock and soil with some concrete and rebar without prior notice to TERMS or an opportunity for TERMS to sample and test this material.

On or about July 12, 2013, Matt Follo of TERMS emailed Peter Lakatos of TERMS a photograph of material imported to Veteran's Field by Waterside. Peter Lakatos of TERMS thereupon notified Mike Berliner and Jason Menzella of Neglia that within the past week Waterside had delivered approximately 40 loads of material to Veteran's Field from an unknown source and which contained a mix of rock and soil with some concrete and rebar without prior notice to TERMS or an opportunity for TERMS to sample and test this material and that the material could not be spread until appropriate testing was performed.

On or about July 12 or 13, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the approximately 40 loads of material that Waterside had delivered to Veteran's Field from July 5 to July 12, 2013 from an unknown source and which contained a mix of rock and soil with some concrete and rebar, and without prior notice to TERMS or an opportunity for TERMS to sample and test this material, could not be spread until appropriate testing was performed. It was later determined that this material originated from Undercliff.

Ronald Dooney and Matt Follo of TERMS visited Veteran's Field and inspected the approximately 40 loads of material brought to Veteran's Field by Waterside from July 5 to July 12, 2013 from an unknown source and which contained a mix of rock and soil with some concrete and rebar.

Mr. Dooney had a series of telephone calls with Mike Berliner of Neglia regarding the material brought to Veteran's Field by Waterside from the unknown source. Mr. Berliner indicated that he had had a conversation with Peter Lakatos of TERMS who had advised him that some of the material had tested dirty and that Mr. Lakatos had suggested that he call Ron about what they were going to do to document the removal of this material. Mr. Berliner indicated that Waterside was asking what needed to be done to correct this issue and stated "[w]e've got to address this right away. What do we have to do to do that?" Mr. Dooney said that they had to get rid of at least some of this material if not all of it; take out 5 or 6 loads, approximately 100 yards, and give me the manifests. Mr. Berliner than asked "[i]f I get them to take out 100 yards and give you manifests that will be enough?" Mr. Dooney said yes and Mr. Berliner then said that he would get them to do that.

On or about July 12, 2013, Peter Lakatos of TERMS advised Mike Berliner of Neglia and Matt Vereb of Waterside that the surface materials at the proposed source for fill material known as Lawton and Anderson was not suitable for use at Veteran's Field. Peter Lakatos subsequently sampled fines and rock from an excavation that was approximately 50 feet deep and advised Mike Berliner of Neglia and Matt Vereb of Waterside that the fines from the excavation were not suitable for use at Veteran's Field but that the rock was suitable for use at Veteran's Field.

On or about July 12, 2013, Ronald Dooney and Peter Lakatos of TERMS attended a meeting at the offices of Neglia with Mike Neglia and Mike Berliner of Neglia and Fred Daibes, Bryan Christiansen, Bryan (last name unknown), and Phil (last name unknown) of Waterside.  Waterside representatives asked "[w]here are we going to get material for this site."  Mr. Daibes stated "I'm going to call DEP, I know people down there, this is ridiculous, too expensive and too much testing."  TERMS representatives stated that "[w]e had sites that passed but you said were too far."  Mr. Daibes then asked "[w]hat can we do to finish the job?  Where are we going to get topsoil in New Jersey?"  TERMS representatives responded that Waterside should go to Mt. Hope, Weldon or another quarry and buy clean fill.  Mr. Daibes said "that will never happen" due to cost.  Someone in attendance suggested using "like on like" material for fill and Mr. Dooney told everyone what the applicable regulations allowed.  It was agreed at this meeting that Waterside would use 18 inches of rock and 6 inches of clean fill to achieve the two foot thick cap proposed for Veteran's Field.

A meeting was held in 2013 and attended by Mr. Dooney and Peter Lakatos of TERMS, Mr. Daibes and Matt Vereb of Waterside, Mike Neglia and Mike Berliner of Neglia and Greg Franz.  During this meeting Mr. Daibes commented that '[y]ou're [TERMS] killing me here because your guys keep rejecting everything I try to bring in.  All you want to do is obstruct things, you just want to keep testing."  Mr. Dooney responded by indicating that TERMS was not rejecting anything, that it was just comparing test results to applicable standards to see if it satisfied the requirements for clean fill.  Mr. Dooney then stated that TERMS was trying to help Waterside find soil, that TERMS had told Waterside about 50,000 yards of soil near the Mennen Arena that had already been tested and that the owner would load onto trucks for Waterside, but that Daibes had rejected that as being too far away.  Mr. Daibes asked how he was going to find soil to finish the job.  Mr. Dooney replied that it was not TERMS' obligation and that Waterside should go get material from Tilcon or some other quarry.  Mr. Daibes stated that would never happen and observed that it cost about $15 per yard from Tilcon.  Mr. Dooney stated that Waterside couldn't bring in dirty material unless it obtained a beneficial reuse permit and Mr. Daibes responded by stating that they didn't have the time to do that.

On or about July 26, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that if Waterside provided test results and a certification from a LSRP authorizing the use of soil from 646 Undercliff Avenue, Edgewater, New Jersey that Waterside could use 20 tons of soil from that source as fill material at Veteran's Field.

