**K&L Gates LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel: (973) 848-4000
*Attorneys for Arconic Inc. (f/k/a/ Alcoa Inc.)*
*and Arconic Domestic, LLC (f/k/a/ Alcoa Domestic, LLC,*
*as successor in interest to A.P. New Jersey, Inc.)*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BOROUGH OF EDGEWATER, | Case Nos.: 2:14-CV-05060-JMV-JBC 2:14-cv-08129-MCA-LDW |
| Plaintiff, | Hon. John M. Vazquez, U.S.D.J. |
| v. | Hon. James B. Clark, III, U.S.M.J. |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALCOA INC. (formerly known as "Aluminum Company of America"); ALCOA DOMESTIC LLC, as successor in interest to A.P. NEW JERSEY, INC.; JOHN DOES 1-100; and ABC CORPORATIONS 1-100, | |
| Defendants, | **LOCAL CIVIL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE** |
| and | |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; and FRED A. DAIBES, | |
| Defendants/Third-Party Plaintiffs, | |
| v. | |
| NEGLIA ENGINEERING ASSOCIATES, | |
| Third-Party Defendant, | |
| and | |

ALCOA DOMESTIC, LLC, as successor in interest to A.P. NEW JERSEY, INC.,

       Defendant/Third-Party Plaintiff,

       v.

COUNTY OF BERGEN and RIVER ROAD IMPROVEMENT PHASE II, INC., and HUDSON SPA, LLC,

       Third-Party Defendants.

# TABLE OF CONTENTS

**Page**

I.        Arconic Inc. ................................................................................................... 1

II.       Purchase of the Former Alcoa Site .............................................................. 1

      A.    Purchase and Sale Agreement............................................................ 2

      B.    Multi-Party Acquisition Agreement ................................................... 6

      C.    Funding Agreement ............................................................................ 7

      D.    Environmental Indemnity Agreement................................................. 8

      E.    Deed Notice, Release of Demolition Funds, and No Further Action
           Letter For Building 12 ....................................................................... 9

III.      Discovery and Removal of Underground Storage Tanks........................... 11

IV.     Waterside Places Contaminated Materials at Veterans Field.................... 13

V.      The Borough Remediates Veterans Field.................................................. 17

VI.     Claims against Arconic in the Edgewater Matter...................................... 18

VII.    Arconic's Crossclaim and Third Party Claim for Defense and
         Indemnification Against the Daibes Defendants and RRIP in the Edgewater
         Matter .............................................................................................. 19

VIII.   Claims Against Arconic in the North River Matter ................................. 19

## LOCAL CIVIL RULE 56.1 STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rule 56.1, Defendants Arconic Inc, and Arconic Domestic LLC sets forth the following material facts as to which there is no genuine issue:

### I.     Arconic Inc.

1.      Arconic Inc. (f/k/a/ Alcoa Inc.) is a Pennsylvania Corporation having its principal place of business at 390 Park Avenue, New York, New York, 10022. (Arconic Inc. and Arconic Domestic, LLC's Third-Party Complaint Against Hudson Spa, LLC, ECF No. 249, ¶ 1 (Dec. 13, 2017) (Case 2:14-cv-05060)).

2.      Arconic Domestic, LLC (f/k/a Alcoa Domestic, LLC) is a Delaware limited company having its principal place of business at 201 Isabella Street, Pittsburgh, Pennsylvania. (*Id.* at ¶ 2).

3.      A.P. New Jersey, Inc. was a Delaware corporation that merged into Alcoa Domestic LLC, a wholly-owned subsidiary of Alcoa Inc., in 2010. (*Id.* at ¶ 3).

4.      Alcoa Inc. (f/k/a as "Aluminum Company of America") was a Pennsylvania Corporation with offices at 201 Isabella Street, Pittsburg, Pennsylvania 15212. (*Id.* at ¶ 4).

5.      Alcoa Domestic, LLC was the successor-in-interest to A.P. New Jersey, Inc. and was a Delaware limited liability company having its principal place of business at 201 Isabella Street, Pittsburgh, Pennsylvania 15212-5858. (*Id.* at ¶ 5).

### II.    Purchase of the Former Alcoa Site

6.      In or about 1996 a developer, Fred A. Daibes, and the Borough of Edgewater ("Borough") approached Arconic predecessors, Alcoa Inc. and Alcoa Domestic LLC., as successor-in-interest to A.P. New Jersey, Inc, (collectively "Arconic") to sell a former

1

manufacturing site in Edgewater, New Jersey ("Former Alcoa Site"). (Deposition of Kevin McKnight, Feb. 2, 2017 ("McKnight Dep. Vol. II"), 325:18 - 326:1, 388:19 - 389:1).

