```
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY
 2

 3    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

      BOROUGH OF EDGEWATER,
 4
           Plaintiff,              CIVIL ACTION NUMBER:
 5
               vs.                 2:14-cv-5060
 6
      WATERSIDE CONSTRUCTION, LLC,  Oral Argument
 7    et al.,

 8         Defendants.

 9    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

           Frank R. Lautenberg Post Office and Courthouse
10         Two Federal Square
           Newark, New Jersey  07102
11         July 7, 2020

12    B E F O R E:            THE HONORABLE JOHN MICHAEL VAZQUEZ,
                              UNITED STATES DISTRICT COURT JUDGE
13

14    ** ALL PARTIES PRESENT VIA TELEPHONE AND/OR VIDEOCONFERENCE **

15
      A P P E A R A N C E S:
16
           CONNELL FOLEY, LLP  BY:
17         TIMOTHY E. CORRISTON, ESQ.
           MEGHAN K. MUSSO, ESQ.
18         85 Livingston Avenue
           Roseland, New Jersey  07068
19
               appeared on behalf of the Plaintiff;
20

21

22              /S/Lisa A. Larsen, RPR, RMR, CRR, FCRR
                    Lisalarsen25@gmail.com
23                      (630)338-5069

24

25
```

```
 1  A P P E A R A N C E S: (Cont'd.)

 2       SHAFRON LAW GROUP, LLC, BY:
         JASON T. SHAFRON, ESQ.
 3       ZACHARY THOMAS BERNSTEIN, ESQ.
         ASHLEY RYAN, Intern
 4       2 University Plaza
         Suite 400
 5       Hackensack, New Jersey  07601

 6           appeared on behalf of the Defendant/Third-Party
             Plaintiffs Waterside Construction, LLC; 38 COAH;
 7           Dabies Brothers, Inc.; North River Mews Associates,
             LLC; and Fred A. Dabies;
 8
         LINDABURY, MCCORMICK, ESTABROOK & COOPER, P.C., BY:
 9       DAVID R. PIERCE, ESQ.
         53 Cardinal Drive
10       P.O. Box 2369
         Westfield, New Jersey 07091-2369
11
             appeared on behalf of Defendant TERMS
12           Environmental Services, Inc.;

13       K&L GATES LLP, BY:
         MICHAEL E. WALLER, ESQ.
14       CHARLES F. RYSAVY, ESQ.
         DANA B. PARKER, ESQ.
15       MALORY MARIE PASCARELLA, ESQ.
         One Newark Center
16       Tenth Floor
         Newark, New Jersey  07102
17
             appeared on behalf of Defendants Arconic Inc.
18           and Arconic Domestic, LLC;

19       FINAZZO COSSOLINI O'LEARY MEOLA & HAGER LLC, BY:
         ROBERT JOHN PANSULLA, ESQ.
20       67 East Park Place
         Suite 901
21       Morristown, New Jersey  07960

22           appeared on behalf of Third-Party Defendant
             County of Bergen, New Jersey; and
23

24

25
```

1   **A P P E A R A N C E S**: (Cont'd.)

2        BRESLIN AND BRESLIN, BY:
         KEVIN C. CORRISTON, ESQ.
3        41 Main Street
         Hackensack, New Jersey  07601
4
             appeared on behalf of Third-Party Defendant
5            Hudson Spa, LLC.

```
1               (PROCEEDINGS held via videoconference before

2                the HONORABLE JOHN MICHAEL VAZQUEZ, United States

3                District Judge, on July 7, 2020.)

4          THE COURT:  Good afternoon.  We're on the record in

5  the matter of Borough of Edgewater vs. Waterside Construction,

6  LLC, et al.  The civil number in this case is 14-5060.

7          Can I please have the appearances of counsel, starting

8  with plaintiff.

9          MR. T. CORRISTON:  Yes, Your Honor, good afternoon.

10 Timothy Corriston from Connell Foley for the plaintiff.

11         THE COURT:  Hello, Mr. Corriston.

12         MS. MUSSO:  Meghan Musso, also of Connell Foley, also

13 for plaintiff.

14         THE COURT:  Thank you.

15         MR. T. CORRISTON:  That's it for the plaintiff.

16         THE COURT:  Okay.  I know we have third-party

17 defendants, as well, but why don't we start with counsel for

18 the named defendants first.

19         MR. WALLER:  Your Honor, this is Michael Waller from

20 K&L Gates.  With me is Charles Rysavy and Dana Parker.

21 Online, audio only, we have Malory Pascarella with us.

22         THE COURT:  And you're for --

23         MR. WALLER:  I'm sorry.  Arconic and Arconic

24 Domestic.

25         THE COURT:  Thank you.
```

1          MR. WALLER:  Thank you.

2          MR. K. CORRISTON:  Kevin Corriston, Breslin and

3   Breslin, for Hudson Spa, defendant.

4          THE COURT:  Thank you.

5          MR. SHAFRON:  Good afternoon, Your Honor, Jason

6   Shafron from Shafron Law Group for the Waterside defendants.

7   We also have with us Zachary Bernstein from my office, and on

8   audio but not video is our summer intern Ashley Ryan.

9          THE COURT:  Thank you.

10         MR. PIERCE:  Good afternoon, Your Honor, David Pierce

11  of Lindabury, McCormick, Estabrook & Cooper for defendant

12  TERMS Environmental Services, Inc.

13         THE COURT:  Good afternoon.

14         MR. PANSULLA:  Good afternoon, Your Honor, Robert

15  Pansulla, Finazzo Cossolini O'Leary Meola & Hager for the

16  third-party defendant County of Bergen.

17         THE COURT:  Thank you, Mr. Pansulla.

18      By my count that should be everybody on what I

19  reviewed.

20      Okay, folks, I have received numerous requests for

21  leave to file summary judgment.  At the outset those requests

22  will be granted.  I will do an order after today's conference.

23      The purpose of today's conference is I spent a

24  significant amount of time reviewing not only the legal

25  positions, which I know were truncated per my practice, but

1    really reviewing the statements of material facts not in

2    dispute, the opposition to those facts, to the extent they

3    were either denied or contested in part, and then also the

4    supplemental statement of material facts that certain parties

5    submitted.

6         After reviewing all of that material, a few issues

7    came up that I wanted to talk to the parties about as far as

8    getting a better understanding of what the dispute is so that

9    when this matter comes before me with the official motion

10   briefs I have a much better understanding.

11        The case itself is not overly complicated when you get

12   down to the core issue which is the alleged illegal dumping at

13   Veteran's Field.

14        However, given the number of parties as well as

15   transactions that occurred before the Veteran's Field project

16   that led us to that point, there are a number of facts in this

17   case that need to be reviewed based on the parties' theories

18   of liability and defenses.

19        One thing I did want to note for the parties so you're

20   not surprised when you get the order indicating that you have

21   leave to file for summary judgment, I do not permit the

22   parties to re-file their statements of material facts not in

23   dispute, their disputes, or their supplemental facts that were

24   provided.

25        The only factual issue that could be presented with the

 1    briefs is that if a party wants to now contest the

 2    supplemental statement of facts not in dispute because no one

 3    has had an opportunity to do so.

 4         I think it's probably more strategic.  I don't think

 5    anybody had a necessary oversight.  But in some of the

 6    opposition portions, our local rule was not followed.

