## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER,<br><br>    Plaintiff,<br><br>    v.<br><br>WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALCOA INC. (formerly known as "Aluminum Company of America"); ALCOA DOMESTIC LLC, as successor in interest to A.P. NEW JERSEY, INC.; et al.,<br><br>    Defendants,<br><br>(caption continued on next page) | Case Nos.: 2:14-CV-05060-JMV-JBC<br>                2:14-cv-08129-MCA-LDW<br>Hon. John M. Vazquez, U.S.D.J.<br>Hon. James B. Clark, III, U.S.M.J. |

---

## BRIEF OF ARCONIC DEFENDANTS
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
## DISMISSING CLAIMS OF THE DAIBES DEFENDANTS

---

**K&L Gates LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
*Attorneys for Arconic Inc. (f/k/a/ Alcoa*
*Inc.) and Arconic Domestic, LLC*
*(f/k/a/ Alcoa Domestic, LLC, as*
*successor in interest to A.P. New*
*Jersey, Inc.)*

*On the Brief:*
Michael E. Waller, Esq.
Charles F. Rysavy, Esq.
Dana B. Parker, Esq.

**K&L Gates LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
*Attorneys for Arconic Inc. (f/k/a/ Alcoa Inc.)*
*and Arconic Domestic, LLC (f/k/a/ Alcoa Domestic, LLC,*
*as successor in interest to A.P. New Jersey, Inc.)*

(continued from previous page)

WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; and FRED A. DAIBES,

    Defendants/Third-Party Plaintiffs,

    v.

NEGLIA ENGINEERING ASSOCIATES,

    Third-Party Defendant,

and

ALCOA DOMESTIC, LLC, as successor in interest to A.P. NEW JERSEY, INC.,

    Defendant/Third-Party Plaintiff,

    v.

COUNTY OF BERGEN and RIVER ROAD IMPROVEMENT PHASE II, INC., and HUDSON SPA, LLC,

    Third-Party Defendants.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................. 1

STATEMENT OF FACTS ................................................................... 4

    Purchase of the Former Alcoa Site ............................................. 4

    Purchase and Sale Agreement .................................................... 4

    Multi-Party Acquisition Agreement ............................................ 8

    Funding Agreement ................................................................. 100

    Environmental Indemnity Agreement ........................................ 11

    Deed Notice, Release of Demolition Funds, and No Further Action
        Letter For Building 12 .................................................... 12

    North River Demolishes Building 12 Sixteen Years after Purchasing
        it from Arconic. .............................................................. 13

    Waterside Allegedly Places Contaminated Materials at Veterans
        Field .............................................................................. 15

    The Borough Remediates Veterans Field ................................... 18

ARGUMENT ................................................................................. 18

    I.    North River's claims must be dismissed based on the express
        terms of its contracts with Arconic. ............................... 18

    II.   The Daibes Defendants' CERCLA § 107 claim (Count Three)
        fails because they did not incur *any* response costs at Veterans
        Field, much less costs consistent with the National
        Contingency Plan. ....................................................... 20

    III.  The Daibes Defendants' CERCLA § 107 claim (Count Three)
        should be dismissed because Arconic is not a "responsible
        party" regarding the Veterans Field remediation. ............. 23

    IV.  The Daibes Defendants' CERCLA § 113(f) claim (Count
        Four) should be dismissed because Arconic is not liable under
        CERCLA § 107. .......................................................... 26

i

V.   Arconic is entitled to summary judgment on its Counterclaim
     for Indemnification because the Purchase and Sale Agreement
     and the EIA unambiguously require North River and RRIP to
     defend and indemnify Arconic in connection with all claims
     against it. .......................................................................................... 26

VI.  Summary Judgment should be entered in Arconic's favor on
     its claim for breach of contract against North River and RRIP. ....... 29

CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.*,
791 F. Supp. 2d 431 (D.S.C. 2011) ...................................................................20

*Bonnieview Homeowners Ass'n v. Woodmont Builders, L.L.C.*,
655 F. Supp. 2d 473 (D.N.J. 2009) ...................................................................26

*Bowen Engineering v. Estate of Reeve*,
799 F. Supp. 467 (D.N.J. 1992) ........................................................................27

*Burlington N. & Santa Fe Ry. Co.*,
556 U.S. 599 (2009) ..........................................................................................25

*County Line Inv. Co. v. Tinney*,
933 F.2d 1508 (10th Cir. 1991) ...................................................................22, 23

*Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co.*,
767 F.2d 43 (3d Cir. 1985) ...............................................................................26

*Fireman's Fund Insurance Co. v. City of Lodi*,
302 F.3d 928 (9th Cir. 2002) ............................................................................22

*Fisher Dev. Co. v. Boise Cascade Corp.*,
37 F.3d 104 (3d Cir. 1994) ...............................................................................19

*Freeman v. Glaxo Wellcome, Inc.*,
189 F.3d 160 (2d Cir. 1999) .............................................................................24

*Kiewit E. Co. v. L & R Const. Co.*,
44 F.3d 1194 (3d Cir. 1995) .............................................................................29

*Montville Twp. v. Woodmont Builders, LLC*,
Civ. No. 03-2680 (DRD), 2009 WL 3253911 (D.N.J. Oct. 7, 2009) ................20

*Polidori v. Kordys, Puzio & Di Tomasso, AIA*,
217 N.J. Super. 424 (App. Div. 1987) ..............................................................30

*Smith Land & Imp. Corp. v. Celotex Corp.*,
851 F.2d 86 (3d Cir. 1988) ...............................................................................24

*SmithKline Beecham Corp. v. Rohm and Haas Co.*,
   89 F.3d 154 (3d Cir. 1996) .................................................................27

*Transtech Indus., Inc. v. A & Z Septic Clean*,
   798 F. Supp. 1079 (D.N.J. 1992) ........................................................26

*U.S. v. Hardage*,
   982 F.2d 1436 (10th Cir. 1992) ...................................................22, 23

*United States v. Atl. Research Corp.*,
   551 U.S. 128 (2007) ......................................................................21, 22

*United States v. Bills*,
   639 F. Supp. 825 (D.N.J. 1986), *modified on other grounds*, 822
   F.2d 373 (3d Cir. 1987) ......................................................................27

