## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER,<br><br>    Plaintiff,<br><br>    v.<br><br>WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALCOA INC. (formerly known as "Aluminum Company of America"); ALCOA DOMESTIC LLC, as successor in interest to A.P. NEW JERSEY, INC.; et al.,<br><br>    Defendants,<br><br>(caption continued on next page) | Case Nos.: 2:14-CV-05060-JMV-JBC<br>              2:14-cv-08129-MCA-LDW<br>Hon. John M. Vazquez, U.S.D.J.<br>Hon. James B. Clark, III, U.S.M.J. |

_____

## BRIEF OF ARCONIC DEFENDANTS
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
## DISMISSING CLAIMS OF PLAINTIFF NORTH RIVER MEWS
## ASSOCIATES, LLC, AND 38 COAH, LLC
_____

**K&L Gates LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
*Attorneys for Arconic Inc. (f/k/a/ Alcoa*
*Inc.) and Arconic Domestic, LLC*
*(f/k/a/ Alcoa Domestic, LLC, as*
*successor in interest to A.P. New*
*Jersey, Inc.)*

*On the Brief:*
Michael E. Waller, Esq.
Charles F. Rysavy, Esq.
Dana B. Parker, Esq.

**K&L Gates LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
*Attorneys for Arconic Inc. (f/k/a/ Alcoa Inc.)*
*and Arconic Domestic, LLC (f/k/a/ Alcoa Domestic, LLC,*
*as successor in interest to A.P. New Jersey, Inc.)*

(continued from previous page)

WATERSIDE CONSTRUCTION,
LLC; 38 COAH, LLC; DAIBES
BROTHERS, INC.; NORTH RIVER
MEWS ASSOCIATES, LLC; and
FRED A. DAIBES,

  Defendants/Third-Party Plaintiffs,

  v.

NEGLIA ENGINEERING
ASSOCIATES,

  Third-Party Defendant,

and

ALCOA DOMESTIC, LLC, as
successor in interest to A.P. NEW
JERSEY, INC.,

  Defendant/Third-Party Plaintiff,

  v.

COUNTY OF BERGEN and RIVER
ROAD IMPROVEMENT PHASE II,
INC., and HUDSON SPA, LLC,

  Third-Party Defendants.

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF FACTS ....................................................................2

    Purchase of the Former Alcoa Site ................................................2

    Purchase and Sale Agreement ......................................................3

    Multi-Party Acquisition Agreement .............................................7

    Funding Agreement ......................................................................9

    Environmental Indemnity Agreement ...........................................9

    Deed Notice, Release of Demolition Funds, and No Further Action
        Letter for Building 12 ..........................................................11

    North River Demolishes Building 12 Sixteen Years after Purchasing it
        from Arconic. .......................................................................13

    Discovery and Removal of Underground Storage Tanks.............................14

    Waterside Allegedly Places Contaminated Materials at Veterans Field......16

    Claims Against Arconic..................................................................20

I.     ALL OF NORTH RIVER'S CLAIMS MUST BE DISMISSED
       BASED ON THE EXPRESS TERMS OF ITS CONTRACTS WITH
       ARCONIC. ....................................................................21

II.    THE NORTH RIVER PLAINTIFFS' CERCLA § 107 CLAIM
       AGAINST ARCONIC (COUNT ONE) SHOULD BE DISMISSED
       BECAUSE THE RESPONSE ACTION RELATED TO THE USTS
       WAS NOT CONSISTENT WITH THE NATIONAL
       CONTINGENCY PLAN. ..................................................24

III.   NORTH RIVER PLAINTIFFS' CERCLA § 113(F) CLAIM (COUNT
       TWO) SHOULD BE DISMISSED BECAUSE THE NORTH RIVER
       PLAINTIFFS HAVE NOT BEEN SUED UNDER CERCLA § 106
       OR § 107.....................................................................27

IV.   THE NORTH RIVER PLAINTIFFS' BREACH OF CONTRACT
       (COUNT EIGHT) AND BREACH OF IMPLIED COVENANT OF
       GOOD FAITH AND FAIR DEALING (COUNT TEN) CLAIMS
       AGAINST ARCONIC SHOULD BE DISMISSED. ...................28

V.    ARCONIC IS ENTITLED TO SUMMARY JUDGMENT ON ITS
       CLAIM FOR BREACH OF CONTRACT AGAINST NORTH
       RIVER AND RRIP.......................................................31

i

**TABLE OF CONTENTS**
**(CONTINUED)**

**PAGE**

VI.  NORTH RIVER PLAINTIFFS' TORT CLAIMS (NEGLIGENCE, STRICT LIABILITY, AND NEGLIGENT OR FRAUDULENT CONCEALMENT) (COUNTS FOUR, FIVE, AND SEVEN) SHOULD BE DISMISSED...........................................................33

CONCLUSION ......................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashley II of Charleston, LLC v. PCS Nitrogen, Inc*.,
  791 F. Supp. 2d 431 (D.S.C. 2011) ...................................................................23

*Cooper Industries, Inc. v. Aviall Services, Inc.*,
  543 U.S. 157 (2004).........................................................................................27

*County Line Inv. Co. v. Tinney*,
  933 F.2d 1508 (10th Cir. 1991) ..................................................................24, 26

*Fireman's Fund Insurance Co. v. City of Lodi*,
  302 F.3d 928 (9th Cir. 2002) ............................................................................24

*Fisher Dev. Co. v. Boise Cascade Corp*.,
  37 F.3d 104 (3d Cir. 1994) ..........................................................................21, 23

*Mendez v. Avis Budget Grp., Inc.*,
  No. CIV.A 11-6537 JLL, 2012 WL 1224708 (D.N.J. Apr. 10,
  2012) ................................................................................................................30

*Montville Twp. v. Woodmont Builders*,
  LLC, Civ. No. 03-2680 (DRD), 2009 WL 3253911 (D.N.J. Oct. 7,
  2009) ...........................................................................................................22, 23

*Pierson Sand and Gravel, Inc. v. Pierson Twp.*,
  43 ERC (BNA) 1559 (6th Cir. 1996).................................................................27

*RNC Sys., Inc. v. Modern Tech. Grp., Inc*.,
  861 F. Supp. 2d 436 (D.N.J. 2012)...................................................................34

*Travelers Indem. Co. v. Dammann & Co., Inc.*,
  594 F.3d 238 (3d Cir. 2010) .............................................................................33

*U.S. v. Atlantic Research*,
  551 U.S. 128 (2007).........................................................................................27

*United States v. Esdale*,
  CIV.A. 05-2046, 2006 WL 2129101 (D.N.J. July 25, 2006) .......................30, 31

*United States v. Hardage*,
982 F.2d 1436 (10th Cir. 1992) ..............................................................27

*United States v. Northeastern Pharmaceutical & Chemical Co.*,
810 F.2d 726 (8th Cir. 1986), *cert. denied*, 484 U.S. 848 (1987) .....................24

*Washington State Dept. of Trans. v. Wash. Nat'l Gas Co.*,
59 F.3d 793 (9th Cir. 1995) .................................................................27

**Statutes**

42 U.S.C. § 9607 (2018) ....................................................................*passim*

42 U.S.C. § 9613(f) (2018) ...............................................................27, 28

CERCLA § 106 ...........................................................................1, 27, 28

**Other Authorities**

40 C.F.R. § 300.68 ......................................................................26, 27

40 C.F.R. § 300.430 ..............................................................24, 25, 27

40 C.F.R. § 300.700 ......................................................................25

L. Civ. R. 56.1 ...........................................................................2, 26

## PRELIMINARY STATEMENT

When North River Mews Associates, LLC ("North River") acquired the Former Alcoa site in 1997, they knew what they were getting: a contaminated industrial property vacant since the 1990s. As a condition to acquiring the property, and with full knowledge that it was contaminated, North River granted extensive releases to Arconic predecessors, Alcoa Inc. and Alcoa Domestic LLC., as successor-in-interest to A.P. New Jersey, Inc, (collectively "Arconic"). Professing surprise at the existence of contamination, and despite also acquiring the Former Alcoa site **"AS IS, WITH ALL FAULTS,"** the North River Plaintiffs brought this action in an attempt to repudiate their agreements with Arconic.

