# EXHIBIT 4

# AGREEMENT TO PURCHASE AND SELL REAL ESTATE

THIS AGREEMENT TO PURCHASE AND SELL REAL ESTATE (this "Agreement") is made and entered into as of the _____ day of June, 1997, by and between **A. P. NEW JERSEY, INC.**, a Delaware corporation with a place of business at 1501 Alcoa Building, 425 Sixth Avenue, Pittsburgh, Pennsylvania 15219 ("Seller"), and **NORTH RIVER MEWS ASSOCIATES, LLC,** a New Jersey limited liability company with a place of business c/o Mr. John De Sheplo, Esquire, 260 Columbia Avenue, Fort Lee, New Jersey 07024 ("Buyer").

1.    **Purchase And Sale.** Seller agrees to sell, transfer, and convey to Buyer, and Buyer agrees to purchase from Seller, upon the terms, provisions and conditions hereinafter set forth those certain tracts, lots or parcels of real property situated in the Borough of Edgewater, County of Bergen and State of New Jersey, described in Exhibit A attached hereto and incorporated herein by reference (collectively, the "Property").

2.    **Purchase Price.** The purchase price which Seller agrees to accept for the Property and which Buyer agrees to pay therefor shall be a minimum of $8,000,000, and shall increase by $20,000 for each unit approved for construction on the Property in excess of 400 units (the "Purchase Price"). The Purchase Price shall be payable as follows:

(a)    At the Closing (defined below), Buyer shall deliver to Seller:

(i)    Buyer's fully executed unconditional promissory note (the "Note"), secured by Buyer's mortgage to the Property (the "Mortgage"), in the principal amount of the Purchase Price less $2,000,000, for a term of eighteen (18) months from the Closing Date and with an annual interest rate of 6% accruing until fully satisfied, substantially in the form and substance attached hereto as Exhibits B and C, respectively. Upon maturity of the Note, Buyer shall pay to Seller the amount of the Note, principal plus interest, by wire transfer in immediately available funds to the following account (the "Mellon Account"):

Mellon Bank NA, Pittsburgh, PA
ABA #043 000 261
Account Number: #000-1206
Account Name: Aluminum Company of America;

(ii)    An irrevocable, unconditional letter of credit (the "Letter of Credit") issued by PNC Bank, or a reputable commercial bank, savings bank or savings and loan association acceptable to Seller, to the benefit of Seller in the amount of $2,000,000, with an expiration date of not earlier than twenty-four (24) months after the Closing, in a form acceptable to Seller. The Letter of Credit shall be payable upon presentation of Seller's sight draft dated 18 months from the date of the Closing or upon presentation of Seller's sight draft dated earlier than 18 months from the date of the Closing accompanied by Seller's notarized written statement as follows: "North River Mews Associates, LLC is in

A001387

default of its obligations under a certain Agreement to Purchase and Sell Real Estate dated June ___, 1997 (the "Agreement"), with the undersigned, as Seller, and such default has not been cured in accordance with paragraph 8(b) of the Agreement.

(b)     Payment for Additional Units.   In the event Buyer, or anyone who acquires title to the Property or any part thereof from Buyer, receives approval to construct more than 400 units at the Property during the time period from May 1, 1997 through May 1, 2117, then at Closing, or within 15 days of receiving such approval, Buyer shall notify Seller of such approval and, within two (2) days following receipt of a building permit to construct the additional units shall pay to the Mellon Account, by wire transfer in immediately available funds, the amount of $20,000 for each additional unit for which approval was granted.

(i) Covenant.   This Section 2(b) shall be a covenant running with the land, and shall be recorded in the form of a Memorandum of Agreement with the Deed. Any subsequent transfer of the property is subject to Section 2(b), and Section 2(b) shall not merge with and into the Deed on Closing.

(ii) Estoppel Certificate.   From time to time, upon Buyer's request, Seller shall execute an estoppel certificate in a form reasonably acceptable to Buyer stating that Buyer is not in default of Section 2(b).

