# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER, | Case Nos.: 2:14-CV-05060-JMV-JBC<br>Hon. John M. Vazquez, U.S.D.J.<br>Hon. James B. Clark, III, U.S.M.J. |
|     Plaintiff, | |
|     v. | |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALCOA INC. (formerly known as "Aluminum Company of America"); ALCOA DOMESTIC LLC, as successor in interest to A.P. NEW JERSEY, INC.; JOHN DOES 1-100; and ABC CORPORATIONS 1-100, | **ARCONIC'S LOCAL CIVIL RULE 56.1 RESPONSE TO THE ADDITIONAL STATEMENT OF UNDISPUTED MATERIAL FACTS OF DEFENDANTS WATERSIDE CONSTRUCTION, LLC, 38 COAH, LLC, DAIBES BROTHERS, INC., NORTH RIVER MEWS ASSOCIATES, LLC, FRED A. DAIBES, AND THIRD-PARTY DEFENDANTS RIVER ROAD IMPROVEMENT PHASE II, INC.** |
|     Defendants, | |
| and | |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; and FRED A. DAIBES, | |
|     Defendants/Third-Party Plaintiffs, | |
|     v. | |
| NEGLIA ENGINEERING ASSOCIATES, | |
|     Third-Party Defendant, | |
| and | |

ALCOA DOMESTIC, LLC, as
successor in interest to A.P. NEW
JERSEY, INC.,

      Defendant/Third-Party Plaintiff,

      v.

COUNTY OF BERGEN and RIVER
ROAD IMPROVEMENT PHASE II,
INC., and HUDSON SPA, LLC,

      Third-Party Defendants.

Pursuant to Local Civil Rule 56.1, Defendants Arconic Inc, and Arconic Domestic LLC (collectively "Arconic") sets forth the following response to the Additional Statement of Undisputed Material Fact of Defendants Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., North River Mews Associates, LLC, Fred A. Daibes, and Third-Party Defendants, River Road Improvement Phase II, Inc. and Plaintiffs North River Mews Associates, LLC, and 38 COAH, LLC ("Daibes Defendants").

1.      Undisputed.

2.      Arconic does dispute the cited pages state "Alcoa manufactured aluminum products . . . including the collapsible toothpaste tube, the 17S-alloy road, and sheet metal for World War II aircraft." (Certification of Malory M. Pascarella, dated September 11, 2020 ("Pascarella Cert."), ¶ 2, Ex. 1, at W009644). However, Arconic lacks sufficient information to dispute or affirm the accuracy of that statement.

3.      Undisputed.

4.      Disputed to the extent that "related to" is intended to mean that the hot rolling mill operation was located in Building 12.  The hot rolling mill was located in Building 11.

5.      Disputed. The cited pages do not state that Alcoa purchased oils containing Polychlorinated Biphenyls ("PCBs"). Rather, the internal

1

correspondence to Mr. M. E. Brooks, dated September 17, 1956, states that "30,000 gallons of fire resistant fluid were purchased during the past twelve months" and "located at twenty-two (22) plants" but does not list "the former Alcoa property" or mention PCBs. (Pascarella Cert., ¶ 3, Ex. 2, at A011801). The second correspondence to Mr. D. W. Sawyer, dated January 5, 1956, provides a tabulated sheet of lubricants in use at the time, but also does not mention PCBs. (Pascarella Cert., ¶ 4, Ex. 3, at A11808).

6.    Arconic objects to this Paragraph as providing insufficient evidence for Arconic to dispute or affirm the statements therein, as it cites to a non-sequential bates range, "A006626-A005722." Disputed that the cited deposition testimony of Gerard Beck supports that machines located in Building 12 were designed to use PCBs. (*See* Pascarella Cert., ¶ 5, Ex. 4, at 58:3-59:1).

7.    Arconic objects to this Paragraph as providing insufficient evidence for Arconic to dispute or affirm the statements therein, as it cites to a non-sequential bates range, "A006626-A005722."  Arconic disputes that the cited deposition testimony of Gerard J. Beck supports that machines and processes in Building 12 utilized PCBs. (*See* Pascarella Cert., ¶ 5, Ex. 4, at 58:3-59:1).

8.    Undisputed.

9.    Undisputed.

10.    Undisputed.

11.     Undisputed.

12.     Undisputed.

13.     Undisputed.

14.     Disputed that the cited evidence proves that no manufacturing processes were undertaken at the site from 1968 to 1983.  Arconic further states that no evidence adduced in this action either proves or disproves that no manufacturing processes were undertaken at the site from 1968 to 1983.

