## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER,<br><br>     Plaintiff,<br><br>     v.<br><br>WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALCOA INC. (formerly known as "Aluminum Company of America"); ALCOA DOMESTIC LLC, as successor in interest to A.P. NEW JERSEY, INC.; et al.,<br><br>     Defendants,<br><br>(caption continued on next page) | Case Nos.: 2:14-CV-05060-JMV-JBC<br>          2:14-cv-08129-MCA-LDW<br>Hon. John M. Vazquez, U.S.D.J.<br>Hon. James B. Clark, III, U.S.M.J. |

_____

## BRIEF OF ARCONIC DEFENDANTS
## IN OPPOSITION TO BOROUGH OF EDGEWATER'S
## MOTIONS FOR SUMMARY JUDGMENT
_____

**K&L Gates LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel: (973) 848-4000
*Attorneys for Arconic Inc. (f/k/a/ Alcoa*
*    Inc.) and Arconic Domestic, LLC*
*    (f/k/a/ Alcoa Domestic, LLC, as*
*    successor in interest to A.P. New*
*    Jersey, Inc.)*

*On the Brief:*
Michael E. Waller, Esq.
Charles F. Rysavy, Esq.
Dana B. Parker, Esq.

**K&L Gates LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel: (973) 848-4000
*Attorneys for Arconic Inc. (f/k/a/ Alcoa Inc.)*
*and Arconic Domestic, LLC (f/k/a/ Alcoa Domestic, LLC,*
*as successor in interest to A.P. New Jersey, Inc.)*

(continued from previous page)

WATERSIDE CONSTRUCTION,
LLC; 38 COAH, LLC; DAIBES
BROTHERS, INC.; NORTH RIVER
MEWS ASSOCIATES, LLC; and
FRED A. DAIBES,

      Defendants/Third-Party Plaintiffs,

      v.

NEGLIA ENGINEERING
ASSOCIATES,

      Third-Party Defendant,

and

ALCOA DOMESTIC, LLC, as
successor in interest to A.P. NEW
JERSEY, INC.,

      Defendant/Third-Party Plaintiff,

      v.

COUNTY OF BERGEN and RIVER
ROAD IMPROVEMENT PHASE II,
INC., and HUDSON SPA, LLC,

      Third-Party Defendants.

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ............................................................................. 4

ARGUMENT ............................................................................................... 4

    I.    The Borough is not entitled to summary judgment on its CERCLA claim because Arconic is not an "arranger" under CERCLA § 107(a)(3). ........................................................ 4

        A.    Arconic did not arrange for the disposal of hazardous waste at Veterans' Field through the sale of Building 12. ................................................................................ 6

        B.    Building 12 was not hazardous waste. .................................... 10

        C.    Arconic did not have ownership, possession, and control over the demolition, treatment, and remediation of Building 12. ..................................................... 14

            1.    Arconic did not have actual or constructive "ownership or possession" of the hazardous waste allegedly dumped at Veterans Field. ........................... 15

            2.    Arconic did not have "knowledge or control" sufficient to trigger arranger liability. ......................... 18

    II.    The Borough is not entitled to summary judgment on its CERCLA claim because its response was not consistent with the National Contingency Plan. .......................................... 20

        A.    The Borough failed to provide the public with sufficient notice and opportunity to participate meaningfully on the selection of the remedy. .................................. 21

            1.    Compliance with the public comment provisions of the NCP was not discretionary for the Borough's remediation of Veterans Field. ................... 22

            2.    The Borough failed to provide an opportunity for "meaningful" public participation in the selection of the remedial action. .................................. 27

**TABLE OF CONTENTS**
**(CONTINUED)**

**Page**

        3.     The Borough cannot rely on EPA, NJDEP, or LSRP oversight as a substitute for the public comment requirements of the NCP. ............................ 28

III.     Arconic is not liable to the Borough under the Spill Act because it is not "in any way responsible" for the discharge of hazardous substances at Veterans Field. ........................................... 32

    A.     Arconic's operations in Building 12 did not supply the requisite connection between Arconic and the discharge of hazardous substances by Waterside at Veterans Field. ...... 34

    B.     Arconic did not maintain "control and responsibility" over Building 12 or the hazardous substances discharged at Veterans Field. .................................................. 39

CONCLUSION ................................................................................. 46

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*,
  2006 WL 3366167 (E.D. Pa. Nov. 20, 2006) .............................................16, 17

*Amcast Industrial Corp. v. Detrex Corp.*,
  779 F. Supp. 1519 (N.D. Ind. 1991) ...................................................................30

*Amland Properties v. Aluminum Co. of America*,
  711 F. Supp. 784 (D.N.J. 1989) ...................................................................*passim*

*Artesian Water Co. v. New Castle County*,
  659 F. Supp. 1269 (D. Del. 1987) ......................................................................23

*Atl. City Mun. Utilities Auth. v. Hunt*,
  210 N.J. Super. 76 (App. Div. 1986) ..................................................................32

*Bd. of Cty. Com'rs of Cty. of La Plata, Colorado v. Brown Grp.*
  *Retail, Inc.*,
  768 F. Supp. 2d 1092 (D. Colo. 2011) ................................................................24

*Bedford Affiliates v. Sills*,
  156 F.3d 416 (2d Cir. 1998) .........................................................................24, 29

*Bethlehem Iron Works, Inc. v. Lewis Indus., Inc.*,
  No. CIV.A. 94-0752, 1996 WL 557592 (E.D. Pa. Oct. 1, 1996) ......................28

*Burlington Northern & Sante Fe Ry. Co. v. United States*,
  556 U.S. 599 (2009) ...................................................................................5, 12

*Cadillac Fairview/Cal., Inc. v. United States*,
  41 F.3d 562 (9th Cir. 1994) .................................................................................6

*Caldwell Trucking Prp Grp. v. Pullman Co.*,
  2002 U.S. Dist. LEXIS 28410 (D.N.J. Nov. 21, 2002) ......................................30

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
  287 F. Supp. 2d 1118 (C.D. Cal. 2003) ..............................................................31

iii

*Catellus Devel. Corp. v. United States*,
  34 F.3d 748 (9th Cir. 1994) .......................................................................5, 7, 15

*Chatham Steel v. Brown*,
  858 F. Supp. 1130 (N.D. Fla. 1994) ...................................................................12

*City of Oakland v. Nestle USA, Inc.*,
  No. C-98-3963 SC, 2000 WL 113066 (N.D. Cal. Aug. 8, 2000)......................29

*Consol. Coal Co. v. Ga. Power Co.*,
  781 F.3d 129 (4th Cir. 2015) .......................................................................10, 12

*County Line Inv. Co. v. Tinney*,
  933 F.2d 1508 (10th Cir. 1991) ...................................................................22, 29

*Des Champs Labs, Inc. v. Martin*,
  427 N.J. Super. 84 (App. Div. 2012)..................................................................32

*Dexter v. Cosan Chem. Corp.*,
  1997 WL 557637 (D.N.J. Jan. 10, 1997)......................................................23, 27

*Estes v. Scotsman Group, Inc.*,
  16 F. Supp. 2d 983 (C.D. Ill. 1998) ...................................................................30

*In re Gabapentin Patent Litig.*,
  No. CA 00-CV-2931 FSH, 2011 WL 1807448 (D.N.J. May 12,
  2011) ...................................................................................................................10

*Garrett Day LLC v. International Paper Co.*,
  2016 U.S. Dist. LEXIS 25494 (S.D. Oh. 2016) .................................................25

*Gussin Enters., Inc. v. Rockola*,
  No.89–C–4742, 1993 WL 114643 (N.D. Ill. Apr. 13, 1993) .............................23

*Hatco Corp v. W.R. Grace & Co. Conn.*
  849 F. Supp. 931, 970 (D.N.J. 1994)............................................................26, 30

*In re Kimber Petroleum Corp.*,
  110 N.J. 69 (1988) ..............................................................................................40

*Marsh v. New Jersey Dept. of Envtl. Protec.*,
  152 N.J. 137 (1997) .......................................................................................40, 41

*Morristown Assocs. v. Grant Oil Co.*,
220 N.J. 360 (2013) ................................................................................32

*Morton Int'l v A.E. Staley Mfg. Co.*,
343 F.3d 669 (3d Cir. 2003) .........................................................14, 15, 16, 18

*N.J. Dep't of Envt'l Prot. v. Dimant*,
212 N.J. 153 (2012) ................................................................33, 35, 40

*NCR Corp. v. George A. Whiting Paper Co.*,
768 F.3d 682 (7th Cir. 2014) ..................................................................12

*New Jersey Dep't of Envtl. Prot. v. Amerada Hess Corp.*,
323 F.R.D. 213 (D.N.J. 2017)..................................................................31

*New Jersey Sch. Dev. Auth. v. Marcantuone*,
428 N.J. Super. 546 (App. Div. 2012) ..................................................33

*New Jersey Tpk. Auth. v. PPG Indus., Inc.*,
197 F.3d 96 (3d Cir. 1999) ....................................................................33

*New York v. City of Johnstown*,
701 F. Supp. 33 (N.D.N.Y. 1988)..........................................................15

*Pierson Sand & Gravel, Inc. v. Pierson Twp.*,
851 F. Supp. 850 (W.D. Mich. 1994), *aff'd* 89 F.3d 835 (6th Cir.
1996) ......................................................................................................22

