## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER,<br>        Plaintiff,<br><br>v.<br><br>WATERSIDE CONSTRUCTION, LLC; 38<br>COAH, LLC; DAIBES BROTHERS, INC.;<br>NORTH RIVER MEWS ASSOCIATES, LLC;<br>FRED A. DAIBES; TERMS<br>ENVIRONMENTAL SERVICES, INC.;<br>ALCOA, INC. (f/k/a "Aluminum Company of<br>America"); ALCOA DOMESTIC, LLC, as<br>successor in interest to A.P. NEW JERSEY, INC.;<br>JOHN DOES 1-100; and ABC CORPORATIONS<br>1-100,<br>        Defendants,<br><br>and<br><br>WATERSIDE CONSTRUCTION, LLC; 38<br>COAH, LLC; DAIBES BROTHERS, INC.;<br>NORTH RIVER MEWS ASSOCIATES, LLC;<br>and FRED A. DAIBES,<br>        Defendants/Third-Party Plaintiffs,<br><br>v.<br><br>NEGLIA ENGINEERING ASSOCIATES,<br>        Third-Party Defendants,<br><br>and<br><br>ALCOA DOMESTIC, LLC, as successor in<br>interest to A.P. NEW JERSEY, INC.,<br>        Defendant/Third-Party Plaintiff,<br><br>v.<br><br>COUNTY OF BERGEN and RIVER ROAD<br>IMPROVEMENT PHASE II, INC., and<br>HUDSON SPA, LLC,<br>        Third-Party Defendants. | Civil Action No.: 2:14-cv-05060<br>(JMV-JBC) |

NORTH RIVER MEWS ASSOCIATES, LLC
and 38 COAH ASSOCIATES,

      Plaintiffs,

v.

ALCOA, INC., ALCOA DOMESTIC, LLC, as
successor in interest to A.P. NEW JERSEY, INC.,

      Defendants,

v.

RIVER ROAD IMPROVEMENT PHASE II,
INC., *et al*.

Civil Action No.: 2:14-cv-8129
(MCA) (LDW)

1

**MEMORANDUM OF LAW OF THE WATWRSIDE PARTIES IN OPPOSITION TO ALCOA'S MOTION FOR SUMMARY JUDGMENT**

SHAFRON LAW GROUP, LLC
2 University Plaza, Suite 400
Hackensack, NJ  07601
(201) 342-6000
*Attorneys for Defendants/Counterclaimants Waterside Construction, LLC; 38 COAH. LLC; North River Mews Associates, LLC.; Fred A. Daibes, and Third-Party Defendant River Road Improvement Phase II, Inc.*

*Of Counsel and on the Brief:*
Jason T. Shafron, Esq.

*On the Brief:*
Zachary T. Bernstein, Esq.

i

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 2

    Alcoa Site Background ........................................................................................................ 2

    Veteran's Field Background ................................................................................................. 7

    Discovery of UTSs.............................................................................................................. 10

LEGAL ARGUMENT.............................................................................................................. 12

    I.    LEGAL STANDARD FOR RULE 56 MOTION ................................................... 12

    II.   THE INDEMINTY PROVISIONS ARE UNENFORCEABLE .............................. 12

    A.   Alcoa May Not Seek Indemnity Due To Alcoa's Fraudulent Conduct ................... 13

    B.   The Indemnity Agreement Is Unenforceable As It Was Enter Into Based on Mutual Mistake........................................................................................................ 16

    III.  ALCOA MAY NOT MAKE ANY CLAIMS UNDER THE CONTRACTS DUE TO ITS BREACH OF THE CONTRACT ..................................................................... 17

    IV.  THE EXPRESS TERMS OF THE CONTRACTS DO NOT RELEASE ALCOA FROM WATERSIDE CONSTRUCTION, 38 COAH, DAIBES BROTHERS AND FRED DAIBES CLAIMS AS THEY WERE NOT PARTIES TO THE AGREEMENTS WITH ALCOA................................................................................... 18

    V.   ALCOA MAY NOT MAKE ANY CLAIMS UNDER THE CONTRACTS AS THEY WERE FRAUDULANTLY INDUCED BY ALCOA. ............................................... 18

    VI.  ALCOA IS AN ARRANGER AND LIABLE PARTY UNDER CERCLA ............ 20

CONCLUSION......................................................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

*Berman v. Gurwicz,*
189 N.J. Super. 89 (Ch.Div. 1981) ...................................................................... 19

*Burlington N. & Santa Fe Ry. Co. v. United States*,
556 U.S. 499 (2009).............................................................................................20, 21

*Fisher Dev. Co. v. Boise Cascade Corp.*,
37 F.3d 104, (3d Cir. 2005).............................................................................13, 14, 16

*Gennari v. Weichert Co. Realtors*,
148 N.J. 582 (1997) ............................................................................................ 18

*GKE Enters., LLC v. Ford Motor Credit Co. LLC USA*,
2010 U.S. Dist. LEXIS 53714 (D.N.J. May 26, 2010) ..................................... 18

*Gleason v. Norwest Mortg., Inc.*,
243 F.3d 130 (3d Cir. 2001)................................................................................ 18

*Hatco Corp. v. W.R. Grace Co.*
59 F.3d 400 (3d Cir. 1995)................................................................................. 12

*Ingram Corp. v. J. Ray McDermott & Co.*,
698 F.2d 1295 (5th Cir. 1983) ........................................................................... 19

*Jackson v. Fauver*,
334 F. Supp. 2d 697 (D.N.J. 2004) .................................................................... 12

*Magnet Res., Inc. v. Summit MRI, Inc.*,
318 N.J.Super. 275 (App.Div.1998). .................................................................. 17

*Ramapo Bank v. Bechtel*,
224 N.J. Super. 191 (App.Div.1988) .................................................................. 19

*RNC Sys., Inc. v. Modern Tech. Grp., Inc.*,
861 F. Supp. 2d 436 (D.N.J. 2012) .................................................................... 17

*Strawn v. Canuso*,
140 N.J. 43 (1995) .............................................................................................. 18

*Town of Islip v. Datre*,
245 F. Supp. 3d 397 (E.D.N.Y. 2017) ............................................................... 20

## STATUTES

42 U.S.C. § 9607(a)(3)...............................................................................................20

**RULES**

Fed. R. Civ. P. 56(a) ..................................................................................................... 12

