# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| BOROUGH OF EDGEWATER,<br><br>     Plaintiff,<br><br>     v.<br><br>WATERSIDE CONSTRUCTION, LLC; 38 COAH, LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALCOA INC. (formerly known as "Aluminum Company of America"); ALCOA DOMESTIC LLC, as successor in interest to A.P. NEW JERSEY, INC.; et al.,<br><br>     Defendants,<br><br>(caption continued on next page) | Case Nos.: 2:14-CV-05060-JMV-JBC<br>                 2:14-cv-08129-MCA-LDW<br>Hon. John M. Vazquez, U.S.D.J.<br>Hon. James B. Clark, III, U.S.M.J. |

---

## ARCONIC DEFENDANTS' REPLY BRIEF
## IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT
## AGAINST PLAINTIFF BOROUGH OF EDGEWATER

---

**K&L Gates LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
*Attorneys for Arconic Inc. (f/k/a/ Alcoa Inc.) and Arconic Domestic, LLC (f/k/a/ Alcoa Domestic, LLC, as successor in interest to A.P. New Jersey, Inc.)*

*On the Brief:*
Michael E. Waller, Esq.
Charles F. Rysavy, Esq.
Malory M. Pascarella, Esq.

**K&L Gates LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
*Attorneys for Arconic Inc. (f/k/a/ Alcoa Inc.)*
*and Arconic Domestic, LLC (f/k/a/ Alcoa Domestic, LLC,*
*as successor in interest to A.P. New Jersey, Inc.)*

(continued from previous page)

WATERSIDE CONSTRUCTION,
LLC; 38 COAH, LLC; DAIBES
BROTHERS, INC.; NORTH RIVER
MEWS ASSOCIATES, LLC; and
FRED A. DAIBES,

     Defendants/Third-Party Plaintiffs,

     v.

NEGLIA ENGINEERING
ASSOCIATES,

     Third-Party Defendant,

and

ALCOA DOMESTIC, LLC, as
successor in interest to A.P. NEW
JERSEY, INC.,

     Defendant/Third-Party Plaintiff,

     v.

COUNTY OF BERGEN and RIVER
ROAD IMPROVEMENT PHASE II,
INC., and HUDSON SPA, LLC,

     Third-Party Defendants.

**TABLE OF CONTENTS**

**PAGE**

PRELIMINARY STATEMENT ...........................................................................1

ARGUMENT .....................................................................................................2

I.      THE BOROUGH'S SPILL ACT CLAIM SHOULD BE DISMISSED
BECAUSE ARCONIC WAS NOT THE DIRECT DISCHARGER,
AND HAD NO CONTROL OVER THE DIRECT DISCHARGER,
OF HAZARDOUS MATERIALS AT VETERANS FIELD.........................2

II.    ARCONIC IS NOT LIABLE UNDER CERCLA. ........................................4

      A.     Building 12 was not "waste," and the 1997 sale of the Building,
as modified by the 1999 Environmental Indemnity Agreement,
was not an "arrangement for disposal." ................................................4

      B.     The Borough's response action was not consistent with the
National Contingency Plan.....................................................................5

            i.     The Borough's response was a "remedial action."....................5

            ii.    The Borough's remedial action was not consistent with
the NCP.......................................................................................8

III.   THE BOROUGH'S UNJUST ENRICHMENT CLAIM (COUNT VII)
MUST BE DISMISSED..............................................................................11

IV.   THE BOROUGH DOES NOT DISPUTE THAT IT HAS FAILED
TO PROVE PROXIMATE CAUSATION FOR ITS STRICT
LIABILITY CLAIM (COUNT IX)..............................................................12

V.    ARCONIC OWED NO COMMON LAW NEGLIGENCE DUTY TO
THE BOROUGH........................................................................................13

CONCLUSION .................................................................................................15

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AMA Realty LLC v. 9440 Fairview Avenue LLC*,
  2017 WL 6728641 (D.N.J. Dec. 28, 2017)........................................................12

*Coffman v. Keene Corp.*,
  133 N.J. 581 (1993) ..........................................................................................12

*County Line Inv. Co. v. Tinney*,
  933 F.2d 1508 (10th Cir. 1991) ........................................................................10

*Hatco Corp v. W.R. Grace & Co.*,
  849 F. Supp. 931 (D.N.J. 1994) ..........................................................................7

*N.J. Dep't of Envt'l Prot. v. Dimant*,
  212 N.J. 153 (2012) ........................................................................................2, 3

