**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

BOROUGH OF EDGEWATER,

       Plaintiff,

    v.

WATERSIDE CONSTRUCTION, LLC; 38
COAH , LLC; DAIBES BROTHERS, INC.;
NORTH RIVER MEWS ASSOCIATES, LLC;
FRED A. DAIBES; TERMS
ENVIRONMENTAL SERVICES, INC.;
ALCOA INC.; ALCOA DOMESTIC, LLC, as
successor in interest to A.P. NEW JERSEY,
INC.; HUDSON SPA, LLC; JOHN DOES 1-
100; ABC CORPORATIONS 1-100,

       Defendants

and

WATERSIDE CONSTRUCTION, LLC; 38
COAH LLC; DAIBES BROTHERS, INC.;
NORTH RIVER MEWS ASSOCIATES, LLC;
FRED A. DAIBES,

       Defendants/ Third-Party Plaintiffs

    v.

NEGLIA ENGINEERING ASSOCIATES,

       Third-Party Defendants,

and

ALCOA DOMESTIC, LLC as successor in
interest to A.P. NEW JERSEY, INC.,

Civil Action No. 14-5060

**OPINION**

|                                              |
|----------------------------------------------|
| Defendant/Third-Party Plaintiff,             |
| v.                                           |
| COUNTY OF BERGEN; RIVER ROAD IMPROVEMENT PHASE II, INC.; HUDSON SPA, LLC, |
| Third-Party Defendants.                      |

**John Michael Vazquez, U.S.D.J.**

Presently before the Court are four motions (D.E. 347, 348, 350, 353) for summary judgment filed by Plaintiff Borough of Edgewater ("Edgewater") against Waterside Construction, LLC ("Waterside"), 38 COAH, LLC ("38 COAH"), North River Mews Associates, LLC ("North River"), and Fred Daibes (collectively, the "Waterside Defendants"). The Court reviewed all submissions made in support and in opposition to the motion and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Edgewater's motions for summary judgment at D.E. 347 and D.E. 348 are **DENIED,** while Edgewater's motions for summary judgment at D.E. 350 and D.E. 353 are **DENIED in part and GRANTED in part**.[1]

---

[1] The current motions are part of a large number of motions for summary judgment filed in this matter. All pending motions are listed in the Procedural History section of this Opinion. If the Court were to address all motions in a single opinion, the results would be unwieldly. As a result, the Court addresses the motions individually or, as here, in a group. The Court also does not repeat each and every alleged fact in each opinion. Instead, the Court focuses on the facts pertinent to each motion (or motions) as asserted by the parties to the motion(s). Therefore, if the facts in one opinion appear to be distinguishable from facts in another opinion, it is because those are the facts asserted by the party or parties in its/their respective motions.

## I.  BACKGROUND

### A.  Facts[2]

This matter stems from an allegation that Waterside Defendants used polychlorinated biphenyl ("PCB")[3] contaminated material as fill in a public park project.  The park is owned by Plaintiff Edgewater, but the contaminated materials (or at least some of them) came from a property previously owned by Alcoa Corporation ("Alcoa").

#### 1.  The Alcoa Property

Alcoa, a party in this case, constructed and operated an industrial plant (the "Alcoa Property") from 1914-1965 in Edgewater, New Jersey.  BE SOMF ¶ 1.  A structure, referred to as "Building 12," was constructed on that site in 1938.  BE SOMF ¶ 3.  The site was subsequently acquired by Amland Properties Corporation ("Amland"), who then discovered PCB contamination throughout the property.  Amland sued Alcoa, which resulted in a settlement and the site was

---

[2] Both parties filed Statements of Material Facts.  Edgewater's statement (D.E. 319-1) will be referred to as "BE SOMF," while Waterside's statement (D.E. 328-1) will be referred to as "W SOMF."  The Court notes that Waterside failed to follow the proper procedure set forth in Local Rule 56.1—instead of citing to the record when disputing a specific fact, Waterside cited generally to its own statement of material facts.  The Court has done its best to follow Waterside's factual disputes, but to the extent the Court is unable to discern what in the record causes Waterside to dispute a specific fact, that fact will be deemed undisputed.  *See Nike, Inc. v. E. Ports Custom Brokers, Inc.*, No. 2:11-CV-4390-CCC-MF, 2018 WL 3472628, at *1, n.1 (D.N.J. July 19, 2018) (where non-moving party did not provide citations to specific facts of record in its responsive statement, Court deemed all statements not properly denied by non-moving party as admitted); *Friedman v. Bank of Am., N.A.*, No. CIV.A. 09-2214 JBS, 2012 WL 1019220, at *6, n.2 (D.N.J. Mar. 26, 2012) ("[T]he court will consider any statement of fact which was not denied by the Plaintiffs with a citation to the record as undisputed for the purposes of this motion for summary judgment.").

[3] According to the Environmental Protection Agency, PCBs are a group of man-made organic chemicals consisting of carbon, hydrogen and chlorine atoms.  *United States Environmental Protection Agency, Learn about Polychlorinated Biphenyls* (PCBs), https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls-pcbs.  PCBs have been demonstrated to cause a variety of adverse health effects.  *Id.*

conveyed to an Alcoa entity, A.P. New Jersey, Inc. ("AP"), which later became Arconic Domestic LLC. BE SOMF ¶ 12. The Amland settlement agreement required that the deed of conveyance contain a legend notice stating that "[t]his property may be contaminated with hazardous substances including Polychlorinated Biphenyls." BE SOMF ¶ 11.

In 1997, Alcoa sold the property to North River, an entity affiliated with Fred Daibes. Pursuant to the terms of the Purchase and Sale Agreement ("PSA") and the related Multi-Party Agreement ("MPA"), AP agreed to pay River Road Improvement Phase II, Inc. ("RRIP") up to $12,000,000 for the demolition, removal, and proper disposal of the buildings on the site pursuant to a Remedial Action Work Plan. BE SOMF ¶ 41. Later that year, North River requested permission to postpone the demolition of Building 12. BE SOMF 52. In 2006, the portion of the Alcoa Property containing Building 12 was transferred from North River to 38 COAH, another entity affiliated with Fred Daibes. BE SOMF ¶ 65. In 2010, certain areas of the exterior walls on Building 12 became unstable and fell. BE SOMF ¶ 68.

### 2. Veteran's Field in Edgewater

In 2011, Plaintiff Edgewater sought to improve Veterans Field, a 27-acre public park owned by the borough. BE SOMF ¶¶ 75-76. TERMS, an environmental consulting firm, was retained as a consultant and Licensed Site Remediation Professional for the project. After a bidding process, Waterside, a construction company managed by Fred Daibes, was awarded the contract for the improvement project. BE SOMF ¶¶ 80, 85, 86.

When the amount of fill needed at the Veterans Field project increased, Waterside imported and used the PCB-contaminated material from Building 12 as fill on Veterans Field. BE SOMF ¶ 93. The parties dispute whether this was done with TERMS' knowledge and/or approval. Edgewater further asserts that on September 7, 2013, after advising Neglia, the engineer assigned

to the project, that no work would be performed over the weekend, Waterside dumped unapproved fill on the site and then covered the fill when the Neglia supervisor arrived to the site. BE SOMF ¶¶ 95-98. Edgewater alleges that Waterside continued to import contaminated materials from September 7, 2013 to October 3, 2013, when TERMS issued a letter advising of the PCB contamination and closed the Veterans Field site for an assessment. BE SOMF ¶¶ 106-107. Waterside disputes this.

There was some PCB contamination present at Veterans Field before the project began, with the highest level being 2.5 parts per million ("ppm"). BE SOMF ¶ 78. Sampling done after the site was closed in October 2013 found that fill materials used throughout the site were contaminated with PCBs, including (1) crushed concrete with levels ranging from 100-350 ppm used for concrete sidewalks and cement pads, and (2) concrete combined with soil with levels ranging from 10-350 ppm used as fill on the field and under paved areas. BE SOMF ¶¶ 11. Impacted materials were excavated pursuant to an EPA-approved Self-Implementing Plan and disposed off-site. BE SOMF ¶¶ 115.

To recap, North River was the owner of the Alcoa Property beginning in 1997. BE SOMF ¶ 36. 38 COAH was the owner of the portion of the Alcoa Property containing Building 12 and the owner of the contaminated building materials discharged at Veterans Field. BE SOMF ¶ 65. Waterside was the contractor charged with remediating Veterans Field. BE SOMF ¶ 85. Though not a party to the instant motions, TERMS was an environmental consulting group retained by Edgewater in 2011 to conduct an initial investigation of the site to assess historic contaminated fill at Veterans Field. In or about 2012, TERMS agreed to serve as the Licensed Site Remediation Professional for the Veterans Field Project. BE SOMF ¶¶ 76, 80.

