<u>Not for Publication</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

BOROUGH OF EDGEWATER,

        Plaintiff,

    v.

WATERSIDE CONSTRUCTION, LLC; 38
COAH , LLC; DAIBES BROTHERS, INC.;
NORTH RIVER MEWS ASSOCIATES, LLC;
FRED A. DAIBES; TERMS
ENVIRONMENTAL SERVICES, INC.;
ALCOA INC.; ALCOA DOMESTIC, LLC, as
successor in interest to A.P. NEW JERSEY,
INC.; HUDSON SPA, LLC; JOHN DOES 1-
100; ABC CORPORATIONS 1-100,

        Defendants

and

WATERSIDE CONSTRUCTION, LLC; 38
COAH LLC; DAIBES BROTHERS, INC.;
NORTH RIVER MEWS ASSOCIATES, LLC;
FRED A. DAIBES,

        Defendants/ Third-Party Plaintiffs

    v.

NEGLIA ENGINEERING ASSOCIATES,

        Third-Party Defendants,

and

ALCOA DOMESTIC, LLC as successor in
interest to A.P. NEW JERSEY, INC.,

Civil Action No. 14-5060

## <u>OPINION</u>

|  |
|---|
| Defendant/Third-Party Plaintiff, |
| v. |
| COUNTY OF BERGEN; RIVER ROAD IMPROVEMENT PHASE II, INC.; HUDSON SPA, LLC, |
| Third-Party Defendants. |

**John Michael Vazquez, U.S.D.J.**

Presently before the Court are four motions: a motion (D.E. 344) for summary judgment filed by Defendants Arconic Inc. (f/k/a Alcoa Inc.) and Arconic Domestic, LLC (f/k/a Alcoa Domestic LLC, as successor in interest to A.P. New Jersey, Inc.) (collectively "Arconic") against Plaintiff Borough of Edgewater ("Edgewater")[1]; two motions (D.E. 349, 352) for summary judgment filed by Edgewater against Arconic; and a motion (D.E. 402) filed by Arconic to strike the affidavit of Thomas Bambrick.

The Court has reviewed all submissions made in support and in opposition to the motions and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Arconic's motion for summary judgment at D.E. 344 is **GRANTED in part and DENIED in part,** while Edgewater's motions for summary judgment at D.E. 349 and D.E. 352 are **DENIED**. Arconic's motion to strike at D.E. 402 is **DENIED** as moot.[2]

---

[1] Arconic's brief (D.E. 344-1) in support of its motion (D.E. 344) for summary judgment will be referred to as "Def. Brf."; Edgewater's brief (D.E. 376) in opposition to that motion will be referred to as "Pl. Brf."; and Arconic's brief (D.E. 398) in reply will be referred to as "Def. Reply."

[2] The current motions are part of a large number of motions for summary judgment filed in this matter. All pending motions are listed in the Procedural History section of this Opinion. If the Court were to address all motions in a single opinion, the results would be unwieldly. As a result, the Court addresses the motions individually or, as here, in a group. The Court also does not repeat

I.    BACKGROUND

This matter stems from allegations that certain Defendants, unrelated to the instant motions, used polychlorinated biphenyl ("PCB") [3] contaminated material as fill in a public park project.  The park is owned by Plaintiff Edgewater, but the contaminated materials (or at least some of them) came from a property previously owned by Arconic.

A.    Facts[4]

Alcoa, now known as Arconic, constructed and operated an industrial plant (the "Alcoa Property") from 1914-1965 in Edgewater, New Jersey.  BE SOMF ¶ 1.  A structure, referred to as "Building 12," was constructed on that site in 1938.  BE SOMF ¶ 3.  The site was subsequently acquired by Amland Properties Corporation ("Amland"), who then discovered PCB contamination throughout the property.  Amland sued Alcoa, which resulted in a settlement and the site was conveyed to an Alcoa entity, A.P. New Jersey, Inc. ("AP"), which later became Arconic Domestic LLC.  BE SOMF ¶ 12.  The Amland settlement agreement required that the deed of conveyance

─────────────────

each and every alleged fact in each opinion.  Instead, the Court focuses on the facts pertinent to each motion (or motions) as asserted by the parties to the motion(s).  Therefore, if the facts in one opinion appear to be distinguishable from facts in another opinion, it is because those are the facts asserted by the party or parties in its/their respective motions.

