Not for Publication

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER, | Civil Action No. 14-5060 |
| Plaintiff, | **OPINION** |
| v. | |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH , LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALCOA INC.; ALCOA DOMESTIC, LLC, as successor in interest to A.P. NEW JERSEY, INC.; HUDSON SPA, LLC; JOHN DOES 1-100; ABC CORPORATIONS 1-100, | |
| Defendants | |
| and | |
| WATERSIDE CONSTRUCTION, LLC; 38 COAH LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES, | |
| Defendants/ Third-Party Plaintiffs | |
| v. | |
| NEGLIA ENGINEERING ASSOCIATES, | |
| Third-Party Defendants, | |
| and | |
| ALCOA DOMESTIC, LLC as successor in interest to A.P. NEW JERSEY, INC., | |
| Defendant/Third-Party Plaintiff, | |

v.

COUNTY OF BERGEN; RIVER ROAD
IMPROVEMENT PHASE II, INC.; HUDSON
SPA, LLC,

          Third-Party Defendants.

**John Michael Vazquez, U.S.D.J.**

Presently before the Court are three motions filed by Defendants Arconic Inc. (f/k/a Alcoa Inc.) and Arconic Domestic, LLC (f/k/a Alcoa Domestic LLC, as successor in interest to A.P. New Jersey, Inc.) (collectively "Arconic"): (1) a motion for summary judgment (D.E. 345) against Waterside Construction, LLC ("Waterside"), 38 COAH, LLC ("38 COAH"), North River Mews Associates, LLC ("North River"), Daibes Brothers, Inc., and Fred Daibes (collectively, the "Waterside Defendants") and River Road Improvement Phase II, Inc. ("RRIP"); (2) a motion for summary judgment (D.E. 351) against North River and 38 COAH (the "North River Plaintiffs") and RRIP; and (3) a motion to strike (D.E. 403).

The Court has reviewed all submissions made in support and in opposition to the motions and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Arconic's motion for summary judgment at D.E. 345 is **GRANTED in part and DENIED in part,** and Arconic's motion for summary judgment at D.E. 351 is **GRANTED in part and DENIED in part**. Arconic's motion to strike at D.E. 403 is **DENIED**.[1]

---

[1] The current motions are part of a large number of motions for summary judgment filed in this matter. All pending motions are listed in the Procedural History section of this Opinion. If the Court were to address all motions in a single opinion, the results would be unwieldly. As a result, the Court addresses the motions individually or, as here, in a group. The Court also does not repeat

## I.     BACKGROUND

This matter stems from an allegation that the Waterside Defendants used polychlorinated biphenyl ("PCB")[2] contaminated material as fill in a public park project.  The park is owned by Plaintiff Borough of Edgewater, but the contaminated materials (or at least some of them) came from a property previously owned by Alcoa Corporation ("Alcoa"), now known as Arconic.

### A.  Facts[3]

Arconic constructed and operated an industrial plant and site (the "Alcoa Property") from 1914-1965 in Edgewater, New Jersey.  BE SOMF ¶ 1.  A structure referred to as "Building 12" was erected on the site in 1938.  BE SOMF ¶ 3.  The site was subsequently acquired by Amland Properties Corporation ("Amland"), who then discovered PCB contamination throughout the property.  Amland sued Arconic, which resulted in a settlement and the site was conveyed to A.P. New Jersey, Inc. ("AP"), which later became Arconic Domestic, LLC.  BE SOMF ¶ 12.  The Amland settlement agreement required that the deed contain a legend notice stating that "[t]his

---

each and every alleged fact in each opinion.  Instead, the Court focuses on the facts pertinent to each motion (or motions) as asserted by the parties to the motion(s).  Therefore, if the facts in one opinion appear to be distinguishable from facts in another opinion, it is because those are the facts asserted by the party or parties in its/their respective motions.

[2] According to the Environmental Protection Agency, PCBs are a group of man-made organic chemicals consisting of carbon, hydrogen and chlorine atoms.  *United States Environmental Protection Agency, Learn about Polychlorinated Biphenyls* (PCBs), https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls-pcbs.  PCBs have been demonstrated to cause a variety of adverse health effects.  *Id.*

[3] Many of the facts are derived from Plaintiff Borough of Edgewater's statement of material facts (D.E. 319-1), which will be referred to as "BE SOMF"; Arconic's statement of material facts (D.E. 318) will be referred to as "A SOMF"; the Waterside Defendants' statement of material facts (D.E. 328) will be referred to as "W SOMF"; and Arconic's responsive statement of facts (D.E. 361) will be referred to as "A Response."  The Court uses Edgewater's facts as to background information to provide relevant context.  The Court does not use Edgewater's facts to determine whether there is a genuine dispute of material fact in the current motions.

property may be contaminated with hazardous substances including Polychlorinated Biphenyls."
BE SOMF ¶ 11.

In 1997, Arconic sold the property to North River, an entity affiliated with Fred Daibes. Pursuant to the terms of the Purchase and Sale Agreement and the related Multi-Party Property Acquisition Agreement, AP agreed to pay RRIP up to $12,000,000 for the demolition, removal, and proper disposal  of the buildings on the site pursuant to a Remedial Action Work Plan.  BE SOMF ¶ 41.  Later that year, North River requested permission to postpone the demolition of Building 12.  BE SOMF 52.  In 2006, the portion of the Alcoa Property containing Building 12 was transferred from North River to 38 COAH, another entity affiliated with Fred Daibes.  BE SOMF ¶ 65.  In 2010, certain areas of the exterior walls on Building 12 became unstable and fell. BE SOMF ¶ 68.

In 2011, Plaintiff Edgewater looked to improve Veterans Field, a 27-acre public park owned by the borough.  BE SOMF ¶¶ 75-76.  TERMS, an environmental consulting firm, was retained as a consultant and Licensed Site Remediation Professional for the project.  After a bidding process, Waterside, a construction company managed by Fred Daibes, was awarded the contract for the improvement project.  BE SOMF ¶¶ 80, 85, 86.

When the amount of fill needed at the Veterans Field project increased, Waterside imported and used the PCB-contaminated material from Building 12 as fill on Veterans Field.  BE SOMF ¶ 93.  Veterans Field had PCB contamination before the project began, with the highest level being 2.5 parts per million ("ppm").  BE SOMF ¶ 78.  Sampling done after the site was closed in October 2013 found that fill materials used throughout the site were contaminated with PCBs, including (1) crushed concrete with levels ranging from 100-350 ppm used for concrete sidewalks and cement pads, and (2) concrete combined with soil with levels ranging from 10-350 ppm used as

fill on the field and under paved areas.  BE SOMF ¶ 11.  Impacted materials were excavated

pursuant to an EPA-approved Self-Implementing Plan and disposed off-site.  BE SOMF ¶ 115.

