<u>Not for Publication</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BOROUGH OF EDGEWATER,<br><br>        Plaintiff,<br><br>   v.<br><br>WATERSIDE CONSTRUCTION, LLC; 38 COAH , LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALCOA INC.; ALCOA DOMESTIC, LLC, as successor in interest to A.P. NEW JERSEY, INC.; HUDSON SPA, LLC; JOHN DOES 1-100; ABC CORPORATIONS 1-100,<br><br>        Defendants<br><br>and<br><br>WATERSIDE CONSTRUCTION, LLC; 38 COAH LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES,<br><br>        Defendants/ Third-Party Plaintiffs<br><br>   v.<br><br>NEGLIA ENGINEERING ASSOCIATES,<br><br>        Third-Party Defendants,<br><br>and<br><br>ALCOA DOMESTIC, LLC as successor in interest to A.P. NEW JERSEY, INC.,<br><br>        Defendant/Third-Party Plaintiff, | Civil Action No. 14-5060<br><br>**<u>OPINION</u>** |

v.

COUNTY   OF   BERGEN;   RIVER   ROAD
IMPROVEMENT   PHASE   II,   INC.;   HUDSON
SPA, LLC,

                    Third-Party Defendants.

**John Michael Vazquez, U.S.D.J.**

Presently before the Court is a motion for summary judgment (D.E. 343) filed by TERMS

Environmental Services, Inc. ("TERMS").   The Court has reviewed all submissions made in

support and in opposition to the motion and considered the motion without oral argument pursuant

to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b).   For the reasons stated below, TERMS' motion for

summary judgment (D.E. 343) is **GRANTED in part and DENIED in part**.[1]

I.      **BACKGROUND**

This matter stems from an allegation that certain Defendants used polychlorinated biphenyl

("PCB")[2] contaminated material as fill in a public park project.   The park is owned by Plaintiff

---

[1] The current motion is part of a large number of motions for summary judgment filed in this matter.   All pending motions are listed in the Procedural History section of this Opinion.   If the Court were to address all motions in a single opinion, the results would be unwieldly.   As a result, the Court addresses the motions individually or in a group.   The Court also does not repeat each and every alleged fact in each opinion.   Instead, the Court focuses on the facts pertinent to each motion (or motions) as asserted by the parties to the motion(s).   Therefore, if the facts in one opinion appear to be distinguishable from facts in another opinion, it is because those are the facts asserted by the party or parties in its/their respective motions.

[2] According to the Environmental Protection Agency, PCBs are a group of man-made organic chemicals consisting of carbon, hydrogen and chlorine atoms.   *United States Environmental Protection   Agency,   Learn   about   Polychlorinated   Biphenyls*   (PCBs), https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls-pcbs.   PCBs   have   been demonstrated to cause a variety of adverse health effects.   *Id.*

Borough of Edgewater ("Edgewater"), but the contaminated materials (or at least some of them) came from a property previously owned by Alcoa Corporation ("Alcoa"), now known as Arconic.

A.  **Facts**[3]

Alcoa constructed and operated an industrial plant (the "Alcoa Property") from 1914-1965 in Edgewater, New Jersey.  BE SOMF ¶ 1.  A structure, referred to as "Building 12," was constructed on that site in 1938.  BE SOMF ¶ 3.  The site was subsequently acquired by Amland Properties Corporation ("Amland"), who then discovered PCB contamination throughout the property.  Amland sued Alcoa, which resulted in a settlement and the site being conveyed to an Alcoa entity, A.P. New Jersey, Inc. ("AP"), which later became Arconic Domestic, LLC.  BE SOMF ¶ 12.  The Amland settlement agreement required that the deed of conveyance contain a legend notice stating that "[t]his property may be contaminated with hazardous substances including Polychlorinated Biphenyls."  BE SOMF ¶ 11.

In 1997, Alcoa sold the property to North River, an entity affiliated with Fred Daibes.  Pursuant to the terms of the Purchase and Sale Agreement ("PSA") and the related Multi-Party Property Acquisition Agreement ("MPAA"), AP agreed to pay RRIP up to $12,000,000 for the demolition, removal, and proper disposal of the buildings on the site pursuant to a Remedial Action Work Plan.  BE SOMF ¶ 41.  Later that year, North River requested permission to postpone the demolition of Building 12.  BE SOMF 52.  In 2006, the portion of the Alcoa Property containing

---

[3] Many of the facts are derived from Plaintiff Borough of Edgewater's statement of material facts (D.E. 319-1), which will be referred to as "BE SOMF"; TERMS' statement of material facts (D.E. 312-1) will be referred to as "TERMS SOMF"; TERMS' statement of facts in response to Edgewater's statement (D.E. 322) will be referred to as "TERMS Response"; Edgewater's statement in response to TERMS' statement of facts (D.E. 323-1) will be referred to as "BE Response"; and Arconic's responsive statement of facts (D.E. 361) will be referred to as "A Response."

