Not for Publication

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

BOROUGH OF EDGEWATER,

    Plaintiff,

v.

WATERSIDE CONSTRUCTION, LLC; 38 COAH , LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES; TERMS ENVIRONMENTAL SERVICES, INC.; ALCOA INC.; ALCOA DOMESTIC, LLC, as successor in interest to A.P. NEW JERSEY, INC.; HUDSON SPA, LLC; JOHN DOES 1-100; ABC CORPORATIONS 1-100,

    Defendants

and

WATERSIDE CONSTRUCTION, LLC; 38 COAH LLC; DAIBES BROTHERS, INC.; NORTH RIVER MEWS ASSOCIATES, LLC; FRED A. DAIBES,

    Defendants/ Third-Party Plaintiffs

v.

NEGLIA ENGINEERING ASSOCIATES,

    Third-Party Defendants,

and

ALCOA DOMESTIC, LLC as successor in interest to A.P. NEW JERSEY, INC.,

    Defendant/Third-Party Plaintiff,

Civil Action No. 14-5060

**OPINION & ORDER**

> v.
>
> COUNTY OF BERGEN; RIVER ROAD IMPROVEMENT PHASE II, INC.; HUDSON SPA, LLC,
>
>         Third-Party Defendants.

**John Michael Vazquez, U.S.D.J.**

      Presently before the Court is a motion for reconsideration, D.E. 417, of the Court's July 19, 2021 Opinion and Order, D.E. 415, 416, filed by Plaintiff Borough of Edgewater ("Edgewater"). The Court has reviewed all submissions[1] made in support and in opposition to the motion and considered the motion without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons stated below, Edgewater's motion for reconsideration (D.E. 417) is **DENIED**.

    **I.**    **BACKGROUND**

      For the purposes of the pending motion, the Court does not retrace this case's full factual and procedural history, but instead incorporates the same from the Court's Prior Opinion. This matter stems from an allegation that certain defendants, not involved in the instant motion, used polychlorinated biphenyl ("PCB")[2] contaminated material as fill in a public park project. The park is owned by Plaintiff Borough of Edgewater, and the contaminated materials (or at least some of

---

[1] Edgewater's brief in support of its motion (D.E. 417-1) will be referred to as "Br."; and Arconic's brief in opposition (D.E. 422) will be referred to as "Opp." The Court's July 19, 2020 Opinion (D.E. 415) will be referred to as the "Prior Opinion" or "Prior Op."

[2] According to the Environmental Protection Agency, PCBs are a group of man-made organic chemicals consisting of carbon, hydrogen and chlorine atoms. *United States Environmental Protection Agency, Learn about Polychlorinated Biphenyls* (PCBs), https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls-pcbs. PCBs have been demonstrated to cause a variety of adverse health effects. *Id.*

2

it) came from a property previously owned by Alcoa Corporation ("Alcoa"), now known as Arconic. The material was taken from an area on the former Alcoa property known as Building 12.

In the Prior Opinion, the Court granted summary judgment in favor of Arconic as to Edgewater's CERCLA and Spill Act claims. Edgewater now moves for reconsideration of these rulings.

## II.     LEGAL STANDARD

Motions for reconsideration are governed by Local Civil Rule 7.1(i). The rule provides that such motions must be made within fourteen days of the entry of an order. Edgewater has complied with this requirement. Substantively, a motion for reconsideration is viable in three situations: (1) an intervening change in the controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice. *Carmichael v. Everson*, No. 03-4787, 2004 WL 1587894, at *1 (D.N.J. May 21, 2004) (citations omitted). Granting a motion for reconsideration is an "extraordinary remedy," to be granted "sparingly." *NL Indus., Inc. v. Commercial Union Ins. Co.*, 935 F. Supp. 513, 516 (D.N.J. 1996) (citations omitted).