On July 29, 2013, Mr. Dooney met Mr. Daibes at Veteran's field to review material that Waterside had brought to the site.  Mr. Dooney observed debris and at least one drum in the material that had been brought to the site.  Mr. Dooney stated to Mr. Daibes "[y]ou're saying this stuff is clean, I almost tripped over a drum."  Mr.

Daibes said that the material was coming from a residential site and was clean. Mr. Dooney then said that it did not matter, that they still had to test it because they were using it on a site remediation program site. When Mr. Dooney pointed out the drum and other debris Mr. Daibes responded by saying that he didn't know how that got mixed in. Mr. Dooney then told Mr. Daibes that he had been told that Mr. Daibes had approvals for fill material from his own LSRP, but that he hadn't seen any such approvals and that he still had to approve the material as the LSRP for the site. Mr. Daibes asked Mr. Dooney to come back to his office where he showed him a letter from Andrew Robinson of Groundworks. Mr. Dooney read the letter which stated that one sample had been collected and analyzed, that the results were below the standards, but that the author was not the LSRP of record and that the were no representations about how many samples would be needed. Mr. Dooney asked Mr. Daibes if he had read the letter. Mr. Daibes said that he had not and asked what it said. Mr. Dooney told Mr. Daibes that it's for one test which is good for 20 yards. Mr. Dooney then said to Mr. Daibes that he had heard the Mr. Daibes was telling people that he had approval from a LSRP. Mr. Daibes responded by stating no, that he was telling them that he had a source.

On or about August 22, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as Hollywood Memorial as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about August 30, 2013, Matt Vereb of Waterside emailed Peter Lakatos of TERMS and identified a site known as Livingston Street, Northvale as a potential source of fill material and provided some soil testing data regarding this proposed source.

On or about September 3, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material at Livingston Street, Northvale was not suitable for use at Veteran's Field.

On or about September 10, 2013, Peter Lakatos of TERMS sampled the material at Hollywood Memorial. Peter Lakatos of TERMS subsequently advised Matt Vereb of Waterside that the proposed source for fill material at Hollywood Memorial was acceptable for use at Veteran's Field.

On or about September 11, 2013, Mr. Dooney received a telephone call from Mike Berliner who told him that a town bus driver had seen Waterside running trucks from the Alcoa Site to Veteran's Field over the past weekend. Mr. Dooney immediately suspected that the fill material could be contaminated since the Alcoa Site was a known contaminated site. In subsequent conversations it was related that it was an employee from the DPW and then, in even later conversations, a Neglia employee who witnessed the trucks coming to Veteran's Field over that weekend.

On or about September 11, 2013, Peter Lakatos of TERMS received a telephone call from Michael Berliner of Neglia in which Mr. Berliner advised Mr. Lakatos that Waterside had imported a large volume of fill material to Veteran's Field from an unidentified source over the weekend. Mr. Lakatos advised Mr. Berliner that TERMS would look into it.

On September 11, 2013 TERMS advised Plaintiff in writing, through Neglia, that Waterside had brought untested fill material to the site and requested confirmation from the Borough, through Neglia, that Waterside had been instructed not to cover or move the stockpiled fill material until testing results were available and that Waterside had been instructed not to bring in any additional material from the source of this material.

On or about September 12, 2013, Matt Follo of TERMS visited Veteran's Field and observed several piles of stockpiled material that were not previously present at Veteran's Field and appeared to contain crushed concrete. Mr. Follo related this information to Mr. Lakatos who instructed him to collect samples from the stockpiled material. Mr. Lakatos then called Waterside's foreman, Mark (last name unknown) and advised him that TERMS had been getting reports of large amounts of material coming in." Mark responded that "[t]he kid's [Matt Follo] on drugs; there's a couple of piles, no big impact." Mr. Lakatos instructed Waterside's foreman, Mark, not to spread or use the stockpiled material and not to bring in any additional material from the source of this material.

On or about September 12, 2013, Matt Follo of TERMS collected samples of the stockpiled material for analysis.

During a telephone call between Mr. Dooney and Mr. Daibes between September 12, 2013 and September 23, 2013, Mr. Daibes stated that the material brought to Veteran's Field from the Alcoa Site consisted of one truckload.

In or about September, 2013 Waterside identified to TERMS a proposed source of fill material known as We Care and provided some soil testing data regarding this proposed source.

On or about September 19, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material known as We Care was not suitable for use at Veteran's Field.

On September 23, 2013 TERMS received the laboratory results for the initial samples of the fill material that had originated from the Alcoa Site and which confirmed that the stockpiled fill material was contaminated with, among other things, PCBs. TERMS advised plaintiff, through Neglia, that the stockpiled fill material was contaminated and had to be removed from Veteran's Field.

On September 24, 2013, Peter Lakatos of TERMS notified Matt Vereb of Waterside that the stockpiled fill material was not suitable for use at Veteran's Field and must be removed.