7.     In 1997, Arconic worked with the New Jersey Department of Environmental Protection ("NJDEP"), the Governor's office, the County of Bergen (the "County"), and the Borough to sell the Former Alcoa Site to an entity controlled by Fred A. Daibes, North River Mews Associates, LLC ("North River").   (Deposition of Kevin McKnight, November 9, 2017 ("McKnight Dep. Vol IV"), 865:10 - 866:19, 863:25 - 864:11).

### A.     Purchase and Sale Agreement

8.     North River purchased the Former Alcoa Site pursuant to a June 1997 Agreement to Purchase and Sell Real Estate (the "Purchase and Sale Agreement"). (Purchase and Sale Agreement, dated June 1997 (A001387 - A001406)).

9.     Pursuant to the Purchase and Sale Agreement. North River purchased the property for $8 million and agreed that:

> OTHER THAN THE REPRESENTATION AND WARRANTY SET FORTH IN THIS SECTION, BUYER SPECIFICALLY ACKNOWLEDGES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "**AS IS, WITH ALL FAULTS BASIS."** AND THAT BUYER SHALL HAVE AN OPPORTUNITY TO INSPECT THE PROPERTY AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE PROPERTY…

(*Id.* § 2; § 5(b)) (emphasis in original).

10.     This provision continues and expressly lists, without limitation, the following subjects about which Arconic was making no warranties:

> (i)     the quality, nature, adequacy and physical condition of the property. . .

        (ii)     the quality, nature, adequacy, and physical condition of soils, geology and any groundwater;

\* \* \*

        (vii)    the presence or removal of hazardous or toxic materials, substances or wastes in, on, under, or about the Property or the adjoining or neighboring property….

(*Id.* § 5(b)(i), (ii), and (vii)).

11.     The Purchase and Sale Agreement also provides that "[a]ll understandings and agreements heretofore had between the parties, oral or written are merged into this Agreement, which alone fully and completely expresses their understanding." (*Id.* § 16).

12.     The Purchase and Sale Agreement further states that if Arconic "fails to perform any of its obligations under this Agreement or the Multi-Party Agreement [*infra*], the same shall constitute a default of this Agreement and thereupon, [North River], at its option, may declare a forfeiture by written notice to seller." (*Id.* § 8(a)). This Section goes on to explain the requirements for North River to provide Arconic with notice of any such default, and states that, "where the default is not capable of being remedied in forty-five (45) days, [North River] may declare this Agreement null and void." (*Id.*).

13.     The parties to the Purchase and Sale Agreement also agreed on, and specifically circumscribed, what would constitute the "known environmental condition" of the Former Alcoa Site:

        (c)    <u>Environmental Reports</u>: Seller shall make available to Buyer the reports listed on Schedule 7(c), attached hereto and incorporated by reference, concerning the environmental condition of and contamination in, on, under, or about the Property (the "Environmental Reports"). The parties agree that the Environmental Reports and any and all reports, analyses, surveys, assessments, evaluations or the like prepared by Buyer and its representatives pursuant to Section 7(d) will establish the known environmental condition of the Property as of the Closing Date.

(*Id.* § 7(c)).

14.     The "Environmental Reports" were several studies of PCB contamination at the Former Alcoa Site provided to North River and incorporated by reference into the Agreement. (*See id.* § 7(c), Schedule 7C, A000001-A001056, A001387-A001406, EW 07357-EW 07677).

15.     These reports identified site-wide PCB contamination and reported that Building 12, particularly its floors and walls, comprised the most contaminated portions of the Former Arconic Site.  (*Id.*).

16.     The Former Alcoa Site also had a well-publicized history of PCB contamination before North River purchased it, having been the subject of a previous CERCLA litigation. *See Amland Props. Corp. v. Aluminum Co. of Am.*, 711 F. Supp. 784 (D.N.J. 1989).

17.     The Borough correctly acknowledges that Defendant Daibes Brothers, Inc. was aware since 1997 that the materials in the former Alcoa Site's Building 12 were contaminated with PCBs. (Fifth Amended Complaint, ECF No. 256, ¶ 60 (Mar. 19, 2018) (Case 2:14-CV-05060)).

18.     North River hired its own environmental consultant, Enviro-Sciences, Inc., and conducted its own due diligence of the site prior to the purchase. (Defendant North River Mews Associates, LLC's Answers to Alcoa's First Set of Interrogatories, Interrogatory Response No. 14 (July 22, 2015)).

19.     Before the sale, Arconic provided historic maps, diagrams, environmental reports, and blueprints of the Former Alcoa Site to North River, which indicated two storage tanks were present under Building 12.  (Deposition of Kevin McKnight, November 8, 2017 ("McKnight Dep. Vol. III"), 591:4 - 593:16; Note from K. L. McKnight to A. Daibes, et. al., A003144-45; Letter from M. Novacky, Paralegal, Alcoa, to A. Daibes (June 24, 1997), A003136-A003142).