 7         Our local Rule 56.1 says that if you're going to

 8    contest certain stated facts you have to give the basis for

 9    why you're contesting it and then also cite to the evidence.

10         Certain denials were just that.  Denials -- some didn't

11    have any reason why they were being denied, and then some were

12    denied but didn't give any citations to what the evidence they

13    would be relying upon.  So those would not be considered, but

14    they would not be considered in any summary judgment motion

15    practice.

16         So I just want to give you -- you'll see a footnote

17    to that effect in the order, but it just follows our local

18    Civil Rule 56.1.

19         There were three issues that I saw that I wanted to

20    know if it perhaps could be resolved by agreement before we

21    filed for summary judgment.  Then I want to go over some of

22    the alleged facts to make sure I'm understanding them

23    correctly.

24         The three issues that I saw that, at least from my

25    view, potentially could be resolved at this stage -- I'm

1    going to let the parties -- I'm not forcing anybody to do so,

2    but I just want to know why they could not be resolved.

3         The first issue pertains to Edgewater's claim that

4    Arconic is an arranger under CERCLA liability.  That I

5    couldn't see any facts that supported the legal theory of

6    arranger.

7         Again, that's more of a legal question, and I'll tell

8    you the cases I went through.  And perhaps I'm missing

9    something and I'll still let you brief it, but I just want to

10   understand that theory.

11        The other two issues pertain to the third-party claims

12   against Bergen County and Hudson Spa.  I'm not quite sure why

13   those two are in the case at this point, but what facts are we

14   fighting over as far as potential liability for Bergen County

15   and Hudson Spa?

16        Then I have a number of issues that I think get the

17   heart of the case which I'll discuss with you.  Let's start

18   with the arranger liability issue under CERCLA for Arconic.

19        Again, I've had this issue come up in other cases.  I

20   did go back over the *Burlington* case from the Supreme Court,

21   the *Morton* case from the Third Circuit in 2003.

22        But it's clear that to be libel as an arranger a party

23   has to take intentional steps to dispose of the hazardous

24   substance.  Knowledge alone is insufficient.

25        What I'm trying to see is -- we'll get to the dispute

1    between the Daibes defendants, which I call them collectively,

2    and Arconic, but what's Edgewater's theory as to how Bergen

3    County -- I'm sorry, as to how Arconic is an arranger for

4    CERCLA purposes as to those building materials?

5            MR. T. CORRISTON:  Judge, yes, they contracted with

6    the Daibes entities to dispose and treat the materials that

7    were the source of this PCB contamination subsequently at the

8    field.  It's not just dispose, it's also treat.

9        It was their obligation to remediate that site.  They

10   hired Daibes to do the treatment and dispose; dispose of the

11   material above a certain level and treat the other material

12   on-site.  So that's what the contractual arrangement was.

13           THE COURT:  They sold it to Daibes.  They didn't

14   contract Daibes to do the -- this is not a Hudson Spa issue

15   where they say, well, you got Waterside, I believe it was, to

16   do the demolition.  They sold it to Daibes Entities -- I know

17   it wasn't Daibes themselves -- and then there were

18   discussions.

19       From what I see, I didn't see any facts supporting

20   that Arconic had anything to do with bringing the Building 12

21   materials to Veteran's Field, which seems to be, to me, the

22   rub of this case.

23           MR. T. CORRISTON:  Well, here is the distinction,

24   Your Honor.  It doesn't matter -- they don't have to arrange

25   for them to bring it to the field.  They have to arrange for

1  the treatment and the disposal of the material, and they

2  entered a contract with Waterside to do that in conjunction

3  with the sale.

4      So when I arrange for a disposal -- for example, take

5  the typical waste oil case -- I pay someone and say, okay,

6  here.  Take my waste oil.

7      If they take it somewhere and dispose of it there, then

8  I'm responsible.  Here --

9      THE COURT:  That's not the facts of this case.  In

10 your case let's say you sold your waste oil company to

11 somebody else and they said this is how we're going to get

12 rid of it and that's how they got rid of it.  That's not a

13 congruent analogy from the facts of this case.

14     MR. CORRISTON:  Well, here is the distinction:  They

15 didn't sell them the property.  It was all part and parcel --

16 the deal was we're selling the property and we're hiring you,

17 your other entity.  It's all interrelated.

18     It wasn't just, oh, we sold you the property and Daibes

19 disposed of it.  They paid him to dispose of the material and

20 to remediate the site in a contractual agreement as part --

21     THE COURT:  Are you sure about that?  Because from

22 what I'm reading it seems to me it was indefinite whether

23 Building 12 was ever going to be taken down as far as Arconic

24 is concerned.

25     My reading was they cut Building 12's property out.

1  I know there's a dispute where Arconic says Daibes wanted it

2  for his car collection.  Daibes says, no, Arconic wanted to

3  keep it, too.

4      I'm going to ask about that because I still don't

5  understand why Arconic -- before we get to it, my

6  understanding is they didn't know whether the building was

7  going to be taken down or not.

8      They just said, okay, this is what's going to happen.

9  If you take it down, this is what our obligation will be.  If

10 you don't take it down, then this will be our obligation.

11     How was he involved with that, then?  It seems to me

12 they had a wall collapse -- right? -- well after the fact.

13 Daibes decided to take the materials -- not Daibes himself but

14 one of his entities decided to take it to Veteran's Field.

15     I didn't see any involvement -- I didn't even see

16 Arconic notified until after the fact that Building 12 --

17 we've taken materials off Building 12.

18     MR. T. CORRISTON:  Well, Judge, here is how I would

19 view it, and I think there's legal authority for it.

20     They contracted to take -- to have Daibes take down and

21 dispose of Building 12.

22     THE COURT:  Originally.  Originally.

23     MR. T. CORRISTON:  Right, right.  They --

24     THE COURT:  Then Building 12 gets cut out of the

25 deal.

1        MR. T. CORRISTON:  I'm not sure "cut out of the deal"

2   is the correct way to characterize it, but in any event,

3   Daibes then said, look, I don't know if I'm going to take the

4   building down or not.  I may try to use it and try to get some

5   approval to leave it in the ground.  Fine.

6        They then modified the agreement.  Alcoa, recognizing

7   that it's unclear what's going to happen and they still have

8   responsibility over that PCB material, says we don't know what

9   you're going to do with it, but you're going to indemnify us

10  for what you do with it.

11       Alcoa cannot cut off their liability when they have

12  the legal obligation to make sure that that site was

13  appropriately remediated and the material disposed by saying,

14  okay, Daibes, now it's your issue.

15       We don't believe they're able to do that.  Because he

16  ultimately did take it off site and did not dispose of it

17  legally, they are responsible.

18        THE COURT:  You have a case that says that?  Because

19  the cases I'm reading says they have to have some type of

20  intentional act to be an arranger.

21       Mr. Corriston, I'm going to let you file on it and I

22  don't mind theories in discovery, but once a case of this

23  complex nature -- what I'm trying to do is focus on what I

24  have to to decide the case, and I'm not looking for pleading

25  in the alternative anymore.

1          I'm looking for tell me what case law you have to

2   support that theory because I'm trying to get this case to

3   where I think it needs to be in light of the facts of this

4   case.