**Statutes**

42 U.S.C. § 9607(a) (2018)................................................20, 22, 23

42 U.S.C. § 9613(f) (2018) ...........................................................26

**Other Authorities**

40 C.F.R. § 300.430 .....................................................................23

40 C.F.R. § 300.700(c)(6) ............................................................23

55 Fed. Reg. 8793 ........................................................................22

## PRELIMINARY STATEMENT

The undisputed and straightforward facts before the Court on this Motion are these: (1) in 1997 North River Mews Associates LLC ("North River"), an entity owned by Defendant Fred A. Daibes, purchased the Former Alcoa Site in Edgewater, NJ, including Building 12 thereon, from Arconic; (2) North River and another entity owned by Daibes, River Road Improvement Phase II ("RRIP"), contractually agreed to release, defend, and indemnify Arconic from all claims arising from contamination of the Former Alcoa Site and to demolish in accordance with the transaction contracts and federal, state, and local laws; (3) shortly thereafter, Daibes, on behalf of North River and RRIP, decided to keep Building 12 and put it to beneficial use; (4) in 1999, North River and RRIP entered into a new contract with Arconic, the Environmental Indemnity Agreement ("EIA"), by which North River and RRIP unequivocally assumed all legal responsibility for Building 12 going forward; (5) fourteen years later, and totally unbeknownst to Arconic, North River leased the property to a tenant who hired another Daibes entity, Waterside Construction, to demolish Building 12; and (6) Waterside Construction, in turn, spread known contaminated rubble from that building on a public park in the Borough of Edgewater in violation of state and federal laws. The Daibes Defendants[1]

---

[1] The "Daibes Defendants," include Waterside Construction, LLC; North River Mews Associates, LLC; 38 COAH, LLC; Daibes Brothers, Inc.; and Fred A. Daibes.

1

attempt to twist these facts, which plainly show their consummate liability for the contamination at Veterans Field, to support claims for contribution and indemnity from Arconic under Sections 107(a) and 113(f)(1) of CERCLA, the Spill Act, New Jersey Joint Tortfeasors Contribution Act ("JTCA"), the Comparative Negligence Act ("CNA"), and common law.

The Daibes Defendants cannot recover on any of its claims. First, North River purchased the Former Alcoa Site "AS IS," with all faults. Second, North River and RRIP, unambiguously released Arconic from all claims under CERCLA, the Spill Act, and all other claims arising from contamination at the Former Alcoa Site. Third, the Daibes Defendants' CERCLA § 107 claim fails because they did not incur any response costs at Veterans Field, much less costs consistent with the National Contingency Plan. Fourth, the CERCLA § 107 claim also fails because Arconic never owned or operated Veterans Field, and did not arrange for the "disposal" of contaminated "waste" on Veterans Field, or anywhere else. In the EIA, the parties agreed that North River considered Building 12 to be a useful structure, which Arconic was given no reason to believe would be demolished at any point in the foreseeable future—but if it were demolished, the North River and RRIP agreed they would have sole control over, and sole legal responsibility for, the proper disposal of any contaminated materials that remained on the site at that point in time.

Fifth, the Daibes Defendants cannot recover from Arconic for contribution under CERCLA § 113(f) because they cannot prove Arconic's liability under CERCLA § 107.

Last, to the extent that Arconic's Motion for Summary Judgment Dismissing Claims of Plaintiff Borough of Edgewater is granted, the Daibes Defendants' claims for common law and statutory contribution should be dismissed because Arconic will not be found liable for any fill deposited at Veteran's Field.

Arconic should be granted summary judgement on its Counterclaims for indemnification and breach of contract. The Purchase and Sale Agreement and EIA unambiguously require North River and RRIP to defend and indemnify Arconic in connection with all claims against it arising from Building 12. Arconic only presses its breach of contract claim if, and to the extent that this Court finds that the EIA did not completely extinguish the terms and conditions of the 1997 Multi-Party Acquisition Agreement ("MPAA") among Arconic, North River, and RRIP, which previously governed the remediation of the Former Alcoa Site. Should this Court make that ruling, the MPAA was breached as a matter of law by North River and RRIP when Waterside Construction illegally deposited PCB-contaminated concrete rubble from the Former Alcoa Site on Veterans Field. Arconic suffered damages as a result of the breach, and is entitled to compensation.

## STATEMENT OF FACTS

### Purchase of the Former Alcoa Site

In or about 1996, developer Fred A. Daibes and the Borough of Edgewater approached Arconic predecessors, Alcoa Inc. and Alcoa Domestic LLC., as successor-in-interest to A.P. New Jersey, Inc. (collectively "Arconic"), in connection with Mr. Daibes' desire to purchase Arconic's former manufacturing site in Edgewater, New Jersey ("Former Alcoa Site"). (*See* Arconic's Statement of Material Facts ("SUMF") ¶ 6; Certification of Dana B. Parker, dated September 11, 2020 ("Parker Cert."), ¶ 3, Ex. 2).

In 1997, Arconic worked with the New Jersey Department of Environmental Protection, the Governor's office, the County of Bergen, and the Borough to sell the Former Alcoa Site to an entity controlled by Mr. Daibes, North River Mews Associates, LLC ("North River"). (SUMF ¶ 7; Parker Cert. ¶ 4, Ex. 3).

### Purchase and Sale Agreement

North River purchased the Former Alcoa Site pursuant to a June 1997 Agreement to Purchase and Sell Real Estate (the "Purchase and Sale Agreement"). (SUMF ¶ 8; Parker Cert. ¶ 5, Ex. 4). Pursuant to the Purchase and Sale Agreement, North River purchased the property for $8 million and agreed that:

> OTHER THAN THE REPRESENTATION AND WARRANTY SET FORTH IN THIS SECTION, BUYER SPECIFICALLY ACKNOWLEDGES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE

PROPERTY ON AN "**AS IS, WITH ALL FAULTS BASIS.**" AND THAT BUYER SHALL HAVE AN OPPORTUNITY TO INSPECT THE PROPERTY AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE PROPERTY . . . .

(SUMF ¶ 9; Parker Cert. ¶ 5, Ex. 4) (emphasis in original).

This provision continues and expressly lists, without limitation, the following subjects about which Arconic was making no warranties:

(i)    the quality, nature, adequacy and physical condition of the property. . .