Alcoa respectfully asks this Court to reject the North River Plaintiffs' artificial reading of the 1997 Purchase and Sale Agreement and the 1999 Environmental Indemnity Agreement ("EIA") (by which the North River Plaintiffs accepted all responsibility for Building 12), enforce those unambiguous agreements as written, and dismiss all of the North River Plaintiffs' claims. Additionally, the North River Plaintiffs cannot recover response costs related to remediation of the Former Alcoa Site because its response action was not consistent with the National Contingency Plan. They also cannot seek contribution from Arconic under CERCLA because the North River Plaintiffs have not been sued in this case under CERCLA § 106 or

§ 107(a). Additionally, all of the plaintiffs' tort claims are barred by the economic loss doctrine.

Last, Arconic only presses its breach of contract claim if, and to the extent that, this Court finds that the EIA did not completely extinguish the terms and conditions of the 1997 Multi-Party Acquisition Agreement ("MPAA") among Arconic, North River, and River Road Improvement Phase II ("RRIP") that governed the remediation of the Former Alcoa Site. Should this Court make such a ruling, the MPAA was breached as a matter of law by North River and RRIP when they permitted Waterside Construction to illegally dump PCB-contaminated concrete rubble from the Former Alcoa Site on Veterans Field, a recreational park in the Borough of Edgewater. Arconic suffered damages as a result of the breach, and is entitled to compensation.

## STATEMENT OF FACTS

### Purchase of the Former Alcoa Site

In or about 1996 developer Fred A. Daibes, and the Borough of Edgewater approached Arconic predecessors, Alcoa Inc. and Alcoa Domestic LLC., as successor-in-interest to A.P. New Jersey, Inc, in connection with Mr. Daibes's desire to purchase Arconic's former manufacturing site in Edgewater, New Jersey (the "Former Alcoa Site," or the "Property"). (*See* Arconic's Local Civil Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue, ECF 318, (Jan.

31, 2020) (2:14-cv-05060) ("SUMF") ¶ 6; Certification of Dana B. Parker, dated September 11, 2020 ("Parker Cert."), ¶ 3, Ex. 2).

In 1997, Arconic worked with the New Jersey Department of Environmental Protection, the Governor's office, the County of Bergen, and the Borough to sell the Former Alcoa Site to an entity controlled by Mr. Daibes, North River Mews Associates, LLC ("North River"). (SUMF ¶ 7; Parker Cert. ¶ 4, Ex. 3).

**Purchase and Sale Agreement**

North River purchased the Former Alcoa Site pursuant to a June 1997 Agreement to Purchase and Sell Real Estate (the "Purchase and Sale Agreement"). (SUMF ¶ 8; Parker Cert. ¶ 5, Ex. 4). Pursuant to the Purchase and Sale Agreement, North River purchased the property for $8 million and agreed that:

> OTHER THAN THE REPRESENTATION AND WARRANTY SET FORTH IN THIS SECTION, BUYER SPECIFICALLY ACKNOWLEDGES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "**AS IS, WITH ALL FAULTS BASIS."** AND THAT BUYER SHALL HAVE AN OPPORTUNITY TO INSPECT THE PROPERTY AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE PROPERTY…

(SUMF ¶ 9; Parker Cert. ¶ 5, Ex. 4) (emphasis in original).

This provision continues and expressly lists, without limitation, the following subjects about which Arconic was making no warranties:

> (i)  the quality, nature, adequacy and physical condition of the property. . .
>
> (ii)  the quality, nature, adequacy, and physical condition of soils, geology and any groundwater;
>
> * * *
>
> (vii)  the presence or removal of hazardous or toxic materials, substances or wastes in, on, under, or about the Property or the adjoining or neighboring property . . . .

(SUMF ¶ 10; Parker Cert. ¶ 5, Ex. 4).

The Purchase and Sale Agreement also includes an integration clause that states: "[a]ll understandings and agreements heretofore had between the parties, oral or written are merged into this Agreement, which alone fully and completely expresses their understanding." (SUMF ¶ 11; Parker Cert. ¶ 5, Ex. 4). Under Section 8(a) of that agreement North River agreed that if Arconic "fails to perform any of its obligations under this Agreement or the Multi Party Agreement [*infra*], the same shall constitute a default of this Agreement and thereupon, [North River], at its option, may declare a forfeiture by written notice to Seller." (SUMF ¶ 12; Parker Cert. ¶ 5, Ex. 4). This Section explains the requirements for North River to provide Arconic with notice of any such default, and states that, "where the default is not capable of being remedied in forty-five (45) days, [North River] may declare this Agreement null and void." (SUMF ¶ 12; Parker Cert. ¶ 5, Ex. 4).

Under Section 7(c) of the Purchase and Sale Agreement North River also agreed what would constitute the "known environmental condition" of the Former Alcoa Site. That section states:

> (c)    Environmental Reports: Seller shall make available to Buyer the reports listed on Schedule 7(c), attached hereto and incorporated by reference, concerning the environmental condition of and contamination in, on, under, or about the Property (the "Environmental Reports"). The parties agree that the Environmental Reports and any and all reports, analyses, surveys, assessments, evaluations or the like prepared by Buyer and its representatives pursuant to Section 7(d) will establish the known environmental condition of the Property as of the Closing Date.

(SUMF ¶ 13; Parker Cert. ¶ 5, Ex. 4).

The "Environmental Reports" were several studies of PCB contamination at the Former Alcoa Site provided to North River and incorporated by reference into the Agreement. (SUMF ¶ 14; Parker Cert. ¶ 5, Ex. 4). These reports identified site-wide PCB contamination and reported that Building 12, particularly its floors and walls, comprised the most contaminated portions of the Former Alcoa Site. (SUMF ¶ 15; Parker Cert. ¶ 5, Ex. 4).

North River also hired its own environmental consultant, Enviro-Sciences, Inc., and conducted its own due diligence of the site prior to the purchase of the Former Arconic Site. (SUMF ¶ 18; Parker Cert. ¶ 7, Ex. 6). Before the closing, Arconic provided historic maps, diagrams, environmental reports, and blueprints of

the Former Alcoa Site to North River, which indicated specifications for two fuel oil

storage tanks under Building 12. (SUMF ¶ 19; Parker Cert. ¶ 8, Ex. 7; Parker Cert.