3.     Instruments Of Transfer.   At the Closing, Seller shall convey title to the Property to Buyer by Seller's warranty deed with covenant against grantor's acts (the "Deed") and Seller and Buyer shall execute and deliver to the other, and, where applicable, file and record such instruments of conveyance, transfer and assignment, as shall be necessary or appropriate in the opinion of their respective counsel or as required by the Title Company (defined below) to transfer to Buyer all of the aforesaid right, title and interest of Seller in the Property pursuant to this Agreement.

4.     Title Matters.

(a) Title Commitment.   Seller shall, at its sole cost and expense, as soon as reasonably possible following the execution of this Agreement, cause Chicago Title and Insurance Company (the "Title Company") to issue its commitment for an owner's fee policy of title insurance for the Property in the amount of the purchase price and designating Buyer as the proposed insured (the "Commitment").   Buyer shall, within fifteen (15) days after receipt of the Commitment, either:

(i)     Approve the form and substance of the Commitment; or

(ii)     Notify Seller in writing (the "Notice") to remove or satisfy any reasonable matters relating to the title or interests which are objectionable to Buyer as shown on the Commitment.   Seller shall have ninety (90) days following the receipt of the Notice to correct those objections specified in the Notice.   In the event that Seller is unwilling or unable to correct such objections, then, as Buyer's sole remedy and at Buyer's option to be exercised by written notice within thirty (30) days following the expiration of such 90-

2

day period, either accept such title and interest as Seller is able to furnish without reduction in or abatement of the Purchase Price and without liability of Seller to Buyer or terminate this Agreement. Upon such termination, neither party hereto shall thereafter have any further liability or obligation to the other party hereunder. Unless Buyer objects to the title condition and terminates this Agreement, said title condition shall be deemed to be acceptable and any objection to the condition shall be deemed to have been waived by Buyer for all purposes.

(b) <u>Survey</u>. Seller shall cause to be prepared an ALTA survey of the Property from a New Jersey licensed surveyor sufficient to delete the survey exception from the Commitment. The cost of the Survey shall be borne by Seller unless this Agreement is terminated before Closing, in which case the cost of the Survey shall be borne by Buyer.

(c) <u>Title Insurance</u>. Buyer shall bear the cost of the Policy of Title Insurance.

5.　　　**Warranties and Representations.**

(a)　　　<u>Litigation and Claims</u>. Except as set forth on Schedule 5(a), to Seller's knowledge there are no legal actions, suits, arbitrations or other legal, administrative or governmental proceedings pending or threatened against Seller which would materially adversely affect the condition or ability to use the Property as contemplated by this Agreement, nor is Seller aware of any basis for the foregoing.

(b)　　　**OTHER THAN THE REPRESENTATION AND WARRANTY SET FORTH IN THIS SECTION, BUYER SPECIFICALLY ACKNOWLEDGES THAT SELLER IS SELLING AND BUYER IS PURCHASING THE PROPERTY ON AN "AS IS, WITH ALL FAULTS" BASIS AND THAT BUYER SHALL HAVE AN OPPORTUNITY TO INSPECT THE PROPERTY AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ITS AGENTS, OR REPRESENTATIVES AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING WITHOUT LIMITATION:**

(i)　　　the quality, nature, adequacy and physical condition of the Property, including, but not limited to, the structural elements, foundations, roofs, floors, appurtenances, access, landscaping, parking facilities, and the electrical, mechanical, HVAC, plumbing, sewage, and utility systems, facilities and appliances;

(ii)　　　the quality, nature, adequacy, and physical condition of soils, geology and any groundwater;

(iii)　　　the existence, quality, nature, adequacy and physical condition of the Property;

(iv)　　　the development potential of the Property, and the Property's use, habitability, merchantability, or fitness, suitability, value, or adequacy of the Property for any particular purpose;

3

(v)     the zoning or other legal status of the Property or any other public or private restrictions on use of the Property;

(vi)    the compliance of the Property or its operation with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions and restrictions of any governmental or quasi-governmental entity or of any other person or entity;

(vii)   the presence or removal of hazardous or toxic materials, substances or wastes in, on, under, or about the Property or the adjoining or neighboring property;

(viii)  the quality of any labor and materials used in any improvements on the Property;

(ix)    subject to Section 4 hereof, the condition of title to the Property, other than those representations and warranties, if any, contained in the Deed by operation of law;

(x)     the leases, service contracts, or other agreements affecting the Property; and

(xi)    the economics of the operation of the Property.