15.     Undisputed that Amland allegedly discovered the presence of PCBs at the Alcoa property. Disputed to the extent that the Paragraph infers that the entire Alcoa property was contaminated. PCB contamination was only found in several specific areas in specific buildings at the Alcoa property, but was not found in many other areas of the buildings at the Alcoa property. (*See generally* Pascarella Cert., ¶ 6, Ex. 5, at EW03311-3418; Pascarella Cert., ¶ 7, Ex. 6, at EW 03221-3310).

16.     Undisputed.

17.     Undisputed.

18.     Undisputed, except that numerous additional terms were contained in the Settlement Agreement between Alcoa and Amland, which Agreement speaks for itself.

19.     Undisputed.

20.     Undisputed, except that Daibes Defendants' paraphrase leaves out substantial portions of the Interim Response Action Administrative Consent Order, which speaks for itself.

21.     Undisputed, except that Daibes Defendants' paraphrase leaves out substantial portions of the Interim Response Action Administrative Consent Order, which speaks for itself.

22.     Undisputed.

23.     Undisputed.

24.     Undisputed, except that the Daibes Defendants' paraphrase leaves out substantial portions of the Interim Response Action Report, dated September 1991, which speaks for itself.

25.     Undisputed that, in the 1992 Underground Storage Tank Registration Questionnaire, Arconic identified only the six USTs. These were the only USTs at the Edgewater site of which Arconic personnel were aware at that time. (*See* Pascarella Cert. ¶ 8, Ex. 7, at 711:25-712:20).

26.     Undisputed that, in the 1992 Annual Certification Questionnaire, AP stated "[a]ll tanks removed October/November 1992 . . . ." At the time, AP identified only six USTs and removed all of them under NJDEP Closure Approval.

27.     Undisputed.

28.     Undisputed, except that the September 1993 Interim Response Action Final Report was also submitted to the NJDEP by William DeStefano, CHMM, Consulting Engineer, Metcalf & Eddy, Inc. (Pascarella Cert. ¶ 9, Ex. 8, at EW 02409).

29.     Undisputed, except that Daibes Defendants' paragraph leaves out substantial portions of the document, which speaks for itself. Also, Arconic was not required to only "remove the contents of any existing underground storage tanks." Rather, among the Requirements of Interim Response Actions was the requirement that Arconic "remove the contents of any existing underground or aboveground storage tanks." (Pascarella Cert. ¶ 19, Ex. 9, at EW 02433).

30.     Undisputed that NJDEP approved A.P.'s proposal for the issuance of a No Further Action at the former Alcoa property. Disputed that the approval was based on "NJDEP's review of the certified Sept. 1993 IRAFR, and the representation that A.P. had complied with the ACO." Rather, the letter from NJDEP to Mr. Ewald J. Dollhopf III, dated November 7, 1994, states "[t]his approval is based on the Department's review of the certified Interim Response Action Final Report, dated September 1993, submitted by Metcalf & Eddy, Inc., and the filing of a Declaration of Environmental Restrictions and Grant of Easement." (Pascarella Cert. ¶ 11, Ex. 10, at EW 06838).

31.     Arconic objects to this Paragraph as providing insufficient evidence for Arconic to dispute or affirm the statements therein, as the drawings that the Daibes Defendants rely upon for this statement do not reference blueprint drawings provided by Ewald Dollhopf, III, to NJDEP, and do not depict the locations of six underground storage tanks.

32.     Disputed, Arconic had no information regarding the former Alcoa property after 1968, when it gave up ownership of the property, until 1991 when it took ownership back over. (Pascarella Cert., ¶ 12, Ex. 11, at 86:18-87:18). Arconic was similarly not aware of the existence of the blueprint drawings that depicted the two USTs under Building 12 until 1997. (Pascarella Cert., ¶ 8, Ex. 7, at 704:19-705:6). Rather, the "known environmental condition" of the Property was defined in the Purchase and Sale Agreement. (Certification of Dana B. Parker, dated September 11, 2020 ("Parker Cert.") ¶ 5, Ex. 4 at § 7(c)).

33.     Arconic does not dispute that its personnel were unaware of the existence of the drawings showing the potential existence of two USTs under Building 12 until 1997 (Pascarella Cert., ¶ 8, Ex. 7, at 704:19-705:6), that in the Annual Certification and Registration Questionnaire submitted on September 20, 1993, Arconic identified only the six USTs identified and removed under NJDEP Closure Approval as part of the site-wide ACO because they were the only USTs at the Edgewater site of which Arconic personnel were aware at that time (*see*

Pascarella Cert. ¶ 8, Ex. 7, at 711:25-712:20), and that Arconic is aware of no facts indicating that it was not in possession of the drawings showing the potential existence of two USTs under Building 12 in 1993.

34.    Arconic objects to this Paragraph as providing insufficient evidence for Arconic to dispute or affirm the statements therein, as it cites to no evidence to support the statements.