*Sherwin-Williams Co v. City of Hamtramck*,
840 F. Supp. 470 (E.D. Mich. 1993) ..............................................23, 29

*State Dept. of Environmental Protection v. Ventron*,
94 N.J. 473 (1983) ................................................................................40

*Team Enters. v. W. Inv. Real Estate Tr.*,
647 F.3d 901 (9th Cir. 2011) ................................................................10

*Tex Tin Settling Defendants Steering Committee v. Great Lakes
Carbon Corp.*,
2008 WL 4376363 (S.D. Tex. 2008) ....................................................14

*Union Elec. Co. v. Union Elec. Co.*,
54 F.3d 379 (7th Cir. 1995) ..................................................................10

*United States v. Cartwright*,
    359 F.3d 281 (3d Cir. 2004) ...............................................................16

*United States v. Dico, Inc.*,
    808 F.3d 342 (8th Cir. 2015) ............................................12, 13, 14

*United States v. Dico, Inc.*,
    920 F.3d 1174 (8th Cir. 2019) .........................................................13

*United States v. Manzo*,
    182 F. Supp. 2d 385 (D.N.J. 2000) ..................................................34

*United States v. Mountain Metal Co.*,
    137 F. Supp. 2d 1267 (N.D. Ala. 2001) ............................................12

*VME Americas, Inc. v. Hein-Werner Corp.*,
    946 F. Supp. 683 (E.D. Wis. 1996) ..................................................29

*Voellinger v. Electro-Coatings, Inc.*,
    A-2261-09T3, 2012 WL 1548060 (App. Div. June 29, 2011) ..........36

*W.R. Grace & Co. v. Zotos Int'l, Inc.*,
    No. 98-CV-838S, 2013 WL 5488939 (W.D.N.Y. Sept. 30, 2013) ..................15

**Statutes**

42 U.S.C. § 9607(a) ..............................................................................5, 20

N.J.S.A. 58:10- 23.11f(a)(2) ...................................................................32

**Other Authorities**

40 C.F.R. § 300.430 ......................................................................20, 21, 22

40 C.F.R. § 300.700 ..........................................................................20, 22

Defendants/Third-Party Plaintiffs Arconic Inc. (f/k/a Alcoa Inc.) and Arconic Domestic, LLC (f/k/a Alcoa Domestic, LLC, as successor-in-interest to A.P. New Jersey, Inc.) (collectively "Arconic"), submit this Brief in opposition to the Motions for Summary Judgment[1] filed by the Borough of Edgewater against Arconic.

## PRELIMINARY STATEMENT

A careful review of the Borough's Motions for Summary judgment shows that the arguments and the evidence to which it cites only reinforce Arconic's position that summary judgment is appropriate *in Arconic's favor* on these claims.

The Borough unsuccessfully attempts to pin CERCLA "arranger" liability on Arconic.  Yet it is undisputed that Arconic had not owned or possessed Building 12 for *fifteen years* prior to its being demolished and the resulting rubble disposed of at Veterans Field.  Arconic had no say in, or control over, the disposal of hazardous materials then existing in the building.  It did not hire, and had no relationship with, Waterside Construction, the party that actually disposed of the materials.  It did not

---

[1] The arguments herein respond to the Borough's arguments against Arconic in the following motions: Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment on CERCLA Claims against Alcoa Entities (ECF No. 352-1), dated September 11, 2020 ("Borough CERCLA Br."); Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment on Spill Act Claims against Alcoa Entities (ECF No. 349-1), dated September 11, 2020 ("Borough Spill Br."); or Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment on CERCLA Claims against Daibes Entities (ECF No. 353-1), dated September 11, 2020 ("Borough/Daibes Br.").

direct Waterside's actions or have any input into either the decision to demolish the building or the decision on how to dispose of the rubble.  It did not even know that the demolition and disposal had occurred until months later.  In fact, Arconic believed that Building 12 was still in use until it found out otherwise when it was named in this lawsuit.  This is not a description of an "arranger."

The Borough (incorrectly) describes the 1997 Purchase and Sale Agreement and the Multi-Party Acquisition Agreement ("MPAA") as an "arrangement" to dispose of hazardous materials.  Even if that were true, the 1999 Environmental Indemnity Agreement ("EIA") between Arconic, North River Mews ("North River"), and River Road Improvement Phase II, Inc. ("RRIP"), *extinguished* any rights or obligations related to Building 12 that the parties may have had arising out of the 1997 Agreements.

Arconic also did not undertake a CERCLA "arrangement for disposal" because a "disposal" only occurs when the party making the transfer treats the material as *waste*.  The impetus for the EIA was specifically that Building 12 was *not* being treated as waste because Fred Daibes intended to put the building to use. The fact that Building 12 was not exactly in move-in condition at the time, and that it contained hazardous materials subject to NJDEP and EPA regulations, did not mean it was not useful as a building or that it was waste.

2

The Borough also cannot recover under its CERCLA claim because it failed to perform the remediation of the hazardous materials dumped by Waterside at Veterans Field "consistent with" the National Contingency Plan.  Missing from all of the evidence of "public participation" submitted by the Borough is any evidence that the Borough gave thoughtful consideration to alternatives to its pre-ordained remediation plan for the Waterside contamination, or that it allowed input from the public on the plan *before* it was chosen.  The result was a remediation that, if one believes the Borough's damages claim, cost *sixty times* what Arconic's experts estimated should have been the cost to remediate any contamination from Building 12 debris at Veterans Field.  This case is a prime example of why compliance with these aspects of the NCP is not discretionary, as the Borough argues.

Finally the Borough attempts to impose New Jersey Spill Act liability on Arconic under the theory that it was "in any way responsible" for the discharge of hazardous materials at Veterans Field.  But neither statute, nor case law, nor common sense would impose Spill Act liability on Arconic when it had no control over, or relationship with, the direct discharger, and did not know that North River would ever demolish Building 12 and dispose of any hazardous materials within it—in fact, Arconic "knew" the opposite.  The Borough tries to bypass these problems with its theory by claiming that Arconic had "control over" Building 12 and "continuing activities" related to it after 1999.  But this is a misrepresentation of the evidence,

which shows the exact opposite.  The Borough also claims that Arconic sold the property knowing that it would require decontamination, disposal, and demolition. But accepting this argument would require ignoring both the substance and the intent of the EIA.

Upon consideration of all relevant evidence before the Court, the Borough's Motions for Summary Judgment against Arconic must be denied.

## STATEMENT OF FACTS

Arconic refers the Court to the Statement of Facts in its Brief of Arconic Defendants in Support of Motion for Summary Judgment Dismissing Claims of Plaintiff Borough of Edgewater (ECF No. 344-1), dated September 11, 2020, ("Arconic's Motion"), which it adopts for purposes of this Opposition. To the extent that the Borough's Brief makes any factual assertions not addressed in Arconic's Motion, they are responded to herein in context.

## ARGUMENT

**I.     The Borough is not entitled to summary judgment on its CERCLA claim because Arconic is not an "arranger" under CERCLA § 107(a)(3).**

The Borough argues that it is entitled to summary judgment on its CERCLA § 107 claim because Arconic "arranged for" the disposal of hazardous materials within the structure of Building 12.  (Borough CERCLA Br., pp. 15-39).  To establish "arranger" liability, the Borough must show that Arconic "arranged for

disposal or treatment . . . of hazardous substances owned or possessed by" Arconic. 42 U.S.C. § 9607(a)(3).

The Supreme Court has explained that the phrase "arranged for disposal" must be given its ordinary meaning, and that "[i]n common parlance, the word 'arrange' implies action directed to a specific purpose" or "intentional action." *Burlington Northern & Sante Fe Ry. Co. v. United States*, 556 U.S. 599, 610-11 (2009).  Thus, under the statute's plain language, "an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Id.* In order for there to have been a CERCLA "arrangement" for disposal of a hazardous substance, the "substance [must have] had the characteristic of waste . . . at the point at which it was delivered to another party." *Catellus Devel. Corp. v. United States*, 34 F.3d 748, 752 (9th Cir. 1994).  "[K]nowledge alone" that a third party may dispose of a hazardous substance as waste "is insufficient to prove that an entity 'planned for' the disposal" of the hazardous substance. *Burlington*, 556 U.S. at 612.

Arconic has addressed and disposed of the "arranger" liability issue in its Motion for Summary Judgment against the Borough (ECF No. 344), Section (I)(A)). Arconic, therefore, will devote itself in this Brief to refuting the arguments made by the Borough in its Motion.

### A.     Arconic did not arrange for the disposal of hazardous waste at Veterans' Field through the sale of Building 12.

The Borough argues that Arconic arranged for the disposal of hazardous waste through the terms of the Purchase and Sale Agreement and MPAA, both executed in 1997. (Borough CERCLA Br. 17-20).   However, the Borough does not cite to a single case where an alleged arranger was found liable when that entity did not know whether the materials would *ever* be disposed of, or did not know until long after the fact that the materials had actually been disposed of, both of which happened here. (Arconic's Local Rule 56.1 Statement of Material Facts as to Which There is No Genuine Dispute, ECF 318, dated January 31, 2020 ("SUMF") ¶ 53; Certification of Dana B. Parker, dated September 11, 2020 (ECF No. 359) ("Parker Cert. ¶ 3"), Ex. 2; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 28, Ex. 27).   The Borough instead cites to cases in other Circuits that found "arranger" liability arising from the parties' actual involvement in, or exercise of control over, the arrangements for disposal. (Borough CERCLA Br., p. 17).   None of these decisions is binding on this Court, and none of them would support the Borough's argument if they were, because they are all factually distinguishable.