**TREATISES**

12 S. Williston, *A Treatise on the Law of Contracts* § 1488 (3d ed. 1970) .......................... 19

2 E. Allen Farnsworth, *Farnsworth on Contracts,* § 9.3 ..................................................... 16

37 Am.Jur.2d *Fraud and Deceit* §§ 8, 12 (1968) ............................................................... 19

37 C.J.S. *Fraud* § 64 (1943) .............................................................................................. 19

*Restatement (Second) of Contracts* §§ 164, 167 (1979) .................................................... 19

## PRELIMINARY STATEMENT

Defendants/Counterclaimants Waterside Construction, LLC, 38 COAH LLC. North River Mews Associates, LLC. Fred A. Daibes (hereinafter collectively the "Waterside Parties"), submit this Memorandum of Law in opposition to Alcoa Domestic, LLC and A.P. New Jersey, Inc. (hereinafter collectively the "Alcoa") motion for Summary Judgment pursuant to Rule 56 (hereinafter the "Alcoa's Motion").

Alcoa's motion seeks summary judgment against the Waterside Parties Cross-claims and seeks defense and indemnity from North River Mews, Associates, LLC.   Alcoa's Rule 56 motion relies on facts that are not only in dispute, but unsupported facts that are directly contradictory to the factual record, and broadly misapplies the statutory and case law.

As such, there are significant factual and legal issues with respect to the Alcoa's motion, and therefore inappropriate for resolution on a Fed.R.Civ.P. 56 motion for Summary Judgment.  Ultimately, the Alcoa's Motion does not meet the high standard that governs Rule 56 motions for summary judgment and should be denied in its entirety.

## STATEMENT OF FACTS

The Waterside Parties hereby incorporate by reference their Additional Statement of Undisputed Material Facts (hereinafter "*SOMF*") and the Certification of Jason T. Shafron (hereinafter "*Shafron Cert.*") and accompanying exhibits submitted therein in support of the Waterside Parties opposition to the instant motion.

### Alcoa Site Background

Alcoa is a prior owner and operator of an industrial aluminum manufacturing facility on the former Alcoa Property located at 700 River Road in Edgewater, New Jersey (the "former Alcoa Property"). *Shafron Cert.* ¶ 2,3; *SOMF* ¶ 1. Alcoa operated the facility, producing manufactured aluminum products, such as aluminum foil, consumer products and aircraft parts, from 1914 through 1965. *Shafron Cert.* ¶ 3; *SOMF* ¶ 2. Alcoa constructed Building 12 on the former Alcoa Property in 1938. *Shafron Cert.* ¶ 3; *SOMF* ¶ 3. Building 12 was utilized for purposes related to Alcoa's ingot milling and hot rolling mill operations. *Shafron Cert.* ¶ 4; *SOMF* ¶ 4.

During Alcoa's operation at the former Alcoa Property, Alcoa purchased oils containing Polychlorinated Biphenyls ("PCBs") for use at the former Alcoa Property. *Shafron Cert.* ¶ 5,6; *SOMF* ¶ 5. Machines located in Building 12 were designed to use PCBs. *Shafron Cert.* ¶ 2,7; *SOMF* ¶ 6. Alcoa employees identified machines and process that utilized PCBs in Building 12. *SOMF* ¶ 7.

In 1968, Alcoa sold the former Alcoa Property to Irving Maidman. *Shafron Cert.* ¶ 8; *SOMF* ¶ 8. In 1974, Irving Maidman transferred the former Alcoa Property to Tri-Terminal, Corp. *Shafron Cert.* ¶ 9; *SOMF* ¶ 9. In 1978, Tri-Terminal Corp. defaulted on a mortgage to Citibank and gave a deed in lieu of foreclosure to Citibank's affiliate 700 River Road Corp. *Shafron Cert.* ¶ 9; *SOMF* ¶ 10. In 1978, 700 River Road Corp. transferred the former Alcoa Property to Edgewater Associates. *Shafron Cert.* ¶ 9; *SOMF* ¶ 11. In 1980, Edgewater Associates defaulted on a mortgage to Citibank and transferred title of the former Alcoa Property in lieu of foreclosure to 700 River Road Corp. *Shafron Cert.* ¶ 9;

*SOMF* ¶ 12.  In 1983, Amland Properties Corporation ("Amland") acquired the former Alcoa Property from 700 River Road Corp. *Shafron Cert*. ¶ 9; *SOMF* ¶ 13.  From 1968 to 1983, the former Alcoa Property was not used for manufacturing. *Shafron Cert.* ¶ 9; *SOMF* ¶ 14.

In or about 1985, Amland discovered that the former Alcoa Property was contaminated with PCBs and notified the Borough of Edgewater, the New Jersey Department of Environmental Protection ("NJDEP") and Environmental Protection Agency ("EPA") of the presence of PCBs at the former Alcoa Property. *Shafron Cert.* ¶ 9; *SOMF* ¶ 15.  In 1985, Amland retained Paulus, Sokolowski & Sartor ("PSS"), an environmental engineering firm to investigate the contamination of the former Alcoa Property. *Shafron Cert.* ¶ 9; *SOMF* ¶ 16.  In 1986, Amland filed a lawsuit against Alcoa related to the contamination discovered at the former Alcoa Property.  *Shafron Cert.* ¶ 2; *SOMF* ¶ 17.  In 1991, Alcoa and Amland entered into a Settlement Agreement pursuant to which Alcoa agreed to pay Amland fifteen million dollars ($15,000.000.00) and purchase the former Alcoa Property from Amland for ten dollars ($10.00*). Shafron Cert.* ¶ 10. *SOMF* ¶ 18.  As part of the settlement agreement, Alcoa had Amland convey the former Alcoa Property to a wholly owned subsidiary, A.P. New Jersey, Inc ("A.P.) *Shafron Cert.* ¶ 2; *SOMF* ¶ 19.

In 1991, A.P. entered into an Interim Response Action Administrative Consent Order ("ACO") with the NJDEP to satisfy a condition of the settlement agreement. *Shafron Cert.* ¶ 2; *SOMF* ¶ 20. Pursuant to the ACO, A.P was required to "[r]emove the contents of any underground or aboveground storage tanks which exist at the Site to eliminate the potential for any future discharge of hazardous substances, hazardous wastes or pollutants." *Shafron Cert.* ¶ 2; *SOMF* ¶ 21.  In July 1991, Alcoa retained the engineering services of Metcalf & Eddy with respect to Alcoa's compliance with the ACO. *Shafron Cert*. ¶ 11; *SOMF* ¶ 22.  In September 1991, Metcalf & Eddy prepared an Interim Response Action Report ("Sept. 1991 IRAR") as required by the ACO. *Shafron Cert.* ¶ 12; *SOMF* ¶ 23.  The Sept. 1991 IRAR states that "[u]nderground storage tanks on site will be reported to the [NJDEP]."