*New Jersey Turnpike Authority v. PPG Indus.*,
  197 F.3d 96 (3d Cir. 1999) ..................................................................................3

*Olivo v. Owens-Ill., Inc.*,
  189 N.J. 394 (2006) ..........................................................................................15

*Pierson Sand & Gravel, Inc. v. Pierson Twp.*,
  89 F.3d 835 (6th Cir. 1996) ..............................................................................10

*Preferred Real Estate Invs. v. Edgewood Props.*,
  2007 WL 81881 (D.N.J. Jan. 9, 2007)...............................................................14

*Yun v. Ford Motor Co.*,
  276 N.J. Super. 142 (App. Div. 1994)...............................................................13

**Statutes**

42 U.S.C. § 9601(21) .............................................................................................7

**Other Authorities**

40 C.F.R. 300.430 (1990) .....................................................................................10

ii

40 C.F.R. § 300.68 (1986) .........................................................................................10

40 C.F.R. § 300.68 (1984) .........................................................................................10

40 C.F.R. § 300.415 .................................................................................................11

## PRELIMINARY STATEMENT

Plaintiff Borough of Edgewater's Opposition Brief offers no legitimate basis to deny Arconic's Motion for Summary Judgment. The vast majority of the Borough's arguments have been addressed and disposed of in Arconic's moving brief on this Motion, and in its opposition to the Borough's dueling motion for summary judgment as to Arconic's claims.

Among the few new arguments the Borough makes are that it complied with CERCLA's National Contingency Plan because (1) the Borough had only one remedial alternative for addressing the hazardous materials dumped in Veterans Field by Waterside Construction, and (2) because the remediation was actually a "removal action." But those arguments are based on new opinions from a new expert in a report the Borough euphemistically calls a "supplemental affidavit." Arconic has filed a motion to bar this wildly improper effort to bypass the expert discovery schedule set by this Court. Without that "affidavit," the Borough's CERCLA claim fails.

The Borough's argument supporting its Spill Act claim incorrectly attempts to convert *one* of the requirements for Spill Act liability into the *only* requirement. And it offers only half-hearted, and ultimately unsuccessful, attempts to save its unjust enrichment, strict liability, and negligence claims.

All of the Borough's claims against Arconic should be dismissed.

## **ARGUMENT**

I.   **The Borough's Spill Act claim should be dismissed because Arconic was not the direct discharger, and had no control over the direct discharger, of hazardous materials at Veterans Field.**

A party that was not itself directly responsible for a discharge may only be held liable under the New Jersey Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 *et seq.*, if it "nevertheless had some control over the direct discharger." *N.J. Dep't of Envt'l Prot. v. Dimant,* 212 N.J. 153, 176 (2012).  There is no dispute that the only "direct discharger" at Veterans Field was Waterside Construction.  (*See* SUMF ¶ 78).  The undisputed evidence also shows that Arconic had no relationship with, much less control over, Waterside.   (*See* Arconic's Opposition to the Borough's Motion for Summary Judgment, ECF No. 373 ("Arconic Op."), pp. 14-20, 40).

The Borough does not even attempt to show Arconic had any control over Waterside.  It argues only that "there is clearly 'some connection' between the Alcoa Entities and the Daibes Entities."  (ECF No. 376 ("Borough Op."), p. 9).  But the Daibes Entities *as a group* were not direct dischargers.  That title is held by Waterside alone.   And "some connection" between Arconic and other Daibes Entities—which specifically did not include Waterside, and which ended thirteen years before Waterside's discharge at Veterans Field—does not prove Arconic had *control* over the direct discharger necessary for Spill Act liability.

2

In an effort to avoid this fatal defect in its Spill Act claim, the Borough argues that it need only prove a  connection  between the Alcoa Entities "and the hazardous substances discharged at Veterans Field."  (Borough Op. p. 6) (citing *New Jersey Turnpike Authority v. PPG Indus.*, 197 F.3d 96 (3d Cir. 1999)).  But the Borough's argument confuses *necessary* proof with *sufficient* proof.  In *PPG*, the plaintiff failed to offer proof that the defendant's hazardous material ended up on plaintiff's land. *PPG,* 197 F.3d at 105-06.  The Supreme Court affirmed the dismissal of the defendant because such proof is *necessary* for Spill Act liability.  *Id.*  The *PPG* Court neither held nor suggested the converse: that if the plaintiff *had* shown that hazardous material manufactured by the defendant ended up on plaintiff's land, such proof alone would have been *sufficient* to impose Spill Act liability.