## B. Procedural History

Edgewater first filed suit on August 12, 2014. D.E. 1. The Alcoa Defendants filed a Third-Party Complaint against the County of Bergen and RRIP on December 5, 2014. D.E. 23. The Waterside Defendants filed a Third-Party Complaint against Neglia on December 5, 2015. D.E. 24. On February 27, 2018, the separate matters docketed as 14-8129 and 14-50560 were consolidated. D.E. 255. On March 19, 2018, Edgewater filed its Fifth Amended Complaint, which is the operative complaint in this matter. D.E. 256 ("Complaint"). The claims contained in that Complaint are as follows:

| | |
|---|---|
| Count I: | Contribution under the Spill Act against Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, Alcoa, TERMS, Alcoa Domestic, Hudson Spa, John Does 1-100, and ABC Corporations 1-100; |
| Count II: | Cost Recovery under CERCLA against Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, Alcoa, TERMS, Alcoa Domestic, Hudson Spa, John Does 1-100, and ABC Corporations 1-100; |
| Count III: | Breach of contract against Waterside; |
| Count IV: | Fraud against Waterside and Fred Daibes; |
| Count V: | Negligence against Waterside; |
| Count VI: | Negligence against Fred Daibes, Daibes Brothers, North River, and 38 COAH; |
| Count VII: | Negligence against Alcoa, Alcoa Domestic, and Hudson Spa; |
| Count VIII: | Unjust Enrichment against and Waterside, Fred Daibes, North River, Daibes Brothers, 38 COAH, Alcoa, Alcoa Domestic, Hudson Spa; |
| Count IX: | Strict Liability against Alcoa, Alcoa Domestic, and Hudson Spa; |
| Count X: | Strict Liability against Waterside, Fred Daibes, Daibes Brothers, North River, and 38 COAH; |
| Count XI: | Consumer Fraud Act claim against Waterside and Fred Daibes; |
| Count XI: | Breach of contract against TERMS; and |

Count XII:    Negligence against TERMS.

Multiple parties have filed multiple motions for summary judgment. The motions are as follows:

- Motion by TERMS for summary judgment against Edgewater (D.E. 339);
- Motion by Hudson Spa for summary judgment against Edgewater (D.E. 342);
- Motion by Arconic for summary judgment against Edgewater (D.E. 344);
- Motion by Arconic for summary judgment against Fred Daibes and North River;
- Motion by Bergen County for summary judgment against Alcoa, North River, and RRIP (D.E. 346);
- Motion by Edgewater for summary judgment against the Waterside Entities on Count XI (D.E. 347);
- Motion by Edgewater for summary judgment against the Waterside Entities on Counts II and VI (D.E. 348);
- Motion by Edgewater for summary judgment against Alcoa on Count I (D.E. 349);
- Motion by Edgewater for summary judgment against the Waterside Entities on Count I (D.E. 350);
- Motion by Arconic for summary judgment against North River, 38 COAH, and RRIP (D.E. 351);
- Motion by Edgewater for summary judgment against Alcoa on Count II (D.E. 352); and
- Motion by Edgewater for summary judgment against the Waterside Entities on Count II (D.E. 353).

This Opinion address only the motions filed by Edgewater for summary judgment against the Waterside Entities. (D.E. 347, 348, 350, 353).

## II.    LEGAL STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary

judgment.  *Id.*  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)).  A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party.  *Anderson*, 477 U.S. at 250.  "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322.  "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate.  *See Anderson*, 477 U.S. at 250-51.

III.    ANALYSIS

A.  CERCLA

Edgewater has moved for summary judgment against Waterside, 38 COAH, North River, and Fred Daibes on Count II, a claim for cost recovery under CERCLA.[4]  D.E. 353.

1.  CERCLA Overview

Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), codified as 42 U.S.C. § 9601 et seq., "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination."  *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal quotations omitted).  "CERCLA provides two mechanisms that allow potentially responsible parties ("PRPs") to recover costs they have expended to decontaminate a polluted site: § 107(a) cost recovery claims and § 113(f) contribution claims."  *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 216 (3d Cir. 2010).  Section 107(a), in part, allows private parties to hold PRPs responsible for "any other necessary costs of response incurred by any other person" consistent with CERCLA.  42 U.S.C. § 9607(a)(4)(B); *Agere Sys., Inc.*, 602 F.3d at 225.

Under CERCLA, PRPs are

> (1) the owner and operator of a vessel or a facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or

---

[4] In this Section, Plaintiff's Brief in Support (D.E. 353-1) will be referred to as "Pl. Brf."; Defendant's Brief in Opposition (D.E. 377) will be referred to as "Def. Brf."; and Plaintiff's Brief in Reply (D.E. 397) will be referred to as "Pl. Reply."

possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance[.]

42 U.S.C. § 9607(a)(1)-(4); *see also Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 379 (3d Cir. 2013). The first two categories are commonly referred to as "owner or operator," the third as "arranger," and the fourth as "transporter."

"CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence." *United States v. Cornell-Dubilier Elecs., Inc.*, No. 12-5407 JLL, 2014 WL 4978635, at *8 (D.N.J. Oct. 3, 2014) (citing *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000)) (internal quotations omitted). "When determining CERCLA liability, 'there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain.'" *Niagara Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112, 131 (2d Cir. 2010) (quoting *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 547 (6th Cir. 2001)).

Edgewater first argues that Veterans Field is a "facility" and that there was a "release." A facility is defined as follows:

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9). 42 U.S.C. § 9601(9)(B); *see also New York v. Shore Realty Corp.*, 759 F.2d 1032, 1043 n.15 (2d Cir. 1985) (noting that "CERCLA defines the term 'facility' broadly to include

any property at which hazardous substances have come to be located"). Imposition of liability under CERCLA requires evidence of a release or threatened release of hazardous substances at the facility. A "release" includes the following:

> [A]ny spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)

42 U.S.C. § 9601 (22). PCBs are denominated a hazardous substances in § 302.4. 40 C.F.R. § 302.4, Table 302.4.

The Waterside Defendants do not dispute Edgewater's arguments that (1) Veterans Field is a "facility" or that (2) a "release" occurred at Veterans Field. Instead the Waterside Defendants argue that they were not owners, operators, arrangers, or transporters under CERCLA. The Court will address each category.

### 2. Potentially Responsible Parties

#### a. Operator Liability

Edgewater argues that both Fred Daibes and Waterside are liable as "operators." Under the statute, an operator is a person who "controlled activities at such facility." 42 U.S.C. § 9601(20)(A). According to the Supreme Court, an operator is "simply someone who directs the workings of, manages, or conducts the affairs of a facility." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998). In *Bestfoods*, the critical issue was "whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary." 524 U.S. at 55. The Supreme Court recognized that a parent company could be *derivatively* liable under CERCLA for the acts of its subsidiary by piercing the corporate veil. *Id.* at 62. The *Bestfoods*

Court also explained that a parent company could be *directly* liable under CERCLA if it was in fact an operator of the facility. *Id.* at 65. However, the Court held that "[t]o sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations *specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations*." *Id.* at 66-67 (emphasis added). The *Bestfoods* standard looks beyond general control of a company to specific control over pollution-related activity at a facility. *Id.* at 66-67.

Several courts, including the Third Circuit, have applied the *Bestfoods* definition of operator outside of the parent-subsidiary context. *See, e.g.*, *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 381-83 (3d Cir. 2013) (using *Bestfoods* to determine whether an independent company, not the parent company, was liable as an operator for its active remediation efforts at a facility).[5] And at least one court has applied *Bestfoods* to find that a shareholder liable under CERCLA as an operator. *See United States v. Lawrence Aviation Indus., Inc.*, No. 06-CV-4818, 2019 WL 1259791, at *15 (E.D.N.Y. Mar. 19, 2019).