[3] According to the Environmental Protection Agency, PCBs are a group of man-made organic chemicals consisting of carbon, hydrogen and chlorine atoms.  *United States Environmental Protection Agency, Learn about Polychlorinated Biphenyls* (PCBs), https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls-pcbs.  PCBs have been demonstrated to cause a variety of adverse health effects.  *Id.*

[4] Edgewater's statement of material facts (D.E. 319-1) will be referred to as "BE SOMF"; Arconic's own statement of material facts (D.E. 318) will be referred to as "A SOMF"; Arconic's response to Edgewater's statement of material facts (D.E. 330) will be referred to as "A Response"; Edgewater's counterstatement of facts (D.E. 323-2) will be referred to as "BE Reply SOMF;" and Arconic's response to Edgewater's counterstatement of facts (D.E. 360) will be referred to as "A Reply SOMF."

contain a legend notice stating that "[t]his property may be contaminated with hazardous substances including Polychlorinated Biphenyls." BE SOMF ¶ 11.

In 1997, Alcoa sold the property to North River, an entity affiliated with Fred Daibes. Pursuant to the terms of the Purchase and Sale Agreement ("PSA") and a related Multi-Party Property Acquisition Agreement ("MPAA"), AP agreed to pay River Road Improvement Phase II, Inc. ("RRIP") up to $12,000,000 for the demolition, removal, and proper disposal of the buildings on the site pursuant to a Remedial Action Work Plan. BE SOMF ¶ 41. Later that year, North River requested permission to postpone the demolition of Building 12. BE SOMF 52. In 2006, the portion of the Alcoa Property containing Building 12 was transferred from North River to 38 COAH, another entity affiliated with Daibes. BE SOMF ¶ 65. In 2010, certain areas of the exterior walls on Building 12 became unstable and fell. BE SOMF ¶ 68.

In 2011, Plaintiff Edgewater looked to improve Veterans Field, a 27-acre public park owned by the borough. BE SOMF ¶¶ 75-76. TERMS, an environmental consulting firm, was retained as a consultant and Licensed Site Remediation Professional for the project. After a bidding process, Waterside, a construction company managed by Daibes, was awarded the contract for the improvement project. BE SOMF ¶¶ 80, 85, 86.

When the amount of fill needed at the Veterans Field project increased, Waterside imported and used PCB-contaminated material from Building 12 as fill on Veterans Field. BE SOMF ¶ 93. The parties dispute whether this was done with TERMS' knowledge and/or approval. Edgewater further asserts that on September 7, 2013, after advising Neglia, the engineer assigned to the project, that no work would be performed over the weekend, Waterside dumped unapproved fill on the site and then covered the fill when the Neglia supervisor arrived to the site. BE SOMF ¶¶ 95-98. Edgewater alleges that Waterside continued to import contaminated materials from

September 7, 2013 to October 3, 2013, when TERMS issued a letter advising of the PCB contamination and closed the Veterans Field site for an assessment.   BE SOMF ¶¶ 106-107. Waterside disputes this.

Veterans Field had PCB contamination before the project began, with the highest level being 2.5 parts per million ("ppm").  BE SOMF ¶ 78.  Sampling done after the site was closed in October 2013 found that fill materials used throughout the site were contaminated with PCBs, including (1) crushed concrete with levels ranging from 100-350 ppm used for concrete sidewalks and cement pads, and (2) concrete combined with soil with levels ranging from 10-350 ppm used as fill on the field and under paved areas.  BE SOMF ¶ 11.  Impacted materials were excavated pursuant to an EPA-approved Self-Implementing Plan and disposed off-site.  BE SOMF ¶¶ 115.

### B.  Procedural History

Edgewater first filed suit on August 12, 2014.  D.E. 1.  On February 27, 2018, the separate matters docketed as 14-8129 and 14-50560 were consolidated.  D.E. 255.  On March 19, 2018, Edgewater filed its Fifth Amended Complaint, which is the operative pleading in this matter.  D.E. 256 ("Complaint").  The claims contained in that Complaint are as follows:

Count I:      Contribution under the Spill Act against Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, Alcoa, TERMS, Alcoa Domestic, Hudson Spa, John Does 1-100, and ABC Corporations 1-100;

Count II:     Cost Recovery under CERCLA against Waterside, Fred Daibes, Daibes Brothers, 38 COAH, North River, Alcoa, TERMS, Alcoa Domestic, Hudson Spa, John Does 1-100, and ABC Corporations 1-100;

Count III:    Breach of Contract against Waterside;

Count IV:     Fraud against Waterside and Fred Daibes;

Count V:      Negligence against Waterside;