## II.    Procedural History

Edgewater first filed suit on August 12, 2014.  D.E. 1.  The Arconic Defendants filed a

Third-Party Complaint against the County of Bergen and RRIP on December 5, 2014.  D.E. 23.

On December 5, 2014, the Waterside Defendants filed counterclaims against Arconic for (among

others) contribution, indemnification, and claims under CERCLA and the Spill Act.  On September

28, 2015, the North River Plaintiffs filed an amended complaint in a related case, 14-8129,

asserting claims against Arconic under CERCLA, the Spill Act, breach of contract, negligence,

unjust enrichment, and strict liability.  14-cv-8129, D.E. 28.  On December 14, 2016, the Court

denied Arconic's motion for judgment on the pleadings as to North River and 38 COAH.  D.E.

184.  On February 27, 2018, the separate matters docketed as 14-8129 and 14-50560 were

consolidated.  D.E. 255.

Multiple parties have filed multiple motions for summary judgment.  The motions are as

follows:

- Motion by TERMS for summary judgment against Edgewater (D.E. 339);
- Motion by Hudson Spa for summary judgment against Edgewater (D.E. 342);
- Motion by Arconic for summary judgment against Edgewater (D.E. 344);
- Motion by Arconic for summary judgment against Fred Daibes and North River;
- Motion by Bergen County for summary judgment against Alcoa, North River, and RRIP (D.E. 346);
- Motion by Edgewater for summary judgment against the Waterside Entities on Count XI (D.E. 347);
- Motion by Edgewater for summary judgment against the Waterside Entities on Counts II and VI (D.E. 348);
- Motion by Edgewater for summary judgment against Alcoa on Count I (D.E. 349);
- Motion by Edgewater for summary judgment against the Waterside Entities on Count I (D.E. 350);

- Motion by Arconic for summary judgment against North River, 38 COAH, and RRIP (D.E. 351);
- Motion by Edgewater for summary judgment against Alcoa on Count II (D.E. 352); and
- Motion by Edgewater for summary judgment against the Waterside Entities on Count II (D.E. 353).

This Opinion address only the motions for summary judgment filed by Arconic against the Waterside Defendants, RRIP, and the North River Plaintiffs (D.E. 345, D.E. 351), along with Arconic's motion to strike (D.E. 403).

## III.   LEGAL STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)).  A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party adequately supports its motion,

the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## IV.    Motion to Strike (D.E. 403)

The Court first addresses Arconic's motion to strike. Arconic asserts that the Court should deem undisputed all facts in Arconic's Statement of Undisputed Facts. Arconic is correct that Waterside failed to follow the proper procedure set forth in Local Civil Rule 56.1. Instead of citing to the record when disputing a fact, as required, Waterside cited generally to its own statement of material facts. While the Court agrees that the Waterside Defendants should have followed the correct procedure, it will not impose the harsh remedy Arconic suggests. However, to the extent the Court is unable to discern Waterside's support in the record as to a disputed fact, that fact will be deemed undisputed. *See Nike, Inc. v. E. Ports Custom Brokers, Inc*., No. 2:11-CV-4390-CCC-MF, 2018 WL 3472628, at *1, n.1 (D.N.J.  July  19,  2018)  (where non-moving party did not provide citations to specific facts of record in its responsive statement, Court deemed all statements

7

not properly denied by non-moving party as admitted); *Friedman v. Bank of Am., N.A.*, No. CIV.A. 09-2214 JBS, 2012 WL 1019220, at *6, n.2 (D.N.J. Mar.  26, 2012) ("[T]he court will consider any statement of fact which was not denied by the Plaintiffs with a citation to the record as undisputed for the purposes of this motion for summary judgment.").  As such, the motion  to strike (D.E. 403) is denied.

### V.    Motion for Summary Judgment against the Waterside Defendants (D.E. 345)

Arconic's motion for summary judgment at D.E. 345 addresses claims contained in the Waterside Defendant's Crossclaims against Arconic (D.E. 24) as well as Arconic's own claims for breach of contract and indemnification.[4]   The Waterside Defendants Crossclaims against are contribution (count one); indemnification (count two); CERCLA § 107 (count three); CERCLA § 113 (count four); and contribution under the New Jersey Spill Act (count five).  D.E. 24.

### A.  The Relevant Contracts

Many of Arconic's arguments turn on contracts between or among the parties. There are three relevant agreements: the Purchase and Sale Agreement ("PSA"), the Multi-Party Property Acquisition Agreement ("MPAA"), and the Environmental Indemnity Agreement ("EIA").  As noted, North River bought the Alcoa Property from Arconic[5] in 1997.  In conjunction with the sale of the property, Arconic and North River entered into the PSA in June 1997.  Parker Cert., Ex. 4 ("PSA").

---

[4] In this section, Arconic's brief (D.E. 345-1) in support of its motion (D.E. 345) will be referred to as "Arconic Brf."; the Waterside Defendants' brief (D.E. 382) in opposition to that motion will be referred to as "Waterside Brf."; and Arconic's brief (D.E. 395) in reply will be referred to as "Arconic Reply."

[5] The actual entity in the agreements was A.P. New Jersey, Inc.  For ease of reference, the Court refers to the party as Arconic.

Section 5 of the PSA, titled "Warranties and Representations" provides as follows:

> OTHER THAN THE REPRESENTATION AND WARRANTY SET FORTH IN THIS SECTION, [NORTH RIVER] SPECIFICALLY ACKNOWLEDGES THAT [ARCONIC] IS SELLING AND [NORTH RIVER] IS PURCHASING THE PROPERTY ON AN "AS IS, WITH ALL FAULTS" BASIS AND THAT [NORTH RIVER] SHALL HAVE AN OPPORTUNITY TO INSPECT THE PROPERTY AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM [ARCONIC], ITS AGENTS, OR REPRESENTATIONS AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING WITHOUT LIMITATION:
>
> (iii) the existence, quality, nature, adequacy and physical condition of the property;
> …
> (vii) the presence or removal of hazardous or toxic materials, substances or wastes in, on, under, or about the Property or the adjoining or neighboring property

PSA, § 6 (emphasis in original).

Section 6 of the PSA provides for Arconic to pay for certain remediation costs.  Section 6(a)(ii)(2) states that Arconic "will be responsible for costs of disposal of material contaminated with PCB's at concentrations greater than 50 ppm at approved TSCA landfills if those disposal costs exceed $250,000 up to a maximum of $2,500,000."  Arconic also promised to pay $9,500,00 in demolition costs, with a total cap of $12,000,000 for both demolition and disposal costs.