Building 12 was transferred from North River to 38 COAH, another entity affiliated with Fred Daibes.  BE SOMF ¶ 65.  In 2010, certain areas of the exterior walls on Building 12 became unstable and fell.  BE SOMF ¶ 68.

In 2011, Plaintiff Edgewater looked to improve Veterans Field, a 27-acre public park owned by the borough.  BE SOMF ¶¶ 75-76.  TERMS, an environmental consulting firm, was retained as a consultant and Licensed Site Remediation Professional for the project.  After a bidding process, Waterside, a construction company managed by Fred Daibes, was awarded the contract for the improvement project.  BE SOMF ¶¶ 80, 85, 86.

When the amount of fill needed at the Veterans Field project increased, Waterside imported and used the PCB-contaminated material from Building 12 as fill on Veterans Field.  BE SOMF ¶ 93.  The parties dispute whether this was done with TERMS' knowledge and/or approval. Edgewater further asserts that on September 7, 2013, after advising Neglia, the engineer assigned to the project, that no work would be performed over the weekend, Waterside dumped unapproved fill on the site and then covered the fill when the Neglia supervisor arrived to the site.  BE SOMF ¶¶ 95-98.  Edgewater alleges that Waterside continued to import contaminated materials from September 7, 2013 to October 3, 2013, when TERMS issued a letter advising of the PCB contamination and closed the Veterans Field site for an assessment.  BE SOMF ¶¶ 106-107. Waterside disputes this.

Veterans Field had PCB contamination before the project began, with the highest level being 2.5 parts per million ("ppm").  BE SOMF ¶ 78.  Sampling done after the site was closed in October 2013 found that fill materials used throughout the site were contaminated with PCBs, including (1) crushed concrete with levels ranging from 100-350 ppm used for concrete sidewalks and cement pads, and (2) concrete combined with soil with levels ranging from 10-350 ppm used

as fill on the field and under paved areas.  BE SOMF ¶ 11.  Impacted materials were excavated

pursuant to an EPA-approved Self-Implementing Plan and disposed off-site.  BE SOMF ¶ 115.

## II.    Procedural History

Edgewater first filed suit on August 12, 2014.  D.E. 1.  On February 27, 2018, the separate

matters docketed as 14-8129 and 14-50560 were consolidated.  D.E. 255.  Multiple parties have

filed multiple motions for summary judgment in this matter.  The motions are as follows:

- Motion by TERMS for summary judgment against Edgewater (D.E. 343);
- Motion by Hudson Spa for summary judgment against Edgewater (D.E. 342);
- Motion by Arconic for summary judgment against Edgewater (D.E. 344);
- Motion by Arconic for summary judgment against Fred Daibes and North River;
- Motion by Bergen County for summary judgment against Alcoa, North River, and RRIP (D.E. 346);
- Motion by Edgewater for summary judgment against the Waterside Entities on Count XI (D.E. 347);
- Motion by Edgewater for summary judgment against the Waterside Entities on Counts II and VI (D.E. 348);
- Motion by Edgewater for summary judgment against Alcoa on Count I (D.E. 349);
- Motion by Edgewater for summary judgment against the Waterside Entities on Count I (D.E. 350);
- Motion by Arconic for summary judgment against North River, 38 COAH, and RRIP (D.E. 351);
- Motion by Edgewater for summary judgment against Alcoa on Count II (D.E. 352); and
- Motion by Edgewater for summary judgment against the Waterside Entities on Count II (D.E. 353).

This Opinion address only the motion for summary judgment filed by TERMS (D.E. 343).

## III.    LEGAL STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A fact in dispute is material when it "might affect the outcome of the suit

under the governing law" and is genuine "if the evidence is such that a reasonable jury could return

a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*

*Corp.*, 477 U.S. at 322.  "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate.  *See Anderson*, 477 U.S. at 250-51.

## IV.   DISCUSSION

TERMS' motion addresses Edgewater's Spill Act and Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") claims against it; breach of contract claims asserted by TERMS, Edgewater, and Waterside Construction, LLC, 38 COAH, LLC, Daibes Brothers, Inc., North River Mews Associates, LLC, and Fred Daibes ("the Waterside Defendants"); and claims for contribution and indemnification asserted by Alcoa and A.P. (collectively, "Arconic") and the Waterside Defendants.[4]

### A.  CERCLA

TERMS first moves for summary judgment on the CERCLA claims asserted against it by Edgewater.  Congress enacted CERCLA, codified as 42 U.S.C. § 9601 *et seq*., "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal quotations omitted).  "CERCLA provides two mechanisms that allow potentially responsible parties ("PRPs") to recover costs they have expended to decontaminate a polluted site: § 107(a) cost recovery claims and § 113(f) contribution claims." *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 216 (3d Cir. 2010). Section 107(a), in part, allows private parties to hold PRPs responsible for "any other necessary costs of response incurred by any other person" consistent with CERCLA.   42 U.S.C. §

---

[4] TERMS' brief in support of its motion (D.E. 339) will be referred to as "TERMS Brf."; Arconic's brief in opposition (D.E. 370) will be referred to as "Arconic Brf."; Edgewater's brief in opposition (D.E. 367) will be referred to as "BE Brf."; and TERMS' brief in reply (D.E. 390) will be referred to as "TERMS Reply."