A motion for reconsideration does not entitle a party to a second bite at the apple. Therefore, a motion for reconsideration is inappropriate when a party merely disagrees with a court's ruling or when a party simply wishes to re-argue its original motion. *Sch. Specialty, Inc. v. Ferrentino*, No. 14-4507, 2015 WL 4602995, *2–3 (D.N.J. July 30, 2015); *see also Florham Park Chevron, Inc. v. Chevron U.S.A.*, 680 F. Supp. 159, 162 (D.N.J. 1988). Moreover, a motion for reconsideration is not an opportunity to raise matters that could have been raised before the original decision was reached. *Bowers v. NCAA*, 130 F. Supp. 2d 610, 613 (D.N.J. 2001).

Here, Plaintiff asserts that reconsideration is appropriate to correct a clear error of law and to prevent manifest injustice.

### III. DISCUSSION

At the outset, the Court notes that Edgewater fails to adequately articulate its position as to the Court's finding concerning its CERCLA claim. As a result, the Court denies Edgewater's motion as to that claim.

Turning to the Spill Act, Edgewater essentially argues that reconsideration is appropriate because the Court overlooked facts and legal precedent by (1) misconstruing the relevant law, including the applicability of *New Jersey Turnpike Authority v. PPG Industries, Inc.*, 197 F.3d 96, 99 (3d Cir. 1999), and (2) overlooking the import of a 2002 No Further Action letter. Br. at 10-21. Relatedly, Edgewater asserts that the Court misinterpreted the New Jersey Supreme Court's decision in *New Jersey Department of Environmental Protection v. Dimant*, 51 A.3d 816, 829 (N.J. 2012). *Id.* at 17. Edgewater alternately argues that genuine issues of material fact preclude summary judgment. *Id.* at 21. The Court addresses the legal challenge and the factual claim in turn, but first provides a synopsis of the pertinent law. The Court does not repeat its prior recitation of the law as to the New Jersey Spill Act, but instead incorporates it here by reference. Prior Op. at 18-20. The Court, however, will review the portions of the Spill Act, N.J. Stat. Ann. § 58:10-23.11 *et. seq.*, relevant to the current motion.

The New Jersey Appellate Division has described the two private rights of action provided by the Spill Act:

> In 1991, the Legislature amended the Spill Act to provide a private right of action for contribution so that pollution dischargers could share the costs of remediation with additional dischargers not so designated by DEP, i.e., non-settling entities. *Magic Petroleum Corp. v. Exxon Mobil Corp.*, 218 N.J. 390, 405, 95 A.3d 175 (2014); *Hous. Auth. of New Brunswick v. Suydam Inv'rs, L.L.C.*, 177

4

> N.J. 2, 18, 826 A.2d 673 (2003). *The Spill Act "provides for two causes of action: one to recover clean-up costs from [other] dischargers (contribution claim), [N.J.S.A.] 58:10–23.11f(a)(2), and one to recover damages from the NJDEP, or Spill Compensation Fund, [N.J.S.A.] 58:10–23.11k." Bonnieview Homeowners Ass'n v. Woodmont Builders, L.L.C.*, 655 F.Supp.2d 473, 503 (D.N.J. 2009).

*N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp.*, 181 A. 3d 257, 268 (N.J. Sup. Ct. App. Div. 2018) (emphasis added) (alterations in original), certif. denied, 185 A.3d 875 (2018). The second right of action, under N.J. Stat. Ann. § 58:10-23.11k, is not applicable here. The first provides in relevant part as follows:

> Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance. In an action for contribution, the contribution plaintiffs need prove only that a discharge occurred for which the contribution defendant or defendants are liable pursuant to the provisions of subsection c. of section 8 of P.L.1976, c. 141 (C.58:10-23.11g), and the contribution defendant shall have only the defenses to liability available to parties pursuant to subsection d. of section 8 of P.L.1976, c. 141 (C.58:10-23.11g). In resolving contribution claims, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall affect the right of any party to seek contribution pursuant to any other statute or under common law.

N.J. Stat. Ann. § 58:10-23.11f(a)(2)(a).