In late September, 2013 Ronald Dooney and Matt Follo of TERMS met Mr. Daibes at Veteran's Field and Mr. Daibes advised that Waterside had actually brought in 8 or 9 truckloads of the material. Mr. Dooney stated that he would have to test it to which Mr. Daibes responded that he could just take it back to the source. Mr. Dooney said that couldn't happen and that nothing was going to be done until TERMS knew what was going on. At that time, trucks started coming into Veteran's Field with crushed concrete. Mr. Dooney stopped the trucks and asked Mr. Daibes what ws going on and asked if the trucks contained recycled concrete. Mr. Daibes said no, that it is coming from a recycling plant that has permits and they tested it. Mr. Dooney obtained the name of the facility from Mr. Daibes and called it asking where it was coming from and whether it had been tested. The person who answered the telephone stated that they had run one test. Mr. Dooney then advised Mr. Daibes that he could not bring this stuff into Veteran's Field. Mr. Daibes protested, stating that it was going under the sidewalks. Mr. Dooney responded that it could not be used anywhere unless it was tested and said "Fred, we're not bringing anything else here until it's tested." Mr. Daibes responded by stating that he had enough material at Undercliff to finish the job and asked Mr. Dooney to test that. Mr. Daibes then stated "[y]ou know what, I don't need any more fill, but if I do, I'll bring it in from a quarry." Mr. Daibes also then stated that he wanted TERMS to test material from another source. Mr. Dooney asked what was going on because Mr. Daibes had just said that if he needed any material he was going to get it from a quarry. Mr. Daibes then said that he wanted to have it tested just in case. Mr. Follo stated that there was still a concrete slab over the area that Mr. Daibes wanted to have tested and Mr. Dooney told Mr. Daibes to give TERMS a week's notice after the slab was removed so that they could do the necessary testing. As the conversation was ending more trucks with recycled concrete arrived at Veteran's Field and Mr. Dooney instructed Mr. Follo to turn them away. Mr. Dooney then asked Mr. Daibes what was going on, that he had told him that the material could not be brought into Veteran's Field. Mr. Daibes responded that those trucks must have been in transit and he had no way of knowing that. Mr. Daibes then asked what was the problem with concrete, stating that they use it everywhere. Mr. Dooney recounted the history of the former Ford plant and the dispersal of PCB contaminated concrete from that facility and that the applicable regulations require that concrete be tested for PCBs and PAHs at a minimum before it can be recycled and reused as fill material. Mr. Daibes asked how anyone knew that the concrete contained PCBs and Mr. Dooney responded that DEP knew based on prior experience.

Mr. Dooney had a telephone conversation with Mr. Berliner in which Mr. Berliner stated, in reference to Mr. Daibes, that he was right, that they're using the recycled concrete material all over town.

On about September 29 or 30, 2013, Peter Lakatos of TERMS visited Veteran's Field and immediately observed that more material than just that contained in the stockpiles had been brought to Veteran's Field and that Waterside had not correctly or accurately described the site work to him.  Mr. Lakatos observed that while certain areas of the Site had been paved, the sidewalks and lighting island had not been poured with concrete and were still open forms.  Within those forms Mr. Lakatos observed the presence of pieces of crushed concrete which matched the stockpiled material that had not been moved as evidenced by both locations containing pieces of a distinctive brick with a star like pattern.  By examining the sidewalk and lighting islands areas and brushing back some of the rock, Mr. Lakatos could also see that the crushed concrete material extended under the newly paved areas as well.  Mr. Lakatos also observed that a 150 foot by 150 foot area had received lift material and was dressed with stone on top of it and that this was the only area on the field that had been covered with crushed stone.  Mr. Lakatos then spoke to Waterside's foreman, Mark, and stated "[y]ou guys aren't supposed to bring concrete to the site, where did it come from?"  Mark only responded by stating that "[t]his is just sub-base."

On September 30, 2013, Peter Lakatos of TERMS visited Veteran's Field for purposes of collecting additional samples from the suspect fill material.  Matt Follo of TERMS was also present as were Fred Daibes and Bryan Christianson of Waterside.  When TERMS personnel tried to set up for a preliminary investigation with a geoprobe, Mr. Daibes insisted that Waterside would dig test pits for TERMS to collect samples. Mr. Daibes asked "What are you guys looking for, this stuff's all good.  Don't make holes in the parking lot it's just paved."  Mr. Daibes also stated that the material under the parking lot is the same material that is in the sidewalk and lighting island forms.  Mr. Lakatos advised Mr. Daibes that he didn't know how much of this stuff is here, where it's been put and that he had to sample it all.  Bryan Christiansen stated that "[i]t [the material] went over here" indicating an area near the north parking lot.

In or about October, 2013, Peter Lakatos of TERMS met at Veteran's Field with Fred Daibes, Bryan Christiansen, Mark (foreman, last name unknown) and Kenny (site supervisor, last name unknown) all from Waterside.  Mr. Lakatos advised all present that the latest samples of the material from the Alcoa site had come back.  Mr. Daibes inquired as to how bad the results were and Mr. Lakatos responded that the results were pretty bad.  Mr. Lakatos advised all present that the contaminant levels exceeded Federal limits and that he still didn't "know what the hell happened here" and that he really needed to start grinding out the field for more sampling. Mr. Daibes stated that he would bring workers out to help TERMS, but Mr. Lakatos advised him that Waterside personnel could not help as he needed to do corings. Mr. Lakatos then advised all present that they had to get everyone off the field.  A Waterside representative told subcontractors working on the playground that they had to go home because permits had not yet been issued.  Mr. Lakatos advised Waterside representatives that they needed to send their workers home.  Waterside representatives advised Mr. Lakatos that they were just working on the fieldhouse. Mr. Lakatos advised Waterside representatives that dust is going to blow around the

field and that the areas with exposed contaminated material, such as the piles and exposed medians had to be covered. Waterside personnel proceeded to cover the areas containing exposed materials.