20.    Pursuant to the Purchase and Sale Agreement, North River released Arconic from all claims arising from the presence of any and all hazardous substances, known or unknown, at the Former Alcoa Site:

> Buyer expressly releases Seller and agrees to waive all rights that it may have to seek contribution from Seller for any response costs or claims that may arise as a result of the actions or inactions of Seller and any previous owner, operator or third party on or with respect to the Property relating to Hazardous Substances.

> "Hazardous Substances" shall mean "any substance … that is listed or defined as hazardous, toxic, or dangerous" under a host of federal environmental laws, including CERCLA, and related state and local laws.

(Purchase and Sale Agreement (A001387 - A001406); *id.* §§ 7(g); 7(a)).

21.    North River also agreed to defend and indemnify Arconic:

> Buyer shall indemnify, defend and hold Seller harmless for any and all claims… including all foreseeable and unforeseeable consequential damages … arising under Applicable Law related to Buyer's use … of the Property and/or any and all activities relating thereto."

> "Applicable Law" shall mean the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") … the Resource Conservation Recovery Act ("RCRA") … the Toxic Substances Control Act . . . any and all formal or informal orders, decrees or requests from the United States Environmental Protection Agency, the appropriate New Jersey state governmental and regulatory bodies … and any similar state and local laws and ordinances and regulations implementing such statutes ….

(*Id.* §§ 7(f), (b)).

22.     Arconic intended that the Purchase and Sale Agreement be a full and complete indemnification and release of Arconic, and that Arconic was making no representations of any kind regarding the condition of the property.  Arconic believed that this was clearly set out in the Agreement. (McKnight Dep. Vol. II, 346:9-348:9).

23.     Arconic had several discussions with Mr. Daibes to ensure he similarly understood the terms of the Agreement, particularly paragraphs five and seven. (*Id.* 347:18-348:9; McKnight Dep. Vol. IV, 868:14-873:17, 878:1-882:1).

**B.     Multi-Party Acquisition Agreement**

24.     As part of the Borough's master plan to widen River Road and redevelop areas within the Borough, the County, North River, Arconic and River Road Improvement Phase II ("RRIP") entered into the June 27, 1997, Multi-Party Property Acquisition Agreement (the "MPAA"). (Multi-Party Agreement, dated June 1997 (A001367 - A001386)).

25.     The MPAA was incorporated by reference into the Purchase and Sale Agreement. (Purchase and Sale Agreement (A001387 - A001406); *id.* § 6(a)(ii)).

26.     Pursuant to the MPAA, North River and RRIP agreed to:

> defend and save the County and [Arconic] harmless from any and all claims that may be filed in any Court arising from the performance of [the Multi-Party Agreement]. In connection with the defense of any claim, the County and [Arconic] shall be entitled to select their own counsel . . . neither the County nor [Arconic] shall be under any obligation to expend any funds for any purpose in connection with such litigation.

(*See id.* at A001376, ¶ 16).

27.     North River and RRIP further agreed to demolish and remove the existing structures at the Former Alcoa Site. (*Id.* at A001373, ¶ 2).

28.     Arconic's only obligation was to provide $9,500,000 for demolition of the buildings at the Site, and agreed to provide limited funds for disposal of PCB contaminated material (over 50 PPM). (*Id.* ¶¶ 3-4).

29.     North River and RRIP were required to complete any and all demolition and removal of contaminated materials in accordance with a Remedial Action Workplan submitted to

the NJDEP and approved by Arconic. (*Id.* ¶ 2; *see also* Remedial Action Workplan Buildings # 5, 7, and 9, dated August 3, 1997 (ENVIRO_001617-ENVIRO_001648)).

30.     Upon satisfactory monthly inspections, the County, upon notice to Arconic, would authorize the disbursement of funds to RRIP. (*Id.* ¶ 4).

31.     Plans for the then-expected remediation and demolition of Building 12 were laid out in the September 17, 1997, Remedial Action Workplan (RAWP) for Buildings 11 and 12. (Remedial Action Work Plan, Buildings 11 and 12, dated September 1997 (EW 35388-525)).  The RAWP required that North River and RRIP remove floor panels with PCB contamination greater than 50 mg/kg prior to demolition, followed by demolition, crushing, and segregation of the remaining debris based on whether the debris had 0 to .49 mg/kg of PCB contamination, or had PCB contamination above .49 mg/kg but below 50 mg/kg. (*Id.* EW35392).  The differing treatment of materials based on their PCB contamination levels mirrored NJDEP regulations governing the disposal or re-use of such materials.   (Enviro-Sciences Inc., Phase I Environmental Site Assessment, dated May 2011, ENVIRO_006626).

### C.     Funding Agreement

32.     On September 23, 1997, the County, North River, Arconic, and RRIP entered into a Funding Agreement, whereby Arconic would withhold payment of $500,000 of the demolition funding until it received full payment of the purchase price of the Former Alcoa site and a No Further Action Letter ("NFA") from NJDEP for the Former Alcoa Site, including Building 12. (Funding Agreement, dated Sept. 23, 1993, A001504-A001506; McKnight Dep. Vol. II, 472:1-475:15).