5          I'm going to let Mr. Corriston file on that issue.

6          But, Mr. Corriston, please have case law that supports

7   that theory of liability in light of the uncontested facts in

8   this case.  I'm not talking about contested facts.

9          This, to me, is more of a legal issue that I have to

10  deal with.  Along those lines, the legal issues that I have to

11  deal with, Bergen County and Hudson Spa, how are they still

12  involved in this case?  What's their potential liability at

13  this point?

14         Let's start with Bergen County at this point.  How is

15  Bergen County still involved in this case?

16              MR. WALLER:  Robert, if it's all right, I'll start.

17              MR. PANSULLA:  I think he's looking for you to

18  address it, Mike.

19              MR. WALLER:  Okay, thanks.

20         It has to do, Your Honor, with application of the 1999

21  environmental indemnity agreement and arguments that are being

22  made on how that applies, which is our contention.

23         If the environmental indemnity agreement extinguishes

24  the 1997 multi-party agreement, then Bergen County would not

25  be in the case.

1          If, however, the Court interprets that as part of the

2    1997 multi-party agreement that continues, then there is a

3    possibility that because of Bergen's responsibilities under

4    the multi-party agreement; that is, to supervise, to inspect,

5    and to recommend payments for remediation as that may apply --

6    and we don't think it does -- as it may apply to Building 12,

7    then we still have an argument as to the county.

8          THE COURT:  So when we look at the key agreements

9    before Veteran's Field -- I'm not talking about Veteran's

10   Field at this point, but I'm talking about after the Amland

11   litigation.

12         We have the purchase and sale agreement.  At the same

13   time we have the multi-party acquisition agreement.  We then

14   have the funding agreement which was the withholding of

15   $500,000, and that was all in '97.

16         MR. WALLER:  Correct.

17         THE COURT:  After '99 we have the environmental

18   indemnity agreement.  Okay.

19         So you're basically saying not so much a factual issue

20   but it's going to depend upon how I rule upon how these

21   agreements --

22         MR. WALLER:  That's correct, Your Honor.  That's

23   correct.

24         THE COURT:  Okay.  That I got.

25         What about Hudson Spa?

1          MS. PARKER:  Your Honor, your question from Arconic's

2    perspective or Edgewater's perspective?  Because Edgewater

3    also has claims against Hudson Spa.

4          THE COURT:  What I understand is Hudson Spa comes in,

5    they contract, right, and -- let's see . . . let me make sure

6    that I have it correctly.  It's leased in 2012 I believe by

7    North River.

8          Then Waterside, I believe, is the one who contracted to

9    clean -- to demolish it and take away the materials.

10          MS. PARKER:  Right.

11          THE COURT:  If you could say what is the theory of

12    liability as to what Mr. Corriston just articulated as to why

13    Arconic is liable, as well.

14          MS. PARKER:  Well, I believe that the Borough's

15    theory of liability is the same and that it's arranger

16    liability with respect to Hudson Spa.

17          We have claims for contribution and indemnity based on

18    Edgewater's direct claims and we also have common law claims

19    against them, as well.  We have a simple negligence claim

20    against them, as well.  So the issue --

21          THE COURT:  Negligence in hiring the contractor who

22    did it?

23          MS. PARKER:  Yeah, and negligence in terms of they

24    had a demolition contract, and pursuant to the demolition

25    contract instructions in there with respect to removing the

 1   hazardous materials.

 2        We have a general common law negligence claim as well

 3   against them because obviously that was not carried out

 4   correctly.

 5           THE COURT:  Okay.  I've got those issues.

 6        Okay.  Let's go to what I perceive to be the meat and

 7   potatoes of this case.  First, let's talk about Arconic and

 8   the Daibes defendants.

 9        I understand from the reading that the big argument as

10   to the purchase and sale agreement is that Arconic hid the

11   fact of these two underground storage tanks under Building 12.

12        I also read in the statement of material facts that

13   Arconic, at least in my reading, said that in 1997 we

14   discovered these additional drawings that indicated the

15   two underground storage tanks.

16        Is there a dispute as to whether those drawings were

17   ever made available to the Daibes defendant -- North River, I

18   would say, but to the Daibes defendants before they entered

19   into that contract for the purchase and sale agreement?

20           MR. WALLER:  From our perspective, Your Honor, no.  I

21   expect Mr. Shafron to dispute that.

22           THE COURT:  What's the dispute there as far as the

23   information?

24           MR. SHAFRON:  Your Honor, this also gets to I think

25   a little bit about what you were mentioning before we began

1    about the depth of the citations to the record on some of

2    these issues.

3          There is a substantial record and a host of discovery

4    that was done on this issue and those -- that discovery will

5    clearly show a jury that this -- that our co-defendants knew

6    about the existence of these tanks and purposely didn't

7    disclose those, didn't provide any of the blueprints which

8    would have indicated that there are underground storage tanks

9    there that they knew of.

10         It was purposeful hiding of this information.  That's a

11   major factual dispute for trial, Your Honor.

12          THE COURT:  Okay.  Now let's get down to the issue

13   between Veteran's Field and Building 12.  Put that issue to

14   the side because I'm wondering if that issue even matters, and

15   I'll tell you why.

16         It seems as though in the record -- and I'll go through

17   what those citations are.  Before the Daibes entity brought

18   that material from Building 12 to the Veteran's Field, put

19   aside the underground storage tank, I think I saw at least

20   four or five times that the Daibes entities were notified that

21   the Building 12 area was contaminated with PCBs.

22         Put aside the underground storage tanks.  Once the

23   Daibes entities know that there are PCBs at Building 12,

24   they're on notice they can't bring that.  I know you said we

25   didn't know about it when Waterside brought the material in.

1        That's an issue of material fact.  It may not be a

2    genuine issue of material fact because from what I'm reading

3    there's four times at least Daibes was told directly there's

4    PCBs in the Building 12 area.

5        Once you know there's PCBs at the Building 12 area,

6    regardless of the source, you can't bring them to Veteran's

7    Field.

8         MR. SHAFRON:  Yes, Your Honor.  That's a material

9    issue of fact.  I think we will show in the motion that there

10   are -- that that's the issue.

11        THE COURT:  I'm going to go through those with you

12   because this is what I want you to focus on.  I went through

13   all the issues.  I said let's put aside the underground

14   storage tanks.

15        It could be an issue between you and Arconic on the

16   contract, but once your clients are on notice that that area

17   is contaminated with PCBs, regardless of the source, I don't

18   know how you can blame Arconic because at that point you're

19   the one -- I'll go through the records.

20        This is what I really focused on.  And I will get to

21   TERMS and I will get to Veteran's Field.

22        When we went through this, what I see as undisputed is

23   during the Amland litigation of Paulus Sokolowski & Sartor,

24   PS&S, and DuPont Environmental Remedial Services -- and this

25   is an Edgewater statement of undisputed material facts,

1  paragraphs 15, 21 to 22.  DuPont said Building 12 area is

2  widely contaminated with PCBs.

3      That was before the sale.  That was during the Amland

4  litigation.

5      Then the next time I saw it was in 1999 Building 12

6  subdivided from the rest of the property.  It seems as though

7  the Daibes defendants' own environmental consultant tested

8  the walls, found PCBs, and put epoxy over it.  So at that

9  point again the Daibes defendants, through their own

10  consultant, know that those walls have PCBs in them.