(ii)   the quality, nature, adequacy, and physical condition of soils, geology and any groundwater;

* * *

(vii)  the presence or removal of hazardous or toxic materials, substances or wastes in, on, under, or about the Property or the adjoining or neighboring property . . . .

(SUMF ¶ 10; Parker Cert. ¶ 5, Ex. 4).

The Purchase and Sale Agreement includes an integration clause that states: "[a]ll understandings and agreements heretofore had between the parties, oral or written are merged into this Agreement, which alone fully and completely expresses their understanding." (SUMF ¶ 11; Parker Cert. ¶ 5, Ex. 4). Under Section 8(a) of the Agreement, North River agreed that if Arconic "fails to perform any of its obligations under this Agreement or the Multi-Party Agreement [*infra*], the same

5

shall constitute a default of this Agreement and thereupon, [North River], at its option, may declare a forfeiture by written notice to Seller." (SUMF ¶ 12; Parker Cert. ¶ 5, Ex. 4). This Section explains the requirements for North River to provide Arconic with notice of any such default, and states that, "where the default is not capable of being remedied in forty-five (45) days, [North River] may declare this Agreement null and void." (SUMF ¶ 12; Parker Cert. ¶ 5, Ex. 4).

The parties to the Purchase and Sale Agreement also agreed on, and specifically circumscribed, what would constitute the "known environmental condition" of the Former Alcoa Site at the time of the 1997 sale:

> (c)    Environmental Reports: Seller shall make available to Buyer the reports listed on Schedule 7(c), attached hereto and incorporated by reference, concerning the environmental condition of and contamination in, on, under, or about the Property (the "Environmental Reports"). The parties agree that the Environmental Reports and any and all reports, analyses, surveys, assessments, evaluations or the like prepared by Buyer and its representatives pursuant to Section 7(d) will establish the known environmental condition of the Property as of the Closing Date.

(SUMF ¶ 13; Parker Cert. ¶ 5, Ex. 4).

The "Environmental Reports" were several studies of PCB contamination at the Former Alcoa Site provided to North River and incorporated by reference into the Agreement. (SUMF ¶ 14; Parker Cert. ¶ 5, Ex. 4). These reports identified site-wide PCB contamination and reported that Building 12, particularly its floors and

walls, comprised the most contaminated portions of the Former Arconic Site. (SUMF ¶ 15; Parker Cert. ¶ 5, Ex. 4). North River also hired its own environmental consultant, Enviro-Sciences, Inc., and conducted its own due diligence of the site prior to the purchase. (SUMF ¶ 18; Parker Cert. ¶ 7, Ex. 6). Before the sale, Arconic provided historic maps, diagrams, environmental reports, and blueprints of the Former Alcoa Site to North River, which indicated specifications for two fuel oil storage tanks under Building 12. (SUMF ¶ 19; Parker Cert. ¶ 8, Ex. 7; Parker Cert. ¶ 9, Ex. 8; Parker Cert. ¶ 10, Ex. 9).

Under Section 7 of the Purchase and Sale Agreement, North River released Arconic from all claims arising from the presence of any and all hazardous substances, known or unknown, at the Former Alcoa Site:

> Buyer expressly releases Seller and agrees to waive all rights that it may have to seek contribution from Seller for any response costs or claims that may arise as a result of the actions or inactions of Seller and any previous owner, operator or third party on or with respect to the Property relating to Hazardous Substances.

> "Hazardous Substances" shall mean "any substance … that is listed or defined as hazardous, toxic, or dangerous" under a host of federal environmental laws, including CERCLA, and related state and local laws.

(SUMF ¶ 20; Parker Cert. ¶ 5, Ex. 4).

Under the same Section, North River also agreed to defend and indemnify Arconic:

> Buyer shall indemnify, defend and hold Seller harmless for any and all claims… including all foreseeable and unforeseeable consequential damages … arising under Applicable Law related to Buyer's use … of the Property and/or any and all activities relating thereto."
>
> "Applicable Law" shall mean the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") … the Resource Conservation Recovery Act ("RCRA") … the Toxic Substances Control Act . . . any and all formal or informal orders, decrees or requests from the United States Environmental Protection Agency, the appropriate New Jersey state governmental and regulatory bodies … and any similar state and local laws and ordinances and regulations implementing such statutes ….

(SUMF ¶ 21; Parker Cert. ¶ 5, Ex. 4).

**Multi-Party Acquisition Agreement**

As part of the Borough's master plan to widen River Road and redevelop areas within the Borough, the County, North River, Arconic, and River Road Improvement Phase II ("RRIP"),[2] entered into the June 27, 1997, Multi-Party Property Acquisition Agreement ("MPAA"). (SUMF ¶ 24; Parker Cert. ¶ 11, Ex. 10). The MPAA was incorporated by reference into the Purchase and Sale Agreement under Section 1 of the MPAA. (SUMF ¶ 25; Parker Cert. ¶ 11, Ex. 10).

Under the terms of the MPAA, North River and RRIP agreed to demolish and remove all existing structures at the Former Alcoa Site. (SUMF ¶ 27; Parker Cert. ¶

---

[2] RRIP is a Third-Party Defendant and is owned and/or controlled by Fred Daibes. (SUMF ¶ 102; Parker Cert. ¶ 57, Ex. 56).

11, Ex. 10). Arconic's only obligation was to provide $9,500,000 for demolition of the buildings at the Site, and agreed to provide limited funds for removal and disposal of material contaminated with over 50 PPM of PCBs. (SUMF ¶ 28; Parker Cert. ¶ 11, Ex. 10). The County was required to supervise the demolition and administer the disbursement of funds to RRIP under Section 4 of the MPAA. (SUMF ¶ 30; Parker Cert. ¶ 11, Ex. 10). Pursuant to Section 10, the County guaranteed to A.P. that the demolition and removal of structures would be completed in accordance with the Remedial Action Workplan and the demolition plan approved by A.P. (SUMF ¶ 29; Parker Cert. ¶ 11, Ex. 10; Parker Cert. ¶ 12, Ex. 11).

The MPAA required North River and RRIP to complete any and all demolition and removal of contaminated materials in accordance with a Remedial Action Workplan submitted to the NJDEP and approved by Arconic. (SUMF ¶ 29; Parker Cert. ¶ 11, Ex. 10; Parker Cert. ¶ 12, Ex. 11). Upon satisfactory monthly inspections, the County, upon notice to Arconic, would authorize the disbursement of funds to RRIP. (SUMF ¶ 30; Parker Cert. ¶ 11, Ex. 10).