¶ 9, Ex. 8; Parker Cert. ¶ 10, Ex. 9).

Under Section 7 of the Purchase and Sale Agreement, North River released

Arconic from all claims arising from the presence of any and all hazardous

substances, known or unknown, at the Former Alcoa Site:

> Buyer expressly releases Seller and agrees to waive all
> rights that it may have to seek contribution from Seller for
> any response costs or claims that may arise as a result of
> the actions or inactions of Seller and any previous owner,
> operator or third party on or with respect to the Property
> relating to Hazardous Substances.

> "Hazardous Substances" shall mean "any substance …
> that is listed or defined as hazardous, toxic, or dangerous"
> under a host of federal environmental laws, including
> CERCLA, and related state and local laws.

(SUMF ¶ 20; Parker Cert. ¶ 5, Ex. 4).

North River also agreed in Section 7 to defend and indemnify Arconic as

follows:

> Buyer shall indemnify, defend and hold Seller harmless
> for any and all claims… including all foreseeable and
> unforeseeable consequential damages … arising under
> Applicable Law related to Buyer's use … of the Property
> and/or any and all activities relating thereto."

> "Applicable Law" shall mean the Comprehensive
> Environmental Response, Compensation and Liability Act
> ("CERCLA") … the Resource Conservation Recovery
> Act ("RCRA") … the Toxic Substances Control Act . . .

6

> any and all formal or informal orders, decrees or requests
> from the United States Environmental Protection Agency,
> the appropriate New Jersey state governmental and
> regulatory bodies … and any similar state and local laws
> and ordinances and regulations implementing such
> statutes ….

(SUMF ¶ 20; Parker Cert. ¶ 5, Ex. 4).

### Multi-Party Acquisition Agreement

As part of the Borough's master plan to widen River Road and redevelop areas within the Borough, Bergen County, North River, Arconic and River Road Improvement Phase II ("RRIP")[1] entered into the June 27, 1997, Multi-Party Property Acquisition Agreement ("MPAA"). (SUMF ¶ 24; Parker Cert. ¶ 11, Ex. 10). The MPAA was incorporated by reference into the Purchase and Sale Agreement under Section 1 of that Agreement. (SUMF ¶ 25; Parker Cert. ¶ 11, Ex. 10).

Under the terms of the MPAA, North River and RRIP agreed to demolish and remove all existing structures at the Former Alcoa Site. (SUMF ¶ 27; Parker Cert. ¶ 11, Ex. 10). Arconic's only obligation under the MPAA was to provide $9,500,000 for demolition of the buildings at the Site, and agreed to provide limited funds for removal and disposal of material contaminated with over 50 PPM of PCBs. (SUMF ¶ 28; Parker Cert. ¶ 11, Ex. 10). The County was required to supervise the demolition

---

[1] RRIP is a Third-Party Defendant and is owned and/or controlled by Fred Daibes. (SUMF ¶ 102; Parker Cert. ¶ 57, Ex. 56).

and administer the disbursement of funds to RRIP under Section 4 of the MPAA. (SUMF ¶ 30; Parker Cert. ¶ 11, Ex. 10).

The MPAA required North River and RRIP to complete all demolition and removal of contaminated materials in accordance with Remedial Action Workplans submitted to the NJDEP and approved by Arconic. (SUMF ¶¶ 29, 31; Parker Cert. ¶ 11, Ex. 10; Parker Cert. ¶ 12, Ex. 11). After monthly inspections, if Bergen County found the site work satisfactory it would, upon notice to Arconic, approve the work and authorize the disbursement of funds to reimburse RRIP for their work. (SUMF ¶ 30; Parker Cert. ¶ 11, Ex. 10).

Plans for the remediation and demolition of Building 12 were specified in a Remedial Action Workplan (RAWP) for Buildings 11 and 12, dated September 17, 1997, which was submitted by North River to the NJDEP. (SUMF ¶ 31; Parker Cert. ¶ 13, Ex. 12). The RAWP required that North River and RRIP remove floor panels with PCB contamination greater than 50 ppm prior to demolition, followed by demolition, crushing, and segregation of the remaining debris based on whether the debris had 0 to .49 ppm of PCB contamination, or had PCB contamination above .49 ppm but below 50 ppm. (SUMF ¶ 31; Parker Cert. ¶ 13, Ex. 12). The differing treatment of materials based on their PCB contamination levels mirrored NJDEP regulations governing the disposal or re-use of such materials. (SUMF ¶ 31; Parker Cert. ¶ 14, Ex. 13).

Pursuant to Section 6 of the MPAA, North River and RRIP agreed to:

> defend and save the County and [Arconic] harmless from any and all claims that may be filed in any Court arising from the performance of [the Multi-Party Agreement]. In connection with the defense of any claim, the County and [Arconic] shall be entitled to select their own counsel . . . neither the County nor [Arconic] shall be under any obligation to expend any funds for any purpose in connection with such litigation.

(SUMF ¶ 26; Parker Cert. ¶ 11, Ex. 10).

**Funding Agreement**

On September 23, 1997, Bergen County, North River, Arconic, and RRIP entered into a Funding Agreement, whereby the County was required to withhold payment of $500,000 of the demolition funding until Arconic received full payment of the purchase price for the Former Alcoa site and North River obtained a No Further Action Letter[2] from NJDEP for the Former Alcoa Site, including Building 12. (SUMF ¶ 32; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 15, Ex. 14).

**Environmental Indemnity Agreement**

All of the buildings at the Former Alcoa Site were demolished before 2000, as required by the MPAA, except for Building 12. (SUMF ¶ 33; Parker Cert. ¶ 6, Ex. 5). By 1999, Mr. Daibes decided not to demolish Building 12. According to Mr.

---

[2] When NJDEP "issues a no further action letter pursuant to a remediation, the person responsible for conducting the remediation shall be deemed by operation of law to have received a covenant not to sue with respect to the real property upon which the remediation has been conducted." N.J.S.A. 58:10B-13.1.

Daibes, he decided to keep Building 12 and put it to beneficial use. (SUMF ¶¶ 34-35; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 17, Ex. 16). Because Mr. Daibes's decision to keep Building 12 was contrary to the MPAA, Arconic, North River, and RRIP entered into the March 13, 1999, Environmental Indemnity Agreement ("EIA"), which extinguished the MPAA requiring demolition of all buildings on the Former Alcoa Site. (SUMF ¶ 37; Parker Cert. ¶ 18, Ex. 17).

Consistent with the Purchase and Sale Agreement, and the requirements of the MPAA, the EIA makes clear that Building 12 became the sole responsibility of North River and RRIP (both entities owned and controlled by Fred Daibes). (SUMF ¶ 39; Parker Cert. ¶ 18, Ex. 17). Under the EIA, North River and RRIP expressly agreed to:

> Indemnify, defend and hold harmless [Arconic] for any and all claims . . . including all foreseeable and unforeseeable consequential damages, occurring at any time before, during, or after North River's ownership of [the Former Alcoa Site], relating to Building 12 and the land under and adjacent thereto, arising under Applicable Law (as defined in the Purchase Agreement),[3] including, but not limited to, remediation and disposal costs … related to PCBs.