6.     **Conditions Precedent To Closing.**

(a)    <u>Buyer's and Seller's Conditions</u>.  Unless all of the following conditions are satisfied, Buyer shall not be obligated to purchase, and Seller shall not be obligated to sell, convey, or transfer, the Property (except as such conditions may hereafter be expressly waived by Buyer and Seller in writing):

(i)     The New Jersey Department of Environmental Protection ("NJDEP") shall have executed and issued a Memorandum of Agreement providing for the issuance of a "No Further Action" letter substantially in the form and substance attached hereto as Exhibits D and E, respectively.

(ii)    Seller, Buyer, River Road Improvement Phase II, Inc. and the County of Bergen, New Jersey, shall have entered into a Multi Party Property Acquisition Agreement substantially in the form and substance attached hereto as Exhibit F (the "Multi-Party Agreement").  The Multi-Party Agreement, once fully executed, shall be incorporated into this Agreement by reference and attached as Exhibit G.  The Multi Party Agreement shall contain provisions for:

(1)    the requirement to demolish the structures on the Property in accordance with a Remedial Action Work Plan submitted to the NJDEP by River Road Improvement Phase II, Inc. (the "Demolition");

4

(2)   the requirements that: (i) Seller will be responsible for payment of Demolition costs in the Amount of $9,500,000, (ii) Seller will be responsible for costs of disposal of material contaminated with PCB's at concentrations greater than 50 ppm at approved TSCA landfills if those disposal costs exceed $250,000 up to a maximum of $2,500,000, and (iii) Seller's total liability for Demolition and disposal of waste material will not exceed $12,000,000; and

(3)   the establishment of an acceptable funding mechanism for the Demolition.

(b)   Buyer's Conditions.  Unless all of the following conditions are satisfied, Buyer shall not be obligated to purchase the Property (except as such conditions may hereafter be expressly waived in writing by Buyer):

(i)   Buyer shall have received the necessary, final, non-appealable approvals of its development plans for the Property from the Borough of Edgewater, New Jersey. Seller agrees to execute all required consents to enable Buyer to meet this condition and all other requisite approvals; and

(ii)   From the date of this Agreement until the Closing, there shall not have occurred any material adverse change in the physical condition of the Property or the condition of title to the Property.

(c)   Seller's Conditions.  Unless all of the following conditions are satisfied, Seller shall not be obligated to sell, convey, and transfer the Property to Buyer (except as such conditions may hereafter be expressly waived in writing by Seller):

(i)   Seller shall have received from the County of Bergen, New Jersey, a guarantee of performance acceptable to Seller for the Demolition.

**7.   Environmental Conditions.**  The following terms and conditions shall survive Closing hereunder and shall not be merged with and into the Deed.

(a)   Hazardous Substance.  For the purposes hereof, the term "Hazardous Substance" shall mean any substance, chemical or waste that is listed or defined as hazardous, toxic, or dangerous under Applicable Law (defined below), and any asbestos containing materials, radioactive materials or petroleum products.

(b)   Applicable Law.  For the purposes hereof, the term "Applicable Law" shall mean the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1471 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; and the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; each as amended from time to time, together with the rules and regulations promulgated thereunder, and any and all formal or

informal orders, decrees or requests from the United States Environmental Protection Agency, the appropriate New Jersey state governmental and regulatory bodies, or any other governmental agency, authority or instrumentality having jurisdiction and any similar state and local laws and ordinances and the regulations implementing such statutes; together with any and all federal, state, and local environmental or land use laws, rules, ordinances, or regulations.