35.    Undisputed.

36.    Undisputed.

37.    Arconic disputes the characterization of the cited document in this Paragraph.  Pursuant to the Multi-Party Property Acquisition Agreement, Arconic agreed that "A.P.'s total liability for demolition of the structures and disposal of waste material *will not excee*d $12,000,000.00." (Parker Cert. ¶ 11, Ex. 10 at ¶ 3) (emphasis added). As a condition to this funding, A.P. and the County of Bergen "shall review and approve the demolition and remediation plan prepared by RRIP and approved by [NJDEP], which shall, when completed and approved, provide and guarantee to A.P. and Alcoa the issuance of a No Further Action letter from DEP in form acceptable to A.P." (Parker Cert. ¶ 11, Ex. 10).

38.    Disputed.  The parties to the Purchase and Sale Agreement agreed "that the Environmental Reports and any and all reports, analyses, surveys, assessments, evaluations or the like prepared by [North River Mews] and its representatives

pursuant to Section 7(d) [of the Agreement] will establish the known environmental condition of the Property as of the Closing Date." (Parker Cert. ¶ 5, Ex. 4 § 7(c)). The environmental reports provided to North River identified site-wide contamination and reported that Building 12 comprised the most contaminated portions of the former Arconic site. (Parker Cert. ¶ 5, Ex. 4 § 7(c)), Schedule 7C)). The Purchase and Sale Agreement also states: "OTHER THAN THE REPRESENTATION AND WARRANTY SET FORTH IN [SECTION 5, NORTH RIVER MEWS] SPECIFICALLY ACKNOWLEDGES THAT [ALCOA] IS SELLING AND [NORTH RIVER MEWS] IS PURCHASING THE PROPERTY ON AN "AS IS, WITH ALL FAULTS" BASIS AND THAT [NORTH RIVER MEWS] SHALL HAVE AN OPPORTUNITY TO INSPECT THE PROPERTY AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER . . . AS TO ANY MATTERS CONCERNING THE PROPERTY[.]" (Parker Cert. ¶ 5, Ex. 4 § 5(b)).

Furthermore, the parties entered into subsequent agreements that addressed environmental contamination at the property. (*See* Parker Cert. ¶ 15, Ex. 14 at A001506) ("AP has also agreed to pay for all costs of transportation and disposal of PCB contaminated rubble up to a total amount of $2,750,000."); Parker Cert. ¶ 18, Ex. 17 at A001532 ("North River and River Road shall indemnify, defend and hold A.P. harmless from any and all claims, demands, causes of actions, and suit or suits

. . .occurring at any time before, during or after North River's ownership of the Property, relating to Building 12 and the land under and adjacent thereto, . . . including, but not limited to, remediation and disposal costs and expenses related to PCBs.")).

39.    Disputed. Alcoa alone did not claim the environmental reports "established the known environmental condition of the Property." Rather, among other terms and conditions, the 1997 Purchase and Sale Agreement expressly states that "[Alcoa] shall make available to [North River] the reports listed on Schedule 7(c) . . . concerning the environmental condition of and contamination in, on, under, or about the Property (the 'Environmental Reports'). *The parties agree* that the Environmental Reports and any and all reports, analyses, surveys, assessments, evaluations or the like prepared by [North River] and its representatives  . . . will establish the known environmental condition of the Property as of the Closing Date." (Parker Cert. ¶ 5, Ex. 4  at A001392 § 7(c)) (emphasis added).

40.    Undisputed.

41.    Disputed. Pursuant to the Purchase and Sale Agreement, the parties agreed that North River would "have an opportunity to inspect the property and is not relying on any representation or warranties of any kind whatsoever . . . as to any matters concerning the property." (Parker Cert. ¶ 5, Ex. 4 at A001389 § 5(b)). The parties further agreed that "the Environmental Reports and any and all reports,

analyses, surveys, assessments, evaluations or the like prepared by [North River] and its representatives . . . will establish the known environmental condition of the Property as of the Closing Date." (Parker Cert. ¶ 5, Ex. 4   at A001392 § 7(c)).

42.   Undisputed, that the Daibes Defendants proffered testimony on this topic, except that the Daibes Defendants' paraphrase leaves out substantial portions of the deposition testimonies of Fred Daibes and Irving David Cohen, which speak for themselves.

43.   Arconic disputes Daibes Defendants' characterization of the referenced documents. First, the testimony of Irving David Cohen cited by Daibes Defendants does not support the assertion that Enviro-Sciences was provided the "1993 IRAFR." Rather, Mr. Cohen testified that he reviewed many "sampling reports or environmental reports." (Pascarella Cert., ¶ 13, Ex. 12, at 11:14-11:19). Second, the 1993 IRAFR did not expressly "state[] that all underground storage tanks had been located and that none remained at the former Alcoa property." Rather, the document stated "[a] total of six (6) underground storage tanks were located . . . [and] APNJ . . . remov[ed] the tank contents and all six of the existing USTs." (Pascarella Cert., ¶ 10, Ex. 9).