For example, the court in *Cadillac Fairview/Cal., Inc. v. United States*, 41 F.3d 562 (9th Cir. 1994), found that the defendant was an "arranger" because it had agreed to a prearranged process for contaminated styrene to be shipped out, cleaned, and returned for continued use, so the release of hazardous substances (disposal) was

6

inevitable.  Likewise, the court in *Catellus*, 34 F.3d 748, was presented with the sale of spent automotive batteries that were sold to a lead reclamation plant for lead recovery and disposal.  Given the nature of the specific recycling process being used, the court found it was "[a]n inescapable fact" that the disposal of hazardous waste would occur. *Id.* at 752.

In contrast to those cases, the demolition of Building 12 was not inevitable, especially after the execution of the EIA.  Any terms in the Purchase and Sale Agreement and the MPAA addressing responsibility for the demolition of the buildings, and for proper disposal of hazardous materials at the site, were based on the express understanding between the parties that *all* of the buildings at the site would be demolished as part of the same process, and *all* hazardous materials properly disposed of during that process.  (SUMF ¶ 27; Parker Cert., Exs. 4, 10). However, after the Purchase and Sale Agreement and the MPAA were signed, a fundamental change in the circumstances occurred: Mr. Daibes decided not to demolish Building 12 and instead to put it to beneficial use. (SUMF ¶ 35; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 17, Ex. 16).  To address the new circumstances, the parties entered into the EIA, which extinguished all obligations related to Building 12 in the Purchase and Sale Agreement and MPAA.  (SUMF ¶ 37; Parker Cert. ¶ 18, Ex. 17).

The Borough incorrectly characterizes the EIA as "addressing the possible contingency that Building 12 was not demolished." (Borough CERCLA Br., p. 5; Borough CERCLA Br., p. 26).  This is wrong.  The EIA was necessary because Mr. Daibes **decided not to demolish Building 12**.[2]  This is undisputed.  Arconic simply wanted to make sure that, *if* Building 12 were ever demolished—one, ten, or a hundred years in the future—North River would be solely responsible for whether and how any remediation and disposal of hazardous materials would be handled.  In other words, North River was no longer obligated to perform demolition, remediation, and disposal, if any, of Building 12 along with the other buildings at the site and in accordance with the terms agreed upon by the parties in the MPAA.  (Parker Cert., Ex. 17 at A001533, ¶ 1).  In turn, Arconic would have no potential liability for anything North River chose to do at the Building 12 site.  (SUMF ¶¶ 36, 38; Parker Cert. ¶ 3, Ex. 2) (the purpose of the EIA was to confirm that, "regardless of what happened to Building 12, Arconic would have no responsibility for anything related to the Edgewater site.").

---

[2] Mr. Daibes testified that the decision not to demolish Building 12 was made jointly by Arconic and himself.  Arconic's position is that Mr. Daibes' testimony on this point is not true or even credible—but it is irrelevant for purposes of this discussion. Either way, the parties understood that Building 12 would be put to use and not be demolished along with the rest of the buildings at the site.

The terms of the EIA plainly confirm this purpose.  North River and RRIP agreed to:

> Indemnify, defend and hold harmless [Arconic] for any and all claims … including all foreseeable and unforeseeable consequential damages, occurring at any time before, during, or after North River's ownership of [the Former Alcoa Site], relating to Building 12 and the land under and adjacent thereto, arising under Applicable Law (as defined in the Purchase Agreement), including, but not limited to, remediation and disposal costs … related to PCBs.

(SUMF ¶ 39; Parker Cert. ¶ 18, Ex. 17).

In simplest terms, *if* the Purchase and Sale and Multi-Party Agreements were an "arrangement" for the disposal of hazardous substances (which Arconic does not concede), *the EIA terminated that arrangement.*

The Borough further contends that the EIA did not modify the requirements for treatment and disposal of Building 12 as set forth in the Purchase and Sale Agreement or MPAA.  However, the EIA clearly states: "[N]otwithstanding any other agreement or obligation of the parties, to the extent Building 12 is *not demolished*, North River and [RRIP] shall indemnify" Arconic. (Parker Cert., Ex. 17).  Thus, after Arconic and North River entered into the EIA on March 13, 1999, North River no longer needed to follow the requirements under the MPAA, and Arconic would no longer be responsible for, or even kept apprised of, anything North River did at the site.  (SUMF ¶¶ 34-40; Parker Cert., ¶ 4, Ex. 3; Parker Cert., ¶ 5, Ex.

4; Parker Cert., ¶ 6, Ex. 5; Parker Cert., ¶ 16, Ex. 15; Parker Cert., ¶ 17, Ex. 16; Parker Cert., ¶ 18, Ex. 17; Parker Cert., ¶ 3, Ex. 2).

Finally, the Borough claims that by entering into the EIA, Arconic "acknowledged [its] liability" for the contamination of Building 12.  But an agreement that seeks to *eliminate* a party's liability cannot be used to *establish* a party's liability.  *See, e.g., In re Gabapentin Patent Litig.*, No. CA 00-CV-2931 FSH, 2011 WL 1807448, at *9 (D.N.J. May 12, 2011).

### B.   Building 12 was not hazardous waste.

Arconic cannot be said to have intended to dispose of hazardous waste simply by selling Building 12, which contained PCBs. (*See* Borough CERCLA Br., p. 20). There is a critical distinction between the intent to dispose of hazardous waste and the intent to sell a useful product that happens to contain a hazardous substance. *Consol. Coal Co. v. Ga. Power Co.*, 781 F.3d 129, 149 (4th Cir. 2015).

> Anytime an entity sells a product that contains a hazardous substance, it also "intends" to rid itself of that hazardous substance in some metaphysical sense. But intent to sell a product that happens to contain a hazardous substance is not equivalent to intent to dispose of a hazardous substance under CERCLA. For arranger liability to attach, there must be something more.

*Id. See also Team Enters. v. W. Inv. Real Estate Tr.*, 647 F.3d 901, 909-10 (9th Cir. 2011) ("[P]eople sell useful products for legitimate business purposes, not for the purpose of disposing of waste."); *Union Elec. Co. v. Union Elec. Co.*, 54 F.3d 379, 384 (7th Cir. 1995) ("[T]he sale of a product which contains a hazardous substance

cannot be equated to the disposal of the substance itself or even the making of arrangements for its subsequent disposal.").

The Borough's argument that Building 12 is hazardous waste is based primarily on its analogy to the recycling of spent car batteries. The residual commercial value of an intact Building 12 (whatever its condition) that was going to be put to beneficial use is inapposite to the salvage value of spent batteries for purposes of determining "usefulness" under CERCLA. Spent batteries, even when cracked to recycle constituent materials of value such as lead, start out as waste, retain their character as waste, and must eventually be disposed of as waste. In contrast, Building 12 retained reuse potential as a commercial building.[3]

Building 12 was not a "dilapidated" structure only capable of use "after it was treated," or "crumbling from the extensive contamination found within its floors and walls," as described by the Borough. (Borough CERCLA Br, p. 22). The Borough does not cite to any evidence to support these descriptions. (*See id.*). Rather, the undisputed evidence shows that, while reports identified PCB contamination in the floors and walls of Building 12, institutional/engineering controls had been put in

---

[3] The Borough contends that "North River considered possibly using portions of the remnants of Building 12 as a foundation." (Borough CERCLA Br., p. 27). But this statement is not supported by any evidence and is a misrepresentation of the facts. (*See* Arconic's Statement of Material Facts in Response to Borough of Edgewater, ECF No. 330 (Mar. 2, 2020) (Case 2:14-CV-05060) ("Arconic RSUMF") ¶ 59).

place to encapsulate the PCBs and to allow Building 12 to be used as commercial real estate.  (SUMF ¶ 42).

Courts have also flatly rejected the notion that the need for further treatment to make something useful makes the sale of that thing a "disposal."  *See, e.g.*, *NCR Corp. v. George A. Whiting Paper Co.*, 768 F.3d 682, 706-07 (7th Cir. 2014) (waste, scraps, and undersized rolls of paper unusable by original manufacturer were useful product, despite need for further processing before use).  Similarly, because arranger liability attaches to transactions involving "used and no longer useful hazardous substance[s]," *Burlington*, 556 U.S. at 610, courts have held that the sales of used but otherwise useful products were not an "arrangement."  *See Consol. Coal Co. v. Ga. Power Co.*, 781 F.3d 129, 153–55 (4th Cir. 2015) (used transformers); *NCR Corp.*, 768 F.3d 682 at 707 (scraps of carbonless paper).  *Cf. Chatham Steel v. Brown*, 858 F. Supp. 1130, 1140 (N.D. Fla. 1994) (disposal of spent batteries was an arrangement because product no longer had value for purpose for which it was manufactured, and contained a hazardous substance); *United States v. Mountain Metal Co.*, 137 F. Supp. 2d 1267, 1275 (N.D. Ala. 2001) (same).