3

*Shafron Cert.* ¶ 12; *SOMF* ¶ 24.   The 1992 Underground Storage Tank Registration Questionnaire Alcoa submitted to the NJDEP stated that the total number of facility underground storage tanks at the former Alcoa Property was six (6). *Shafron Cert.* ¶ 13; *SOMF* ¶ 25.   The 1992 Annual Certification Questionnaire Alcoa submitted to the NJDEP stated "All tanks removed October/November 1992." *Shafron Cert.* ¶ 14; *SOMF* ¶ 26.   In September 1993, Metcalf & Eddy prepared an Interim Response Action Final Report for Alcoa ("Sept. 1993 IRAFR"). *Shafron Cert.* ¶ 15; *SOMF* ¶ 27.   On September 15, 1993, the Sept. 1993 IRAFR was submitted to the NJDEP by "E.J. Dolhopf III, Respondent Contact, A.P. New Jersey." *Shafron Cert.* ¶ 15; *SOMF* ¶ 28.   The Sept. 1993 IRAFR states that:

> As part of the June 25, 1991 ACO for the facility and under the ACO Interim Action Scope Item #I.F., APNJ agreed to remove the contents of any existing underground storage tanks.   As documented within this submittal, APNJ exceeded the requirement by both removing the tank contents and all six of the existing USTs. *Shafron Cert.* ¶ 15; *SOMF* ¶ 29.

Based upon the NJDEP's review of the certified Sept. 1993 IRAFR, and the representation that Alcoa had complied with the ACO, which "required the removal of all underground storage tanks," on June 15, 1994 the NJDEP approved A.P's proposal for the issuance of a No Further Action at the former Alcoa Property.  *Shafron Cert.* ¶ 16; *SOMF* ¶ 30. On February 10, 1993, Ewald Dollhopf III provided blueprint drawings of the former Alcoa Property to the NJDEP which depicted the locations of only six underground storage tanks at the former Alcoa Property. *Shafron Cert.* ¶ 17; *SOMF* ¶ 31.

Alcoa was in possession of blueprint drawings that depicted additional underground storage tanks beneath Building 12 at the former Alcoa Property. *Shafron Cert.* ¶ 18,19; *SOMF* ¶ 32.   At no time did Alcoa provide the blueprint drawings that depicted underground storage tanks beneath Building 12 at the former Alcoa plant to the NJDEP or Metcalf & Eddy, or otherwise advise them of their existence. *Shafron Cert.* ¶ 18; *SOMF* ¶ 33.   Alcoa never submitted an amended Annual Certification and Registration Questionnaire or amended Underground Storage Tank Closure Plan to the NJDEP to advise the NJDEP of the existence of the 2 storage tanks that remained under Building 12 and had never been previously disclosed to anyone outside of Alcoa. *SOMF* ¶ 34.

4

North River acquired the former Alcoa Property from Alcoa in 1997 pursuant to the 1997 Agreement to Purchase and Sell Real Estate (hereinafter "1997 Agreement") and 1997 Multi-Party Property Acquisition Agreement (hereinafter "MPPA"). *Shafron Cert.* ¶ 20,21; *SOMF* ¶ 35. Pursuant to the 1997 Agreement, North River paid Alcoa $8,000.000.00 for the former Alcoa Property. *Shafron Cert.* ¶ 20; *SOMF* ¶ 36.  Pursuant to the 1997 Agreement, Alcoa agreed to pay $12,000,000.00 for the demolition of the buildings at, and disposal of PCBs from, the former Alcoa Property. *Shafron Cert.* ¶ 20; *SOMF* ¶ 37.

Alcoa. and its officer Kevin McKnight, made representations to North River that at the time of the closing, there would be no environmental issues remaining on the former Alcoa Property. *Shafron Cert.* ¶ 22; *SOMF* ¶ 38.  Prior to North River's acquisition of the former Alcoa Property, Alcoa provided North River with environmental reports Alcoa claimed "established the known environmental condition of the Property." *Shafron Cert.* ¶ 20; *SOMF* ¶ 39.  The reports provided by Alcoa included the September 1986 PSS report, Volumes 1-3 of the November 1988 Woodward-Clyde Remedial Investigation/Feasibility Study, the Sept. 1993 IRAFR prepared by Metcalf & Eddy and the July 11, 1986 Detailed Options Evaluation report prepared by DuPont (the "Reports"). *Shafron Cert.* ¶ 20; *SOMF* ¶ 40.

North River relied on the Reports provided by Alcoa in determining the extent of the contamination at the former Alcoa Property. *Shafron Cert*. ¶ 23; *SOMF* ¶ 41.  North River provided those Reports to its environmental consultant, Enviro-Sciences to determine what areas needed to be sampled and remediated. *Shafron Cert.* ¶ 23,24; *SOMF* ¶ 42.  Enviro-Sciences was provided the 1993 IRAFR that stated that all underground storage tanks had been located and that none remained at the former Alcoa Property. *Shafron Cert*. ¶ 13,24; *SOMF* ¶ 43.  Neither the Waterside Parties nor Enviro-Sciences were aware that the USTs under Building 12 existed.  *Shafron Cert.* ¶ 23; *SOMF* ¶ 44.  North River did not receive any blueprints drawings from Alcoa depicting the former Alcoa Property. *Shafron*

*Cert.* ¶ 22; *SOMF* ¶ 45. During discovery in this matter, it was revealed that these documents remained in Alcoa's possession. *Shafron Cert.* ¶ 18,19; *SOMF* ¶ 46.   Enviro-Sciences would not look for underground storage tanks as they had received reports representing that no underground storage tanks remained on site. *Shafron Cert.* ¶ 24; *SOMF* ¶ 47.