The requirement in *Dimant* that a defendant not itself the direct discharger must have had control over the direct discharger is *in addition to, and not exclusive of,* the requirement in *PPG* that the plaintiff prove a connection between the defendant's hazardous material and the plaintiff's site.  *Dimant*, 212 N.J. at 830-31 ("Once a party is found responsible for a discharge, there is another requirement to be satisfied.  A nexus must be demonstrated to exist between the discharge for which one is responsible—in any way—and the contaminated site . . .") (citing *PPG*, 197 F.3d at 106)).

3

The Borough's other attempts to supply a connection between Arconic and the discharge itself (Borough Op., p. 7-8), are refuted in Arconic's Opposition to the Borough's Motion.  (Arconic Op. pp. 34-45).

Because the Borough has failed to show Arconic had any control over Waterside, its Spill Act claim against Arconic must be dismissed.

## II.     Arconic is not liable under CERCLA.

### A.     Building 12 was not "waste," and the 1997 sale of the Building, as modified by the 1999 Environmental Indemnity Agreement, was not an "arrangement for disposal."

The Borough's arguments in its Opposition Brief that Arconic has "arranger" liability under CERCLA are largely identical in substance to the arguments in its Memorandum of Law in Support of Motion for Summary Judgment on CERCLA Claims against Alcoa Entities (ECF No. 352-1) ("Borough Mov. Br.").  Those arguments have been thoroughly addressed and rebutted in Arconic's Opposition to the Borough's Motion.  (Arconic Op., pp. 4-20).

In addition to those arguments, the Borough incorrectly asserts that, because the parties knew PCB contamination in the walls and floors in Building 12 required "treatment," the entire building constituted "waste."  (Borough Op. pp. 14-15).  But simply because an otherwise useful building requires "treatment" due to the presence of hazardous materials within it does not make a sale of that building *disposal* of *waste*, and the Borough cites to no case law supporting that contention.  Moreover,

the Borough's assertion that the Environmental Indemnity Agreement ("EIA") "did not change the required treatment" of Building 12 is demonstrably false.  The EIA terminated North River's demolition and disposal responsibilities related to Building 12, which had been imposed on it by the Purchase and Sale Agreement and the Multi-Party Acquisition Agreement.  (Arconic Op., pp. 8-10).

### B. The Borough's response action was not consistent with the National Contingency Plan.

#### i. The Borough's response was a "remedial action."

The Borough now claims that the clean-up of Veterans Field was not a "remedial action" but a "removal action," which required it to comply with different, relatively simple, provisions of the NCP.  (Borough Op., 17-22).  The Borough's argument fails for a very simple reason: no one—not the Borough, nor its LSRPs, nor the EPA, nor the NJDEP, nor even the Borough's own expert—has *ever* categorized the remediation of the Waterside contamination at Veterans Field as a "removal action."  On the contrary, that work has consistently been described by as a "remediation" by everyone connected with it.  (*See, e.g.*, Borough SUMF ¶ 112 ("TERMS estimated a minimum volume of 25,000 cubic yards, or approximately 40,000 tons, of PCB impacted material exceeded the Residential Soil Remediation Standards of 0.2 ppm and, therefore, required **remediation**.");[1] TERMS PCB

---

[1] The Borough describes the cleanup of the Waterside contamination at Veterans Field as "remediation" or a "remedial" action *forty times* in its SUMF and

Remedial Action Workplan,[2] Corriston Cert. Ex. VVV, at EW12240 ("This **Remedial** Action Work Plan (RAWP) relates to the proposed **remediation** of contaminated soils imported to Veterans Field"); Certification of Malory M. Pascarella, dated December 7, 2020, ¶ 3 ("Mr. Bambrick . . . has knowledge of the **remediation** of Veteran's Field.")).  Even the Borough's own expert, Bernard T. Delaney of First Environment, describes the cleanup of Veterans Field as "remediation activities"  (Corriston Cert., Ex. DDDD ("Delaney Report") at pp. 3, 7, 30-33), which directly contradicts the claim that the remediation was actually a "removal" made by *his First Environment colleague*, Thomas Bambrick.  *See* Supplemental Affidavit of Thomas Bambrick, dated November 6, 2020 (ECF No. 376-14), ¶ 22.