### i. Waterside

Edgewater argues that Waterside was an operator because it conducted operations specifically related to the disposal of Building 12's hazardous waste. Pl. Brf. at 25. Waterside

---

[5] In *Litgo*, the district judge applied the *Bestfoods* standard to the United States in determining whether it was liable as an operator under CERCLA for its relationship with plaintiff's aircraft manufacturing facility during and after World War II. 2010 WL 2400388, at *6-7, 23. After recognizing that "[t]he United States Defendants' role in the operations of [plaintiff's aircraft manufacturing facility] was limited to purchasing aircraft parts from the company and conducting periodic inspections to ensure that the site was maintained in compliance with industry standards," the district court concluded that "[t]he United States Defendants did not manage, direct, or conduct any of the day-to-day operations or manage, direct, or conduct any activities that had to do with the leakage or disposal of hazardous wastes" at the facility. *Id.* at 24. As a result, the government was not liable as an operator. *Id.*

responds that it was following TERMS' direction, and that it therefore did not "manage, direct, or conduct operations." Def. Brf. at 17. In support of Waterside's contention that it sought permission from TERMS to utilize material from the former Alcoa Property, Waterside cites to the deposition testimony of Fred Daibes, the managing member and majority shareholder of Waterside (BE SOMF ¶ 132), Mark Iafelice,[6] and Matthew Vereb, Waterside's job supervisor at Veterans Field (BE SOMF ¶ 131). Daibes testified that Waterside sought permission from TERMS to utilize the Alcoa material, but did not seek permission from TERMS to utilize any other recycled concrete aggregate ("RCA"). Corriston Cert. (D.E. 355), Ex. Y at T. 79:15-20. Daibes also testified that all the fill material brought to the site was required to be tested and that the Alcoa material was the only material that was not tested. Corriston Cert. (D.E. 355), Ex. Y at T. 80:11-20. Vereb testified that Waterside advised that the source of the material was the Alcoa Property but did not advise that the material contained PCBs. Vereb also indicated that he thought that there had been discussions indicating that testing would not be required since the material would be installed under a cap, but then clarified that he was not aware of any written approval from TERMS permitting Waterside to use the RCA material. Corriston Cert., Ex. XXX at T. 93:25-96:21.

While the parties dispute whether TERMS actually approved the use of the RCA from Building 12 at Veterans Field, the dispute is not material. Waterside relies on *Lentz*, asserting that it is not liable as an operator because it did not have the power to control the disposal actives. *Lentz v. Mason*, 961 F. Supp. 709, 716 (D.N.J. 1997). The facts of *Lentz*, however, have little bearing on Waterside's activity here. In *Lentz*, a landowner sued a realtor after a tenant violated

---

[6] While Mark Iafelice's deposition is ostensibly attached to the Bernstein Certification at Exhibit VV, the Certification skips this exhibit. The Court is therefore unable to review the deposition testimony cited as Bernstein Cert. (D.E. 384), Ex. VV at T. 42:22-43:22.

CERCLA by storing torpedo tubes on the landowner's property. *Id.* The realtor's sole involvement was in locating the tenant for the landowners. *Id.* The broker played no role in the disposal of hazardous waste at the property. *Id.* The *Lentz* court therefore held that the realtor was not an operator. *Id.*

Here, Waterside is a contractor who managed, directed, or conducted operations specifically related to pollution, including the disposal of hazardous waste. Waterside, even if it were acting with TERMS' "approval," still conducted operations specifically related to pollution at Veterans Field. *See Bestfoods*, 524 U.S. at 66. Even resolving the factual disputes in Waterside's favor, Waterside was the entity who selected the Building 12 material and disposed of it at Veterans Field. BE SOMF ¶¶ 97, 106. Waterside has not asserted that TERMS directed it to import contaminated material. Further, to the extent Waterside is asserting that TERMS' involvement would relieve Waterside of fault, CERCLA imposes strict liability and is not dependent on a finding of fault. *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Env't Prot.*, 725 F.3d 369, 381 (3d Cir. 2013); *United States v. USX Corp.*, 68 F.3d 811, 815 (3d Cir. 1995), as amended (Dec. 14, 1995) ("Liability of responsible parties is strict, i.e., not dependent on a finding of fault."). *See also Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1342 (9th Cir. 1992) (denying motion to dismiss "operator" claim against contractor who excavated tainted soil, moved it, and spread it over uncontaminated portions of property); *Ganton Techs., Inc. v. Quadion Corp.*, 834 F. Supp. 1018 (N.D. Ill. 1993) (denying motion to dismiss "operator" claim against contractors hired for clean up who contaminated previously uncontaminated areas). Because there are no genuine disputes of material fact, the Court grants summary judgment in favor of Edgewater as to Waterside's CERCLA liability as an operator.

### ii. Fred Daibes

Fred Daibes is the managing member and majority shareholder of North River, 38 COAH, and Waterside. BE SOMF ¶ 39, 132. The parties' factual dispute boils down to whether, and to what extent, Fred Daibes himself played a role in using the Building 12 material at Veterans Field. According to Edgewater, Daibes was the point of contact for the remediation of the Alcoa Property. BE SOMF ¶ 131-32. Edgewater further claims that Daibes gave the approval of the use of the Building 12 RCA material and did not advise Vereb that the material contained PCBs. BE SOMF ¶ 131. Waterside submits that Mark Iafelice instructed Waterside Construction employees to bring RCA from Building 12 and that Iafelice did not receive authorization from Daibes. W SOMF ¶ 87.

During his deposition and in response to whether Daibes approved the use of the material, Vereb responded "yes" and stated that Daibes did not advise him that it contained PCBs. Corriston Cert., Ex. XXX, at T. 72:5-22. Kenneth Schiller, a Waterside employee (Corriston Cert. Ex. SSS, (Menzella Dep.) at T. 40:5-19), stated that he authorized the bringing of the Building 12 material to Veterans Field. Schiller did not recall anyone else instructing him to do so but indicated that Vereb "may have mentioned" doing so and that Vereb was responsible for determining what material should be brought to Veterans Field. Musso Cert. (D.E. 397-2), Ex. A, at T. 42:16-45:11. Iafelice testified that Vereb and Schiller were involved in the decision to use that Building 12 RCA as fill at Veterans Field. In response to the question whether Daibes wanted the RCA material used on Veterans Field, Iafelice responded "not to my knowledge[.]" Musso Cert. (D.E. 397-2), Ex. B, at T. 110:24-112:1.

Daibes testified that the ultimate decision making as to 38 COAH and North River is his alone. Corriston Cert, Ex. Z, at T. 32:6-15; 33:19-22. He also testified that for Waterside, he

makes "all the big decisions" and responded affirmatively to the question "the buck stops with you?" Corriston Cert, Ex. Z, at T. 36:8-13. Daibes added that he was aware Waterside was bringing RCA from the Alcoa Property to Veterans Field because "his people," "Kenny, Mark, whoever," told him. Musso Cert. (D.E. 397-2), Ex. C, at T. 102:25-103:25.

However, "knowledge of a practice is not the same as undertaking that practice for the purposes of operator liability under CERCLA." *PPG Indus. Inc. v. United States*, 957 F.3d 395, 404 (3d Cir. 2020). Here, because the testimony conflicts as to whether the Building 12 material was brought to Veterans Field at the direction of Fred Daibes, the Court denies summary judgment. *See Bestfood* at 66-67; *see also City of New York v. N.Y. Cross Harbor R.R. Terminal Corp.*, No. 98-CV-7227, 2006 WL 140555, at *14 (E.D.N.Y. Jan. 17, 2006) (denying summary judgment against owner and CEO because there was an issue of material fact as to the depth of his "involvement in environmental compliance and hazardous waste disposal").

### b. Arranger Liability

Edgewater argues that Fred Daibes, Waterside, Daibes Brothers, North River, and 38 COAH (the "Arranger Defendants") are liable as arrangers under 42 U.S.C. § 9607(a)(3). Pl. Brf. at n.1, 27. "[U]nder the plain language of the [CERCLA] statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Burlington*, 556 U.S. at 611. "[K]nowledge alone is insufficient." *Burlington*, 556 U.S. at 612. In addition, "[o]wnership or possession of the hazardous substance must be demonstrated." *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 677 (3d Cir. 2003). Arranger liability does not attach "when the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product." *Burlington*, 556 U.S. at 611. In addition to ownership or possession, an arranger also must have "either control over the process that results in a release of hazardous waste or

knowledge that such a release will occur during the process." *Morton*, 343 F.3d at 677. Arranger liability is to be broadly construed as "only through a broadly read scheme of arranger liability could Congress hold those actually responsible for any damage, environmental harm, or injury from chemical poisons for the cost of their actions." *EPEC Polymers, Inc. v. NL Indus., Inc.*, No. CIV.A. 12-3842 MAS, 2013 WL 2338711, at *7 (D.N.J. May 28, 2013) (citing *Morton*, 343 F.3d at 676) (internal quotations and alterations omitted). The most important factors in determining arranger liability are (1) ownership or possession; and (2) knowledge; or (3) control, *id.*, coupled with the entity taking "intentional steps to dispose of [the] hazardous substance." *Burlington*, 556 U.S. at 611 (citation omitted).