Count VI:     Negligence against Fred Daibes, Daibes Brothers, North River, and 38 COAH;

Count VII:    Negligence against Alcoa, Alcoa Domestic, and Hudson Spa;

Count VIII:    Unjust Enrichment against and Waterside, Fred Daibes, North River, Daibes Brothers, 38 COAH, Alcoa, Alcoa Domestic, Hudson Spa;

Count IX:    Strict Liability against Alcoa, Alcoa Domestic, and Hudson Spa;

Count X:    Strict Liability against Waterside, Fred Daibes, Daibes Brothers, North River, and 38 COAH;

Count XI:    CFA against Waterside and Fred Daibes;

Count XI:    Breach of contract against TERMS; and

Count XII:    Negligence against TERMS.

Multiple parties have filed multiple motions for summary judgment. This Opinion address only the motions for summary judgment between Edgewater and Arconic as well as the related motion to strike. (D.E. 344, 349, 352, 402).

## II.    LEGAL STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence

and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

III.   **ANALYSIS**

A.  **Unjust Enrichment**

Arconic moves for summary judgment on Edgewater's unjust enrichment claim, arguing that Edgewater had an independent duty to remediate Veterans Field. Def. Brf. at 35. "To prove a claim for unjust enrichment, a party must demonstrate that the opposing party received a benefit and that retention of that benefit without payment would be unjust." *Thieme v. Aucoin-Thieme*,

151 A.3d 545, 557 (N.J. 2016) (internal quotation and citation omitted).  The "quasi-contact doctrine also requires that the plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *Stewart v. Beam Glob. Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 288 (D.N.J. 2012) (internal quotation and citation omitted).

In *SC Holdings, Inc. v. A.A.A. Realty Co.*, an owner of a contaminated site brought CERCLA, Spill Act, and unjust enrichment claims against a potentially responsible party.  935 F. Supp. 1354 (D.N.J. 1996).  The court found that because the plaintiff was the owner of the contaminated site, it was under a legal duty pursuant to both CERCLA and the Spill Act to remediate the site.  *Id.* at 1372.  The *SC Holdings* court therefore dismissed the owner's unjust enrichment claim.  *Id.*  In that case, the plaintiff was suing to recover the cleanup costs the defendant had allegedly avoided.  Similarly, in *Smith Land & Improvement Corp. v. Rapid–American Corp.*, the defendant was alleged to be a party "liable to clean up" the land but was spared from clean-up costs because the plaintiff was chosen by the EPA to do conduct the cleanup. 26 Env't Rep. Cas. (BNA) 2023, 1987 WL 56461 (M.D. Pa. 1987), vacated on other grounds, *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir.1988), *cert. denied*, 488 U.S. 1029, 109 S. Ct. 837, 102 L. Ed. 2d 969 (1989).  The *Smith Land* court ruled that the plaintiff was not enriched because it was "equally responsible to clean up its land." *Id.*

Edgewater responds that the relevant benefit conferred is not the remediation of Veterans Field but the illegal disposal of hazardous materials through which Arconic avoided paying for proper disposal.  Edgewater cites to an opinion from this Court: *AMA Realty LLC v. 9440 Fairview Ave. LLC*, No. CV 13-457, 2017 WL 6728641, at *1 (D.N.J. Dec. 28, 2017).  In that case, the plaintiff alleged that by improperly dumping hazardous material on the plaintiff's property, the

defendants were unjustly enriched.  The court held that that allegation "may give rise to unjust enrichment." *Id.* at \*9.

Arconic argues that a benefit of avoiding of the cost of proper disposal would only be cognizable if Edgewater did not have an independent legal duty to properly dispose of the hazardous materials at Veterans Field.  Def. Reply. at 11.  However, that duty only arose because the Building 12 materials were first deposited at Veterans Field.  In other words, Edgewater had no duty to properly dispose of the Building 12 materials until they were dumped at Veterans Field. The Court is not convinced that– as a matter of law—the subsequent duty to remediate negates the potential enrichment gained by Arconic by avoiding the cost to properly dispose of Building 12. While there may be other reasons that Edgewater cannot recover for unjust enrichment,[5] Arconic has not raised any other argument.  Arconic's motion for summary judgment on Count VIII is therefore denied.