Section 7 of the PSA is entitled "Environmental Conditions."  This Section defines numerous terms and conditions relating to the environmental situation of the property.  Section 7(a) defines "hazardous substances," which includes "any substance, chemical or waste that is listed or defined as hazardous, toxic, or dangerous under Applicable Law."  Section 7(b) goes on to define "Applicable Law" as including CERCLA, the Spill Act, and numerous other environmental laws and regulations.

9

The PSA then turns to environmental reports regarding the condition of the property. Section 7(c) requires that Arconic make available to North River all environmental reports concerning the condition of the property (the "Environmental Reports"). The parties further agree that the Environmental Reports, along with any reports prepared by the North River, comprise the "known environmental condition" of the property. Section 7(d) provides that North River, "at its sole cost and expense, may conduct an environmental transfer assessment of the [p]roperty prior to closing."

Sections 7(f) and 7(g) concern indemnification and a release. Section 7(f) discusses the indemnification of Arconic, the seller, by North River, the buyer, stating as follows:

> Indemnification of Seller. Buyer shall indemnify, defend and hold Seller harmless from any and all claims, demands, causes of action, and suit or suits, including all foreseeable and unforeseeable consequential damages, occurring on or after the Closing Date arising under Applicable Law related to Buyer's (or, during Buyer's ownership of the Property, any operators' or any third parties') use of the Property and/or any and all activities relating thereto.

PSA, § 7(f).

Section 7(g) then sets forth the circumstances surrounding the release of Arconic:

> Release of Seller. Except in the event that Seller remains in default on any payment obligation after receiving notice of such default and opportunity to cure as set forth in Section 8, Buyer expressly releases Seller and agrees to waive all rights that it may have to seek contribution from Seller for any response costs or claims that may arise as a result of the actions or inactions of Seller and any previous owner, operator or third party on or with respect to the property relating to Hazardous Substances. Nothing in this provision shall alter or expand the parties' rights or obligations under the Multi-Party Agreement.

PSA, § 7(g).

10

As noted, Arconic agreed to pay up to $2,500,000 in disposal costs.  Section 8(a) addresses default by Arconic.  It states that if Arconic "fails to perform any of its obligations under this Agreement or the Multi Party Agreement, the same shall constitute a default of this Agreement and thereupon, [North River], at its option, may declare a forfeiture by written notice to seller." PSA, § 8(a).  The Section goes on to explain the notice requirements concerning Arconic's default, and states that "where the default is not capable of being remedied in forty-five (45) days, [North River] may declare this Agreement null and void."  *Id*.

The PSA also contains an integration clause, which provides that "[a]ll understandings and agreements heretofore had between the parties, oral or written, are merged into this Agreement, which alone fully and completely expresses their understanding."  PSA, § 16 (the "integration clause").

At the time of the PSA, Arconic (then known as A.P.), the County of Bergen, North River, and RRIP entered into the MPAA.  Parker Cert., Ex. 10 ("MPAA").  Under the terms of the MPAA, North River and RRIP agreed to demolish and remove all existing structures at the Alcoa Property. Parker Cert., Ex. 10 ("MPAA") at 7.

The MPAA also contains a hold harmless and duty to defend clause:

> It is understood and agreed that North River and RRIP shall defend and save the County[6] and [Arconic] harmless from any and all claims that may be filed in any Court arising from the performance of this Agreement.  In connection with the defense of any claim, the County and [Arconic] shall be entitled to select their own counsel. The County and [Arconic] shall fully cooperate in any such litigation provided, however, that neither the County nor [Arconic] shall be under any obligation to expend any funds for any purpose whatsoever in connection with such litigation.  Should the County or [Arconic] be named as a party in any court, administrative or other action proceeding, North River and RRIP agree to reimburse

[6] The county referred to is Bergen County, in which Edgewater is located.

11

> the County and/or [Arconic] (as applicable) for the cost of any legal,
> expert or other fees expended by the County and/or [Alcoa] in such
> action of proceeding.

MPAA § 16.  The MPAA also expressly refers to the PSA.  MPAA § 1.

As noted, the MPAA indicated that all the buildings on the Alcoa Site would be demolished.  Parker Cert., Ex. MPAA at 7 ¶ 2 ("North River and RRIP agree that they will cause to be demolished and removed from the [Alcoa] property all structures and improvements currently existing on the property.").  Building 12 on the Alcoa Property, however, was not demolished at that time.  As a result, North River, Arconic, and RRIP entered into the EIA on March 13, 1999.  Parker Cert., Ex. 17 ("EIA").  The EIA addressed Building 12 if it was not razed, providing as follows:

> To the extent that Building 12 is not demolished, North River and
> River Road shall indemnify, defend and hold [Arconic] harmless
> from any and all claims, demands, causes of action, and suit or suits,
> including all foreseeable and unforeseeable consequential damages,
> occurring at any time before, during or after North River's
> ownership of the property, relating to Building 12 and the land under
> and adjacent thereto, arising under Applicable Law (as defined in
> the Purchase Agreement), including but not limited to, remediation
> and disposal costs and expenses related to PCBs.

Arconic makes the following arguments as to the parties' contracts: North River's claims against Arconic are barred, Arconic is entitled to indemnification, and North River and RRIP breached.  In response, the Waterside Defendants argue that the contracts were fraudulently induced because Arconic had knowledge of undisclosed contamination beneath Building 12.  Because there is a genuine dispute of material fact as to Arconic's knowledge, as will be discussed below, summary judgment is not appropriate based on the relevant contracts.

### 1. Fraudulent Inducement

The Court first addresses the factual dispute over Arconic's knowledge of undisclosed contamination.  In September 2013, the Waterside Defendants discovered two underground storage tanks ("USTs") buried underneath Building 12 and containing PCB contamination.  The parties dispute whether Arconic had knowledge of these USTs and intentionally failed to disclose their existence to 38 COAH at the time of the PSA.  The Waterside Defendants assert that such knowing concealment would constitute fraudulent inducement therefore invalidating the contracts. Waterside Brf. at 19.

To establish a claim for fraudulent inducement, a party must show the following: "(1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment." *CDK Glob., LLC v. Tulley Auto. Grp., Inc*., 489 F. Supp. 3d 282, 303–04 (D.N.J. 2020).  Fraudulent inducement therefore requires knowledge of falsity.  The parties have focused on the knowledge requirement in their motions.

The 1992 Underground Storage Tank Registration Questionnaire that Arconic (then AP) submitted to the NJDEP indicated that there were six USTs at the Alcoa Property.  W SOMF ¶ 25. The 1992 Annual Certification Questionnaire that Arconic submitted to the NJDEP stated that "[a]ll tanks removed October/November 1992."  W SOMF ¶ 26.  Metcalf & Eddy, engineers hired by Arconic, prepared an Interim Response Action Report in 1991.  W SOMF ¶ 27.  That report stated that USTs on the site would be reported to the NJDEP.  W SOMF ¶ 24.