9607(a)(4)(B); *Agere Sys., Inc.*, 602 F.3d at 225.   Section 113(f)(1) provides for a right to contribution following a civil action under CERCLA, stating that "[a]ny person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title."  42 U.S.C. § 9613.  Section 113(f)(3)(B) provides for a right to contribution after liability to a State or the United States has been determined in "an administrative or judicially approved settlement." 42 U.S.C. § 9613 (Section 113(f)(3)(B) referring to 113(f)(2)); *see also Agere Sys., Inc.*, 602 F.3d at 217-18 (describing CERCLA Section 107 and Section 113).

Under CERCLA, PRPs consist of the following:

> (1) the owner and operator of a vessel or a facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance[.]

42 U.S.C. § 9607(a)(1)-(4); *see also Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 379 (3d Cir. 2013).

Edgewater's Complaint asserts a claim for cost recovery under CERCLA (Count II). Compl. at ¶¶ 120-135.  TERMS argues that it does not qualify as a PRP with respect to the discharge at Veteran's Field.  Edgewater did not respond to TERMS' motion for summary judgment as to the CERCLA claims and stated explicitly that it does not oppose TERMS' position

that it is not a PRP under CERLA Section 107(a).  BE Brf. at 8.  TERMS' motion as to the

CERCLA claim asserted by Edgewater is therefore granted.  *See Smith v. Chase Bank*, Civ. No.

18-16428, 2021 WL 753897, at *3 (D.N.J. Feb. 25, 2021) (treating the explicit abandonment of a

claim in a brief as dismissal upon consent).

TERMS has also moved for summary judgment as to the CERCLA contribution claims

asserted by Arconic and the Waterside Defendants.  Arconic's claim for CERCLA contribution is

moot as this Court has granted Arconic's motion for summary judgment on the CERCLA claim

asserted against it by Edgewater.  TERMS' motion as to the CERCLA contribution claim asserted

by Arconic is therefore granted.

The Waterside Defendants have not responded to TERMS' motion. The Waterside

Defendants' crossclaim states that "Defendants are or were each an owner and/or operator of the

Veteran's Field site within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9610(20)

and/or arranged, by contract, agreement, or otherwise, for disposal of hazardous substances."

The crossclaim does not go into further detail as to which category of PRP they allege TERMS

to be or what facts support that claim.  Without the benefit of a brief in opposition (and, more

importantly, evidence that raises a genuine dispute of material fact), the Court is not

independently aware of a reason that summary judgment should not be granted.  TERMS' motion

as to the CERCLA contribution claims asserted against it is therefore granted.

**B.  Negligence Claims**

Edgewater asserts a negligence claim against TERMS in Count XIII of its Fifth Amended

Complaint.  That claim indicates that TERMS owed a duty of care to Edgewater "as the

environmental consultant, LSRP for the Veteran's Field Project" to do the following:

> [E]nsure that contaminated fill materials  were  not imported and
> placed on the Site, to prevent the cross-contamination at the Site, to

> perform proper and adequate sampling of contamination of the Site, and to prepare a [Self-Implementing Plan] which conformed with the [Environmental Protection Administration] regulations and guidelines in such a manner as to not cause Edgewater injury or damages.

Compl. at ¶ 270.

TERMS first argues that Edgewater's negligence claim is barred by the economic loss doctrine. TERMS Brf. at 35. "The economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract." *Chen v. HD Dimension Corp.*, No. 10-863, 2010 WL 4721514, at *8 (D.N.J. Nov. 15, 2010). Thus, "whether a tort claim can be asserted alongside a breach of contract claim depends on whether the tortious conduct is extrinsic to the contract between the parties." *Id.* Edgewater counters that New Jersey law recognizes an independent duty separate from contractual obligations for certain professions, including environmental consultants.

Edgewater cites to *Ford Motor Co. v. Edgewood Props*. for the proposition that an environmental consultant must conform to a standard of care possessed by members of the profession in good standing. Civil Action No. 06-1278 (ES), 2012 WL 4172133, at *63-64 (D.N.J. Aug. 31, 2012) (citing *Bonnieview Homeowners Ass'n, LLC v. Woodmont Builders*, *LLC*, No. 03-4317, 2006 WL 1982882, at *6 (D.N.J. July 11, 2006)). In *Ford Motor*, the court addressed the economic loss doctrine as it related to an environmental consultant. Though contract claims had not been asserted against the consultant, the court noted that recovery would nonetheless flow from an independent duty imposed by law. *Id.* at *74. TERMS did not respond to Edgewater's argument that environmental consultants owe an independent duty, leaving the Court with no basis

to disagree with the decision in *Ford Motor*.  The Court will therefore deny TERMS' motion as far as its argument that Edgewater's negligence claim is barred by the economic loss doctrine.[5]