N.J. Stat. Ann. § 58:10-23.11g(c)(1) provides for joint and several liability as to "cleanup and removal costs," and such costs are defined in N.J. Stat. Ann. § 58:10-23.11b. N.J. Stat. Ann. § 58:10-23.11g(d) indicates, as relevant here, that only defenses based on "an act or omission caused solely by war, sabotage, or God, or a combination thereof" are available.

Edgewater relies on the "persons in any way responsible for a discharged hazardous substance" from N.J. Stat. Ann. § 58:10-23.11f(a)(2)(a) to press its claim against Arconic. New Jersey courts have interpreted "in any way responsible" to be "broadly construed to encompass either ownership or control over the property at the time of the damaging discharge, or control over the hazardous substance that caused the contamination." *N.J. Sch. Dev. Auth. v. Marcantuone*, 54 A.2d 830, 838 (N.J. Sup. Ct. App. Div. 2012) (citing *Dimant*, 51 A.3d at 830-31). And, as noted, New Jersey courts have described an action to recover under § 58:10-23.11f(a)(2) as "one to recover clean-up costs from [other] dischargers (contribution claim), [N.J.S.A.] 58:10–23.11f(a)(2)." *Exxon Mobil Corp.*, 181 A. 3d 257, 268 (alteration in original).

The Court now turns to Edgewater's arguments.

### A. *PPG Industries*

In its Prior Opinion, the Court observed that "Edgewater has not cited any case imposing Spill Act liability under similar circumstances. Instead, Edgewater relies on *New Jersey Turnpike Authority v. PPG Industries, Inc.*, 197 F.3d 96 (3d Cir. 1999), a case in which Spill Act liability was *not* imposed." Prior Op. at 20 (emphasis in original). In its current motion, Edgewater asserts that "the Court further erred by not relying on the directly analogous factual situation in [*PPG*]." Br. at 10.

Before turning to *PPG*, the Court also notes that Edgewater adds the following comment:

> The Court's [Prior Opinion] appears to disregard the Spill Act's clear and broad standard because Edgewater did not cite to "any case imposing Spill Act liability under similar circumstances." However, the mere fact that there is not a specific case imposing liability under the same fact pattern is not dispositive of whether liability is appropriate here under the statutory elements of the Spill Act. Indeed, by this same logic, there is no case law holding liability should not be imposed under these circumstances.

6

Br. at 13 n. 4. The Court has few comments as to this remark. First, it directly undercuts Edgewater's claim that *PPG* offers a "directly analogous factual situation[.]" *See* Br. at 10. Second, the Court's remark about an absence of authority could be fairly criticized if the Spill Act was a new statute. But the relevant provision in the Spill Act has been around for over thirty years.

*PPG* is not factually similar. That case involved three companies (or their predecessors) who processed chromium ore in New Jersey for decades. *PPG Indus.*, 197 F.3d at 100. Chromate ore processing residue, or COPR, resulted from the companies' activities. *Id.* at 99. The three entities then "*sold or gave* the COPR produced at their plants to contractors for construction fill or other uses." *Id.* at 100 (emphasis added). Later, the New Jersey Turnpike sued the three companies for COPR contamination at various Turnpike sites. *Id.* at 100-02. The Third Circuit found that the three companies were not liable under the Spill Act because the Turnpike could not show that the COPR found at the Turnpike's sites came from any of the three entities. *Id.* at 108-13.

The reason that *PPG* is not factually analogous is because Arconic did not sell or give the Building 12 (PCB) material from its former site to anyone for any purpose, unlike the three companies in *PPG*. Critically, Edgewater has not shown a genuine dispute of material fact which supports a finding that Arconic did so as to the material deposited at Veteran's Field. Instead, as the Court previously noted, the material was taken from Building 12 to Veteran's Field without Arconic's knowledge and Arconic had not owned, possessed, or controlled Building 12 for approximately 15 years. Prior Op. at 20. The Court would agree with Edgewater as to *PPG*'s relevance if Edgewater could show that Arconic sold or gave the material from Building 12 to others for use as fill. But the record is devoid of such evidence.