On October 2, 2013, TERMS coordinated with Plaintiff, through Neglia, the restriction of access to the site by contractors other than Waterside and municipal employees seeking to perform work at the site.

On or about October 3, 2013, TERMS received the results of the analysis of samples collected on September 30 and the results verified that the material that had been placed in the sidewalk and lighting island forms as well as the material underneath the parking lots were contaminated with PCBS.

On October 3, 2013 TERMS reported to the NJDEP the discharge at Veteran's Field resulting from the placement of the contaminated fill originating from the Alcoa Site.

On October 3, 2013 TERMS prepared a letter to Borough Administrator Greg Franz advising the Borough of, and summarizing, the current situation regarding the contamination of the park and placing the Borough on notice that TERMS was requiring all activity at the park to be stopped and all access to the site prohibited.

On October 4, 2013, after discussions with Neglia and Greg Franz, TERMS issued, through Neglia Engineering, a letter to Borough Administrator Greg Franz advising the Borough of, and summarizing, the current situation regarding the contamination of the park and placing the Borough on notice that TERMS was requiring all activity at the park to be stopped and all access to the site prohibited.

On October 4, 2013 TERMS issued written notice to Waterside advising that all access to and work at the site was to cease until the contamination from the fill material originating from the Alcoa site was addressed.

In a subsequent meeting with TERMS, Waterside and Edgewater representatives, Fred Daibes admitted that the fill material imported to Veteran's Field by Waterside in September, 2013 had originated from the Alcoa Site.

Mr. Dooney and Mr. Lakatos of TERMS attended a meeting with Mike Neglia and Mike Berliner of Neglia, Greg Franz, Philip Boggia, Esq. and the Mayor of Edgewater to discuss the situation with the contaminated material from the Alcoa Site and the associated costs. Mr. Dooney advised the group that Mr. Daibes had told him that Waterside had brought 8 or 9 truckloads of that material to Veteran's Field. Mr. Dooney then estimated that 8 or 9 loads weighed several hundred tons, assumed that there were 300 tons of material and that it was the worst case and it was all above TCSA levels and estimated a cost of probably $100,000 to remove and dispose of it.

Mr. Dooney had a telephone conversation with Mr. Berliner in which Mr. Berliner stated, that at Veteran's Field the Waterside people are telling everyone that it was o.k. because they blended the material with other material. Mr. Dooney stated that this was not better but actually worse and not acceptable, that by doing this Waterside had created a larger volume of contaminated material.

At another meeting with representative of Edgewater Mr. Dooney was asked if they could solve the problem by having Mr. Daibes just take the material back to where it had come from. Mr. Dooney stated that they could not do that. Later that day Mr. Dooney met Mr. Daibes at Veteran's Field who told Mr. Dooney that he spoke with the Town and that they were going to load the material onto trucks and take it back to the other site. Mr. Dooney responded "[n]o, absolutely not, you're not doing that." Mr. Daibes then said that he would call the town and Mr. Dooney responded by telling Mr. Daibes to go ahead and do that because he had just come from a meeting with the town's representatives.

In October, 2013, Peter Lakatos and Ronald Dooney of TERMS had a series of telephone conversations with Greg Franz of Plaintiff in which they were trying to get Edgewater to take action to close Veteran's Field and instruct Waterside to cease all work at Veteran's Field due to the high levels of contamination from the Alcoa material and advised Mr. Franz that they were covering the exposed material with plastic because of concerns regarding dust from the Alcoa material.

Between October 15, 2013 and October 30, 2013, TERMS again visited Veteran's Field to collect additional samples of the suspect fil material. During this time TERMS also covered various areas of Veteran's Field that had been confirmed to contain high contamination levels with plastic sheeting.

In or about October, 2013 Ron Dooney of TERMS physically placed a lock on the gate to the fence at Veteran's Field.

After Mr. Dooney placed a lock on the gates at Veteran's Field Mr. Dooney had at least one telephone call and one conference with Greg Franz discussing Waterside's access to the site. Mr. Franz indicated that Waterside had told him that they wanted to come in and get their equipment. Mr. Dooney stated that Waterside could not do that, that they were not properly trained and that it was a different ballgame now because the contaminant levels exceed TSCA limits. Mr. Franz responded by saying that he did not know what to tell Mr. Daibes, that he wants to get his equipment. Mr. Franz asked "[h]ow can I tell them no?" Mr. Dooney stated that Waterside would have to decontaminate the equipment with properly trained personnel. Approximately a week later Mr. Dooney observed that all of Waterside's equipment had been removed from Veteran's Field and that there was no evidence that it had been decontaminated prior to removal. Mr. Dooney then discussed this occurrence with Mr. Franz and Mr. Franz said "I don't know what to tell you." Mr. Dooney observed that they obviously wanted their equipment and came and got it.