D.      **Environmental Indemnity Agreement**

33.     All of the buildings at the Former Alcoa Site were demolished before 2000 as provided in the Multi-Party Agreement, except for Building 12. (Fifth Amended Complaint, ECF No. 256, ¶¶ 200, 203, 204  (Case 2:14-cv-05060)).

34.     By 1999, Mr. Daibes decided not to demolish Building 12. (Deposition of Fred Daibes, July 18, 2017 ("Daibes Dep. Vol. II"), 80:17 - 80:22).

35.     According to Mr. Daibes, he decided not to demolish Building 12 at that time because he wanted to use it to garage his luxury car collection. (*Id.*, 82:22 - 83:8; Remedial Investigation Report Remedial Action Report, Enviro-Sciences, Inc., dated August 2002, ENVIRO_003255).

36.     This was consistent with Arconic's understanding at the time.  (McKnight Dep. Vol. II, 513:8-513:11).

37.     For that reason, Arconic, North River, and RRIP entered into the March 13, 1999, Environmental Indemnity Agreement. (*See* Environmental Indemnity Agreement, dated March 1999, A001532- A001534).

38.     As Kevin McKnight, Arconic's Vice President of Environment, Health and Safety and Chief Sustainability Officer, explained, that the Environmental Indemnity Agreement "was an agreement that had the sole purpose of confirming that regardless of what happened to Building 12, Arconic would have no responsibility for anything related to the Edgewater site." (McKnight Dep. Vol. II, 512:15-513:4).

39.     Consistent with this purpose, North River and RRIP agreed to:

> Indemnify, defend and hold harmless [Arconic] for any and all claims … including all foreseeable and unforeseeable consequential damages, occurring at any time before, during, or after North River's ownership of [the Former Alcoa Site], relating to Building

> 12 and the land under and adjacent thereto, arising under Applicable Law (as defined in the Purchase Agreement), including, but not limited to, remediation and disposal costs … related to PCBs.

(Environmental Indemnity Agreement, dated March 1999, A001532 at ¶ 1) (emphasis added).

40.     As defined in the Purchase and Sale Agreement, the term "Applicable Law" meant numerous specific federal environmental laws, including CERCLA, similar state and local laws, "and any and all federal, state, and local environmental or land use laws, rules, ordinances, or regulations. (*See* Purchase and Sale Agreement, dated June 1997 (A001387 - A001406) at ¶ 7(b)) (definition of "Applicable Law").

### E.     Deed Notice, Release of Demolition Funds, and No Further Action Letter For Building 12

41.     On January 14, 2003, North River filed a Deed Notice for the Building 12 parcel (Block 74, Lot 1.02).  (North River's Deed Notice, dated January 2003 (EW 04313 - EW 04327).

42.     The Notice cited NJDEP approval for the institutional/engineering controls for PCBs at the Building site (NJDEP Site #97-6-10-0037 28).  Those controls included restricting public access to the site and prohibiting modification or development of the interior surfaces of the building without prior approval of NJDEP. (*Id.* at EW 04314 - EW04327, EW 04316).

43.     NJDEP required these controls due to  the presence of PCBs in the walls of Building 12 at concentrations above 0.49 mg/kg. (*Id.* at EW 04327).

44.     The Deed Notice was signed by Fred Daibes.  (*Id.* at EW 04319).

45.     On January 18, 2001, contingent on North River Mews' obligation to obtain a no further action letter, John Millett of Arconic sent a letter to Farouk Ahmad, of the County of Bergen's Department of Planning and Economic Development, authorizing release of $500,000 to North River. (Letter from J. A. Millett, P.E. to F. Ahmad (Jan. 18, 2001), A001867).

46.     On February 12, 2003, NJDEP issued a Restricted Use NFA for Building 12, which required compliance with the January 14, 2003, Deed Notice, maintenance of the engineering controls (e.g., epoxy wall paint), and notice to any persons who intended to excavate on the site the nature and location of contaminants. (NJDEP Restricted Use No Further Action Letter, dated February 12 2003 (EW 04328-EW 04334)).

47.     The February 2003 NJDEP Restricted Use NFA recognized the presence of PCBs above 0.49 ppm within some of the building materials of Building 12 in 2002. (*Id.* at EW 04332).

48.     Although the NJDEP recognized the presence of PCBs in the building materials, it concluded as late as 2010—thirteen years after Arconic sold the property—that no contamination from Building 12 had entered the environment.  (NJDEP Letter to Glen Donlon, Daibes Brothers Inc. (Sept. 17, 2010), W001831; Enviro-Sciences (of Delaware) Inc. Letter to Glen Donlon, Daibes Brothers, Inc. (Oct. 27, 2010), OPRA 188615_0000104 - OPRA 188615_0000106).