11      Then when you have the partial wall collapse in 2010,

12  it seems as though Daibes' consultant again tested the

13  collapsed material and found PCBs of 91 parts per million, so

14  again this is all before bringing it to Veteran's Field.

15      And Daibes' own environmental consultant said that any

16  future demolition of B-12 walls would have to be sampled and

17  disposed of at a licensed facility.  Again, 2010.

18      So what are we arguing over from Daibes if we have --

19  you were on clear notice through your own environmental

20  experts that that place is contaminated with PCBs?

21      Put aside the underground storage tanks.  Once you

22  know it's contaminated with PCBs, how do you defend that by

23  bringing it to Veteran's Field?

24      MR. SHAFRON:  Well, Your Honor, first, there is a

25  substantial dispute about what was contaminated and what was

1   brought.  That is certainly disputed as to the walls that were

2   epoxy'd and what was then contaminated --

3             THE COURT:  How is that disputed?  Your consultant

4   told you they had PCBs in them.

5             MR. SHAFRON:  Right.  But whether that was the

6   material that was brought, that's a completely different

7   issue --

8             THE COURT:  Wait, wait.  This whole issue, from

9   what I understand, is you guys admitted that you brought the

10  materials from Building 12 over to the Veteran's Field site.

11            MR. SHAFRON:  That's correct, Your Honor.

12            THE COURT:  So that's not in dispute.  Your

13  environmental expert told you had that there were PCBs in

14  the walls.  And I don't think it's in dispute that your

15  environmental expert said before you dispose of this you have

16  to test it and bring it to a licensed facility.

17        Where is the dispute?

18            MR. BERNSTEIN:  May I, Your Honor?

19            THE COURT:  Sure.

20            MR. BERNSTEIN:  With respect to the JASS and

21  everything, all the PCBs identified in 2003 above 1 part

22  per million were actually previously removed by

23  Enviro-Sciences in 2003.

24        And then the epoxy'd walls that were epoxy'd by

25  Enviro-Sciences were not demolished during the demolition.

1    They still remain today.  They're in the foundation walls.

2          THE COURT:  What about the 2010 testing of what went

3    down and you had 91 parts per million in --

4          MR. BERNSTEIN:  I believe those were the parts

5    that were removed during 38 COAH's building of the affordable

6    housing on a 38 COAH portion which was removed by

7    Enviro-Sciences.

8          THE COURT:  So you're not disputing that you knew

9    that it was contaminated with PCBs in 2003 and 2010, you're

10   not disputing that Enviro-Science told you if it comes down

11   you're going to have to test it and bring it to a licensed

12   facility before you dispose of it.

13         MR. BERNSTEIN:  But we're disputing that we knocked

14   down any of the walls that they indicated had PCBs.

15         THE COURT:  You're disputing that you knocked down

16   any of the walls that had PCBs?

17         MR. BERNSTEIN:  Yes.  We dispute that the walls that

18   we knocked down contained PCBs or that we knew they contained

19   PCBs at the time based off of the reports.

20         If you look at those original reports from 1987 where

21   they tested the walls, they show that those portions of the

22   walls that were even left up had parts per million below 1,

23   and we left those walls up.

24         THE COURT:  Okay.  I'll take a look at the facts.  I

25   just don't know where Daibes defendants are going as far as

1   genuine issue of material fact as to what you knew and when

2   you knew it.  You've been told by your own environmental

3   experts it's contaminated with PCBs.  You have to test it

4   before you take it away.

5          I mean, you knew back before you bought the property

6   the whole area was contaminated with PCBs based on earlier

7   reports.

8          How can you say we didn't know it was contaminated with

9   PCBs when we brought it out to Veteran's Field?

10             MR. BERNSTEIN:  Because if you look at the

11   environmental reports from 2003, all the places on the floors

12   that indicated they contained PCBs were removed.  All the

13   places where the walls indicated they contained PCBs were

14   epoxy'd.

15             THE COURT:  Okay.  We'll deal with that issue.  Okay.

16             MR. BERNSTEIN:  I'll indicate through the record,

17   Your Honor, no problem.  It's in the reports.

18             THE COURT:  Okay.  I will look at the reports, but

19   I will note, Mr. Bernstein, your counter-statement of material

20   facts did not cite anything in the record.  They're not

21   going to be considered at the summary judgement stage.

22             MR. BERNSTEIN:  It is cited, those sections of the

23   report.  I cited the sections where the walls were indicated

24   they had low levels of PCBs and that they were epoxy'd.

25             THE COURT:  So, Mr. Bernstein, if we're going to get

1    into a dispute over what you did and did not do, let's just go

2    through it right now.

3         Pull up your counter-statement of material facts.

4    Start at page 1 -- go to page 42 and tell me where in any one

5    of those disputes you cite to the record.

6         MR. BERNSTEIN:  I can go to page 6 where it says:

7              "Undisputed that the document contains the

8              cited language" -- this is number 49 -- "and

9              that all areas identified by Enviro-Sciences

10             with PCBs were eventually removed from

11             Building 12 pursuant to a later RAW, except

12             for the foundation walls.  Samples of the

13             foundation walls revealed PCBs in concentrations

14             between .037 ppm and 1.00 ppm.  Said

15             foundation walls were later remediated by

16             Enviro-Sciences pursuant to the approval of

17             the NJDEP and still remain."

18        And I have cites within the additional statement of

19   material facts which cite to the record where it specifically

20   states that in those reports.

21        THE COURT:  That wasn't my question.  My question to

22   you is tell me where in any of your disputed material facts

23   you cite to the record.

24        It's 1 through 42.  You dispute a lot.  You tell me

25   once where you cite to the record in any of those disputes.

```
 1          MR. BERNSTEIN:  No. 96, "the foundation
 2  were the only walls" -- actually, I'd have to cite to the
 3  record . . .
 4          THE COURT:  I looked through it.  I didn't see a cite
 5  to the record once.  You said see your additional material
 6  facts.  I'm going to look at those because you do cite to the
 7  record there, but in all your disputes I don't see any cites
 8  to the record.
 9          MR. SHAFRON:  Your Honor, I will say that the reason
10  that there's a continual -- a reference to the additional
11  statements in the additional statement is where the specific
12  cites to all of the records that addresses most of those
13  issues are located.
14          THE COURT:  I will consider the additional statement
15  of supplemental facts.  I'm just saying in every fact you
16  disputed you didn't cite to the record once.
17          MR. BERNSTEIN:  We didn't create a supplemental.  We
18  created a statement of undisputed facts so we could reference
19  below.  We didn't create a separate supplemental statement of
20  facts, so we didn't have any affirmative motions that we were
21  trying to do.
22          THE COURT:  I think we're having a disconnect as to
23  what you were required to do and what you did.  This is what
24  local Rule 56.1 says:
25          The opponent of summary judgment shall furnish, with
```

1    its opposition papers, a responsive statement of material

2    facts addressing each paragraph of the movant's statement

3    indicating agreement or disagreement and, if not agreed,

4    stating each material fact in dispute and citing to the

5    affidavits and other documents submitted in connection with

6    the motion.