Plans for the remediation and demolition of Building 12 were laid out in a Remedial Action Workplan ("RAWP") dated September 17, 1997, for Buildings 11 and 12, which was submitted to the NJDEP by North River. (*Id.* ¶ 31). The RAWP required that North River and RRIP remove floor panels with PCB contamination greater than 50 ppm prior to demolition, followed by demolition, crushing, and

segregation of the remaining debris based on whether the debris had 0 to .49 ppm of PCB contamination, or had PCB contamination above .49 ppm but below 50 ppm. (SUMF ¶ 31; Parker Cert. ¶ 13, Ex. 12). The differing treatment of materials based on their PCB contamination levels mirrored NJDEP regulations governing the disposal or re-use of such materials. (SUMF ¶ 31; Parker Cert. ¶ 14, Ex. 13).

Section 6 of the MPAA contained an indemnity clause in favor of the County and Arconic. Specifically, North River and RRIP agreed to:

> defend and save the County and [Arconic] harmless from any and all claims that may be filed in any Court arising from the performance of [the Multi-Party Agreement]. In connection with the defense of any claim, the County and [Arconic] shall be entitled to select their own counsel . . . neither the County nor [Arconic] shall be under any obligation to expend any funds for any purpose in connection with such litigation.

(SUMF ¶ 26; Parker Cert. ¶ 11, Ex. 10).

**Funding Agreement**

On September 23, 1997, the County, North River, Arconic, and RRIP entered into a Funding Agreement, whereby the County was required to withhold payment of $500,000 of the demolition funding until Arconic received full payment of the purchase price for the Former Alcoa site and North River obtained a No Further

Action Letter from NJDEP for the Former Alcoa Site, including Building 12. (SUMF ¶ 32; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 15, Ex. 14).[3]

### Environmental Indemnity Agreement

All of the buildings at the Former Alcoa Site were demolished before 2000 as required by the MPAA, except for Building 12. (SUMF ¶ 33; Parker Cert. ¶ 6, Ex. 5). According to Mr. Daibes, he decided not to demolish Building 12 at that time because he wanted to put it to beneficial use (a parking garage). (SUMF ¶ 35; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 17, Ex. 16). That Mr. Daibes wanted to keep Building 12 was consistent with Arconic's understanding at the time. (SUMF ¶ 36, Parker Cert. ¶ 3, Ex. 2). Because the MPAA required demolition of everything on the Former Alcoa Site, Arconic, North River, and RRIP entered into the March 13, 1999, EIA. (SUMF ¶ 37; Parker Cert. ¶ 18, Ex. 17).

As Kevin McKnight, Arconic's Vice President of Environment, Health and Safety, and Chief Sustainability Officer, explained, the EIA "was an agreement that had the sole purpose of confirming that regardless of what happened to Building 12, Arconic would have no responsibility for anything related to the Edgewater site." (SUMF ¶¶ 36, 38; Parker Cert. ¶ 3, Ex. 2). The terms of the EIA plainly confirm this

---

[3] When NJDEP "issues a no further action letter pursuant to a remediation, the person responsible for conducting the remediation shall be deemed by operation of law to have received a covenant not to sue with respect to the real property upon which the remediation has been conducted." N.J.S.A. 58:10B-13.1.

purpose; the EIA reiterated the requirement that North River obtain a No Further

Action letter regarding the site from the NJDEP, and North River and RRIP agreed

to:

> Indemnify, defend and hold harmless [Arconic] for any
> and all claims … including all foreseeable and
> unforeseeable consequential damages, occurring at any
> time before, during, or after North River's ownership of
> [the Former Alcoa Site], relating to Building 12 and the
> land under and adjacent thereto, arising under Applicable
> Law (as defined in the Purchase Agreement),[4] including,
> but not limited to, remediation and disposal costs …
> related to PCBs.

(SUMF ¶ 39; Parker Cert. ¶ 18, Ex. 17). Accordingly, the EIA extinguished the

MPAA.

### Deed Notice, Release of Demolition Funds, and No Further Action Letter For Building 12

On January 14, 2003, in order to obtain a No Further Action regarding the

Building 12 site, North River filed a Deed Notice for the Building 12 parcel (Block

74, Lot 1.02), as required by the NJDEP. (SUMF ¶¶ 41, 46; Parker Cert. ¶ 19, Ex.

18; Parker Cert. ¶ 21 Ex. 20). The Notice cited NJDEP requirements for the

institutional/engineering controls for PCBs at the Building 12 site (NJDEP Site #97-

6-10-0037 28). (SUMF ¶ 42; Parker Cert. ¶ 19, Ex. 18). Those controls included

---

[4] As defined in the Purchase and Sale Agreement, the term "Applicable Law" means numerous specific federal environmental laws, including CERCLA, similar state and local laws, "and any and all federal, state, and local environmental or land use laws, rules, ordinances, or regulations." (SUMF ¶ 40; Parker Cert. ¶ 5, Ex. 4).

restricting public access to the site and prohibiting modification or development of the interior surfaces of the building without prior approval of NJDEP. (*Id.*). NJDEP required these controls due to the presence of PCBs in the walls of Building 12 at concentrations above 0.49 ppm. (SUMF ¶ 43; Parker Cert. ¶ 19, Ex. 18).

On February 12, 2003, NJDEP issued North River a Restricted Use No Further Action letter for Building 12. (SUMF ¶ 46; Parker Cert. ¶ 19, Ex. 18; Parker Cert. ¶ 21 Ex. 20). The restriction on use required North River to comply with the January 14, 2003, Deed Notice, to monitor and provide written certification of the continued maintenance of the engineering controls (e.g., epoxy wall paint), and to notify any persons who intended to excavate at the site about the nature and location of contaminants. (SUMF ¶¶ 41, 46; Parker Cert. ¶ 19, Ex. 18; Parker Cert. ¶ 21 Ex. 20). The letter specifically noted that PCBs above 0.49 ppm were present within some of the building materials of Building 12 at that time. (SUMF ¶ 43; Parker Cert. ¶ 19, Ex. 18).