---

[3] The Purchase and Sale Agreement defines the term "Applicable Law" as the numerous specific federal environmental laws, including CERCLA, similar state and local laws, "and any and all federal, state, and local environmental or land use laws, rules, ordinances, or regulations." (SUMF ¶ 40; Parker Cert. ¶ 4, Ex. 4).

(SUMF ¶ 39; Parker Cert. ¶ 18, Ex. 17). The fact that North River was taking full responsibility for Building 12 going forward is also consistent with Arconic's understanding at that time. (SUMF ¶ 36; Parker Cert. ¶ 3, Ex. 2). As Kevin McKnight, Arconic's Vice President of Environment, Health and Safety and Chief Sustainability Officer, explained, the EIA "was an agreement that had the sole purpose of confirming that regardless of what happened to Building 12, Arconic would have no responsibility for anything related to the Edgewater site." (SUMF ¶ 38; Parker Cert. ¶ 3, Ex. 2).

### Deed Notice, Release of Demolition Funds, and No Further Action Letter for Building 12

Under the terms of the Funding Agreement, in order to receive the remaining $500,000 in remediation funds being held by Bergen County, North River was required to obtain a No Further Action letter regarding the Former Alcoa Site, including Building 12. (SUMF ¶ 32; Parker Cert. ¶ 15, Ex. 14; Parker Cert. ¶ 3, Ex. 2). To obtain the No Further Action letter the NJDEP required North River to record a Deed Notice setting out certain institutional controls regarding use and access to the site. (SUMF ¶ 46; Parker Cert. ¶ 19, Ex. 18; Parker Cert. ¶ 21, Ex. 20). Accordingly, on January 14, 2003, North River filed a Deed Notice for the Building 12 parcel (Block 74, Lot 1.02). (SUMF ¶¶ 41, 46; Parker Cert. ¶ 19, Ex. 18; Parker Cert. ¶ 21, Ex. 20). The Notice contained certain institutional/engineering controls for PCBs at the Building 12 site (NJDEP Site #97-6-10-0037 28). (SUMF ¶ 42;

Parker Cert. ¶ 19, Ex. 18). Those controls included restricting public access to the site and prohibiting modification or development of the interior surfaces of the building without prior approval of NJDEP. (SUMF ¶ 42; Parker Cert. ¶ 19, Ex. 18). Walls containing PCBs at concentrations above 0.49 ppm were required to be coated with two coats of epoxy paint to a height of 8-feet. The interior painted wall surfaces were to be marked to allow identification of each wall panel and the walls would be inspected on a semi-annual basis. (SUMF ¶ 43; Parker Cert. ¶ 19, Ex. 18).

On February 12, 2003, NJDEP issued North River a Restricted Use No Further Action letter for Building 12. (SUMF ¶ 46; Parker Cert. ¶ 21, Ex. 20). The restriction on use required North River to comply with the January 14, 2003, Deed Notice, to monitor and provide written certification of the continued maintenance of the engineering controls (e.g., epoxy wall paint), and to notify any persons who intended to excavate on the site the nature and location of contaminants. (SUMF ¶ 46; Parker Cert. ¶ 21, Ex. 20).

Although the NJDEP recognized the presence of PCBs in the building materials, it concluded as late as 2010—thirteen years after Arconic sold the Property—that no contamination from Building 12 had entered the environment. (SUMF ¶ 48; Parker Cert. ¶ 22, Ex. 21; Parker Cert. ¶ 23, Ex. 22).

**North River Demolishes Building 12 Sixteen Years after Purchasing it from Arconic.**

North River owned Building 12 from June 1997 until May 22, 2006, when North River transferred ownership of the building and site to another entity controlled by Mr. Daibes, 38 COAH, LLC for one dollar. (SUMF ¶ 49; Parker Cert. ¶ 24, Ex. 23). Interestingly, 38 COAH transferred ownership back to North River on February 19, 2015, about two months after North River filed this litigation. (SUMF ¶ 50; Parker Cert. ¶ 24, Ex. 23).

In 2012, North River leased the Building 12 site to E. Rae Jo. (SUMF ¶ 51; Parker Cert. ¶ 25, Ex. 24; Parker Cert. ¶ 26, Ex. 25). An E. Rae Jo entity, The Heaven LLC, contracted with a construction company owned by Mr. Daibes, Waterside Construction, LLC, in November 27, 2012, to demolish Building 12 to allow construction of the "SoJo Spa" on the site. (SUMF ¶ 52; Parker Cert. ¶ 26, Ex. 25; Parker Cert. ¶ 27, Ex. 26).

No one involved in the project notified Arconic that Building 12 was being demolished. (SUMF ¶ 53; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 28, Ex. 27). If Fred Daibes, North River, or RRIP believed the MPAA was still in effect, North River did not submit the required RAWP to NJDEP for the demolition, did not request that Arconic approve a RAWP for the work, did not request oversight of the demolition by Bergen County, and did nothing consistent with any of the demolition and remediation provisions set out in

the original Purchase and Sale Agreement and MPAA. (SUMF ¶ 53; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 28, Ex. 27). Arconic was not even aware that Waterside had demolished Building 12 until months after the demolition was complete. (SUMF ¶ 54; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3).

### Discovery and Removal of Underground Storage Tanks

Unknown to Arconic, on or around September 19, 2013, during demolition of Building 12, Waterside uncovered two underground storage tanks (USTs) beneath the floor slab of Building 12. (SUMF ¶ 55; Parker Cert. ¶ 29, Ex 28; Parker Cert. ¶ 30, Ex. 29). Waterside hired Environmental Waste Minimization, Inc. to remove fuel oil from the USTs, which it did on or about September 19, 2013. (SUMF ¶ 56; Parker Cert. ¶ 31, Ex. 30). Most of the oil from the USTs was drummed and transported to Veolia ES Technical Solutions in Port Arthur, Texas, for disposal. (SUMF ¶ 56; Parker Cert. ¶ 31, Ex. 30; Parker Cert. ¶ 32, Ex. 31). On or about October 8, 2013, Waterside received laboratory results of a soil sample reportedly collected from the vicinity of the USTs that showed PCB contamination. (SUMF ¶ 57; Parker Cert. ¶ 30, Ex. 29; Parker Cert. ¶ 32, Ex. 31).

On "October 28, 2014 [*sic*],"[4] Environmental Waste Minimization Inc., mobilized to the site, ventilated the USTs, and cut access holes. (SUMF ¶ 58; Parker

---

[4] The correct date of this letter is believed to be October 28, 2013.

Cert. ¶ 31, Ex. 30). UST-1 was found to contain approximately 6 inches of oil/sludge and UST-2 contained 11 inches of oil/sludge. (SUMF ¶ 58; Parker Cert. ¶ 31, Ex. 30). It was later determined that the oil/sludge found in the bottom of the USTs was contaminated with PCBs. (SUMF ¶ 58; Parker Cert. ¶ 31, Ex. 30). The source of the PCBs in the oil is unknown. (SUMF ¶ 58; Parker Cert. ¶ 31, Ex. 30).