(c)    Environmental Reports.  Seller shall make available to Buyer the reports listed on Schedule 7(c), attached hereto and incorporated by reference, concerning the environmental condition of and contamination in, on, under, or about the Property (the "Environmental Reports").  The parties agree that the Environmental Reports and any and all reports, analyses, surveys, assessments, evaluations or the like prepared by Buyer and its representatives pursuant to Section 7(d) will establish the known environmental condition of the Property as of the Closing Date.  The Environmental Reports, and any and all reports, surveys and assessments, including all copies thereof, produced by Buyer or its representatives pursuant to this Agreement, shall be held in strict confidence by Buyer and shall not be disclosed by Buyer or its employees, consultants, agents and representatives, without the prior written consent of Seller.

(d)    Buyer's Assessment.  Buyer, at its sole cost and expense, may conduct an environmental transfer assessment of the Property prior to Closing ("Buyer's Assessment").  Seller shall permit Buyer or its representatives, at all reasonable times prior to the Closing Date, to enter upon any and all of the Property for the purposes of inspection, making tests, taking samples and soil borings, and/or conducting groundwater studies and such other investigations as Buyer shall deem appropriate, in order to complete Buyer's Assessment.

(e)    Restrictions on Buyer's Assessment.  Notwithstanding any other provision of this Agreement, Buyer's right to enter the Property for purposes of conducting Buyer's Assessment shall be subject to the following restrictions:

(i)    Buyer shall notify Seller at least twenty-four (24) hours prior to entry onto the Property to conduct such activity;

(ii)    All activities undertaken in connection with Buyer's Assessment shall fully comply with any Applicable Law, and other laws relating to worker safety and to proper disposal of any samples taken, and any soil or water generated in the process of taking the samples, and Buyer shall provide Seller with split samples of all soil, air or water sample so taken;

(iii)    Seller shall be permitted to have a representative present during all such investigations, and copy the results of on-site testing and visual inspections, and shall have complete access to all samples taken, test results, and boring records;

(iv)    In the event that Buyer shall not consummate this transaction for any reason, Buyer shall restore the Property to its condition prior to such investigative activities;

6.

(v)     Buyer shall take all actions and implement all protections necessary to ensure that actions taken hereunder and equipment, materials, and substances generated, used or brought onto the Property pose no threat to the safety or health of persons or the environment, and cause no damage to the Property of Seller or of any other person;

(vi)    Buyer shall be solely responsible for the security of the activities, equipment and materials brought on the Property prior to the Closing Date;

(vii)   Buyer for itself, its successors and assigns, covenants and agrees that it shall indemnify and save harmless Seller, its successors and assigns, from and against any and all loss or liability, and all claims, damages, fees, costs and expenses resulting from, incident to or in any way arising out of the entry onto the Property to conduct Buyer's Assessment, or any other act done pursuant to the rights, privileges and authority hereby granted. Buyer shall reimburse Seller for actual damage to the Property resulting from said activities.

(viii)  Unless specifically required by New Jersey law, any and all reports, surveys and assessments, including all copies thereof, produced by Buyer or its representatives pursuant to this Agreement shall be held in strict confidence by Buyer, shall not be disclosed by Buyer or its employees, consultants, agents and representatives, without the prior written consent of Seller, and shall be forthwith delivered to Seller at no cost or expense to Seller;

(ix)    Without limiting the effect of the last clause, Buyer shall require that any party performing services hereunder waive all rights to assert any lien or claim against Seller or the Property arising out of services performed hereunder and provide insurance against injury and damage to Seller or any other person, in coverage amounts and terms satisfactory to Seller, and shall obtain Seller's written approval of such coverage prior to that party's first entry onto the Property; and

(x)     Buyer and its representatives shall comply with all governmental laws and regulations and all policies and regulations of Seller in effect at such time, including, but not limited to, those relating to health and safety, and with such special regulations, rules or policies as may be considered appropriate by Seller under the circumstances and Seller shall have the right to refuse initial or continued access to the Property to any person when it determines that such action is necessary or desirable.

(f)     Indemnification of Seller.  Buyer shall indemnify, defend and hold Seller harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages, occurring on or after the Closing Date arising under Applicable Law related to Buyer's (or, during Buyer's ownership of the Property, any operators' or any third parties') use of the Property and/or any and all activities relating thereto.