44.   Arconic objects to this statement to the extent it fails to identify an applicable time period and therefore, disputes that neither the Waterside Parties nor

Enviro-Sciences were aware that USTs were under Building 12. (*See* Pascarella Cert., ¶ 2, Ex. 1, at W009657).

45.  Disputed. Before the sale of the property, Alcoa provided historic maps, diagrams, environmental reports, and blueprints of the former Alcoa property to North River, which indicated two storage tanks were present under Building 12. (Parker Cert. ¶ 8, Ex. 7; Parker Cert. ¶ 9, Ex. 8; Parker Cert. ¶ 10, Ex. 9).

46.  Disputed. Arconic personnel were not aware of the drawings that illustrated the potential existence of the two USTs under Building 12 until 1997. (Pascarella Cert. ¶ 8, Ex. 7, at 711:25-712:20; 728:10-728:21). Upon becoming aware of these drawings, Arconic provided them to Amir Daibes. (*See* Parker Cert. ¶ 8, Ex. 7) (stating "all maps & drawings & microfilm sent to Amir"); (Parker Cert. ¶ 10, Ex. 9) (enclosing microfilm blueprints and indicating that drawings would be sent under separate cover); (Pascarella Cert., ¶ 14, Ex. 13) (drawings of USTs under Building 12).

47.  Arconic disputes the Daibes Defendants' characterization of Irving David Cohen's testimony. Mr. Cohen did not testify that "Enviro-Sciences would not look for underground storage tanks if they had received reports representing that no underground storage tanks remained on site." Rather, Mr. Cohen testified that "if a report was given to us that identified underground storage tanks that were removed, *unless we were asked to redo that kind of work* the answer would be no, we would

11

not recommend going in and looking for more tanks." (Pascarella Cert. ¶ 13, Ex. 12, at 94:11-94:15) (emphasis added).

48.     Undisputed.

49.     Undisputed that, pursuant to the Memorandum of Agreement, North River Mews Associates, as well as Alcoa, were required to "notify the [NJDEP] immediately upon knowledge of any condition posing an immediate threat to human health and/or the environment." (Pascarella Cert. ¶ 15, Ex. 14, at EW 06622 ¶ 14). Arconic further states that numerous additional requirements, understandings, and other terms were contained in the MOA, which speaks for itself. (*Id.*).

50.     Disputed. Arconic did not play a role in the decision to demolish Building 12; that decision was made solely by Mr. Daibes. (Pascarella Cert., ¶ 16, Ex. 15, at 471:18-474:4). Rather, pursuant to the Funding Agreement, Arconic would withhold $500,000 of demolition funding to respond to the potential that Building 12 would not be demolished. (Parker Cert. ¶ 15, Ex. 14, A001506). (*See also* Parker Cert. ¶ 18, Ex. 17) ("*North River* presently does not intend to demolish Building 12.") (emphasis added). However, no one involved in the demolition of Building 12 notified Arconic that it was ultimately demolished. (Parker Cert. ¶ 3, Ex. 2).

51.     Disputed. The Funding Agreement, dated September 23, 1997 did not memorialize "Alcoa's and North River's decision not to demolish Building 12."

(Parker Cert. ¶ 15, Ex. 14) ("[T]o the extent that Building 12 is not demolished, A.P. shall withhold or cause Bergen County to withhold payment of $500,000 of the demolition funding . .  ."). Rather, Arconic entered the Funding Agreement after learning "there was some possibility that the Daibes brothers might not decide to demolish Building 12" since the parties previously "agreed to a scheduled payment that provided for $500,000 associated with Building 12." (Parker Cert. ¶ 3, Ex. 2, at 473:180-474:4). Arconic did not play a role in the decision to demolish Building 12; that decision was made solely by Mr. Daibes. (Parker Cert. ¶ 3, Ex. 2, at 472:18-474:4).

52.   Arconic disputes Daibes Defendants' characterization of the Environmental Indemnity Agreement. The purpose of the Environmental Indemnity Agreement "was to make absolutely clear that in the event that the Daibes entities ultimately decided not to demolish Building 12 that all provisions and agreements of prior documents surrounding the transaction, including the full release and indemnity of Alcoa for the site, would apply." (Parker Cert. ¶ 3, Ex. 2, at 512:17-512:4). (*See also* Parker Cert. ¶ 18, Ex. 17, A001533) ("In addition to and notwithstanding any other agreement or obligation of the parties, to the extent that Building 12 is not demolished, North River and River Road shall indemnify, defend and hold A.P . harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages,

occurring at any time before, during or after North River's ownership of the Property, relating to Building 12 . . . .including, but not limited to, remediation and disposal costs and expenses related to PCBs.")