The Borough's reliance on *United States v. Dico*, is also misplaced.  In that case, the Eighth Circuit reversed the district court's finding on summary judgment of "arranger" liability for defendants that sold PCB-contaminated buildings to a third party.  *United States v. Dico, Inc.*, 808 F.3d 342, 348 (8th Cir. 2015).  The Eighth

12

Circuit held that the lower court erred in finding that the defendants' knowledge that the buyer of the buildings would only use part of the contaminated goods and would discard the rest was sufficient, without more, to find them liable as "arrangers." After remand, a bench trial eliciting "[s]ubstantial further evidence," and a second appeal, the Eighth Circuit once again considered the issue. *United States v. Dico, Inc.*, 920 F.3d 1174, 1178 (8th Cir. 2019). Based on the full trial record, it upheld the lower court's ruling that the defendants were "arrangers." *Id.* The Circuit Court's decision turned on the following established facts: (i) the defendants knew that the buildings would be torn down after the sale; (ii) the costs the defendants avoided by not complying with the EPA order greatly exceeded the sales price of the buildings; and (iii) defendants did not tell the buyer that the buildings were contaminated or subject to an EPA order. *Id.* at 1178-79.

The Eighth Circuit's decision in *Dico* would not mandate the same outcome here. The undisputed evidence shows that Arconic did not know that Building 12 *would* be torn down; on the contrary, it understood that Building 12 *would not* be torn down. (SUMF ¶¶ 35-36; Parker Cert. ¶ 3, Ex. 2; SUMF ¶ 81; Parker Cert. ¶ 36, Ex. 35; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 47, Ex. 46). And while the sale price of the Alcoa Property may have been less than the estimated costs to address the

contamination,[4] this is not, by itself, determinative of intent.  *See Tex Tin Settling Defendants Steering Committee v. Great Lakes Carbon Corp.*, 2008 WL 4376363, at *8 (S.D. Tex. 2008) ("Price is one factor to consider in determining whether a transaction was an arrangement for disposal or the sale of a useful product," but "[a] material does not become waste simply because it is inexpensive[.]") (internal quotations omitted).  Finally, unlike the buyer in *Dico*, North River was fully aware of the nature and extent of the PCB contamination in Building 12.  It had a well-publicized history of PCB contamination before North River purchased it (SUMF ¶ 16), and North River hired its own environmental consultant to conduct due diligence at the site prior to purchase. (SUMF ¶ 18).

### C.   Arconic did not have ownership, possession, and control over the demolition, treatment, and remediation of Building 12.

The Third Circuit in *Morton Int'l v A.E. Staley Mfg. Co.*, set out the three essential factors for a finding of "arranger" liability.  343 F.3d 669, 676-80 (3d Cir. 2003).  First, the defendant must have "ownership or possession" of the hazardous waste.  *Id.*  If ownership or possession is established, the defendant must *also* have

---

[4] The Borough cites to Paragraph 47 of its Statement of Material Facts in Support of its Motion for Summary Judgment, which states: "The transaction with North River resulted in a loss to AP of at least $200,000 which was exclusive of the $15,000,000 paid to Amland by Alcoa." However, Arconic disputes this fact because "[t]he document upon which the Borough relies for this statement does not support the statement." (Arconic RSUMF ¶ 47).  Accordingly, the Borough cannot rely on this fact in support of summary judgment.

either "knowledge" or "control" of the disposal of the hazardous waste to be liable as an "arranger." *Id.*

1.   *Arconic did not have actual or constructive "ownership or possession" of the hazardous waste allegedly dumped at Veterans Field.*

"Liability for releases under § 9607(a)(3) is not endless; it ends with that party who both owned the hazardous waste and made the crucial decision how it would be disposed of or treated, and by whom." *New York v. City of Johnstown*, 701 F. Supp. 33, 36 (N.D.N.Y. 1988).  That party was North River.

Arconic did not have actual ownership or possession of Building 12 or any hazardous materials therein at the time North River and Waterside decided to demolish the building and dispose of the PCB-contaminated concrete rubble they created.  Indeed, Arconic had not had ownership or possession of Building 12 for fifteen years before those decisions were made.  (SUMF ¶ 37).  It did not, therefore have actual "ownership or possession" of Building 12 or any of the hazardous materials within it for purposes of imposing "arranger" liability.

The Borough points to two decisions to suggest that continued ownership of a hazardous substance is not required for "arranger" liability. (Borough CERCLA Br., pp. 29-30); *W.R. Grace & Co. v. Zotos Int'l, Inc.*, No. 98-CV-838S, 2013 WL 5488939, at *33 (W.D.N.Y. Sept. 30, 2013); *Catellus*, 34 F.3d 748.  Neither of these cases is binding on this Court, and both are directly contrary to the Third Circuit's

opinion in *Morton*.  343 F.3d at 678 ("proof of ownership, or at least possession, of the hazardous substance is required by the plain language of the statute.").

Nor did Arconic have "constructive" possession of the hazardous materials dumped at Veterans Field.  Proof of personal ownership or actual physical possession of a hazardous substance can also be established through a showing of constructive possession.  *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 2006 WL 3366167, at *3 (E.D. Pa. Nov. 20, 2006).  Constructive possession arises "only when the defendant exercises some control over the waste."  *Id.  See also United States v. Cartwright*, 359 F.3d 281, 290 (3d Cir. 2004) ("[C]onstructive possession exists if an individual knowingly has both the power and intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons.").

Arconic did not have constructive possession of Building 12 or any of the hazardous substances within it at the time decisions were made about disposal, or at the time of the disposal itself.  As previously shown, any demolition, remediation, and disposal obligations related to Building 12 were carved out of the MPAA via the EIA.  Consistent with this, when North River demolished Building 12 thirteen years after the parties entered into the EIA, North River did nothing consistent with any of the demolition and remediation provisions that had been set out in the MPAA.  North River did not notify the NJDEP that it was demolishing the building, did not submit

16

the required RAWP to NJDEP for the demolition, did not request that Arconic approve a RAWP for the work, and did not request oversight of the demolition by the County. (SUMF ¶ 53; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 28, Ex. 27).  The EIA gave Arconic zero control and zero liability for Building 12 or the hazardous materials within it—and consistent with this, no one even notified Arconic about the demolition of Building 12 until months after the demolition was complete. (SUMF ¶ 53; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 28, Ex. 27).

Finally, the Borough's reliance on *Agere Sys. v. Advanced Envtl. Tech. Corp.*, 2006 WL 3366167 (E.D. Pa. Nov. 20, 2006), is misplaced.  (Borough CERCLA Br., p. 32).  The *Agere* court found that the defendant exercised control because it had a contractual obligation to arrange for disposal, then contracted with another party to fulfill that obligation.  *Id.* at \*4. Here, Arconic had no involvement with, or contractual obligation to arrange for, the disposal of waste from Building 12. And Arconic had no knowledge of the events leading to the contamination of Veterans Field, including the demolition of Building 12, until it was named in this litigation. (SUMF ¶ 53; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 28, Ex. 27).

Because Arconic did not have actual ownership, actual possession, or constructive possession of Building 12 at the time North River and Waterside made

17

their decisions to demolish the building and to dispose of the PCB-contaminated concrete rubble they created, Arconic cannot be liable as an "arranger." *Morton*, 343 F.3d at 678.

> 2. *Arconic did not have "knowledge or control" sufficient to trigger arranger liability.*

As shown in the preceding sections, Arconic had no control over the disposal of contaminated materials from Building 12, and did not even know Building 12 had been demolished and the rubble disposed of until months after it occurred. Arconic, therefore, did not have the "knowledge or control" necessary for CERCLA "arranger" liability.

Nonetheless, the Borough argues that Arconic had control over the hazardous substances in Building 12 because it made payments for the demolition and removal of PCB contaminated materials at the site, and remained responsible for the remediation of the property. (Borough CERCLA Br., p. 33). But the $9,000,000 Arconic contributed to demolition and remediation at the Former Alcoa Site did not include Building 12. When Mr. Daibes decided not to demolish Building 12, $500,000 of the original $9,500,000 was held in escrow per the Funding Agreement. (SUMF ¶ 32; Parker Cert. ¶ 15, Ex. 14). The $500,000 was eventually released from escrow at a time when the parties still understood that Mr. Daibes intended to put Building 12 to beneficial use *and not demolish it.* (SUMF ¶ 45; Parker Cert. ¶ 20, Ex. 19). The $500,000 payment, therefore, could not have been a payment for

demolition and disposal costs because the parties believed demolition and disposal of Building 12 might never occur.

The Borough also reiterates its argument that Alcoa "directed" the Daibes Defendants' decisions with regard to the treatment and disposal of Building 12 through the MPAA and Purchase and Sale Agreement.  (Borough CERCLA Br., pp. 35-36).  But for the same reasons discussed previously, this argument is meritless because the EIA effectively extinguished the MPAA and Purchase and Sale Agreement.

Finally, the Borough accuses Arconic of allowing for the "continuous delay" of the treatment of Building 12. (Borough CERCLA Br., pp. 36-37).  Not only does the Borough fail to cite any facts in support of this assertion, it ignores the undisputed purpose of the EIA to transfer all responsibility to North River to address any hazardous materials in the Building consistent with federal, state, and local laws *if* North River ever decided to demolish the building. (SUMF ¶¶ 38-40, 53-54; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 5, Ex. 4; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 18, Ex. 17; Parker Cert. ¶ 28, Ex. 27).  Further, even if Arconic had "allowed" North River to "delay" treating hazardous waste, this would be the exact opposite of taking "intentional steps to dispose of a hazardous substance," as necessary for arranger liability.