On June 11, 1997, North River and Alcoa entered into a Memorandum of Agreement ("MOA") with the NJDEP in relation to the former Alcoa Property. *Shafron Cert.* ¶ 25; *SOMF* ¶ 48.   Pursuant to the MOA, Alcoa was required to notify the NJDEP "immediately upon knowledge of any condition posing an immediate threat to human health/and or the environment." *Shafron Cert.* ¶ 25; *SOMF* ¶ 49. Alcoa and North River Mews decided not to demolish Building 12 at that time, shortly after signing the Purchase and Sale Agreement. *Shafron Cert.* ¶ 23,26.   *SOMF* ¶ 50. Alcoa and North River Mews agreed to modify the Purchase and Sale Agreement and MPAA by the September 23, 1997 Funding Agreement, wherein Alcoa's and North River's decision not to demolish Building 12 at that time was memorialized and Alcoa agreed to pay for the disposal of PCB contaminated material up to a total amount of $2,750,000.00 and pay those costs directly to the disposal company. *Shafron Cert.* ¶ 26; *SOMF* ¶ 51.

In 1999, Alcoa, North River and RRIP entered an Environmental Indemnity Agreement (hereinafter "1999 Agreement") which was "[i]n addition to and notwithstanding any other agreement or obligation of the parties" and was explicitly limited "**to the extent that Building 12 is not demolished.**" (emphasis added). *Shafron Cert.* ¶ 27; *SOMF* ¶ 52.   On February 26, 1999, the portion of the former Alcoa Property that contained Building 12 was subdivided from the rest of the former Alcoa Property. *SOMF* ¶ 53.   Alcoa marked the portions of the floor of Building 12 that had contamination above .49ppm and had people come in to remove those sections of the floor and disposed of the material that contained PCBs in excess of 50 ppm in Niagara, New York. *Shafron Cert.* ¶ 22,28; *SOMF* ¶ 54.   The portions of the floor of Building 12 that were removed that contained PCBs in

6

concentrations of less than 50 ppm were removed from the former Alcoa Property and used as road base. *Shafron Cert*. ¶ 28; *SOMF* ¶ 55.  Enviro-Sciences conducted samples of the walls of Building 12 which were adjacent to floor panels that had been removed. The samples indicated that there were PCBs in the foundation walls at levels between .070ppm and 1.000ppm. *Shafron Cert*. ¶ 22,28; *SOMF* ¶ 56.

As a result, Enviro-Sciences painted the walls of Building 12, containing the low levels of PCBs, with epoxy. *Shafron Cert.* ¶ 22,31; *SOMF* ¶ 57.  The NJDEP approved of the capping by Enviro-Sciences and approved a Deed Notice in 2002 and No Further Action Letter for Building 12 in 2003. *Shafron Cert*. ¶ 28,29,30; *SOMF* ¶ 58.  The portion of the former Alcoa Property on which Building 12 sat was itself subdivided in 2009 for the purpose of building affordable housing on a portion of the property.  Mistakenly, the portion that did not contain the affordable housing was not deeded back to North River until 2015. *Shafron Cert.* ¶ 22; *SOMF* ¶ 59.

In 2010, Enviro-Sciences was retained to terminate the Deed Notice on Building 12 to allow a portion of the Building 12 property to be used for affordable housing. *Shafron Cert.* ¶ 22,32; *SOMF* ¶ 60.  In October of 2010, the Deed Notice on Building 12 was terminated. *Shafron Cert.* ¶ 33; *SOMF* ¶ 61.

**Veteran's Field Background**

Veteran's Field is a public park, owned by the Borough of Edgewater and located at 1167 River Road, Edgewater, New Jersey. *SOMF* ¶ 62.  Veteran's Field was known to be contaminated with hazardous materials prior to 2011. *Shafron Cert*. ¶ 34,35; *SOMF* ¶ 63.  In 2011, the Borough retained TERMS Environmental Services, Inc ("TERMS") to conduct an initial investigation of Veteran's Field to assess the extent of the historical contamination at Veteran's Field. *Shafron Cert*. ¶ 35; *SOMF* ¶ 64. During TERMS' 2011 investigations, TERMS took ten (10) pit samples and six (6) surface samples. *Shafron Cert*. ¶ 35; *SOMF* ¶ 65.  TERMS' initial investigation determined that Veteran's Field was contaminated with hazardous substance, including, but not limited to, PCBs. *Shafron Cert.* ¶ 35; *SOMF*

¶ 66.  TERMS' investigations determined that there was evidence of non-native fill present at Veteran's Field including brick, concrete, metal and wood. *Shafron Cert.* ¶ 35; *SOMF* ¶ 67.  Based on TERMS' investigation, TERMS recommended that "hot spot" remediation be performed at the four PCB locations. *Shafron Cert.* ¶ 35; *SOMF* ¶ 68.  TERMS also recommended that "an Engineering Control be installed by capping the entire site". *Shafron Cert.* ¶ 35; *SOMF* ¶ 69.

TERMS did not properly test the field for PCBs prior to the remediation of Veteran's Field, as TERMS only performed limited hot spot testing and not proper grid testing. *Shafron Cert.* ¶ 22,43; *SOMF* ¶ 70.  In 2012, the Borough entered into a contract with TERMS to oversee the sampling, approval and placement of fill and to act as the Licensed Site Remediation Professional for the remediation of Veteran's Field. *Shafron Cert.* ¶ 36; *SOMF* ¶ 71.  In 2012, the Borough issued a Bid Notice for the Veteran's Field Improvement Project (the "Veteran's Field Project" or "Project"). *Shafron Cert.* ¶ 37; *SOMF* ¶ 72.  In 2012, the Borough awarded the Veteran's Field Project contract to Waterside Construction, LLC ("Waterside"). *Shafron Cert.* ¶ 38; *SOMF* ¶ 73.

TERMS was in charge of all the testing and the approval of fill for the Veteran's Field Project and acted as the "gatekeeper" on the Project. *Shafron Cert.* ¶ 22,23; *SOMF* ¶ 74.  Prior to the commencement of the Project, TERMS, Waterside and Neglia met to discuss the protocol for the use of fill on the field at Veteran's Field, wherein TERMS stated that Waterside could utilize fill from non-virgin sites and that TERMS would conduct testing to ensure that the fill met applicable standards. *Shafron Cert.* ¶ 39,40; *SOMF* ¶ 75.  Fred Daibes did not have discussions with Waterside Construction employees regarding finding sources of fill material for the Veteran's Field Project. *Shafron Cert.* ¶ 23; *SOMF* ¶ 76.  On or about July 9, 2012, Waterside began performing pursuant to the contract. *Shafron Cert.* ¶ 41; *SOMF* ¶ 77.