First Environment categorized the cleanup as a "remediation" in the Self Implementation Plan (SIP) the Borough submitted to the EPA for approval.  (*See*

---

RSUMF, not including the dozens of references to Remedial Action Workplans and Residential Soil Remediation Standards.  In contrast, the word "removal" appears only *twice* in both documents combined, and neither time in the context of describing the work as a "removal" action.

[2] The Borough accuses Arconic of "attempt[ing] to mislead the Court by citing to a RAWP and SIP drafted by TERMS, despite the fact that TERMS was fired and Edgewater instead relied upon a later RAWP and SIP prepared by its new LSRP, First Environment." (Borough Op. p. 31).  The Borough, however, fails to note that the RAWP and SIP prepared by First Environment *simply adopted the TERMS RAWP and SIP*.  (Opening Br., p. 13).

EPA Approval Letter, Sept. 8, 2014, Corriston Cert., Ex. MMMM, at EW11869). The EPA formally approved the SIP and directed the Borough to "proceed with the **remediation"** of Veterans Field subject to this Approval." (*Id.*).  After having obtained approval from the EPA for a "remedial" action, the Borough cannot now claim that the same work is governed by EPA regulations for "removal" actions.

Moreover, the cleanup of the Waterside contamination at Veterans Field was, in fact, a "remedial action."  A "remedial action" includes, but is not limited to: (1) "cleanup of released hazardous substances and associated contaminated materials," (2) "excavations," (3) "any monitoring reasonably required to assure that such actions protection the public health and welfare and the environment," and (4) "offsite transport and offsite storage, treatment, destruction, or secure disposition of the hazardous substances and contaminated materials."  42 U.S.C. § 9601(21).  All of these remedial activities took place during the cleanup of the Waterside contamination.  (*See* Corriston Cert., Ex. BBBB, at EW 11028-38).

Relying on *Hatco Corp v. W.R. Grace & Co.*, 849 F. Supp. 931, 963 (D.N.J. 1994), the Borough argues that this was a removal action because the potential harm caused by the Waterside contamination was "imminent." (Borough Op., p. 20-21). In support of this assertion, the Borough cites only to the Supplemental Affidavit of Thomas Bambrick and a June 13, 2014, Notice of Violation ("NOV") from the NJDEP to support its claim of "imminence."  (Borough Op., p. 20-21).  But the

Supplemental Bambrick "affidavit" is an inadmissible late expert report, and the NOV was prompted by a request *from the Borough's council* to the NJDEP for an order requiring the immediate removal of the material.  (*See* Arconic's Motion to Strike the Supplemental Affidavit of Thomas Bambrick Aff., dated December 7, 2020 ("Motion to Strike"), Section (I), filed simultaneously with this Brief).  The NJDEP then issued the requested NOV *eight months* after Waterside was caught importing and spreading contaminated materials at Veterans Field. (*See* Borough SUMF ¶ 107).  Given the site's long history of PCB contamination, any threat to public health, safety, and the environment was no more "imminent" in mid-2014 than it had been during the decades that preceded it.  (SUMF ¶ 69).

The clean-up of the Waterside contamination at Veterans Field was a remedial action governed by USEPA regulations for remedial actions.

### ii.    *The Borough's remedial action was not consistent with the NCP.*

The Borough's claim that its remediation of Veterans Field was consistent with the National Contingency Plan rests primarily on the self-described "critical fact" that "Edgewater had only one option available to comply with the applicable stringent and comprehensive New Jersey environmental laws and regulations: investigate and remove all the Building 12 contaminated material."[3]  (Borough Op.

---

[3] The Borough does not dispute that any NCP obligations it may have discharged prior to October 3, 2013, were related to the already completed

p. 24) (citing Supp. Bambrick Aff., ¶ 4-17, 20-21, and June 13, 2014, NOV).  But that "critical fact" is not a fact at all.

First and most importantly, the undisputed evidence shows that the Borough had more than one remedial option available to it.  In January 2014, TERMS, as the Borough's LSRP at the time, advised the Borough that Waterside's proposed alternative remedial action would have been "allowed under NJDEP and EPA regulations." (Certification of Charles F. Rysavy, dated Sept. 11, 2020, ¶ 5, Ex. 3).  Second, the Borough's argument relies upon the Supplemental Bambrick Affidavit, which must be stricken.  (Motion Strike, Section (II)).  Finally, the NOV issued by the NJDEP is not proof that Borough had only one remedial option available to it.  (*See* Motion to Strike, pp. 12-14).