Waterside argues that it is not liable because the Building 12 RCA was not considered waste by Waterside at the time the material was brought to Veterans Field and Waterside therefore did not intend to dispose of hazardous material. Def Brf. at 18-19. In *Burlington Northern*, the Supreme Court effectively decided that arranger liability creates an exception to the statute's strict liability provisions. *See Town of Islip v. Datre*, 245 F. Supp. 3d 397, 418 (E.D.N.Y. 2017) (citing *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599 (2009). As *Datre* noted, the *Burlington Northern* decision did not address whether an alleged arranger must know whether the material was hazardous. *Id.* at 419. In fact, "few courts have addressed whether an arranger defendant must know that the material in question is hazardous." *Id.* at 422. *Datre*, to which both sides cite, explained that knowledge is relevant to the inquiry. *Darte*, relying heavily on *Appleton Papers Inc. v. George A. Whiting Paper Co.*, No. 08-C-16, 2012 WL 2704920 (E.D. Wis. July 3, 2012), reasoned that CERCLA is intended to deter parties from polluting and that a party cannot be deterred from such behavior if it did "not even realize it was polluting." *Datre*, 245 F. Supp at *423 (citing *Appleton Papers*, at *11). *Datre* indicated that for arranger liability to apply, "a

plaintiff must establish that the defendant who arranged for the disposal of material knew, *or should have known*, that the material contained hazardous substances. *Id.* at 424 (emphasis added). The Court finds *Datre* persuasive and adopts its standard here.

Waterside asserts that the only material that it knew contained hazardous material stemmed from the foundation walls at Building 12 and that it was not aware that the fill material coming from the interior of Building 12 was contaminated until it was later informed by TERMS. W SOMF ¶ 94. Waterside supports this mainly via Fred Daibes' deposition testimony. Waterside SOMF ¶¶ 94, 96, 97. A court deciding a motion for summary judgment is not required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question. *Hammonds v. Collins*, Civ. No. 12-236, 2016 WL 1621986, at *3 (M.D. Pa. Apr. 20, 2016) (citing *Brooks v. Am. Broad. Co.*, 999 F.2d 167, 172 (6th Cir. 1993)); *see also Brooks v. Kerry*, 37 F. Supp. 3d 187, 210 (D.D.C. 2014) (non-movant "cannot defeat a summary judgment motion on the basis of such self-serving testimony alone.").

As affirmative proof, Edgewater indicates that North River paid $8 million for the Alcoa Property and its structures. BE SOMF ₱ 41. Edgewater asserts that the relatively low price of the 1997 Agreements (the PSA and MPA) indicates North River knew the Alcoa Property's structures were waste. Edgewater continues that per the terms of the 1997 agreements, RRIP was to receive up to $12 million from the Alcoa Entities for demolishing, treating, and removing all structures on the Alcoa Property. BE SOMF ₱ 41. Subsequently, Enviro-Sciences advised the New Jersey Department of Environmental Protection ("NJDEP") that Building 12 was to remain in place. BE SOMF ₱ 59. As a result, the NJDEP approved the temporary measure of capping the Building 12 walls subject to a deed notice with the following restrictions: (1) no public access to Building 12; (2) the painted walls could not be modified without prior NJDEP approval; and (3) no

development or modification of the site was permitted without prior NJDEP approval. BE SOMF ¶ 61.

In 2010, Enviro-Sciences wrote to NJDEP, indicating that Enviro-Sciences was retained by 38 COAH "to evaluate the Deed Notice that was established for contamination in the walls of Building 12." Corriston Cert., Ex. CCC. The letter stated that the exterior walls on Building 12 became unstable and fell, and that the fallen walls were collected and stored inside Building 12. *Id.* The letter continued that "[i]f in the future Building 12 is demolished and (sic) the walls containing PCBs will be sampled and disposed of to a licensed facility under the supervision of the Department of Health." *Id.* Though Edgewater cites to this 2010 letter, Edgewater has not pointed the Court to a specific portion of the letter that discussed Building 12's *interior*. BE SOMF ¶ 68 (citing Corriston Cert., Ex. CCC). The letter specifically stated that the *exterior* walls became unstable and fell, were stored on a tarp, and were sampled. Ex. CCC at pg. 2. Edgewater also cites to an analytical data report dated April 4, 2011, though it is not clear what Building 12 material (interior, exterior, or otherwise), the report is analyzing. Corriston Cert., Ex. DDD.

In an April 11, 2011 letter to Daibes Enterprises, Enviro-Sciences provided a revised proposal to sample and dispose of the PCB impacted concrete associated with Building 12. Corriston Cert., Ex. EEE. The letter stated that waste classification samples were obtained and showed PCB concentrations of 91 ppm. *Id.* It continued that "the bricks and concrete will have to be disposed of as hazardous material." *Id.* The letter does not distinguish between the interior and exterior walls of Building 12. *Id.* On September 17, 2020, the NJDEP informed Glen Donlon of Daibes Brothers that it had approved the Draft Termination of Deed Notice for Building 12. Corriston Cert., Ex. FFF. The letter explained that the NJDEP no longer regulated the remediation of building interiors unless there is a known or suspected discharge of a hazardous substance that

may result in a discharge to the environment. *Id.* However, NJDEP required that the Remedial Action Outcome include an insert stating, "Building Interiors Not Addressed," which was "intended to clarify that the response action outcome did not address contamination that may be in the building." *Id.*

There is a genuine dispute of material facts as to whether any of the Waterside Entities knew or should have known that the *interior* walls of Building 12 were contaminated. Summary judgment is denied on the theory of arranger liability for this reason. *See UPMC v. CBIZ, Inc*., 436 F. Supp. 3d 822, 842 (W.D. Pa. 2020) ("[A] party's knowledge is [usually] a question of fact for the jury to determine.").

### c. Transporter Liability

Edgewater seeks to impose CERCLA liability on Waterside as a "transporter" under 42 U.S.C. § 9607(a)(4). Transporter liability is established by showing that a person accepted hazardous substances for transport and either selected the disposal facility or had substantial input into deciding where the hazardous substance should be disposed. *United States v. USX Corp*., 68 F.3d 811, 820 (3d Cir. 1995), as amended (Dec. 14, 1995)).

Defendants have not cited any authority, nor otherwise argued, that transporter liability requires the same considerations as arranger liability. *See Datre*, 245 F. Supp. 3d at 423 (citing *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599 (2009)). The genuine dispute of material fact as to the Waterside Entity's knowledge of contamination, discussed above, therefore does not preclude a finding of transporter liability. Waterside argues that it was Edgewater, through TERMS and Neglia, that maintained control of the Building 12 disposal, and that the Waterside Defendants are therefore not liable. Waterside does not dispute that it transported and disposed of the Building 12 materials at Veterans Field. BE SOMF ¶ 119, 120, 130. Waterside

has not cited to any binding or persuasive authority that demonstrates that the involvement of TERMS or Neglia negates Waterside's own liability. Even if TERMS did approve the use of the Building 12 material, Waterside has not disputed that it chose the material and Veterans Field as the disposal site. Having transported the contaminated Building 12 material to Veterans Field, Waterside is liable as a transporter, and the Court grants summary judgment in Edgewater's favor on its CERCLA claim against Waterside on a theory of transporter liability.[7]

### d. Owner Liability

Edgewater moves for the imposition of "owner" liability against 38 COAH and North River. Section 107(a) of CERCLA provides in pertinent part that an owner or operator shall be liable for "any other necessary costs of response incurred by any other person consistent with the national contingency plan[.]" 42 U.S.C. § 9607(a). Edgewater argues that 38 COAH qualifies as both a current and former owner under 42 U.S.C. § 9607(a)(1) and (a)(2). Under subsection (a)(1), Edgewater argues that it is sufficient that 38 COAH owned the Alcoa Property in 2010, when Building 12 began to crumble, and in 2013, when Building 12 was demolished and material was taken to Veterans Field. Pl. Brf. at 19; BE SOMF ¶ 65, 68. Under subsection (a)(2), Edgewater claims that it is sufficient that 38 COAH owned the Alcoa Property when Building 12 was demolished and taken to Veterans Field. Pl. Brf. at 19.