### B.  Strict Liability

Arconic next moves for summary judgment on Edgewater's strict liability claim.  Def. Brf. at 32.  "To prevail on a claim for strict liability, two elements must be demonstrated: (1) that the defendant's disposal of waste constituted an 'abnormally dangerous activity,' and (2) that such activity has harmed the plaintiff." *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 850 (D.N.J. 2003), aff'd, 399 F.3d 248 (3d Cir. 2005) (citing *T & E Indus. v. Safety Light Corp.*, 587 A.2d 1249 (N.J. 1991); *New Jersey Turnpike Auth. v. PPG Indus., Inc., et al.*, 16 F. Supp. 2d 460, 479 (D.N.J. 1998); *Dep't of Env'l Prot. v. Ventron*, 468 A.2d 150 (N.J. 1983)).  As

---

[5] For example, Arconic does not point to the factual differences between this matter and *AMA Realty*.  In that case, the parties had an underlying contractual relationship and the plaintiff had accused the defendant of actually dumping the hazardous material.  *AMA Realty*, 2017 WL 6728641, at \*9.

to the first element, "whether an activity is abnormally dangerous is to be determined on a case-by-case basis, taking all relevant circumstances into consideration." *Rowe v. E.I. Dupont De Nemours & Co.*, 262 F.R.D. 451, 466 (D.N.J. 2009) (quoting *Ventron*, 468 A.2d 150). Specifically, a court should consider the following factors:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others;
> (b) likelihood that the harm that results from it will be great;
> (c) inability to eliminate the risk by the exercise of reasonable care;
> (d) extent to which the activity is not a matter of common usage;
> (e) inappropriateness of the activity to the place where it is carried on; and
> (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Id.*  Arconic does not dispute that generating PCB-contaminated concrete would constitute an abnormally dangerous activity.  Instead, Arconic argues that that activity did not proximately cause the contamination at Veterans Field because the actions of Waterside and related parties' behavior cut the chain of causation.

"Even in a strict-liability action, a plaintiff must prove causation."  *Ciapinski v. Crown Equip. Corp.*, No. A-4505-07T2, 2010 N.J. Super. Unpub. LEXIS 146, at *48 (N.J. Super. Ct. App. Div. Jan. 21, 2010) (citing *Cruz-Mendez v. ISU/Ins. Servs. Of S.F.*, 722 A.2d 515, 524 (N.J. 1999)); *see also Yun v. Ford Motor Co.*, 647 A.2d 841, 845 (App. Div. 1994), rev'd, 669 A.2d 1378 (N.J. 1996) (stating that proximate cause "is an essential element of an action based in either strict liability or negligence.").  Proximate cause is "any cause which in the natural and continuous sequence, unbroken by an efficient intervening cause, produces the result complained of and without which the result would not have occurred."  *Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015) (quoting *Conklin v. Hannoch Weisman,* 678 A.2d 1060, 1071 (N.J. 1996)) (citations omitted).  "Foreseeability is a constituent part of proximate cause."  *Komlodi v. Picciano*, 89 A.3d

1234, 1251 (N.J. 2014).  "An act is foreseeable when a reasonably prudent, similarly situated person would anticipate a risk that her conduct would cause injury or harm to another person."  *Id.* at 1251 (citation omitted).  However, "if an injury or harm was so remote that it could not have been reasonably anticipated, the injury or harm is not foreseeable."  *Id.* (citation omitted).

Under New Jersey law, "the doctrine of superseding cause focuses on whether events or conduct that intervene subsequent to the defendant's negligence are sufficiently unrelated to or unanticipated by that negligence to warrant termination of the defendant's responsibility."  *Lynch v. Scheininger*, 744 A.2d 113, 125 (N.J. 2000).  The *Lynch* court found that the Second Restatement's definition of a superseding event is "simple and straightforward":

> A superseding cause relieves the actor from liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm.  Therefore, if in looking back from the harm and tracing the sequence of events by which it was produced, it is found that a superseding cause has operated, there is no need of determining whether the actor's antecedent conduct was or was not a substantial factor in bringing about the harm.

*Id.* at 122-123 (quoting Restatement (Second) of Torts § 440 comment b (Am. Law Inst. 1965)).  Thus, "[p]roximate cause has been described as a standard for limiting liability for the consequences of an act based upon mixed considerations of logic, common sense, justice, policy and precedent."  *Fluehr v. City of Cape May*, 732 A.2d 1035, 1041 (N.J. 1999) (internal quotations omitted).