However, Waterside asserts that Arconic was in possession of blueprint drawings which depicted the additional USTs beneath Building 12.  W SOMF ¶ 32.  Arconic asserts that its personnel were not aware of the blueprint drawings depicting the USTs until 1997, at which time

13

it provided the blueprints to Amir Daibes.  A Response ¶ 46.  At the same time, Arconic states that it is "aware of no facts indicating that it was not in possession of the drawings showing the potential existence of two USTs under Building 12 in 1993."  A SOMF, Reply at P 33.

Both sides cite to the deposition of Kevin McKnight, Arconic's Vice President of Environmental Health & Safety and Chief Sustainability Officer.  In his deposition, McKnight testified that "we were unaware of those drawings until 1997 when Amir Daibes asked me if we had any historical drawings.  First time we became aware of any of those drawings was in 1997."  Pascarella Cert. (D.E. 359), Ex. 7, at 704:25-705:4.  McKnight explained that he recalled a conversation with Amir Daibes, who he understood was the engineer managing the demolition work for Fred Daibes, in which Amir Daibes asked whether Alcoa "might have any old drawings of the Edgewater facility."  Parker Cert., Ex. 7, at 591:19.  McKnight testified:

> I told him I would check. And I called Ewald Dollhoff at the Alcoa Technical Center and I asked Ewald to go to the library and to look through the library and see if we might have any old drawings from the Edgewater facility.
>
> I recall Ewald calling me back and telling me that he found a whole bunch of film.  I think he said microfiche, which may have been how we retained those records at the Alcoa Technical Center. . . . I asked him if he could assemble those drawings and send them to me.

*Id.* at 592:5-592:19.  McKnight continued:

> And I believe I instructed either a secretary or a paralegal to send those documents on to Amir Diabes and we sent them all on.  I don't recall specifically whether we copied them.
>
> I think they were so voluminous that I told them to just go ahead and send him the documents and then ask for them back, so that in the even that we didn't move ahead, we would at least get the records back.

*Id.* at 593:3-593:13.  McKnight also testified that his understanding of the Administrative Consent

Order was that Arconic was required to remove the contents of USTs at the property.  *Id.*, at

711:25-712:9.[7]

Arconic has provided a letter dated June 24, 1997 on Alcoa letterhead from Margaret

Novacky, a paralegal, to Amir Daibes.  Parker Cert. (D.E. 359), Ex. 9.  The letter provides as

follows:

> Pursuant to our telephone conversation of today, enclosed you will
> find microfilm blueprints dating back to 1915 of the former Alcoa
> Edgewater Works.  Under separate cover, I am sending to you four
> Federal Express tubes containing original drawings of the
> Edgewater Works.
>
> You are welcome to keep these original drawings and microfilm
> blueprints, but if for some reason the sale does not take place, we
> would appreciate your returning them to us.

Parker Cert. (D.E. 359), Ex. 9.

The Waterside Defendants, however, assert that they did not receive any blueprint

drawings from Arconic depicting the Alcoa Property.  W SOMF ¶ 45.  Fred Daibes testified in his

deposition that he did not recall receiving any blueprints or maps of the Alcoa property before

purchasing it.  Shafron Cert., Ex. U (Deposition of Fred Daibes), at 44:23-45:4.  Fred Daibes stated

that "nobody knew these two large tanks existed.  I mean Enivo-Sciences never knew. Nobody

was ever told these tanks were there." Shafron Cert., Ex. V (Deposition of Fred Daibes), at 45:15-

20.  Fred Daibes stated that Amir Daibes was his cousin who worked on the project, but that "he

was never really employed by me." Shafron Cert., Ex. U at 45:14-45:23.

---

[7] The Court notes that Arconic's responsive statement of facts (D.E. 361) at ¶ 46 cites to more of
Kevin McKnight's deposition than is available in the Pascarella Certification.  The Court is unable
to review the citation to page 728 of the deposition transcript.

The Waterside Defendants further claim that "during discovery in this matter, it was revealed that these documents remained in Alcoa's possession." W SOMF ¶ 46. In his deposition, McKnight was asked if Alcoa was currently in possession of "the binders created from the microfiche back in 1997." In response, McKnight stated: "That would be my understanding. I don't think anybody would have thrown that away. I believe we probably still have the original microfiche, you know, is there at [Alcoa Technical Center]." Shafron Cert, Ex. Q, at 617:1-11.

The Waterside Defendants continue that their own due diligence did not uncover the USTs under Building 12 because those USTs were "constructed in a manner concealing them from view as they were in a subterranean vault buried underneath two floor slabs with the newer floor slab constructed in such a way that it covered the access man-ways for the tanks." Waterside Brf. at 20; W SOMF ¶ 100.

The record presents a genuine dispute of material fact as to whether Arconic was aware of the two undisclosed USTs at the time it entered into the contracts for the sale of the Alcoa Property and as to whether the Waterside Defendants were informed of the USTs. While Arconic has evidence in the form of a letter that the blueprints were provided to Amir Daibes, the Waterside Defendants assert that they did not receive them. Further, although Arconic disputes that it had knowledge of the USTs prior to 1997, it appears undisputed that the blueprints were at least in Arconic's possession prior to that time.[8]

---

[8] The letter to Amir Daibes is dated June 24, 1997. The PSA is dated June 1997, but the specific date is left blank. Shafron Cert., Ex. S. It is unclear to the Court whether Kevin McKnight would have known about the underground USTs prior to the signing of the PSA and whether Arconic asserts that Amir Daibes received the documents prior to the signing. Yet, even if Amir Daibes received the documents after the PSA was finalized, his receipt would appear to have potentially triggered the statute of limitations as to the fraudulent inducement claim.

Under New Jersey law, courts have "recognize[d] fraud in the inducement as an equitable remedy that may serve as the basis for rescission of a contract." *TekDoc Servs., LLC v. 3i-Infotech Inc.*, 2013 WL 2182565, at *21 (D.N.J. May 20, 2013). The Waterside Defendants assert that Arconic's alleged fraudulent inducement invalidates the contracts. The resolution of this dispute of fact is therefore preliminary to the resolution of any of the parties' claims which implicate the contracts.

### 2.  Counterclaim for Indemnification

Arconic moves for summary judgment on its Counterclaim for indemnification pursuant to the PSA. The Waterside Defendants respond that the indemnification provision is unenforceable because Arconic failed to disclose a material adverse condition, namely the existence of the 2 USTs below Building 12. Waterside Brf. at 14.