TERMS next argues that Edgewater cannot establish that TERMS acted negligently. TERMS Brf. at 38.  "The fundamental elements of a negligence claim are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, injury to the plaintiff proximately caused by the breach, and damages."  *Shields v. Ramslee Motors*, 223 A.3d 172, 176 (N.J. 2020) (quoting *Robinson v. Vivirito*, 86 A.3d 119, 124 (N.J. 2014)).  "Whether a duty of care exists is a question of law that must be decided by the court."  *Jerkins ex rel. Jerkins v. Anderson*, 922 A.2d 1279, 1284 (N.J. 2007) (citation omitted).  "In making that determination, the court must first consider the foreseeability of harm to a potential plaintiff . . . and then analyze whether accepted fairness and policy considerations support the imposition of a duty[.]"  *Id.* (citations omitted).  As discussed, an environmental consultant must conform to a standard of care possessed by members of the profession in good standing.  *Ford Motor,* 2012 WL 4172133, at *63-64 (citing *Bonnieview Homeowners*, *LLC*, 2006 WL 1982882, at *6)).

Edgewater asserts that TERMS acted negligently by adopting an inappropriate protocol for fill material at Veterans Filed, failing to shut down Veterans Field until October 3, 2012, and producing an inadequate Self-Implementing Plan ("SIP").  As to the protocol for the project, it is undisputed that the project specifications required that the remedial cap consist of "certified or crushed virgin stone" and "be installed in the presence of the Borough's LSRP."  BE SOMF ¶84. It is further undisputed that, at the request of Waterside, TERMS established a protocol that

---

[5] TERMS also argues that Edgewater's negligence claim is barred by CERCLA.  TERMS Brf. at 38.  Because TERMS' motion for summary judgment as to Edgewater's CERCLA claim is granted, Edgewater's negligence claim is not barred.

permitted Waterside to use non-virgin fill as long as it tested as certified clean fill prior to being imported to Veterans Field. BE SOMF ¶89. Edgewater asserts that TERMS "became lax" with the protocol throughout the project and that TERMS deviated from the agreed upon project specifications, failed to ensure that the new protocol was implemented correctly, and did not document Waterside's disregard of the protocol. Delaney Rpt., Corriston Cert. Ex. DDDD, at 29. TERMS replies that Edgewater, through Neglia and the Borough Administrator, was aware that the protocol for the use of non-virgin fill material had been developed and permitted it to be implemented. TERMS further asserts that TERMS made it clear, via email to Waterside's project manager Matt Vereb, that Waterside was to inform TERMS prior to bringing any proposed fill material to Veteran's Field. TERMS SOMF ¶ 47.

Edgewater also argues that an LSRP is required to immediately notify both the person conducting the remediation and the New Jersey Department of Environmental Protection ("NJDEP") if he or she learns of an immediate environmental concern. BE Brf. at 13 (citing N.J.S.A. § 58:10C-16(j)).[6] Edgewater asserts that TERMS did not inform NJDEP or Edgewater immediately. BE Brf. at 18-19. Edgewater also argues that TERMS breached its professional standard of care by keeping the site open after receiving the initial sampling results on September 23, 2013. BE SOMF ¶105. The Court will now turn to the facts in the record to determine whether the parties have met their respective burdens at the summary judgment stage.

---

[6] In a footnote, TERMS disputes that it is or could be an LSRP as only individuals can be an LSRP. TERMS Brf. at n.1. However, the proposal executed by TERMS and Edgewater provides for "LSRP Services." Pierce Cert., Ex. D, Task 6. Without further support, the Court is unconvinced that regulations affecting LSRPs do not apply to TERMS. Regardless, the duty possessed by an environmental consultant is sufficient for Edgewater's negligence claim to survive summary judgment.

Edgewater asserts that TERMS "did nothing" to ensure that Waterside stopped importing the suspect material and that TERMS merely instructed Waterside not to utilize any more suspect material or disturb the piles remaining at Veterans Field.  BE SOMF ¶103.  Because of TERMS' lack of action, Edgewater continues, Waterside was able to import contaminated material for three additional weeks.  BE SOMF ¶105, 130.  Edgewater adds that TERMS had numerous opportunities to shut down the project during that time but did not do so.  TERMS responds that after learning of Waterside's improper activities, TERMS instructed Waterside that it was not to spread or utilize the relevant material and not to import any additional material from that source.  TERMS SOMF ¶ 73.  After receipt of the analytical results on September 23, 2013, TERMS asserts that it notified Neglia and Waterside that the crushed concrete material was not suitable for use at Veteran's Field and had to be removed.  TERMS SOMF ¶ 80.

TERMS explains that after receipt of the initial sampling results on September 23, 2013, TERMS had multiple discussions with Neglia and the Borough Administrator for Edgewater in which TERMS recommended that the Project be shut down.  TERMS SOMF ¶ 81.  TERMS asserts that in these conversations, Edgewater did not agree to halt the project and that, in fact, Neglia and the administrator expressed legal concerns about shutting it down.  TERMS Response ¶ 2.  TERMS adds that it was not able to shut down the project without Edgewater's consent.  TERMS Brf at 12.