To demonstrate why the Court is concerned about a lack of legal precedent, the Court uses a common example confronted by New Jersey courts under the Spill Act, a discharge from

7

underground storage tank ("UST") or aboveground storage tank ("AST"). In *Morristown Associates v. Grant Oil Co.*, 106 A.3d 1176, 1178 (N.J. 2015), the New Jersey Supreme Court determined that the six-year statute of limitations in N.J. Stat. Ann. § 2A:14-1 was not applicable to the Spill Act. In *Grant Oil*, a dry cleaner at a strip mall had a UST for fuel oil. *Id.* at 1179. Decades later, fuel oil contamination was detected in the area of the UST. *Id.* at 180. The UST was intact, but the fill and vent pipes had holes, which resulted in the fuel oil leakage. *Id.* Several oil company defendants, who delivered fuel oil when the leakage occurred, were sued under the Spill Act. *Id.* The trial court dismissed the case on statute of limitation grounds, and the Supreme Court reversed. On remand, the New Jersey Appellate Division found that there was a genuine issue of material fact as to whether oil companies' fuel deliveries had a reasonable nexus to the contamination, thereby precluding summary judgment. *Morristown Associates v. Grant Oil Co.*, A-0313-11T3, 2013 WL 11080369, *4 (N.J. Super. Ct. App. Div. Nov. 17, 2015).

Thus, it appears[3] that a local oil delivery service may be liable under the Spill Act if its product causes contamination. However, the Court has not been able to locate cases finding that others in the chain of oil production and delivery (such as the surveyors, the extractors, the refiners, and the international shippers) liable too. Yet, all would seemingly be responsible for cleanup and removal costs as Edgewater reads the "persons in any way responsible for a discharged hazardous substance" language in N.J. Stat. Ann. § 58:10-23.11f(a)(2)(a). The lack of such cases concerns the Court because those other entities would be apparent to a plaintiff's counsel, would seemingly be in a fiscal position to contribute, and would be (at least as to more recent discharges) readily

---

[3] Although, as discussed below, the scope of liability under the Spill Act for an oil delivery company may be more limited than the Court's hypothetical.

discernible.[4]  And each of those entities in the chain of oil production and delivery knew and/or intended their petroleum product to be used in USTs or ASTs.  By comparison, here Arconic did not intend for the material from Building 12 to be used at Veteran's Field, did not agree to such use, and did not know of such use; in fact, Arconic had not owned its former property for years.

Edgewater also contends that the Court incorrectly interpreted *Dimant*.  Br. at 22.  Edgewater appears take issue with the following citation from the Prior Opinion:  "*See Dimant*, 51 A.3d at 830 (reviewing prior decisions and the nexus requirement as to 'holding liable a party who was not directly responsible for the discharge that had occurred, *but who nevertheless had some control over the direct discharger in each matter*' (emphasis added))."  Prior Op. at 20.  Edgewater's argument is perplexing in light of the following statement that it made its original brief:  "In *Dimant*, the Supreme Court cited the prior holdings in *Ventron*, *Kimber*, and *Marsh* in the context of determining whether a party was 'in any way responsible' for the discharge that had occurred, *but nevertheless had some control over the direct discharger*."  D.E. 349 at 21.  In short, the Court used the same language originally cited by Edgewater, and to which Edgewater now objects.  In any event, the relevant passage from *Dimant* reads as follows:

> This perspective on the available legislative history comports with the approaches taken in *Ventron, Kimber,* and *Marsh*—the cases cited by the Appellate Division to support a nexus requirement—which concerned the distinctly separate question about holding liable a party who was not directly responsible for the discharge that had occurred, but who nevertheless had some control over the direct discharger in each matter.
> . . .
> Nevertheless, *Ventron, Kimber,* and *Marsh* underscore the important point *that the phrase "in any way responsible" requires*

---

[4] The Court did locate one case in which Judge Hillman denied a motion to dismiss by a manufacturer of perfluoroalkyl substances ("PFAS"), whose product was sold to a site where it was discharged.  *Giordano v. Solvay Specialty Polymers USA, LLC*, 522 F. Supp. 3d 26, 35 n.7 (D.N.J. 2021).