In or about October, 2013, Matt Vereb of Waterside contacted Peter Lakatos of TERMS and identified a site known as Madonna Cemetery as a potential source of fill material and provided some soil testing data regarding this proposed source.

In or about October, 2013, Peter Lakatos of TERMS advised Matt Vereb of Waterside that the proposed source for fill material at Madonna Cemetery was not suitable for use at Veteran's Field.

In 2013 Ronald Dooney and Peter Lakatos of TERMS attended several meetings at the offices of Neglia with Mike Neglia and Mike Berliner of Neglia and Greg Franz, Philip Boggia, Esq. and Jim Delaney of Edgewater. At these meetings Mr. Boggia stated "[i]t's obvious he [Fred Daibes] did this, he's got to take care of it and it's got to be done quickly, like tomorrow." Mr. Boggia then asked "[w]hat has to be done, he [Fred Daibes] is paying for it, I don't care what it costs." Mr. Lakatos advised all present that disposal was going to be expensive and reviewed various alternatives, including, among others, the use of a central dump site and rail cars. Mr. Lakatos further advised all present that there needed to be a self-implementing plan and a remedial action workplan prepared and submitted to the USEPA and NJDEP. Mr. Lakatos explained to all present that there were two options for the remediation. The first option was to undertake a risk based approach since this was not a spill or historic contamination, but that this approach required that TERMS take more grid samples and obtain the prior approval of NJDEP which would take 30 days. Mr. Lakatos explained that the second option was to take a risk-based approach which involved a 10 foot by 10 foot grid approach with composite samples and that this was a more time consuming and more expensive approach. Mr. Boggia stated "[w]hy should we do more, we know where it [the contamination] is?" Mr. Lakatos advised all present that the only way to get the cleanup done without review was to use the risk-based approach. Mr. Boggia then stated that they should use the risk based approach and asked Mr. Lakatos if TERMS had enough samples. Mr. Lakatos advised all present that it was up to USEPA and they they could require more samples. Mr. Berliner inquired about the potential of using artificial turf to help address the contamination issue and Mr. Dooney responded by stating that they would still have to be some cleanup to some level. Mr. Boggia also responded by stating "[n]o, they're going to clean it; there were no PCBs before, they have to take it all out." At a meeting after Waterside's representatives indicated that they wanted to have TERMS' sampling data validated, Mr. Boggia stated that it "[w]ould take forever to validate more samples, let's submit this, go with what we have now and see what they [USEPA] say in thirty days." Mr. Lakatos stated that the cleanup was not going to be surgical and that there would likely be hot spots remaining after the initial excavation that would have to be excavated further. Based upon these discussions and the instructions and/or directions received from Plaintiff's representatives, TERMS prepared and submitted a SIP to the USEPA using the risk-based alternative with confirmation sampling.

In 2013, Peter Lakatos and Ronald Dooney of TERMS attended a meeting at the offices of Neglia with Mike Neglia and Mike Berliner of Neglia during which Mr. Neglia stated "[y]ou guys are environmental consultants and you go by the book on this."

TERMS had telephone conversations with Mike Berliner of Neglia Engineering on various dates regarding the site conditions and activities and the actions to be taken in connection with the fill material from the Alcoa Site.

TERMS made inquiry about remedial options and disposal options and costs. TERMS investigated the USEPA requirements for proper removal and remediation of PCB contamination.

On or about November 21, 2013, Rodger Ferguson requested that TERMS authorize Waterside to bring up to 1,500 cubic yards of fill material from the Undercliff site to Veteran's Field.

On or about November 25, 2013, Ronald Dooney of TERMS advised Mr. Ferguson that Waterside was not to bring any material from the Undercliff site to Veteran's Field until further notice.

TERMS transmitted documents and data from the laboratory analysis of the fill material from Alcoa and the prior investigation of historic fill at Veteran's Field to Waterside and its representatives.

TERMS attended numerous meetings with Fred Daibes, other Waterside representatives, and representatives of Plaintiff, including but not limited to personnel from Neglia, to discuss site conditions and activities and the actions to be taken in connection with the fill material from the Alcoa Site.

TERMS notified Plaintiff, through Greg Franz, Borough Administrator, of Waterside's failure to stop work at Veteran's Field despite TERMS' instructions to do so.

TERMS Attended meetings with Greg Franz, Plaintiff's attorneys and representatives of Neglia and Borough Council to discuss and plan the scope of the investigation and remediation relating to the fill material from the Alcoa Site.

TERMS prepared and submitted to Greg Franz summaries of the status of Veteran's Field, the investigation of fill material from the Alcoa Site and the anticipated remedial action workplan requirements.

TERMS submitted proposal to Edgewater for investigation and remediation of the fill material from the Alcoa Site and plaintiff approved that TERMS proposal and the retention of TERMS for the investigation and remediation of the fill material from the Alcoa Site at a Borough Council meeting on February 18, 2014.

TERMS attended meetings with Waterside's LSRP, Rodger Ferguson, Greg Franz, validation, and potential approaches to resolving the situation and Waterside's request to have the sampling data verified.