### III.     North River Demolishes Building 12 Sixteen Years after Purchasing it from Arconic.

49.     North River owned Building 12 from June 1997 until May 22, 2006, when North River transferred ownership to another entity controlled by Fred Daibes, 38 COAH, LLC ("38 COAH"), for one dollar. (Defendant North River Mews Associates, LLC's Answers to Borough of Edgewater's First Set of Interrogatories (July 22, 2015), Interrogatory Response No. 1).

50.     38 COAH transferred ownership back to North River on February 19, 2015. (*Id.*).

51.     North River leased the property to E. Rae Jo in 2012.  (Ground Lease North River Associates, LLC and E. Rae Jo, (Apr. 5, 2012) HUD 0000044 - HUD 0000072; Deposition of Eunrae Jo, April 12, 2017 ("Jo Dep."), 34:16-35:8).

52.     Another E. Rae Jo entity, The Heaven LLC, contracted with a construction company owned by Fred Daibes, Waterside Construction, LLC, in November 27, 2012, to perform the demolition of Building 12 to allow construction of the SoJo Spa on the lot. (Jo Dep., 45:25-

10

46:18; AIA Document A107 - 2007, Standard Form of Agreement Between Owner and Contractor for a Project of Limited Scope, W080585-W080603).

53.     No one involved in the project notified Arconic that Building 12 was being demolished.  Nor did North River submit a Remedial Action Work Plan to NJDEP for the demolition, request that Arconic approve a RAWP for the work, request oversight of the demolition by the County, or otherwise comply with any of the demolition and remediation provisions that had been set out in the original Purchase and Sale Agreement. (McKnight Dep. Vol. II, 540:4-540:10; McKnight Dep. Vol IV, 892:6-892:14; Third-Party Defendant River Road Improvement Phase II, Inc.'s Responses to Alcoa's Requests to Admit, Response No. 1 (May 17, 2017) (Case 2:14-CV-08129); Daibes Dep. Vol. II 144:12-146:13).

54.     Arconic was not even aware that Waterside had demolished Building 12 until months after the demolition was complete. (McKnight Dep. Vol. II, 540:4-540:10; McKnight Dep. Vol. IV, 892:6-892:14).

**III.     Discovery and Removal of Underground Storage Tanks**

55.     On or around September 19, 2013, during demolition of Building 12, Waterside uncovered two underground storage tanks (USTs) beneath the floor slab of Building 12. (Remedial Investigation/Remedial Action Report/ Remedial Action Workplan for Former Alcoa Building 12, dated Mar. 5, 2015, W009659; Report, S&S Environmental Sciences, Inc., W001546).

56.     Waterside hired Environmental Waste Minimization, Inc. to remove fuel oil from the USTs, which it did on or about September 19, 2013.  (Self Implemented Disposal Plan for Former Alcoa Building 12, PennJersey Environmental Consulting (July 2014), W009445; Email from William P. Call, P.G., LSRP, Vice President, PennJersey Environmental Consulting, to John

11

M. McNally, W079535). The oil from the USTs was drummed and transported to Veolia in Port Arthur, Texas. (*Id.* at W009450).

57.     On or abound October 8, 2013, Waterside received laboratory results of a soil sample reportedly collected from the vicinity of the USTs that also showed PCB contamination. (Report, S & S Environmental Sciences, Inc., W001545-48; Email from William P. Call, P.G., LSRP, Vice President, PennJersey Environmental Consulting, to John M. McNally, W079535).

58.     On October 28, 2014, Environmental Waste Minimization Inc., mobilized to the site, ventilated the USTs, and cut access holes into them (Self Implemented Disposal Plan for Former Alcoa Building 12, PennJersey Environmental Consulting (July 2014), W009445). UST-1 was found to contain approximately 6 inches of PCB-contaminated oil/sludge and UST 2 contained 11 inches of PCB-contaminated oil/sludge. The source of the PCBs in the oil remains unknown. (*Id.*).

59.     Environmental Waste Minimization cleaned the USTs on October 29, 2013, and removed the waste.  (Self Implemented Disposal Plan for Former Alcoa Building 12 (July 18, 2014), W009445).

60.     On November 11, 2013, PennJersey began overseeing the excavation of petroleum and PCB-impacted soils and other materials allegedly found around the two USTs.  (Self Implemented Disposal Plan for Former Alcoa Building 12, PennJersey Environmental Consulting (July 2014), W009445).

61.     The two USTs were removed, cut into pieces, and shipped offsite. (*Id.*).

62.     The first time Arconic was notified of the discovery of the USTs was on March 18, 2014, months after the USTs, their contents, and the allegedly contaminated soils and other

materials around the USTs were removed from the site and destroyed. (Email from M. Slowinski to J. Lettrich (Mar. 18, 2014) W080580).

63.     There is no evidence that the Daibes Defendants[1] incurred any costs related to remediating Veterans' Field.

64.     North River never provided the public with any opportunity to comment on any alternatives to the remediation actions it took regarding the USTs and surrounding materials, and did not provide the public with notice to participate in the selection of the remedial action.