7         Okay.

8         MR. BERNSTEIN:  I have another reference here.  It

9    took my a while.  No. 57 of our undisputed material facts.

10        "As a result, Enviro-Sciences painted the

11        walls of Building 12, which tests indicated

12        contained the low levels of PCBs, with

13        epoxy."

14        And it cites the Enviro-Sciences reports.

15             56:  "Enviro-Sciences conducted

16        samples of the walls of Building 12 which

17        were adjacent to the floor panels that had

18        been removed.  The samples indicated that

19        there were PCBs in the foundation walls at

20        levels between .070 ppm and 1 ppm."

21        And it cites the record.  55 -- I mean 54 through --

22        THE COURT:  Wait.  50, no cites to the record; 51, no

23   cites to the record.

24        MR. BERNSTEIN:  Starting at 54 -- 54, 55, 56, 57 all

25   have cites to the record and to the environmental reports

1   which indicate these things.

2          THE COURT:  I'll handle this off-line.  I don't see

3   any cites to the record.

4          MR. BERNSTEIN:  It says --

5          THE COURT:  At best, I see "see additional statement

6   of undisputed material facts below."  I do see that.  I'll let

7   that stand.

8        But I'm talking about when you're disputing what your

9   opponent said as far as statement of facts on material -- you

10  disputed a lot.

11         MR. BERNSTEIN:  Yes.

12         THE COURT:  That's step one.  Step two is tell me

13  where you're getting that dispute from.  That's what I didn't

14  see in your statement of undisputed facts.

15         MR. BERNSTEIN:  It's in the additional statement of

16  undisputed material facts below.  And then it contains the

17  facts on which we form the basis of those disputes.

18         MR. SHAFRON:  Your Honor, I understand your concern,

19  so we would ask Your Honor to consider those additional

20  statement of material facts and those cites to the record to

21  the disputes as to those issues.

22         THE COURT:  I will consider the statements that have

23  citations to the record.  I will.  I said that at the outset.

24  But the disputed ones that don't have citations to the record

25  don't get considered.

1     Go ahead, Mr. Waller.

2        MR. WALLER:  Yes, Your Honor, with respect to the

3  paragraph numbers corresponding to Alcoa's statement of

4  undisputed material facts -- they're all re-numbered but they

5  start at 1 again.  There are no citations to the record.

6     The most we have is "statement of undisputed material

7  facts below," and we were going to raise it and thank

8  Your Honor for raising it.  Otherwise, it makes us guess as to

9  what's being cited.  It's going to make it very, very

10  difficult to try to respond.

11        THE COURT:  That's the whole purpose of this exercise

12  is that we lock in the facts and the exhibits that you're

13  relying upon for those facts.  That's why I do this so that

14  I can go through it and have this exercise to see where we're

15  going and how we can get it resolved.

16     All I'm saying to Mr. Shafron is I will consider the

17  additional statement of material facts as cited for the

18  record.  Those I will consider and I'll have them.  I went

19  through and I looked at the record cites versus the other

20  record cites.

21     At least from my view -- I know Mr. Bernstein takes a

22  different view but not from what I'm reading.  Up until the

23  additional statement of undisputed facts, that's page 43, but

24  up until that page, the first 42 pages I don't see any

25  citations to the record.

1    I see disputed and why it's disputed, but I don't see

2    the evidence to support that dispute, which is what I'm trying

3    to avoid.

4    Mr. Bernstein, the reason for that is exactly what

5    Mr. Waller is saying.  You say, well, see my statement of

6    undisputed facts.  Now we have to go get which statement of

7    undisputed facts you're relying upon to contest that.

8    That defeats the entire purpose of a summary judgment

9    motion.  We're not going to say, okay, was that statement of

10    undisputed material facts number 12?  Was it number 14?

11    What are you really relying upon?  That's what the rule

12    requires, that's what my practice requires, and it's in the

13    District of New Jersey.  That's a district-wide practice.

14    What the Daibes defendants are relying upon is that

15    they knew there were PCBs at Building 12 but they didn't think

16    what they took from those materials were contaminated with

17    PCBs, as far as from Building 12 to Veteran's Field.

18    That's the defense; we took the material from

19    Building 12; we didn't know it was contaminated with PCBs.

20    MR. SHAFRON:  Your Honor, to the extent that testing

21    may or may not have been required, that's only the first part.

22    The primary defense on that issue is to the extent that

23    testing would have been required, is that the Borough of

24    Edgewater through its agent, TERMS, permitted that material to

25    be brought to the site to be put under hard surfaces.  That's

1   a major factual issue in dispute.

2           THE COURT:  All right.  Even though you later entered

3   into the consent decree with the EPA admitting to illegal

4   dumping and so forth, that's still a major factual dispute.

5           MR. SHAFRON:  Your Honor --

6           THE COURT:  Wait.  Wasn't it in 2015 -- I'm just

7   trying to see why facts are in dispute.  I'm not saying who is

8   going to win, who is going to lose.  I'm trying to understand

9   the facts in dispute and why.

10          What I wrote down is September 29th of 2015, signed

11  by Mr. Daibes himself, entered into a consent agreement and

12  final order with the EPA acknowledging that 38 COAH unlawfully

13  disposed of contaminated debris at Veteran's Field, unlawfully

14  disposed of the two underground storage tanks, and committed

15  other violations of federal environmental regs.

16          That's a fact; right?  Nobody is disputing that that

17  consent was entered into?

18          MR. SHAFRON:  That's correct, Your Honor.  There's no

19  dispute that that consent order was entered into.

20          THE COURT:  So there's a dispute I understand as far

21  as when the -- after Superstorm Sandy we start up again.  It

22  seems to me that the key date is September 7th of 2013.

23  There's a dispute.

24          Waterside says they did inform Neglia's representative

25  Menzella that they were going -- my understanding is

1  Waterside's position is Waterside said we never took a

2  Saturday off.  We weren't taking the Saturday off.

3       Menzella says he was informed -- Menzella from Neglia

4  was informed that they were not going to work on that

5  Saturday.  Fortuitously he happened to be coming home from a

6  Mets game.  He stopped, he saw the truck, he saw all this

7  dumping going on.

8       He said:  What are you doing?  It wasn't supposed to be

9  here.  Stop.

10      It wasn't stopped.  Then he reported it to TERMS soon

11  thereafter.

12      That's a material issue of fact, right, whether or

13  not -- I don't know.  I don't know who is going to win or lose

14  that fact, but that's a material issue of fact, whether

15  Waterside didn't say they were coming on that Saturday or said

16  they weren't coming that Saturday.

17      Do the parties agree that that's in dispute?

18       MR. SHAFRON:  Your Honor, that's certainly in

19  dispute, but I would also dispute whether the fact is

20  material.  That's going to be a major issue, as well.

21      Whether or not that occurred -- and that's the whole

22  idea, that nothing was different -- it doesn't change the fact

23  that materials were stockpiled there and that TERMS witnessed

24  that and it was permitted.  This whole issue --

25           THE COURT:  I don't think that was TERMS.  I thought

 1   that was Neglia that day.  Let me ask -- wasn't that Neglia?