### North River Demolishes Building 12 Sixteen Years after Purchasing it from Arconic.

North River owned Building 12 from June 1997 until May 22, 2006, when North River transferred ownership of the building and site to another entity controlled by Mr. Daibes, 38 COAH, LLC, for one dollar. (SUMF ¶ 49; Parker Cert. ¶ 24, Ex. 23).

In 2012, North River entered into a ground lease of the property to E. Rae Jo. (SUMF ¶ 51; Parker Cert. ¶ 25, Ex. 24; Parker Cert. ¶ 26, Ex. 25). In November 27, 2012, another E. Rae Jo entity, The Heaven LLC, contracted with a construction company owned by Mr. Daibes, Waterside Construction, LLC, to demolish Building 12 to allow construction of the "SoJo Spa" on the lot. (SUMF ¶ 52; Parker Cert. ¶ 26, Ex. 25; Parker Cert. ¶ 27, Ex. 26).

No one involved in the project notified Arconic that Building 12 was being demolished. (SUMF ¶ 53; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 28, Ex. 27). Furthermore, North River did not notify the NJDEP that it was demolishing the building, did not submit the required RAWP to NJDEP for the demolition, did not request that Arconic approve a RAWP for the work, did not request oversight of the demolition by the County, and did nothing consistent with any of the demolition and remediation provisions that had been set out in the original Purchase and Sale Agreement and MPAA. (SUMF ¶ 53; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 28, Ex. 27) Arconic was not even aware that Waterside had demolished Building 12 until months after the demolition was complete. (SUMF ¶ 54; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3).

**Waterside Allegedly Places Contaminated Materials at Veterans Field**

At all times relevant to these lawsuits, the Borough owned and operated Veterans Field, a public park in the Borough. (SUMF ¶ 67; Parker Cert. ¶ 6, Ex. 5). In June 2012, the Borough hired Waterside to develop Veterans Field. (SUMF ¶ 68; Parker Cert. ¶ 6, Ex. 5). The contract required Waterside to remediate certain historically contaminated soils at the Park and construct new playing fields and other facilities. (SUMF ¶ 69; Parker Cert. ¶ 34, Ex. 33).

The remediation of contaminants within the historic fill at Veterans Field was conducted pursuant to NJDEP's Site Remediation Program, under the supervision of Licensed Site Remediation Professional ("LSRP") Ronald Dooney of TERMS Environmental Services, Inc. ("TERMS"). The Borough retained TERMS to assure that the remediation and construction followed all applicable environmental regulations. (SUMF ¶ 70; Parker Cert. ¶ 6, Ex. 5). This responsibility included testing fill before it was brought to the site to assure that it met the requirements of the New Jersey Site Remediation Program regulations for clean fill. (SUMF ¶ 70; Parker Cert. ¶ 35, Ex. 34; Parker Cert. ¶ 36, Ex. 35). The Specifications for Veteran's Field Improvements, dated April 2012 (rev. May 2012) required the importation of 65,000 cubic yards of "certified fill," which was defined as "certified or crushed virgin stone, as approved by the LSRP." (SUMF ¶ 71; Parker Cert. ¶ 37, Ex. 36; Parker Cert. ¶ 38, Ex. 37).

In March 2013, Neglia Engineering Associates, the Borough's engineering firm, recommended raising the grade of Veterans Field an additional one-to-two feet after flooding that occurred from Superstorm Sandy's twelve-foot storm surge. (SUMF ¶ 74; Parker Cert. ¶ 40, Ex. 39; Parker Cert. ¶ 41, Ex. 40). To accomplish this, Neglia recommended importing an additional 30,000 cubic yards of fill, bringing the total required fill to approximately 95,000 cubic yards. (SUMF ¶ 75; Parker Cert. ¶ 43, Ex. 42; Parker Cert. ¶ 44, Ex. 43).

The Borough, acting through Neglia and TERMS, directed Waterside to perform the additional remediation and construction activities at Veterans Field, consistent with Neglia's recommendations. (SUMF ¶ 76; Parker Cert. ¶ 42, Ex. 41; Parker Cert. ¶ 43, Ex. 42). Beginning in September 2013, Waterside located and arranged for specific fill material to be hauled to the Veterans Field site, sometimes in consultation with TERMS, and sometimes hauling and depositing untested material that had not been cleared for use at Veterans Field by TERMS. (SUMF ¶ 77; Parker Cert. ¶ 45, Ex. 44).

Mr. Daibes testified that Waterside was having difficulty sourcing certified clean fill in connection with its work at Veterans Field; therefore, it decided to use crushed concrete from the demolition of Building 12 as fill. (SUMF ¶ 78; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 46, Ex. 45; Parker Cert. ¶ 47, Ex. 46). According to Matthew Vereb of Waterside, the Building 12 walls and floor slabs were crushed

onsite and taken to Veterans Field, where the material was used as a base under areas to be paved. (SUMF ¶ 79; Parker Cert. ¶ 45, Ex. 44).

In a letter to the Borough dated October 3, 2013, Mr. Dooney reported the unauthorized importation and spreading of crushed concrete at Veterans Field by Waterside and issued a written stop work order for the site. (SUMF ¶ 83; Parker Cert. ¶ 48, Ex. 47). By letter dated October 9, 2013, Waterside acknowledged the stop work order. (SUMF ¶ 84; Parker Cert. ¶ 49, Ex. 48). There is no evidence that Waterside violated the written stop work order and imported any materials to the Veterans Field site after October 3, 2013. (SUMF ¶ 85).

The USEPA subsequently investigated the events at Veterans Field and the Building 12 site and found that 38 COAH, the owner of the Building 12 site as the time, unlawfully disposed of contaminated debris at Veterans Field and committed other violations of federal environmental regulations. (SUMF ¶ 86; Parker Cert. ¶ 50, Ex. 49). On September 29, 2015, Mr. Daibes, on behalf of 38 COAH, entered into a Consent Agreement and Final Order with the USEPA acknowledging these findings and consenting to the payment of a civil penalty to EPA as a result. (SUMF ¶ 87; Parker Cert. ¶ 50, Ex. 49).

Until it was named as a party in this litigation, Arconic had no knowledge of the events leading to the contamination of Veterans Field. (SUMF ¶¶ 53-54; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 28, Ex. 27).