Environmental Waste Minimization cleaned the USTs on October 29, 2013, and removed the remaining waste. (SUMF ¶ 59; Parker Cert. ¶ 31, Ex. 30). On November 11, 2013, PennJersey Environmental Consulting, hired by 38 COAH began overseeing the excavation of petroleum and PCB-impacted soils and other materials allegedly found around the two USTs. (SUMF ¶ 60; Parker Cert. ¶ 31, Ex. 30). The two USTs were removed sometime later, cut into pieces, and shipped offsite. (SUMF ¶ 61; Parker Cert. ¶ 31, Ex. 30). The first time Arconic was notified of the discovery of the USTs was on March 18, 2014, after the USTs, their contents, and the allegedly contaminated soils and other materials around the USTs were removed from the site and destroyed. (SUMF ¶ 62; Parker Cert. ¶ 33, Ex. 32).

North River never provided the public with any opportunity to comment on any alternatives to the remediation actions it took regarding the USTs and surrounding materials, and did not provide the public with notice to participate in the selection of the remedial action. (SUMF ¶ 64). It held no public meetings, nor did it publicize in the local paper summaries of any public comments it may have

received regarding the evaluation and selection of the remediation remedy associated with the USTs. (SUMF ¶ 65). The proposed remediation plan associated with the USTs was never published and the public was not given at least 30 calendar days to submit written and oral comments. (SUMF ¶ 66). Moreover, as discussed more fully herein, the USEPA found that Waterside failed to dispose of the tanks properly, a finding with which Mr. Daibes agreed to in a Consent Order that also imposed civil penalties for the offense.

### Waterside Allegedly Places Contaminated Materials at Veterans Field

At all times relevant to these lawsuits the Borough owned and operated Veterans Field, a public park in the Borough. (SUMF ¶ 67; Parker Cert. ¶ 6, Ex. 5). In June 2012, the Borough hired Waterside to develop Veterans Field, (SUMF ¶ 68; Parker Cert. ¶ 6, Ex. 5). The contract required Waterside to remediate certain historically contaminated soils at the park and construct new playing fields and other facilities. (SUMF ¶ 69; Parker Cert. ¶ 34, Ex. 33).

The remediation of contaminants within the historic fill at Veterans Field was conducted pursuant to the NJDEP's Site Remediation Program, under the supervision of a Licensed Site Remediation Professional ("LSRP"), Ronald Dooney of TERMS Environmental Services, Inc. ("TERMS"). The Borough retained TERMS to assure that the remediation and construction followed all applicable environmental regulations. (SUMF ¶ 70; Parker Cert. ¶ 6, Ex. 5). This responsibility

included testing fill material before it was brought to the site to assure that it met the requirements of the New Jersey Site Remediation Program regulations for clean fill. (SUMF ¶ 70; Parker Cert. ¶ 35, Ex. 34; Parker Cert. ¶ 36, Ex. 35). The Specifications for Veteran's Field Improvements, dated April 2012 (rev. May 2012), required the importation of 65,000 cubic yards of "certified fill," which was defined as "certified or crushed virgin stone, as approved by the LSRP." (SUMF ¶ 71; Parker Cert. ¶ 37, Ex. 36; Parker Cert. ¶ 38, Ex. 37).

Remediation and restoration work at Veterans Field began July 9, 2012. (SUMF ¶ 72; Parker Cert. ¶ 39, Ex. 38). In late October 2012, work at Veterans Field was suspended following Superstorm Sandy. (SUMF ¶ 73; Parker Cert. ¶ 40, Ex. 39).

In March 2013, Neglia Engineering Associates, the Borough's engineering firm, recommended raising the grade of Veterans Field an additional one-to-two feet after flooding that occurred from Superstorm Sandy's twelve foot storm surge. (SUMF ¶ 74; Parker Cert. ¶ 40, Ex. 39; Parker Cert. ¶ 41, Ex. 40). To accomplish this, Neglia recommended importing an additional 30,000 cubic yards of fill, bringing the total required fill to approximately 95,000 cubic yards. (SUMF ¶ 75; Parker Cert. ¶ 43, Ex. 42; Parker Cert. ¶ 44, Ex. 43). The Borough, acting through Neglia and TERMS, directed Waterside to perform the additional remediation and

construction activities at Veterans Field consistent with Neglia's recommendations. (SUMF ¶ 76; Parker Cert. ¶ 42, Ex. 41; Parker Cert. ¶ 43, Ex. 42).

Beginning in March 2013, Waterside located and arranged for specific fill material to be hauled to the Veterans Field site, sometimes in consultation with TERMS, and other times hauling and depositing untested material that had not been cleared for use at Veterans Field by TERMS. (SUMF ¶ 77; Parker Cert. ¶ 45, Ex. 44). Mr. Daibes testified that, in September 2013, Waterside was having difficulty sourcing certified clean fill in connection with its work at Veterans Field; therefore, it apparently decided to use crushed concrete from the demolition of Building 12 as fill. (SUMF ¶ 78; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 46, Ex. 45; Parker Cert. ¶ 47, Ex. 46). According to Matthew Vereb, an employee of Waterside, the Building 12 walls and floor slabs were crushed onsite and taken to Veterans Field, where the material was used as a base under areas to be paved. (SUMF ¶ 79; Parker Cert. ¶ 45, Ex. 44).

Mr. Dooney reported the unauthorized importation and spreading of crushed concrete at Veterans Field by Waterside in an October 3, 2013, letter to the Borough, and he issued a written stop work order for the site. (SUMF ¶ 83; Parker Cert. ¶ 48, Ex. 47). In an October 9, 2013, letter, Waterside acknowledged the stop work order. (SUMF ¶ 84; Parker Cert. ¶ 49, Ex. 48). There is no evidence that Waterside violated the written stop work order and imported any materials to Veterans Field site after

October 3, 2013. (SUMF ¶ 85). Accordingly, none of the concrete or soils allegedly impacted by material from the USTs could have been deposited at Veterans Field. (SUMF ¶ 80; Parker Cert. ¶ 31, Ex. 30; Parker Cert. ¶ 48, Ex. 47).

The USEPA subsequently investigated the events at Veterans Field and the Building 12 site and found that 38 COAH unlawfully disposed of contaminated debris at Veterans Field, unlawfully disposed of the two USTs, and committed other violations of federal environmental regulations. (SUMF ¶ 86; Parker Cert. ¶ 50, Ex. 49). On September 29, 2015, Mr. Daibes, on behalf of 38 COAH, entered into a Consent Agreement and Final Order with the USEPA acknowledging these findings and consenting to the payment of a civil penalty as a result. (SUMF ¶ 87; Parker Cert. ¶ 50, Ex. 49).

Until it was named as a party in this litigation, Arconic had no knowledge of the events leading to the contamination of Veterans Field. Arconic was never notified that Building 12 was being demolished, and Arconic was not involved in Waterside's decision to raze Building 12. (SUMF ¶ 53; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 28, Ex. 27). Arconic was similarly not involved in transporting the crushed concrete from Building 12 to Veterans Field. (SUMF ¶ 77; Parker Cert. ¶ 45, Ex. 44; SUMF ¶ 81; Parker Cert. ¶ 36, Ex. 35; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 47, Ex. 46). Furthermore, Arconic

did not benefit (monetary or otherwise) from Waterside's placement of crushed concrete from Building 12 on Veterans Field. (SUMF ¶ 82).