(g)     Release of Seller.  Except in the event that Seller remains in default on any payment obligation after receiving notice of such default and opportunity to cure as set forth in Section 8, Buyer expressly releases Seller and agrees to waive all rights that it may have to seek

7

contribution from Seller for any response costs or claims that may arise as a result of the actions or inactions of Seller and any previous owner, operator or third party on or with respect to the Property relating to Hazardous Substances. Nothing in this provision shall alter or expand the parties' rights or obligations under the Multi Party Agreement.

**8.  Default.**

(a)  By Seller.  If Seller fails to perform any of its obligations under this Agreement or the Multi Party Agreement, the same shall constitute a default of this Agreement and thereupon Buyer, at its option, may declare a forfeiture by written notice to Seller ("Notice of Seller's Default").  At the expiration of forty-five (45) days after the Notice of Seller's Default, if Seller has not remedied the default, or if Seller has not exercised all efforts to remedy the default as quickly as possible where the default is not capable of being remedied in forty-five (45) days, Buyer may declare this Agreement null and void.  In any event, if such default is not remedied within 120 days after the Notice of Seller's Default, Buyer may declare this Agreement null and void.

(b)  By Buyer.  If Buyer fails to perform any of its obligations under this Agreement or the Multi Party Agreement, the same shall constitute a default of this Agreement and thereupon Seller, at its option, may declare a forfeiture by written notice to Buyer ("Notice of Buyer's Default").  At the expiration of forty-five (45) days after the Notice of Buyer's Default, if Buyer has not remedied the default, or if Buyer has not exercised all efforts to remedy the default as quickly as possible where the default is not capable of being remedied in forty-five (45) days (an "Extended Default"), Seller may at its option:

(i)  if the default occurs before Closing and is not cured as described in Section 8(b), declare the Agreement null and void; or

(ii)  if the default occurs after Closing and Seller is not in default, upon thirty (30) days' written notice, demand immediate payment of the Note and/or Letter of Credit or immediately foreclose on the Mortgage.

In any event, if an Extended Default is not remedied within 120 days after the Notice of Buyer's Default, Seller may elect to exercise its remedies under this Section 8(b)(i) or (ii).

(c)  Limitation of Liability.  In the event of default under this Agreement, the remedies of the parties are limited to the remedies set forth in Sections 8(a) and (b) above.  No party shall be liable for any incidental or consequential damages for default under this Agreement.

(d)  Waiver of Breach.  The waiver by either party of any condition or breach by the other party of any term, covenant, or condition herein contained shall not be deemed to be a waiver of any other condition of any subsequent breach of the same or any other term, covenant, or condition herein contained.

8.

**9.     Force Majeure.**

(a)     "Force Majeure" shall mean an act, event or condition having a material adverse effect upon the rights or obligations of either party hereunder if such act, event, or condition is beyond the reasonable control of the parties to this Agreement and is relied upon as justification for the failure to perform any obligation set forth herein or to comply with any condition required of the respective parties pursuant to this Agreement. Such acts, events or conditions shall be limited to the following: (i) any labor strike or interruption, or (ii) the action or inaction of any governmental body of the United States of America or the State of New Jersey and any other subdivisions thereof exercising jurisdiction.

(b)     Each party hereto is excused from failure or delay in the performance of any act required hereunder (except for payment of the Letter of Credit, accrual and payment of interest on the Note, and Seller's payment obligations with respect to the Demolition) by reason of Force Majeure. In the event a party is rendered unable, either in whole or in part, to carry out the terms of this Agreement, such affected party shall give immediate notice ("Force Majeure Notice") to the other party and the obligations (other than payment of the Letter of Credit, accrual and payment of interest on the Note, and Seller's payment obligations with respect to the Demolition) of such affected party, to the extent affected by such Force Majeure and to the extent that due diligence is being used to resume performance at the earliest practicable date, shall be suspended. The parties hereto shall use their best efforts to overcome or remove any Force Majeure and to minimize the effect of such Fore Majeure. Notice shall be given to the other party when the effect of the Force Majeure has ceased. The parties hereto acknowledge that notwithstanding any Force Majeure, all payment obligations shall continue to be performed without delay, including but not limited to the payment of the Letter of Credit and the Note.