53.     Arconic objects to this Paragraph as providing insufficient evidence for Arconic to dispute or affirm the statements therein, as it cites to no evidence to support the statements.

54.     Disputed. Any marking and remediation of Building 12 was conducted by North River's and RRIP's environmental consultant, Enviro-Sciences, and supervised, inspected, and approved by Bergen County. (Parker Cert. ¶ 11, Ex. 10, ¶¶ 2, 4, 20; *see also* Parker Cert. ¶ 12, Ex. 11; Pascarella Cert. ¶ 16, Ex. 15 ("Bergen County was acting as the inspector and the verifier."); Pascarella Cert. ¶ 17, Ex. 16, at 949:22-951:4 ("So when [Alcoa] drafted the multiparty agreement, again, our intention was we wanted Bergen County right in the middle of this thing. We wanted them to be responsible to inspect, to approve, and actually to guarantee. . . Alcoa didn't want to have anybody on-site.").

55.     Undisputed except that Daibes Defendants' paraphrase leaves out substantial portions of the Remedial Investigation Report Remedial Action Workplan, which speaks for itself.

56.     Disputed. ENVIRO003257 and ENVIRO003265 do not support that samples indicated that there were PCBs in the "foundation walls" at levels between

14

.070 ppm and 1.000 ppm. Rather, the documents indicate samples were taken from exterior wall panels within an above-ground two-story space and a partial basement underlying the eastern portion of the building. (Pascarella Cert. ¶ 18, Ex. 17).

57.    Arconic disputes the Daibes Defendants characterization that walls containing "low levels" of PCBs were painted with epoxy. Pursuant to Enviro-Sciences' Remedial Action Report, dated August 2002, "[w]alls adjacent to the floor panels that . . . were suspected of having been contaminated with low levels of PCBs" were removed. "Walls adjacent to existing floor panels were determined to be less contaminated." (Pascarella Cert. ¶ 19, Ex. 18).

58.    Disputed that that the NJDEP approved of "capping" by Enviro-Sciences. Rather, the NJDEP approved a Remedial Action Workplan which required sealing the interior surface of the exterior walls on the first floor and in the basement of Building 12, washing the walls with biodegradable detergent, and coating of the walls with two applications of epoxy paint to encapsulate the PCBs within the concrete walls. (Parker Cert. ¶ 17, Ex. 16).

59.    Arconic disputes that the portion of the former Alcoa property was mistakenly not deeded to North River. Rather, numerous documents were submitted to NJDEP in 30 COAH's name regarding the site, including Building 12. (Pascarella Cert. ¶ 20, Ex. 19). As to the reason for why the former Alcoa property was

15

subdivided, Arconic lacks sufficient information to dispute or affirm the accuracy of that statement.

60.    Undisputed that the cited document supports the statement that Building 12 was subdivided "to redevelop the West Lot to low income housing" W076334, and "ESI was instructed to file [a] Termination of Deed Notice," W076335. Disputed that the cited pages and testimony state that "[i]n 2010, Enviro-Sciences was retained to terminate the Deed Notice on Building 12." (Pascarella Cert. ¶ 21, Ex. 20).

61.    Undisputed.

**Veterans Field Background**

62.    Undisputed.

63.    Undisputed.

64.    Undisputed that TERMS Environmental Services, Inc.'s Site/Remedial Investigation Report dated October 25, 2011, reflects that TERMS was hired to conduct a Site Investigation and prepare a Site Investigation Report, but Arconic has insufficient evidence to dispute or affirm the accuracy of that statement.

65.    Undisputed.

66.    Undisputed except that Daibes Defendants' paraphrase leaves out substantial portions of TERMS Environmental Services, Inc.'s Site/Remedial Investigation Report, dated October 25, 2011, which speaks for itself.

67.     Undisputed except that Daibes Defendants' paraphrase leaves out substantial portions of TERMS Environmental Services, Inc.'s Site/Remedial Investigation Report, dated October 25, 2011, which speaks for itself.

68.     Undisputed that TERMS Environmental Services, Inc.'s Site/Remedial Investigation Report, dated October 25, 2011, included the recommendations stated in this Paragraph, among others.  Disputed that TERMS recommended "hot spot" remediation in only four locations. Rather, TERMS recommended that "'hot spot' remediation be performed at the vanadium, nickel, and four PCB locations." (Pascarella Cert., ¶ 22, Ex. 21, EW 12357).