The Borough concludes its argument in favor of Arconic's "arranger" liability by renewing its earlier point that Arconic had the requisite intent to dispose of hazardous materials. However, for the reasons stated in Section I(A) *supra*, this argument fails.

## II.   The Borough is not entitled to summary judgment on its CERCLA claim because its response was not consistent with the National Contingency Plan.

CERCLA permits any private "person," such as the Borough, to recover response costs for environmental contamination from another party, but only if the response action was consistent with the National Contingency Plan ("NCP"). 42 U.S.C. § 9607(a). "A private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a whole, is in substantial compliance with the applicable requirements in [40 C.F.R. § 300.700(c)(5)-(6)], and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). Proving consistency with the NCP is an element of a plaintiff's *prima facie* case under CERCLA. *Amland Properties v. Aluminum Co. of America*, 711 F. Supp. 784, 749 (D.N.J. 1989).

As explained in detail in Section (IV) of Arconic's Motion, the undisputed facts show that the remediation of Veterans Field was not consistent with—that is, not "in substantial compliance" with—the NCP because: (1) the Borough failed to provide the public with advance notice and opportunity to participate meaningfully in the selection of the response action (*see* 40 C.F.R. § 300.700(c)(6); 40 C.F.R. §

300.430(f)(3)(i)(A)-(E)); and (2) the Borough failed to perform meaningful analysis of potential alternatives to the response action it chose, which was the strictest and costliest of the options available. *See* 40 C.F.R. § 300.430(f)(2)-(3).

The Borough's Moving Brief does not even address its failure to critically analyze potential alternatives, (Borough/Daibes Br., pp. 17-23), which alone bars the Borough's CERCLA cost recovery action.  In addition, the Borough's argument that its "public notice" actions were in substantial compliance with the NCP fails. This is also fatal to its CERCLA claim.

> A.  **The Borough failed to provide the public with sufficient notice and opportunity to participate meaningfully on the selection of the remedy.**

The applicable federal regulations set out specific "public comment" requirements that must be met in order for a response action to be deemed consistent with the NCP. 40 C.F.R. § 300.430(f)(2), (3), (6).  The purpose of these requirements is not simply to assure that the public knows what response action has already been chosen and how the remediation is progressing, but to assure that the public has an opportunity to provide meaningful input *in advance of selection of the remedy*. 40 C.F.R. § 300.430(f)(2), (3), (6). Among other requirements the NCP imposes to accomplish this goal, the party responsible for the response action must do the following: make available for public comment a report describing the preferred remedy along with alternatives (40 C.F.R. § 300.430(f)(2)-(3)); make its proposed

plan and supporting analyses and information available in the public record (40

C.F.R. § 300.430(f)(3)(i)(B)); allow a reasonable period of not less than thirty days

for submission of written and oral comments on the proposed plan and the

supporting analysis, and hold public meetings during the comment period to solicit

additional input from the public (40 C.F.R. § 300.700(c)(6)); 40 C.F.R. §

300.430(f)(3)(i)(A)-(E)). The Borough fails to show it did any of this.

> 1.  *Compliance with the public comment provisions of the NCP
>     was not discretionary for the Borough's remediation of
>     Veterans Field.*

The Borough asserts that adherence to the public comment provisions of the

NCP is only "suggested," not required, for a response action to be "consistent with"

the NCP. This theory runs counter to decisions of other Circuits and to decisions

within the Third Circuit holding that the failure to provide meaningful opportunity

for public comment *alone* renders a response action "inconsistent with" the NCP.

*See County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1514-15 (10th Cir. 1991) (public

comment requirement not satisfied by "incidental opportunities for public

comment;" response action must provide, "at a minimum," opportunity for

meaningful public comment on selection of response action); *Pierson Sand &*

*Gravel, Inc. v. Pierson Twp.,* 851 F. Supp. 850, 856–58 (W.D. Mich. 1994), *aff'd* 89

F.3d 835 (6th Cir. 1996); *Amland Properties Corp.*, 711 F. Supp. at 801 (failure to

provide an opportunity for public comment renders a remedial action inconsistent

with the NCP and bars recovery); *Dexter v. Cosan Chem. Corp.*, 1997 WL 557637, at *22 (D.N.J. Jan. 10, 1997) (the "hearing and community involvement requirements of the NCP" must be substantially complied with even where only "a small parcel of land" is at issue); *Artesian Water Co. v. New Castle County*, 659 F. Supp. 1269, 1297 (D. Del. 1987) (public comment on document that did not determine nature and extent of hazardous release or evaluate proposed remedies not consistent with NCP); *Sherwin-Williams Co.*, 840 F. Supp. at 470, 476 (D. Mich. 1993) ("Courts have consistently held that failure by a party to provide for the required opportunity for public comment 'renders a remedial action inconsistent with the NCP and bars recovery of costs.'") (quoting *Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp.,* 748 F. Supp. 373, 389 (E.D.N.C. 1990)); *Gussin Enters., Inc. v. Rockola,* No.89–C–4742, 1993 WL 114643, at *5–6 (N.D. Ill. Apr. 13, 1993) ("the absence of meaningful public participation defeats a claim for recovery for a remedial action under the 1990 NCP.").

The handful of cases that the Borough cites from other jurisdictions are not binding, and are either distinguishable or they do not stand for the proposition for which they are cited.  For example, in *Bd. of Cty. Com'rs of Cty. of La Plata, Colorado v. Brown Grp. Retail, Inc.*, the court found the town's failure to prepare a community relations plan and conduct "widespread interviews" prior to commencing field work was an "immaterial and insubstantial deviation" from the

NCP.  768 F. Supp. 2d 1092, 1116-17 (D. Colo. 2011); (Borough/Daibes Br., p. 41). The court's conclusion was driven by the peculiar facts of that case, including that no residential neighborhoods were directly impacted by the contamination, no community organizations had ever contacted the town about the issue despite local media coverage, the remediation was discussed with adjacent landowners, and the town ultimately implemented a community relations plan. *Id.* at 1116-17.  Here, the contaminated site was a public park, where the selected remedial action would directly impact the entire Borough and most or all of its residents. (SUMF ¶ 67). Despite its potential Borough-wide impact, and as detailed fully in Arconic's Motion (pages 23-30), the documents the Borough cites show it did not make available for public comment a report of the preferred remedy and available alternatives. On the contrary, the remedy was already chosen, and one alternative cursorily considered and rejected, *before* the public was given *post hoc* notice and opportunity to comment on the remedial action plan.  In the particular facts of this case, the Borough's deviations from the NCP's public comment requirements were not "immaterial or insubstantial."

The court in *Bedford Affiliates v. Sills*, concluded in part that it would have elevated form over substance to require strict adherence to the public comment requirements under the facts of that case, where the parties did not dispute the quality or costs of the cleanup.  156 F.3d 416, 428 (2d Cir. 1998) (since "none of the parties

to the action disputes the quality or cost of Bedford's cleanup efforts, to preclude its recovery solely because of the lack of public comment would ignore the equitable component that Congress and the EPA built into cleanup costs decisions."); (Borough/Daibes Br., p. 41). The case before this Court is dramatically different. The Borough seeks reimbursement of over $20 million in remediation costs from Defendants. That figure is more than *sixty times* what Arconic's experts estimated should have been the cost to remediate any contamination from Building 12 debris at Veterans Field. (Certification of Charles F. Rysavy, dated September 11, 2020 ("Rysavy Cert. I"), ¶ 33, Ex. 31). It is far from certain that the citizens of Edgewater would have approved the remediation plan chosen by the Mayor and Borough Council had they been provided with: details of that plan *including estimated costs;* details of substantially less costly alternatives that nonetheless satisfied DEP regulations; and an explanation that they will have to foot the bill for the remediation if the Borough does not succeed in its recovery action. It would be far from elevating form over substance in these circumstances to require the Borough to give the public notice and opportunity to provide meaningful input on the choice of remedial alternatives.

The court in *Garrett Day LLC v. International Paper Co.*, found that "certain preliminary investigation and monitoring costs . . . are recoverable by private parties regardless of compliance with the NCP." 2016 U.S. Dist. LEXIS 25494, *16 (S.D.

Oh. 2016); (Borough/Daibes Br., p. 41). The court's finding did not address remedial actions, for which both CERCLA and courts interpreting the statute require consistency with the NCP for a private party to recover costs. *See, e.g., Amland Properties Corp.* 711 F. Supp. at 795-96 (although NCP provisions do not apply to "preliminary monitoring and evaluation costs," consistency with the NCP is required to recoup costs incurred in remedial actions). The costs at issue here are not limited to investigation and monitoring costs, and include all costs related to the Borough's remediation of Veterans Field.