In late October 2012, while Waterside was in the process of bringing fill to Veteran's Field, work on the Veteran's Field Project was suspended following Superstorm Sandy. *Shafron Cert.* ¶ 23,42;

*SOMF* ¶ 78.  No testing of Veteran's Field was conducted as a result of the flooding caused by Superstorm Sandy, despite the fact that the Hudson River, which is known to be contaminated with a significant amount of PCBs, caused flooding at Veteran's Field. *Shafron Cert.* ¶ 42,43,44;  *SOMF* ¶ 79.  Pursuant to FEMA requirements, the grade of the Project was increased, requiring an increase in the amount of fill needed to cap Veterans' Field. *Shafron Cert.* ¶ 45; *SOMF* ¶ 80.

Waterside Construction had discussions with TERMS about utilizing recycled crushed concrete at Veteran's Field. *Shafron Cert.* ¶ 23,46,47; *SOMF* ¶ 80.  TERMS informed Waterside Construction that it could place crushed concrete under the parking lots and other hard, impervious surfaces. *Shafron Cert.* ¶ 23,47,48,49; *SOMF* ¶ 82.  TERMS did not require testing of the crushed concrete material if it was going to be placed under the parking lot or other hard, impervious surfaces. *Shafron Cert.* ¶ 46,47; *SOMF* ¶ 83. Waterside sought permission from TERMS to utilize material from the former Alcoa Property.  *Shafron Cert.* ¶ 23,46,49; *SOMF* ¶ 84.

Fred Daibes was not involved in the decision to use material from the former Aloca property at Veteran's Field. *Shafron Cert.* ¶ 47; *SOMF* ¶ 85.  Under the supervision of TERMS, Waterside placed recycled crushed concrete from the former Alcoa Property under the southern parking lot at Veteran's Field. *Shafron Cert.* ¶ 23; *SOMF* ¶ 86.  Mark Iafelice instructed Waterside Construction employees to bring recycled concrete aggregate from Building 12 and did not receive authorization from others as to whether it was appropriate. *Shafron Cert.* ¶ 47; *SOMF* ¶ 87. Waterside Construction brought recycled concrete aggregate from the former Alcoa Property to Veteran's Field over approximately two weeks and only spread fill material under impervious surfaces. *Shafron Cert.* ¶ 46; *SOMF* ¶ 88.  Soil from the former Alcoa Property was not brought to Veteran's Field. *Shafron Cert.* ¶ 46. *SOMF* ¶ 89.  Material from Building 12 was not blended with other material at Veteran's Field. *Shafron Cert.* ¶ 47; *SOMF* ¶ 90.

Waterside Construction worked on the Project every Saturday, weather permitting. *Shafron Cert*. ¶ 47; *SOMF* ¶ 91. The material brought to Veteran's Field on September 7, 2013 by Waterside was gravel, not recycled concrete aggregate. *Shafron Cert.* ¶ 47; *SOMF* ¶ 92. The material depicted in the picture labeled EW21288, depicts clean stone, not recycled concrete aggregate. *Shafron Cert.* ¶ 47; *SOMF* ¶ 93. Waterside Construction was not aware that the fill material that was brought from the former Alcoa Property to be used under the impervious surfaces at Veteran's Field was contaminated until it was informed by TERMS. *Shafron Cert*. ¶ 23; *SOMF* ¶ 94.

**Discovery of USTs**

Building 12 was demolished, except for the foundation walls, in 2013. *Shafron Cert.* ¶ 23; *SOMF* ¶ 95. The foundation walls were the only walls known to contain any PCBs at the time Building 12 was demolished. The foundation walls were not demolished. *Shafron Cert*. ¶ 23; *SOMF* ¶ 96. At the time of demolition, Waterside and North River believed that the portions of Building 12 being demolished did not contain PCBs. *Shafron Cert*. ¶ 43; *SOMF* ¶ 97. If North River believed that the portions of Building 12 that were demolished had contained PCBs, they would have had Alcoa pay for the transportation and disposal of the PCBs, as Alcoa is required to pay up to $2.75 million for removing PCBs from the former Alcoa Property, at the time of demolition. *Shafron Cert.* ¶ 43; *SOMF* ¶ 98.

In or about September 2013, while in the process of developing the former Alcoa Property for beneficial use, two previously unknown and undisclosed underground storage tanks were discovered underneath Building 12 of the former Alcoa Property. *Shafron Cert*. ¶ 50; *SOMF* ¶ 99. The USTs were buried in a subterranean vault beneath two floor slabs of concrete with the second, newer floor slab constructed in a way to conceal the access man-ways for the USTs, thereby effectively hiding any indication of the existence of the USTs from North River. *Shafron Cert*. ¶ 22,50; *SOMF* ¶ 100. The USTs contained oil that had been mixed with various hazardous substances, including Polychlorinated Biphenyls ("PCBs"). *Shafron Cert.* ¶ 50; *SOMF* ¶ 101. Further excavation of the Property in the

vicinity of the USTs revealed contamination, including hazardous materials that were not previously known by North River to be on the former Alcoa Property. *Shafron Cert*. ¶ 50; *SOMF* ¶ 102.

The previously undisclosed USTs were installed by Alcoa and utilized by Alcoa in its operations at the former Alcoa Property. *Shafron Cert*. ¶ 19; *SOMF* ¶ 103.  None of the environmental assessments, either provided to Defendants or conducted on their behalf, indicated the presence of the USTs underneath Building 12. *SOMF* ¶ 104.  The USTs were constructed in a manner that concealed them from view and prevented detection by North River.  *Shafron Cert*. ¶ 22,23; *SOMF* ¶ 105. While Waterside was demolishing Building 12 in 2013, it removed material from around the USTs prior to discovering the USTs. *Shafron Cert*. ¶ 22; *SOMF* ¶ 106. The material surrounding the USTs, including the floor the USTs, were contaminated with PCBs due to leaks from the USTs. *Shafron Cert*. ¶ 22; *SOMF* ¶ 107.