That the Borough had more than one available remedial action means its complete failure to consider alternatives, or to provide the public with opportunity to comment on the choice of remedy *before* the Borough chose it, was hardly "technical," "immaterial" or "insubstantial."  (Borough Op. p. 16).  The NCP provisions requiring thorough consideration of remedial alternatives and options for the public to comment on the choice among those alternatives, with which the Borough failed to comply, are critical to a remedial action's being found "consistent

_____

remediation of historic contamination at Veterans Field and, therefore, were not relevant to the Borough's present cost recovery action.  (*See* Opening Br., at 12, 20).

with" the NCP.  (*See* Brief in Support of Motion for Summary Judgment Dismissing Claims Against Plaintiff Borough of Edgewater, dated September 11, 2020 (ECF No. 344-1) ("Opening Br."), pp. 17-23; Arconic Op. pp. 20-32).  None of the evidence cited by the Borough demonstrates compliance with either provision.

Finally, the Borough's repeated attempts to discredit Arconic's citation to NCP provisions and cases that pre-date the 1990 NCP revisions are misguided, because NCP requirements upon which Arconic's arguments are based survived the 1990 revisions.  Both the current and prior versions of the NCP require an opportunity for public comment on the choice of remedial alternatives, development of alternative courses of action, screening of alternatives, and documentation of rationales for eliminating alternatives.  *See, e.g.*, 40 C.F.R. § 300.68(e)(2), (f)(2), (g) (1986); 40 C.F.R. § 300.68(e), (g)-(h) (1984); 40 C.F.R. 300.430(e)(1)-(9), (f) (1990).  Further, all of the cases that the Borough claims are "outdated" (Borough Op. 27), apply the current version of the NCP.  *See County Line Inv. Co. v. Tinney,* 933 F.2d 1508, 1514-15 (10th Cir. 1991); *Pierson Sand & Gravel, Inc. v. Pierson Twp.,* 89 F.3d 835 (6th Cir. 1996).[4]

_____

[4] The Borough criticizes Arconic for citing cases that are not binding on this Court regarding the NCP public notice and comment provisions, while itself citing exclusively to cases that are not binding on this Court on the same issue.  (Borough Op. 27-28).  The reason both sides have done this is simple: the Third Circuit has not yet ruled on the issue.

i. *The Borough's response was not even consistent with the NCP requirements for removal actions.*

Even if this Court were to conclude that the Borough's response was a "removal action," the undisputed evidence conclusively establishes that the Borough failed to comply with even the less stringent requirements of the NCP governing removal actions.  The NCP would still have required the Borough to consider removal alternatives, and provide notice to the public and an opportunity to comment on the removal alternatives.  40 C.F.R. § 300.415(n)(2)(i)-(iii).  The Borough did neither.  (Opening Br. pp 23-30).  There is no evidence that the public had advance notice that remedial alternatives would be discussed at Council meetings, or that the public had an opportunity to comment until *after* the remedial action was selected, or that critical decisions were evaluated and made during the public meetings, instead of behind closed doors.  (*See id.*).

## III.   The Borough's Unjust Enrichment Claim (Count VII) must be dismissed.

In response to Arconic's well-supported argument that the Borough's independent duty to remediate the Veterans Field site bars its Unjust Enrichment claim, the Borough argues that Arconic is pointing to the wrong "benefit" conferred on it.  (Borough Op. pp. 35-36).  The Borough asserts that the benefit conferred upon Arconic was not from the Borough's remediation of Veteran's Field itself, but from "the illegal disposal of hazardous materials at Veterans Field rather than the proper

11

disposal of the same off-site at a licensed facility. . . The Alcoa Entities thereby unjustly avoided the true cost of disposal of these materials." *Id.*

This argument would only make sense if the Borough did not have an independent legal duty to properly dispose of hazardous materials from Veterans Field, and was not seeking to impose the cost of that disposal on Arconic. But it did, and it is. The Borough had an independent legal duty to properly dispose of the materials, which means it cannot assert a claim that Arconic was unjustly enriched by avoiding the cost of that disposal. (Opening Br. 30-32).[5]

## IV.    The Borough does not dispute that it has failed to prove proximate causation for its Strict Liability Claim (Count IX).