It is undisputed that 38 COAH owned Building 12 when it was demolished and brought to Veterans Field, that a release occurred at Veterans Field, and that Edgewater—not 38 COAH—

---

[7] It is not clear whether Edgewater also moved for summary judgment as to Fred Daibes on a theory of transporter liability. Edgewater's opening brief discusses Daibes' involvement, but Edgewater does not respond in its reply brief to the Waterside Defendant's argument that Daibes is not liable as a transporter. To the extent Edgewater moved for summary judgment as to Daibes on a theory of transporter liability, summary judgment is denied there is a genuine issue of material fact as to the involvement and approval of Daibes.

owns Veterans Field. This Court first finds that both Building 12 and Veteran's Field can both be facilities. *See EPEC Polymers, Inc. v. NL Indus., Inc*., No. CIV.A. 12-3842 MAS, 2013 WL 2338711, at *6 (D.N.J. May 28, 2013) ("Although [the site where the hazardous substance was disposed] may arguably be considered a 'facility' as well, that fact does not require dismissal of Plaintiff's owner/operator theory."). The question then becomes whether it is necessary for owner liability that the discharger owned the "facility" at which the discharge occurred and where cleanup costs were incurred.

Owner liability straight-forwardly attaches to the owner of the facility at which the discharge occurred and cleanup costs were incurred. *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Env't Prot*., 725 F.3d 369, 379 (3d Cir. 2013) (describing owner liability as applying to "current owners and operators of the 'facility' *at which the contamination occurred*") (emphasis added). The more difficult question arises when a discharge at the owner or operator's facility results in cleanup costs on a property other than the facility itself.

In *EPEC Polymers*, a plaintiff sued after hazardous waste generated at the defendant's site was dumped into a bordering river and contaminated plaintiff's property. *EPEC Polymers, Inc. v. NL Indus., Inc*., No. CIV.A. 12-3842 MAS, 2013 WL 2338711, at *4 (D.N.J. May 28, 2013). The defendants argued at the motion to dismiss stage that, because the facility they owned was not the facility which incurred response costs, they were not liable as "owners" under CERCLA. Judge Shipp disagreed, ruling that the defendant's role as owner of the initial site from which the contaminated materials came sufficiently alleged a *prima facie* case. *Id.* Judge Shipp reasoned that the fact that the two sites were not adjacent to each other was irrelevant because they could be considered "functionally adjacent" due to sharing a common border via the river. *Id.* at *6. Judge Shipp also found a similarity to cases involving "the flow of water due to gravity or erosion"

transferring hazardous materials, which he found applicable even though a third-party may have spread the contamination further. *Id.* at *6. For comparison, he cited to *Beazer*, in which the defendant dumped hazardous waste into the water flowing between his property and the plaintiff's, and *Nutra Sweet*, in which the defendant was liable for hazardous waste after contaminated mop water was dumped onto adjacent land and had traveled via groundwater flow. *See Louisiana–Pac. Corp. v. Beazer Materials & Servs., Inc.,* 811 F.Supp. 1421, 1431 (E.D.Cal.1993); *NutraSweet Co. v. X-L Eng'g Corp.*, 933 F. Supp. 1409, 1422 (N.D. Ill. 1996), aff'd sub nom. *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776 (7th Cir. 2000).

Here, the two sites are not adjacent, in reality or functionally. The release activity is also distinguishable: in *EPEC Polymers*, the defendants had released hazardous waste from their property directly into the river, where it then traveled to the plaintiff's property. Such a release more analogous to cases involving the flow of water than the circumstances presented here. Edgewater has not cited, nor has the Court found, any authority in which owner/operator liability has been extended the factual circumstances presented in this case. The Court is concerned that if it adopted Edgewater's argument, arranger liability (and its corresponding intent requirement) would be superfluous, at least as to owners/operators.[8] In short, while there was a discharge at Building 12, that is not the discharge that is at issue; instead, it is the discharge at Veteran's Field that resulted in the cleanup costs at issue. The Court therefore denies Edgewater's motion as to 38 COAH.

Edgewater also argues that North River is responsible as an owner because in 1997-1998, North River's environmental consultant removed floor panels from Building 12 and material was

---

[8] Edgewater also brought a claim against 38 COAH under a theory of arranger liability, which is discussed above.

disposed of in a secure landfill or used as a road base.  Pl. Brf. at 20.  The removal of floor panels was not the release which caused Edgewater to incur the cleanup costs here.  Edgewater has not addressed this issue in its reply brief or cited to any caselaw supporting North River's liability.  As such, the Court denies summary judgment as to North River.

### B.  Spill Act

Edgewater also moves for summary judgment on Count I, seeking contribution under the Spill Act against Waterside, Fred Daibes, Daibes Brothers, 38 COAH, and North River.[9]  D.E. 350.  The Spill Act is the New Jersey analog to CERCLA and specifically incorporates CERCLA's definition of hazardous substances.  Like CERCLA, the Spill Act permits courts to "allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate."  *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Env't Prot*., 725 F.3d 369, 392 (3d Cir. 2013).  The Spill Act imposes strict joint and several liability on any person who has discharged a hazardous substance.  *NJDEP v. Gloucester Environmental Mgmt. Servs., Inc.*, 821 F. Supp. 999, 1009 (D.N.J. 1993).  Liability under the Spill Act arises "whether the discharge was the result of 'intentional or unintentional' acts or omissions.  *Morris Plains Holding VF, LLC v. Milano French Cleaners, Inc*., No. A-0604-16T1, 2018 WL 1882956, at *1 (N.J. Super. Ct. App. Div. Apr. 20, 2018) (citing N.J.S.A. 58:10-23.11b).

In addition to liability as a direct discharger, the Spill Act provides that a person who is "in any way responsible for any hazardous substance" is strictly liable, upon its discharge, for "all cleanup and removal costs no matter by whom incurred."  *New Jersey Dep't of Env't Prot. v.*

---

[9] In this section, Plaintiff's brief in support of its motion for summary judgment as to the Spill Act claims against the Waterside Defendants (D.E. 350) will be referred to as "Pl. Brf."; the Waterside Defendants' brief in opposition (D.E. 370) will be referred to as "Def. Brf."; and Plaintiff's brief in reply (D.E. 396) will be referred to as "Pl. Reply."

*Dimant*, 51 A.3d 816, 829 (2012) (citing N.J.S.A. 58:10–23.11g(c)(1)).  A person is "in any way responsible" for a discharge if he or she had "control over the hazardous substance that caused the contamination."  *760 New Brunswick Urb. Renewal Ltd. Liab. Co. v. Navigators Specialty Ins. Co.*, No. CV 20-5877 (FLW), 2021 WL 287876, at *8 (D.N.J. Jan. 28, 2021) (citation omitted).  However, in "an action to obtain damages, authorized costs and other similar relief under the Act there must be shown a *reasonable link* between the discharge, the putative discharger, and the contamination at the specifically damaged site."  *Dimant*, 51 A.3d at 833.  (emphasis added).

In *Marsh v. New Jersey Dep't of Env't Prot.*, the New Jersey Supreme Court analyzed the phrase "in any way responsible" as to a purportedly "innocent landowner" who was unaware that she had an underground tank that was emitting petroleum pollutants when she took title to the property.  703 A.2d 927, 931 (N.J. 1997).  The Supreme Court of New Jersey found the landowner liable as "any way responsible" despite her purported innocence.  In so finding, the *Marsh* Court explained that the Legislature intended the Spill Act to be liberally construed to effect its purpose. *Id*. at 147; *see also In re Kimber Petroleum Corp*., 539 A.2d 1181 (N.J. 1988) (stating that "[a] party even remotely responsible for causing contamination will be deemed a responsible party under the Act").

Following a Spill Act amendment in 1991, the DEP adopted N.J. Admin. Code § 7:1E–1.6. *Marsh* at 147.  The DEP defined "person responsible for a discharge" as follows:

> 1. Any person whose act or omission results or has resulted in a discharge;
> 2. Each owner or operator of any facility, vehicle or vessel from which a discharge has occurred;
> 3. Any person who owns or controls any hazardous substance which is discharged;
> 4. Any person who has directly or indirectly caused a discharge;
> 5. Any person who has allowed a discharge to occur; or

6. Any person who brokers, generates or transports the hazardous substance discharged.

N.J. Admin. Code § 7:1E-1.6

### i. Preemption

The Waterside Defendants first assert that CERCLA preempts Edgewater's Spill Act claims. The Court disagrees and finds persuasive the ruling in *Caldwell Trucking PRP Grp. v. Caldwell Trucking Co*., in which the court found that CERCLA does not completely preempt the Spill Act. 154 F. Supp. 2d 870, 876 (D.N.J. 2001) (citing *Exxon Corp. v. Hunt*, 475 U.S. 355, 376, (1986); *Manor Care, Inc. v. Yaskin*, 950 F.2d 122, 125–27 (3d Cir. 1991)). The Waterside Defendants rely on *Allied Corp. v. Frola*, which found that CERCLA's Section 113(f)(2) preempts the Spill Act within the context of an administrative consent order. No. CIV. A. 87-462, 1993 WL 388970, at *15 (D.N.J. Sept. 21, 1993). No such consent order exists here. However, while CERCLA does not preempt state law claims, it does bar double recovery. As a result, the Spill Act claims are not dismissed on preemption grounds, but Edgewater will be precluded from double recovery.