Generally, "[p]roximate cause is a factual issue, to be resolved by the jury after appropriate instruction by the trial court."  *Scafidi v. Seiler*, 574 A.2d 398, 402 (N.J. 1990).  Edgewater argues that Arconic knew that the building materials were intended to be reused at properties owned by third parties and it was therefore foreseeable that the Waterside Entities would harm such a third party by disposal of the contamination.  Pl. Brf. at 38.  Whether the Waterside and the related

entities' subsequent actions broke the chain of causation is a question for the jury.  Arconic's motion for summary judgment on Count IX is therefore denied.

### C.  Negligence

Arconic further moves for summary judgment on Edgewater's negligence claim, arguing that Alcoa owed no duty to Edgewater.  "The fundamental elements of a negligence claim are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, injury to the plaintiff proximately caused by the breach, and damages." *Shields v. Ramslee Motors*, 223 A.3d 172, 176 (N.J. 2020) (quoting *Robinson v. Vivirito*, 86 A.3d 119, 124 (N.J. 2014)).  "Whether a duty of care exists is a question of law that must be decided by the court." *Jerkins ex rel. Jerkins v. Anderson*, 922 A.2d 1279, 1284 (N.J. 2007) (citation omitted).  "In making that determination, the court must first consider the foreseeability of harm to a potential plaintiff . . . and then analyze whether accepted fairness and policy considerations support the imposition of a duty[.]"  *Id.* (citations omitted).

Foreseeability is relevant to both duty and proximate cause.[6]  *See In re Asbestos Prods. Liab. Litig.*, 873 F.3d 232, 236 (3d Cir. 2017) (noting that foreseeability "is a concept embedded" in both duty and proximate cause).  At the same time, there are differences between the two:

> ". . . the risk reasonably to be perceived defines the duty to be obeyed; it is the risk reasonably within the range of apprehension, of injury to another person, that is taken into account in determining the existence of the duty to exercise care."  [Hill v. Yaskin, 380 A.2d 1107 (N.J. 1977)] (citation omitted).  "The broad test of negligence is what a reasonably prudent person would foresee and would do in the light of this foresight under the circumstances."  *Ibid.*
>
> Foreseeability as it relates to proximate cause, "on the other hand, relates to 'the question of whether the specific act or omission of the

---

[6] Arconic does not argue that it is entitled to summary judgment based on proximate cause.  Def. Brf. at 36-39.

defendant was such that the ultimate injury to the plaintiff
reasonably flowed from defendant's breach of duty." [*Clohesy v.
Food Circus Supermarkets, Inc*., 694 A.2d 1017, 1021 (N.J. 1997)]
(quoting *Hill*, 75 N.J. at 143, 380 A.2d 1107). In other words,
"[f]oreseeability in the proximate cause context relates to
remoteness rather than the existence of a duty." *Ibid.*

*S.H. v. K & H Transp., Inc.*, 242 A.3d 278, 286-87 (N.J. Super. Ct. App. Div. 2020).

Edgewater argues that Arconic "owed a duty of care to Edgewater to 1) ensure compliance
with applicable regulations relating to the transfer and reuse of PCB-contaminated concrete outside
of the Alcoa Property, and 2) to ensure that the handling and disposal of such materials was
conducted in a safe and reasonable manner." Pl. Brf. at 40. Edgewater relies primarily on
*Preferred Real Est. Invs., Inc. v. Edgewood Properties, Inc.*, No. CIV. 06-4266 (AET), 2007 WL
81881 (D.N.J. Jan. 9, 2007). In that case, the defendants supplied another entity, Edgewood, with
contaminated concrete, which was then used to contaminate the plaintiff's property. At the motion
to dismiss stage, the Court held that the plaintiffs were foreseeable victims because it was
reasonably foreseeable that the concrete could be used to contaminate other property, "such as a
co-owner or those contracting with Edgewood." *Id.* at *3. The court reasoned that the defendants
provided Edgewood with crushed concrete for fill from an already demolished building, knowing
it was contaminated, and without informing the developer of the contamination.

In this case, it is alleged that Arconic knew of undisclosed contamination at the time it sold
the Alcoa Property—specifically that there were two underground storage tanks (USTs) beneath
Building 12 which Arconic did not disclose. BE SOMF ¶¶ 32, 33, 35. Arconic claims that it was
unaware of the existence of the two USTs when it made representations about the number of USTs
on the Alcoa Property. A Response ¶ 30. At the same time, Arconic states that it "is aware of no
facts indicating that it was not in possession of the drawings showing the potential existence of
two USTs under Building 12 in 1993." A Response ¶ 32. Before the Court can determine whether

Arconic owed a duty to Edgewater, a factual issue must be resolved—specifically, whether Arconic knew (or should have known) of the two USTs when it made the relevant representations. That issue presents a genuine dispute of a material fact.  If it is true that Arconic knew or should have known of the two USTs, then this matter is more analogous to *Preferred Real Estate.*[7]  A legal determination of duty is not appropriate until the factual questions surrounding Arconic's knowledge of contamination are made.  Arconic's motion for summary judgment on Count VII is therefore denied.