Section 7 of the PSA states:

> Buyer shall indemnify, defend and hold Seller harmless for any and all claims . . . including all foreseeable and unforeseeable consequential damages . . . arising under Applicable Law related to Buyer's use . . . of the Property and/or any and all activities relating thereto.

Parker Cert., Ex. 4 ("PSA"), § 7(a).  "Applicable Law" is defined to include CERCLA, the Resource Conservation Recovery Act, the Toxic Substances Control Act, and "any and all formal or informal orders, decrees or requests from the United States Environmental Protection Agency, the appropriate New Jersey state governmental and regulatory bodies . . . and any similar state and local laws and ordinances and regulations implementing such statutes[.]"  PSA, § 7(b).

If the Waterside Defendants succeed on their fraudulent inducement claim, then the PSA will be subject to rescission.  Thus, the genuine issue of material fact that precluded summary

judgment as to fraudulent inducement likewise precludes summary judgment as to the Counterclaim for indemnification.

### 3.   North River's Claims Against Arconic

Arconic also moves for summary judgment on North River's claims against Arconic, arguing that they must be dismissed based on the express terms of the PSA.  The PSA's release provision provides, in relevant part, that "Buyer expressly releases Seller and agrees to waive all rights that it may have to seek contribution from Seller for any response costs or claims that may arise as a result of the actions or inactions of Seller and any previous owner, operator or third party on or with respect to the Property relating to Hazardous Substances."  PSA, Section 7(g).  Arconic argues that this provision releases Arconic from claims arising from CERCLA and the Spill Act, as well as related common law claims.  Arconic Brf. at 18.  Arconic therefore moves for the dismissal of Counts One through Five, which are cost recovery under CERCLA § 107; CERCLA § 113; Declaratory Judgment pursuant to CERCLA and the Spill Act; Strict Liability; and Negligence.  Civ. No. 14-cv-8129, D.E. 28 ¶¶ 29-59.

For the same reason that the Court denied summary judgment as to Arconic's Counterclaim for indemnification, the Court denies summary judgment on North River's Counts One through Five against Arconic.  If the PSA is subject to recission, then its release will be inapplicable.

### 4.   Arconic's Breach of Contract Claim

Arconic also moves for summary judgment on its claim for breach of contract against North River and RRIP.  Arconic asserts that North River breached the MPAA by transporting the material from Building 12 to Veterans Field.  In particular, Arconic argues that North River breached the following provision of the MPAA:

> North River and RRIP agree that they will cause to be demolished and removed from the [Arconic] property all structures and

> improvements currently existing on the property. Said demolition and removal shall be completed in accordance with the Remedial Action Workplan submitted to the DEP and the demolition plan reviewed and approved by [Arconic].

MPAA, ¶ 2.

The Waterside Defendants do not conduct a separate fraudulent inducement analysis for each contract but assert that Arconic "may not seek summary judgment asserting rights under the subject contracts because [Arconic]'s fraudulent inducement of North River to enter into the contracts vitiates any rights [Arconic] seeks to assert arising from the contracts." Waterside Brf. at 18. If Arconic is found to have fraudulently induced the PSA, it would be logical to find that the MPAA was fraudulently induced as well. The MPAA addresses removal of structures, including Building 12, on the Alcoa Property. As discussed, Arconic's knowledge of the Building 12 USTs at the time of contracting presents a genuine dispute of material fact. Because the existence of a valid contract is a requirement for there to have been an actionable breach of such contract, summary judgment is denied.[9]

### B. CERCLA Claims

The Waterside Defendants have asserted CERCLA Counterclaims against Arconic: count three asserts a claim for cost recovery under § 107, and count four asserts a claim for contribution under § 113(f). Arconic moves for summary judgment on both claims.

---

[9] The Waterside Defendants argue that Arconic's own breach of the contract precludes it from bringing a breach claim against the North River Plaintiffs. The Court construes this as an argument made in the alternative to the Waterside Defendants' argument as to fraudulent inducement. Having denied summary judgment on that basis, the Court does not reach the Waterside Defendants' alternative argument.

### 1.  CERCLA Overview

Congress enacted the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), codified as 42 U.S.C. § 9601 et seq., "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal quotations omitted).  "CERCLA provides two mechanisms that allow potentially responsible parties ("PRPs") to recover costs they have expended to decontaminate a polluted site: § 107(a) cost recovery claims and § 113(f) contribution claims." *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp*., 602 F.3d 204, 216 (3d Cir. 2010).  Section 107(a), in part, allows private parties to hold PRPs responsible for "any other necessary costs of response incurred by any other person" consistent with CERCLA.  42 U.S.C. § 9607(a)(4)(B); *Agere Sys., Inc*., 602 F.3d at 225.  Section 113(f)(1) provides for a right to contribution following a civil action under CERCLA, stating that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title." 42 U.S.C. § 9613.  Section 113(f)(3)(B) provides for a right to contribution after liability to a State or the United States has been determined in "an administrative or judicially approved settlement." 42 U.S.C. § 9613 (Section 113(f)(3)(B) referring to 113(f)(2)); *see also Agere Sys., Inc.*, 602 F.3d at 217-18 (describing CERCLA Section 107 and Section 113).

Under CERCLA, PRPs consist of the following:

> (1) the owner and operator of a vessel or a facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport

> for disposal or treatment, of hazardous substances owned or
> possessed by such person, by any other party or entity, at any facility
> or incineration vessel owned or operated by another party or entity
> and containing such hazardous substances, and
> (4) any person who accepts or accepted any hazardous substances
> for transport to disposal or treatment facilities, incineration vessels
> or sites selected by such person, from which there is a release, or a
> threatened release which causes the incurrence of response costs, of
> a hazardous substance[.]

42 U.S.C. § 9607(a)(1)-(4); *see also Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 379 (3d Cir. 2013). The first two categories are commonly referred to as "owner or operator," the third as "arranger," and the fourth as "transporter."

"CERCLA liability may be inferred from the totality of the circumstances; it need not be proven by direct evidence." *United States v. Cornell-Dubilier Elecs., Inc.*, No. 12-5407 JLL, 2014 WL 4978635, at *8 (D.N.J. Oct. 3, 2014) (citing *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000)) (internal quotations omitted). "When determining CERCLA liability, 'there is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain.'" *Niagara Mohawk Power Corp. v. Chevron USA, Inc.*, 596 F.3d 112, 131 (2d Cir. 2010) (quoting *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 547 (6th Cir. 2001)).

## 2. Section 107 Claim

Section 107 provides for the collection of "any other necessary costs of response incurred by any other person consistent with the national contingency plan[.]" 42 U.S.C. § 9607(a)(4)(B). CERCLA does not define "costs of response." The statute, however,

> broadly defines the term "response" as "remove, removal, remedy
> and remedial action," which are in turn defined to include "such
> actions as may be necessary to monitor, assess and evaluate the
> release or threat of release of hazardous substances," "[t]he cleanup
> of released hazardous substances from the environment," and "the
> disposal of removed material."