In support of its arguments, TERMS cites to the depositions of Peter Lakatos (a TERMS employee), Michael Neglia (President of Neglia Engineering Associates), and Ronald Dooney (owner and president of TERMS).  Lakatos stated that TERMS recommended around October 2013 that the job be shut down.  Pierce Cert., Ex. L ("Lakatos Dep.") at 7/19/17, 138:20-146:16.  Lakatos also stated that around September 29, 2013, he told Mark Iafelice, a Waterside employee,

13

that there was serious problem after receiving the initial samples.  Lakatos continued that as a result, he and some of the Waterside personnel covered the deposited material with plastic and that some of the work stopped.  Lakatos then referenced ongoing conversations but stated that they were either in late September or early October.  Again, the site was shut down on October 4, 2013, so conversations in early October would be consistent with promptly shutting down the site.  Lakatos also testified that he did not recall a specific discussion with Edgewater's Borough Administrator Gregory Franz regarding a recommendation to close the field.  *Id*. at 143:25-144:10.

Michael Neglia testified that "it was discussed to stop and cease all operations on the site" but did not clarify when that was discussed.  Pierce Cert., Ex. R ("Neglia Dep.") at 11/27/17, 35:7-37:18.    In his deposition, Dooney agreed that "there was no determination or recommendation prior to October 3rd, 2013, to close the site."  Pierce Cert., Ex. M ("Dooney Dep."), at 7/20/17, 117:4-118:12; 128:2-17.  Dooney did testify that he felt he needed to have the town in favor of the shutdown in order to do so but did not explain his basis for that feeling.  *Id*. at 128:7-12.

TERMS also cites to the deposition testimony of Michael Berliner of Neglia, who stated that Edgewater "did not want to see the Project come to a halt."  Pierce Cert., Ex. G ("Berliner Dep.") at 47:5-20.  However, Berliner did not recall when he communicated that to Dooney or Lakatos, indicating that it was probably "during the project when things were probably getting slow and I was probably with the governing body who said we have to move this along."  *Id*. at 47:14-47:25.

The cited testimony does not provide a clear or undisputed timeline on which the Court can rule that summary judgment is appropriate.

14

Edgewater also argues that TERMS deviated from the professional standard of care by creating an inadequate SIP under the Toxic Substances Control Act ("TSCA").  Pursuant to the TCSA, "[a]ny person conducting self-implementing cleanup of PCB remediation waste must characterize the site adequately to be able to provide the information required by paragraph (a)(3) of this section." 40 C.F.R. § 761.61(2).  Paragraph (a)(3) in turn provides that in order to adequately characterize the site, the person must identify "[t]he location and extent of the identified contaminated area." 40 C.F.R. §761.61(a)(3)(i)(C).  Edgewater asserts that TERMS failed to ensure that the new protocol was correctly implemented and did not document where Waterside brought non-tested material.  BE Brf. at 21.  Because of this, and allegedly inadequate sampling, Edgewater argues that TERMS produced an inadequate SIP.  BE Brf. at 22.

Edgewater has also presented the expert report of B. Tod Delaney asserting that TERMS behavior failed to meet the professional standard of care.  Delaney Rpt., Corriston Cert. (D.E. 355), Ex. DDDD, at 28.  Whether TERMS' behavior met the relevant standard of care, or breached its duty, is a question of fact that cannot be resolved on this motion. *Jerkins v. Anderson*, 191 N.J. 285, 305, 922 A.2d 1279 (2007) (citing *Anderson v. Sammy Redd & Assocs.*, 278 N.J. Super. 50, 56, 650 A.2d 376 (App. Div. 1994), certif. denied, 139 N.J. 441, 655 A.2d 444 (1995)).  Proximate cause, too, is generally an issue of fact to be resolved by the jury. *Scafidi v. Seiler*, 574 A.2d 398, 402 (N.J. 1990).   The Court will therefore allow Edgewater's negligence claim against TERMS to proceed past summary judgment, but notes that to the extent both the negligence and breach of contract claims are successful, the Court will mold the verdict if necessary to avoid double recovery.

### C.  Breach of Contract Claims

TERMS moves for summary judgment on three separate breach of contract claims: Edgewater's claim against TERMS, TERMS' claim against Edgewater, and the Waterside Defendants' claim against TERMS.  The Court will address each claim below but first reviews the applicable law.