9

> *some connection between the discharge complained of and the alleged discharger*—in *Ventron* and *Kimber,* the parent companies, and in *Marsh,* the subsequent landowner one of whose underground tanks still leaked during her ownership. That nexus is what ties the discharger to the discharge that is alleged to be the, or a, culprit in the environmental contamination in issue.

*Dimant*, 51 A.3d at 830 (emphasis added). Thus, not only did the Court use Edgewater's own recitation of *Dimant*; it is clear that *Dimant* was interpreting the "in any way responsible" language, the very language relied on by Edgewater.

Moreover, following *Dimant*, the New Jersey Appellate Division interpreted "in any way responsible" to be "broadly construed to encompass *either ownership or control* over the property at the time of the damaging discharge, *or control over* the hazardous substance that caused the contamination." *N.J. Sch. Dev. Auth. v. Marcantuone*, 54 A.2d 830, 838 (N.J. Sup. Ct. App. Div. 2012) (citing *Dimant*, 51 A.3d at 830-31). This requirement undercuts Edgewater's argument that it must merely show a "connection between the defendant's hazardous substance (Alcoa's generation of PCB contamination in Building 12) and the ultimate environmental harm (PCB soil contamination at Veteran's Field)." Br. at 18.

In a recent unpublished decision, the Appellate Division declined to find liability as to an oil company. *Dorrell v. Woodruff Energy, Inc.*, A-3144-17, 2021 WL 922446 (N.J. Sup. Ct. App. Div. Mar. 11, 2021). In *Dorrell*, the defendant oil company regularly delivered fuel oil to an AST, but oil spilled and seeped into the ground. *Id.* at *1. The trial court found the defendant not liable under the Spill Act, which the Appellate Division affirmed, reasoning as follows:

> Dorrell effectively asks this court to find that mere delivery of oil, that is at some later point in time discharged from a tank, is sufficient to establish liability. We decline to do so where Woodruff did not own the tank, and where the record fails to establish a contractual responsibility to maintain or inspect the tank.
>
> .... In order to hold Woodruff liable for delivering fuel, plaintiff was thus obliged to establish when and why the tank leaked

10

> oil. If the tank had a small leak leading to oil leaking over time, Woodruff may have been on notice there was an issue if it was delivering more oil than the tank's capacity in order to fill it up. Or, the tank may have had a burst seam leading to the leak occurring over the course of a few hours. Failure to establish why the leak occurred doomed plaintiff's claim.

*Id.* at *9. Thus, using Edgewater's test, the plaintiff in *Dorrell* clearly showed a connection between the oil company's hazardous substance and the ultimate environmental harm. Br. at 18. The Appellate Division, however, determined that this was insufficient under the Spill Act.

Earlier, the Appellate Division reached a similar conclusion in *Voellinger v. Electro-Coatings, Inc.*, No. A-2261-09T3, 2012 WL 1548060 (N.J. Sup. Ct. App. Div. June 29, 2011). In *Voellinger*, the defendant ("ECI") owned and operated a metal plating business from 1969 to 1980, when the business was sold to Aeroplating. *Id.* at *1. Plaintiffs (shareholders of Aeroplating) later sued ECI under the Spill Act for the release of certain chemicals (abbreviated to TCE and PCE) onto the property during ECI's ownership. *Id.* The chemicals apparently stemmed from a degreaser used by ECI.

The Appellate Division overturned the trial court's finding of liability as to ECI:

> *Even an assumption that ECI used the substances in question does not demonstrate the substances were discharged into the environment during ECI's ownership.* And, certainly, Spill Act liability cannot attach to ECI merely because it operated at the premises prior to plaintiffs. Aeroplating acquired ECI's assets and conducted a similar operation. And it may be true that the degreaser, which was purchased by Aeroplating from ECI, was a source of contamination. But those circumstances do not automatically impose responsibility on the prior owner. Plaintiffs were required to prove that a discharge occurred during the prior ownership. We conclude that no evidence supports the judge's finding that defendant discharged TCE and PCE at the property. As a result, we reverse and remand for the entry of a judgment in favor of ECI.