In 2014 Peter Lakatos of TERMS attended at the offices of Philip Boggia, Esq. with Gregory Franz, Philip Boggia, and Tim Corriston as representative of Plaintiff. At this meeting Mr. Boggia stated "[w]e're going after them [Waterside], work with Tim, he's going to help represent the town as an environmental attorney."

In 2014 Peter Lakatos of TERMS attended a meeting with Mike Neglia and Mike Berliner of Neglia, Councilman Henwood, Greg Franz and Philip Boggia, Esq. of Edgewater, Waterside's attorney and representatives of Liberty Mutual. Mr. Lakatos was asked to explain, start to finish, what happened at Veteran's Field. During a break in the meeting, Mr. Lakatos, Mike Neglia, Mike Berliner, Greg Franz and Philip Boggia had a discussion at which time Mr. Boggia stated "[w]e got him, the evidence is overwhelming." In addition, Mike Neglia stated "[e]verytime they go to blame TERMS, TERMS has the right answer."

TERMS arranged for the validation of the analytical results of the samples from Veteran's Field after the material from the Alcoa Site had been placed on Veteran's Field.

TERMS communicated with the data validators and reviewed the validation findings.

TERMS communicated with Waterside's LSRP regarding the sampling data and data validation.

TERMS transmitted the data validation results to Waterside's LSRP and confirmed Waterside's concurrence that the sampling data had been properly validated and was reliable and useable.

TERMS collected samples from Veteran's Field consistent with the scope of the proposed delineation and remediation as determined by Plaintiff and in accordance with Plaintiff's instructions.

TERMS prepared and submitted a SIP that was consistent with the scope of delineation and remediation as determined by Plaintiff and in accordance with Plaintiff's instructions.

At all times, despite TERMS role as environmental consultant providing oversight, Waterside and Daibes had exclusive control over what materials were brought to and deposited onto Veteran's Field – TERMS had no physical ability to prevent Waterside from bringing materials to the site.

a.  The following are the dates and information known to TERMS about the importation of fill material to Veteran's Field and there may have been other instances when fill material was imported to Veteran's Field which are unknown to TERMS:

     i.  July 30, 2012, used on the Sea Wall, not part of the Project
     ii.  August 1, 2012, used on the Sea Wall, not part of the Project
     iii.  August 2, 20112, used on the Sea Wall, not part of the Project
     iv.  August 13, 2012, used around drains and on ballfield
     v.  August 14, 2012, used around drains and on ballfield
     vi.  August 15, 2012, used around drains and on ballfield
     vii.  August 16, 2102, used around drains and on ballfield
     viii.  August 17, 2012, used around drains and on ballfield
     ix.  August 20, 2012
     x.  August 21, 2012
     xi.  August 22, 2012 used on the Sea Wall, not part of the Project
     xii.  August 23, 2012
     xiii.  August 24, 2012
     xiv.  August 27, 2012
     xv.  September 14, 2012
     xvi.  September 25, 2012
     xvii.  September 27, 2012
     xviii.  September 28, 2012
     xix.  October 1, 2012
     xx.  October 2, 2012
     xxi.  October 15, 2012
     xxii.  March 14, 2013
     xxiii.  Dates unknown
     xxiv.  Approximately March 25, 2013
     xxv.  July 5 – July 12, 2013
     xxvi.  September, ___, 2013

Material from the Route 3, Clifton NJ project was placed on the athletic field and southern parking lot areas.

Material from Undercliff Avenue was placed in a northern location adjacent to the tennis court.

Material from Lawton & Anderson was placed in the center of the athletic field and around the perimeter of the athletic field.

Material reported to be from the Alcoa Site was apparently placed in stockpiles, and in the southern parking area, the western side of the tennis court, in the northern parking area and along the River Road perimeter.

b.    The following is the information known to TERMS about the nature and quantity of fill material to Veteran's Field and there may have been other instances when fill material was imported to Veteran's Field which are unknown to TERMS

   i.    July 30, 2012 – Rock
   ii.   August 1, 2012 – Rock
   iii.  August 2, 2012 – Soil/Rock, 14 loads
   iv.   August 13, 2012 – Stone, 25.52 tons
   v.    August 14, 2012 – Stone, 243.91 tons
   vi.   August 15, 2012 – Stone, 403.18 tons
   vii.  August 16, 2102 – Stone, 163.02 tons
   viii. August 17, 2012 – Stone, 50.14 tons
   ix.   August 20, 2012 – Dirt, 18 loads
   x.    August 21, 2012 – Dirt, 69 loads
   xi.   August 22, 2012 – Dirt, 19 loads; Shot Rock
   xii.  August 23, 2012 – Dirt, 60 loads, Stone, 723.95 tons
   xiii. August 24, 2012 – Dirt, 76 loads
   xiv.  August 27, 2012 – Dirt, Stone, 252.71 tons
   xv.   September 14, 2012 – Stone, 50.24 tons
   xvi.  September 25, 2012 – Stone, 52.63 tons
   xvii. September 27, 2012 – Topsoil, 100 yds; Stone 258.55 tons
   xviii. September 28, 2012 – Topsoil, 175 yds
   xix.  October 1, 2012 – Topsoil, 250 yds; Stone 179.9 tons
   xx.   October 2, 2012 – Dirt, 88 loads; Topsoil, 175 yds; Stone, 2 loads
   xxi.  October 15, 2012 - Dirt
   xxii. March 14, 2013 – Dirt
   xxiii. Dates unknown – Dirt, 500 yds, Rock
   xxiv. Approximately March 25, 2013 – Soil, Stone, Brick, Crushed concrete and Asphalt, approximately 60 loads
   xxv.  July 5 – July 12, 2013 – Dirt, rock, mixed with concrete and rebar, approximately 40 loads
   xxvi. September ___, 2013 – Recycled Concrete Aggregate, approximately 8 loads

The material from the Route 3, Clifton NJ project was visually characterized as red silt and shale stone.