65.     North River held no public meetings and did not publicize in the local paper summaries of public comments received regarding the evaluation and selection of the remediation remedy associated with the USTs.

66.     The proposed remediation plan associated with the USTs was never published and the public was not given at least 30 calendar days to submit written and oral comments.

## IV.     Waterside Places Contaminated Materials at Veterans Field

67.     The Borough is the current owner and operator of Veterans Field, a public park in the Borough, and has been at all times relevant to these lawsuits.  (Fifth Amended Complaint, ECF No. 256, ¶ 234 (Case 2:14-cv-05060)).

68.     In June 2012, the Borough hired Waterside to develop Veterans Field. (*Id.* ¶ 30).

69.     The contract required Waterside to remediate certain historically contaminated soils at the park and construct new playing fields and other facilities. (Borough of Edgewater Contract, dated June 27, 2012 (EW 08488-EW 08557)).

---

[1] The Daibes Defendants refer to Fred A. Daibes, North River Mews Associates, LLC, Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc.

70.     The remediation of Veterans Field was conducted pursuant to the NJDEP's Site Remediation Program, under the supervision of Licensed Site Remediation Professional ("LSRP"), Ronald Dooney of TERMS Environmental Services, Inc., who was retained to assure that the remediation and construction followed all applicable environmental regulations. (*Id.* at ¶¶ 24-25, 41-42, 241-42).  This included testing fill before it was brought to the site to assure that it met the requirements of the New Jersey Site Remediation Program regulations for clean fill. (Borough of Edgewater Resolution (Mar. 18, 2013), W003490; Deposition of Kenneth E. Schiller, Jr. (June 22, 2017) ("Schiller Dep.") 47:1-47:10).

71.     The specifications for the Veterans Field work required the importation of 65,000 cubic yards of "certified fill," which was defined as "certified or crushed virgin stone, as approved by the LSRP." (Site Remediation Instructions, EW 21241-42; Specifications for Veteran's Field Improvements Borough of Edgewater (April 2012), EW 08674).

72.     Remediation and restoration work at Veterans Field began July 9, 2012.  (Letter to Neighbor from Borough of Edgewater (June 26, 2012), EW 22188).

73.     In late October 2012, work at Veterans Field was suspended following Superstorm Sandy.  (Remedial Investigation Report/Remedial Action Workplan, Veterans Field, Edgewater, New Jersey (Oct. 2014), EW 11024).

74.      In March 2013, Neglia Engineering Associates, the Borough's engineering firm, recommended raising the grade of Veterans Field an additional 1 to 2 feet after flooding that occurred from Superstorm Sandy's 12 foot storm surge.  (*Id.*; Svetlana Shkolnikova, *Edgewater considers grade raise at Veterans Field*, Edgewater View (Mar. 22, 2013)).

75.     To accomplish this, Neglia recommended importing an additional 30,000 cubic yards of fill, bringing the total required fill to approximately 95,000 cubic yards. (Veterans Field

Improvements Change Order No. 4 (Apr. 11, 2013); Neglia Engineering Associates, Engineer's Certificate No. 10, W009188).

76.     The Borough, acting through Neglia and TERMS, directed Waterside to perform the remaining and additional remediation and construction activities at Veterans Field, consistent with Neglia's recommendations.  (Veterans Field Improvements Change Order No. 4 (Apr. 11, 2013); Neglia Engineering Associates, Engineer's Certificate No. 1, EW 23437).

77.     Waterside located and arranged for specific fill material to be hauled to the site, sometimes in consultation with TERMS, and sometimes hauling and depositing untested material that had not been cleared by TERMS. (Deposition of Matthew Vereb, February 15, 2017 ("Vereb Dep. Vol I") 36:6-42:20).

78.     Mr. Daibes testified that, in September 2013, Waterside was having difficulty sourcing certified clean fill in connection with its work at Veterans Field; therefore, it decided to use crushed concrete from the demolition of Building 12 as fill.  (Daibes Dep. Vol. II, 133:16-143:23; *see also* Deposition of Jason Menzella, February 1, 2017 48:6-50:16; Iafelice Dep. 96:14-96:25).

79.     According to Matthew Vereb of Waterside, the Building 12 walls and floor slabs were crushed onsite and taken to Veterans Field, where the material was used as a base under areas to be paved. (Vereb Dep. Vol. I, 82:1-82:15).

80.     None of the concrete or soils allegedly impacted by material from the USTs was deposited at Veterans Field.  (Self Implemented Disposal Plan for Former Alcoa Building 12, PennJersey Environmental Consulting (July 2014), W009445-50; Letter from R. Dooney, President, LSRP, TERMS, to G. Franz, Edgewater Borough Administrator (Oct. 3, 2013), W000174).