 2          MR. SHAFRON:  It was now a former employee but then a

 3   Neglia employee.  That's correct.

 4          THE COURT:  Menzella, right?

 5          MR. SHAFRON:  Correct.

 6          MR. T. CORRISTON:  Your Honor, Neglia were the

 7   engineers for the Borough.  TERMS was the environmental

 8   contracting licensed professional -- LSRP.

 9          MR. SHAFRON:  That's correct, Your Honor.

10          THE COURT:  Now, Mr. Corriston, as to the contract

11   that Edgewater had with TERMS, I saw everybody basically --

12   TERMS is out there saying we did everything right, you weren't

13   told it was coming.  And there's a big disagreement between

14   the Daibes entities and TERMS as to what was said.

15          As far as the contract between Edgewater and TERMS,

16   I know one of the arguments -- it's a fact but it's obviously

17   a disputed fact that TERMS should have shut down the project

18   right after that dumping.

19          They waited, more stuff was brought in, and it doesn't

20   get shut down until October after the testing comes back.

21          My question is -- I'm going to ask TERMS, as well.  The

22   contractual provision between TERMS and Edgewater, did it

23   require TERMS to shut down automatically or did TERMS have the

24   option of going back to Edgewater and Neglia and saying this

25   is what's happened, what do you want to do?

1              MR. T. CORRISTON:  Your Honor, the way the

2    contractual relationship was done, there was not like an

3    eight-page contract because the relationship evolved from

4    the initial services to expanding it to overseeing the

5    remediation and being what we will call the gatekeeper of the

6    field.  So there's not a formal contract addressing that.

7              It's our position that as the environmental experts, if

8    they saw an issue, they should have either shut down the site

9    or at a minimum told us to shut it down.  So there's not a

10   contract saying who has the right to do what.

11             THE COURT:  Okay.  So this is just an argument based

12   on -- it's not a contractually based argument as far as who

13   had what duty.  It's based on the role, that's the position of

14   Edgewater, and TERMS -- I didn't mean to overlook you,

15   Mr. Pierce.

16             Mr. Pierce, you have TERMS; correct?

17             MR. PIERCE:  Yes, Your Honor.

18             THE COURT:  Your position is -- I just want to make

19   sure I understand it.  Your position is we told Neglia, we

20   told the Borough administrator for Edgewater, and there was a

21   decision made not to shut down at that time.  Correct?

22             MR. PIERCE:  Correct.  In fact, if you read the

23   testimony, eventually it was basically TERMS pleading with the

24   Borough to shut it down.  It wasn't until the second round of

25   sample results came back on October 3rd that the town and

```
 1  Neglia finally consented and asked TERMS to draft a letter
 2  shutting the project down.
 3          THE COURT:  Okay.  And Edgewater's position is that
 4  TERMS never recommended -- I understand the dispute.
 5  Edgewater's position is that TERMS never recommended shutting
 6  it down before that.  Correct?
 7          MR. T. CORRISTON:  Correct.  When they did, we had a
 8  discussion with them and it was shut down.
 9          THE COURT:  Okay.  That's a genuine issue of -- the
10  only question is is it material.  It's certainly a genuine
11  issue of fact on that.
12      I know that you guys have disputes over the
13  self-implementing plan.  I know there's disputes over the
14  national contingency plan and public comment.  I've seen what
15  the facts are.
16      I'm going to have to go deeper on -- I think it was the
17  law on the national contingency plan -- when that comes
18  through.
19      Ultimately, just so I have my head around it, what it
20  comes down to is there's no dispute that material was brought
21  from Building 12 to Veteran's Field.  There are several
22  disputes, obviously.
23      The critical dispute, one is between the Daibes
24  defendants and Arconic.  I don't mean to be disrespectful to
25  the Daibes defendants with respect to there's so many entities
```

```
 1   involved.  I know the specific entities involved.

 2        Arconic hit the ball on the two underground storage

 3   tanks so Arconic is responsible.  Arconic's position is you

 4   knew it was contaminated, we're not responsible for it, and

 5   you shouldn't have brought the material there.

 6        Veteran's Field, Edgewater is saying they shouldn't

 7   have brought the material here and TERMS should have done a

 8   better job of catching it when they did.  And TERMS' position

 9   is we did everything right, we kept everybody in the loop, and

10   now we're the fall guy at this point.

11        That's a very overly-simplified viewed of this case,

12   but those seem to be the big, big issues on this case.  On the

13   periphery we have Bergen County, we have Hudson Spa, depending

14   upon their roles, depending on the contractual obligations

15   that were involved, but it seems as though that's the thrust

16   of what we're trying to get to as far as who is responsible.

17        It doesn't seem to be a big fight right now -- well,

18   there might be a fight over damages, but the big fight is over

19   who knew what when and who is responsible for it at this

20   point.

21          MR. T. CORRISTON:  And the Spill Act -- obviously, we

22   have spoken about CERCLA, but obviously the Spill Act claim

23   also against the Arconic and Daibes entities.

24          THE COURT:  Okay.  The Spill Act claim, the

25   New Jersey Spill Act.
```

1          There are certain ones that I have to go deeper once I

2   get to a legal argument.

3          All right, folks --

4          MR. SHAFRON:  Your Honor, may I address one issue?

5          THE COURT:  Of course.  You can address whatever you

6   want.

7          MR. SHAFRON:  I just want to ask with respect to

8   requests to file, I was confused about some of the requests.

9   They seem to be in the nature of in limine motions with

10  respect to experts' opinions.

11         Is that going to be part of the permission to file

12  summary judgment is to basically make an in limine motion

13  with respect to the quality or whatever of anybody's expert

14  reports?

15         THE COURT:  I saw Arconic made a claim based on North

16  River's expert Hoffman.  That's just one example.

17         That's true, right, Mr. Waller?

18         MR. WALLER:  Yes, Your Honor, it is.  That's correct.

19         Our feeling is that -- again, we didn't see it in the

20  56.1 statement, but we anticipate that the Daibes defendants

21  are going to rely on the opinion -- on the opinions of their

22  expert David Hoffman.

23         Our feeling is a lot of his opinions, if not all of

24  them, are either outside of his expertise or have no basis in

25  fact.  It really depends on the extent to which Mr. Shafron is

1  going to rely on the opinions of Mr. Hoffman in his summary

2  judgment briefing, and we don't know that because we can't

3  tell from the 56.1.

4        THE COURT:  I think what I'll have to do is if it

5  needs to have a *Daubert* hearing and I get to the issue, I will

6  deny it without prejudice pending a *Daubert* hearing, and then

7  after the *Daubert* hearing I'll let you renew the motion to the

8  extent I need to decide on expert testimony.  Okay?

9        MR. T. CORRISTON:  Your Honor, I had one question.  I

10 wanted to resolve the issue --

11       THE COURT:  Wait, Mr. Corriston.  Before you go, I

12 have one question to you both.

13     Is there any relation between Kevin Corriston and

14 Timothy Corriston?

15       MR. T. CORRISTON:  He's my older brother.

16       THE COURT:  Older?  He looks younger.

17       MR. K. CORRISTON:  Judge, you think he'd let me

18 out of the case.  I think he figures he's doing me a favor

19 because I'm earning a fee for not really doing anything.

20       THE COURT:  Kevin Corriston, not Tim, but if you were

21 my brother, I'd let you out of the case.