Arconic was never notified that Building 12 was being demolished, and Arconic was not involved in Waterside's decision to raze Building 12. (SUMF ¶¶ 53-54; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 28, Ex. 27). Arconic was similarly not involved in transporting the crushed concrete from Building 12 to Veterans Field. (SUMF ¶ 77; Parker Cert. ¶ 45, Ex. 44; SUMF ¶ 81, Parker Cert. ¶ 36, Ex. 35; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 47, Ex. 46). Furthermore, Arconic did not benefit (monetarily or otherwise) from Waterside's placement of crushed concrete from Building 12 on Veterans Field. (SUMF ¶ 82).

### The Borough Remediates Veterans Field

On or about May 19, 2014, the Borough retained First Environment as the LSRP to conduct testing and oversee remediation of any contaminated materials placed at Veterans Field by Waterside. (SUMF ¶ 88; Parker Cert. ¶ 51, Ex. 50). On or about May 19, 2014, the Borough terminated its contract with TERMS and retained First Environment as the LSRP to conduct testing and oversee the remediation of Veterans Field. (SUMF ¶ 88; Parker Cert. ¶ 51, Ex. 50).

## ARGUMENT

### I.   North River's claims must be dismissed based on the express terms of its contracts with Arconic.

The Third Circuit has long held that property buyers and sellers may allocate the financial burden of environmental cleanup among themselves by contract. *Fisher*

*Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104, 107 (3d Cir. 1994). North River and Arconic did that here.

North River unambiguously released Arconic from all claims under CERCLA, the Spill Act, and state common law arising from contamination at the Former Alcoa Site when North River purchased the Property. In Section 7 of the Purchase and Sale Agreement, North River agreed that it "expressly releases Seller and agrees to waive all rights that it may have to seek contribution from Seller for any response costs or claims that may arise as a result of the actions or inactions of Seller and any previous owner, operator or third party on or with respect to the Property relating to Hazardous Substances." (SUMF ¶ 20; Parker Cert. ¶ 5, Ex. 4). "Hazardous Substances" are defined in the Agreement to include "any substance . . . that is listed or defined as hazardous, toxic, or dangerous" under a host of federal environmental laws, including CERCLA and related state and local laws. (SUMF ¶ 20; Parker Cert. ¶ 5, Ex. 4).

Where, as here, a party has explicitly released another from CERCLA and Spill Act liability arising from the site in question, that party's claims arising from CERCLA, the Spill Act, and related common law claims must fail. For example, in *Montville Twp. v. Woodmont Builders*, *LLC*, Civ. No. 03-2680 (DRD), 2009 WL 3253911 (D.N.J. Oct. 7, 2009), this Court dismissed claims seeking reimbursement for cleanup costs under CERCLA and the Spill Act where the parties previously

entered into a release precluding any such claim arising under CERCLA, the Spill Act, or any other environmental statute or law. *Id.* at *6. *See also Ashley II of Charleston, LLC v. PCS Nitrogen, Inc.*, 791 F. Supp. 2d 431, 473 (D.S.C. 2011) (same).

All of North River's claims against Arconic (Counts One through Five), therefore, must be dismissed.

## II.       The Daibes Defendants' CERCLA § 107 claim (Count Three) fails because they did not incur *any* response costs at Veterans Field, much less costs consistent with the National Contingency Plan.

A private party may sue any person under CERCLA to recover "any other necessary cost of response incurred . . . consistent with the National Contingency Plan." CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B). This section, however, does not give rise to a cause of action by a private party to recover response costs *incurred by another*, for which the private party reimbursed the other voluntarily or under court order. *United States v. Atl. Research Corp.*, 551 U.S. 128, 139 (2007). "Section 107(a) permits a PRP to recover only the costs it has 'incurred' in cleaning up a site. When a party pays to satisfy a settlement agreement or a court judgment, it does not incur its own costs of response; rather, it reimburses other parties for costs that those parties incurred." *Id.* (internal citations omitted).

The Daibes Defendants assert a claim against Arconic for contribution pursuant to Section 107(a) of CERCLA. (SUMF ¶ 99; Parker Cert. ¶ 53, Ex. 52). However, the Daibes Defendants cannot recover response costs from Arconic related to Veterans Field because there is no evidence that *the Daibes Defendants themselves* incurred any recoverable response costs related to Veterans Field. The remediation that is the subject of this lawsuit was performed entirely by the Borough or at its direction. (SUMF ¶ 63); (*see also* Certification of Charles F. Rysavy, dated September 11, 2020, ¶ 3, Ex. 1) (All historic contamination was "successfully remediated prior to beginning the importation of clean fill soils that were to be a part of the required 'Cap.'"). The Daibes Defendants did none of the remediation of the allegedly contaminated fill they brought to the site. (*Id.*). The only costs the Daibes Defendants will incur in connection with Veterans Field will be to satisfy the Borough's claim for reimbursement for the remediation contracted and paid for by the Borough, and costs incurred by the Daibes Defendants in fighting that claim and attempting to shift blame to *anyone* other than themselves. These are not recoverable "costs incurred" in connection with a remedial action. *Atl. Research Corp.*, 551 U.S. at 139; *U.S. v. Hardage,* 982 F.2d 1436, 1447-48 (10th Cir. 1992) (litigation costs that are not themselves "necessary to the containment and cleanup of hazardous releases" are not recoverable under Section 107(a)(4)(B)). Therefore, the Daibes Defendants' CERCLA § 107 claim against Arconic must be dismissed. *Id.*

21

The Daibes Defendants cannot recover response costs from Arconic for the additional reason that they did no work at Veterans Field "consistent with the National Contingency Plan." CERCLA § 107(a); 42 U.S.C. § 9607(a) (2018). Proving consistency with the National Contingency Plan is an element of a plaintiff's *prima facie* case for cost recovery under CERCLA. *Fireman's Fund Insurance Co. v. City of Lodi*, 302 F.3d 928, 950 (9th Cir. 2002); *County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1512 (10th Cir. 1991) (citations omitted). A plaintiff's failure to prove that a remedial action was consistent with the National Contingency Plan entitles a defendant to summary judgment in its favor. *Id.*

One of the essential requirements for a response action to be "consistent with the NCP" is that the party seeking to recover its costs must have provided proper notice to the public and allowed "meaningful public participation" in the selection of a remedy. 55 Fed. Reg. at 8793. There is no evidence that the Daibes Defendants provided sufficient notice to allow the public to participate meaningfully (or at all) in the selection of the chosen remedy at Veterans Field, or that they complied with any of the National Contingency Plan "public comment" requirements set out in the applicable federal regulations in connection with Veterans Field. *See* 40 C.F.R. § 300.700(c)(6) and 40 C.F.R. § 300.430. This failure alone demonstrates that any response actions the Daibes Defendants *might* have taken at Veterans Field were not consistent with the National Contingency Plan. *See County Line Inv. Co. v. Tinney,*

933 F.2d 1508, 1514 (10th Cir. 1991). Therefore, Arconic is entitled to summary

judgment on the Daibes Defendants' CERCLA § 107 claim for this reason as well.