**Claims Against Arconic**

On or about September 28, 2015, North River and 38 COAH (the "North River Plaintiffs") filed an Amended Complaint asserting claims against Arconic under CERCLA, the New Jersey Spill Compensation and Control Act, breach of contract, negligence, unjust enrichment,[5] and strict liability for alleged contamination caused by material leaking from the USTs. (SUMF ¶ 103; Parker Cert. ¶ 57, Ex. 56).

The North River Plaintiffs' Breach of Contract claim against Arconic is based on the theory that Arconic was "contractually obligated to convey to plaintiffs real property free of hidden dangerous [sic] and defects and/or to pay costs to remediate and investigate PCB contamination." (SUMF ¶ 104; Parker Cert. ¶ 57, Ex. 56). The North River Plaintiffs also allege that Arconic is a "Responsible Party" under CERCLA § 107(a) because Arconic is an "owner or operator" of the Veterans Field "facility" and a "former owner or operator" of that facility when hazardous substances were disposed of there, that it "arranged" for the "disposal" of hazardous

---

[5] By order dated May 19, 2016, this Court dismissed the North River Plaintiffs' unjust enrichment claim with prejudice. (ECF No. 62).

substances at Veterans Field, and that it is liable for contribution under CERCLA and the Spill Act. (SUMF ¶ 105; Parker Cert. ¶ 57, Ex. 56).

The North River Plaintiffs seek a declaratory judgment that Arconic is liable to reimburse them for necessary response costs. (SUMF ¶ 106; Parker Cert. ¶ 57, Ex. 56). They also allege that Arconic is strictly liable in tort because its generating, handling, disposing and/or arranging for the disposal of PCB-contaminated concrete from Building 12 was an "abnormally dangerous" activity. (SUMF ¶ 107; Parker Cert. ¶ 57, Ex. 56).

The North River Plaintiffs also assert claims against Arconic under tort theories of negligence and negligent or fraudulent concealment for failure to disclose the USTs, and a contract claim for breach of the implied covenant of good faith and fair dealing, all of which are based on the assertion that Arconic failed to disclose "the existence of the hidden underground storage tanks and/or the existence of hazardous substances." (SUMF ¶ 108; Parker Cert. ¶ 57, Ex. 56).

This Motion seeks summary judgment with respect to all claims by the North River Plaintiffs.

## ARGUMENT

### I.   All of North River's claims must be dismissed based on the express terms of its contracts with Arconic.

The Third Circuit has long held that property buyers and sellers may allocate the financial burden of environmental cleanup among themselves by contract. *Fisher*

*Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104, 107 (3d Cir. 1994). North River and

Arconic did that here.

    In the Purchase and Sale Agreement, the North River Plaintiffs

unambiguously released Arconic from all claims under CERCLA, the Spill Act, and

state common law arising from contamination at the Property. In Section 7 of the

Purchase and Sale Agreement, North River agreed that it:

> expressly releases Seller and agrees to waive all rights that it may have
> to seek contribution from Seller for any response costs or claims that
> may arise as a result of the actions or inactions of Seller and any
> previous owner, operator or third party on or with respect to the
> Property relating to Hazardous Substances.

(SUMF ¶ 20; Parker Cert. ¶ 5, Ex. 4). "Hazardous Substances" are defined in the

Agreement as "any substance … that is listed or defined as hazardous, toxic, or

dangerous" under a host of federal environmental laws, including CERCLA, and

related state and local laws. (*Id.*).

    Where, as here, a party has unambiguously released another from CERCLA,

Spill Act, and common law liability arising from the site in question, that party's

claims arising from CERCLA, the Spill Act, and related common law claims must

fail. For example, in *Montville Twp. v. Woodmont Builders*, LLC, Civ. No. 03-2680

(DRD), 2009 WL 3253911 (D.N.J. Oct. 7, 2009), this Court dismissed claims

seeking reimbursement for cleanup costs under CERCLA and the Spill Act where

the parties previously entered into a release precluding any such claim arising under

CERCLA, the Spill Act, or any other environmental statute or law. *Id.* at *6. *See also Ashley II of Charleston, LLC v. PCS Nitrogen, Inc*., 791 F. Supp. 2d 431, 473 (D.S.C. 2011) (dismissing purchaser's contribution claims under CERCLA where contract of sale between the purchaser and vendor included a release provision). It is irrelevant whether the party granting the release knew at the time about the specific environmental harm for which it later seeks damages. *Fisher Dev*., 37 F.3d at 110 n.1. The plain language of the release controls. *Ashley II*, 791 F. Supp. 2d at 473.

The claims by North River fall squarely within the claims expressly released by the Purchase and Sale Agreement. The North River Plaintiffs allege in this case that Arconic "stored, released, spilled and/or discharged hazardous substances and/or substances containing PCBs at the Property during [Arconic's] ownership and operations." (Second Amended Compl. ¶ 69). They further allege that the two USTs that are the focus of the Second Amended Complaint contained PCBs and other unspecified hazardous substances that caused contamination of soils at the Site, requiring remediation. (*Id.* ¶¶ 14–15).

Having agreed to give Arconic a broad release from all claims related to Hazardous Substances as part of the consideration for their acquisition of the Property, North River is contractually barred from asserting claims that are within the scope of that release. All of the North River's claims, therefore, must be dismissed.

23

**II.     The North River Plaintiffs' CERCLA § 107 claim against Arconic (Count One) should be dismissed because the response action related to the USTs was not consistent with the National Contingency Plan.**

North River Plaintiffs cannot recover response costs related to remediation of the USTs at the Building 12 site because its response action was not consistent with the National Contingency Plan ("NCP"). CERCLA § 107(a), 42 U.S.C. § 9607(a) (2018). Proving consistency with the NCP is an element of a plaintiff's *prima facie* case for cost recovery under CERCLA; therefore, a plaintiff's failure to meet that burden entitles a defendant to summary judgment on plaintiff's cost recovery claim. *Fireman's Fund Insurance Co. v. City of Lodi*, 302 F.3d 928, 950 (9th Cir. 2002); *County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1512 (10th Cir. 1991) (citations omitted); *United States v. Northeastern Pharmaceutical & Chemical Co.,* 810 F.2d 726, 747 (8th Cir. 1986), *cert. denied*, 484 U.S. 848 (1987).

An essential requirement for a response action to be "consistent with the NCP" is that the party seeking to recover its response costs from another must have provided proper notice to the public and allowed "meaningful public participation" in the selection of a remedy. 40 C.F.R. § 300.430(f)(2). Among other requirements the NCP imposes to accomplish this goal are that the party must do the following: make available for public comment a report describing the preferred remedy along with alternatives (40 C.F.R. § 300.430(f)(2)-(3)); make its proposed plan and supporting analyses and information available in the public record (40 C.F.R.

24

§ 300.430(f)(3)(i)(B)); allow a reasonable period of not less than thirty days for submission of written and oral comments on the proposed plan and the supporting analysis, and hold public meetings during the comment period to solicit additional input from the public (40 C.F.R. § 300.700(c)(6)), 40 C.F.R. § 300.430(f)(3)(A)-(E)); create a record of its decision (40 C.F.R. § 300.430(f)(5)) and make the record and decision available for public inspection and copying (40 C.F.R. § 300.430(f)(6)(ii)). North River did none of this.