(c)     If any event of Force Majeure claimed by a party is not overcome or removed within two (2) years of the Force Majeure Notice being given, then at the option of the other party, upon ten (10) days' written notice, this Agreement shall be null and void.

**9.     Closing.**

(a)     <u>Date and Location</u>. The purchase and sale transaction contemplated by this Agreement shall close (the "Closing") on or before October 31, 1997, or on such other date as the parties may otherwise mutually agree (the "Closing Date"); provided, however, that the Closing Date shall not be later than December 31, 1997. The Closing shall be held at a location which is mutually agreeable to both parties.

(b)     <u>Seller's Obligations</u>. At the Closing, Seller shall:

(i)     Deliver to Buyer a duly executed and acknowledged deed in substantially the form and substance as Exhibit H, attached hereto (the "Deed");

(ii)     Deliver to Buyer a duly executed Affidavit of Title in substantially the form and substance as Exhibit I attached hereto;

(iii)     Deliver to Buyer possession of the Property;

9

      (iv)    Deliver to Buyer reasonable evidence of Seller's capacity and authority for closing the transaction as required by the Title Company;

      (v)    Deliver documents reasonably requested by the Title Company as administrative requirements for closing this transaction, including but not limited to an ALTA survey; and

      (vi)    Deliver to Buyer an Owner's Policy of Title Insurance in the amount of the Purchase Price, dated as of the Closing Date.

(c)    <u>Buyer's Obligations</u>.  At the Closing, Buyer shall:

      (i)    Deliver to Seller the Note, Mortgage and Letter of Credit.  Buyer shall pay to Seller the cost of the Policy of Title Insurance and the title search;

      (ii)    Deliver to Seller reasonable evidence of Buyer's capacity and authority for closing the transaction; and

      (iii)    Deliver documents reasonably requested by the Title Company as administrative requirements for closing this transaction.

(d)    <u>Taxes</u>.  General real estate taxes for the then-current year relating to the Property shall be prorated as of the Closing Date and shall be adjusted in cash at Closing.  If the Closing shall occur before the tax rate is fixed for the then current year, the apportionment of taxes shall be upon the basis of the tax rate for the next preceding year applied to the latest assessed valuation.  All special taxes or assessments prior to the Closing Date shall be paid by Seller.  Any rebates or refunds of taxes paid prior to Closing shall be for Seller's benefit.  Seller shall pay all transfer tax on the Property that becomes due as a result of the transactions contemplated by this Agreement.

(e)    <u>Costs</u>.  Except to the extent specifically allocated in this Agreement, each party shall pay its share of the normal and incidental costs associated with the Closing which are routinely incurred by a Seller and Buyer in a transaction of this character in the county where the Property is located.

10.    **Risk Of Loss; Condemnation.**  Seller shall assume the risk of loss, destruction or damage to the Property by fire, Act of God, other casualty, or condemnation prior to the Closing Date and the transfer of title to the Property to Buyer.  Buyer assumes, as of the Closing Date and transfer of title, all hazards of damage to or destruction of the Property and of the taking of the Property or any part thereof for public use, and agrees that no such damage, destruction or taking shall constitute a failure of consideration.  Upon the execution of this Agreement, Buyer shall have an insurable interest in the Property.

A001396

**11.   Brokers.**  Seller and Buyer each represent and warrant to the other that no real estate brokers or finders are or were involved with respect to any of the transactions contemplated by this Agreement, Each party hereto will indemnify and save harmless the other from any claim or claims made by any brokers or finders for any commissions or compensation alleged to be due by reason of the indemnifying party involving such brokers or finders.