69.     Undisputed that TERMS Environmental Services, Inc.'s Site/Remedial Investigation Report dated October 25, 2011, included the recommendations stated in this Paragraph, among others.

70.     Arconic disputes Daibes Defendants' paraphrase of Mr. Daibes's testimony to the extent Mr. Daibes did not testify that TERMS did not properly test the field for PCBs prior to the remediation.  Rather, Mr. Daibes stated, "[Roger] Ferguson took a position that he got the samples that TERMS had done of the field and it was like maybe 16, 17 different spots that he took samples, and TERMS -- and Ferguson believed that there should have been a hundred to 150 samples done, based on a certain type of a grid." (Pascarella Cert., ¶ 23, Ex. 22, at 163:19-163:25). Arconic also objects to the extent that the report of David Hoffman is cited as

authority for this statement, inasmuch as Mr. Hoffman's opinions in this case are inadmissible and should be stricken pursuant to Fed. R. Evid. 702.

71.   Undisputed.

72.   Undisputed.

73.   Undisputed.

74.   Undisputed.

75.   Undisputed.

76.    Undisputed that Fred Daibes testified that he did not have discussions with Waterside employees about finding a source of fill material.  (Pascarella Cert., ¶ 23, Ex. 22, at 133:16-21). However, Arconic lacks sufficient information to dispute or affirm the accuracy of this statement.

77.   Arconic objects to this paragraph to the extent the Daibes Defendants' reference to "the contract" is undefined. Arconic also disputes that the cited pages state that "[o]n or about July 9, 2012, Waterside began performing pursuant to the contract." Rather, the letter from Gregory S. Franz, dated June 26, 2012, provides that the "*tentative start date* of the remediation and restoration of Veterans Field is the week of Monday, July 9, 2012." (Parker Cert. ¶ 39; Ex. 28) (emphasis added).

78.   Undisputed.

79.   Undisputed, except that Arconic objects to the extent that the report of David Hoffman is cited as authority for this statement, inasmuch as Mr. Hoffman's

18

opinions in this case are inadmissible and should be stricken pursuant to Fed. R. Evid. 702.

80.    Undisputed.

81.    Undisputed that the cited testimony of Fred Daibes, Matthew Vereb, and Kenneth Schiller reflect that Waterside Construction had discussions with TERMS about utilizing recycled crushed concrete at Veterans Field.  However, Arconic lacks sufficient information to dispute or affirm the accuracy of this statement.

82.    Undisputed that the cited testimony of Fred Daibes, Mark Iafelice, and Kenneth Schiller reflect that TERMS informed Waterside Construction that it could place crushed concrete under the parking lots and other hard, impervious surfaces. However, Arconic lacks sufficient information to dispute or affirm the accuracy of this statement.

83.    Undisputed that the cited testimony of Matthew Vereb and Kenneth Schiller reflects that the recycled concrete material did not need to be tested if it would be placed under a capped hard surface. (Pascarella Cert. ¶ 24; Ex. 23, at 95:8-95:11; Pascarella Cert. ¶ 25; Ex. 24, at 39:1-41:25). However, Arconic lacks sufficient information to dispute or affirm the accuracy of that statement.

84.    Undisputed that the cited testimony of Matthew Vereb and Fred Daibes reflects that Waterside sought permission from TERMS to utilize material from

Building 12. (Pascarella Cert. ¶ 22; Ex. 22, at 79:15-20; Pascarella Cert. ¶ 24; Ex. 23, at 93:25-94:17). However, Arconic lacks sufficient information to dispute or affirm the accuracy of this statement.

85. Undisputed that the cited testimony of Kenneth Schiller reflects that Mr. Daibes was not involved in the decision to use recycled concrete asphalt ("RCA") from Building 12 as fill. (Pascarella Cert. ¶ 25; Ex. 24, at 114:8-21; 120-12-20). However, Arconic lacks sufficient information to dispute or affirm the accuracy of this statement.

86. Undisputed that the cited testimony of Fred Daibes reflects that, under the supervision of TERMS, Waterside place recycled crushed concrete from the former Alcoa property under the southern parking lot of Veterans Field.   However, Arconic lacks sufficient information to dispute or affirm the accuracy of this statement.

87. Undisputed that the testimony of Kenneth Schiller reflects that Mark Iafelice instructed Waterside Construction employees to bring recycled concrete aggregate from Building 12 and did not receive authorization from others as to whether it was appropriate.   However, Arconic lacks sufficient information to dispute or affirm the accuracy of this statement.

88. Undisputed that the testimony of Matthew Vereb reflects that Waterside Construction brought recycled concrete aggregate from the former Alcoa

property to Veteran's Field over approximately two weeks and only spread fill material under impervious surfaces. (Pascarella Cert. ¶ 26, Ex. 25, at 237:1-238:25). However, Arconic lacks sufficient information to dispute or affirm the accuracy of this statement.