Finally, the Borough cites *Hatco Corp v. W.R. Grace & Co. Conn.*, as support for the proposition that "several courts" have found "some form" of a community relations plan to be sufficient for meaningful public participation. 849 F. Supp. 931, 970 (D.N.J. 1994); (Borough/Daibes Br., p. 43). Aside from the fact that one case is not "several," the costs at issue in *Hatco* stemmed from a removal action, not a remedial action, and thus has different requirements under the NCP. As Judge Debevoise explained in a later case:

> [Defendant] cannot rely upon *Hatco Corp. V.W.R. Grace & Co.–Conn.*, 849 F.Supp. 931 (D.N.J.1994) ("*Hatco IV*") to excuse its failure to comply with the community relations provisions of the 1990 NCP. *Hatco IV* dealt with a removal, not a remedial action, and it dealt with a failure to develop a community relations program in the context of the 1985 NCP which did not require the development of such a program in connection with removal actions. By way of contrast, the 1990 NCP requires community relations efforts with respect to both removal and remedial actions.

*Dexter*, 1997 WL 557637 at *23. *See also Amland Props. Corp.*, 711 F. Supp. at 795 ("[W]hereas removal actions need only comply with relatively simple NCP requirements . . . remedial actions must comport with the more detailed procedural and substantive provisions of the NCP."). In fact, the "meaningful public participation" requirement under 40 C.F.R. § 300.430(f) is not even referenced in the *Hatco* court's decision. Therefore, *Hatco*, like the other cases cited by the Borough, do not support its argument that adherence to the public comment provisions of the NCP is only "suggested," not required, for the Borough's response action to be "consistent with" the NCP.

> 2.   *The Borough failed to provide an opportunity for "meaningful" public participation in the selection of the remedial action.*

In arguing that the public received sufficient notice and opportunity for comment on the remediation of Veterans Field, the Borough points to meeting minutes, signs, correspondence, and press releases. But as explained in detail in Section (I)(B)(2) of Arconic's Motion, the evidence shows that the Borough did not make available for public comment a report describing the preferred remedy along with alternatives, or give the public at least thirty days' advance notice to make oral and written comments on the proposed plan. Similarly, the public was not provided with information that would allow it to consider and offer meaningful input on alternative remedies. Finally, there is nothing on the Borough's website or in any of the documents produced by the Borough (other than unsupported affidavits from

Greg Franz and Thomas Bambrick) supporting the Borough's contention that the public "favored remediating Veteran's Field to a strict standard." (Borough/Daibes Br., p. 44).

Notably, the Borough refers repeatedly to documents dating back to 2012 as "proof" that it complied with the public comment requirement for remediation. (Borough/Daibes Br., pp. 43, 48). But all remediation performed at Veterans Field before March 2013 was related to contamination found in historic fill at the site, and was complete before Waterside even began demolition of Building 12. (Rysavy Cert. I, ¶ 3, Ex. 1, at 2). As such, any opportunity for public comment that may have existed in connection with the earlier remediation is irrelevant to this cost recovery action, which stems *solely* from Waterside's alleged placement of crushed concrete from Building 12 on Veterans Field in 2013.

3. *The Borough cannot rely on EPA, NJDEP, or LSRP oversight as a substitute for the public comment requirements of the NCP.*

Contrary to the Borough's assertion, courts throughout the Third Circuit, including this Court, have held that a government agency's involvement in a remedial action is *not* a substitute for complying with the NCP. *See Amland Properties Corp.*, 711 F. Supp. at 801 ("[T]he NCP itself mandates that, even when a cleanup is being conducted by EPA or a state agency such as DEP, a public comment period [must] be implemented."); *Bethlehem Iron Works, Inc. v. Lewis Indus., Inc.*, No. CIV.A. 94-0752, 1996 WL 557592, at *60 (E.D. Pa. Oct. 1, 1996)

28

("Courts have consistently held that the failure to provide an opportunity for public comment renders the response action inconsistent with the NCP and precludes recovery of costs."); *County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1512 (10th Cir. 1991) (plaintiff's failure to provide an opportunity for public comment on a remedial action barred its recovery under CERCLA despite the fact that its cleanup plan was approved by the state agency); *Sherwin-Williams Co v. City of Hamtramck*, 840 F. Supp. 470, 479 (E.D. Mich. 1993) ("The regulations clearly contemplate participation by the general public. . . . Using state regulators as a substitute . . . is contrary to the letter and the spirit of the regulations.").

Although courts in certain other jurisdictions have concluded participation by a public agency is sufficient to demonstrate compliance with the NCP public comment requirement, they reached this conclusion only when the evidence revealed "comprehensive" agency involvement in the cleanup. *See, e.g.*, *Bedford Affiliates*, 156 F.3d at 428 (state environmental agency, "charged with the protection of the public environmental interest," substantially involved in the formulation and execution of the remediation plan, serving identical purpose of public notice); *VME Americas, Inc. v. Hein-Werner Corp.*, 946 F. Supp. 683, 692 (E.D. Wis. 1996); *City of Oakland v. Nestle USA, Inc.*, No. C-98-3963 SC, 2000 WL 113066, at *3 (N.D. Cal. Aug. 8, 2000) ("[T]he notification of the regulatory authorities about the

cleanup was not enough to obviate the need for public comment because the evidence presented does not show these agencies' input to be 'comprehensive.'").[5]

Other courts have relied on the fact that an agency's process itself included opportunities for public comment to find that the agency's involvement fulfilled the purpose of the NCP. *See Amcast Industrial Corp. v. Detrex Corp.*, 779 F. Supp. 1519, 1537 (N.D. Ind. 1991) (NCP public participation requirement fulfilled because state environmental agency gave public notice and received public comments before issuing NPDES permit for cleanup); *Caldwell Trucking Prp Grp. v. Pullman Co.*, 2002 U.S. Dist. LEXIS 28410, at *89-*91 (D.N.J. Nov. 21, 2002) (EPA's consent to remedial activities accompanied by "evidence that the public [ ] participated at all stages of the . . . response efforts at the Site."); *Estes v. Scotsman Group, Inc.*, 16 F. Supp. 2d 983, 991 (C.D. Ill. 1998) ("Cases allowing public agency involvement to be substituted for public comment have only allowed such a substitution if the public is provided an ample opportunity for comment and there is substantial involvement throughout the cleanup by a state agency."). Notably, *any* level of agency involvement will not suffice to extinguish a party's obligation to comply with NCP public requirements. If this were true, "minimal contact with state officials would

---

[5] The Borough also relies on *Hatco Corp.*, which once again is inapplicable because the response costs incurred there were for a removal action, not a remedial action. 849 F. Supp. at 968. *See supra* pp. 26-27.

permit a party to avoid" ever needing to involve the public to select the appropriate remedial action and evaluate remedial alternatives. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 287 F. Supp. 2d 1118, 1168 (C.D. Cal. 2003).

Here there is no evidence of the EPA's or NJDEP's active involvement in the remediation plan.  More specifically, there is no evidence that the EPA or NJDEP assessed the site or evaluated alternate remedial responses, participated in implementing the remediation work, or oversaw or monitored the work in any way. While the Borough claims NJDEP and EPA "approved" the remedial action activities (Borough/Daibes Br., p. 47), this does not amount to comprehensive input or active involvement in the planning, investigation or remediation phases.  There is also no evidence that either the EPA or NJDEP afforded the public opportunity for comment or involvement.  There is also no evidence that the NJDEP or EPA involvement provided opportunity for public comment.

Finally, the Borough makes the unsupported assertion that an LSRP's involvement in the remediation of Veterans Field satisfies the public comment requirement.  The Borough cites no case law (and Arconic is aware of none) even suggesting that the participation of an LSRP satisfies the public comment requirement of the NCP.  If the Borough's theory were accurate, no remediating party in New Jersey would ever need to provide an opportunity for public comment because *every* voluntarily site remediation must be overseen by an LSRP.  *See New*

*Jersey Dep't of Envtl. Prot. v. Amerada Hess Corp.*, 323 F.R.D. 213, 226 (D.N.J. 2017).

The two cases that the Borough cites, *Morristown Assocs. v. Grant Oil Co.*, 220 N.J. 360, 378 n.5 (2013), and *Des Champs Labs, Inc. v. Martin*, 427 N.J. Super. 84, 99 (App. Div. 2012), do not make any references to an LSRP's role in the context of NCP compliance. Both cases merely recite the general requirement for LSRP supervision of a remediation in New Jersey.

Accordingly, the Borough's attempt to show it complied in any meaningful respect with the public comment requirements in its selection of a response action must be rejected. The Borough is not entitled to summary judgment in its favor on its CERCLA claim. Quite the opposite—summary judgment should be entered dismissing the claim.

## III. Arconic is not liable to the Borough under the Spill Act because it is not "in any way responsible" for the discharge of hazardous substances at Veterans Field.

The Spill Act imposes responsibility for the costs of environmental remediation on any person who has "discharged a hazardous substance" or who is "in any way responsible for a discharged hazardous substance." *See* N.J.S.A. 58:10-23.11f(a)(2). A "discharge" under the Spill Act occurs when there is a "release into the air, water or land of a hazardous or toxic substance." *Atl. City Mun. Utilities Auth. v. Hunt*, 210 N.J. Super. 76, 96 (App. Div. 1986).

The Borough does not argue that Arconic is a party that "discharged a hazardous substance" at Veterans Field, because it cannot. Instead, the Borough focuses its argument on the notion that Arconic is "in any way responsible" for the discharge of "hazardous substances" onto Veterans Field. (Borough Spill Br., pp. 14-26).