Prior to discovery of the USTs, some of the materials contaminated by the USTs was brought to Veteran's Field and placed in areas that were to be covered by impervious surfaces. *Shafron Cert*. ¶ 22; *SOMF* ¶ 108.  The removal and disposal of the USTs cost approximately one million dollars. *Shafron Cert*. ¶ 22; *SOMF* ¶ 109.  In the fall of 2013, Fred Daibes made calls to Alcoa requesting reimbursement for costs resulting from the contamination at Building 12 and North River Mews attorney sent Alcoa written notice demanding same. *Shafron Cert*. ¶ 22; *SOMF* ¶ 110.  To date, Alcoa has failed to remit any expenses for the transportation and disposal of PCBs. *Shafron Cert*. ¶ 22; *SOMF* ¶ 111.

11

<u>**LEGAL ARGUMENT**</u>

**I.    LEGAL STANDARD FOR RULE 56 MOTION**

Summary Judgment should only be granted if the moving party proves its burden by demonstrating that there is no genuine issue of material fact and that judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(a); accord *Celotex Corp. v. Catrett,* 477 U.S. 317, 323(1986). Only if a properly supported motion for summary judgment is made, then the burden shifts to the non-moving party, to set forth specific facts establishing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). The Court must review the facts and draw all inferences in the light most favorable to the non-moving party, in this case the Waterside Parties. *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

In deciding a motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. "In determining whether a genuine issue of material fact exists, all inferences must be drawn, and all doubts must be resolved, in favor of the non-moving party." *Jackson v. Fauver,* 334 F. Supp. 2d 697, 705 (D.N.J. 2004). "Summary judgment is inappropriate if the parties dispute the inferences that could be reasonably drawn from the underlying facts." *Jackson v. Fauver*, 334 F. Supp. 2d 697, 705 (D.N.J. 2004). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Anderson*, 477 U.S. at 255.

**II.    THE INDEMINTY PROVISIONS ARE UNENFORCEABLE**

Alcoa may not seek indemnification from North River Mews Associates and RRIP because the contract provisions under which they seek indemnification are unenforceable.

New Jersey state law applies to determine when an indemnification provision encompasses CERCLA response costs.  *Hatco Corp. v. W.R. Grace Co.* 59 F.3d 400, 405 (3d Cir. 1995).  In New

Jersey, there are five circumstances under which an indemnification provision is unenforceable: (1) extrinsic evidence demonstrates that the parties intended to release only the claims that were being settled and not environmental claims; (2) a release is not effective to release liability under CERCLA unless specific reference is made to that liability; (3) the release was obtained by fraud; (4) the parties to the settlement agreement were acting under a mutual mistake of fact; and (5) enforcement of the release would violate public policy. *Fisher Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104, 107 (3d Cir. 2005).

### A.      Alcoa May Not Seek Indemnity Due To Alcoa's Fraudulent Conduct

Alcoa may not seek indemnification from North River Mews Associates and RRIP because the contract provisions under which they assert they are entitled to indemnification are unenforceable. The contracts were entered into due to Alcoa's fraudulent conduct as Alcoa took affirmative to conceal the underground storage tanks at the former Alcoa Property from North River Mews Associates.

Alcoa had a duty to disclose the existence of the underground storage tanks to North River Mews Associates and the NJDEP, because Alcoa expressly represented that all underground storage tanks had been removed from the Alcoa property and entered into the MOA, pursuant to which Alcoa was agreed to notify the NJDEP "immediately upon knowledge of any condition posing an immediate threat to human health/and or the environment." *Shafron Cert.* ¶ 25; *SOMF* ¶ 49.   Nevertheless, Alcoa failed to disclose the existence of the tanks.

> Under New Jersey law, there are only three categories of relationships that give rise to an affirmative duty to disclose. The first category "includes definite fiduciary relationships, such as principal and agent."  The second class: [E]mbraces those instances in which there is no existing special fiduciary relation between the parties, and the transaction is not in its essential nature fiduciary, but it appears that either one or each of the parties, in entering into the contract or other transaction, *expressly* reposes a trust and confidence in the other; or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is *necessarily* implied. The nature of the transaction is not the test in this class. Finally: The third class includes those instances where there is no existing fiduciary relationship between the parties, and no special confidence reposed is expressed by their words or implied from their

acts, but the very contract or other transaction itself, in its essential nature, is intrinsically fiduciary, and necessarily calls for perfect good faith and full disclosure, without regard to any particular intention of the parties. The contract of insurance is a familiar example."

*Fisher Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104, 111 (3d Cir. 2005) (internal citations omitted)

The indemnity provisions are unenforceable because Alcoa knew of a material adverse condition of the property, yet intentionally failed to inform North River of that condition.  In the contracts, documents referenced in the contracts, documents submitted by Alcoa to the NJDEP that are not referenced in the contracts and in the Memorandum of Agreement entered into by Alcoa, North River and the NJDEP,  Alcoa made representations as to both the condition of the former Alcoa Property, its past compliance with NJDEP regulations and its future compliance with NJDEP regulations.  Despite these representations, and Alcoa's knowledge that both North River and the NJDEP were relying on Alcoa's representations that it was acting, and would continue to act in compliance both with NJDEP regulations and the express representations it made in those documents, Alcoa both misrepresented the condition of the former Alcoa Property and took affirmative steps to conceal its condition from North River. Further, based on the express representations of Alcoa as to the "known environmental condition" of the property and Alcoa's knowledge of North River's reliance on its representations, Alcoa had a duty to disclose and remained silent in breach of that duty.

The record shows that Alcoa installed and utilized the underground storage tanks beneath Building 12 and concealed their existence from North River. *SOMF* ¶ 26-33,39-46.  Pursuant to the ACO that Alcoa entered into with the NJDEP, Alcoa was required to "[r]emove the contents of any underground or aboveground storage tanks which exist at the Site to eliminate the potential for any future discharge of hazardous substances, hazardous wastes or pollutants." *SOMF* ¶ 21. The 1992 Annual Certification Questionnaire Alcoa submitted to the NJDEP stated "All tanks removed October/November 1992." *SOMF* ¶ 26.  Based upon the NJDEP's review of the certified Sept. 1993

14

IRAFR, and the representation that Alcoa had complied with the ACO, which "required the removal of all underground storage tanks," on June 15, 1994 the NJDEP approved Alcoa's proposal for the issuance of a No Further Action at the former Alcoa Property. *SOMF* ¶ 30.