A plaintiff asserting a claim for strict liability in tort under any legal theory must prove that the defendant's actions proximately caused harm to the plaintiff. *Coffman v. Keene Corp.,* 133 N.J. 581, 594 (1993). The subsequent actions of a second party that were not "reasonably foreseeable" and that directly caused harm to the plaintiff are said to "break the causal chain" between the first party's actions

---

[5] The Borough's reliance on this Court's opinion in *AMA Realty LLC v. 9440 Fairview Avenue LLC*, 2017 WL 6728641 (D.N.J. Dec. 28, 2017), for the general proposition that a defendant's dumping of hazardous material on plaintiff's property, thereby avoiding proper disposal costs, *may* give rise to an unjust enrichment claim, does not advance the ball. There is nothing in that opinion indicating that the plaintiff had an independent duty to dispose of the materials, or that the Court had even considered the independent duty bar.

and the harm. *Yun v. Ford Motor Co.*, 276 N.J. Super. 142, 152 (App. Div. 1994).

The Borough does not even mention, much less rebut, Arconic's point that it cannot

be liable under a strict liability theory because Waterside's extraordinary and

senseless actions in dumping known contaminated materials in a public park was not

"reasonably foreseeable." (Opening Br. 32-34). The Borough's claim for strict

liability, therefore, must be dismissed.

## V.     Arconic owed no common law negligence duty to the Borough.

It is undisputed that North River advised Arconic in 1999 that it would put

Building 12 to use and agreed via the EIA to assume all practical and legal

responsibilities for any hazardous materials within the building. It is further

undisputed that Arconic believed Building 12 was still standing and in use until

being advised in 2014 that the building had already been demolished and some of

the resulting rubble had been placed on Veterans Field. The Borough has provided

neither case law nor rationale for imposing a negligence duty on Arconic in these

circumstances.

If Arconic owed the Borough a legal duty under these facts, anyone who ever

sold a useful building that contained any hazardous materials would have a legal

duty to monitor the building *in perpetuity* should some future owner decide to

demolish it. This perpetual duty would not end with monitoring; it would require

the seller of the building to track all hazardous materials that had been in the building

13

after demolition to assure that they were disposed of in accordance with state and federal regulations, and to warn all third party owners of property where the demolished materials might be placed.  (Opening Br., pp. 36-39).  The law imposes no such legal duty, and complying with it would be a practical impossibility.

Neither of the cases cited by the Borough supports the imposition of such a far reaching duty.  In *Preferred Real Estate Invs. v. Edgewood Props.*, 2007 WL 81881 (D.N.J. Jan. 9, 2007), the defendants provided a developer with crushed concrete for fill from an already demolished building, knowing it was contaminated, and without informing the developer of the contamination.  *Id.* at *3.  The court rejected the defendant's argument that it could escape liability because it "did not know the contaminated concrete would wind-up specifically on [p]laintiffs' property . . ." *Id.*  Here, Arconic did not sell contaminated concrete as fill material, nor is its defense that it did not know that the contaminated fill would end up specifically at Veterans Field.  Rather, Arconic sold a standing building that the purchaser intended to put to use, knowing it contained some contamination.  (SUMF ¶ 42).  Arconic had no reason to believe that the building or any of its constituent materials would, in the foreseeable future, be placed on any third party's property.  There was no reasonably foreseeable or even identifiable class of persons for Arconic to protect or warn.

The other case cited by the Borough, *Olivo v. Owens-Ill., Inc.*, 189 N.J. 394 (2006), stands for nothing other than the general proposition that the existence of a duty turns on foreseeability.

Because the Borough has failed to establish that Arconic owed it a duty of care, its negligence claim should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons and for the reasons set forth in Arconic's moving papers, Arconic respectfully requests this Court grant its motion for summary judgment and dismiss all claims by Plaintiff Borough of Edgewater against Arconic, with prejudice.

Dated:        December 7, 2020          Respectfully submitted,
                                         **K&L GATES LLP**

                                         By: *<u>/s/ Michael E. Waller</u>*
                                              Michael E. Waller
                                              Charles F. Rysavy
                                              Malory M. Pascarella
                                              One Newark Center, Tenth Floor
                                              Newark, New Jersey 07102
                                              Tel:  (973) 848-4000
                                              michael.waller@klgates.com
                                              charles.rysavy@klgates.com
                                              malory.pascarella@klgates.com
                                              *Attorneys for Arconic Inc. (f/k/a*
                                              *Alcoa Inc.) and Arconic Domestic,*
                                              *LLC (f/k/a Alcoa Domestic LLC, as*
                                              *successor in interest to A.P. New*
                                              *Jersey, Inc.)*