### ii. Fred Daibes

Edgewater argues that Fred Daibes is individually liable under the Spill Act as a person "in any way responsible."[10] Edgewater relies on *Morris Plains Holding VF, LLC v. Milano French Cleaners, Inc*., No. A-0604-16T1, 2018 WL 1882956 (N.J. Super. Ct. App. Div. Apr. 20, 2018). The defendant in that case, like Daibes, was the sole shareholder of an entity that discharged a contaminant, and like Daibes, argued that there was a lack of evidence demonstrating he was "in

---

[10] While Waterside addressed vicarious liability, Edgewater clarified that it is not arguing for vicarious liability but rather that Daibes is individually liable. Pl. Reply at 13 n.10. The Court therefore does not address Waterside's vicarious liability arguments.

any way responsible." *Id*. at *2. The *Milano French* court found that the shareholder was liable, noting that the Spill Act broadly imposes liability, and that the legislative intent was to expand liability without regard for "corporate veils and the like." *Id*. at *2. At the same time, Daibes' behavior must meet the requisite nexus under *Dimant*, which found that there must be a reasonable link between the discharge, the putative discharger, and the contamination at the specifically damaged site. *Dimant*, 51 A.3d 816, 834 (N.J. 2012). While Edgewater has cited to much evidence showing Fred Daibes' active role in the Waterside Entities, there exists a genuine dispute of material fact as to his personal involvement and whether he approved the use of the Building 12 material at Veteran's Field. *See supra* section III.A.ii. Liability. The Court will therefore not grant summary judgment as to Fred Daibes' liability.

### iii. Waterside

Edgewater asserts that Waterside is liable as a direct discharger under the Spill Act. Pl. Brf. at 18. Waterside argues that it is not liable because TERMS acted as a gatekeeper for the project. Def. Brf. at 19-20. Waterside also asserts that Veterans Field was a highly contaminated facility prior to Waterside's involvement. Def. Brf. at 19. The Spill Act imposes strict liability on dischargers, and Waterside has cited no authority which relieves it of liability. It is undisputed that Waterside discharged RCA material containing PCBs from Building 12 material to Veterans Field. BE SOMF ¶ 19. Waterside also does not dispute that the material was a hazardous material under the Spill Act. That behavior is sufficient to meet the *Dimant* nexus requirement. Under the strict liability imposed by the Spill Act, Waterside is liable as a discharger. Because there is no genuine dispute of material fact, the Court grants summary judgment in favor of Edgewater against Waterside under the Spill Act.

### iv. 38 COAH

Additionally, 38 COAH owned the Alcoa Property in 2013 when Building 12 was demolished and disposed of a Veterans Field.  BE SOMF ¶¶ 68, 129-130.  "Under the Spill Act, if a party owns property at the time of a discharge, they are responsible for that discharge."  *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Env't Prot.*, 725 F.3d 369, 392 (3d Cir. 2013) (citing *N.J. Dep't of Envtl. Prot. V. Dimant*, 51 A.3d 816, 829–30 (N.J. 2012); N.J. Admin. Code § 7:1E–1.6).  Unlike CERCLA, the text of the Spill Act makes clear that it applies to an owner of a facility *from which* a discharge has occurred.  N.J. Admin. Code § 7:1E–1.6 (defining "person responsible for a discharge" to include "[e]ach owner or operator of any facility, vehicle or vessel from which a discharge has occurred").  38 COAH owned the contaminated materials that were discharged at Veterans Field.  BE SOMF ¶ 129.  However, Waterside's brief does not address Edgewater's arguments as to 38 COAH's liability.  *See Leisure Pass N. Am., LLC v. Leisure Pass Grp.*, Ltd., No. 2:12-CV-03375 WJM, 2013 WL 4517841, at *4 (D.N.J. Aug. 26, 2013) ("Plaintiff has waived its opposition to this argument by failing to respond to it."); *Arconic Inc. v. Novelis Inc.*, No. CV 17-1434, 2019 WL 5802365, at *5 (W.D. Pa. Sept. 6, 2019) ("[A] party's failure to dispute an argument in its opposition brief constitutes waiver of the right to relief.").  Because there is no genuine dispute of material fact, the Court therefore grants summary judgment in favor of Edgewater against 38 COAH under the Spill Act.

### v. North River

Edgewater further argues that North River is liable as the prior owner of the Alcoa Property who commenced remediation and disposal of the Building 12 hazardous materials.  In support, Edgewater relies on the following.  North River obtained the Alcoa Property from AP in 1997.  BE SOMF ¶ 36.  Through the PSA and MPA, North River agreed to demolish and remove the

buildings from the Alcoa Property. BE SOMF ¶ 43. North River also entered into the MOA with the NJDEP to remediate the Alcoa Property in 1997. BE SOMF ¶ 44. North River entered into an Environmental Indemnity Agreement with AP, indicating that if Building 12 were not demolished, North River and RRIP would indemnify, defend, and hold AP harmless from damages including remediation, disposal costs, and expenses related to PCBs. BE SOMF ¶¶ 52-55. North River commenced remediation on-site and removed all former Alcoa Property buildings other than Building 12. BE SOMF ¶¶ 58-61. Finally, North River had common ownership and control with 38 COAH and Waterside Construction via Fred Daibes. BE SOMF ¶¶ 39, 66, 86, 132.

Edgewater argues that North River's actions in partially remediating the Alcoa Property, including Building 12, but failing to complete the remediation or properly maintain the contaminated materials that were ultimately discharged at Veterans Field satisfy the Spill Act's requirement for "some connection" to the contamination at issue. Pl. Brf. at 22. Edgewater's argument centers on the idea that because North River began remediation, it was required under the Spill Act to complete it. Edgewater cites no legal support other than one citation to *Dimant's* causal nexus. Pl. Brf. at 22. Edgewater has not carried its burden, and its motion as to North River is denied.

### vi. Daibes Brothers

Daibes Brothers was the environmental contractor responsible for the removal and disposal of the hazardous substances at the Alcoa Property. BE SOMF ¶ 37. Edgewater asserts that Daibes Brothers was responsible for the transportation and disposal of the materials contaminated with PCBs in excess of 50 ppm from the Alcoa Property. Edgewater cites to the 2010 letter from the NJDEP to Daibes Brothers stating that the response action outcome would not address contamination within Building 12. BE SOMF ¶ 72.

Edgewater argues that Daibes Brothers remained responsible for the removal and disposal of the contaminated materials ultimately discharged at Veterans Field, and that Daibes Brothers and the other Daibes Entities had common ownership and control via Fred Daibes. Edgewater has not cited to any case law other than a general citation to *Dimant's* nexus requirement. Pl. Brf. at 25. Further, while the Waterside Entities opposed Edgewater's arguments as to Daibes Brothers, Edgewater did not address these arguments in its reply brief. Again, Edgewater has failed to carry its burden, and its motion as to Daibes Brother is denied.

### C. Consumer Fraud Act

Edgewater moves for summary judgment on Count XI, a Consumer Fraud Act claim against Fred Daibes and Waterside (together, the "CFA Defendants").[11] D.E. 347. The New Jersey Consumer Fraud Act ("CFA") "seeks to protect consumers who purchase goods or services generally sold to the public at large." *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 514 (3d Cir. 2006) (internal quotations and citation omitted). To bring a CFA claim, a plaintiff must demonstrate "(1) unlawful conduct; (2) ascertainable loss; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1086 (N.J. 2007).