### D.  CERCLA

Both parties move for summary judgment on Edgewater's CERCLA claim.[8]  Edgewater has asserted that Alcoa is liable as an "arranger."  Pl. CERCLA Brf.  CERCLA imposes arranger liability as follows:

> [A]ny person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances[.]

42 U.S.C. § 9607(a)(3).  "[U]nder the plain language of the [CERCLA] statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance."  *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 611 (2009).

---

[7] To be clear, the Court is not definitively deciding the duty issue at this time because even if Arconic knew of the two USTs, there are still seemingly important factual differences with *Preferred Real Estate*.

[8] In this section, Edgewater's brief in support of its motion (D.E. 352) for summary judgment will be referred to as "Pl. CERCLA Brf."; Arconic's brief in opposition (D.E. 373) will be referred to as "Def. CERCLA Brf."; and Edgewater's brief in reply (D.E. 400) will be referred to as "Pl. CERCLA Reply."

"[K]nowledge alone is insufficient." *Burlington*, 556 U.S. at 612.  The most important factors in

determining arranger liability are (1) ownership or possession; and (2) knowledge; or (3) control.

*Morton Int'l, Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 677 (3d Cir. 2003).  Further, an arranger

must have taken "intentional steps to dispose of [the] hazardous substance." *Burlington*, 556 U.S.

at 611 (citation omitted).  The Third Circuit has provided the following guidance on arranger

liability:

> Ownership or possession of the hazardous substance must be
> demonstrated, but this factor alone will not suffice to establish
> liability.  A plaintiff must also demonstrate either control over the
> process that results in a release of hazardous waste *or* knowledge
> that such a release will occur during the process.  We note, too, that
> in conducting this analysis a court should not lose sight of the
> ultimate purpose of Section 113, which is to determine whether a
> defendant was sufficiently responsible for hazardous-waste
> contamination so that it can fairly be forced to contribute to the costs
> of cleanup.

*Morton*, 343 F.3d at 677–78.

Edgewater argues that Arconic—then Alcoa—is an arranger by virtue of the 1997 sale of

the Alcoa Property.  Pl. Brf. at 17-20.  The disposal at Veterans Field is alleged to have occurred

in 2013— approximately *15 years after* the point at which Edgewater alleges Arconic became an

"arranger."  BE SOMF ¶¶ 96, 99.  Edgewater does not allege that Arconic was involved with the

specific decision to demolish Building 12 and deposit the materials at Veterans Field or that

Arconic was even aware of that decision.   At the time Arconic sold the Alcoa Property, Building

12 was still standing and 15 years later, "unbeknownst to" Arconic, Waterside disposed of the

contaminated Building 12 materials at Veterans Field.  Edgewater has not pointed to any authority

which has extended CERCLA arranger liability this far.

Arconic did not have the requisite ownership, possession, knowledge, or control over the

arrangement which led to the disposal at Veterans Field.  Arconic did not have ownership or

possession of Building 12 when its materials were disposed of at Veterans Field.  Def. Reply at
15.  Edgewater cites two cases for the proposition that an arranger is required only to have
"ownership of the product at the time a sale is entered into," as opposed to at the time of disposal.
Pl. Brf. (D.E. 352) at 15 (citing *W.R. Grace & Co. -Conn. v. Zotos Int'l, Inc*., 2013 U.S. Dist.
LEXIS 141028, *82 (W.D.N.Y. Sep. 26, 2013); *Catellus Devel. Corp. v. United States*, 34 F.3d
748 (9th Cir. 1994)).  Accepting this argument as true, Arconic's sale of the Alcoa Property in
1997 was not the arrangement that resulted in the 2013 disposal for which Edgewater incurred
cleanup costs.[9]