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 863 (D.N.J. 2003), aff'd, 399 F.3d 248 (3d Cir. 2005) (citing 42 U.S.C. §§ 9601(23) and (25)).   Thus, broadly speaking, under Section 107, removal and remedial costs must be expenses "directed at containing and cleaning up hazardous releases."  *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.,* 228 F.3d 275, 294 (3d Cir. 2000).

Response costs must also be consistent with the National Contingency Plan ("NCP") as set forth in 42 U.S.C. § 9605 and "must be necessary to the containment and cleanup of hazardous releases."  *Id.*  (quoting *United States v. Hardage,* 982 F.2d 1436, 1448 (10th Cir. 1992) (internal quotation marks omitted)).   As part of its *prima face* case, a party must demonstrate that it has incurred necessary response costs consistent with the NCP.  *Trinity Indus., Inc. v. Greenlease Holding Co*., 903 F.3d 333, 352 (3d Cir. 2018) (citing *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1269 (10th Cir. 2017)).   A cost is considered "necessary" and hence subject to shared liability if there is "some nexus between [it] and an actual effort to respond to environmental contamination."  *Trinity Indus.*, 903 F.3d, 352 (quoting *Young v. United States*, 394 F.3d 858, 863 (10th Cir. 2005)).   "The National Contingency Plan provides a set of standards governing environmental cleanup activities, including 'methods and criteria for determining the appropriate extent of removal, remedy, and other measures,' 42 U.S.C. § 9605(a)(3), and 'means of assuring that remedial action measures are cost-effective.' 42 U.S.C.] § 9605(a)(7)."  *Id*. (quoting *United States v. E.I. Dupont De Nemours & Co. Inc*., 432 F.3d 161, 168 (3d Cir. 2005)).  The NCP requires documentation of all costs that are to be recovered.  *United States v. E.I. Dupont De Nemours & Co. Inc.,* 432 F.3d 161, 168 (3d Cir. 2005) (citing 40 C.F.R. § 300.160(a)(1) (2005)).  40 C.F.R. § 300.700 provides that private parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action.  40 C.F.R. § 300.430(c)(6).

As to compliance with the NCP, 40 C.F.R. § 300.700 provides in part as follows:

> (c)(3) For the purpose of cost recovery under section 107(a)(4)(B) of CERCLA:
>> (i) A private party response action will be considered "consistent with the NCP" if the action, when evaluated as a whole, is *in substantial compliance* with the applicable requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup[.]

40 C.F.R. § 300.700(c)(3)(i) (emphasis added); *see also Outlet City, Inc. v. W. Chem. Prods., Inc.*, 60 F. App'x 922, 927 (3d Cir. 2003). If the procedural deviations are "immaterial or insubstantial" they should not be deemed inconsistent with the NCP. *Id.* (citing 40 C.F.R. § 300.700(c)(4)). The standard therefore is "substantial compliance" with the NCP.

It is not entirely clear for which "disposal" the Waterside Defendants intend to assert CERCLA claims. The Waterside Defendants' Crossclaims assert that Arconic was an "owner and/or operator of the Veteran's Field site" (D.E. 24 at ¶ 19), and state that Arconic is liable "for any such releases or threatened release of hazardous substances at Veteran's Field" (D.E. 24 at ¶ 22). At the same time, the Waterside Defendants' briefing appears to refer to Arconic's role as to the Building 12 USTs. New claims cannot be raised in a brief. *Fanor v. Univ. Hospital-UMDNJ*, No. 16-320, 2020 WL 6938381, at *8, n.12 (D.N.J. Nov. 25, 2020). However, because Arconic does not object and for the sake of organizational clarity,[10] the Court addresses both scenarios.

To the extent the Waterside Defendants intend to collect for the costs incurred for the disposal at Veteran's Field, that claims fails because the Waterside Defendants did not themselves incur any response costs at Veterans Field and because Arconic is not a responsible party in relation

---

[10] The North River Complaint, addressed in Arconic's motion for summary judgment at D.E. 351 does bring CERCLA claims with respect to the Building 12 USTs, and the Court will incorporate this analysis in resolving those claims below.

to the Veterans Field remediation.  This Court has already held that Arconic was not an arranger with respect to the disposal at Veterans Field.  See D.E. 415 at 14-18, D.E. 416.  The Court explained, in part, that

> Edgewater argues that Arconic—then Alcoa—is an arranger by virtue of the 1997 sale of the Alcoa Property.  Pl. Brf. at 17-20.  The disposal at Veterans Field is alleged to have occurred in 2013— approximately 15 years after the point at which Edgewater alleges Arconic became an "arranger."  BE SOMF ¶¶ 96, 99.  Edgewater does not allege that Arconic was involved with the specific decision to demolish Building 12 and deposit the materials at Veterans Field or that Arconic was even aware of that decision.  At the time Arconic sold the Alcoa Property, Building 12 was still standing and 15 years later, "unbeknownst to" Arconic, Waterside disposed of the contaminated Building 12 materials at Veterans Field.  Edgewater has not pointed to any authority which has extended CERCLA arranger liability this far.

*Borough of Edgewater v. Waterside Construction, LLC, et. al.*, No. CV 14-5060, 2021 WL 3030280, at *8 (D.N.J. July 19, 2021).  The Court incorporates that analysis and again finds that Arconic was not an arranger with respect to the disposal at Veterans Field.  CERCLA defines PRPs to include "the owner and operator of a vessel or a facility."  42 U.S.C. § 9607(a)(1).  An "operator" is "simply someone who directs the workings of, manages, or conducts the affairs of a facility." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998).  The Waterside Defendants have not presented facts which support a finding that Arconic owned or operated Veterans Field, nor have they argued so.  Arconic is therefore not an owner, operator, or arranger with respect to the disposal which occurred at Veterans Field, and the Waterside Defendants' claim fails in this regard.

To the extent the Waterside Defendants intend to assert a claim regarding the USTs on the Alcoa Property, that claim fails as well.  The Waterside Defendants have not demonstrated that they incurred cleanup costs as to the USTs that were necessary and in compliance with the NCP.  Waterside only addresses the costs of the disposal of the USTs one time in its statement of facts,

stating simply that "[t]he removal and disposal of the USTs cost approximately one million dollars. Deposition of Fred Daibes, July 18, 2017, 100:23-102:20." W SOMF ¶ 109. The cited deposition, in turn, reads as follows:

> Q: . . . Do you know how much the removal of the underground storage tanks cost?
> A: Off the top of my head, no. A million dollars approximately between.