To state a claim for breach of contract under New Jersey law, a party must allege (1) the existence of a contract; (2) breach of the contract; (3) damages as a result of the breach; and (4) that the complaining party performed its own duties under the contract.  *Pollack v. Quick Quality Restaurants, Inc.*, 452 N.J. Super. 174, 188 (App. Div. 2017) (citing *Globe Motor Co. v. Igdalev*, 225 N.J. 469, 482 (2016)).  In interpreting a contract, a court must determine the intention of the parties as reflected in the language in the agreement.  *Globe Motor*, 225 N.J. at 483 (citation omitted).  As a result, the plain language of the contract is ordinarily the best indicator of the parties' intent.  *Chubb Customs Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008) (citation omitted).  In other words, unless an actual ambiguity in the contract exists, a court should not engage in a strained reading of the agreement to justify a different result than that which the parties bargained for.  *Id.*  (citation omitted).  An ambiguity exists when a contract term is "susceptible to at least two reasonable alternative interpretations[.]"  *Id.* (citing *Nester v. O'Donnell*, 301 *N.J. Super.* 198, 210 (App. Div. 1997)).  If a contract's term is ambiguous, a court may consider extrinsic evidence to interpret the term.  *Id.* (citation omitted).  A court will also normally construe the ambiguous term against the drafting party if the parties had "unequal bargaining power."  *Id.*

### 1. Edgewater's Breach of Contract Claim

Count XII of Edgewater's Fifth Amended Complaint asserts a claim for breach of contract as to TERMS. Edgewater claims that Edgewater and TERMS entered into a valid contract in 2012 and that TERMS breached that contract by failing to ensure that unapproved fill materials were brought to and utilized at Veterans Field. Compl. at ¶¶ 258, 265. Edgewater argues that the contract, together with the protocol established by TERMS, created an obligation for TERMS to act as a "gatekeeper." The June 6, 2012 remediation proposal provided that TERMS would provide "environmental oversight related to the soil remediation . . . performed by others." Pierce Cert. (D.E. 340), Ex. D. Thereafter, the Borough accepted TERMS proposal and entered into a contract with TERMS. BE Brf. at 25; BE SOMF ¶ 80; TERMS Brf. at 3. TERMS subsequently established a protocol for the approval of proposed fill materials. TERMS SOMF ¶ 38, 41; TERMS Brf. at 41. Edgewater argues that that protocol essentially constituted an oral agreement reached after the execution of the written contract between the parties. BE Brf. at 27-28. The written contract required TERMS to provide oversight over the sampling, approval, and placement of fill at the Site; the subsequent protocol required TERMS to regulate which non-virgin clean fill could be imported and used at Veterans Field. BE SOMF ¶¶ 89-90.

Edgewater then argues that TERMS beached the contract by failing to ensure that only approved fill materials were brought to and used at Veterans Field. BE Brf. at 30. Edgewater acknowledges that it was Waterside who dumped the Building 12 material at Veterans Field and that TERMS did not grant approval. However, Edgewater argues that TERMS "failed to take the appropriate actions to prevent Waterside from continuing to utilize the contaminated fill at the Site for almost a month." BE Brf. at 31.

The language of the contract combined with the subsequent protocol create an ambiguity as to TERMS' role. The determination of whether a contract or a specific term therein is clear or

ambiguous is a question of law for the court to decide. *Nevets C.M., Inc. v. Nissho Iwai Am. Corp.*, 726 F. Supp. 525, 531 (D.N.J. 1989). An ambiguity exists if a contract is "susceptible to two reasonably alternative interpretations." *Id*. The contract does not define "oversight," and as a result, the Court must give the word its ordinary, plain, and usual meaning. *See, e.g.*, *Boddy v. Cigna Prop. & Cas. Cos.*, 760 A.2d 823, 826 (N.J. Super. Ct. App. Div. 2000). In aid of this endeavor, courts often turn to dictionary definitions. *Id.* at 827.

Garner's Dictionary of Legal Usage in 2011 defines oversight as "intentional and watchful supervision." *Oversight*, GARNER'S DICTIONARY OF LEGAL USAGE (3d ed. 2011). Oxford defines oversight as "[t]he action of overseeing something; supervision, inspection; authority, management; (also occasionally) an instance of this. Also: supervisory responsibility or authority; custodianship, charge[.]" *Oversight*, OXFORD ENGLISH DICTIONARY (3d ed. 2004).[7] In addition to defining oversight, another critical inquiry is the scope of that oversight along with the applicable standard (for example, objective reasonableness). Here, it is possible to interpret the contract's requirement of "oversight" as involving the sort of "watchful supervision" or giving "charge" such that the contract would require TERMS to take a more proactive role in regard to Waterside's behavior. This interpretation could also find support in light of the subsequent protocol which created situations in which Waterside could use non-virgin fill. On the other hand, the contract's use of "oversight" may not reach as far as Edgewater asserts or, more importantly, it may not encompass situations in which TERMS was actively misled or those in which TERMS could not have reasonably learned of improper action when exercising proper diligence. Thus, the Court finds that word oversight is ambiguous. Generally, the interpretation of ambiguous contract

---

[7] Garner's also defines "oversight" as "an unintentional error," but that is clearly not the definition that applies here.

terms is a question of fact.  726 F. Supp. at 531.  Having identified a contractual ambiguity, it is not appropriate to decide Edgewater's breach of contract claim on a motion for summary judgment. Further, as explained in the discussion of Edgewater's negligence claim, disputes of fact surrounding the time period during which Waterside imported contaminated fill preclude a grant of summary judgment.  These disputes include when TERMS recommended shutting down the project and whether Edgewater prevented the project from being stopped.