11

*Id.* at *8 (emphasis added).

Again, the *Voellinger* court assumed the connection between the defendant's hazardous substance and the ultimate environmental harm, but nevertheless declined to find Spill Act liability.

The Court finds that Edgewater fails to meet it burden as to demonstrating a legal error.

### B. The No Action Letter

Edgewater also argues that the Court overlooked a November 2002 Restricted Use No Further Action Letter ("NFA") issued by the NJDEP. Br. at 2, 13-14. The following background from the Prior Opinion is relevant:

> Alcoa, now known as Arconic, constructed and operated an industrial plant (the "Alcoa Property") from 1914-1965 in Edgewater, New Jersey. BE SOMF ¶ 1. A structure, referred to as "Building 12," was constructed on that site in 1938. BE SOMF ¶ 3. The site was subsequently acquired by Amland Properties Corporation ("Amland"), who then discovered PCB contamination throughout the property. Amland sued Alcoa, which resulted in a settlement and the site was conveyed to an Alcoa entity, A.P. New Jersey, Inc. ("AP"), which later became Arconic Domestic LLC. BE SOMF ¶ 12. The Amland settlement agreement required that the deed of conveyance contain a legend notice stating that "[t]his property may be contaminated with hazardous substances including Polychlorinated Biphenyls." BE SOMF ¶ 11.
>
> In 1997, Alcoa sold the property to North River, an entity affiliated with Fred Daibes. Pursuant to the terms of the Purchase and Sale Agreement ("PSA") a related Multi-Party Property Acquisition Agreement ("MPAA"), AP agreed to pay River Road Improvement Phase II, Inc. ("RRIP") up to $12,000,000 for the demolition, removal, and proper disposal of the buildings on the site pursuant to a Remedial Action Work Plan. BE SOMF ¶ 41. Later that year, North River requested permission to postpone the demolition of Building 12. BE SOMF 52. In 2006, the portion of the Alcoa Property containing Building 12 was transferred from North River to 38 COAH, another entity affiliated with Daibes. BE SOMF ¶ 65. In 2010, certain areas of the exterior walls on Building 12 became unstable and fell. BE SOMF ¶ 68.

> In 2011, Plaintiff Edgewater looked to improve Veterans Field, a 27-acre public park owned by the borough. BE SOMF ¶¶ 75-76. . . .
>
> When the amount of fill needed at the Veterans Field project increased, Waterside imported and used PCB-contaminated material from Building 12 as fill on Veterans Field. BE SOMF ¶ 93.

Prior Op. at 3-4.

Because North River decided that it may not want to demolish Building 12, North River and AP entered into a Funding Agreement in September 1997 and an Environmental Indemnity Agreement in March 1999. The Funding Agreement permitted AP to withhold $500,000 in demolition funding until it received the full purchase price on the property and AP received a "No Further Action" letter from the NJDEP. In February 1999, the Building 12 site was subdivided from the larger property. NJDEP then approved a capping of Building 12 but required a "Deed Notice" that indicated no public access to the Building 12, Building 12's painted walls could not be modified without NJDEP approval, and the site could not be modified without NJDEP approval. In November 2002, NJDEP approved the Deed Notice then issued, in February 2003, a "Restricted Use No Further Action Letter and Covenant Not to Sue" for Building 12. Later, in September 2010, the environmental consultant for North River requested termination of the Deed Notice because the NJDEP no longer regulated the interior of buildings. The consultant also advised NJDEP that Building 12's walls with PCBs would be properly sampled and disposed of at a licensed facility if Building 12 was demolished. NJDEP approved the Deed Notice termination in September 2010 but required the "Remedial Action Outcome" to include an insert stating that "Building Interiors Not Addressed."