The material from Undercliff Avenue was visually classified as yellowish/brown silt/clay and loam.

The material from Lawton & Anderson was visually classified as grey black rock.

The material reported to be from Alcoa was visually classified as soil and crushed concrete.

See also the previous answer to No. 2.

c.    Waterside Contractors, LLC and/or Fred Daibes, 1000 Portside Drive, Edgewater, NJ 07020

d.    Beites, Inc., P.O., Box 1145, Lodi, New Jersey (973) 564-1990

Grinnell Recycling, Inc., 482 Houses Corner Road, Sparta, New Jersey (973) 383-9300

Wantage Stone, LLC, 115 River Road, Suite 104, Edgewater, New Jersey (201) 366-4498

Various unknown employees of Waterside Construction, LLC

See also the previous answer to No. 2 and 2c.

e.    Noah Skyta, Ronald Dooney. Peter Lakotas, Joseph Noon  and Matthew Follo – TERMS Environmental Services, Inc., 599 Springfield Avenue, Berkeley Heights, New Jersey (908) 464-0028

Jason Menzella, Neglia Engineering Associates, 34 Park Avenue, Lyndhurst, New Jersey (201) 939-8805

Dino Menzella, Neglia Engineering Associates, 34 Park Avenue, Lyndhurst, New Jersey (201) 939-8805

See also the previous answers to No. 2, 2c and 2d.

f.   The following is the information known to TERMS about the nature and quantity of fill material to Veteran's Field and there may have been other instances when fill material was imported to Veteran's Field which are unknown to TERMS:

     i.   July 30, 2012 –No

     ii.   August 1, 2012 – No

     iii.   August 2, 2012 – No August 13, 2012 – Quarry supplied material, used around drains and on ballfield

     iv.   August 14, 2012 – Quarry supplied material, used around drains and on ballfield

     v.   August 15, 2012 – Quarry supplied material, used around drains and on ballfield

     vi.   August 16, 2102 – Quarry supplied material, used around drains and on ballfield

     vii.   August 17, 2012 – Quarry supplied material, used around drains and on ballfield

     viii.   August 20, 2012 – yes (RT 3 East)

     ix.   August 21, 2012 - yes (RT 3 East)

     x.   August 22, 2012 – yes for dirt (RT 3 East), no for shot rock

     xi.   August 23, 2012 - yes(RT 3 East)

     xii.   August 24, 2012 - yes (RT 3 East)

     xiii.   August 27, 2012 - yes (RT 3 East)

     xiv.   September 14, 2012 – Quarry supplied material

     xv.   September 25, 2012 – Quarry supplied material

     xvi.   September 27, 2012 – yes for Topsoil (Grinnell); Stone - Quarry supplied material

     xvii.   September 28, 2012 - yes (Grinnell)

     xviii.   October 1, 2012 - yes for topsoil (Grinnell); Stone - Quarry supplied material

     xix.   October 2, 2012 – yes for dirt (RT 3 East); yes for Topsoil (Grinnell); Stone - – Quarry supplied material

     xx.   October 15, 2013 – yes for dirt (RT 3 East)

     xxi.   March 14, 2013 – (SOURCE UNKNOWN), this material was tested after it was brought to Veteran's Field without notice to defendant

     xxii.   Dates Unknown – yes for Dirt(Undercliff), yes for Rock (Lawton & Anderson)

     xxiii.   Approximately March 25, 2013 - yes (Undercliff reject)

  xxiv. July 5 – July 12, 2013 UNKNOWN SOURCE, this material was tested after it was brought to Veteran's Field without notice to defendant

  xxv. September __, 2013 -- yes, this material was tested after it was brought to Veteran's Field without notice to defendant

See also the previous answer to No. 2.

g. See the previous answer to No. 2

h. See the previous answer to No. 2

i. See the previous answer to No. 2

j. See the previous answer to No. 2

k. Those persons at Terms who were responsible for confirming that proposed fill materials were suitable for use at Veteran's Field were Ronald Dooney, Peter Lakatos and/or Noah Skyta.

Neglia Engineering Associates was responsible for approving all of Waterside's work pursuant to the contract between Waterside and Plaintiff.