81.     Arconic was not involved in transporting the crushed concrete to Veterans Field. (Schiller Dep. 114:12-114:16; McKnight Dep. Vol. II, 376:25-377:19; Deposition of Mark Iafelice, June 21, 2017 ("Iafelice Dep.") 98:19-99:12).

82.     Arconic received no benefit (monetary or otherwise) from Waterside's placement of crushed concrete from Building 12 on Veterans Field.

83.     Mr. Dooney reported the unauthorized importation and spreading of crushed concrete at Veterans Field by Waterside in a letter to the Borough dated October 3, 2013, and issued a written stop work order for the site (Letter from R. Dooney, President, LSRP, TERMS, to G. Franz, Edgewater Borough Administrator (Oct. 3, 2013), W000174).

84.     In a letter dated October 9, 2013, Waterside acknowledged the stop work order (and agreed, at Waterside's sole expense, to remove materials containing contaminants that Waterside imported) (Letter from M. Vereb, Director of Operations, Waterside Construction, LLC, to M. Neglia, Neglia Engineering Associates (Oct. 9, 2013), EW 12063).

85.     There is no evidence that Waterside violated the written stop work order and imported any materials to the Veterans Field site after October 3, 2013.

86.     The USEPA subsequently investigated the events at Veterans Field and the Building 12 site and found that 38 COAH unlawfully disposed of contaminated debris at Veterans Field, unlawfully disposed of the two USTs, and committed other violations of federal environmental regulations. (USEPA, Region 2, Consent Agreement and Final Order, Docket No. TSCA-02-2015-9101, at ¶¶ 8, 10 (Sept. 29, 2015), W077042-W077055).

87.     On September 29, 2015, Fred Daibes, on behalf of 38 COAH, entered into a consent agreement and final order with the USEPA acknowledging these findings. (USEPA, Region 2,

Consent Agreement and Final Order, Docket No. TSCA-02-2015-9101 (Sept. 29, 2015), W077042-W077055).

## V.      The Borough Remediates Veterans Field

88.      On or about May 19, 2014, the First Environment was retained as the LSRP and awarded a professional services contract to conduct testing and oversee remediation at Veterans Field.  (Borough of Edgewater Resolution No. 2014-136 (May 19, 2014), EW 36105-36106).

89.      By letter dated October 3, 2014, the Borough provided notice to the public of the contract award to First Environment for the remediation at Veterans Field. (Letter from Gregory S. Franz, Borough of Edgewater Administrator & Thomas C. Bambrick, LSRP, First Environment, Inc. to Residents (Oct. 3, 2014), https://www.edgewaternj.org/DocumentCenter/View/146/Commencement-of-Remediation-October-13-2014-PDF).

90.      The Borough failed to provide notice to the public to comment on remedial alternatives, or to participate in the selection of the remedial action for Veterans Field.

91.      The Borough failed to publicize in the local paper summaries of public comments received regarding the evaluation and selection of the remediation remedy for Veterans Field.

92.      There is no evidence that notice of the proposed remediation plan for Veterans Field was published and/or that the public had at least 30 calendar days to submit written and oral comments.

93.       There is no evidence that a summary of significant comments, criticisms, and/or new relevant information was prepared during the public comment period for the remediation for Veterans Field.

VI.     **Claims against Arconic in the Edgewater Matter**

94.     The Borough asserts claims against Arconic under CERCLA, the Spill Act, and for common law unjust enrichment for the contamination of Veterans Field.   (Fifth Amended Complaint, ECF No. 256, ¶¶ 91-135, ¶¶ 215-221 (Mar. 19, 2018) (Case 2:14-CV-05060)).

95.     The Borough alleges that Arconic is a "Responsible Party" under CERCLA § 107(a) because Arconic is a "current owner or operator" of the Veterans Field "facility" and a "former owner or operator" of that facility when hazardous substances were disposed of there. (Fifth Amended Complaint, ECF No. 256, ¶¶ 120-135 (Mar. 19, 2018) (Case 2:14-CV-05060)).

96.     The Borough alleges that Arconic "arranged" for the "disposal" of hazardous substances at Veterans Field.  (*Id.* ¶¶ 128, 133).

97.     The Borough alleges that Arconic is strictly liable in tort because its generating, handling, disposing and/or arranging for the disposal of PCB-contaminated concrete from Building 12 was an "abnormally dangerous" or "ultrahazardous" activity.  (*Id.* ¶¶ 222-26).

98.     The Borough alleges that Arconic owed the Borough a perpetual legal duty under a negligence theory in tort to monitor the reuse or disposal of PCB-contaminated materials from Building 12, to properly "track" PCBs in Building 12 materials, and to provide advance warning to any third party that owned property where the demolished materials might be placed.  (*Id.* ¶¶ 205-14).

99.     The Daibes Defendants assert claims against Arconic for contribution under CERCLA and the Spill Act, and common law claims for contribution and indemnification. (Fred A. Daibes, North River Mews Associates, LLC, Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., Amended Answer to Plaintiff's First Amended Complaint, Affirmative

Defenses, Counterclaims, Amended Crossclaims and Third-Party Complaint, ECF No. 24, pp. 39-42 ¶¶ 10-64 (Dec. 5, 2014) (Case 2:14-cv-05060)).