22       MR. K. CORRISTON:  Thank you.

23       THE COURT:  I'm only joking.  Only joking.

24     I'm sorry.  Timothy Corriston, plaintiff's counsel.

25 I'm sorry, Mr. Corriston.

 1          MR. T. CORRISTON:  Judge, first of all, I don't think

 2   you can take judicial notice that he looks younger than me,

 3   but we'll have to decide that later.

 4          We've been -- in the papers plaintiffs are referring to

 5   Alcoa and A.P. who are now Arconic and Arconic Domestic or

 6   something like that.  I would imagine that it's probably best

 7   if we all just decide to refer to them in one manner.  I

 8   didn't know if you had a preference.

 9          THE COURT:  No.  Truthfully, I'd rather know if it's

10   Alcoa just because I looked at it that way, but I know they're

11   Arconic now.  It's two Arconic entities.

12          Mr. Waller, what do you prefer?  It's your client.  Do

13   you have a preference?  I know we're talking about the current

14   entities.

15          MR. WALLER:  Yes.  Because of the corporate changes

16   and restructuring, there is a company still out there called

17   Alcoa, Alcoa Corp. or Inc., I believe.

18          There's no denying, you know, for the majority of the

19   time period -- and I'm not giving Tim a hard time on this --

20   the company was called Alcoa.

21          I'm just concerned at this point taking an official

22   position calling them Alcoa.  I think historically when

23   referring to Alcoa we can do that, but officially for

24   corporate law reasons I think we need to refer to them as

25   Arconic and Arconic Domestic.

```
 1        Does that help?
 2          THE COURT:  Let me just say for the parties I'll
 3    definitely do that in the opinion.  I'll make clear who the
 4    predecessor entities were, who the current entities are.
 5          I will certainly observe corporate formalities because
 6    it can make a big difference as to who is involved ultimately.
 7          MR. WALLER:  I think we've included an e-mail in
 8    almost everything we've served acknowledging the prior name so
 9    I don't think that would be a problem.
10          THE COURT:  Do the parties have an objection to doing
11    a consent order to amend the caption just so we can put the
12    proper names in formerly known as?
13          However you would like to work it, but the opinion will
14    make -- I'll understand who you're referring to, and in my
15    opinion I'll make clear who the current entities are and then
16    what the predecessor entities were.
17          I may refer to it maybe just collectively as "Arconic"
18    for purposes of an opinion, but I'll make sure that it's clear
19    who the current entities are.
20          MR. T. CORRISTON:  My only concern is all the
21    documents refer to Alcoa and not obviously A.P. so that's why
22    we were referring to them in that manner.
23          THE COURT:  I will make it clear and maybe what we
24    can do, then, is the parties can do a consent order to change
25    the caption.  I will keep it -- certainly after summary
```

1  judgment when we get into it we're going to have to get it

2  corrected but I understand.  K&L did a good job of laying that

3  out for me and I followed it.  I will make sure that it's

4  clear in the opinion.

5      Is everybody in agreement, then, that if we get to a

6  *Daubert* issue that I need to decide before deciding summary

7  judgment, I'll decide as much as I can, I'll deny it without

8  prejudice pending the outcome of the *Daubert* hearing because I

9  anticipate -- unless I'm wrong but it seems in these cases

10  there's usually a lot of motion practice over experts.

11      I didn't anticipate this case would be any different

12  unless you're seeing it differently.

13      MR. RYSAVY:  Your Honor, this is Charlie Rysavy.

14      Just as a matter of how you want this presented, if we

15  file a motion for summary judgment related to some issue

16  related to the Daibes defendants and their opposition is to

17  cite Mr. Hoffman's expert reports, do we then say, Your Honor,

18  you have to decide whether or not Mr. Hoffman is a qualified

19  expert before this issue can be decided or should we --

20  are you asking us to make the argument in the context of the

21  summary judgment motions that Mr. Hoffman is not a qualified

22  expert?  That's what I'm trying to understand.

23      THE COURT:  That's a good question.

24      So the question is is that if somebody opposing summary

25  judgment is going to rely upon expert testimony and then the

```
 1   party moving for summary judgment does not believe that person
 2   is either a qualified expert or at least qualified as to
 3   certain opinions.
 4        The answer would be that in your reply I just need to
 5   know if you agree that it turns on that expert.  If you say we
 6   don't think you have to get to the expert issue, we think the
 7   facts -- the other facts are sufficient to decide it, that
 8   will be helpful.
 9        Or if you say we do agree that you're going to have to
10   decide about the extent of the expert testimony offered before
11   you decide this issue but we contest what their expert is
12   saying, that's fine, too.
13        At that point when I do the opinion I'll just say this
14   issue is going to turn upon the admissibility of the expert
15   testimony.  As a result, I'm going to deny it now without
16   prejudice, hold a Daubert hearing, and then we'll address it
17   afterwards.  Okay?
18        MR. RYSAVY:  That helps.  Thank you, Judge.
19        THE COURT:  Sometimes you may say we don't think it
20   really goes to the experts.  We think the facts are clear
21   enough without the expert and you can decide it now.
22        I may ultimately agree with the opposition that it's an
23   expert issue, but if you don't think it's an expert issue, I'm
24   not going to preclude you from making that argument.  Okay?
25        MR. RYSAVY:  Very good.  Thank you.
```

```
 1          THE COURT:  Which brings me up to -- I just want to
 2   know the dispute because I'm trying to get my head around it.
 3          One of the other disputes I saw that -- let me just
 4   make sure whose expert is contesting it.
 5              (Brief pause.)
 6          THE COURT:  When TERMS first came in -- let me get my
 7   facts.
 8              (Brief pause.)
 9          THE COURT:  In 2011, give or take, when Edgewater
10   hired TERMS to conduct a preliminary assessment, not later
11   when they hired -- TERMS hired an environmental consultant and
12   Mr. Dooney at the LSRP, and there was testing done and there's
13   a reference to what was found, PCBs among other things, and
14   that there were four hotspots.
15          One of the issues that's raised by the Daibes
16   defendants is that TERMS should have done grid testing rather
17   than hotspot testing.
18          I understand that argument, but what was not clear to
19   me is whether TERMS -- I saw that there were four hotspots,
20   but I didn't necessarily read those facts to mean that they
21   only tested four hotspots.
22          For TERMS, Mr. Pierce, was it random testing and they
23   found hotspots or was it a more robust testing that resulted
24   in four hotspots?
25              MR. PIERCE:  It was more than random testing.  There
```

1   was random testing to begin with, but they went back for at

2   least one or possibly two more rounds.  I'd have to look at

3   the documentation.

4        They identified areas where there was other

5   contamination and there was no PCB contamination, and they

6   identified four spots where there was PCB contamination above

7   standard.

8             THE COURT:  The initial recommendation for hotspots

9   were tack the entire site with fabric and two feet of

10  certified clean fill.

11       I know the bids went out and there were specifications

12  and after Superstorm Sandy it was decided that you needed to

13  raise it even higher, correct, because of the flooding that

14  resulted from Superstorm Sandy?

15            MR. T. CORRISTON:  It was tied to the flooding

16  regulations not the flooding -- the field did not flood from

17  the storm.  It was new flood regulations.

18            THE COURT:  Okay.  So new regulations came in and

19  that made you have to change the specifications for the

20  project.