*See United States v. Hardage*, 982 F.2d 1436, 1447 (10th Cir. 1992).

### III.     The Daibes Defendants' CERCLA § 107 claim (Count Three) should be dismissed because Arconic is not a "responsible party" regarding the Veterans Field remediation.

CERCLA liability may be imposed on a defendant in a cost recovery action

only if the plaintiff proves that the defendant is a "responsible party" under one of

the following categories, as relevant to this action: (1) a current owner or operator

of a vessel or facility; (2) a former owner or operator of a facility at the time of

disposal of any hazardous substance at such facility; or (3) a person who arranged

for disposal or treatment, or arranged for the transportation for disposal or treatment,

of hazardous substances to a facility. CERCLA § 107(a). The Daibes Defendants

erroneously allege that Arconic is an "owner and/or operator" of the Veterans Field

"facility." (SUMF ¶ 105; Parker Cert. ¶ 57, Ex. 56). It is undisputed that the Borough

owned and operated Veterans Field at all times relevant to this action. (*Id.* ¶ 67). At

no time did Arconic "own" or "operate" Veterans Field. (*Id.*). Thus, there can be no

owner/operator liability. *See Smith Land & Imp. Corp. v. Celotex Corp.*, 851 F.2d

86, 92 (3d Cir. 1988) (defendants not liable under Section 9607(a)(1) since "they

never owned or operated the facility.").

The Daibes Defendants also claim that Arconic "arranged" for the "disposal" of hazardous substances at Veterans Field. (SUMF ¶ 105; Parker Cert. ¶ 57, Ex. 56). But there has only been a "disposal" of a hazardous substance if the alleged arranger treated the hazardous substance as *waste*. *See, e.g., Freeman v. Glaxo Wellcome, Inc.,* 189 F.3d 160, 164 (2d Cir. 1999) ("only transactions that involve 'waste' [can] constitute . . . [a] disposal within the meaning of CERCLA"). Alcoa never treated Building 12 or the constituent materials that allegedly were deposited at Veterans Field years later by the Daibes Defendants as waste. The uncontradicted evidence is that Building 12 was the only structure on the Former Alcoa Site purchased by North River that was not demolished. In 1999, Mr. Daibes on behalf of North River and RRIP decided to save Building 12 and put it to beneficial use. (SUMF ¶ 35; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 17, Ex. 16). Even after it was demolished in 2013, the Daibes Defendants did not treat the crushed concrete from the walls and floors as waste. Rather, they treated it as valuable fill to be used in lieu of far more expensive and more difficult to obtain certified fill or virgin stone. (SUMF ¶¶ 71, 78; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 37, Ex. 36; Parker Cert. ¶ 38, Ex. 37; Parker Cert. ¶ 46, Ex. 45; Parker Cert. ¶ 47, Ex. 46).

Although the MPAA references the demolition and disposal of all the buildings at the Site, the Daibes Defendants' conduct was not an "arrangement" by Alcoa for the "disposal" *of Building 12 materials*. Here, the uncontradicted evidence

is that Arconic did not know whether the Daibes Defendants would *ever* demolish Building 12—but if that did occur, under the terms of the EIA, the Daibes Defendants would be solely responsible for the demolition and disposal of any contaminated building materials consistent with federal, state, and local laws. (SUMF ¶¶ 33-38; Parker Cert. ¶ 18, Ex. 17). Simply because a seller knows that a product it sold *might* later be dumped or otherwise discarded by a third party is not proof that the seller "arranged" for disposal of the product. *Burlington N. & Santa Fe Ry. Co.*, 556 U.S. 599, 613 (2009).

Approximately fourteen years after Mr. Daibes advised Arconic that he had decided to keep Building 12 it was demolished without Arconic's knowledge. (SUMF ¶ 53; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 28, Ex. 27). Arconic was not put on notice or consulted about any aspect of the demolition or disposal—none of which was consistent with any of the demolition and remediation provisions that had been set out in the original Purchase and Sale Agreement and MPAA. It cannot be said, therefore, that Arconic "arranged" for the "disposal" of the Building 12 materials that allegedly were placed at Veterans Field by Waterside.

IV.     **The Daibes Defendants' CERCLA § 113(f) claim (Count Four) should be dismissed because Arconic is not liable under CERCLA § 107.**

Only where a party is found liable under CERCLA § 107 can it be liable for contribution under CERCLA § 113. *See Transtech Indus., Inc. v. A & Z Septic Clean,* 798 F. Supp. 1079, 1086 (D.N.J. 1992) ("First, the plaintiff must show that the defendant has incurred section 107(a) liability. Then, it can sue for contribution under section 113(f)(1)."); *Bonnieview Homeowners Ass'n v. Woodmont Builders, L.L.C.*, 655 F. Supp. 2d 473, 500 (D.N.J. 2009) (same); CERCLA § 113(f), 42 U.S.C. § 9613(f) (2018). The Daibes Defendants cannot recover from Arconic for contribution under CERCLA § 113(f) because, as shown in the preceding section, they cannot prove Arconic's liability under CERCLA § 107.