Arconic stated in its SUMF that North River[6] failed to provide at least thirty days advance notice of public meetings to allow the public an opportunity to comment on any alternatives to the remediation actions it took regarding the USTs and surrounding materials; and that this was largely because North River held no public meetings and solicited no public comment. (SUMF ¶¶ 64, 65, 66). North River does not dispute this. (*See* Daibes Defendants' Responses to All Parties Statement of Material Facts, ECF No. 328-1, ¶¶ 64, 65, 66 (Mar. 2, 2020) (2:14-cv-05060).[7] This alone establishes that the North River Plaintiffs' response action was

---

[6] There are no facts that 38 COAH took any independent actions regarding NCP compliance.

[7] North River responded to paragraphs 64, 65, and 66 of Arconic's SUMF with the following: "Undisputed that actions were taken prior to the knowledge of the PCBs related to the USTs and that immediate action was necessary to prevent further damage from the active leaks of PCBs into the environment caused by Alcoa's concealment of the USTs. See Additional Statement of Undisputed Material Facts Below." Nothing beyond the word "undisputed" in this response is valid. First,

not consistent with the NCP. *See County Line Inv. Co.,* 933 F.2d at 1514-15; *Sherwin-Williams,* 840 F. Supp. at 476 ("Courts have consistently held that failure by a party to provide for the required opportunity for public comment 'renders a remedial action inconsistent with the NCP and bars recovery of costs.'") (internal quotation omitted).

There is also no evidence that the North River Plaintiffs complied with the detailed requirements in the NCP regulations for developing and analyzing alternative courses of action, which a party planning a remediation must follow in order for its response action to be consistent with the NCP. Specifically, they were required to develop several alternative courses of action, and to analyze and compare numerous factors during that process. *See* 40 C.F.R. § 300.68(e)(2)(i)-(xvii), (f)(2) (1986); 40 C.F.R. § 300.68(e)(1)-(2), (g) (1984). The NCP requires screening of alternatives by applying the criteria of cost, acceptable engineering practices, and effectiveness, and the rationales for eliminating alternatives must be documented. *See* 40 C.F.R. § 300.68(h)(2)(i)-(vi); 40 C.F.R. § 300.68(i)(2)(A)-(E); 40 C.F.R.

---

everything but "undisputed" is a gratuitous assertion that does not actually respond to the statement in each Paragraph, so it is improper. *See* L. Civ. Rule 56.1(a). Second, North River's Additional Statement of Undisputed Facts asserts no facts indicating it provided the public with any notice or opportunity to comment. (*See* North River Additional Statement of Undisputed Material Fact, ECF No. 328, ¶¶ 95-111). In fact, North River's Additional Statement does not even mention public notice or anything like it.

§ 300.68(g); 40 C.F.R. § 300.68(h) *804; 40 C.F.R. § 300.430(e)(9)(iii)(A)–(I); § 300.430(f)(ii)(A) & (D); *Washington State Dept. of Trans. v. Wash. Nat'l Gas Co.*, 59 F.3d 793, 803 (9th Cir. 1995).

The record is devoid of any indication that the North River Plaintiffs even considered—much less developed, critically examined, and thoughtfully rejected— alternatives to the response action it chose for the remediation of the USTs at the Building 12 site. This too is sufficient by itself to establish that North River's response action was not "consistent with the NCP." *See, e.g., Washington State Dept. of Trans. v. Wash. Nat'l Gas Co.*, 59 F.3d 793, 803-804 (9th Cir. 1995); *Pierson Sand and Gravel, Inc. v. Pierson Twp.*, 43 ERC (BNA) 1559 (6th Cir. 1996).

North River's failure to comply with the public comment requirements, and to vet potential alternative response actions, entitle Arconic to summary judgment on the North River Plaintiff's CERCLA § 107 claim. *United States v. Hardage,* 982 F.2d 1436, 1447 (10th Cir. 1992).

### III.   North River Plaintiffs' CERCLA § 113(f) claim (Count Two) should be dismissed because the North River Plaintiffs have not been sued under CERCLA § 106 or § 107.

A party that has not been sued under CERCLA § 106 or § 107(a) may not obtain contribution from other potentially responsible parties under CERCLA § 113(f). *Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 161 (2004); *U.S. v. Atlantic Research,* 551 U.S. 128, 133 (2007); CERCLA § 113(f), 42 U.S.C.

§ 9613(f) (2018). The North River Plaintiffs have not been sued under CERCLA

§ 106 or § 107(a) in connection with the remediation of the underground storage

tanks beneath Building 12, which forms the basis for their CERCLA § 113(f) claim.

The North River Plaintiffs also cannot recover under CERCLA § 113(f)

because, as shown in the preceding section, Arconic is not liable under CERCLA

§ 107(a). This Court in *Transtech Indus., Inc. v. A & Z Septic Clean* states this

principle clearly: "[CERCLA 107(a) and 113(f)] work together, one governing

liability and the other governing contribution from those found liable. First, the

plaintiff must show that the defendant has incurred section 107(a) liability. Then, it

can sue for contribution under section 113(f)(1)." 798 F. Supp. 1079, 1086 (D.N.J.

1992).

For both of these reasons, the North River Plaintiffs' § 113(f)(1) claim must

be dismissed.

### IV.   The North River Plaintiffs' Breach of Contract (Count Eight) and Breach of Implied Covenant of Good Faith and Fair Dealing (Count Ten) claims against Arconic should be dismissed.

The North River Plaintiffs' Breach of Contract[8] and Implied Covenant of

Good Faith claims against Arconic are based on the unsupportable claim that

Arconic was "contractually obligated to convey to plaintiffs real property free of

---

[8] The North River Plaintiffs bring this claim on behalf of North River *and* 38 COAH; however, there is no contract, nor is it alleged that there is any contract, between 38 COAH and Arconic.

hidden dangerous [sic] and defects and/or to pay costs to remediate and investigate PCB contamination." (SUMF ¶ 104; Parker Cert. ¶ 57, Ex. 56). This argument runs directly contrary to another concession North River made as part of the consideration it paid to acquire the Property—that Arconic made no representations or warranties regarding the physical condition of the Property, including the presence of hazardous substances or wastes in, on, or under the Property. (SUMF ¶¶ 9-11; Parker Cert. ¶ 5, Ex. 4). North River further agreed that Arconic was expressly selling the Property "AS IS, WITH ALL FAULTS." (SUMF ¶ 9; Parker Cert. ¶ 5, Ex. 4) (emphasis in original). Finally, North River agreed that the "known environmental condition" of the Property as of the closing date was established by: (1) the information obtained in the environmental reports appended to the Purchase and Sale Agreement, which identified areas of environmental concern at the Property and, in particular, PCB contamination in Building 12, and (2) any due diligence North River chose to undertake. (SUMF ¶ 13; Parker Cert. ¶ 5, Ex. 4).