**12.   Notices.**  All notices, demands, elections, requests, consents and other communications hereunder shall be in writing and shall be given by personal delivery or sent by certified or registered mail, postage prepaid, return receipt requested and addressed to the parties hereto at the addresses below, or sent by facsimile to the parties at the facsimile numbers below, or at such other address or facsimile number as a party may designate:

Seller

Attention:   Mgr. - Corporate Real Estate
2109 Alcoa Building
425 Sixth Avenue
Pittsburgh, PA 15219
Facsimile No.: (412) 553-2661
Telephone No.: (412) 553-2614

Buyer
Attention:   Mr. John De Sheplo
260 Columbia Aveune
Fort Lee, NJ  07024
Facsimile No.: (201) 224-0572
Telephone No.: (201) 224-6679

Mr. Fred Daibes
725 River Road
Edgewater, NJ  07020
Facsimile No.: (201) 313-9044
Telephone No.: (201) 224-0003

with copy to: David Carmel, Esquire
523 River Road
Edgewater, NJ  07020
Facsimile No.: (201) 943-5614
Telephone No.: (201) 943-9160

**13.   Non-Foreign Person.**

**(a)   Seller's Certification.**  Seller certifies and affirms that Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1954, as amended. Seller will execute at or prior to the Closing Date such appropriate affidavit or affidavits as may

11

A001397

be necessary to evidence same in accordance with Treasury Department Regulation 1.1445-2T(b)(2)(iii).

(b)   Buyer's Certification.  Buyer certifies and affirms that Buyer is not a "foreign person" within the meaning of the federal International Investment Survey Act of 1976, as amended, 22 U.S.C. §3101, et seq.  Buyer will execute at or prior to the Closing Date such appropriate affidavit or affidavits as may be necessary to evidence the same.

14.   **Like-Kind Exchange.**  Seller may transfer or convey the Property to Buyer as a like-kind exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, through the use of a qualified intermediary; provided that the like-kind exchange does not delay Closing or affect any obligation or requirement of this Agreement, that certain Agreement to Purchase and Sell Real Estate between the parties related to the parking lot ("Parking Lot Agreement") or the Multi Party Agreement.  If Seller elects, in its sole discretion, to convey or transfer the Property pursuant to such a like-kind exchange, Buyer shall cooperate with Seller in good faith to effect such exchange.  Buyer shall not incur any additional costs as a result of Seller's election to convey or transfer the Property pursuant to a like-kind exchange.

15.   **Headings.**  The headings contained in this Agreement are for reference purposes only and shall not be deemed to be a part of this Agreement or to affect the meaning or interpretation of this Agreement.

16.   **Merger.**  All understandings and agreements heretofore had between the parties, oral or written, are merged into this Agreement, which alone fully and completely expresses their understanding.

17.   **Modification.**  This Agreement shall not be modified or amended except by a written instrument duly executed by the parties hereto.

18.   **Binding Effect And Assignment.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto.  Neither party shall assign this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld.  Any attempted assignment without such prior written consent shall be void.

19.   **Governing Law.**  This Agreement shall be construed and governed in accordance with the laws of the State of New Jersey.

20.   **Prohibition Against Recording.**  Neither Buyer nor Seller shall cause this Agreement, nor any part or memorandum thereof, to be placed or filed of record.

12

21. **Modified Time Of The Essence.** If full performance of this Agreement is not completed by the Closing Date, either party shall have the right thereafter to declare time to be of the essence of this Agreement by giving written notice thereof to the other party. Such notice shall contain a declaration that time is of the essence and shall fix the time, place and date of final settlement, which date may not be sooner than thirty (30) days following the effective date of such notice.

22. **Survival.** Sections 2(b), 5, 7 and 8 shall survive the Closing and the consummation of the transaction contemplated by this Agreement.

23. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall constitute an original of this Agreement, but all such counterparts shall constitute one and the same instrument.

13

A001399

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:

SELLER:
A. P. NEW JERSEY, INC.

By: _____

By: _____

Its: _____

WITNESS:

BUYER:
NORTH RIVER MEWS ASSOCIATES, LLC

By: _____

By: _____
North River Mews, Inc., Managing Member
Fred A. Daibes, President

14

A001400

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement in duplicate as of the day and year first above written.

WITNESS:

By: _Arthur J Crawford_

SELLER:
A. P. NEW JERSEY, INC.

By: _[signature]_

Its: _Vice – President_

A001401

Schedule 5(a)

Litigation

Complaint filed in Tax Court of New Jersey contesting 1997 real property tax assessments on 700 River Road, Block 74, Lot 1 and 732 River Road, Block 71, Lot 2.