89.     Undisputed.

90.     Undisputed that the testimony of Kenneth Schiller reflects that material from Building 12 was not blended with other material at Veterans Field. (Pascarella Cert. ¶ 25, Ex. 24, at 50:3-50:8). However, Arconic lacks sufficient information to dispute or affirm the accuracy of this statement.

91.     Arconic lacks sufficient information to dispute or affirm the accuracy of this statement, except that the Daibes' Defendants paraphrase of Mr. Schiller's testimony leaves out facts that support on September 6, 2013, Mr. Schiller advised Jason Menzella, the Site supervisor for Neglia Engineering Associates, that it would not be performing any work on Saturday, September 7, 2013. (Parker Cert. ¶ 46, Ex. 45).

92.     Disputed to the extent that Kenneth Schiller testified that "[he did not] know one or way the other . . . where any of the material . . . came from." (Pascarella Cert. ¶ 25, Ex. 24, at 128:12-128:17). Arconic otherwise lacks sufficient information to dispute or affirm the accuracy of this statement.

93.     Undisputed that the testimony of Kenneth Schiller reflects that he believed the material depicted in the picture labeled EW21288 was clean stone based on the color and consistency. (Pascarella Cert. ¶ 25, Ex. 24, at 136:1-136:25). Arconic lacks sufficient information to dispute or affirm the accuracy of this statement

94.     Disputed. Waterside located and arranged for specific fill materials to be hauled to the site, sometimes in consultation with TERMS, and sometimes hauling and depositing untested material that had not been cleared by TERMS. (Pascarella Cert. ¶ 24, Ex. 23, at 36:6-42:20). In September 2013, Waterside was having difficulty sourcing certified clean fill in connection with its work at Veterans Field and so had decided to use crushed concrete from the demolition of Building 12 as fill. (Parker Cert. ¶ 15, Ex. 14, at 133:16-143:23; *see also* Parker Cert. ¶ 46, Ex. 45, at 48:6-50:16; Parker Cert. ¶ 47, Ex. 46, at 96:14-96:25).

**Discovery of Previously Undisclosed USTs**

95.     Undisputed, except that Arconic does not understand what is meant by "foundation walls," inasmuch as neither construction drawings nor photographs of the demolition process reflected the existence of anything that could be accurately described as "foundation walls."

96.     Arconic disputes that the foundation walls were ever tested, and therefore, disputes that they were "the only walls known to contain PCBs at the time

Building 12 was demolished."  Rather, only the floors and walls above ground and in the partial basement of Building 12 were sampled and tested for the presence of PCBs. (Pascarella Cert. ¶ 18, Ex. 19, at ENVIRO_003223; *see also* Parker Cert. ¶ 5, Ex. 4, at § 7(c)).

97.    Disputed. Pursuant to the Remedial Action Workplan, Waterside and North River coated the walls known to contain PCBs with epoxy paint. The epoxy coated walls were not removed before the entire structure was demolished, and the PCBs within them were never remediated. The walls were also annotated so each wall panel could be matched with the results of the testing of the materials in the wall panel for PCBs. (Parker Cert. ¶ 19, Ex. 18, at EW04327). Therefore, North River knew it was demolishing walls that were marked and identified as containing PCBs.

98.    Disputed.  Arconic's obligation was limited to pay "$2,750,000 for transportation and disposal of PCB containing materials *in excess of 50 ppm*." (Parker Cert. ¶ 15, Ex. 14, at A001504).  Also, North River knew that the portions of Building 12 it was demolishing contained PCBs.  Pursuant to the Remedial Action Workplan, Waterside and North River coated the walls known to contain PCBs with epoxy paint. The epoxy coated walls were not removed before the entire structure was demolished, and the PCBs within them were never remediated. The walls were also annotated so each wall panel could be matched with the results of the testing of

the materials in the wall panel for PCBs. (Parker Cert. ¶ 19, Ex. 18, at EW04327). Therefore, North River knew it was demolishing walls that were marked and identified as containing PCBs.

99.    Disputed. Arconic personnel provided to North River in 1997 drawings that showed the two USTs under Building 12. (*See* Parker Cert. ¶ 9, Ex. 8, A003144-45) (stating "all maps & drawings & microfilm sent to Amir"); Parker Cert. ¶ 9, Ex. 10, at A003136-A003142 (enclosing microfilm blueprints and indicating that drawings would be sent under separate cover); drawings of USTs under Building 12); Pascarella Cert. ¶ 14, Ex. 13, at A003731). Arconic can neither dispute nor affirm the remainder of this Paragraph inasmuch as the USTs were removed and destroyed by Waterside or at its direction months before Arconic was notified of the discovery of the USTs.