Although broad, the Spill Act's liability scheme is not without limits. The Borough correctly points out that the Spill Act requires some "nexus" to tie "the discharger to the discharge." (Borough Spill Br., p. 18) (citing *N.J. Dep't of Envt'l Prot. v. Dimant*, 212 N.J. 153, 177 (2012)). *See also New Jersey Sch. Dev. Auth. v. Marcantuone*, 428 N.J. Super. 546, 558-59 (App. Div. 2012) (at a minimum, there must be "some connection between the discharge complained of and the discharger"); *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 106 (3d Cir. 1999) ("one cannot be 'responsible' for a hazardous substance without having some connection to the site on which that substance was deposited."). Where a party "was not directly responsible for the discharge that had occurred," the plaintiff must prove that the party "nevertheless had some control over the direct discharger." *Dimant*, 212 N.J. at 176 (citing *Marsh v. New Jersey Dept. of Envtl. Protec.*, 152 N.J. 137, 139-41 (1997); *State Dept. of Environmental Protection v. Ventron*, 94 N.J. 473 (1983); *In re Kimber Petroleum Corp.*, 110 N.J. 69 (1988)).

The Borough attempts to supply the "nexus" required for Spill Act liability by arguing that: (1) Arconic caused the PCB contamination in Building 12, and then sold it knowing that it would need to be demolished and the contaminated materials within it disposed of properly; and (2) Arconic continued to "maintain control" over Building 12 and the demolition and disposal process long after it sold the building. (Borough Spill Br., pp. 14-26).  The Borough is wrong on both counts.

A. **Arconic's operations in Building 12 did not supply the requisite connection between Arconic and the discharge of hazardous substances by Waterside at Veterans Field.**

"[T]he Spill Act is not so broad as to impose liability on a producer of a hazardous substance merely because it produced the hazardous substance." *United States v. Manzo*, 182 F. Supp. 2d 385, 413 (D.N.J. 2000).  The Borough recognizes this, once again acknowledging that it must prove "some connection" between the discharge and the allegedly responsible party.  (Borough Spill Br., p. 18) (citing *Dimant*, 212 N.J. at 177).  "That nexus is what *ties the discharger to the discharge* that is alleged to be the, or a culprit in, the environmental contamination in issue." *Id.* (emphasis added).

Here, the connection between the discharger—Waterside—and the discharge—the placement of contaminated materials at Veterans Field—is undisputed.  The Borough, however, is not content with imposing Spill Act liability on the direct discharger and parties with control over the direct discharger (Hudson

34

Spa, which hired Waterside to do the work, and North River, which had sole ownership, control, and responsibility for Building 12). The Borough attempts to reach Arconic on the theory that it once owned Building 12 and conducted operations there that ceased more than fifty years earlier. (Borough Spill Br., p. 20). This is a bridge too far.

First, as previously noted, a party that was not itself directly responsible for a discharge may only be held liable under the Spill Act if it "nevertheless had some control over the direct discharger." *Dimant*, 212 N.J. at 176. Arconic had no connection to Waterside, the direct discharger. Arconic did not hire or supervise Waterside. Nor did Arconic exercise any control over Waterside, or have either the *authority* or the *opportunity* exercise any control over Waterside. As explained in detail in Section I(A), *supra*, and in Arconic's Motion, the Environmental Indemnity Agreement terminated any tie there may have been between Arconic and Building 12. (Arconic Br. at 5-6) More specifically, it made it clear that Arconic would have no say or involvement in what North River did with Building 12, including the *possible* future demolition and remediation of the building. After the EIA was signed, thirteen years passed. North River then leased the Building to Defendant Hudson Spa. Hudson Spa then hired Waterside to demolish Building 12. Waterside then demolished Building 12. And Waterside then allegedly discharged hazardous

material from Building 12 at Veterans Field.  This 'House that Jack Built'[6] string of events does not describe a connection between Arconic and Waterside; it describes a *lack* of connection between the two.  It certainly does not prove that Arconic had any control whatsoever over Waterside.

Second, prior ownership of a site, without more, is not a sufficient basis to warrant Spill Act liability.  *See Voellinger v. Electro-Coatings, Inc.*, A-2261-09T3, 2012 WL 1548060, at *8 (App. Div. June 29, 2011) (allegations of party's prior ownership and operations alone not sufficient to impose Spill Act liability).

Third, it is far from undisputed that Arconic's operations in Building 12 were the source of the PCB contamination in the building materials. Because Arconic ceased its operations in Building 12 in 1965, and relatively few records survive from that period, there is little evidence on whether PCB-containing materials were used in the operations that took place in Building 12.  What evidence does exist, however, is equivocal at best.  Kevin McKnight, Arconic's Director of Environmental Remediation, testified to his belief that the PCB contamination at the Alcoa site was

---

[6] "This is the farmer sowing his corn, That kept the cock that crow'd in the morn, That waked the priest all shaven and shorn, That married the man all tatter'd and torn, That kissed the maiden all forlorn, That milk'd the cow with the crumpled horn, That tossed the dog, That worried the cat, That killed the rat, That ate the malt, That lay in the house that Jack built." *The Nursery Rhymes of England: Collected Chiefly from Oral Tradition*, 4th edition (London: John Russell Smith, 1846), no. 398, pp. 175-78.

due to transformers throughout the facility, which contained PCB fluids, that he

observed as having been broken into during the years in which Arconic had neither

ownership nor control of the site:

> [Mr. McKnight:] in my role as the director of environmental remediation, my task was to manage the property that we owned.
>
> Q.     Okay.
>
> A.     My suspicion is that we had transformers on site that probably, when purchased, contained PCB fluids. And during the period when we were not in control of the property, those transformers were probably broken into and the copper material inside was stolen . . . .  And that's probably how – that's at least one theory on how PCBs might have moved from the transformer to the building.
>
> . . .
>
> I recall walking the facility during some period of time and I recall seeing transformers that had been broken into.  It's largely why I had the theory around the contamination being associated with transformers.
>
> So when I walked the site, we saw various transformers that had been broken.  Apparently, people had stolen the copper that was inside the transformers, and so all of the oil that had been in the transformers had leaked out. [7]

Mr. McKnight's testimony was corroborated by the sworn statement of James

Anderson, a security guard at the site between Alcoa's cessation of operations in

---

[7] (Arconic RSUMF, ¶ 16(e); Certification of Charles F. Rysavy, dated November 6, 2020 ("Rysavy Cert. II") ¶ 16, Ex. 14 & Ex. 15).

1965 and its sale of the property in 1968.  Mr. Anderson recalled that the transformers at the site were intact when Alcoa sold the property: "Electrical transformers which were located throughout the buildings were left in the plant and were intact when he left in February 1968.  These transformed were all locked and sealed and appeared to be in good condition." [8]  Mr. Anderson also affirmed that he had reviewed photographs taken in February 1968, which showed that "the plant was in good condition – it was reasonably clean, there were no puddles of oil or fluid spills on the floors . . . ."[9]  Claiborne Pittman, the only witness to testify as to the presence of PCB-containing transformers in Building 12, testified that there had been no transformer oil spills prior to the sale of the Alcoa site in 1968:

> Q.    Are you aware or have you ever heard of any transformer spills, leaks or ruptures that occurred at the Edgewater plant while Alcoa was operating that plant?
> A.    No.[10]

Thus, the broken transformers and spilled PCB-containing transformer fluids that Mr. McKnight observed did not occur during Arconic's ownership of the site.  In light of this evidence, whether Arconic was the only source, or even *a* source, of the

---

[8] (Arconic RSUMF, ¶ 16(e); Rysavy Cert. II, ¶ 18, Ex. 16).

[9] (Arconic RSUMF, ¶ 16(e); Rysavy Cert. II, ¶ 18, Ex. 16).

[10] (Arconic RSUMF, ¶ 16(e); Rysavy Cert. II, ¶ 20, Ex. 18).

PCB contamination within Building 12, is at best a disputed issue of fact that precludes summary judgment in the Borough's favor on its Spill Act claim.[11]

Finally, the Borough incorrectly claims that Arconic sold the property knowing that Building 12 would need to be "demolished, removed, and disposed." (Borough Spill Br., pp. 19-20; Borough SUMF, ¶¶ 26, 119, 121).  As discussed at length in Section I(A) above, the provisions in the MPAA regarding the process by which North River was to demolish all buildings at the site, and properly dispose of contaminated materials, were extinguished as to Building 12 by the EIA.  The need for the EIA was triggered by Mr. Daibes' decision *not* to demolish Building 12 and instead to put it to use.  Thus, the evidence is undisputed that, when Arconic entered into the EIA, it *did not* know that the building would ever need to be "demolished, removed, and disposed."

### B.  Arconic did not maintain "control and responsibility" over Building 12 or the hazardous substances discharged at Veterans Field.

The Borough argues that Arconic is also liable under the Spill Act because of its "continued control and responsibility for the contaminated Building 12."

---

[11] Although not obviously relevant to its Spill Act claim, the Borough incorrectly asserts that Building 12 was the only source of PCB contaminated materials brought to the Veterans Field site.  (Borough Spill Br., p. 20).  This too is a disputed issue of fact.  *See* Arconic's Statement of Material Facts in Response to Borough of Edgewater, ECF No. 330 (Mar. 2, 2020) (Case 2:14-CV-05060) (Arconic RSUMF ¶¶ 119-21.

(Borough Spill Br., p. 21).  This is incorrect, and none of the arguments the Borough makes on this point hold water.