Alcoa's claim that it did not even know of the existence of blueprints depicting underground storage tanks prior to entering contracts with North River is demonstrably false. On February 10, 1993, Ewald Dollhopf III provided blueprint drawings of the former Alcoa Property to the NJDEP which depicted the locations of only six underground storage tanks at the former Alcoa Property. *SOMF* ¶ 31. Only these drawings were produced to the NJDEP, despite the fact that Alcoa were in possession of blueprint drawings that depicted additional underground storage tanks beneath Building 12 at the former Alcoa Property. *SOMF* ¶ 32. At no time did Alcoa provide the blueprint drawings that depicted underground storage tanks beneath Building 12 at the former Alcoa plant to the NJDEP, Metcalf & Eddy, or otherwise advise them of their existence. *SOMF* ¶ 33. Despite Alcoa's representations in the MOA, Alcoa never submitted an amended Annual Certification and Registration Questionnaire or amended Underground Storage Tank Closure Plan to the NJDEP to advise the NJDEP of the existence of the 2 storage tanks that remained under Building 12 which had never been previously disclosed, even after the period in which Alcoa admits that it had knowledge of the blueprints that depict the underground storage tanks it concealed from North River. *SOMF* ¶ 34.

As such, based upon the numerous representations that it had removed all of the underground storage tanks at the former Alcoa Property, its affirmative representations that it had disclosed all of the environmental conditions of the property to North River, and its obligations under the MOA, Alcoa had an affirmative duty to disclose and Alcoa breached that duty by failing to disclose of their existence. Therefore, Alcoa's motion for summary judgment seeking indemnity under the contracts must be denied.

15

**B.**     **The Indemnity Agreement Is Unenforceable As It Was Enter Into Based on Mutual Mistake**

Even if Alcoa had not intentionally concealed the existence of the underground storage tanks beneath Building 12 at the former Alcoa Property, Alcoa would nevertheless be barred from seeking indemnification from North River and RRIP for the damage caused by their existence.  If Alcoa did not have knowledge of the underground storage tanks, that would mean that any indemnification provision related to them would have been entered into by mutual mistake.

"A mutual mistake occurs when both parties are under substantially the same erroneous belief as to the facts." 2 E. Allen Farnsworth, *Farnsworth on Contracts,* § 9.3.  Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party. A compromise which is the result of a mutual mistake is not binding and consent to a settlement agreement is not considered freely given when it is obtained as the result of a mistake. *Fisher Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104, 112 (3d Cir. 2005).

Even if the Court were to discount the substantial evidence of Alcoa's actual knowledge of the existence of the concealed underground storage tanks at the former Alcoa Property, the indemnity provision would still not be enforceable.  In that case, at the time the contracts were entered into, neither party would have been aware of both the extent nor the type of contamination.  Neither party would be aware that there were underground storage tanks at the former Alcoa Property that contained significant amounts of hazardous substance, nor that there were active leaks seeping from underground storage tanks into the surrounding area.  As the active leaking of contaminants into the environment had a substantial impact on the agreed upon exchange, materially affecting North River by causing extensive damages, the indemnity provisions were the result of mistake and not binding.

Therefore, Alcoa's motion for summary judgment seeking indemnity under the contracts must be denied, as even if Alcoa prevails at trial that it had no actual or constructive knowledge of the subject tanks, then the contracts were entered into by mutual mistake.

## III.    ALCOA MAY NOT MAKE ANY CLAIMS UNDER THE CONTRACTS DUE TO ITS BREACH OF THE CONTRACT

Alcoa may not seek claims based on an alleged breach of contract by North River Mews Associates or RRIP because the Alcoa breached its duties under the contracts.

A material breach by either party to a bilateral contract excuses the other party from rendering any further performance. *RNC Sys., Inc. v. Modern Tech. Grp., Inc*., 861 F. Supp. 2d 436, 447–48 (D.N.J. 2012), citing *Magnet Res., Inc. v. Summit MRI, Inc.,* 318 N.J.Super. 275, 285 (App.Div.1998).

The express language of provision 7(c) of the 1997 Agreement imposed a duty on Alcoa to provide documents to "establish the known environmental conditions of the Property as of the Closing Date."  The existence of the USTs was not presented in those documents.  In fact, those documents showed the existence of other USTs that had previously been removed, suggesting that all USTs on the premises had already been removed and the contaminants within them remediated. *SOMF ¶ 29.*  Alcoa breached the express language of the contracts by failing to disclose of a known and material defect present at the former Alcoa, despite the fact that the contract required Alcoa to fully disclose to North River the environmental condition of the property.

Pursuant to the agreements between North River and Alcoa, Alcoa was to pay for the removal of hazardous material containing PCBs in excess of 50ppm. *SOMF ¶* 51.  Despite its obligations under the agreements, and North River's demands that Alcoa pay for the costs of the PCBs removal and reimbursement for costs resulting from the contamination at Building 12, Alcoa has failed to remit any expenses for the transportation and disposal of PCBs. *SOMF ¶* 110,111.

17

Therefore, Alcoa is in breach of its agreements with North River Mews and may not make breach of contract claims against North River.

## IV.   THE EXPRESS TERMS OF THE CONTRACTS DO NOT RELEASE ALCOA FROM WATERSIDE CONSTRUCTION, 38 COAH, DAIBES BROTHERS AND FRED DAIBES CLAIMS AS THEY WERE NOT PARTIES TO THE AGREEMENTS WITH ALCOA

Even if the contracts were to be found to release Alcoa from North River and/or RRIP's claims for Contribution,  neither Waterside Construction, 38 COAH, Daibes Brothers nor Fred Daibes were parties to the Purchase and Sale Agreement, the MPAA or the 1999 Agreement, and as such Alcoa's claims that they are contractually released from contribution claims by those parties are wholly without merit.

## V.   ALCOA MAY NOT MAKE ANY CLAIMS UNDER THE CONTRACTS AS THEY WERE FRAUDULANTLY INDUCED BY ALCOA.

Alcoa may not seek summary judgment asserting rights under the subject contracts because Alcoa's fraudulent inducement of North River to enter into the contracts vitiates any rights Alcoa seeks to assert arising from the contracts.