Unlawful conduct is defined as "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression

---

[11] In this Section, Plaintiff's Brief in Support (D.E. 347-1) will be referred to as "Pl. Brf."; Defendant's Brief in Opposition (D.E. 375) will be referred to as "Def. Brf."; and Plaintiff's Brief in Reply (D.E. 393) will be referred to as "Pl. Reply."

or omission." N.J.S.A. § 56:8-2. The Supreme Court of New Jersey has said the following concerning an unlawful practice under the CFA:

> To violate the Act, a person must commit an "unlawful practice" as defined in the legislation. Unlawful practices fall into three general categories: affirmative acts, knowing omissions, and regulation violations. The first two are found in the language of N.J.S.A. 56:8-2, and the third is based on regulations enacted under N.J.S.A. 56:8-4. A practice can be unlawful even if no person was in fact misled or deceived thereby. The capacity to mislead is the prime ingredient of all types of consumer fraud.
>
> When the alleged consumer-fraud violation consists of an affirmative act, intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act. However, when the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent is an essential element of the fraud.
>
> . . .
>
> The third category of unlawful acts consists of violations of specific regulations promulgated under the Act. In those instances, intent is not an element of the unlawful practice, and the regulations impose strict liability for such violations. The parties subject to the regulations are assumed to be familiar with them, so that any violation of the regulations, regardless of intent or moral culpability, constitutes a violation of the Act.

*Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994) (internal citations omitted). "Unconscionable commercial practice," in turn, refers to a standard of conduct that implies a lack of fair dealing, good faith, and honesty. *Id.* (citation omitted).

Defendants argue that the CFA does not apply because Edgewater is sophisticated and the dispute is contractual in nature. D.E. 375 at 11. "The entire thrust of the [CFA] is 'pointed to products and services sold to consumers in the popular sense.'" *BOC Grp., Inc. v. Lummus Crest, Inc.*, 597 A.2d 1109, 1112 (N.J. Sup. Ct. Law. Div. 1990) (quoting *Neveroski v. Blair*, 358 A.2d 473 (N.J. Sup. Ct. App. Div. 1976)). "A 'consumer' is generally defined as 'one who uses

(economic) goods, and so diminishes or destroys their utilities.'" *Stockroom, Inc. v. Dydacomp Dev. Corp.*, 941 F. Supp. 2d 537, 544 (D.N.J. 2013) (quoting *Hundred East Credit Corp. v. Eric Shuster Corp.*, 515 A.2d 246 (N.J. Sup. Ct. App. Div. 1986)). New Jersey courts have repeatedly emphasized that "the CFA seeks to protect consumers who purchase 'goods or services generally sold to the public at large.'" *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 514 (3d Cir. 2006) (quoting *Marascio v. Campanella*, 298 N.J. Super. 491, 499 (1997)). As such, the Third Circuit has stated that "the CFA is not intended to cover every transaction that occurs in the marketplace, but, rather, its applicability is limited to consumer transactions which are defined both by the status of the parties and the nature of the transaction itself." *Id.* (internal quotations and alterations omitted) (quoting *Arc Networks, Inc. v. Gold Phone Card Co.*, 333 N.J.Super. 587, 590 (Law Div. 2000)).

Nevertheless, "[t]he language of the CFA evinces a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely, to root out consumer fraud*." Lemelledo v. Beneficial Mgmt. Corp. of Am.*, 696 A.2d 546, 551 (N.J. 1997); *see also Real v. Radir Wheels, Inc.*, 969 A.2d 1069, 1075 (N.J. 2009) ("The CFA is recognized to be remedial legislation which should be construed liberally.") (internal quotation marks omitted). "To fall within the scope of the NJCFA, goods and services need not be only those that are purchased by 'average consumers'; the statute may also cover merchandise that is 'expensive, uncommon, or only suited to the needs of a limited clientele.'" *CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, No. 15-3103 (KM) (JBC), 2016 WL 1718100, at *6 (D.N.J. Apr. 29, 2016) quoting *Prescription Counter v. AmeriSource Bergen Corp.*, 2007 WL 3511301, at *14 (D.N.J. Nov. 14, 2007). As a result, courts in New Jersey "have squarely held that the NJCFA applies to the sale of merchandise for use in business operations." *Stockroom, Inc.*, 941 F. Supp. 2d at 543-44

(finding the plaintiff business to be a "consumer" under the CFA in connection with the plaintiff's purchase of order-processing software from defendant business); *see also Coastal Grp., Inc. v. Dryvit Sys., Inc.*, 643 A.2d 649, 653 (N.J. Sup. Ct. App. Div. 1994) (reversing trial court's finding that the plaintiff, a condominium project owner and developer, was not a consumer within the meaning of the CFA in connection with the plaintiff's purchase of prefabricated wall paneling from the defendant panel manufacturer).

As a result, it is not always clear when a given transaction should be covered by the CFA:

> [Some] courts have also dismissed NJCFA claims relying on services or goods that are only offered to a select group of individuals. *See, e.g.*, *Centrum Fin. Servs., Inc. v. Chi. Title Ins. Co.*, Civ. No. 09–3300, 2010 WL 936201, at *4 (D.N.J. Mar. 12, 2010) (rejecting NJCFA claim for title insurance); *Khan v. Conventus Inter–Ins. Exchange*, 440 N.J.Super. 372, 376–77, 113 A.3d 803 (Law Div.2013) (rejecting NJCFA claim for medical malpractice insurance because physicians only represent 0.27% of the general population in New Jersey).

> On the other side of the issue, at least one judge in this district has determined that the NJCFA can encompass claims for merchandise that is "expensive, uncommon, or only suited to the needs of a limited clientele." *See, e.g.*, *Prescription Counter v. AmerisourceBergen Corp.*, Civ. No. 04–5802, 2007 WL 3511301, at *14 (D.N.J. Nov. 14, 2007). Similarly, the judge in *CDK Global, LLC v. Tulley Automotive Group, Inc.*, Civ. No. 15–3103, 2016 WL 1718100, at *6–7 (D.N.J. Apr. 29, 2016) found that the NJCFA would apply to the lease of computer equipment when it was used during the regular course of business and alleged to be marketed to thousands of businesses.

*City of Atl. City v. Zemurray St. Cap., LLC*, 192 F. Supp. 3d 563, 568 (D.N.J. 2016).

Edgewater cites to *All the Way Towing* regarding business-to-business transactions that fall within the scope of the CFA. *All the Way Towing, LLC v. Bucks Cty. Int'l, Inc.*, 200 A.3d 398, 408 (N.J. 2019). While it is not clear that Edgewater is a "business," the court's test is instructive, and considers the following:

> (1) the complexity of the transaction, taking into account any negotiation, bidding, or request for proposals process; (2) the identity and sophistication of the parties, which includes whether the parties received legal or expert assistance in the development or execution of the transaction; (3) the nature of the relationship between the parties and whether there was any relevant underlying understanding or prior transactions between the parties; and . . . ; (4) the public availability of the subject merchandise.

*Id.*

According to Edgewater's statement of facts, Edgewater issued a bid notice in 2012 for the Veterans Field Improvement Project. BE ¶ SOMF 82. As part of the process, certain documents—instructions to bidders, general conditions, technical specifications, and a contract form—were incorporated in the executed contract. BE ¶ SOMF 82. The scope of the work in the bid notice consisted of the remediation of Veterans Field, the installation of baseball fields and a soccer field, along with the associated drainage and grading, and the installation of a playground and parking lots. BE ¶ SOMF 83. The project was then awarded to Waterside. BE ¶ SOMF 85. The cost of importing fill alone was over $800,000. BE ¶ SOMF 88. The total contract amount was listed as $7,069,075.88. Corriston Cert., Ex. NNN. At the time it issued the bid notice, Edgewater had already retained TERMS in conjunction with the proposed improvements at Veterans Field. BE SOMF ¶¶ 76, 80.

Given the foregoing facts, Edgewater has not sufficiently demonstrated that the CFA applies. The transaction was complex and subject to a bidding process. Edgewater also relied on expert assistance – both before, during, and after the contract. *See Princeton Healthcare Sys. v. Netsmart New York, Inc.,* 29 A.3d 361, 365 (App. Div. 2011) (finding the CFA inapplicable to a transaction which entailed requests for proposals and a lengthy process of evaluation and detailed negotiations); *see also Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F. Supp. 2d 494, 509 (D.N.J. 1999) (noting that transactions of goods not available to the general public that were

covered by the CFA tended to involve standardized goods and did not require individualized bargaining while those transactions that were not covered usually involved specific agreements and individualized negotiations). The Court will therefore deny summary judgment on Count XI.[12]

### D. Breach of Contract and Negligence

Edgewater moves for summary judgment on its breach of contract and negligence claims.[13] D.E. 348.