It is true that an arranger need not maintain control of the hazardous substances until
discharge—such a rule would not capture circumstances in which an arranger cedes control in
order for the disposal to take place.  But here, Alcoa did not have ownership or control of Building
12 for 15 years before the discharge.  *C.f. Agere Sys. v. Advanced Envtl. Tech. Corp*., 2006 WL
3366167 (E.D. Pa. Nov. 20, 2006) (imposing liability where a contractor in charge of disposing of
waste contracted with another entity to dispose of the material and where knowledge of a release
was inherent to the disposal).  Edgewater cites to *Agere*, which stated "[t]he mere fact that the
individual is able to transfer the item to a third party establishes that the individual has exercised
control." *Agere Sys. v. Advanced Envtl. Tech. Corp*., No. 02-3830, 2006 U.S. Dist. LEXIS 84114,
at *19 (E.D. Pa. Nov. 17, 2006).  But the case is inapposite. In the *Agere* scenario, Waterside was

---

[9] *Zotos* is also factually distinguishable. Zotos originally used its own employees to staff
problematic salvage operations, Zotos decided which products it wanted its contractor to salvage,
and Zotos abandoned waste from its salvage operations at its own plant. *W.R. Grace & Co.--Conn.
v. Zotos Int'l, Inc*., No. 98-CV-838S, 2013 WL 5488939, at *31 (W.D.N.Y. Sept. 30, 2013).  "At
every step preceding actual disposal, Zotos owned and was responsible for returned product, set
policies governing returns, and made all decisions relative to the ultimate fate of returned goods."
*Id*. at *32.

the third party and 38 COAH had the control to transfer the hazardous material to Waterside prior to the disposal.[10]  Edgewater also cites to *Morton's* indication that "general knowledge that waste disposal is an inherent or inevitable part of the process arranged for by the defendant may suffice to establish liability."  *Morton* at 678.  Yet, Edgewater has not cited authority that extends this proposition to the facts here—a disposal that occurred 15 years after the sale of the Alcoa Property in 1997.

To the extent Edgewater argues that Arconic's initial sale contemplated a demolition of Building 12, Arconic points out that North River and Arconic subsequently agreed that Building 12 would remain standing.  A SOMF ¶ 35.  After the initial sale of the Alcoa Property, Fred Daibes decided not to demolish Building 12 and instead put it to beneficial use.  A SOMF ¶ 35.  As a result, in 1999, the parties entered into an Environmental Indemnity Agreement ("EIA"), which stated that Arconic would have no responsibility for Building 12.  A SOMF ¶¶ 37, 38; Parker Cert., Ex. 17.  Any intent for disposal that Arconic possessed in 1997 did not survive past the EIA—at which point Building 12 was no longer required to be demolished.  The intent to dispose is critical to a finding of arranger liability, *see Burlington*, 556 U.S. at 612, and is absent here.[11]

Congress intended CERCLA to require a party "actually responsible for any damage, environmental harm, or injury from chemical poisons" to share in the cost of cleanup.  *Bestfoods,*

---

[10] The potential liability for Waterside, 38 COAH, and related Defendants is addressed in the Court's Opinion dated June 30, 2021.

[11] The Court is not indicating that a party can escape CERCLA liability via contract or indemnification agreement.  *See* 42 U.S.C. § 9607(e)(1) ("No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section.").  Instead, the EIA is relevant to Arconic's intent to dispose of Building 12.

524 U.S. at 55–56, 118 S. Ct. 1876.  Edgewater has not alleged that Arconic had any involvement with the actual decision to dispose of the Building 12 materials at Veterans Field nor has Edgewater cited to any case in which arranger liability has extended as far as Edgewater proposes it should in this case.  Because there is no genuine dispute of material fact, Arconic's motion for summary judgment on Count II is granted and Edgewater's motion for summary judgment on the count is denied.

Having so decided, the Court does not reach Arconic's argument that Edgewater failed to comply with the National Contingency Plan.  Further, Arconic's motion to strike the supplemental affidavit of Thomas Bambrick submitted by Edgewater is moot.  That affidavit goes solely to Edgewater's arguments as to compliance with the National Contingency Plan.  Arconic's motion (D.E. 402) to strike is therefore denied as moot.

### E.  Spill Act

Both parties also move for summary judgment on Edgewater's New Jersey Spill Act claim.[12]  The Spill Act is the New Jersey analog to CERCLA[13] and was passed before CERCLA. Like CERCLA, the Spill Act permits courts to "allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate."  *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Env't Prot.*, 725 F.3d 369, 392 (3d Cir. 2013).  The Spill Act imposes strict joint and several liability on any person who has discharged a hazardous

---

[12] In this section, Edgewater's brief in support of its motion (D.E. 349) for summary judgment will be referred to as "Pl. Spill Act Brf."; Arconic's brief in opposition (D.E. 373) will be referred to as "Def. Spill Act Brf."; and Edgewater's brief in reply (D.E. 399) will be referred to as "Pl. Spill Act Reply."