D.E. 384, Ex. U, 100:23–101:2. Daibes did explain in his deposition that he retained a Licensed Site Remediation Professional ("LSRP"), whose name he could not recall, to remove the tanks and that that LSRP retained another company to pump out the material in the tank. D.E. 384, Ex. U, 101:17-102:5. However, the Waterside Defendants provide no further explanation of incurred cleanup costs nor do they respond to Arconic's arguments concerning response costs.

In in statement of material facts, Arconic indicated that North River failed to provide at least thirty days advance notice of public meetings to allow the public an opportunity to comment on any alternatives to the remediation actions it took regarding the USTs, that North River held no public meetings, and that North River solicited no public comment. A SOMF ¶¶ 64, 65, 66. North River responded as follows: "Undisputed that actions were taken prior to the knowledge of the PCBs related to the USTs and that immediate action was necessary to prevent further damage from the active leaks of PCBs into the environment caused by [Arconic]'s concealment of the USTs." W SOMF. However, the Waterside Defendants provide no factual support for the necessity of immediate action or legal support for the proposition that the response nonetheless substantially complied with the NCP. "Failure to substantially comply with the public participation requirement is considered a material deviation from the NCP and is grounds for summary judgment." *Aviall Servs. v. Cooper Indus., LLC*, 572 F. Supp. 2d 676, 690 (N.D. Tex. 2008) (citing *Union Pac. R.R. v. Reilly Indus.*, 215 F.3d 830, 839 (8th Cir. 2000); *Carson Harbor Vill., Ltd. v. Cty. of L.A.*, 433

F.3d 1260, 1267 (9th Cir. 2006); *Reg'l Airport Auth. v. LFG, LLC*, 460 F.3d 697, 709 (6th Cir. 2006)).   While only substantial compliance with the NCP is necessary, "wholesale failure to comply with the NCP's remedy-selection process and community relations provisions-the very heart of the NCP-cannot reasonably be characterized as 'immaterial' or 'insubstantial.'" *Reg'l Airport*, 460 F.3d at 709.

The Third Circuit in *Trinity Industries* stated that for a *prima facie* case of liability under Section 107(a), the party bringing the claim must demonstrate that it had incurred "necessary response costs consistent with the National Contingency Plan." *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 352 (3d Cir. 2018) (quoting *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1269 (10th Cir. 2017)).   A moving party is entitled to a judgment as a matter of law where the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).   The Waterside Defendants have not provided any argument or evidence that the costs incurred with respect to the USTs were necessary response costs consistent with the NCP.   Arconic's motion for summary judgment as to the Waterside Defendants' CERCLA § 107 claim is therefore granted.

### 3.   Section 113(f) Claim

Turning to the Waterside Defendant's CERCLA contribution claim, it is again not clear for which disposal the Waterside Defendants intend to recover.   As discussed, Arconic is not a PRP with respect to the disposal at Veterans Field.   Therefore, to the extent the Waterside Defendants are stating a claim under § 113(f) for that disposal, the claim fails.

To the extent the Waterside Defendants are stating a claim under § 113(f) for the cleanup of the Building 12 USTs, they have not shown that they have been sued under § 106 or § 107 of

CERCLA over the Building 12 USTs.  A private party may not bring a § 113(f) contribution claim unless it has been sued under § 106 or § 107 of CERCLA.  See *Agere Sys., Inc. v. Advanced Env't Tech. Corp.*, 602 F.3d 204, 217 (3d Cir. 2010) (citing *Cooper Indus., Inc. v. Aviall Serv., Inc.*, 543 U.S. 157, 163 n. 3, 125 S.Ct. 577, 160 L.Ed.2d 548 (2004)).  Arconic's motion for summary judgment as to the Waterside Defendants' CERCLA § 113 claim is therefore granted.

## VI.   Motion for Summary Judgment Against North River and 38 COAH (D.E. 351)

Arconic's motion at D.E. 351 addresses the claims contained in the Complaint (14-8129, D.E. 28) filed by North River and 38 COAH (the "North River Complaint"), as well as Arconic's Counterclaim for breach of contract.[11]  The North River Complaint contains the following counts against Arconic: Cost Recovery Under Count One - CERCLA § 107; Count Two - CERCLA § 113; Count Three - Declaratory Judgment; Count Four - Strict Liability; Count Five - Negligence; Count Six - Spill Act Contribution; Count Seven - Negligent or Fraudulent Concealment; Count Eight - Breach of Contract; Count Nine - Unjust Enrichment; and Count Ten - Breach of Implied Covenant of Good Faith and Fair Dealing.

### A. Claims Implicating the Relevant Contracts

Arconic again argues that the release provision in the PSA bars North River's claims and moves for summary judgment on its breach of contract claims.  For the reasons discussed above, summary judgment will be denied on claims implicating the relevant contracts.  Summary

---

[11] In this section, Arconic's brief (D.E. 351-1) in support of its motion (D.E. 351) will be referred to as "Arconic Brf."; the Waterside Defendants' brief (D.E. 380) in opposition to that motion will be referred to as "Waterside Brf."; and Arconic's brief (D.E. 391) in reply will be referred to as "Arconic Reply."  The Complaint (14-8129, D.E. 28) filed by North River and 38 COAH will be referred to as "NR Compl."

judgment is therefore denied as to Arconic's argument that the release provision bars certain claims and as to Arconic's breach of contract claim for the same reasons as Arconic's motion at D.E. 345.

### B. CERCLA Claims

The Waterside Defendants have asserted CERCLA claims against Arconic under both § 107 and § 113(f) in the North River Complaint.  Count One asserts cost recovery under § 107 and describes Arconic as "owner and/or operator of the [Alcoa] Property" and continues that Arconic "arranged, by contract, agreement, or otherwise, for disposal of hazardous substances."  North River Compl. at ¶¶ 34, 35.  Count Two seeks contribution under § 113(f).  Arconic moves for summary judgment on both claims.

#### 1. Section 107 Claim

As explained, the Waterside Defendants' § 107 claim fails whether it is in regard to the disposal at Veterans Field or the Building 12 USTs.  To the extent the Waterside Defendants intend to collect for the costs incurred for the disposal at Veteran's Field, that claims fails because the Waterside Defendants did not themselves incur any response costs at Veterans Field and because Arconic is not a PRP in relation to the Veterans Field remediation.  To the extent the Waterside Defendants intend to assert a claim regarding the USTs on the Alcoa Property, that claim fails as well because the Waterside Defendants have not demonstrated that they incurred cleanup costs that were necessary and consistent with the NCP.  For the reasons explained in discussing Arconic's motion at D.E. 345, Arconic's motion for summary judgment as to the CERCLA § 107 claim asserted in the North River Complaint is therefore granted.