Edgewater's motion will therefore be denied.

As noted, TERMS also seeks summary judgment against Edgewater.  TERMS argues that Edgewater made it impossible to act as a gatekeeper by giving Waterside a key.  While this fact may certainly help TERMS' cause, it is not dispositive for purposes of summary judgment.  For example, Edgewater's instructions when providing the key would be seemingly relevant along with any corresponding statements as to TERMS' role.

TERMS also argues that Edgewater is precluded from asserting breach of contract because of waiver and equitable estoppel.  TERMS Reply at 21.  TERMS asserts that Edgewater continued to engage TERMS to investigate and remediate the PCB contamination at Veteran's Field after September 2013.  This argument is only made in reply, and the Court will not consider it because it was not asserted in the opening brief and Plaintiff has not had the opportunity to respond.  *See e.g., Cobra Enters., LLC v. All Phase Servs.*, No. CV 20-4750 (SRC), 2020 U.S. Dist. LEXIS 96033, 2020 WL 2849892, at *1 (D.N.J. June 1, 2020).  Moreover, determining whether Edgewater's claim is waived or estopped presents genuine disputes of material fact, including when Edgewater became aware of TERMS' alleged breach.

TERMS' motion as to Edgewater's breach of contract claim is also denied.

19

### 2. TERMS' Breach of Contract Claim Against Edgewater

TERMS asserts a breach of contract claim against Edgewater, arguing that Edgewater failed to pay certain invoices.  TERMS Brf. at 51-53.  The issue of whether TERMS breached the contract must be resolved before the Court can rule on this claim. "It is black letter contract law that a material breach by either party to a bilateral contract excuses the other party from rendering any further contractual performance . . . . Whether conduct constitutes a breach of contract and, if it does, whether the breach is material are ordinarily jury questions." *Travelodge Hotels, Inc. v. Honeysuckle Enters.*, 357 F. Supp. 2d 788, 797 (D.N.J. 2005) (citing *Magnet Resources, Inc. v. Summit MRI, Inc*., 723 A.2d 976, 981 (N.J. App. Div. 1998).  If TERMS is found to have breached the contract, Edgewater's non-payment may be excused.  Because this claim cannot be resolved at this time, TERMS' motion is denied.

### 3. Waterside's Breach of Contract Claim

TERMS also moves for summary judgment on the breach of contract counterclaim asserted against it by the Waterside Defendants.  Count Six of the Counterclaims (D.E. 24) states that TERMS approved the use of the recycled concrete fill material under roadways and sidewalks at Veteran's Filed and that such approval was in breach of contract.  D.E. 24, ¶¶ 67, 68.  The counterclaim does not specify what contract was allegedly breached, and none of the Waterside defendants have opposed TERMS' motion.  Fred Daibes stated in deposition that there was no contract, written or oral, between TERMS and Waterside.  Pierce Cert., Ex. DD, at 173:21-174:6.  As there is no evidence of a contract between TERMS and the Waterside Defendants, TERMS' motion for summary judgment on the breach of contract claim asserted by the Waterside Defendants is granted.  *See Bocobo v. Radiology Consultants of S. Jersey, P.A.*,

No. 02-1697 (JEI), 2005 WL 3158053, at *39 (D.N.J. Nov. 21, 2005) ("One who is not a party to a contract cannot sue in respect to a breach of duty arising out of it.").

### D. Spill Act Claims

TERMS next moves for summary judgment as to the Spill Act claim asserted against it. The Spill Act is the New Jersey analog to CERCLA[8] and was passed before CERCLA. Like CERCLA, the Spill Act permits courts to "allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate." *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Env't Prot.*, 725 F.3d 369, 392 (3d Cir. 2013). The Spill Act imposes strict joint and several liability on any person who has discharged a hazardous substance. *NJDEP v. Gloucester Environmental Mgmt. Servs., Inc.*, 821 F. Supp. 999, 1009 (D.N.J. 1993). Liability under the Spill Act arises "whether the discharge was the result of 'intentional or unintentional' acts or omissions. *Morris Plains Holding VF, LLC v. Milano French Cleaners, Inc.*, No. A-0604-16T1, 2018 WL 1882956, at *1 (N.J. Super. Ct. App. Div. Apr. 20, 2018) (citing N.J.S.A. 58:10-23.11b).

In addition to liability as a direct discharger, the Spill Act provides that one who is "in any way responsible for any hazardous substance" is strictly liable, upon its discharge, for "all cleanup and removal costs no matter by whom incurred." *New Jersey Dep't of Env't Prot. v. Dimant*, 51 A.3d 816, 829 (2012) (citing N.J.S.A. 58:10–23.11g(c)(1)). However, in "an action to obtain damages, authorized costs and other similar relief under the Act there must be shown a *reasonable*

---

[8] At the same time, there are some important differences between the Spill Act and CERCLA. *New Jersey Dep't of Env't Prot. v. Dimant*, 51 A.3d 816, 831-32 (2012) (reviewing differences between the two acts as to liability and causation).