Turning to Edgewater's argument, the November 2002 letter in the record is addressed to Fred Daibes and states that the NJDEP needs copies of the filed Deed Notice before it can issue

13

the No Further Action letter. Corriston Cert. (D.E. 355), Ex. NN. The Deed Notice, in turn, does not appear to mention that Arconic was required to take any action. The letter Edgewater appears to refer to as the NFA is dated February 12, 2003. Corriston Cert., Ex. OO. That letter states, in part, as follows:

> As a condition of this No Further Action Determination pursuant to N.J.S.A. 58:10B-12o, North River Mews Associates LLC/ *Aluminum Company of America/ AP New Jersey, Inc., and any other person who is liable for the cleanup and removal costs,* and remains liable pursuant to the Spill Act, shall inform the Department in writing within 14 calendar days whenever its name or address changes.

Corriston Cert., Ex. OO, at 1 (emphasis added). The letter then states that North River Mews Associates LLC/Aluminum Company of America/AP New Jersey Inc. "shall ensure that the Deed Notice . . . is complied with" and "shall conduct monitoring for compliance and effectiveness of the institutional and engineering controls specified in this document." Corriston Cert., Ex. OO, at 2.

Arconic counters that the NFA could not have legally required Arconic to take any further action because Arconic would have had to trespass on the property to do so. Opp. at 11; *see also* D.E. 373 at 42. Arconic also point to Daibes' September 4, 2003 letter to the NJDEP, returning a copy of the NFA signed by Daibes but not by Arconic. Opp. at 11 (citing D.E. 374 ("Rysavy Cert."), Ex. 25.). Daibes reported that Arconic "has not executed the NFA and their name has been intentionally stricken from the letter" because Arconic believed that it could not undertake the NFA's monitoring and reporting procedures as it no longer owned the property and did not exercise control over it. Rysavy Cert., Ex. 25. It does not appear that NJDEP contacted Arconic thereafter about Building 12. When the NJDEP approved the termination of the Deed Notice in September 2010, it did not contact or include Arconic.

The issue is whether there is a genuine dispute of material fact as to whether Arconic had "ownership or control over the property at the time of the damaging discharge, or control over the hazardous substance that caused the contamination." *Marcantuone*, 54 A.2d at 838 (citing *Dimant*, 51 A.3d at 830-31). The Court again finds that Edgewater has not sustained its burden of proof. Edgewater did not originally assert that there was a genuine dispute of material fact. D.E. 376. This argument was clearly available to Edgewater at the time of the original briefing so it is improperly raised on a motion for reconsideration.

Moreover, Edgewater does not contend that Arconic had ownership or control over Veteran's Field at the time of the discharge in question. And there is no genuine dispute of material fact demonstrating that Arconic had ownership or control over either the Building 12 property or its contents (specifically, the PCBs) at the time of the discharge on Veteran's Field. Edgewater relies solely on the DEP's 2003 NFA letter to establish a genuine dispute of material fact. Yet, Edgewater fails to explain how the NJDEP could have required Arconic to take any further action on a property that it no longer owned.[5] More importantly, the NJDEP did not contest Daibes' response indicating that Arconic was not subject to the NFA or Daibes' striking of Alcoa and AP from the NFA. Finally, Edgewater fails to address the Deed Notice termination, which did not involve Arconic and which was issued before Waterside imported and used PCB-contaminated material from Building 12 as fill on Veterans Field.

Edgewater has failed to meet its burden as to the import of the NFA.

---

[5] Arconic does not contest that it was responsible for a discharge on its former property that occurred while it owned the property. But, as noted in the Prior Opinion, that is not the discharge at issue.

## IV. CONCLUSION

For the foregoing reasons, and for good cause shown,

It is on this 24th day of February 2022 hereby

**ORDERED** that Edgewater's motion for reconsideration (D.E. 417) is **DENIED**.

_____
John Michael Vazquez, U.S.D.J.