Plaintiff allowed Waterside to deviate from the requirement to provide quarry supplied certified clean fill or virgin rock and instead use other, alternate fill material.

l. See the previous answer to No. 2

m. See the previous answer to No. 2

n. Materials tested by TERMS were sampled at the frequency required in the NJDEP Alternative and Clean Fill Guidance for SRP Sites, analytical results were compared with Residential Direct Contact standards. If concentrations of contaminants in the proposed fill material were below the Residential Direct Contact standards, then TERMS advised Waterside, Neglia and/or Greg Franz that the materials were suitable for use as clean fill at Veteran's Field. TERMS never certified the use of clean fill in as much as plaintiff improperly terminated TERMS' services before the creation and filing of the Remedial Action Report, Remedial Action Permit Applications and Remedial Action Outcome.

o.     See the previous answer to No. 2.

In addition, Andrew Robinson, LSRP for Grinnell agreed to certify topsoil as clean fill, however, no such certification was ever received by TERMS before plaintiff's improper termination of TERMS' services.

_____
Ron Dooney
President of TERMS Environmental Services, Inc.

Dated:  September _30_, 2016

# Exhibit Separator

MICHAEL FRIEDMAN
CCR

NO.: MV-44

**From:** Pete Lakatos
**Sent:** Tuesday, September 24, 2013 8:04 AM
**To:** Matt Vereb
**CC:** Ron Dooney; Michael Berliner
**Subject:**

Matt
The preliminary results are in for the crushed concrete material that was put in the southern parking lot area
Based on these results this material will have to be removed

Please note that this process will require oversight and documentation
When the final lab packages are in I will contact you for schedule and requirements

pete



T0088447

# Exhibit Separator



## TERMS
### Environmental Services, Inc.

599 Springfield Avenue, Berkeley Heights, NJ 07922

October 3, 2013

Gregory S. Franz
Borough Administrator
916 River Road
Edgewater, NJ

RE: Contaminated Fill
     Veterans Field,
     Edgewater, NJ

MICHAEL FRIEDMAN
CCR
NO.: MF - 19

Dear Mr. Franz:

Per our conversations, this letter is intended to formally notify the Borough that the site Contractor (Waterside) recently trucked crushed concrete onto the site over the weekend. It is not clear where the material was generated from.

Neither TERMS or Neglia were notified that the contractor would be working on that weekend. The material that was imported to the site was not tested prior to being brought to the site as we have continually notified the contractor was a requirement. In addition, we had previously notified the contractor that crushed concrete proposed for reuse/recycling had specific testing requirement.

As soon as we became aware of the improper importation, we collected samples of the material to determine if it contained any contaminants above applicable standards. We had verbally directed the contractor not to spread the material but while we awaiting the lab results from the initial testing, the contractor apparently spread/mixed the material with clean fill at the site.

The initial results revealed extremely elevated PCB levels (up to 97 mg/kg) along with several other compounds. Subsequent testing has revealed that the material has been spread over a much larger area that the contractor indicated. Although the majority of the area appears to be covered with plastic to avoid contact or generation of dust from the area, we are still in the process of delineating the entire area that has been impacted by the importation and subsequent spreading/mixing of this material.

As the LSRP for this site, I am requiring that all site operation be discontinued until such time that we can complete our assessment of the extent of the affected area and develop a Workplan to address the proper removal of this material.

In the interim, should you have any questions or require additional information, please do not hesitate to contact our office.

Sincerely,
TERMS Environmental Services, Inc.

Ronald Dooney, LSRP
President

EXHIBIT
RD - 8
7-2017 KL

W000174

# Exhibit Separator

**Matt Vereb**

| | |
|---|---|
| **From:** | Michael J. Neglia [mneglia@negliaengineering.com] |
| **Sent:** | Monday, October 07, 2013 10:15 AM |
| **To:** | Ron Dooney |
| **Cc:** | Matt Vereb; philip@boggialaw.com; Michael Berliner; Greg Franz; Pete Lakatos |
| **Subject:** | Re: Veterans Field Stop Work Directive |

I just received a call from Fred Daibes asking for a meeting Today. I can only make it at 2. What is everyone's availability.

Michael J. Neglia PE,PLS, PP

On Oct 4, 2013, at 4:12 PM, "Ron Dooney" <rdooney@termsconsulting.com<mailto:rdooney@termsconsulting.com>> wrote:

Matt,

Per the attached letter that has been provided to the Borough of Edgewater and in accordance with our verbal directives at the site, please be advised that ALL site operations are to be discontinued while we address the issue that is the subject of the attached letter.  NO ENTRY TO THE SITE IS ALLOWED UNTIL FURTHER NOTICE.

We will advise you when we have completed our required investigations.

Thanks,
Ron


Ronald Dooney Jr., LSRP
President
TERMS Environmental Services, Inc.
599 Springfield Avenue
Berkeley Heights, NJ 07922
(office) 908 464-0028 xt. 225
(fax) 908 464-6255

*MICHAEL FRIEDMAN*
*CCR*
NO: MV 20

rdooney@termsconsulting.com<mailto:rdooney@termsconsulting.com>
www.termsconsulting.com<http://www.termsconsulting.com>


<vet Park-contaminated fill summary letter.pdf>


-----
No virus found in this message.
Checked by AVG - www.avg.com
Version: 2013.0.3408 / Virus Database: 3222/6724 - Release Date: 10/04/13

W004397

EXHIBIT
RD-9
7-20-17   KL