100.    TERMS also asserts cross-claims against Arconic for contribution under CERCLA and the Spill Act, and common law claims for contribution. (TERMS Environmental Services, Inc., Answer to Plaintiff's Amended Complaint with Affirmative Defenses with Counterclaims and Crossclaims, ECF No. 258, pp. 59-70, ¶¶ 1-70 (Apr. 13, 2018) (Case 2:14-cv-05060)).

## VII.    Arconic's Crossclaim and Third Party Claim for Defense and Indemnification Against the Daibes Defendants and RRIP in the Edgewater Matter

101.    Arconic has asserted a Crossclaim against the Daibes Defendants seeking, among other relief, defense and indemnification pursuant to the terms of the Purchase and Sale Agreement, the Multi-Party Agreement, and the Environmental Indemnity Agreement. (Answer to Plaintiff's First Amended Complaint, Affirmative Defenses and Crossclaims against A.P. New Jersey, Inc., Aluminum Company of America, TERMS Environmental Services, Inc., ECF No. 20, pp. 35-36 ¶¶ 18-25 (Nov. 21, 2014) (Case No. 2:14-cv-05060)).

102.    Arconic has asserted a Third Party Claim against RRIP seeking, among other relief, defense and indemnification pursuant to the terms of the Multi-Party Agreement and the Environmental Indemnity Agreement. (A.P. New Jersey Third Party Complaint against County of Bergen, New Jersey, River Road Improvement Phase II, Inc., ECF No. 23 (Dec. 5, 2014) (Case 2:14-cv-05060)).

## VIII.    Claims Against Arconic in the North River Matter

103.    On or about September 28, 2015, North River and 38 COAH ("North River Plaintiffs") filed an Amended Complaint asserting claims against Arconic under CERCLA, the Spill Act, breach of contract, negligence, unjust enrichment, and strict liability for alleged contamination caused by material leaking from the USTs. (North River Mews Associates, LLC

and 38 COAH Associates, LLC's Second Amended Complaint and Jury Demand, ECF No. 28
(Sept. 28, 2015) (Case No. 2:14-cv-08129)).

104.    North River Plaintiffs' Breach of Contract claim against Arconic is based on the
theory that Arconic was "contractually obligated to convey to plaintiffs real property free of hidden
dangerous [sic] and defects and/or to pay costs to remediate and investigate PCB contamination."
(North River Mews Associates, LLC and 38 COAH Associates, LLC's Second Amended
Complaint and Jury Demand, ECF No. 28, ¶ 79,  (Sept. 28, 2015) (Case No. 2:14-cv-08129)).

105.    The North River Plaintiffs also allege that Arconic is a "Responsible Party" under
CERCLA § 107(a) because Arconic is an "owner or operator" of the Veterans Field "facility" and
a "former owner or operator" of that facility when hazardous substances were disposed of there,
(*Id.* ¶¶ 3, 5, 31-34, 36), that it "arranged" for the "disposal" of hazardous substances at Veterans
Field. (*Id.* ¶ 35), and that it is liable for contribution under CERCLA and the Spill Act. (*Id.* ¶¶ 40-
42; 60-67).

106.    The North River Plaintiffs seek a declaratory judgment that Arconic is liable for
necessary response costs. (*Id.* ¶¶ 43-46).

107.    The North River Plaintiffs allege that Arconic is strictly liable in tort because its
generating, handling, disposing and/or arranging for the disposal of PCB-contaminated concrete
from Building 12 was an "abnormally dangerous" activity (*Id.* ¶¶ 47-52).

108.    The North River Plaintiffs also assert claims against Arconic under a tort theory of
negligence (*Id.* ¶¶ 53-59), unjust enrichment. (*Id.* ¶¶ 82-85), negligent or fraudulent concealment
for failure to disclose the USTs (*Id.* ¶¶ 68-77), and breach of the implied covenant of good faith
and fair dealing by failing to disclose "the existence of the hidden underground storage tanks
and/or the existence of hazardous substances." (*Id.* ¶¶ 86-91).

Dated: January 31, 2020

Respectfully submitted,

**K&L GATES LLP**

By: */s/ Michael E. Waller*
    Michael E. Waller
    Charles F. Rysavy
    Dana B. Parker
    One Newark Center, Tenth Floor
    Newark, New Jersey 07102
    Tel:  (973) 848-4000
    michael.waller@klgates.com
    charles.rysavy@klgates.com
    dana.parker@klgates.com
    *Attorneys for Arconic Inc. (f/k/a Alcoa*
    *Inc.) and Arconic Domestic, LLC (f/k/a*
    *Alcoa Domestic LLC, as successor in*
    *interest to A.P. New Jersey, Inc.)*