21            MR. T. CORRISTON:  Correct.

22            THE COURT:  All right, folks.  I didn't want to cut

23  anybody out.

24       Mr. Pansulla, I'm sorry.  Sometimes it's good not to

25  say anything.  I didn't know if you wanted to say anything.

1      MR. T. CORRISTON:  Rob is used to that.

2      THE COURT:  I'm going to get an order out, give you

3  leave to file.

4      How much time do you think you'll need to get your

5  briefs in?  Err on the side of more time and I will give that

6  to you, and then that will start the briefing motion.

7      Do you think 45 days will be enough to file summary

8  judgment?  60 days?  With the pandemic, I have more

9  flexibility.

10      MR. T. CORRISTON:  Judge, on behalf of plaintiff, we

11  were thinking September 11th, which is just about 60 days.

12  It's the Friday after Labor Day.

13      THE COURT:  Everybody in agreement for initial briefs

14  right after Labor Day?  Anybody have any problems with that?

15      MR. PANSULLA:  No, Judge.

16      THE COURT:  We'll do the opposition and we'll go

17  through a regular briefing schedule.  What I'm going to do in

18  the meantime is just start working on the facts section.

19      I know I can't do it completely because there's certain

20  exhibits.  Conversely, I know, for example, Mr. Tim Corriston

21  pointed out, well, this exhibit doesn't really say that.

22      Mr. Waller, you do the same and say, well, that exhibit

23  doesn't support what the fact is.

24      I know there's certain areas where there's going to be

25  some contention, and I'm going to have to take a look at the

1    underlying evidence.

2         To the extent I can, I want to start working on this

3    facts section.  Like I said, going from the Amland litigation

4    to the 1997 transfer, all the parties involved, different

5    agreements, before we get to Veteran's Field, I just need to

6    start working on it now.

7         MR. WALLER:  Your Honor, if you or your clerk would

8    like to see a particular exhibit that we cite, for example,

9    while you work on the facts, we can certainly supply that

10   ahead of time.

11        THE COURT:  I appreciate that.  I think we'll be busy

12   enough.  I'll put a little notation saying the parties are not

13   really in agreement on this particular exhibit.

14        MR. RYSAVY:  Another thing, Your Honor, we could

15   provide if it would be helpful, we've already done it

16   internally, is we have linked copies of everybody's statement

17   of undisputed material facts so if you're going through it on

18   the computer all you have to do is click on a citation to a

19   document and the document comes up.

20        THE COURT:  That would be very helpful.

21        Would anybody have any opposition if I got that?  That

22   would be extremely helpful.

23        MR. T. CORRISTON:  I think it would be helpful if we

24   all had it.

25        THE COURT:  If you think something is wrong, just

```
 1    call me.  Please don't give me a 30-page letter why this one
 2    doesn't go there.  I know you guys are all very thorough, but
 3    I started looking at some of the objections and there's five
 4    documents.  They're like, well, the third document, fourth
 5    paragraph.  It doesn't exactly say what they -- you're very
 6    focused on the facts, which I appreciate, but I'm trying to
 7    find out what's not in dispute.  That would be extremely
 8    helpful.
 9         MS. PARKER:  Your Honor, we can send you Arconic's
10    statements immediately.  We have not hyperlinked the other
11    parties as of yet, but we can send ours immediately.
12         THE COURT:  That's fine.  Will you have a problem
13    just copying the other folks, too, just so they --
14         MS. PARKER:  Sure, we can copy everybody.
15         THE COURT:  I just want to make sure everybody sees
16    what I'm getting.  That's all.
17         MR. T. CORRISTON:  We'll do the same.
18         THE COURT:  That would be very helpful.  I appreciate
19    it.  No subliminal messages, okay, in those documents.
20         MR. WALLER:  Shoot.  You just killed our strategy.
21         THE COURT:  All right, folks.  Thank you.  This has
22    been helpful.  If you ever get to the point where you think
23    you want to try to -- I think we'll have to go through summary
24    judgment motion practice, but I'm just focused on genuine
25    disputes of material facts.
```

1        I'm really not focused at this point on -- I have

2   enough grasp on the facts I think to have intelligent

3   conversations about strengths and weaknesses, but if you ever

4   get to the point where you think it would be helpful to try to

5   sit down and resolve it, let me know.

6        If you'd like to go to somebody who you think might

7   be helpful or if you need a recommendation -- unless you feel

8   differently, it seems like we're going to have to go summary

9   judgment motions before we even start having those

10  conversations, unless somebody has a different view.

11          MR. T. CORRISTON:  On behalf of the plaintiff,

12  Your Honor, we're always open to a discussion.  We've raised

13  the issue before.

14       We had two unsuccessful mediations, but, you know,

15  we're open to it but we need a change -- I don't want to

16  single out any parties, but we need to know that people

17  understand the amount of damages we suffered here.

18          THE COURT:  Who did you mediate with earlier, just

19  out of curiosity?

20          MR. WALLER:  Judge Cavanaugh.

21          THE COURT:  He's good.

22          MR. WALLER:  Yes.

23          THE COURT:  Practical, too.  Okay.  Listen, if it

24  ever gets to the point and everybody thinks now is the time,

25  let me know.  I think Judge Cavanaugh is great.

1          I've used our former chief a couple times recently,

2     Judge Linares.  He's been able to get some very difficult

3     cases solved.  If you have a personal preference, that's

4     fine, too.

5          I try to find somebody who obviously knows the law but

6     also knows what everybody has been going through to get this

7     case to where it is today and understands what needs to be

8     done to try to get a resolution.

9          Judge Cavanaugh is great, Judge Pisano, and

10    Judge Linares.  I'm not beholden to anybody in particular.

11    Okay?

12              MR. T. CORRISTON:  Thank you.

13              THE COURT:  Anything else before we close the record?

14              MS. PARKER:  No, thank you, Your Honor.

15              MR. WALLER:  Thank you, Your Honor.

16              MR. PIERCE:  Thank you, Your Honor.

17              THE COURT:  By the way, the clerk who is working with

18    me on this is Michael Halper, H-A-L-P-E-R, and his term is

19    extended somewhat so he'll still be here not just through

20    September but through November.

21          If you ever need to talk just about scheduling or

22    something, I have two clerks named Mike.  He's Michael Halper.

23    Just ask for Michael, and he'll be able to help you out.

24    Okay?

25              MR. T. CORRISTON:  Thank you.

1            THE COURT:  Thanks, Counsel.

2              (Which were all the proceedings had in

3               the foregoing matter on said day.)

4                      *          *          *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE

2

3        I, **Lisa A. Larsen, RPR, RMR, CRR, FCRR,** Official Court

4     Reporter of the United States District Court for the District

5     of New Jersey, do hereby certify that the foregoing

6     proceedings are a true and accurate transcript of the

7     testimony as taken stenographically by and before me at the

8     time, place, and on the date hereinbefore set forth.

9        I further certify that I am neither related to any of the

10    parties by blood or marriage, nor do I have any interest in

11    the outcome of the above matter.

12

13

14

15            */S/Lisa A. Larsen, RPR, RMR, CRR, FCRR*

16         Official U.S. District Court Reporter ~

17

18              DATED this July 19, 2020

19

20

21

22

23

24

25