V.      **Arconic is entitled to summary judgment on its Counterclaim for Indemnification because the Purchase and Sale Agreement and the EIA unambiguously require North River and RRIP to defend and indemnify Arconic in connection with all claims against it.**

Contract interpretation is a question of law in New Jersey. *Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co.*, 767 F.2d 43, 47 (3d Cir. 1985). If the contract language is clear and unambiguous, judgment may be entered "despite the parties' differing views as to what consequences flow from those clauses." *United States v. Bills*, 639 F. Supp. 825, 829 (D.N.J. 1986), *modified on other grounds*, 822 F.2d 373 (3d Cir. 1987). Risk transfer agreements are construed under the same rules that

govern the interpretation of other contracts. *See Bowen Engineering v. Estate of Reeve*, 799 F. Supp. 467, 483-84 (D.N.J. 1992) (applying New Jersey law). Such contracts are to be construed to effectuate the contracting parties' objective intent as manifested in the language of the contract in light of the circumstances surrounding the transaction. *See SmithKline Beecham Corp. v. Rohm and Haas Co.*, 89 F.3d 154, 159 (3d Cir. 1996).

There is nothing ambiguous about the language used in the contracts to describe North River's and RRIP's indemnity obligations to Arconic. The Purchase and Sale Agreement unambiguously requires North River to "indemnify, defend, and hold Seller harmless for any and all claims . . . including all foreseeable and unforeseeable consequential damages . . . arising under Applicable Law related to Buyer's use . . . of the Property and/or any and all activities relating thereto." (SUMF ¶ 20; Parker Cert. ¶ 5, Ex. 4). "Applicable Law" is defined to include all claims against Arconic asserted in this action, such as CERCLA and "any and all formal or informal orders, decrees or requests from the [USEPA], the appropriate New Jersey state governmental and regulatory bodies . . . and any similar state and local laws and ordinances and regulations . . . ." (SUMF ¶ 21; Parker Cert. ¶ 5, Ex. 4). The EIA also unambiguously requires North River and RRIP to "indemnify, defend and hold [Alcoa] harmless from any and all claims, demands, and causes of action" relating to Building 12 arising under CERCLA, the Spill Act, or any other environmental

statute or law. (SUMF ¶ 39; Parker Cert. ¶ 18, Ex. 17). The terms of the Purchase and Sale Agreement and the EIA, therefore, unambiguously require that North River and RRIP defend and indemnify Arconic against any and all claims arising out of any hazardous materials at the Former Alcoa Site. (SUMF ¶¶ 20-23, 33-40). This includes all claims asserted against Arconic in this matter. (SUMF ¶¶ 20-23, 33-40).

Even if this Court were to conclude that the MPAA still applied to Building 12 in 2013 in conjunction with, or independently of, the EIA, that contract also required that North River "defend and save . . . [Arconic] harmless from any and all claims that may be filed in any Court arising from the performance of [the Multi-Party Agreement]." (SUMF ¶ 26; Parker Cert. ¶ 11, Ex. 10).

The objective intent of the parties, as expressed in the language of the various contracts, and in light of circumstances surrounding the transactions, was that Arconic was entitled to full indemnity for the claims asserted in this case. As Kevin McKnight explained, the sole purpose of the Purchase and Sale Agreement and the EIA was to "confirm[  ] that regardless of what happened to Building 12, Arconic would have no responsibility for anything related to the Edgewater site." (SUMF ¶ 38; Parker Cert. ¶ 3, Ex. 2).

Because the Daibes Defendants have failed to defend and indemnify Arconic, this duty to defend has now become a duty to reimburse Arconic for its defense costs. *See Kiewit E. Co. v. L & R Const. Co.*, 44 F.3d 1194, 1205 (3d Cir. 1995) ("[B]ecause

[the insurer] had a duty to defend but denied that duty, the insurer must reimburse [the contractor] for the costs it has incurred so far in defending the underlying tort claims."). Accordingly, the Daibes Defendants should be liable for the costs that Arconic has incurred in bringing its defense and counterclaims in this case.

## VI.   Summary Judgment should be entered in Arconic's favor on its claim for breach of contract against North River and RRIP.

Any provisions in the MPAA that might have governed the demolition, removal, and remediation of Building 12 were extinguished by the parties' subsequent agreement allowing North River to keep Building 12 standing and put it to beneficial use. (SUMF ¶¶ 32, 34-40). If, however, this Court were to conclude that some or all of the provisions of the MPAA survived the EIA, and if North River were found to have directed Waterside Construction to deposit PCB-contaminated waste from Building 12 on Veterans Field, the Daibes Defendants would have breached the MPAA.

Pursuant to the MPAA, North River and RRIP agreed to demolish and remove existing structures at the Former Alcoa Site, which was to be completed in accordance with a RAWP submitted to the DEP and approved by Arconic. (SUMF ¶ 29; Parker Cert. ¶ 11, Ex. 10; Parker Cert. ¶ 12, Ex. 11). The Daibes Defendants never told Arconic they were demolishing Building 12, let alone sought Arconic's approval for a RAWP. (SUMF ¶ 54; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3).

Had the Daibes Defendants complied with the terms of the MPAA when demolishing and disposing of the materials from Building 12, the facts upon which the Borough based its claims against Arconic in this case would never have occurred. Therefore, if this Court finds that the MPAA governed the demolition and disposal of Building 12 in 2013, it must also find that North River and RRIP breached their duties under the MPAA, causing Arconic to suffer damages.

Arconic has incurred damages resulting from this breach in the form of fees and cost of defense, and any amount Arconic may become obligated to pay the Borough. *See, e.g.*, *Polidori v. Kordys, Puzio & Di Tomasso, AIA*, 217 N.J. Super. 424, 434 (App. Div. 1987) (plaintiff entitled to recover damages for losses that ensued from defendant's breach of contract, including plaintiff's settlement payment to injured third party).

As a result, Arconic is entitled to summary judgment on its breach of contract claim.

## CONCLUSION

For the foregoing reasons, Arconic respectfully requests that this Court (i) grant summary judgment in Arconic's favor with respect to its Counterclaims and (ii) dismiss all claims by the Daibes Defendants against Arconic.

Dated:       September 11, 2020

Respectfully submitted,

**K&L GATES LLP**

By: */s/ Michael E. Waller*
    Michael E. Waller
    Charles F. Rysavy
    Dana B. Parker
    One Newark Center, Tenth Floor
    Newark, New Jersey 07102
    Tel:  (973) 848-4000
    michael.waller@klgates.com
    charles.rysavy@klgates.com
    dana.parker@klgates.com
    *Attorneys for Arconic Inc. (f/k/a*
    *Alcoa Inc.) and Arconic Domestic,*
    *LLC (f/k/a Alcoa Domestic LLC, as*
    *successor in interest to A.P. New*
    *Jersey, Inc.)*