The unambiguous exclusion of any representations and warranties about the presence of hazardous materials in, on, or under the Property, the unambiguous "as is" clause, North River's right to have the Property inspected for environmental issues during the due diligence process (a right that North River exercised), and the parties' stipulation as to the "known environmental condition" of the Property, all mean that the North River has no basis to argue that Arconic breached the Purchase

and Sale Agreement by allegedly failing to divulge the existence of so-called "hidden" environmental conditions at the Property, such as the USTs. Similarly, North River cannot use the implied duty of good faith "to vary the fully specified, unambiguous terms of contract." *Mendez v. Avis Budget Grp., Inc.*, No. CIV.A 11-6537 JLL, 2012 WL 1224708, at *6 (D.N.J. Apr. 10, 2012) (internal quotations and citations omitted).

The North River Plaintiffs' allegations of "fraud" do not save its Breach of Contract claim from dismissal. Under similar facts, this Court in *United States v. Esdale*, CIV.A. 05-2046, 2006 WL 2129101, at *4 (D.N.J. July 25, 2006), dismissed a claim for breach of a contract with a similar "as is" clause. The claimant in that case attempted to argue that "New Jersey law allows for damages to be recovered, even when property is purchased pursuant to an 'as is' contract, when it is 'based on fraudulent conduct of the seller.'" The Court disagreed. *Id.* The correct analysis is "whether the 'as is' [clause] bars a contractual claim and thereby eliminates a basis from which to bring a claim for breach of contract." *Id.* Because the contract unambiguously provided it is for the sale of the property "as is," the Court dismissed the breach of contract claim *despite* the allegations of fraud. *Id.*

Moreover, as previously shown, North River released Arconic from liability for "any response costs or claims that may arise as a result of the actions or inactions of [Arconic] and any previous owner, operator, or third party on or with respect to

the Property relating to hazardous substances." (SUMF ¶ 20; parker Cert. ¶ 5, Ex. 4). There is no carve-out in this release for previously unknown or undisclosed environmental liabilities. (SUMF ¶ 20). On the contrary, the plain language of the "no representations or warranties" provision, the "AS-IS" provision (in all capitals), and the "known environmental condition" provision plainly recognize that there may be unknown environmental contamination at the site—and that North River knowingly accepted that risk and absolved Arconic of any potential liability for it. *Esdale*, 2006 WL 2129101 at *4.

### V. Arconic is entitled to summary judgment on its claim for Breach of Contract against North River and RRIP.

If this Court concludes the MPAA was not fully extinguished by the terms of the EIA (as asserted by Arconic), then the Court must find that North River and Third Party Defendant RRIP breached the MPAA.

The provisions in the MPAA governing the demolition, removal, and remediation of Building 12 were extinguished by the EIA, which was signed by North River and RRIP. The EIA permitted North River to keep Building 12 standing and put it to beneficial use. (SUMF ¶¶ 32, 35-36; Parker Cert. ¶ 18, Ex. 17). Arconic only allowed North River to leave Building 12 standing if North River agreed that it would have sole physical and legal responsibility for Building 12 going forward. (SUMF ¶ 39; Parker Cert. ¶ 18, Ex. 17). North River's agreement to assume 100% of the responsibility for Building 12 is an integral part of the EIA. (SUMF ¶ 39;

Parker Cert. ¶ 18, Ex. 17). Indeed, without that provision, Arconic would not have entered into the EIA. (SUMF ¶ 38; Parker Cert. ¶ 18, Ex. 17).

If this Court were to disagree with Arconic's argument that the EIA extinguished the MPAA, and instead conclude that some or all of the provisions of the MPAA survived through 2014, it must find that the North River and RRIP breached their obligations under the MPAA by directing Waterside Construction to illegally dump PCB-contaminated concrete rubble from Building 12 on Veterans Field. Pursuant to the MPAA,

> North River and RRIP agree[d] that they will cause to be demolished and removed from the AP[9] property all structures and improvements currently existing on the property. Said demolition and removal shall be completed in accordance with the Remedial Action Workplan submitted to the DEP and the demolition plan reviewed and approved by AP.

(SUMF ¶¶ 27-29; Parker Cert. ¶ 11, Ex. 10). RRIP and North River further agreed to "re-use the rubble from the demolished structures that are not contaminated with PCB's greater than 50 ppm in accordance with applicable New Jersey laws." (SUMF ¶¶ 27-29; Parker Cert. ¶ 11, Ex. 10). RRIP was required to "notify the DEP, County Department of Public Works and County Engineer, in writing, at least five (5) days prior to the commencement of any demolition, removal or remediation work affecting the A.P. property." (SUMF ¶¶ 27-29; Parker Cert. ¶ 11, Ex. 10). North

---

[9]A.P. New Jersey (AP) merged into Alcoa Domestic, LLC, a wholly-owned subsidiary of Alcoa Inc., in 2010.

River and RRIP breached every one of these provisions via the actions of their agent, Waterside Construction, transporting materials that North River and RRIP knew were contaminated with PCBs and dumping those materials in a public park, without notifying the DEP, County Department of Public Works, or the County Engineer, or requesting Arconic's approval of a RAWP for the work.

Arconic has incurred damages resulting from this breach, including fees and cost of defending claims against it in the Borough of Edgewater matter, and may incur additional indemnifiable damages if any judgment is rendered against Arconic in this action. (Arconic's Answer and Counterclaim, ECF No. 11, dated April 6, 2016 (2:14-cv-08129-MCA-LDW), at ¶¶ 51-58).

## VI.    North River Plaintiffs' tort claims (Negligence, Strict Liability, and Negligent or Fraudulent Concealment) (Counts Four, Five, and Seven) should be dismissed.

In addition to the broad releases and other provisions of the Purchase and Sale Agreement, all of the North River Plaintiffs' tort claims are barred by the economic loss doctrine.

The economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract. *Travelers Indem. Co. v. Dammann & Co., Inc.*, 594 F.3d 238, 244 (3d Cir. 2010). Under this doctrine, a tort claim must be dismissed if the damages sought under the tort claim are identical to the damages sought by the same party under a breach of contract

claim. *See RNC Sys., Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 455 (D.N.J. 2012). Here, the North River Plaintiffs seek the same damages for its breach of contract claims as it seeks in its tort claims (Second Am. Compl. (ECF No. 28), Counts IV, V, VII, VIII); therefore, its tort-based claims must be dismissed under the economic loss doctrine.

## CONCLUSION

For the foregoing reasons, this Court should dismiss all of the North River Plaintiffs' claims against Arconic and grant Arconic's motion for Summary Judgment against North River and RRIP.

Dated:        September 11, 2020

<div style="margin-left:40%">

Respectfully submitted,

**K&L GATES LLP**

By: */s/ Michael E. Waller*
    Michael E. Waller
    Charles F. Rysavy
    Dana B. Parker
    One Newark Center, Tenth Floor
    Newark, New Jersey 07102
    Tel:  (973) 848-4000
    michael.waller@klgates.com
    charles.rysavy@klgates.com
    dana.parker@klgates.com
    *Attorneys for Arconic Inc. (f/k/a
    Alcoa Inc.) and Arconic Domestic,
    LLC (f/k/a Alcoa Domestic LLC, as
    successor in interest to A.P. New
    Jersey, Inc.)*

</div>