A001402

SCHEDULE 7C

ENVIRONMENTAL REPORTS

Renaissance Square, Edgewater, New Jersey - Appendix G - General Site PCB-Contamination Characterization (includes Exhibit 1, 2 and 3) prepared by Paulus Sokolowski and Sartor Inc. dated September 1986.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 1 prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 2 Appendices A-F, prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Remedial Investigation/Feasibility Study - Former Alcoa Aluminum Works, Edgewater, New Jersey, Volume 3 Appendices G-I, prepared for Amland Properties Corporation by Woodward-Clyde Consultants dated November 1988.

Interim Response Action Final Report - A.P. New Jersey, Inc. - prepared by Metcalf & Eddy, Inc. dated September 1993.

Detailed Options Evaluation Report - Aluminum Company of America - Edgewater, New Jersey (DERS Project No. 3589) prepared by DuPont Environmental Remediation Services dated July 11, 1996.

A001403

## EXHIBIT "A"

THE PROPERTY to be conveyed shall consist of all those parcels of land and premises situate, lying and being in the Borough of Edgewater in the County of Bergen and State of New Jersey, more particularly described as follows:

## PARCEL A

BEGINNING at the intersection of the Southerly line of Russell Avenue and the Westerly line of River Road; thence

(1) Along the Westerly line of River Road South 21 degrees 41' 51" West a distance of 84.55 feet to a point; thence

(2) Along the Westerly line of River Road South 20 degrees 58' 51" West a distance of 132.06 feet to a point; thence

(3) Along the Westerly line of River Road forming a curve to the right with a radius of 283.97 feet (or 300.47 feet as the case may be) and an arc distance of 98.13 feet to a point; thence

(4) Along the Westerly line of River Road South 40 degrees 46' 51" West a distance of 154.71 feet to a point; thence

(5) Along the Westerly line of River Road South 40 degrees 43' 51" West a distance of 213.02 feet to a point; thence

(6) Along the Westerly line of River Road South 37 degrees 05' 21" West 157.71, to a spike in the pavement at the intersection of the Westerly line of River Road and the Northerly line of Vreeland Terrace; thence

(7) Along the Northerly line of Vreeland Terrace North 53 degrees 38' 09" West a distance of 463.00 feet to the Easterly line of Undercliff Avenue; thence

(8) Along the Easterly line of Undercliff Avenue North 23 degrees 23' 51" East a distance of 162.02 feet to a point; thence

(9) Along the Easterly line of Undercliff Avenue North 27 degrees 21' 56" East 204.30 feet to a point; thence

(10) Along the Easterly line of Undercliff Avenue North 27 degrees 38' 51" East 463.84 feet to a point on the Southerly line of Russell Avenue; thence

1

A001404

(11)   Along the Southerly line of Russell Avenue South 54 degrees 54' 09" East a distance of 566.09 feet to the point and place of beginning.

EXCEPTING, however, from the above described parcel all that parcel of land known as The Edgewater Cemetery and bounded and described as follows:

BEGINNING at a point which point is North 23 degrees 00' 16" East a distance of 161.72 feet from the intersection of the Westerly line of River Road with the Northerly line of Vreeland Terrace; thence

(1)   Parallel with the Northerly line of Vreeland Terrace North 53 degrees 38' 09" West a distance of 340.63 feet to a point; thence

(2)   North 35 degrees 08' 31" East a distance of 185.11 feet to a point; thence

(3)   South 54 degrees 51' 29" East a distance of 233.25 feet to a point; thence

(4)   South 35 degrees 08' 31" West a distance of 54.64 feet to a point; thence

(5)   South 54 degrees 51' 29" East a distance of 107.28 feet to a point; thence

(6)   South 35 degrees 07' 57" West a distance of 137.74 feet to a point and place of beginning.

SAID PREMISES are known as Lots 1, 2 and 3 in Block 74 as shown on the Tax Map of the Borough of Edgewater.

BEING the same premises conveyed as Parcel 1 to Amland Properties Corporation by Indenture between 700 River Road Realty, dated January 3, 1983 and recorded January 3, 1983 in the Office of the Clerk of Bergen County in Deed Book 6728, page 760.

2

A001405







A001406