100.   Arconic can neither dispute nor affirm the statement in this Paragraph inasmuch as the USTs were removed and destroyed by Waterside or at its direction months before Arconic was notified of the discovery of the USTs.

101.   Arconic can neither dispute nor affirm the statement in this Paragraph inasmuch as the USTs were removed and destroyed by Waterside or at its direction months before Arconic was notified of the discovery of the USTs.

102.    Arconic can neither dispute nor affirm this Paragraph inasmuch as the material inside the tanks and the tanks themselves were removed and destroyed by

Waterside or at its direction months before Arconic was notified of the discovery of the USTs, and Arconic therefore had no ability to verify or refute what PennJersey Environmental Consulting reported.

103.    Arconic can neither dispute nor affirm this Paragraph inasmuch as the material inside the tanks, the tanks themselves, and any allegedly contaminated concrete and soil surrounding them were removed and destroyed by Waterside or at its direction months before Arconic was notified of the discovery of the USTs, and Arconic therefore had no ability to verify or refute what PennJersey Environmental Consulting reported.

104.    Arconic objects to this statement inasmuch as the cited pages do not indicate that "[t]he previously undisclosed USTs were installed by Alcoa and utilized by Alcoa in its operations at the former Alcoa property." (*See* Pascarella Cert. ¶ 14, Ex. 13, at A003731).

105.    Arconic objects to this statement inasmuch as it does not cite to any document that indicates "[n]one of the environmental assessments . . . indicated the presence of the USTs underneath Building 12," nor does it explain what is meant by "environmental assessments." Further, Arconic personnel provided to North River in 1997 drawings that showed the two USTs under Building 12. (*See* Parker Cert. ¶ 9, Ex. 8, at A003144-45 (stating "all maps & drawings & microfilm sent to Amir"); Parker Cert. ¶ 10, Ex. 9, at A003136-A003142 (enclosing microfilm blueprints and

indicating that drawings would be sent under separate cover; drawings of USTs under Building 12); Pascarella Cert. ¶ 14, Ex. 13, at A003731).

106.   Denied.  Google Earth photographs of the site while the demolition was in progress show that the access manways were uncovered and, therefore, the existence of the USTs revealed, before Waterside removed any material from around the USTs.  (Pascarella Cert. ¶ 27, Ex. 26).

107.   Arconic can neither dispute nor affirm this Paragraph inasmuch as the material inside the tanks, the tanks themselves, and any allegedly contaminated concrete and soil surrounding them were removed and destroyed by Waterside or at its direction months before Arconic was notified of the discovery of the USTs, although Arconic disputes that any material within the USTs could have contaminated the floors of Building 12 above the USTs inasmuch as leaking oil does not travel upward, and photos of the demolition of Building 12 and the uncovering of the USTs show no contamination of the soils above and around the USTs. (Pascarella Cert. ¶ 27, Ex. 26).

108.   Disputed. None of the concrete or soils allegedly impacted by material from the USTs was deposited at Veterans Field. (Parker Cert. ¶ 32, Ex. 31, at W009445-50; Parker Cert. ¶ 48, Ex. 47, W000174).

109.   Disputed, inasmuch as the cited testimony of Fred Daibes is that he "[did not] know how much the removal of the underground storage tanks cost" but

"[o]ff the top of [his] head it was "[a] million dollars approximately," which is not competent or admissible proof of the cost of the removal and disposal of the USTs. (Pascarella Cert. ¶ 27, Ex. 26, at 100:23-101:2).

110. Disputed. Kevin McKnight testified that there was no oral communications "between September 15, 2003, and the date that the Complaint was filed" between "Alcoa, Fred Daibes or any of the Daibes entities." (Pascarella Cert. ¶ 16, Ex. 15, at 542:13-542:21). Undisputed that North River's attorney's sent an email to Arconic, but this did not constitute written notice under the contract.

111. Undisputed.

Dated: September 11, 2020

                                                      Respectfully submitted,

                                                      **K&L GATES LLP**

                                                    By: */s/ Michael E. Waller*
                                                        Michael E. Waller
                                                        Charles F. Rysavy
                                                        Dana B. Parker
  One Newark Center, Tenth Floor
  Newark, New Jersey 07102
  Tel:  (973) 848-4000
  michael.waller@klgates.com
  charles.rysavy@klgates.com
  dana.parker@klgates.com
  *Attorneys for Arconic Inc. (f/k/a Alcoa Inc.) and Arconic Domestic, LLC (f/k/a Alcoa Domestic LLC, as successor in interest to A.P. New Jersey, Inc.)*