First, there is no dispute that Arconic did not own or possess Building 12 at the time it was demolished.

Second, Arconic had no control over the direct discharger.  (Borough Spill Br., p. 21).  As shown in Section I(C), *supra*, Arconic had no relationship with, much less control over, Waterside.  Indeed, there is no evidence that Arconic was aware that Waterside even existed before Arconic was named as a defendant in this lawsuit. The cases cited by the Borough on this point, *Marsh*, 152 N.J. 137, *Ventron*, 94 N.J. 473, and *Kimber,* 110 N.J. 69 (Borough Spill Br., pp. 20-26), do not support its argument.  In each of those cases, the defendant was not directly responsible for a discharge but nonetheless controlled the property or had "some control over the direct discharger." *Dimant*, 212 N.J. at 176.

For example, *Ventron*, 94 N.J. 473, and *Kimber*, 110 N.J. 69, involved parties that had control over the direct dischargers by virtue of being the parent companies of the direct dischargers. *Dimant*, 212 N.J. at 176-77.  No one contends that Arconic held any type of relationship, let alone a parent-subsidiary relationship, with Waterside.

Third, Arconic did not have control of, or responsibility for, either Building 12 or the Veterans Field site at the time of the discharge (Borough Spill Br., p. 21).

40

This is in direct contrast to *Marsh*, 152 N.J. 137, which involved an "innocent landowner" who, unbeknownst to her, had an underground tank emitting pollutants in her land.  The court concluded that the landowner was "in any way responsible" for the discharge because she "owned or controlled the property at the time of the pollution." *Id.* at 146-47.

It is undisputed that Arconic never had any control over the Veterans Field site.  And Arconic had not had control of, or responsibility for, Building 12 or any hazardous materials within it for more than thirteen years prior to the building being demolished and its contaminated rubble discharged at Veterans Field.  Indeed, assuring that Arconic had no such control or responsibility was the specific purpose of the EIA.  (SUMF ¶¶ ¶ 33-38; Parker Cert. ¶ 18, Ex. 17).

The Borough mischaracterizes the EIA by claiming it "did not alter the requirements set forth by the Alcoa Entities for the treatment and/or disposal of the Building 12 waste," and that "through the Indemnity Agreement, the Alcoa Entities were further exercising their control over the contamination by dictating how it should be addressed in the future."  (Borough Spill Br., p. 32 n.6).  The reality is the exact opposite.  As was explicitly stated in the EIA, North River had decided not to demolish Building 12.  (Arconic SUMF ¶¶ 33-40).  Because Alcoa did not know when it entered into the EIA whether North River would *ever* demolish Building 12, North River agreed that it would be solely responsible, both factually and legally,

for the future demolition, if any, and for the disposal of any contaminated materials. (SUMF ¶¶ 38-40, 53-54; Parker Cert. ¶ 3, Ex. 2; Parker Cert. ¶ 5, Ex. 4; Parker Cert. ¶ 4, Ex. 3; Parker Cert. ¶ 16, Ex. 15; Parker Cert. ¶ 18, Ex. 17; Parker Cert. ¶ 28, Ex. 27).

The Borough's characterization of the Deed Notice and the NJDEP's No Further Action letter, as requiring Arconic to submit written certifications to the NJDEP concerning the "maintenance of institutional and engineering controls" over the site, overstates the document and its own SUMF. (*Compare* Borough SUMF ¶¶ 61-63 *with* Borough Spill Br., p. 5). The Deed Notice itself makes no mention of Arconic being required to take *any* action. (Parker Cert. ¶ 19, Ex. 18).

As for the NFA, the Borough repeatedly mischaracterizes it as a finding by the NJDEP that Arconic remained responsible for maintaining Building 12 and liable for contamination at the site. (Borough Spill Br. 5-6, 22-23). In reality, the NFA could not possibly have required Arconic to remain responsible for a site it sold years earlier. For Arconic to perform any of the purported duties the Borough ascribes to it pursuant to the NFA, Arconic would have needed to trespass onto the site. This was made clear in Mr. Daibes' September 4, 2003, letter to the NJDEP returning a signed copy of the NFA. (Rysavy Cert. ¶ 27, Ex.25).[12] That letter noted that

---

[12] The Borough's description of the NFA as tasking Arconic with the "maintenance of institutional and engineering controls" is materially different from the way it described the document in its SUMF. (Compare Borough SUMF ¶ 63 with Borough

Arconic "has not executed the NFA and their name has been intentionally stricken from the letter," because Arconic believed it could not "take on the monitoring and reporting procedures and obligations set forth in the NFA." *Id.* The reason was simple: "They are no longer the owner and exercise no control over the property." *Id.* The NJDEP did not respond to Mr. Daibes' letter by requiring that Arconic sign the NFA. Consistent with this, the NJDEP directed no further correspondence to Arconic regarding the site, and the NJDEP's September 17, 2010 letter authorizing the Daibes Defendants to terminate the Building 12 Deed Notice (which was central to the NFA) was not addressed to, nor did it cc, Arconic. (Arconic SUMF ¶ 48, Parker Cert. ¶ 22, Ex. 21). In fact, Arconic is not even mentioned in the letter. *Id.* Thus, when considered in context, the NJDEP did *not* view Arconic as responsible for maintaining Building 12 and liable for contamination at the site going forward.

The Borough also points to Arconic's supposed "continuous activities" at the site. (Borough Spill Br., pp. 23-25). The Borough contends that Arconic had "continuous communications with the NJDEP, prepar[ed] and approv[ed] remedial

---

Spill Br. 5-6, 22-23). As such, Arconic respectfully requests that the Court take notice of the September 4, 2003 letter produced by the Borough (EW 0437 – EW 04312), disputing the Borough's description of the NFA. In the alternative, Arconic respectfully requests permission to introduce the document as part of a supplemental submission pursuant to Local Rule 56.1.

reports for the Alcoa Site, attend[ed] public outreach meetings regarding the buildings' demolition, and executed [a] Memorandum of Agreement with the NJDEP regarding the remediation of the Alcoa Site." (Borough Spill Br., pp. 23-24; Borough SUMF ¶ 64). But the Borough fails to mention that all but one of the "continuous activities" took place *two years before the parties entered into the EIA*. Therefore, any supposed "continuous activities" did not involve Building 12, because the EIA specifically carved Building 12 out of the rest of the site and terminated any MPAA responsibilities as they may have applied to Building 12. The single "continuing activity" the Borough cites that took place after the EIA was signed was the release of the final $500,000 held in escrow. But as explained in Section I(C), *supra*, the release of those funds was not for demolition or remediation of Building 12 because the parties still understood that Mr. Daibes intended to put Building 12 to beneficial use *and not demolish it* when the funds were released.

The Borough also neglects to mention that Arconic disputed many of the allegations in ¶ 64 of its SUMF, and specifically disputed that any of those allegations demonstrated "continued participation in the remediation of the site." (Arconic RSUMF ¶ 64).

Finally, the Borough argues that Arconic knew that Building 12 was still extensively contaminated and would need to be remediated. (Borough Spill Br., p. 25). The Borough cites to nothing in the Spill Act or in the case law indicating that

the sale of a building that the seller—and the buyer—know contains hazardous materials, without more, gives rise to liability under the Spill Act.  Moreover, there is no evidence that Arconic knew the building would need to be further remediated.[13] On the contrary, the floor panels containing PCBs in concentrations requiring disposal at a TSCA-approved site had been removed, and the NJDEP had signed off on North River and RRIP's proposal to encapsulate the PCBs that remained in the building walls.  (SUMF ¶ 31; Parker Cert. ¶ 13, Ex. 12).  There is no evidence that the encapsulation would not have remained a sufficient remedial measure had Mr. Daibes used Building 12 as a garage, as he advised Arconic was his plan.

For these reasons, the Borough is not entitled to summary judgment on its Spill Act claims.

---

[13] The Borough also claims that Arconic knew that "PCB concentrations within Building 12 far exceeded the TSCA 50 ppm standard and that the building could not be reused."  (Borough Spill Br., p. 25).  In support of this assertion, the Borough cites to two letters by Enviro-Sciences, one addressed to Daibes Enterprises and one to NJDEP, in support of its argument.  (Borough SUMF ¶¶ 69-70).  Arconic is not the recipient of either letter and is not shown as a cc on either one.  It is unclear how the Borough contends that either of these letters proves Arconic's knowledge about anything at the Building 12 site.

## <u>CONCLUSION</u>

For the foregoing reasons, the Borough's Motions for Summary Judgment against Arconic should be denied in all respects.

Dated:  November 6, 2020

<div style="margin-left: 50%;">

Respectfully submitted,

**K&L GATES LLP**

By: *<u>/s/ Michael E. Waller</u>*
    Michael E. Waller
    Charles F. Rysavy
    Dana B. Parker
    One Newark Center, Tenth Floor
    Newark, New Jersey 07102
    Tel:  (973) 848-4000
    michael.waller@klgates.com
    charles.rysavy@klgates.com
    dana.parker@klgates.com
    *Attorneys for Arconic Inc. (f/k/a*
    *Alcoa Inc.) and Arconic Domestic,*
    *LLC (f/k/a Alcoa Domestic LLC, as*
    *successor in interest to A.P. New*
    *Jersey, Inc.)*

</div>