Alcoa committed fraud against North River and River Road Improvement Phase II to induce them to enter into the Agreements. In order to prevail on a fraud claim, a party must prove: "(1) a material misrepresentation or omission of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity or knowing the omission to be material; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *GKE Enters., LLC v. Ford Motor Credit Co. LLC USA*, 2010 U.S. Dist. LEXIS 53714, *11 (D.N.J. May 26, 2010) (citing *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997)). Deliberate suppression of a material fact that should be disclosed is equivalent to a material misrepresentation (*i.e.,* an affirmative false statement)." *Gleason v. Norwest Mortg., Inc.,* 243 F.3d 130, 145 (3d Cir. 2001); (referencing *Strawn v. Canuso,* 140 N.J. 43, 62 (1995)).  The concealed facts "must be facts which if

known ... would have prevented [the obligor] from obligating himself, or which materially increase his responsibility." *Ramapo Bank v. Bechtel,* 224 N.J. Super. 191, 198 (App.Div.1988). If in addition to the party's silence, there is any statement, even any word or act on his own part, which tends affirmatively to a suppression of the truth, to a covering up or disguising the truth, or to a withdrawal or distraction of the other party's attention or observation from the real facts, then the line is overstepped, and the concealment becomes fraudulent. *Berman v. Gurwicz,* 189 N.J. Super. 89, 93 (Ch.Div. 1981). Alcoa's fraudulent inducement of North River invalidates the contracts and any protection they may have afforded Alcoa. *Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295, 1314 (5th Cir. 1983) ("Fraudulent inducement . . . can vitiate a release. This is hornbook law.") ((See Restatement (Second) of Contracts §§ 164, 167 (1979); 12 S. Williston, A Treatise on the Law of Contracts § 1488 (3d ed. 1970); 37 Am.Jur.2d *Fraud and Deceit* §§ 8, 12 (1968); 37 C.J.S. *Fraud* § 64 (1943)).

As set forth above and in the Waterside Parties' Statement of Facts, Alcoa had knowledge of the underground storage tanks that it had filled with hazardous material and concealed beneath Building 12. Alcoa, with this knowledge, made false representations to the NJDEP that it had removed all underground storage tanks and entered into the Memorandum of Agreement with NJDEP and North River to induce North River into entering the contracts for the sale of the former Alcoa Property. Pursuant to the Memorandum of Agreement, Alcoa was required to notify the NJDEP "immediately upon knowledge of any condition posing an immediate threat to human health and/or the environment." *Shafron Cert.* ¶ 25; *SOMF* ¶ 49. Alcoa had knowledge of the concealed underground storage tanks beneath Building 12, and failed to notify either the NJDEP or North River of their existence. They failed to disclose these tanks despite the fact that they contained large amounts of PCBs that were actively leaking into the environment.

The due diligence undertaken by North River to uncover the extent of the contamination was reasonable.  This due diligence did not uncover the USTs under Building 12 because those USTs were constructed in a manner concealing them from view as they were in a subterranean vault buried underneath two floor slabs with the newer floor slab constructed in such a way that it covered the access man-ways for the tanks. *SOMF ¶ 100.*  Further, North River's environmental consultant was not able to discover the underground storage tanks because of the purposeful omission of them in Alcoa's disclosures and misrepresentations of Alcoa that they had all been removed.

Therefore, Alcoa due to Alcoa's fraudulent inducement of North River to enter the contracts, Alcoa may not seek to rely on the contracts for any purpose.

## VI.        ALCOA IS AN ARRANGER AND LIABLE PARTY UNDER CERCLA

Alcoa was an owner and operator of the former Alcoa Property responsible for the disposal of hazardous material.

CERCLA defines an arranger as "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for disposal or treatment, of hazardous substances owned or possessed by such person[.]" 42 U.S.C. § 9607(a)(3).   The Third Circuit has identified three important factors in determining "arranger" liability under CERCLA: (1) ownership, plus either (2) knowledge or (3) control. Ascribing the phrase "arrange for disposal" its ordinary meaning, the Supreme Court reasoned that "an entity may qualify as an arranger under §9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 499, 506 (2009).  "The issue was not whether the defendants 'acted in a manner that resulted in the hazardous material being placed on the [plaintiff's] property' but whether they intended to dispose of that material.  *Town of Islip v. Datre*, 245 F. Supp. 3d 397, 421 (E.D.N.Y. 2017)(internal citations omitted).  "Where 'the dangerousness of the product is unknown to the would-be arranger,' however, 'it is difficult to find that the disposer was trying to evade liability for that

danger.'. In addition, absent knowledge of the substance's hazardous nature, "there is no conduct to deter by imposing arranger liability because the disposal was essentially an innocent act: people who do not even suspect that their product is harmful are not in a position to be deterred." *Town of Islip v. Datre*, 245 F. Supp. 3d 397, 421 (E.D.N.Y. 2017)(internal citations omitted) *Citing Burlington N. & Santa Fe Ry. Co. v. United States,* 556 U.S. 499 (2009).

The record clearly establishes that Alcoa purchased and utilized PCBs at the former Alcoa Property. *SOMF* ¶ 5-7. The record also shows that Alcoa installed and utilized the underground storage tanks beneath Building 12 and concealed their existence. *SOMF* ¶ 26-33,39-46. No party, other than Alcoa, was aware of the existence of the hidden underground storage tanks below Building 12, or the existence of the hazardous material contained within them. Alcoa was an owner of the hazardous material contained in the undisclosed underground storage tanks. It was the only party with knowledge that the underground storage tanks both existed and contained hazardous material. Alcoa, by its fraudulent conduct in concealing the tanks from North River when it entered into contract with North River, through the funding agreement, and through its course of performance by actively conducting the disposal of hazardous material, arranged for the disposal of the hazardous material at the former Alcoa Property. Further, it is clear from the contracts that Alcoa considered the material contained in Building 12 to be hazardous material, because, by the very nature of its agreements, it agreed to pay for the disposal of hazardous material.

Therefore, Alcoa is liable as Arrangers under CERCLA and are not entitled to Summary Judgment with respect to the Waterside Partied 113(f) claim.

## <u>CONCLUSION</u>

For the foregoing reasons, the Waterside Parties respectfully request that Alcoa's Motion be denied in its entirety.

Respectfully submitted,

By: /s/*Jason T. Shafron*
     Jason T. Shafron
     Shafron Law Group, LLC
     2 University Plaza, Suite 400
     Hackensack, NJ  07601
     (201) 343-7200
     *Attorneys for Defendants Waterside*
     *Construction, LLC; 38 COAH. LLC; North River*
     *Mews Associates, LLC.; Fred A. Daibes, and*
     *Third-Party Defendant River Road Improvement*
     *Phase II, Inc.*