#### 1. Breach of Contract

To prevail on a breach of contract claim under New Jersey law, a plaintiff must demonstrate (1) the existence of a valid contract; (2) breach of the contract; (3) damages as a result of the breach; and (4) that the complaining party performed its own duties under the contract. *Pollack v. Quick Quality Rests., Inc.*, 172 A.3d 568, 576 (N.J. Super. App. Div. 2017) (citing *Globe Motor Co. v. Igdalev*, 139 A.3d 57, 64 (N.J. 2016)).

Waterside does not dispute any of these elements but instead argues that Edgewater waived its right to assert breach of contract and that it is estopped from doing so. Def. Brf. at 12. As to the estoppel argument, there are genuine issues of material fact regarding TERMS' approval (as an agent of Edgewater) and Edgewater's knowledge. "Equitable estoppel is invoked in the interests of justice, morality and common fairness." *China Falcon Flying Ltd. v. Dassault Falcon Jet Corp.*, 329 F. Supp. 3d 56, 72 (D.N.J. 2018) (citing *Newark Cab Ass'n v. City of Newark*, 235

---

[12] Having denied summary judgment on this ground, the Court does not reach Waterside's arguments as to whether a municipality can be considered a "person" and whether Edgewater experienced an ascertainable loss.

[13] In this section, Edgewater's brief in support of its motion (D.E. 348-1) will be referred to as "Pl. Brf.," Defendants' brief in opposition (D.E. 378) will be referred to as "Def. Brf.," and Edgewater's brief in reply (D.E. 394) will be referred to as "Reply Brf."

F. Supp. 3d 638, 648 (D.N.J. 2017). "To establish equitable estoppel, plaintiffs must show that defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that plaintiffs acted or changed their position to their detriment." *Id.* Waterside argues that it relied on TERMS as the gatekeeper of the project, that TERMS was an agent of Edgewater, and that Waterside believed that it had TERMS' approval. Def. Brf. at 15. Waterside continues that it relied on Edgewater's behavior as signaling that the acts now alleged to constitute breach of contract were done with Edgewater's consent. Waterside has presented disputes of fact at least as to (1) TERMS approval of the use of the Building 12 material and (2) Edgewater's knowledge of such approval. W SOMF ¶¶ 80, 82, 83, 84. Given these genuine disputes of material fact as to estoppel, Edgewater's motion is denied in this regard.

Under New Jersey law, waiver is defined as "an intentional relinquishment of a known right." *Sleep Tight Diagnostic Ctr., LLC v. Aetna Inc*., 399 F. Supp. 3d 241, 253–54 (D.N.J. 2019), reconsideration denied, No. CV 18-3556 (FLW), 2020 WL 967819 (D.N.J. Feb. 27, 2020) (citing *Knorr v. Smeal*, 836 A.2d 794, 798 (N.J. 2003)). "The intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it." *Id*. Such words or acts however, must be "voluntary, clear and decisive," such that they imply "an election to forego some advantage which the waiving party might have insisted on." *Id.* (quoting *Deerhurst Estates v. Meadow Homes, Inc*., 165 A.2d 543 (App. Div. 1960), certif. denied, 167 A.2d 55 (N.J. 1961)). Waterside asserts that because TERMS was in charge of all testing and approval of fill, Edgewater waived its right to claim breach of contract as to fill that was used pursuant to the guidance and direction of TERMS. Def. Brf. at 13. Waterside explains that Edgewater, via TERMS, was aware that material being utilized at Veterans Field was not tested. W SOMF P 80, 82, 83, 84, 86. Having decided that summary judgment is not appropriate given

the genuine disputes of material fact inherent in Waterside's estoppel argument, the Court need not reach Waterside's waiver argument. The Court notes however that this argument appears to involve many of the same factual issues, including (1) TERMS approval of the Building 12 material and (2) Edgewater's knowledge of such approval. These are not issues amendable to resolution on summary judgment.

Because there are genuine disputes of material fact as to Waterside's estoppel and waiver arguments, summary judgment on Edgewater's breach of contract claim is denied.

### 2. Negligence

Edgewater moves for summary judgment on its negligence claim against Fred Daibes and 38 COAH. "To prevail on a claim of negligence a plaintiff must establish four elements: (1) that the defendant owed a duty of care; (2) that the defendant breached that duty; (3) actual and proximate causation; and (4) damages." *Fernandes v. DAR Dev. Corp.*, 119 A.3d 878, 885-86 (N.J. 2015) (citing *Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015)).

Defendants first argue that the economic loss doctrine bars the negligence claims asserted against them. Def. Brf. at 16-17. "The economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract." *Chen v. HD Dimension Corp.*, No. 10-863, 2010 WL 4721514, at *8 (D.N.J. Nov. 15, 2010). Thus, "whether a tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties." *Id.* Additionally, in the absence of "personal injury or consequential property damage arising from a traumatic event," a plaintiff's negligence claim fails under the economic loss doctrine. *Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 280 (N.J. 2002).

Waterside argues that Edgewater's negligence claim is nothing more than a claim that Waterside negligently performed the contract, which Edgewater extends to Fred Daibes as a corporate officer and the other Waterside Entities via vicarious liability. Def. Brf. at 17. The Court disagrees. 38 COAH and Fred Daibes are not parties to the contract, and Edgewater has not asserted breach of contract claims against them. Pl. Brf. at 14. Therefore, Edgewater's claims against 38 COAH and Fred Daibes do not flow from contract. *See Ford Motor Co. v. Edgewood Properties, Inc.*, No. Civ. 06-1278-ES, 2012 WL 4172133, at *23 (D.N.J. Aug. 31, 2012) (holding the economic loss doctrine inapplicable where plaintiff's breach of contract and negligence claims were asserted against different parties); *see* also *Capitalplus Equity, LLC v. Prismatic Dev. Corp*., No. 07–321, 2008 WL 2783339, at *6 (D.N.J. July 16, 2008) ("Plaintiff's fraud, negligent misrepresentation, promissory estoppel and equitable estoppel claims are not barred by the economic loss doctrine because they do not arise out of the same facts underlying the breach of contract claims."). It would be contrary to reason to allow 38 COAH and Fred Daibes to escape liability based on the economic loss doctrine because a contract exists when they are not parties to the contract and therefore cannot be sued for breach of contract; the economic loss doctrine prevents recovery under tort when contract recovery is more appropriate, but the doctrine's application here would mean that that neither claim applies.

Further, Edgewater has shown that a duty as to potential contamination can exist outside of a contractual obligation. *Preferred Real Est. Invs., Inc. v. Edgewood Properties, Inc*., No. Civ. 06-4266-AET, 2007 WL 81881, at *3 (D.N.J. Jan. 9, 2007) (holding that defendants owed a duty to plaintiffs as foreseeable victims and breached that duty when they gave another party PCB-contaminated concrete without informing them of the contamination). Finally, Edgewater has demonstrated that contamination of property is not "purely economic" because it also results in

actual property damage.  *See Ford Motor*, 2012 WL 4172133, at \*23 (finding support for allegations of physical harm via evidence of alleged environmental contamination resulting from the use of contaminated concrete as backfill); *see also Green Hills (USA), L.L.C. v. Aaron Streit, Inc.*, 361 F. Supp. 2d 81, 90 (E.D.N.Y. 2005) (ruling that the economic loss doctrine did not apply to injury from environmental contamination, which arose from a duty separate from the contractual duty).  The economic loss doctrine therefore does not bar Edgewater's negligence claims asserted against 38 COAH and Fred Daibes.

However, genuine questions of material fact regarding the parties' knowledge of contamination preclude a grant of summary judgment on the issue.  As discussed above, 38 COAH and Daibes' knowledge of contamination of the interior walls is a genuine dispute of material fact. As a result, summary judgment as to Edgewater's negligence claim is denied.

## IV.    CONCLUSION

For the foregoing reasons, Edgewater's motion (DE 347) for summary judgment is DENIED; Edgewater's motion (DE 348) for summary judgment is DENIED; Edgewater's motion (DE 350) for summary judgment is GRANTED in part and DENIED in part; and Edgewater's motion (DE 353) for summary judgment is GRANTED in part and DENIED in part.  Edgewater's motion (DE 350) for summary judgment on its Spill Act claim is GRANTED as to Waterside and 38 COAH but is otherwise DENIED.  Edgewater's motion (DE 353) for summary judgment on its CERCLA claim is GRANTED as to Waterside's liability as an operator and transporter but is otherwise DENIED.  An appropriate Order accompanies this Opinion.

Dated: June 30, 2021


John Michael Vazquez, U.S.D.J.

39