[13] At the same time, there are some important differences between the Spill Act and CERCLA." *New Jersey Dep't of Env't Prot. v. Dimant*, 51 A.3d 816, 831-32 (2012) (reviewing differences between the two acts as to liability and causation).

substance. *NJDEP v. Gloucester Environmental Mgmt. Servs., Inc.*, 821 F. Supp. 999, 1009 (D.N.J. 1993). Liability under the Spill Act arises "whether the discharge was the result of 'intentional or unintentional' acts or omissions. *Morris Plains Holding VF, LLC v. Milano French Cleaners, Inc*., No. A-0604-16T1, 2018 WL 1882956, at *1 (N.J. Super. Ct. App. Div. Apr. 20, 2018) (citing N.J.S.A. 58:10-23.11b).

In addition to liability as a direct discharger, the Spill Act provides that one who is "in any way responsible for any hazardous substance" is strictly liable, upon its discharge, for "all cleanup and removal costs no matter by whom incurred." *New Jersey Dep't of Env't Prot. v. Dimant*, 51 A.3d 816, 829 (2012) (citing N.J.S.A. 58:10–23.11g(c)(1)). However, in "an action to obtain damages, authorized costs and other similar relief under the Act there must be shown a *reasonable link* between the discharge, the putative discharger, and the contamination at the specifically damaged site." *Dimant*, 51 A.3d at 833 (emphasis added).

In *Dimant*, the New Jersey Supreme Court addressed the liability of a dry cleaner for groundwater contamination. In analyzing the requisite nexus for liability under the Spill Act, the *Dimant* court concluded that the phrase "in any way responsible" requires some connection between the discharge complained of and the alleged *discharger. Id.* at 830. Once a party is found responsible for a discharge, the court in *Dimant* continued, there also must be a nexus between the discharge and the contaminated site for which cleanup costs are incurred. *Id.* at 831. The New Jersey Supreme Court concluded that "through the requirement of a connection between the discharge, over which the party had some control or responsibility, and the Spill Act response to the damage, the focus in the Spill Act remains on proof of a connection between the discharge complained of and the resultant Spill Act response." *Id*. at 831.

19

To be clear, the discharge at issue here is the one occurred at Veterans Field rather than the discharge that apparently occurred at the Building 12 site.  In addition, this matter is not a traditional "two-site" case in which hazardous substances are released at one site and then migrate to another.  *Id.* at 834-35.  The traditional scenario would be met if, for example, a discharge at Building 12 migrated to wells at an adjacent site.

Edgewater argues that Arconic is "in any way responsible" by virtue of its generation of the PCBs at the Alcoa Property and its prior ownership of Building 12.  However, Edgewater has not cited any case imposing Spill Act liability under similar circumstances.  Instead, Edgewater relies on *New Jersey Tpk. Auth. v. PPG Indus., Inc.*, 197 F.3d 96 (3d Cir. 1999), a case in which Spill Act liability was *not* imposed.  Pl. Spill Act Brf. at 3.  As discussed, Arconic did not own, possess, or control Building 12 at the time its hazardous materials were disposed of at Veterans Field, and had not for approximately 15 years. *See Dimant*, 51 A.3d at 830 (reviewing prior decisions and the nexus requirement as to "holding liable a party who was not directly responsible for the discharge that had occurred, *but who nevertheless had some control over the direct discharger in each matter*" (emphasis added)).  Arconic was not the discharger of the contamination at Veterans Field and was not involved in any decisions or actions concerning the discharge.  Because there is no genuine dispute of material fact,[14] Arconic's motion for summary judgment on Count I is granted, and Edgewater's motion for summary judgment on the count is denied.

---

[14] Edgewater has also not cited any authority which extends Spill Act liability to Arconic even if Arconic was aware of the two undisclosed USTs beneath Building 12.

IV.     **CONCLUSION**

For the foregoing reasons, Arconic's motion (D.E. 344) for summary judgment is GRANTED as to Counts I and II and DENIED as to Counts VII, VIII, and IX; Edgewater's motion (D.E. 349) for summary judgment is DENIED; Edgewater's motion (D.E. 352) for summary judgment is DENIED; and Arconic's motion (D.E. 402) to strike is DENIED as moot.   An appropriate Order accompanies this Opinion.

Dated: July 19, 2021

John Michael Vazquez, U.S.D.J.