#### 2. Section 113(f) Claim

As to the Waterside Defendant's CERCLA contribution claim, it is again not clear for which disposal the Waterside Defendants intend to recover.  To the extent the Waterside

28

Defendants are stating a claim under § 113(f) for the disposal at Veterans Field, the claim fails because Arconic is not a PRP with respect to that disposal.  To the extent the Waterside Defendants are stating a claim under § 113(f) for the cleanup of the Building 12 USTs, they have not shown that they have been sued under § 106 or § 107 of CERCLA over the Building 12 USTs.  *See Agere Sys., Inc. v. Advanced Env't Tech. Corp.*, 602 F.3d 204, 217 (3d Cir. 2010).  For the reasons explained in discussing Arconic's motion at D.E. 345, Arconic's motion for summary judgment as to the CERCLA § 113 claim contained in the North River Complaint is granted.

### C.  North River's Breach of Contract and Covenant of Good Faith and Fair Dealing Claims

Arconic moves for summary judgment on North River's breach of contract (Count Eight) and breach of implied covenant of good faith and fair dealing (Count Ten) claims.  North River's Complaint states that "Defendants, during the relevant time period, were contractually obligated to convey to plaintiffs real property free of hidden dangerous and defects and/or to pay costs to remediate and investigate PCB contamination."  NR Compl. at ¶ 79.  Arconic argues that this claim must be dismissed because

> [of the] exclusion of any representations and warranties about the presence of hazardous materials in, on, or under the Property, the unambiguous "as is" clause, North River's right to have the Property inspected for environmental issues during the due diligence process (a right that North River exercised), and the parties' stipulation as to the "known environmental condition" of the Property.

Arconic Brf. 29.  The Waterside Defendants counter that the "as is" language does not preclude the breach of contract claim because Arconic took affirmative steps to conceal the USTs under Building 12.  Waterside Brf. at 18.

In support, Arconic cites to *United States v. Esdale*, in which a defendant brought a breach of contract counterclaim against the plaintiff over a contract with an "as is" clause.  *United States*

*v. Esdale*, No. CIV.A. 05-2046, 2006 WL 2129101, at *1 (D.N.J. July 25, 2006). The plaintiff

argued that an attempt to construe its alleged failure to disclose defects was "actually a

misrepresentation claim couched in contract terms." *Id*. at *4 (citing *Edelman v. Federal Housing

Administration*, 382 F.2d 594 (2d Cir. 1967)). The *Esdale* court ruled that the defendant's claim

for breach of contract was "actually the same as a misrepresentation claim," and dismissed the

contract claim. *Id.*

The North River Plaintiffs cite to *Weintraub v. Krobatsch*, 317 A.2d 68 (N.J. 1974) and

rely on *Esdale* for the proposition that "New Jersey law allows for damages to be recovered, even

when property is purchased pursuant to an 'as is' contract, when it is based on fraudulent conduct

of the seller." Waterside Brf. at 18. This excerpt, however, conveniently omits the phase "Esdale

responds that" immediately preceding the quoted portion, indicating that this was the defendant's

argument, not the Court's holding. In fact, the *Esdale* Court rejected the argument that the

defendant's breach of contract claim withstood the "as is" provision:

> In *Weintraub*, the New Jersey Supreme Court did not construe the
> contract's stipulation that the purchaser accepted the property in its
> "present condition" to bar the defendant's claim of fraudulent
> concealment. [*Weintraub v. Krobatsch*, 317 A.2d 68 (N.J. 1974)].
> The court held that "if the trial judge finds such deliberate
> concealment or nondisclosure of the latent infestation not
> observable by the purchasers on their inspection, he will still be
> called upon to determine whether . . . the concealment or
> nondisclosure was of such significant nature as to justify rescission."
>
> But applied here, *Weintraub* does not save this counterclaim because
> the issue is whether the "as is" claim bars a *contractual* claim and
> thereby eliminates a basis from which to bring a claim for breach of
> contract. . . . *Weintraub* involved a claim of fraud, not of contract.
> The *Weintraub* court held that although the contract language stated
> that the purchasers would accept the property in its "present
> condition," this did not bar a party from bringing a fraudulent
> concealment of defect claim.

*Esdale*, 2006 WL 2129101, at *4.

As a result, the North River Plaintiffs may be able to recover for alleged fraud despite the "as is" provision, but that they cannot do so through a breach of contract claim. *See Newman v. Arenstein*, No. A-4624-04T5, 2006 WL 561072, at *5 (N.J. Super. Ct. App. Div. Mar. 9, 2006) (dismissing breach of contract claim despite a potentially viable claim for deliberate concealment). The Court agrees with Arconic that North River's breach claims are really misrepresentation claims recast in terms of breach of contract. The Court will therefore dismiss those claims. However, *Esdale* does not address the viability of a breach of implied duty of good faith and fair dealing claim asserted alongside a claim for fraud. The Court will therefore allow that claim to proceed but notes that whether the North River Plaintiffs can recover for this claim will depend in part on whether there is a valid contract. In the event there is a valid contract, and that both the breach of the implied duty of good faith and fair dealing and the misrepresentation claim are successful, the Court will if necessary mold the verdict so that there is no double recovery.

### A. North River's Tort Claims

The North River Complaint asserts strict liability, negligence, and concealment claims (Counts Four, Five, and Seven). Arconic argues that these claims are barred by the economic loss doctrine because the North River Plaintiffs seek the same damages for its breach of contract claims as it seeks in its tort claims. Arconic Brf. at 33-34.

"The economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract." *Chen v. HD Dimension Corp.*, No. 10-863, 2010 WL 4721514, at *8 (D.N.J. Nov. 15, 2010). Thus, "whether a tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties." *Id*. Additionally, in the absence of "personal injury or consequential

property damage arising from a traumatic event," a plaintiff's negligence claim fails under the economic loss doctrine. *Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 280 (N.J. 2002).

For these claims, too, the validity of the contracts is potentially dispositive. If the contracts are subject to recission, then the economic loss doctrine will not bar the Waterside Defendant's tort claims. The Court therefore denies summary judgment on Counts Four, Five, and Seven.

## VII.   CONCLUSION

For the foregoing reasons, Arconic's motion (D.E. 345) for summary judgment is GRANTED as to Counts 3 and 4 of the Waterside Defendants' Crossclaims (D.E. 24) and DENIED in all other respects; Arconic's motion (D.E. 351) summary judgment is GRANTED as to Counts 1 and 2 of the Complaint filed by North River and 38 COAH (14-8129, D.E. 28) and DENIED in all other respects; and Arconic's motion (D.E. 403) to strike is DENIED. An appropriate Order accompanies this Opinion.


Dated: August 17, 2021

John Michael Vazquez, U.S.D.J.