*link* between the discharge, the putative discharger, and the contamination at the specifically damaged site." *Dimant*, 51 A.3d at 833 (emphasis added).

In *Dimant*, the New Jersey Supreme Court addressed the liability of a dry cleaner for groundwater contamination.  In analyzing the requisite nexus for liability under the Spill Act, the *Dimant* court concluded that the phrase "in any way responsible" requires some connection between the discharge complained of and the alleged *discharger. Id.* at 830.  Once a party is found responsible for a discharge, the court in *Dimant* continued, there also must be a nexus between the discharge and the contaminated site for which cleanup costs are incurred.  *Id.* at 831.  The New Jersey Supreme Court concluded that "through the requirement of a connection between the discharge, over which the party had some control or responsibility, and the Spill Act response to the damage, the focus in the Spill Act remains on proof of a connection between the discharge complained of and the resultant Spill Act response." *Id*. at 831.

Edgewater argues that TERMS is "in any way responsible" for the contamination at Veterans Field because it has a connection to both Waterside and the hazardous substance. Specifically, Edgewater argues that TERMS was "integrally involved in the decisions made at the Site, especially the regulation of certified clean fill imported to Veterans Field."  BE Brf. at 36. Edgewater continues that TERMS "became lax" and ultimately disregarded the established protocol, "paving the way for Waterside's continual illegal disposals."  BE Brf. at 37.  Edgewater states that TERMS "granted itself control over the fill and the contractor." BE Brf. at 38.  TERMS counters that it had no ability or authority to control the actions of Waterside.  TERMS Brf. at 31. TERMS points out that TERMS was not present on the site the day the discharge occurred.

The Court finds that genuine issues of material regarding TERMS' level of control over Waterside preclude a grant of summary judgment.  Importantly, the Spill Act encompasses

omissions. *See, e.g.*, *Marsh v. N.J. Spill Comp. Fund & Envtl. Claims Admin.*, 670 A.2d 67, 72 (Super. Ct. App. Div. 1996) (discussing a case in which the failure of a lessor to prevent or halt discharger when it knew or should have known of the danger of contamination was an act or omission resulting in the releasing, spilling, and leaking of pollutants).  If TERMS is found to have fallen short in its oversight role, Spill Act liability may be appropriate.  TERMS' motion for summary judgment as to Edgewater's Spill Act claim is therefore denied.[9]

Because the Spill Act asserted against TERMS is not dismissed, TERMS' motion for summary judgment as to the Spill Act and common law contribution claims asserted against it is denied.

**E.  Indemnification Claims**

The Waterside Defendants and Arconic each assert Crossclaims against TERMS for common law indemnification.  "Indemnification is available under New Jersey law in two situations: when a contract explicitly provides for indemnification or when a special legal relationship between the parties creates an implied right to indemnification."  *Fireman's Fund Ins. Co. v. 360 Steel Erectors, Inc.*, Civ. A. No. 16-2782, 2018 WL 1069417 (D.N.J. Feb. 26, 2018) (quoting *Allied Corp. v. Frola*, 730 F. Supp. 626, 639 (D.N.J. 1990), *abrogated on other grounds by Apgar v. Lederle Labs.*, 588 A.2d 380 (N.J. 1991)); *see also Ferriola v. Stanley Fastening Sys.*, L.P., Civ. No. 04–4043, 2007 WL 2261564, at *2 (D.N.J. Aug. 1, 2007); *Ramos v. Browning Ferris Indus. of S. Jersey, Inc.*, 510 A.2d 1152 (N.J. 1986).  "Examples of the special relationship

---

[9] TERMS argues that Edgewater's Spill Act claim is preempted by its CERCLA claim.  TERMS Brf. at 31-21.  As the Court is granting TERMS' motion as to Edgewater's CERCLA claim, TERMS' preemption argument is moot and the Spill Act claim will not be dismissed on that basis.

that will support a third party's claim for indemnification include that of principal and agent, bailor and bailee, and lessor and lessee." *Ramos*, 510 A.2d 1152, 1158 (citations omitted).

The Waterside Defendants have not opposed TERMS' motion, and Arconic's opposition brief does not address indemnification.  Arconic has not shown the existence of a contract with TERMS.  The Waterside Defendants alleged the existence of a contract with TERMS, but as discussed, that claim has not been supported by the record.  Additionally, neither Arconic nor the Waterside Defendants have demonstrated the existence of a special legal relationship with TERMS which would support a claim for common law indemnification.  The crossclaims for indemnification against TERMS will therefore be dismissed.

## V.      CONCLUSION

TERMS' motion for summary judgment (D.E. 343) is GRANTED in part and DENIED in part.  TERMS motion is granted as to the CERCLA claim asserted by Edgewater and the CERCLA contribution claims asserted by Arconic and the Waterside Defendants.  The motion is also granted as to the indemnification claims asserted against TERMS and the breach of contract claim asserted by the Waterside Defendants.  The motion is otherwise denied.  An appropriate Order accompanies this Opinion.


Dated: September 3, 2021

_____
John Michael Vazquez, U.S.D.J.

24